## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
:
In re                                    :          **Chapter 11**
:
**TK HOLDINGS INC.,** *et al.,*          :          **Case No. 17-11375 (___)**
:
**Debtors.**[1]                          :          **Joint Administration Requested**
:
-------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), 364(a), AND 503(b) AND FED. R. BANKR. P. 6003 AND 6004 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) PROVIDE CERTAIN POSTPETITION CLAIMS ADMINISTRATIVE EXPENSE PRIORITY, (D) CONTINUE INTERCOMPANY FUNDING OF CERTAIN NON-DEBTORS, AND (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND (II) EXTENDING TIME TO COMPLY WITH REQUIREMENTS OF 11 U.S.C. § 345(b)**

TK Holdings Inc. ("***TKH***") and its affiliated debtors in the above-captioned

chapter 11 cases ("***Chapter 11 Cases***"), as debtors and debtors in possession (collectively, the

"***Debtors***"), respectfully represent as follows in support of this motion (this "***Motion***"):

### Relief Requested

1.     By this Motion, pursuant to sections 105(a), 345(b), 363(b), 363(c),

364(a), and 503(b) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules

6003 and 6004 the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), the

Debtors request entry of interim and final orders (i) authorizing the Debtors to (a) continue

operating their existing cash management system (the "***Cash Management System***"), as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

described herein, including the continued maintenance of existing bank accounts (the "***Bank Accounts***") at the existing banks (the "***Banks***") consistent with their prepetition practices, (b) honor certain prepetition obligations related to the Cash Management System, (c) provide certain postpetition claims administrative expense priority, (d) continue intercompany funding of certain Non-Debtor Affiliates (as defined herein) consistent with their prepetition practices and as described herein, and (e) maintain existing business forms; and (ii) extending the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank Accounts on an interim basis, and, subject to a final order, waiving such requirements.

2. Proposed forms of order granting the relief requested herein on an interim and final basis are annexed hereto as **Exhibit A** (the "***Proposed Interim Order***") and **Exhibit B** (the "***Proposed Final Order***"), respectively.  A list of Banks and Bank Accounts is annexed hereto as **Exhibit C**.

## Jurisdiction

3. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

RLF1 17750882V.1

## Background

4.        On the date hereof (the "***Petition Date***"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

5.        In coordination with the commencement of the Chapter 11 Cases, contemporaneously to the date hereof, Takata Corporation, the Debtors' ultimate corporate parent ("***TKJP***" and, together with its direct and indirect global subsidiaries, including TKH, "***Takata***"), together with Takata Kyushi K.K. and Takata Service Corporation, commenced civil rehabilitation proceedings under the Civil Rehabilitation Act of Japan in the 20th Department of the Civil Division of the Tokyo District Court.

6.        Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the declaration of Scott E. Caudill, the Executive Vice President and Chief Operating Officer for TKH, filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "***Caudill Declaration***").[2]

## The Debtors' Bank Accounts and Cash Management System

7.        The Debtors support their operations by using a complex Cash Management System to collect, concentrate, and disburse funds generated by the manufacture

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Caudill Declaration.

and sale of a broad range of automotive safety and non-safety products that includes seatbelts and airbag systems, steering wheels, child restraint systems, and electronic devices such as satellite sensors and electronic control units.  The Cash Management System is also used to fund the operations of certain of the Debtors' foreign and domestic Non-Debtor affiliates (the "***Non-Debtor Affiliates***").  The Cash Management System provides the Debtors with efficiencies in (i) funding their operations and the operations of certain Non-Debtor Affiliates, (ii) monitoring and forecasting their cash needs, (iii) tracking the collection and disbursement of funds, and (iv) maintaining control over the administration of their Bank Accounts.  In broad terms, the Cash Management System is similar to the cash management systems used by other major corporate enterprises.  A general overview of the movement of cash through the Debtors' Cash Management System is illustrated by the flow of funds charts attached hereto as **Exhibit D**.

8.    The Cash Management System is divided into two centralized sub-systems:

a.    the cash management system (the "***U.S. Cash Management System***") for TKH, Takata Americas, TK Finance, LLC, TK China, LLC, Takata Protection Systems Inc., Interiors in Flight Inc., TK Mexico Inc., and TK Mexico LLC (collectively, the "***U.S. Debtors***") and their U.S. non-Debtor affiliates Highland Industries, Inc. ("***Highland***"), SynTec Seating Solutions LLC ("***Syntec***"), and ALS, Inc. ("***ALS***" and the U.S. Debtors, Highland, Syntec, and ALS, collectively, the "***U.S. Cash Management Entities***"); and

b.    the cash management system (the "***Mexican Cash Management System***") for TK Holdings de Mexico, S. de R.L. de C.V. ("***TK Holdings de Mexico***"), Industrias Irvin de Mexico, S.A. de C.V. ("***Industrias***"); Takata de Mexico, S.A. de C.V. ("***TK DM***"); Strosshe-Mex, S. de R.L. de C.V. ("***Strosshe-Mex***") (TK Holdings de Mexico, Industrias, TK DM, and Strosshe-Mex, collectively, the "***Mexican Debtors***") and their Mexican non-Debtor affiliates Equipo Automotriz S.A. de C.V. ("***Equipo***) and Falcomex S.A. de C.V. ("***Falcomex***", and the Mexican Debtors, Equipo, and Falcomex, collectively, the "***Mexican Cash Management Entities***", and the Mexican Cash Management Entities together with the U.S. Cash Management Entities, collectively, the "***Cash Management Entities***").

4

9.      Although much of the Debtors' Cash Management System is automated, personnel in the Debtors' treasury department (the "***Treasury Staff***") monitor the system and manage the proper collection and disbursement of funds.  Given the substantial economic scale of the Debtors' business operations, any disruption to the Cash Management System could significantly interfere with the Debtors' businesses, impede a successful reorganization, and potentially threaten the Global Transaction.

### A.      The U.S. Cash Management System

10.      The U.S. Cash Management System is comprised of approximately fifty-eight (58) Bank Accounts: thirty-six (36) maintained at Comerica Bank ("***Comerica***"), seven (7) maintained at Wells Fargo Bank, N.A. ("***Wells Fargo***"), three (3) maintained at Sumitomo Mitsui Banking Corp ("***SMBC***"), one (1) maintained at Sumitomo Mitsui Trust Bank ("***Sumitomo Trust***"), three (3) maintained at Bank of Tokyo Mitsubishi UFJ ("***BTMU***"), three (3) maintained at JP Morgan Chase Bank ("***JP Morgan***"), two (2) maintained at Fifth Third Bank ("***Fifth Third***"), two (2) maintained at American Express Bank ("***Amex Bank***"), and one (1) maintained at The Bank & Trust ("***Bank & Trust***").  Comerica, Wells Fargo, JP Morgan, and Fifth Third are designated as authorized depositories by the Office of the United States Trustee for Region 3 (the "***U.S. Trustee***") pursuant to the U.S. Trustee's Operating Guidelines for Chapter 11 Cases (the "***UST Operating Guidelines***").

11.      The U.S. Cash Management System is divided into sixteen (16) operating divisions (the "***Cash Management Divisions***"): seven (8) divisions within TKH (divided into five (5) distinct product divisions and three (3) distinct administrative functions) and a separate division for each of TK Mexico Inc., TK Mexico LLC, Takata Americas, TK Finance, LLC, and TK China, LLC as well as non-Debtors ALS, Syntec, and Highland.

i.     *Cash Collection*

12.     As set forth in the Caudill Declaration, the U.S. Cash Management

Entities' primary source of income derives from the direct and indirect sale of their broad range

of automotive safety and non-safety products.  The revenues and receipts of these entities enter

the U.S. Cash Management System through several transfer methods, including check, wire

transfer, and automated clearing house ("***ACH***") payment.  Depending on the type of transfer

method and the source of the payment, funds may go to one of several collection accounts.

Certain Cash Management Divisions have a lockbox account (a "***Lockbox Account***") to receive

checks.  ACH and wire transfers are received directly by concentration accounts (each,

a "***Concentration Account***") utilized by the Cash Management Divisions.  In addition, as

discussed in further detail below, certain of the Debtors receive management fees and certain

other amounts from affiliates through direct transfers to their Concentration Account.

ii.     *Cash Concentration*

13.     All of the collections of the U.S. Cash Management Entities are ultimately

transferred into a centralized Concentration Account held by TKH (the "***U.S. Master Account***"),

which functions as a centralized repository of cash in the U.S. Cash Management System.  On a

daily basis, funds from every account at each Cash Management Division, including the

Lockbox Accounts, if applicable, are automatically transferred (or "swept") into that Cash

Management Division's Concentration Account.  The funds in each Cash Management

Division's Concentration Account are, in turn, manually swept periodically into the U.S. Master

Account.

iii.     *Cash Disbursements*

14.     The majority of payments made from the U.S. Cash Management System,

including payroll, employee health and welfare benefits, wire transfers, tax payments, and

RLF1 17750882V.1

operating expenses, are made through each Cash Management Division's Concentration Account.  In addition, the Debtors maintain a limited number of specialized disbursement accounts (each, a "***Disbursement Account***" and, collectively, the "***Disbursement Accounts***"). When a disbursement is planned and the relevant Cash Management Division does not have sufficient cash on hand, that Cash Management Division's Concentration Account is funded with sufficient cash from the U.S. Master Account.

15. <u>Payroll</u>.  Typically, the Cash Management Divisions at the U.S. Cash Management Entities use their Concentration Accounts for payroll and other related expenses. The Debtors process their payroll in-house using a payroll system known as Infinium.  Certain employees are paid directly from the divisional Concentration Account via direct deposit.  The Debtors also pay various payroll related expenses, including employee benefits, from the divisional Concentration Accounts via either wire transfer or ACH payment.  There are five Cash Management Divisions that maintain special-purpose Disbursement Accounts for payroll and other related expenses that need to be paid by check; however, these accounts are rarely used. When they are needed, these special-purpose accounts are funded directly from the relevant Cash Management Division's Concentration Account.

16. <u>Manager Accounts</u>.  The U.S. Cash Management Entities maintain special-purposes Disbursement Accounts at certain Cash Management Divisions for limited payments made by checks written by authorized managers to certain trade vendors, suppliers, and other holders of accounts payable at the discretion of the manager (the "***Manager Accounts***").  The Manager Accounts are manually funded from the relevant Cash Management Division's Concentration Account up to the relevant manager's approved spend amount (typically $10,000) upon request of the relevant manager.

RLF1 17750882V.1

17.     Petty Cash Accounts.  The U.S. Cash Management Entities maintain a Disbursement Account at each Cash Management Division for unanticipated operating expenses and check requests (the "***Petty Cash Accounts***"), as well as small amounts of cash on hand at the U.S. Entities' plants and facilities.  The Petty Cash Accounts are non-zero balance accounts and maintain nominal cash balances.  The Debtors will instruct their employees that petty cash may not to be used to satisfy prepetition obligations, and the Debtors propose to continue using petty cash on hand in the ordinary course of business.

    *iv.*     *Additional Payment Methods and Other Accounts*

18.     The U.S. Cash Management Entities use certain additional cash management tools in support of the ordinary course operation of their businesses, including the Corporate Credit Card Program (as defined herein), the Currency Exchange Account (as defined herein), and the Pledged Comerica Account.

19.     Corporate Credit Card Program.  As described in further detail in the Debtors' motion seeking interim and final approval to honor its employee wage and benefit obligations filed concurrently herewith, the Debtors maintain corporate credit card programs with American Express, Comerica, and Bank of America (the "***Corporate Credit Card Program***") in the ordinary course of business.  The Corporate Credit Card Program provides a convenient way to allow employees to make purchases for the business where a wire, check, or ACH payment is not possible or is otherwise inconvenient.  In addition, the Debtors' procurement group uses specialized purchasing cards to purchase various supplies, consumables, and off-the-shelf parts.  The Corporate Credit Card Program consists of sixty-eight (68) American Express corporate, purchasing, and travel cards, forty-eight (48) Comerica corporate cards, and one (1) Bank of America corporate card.  The Corporate Credit Card Program features a number of safety and security measures designed to prevent fraud or misuse.  For example, the

American Express cards utilized by employees of the U.S. Cash Management Entities have controlled merchant codes, which prevent cardholders from using their cards for certain categories of inappropriate expenses.

