## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                      :
In re                                 :     Chapter 11
                                      :
TK HOLDINGS INC., et al.,             :     Case No. 17-11375 (___)
                                      :
            Debtors.¹                 :     Joint Administration Requested
                                      :
-------------------------------------------------------x
```

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b)(9) FOR INTERIM AND FINAL AUTHORITY TO PAY PREPETITION OBLIGATIONS OWED TO CERTAIN CRITICAL VENDORS

TK Holdings Inc. ("**TKH**") and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### Relief Requested

1.      By this Motion, pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors request authority to pay the prepetition claims (the "**Critical Vendor Claim**s") of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to maintaining the going concern value of the Debtors' businesses (the "**Critical Vendors**").

2.      The Debtors are requesting critical vendor relief similar to that received by other distressed automotive suppliers and other companies heavily reliant on supply chain

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

continuity to preserve their viability as a going-concern enterprise.  As a major Tier One supplier

to the largest automotive manufacturers in the world, the Debtors rely heavily on the Critical

Vendors to provide them with the specialized and unique parts, materials, and services necessary

to manufacture the seat belts, airbags, and other critical safety and non-safety components and

parts that the Debtors produce for original equipment manufacturers (the "***OEMs***" or the

"***Customers***").  As described in further detail below, the Debtors have put into place detailed

procedures for identifying and selecting Critical Vendors and ensuring that only Critical Vendors

will be paid pursuant to this Motion on account of their prepetition claims.  The Debtors are not

seeking to pay all prepetition claims of the Critical Vendors, but rather to pay such undisputed

amounts in the ordinary course of the Debtors' businesses and on terms consistent with the

Debtors' prepetition practices.  Accordingly, payments to the Critical Vendors will be contingent

on their agreement to continue to sell goods or provide services to the Debtors on terms at least

as favorable as those in effect before the Petition Date (as defined herein).

   3.  As of the Petition Date, the Debtors estimate that they owe approximately

$47,440,000 for Critical Vendor Claims, of which approximately $35,580,000 will come due in

the first thirty (30) days of the Chapter 11 Cases.  A chart outlining the various categories and

approximate amounts of the Critical Vendor Claims that the Debtors are seeking authority to pay

pursuant to this Motion, including those Critical Vendor Claims that would be entitled to

administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, is set forth

below.

RLF1 17750887V.1

| Category of Critical Vendor Claims | Amount Seeking Authority to Pay on Interim Basis | Amount Seeking Authority to Pay on Final Basis |
|---|---|---|
| *Production Material Suppliers* | | |
| • Component Parts Suppliers: | $30,397,500 | $40,530,000 |
| • Raw Material and Other Production Suppliers: | $1,627,500 | $2,170,000 |
| *MRO Providers* | | |
| • Essential Operational Service Providers: | $735,000 | $980,000 |
| • Dedicated Third-Party Logistic Providers: | $2,820,000 | $3,760,000 |
| Critical Vendor Claims Entitled to 503(b)(9) Administrative Expense Priority (total from each Critical Vendor Claim category above): | $16,785,000 | $22,380,000 |
| **Total Critical Vendor Claims:** | **$35,580,000** | **$47,440,000** |

4.      Concurrently herewith, the Debtors have filed a separate motion seeking authority to pay, among other things, the prepetition claims of certain foreign vendors and suppliers and certain third party shippers, warehousemen, vendors and other service providers that could potentially assert liens against the Debtors' property on account of their prepetition claims (the "***Foreign Vendors and Lien Claimants Motion***" and, together with this Motion, the "***Vendor Motions***").[2]  In support of the Vendor Motions, the Debtors submit the Declaration of Scott Simpton (the "***Simpton Declaration***"), the Debtors' Vice President of Supply Chain Management, which has been filed contemporaneously herewith.

5.      Proposed forms of order granting the relief requested herein on an interim basis and a final basis are annexed hereto as **Exhibit A** (the "***Proposed Interim Order***") and **Exhibit B** (the "***Proposed Final Order***"), respectively.

---

[2] Although the Debtors have endeavored to provide accurate figures and calculations herein, there may, in some instances, be overlap between the amounts sought to be expended herein and the Foreign Vendors and Lien Claimants Motion.

## Jurisdiction

6.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

7.      On the date hereof (the "***Petition Date***"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8.      In coordination with the commencement of the Chapter 11 Cases, contemporaneously to the date hereof, Takata Corporation, the Debtors' ultimate corporate parent ("***TKJP***" and, together with its direct and indirect global subsidiaries, including TKH, "***Takata***"), together with Takata Kyushi K.K. and Takata Service Corporation, commenced civil rehabilitation proceedings under the Civil Rehabilitation Act of Japan in the 20th Department of the Civil Division of the Tokyo District Court.

9.     Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the declaration of Scott E. Caudill, the Executive Vice President and Chief Operating Officer for TKH, filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "***Caudill Declaration***").[3]

## The Debtors' Business Model and Supply Chain

10.     The Debtors and their non-debtor affiliates are a leading global developer and manufacturer of automotive safety and non-safety systems, including airbag systems, seat belts, steering wheels, child seats, and electronic devices such as satellite sensors and electronic control units.  As is commonplace throughout the automotive industry, the Debtors' businesses function under a tiered supply chain structure.  The Debtors produce the specialized component parts, service parts, and assembled goods utilized and incorporated by their Customers into their platforms and vehicles.  In this regard, the automotive manufacturing industry necessarily has a customer base that demands highly specific and customized products.  The Debtors' constant pursuit of the development of proprietary automotive safety products and position as a leader in the research and development for the automotive safety industry affords them a unique position from which they are able to respond quickly to their Customers' requests for design reviews, product testing, and prototypes.

11.     As a Tier One supplier, the OEMs rely on the Debtors to provide a constant and steady supply of component goods and would be severely impacted if the Debtors were forced to suddenly cease producing such components for any reason.  This is especially true with respect to the ongoing recalls and the need to continuously manufacture and supply the

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Caudill Declaration.