20.     The average monthly expenses associated with the Corporate Credit Card Program for the U.S. Cash Management Entities are approximately eight hundred and fifty thousand dollars ($850,000).  As of the Petition Date, the Debtors do not believe that any amounts are outstanding on account of the Corporate Credit Card Program, and are only seeking to continue using the Corporate Credit Card Program in the ordinary course of business.

21.     TKH and Highland each maintain a certificate of deposit with American Express Bank (the "*Amex Bank CDs*") to secure their respective obligations to American Express in respect of their corporate, purchasing, and travel cards.  The Amex Bank CD at TKH is for a principal amount of six hundred thousand dollars ($600,000).  The Amex Bank CD at Higland is for a principal amount of seven hundred and fifty thousand dollars ($750,000).

22.     Currency Exchange Account.  TKH maintains a currency exchange account (the "*Currency Exchange Account*") at BTMU for the specific purpose of converting foreign currencies (primarily Euros) into U.S. Dollars.  Such swaps are priced at a market rate set by BTMU on the day of the trade.  TKH performs these trades in the ordinary course of business to convert Euro denominated receipts from one of the Debtors' European affiliates, TK Sachsen GmbH, into U.S. Dollars before they are transferred to the U.S. Master Account.  TKH does not use these transactions to hedge against fluctuations in currency prices.

23.     The Comerica Pledged Account.  TKH granted a security interest to Comerica Bank ("*Comerica*") in one of its Concentration Accounts (account number ending in 3869-5) maintained at Comerica, which has a balance of approximately $1,450,000

9

(the "***Pledged Comerica Account***") to secure all obligations of TKH to Comerica, including

without limitation obligations with respect to corporate credit cards issued by Comerica and

reimbursement obligations with respect to a letter of credit issued by Comerica for the account of

TKH in relation to certain surety bonds described in more detail in the Debtors' motion to

continue its insurance programs, filed contemporaneously herewith.  In accordance with its

agreements with Comerica, TKH may not withdraw any funds from the Pledged Comerica

Account without the prior written consent of Comerica.

B.      **The Mexican Cash Management System**

24.     The Mexican Cash Management System is comprised of thirty-nine (39)

Bank Accounts: six (6) maintained at Comerica and thirty-three (33) maintained at Banorte.

Comerica is designated as an authorized depository by the U.S. Trustee pursuant to the

UST Operating Guidelines.

25.     The Mexican Cash Management System is divided into six (6) operating

divisions – one division for each Mexican Cash Management Entity (the "***Mexican Cash***

***Management Divisions***"): one (1) division at TK Holdings de Mexico, one (1) division at TK

DM, one (1) division at Industrias Irvin, one (1) division at Strosshe-Mex, one (1) division at

Non-Debtor Equipo, and one (1) division at non-Debtor Falcomex.

*i.     Cash Collection*

26.     The Mexican Entities have two primary sources of income: (i) the sale of a

broad range of automotive safety and non-safety products to the Mexican affiliates and

subsidiaries of the OEMs, and (ii) as described more fully below, the fees charges by TK DM,

Equipo, and Industrias Irvin (collectively, the "***Maquiladoras***") to TKH for their provision of

assembly services to TKH (the "***Maquiladora Fee***").  The Maquiladora Fee represents the

Maquiladora's costs to assemble TKH's products, including all labor, real estate, and capital

10

costs, plus a modest margin.  The Mexican Cash Management Entities' revenues and receipts enter the Mexican Cash Management System through several transfer methods, including check, wire transfer, and ACH payment and are received directly into each Mexican Cash Management Division's Concentration Account.

*ii.    Cash Concentration*

27.    All of the collections of the Mexican Cash Management Entities are ultimately transferred into a centralized Concentration Account held by TK Holdings de Mexico (the "***Mexican Master Account***"), which functions as a centralized repository of cash in the Mexican Cash Management System.  Funds are swept on a daily basis from every account at each Mexican Cash Management Division into the Mexican Master Account.  In addition to the Mexican Master Account, the Mexican Debtors also maintain an investment account at TK Holdings de Mexico where excess cash is invested in a money-market fund for the benefit of the Mexican Entities.  Proceeds of such investment activities are allocated to each Mexican Cash Management Entity according to its net positive balance in the Mexican Cash Management System.

*iii.    Cash Disbursements*

28.    The majority of payments made from the Mexican Cash Management System, including payroll, employee health and welfare benefits, and operating expenses, are made through several different Disbursement Accounts.  The Disbursement Accounts are automatically funded on a transaction basis from the Mexican Master Account in an amount equal to the payments made from the Disbursement Accounts for that day.  The Disbursement Accounts utilized by the Mexican Cash Management Entities are discussed in further detail below.  In certain situations, where it is more convenient, disbursements are made directly from the Mexican Master Account.

11

29. <u>Payroll</u>. The Mexican Cash Management Entities maintain special-purpose disbursement accounts (each, a "***Payroll Account***") for payroll and other related expenses. The Payroll Accounts are zero-balance accounts. The Mexican Debtors process their payroll in-house through a system known as "Giro", and employees are paid directly from the Payroll Account via direct deposit or check. The Mexican Debtors also pay various payroll related expenses, including employee benefits, from the Payroll Account via either wire transfer or ACH payment.

30. <u>A/P Accounts</u>. The Mexican Cash Management Entities maintain A/P Accounts. The A/P Accounts are zero-balance accounts, and the payments paid out of the A/P Accounts are funded on a transaction basis.

31. <u>Petty Cash</u>. The Mexican Cash Management Entities maintain nominal amounts of petty cash onsite at their operating facilities in a lockbox or safe. The Debtors will instruct their employees that petty cash may not to be used to satisfy prepetition obligations, and the Debtors propose to continue using petty cash on hand in the ordinary course of business.

32. <u>The Mexico Savings Fund</u>. As described in more detail in the Debtors' motion seeking authority to pay prepetition wages, salaries, and other compensation and benefits, filed contemporaneously herewith, in accordance with Mexican social security law, the Mexican Debtors allow eligible employees to contribute up to ten percent (10%) of their monthly pre-tax income into an escrowed account established by the Mexican Debtors for the benefit of the contributing employees (the "***Mexico Savings Fund***"). The Mexican Debtors match employee contributions to the Mexico Savings Fund up to a maximum of twice Mexico's monthly minimum wage. Participating employees may withdraw amounts from the Mexico Savings Fund on an annual basis, and any withdrawals are not subject to income tax.

RLF1 17750882V.1

C.      **Intercompany Transactions and Claims**

33.      In the ordinary course of business, the Debtors maintain business relationships between and among affiliated Debtors and also with the Non-Debtor Affiliates. These business relationships generate intercompany receivables and payables (the "***Intercompany Claims***") from a variety of intercompany transactions (the "***Intercompany Transactions***").  The Intercompany Claims are tracked on a net basis on a schedule of intercompany balances (such Intercompany Claims, as netted, the "***Intercompany Balances***", and the schedule where Intercompany Balances are tracked, the "***Intercompany Balance Schedule***").  Certain Intercompany Transactions between and among the U.S. Cash Management Entities and Mexican Cash Management Entities are typically cash settled (*e.g.*, purchases of product or charges for services rendered), while others (*e.g.*, shared services, short term intercompany loans) are accrued on the Intercompany Balance Schedule and only cash settled when it is deemed convenient or necessary by the Treasury Staff.  Although each Debtor and Non-Debtor Affiliate plays a role that is integral to the enterprise's overall operations, not all entities generate their own cash flow.  Thus, the Cash Management System provides the mechanism for cash to flow throughout the entire company so that operations may be maintained.  To lessen the disruption caused by these Chapter 11 Cases and to maximize the value of the Debtors' estates, it is essential that the Debtors be allowed to continue the Intercompany Transactions in the ordinary course.

34.      As discussed in more detail below, the Debtors generally engage in four primary categories of Intercompany Transactions: (i) transactions among the Cash Management Entities within each of the U.S. and Mexico, other than intercompany vendor transactions; (ii) transactions between TKH and the Mexican Cash Management Entities, other than

intercompany vendor transactions; and (iii) transactions between the U.S. Cash Management

Entities and their international affiliates, including TKJP, other than intercompany vendor

transactions, and (iv) intercompany vendor transactions.

      35.      <u>Intercompany Transactions Between Cash Management Entities</u>.  A

variety of Intercompany Transactions occur in the ordinary course of business between and

among the Cash Management Entities (the "***Intercompany Cash Management Transactions***"),

including:

(a)      <u>Intercompany Allocations.</u>  In the ordinary course of business, certain expenses are allocated from one Cash Management Entity, both Debtor and non-Debtor, to the other.  These include allocations for items such as building rent, IT, and certain other day-to-day intercompany expenses.

(b)      <u>Intercompany Services</u>.  In the ordinary course of business, certain of the Cash Management Entities provide services for various Debtor and Non-Debtor Affiliates.  For example, TKH charges Highland management fees of approximately one hundred and fifteen thousand dollars ($115,000) per month for shared administrative services.  Such fees accrue monthly and are billed quarterly, with 30-day terms.  In addition, in the ordinary course of business, TK Holdings de Mexico charges each of the other Mexican Cash Management Entities a management fee for its provision of a variety of centralized administrative services for the Mexican Entities.

(c)      <u>Disbursements</u>.  In certain situations, one U.S. Cash Management Entity will make disbursements on behalf of another U.S. Cash Management Entity or one Mexican Cash Management Entity will make disbursements on behalf of another Mexican Cash Management Entity.  When such a payment is made, an intercompany payable is created between the two entities.

(d)      <u>Other Transactions</u>.  Certain other Intercompany Transactions are tracked among the Cash Management Entities, including short and long term intercompany loans, and intercompany payables and receivables booked on account of asset transfers among the entities.  For example, one North American Cash Management Entity may transfer a piece of equipment to another North American Cash Management Entity, which would generate an intercompany account payable on the books of the transferee and an intercompany payable on the books of the transferor.  Another example is TKH's intercompany funding support for its non-Debtor subsidiary Syntec in the ordinary course of business at certain times of the year when

14

Syntec's business slows down (typically June and July).  On an annual basis, Syntec is typically profitable and its value accretes to TKH.

36.     <u>Intercompany Transactions Between TKH and the Mexican Cash Management Entities</u>.  In the ordinary course of business, TKH transacts with the Maquiladoras for the production and assembly of component parts (the "***Maquiladora Transactions***").  TKH arranges to have raw materials and sub-assemblies it owns shipped to the Maquiladoras, which assemble and process the components to produce larger sub-assemblies, and, in some cases, finished goods, which in all cases remain the property of TKH.  In exchange for these services, the Maquiladoras each charge TKH a Maquiladora Fee, which total approximately twenty five million dollars ($25,000,000) per month.  As of the Petition Date, TKH owes the Maquiladoras approximately $43.5 million dollars ($43,500,000) in accrued and unpaid Maquiladora Fees.

37.     The Maquiladora arrangement is common in the automotive industry, confers certain tax benefits, and allows TKH to have its products assembled as cost-efficiently as possible.  Each of Takata's Maquiladora entities, Equipo, Industrias Irvin, and TK DM, have a special "IMMEX authorization," which authorizes those entities to operate manufacturing facilities with the Maquiladora status.

38.     The Maquiladora Fees are cash settled in the ordinary course of business, and are a critical part of the Debtors' ability to continue operating in the ordinary course of business.  The Maquiladora Fee is essentially a formulaic fee of the "cost" of providing the assembly services plus three percent (3%).  Without the Maquiladora Fees paid by TKH, the Maquiladora entities would not be able to pay their employees or fund their operations.

39.     <u>Intercompany Transactions with International Non-Debtor Affiliates</u>.  The Debtors also transact business with their global affiliates, including TKJP.  These transactions include intercompany loans (the "***Intercompany Loans***"), as well as more ordinary course

transactions (the "***Intercompany International Transactions***"), such as the provision of engineering services between regions, and allocations of insurance and IT expense.  Longer term Intercompany Loans are typically documented in a formal note or loan agreement, while the ordinary course Intercompany International Transactions are recorded as Intercompany Balances on the Intercompany Balance Schedule.