OEMs with replacement kits.  The Debtors are often the sole manufacturer of certain essential

component parts and vehicle systems utilized by their Customers.  Additionally, the Debtors'

products are designed, tested, and specifically qualified for particular applications.  Typically, a

Customer will engage with the Debtors to supply a specific product or system for a particular

vehicle model or platform being built by the Customer.  As a result of this customization, the

parts produced by the Debtors are often the end result of a lengthy and intensive development,

testing, and manufacturing process.

    12.    If outside suppliers are needed, after conducting a rigorous selection

process, the Debtors will often do business with one vendor for a particular component part and

rely on that vendor as their sole source supplier (*i.e.*, the only supply source for certain complex

parts and specifically designed systems necessary to the Debtors' production process).  Sole

sourcing is driven by a rigorous certification process that the Debtors and their suppliers must

undertake for a significant portion of the parts integrated into the products shipped to their

Customers and, ultimately, incorporated into a completed vehicle.  The parts sold to the Debtors,

therefore, are often custom designed months or years in advance of production and built to fit the

Debtors' and the OEMs' specified needs.  Using sole source suppliers allows the Debtors to

reduce the costs of product start-up, tooling,[4] capital investment, and validation, which are

necessary to make each part and to achieve consistent quality.  Sole sourcing is a normal practice

in the automotive industry and is required to remain cost-competitive.  Additionally, a number of

---

[4] In the ordinary course of their businesses, the Debtors must acquire the manufacturing components and machines needed for production of the parts and components they provide to the OEMs, which often includes unique tooling such as specific fixtures, jigs, gauges, molds, dies, cutting equipment, and patterns.  Accordingly, in the ordinary course of business, the Debtors acquire specialized tools and equipment on behalf of many of their Customers, though in many instances the Customers may own the tooling equipment and use the Debtors to subcontract the tool production work.

6

the Debtors' suppliers are "directed-buy" suppliers, which makes them equally as difficult to replace.

13.    Accordingly, the parts produced by the Debtors and the constituent components of these parts must meet demanding specifications mandated both by the Debtors and the Customers, as well as federally mandated safety standards, before they can be used in the Debtors' manufacturing process.  Due to these extensive design, development, and certification requirements, the process by which the Debtors and the OEMs select and certify a new supplier and a new program can take approximately eighteen to twenty-four months.  Any attempt by the Debtors to re-source a product or shift business to a different vendor after production is commenced would result in the loss of the Debtors' certification for that component part.  The Debtors would then be required to implement a de-sourcing process, including the "Production Part Approval Process," necessary for certain automotive parts to be approved for production. This requalification process can take approximately four to six months for standard products and up to eighteen months for highly engineered products.  Even if the Debtors were able to re-source a part, the process of seeking out an alternative supplier, transferring tooling from the old supplier to the new supplier, and renegotiating purchase orders would create an expensive and time-consuming burden for the Debtors.  Additionally, to operate their businesses, the Debtors and their Customers rely, in many instances, on a daily or weekly "just-in-time" inventory supply system, making the Debtors highly dependent on the inventory supplied by the Critical Vendors to meet the OEMs' needs for production.  The Critical Vendors have developed certain capabilities and expertise specific to the Debtors' needs that cannot be easily replaced, if at all, and would be lost if the Debtors were forced to seek similar services elsewhere.  Further, many of the Critical Vendors rely on the Debtors' continued payments for goods and services simply to

7

stay in business and would be unable to do so unless the Debtors satisfied all or part of their prepetition invoices.

14.     In order for the Debtors to continue timely producing and supplying the OEMs with components, the Debtors will need to continue purchasing goods and services from the Critical Vendors.  Any delay or disruption in the flow of critical goods and services to the Debtors would materially impact the Debtors' ability to supply parts to the OEMs, including, without limitation, replacement kits for recalled non-desiccated PSAN Inflators.

<u>**The Debtors' Critical Vendors**</u>

15.     The Critical Vendors generally fall into two main categories: (i) production material suppliers, which supply the Debtors with, among other things, component parts and raw materials utilized in the chain of production and specialized tools that are integral to the Debtors' manufacturing processes ("***Production Material Suppliers***"), and (ii) maintenance, repair, and operations providers, which provide the Debtors with, among other things, equipment and materials relating to the Debtors' specialized manufacturing equipment and machinery, as well as freight logistics services ("***MRO Providers***").  Each of these subcategories of Critical Vendors is discussed in further detail below.

**A.     Production Material Suppliers**

a)  <u>Component Parts Suppliers and Tool Makers</u>.  To meet production requirements and demand, the Debtors utilize a number of lower-tiered component parts providers, a large portion of which are sole source suppliers.  Certain of the sole source component suppliers are also "directed-buy suppliers" where the Debtors are directed by their Customers to utilize the components of a specific sub-supplier.  The Debtors often do business with a large number of these component parts suppliers for the production of specialized tools, moldings, fixtures, and special machines necessary for the production of the Debtors' various

8

products.  Accordingly, at any given time, a number of component parts suppliers may be in the process of producing both parts and tools that the Debtors will need to continue existing lines of business or to launch new production programs.  Many of these component parts suppliers have demanded that the Debtors satisfy their prepetition obligations as a condition to continuing performance on a postpetition basis.  Indeed, certain of the component parts suppliers have already refused to deliver parts and new tooling to the Debtors or to return tooling that they are servicing absent payment of their outstanding invoices and modifications to their ongoing payment terms.[5]  As discussed above, a significant amount of the component parts and tools supplied by the Critical Vendors require substantial lead time to develop.  Because a portion of the Debtors' business is positioned in a "just-in-time" nature, delay or stoppage in shipment may significantly delay, or even halt, an entire production line.  Finding replacements parts and tooling that meet both the Debtors' and the OEMs' specifications in a timely and cost-effective manner is virtually impossible and simply not an option for the Debtors given the critical and ongoing need for the Debtors' production of replacement kits for recalled non-desiccated PSAN Inflators.