40.    <u>Intercompany Vendor Transactions.</u>  Given the global nature of the Debtors' businesses, the Debtors purchase goods, services, and vital components from certain Non-Debtor Affiliates, including Highland and TKJP on a regular basis (the "***Intercompany Vendor Transactions***").

41.    Before accounting for setoffs, the Debtors owe Non-Debtor Affiliates twenty-three million dollars ($23,000,000) on account of goods sold to the Debtors in the twenty (20) days prior to the Petition Date.  This total includes approximately nine million dollars ($9,000,000) owed to Highland, approximately ten million dollars ($10,000,000) owed to TKJP, approximately one million five hundred thousand dollars ($1,500,000) owed to TKH's Brazilian Non-Debtor affiliate Takata Brasil S.A., and approximately two million five hundred thousand dollars ($2,500,000) owed to the Debtors' European and Asian Non-Debtor affiliates (excluding Japan).  Payment of these amounts is necessary to ensure that those entities are able to continue operating in the ordinary course of business while the Global Transaction is consummated, and the payment of these amounts is only a matter of timing, as they are conferred administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code.

42.    The Debtors have communicated with their Non-Debtor Affiliates and carefully evaluated what amounts related to the intercompany sale of product in the twenty (20) days before bankruptcy are actually necessary to be paid on an interim basis in order to avoid

16

irreparable harm to the Debtors' businesses.  The outcome of those discussions is that the

Debtors can defer eighteen million five hundred thousand dollars ($18,500,000) of the section

503(b)(9) amounts to a final order, and are only seeking to pay on an interim basis, in the

ordinary course of business as invoices come due, up to four million five hundred thousand

dollars ($4,500,000) to Highland on account of goods sold to TKH in the twenty (20) days before

the petition.  Payment of these limited amounts is critical to support Highland's ability to

continue to operate in the ordinary course of business, and although Highland is a Non-Debtor

Affiliate, it is a solvent wholly owned subsidiary of TKH and therefore its value ultimately flows

up to TKH.  In addition, Highland is a net contributor to the Cash Management System.

43.    Because of the centralized nature of the Debtors' payment systems, the

Debtors' operations would be severely impaired if they were not able to continue making

Intercompany Transactions in the ordinary course of business consistent with past practices.  In

particular, product purchases from global affiliates are a critical component of the Debtors'

global supply chain, and the inability to buy products from, and sell products to, the Debtors'

global affiliates would create significant supply disruptions.

### D.    Bank Fees

44.    In the ordinary course of business, the Debtors incur and pay, honor, or

allow to be deducted from the appropriate Bank Accounts certain service charges and other

related fees, costs, and expenses charged by the Banks (collectively, the "***Bank Fees***").  To the

extent the balance in the applicable Bank Account decreases below a threshold amount

established by the applicable Bank, the Debtors may incur additional fees for sending and

receiving wire transfers, clearing checks, ACH transfers, and other transactions.  The Debtors

have an arrangement with Comerica where their Bank Fees vary depending on the amount of

cash held at Comerica.  The Debtors currently pay approximately thirty thousand dollars ($30,000) per month on account of Bank Fees.  As of the Petition Date, the Debtors estimate that approximately twenty five thousand dollars ($25,000) in Bank Fees are accrued and unpaid and will become due in the first thirty (30) days after the Petition Date.  The Debtors are seeking to pay such amounts as they come due in the ordinary course of business.

### E.      The Debtors' Existing Business Forms and Checks

45.      The Debtors issue checks from time to time and use a variety of business forms (including, but not limited to letterhead, purchase orders, invoices, and other business forms) in the ordinary course of their businesses (collectively, the "***Business Forms***").  To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue using their Business Forms substantially in the forms used immediately prior to the Petition Date, without reference therein to the Debtors' status as "Debtor-in-Possession."  The Debtors have prepared communication materials to distribute to the various parties with whom they conduct business, which will, among other things, inform such parties of the commencement of these Chapter 11 Cases.  The Debtors believe that these direct communications will provide adequate notice of the Debtors' status as debtors in possession.

### F.      Transition Services for NAS Sales

46.      Prior to the commencement of the Chapter 11 Cases, TKH completed the sale of two of its non-automotive safety subsidiaries to TransDigm Group, Inc. (the "***NAS Purchaser***"), including Interiors in Flight, Inc. and Takata Protection Systems, Inc. (the "***NAS Sales***").  The NAS Sales closed on or about February 22, 2017.  In connection with those sales,

18

the Debtors entered into a series of agreements (collectively, the "***NAS Transition Services Agreements***") to provide certain limited transition services to the NAS Purchaser, including without limitation, certain collection, distribution and other treasury-related services, certain human resources, payroll and employee benefit services, and certain IT and connectivity related services (the "***NAS Transition Services***").[3]  The agreement to provide the treasury-related services expired on June 22, 2017.  Pursuant to the various underlying agreements, the Debtors have agreed to provide the remaining NAS Transition Services until September 22, 2017.  In exchange for the non-treasury related services, the NAS Purchaser has agreed to pay the Debtors certain monthly fees of approximately five thousand dollars ($5,000) per month for the various services.

47.     Though the NAS Transition Services related to cash collection and distribution services ended on June 22, 2017, there may be certain limited matters that arise in relation to these services during the first few weeks of these Chapter 11 Cases.  Consequently, maintenance of the Debtors' existing Cash Management Service is necessary to allow the Debtors' to continue to discharge their surviving obligations under the NAS Transition Services Agreement.  Accordingly, the Debtors respectfully request they be allowed to continue taking all necessary actions and making any necessary transfers, disbursements, or collections in connection with the Cash Management System as required to discharge their surviving obligations under the NAS Transition Services Agreements.

## **Basis for Relief Requested**

48.     The operation of the Debtors' businesses requires the continuation of the Cash Management System during these Chapter 11 Cases.  Accordingly, the Debtors seek

---

[3] Copies of the NAS Transition Services Agreements are available upon request to the Debtors subject to reasonable confidentiality restrictions.

authority to: (i) continue operating the Cash Management System and to make ordinary course changes to it consistent with past practice, (ii) to honor certain prepetition obligations related to the Cash Management System, (iii) provide certain postpetition claims (including Intercompany Claims) with administrative expense priority, (iv) continue funding certain Non-Debtor Affiliates, and (v) maintain their existing business forms.  Additionally, the Debtors seek an interim extension, and ultimately a waiver, of the requirements of section 345(b) of the Bankruptcy Code to the extent applicable to any of the Bank Accounts.

> **A.    Continuation of the Cash Management System is in the Best Interests of the Debtors and All Other Parties in Interest**

49.    As set forth above, the Debtors request authority to continue using the Cash Management System in the same manner as it was utilized prior to the Petition Date and to implement ordinary course changes to the Cash Management System consistent with past practice.  Such relief is appropriate under sections 363(c) and 105(a) of the Bankruptcy Code.

50.    Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of this section is to provide a debtor with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (citations omitted); *In re Vision Metals, Inc.*, 325 B.R. 138, 145 (Bankr. D. Del. 2005) (same).  Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's cash management system.  *See, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007)

RLF1 17750882V.1

(noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions) (citations omitted); *In re Vision Metals*, 325 B.R. at 142 ("[W]hen a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business."). Accordingly, the Debtors seek authority pursuant to section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement, including intercompany transfers, of cash pursuant to their Cash Management System described above.

51.     Additionally, the Court may exercise its equitable powers to grant the relief requested herein. Specifically, section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. 11 U.S.C. § 105(a). Under section 105(a) and the doctrine of necessity, the Court may exercise its broad grant of equitable powers to approve this Motion, including the payment of prepetition obligations, when such payment is essential to the continued operation of a debtor's business. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"). Therefore, it is within the Court's equitable power under section 105(a) to approve the continued use of the Cash Management System.

52.     The Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtors, including the ability to

control corporate funds, ensure the maximum availability of funds when and where necessary, and reduce borrow costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  The use of the Cash Management System has historically reduced the Debtors' expenses by enabling the Debtors to use funds in an optimal and efficient manner.  Accordingly, the continued use of the Cash Management System without interruption is vital to the Debtors' business operations and the success of these Chapter 11 Cases.

53.    The operation of the businesses of the Debtors and their Non-Debtor Affiliates requires that the Cash Management System continue during the pendency of these Chapter 11 Cases.  As a practical matter, because of the Debtors' corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a separate cash management system for each Debtor and Non-Debtor Affiliate.  Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases, or to extract the Debtors from the Cash Management System, would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of their global network. Any disruption to the Cash Management System would have a severe and adverse impact upon the Debtors' value and would create unnecessary costs and administrative burdens and be extraordinarily disruptive to the Debtors' operations.

54.    In furtherance of the foregoing, the Debtors request that all Banks at which the Bank Accounts are maintained be authorized to continue to administer such accounts as they were maintained prepetition, without interruption, in the ordinary course of business. The Debtors also request authority to pay any prepetition Bank Fees that remain unpaid as of the Petition Date.  As outlined above, the Debtors estimate that approximately twenty-five thousand

dollars ($25,000) in Bank Fees are unpaid as of the Petition Date.  Payment of the prepetition

Bank Fees is in the best interests of the Debtors, their estates, and all parties in interest as it will

prevent any disruption to the Cash Management System.  Because the Banks may have setoff

rights with respect to the prepetition Bank Fees, payment of any prepetition Bank Fees will not

affect unsecured creditors and would merely be a matter of timing.  The Banks should also be

authorized to pay any and all drafts, wires, and ACH transfers issued on the Bank Accounts for

payment of any claims arising on or after the Petition Date, or prior to the Petition Date to the

extent such claims were approved by an order of the Bankruptcy Court, in each case so long as

sufficient funds are in these accounts.

55.    Additionally, the Debtors request the Court allow the Debtors to continue

to provide the NAS Transition Services as set forth in the NAS Transition Services Agreements.

As described above, although they have now largely concluded, certain of the NAS Transition

Services included cash collection and distribution services.  To avoid any administrative hiccups

or missteps (*e.g.*, late payments may be received, checks may not yet have cleared), maintenance

of the Debtors' existing Cash Management Service is necessary to allow the Debtors' to

discharge their obligations under the NAS Transition Services Agreement.  The Debtors'

remaining (non-treasury) services under the NAS Transition Services are being provided at fair

market value, and the Debtors' provision of such services generates additional revenue for the

Debtors' estates.  Accordingly, the Debtors respectfully request they be allowed to continue the

Cash Management System and continue to NAS Transition Services

56.    Likewise, out of an abundance of caution, the Debtors request that

ordinary course obligations arising under the Corporate Credit Card Program postpetition be

afforded administrative expense priority.

57.    For the foregoing reasons, continuation of the Cash Management System is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these Chapter 11 Cases and should be authorized pursuant to sections 363(c)(1) and 105(a) of the Bankruptcy Code.

**B.    The Relief Requested with Regard to Intercompany Transactions Should be Approved**

   a)    *Continued Performance of Intercompany Cash Management Transactions Postpetition is Warranted and Postpetition Intercompany Claims Should be Granted Administrative Expense Priority*

58.    As described above, the Cash Management System is similar to those commonly employed by other large corporate enterprises, in which Intercompany Transactions are tracked as Intercompany Claims.    At any point in time, there may be outstanding amounts due and owing among the various Debtors and their Non-Debtor Affiliates, all of which are recorded and documented as Intercompany Transaction and accurately tracked on the Intercompany Balance Schedule.

59.    The Debtors believe that they do not require the Court's approval to continue entering into and performing under the Intercompany Transactions, which are transacted "in the ordinary course of business" within the meaning of section 363(c)(1).    The Intercompany Transactions are not just a matter of ordinary course in the Debtors' businesses: they are the sorts of transactions that are common among many business enterprises that operate with a centralized cash management system through multiple affiliates.    Yet, precisely because of their routine nature, and in particular the ability to fund Debtor and Non-Debtor Affiliates efficiently to maintain the value to the overall enterprise afforded by the Intercompany Transactions, the continuation of such transactions are integral to the Debtors' ability to operate their businesses and successfully emerge from chapter 11.    Accordingly, out of an abundance of

caution, the Debtors request express authority to engage in Intercompany Transactions postpetition.

60.     If the Intercompany Transactions among Debtors are discontinued, a number of services provided by and among the Debtor entities would be disrupted.  Moreover, discontinuing the Intercompany Transactions could impair the Debtors' ability to pay benefits to their employees, and make timely payments to certain vendors.  Accordingly, the Debtors believe that continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors, and seek authority to enter into such Intercompany Transaction in the ordinary course of business.