　　　　　b)  <u>Raw Materials and Other Production Suppliers</u>.  In the ordinary course of their businesses, the Debtors also utilize a number of production suppliers and rely on the timely delivery of materials, including raw materials and certain chemical compounds, which are necessary to fulfill Customer demands.  Many of these suppliers provide specialty materials

---

[5] Many states, including Michigan, have legislatively granted Tool Makers security interests in finished or unfinished tools. *See, e.g.* Mich. Comp. Laws §§ 5790.541 *et seq.* (defining "special tool" for which a statutory lien is granted as "tools, dies, jigs, gauges, gauging fixtures, special machinery, cutting tools, or metal castings manufactured by a special tool builder" and "special tool builder" as "a person who designs, develops, manufactures, or assembles special tools for sale").  These statutory liens often allow such parties to retain possession of the tools, or impair title of the tool by filing a security interest, until the debtor satisfies the outstanding amounts owed.  Arguably, these statutory liens may also be unaffected by the automatic stay under section 362 of the Bankruptcy Code.

utilized in the production process that cannot be easily replaced and are sole source providers. Additionally, if any of the raw material vendors refused to deliver without prepetition payment, the Debtors would be forced to purchase necessary raw materials, including rubber, plastic, magnesium, steel, silicone, and wood, on the spot market. The Debtors believe that the price differential between raw materials procured from suppliers with whom the Debtors have a long standing relationship and receive favorable pricing and raw materials procured on the spot market could create an increase in operating costs that would detrimentally effect the Debtors' operations. Further, if the Debtors are forced to procure raw materials on the spot market, they would be subject to product availability risks and the validation processes required by their Customers.

### B.  MRO Providers

a)  <u>Essential Operational Service Providers</u>.  The Debtors rely on certain service providers to assist with some of their most critical business functions, such as equipment maintenance, information technology work, and work pertaining to their crash and other testing simulation software. Demand for these particular services is high and the availability of qualified personnel is often extremely limited. If the Debtors were required to suddenly change service providers, it would likely require a significant amount of time, capital, and other resources to locate qualified replacements, to the extent such replacements exist.

b)  <u>Dedicated Third-Party Logistic Providers.</u>  The Debtors employ the services of certain third-party logistics providers that provide a range of supply chain services, including highly engineered solutions and high-value-add contract logistics, to the Debtors. The logistics providers arrange for the transportation and delivery of goods from the Debtors' manufacturing facilities to the OEMs and from the Debtors' suppliers to the Debtors' facilities.

10

During the twelve (12) months prior to the Petition Date, approximately 68% of the Debtors' freight logistics costs were incurred by, and paid to, XPO Logistics, Inc. ("***XPO***").  With respect to the freight carriers and transportation service providers that the Debtors do not contract with directly, the Debtors remit payment to XPO and XPO subsequently pays the freight carriers. Accordingly, if XPO's invoices remain unpaid, there is a risk that the freight carriers' invoices will not be paid.  In such an event, the freight carriers may try to assert possessory liens for transportation or storage costs and may refuse to deliver or release goods in their possession until their claims are satisfied, notwithstanding that the Debtors do not contract with them directly. Further, XPO serves the Debtors' businesses with dedicated personnel and equipment physically located at the Debtors' San Antonio facility in two capacities.  First, XPO runs a call center on site at the San Antonio facility staffed with approximately twelve employees to track inflator return inventory at dealerships across the country.  Second, XPO has dedicated approximately twelve employees for its logistics coordination services, which are run out of the San Antonio facility.  XPO is, therefore, highly integrated into the Debtors' business operations, manufacturing processes, and delivery schedules and is familiar with the OEMs.  Absent the continued services provided by XPO, the Debtors would risk disruption in their supply and delivery chain and would be unable to transport their products in a timely and cost-effective manner.

16.     As discussed herein, the Critical Vendors are so essential to the Debtors' supply chain that the lack of any of their particular goods or services, even for a short duration, would disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses and their ability to supply replacement kits and to otherwise comply with their ongoing recall obligations.

RLF1 17750887V.1

### Identification of the Critical Vendors

17.     As is typical in distressed situations, vendors have been increasingly unwilling to extend trade credit to the Debtors.  Anticipating this situation, the Debtors, with the assistance of their advisors, spent significant time prior to the Petition Date reviewing and analyzing their books and records, open accounts payable systems, and prepetition vendor lists to identify those vendors and suppliers that are in fact critical to the Debtors' operations, the loss of which could materially harm the Debtors' businesses or impair going-concern viability.  Through this process, the Debtors considered the following criteria: (i) whether the suppliers are sole source or limited source suppliers, (ii) the potential disruption or lost revenues suffered while a new supplier is resourced, (iii) whether quality control or other OEM requirements prevent the Debtors from replacing the vendor, (iv) whether a supplier is a "directed-buy supplier" where the Debtors are required by their Customers to utilize the component parts of such supplier, (v) whether the vendor supplies the Debtors with highly engineered component parts that require substantial lead time to develop and the Debtors' ability to find alternative sources of supply, (vi) whether the Debtors currently receive advantageous pricing or other terms from a vendor, (vii) whether the vendor might face its own liquidity crisis, due to such vendor's operational or cash flow issues, if the Debtors do not promptly pay such vendor's prepetition claims, (viii) whether the vendor has a long-term supply contract with the Debtors, (ix) which suppliers would be prohibitively expensive to replace, and (x) whether the vendor might be able to obtain (or has obtained) mechanics liens, possessory liens, shippers liens, or similar state law trade liens on property necessary for the Debtors' ongoing operations.

18.     After evaluating the information relevant to the above criteria, the Debtors have and, upon approval of the Court, will continue to designate, in their discretion, certain vendors as critical to the Debtors' operations.  To do so, the Debtors have designated a

centralized, high-level team (collectively, the "***Vendor Contingency Team***") to review, assess, and authorize payment to a Critical Vendor.  The Debtors and their advisors began to implement a detailed protocol (the "***Payment Protocol***") to route all requests for Critical Vendor treatment through the Vendor Contingency Team and to educate lower-level procurement, payables, and operations personnel on the process.

19.     The Debtors then estimated the amount they believe they may be required to pay for prepetition obligations to ensure the continued supply of critical goods and services. The Debtors estimate that the aggregate amount owed to Critical Vendors for goods delivered or services provided during the period before the Petition Date is approximately $47,440,000 (the "***Critical Vendor Cap***").[6]  Of this amount, the Debtors are requesting authority to pay approximately $35,580,000 of Critical Vendor Claims on an interim basis.