61.     Additionally, to ensure that each individual entity will not, at the expense of its creditors, fund the operations of an affiliated Debtor and that each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its ordinary course transactions with affiliates, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(a) of the Bankruptcy Code, all Intercompany Claims against Debtors arising after the Petition Date in the ordinary course of business be afforded administrative expense priority.  Under section 503(b)(1)(A) of the Bankruptcy Code, "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . . ."  Administrative expenses treatment for postpetition intercompany claims has been granted in other large Chapter 11 Cases in this and other districts. *In re Paragon Offshore PLC*, Case No. 16-10386 (Bankr. D. Del. Feb. 17, 2016) (D.I. 73); *In re Offshore Group Investment Limited*, Case No. 15-12422 (Bankr. D. Del. Dec. 4, 2015) (D.I. 45); *In re Quiksilver, Inc.*, Ch. 11 Case No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015) (D.I. 74); *In re Endeavour Operating Corp.*, Ch. 11 Case No. 14-12308 (KJC) (Bankr. D. Del. Oct.

15, 2014) (D.I. 60); *In re Physiotherapy Holdings, Inc*., Ch. 11 Case No. 13-12965 (KG) (Bankr.

D. Del. Nov. 14, 2013) (D.I. 47); *In re Southern Air Holdings, Inc.*, Ch. 11 Case No. 12-12690

(CSS) (Bankr. D. Del. Sept. 28, 2012) (D.I. 46); *In re General Growth Properties, Inc.*, Case No.

09-11977 (Bankr. S.D.N.Y. May 14, 2009) (D.I. 518); *In re Lehman Bros. Holdings, Inc.*, Case

No. 08-13555 (Bankr. S.D.N.Y. Nov. 6, 2008) (D.I. 1416).[4]  The Debtors submit that similar

relief is warranted in these Chapter 11 Cases.

> b)    *Continued Performance of the Maquiladora Transactions and*
> *Payment of the Maquiladora Fees are Warranted*

62.    As described above, the Maquiladora Transactions enable TKH to

manufacture and assemble product on a cost-efficient basis.  As such, continuation of the

Maquiladora Transactions postpetition in the ordinary course is warranted.

63.    Moreover, and any disruption to the ordinary course payment of the

Maquiladora Fee would have a disastrous effect on the Debtors' businesses.  As explained above,

the Maquiladoras obtain all of their funding from TKH.    Simply put, without the payment

Maquiladora Fees, the Maquiladoras would not be able to pay their employees or continue their

operations.  As the operations of the Maquiladoras exist solely to provide critical manufacturing

and assembly services to the Debtors, the Debtors' ability to supply their Customers would be

severely interrupted if the Maquiladoras were to shut down.  With over twenty thousand

employees located in Mexico, a disruption in Mexico would almost certainly threaten the

Debtors' ability to continue operating in the ordinary course of business elsewhere in North

America, and it is highly likely that a severe disruption in Mexico would cascade and trigger a

series of events that would likely threaten the Global Transaction.

---

[4] Because of the voluminous nature of the orders cited herein, they are not annexed to this Motion.  Copies of these
orders are available upon request of Debtors' counsel.

64.     In addition, TKH also benefits from paying these amounts because the value of all three (3) Maquiladoras (two (2) of which are Debtors) ultimately flows up to TKH.

65.     As such continuation of the Maquiladora Transactions and payment of the Maquiladora Fees are warranted.

     c)     *Continued Performance of the Intercompany International Transactions is Warranted*

66.     As described above, the Debtors and certain of their international Non-Debtor Affiliates engage in ordinary course Intercompany International Transactions, including the provision of engineering services and shared services.  The Debtors believe that the continuation of such transactions, which enables the Debtors and their affiliates to provide key services to one another and share services on an efficient and fair basis, provides value to them and their affiliates and should be permitted to continue in the ordinary course.  The justifications for these transactions are similar to those for the Intercompany Cash Management Transactions described above.  The Debtors are not seeking authority to continue to enter into Intercompany Loans with their international Non-Debtor Affiliates or to pay any prepetition claims of such affiliates (except in connection with the International Vendor Transactions described below).

     d)     *Continuation of the Intercompany Vendor Transactions and Payment of Intercompany Trade Claims of Highland, TKJP and Certain Other Non-Debtor Affiliates that are Entitled to Administrative Priority Under Section 503(b)(9) is Necessary and Appropriate and Should be Approved*

67.     By this Motion, the Debtors seek authority to continue the Intercompany Vendor Transactions in the ordinary course of business.  In addition, pursuant to section 503(b)(9) of the Bankruptcy Code, the Debtors are requesting authority to pay in the ordinary course of business certain prepetition amounts owing to their domestic and global affiliates on account of goods received by the Debtors in the twenty (20) days prior to the Petition Date and

sold to them by such affiliates in the ordinary course of business.  These Intercompany Claims

are entitled to Administrative Priority treatment under section 503(b)(9) of the Bankruptcy Code.

Section 503(b)(9) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall

be allowed administrative expenses . . . including . . . the value of any goods received by the

debtor within 20 days before the date of commencement of a case under this title in which the

goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C.

§ 503(b)(9).  The Debtors will be required to pay in full all claims entitled to administrative

priority under section 503(b)(9) of the Bankruptcy Code to confirm any chapter 11 plan filed in

these cases.  *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to

priority).

   68. Although section 503(b)(9) of the Bankruptcy Code does not specify a

time for payment of these expenses, bankruptcy courts have the discretion to allow for

distributions to administrative claimants prior to confirmation if the debtor has the ability to pay

and there is a need to do so.  *See In re Global Home Prods.*, LLC, No. 06-10340 (KG), 2006 WL

3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that

administrative expense claim is left to the discretion of the Court.").  Indeed, nothing in the

Bankruptcy Code prohibits the Debtors from paying such claims sooner if it chooses to do so, or

this Court from exercising its discretion to authorize the postpetition payment of such obligations

prior to confirmation of a chapter 11 plan.  *See In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC)

(Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the [D]ebtor could pay its

503(b)(9) claimants without court approval.").

   69. Because of the centralized nature of the Debtors' payment systems, the

Debtors' operations would be severely impaired if they were not able to continue engaging in

Intercompany Vendor Transactions in the ordinary course of business consistent with past practices. Continuing the vendor transactions between the Debtors and its Non-Debtor Affiliates in the ordinary course of business is necessary to ensure that the Debtors continue to receive essential component parts and services without the need to find alternative suppliers during the Chapter 11 Cases.  In particular, product purchased from global affiliates is a critical component of the Debtors' global supply chain, and the inability to buy products from, and sell products to, the Debtors' global affiliates would create significant supply disruptions.  If the Debtors were forced to find alternative suppliers, the Debtors' operations would be severely disrupted and they would likely be forced to contract with replacement vendors on significantly worse terms.

70.    Moreover, the Debtors' failure to continue purchasing goods from their Non-Debtor Affiliates consistent with past practices will impair the ability of the Non-Debtor Affiliates to meet their obligations and, in certain cases, would put the Non-Debtor Affiliates out of business.  The value of the Non-Debtor Affiliates, both generally and to the Debtors, would decline. The component parts and supplies sold to the Debtors by their Non-Debtor Affiliates are critical to the Debtors' ability to manufacture automotive safety products for their Customers. Any disruption of parts to the Debtors as a result of the Non-Debtor Affiliates not being able to satisfy their obligations could result in a disruption of the Debtors being able to supply product to the OEMs, leading to significant damages and entitling the OEMs to assert further significant claims against the estates.  A failure to supply component parts to the Debtors customers could also potentially result in the termination of the valuable liquidity enhancements and accommodations that the Debtors' customers have agreed in principle to provide to the Debtors during the Chapter 11 Cases.  These circumstances could severely impair, if not derail, the

Global Transaction to the detriment of all stakeholders, including the creditors and all parties in interest in these Chapter 11 Cases.

71.    Here, due to the nature of the Debtors' businesses, the domestic and global Non-Debtor affiliates that the Debtors seek authority to pay delivered raw materials, supplies, and other goods in the ordinary course to the Debtors within the twenty (20) days prior to the Petition Date.  Payment to the Debtors' Non-Debtor affiliates on account of such deliveries at the onset of these Chapter 11 Cases merely accelerates the timing of payment and not the ultimate treatment of such claims.  Accordingly, the Debtors would have to pay these Intercompany Claims in full, to the extent they fall within the scope of section 503(b)(9) of the Bankruptcy Code, regardless of the timing of such payment.  Furthermore, on an interim basis, the Debtors are only seeking to pay, in the ordinary course of business as invoices come due, up to four million five hundred thousand dollars ($4,500,000) from TKH to Highland on account of goods sold to TKH in the twenty (20) days before the petition.  Payment of these limited amounts is critical to support Highland's ability to continue to operate in the ordinary course of business, and although Highland is a Non-Debtor Affiliate, it is a solvent wholly owned subsidiary of TKH and therefore its value ultimately flows up to TKH.  In addition, Highland is a net contributor to the Cash Management System.

72.    Similar relief has been granted in this district in other cases.  *See, e.g.*, *In re UCI International, LLC*, Case No. 16-11354 (MFW) (Bankr. D. Del. 2016 June 3, 2016) (authorizing payment of a foreign affiliate 503(b)(9) claim on an interim basis).

73.    For the foregoing reasons, continuation of the Intercompany Vendor Transactions, and payment of the Intercompany Claims that fall within the scope of section 503(b)(9) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, is

RLF1 17750882V.1

necessary to avoid irreparable harm to the Debtors' estates in connection with the Debtors' sale process, is in the best interests of the Debtors and their respective estates and creditors, and is warranted under the circumstances.

**C.    Maintenance of the Debtors' Existing Bank Accounts and Business Forms is Warranted**

74.    The UST Operating Guidelines generally require that a chapter 11 debtor, among other things: (i) establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes); (ii) close all existing bank accounts and open new debtor-in-possession accounts; (iii) maintain a separate debtor-in-possession account for cash collateral; (iv) obtain checks that bear the designation "Debtor-in-Possession"; and (v) reference the debtor's bankruptcy case number and type of account on each such check.  *See* UST Operating Guidelines § 2.  Moreover, Local Rule 2015-2(a) generally requires that, upon exhausting its existing check stock, a chapter 11 debtor order new checks labeled "Debtor-in-Possession" with the corresponding chapter 11 case number.  These requirements are designed to establish a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against a debtor's inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the commencement of the debtor's Chapter 11 Cases.

75.    In these Chapter 11 Cases, strict enforcement of the UST Operating Guidelines and Local Rule 2015-2(a) would severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  The Cash Management Entities maintain over ninety (90) Bank Accounts.  If the Debtors were required to close these Bank Accounts and open new debtor in possession accounts, the Debtors would be forced to reconstruct the Cash Management System in its entirety.  This reconstruction would be impractical and cost prohibitive in an enterprise like the

31

Debtors', a business that requires multiple Bank Accounts all over the country.  The Treasury

Staff, including accounting and bookkeeping employees, would need to focus their efforts on

immediately opening new bank accounts and working to establish proper cash flow controls,

thereby diverting them from their daily responsibilities during this critical juncture of the

Debtors' Chapter 11 Cases.  Many accounts could not be replaced in time to effectively continue

the Debtors' businesses.  Even if they could, the opening of new bank accounts would increase

operating costs, and the delays that would result from opening new accounts, revising cash

management procedures, and redirecting payments would negatively impact the Debtors' ability

to operate their businesses while establishing these new arrangements.  This would further

exacerbate the risk to the Debtors' businesses caused by these Chapter 11 Cases.

    76.  The Debtors believe that their transition to chapter 11 will be significantly

smoother and more orderly, with minimum disruption and harm to Debtors' operations, if the

Bank Accounts are continued following the Petition Date with the same account numbers.  By

preserving business continuity and avoiding the disruption and delay to the Debtors' collection

and disbursement procedures that would necessarily result from closing the Bank Accounts and

opening new accounts, all parties in interest, including employees, vendors, customers, and

creditors will be best served.  The confusion that would otherwise result, absent the relief

requested herein, would ill-serve the Debtors' rehabilitative efforts.  Accordingly, the Debtors

respectfully request authority to maintain the Bank Accounts in the ordinary course of business.