## Proposed Conditions to Receiving Payment

**A.     The Debtors' Payment Protocol**

20.     To minimize the amount of payments required, the Debtors will utilize the Payment Protocol annexed hereto as **Exhibit C** to identify particular Critical Vendors and pay Critical Vendor Claims.  The Debtors' Payment Protocol can be generally summarized as follows:

> i.     All aspects of any proposed payment to a Critical Vendor will be scrutinized for, among other things, the amount of payment at issue, the terms offered by the particular vendor, and the business need for the goods or services at issue.
>
> ii.     Requests for Critical Vendor treatment, or suppliers refusing shipment due to non-payment of prepetition claims, will first be received by members of the Debtors' purchasing team and forwarded to the appropriate employee based on the payment thresholds listed in paragraph (iii) below.  In certain

---

[6] The Critical Vendor Cap does not include any amounts owed for prepetition claims that the Debtors are seeking authority to pay pursuant to the Foreign Vendors and Lien Claimants Motion.

circumstances, requests for Critical Vendor treatment may be forwarded to the Debtors' Vice President of Supply Chain Management, who will determine whether the requests should be escalated and routed to the Vendor Contingency Team, which includes professionals from the Debtors' financial advisors and restructuring counsel, for review.

iii.     Material business terms (including proposed payments) require approval by (i) specifically-designated buyers, for proposed payments under $5,000, (ii) specifically-designated directors, for proposed payments of $5,000 up to $25,000, (iii) the Debtors' Vice President of Supply Chain Management, for proposed payments of $25,000 up to $150,000, and (iv) the Debtors' Chief Financial Officer, for proposed payments over $150,000.

iv.     Unless otherwise agreed by the Debtors' Vice President of Supply Chain Management or the Vendor Contingency Team, all proposed payments must be documented pursuant to an executed Vendor Agreement (as defined herein).

v.     Payment may be executed by specifically-designated members of the Debtors' finance department when the Payment Protocol has been completed and upon presentation of completed documentation.

21.     Although the Debtors have effectively "pre-screened" certain vendors who have satisfied the criteria for Critical Vendor treatment, the Debtors are keenly aware they must be prepared to address new or additional exigencies should they emerge, particularly in light of the size and scope of the Debtors' operations.  Thus, the Debtors' Payment Protocol includes specific processes by which vendors may be designated as "Critical Vendors" on a case-by-case basis.  This process will also be routed through the Debtors' Vendor Contingency Team, with executive level of approvals required for such Critical Vendors to receive payment on account of a prepetition claim.

**B.     Vendor Agreements**

22.     The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to supply goods and services to the Debtors (i) on the normal and customary trade terms, practices, and programs (including credit limits,

14

pricing rebates, cash discounts, timing of payments, coupon reconciliation, and other applicable terms and programs) that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors within the twenty-four (24) month period prior to the Petition Date  (the "***Customary Trade Terms***") or (ii) such other trade terms as agreed to by the Debtors and a Critical Vendor.  If the Debtors are unable to negotiate continued supply upon Customary Trade Terms, the Debtors seek authority, based on their business judgment, to pay Critical Vendors all or a portion of their Critical Vendor Claim in return for the continued supply of critical goods and supplies.

23.     To ensure that Critical Vendors continue business with the Debtors on Customary Trade Terms or on such other trade terms as agreed to by the Debtors and a Critical Vendor, the Debtors propose (i) that a letter substantially in the form of the letter attached hereto **Exhibit D** (the "***Vendor Agreement***") be delivered to, and executed by, the Critical Vendors, along with a copy of the order granting the relief requested herein and (ii) that payment of Critical Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the order of the United States Bankruptcy Court for the District of Delaware, dated _____, 2017, in the chapter 11 cases of TK Holdings, Inc., *et al*. (Case No. 17-_____(__)), authorizing the Debtors to pay prepetition obligations of critical vendors.

24.     If a Critical Vendor refuses to continue to supply goods or services to the Debtors on the Customary Trade Terms or such other trade terms as individually agreed to by the Debtors and such Critical Vendor, then the Debtors reserve their rights to and may seek approval from this Court to (i) deem such payment to apply to postpetition amounts payable to such Critical Vendor, if applicable, or (ii) take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owing to such Critical

Vendor.  The Critical Vendor Claim shall then be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Vendor Claim had not been made

25.     Some of the Critical Vendors may also possess mechanics' liens, possessory liens, or similar state law trade liens (the "***Trade Liens***") on the Debtors' assets based upon the claims held by those Critical Vendors.  As a further condition of receiving payment of a Critical Vendor Claim, the Debtors propose that a Critical Vendor must agree to take whatever action is necessary to remove the Trade Lien at the Critical Vendor's sole expense.

26.     Finally, the Debtors propose to maintain a matrix summarizing (i) the name of each Critical Vendor paid, (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim, and (iii) the type of goods or services provided by that Critical Vendor. This matrix will be provided, upon request, to the Office of the United States Trustee for the District of Delaware and the professionals retained by any official committee of unsecured creditors appointed in these Chapter 11 Cases; *provided*, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including any member of such statutory committee of creditors, without prior written consent of the Debtors.

**<u>Basis for Relief Requested</u>**

27.     Pursuant to this Motion, the Debtors seek authority to pay the prepetition claims of certain vendors that are critical to preserving the value of the Debtors' businesses and viability as a going-concern enterprise in an aggregate amount not to exceed the Critical Vendor Cap.  As discussed herein, the Critical Vendors cannot be timely or efficiently replaced given the highly-specialized nature of the component parts and services they provide.  Accordingly, the

16

Debtors respectfully request that the Court authorize the relief requested herein pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code.

**A.    Payment of the Critical Vendor Claims is Warranted Under Sections 363(b) and 105(a) of the Bankruptcy Code.**

28.    Courts may authorize debtors to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Specifically, section 363(b)(1) of the Bankruptcy Code authorizes courts, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of assets outside the ordinary course of business, courts require only that a debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). If a debtor articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).

29.    Courts have properly relied on section 363(b) of the Bankruptcy Code to authorize debtors to pay prepetition claims of critical vendors in circumstances where, as here, the estate will obtain more value for all creditors by making the prepetition payments. *See, e.g., In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) (authorizing debtor to pay, pursuant to 363(b), certain vendors' prepetition claims where the payments were "necessary" and "appropriate" to debtor's reorganization).