Once the Debtors' existing checks have been used, the Debtors will, when reordering checks,

require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all

such checks.

77.     In addition, payment of the Bank Fees, including those incurred prepetition, is warranted.  The Debtors' banks automatically debit the Bank Accounts periodically for Bank Fees incurred in connection with the Cash Management System.  The Debtors' average Bank Fees are approximately thirty thousand dollars $30,000 per month.  The Bank Fees vary depending upon several factors, including the balances in the Bank Accounts and the number and type of transactions that are requested.  Because the Debtors' Banks may hold setoff rights and are entitled to automatically debit the Bank Accounts for amounts owed by the Debtors in connection with maintaining the Cash Management System, payment of prepetition Bank Fees is only a matter of timing, will prevent any disruption to the Cash Management System, is in the best interests of the Debtors and their estates, and will not negatively affect Unsecured Creditors.

78.     In the ordinary course of business, the Debtors conduct transactions by debit, wire, ACH, and other similar methods.  A large percentage of the Debtors' customers pay them through ACH or wire transfer, and the Debtors pay a majority of their third-party vendors and service providers through ACH or wire transfer.  Accordingly, to avoid any disruption or claims against the Debtors, the Debtors are seeking to continue their prepetition debit, wire, and ACH practices during these Chapter 11 Cases.

79.     Although the Debtors request that they be allowed to maintain their prepetition Bank Accounts, the Banks at which such accounts are kept must adhere to certain guidelines.  Specifically, unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a prepetition claim.  The Banks may honor any checks issued on account of prepetition claims where this Court has specifically authorized such checks to be honored.  Furthermore, the Debtors request that the Banks be authorized to accept and honor all

33

representations from the Debtors as to which checks should be honored or dishonored consistent

with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to

the Petition Date.  The Banks shall not be liable to any party on account of following the

Debtors' instructions or representations regarding which checks should be honored.  Should any

Bank honor a prepetition check, draft, wire transfer, ACH transfer or other debit drawn on a

Bank Account (a) at the direction of any of the Debtors to honor such prepetition check or item,

(b) in a good faith belief that the Court has authorized such prepetition item to be honored, (c) as

a result of an innocent mistake made despite the implementation of customary item handling

procedures, or (d) consistent with its past practices under the Cash Management System, such

Bank shall not be deemed to be, nor shall be, liable to the Debtors or their estates or otherwise in

violation of the Interim Order or Final Order.  Further, the Debtors request that the Banks shall

have no liability for any operational processing errors that are the result of human error.

80.     To minimize expenses, the Debtors should also be permitted to maintain

and continue to use their Business Forms substantially in the forms existing immediately before

the Petition Date.  Strict compliance with the UST Operating Guidelines, which require

reprinting such documents, would increase the Debtors' expenses and would risk unnecessarily

confusing the Debtors' customers, suppliers, and employees.  Accordingly, the Debtors believe it

is appropriate to continue to use all Business Forms as such forms were in existence prior to the

commencement of these Chapter 11 Cases, without any reference to the Debtors' current status

as debtors in possession.  However, as described above, once the Debtors' existing checks have

been used, the Debtors will, when reordering checks, require the designation "Debtor-in-

Possession" and the corresponding bankruptcy number on all such checks.

34

81.     In short, any benefits of the Debtors' strict compliance with the UST

Operating Guidelines or Local Rule 2015-2(a) would be far outweighed by the resulting expense,

inefficiency, and disruption to the Debtors' businesses.  Accordingly, the Debtors request

authority to maintain their Bank Accounts and Business Forms during these Chapter 11 Cases.

Furthermore, the Debtors seek a waiver of the UST Operating Guidelines to the extent that

requirements outlined therein otherwise conflict with (i) the Debtors' existing practices under the

Cash Management System, or (ii) any action taken by the Debtors in accordance with the Interim

Order or the Final Order, or any other order entered in these cases.

**D.      An Interim Extension of Time to Comply With the Requirements of Section 345(b) of the Bankruptcy Code is Warranted to the Extent they Apply to the Bank Accounts**

82.     Section 345(a) of the Bankruptcy Code governs a debtor's deposit and

investment of cash during a chapter 11 case and authorizes such deposits or investments as "will

yield the maximum reasonable net return on such money, taking into account the safety of such

deposit or investment."  11 U.S.C. § 345(a).  For deposits or investments that are not "insured or

guaranteed by the United States or by a department, agency, or instrumentality of the United

States or backed by the full faith and credit of the United States," section 345(b) of the

Bankruptcy Code requires that the debtor obtain from the "entity with which the money is

deposited or invested a bond in favor of the United States [that is] secured by the undertaking of

a[n adequate] corporate surety, . . . unless the court for cause orders otherwise.  11 U.S.C. §

345(b).[5]

---

[5] In the alternative, the estate may require such entity to deposit governmental securities pursuant to 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond.  31 U.S.C. § 9303(a).

83.     In Chapter 11 Cases such as these, strict adherence to the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with the value-maximizing purpose of chapter 11 by unduly hampering a debtor's ability under section 345(a) to invest money such "as will yield the maximum reasonable net return on such money."  As a result, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict investment requirements may be waived or modified if the court so orders "for cause."  140 Cong. Rec. H. 10,767 (Oct. 4, 1994).  Here, the Debtors satisfy both the procedural and substantive requirements necessary to obtain a waiver of section 345(b) of the Bankruptcy Code.  However, in recognition of the complex nature of these cases, the Debtors are only seeking a thirty (30) day extension of time to comply with the requirements of section 345(b) of the Bankruptcy Code while they discuss the issue with the U.S. Trustee and any statutory committee appointed in these cases.  Subject to the outcome of those discussions, the Debtors intend to seek a waiver of the requirements of section 345(b) of the Bankruptcy Code when a final hearing on this Motion is held.

84.     With respect to procedural requirements, Local Rule 2015-2(b) provides that:

> no waiver of the investment requirements of section 345 shall be granted by the Court without notice and an opportunity for hearing in accordance with these Local Rules. However, if a motion for such a waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, or otherwise with cause shown, the Court may grant an interim waiver until a hearing on the debtor's motion can be held.

85.     Substantively, there is "cause" to warrant a waiver of the requirements of section 345(b) of the Bankruptcy Code.  Courts consider the "totality of the circumstances" in determining whether "cause" exists, with particular regard to the following factors:

a.     The sophistication of the debtor's business;

36

b.      The size of the debtor's business operations;

c.      The amount of investments involved;

d.      The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor in possession funds are held;

e.      The complexity of the case;

f.      The safeguards in place within the debtor's own business of insuring the safety of the funds;

g.      The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h.      The benefit to the debtor;

i.      The harm, if any, to the estate; and

j.      The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

*In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

86.     Here, "cause" exists because, among other things:  (i) all or nearly all of the Debtors' Banks holding significant balances are highly rated, reputable banks that are typically subject to supervision by national banking regulators; (ii) the Debtors retain the right to close accounts with the Banks and establish new bank accounts as needed; (iii) the cost associated with satisfying the requirements of section 345(b) is needlessly burdensome to the Debtors and their estates; and (iv) the process of satisfying such requirements would lead to needless inconvenience and inefficiencies in the management of the Debtors' businesses.  The benefits of a waiver would far outweigh any potential harm to the estates from noncompliance with section 345(b).  The complex nature of the Debtors' businesses requires numerous bank accounts.  Moreover, a bond secured by the undertaking of a corporate surety would be prohibitively expensive (if such a bond could be obtained at all).  Furthermore, based on their past experience opening new bank accounts, the Debtors estimate that it would take months to

37

create a new suite of bank accounts to service their businesses.  Finally, the fact that these

Chapter 11 Cases have been filed with the support of the Debtors' primary creditor groups

further weighs in favor of granting the relief.  The Debtors submit that the costs of disruption to

the business by having to close dozens of accounts far outweighs the risks of the Debtors

continuing to maintain their historic Bank Accounts for the period of time they remain in chapter

11.

       87.     Accordingly, the Court should, on an interim basis, extend the Debtors'

time to comply with the requirements of section 345(b) of the Bankruptcy Code for thirty (30)

days.  The Debtors believe that, after notice and a hearing, a final waiver is appropriate in these

cases, and will discuss this request with the U.S. Trustee and any statutory committee appointed

in these Chapter 11 Cases.

## Reservation of Rights

       88.     Nothing contained herein is intended to be or shall be construed as (i) an

admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of

any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

order is not intended to be and should not be construed as an admission to the validity of any

claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Bankruptcy Rule 6003 Has Been Satisfied

       89.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to

avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion

to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a

RLF1 17750882V.1

motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  As described herein and in the Caudill Declaration, the Debtors' business operations rely heavily on the Debtors' Cash Management System, Bank Accounts and Business Forms.  Any disruption in the continuation of these practices would severely disrupt the Debtors' operations and cause a severe decline in the value of the Debtors' estates.  Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

<div align="center">

**Request for Bankruptcy Rule 6004 Waivers**

</div>

90.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the Caudill Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

<div align="center">

**Notice**

</div>

91.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware (Attn: David Buchbinder, Esq. and Jane Leamy, Esq.); (ii)  the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Offices of the United States Attorney for each of the District of Delaware and the Eastern District of Michigan; (vi) NHTSA; (vii) each of the Consenting OEMs; (viii) the Plan Sponsor; (ix) the Banks, and (x) any other party entitled to notice pursuant to Local Rule 9013–1(m).  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

<div align="center">

39

</div>

92.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and the Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 25, 2017
   Wilmington, Delaware

/s/ Michael J. Merchant
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

40

**<u>Exhibit A</u>**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x
                               :

In re                           :           **Chapter 11**

                                :

**TK HOLDINGS INC.**, *et al.*,     :          **Case No. 17-11375 (___)**

                                :

               **Debtors.**[1]         :          **(Jointly Administered)**

                                :

-------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), 364(a), AND 503(b) AND FED. R. BANKR. P. 6003 AND 6004 FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) PROVIDE CERTAIN POSTPETITION CLAIMS ADMINISTRATIVE EXPENSE PRIORITY, (D) CONTINUE INTERCOMPANY FUNDING OF CERTAIN NON-DEBTORS, AND (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND <u>(II) EXTENDING TIME TO COMPLY WITH REQUIREMENTS OF 11 U.S.C. § 345(b)</u>**

Upon the motion, dated June 25, 2017 (the "***Motion***"),[2] of TK Holdings Inc. and

its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"), pursuant

to sections 105(a), 345(b), 363(b), 363(c), 364(a), and 503(b) of title 11 of the United States

Code (the "***Bankruptcy Code***") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "***Bankruptcy Rules***"), (i) for authority to (a) continue operating their existing

cash management system (the "***Cash Management System***"), as described in the Motion,

including the continued maintenance of existing bank accounts (the "***Bank Accounts***") at the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

existing banks (the "***Banks***") consistent with their prepetition practices, (b) honor certain

prepetition obligations related to the Cash Management System, (c) provide certain postpetition

claims administrative expense priority, (d) continue intercompany funding of certain Non-Debtor

Affiliates (as defined herein) consistent with their prepetition practices and as described herein,

and (e) maintain existing business forms; and (ii) extending the time to comply with the

requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the

Debtors' Bank Accounts on an interim basis, and, subject to a final order, waiving such

requirements, all as more fully set forth in the Motion; and upon consideration of the Caudill

Declaration; and this Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference*

*from the United States District Court for the District of Delaware* dated February 29, 2012; and

consideration of the Motion and the requested relief being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to the parties listed therein,

and it appearing that no other or further notice need be provided; and this Court having reviewed

the Motion; and this Court having held a hearing on the Motion; and this Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid

immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy

Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in

interests; and upon all of the proceedings had before this Court and after due deliberation and

sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis as provided herein.

2.      The Debtors are authorized and empowered, pursuant to sections 363(c)(1) and 105(a) of the Bankruptcy Code, to continue the Cash Management System maintained by the Debtors before the commencement of these Chapter 11 Cases, and to collect, concentrate, and disburse cash in accordance with that Cash Management System, including, without limitation, Intercompany Transactions (subject to such changes to the Cash Management System as may be necessary, from time to time, to implement the basic purposes of the Cash Management System); provided that, there shall be no Intercompany Loans to non-debtors outside the ordinary course of business absent further order of the court.