30.    Additionally, the Court may authorize the Debtors to pay any prepetition amounts that may be owed to the Critical Vendors pursuant to section 105(a) of the Bankruptcy

17

Code, which provides that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court may exercise its broad grant of equitable powers to permit the payment of prepetition obligations when such payment is essential to the continued operation of a debtor's business. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (holding that a court may authorize the payment of prepetition claims prior to the confirmation of a reorganization plan pursuant to the doctrine of necessity). Courts have consistently permitted the postpetition payment of prepetition obligations "where the payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code." *In re Sharon Steel Corp.*, 159 B.R. 730, 736 (Bankr. W.D. Penn. 1993); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of the debtor); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition claims and explaining that the "ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"). The rationale for making payments to prepetition creditors under the doctrine of necessity is consistent with chapter 11's paramount rehabilitative goals. *Ionosphere Clubs*, 98 B.R. at 176.

31.     As noted herein and in the Simpton Declaration, maintaining the goods and services provided by the Critical Vendors is essential to ensuring a stable and continuous supply of replacement kits and to removing recalled non-desiccated PSAN Inflators from circulation as quickly as possible to minimize public risk.  Additionally, maintaining a stable source of supply and good relationships with the supply base is vital to the Debtors' ability to ensure continuity of supply to the OEMs and to consummate a going-concern sale transaction to the Plan Sponsor for the benefit of all stakeholders.  The Debtors operate in the highly competitive automotive industry where their products are specifically tailored to each Customer's specifications.  Given the customized nature of their businesses and the demonstrated benefits to be obtained in exchange for any payments to the Critical Vendors, the Debtors submit that the expenditure of estate funds proposed herein is minimal when compared to the value of their enterprise at risk.  Given that the Debtors and their advisors have developed a rigorous process to ensure that payments are made only to those vendors that are truly critical, the relief requested herein represents a prudent course of action to ensure the success of these Chapter 11 Cases.

32.     As set forth in the Simpton Declaration, as of the Petition Date, the Debtors have been forced, based on threats of non-shipment, to accelerate payment terms with more than 145 of their vendors and suppliers, which represents approximately $46,000,000 negative cash impact on the Debtors' cash and liquidity.  This includes a diminishment to the Debtors' cash position by approximately $31,200,000 in the past twelve (12) months.  These threats will inevitably increase with news of the commencement of these Chapter 11 Cases.  Accordingly, the Debtors believe, based on their experience, that some of the vendors they deem to be critical to their operations will demand that the Debtors satisfy their prepetition obligations

19

as a condition to doing business on a go-forward basis as a result of the commencement of these

Chapter 11 Cases.  Because many of the Debtors' component part suppliers are sole source or

"directed-buy" suppliers, replacing these suppliers is not feasible, not allowed, or would require

significant time and resources that could be expended elsewhere.  Failure to pay certain of these

vendors would severely inhibit the Debtors' ability to acquire necessary materials and parts for

their operations and would interrupt a production line.  If the Debtors are forced to shut down an

assembly line, the OEMs may have no choice but to look for new suppliers, which would cause

irreparable financial harm to the Debtors, the OEMs, and all other parties in interest and would

dramatically increase possible damage claims against the Debtors' estates.

        33.      There is a significant risk that the Critical Vendors will cease doing

business with the Debtors unless their Critical Vendor Claims are paid.  Any disruption to the

Debtors' supply will have disastrous effects on the Debtors' ability to consummate a sale.  If any

Critical Vendor stops supplying goods or services to the Debtors, the Debtors may be unable to

meet the production demands of the OEMs which, in turn, could result in an event of default

under the contemplated Global Accommodation Agreement.  Upon the occurrence of an event of

default, as currently contemplated under the Global Accommodation Agreement, an impacted

OEM would be permitted to resource its component parts or programs currently on contract with

the Debtors, which would adversely affect the value of the Debtors' businesses and threaten a

going-concern sale transaction to the Plan Sponsor.  Accordingly, allowing the Debtors to pay

certain prepetition claims of the Critical Vendors, in exchange for favorable credit terms, will

serve the purposes of facilitating the Debtors' sale efforts and will not impair the Debtors' other

creditors.  The relief requested herein may also help avoid the institution and prosecution of

numerous reclamation claims, suits, and motions by the Critical Vendors that would disrupt and distract from the Debtors' efforts to maximize the value of these estates.

**B.    Certain of the Critical Vendor Claims are Entitled to Administrative Priority Treatment Under Section 503(b)(9) of the Bankruptcy Code.**

34.    Section 503(b)(9) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). The Debtors will be required to pay in full all claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code to confirm any chapter 11 plan filed in these cases. *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority).

35.    Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a need to do so. *See In re Global Home Prods.*, LLC, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that administrative expense claim is left to the discretion of the Court."). Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if it chooses to do so, or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan. *See In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").

36.    Due to the nature of the Debtors' businesses, certain of the Critical Vendors that the Debtors seek authority to pay delivered raw materials, equipment, supplies, and other goods in the ordinary course to the Debtors within the twenty (20) days prior to the Petition Date.  As set forth above, the Debtors estimate that approximately $22,380,000 owed to Critical Vendors, representing approximately 47% of the total amount of Critical Vendor Claims, is on account of goods that were received during the twenty (20) day period before the Petition Date, and therefore, may be afforded administrative priority.  Payment to any Critical Vendor on account of such deliveries at the onset of these Chapter 11 Cases merely accelerates the timing of payment and not the ultimate treatment of such claims.  Accordingly, the Debtors would have to pay the Critical Vendor Claims in full, to the extent they fall within the scope of section 503(b)(9) of the Bankruptcy Code, regardless of the timing of such payment.  Therefore, the Debtors are only requesting authority to pay approximately $25,060,000 on account of Critical Vendor Claims that would not otherwise be entitled to priority of payment and payment in full under the Bankruptcy Code.

37.    For the foregoing reasons, payment of the Critical Vendor Claims is a sound exercise of the Debtors' business judgment, is necessary to avoid irreparable harm to the Debtors' estates in connection with the Debtors' sale process, is in the best interests of the Debtors and their respective estates and creditors, and is warranted under the circumstances.