3.      The Debtors shall maintain accurate and detailed records of all transfers, including intercompany transfers, so that all transactions may be readily ascertained, traced, recorded properly and distinguished between prepetition and postpetition transactions.

4.      The Debtors are authorized to pay all prepetition and postpetition Maquiladora Fees when due.

5.      The Debtors are authorized, but not directed, pursuant to section 503(b)(9) of the Bankruptcy Code, to satisfy, in the ordinary course of business, the prepetition Intercompany Claims of Highland Industries, Inc. for the sale of goods received by the Debtors in the twenty (20) days prior to the Petition Date; *provided*, *however*, that the prepetition amounts authorized to be paid pursuant to this paragraph shall not exceed four million five hundred thousand dollars ($4,500,000) pending entry of a final order on the Motion.

6.      The Debtors shall continue, in the ordinary course of business, to maintain all receipts and disbursements and records of all transfers within the Cash Management System

3

utilized postpetition so that all postpetition transfers and transactions will be properly documented, and accurate Intercompany Balances will be maintained.

7.      All Intercompany Claims against a Debtor by another Debtor or Non-Debtor Affiliate arising after the Petition Date as a result of Intercompany Transactions and transfers in the ordinary course of business shall be accorded administrative expense priority status in accordance with section 503(b) of the Bankruptcy Code.

8.      The Debtors are authorized to continue using, and performing their obligations under, the Corporate Credit Card Program, and all postpetition obligations of the Debtors under the Corporate Credit Card Program shall be accorded administrative expense priority status in accordance with section 503(b) of the Bankruptcy Code.

9.      TK Holdings Inc. granted a security interest to Comerica Bank ("*Comerica*") in a certain deposit account (ending in 3869-5) maintained at Comerica which has a balance of approximately $1,450,000 (the "*Pledged Comerica Account*") to secure all obligations of TK Holdings Inc. to Comerica, including without limitation obligations with respect to corporate credit cards issued by Comerica and reimbursement obligations with respect to a letter of credit issued by Comerica for the account of TK Holdings Inc.  In accordance with its agreements with Comerica, TK Holdings Inc. shall not withdraw any funds from the Pledged Comerica Account without the prior written consent of Comerica.

10.     The Debtors are authorized, but not directed, to continue the NAS Transition Services in accordance with the terms set forth in the NAS Transition Services Agreements.

11.     The Debtors are authorized to:  (i) designate, maintain and continue to use any or all of their existing Bank Accounts, including those listed on **Exhibit C** to the Motion

4

hereof, in the names and with the account numbers existing immediately prior to the Petition Date (which **Exhibit C** shall be promptly amended to identify any Bank Accounts inadvertently omitted therefrom and which **Exhibit C**, as so amended, shall be served a reasonable period of time therefrom on the U.S. Trustee and the statutory committee of creditors (if appointed)); (ii) deposit funds in and withdraw funds from such accounts by all usual means including, without limitation, checks, drafts, wire transfers, automated clearinghouse ("**ACH**") payments, and other debits; (iii) pay any Bank Fees or charges associated with the Bank Accounts; and (iv) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

12.     The Banks are authorized to charge, and the Debtors are authorized to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled in the ordinary course under the terms of and in accordance with their contractual arrangements with the Debtors (including, without limitation, any fees, costs, charges and expenses arising from any "stop payment").  The Debtors are authorized to promptly reimburse the Banks for any claims, whether arising under their contractual arrangement and account documentation with the Debtors or otherwise or prior to or after the Petition Date, in connection with any returned items to the Bank Accounts in the normal course of business.  Further, the Banks are authorized to "charge back" to the Bank Accounts any amounts incurred by the Bank resulting from returned checks or other returned items in accordance with their contractual arrangements with the Debtors, and the Debtors are authorized to pay promptly any fees and expenses owed to the Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

13.     Except as otherwise provided in this Interim Order, all Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors-in-possession without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wire transfers, ACH payments or other debits drawn on any of the Bank Accounts after the Petition Date by the holders or makers thereof, to the extent funds are available as the case may be.

14.     Any payment from a Bank Account made by any of the Banks arising from a request of the Debtors or a third-party payee in connection with an electronic transfer made prior to or on the Petition Date (including any ACH transfer such Bank is or becomes obligated to settle) shall be deemed to be paid prepetition if the funds have left the Debtors' Bank Accounts prepetition.

15.     The Debtors shall deliver stop payment orders to Banks for any checks, drafts, wires, or ACH payments that are not to be honored and Banks may honor any checks, drafts, wires, or ACH payments for which no stop payment order is delivered.  The Debtors shall pay any fees charged by Banks for the stop payment orders referenced in the preceding sentence. If the Debtors do not deliver a stop payment order to Banks with respect to any particular check, draft, wire or ACH payment, the Banks are authorized to rely upon that as a representation by Debtors that such check, draft, wire or ACH payment is authorized to be honored.  The Banks shall not be liable to any party on account of:  (a) following the Debtors' representations, instructions, or presentations as to any order of this Court (without any duty of further inquiry); (b) the honoring of any prepetition checks, drafts, wires, or ACH payments in a good faith belief or upon a representation by the Debtors that this Court has authorized such prepetition check, draft, wire, or ACH payments; (c) an innocent mistake made despite implementation of

6

reasonable handling procedures, or (d) ordinary negligence with respect to inadvertent honoring

of any prepetition checks, drafts, wires, ACH payments, or other operational processing matters.

The Debtors shall indemnify and hold harmless the Banks with respect to any claims or liabilities

arising from Banks' inadvertent honoring of any prepetition checks, drafts, wires, or ACH

payments.  Nothing in this Interim Order requires any Bank to honor any check or other item for

which such Bank is not holding good and sufficient available funds.

16.    Nothing contained herein shall prevent the Debtors from closing any Bank

Account(s) as they may deem necessary and appropriate, any relevant Bank is authorized to

honor the Debtors' requests to close such Bank Accounts, and the Debtors shall give notice of

the closure of any account to the U.S. Trustee.

17.    The Debtors are authorized to open new bank accounts; *provided*, that all

accounts opened by any of the Debtors on or after the Petition Date at any bank shall, for

purposes of this Interim Order, be deemed a Bank Account as if it had been listed on **Exhibit C**

to the Motion; *provided*, *further*, that (a) any such new Bank Account shall be opened at a bank

that has executed a Uniform Depository Agreement with the U.S. Trustee, or at a bank that is

willing to immediately execute such an agreement, and (b) such opening shall be timely

indicated on the Debtors' monthly operating report and notice of such opening shall be provided

within fifteen (15) days to the U.S. Trustee and counsel to any statutory committee appointed in

these Chapter 11 Cases.

18.    The Debtors' time to comply with section 345(b) of the Bankruptcy Code

is hereby extended for a period of thirty (30) days from the date of this Interim Order

(the "***Extension Period***"); provided, however, that such extension is without prejudice to the

7

Debtors' right to request a further extension of the Extension Period or the waiver of the requirements of section 345(b) of the Bankruptcy Code in these cases.

19.     For all Banks at which the Debtors maintain Bank Accounts that are party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of this Interim Order, the Debtors shall (i) contact each such Bank, (ii) provide each such Bank with each of the Debtor's employee identification numbers, and (iii) identify each of their Bank Accounts held at such Banks as being held by a debtor in possession in a chapter 11 case.

20.     For Banks at which the Debtors hold Bank Accounts that are not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good-faith efforts to cause such Banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within thirty (30) days of the date of this Interim Order.

21.     The Debtors are authorized to use their existing Business Forms without alteration, provided that once the Debtors' existing check stock has been used, the Debtors shall, when reordering checks, require the designation 'Debtor in Possession' and the bankruptcy case number on all checks; provided further that, with respect to checks that the Debtors or their agents print themselves, the Debtors shall print the "Debtor in Possession" legend and the bankruptcy case number on such checks.

22.     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

23.     Nothing contained in this Interim Order or in the Motion is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an

8

approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

24.     Entry of this Interim Order is necessary to avoid immediate and irreparable harm and, to the extent the relief granted herein implicates the use of property of the estate and section 363 of the Bankruptcy Code, the requirements under Bankruptcy Rule 6003(b) have been satisfied.

25.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder shall be subject to the same limitations and restrictions as are provided for in any order of this Court approving the Debtors' entry into any accommodation or similar agreements with the Consenting OEMs and granting the Consenting OEMs adequate protection in connection therewith (each a "***Adequate Protection Order***").  To the extent there is any conflict between this Interim Order and any Adequate Protection Order, the terms of such Adequate Protection Order shall control, *provided* that the Banks shall be entitled to rely on any authorization set forth in this Order without regard to the limitations or restrictions set forth in the Adequate Protection Order.

26.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

27.     The requirements of Bankruptcy Rule 6004(a) are waived.

28.     Notwithstanding the provisions of Bankruptcy Rules 4001(a)(2) and 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

29.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Interim Order.

30.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

31.     The hearing to consider entry of an order granting the relief requested in the Motion on a final basis shall be held on _____**, 2017 at __:00 _.m. (Prevailing Central Time)**; and any objections to entry of such order shall be in writing, filed with this Court, and served upon (i) counsel to the Debtors, (ii) the U.S. Trustee and (iii) counsel for any statutory committee appointed in these cases, in each case so as to be received no later than **4:00 p.m. (Prevailing Central Time) on _____, 2017**.


Dated: _____, 2017
        Wilmington, Delaware

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

RLF1 17750882V.1

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

--------------------------------------------------------x
                                         :

In re                               :          **Chapter 11**
                                           :

**TK HOLDINGS INC.,** *et al.,*          :          **Case No. 17-11375 (___)**
                                           :

               **Debtors.**[1]              :          **(Jointly Administered)**
                                           :

--------------------------------------------------------x

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), 364(a), AND 503(b) AND FED. R. BANKR. P. 6003 AND 6004 (I) AUTHORIZING DEBTORS TO (A) CONTINUE THEIR EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) PROVIDE CERTAIN POSTPETITION CLAIMS ADMINISTRATIVE EXPENSE PRIORITY, (D) CONTINUE INTERCOMPANY FUNDING OF CERTAIN NON-DEBTORS, AND (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b)**

Upon the motion, dated June 25, 2017 (the "***Motion***"),[2] of TK Holdings Inc. and

its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"), pursuant

to sections 105(a), 345(b), 363(b), 363(c), 364(a), and 503(b) of title 11 of the United States

Code (the "***Bankruptcy Code***") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "***Bankruptcy Rules***"), (i) for authority to (a) continue operating their existing

cash management system (the "***Cash Management System***"), as described in the Motion,

including the continued maintenance of existing bank accounts (the "***Bank Accounts***") at the

existing banks (the "***Banks***") consistent with their prepetition practices, (b) honor certain

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

prepetition obligations related to the Cash Management System, (c) provide certain postpetition claims administrative expense priority, (d) continue intercompany funding of certain Non-Debtor Affiliates (as defined herein) consistent with their prepetition practices and as described herein, and (e) maintain existing business forms; and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank Accounts, all as more fully set forth in the Motion; and upon consideration of the Caudill Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the parties listed therein, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing on the Motion on June 25, 2017; and this Court having granted interim relief on the Motion on June 25, 2017 [D.I.   ] ; and this Court having held a final hearing on the Motion on June 25, 2017; and all objections to the Motion having been withdrawn, resolved or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interests; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized and empowered, pursuant to sections 363(c)(1) and 105(a) of the Bankruptcy Code, to continue the Cash Management System maintained by the Debtors before the commencement of these Chapter 11 Cases, and to collect, concentrate, and disburse cash in accordance with that Cash Management System, including, without limitation, Intercompany Transactions (subject to such changes to the Cash Management System as may be necessary, from time to time, to implement the basic purposes of the Cash Management System); provided that, there shall be no Intercompany Loans to non-debtors outside the ordinary course of business absent further order of the court.

3.      The Debtors shall maintain accurate and detailed records of all transfers, including intercompany transfers, so that all transactions may be readily ascertained, traced, recorded properly and distinguished between prepetition and postpetition transactions.