**Applicable Banks Should be Authorized to Receive, Process, Honor, and
Pay Checks Issued and Transfers Requested to Pay the Critical Vendor Claims**

38.    The Debtors further request that the Court authorize, but not direct, applicable banks and financial institutions to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.  The Debtors

22

also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic fund transfers in replacement of any checks or transfer requests on account of any prepetition Critical Vendor Claims dishonored or rejected as a result of these Chapter 11 Cases.

### Reservation of Rights

39.     Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Bankruptcy Rule 6003 Has Been Satisfied

40.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Based on their experience and numerous prepetition threats of non-shipment, the Debtors believe that some of the Critical Vendors will demand that the Debtors satisfy their prepetition obligations as a condition to doing business on a go-forward basis as a result of the commencement of these Chapter 11 Cases.  The Critical Vendors are an integral part of the Debtors' businesses and failure to pay the Critical Vendors could subject the Debtors to a potential cessation of operations to the detriment of all parties in interest. Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

## **Request for Bankruptcy Rule 6004 Waivers**

41.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the Caudill Declaration and the Simpton Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## **Notice**

42.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware (Attn: David Buchbinder, Esq. and Jane Leamy, Esq.); (ii)  the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Offices of the United States Attorney for each of the District of Delaware and the Eastern District of Michigan; (vi) NHTSA; (vii) each of the Consenting OEMs; (viii) the Plan Sponsor; and (ix) any other party entitled to notice pursuant to Local Rule 9013–1(m).  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

43.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

RLF1 17750887V.1

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and the Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 25, 2017
      Wilmington, Delaware

*/s/ Michael J. Merchant*

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

25

## Exhibit A

## Proposed Interim Order

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                                      :

In re                              :           **Chapter 11**
                                        :

**TK HOLDINGS INC.**, *et al.*,       :           **Case No. 17-11375 (___)**
                                          :

               **Debtors.**[1]          :           **(Jointly Administered)**
                                          :

-------------------------------------------------------x

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b)(9) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION OBLIGATIONS OF CRITICAL VENDORS

Upon the motion, dated June 25, 2017 (the "***Motion***"),[2] of TK Holdings Inc. and

its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"), pursuant

to sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code (the "***Bankruptcy***

***Code***") for entry of interim and final orders authorizing the Debtors to pay, in their sole

discretion, prepetition obligations owed to certain vendors, suppliers, service providers, and

other similar parties and entities that are essential to maintaining the going concern value of the

Debtors' businesses (the "***Critical Vendors***" and the prepetition obligations owed to such Critical

Vendors, the "***Critical Vendor Claims***"), all as more fully set forth in the Motion; and upon

consideration of the Caudill Declaration and the Simpton Declaration; and this Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

and 1334, and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware dated February 29, 2012; and consideration of the Motion and the

requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion having been provided to the parties listed therein, and it appearing that no other or

further notice need be provided; and this Court having reviewed the Motion; and this Court

having held a hearing on the Motion; and this Court having determined that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and it appearing

that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to

the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best

interests of the Debtors, their estates, creditors, and all parties in interests; and upon all of the

proceedings had before this Court and after due deliberation and sufficient cause appearing

therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis, as provided herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a),

363(b), and 503(b)(9) of the Bankruptcy Code, to satisfy prepetition Critical Vendor Claims in

the ordinary course of business, upon such terms and in the manner provided in this Interim

Order and the Motion; *provided*, *however*, that the prepetition amounts authorized to be paid

pursuant to this paragraph shall not exceed $35,580,000 pending entry of a final order on the

Motion.

3.      The Debtors shall only make payment on account of a Critical Vendor

Claim to a Critical Vendor who agrees to continue to supply goods or services to the Debtors on

Customary Trade Terms or such other trade terms no less favorable to the Debtors that are individually agreed to by the Debtors and such Critical Vendor.

4.      The Debtors shall undertake all appropriate efforts to cause Critical Vendors to enter into an agreement (the "***Vendor Agreement***") with the Debtors, substantially in the form of the agreement annexed to the Motion as **<u>Exhibit D</u>**.

5.      The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so; *provided, however,* that the Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Vendor Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations.

6.      If the Debtors, in their discretion, determine that a Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to comply with the Customary Trade Terms or such other trade terms that are individually agreed to by the Debtors and such Critical Vendor following the date of the agreement, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor as contained in this Order; *provided*, *however*, that the Vendor Agreement may be reinstated if (i) such determination is subsequently reversed by the Court for good cause shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor, (ii) the underlying default of the Vendor Agreement is fully cured by the Critical Vendor not later than five (5) business days after the Debtors provide notice of such default, or (iii) the Debtors, in their discretion, reach an agreement with the Critical Vendor.

RLF1 17750887V.1

7.      If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor that has received payment of a prepetition claim later refuses to continue to supply  goods or services for the applicable period in compliance with the Vendor Agreement or this Order, then the Debtors reserve their rights to and may seek approval of this Court to (i) deem such payment to apply to postpetition amounts payable to such Critical Vendor, if applicable, or (ii) take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendor.  The Critical Vendor Claim shall then be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Vendor Claim had not been made.

8.      The Debtors shall maintain a matrix summarizing (i) the name of each Critical Vendor paid on account of Critical Vendor Claims, (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim, and (iii) the goods or services provided by such Critical Vendor.  This matrix shall be provided, upon request, to the Office of the United States Trustee for the District of Delaware and the professionals retained by any official committee of unsecured creditors appointed in these Chapter 11 Cases; *provided*, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including any member of such statutory committee of creditors, without prior written consent of the Debtors.

9.      Applicable banks and financial institutions are authorized, but not directed, at the Debtors' request, to receive, process, honor and pay, to the extent of funds on

4

deposit, any and all checks issued or to be issued or electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.

10.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of the Chapter 11 Cases.