4.      The Debtors are authorized to pay all prepetition and postpetition Maquiladora Fees when due.

5.      The Debtors are authorized, but not directed, pursuant to section 503(b)(9) of the Bankruptcy Code, to satisfy, in the ordinary course of business, prepetition Intercompany Claims for the sale of goods received by the Debtors in the twenty (20) days prior to the Petition Date.

6.      The Debtors shall continue, in the ordinary course of business, to maintain all receipts and disbursements and records of all transfers within the Cash Management System utilized postpetition so that all postpetition transfers and transactions will be properly documented, and accurate Intercompany Balances will be maintained.

7.      All Intercompany Claims against a Debtor by another Debtor or Non-Debtor Affiliate arising after the Petition Date as a result of Intercompany Transactions and

3

transfers in the ordinary course of business shall be accorded administrative expense priority status in accordance with section 503(b) of the Bankruptcy Code.

8.      The Debtors are authorized to continue using, and performing their obligations under, the Corporate Credit Card Program, and all postpetition obligations of the Debtors under the Corporate Credit Card Program shall be accorded administrative expense priority status in accordance with section 503(b) of the Bankruptcy Code.

9.      TK Holdings Inc. granted a security interest to Comerica Bank ("*Comerica*") in a certain deposit account (ending in 3869-5) maintained at Comerica which has a balance of approximately $1,450,000 (the "***Pledged Comerica Account***") to secure all obligations of TK Holdings Inc. to Comerica, including without limitation obligations with respect to corporate credit cards issued by Comerica and reimbursement obligations with respect to a letter of credit issued by Comerica for the account of TK Holdings Inc.  In accordance with its agreements with Comerica, TK Holdings Inc. shall not withdraw any funds from the Pledged Comerica Account without the prior written consent of Comerica.

10.      The Debtors are authorized, but not directed, to continue the NAS Transition Services in accordance with the terms set forth in the NAS Transition Services Agreements.

11.      The Debtors are authorized to:  (i) designate, maintain and continue to use any or all of their existing Bank Accounts, including those listed on **Exhibit C** to the Motion hereof, in the names and with the account numbers existing immediately prior to the Petition Date (which **Exhibit C** shall be promptly amended to identify any Bank Accounts inadvertently omitted therefrom and which **Exhibit C**, as so amended, shall be served a reasonable period of time therefrom on the U.S. Trustee and the statutory committee of creditors (if appointed));

4

(ii) deposit funds in and withdraw funds from such accounts by all usual means including, without limitation, checks, drafts, wire transfers, automated clearinghouse ("**ACH**") payments, and other debits; (iii) pay any Bank Fees or charges associated with the Bank Accounts; and (iv) treat their prepetition Bank Accounts for all purposes as debtor-in-possession accounts.

12.　　　The Banks are authorized to charge, and the Debtors are authorized to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled in the ordinary course under the terms of and in accordance with their contractual arrangements with the Debtors (including, without limitation, any fees, costs, charges and expenses arising from any "stop payment").  The Debtors are authorized to promptly reimburse the Banks for any claims, whether arising under their contractual arrangement and account documentation with the Debtors or otherwise or prior to or after the Petition Date, in connection with any returned items to the Bank Accounts in the normal course of business.  Further, the Banks are authorized to "charge back" to the Bank Accounts any amounts incurred by the Bank resulting from returned checks or other returned items in accordance with their contractual arrangements with the Debtors, and the Debtors are authorized to pay promptly any fees and expenses owed to the Banks, in each case regardless of whether such items were deposited prepetition or postpetition or relate to prepetition or postpetition items.

13.　　　Except as otherwise provided in this Order, all Banks are authorized to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors-in-possession without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wire transfers, ACH payments or other debits

drawn on any of the Bank Accounts after the Petition Date by the holders or makers thereof, to the extent funds are available as the case may be.

14.    Any payment from a Bank Account made by any of the Banks arising from a request of the Debtors or a third-party payee in connection with an electronic transfer made prior to or on the Petition Date (including any ACH transfer such Bank is or becomes obligated to settle) shall be deemed to be paid prepetition if the funds have left the Debtors' Bank Accounts prepetition.

15.    The Debtors shall deliver stop payment orders to Banks for any checks, drafts, wires, or ACH payments that are not to be honored and Banks may honor any checks, drafts, wires, or ACH payments for which no stop payment order is delivered.  The Debtors shall pay any fees charged by Banks for the stop payment orders referenced in the preceding sentence. If the Debtors do not deliver a stop payment order to Banks with respect to any particular check, draft, wire or ACH payment, the Banks are authorized to rely upon that as a representation by Debtors that such check, draft, wire or ACH payment is authorized to be honored.  The Banks shall not be liable to any party on account of:  (a) following the Debtors' representations, instructions, or presentations as to any order of this Court (without any duty of further inquiry); (b) the honoring of any prepetition checks, drafts, wires, or ACH payments in a good faith belief or upon a representation by the Debtors that this Court has authorized such prepetition check, draft, wire, or ACH payments; or (c) an innocent mistake made despite implementation of reasonable handling procedures; or (d) ordinary negligence with respect to inadvertent honoring of any prepetition checks, drafts, wires, ACH payments, or other operational processing matters. The Debtors shall indemnify and hold harmless the Banks with respect to any claims or liabilities arising from Banks' inadvertent honoring of any prepetition checks, drafts, wires, or ACH

RLF1 17750882V.1

payments.  Nothing in this Interim Order requires any Bank to honor any check or other item for which such Bank is not holding good and sufficient available funds.

16.      Nothing contained herein shall prevent the Debtors from closing any Bank Account(s) as they may deem necessary and appropriate, any relevant Bank is authorized to honor the Debtors' requests to close such Bank Accounts, and the Debtors shall give notice of the closure of any account to the U.S. Trustee.

17.      The Debtors are authorized to open new bank accounts; *provided*, that all accounts opened by any of the Debtors on or after the Petition Date at any bank shall, for purposes of this Interim Order, be deemed a Bank Account as if it had been listed on **Exhibit C** to the Motion; *provided*, *further*, that (a) any such new Bank Account shall be opened at a bank that has executed a Uniform Depository Agreement with the U.S. Trustee, or at a bank that is willing to immediately execute such an agreement, and (b) such opening shall be timely indicated on the Debtors' monthly operating report and notice of such opening shall be provided within fifteen (15) days to the U.S. Trustee and counsel to any statutory committee appointed in these Chapter 11 Cases.

18.      To the extent applicable, the deposit and bond requirements of section 345(b) of the Bankruptcy Code are hereby waived as to both the Debtors and the Banks.

19.      For all Banks at which the Debtors maintain Bank Accounts that are party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of this Final Order, the Debtors shall (i) contact each such Bank, (ii) provide each such Bank with each of the Debtor's employee identification numbers, and (iii) identify each of their Bank Accounts held at such Banks as being held by a debtor in possession in a chapter 11 case.

7

20.    For Banks at which the Debtors hold Bank Accounts that are not a party to a Uniform Depository Agreement with the U.S. Trustee, the Debtors shall use their good-faith efforts to cause such Banks to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee within thirty (30) days of the date of this Final Order.

21.    The Debtors are authorized to use their existing Business Forms without alteration, provided that once the Debtors' existing check stock has been used, the Debtors shall, when reordering checks, require the designation 'Debtor in Possession' and the bankruptcy case number on all checks; provided further that, with respect to checks that the Debtors or their agents print themselves, the Debtors shall print the "Debtor in Possession" legend and the bankruptcy case number on such checks.

22.    Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

23.    Nothing contained in this Final Order or in the Motion is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Final Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

24.    Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder shall be subject to the same limitations and restrictions as are provided for in any order of this Court approving the Debtors' entry into any accommodation or similar agreements with the Consenting OEMs and granting the Consenting OEMs adequate

8

protection in connection therewith (each a "**_Adequate Protection Order_**").  To the extent there is any conflict between this Interim Order and any Adequate Protection Order, the terms of such Adequate Protection Order shall control, _provided_ that the Banks shall be entitled to rely on any authorization set forth in this Order without regard to the limitations or restrictions set forth in the Adequate Protection Order.

25.     Notwithstanding the provision of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

26.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Final Order.

27.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

Dated: _____, 2017
         Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

9

**<u>Exhibit C</u>**

**Debtors' Bank Accounts**

**US Bank Accounts**

| # | Entity | Bank | Account Number (last 4 digits) | Currency | Type of Account | Debtor/Non-Debtor |
|---|--------|------|-------------------------------|----------|-----------------|-------------------|
| 1 | Interiors in Flight Inc. | Comerica | x6638 | USD | Concentration | Debtor |
| 2 | Takata Americas | Fifth Third | x5411 | USD | Commercial Checking | Debtor |
| 3 | Takata Protection Systems, Inc. | Comerica | x9179 | USD | Concentration | Debtor |
| 4 | Takata Protection Systems, Inc. | Comerica | x9187 | USD | Disbursement | Debtor |
| 5 | TK China, LLC | JP Morgan | x8165 | USD | Commercial Checking | Debtor |
| 6 | TK China, LLC | Sumitomo Mitsui Trust Bank | xODBU | USD | Deposit | Debtor |
| 7 | TK Finance, LLC | The Bank of Tokoyo-Mitsubishi UFJ, Ltd. | x7375 | USD | Corporate Checking | Debtor |
| 8 | TK Holdings Inc. | American Express Bank | x1226 | USD | Certificate of Deposit | Debtor |
| 9 | TK Holdings Inc. | Bank&Trust | x8831 | USD | Manager Account | Debtor |
| 10 | TK Holdings Inc. | Comerica | x8695 | USD | Certificate of Deposit | Debtor |
| 11 | TK Holdings Inc. | Comerica | x6570 | USD | Concentration | Debtor |
| 12 | TK Holdings Inc. | Comerica | x0663 | USD | Concentration | Debtor |
| 13 | TK Holdings Inc. | Comerica | x3624 | USD | Concentration | Debtor |
| 14 | TK Holdings Inc. | Comerica | x3516 | USD | Concentration | Debtor |
| 15 | TK Holdings Inc. | Comerica | x3441 | USD | Concentration | Debtor |
| 16 | TK Holdings Inc. | Comerica | x5033 | USD | Concentration | Debtor |
| 17 | TK Holdings Inc. | Comerica | x3474 | USD | Concentration | Debtor |
| 18 | TK Holdings Inc. | Comerica | x3482 | USD | Concentration | Debtor |
| 19 | TK Holdings Inc. | Comerica | x3490 | USD | Concentration | Debtor |
| 20 | TK Holdings Inc. | Comerica | x0635 | USD | Disbursement | Debtor |
| 21 | TK Holdings Inc. | Comerica | x4952 | USD | Disbursement | Debtor |
| 22 | TK Holdings Inc. | Comerica | x0643 | USD | Disbursement | Debtor |
| 23 | TK Holdings Inc. | Comerica | x4937 | USD | Disbursement | Debtor |
| 24 | TK Holdings Inc. | Comerica | x0916 | USD | Disbursement | Debtor |
| 25 | TK Holdings Inc. | Comerica | x0999 | USD | Disbursement | Debtor |
| 26 | TK Holdings Inc. | Comerica | x7001 | USD | Lockbox | Debtor |
| 27 | TK Holdings Inc. | Comerica | x9501 | USD | Lockbox | Debtor |
| 28 | TK Holdings Inc. | Comerica | x7401 | USD | Lockbox | Debtor |
| 29 | TK Holdings Inc. | Comerica | x9983 | USD | Manager Account | Debtor |
| 30 | TK Holdings Inc. | Comerica | x3213 | USD | Manager Account | Debtor |
| 31 | TK Holdings Inc. | Comerica | x5181 | USD | Manager Account | Debtor |
| 32 | TK Holdings Inc. | Comerica | x9991 | USD | Manager Account | Debtor |
| 33 | TK Holdings Inc. | Comerica | x6536 | USD | Master Account | Debtor |
| 34 | TK Holdings Inc. | Comerica | x3011 | USD | Payroll | Debtor |
| 35 | TK Holdings Inc. | Comerica | x3029 | USD | Payroll | Debtor |
| 36 | TK Holdings Inc. | Comerica | x9903 | USD | Payroll | Debtor |
| 37 | TK Holdings Inc. | Comerica | x3037 | USD | Payroll | Debtor |
| 38 | TK Holdings Inc. | Comerica | x3391 | USD | Payroll | Debtor |
| 39 | TK Holdings Inc. | Comerica | x6815 | USD | Payroll | Debtor |
| 40 | TK Holdings Inc. | Fifth Third Bank | x0353 | USD | Manager Account | Debtor |
| 41 | TK Holdings Inc. | JP Morgan | x1858 | USD | Manager Account | Debtor |
| 42 | TK Holdings Inc. | JP Morgan | x8907 | USD | Manager Account | Debtor |
| 43 | TK Holdings Inc. | Sumitomo Mitsui Bank | x3772 | USD | Concentration | Debtor |
| 44 | TK Holdings Inc. | The Bank of Tokoyo-Mitsubishi UFJ, Ltd. | x8639 | USD | Concentration | Debtor |
| 45 | TK Holdings Inc. | The Bank of Tokoyo-Mitsubishi UFJ, Ltd. | x8647 | USD | Concentration | Debtor |
| 46 | TK Holdings Inc. | Wells Fargo | x9833 | USD | Manager Account | Debtor |
| 47 | TK Holdings Inc. | Wells Fargo | x3644 | USD | Manager Account | Debtor |
| 48 | TK Mexico Inc. | Comerica | x6906 | USD | Concentration | Debtor |
| 49 | TK Mexico LLC | Comerica | x6898 | USD | Concentration | Debtor |
| 50 | ALS, Inc. | Sumitomo Mitsui Bank | x0834 | JPY | Checking | Non-Debtor |
| 51 | ALS, Inc. | Sumitomo Mitsui Bank | x2679 | JPY | Deposit - Savings | Non-Debtor |
| 52 | Highland Industries, Inc. | American Express Bank | x1218 | USD | Certificate of Deposit | Non-Debtor |
| 53 | Highland Industries, Inc. | Wells Fargo | x9965 | USD | Concentration | Non-Debtor |
| 54 | Highland Industries, Inc. | Wells Fargo | x0518 | USD | Disbursement | Non-Debtor |
| 55 | Highland Industries, Inc. | Wells Fargo | x0993 | USD | Manager Account | Non-Debtor |
| 56 | Highland Industries, Inc. | Wells Fargo | x8853 | USD | Manager Account | Non-Debtor |
| 57 | Highland Industries, Inc. | Wells Fargo | x4792 | USD | Manager Account | Non-Debtor |
| 58 | SynTec Seating Solutions LLC | Comerica | x9566 | USD | Concentration | Non-Debtor |