11.     Nothing contained in this Interim Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

12.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

13.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder shall be subject to the same limitations and restrictions as are provided for in any order of this Court approving the Debtors' entry into any accommodation or similar agreements with the Consenting OEMs and granting the Consenting OEMs adequate protection in connection therewith (each a "***Adequate Protection Order***").  To the extent there is any conflict between this Interim Order and any Adequate Protection Order, the terms of such Adequate Protection Order shall control.

5

14.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

15.     The requirements of Bankruptcy Rules 4001(d) and 6004(a) are waived.

16.     Notwithstanding the provisions of Bankruptcy Rules 4001(a)(3) and 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

17.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Interim Order.

18.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

19.     A final hearing to consider the relief requested in the Motion shall be held on _____, ____ at _____ **(Prevailing Eastern Time)** and any objections or responses to the Motion shall be filed and served so as to be actually received on or prior to _____, ____ at **4:00 p.m. (Prevailing Eastern Time)**.

Dated: _____, 2017
      Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

6

**<u>Exhibit B</u>**

**Proposed Final Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                                         :

In re                         :              **Chapter 11**

                                         :

**TK HOLDINGS INC.**, *et al.*,     :      **Case No. 17-11375 (___)**

                                         :

             **Debtors.**[1]        :      **(Jointly Administered)**

                                         :
-------------------------------------------------------x

## FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 503(b)(9) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION OBLIGATIONS OF CRITICAL VENDORS

Upon the motion, dated June 25, 2017 (the "***Motion***"),[2] of TK Holdings Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"), pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code (the "***Bankruptcy Code***") for entry of interim and final orders authorizing the Debtors to pay, in their sole discretion, prepetition obligations owed to certain vendors, suppliers, service providers, and other similar parties and entities that are essential to maintaining the going concern value of the Debtors' businesses (the "***Critical Vendors***" and the prepetition obligations owed to such Critical Vendors, the "***Critical Vendor Claims***"), all as more fully set forth in the Motion; and upon consideration of the Caudill Declaration and the Simpton Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

and 1334, and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware dated February 29, 2012; and consideration of the Motion and the

requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion having been provided to the parties listed therein, and it appearing that no other or

further notice need be provided; and the Court having reviewed the Motion; and the Court

having held a hearing on the Motion on [__], 2017; and the Court having granted interim relief

on the Motion on [__], 2017 (Docket No. [__]); and the Court having held a final hearing on the

Motion on [__], 2017; and all objections to the Motion having been withdrawn, resolved or

overruled; and the Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and it appearing that the relief requested

in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in

interests; and upon all of the proceedings had before the Court and after due deliberation and

sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on a final basis, as provided herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a),

363(b), and 503(b)(9) of the Bankruptcy Code, to satisfy all prepetition Critical Vendor Claims

in the ordinary course of business, upon such terms and in the manner provided in this Final

Order and the Motion.

3.      The Debtors shall only make payment on account of a Critical Vendor

Claim to a Critical Vendor who agrees to continue to supply goods or services to the Debtors on

Customary Trade Terms or such other trade terms no less favorable to the Debtors that are individually agreed to by the Debtors and such Critical Vendor.

4.      The Debtors shall undertake all appropriate efforts to cause Critical Vendors to enter into an agreement (the "***Vendor Agreement***") with the Debtors, substantially in the form of the agreement annexed to the Motion as **<u>Exhibit D</u>**.

5.      The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so; provided, however, that the Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Critical Vendor Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors' operations.

6.      If the Debtors, in their discretion, determine that a Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to comply with the Customary Trade Terms or such other trade terms that are individually agreed to by the Debtors and such Critical Vendor following the date of the agreement, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor as contained in this Order; provided, however, that the Vendor Agreement may be reinstated if (i) such determination is subsequently reversed by the Court for good cause shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor, (ii) the underlying default of the Vendor Agreement is fully cured by the Critical Vendor not later than five (5) business days after the Debtors provide notice of such default, or (iii) the Debtors, in their discretion, reach an agreement with the Critical Vendor.

RLF1 17750887V.1

7.      If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor that has received payment of a prepetition claim later refuses to continue to supply  goods or services for the applicable period in compliance with the Vendor Agreement or this Order, then the Debtors reserve their rights to and may seek approval of this Court to (i) deem such payment to apply to postpetition amounts payable to such Critical Vendor, if applicable, or (ii) take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendor.  The Critical Vendor Claim shall then be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Vendor Claim had not been made.

8.      The Debtors shall maintain a matrix summarizing (i) the name of each Critical Vendor paid on account of Critical Vendor Claims, (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim, and (iii) the goods or services provided by such Critical Vendor.  This matrix shall be provided, upon request, to the Office of the United States Trustee for the District of Delaware and the professionals retained by any official committee of unsecured creditors appointed in these Chapter 11 Cases; *provided*, that the professionals for any such committee shall keep the matrix confidential and shall not disclose any of the information in the matrix to anyone, including any member of such statutory committee of creditors, without prior written consent of the Debtors.

9.      Applicable banks and financial institutions are authorized, but not directed, at the Debtors' request, to receive, process, honor and pay, to the extent of funds on

4

deposit, any and all checks issued or to be issued or electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.

10.    The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of the Chapter 11 Cases.

11.    Nothing contained in this Final Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Final Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

12.    Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

13.    Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder shall be subject to the same limitations and restrictions as are provided for in any order of this Court approving the Debtors' entry into any accommodation or similar agreements with the Consenting OEMs and granting the Consenting OEMs adequate protection in connection therewith (each a "***Adequate Protection Order***").  To the extent there is any conflict between this Final Order and any Adequate Protection Order, the terms of such Adequate Protection Order shall control.

5

14.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Final Order.

16.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated: _____, 2017
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit C

**Payment Protocol**



## Critical Vendor Payment Approval Process

**Receive Requests**
- Requests received & evaluated by purchasing team (TKH and MX)
- Purchasing team to fill out internal vendor form
- Request evaluated by advisor team and S. Simpton
- If > $5,000 / If < $5,000
- Escalate request to VMT?
- Yes
- Log request in Vendor tracker (B. Karpinsky)
- Update vendor tracker with cash impact (D. Duffy)

**Evaluate Requests**
- If < $5,000
- Evaluate cash impact and determine and recommend action
- Is vendor subject to an executory contract?