**Mexican Bank Accounts**

| # | Entity | Bank | Account Number (last 4 digits) | Currency | Type of Account | Debtor/Non-Debtor |
|---|--------|------|-------------------------------|----------|-----------------|-------------------|
| 1 | Industrias Irvin De Mexico, S.A. De C.V. | Banorte | x9445 | MXP | Collection | Debtor |
| 2 | Industrias Irvin De Mexico, S.A. De C.V. | Banorte | x8072 | USD | Collection | Debtor |
| 3 | Industrias Irvin De Mexico, S.A. De C.V. | Banorte | x9436 | MXP | Disbursment | Debtor |
| 4 | Industrias Irvin De Mexico, S.A. De C.V. | Banorte | x2835 | MXP | Employee savings fund | Debtor |
| 5 | Industrias Irvin De Mexico, S.A. De C.V. | Banorte | x8686 | MXP | Employee savings loans | Debtor |
| 6 | Industrias Irvin De Mexico, S.A. De C.V. | Comerica | x8066 | USD | Corporate account | Debtor |
| 7 | Strosshe Mex Sa De Cv | Banorte | x0782 | MXP | Collection | Debtor |
| 8 | Strosshe Mex Sa De Cv | Banorte | x9878 | USD | Collection | Debtor |
| 9 | Strosshe Mex Sa De Cv | Banorte | x1348 | MXP | Disbursment | Debtor |
| 10 | Strosshe Mex Sa De Cv | Banorte | x7275 | USD | Disbursment | Debtor |
| 11 | Strosshe Mex Sa De Cv | Comerica | x4390 | USD | Collection | Debtor |
| 12 | Takata De Mexico, S.A. De C.V. | Banorte | x1548 | MXP | Collection | Debtor |
| 13 | Takata De Mexico, S.A. De C.V. | Banorte | x8209 | USD | Collection | Debtor |
| 14 | Takata De Mexico, S.A. De C.V. | Banorte | x9496 | MXP | Disbursment | Debtor |
| 15 | Takata De Mexico, S.A. De C.V. | Banorte | x9836 | MXP | Disbursment | Debtor |
| 16 | Takata De Mexico, S.A. De C.V. | Banorte | x1531 | MXP | Disbursment | Debtor |
| 17 | Takata De Mexico, S.A. De C.V. | Banorte | x0448 | USD | Disbursment | Debtor |
| 18 | Takata De Mexico, S.A. De C.V. | Banorte | x0112 | USD | Disbursment | Debtor |
| 19 | Takata De Mexico, S.A. De C.V. | Banorte | x1053 | USD | Disbursment | Debtor |
| 20 | Takata De Mexico, S.A. De C.V. | Banorte | x9456 | MXP | Employee Savings fund | Debtor |
| 21 | Takata De Mexico, S.A. De C.V. | Banorte | x7624 | MXP | Saving fund disbursement | Debtor |
| 22 | Takata De Mexico, S.A. De C.V. | Banorte | x44-7 | MXP | Saving fund investment | Debtor |
| 23 | Takata De Mexico, S.A. De C.V. | Comerica | x3524 | USD | Corporate account | Debtor |
| 24 | Tk Holdings De Mexico, S De Rl De Cv | Banorte | x3525 | MXP | Master Account | Debtor |
| 25 | Tk Holdings De Mexico, S De Rl De Cv | Banorte | x8666 | USD | Master Account | Debtor |
| 26 | Tk Holdings De Mexico, S De Rl De Cv | Comerica | x7597 | USD | Corporate account | Debtor |
| 27 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x6592 | MXP | Collection | Non-Debtor |
| 28 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x3880 | USD | Collection | Non-Debtor |
| 29 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x8081 | USD | Collection | Non-Debtor |
| 30 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x2866 | MXP | Disbursment | Non-Debtor |
| 31 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x6604 | MXP | Disbursment | Non-Debtor |
| 32 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x5212 | MXP | Employee Savings fund | Non-Debtor |
| 33 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x6613 | MXP | Employee Savings fund | Non-Debtor |
| 34 | Equipo Automotriz Americana, S.A. De C.V. | Banorte | x6622 | MXP | Employee Savings loan | Non-Debtor |
| 35 | Equipo Automotriz Americana, S.A. De C.V. | Comerica | x3532 | USD | Corporate account | Non-Debtor |
| 36 | Falcomex, S.A. De C.V. | Banorte | x9931 | MXP | Collection | Non-Debtor |
| 37 | Falcomex, S.A. De C.V. | Banorte | x1287 | USD | Collection | Non-Debtor |
| 38 | Falcomex, S.A. De C.V. | Banorte | x9940 | MXP | Disbursment | Non-Debtor |
| 39 | Falcomex, S.A. De C.V. | Comerica | x8074 | USD | Corporate account | Non-Debtor |

## **Exhibit D**

**Cash Management Diagram**

Takata Americas
Cash Management Diagram



**Takata Americas**

**Takata Americas**
**Fifth Third Bank**
x5411

| Takata Holdings Inc. and Subsidiaries (See following page) | TK Finance, LLC | Takata Brazil (non-debtor entity) |

**TK Finance, LLC**
**Concentration Account**
**The Bank of Tokoyo-Mitsubishi**
x7375

**TK China, LLC**

**TK China, LLC**
**JP Morgan**
**Concentration Account**
x8165

**TK China, LLC**
**Sumitomo Mitsui Trust Bank**
**Concentration Account**
xODBU

**Key:**

| |
|---|
| Comerica Centralized Cash Management System |
| Mexico Centralized Cash Management System |
| Non-CMS Account |

# TK Holdings Inc.
## Cash Management Diagram

| RECEIPTS | | Lockbox | Collection Accounts | | | Master Concentration Account | Disbursements | Payroll | VENDOR / PAYROLL / ALL OTHER DISBURSEMENTS |
|---|---|---|---|---|---|---|---|---|---|

### Stamping & Seatbelts

- Seatbelt / Comerica / Lockbox — 267401
- Stamping / Comerica / Manager Account — x9991
- Seatbelt / JP Morgan / Manager Account — x8907
- Seatbelt / Comerica / Manager Account — x9983
- Seatbelt / Fifth Third Bank / Manager Account — x0353
- Seatbelt / Comerica / Concentration Account — x3490
- Stamping (TK Taito) / Comerica / Concentration Account — x5033
- Seatbelt / Bank & Trust Bank / Manager Account — x8831
- Seatbelt / Comerica / Concentration Account — x3490
- Stamping (TK Taito) / Comerica / Concentration Account — x5033
- Seatbelt / Comerica / Disbursement Account — x4952
- Stamping (TK Taito) / Comerica / Disbursement Account — x4937
- Seatbelt/Stamping / Comerica / Payroll Account — x3037

### Airbags

- Airbag/Restraints / Comerica / Lockbox — 267001
- Airbag/Restraints / Comerica / Concentration Account — x3474
- Airbag/Restraints / Comerica / Concentration Account — x3474
- Airbag/Restraints / Comerica / Disbursement Account — x0635
- Airbag/Restraints / Comerica / Payroll Account — x9903

### Inflators

- Inflators / The Bank of Tokoyo-Mitsubishi / Concentration Account — x8639
- Inflators / JP Morgan / Manager Account — x1858
- Inflators / Comerica / Concentration Account — x3482
- Inflators / Comerica / Concentration Account — x3482
- Inflators / Comerica / Disbursement Account — x0643
- Inflators / Comerica / Payroll Account — x3011

### Electronics

- Electronics / Comerica / Lockbox — 269501
- Electronics / Comerica / Concentration Account — x3516
- Electronics / Comerica / Concentration Account — x3516
- Electronics / Comerica / Disbursement Account — x0999
- Electronics / Comerica / Payroll Account — x3029

**Master Concentration Account:** TK Holdings Inc. / Comerica / Master Account [1] — x6536

### SG&A

- SG&A / Wells Fargo / Manager Account — x9833
- SG&A / The Bank of Tokoyo-Mitsubishi / Concentration Account — x8647
- SG&A / American Express Bank / CD Account — x1226
- SG&A / Comerica / CD Account — x8695
- SG&A / Sumitomo Mitsui Bank / Concentration Account — x3772
- SG&A / Wells Fargo / Manager Account — x3644
- SG&A / Comerica / Manager Account — x5181
- SG&A / Comerica / Concentration Account — x3441
- SG&A / Comerica / Manager Account — x3213
- SG&A / Comerica / Concentration Account — x6570
- SG&A / Comerica / Concentration Account — x3441
- SG&A / Comerica / Disbursement Account — x0916
- SG&A / Comerica / Payroll Account — x3391
- SG&A / Comerica / Payroll Tax Account — x6815

### Executive

- Executive / Comerica / Concentration Account — x3624
- Executive / Comerica / Concentration Account — x3624

### ALS

- ALS / Sumitomo Mitsui Bank / Checking Account — x0834
- ALS / Sumitomo Mitsui Bank / Deposit Account — x2679

### Non-Automotive Safety Corp.

- NAS / Comerica / Concentration Account — x0663
- NAS / Comerica / Concentration Account — x0633

### TK Mexico Inc.

- Takata Mexico Inc. / Comerica / Concentration Account (USD) — x6906

### TK Mexico LLC

- TK Mexico LLC / Comerica / Concentration Account (USD) — x6898

*Automatic cash sweep*

**Key:**

| | |
|---|---|
| Comerica Centralized Cash Management System | |
| Mexico Centralized Cash Management System | |
| Non-CMS Account | |

[1] All accounts are manually swept to Master Account, unless otherwise noted

# Non-Automotive Safety Group
# Cash Management Diagram

[(1)] *All accounts are manually swept to Master Account, unless otherwise noted*



Mexico Subsidiary
Cash Management Diagram



**Key:**

| |
|---|
| Comerica Centralized Cash Management System |
| Mexico Centralized Cash Management System |
| Non-CMS Account |

Mexico Employee Accounts
Cash Management Diagram