- Yes
- Legal review of potential enforcement actions
- No
- Approve or reject as critical vendor
- Reject
- Communicate response to purchasing team and evaluate further actions
- No

**Negotiate**
- Approve
- Negotiate terms/payment For payments <$25k – Purchasing team; >$25k – S. Simpton
- VMT final review
- Reject
- Approve
- Legal to prepare/ document agreement
- Final Sign off Payment <150k – S. Simpton Payments >150k – K. Bowling
- Send Final Agreement to AP team
- Determine appropriate payment method wire or ACH

**Pay**
- Pay vendor

\*Vendor Management Team (VMT) consists of:
- Ken Bowling (TKH)
- Scott Simpton (TKH)
- Tina Wertheimer (TKH)
- Teresa Cromer (TKH)
- Amy Green (TKH)
- Matt Goren (Weil)
- Lauren Tauro (Weil)
- Bill Fasel (PwC)
- Stephen Hammond (PwC)

## Exhibit D

**Vendor Agreement**

**[Name of Applicable Debtor]**

_____, 2017

TO:    [Critical Vendor]
       [Name]
       [Address]

Dear Valued Supplier:

      As you are aware, TK Holdings Inc. and certain of its affiliates and subsidiaries (collectively, the "***Company***") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Case***" and the "***Bankruptcy Court***," respectively) on _____, 2017 (the "***Petition Date***").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay certain suppliers and service providers (collectively, "***Vendors***") in recognition of the importance of the Company's relationship with those Vendors and the Company's desire that the Bankruptcy Cases have as little effect on certain Vendors as possible.  On _____, 2017 the Bankruptcy Court entered an interim order (the "***Order***") authorizing the Company, under certain conditions, to pay prepetition claims of certain Vendors that agree to the terms below as well as agree to be bound by the terms of the Order.  A copy of the Order is annexed hereto (collectively with this letter, the "***Letter Agreement***").

      To receive payment on prepetition claims, each selected Vendor must agree to continue to supply goods or services to the Company based on "Customary Trade Terms."  As used herein and in the Order, "Customary Trade Terms" are the normal and customary trade terms, practices, and programs (including credit limits, pricing rebates, cash discounts, timing of payments, coupon reconciliation, and other applicable terms and programs) that were most favorable to the Company and in effect between the Vendor and the Company at any time within the twenty-four (24) month period prior to the Petition Date or such other trade terms as agreed by the Company and the Vendor.

      For purposes of administration of this program, and as authorized by the Bankruptcy Court, the Company and you agree as follows:

1.      On account of your total prepetition claim in the amount of $_____, the Company will provisionally pay you $_____ (the "***Payment***") on account of such claim (net of any setoffs, credits, or discounts) (the "***Vendor Claim***").  $_____ will be applied toward that portion of your Vendor Claim that is entitled to administration expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, satisfying _____% of such claim.

2.      Nothing herein waives the Company's or your rights under section 365 of the Bankruptcy Code.

3.      You will provide Customary Trade Terms as follows (if more space is required, attach continuation pages):

_____
_____
_____
_____

4.      You agree that you shall not require a lump-sum payment upon the confirmation or consummation of a plan of reorganization in these cases on account of any administrative expense priority claim that you may assert, but instead agree that such claims will be paid in the ordinary course of business after confirmation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

5.      You will hereafter extend to the Company all Customary Trade Terms and agree to abide by [_____'s] the Purchase Order Terms and Conditions between you and the Company as in effect prior to the Petition Date (the "***Current PO(s)***").

Payment of your Vendor Claim in the manner set forth in the Order may only occur upon execution of this Letter Agreement by a duly authorized representative of your company and the return of this letter to the Company.  Your execution and return of this letter agreement constitutes an agreement between you and the Company:

(i)      to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Payment set forth above;

(ii)     that, for a period lasting until the later of two (2) years from the Petition Date, or the date upon which the term of your Current PO(s) expire, you will continue to supply the Company with goods or services pursuant to Customary Trade Terms and that the Company will pay for those goods or services in accordance with Customary Trade Terms;

(iii)    that you will continue to supply goods or provide services, as applicable, to any non-debtor affiliate of the Company with which you do business, on the terms set forth in the applicable contracts or purchase orders;

(iv)    that you have reviewed the terms and provisions of the Order and consent to be bound by the same;

(v)     that you will not separately seek payment for reclamation, claims pursuant to section 503(b)(9) of the Bankruptcy Code, or other similar claims outside of the terms of the Order unless your participation in the vendor payment program authorized by the Order (the "***Vendor Payment Program***") is terminated;

(vi)    that, in consideration for the Payment, you agree not to file or otherwise assert against the Company, its estate, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements entered into before the Petition Date.  Furthermore, if you have taken

steps to file or assert a lien before entering into this letter agreement, you agree to take all necessary steps to remove the lien as soon as possible at your sole cost and expense;

(vii)   that if you fail to comply with the terms and provisions of this Letter Agreement, the Company reserves its rights to and may seek approval of the Bankruptcy Court to (i) deem such payment to apply to postpetition amounts payable to you, if applicable, or (ii) take any and all appropriate steps to cause you to repay payments made to you on account of you Vendor Claim to the extent that such payments exceed the postpetition amounts then owing to you.  Your Vendor Claim shall then be reinstated in such an amount so as to restore the Company and you to their original positions as if this agreement had never been entered into and the payment of the Vendor Claim had not been made; and

(viii)   that you will keep the existence and the terms of this Letter Agreement confidential and will not disclose it to any person or entity without the prior written consent of Company, other than as required by law to any court or governmental authority.

The Company and you also hereby agree that any dispute concerning this Letter Agreement, the Order, or your participation in the Vendor Payment Program shall be determined by the Bankruptcy Court and that all litigation arising out of or relating to this Letter Agreement, the Order, and/or your participation in the Trade Payment Program or its subject matter must be commenced by the Bankruptcy Court.

If you have any questions about this Letter Agreement or our financial restructuring, do not hesitate to call.

Sincerely,
[Name of Applicable Debtor]

By:   _____
Title: _____

Agreed and Accepted by:
[Vendor]

By:   _____
Title:   _____
Dated: _____

RLF1 17750887V.1