## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
--------------------------------------------------------x
                                        :
In re                                   :    Chapter 11
                                        :
TK HOLDINGS INC., et al.,               :    Case No. 17-11375 (___)
                                        :
            Debtors.1                   :    Joint Administration Requested
                                        :
--------------------------------------------------------x
```

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a) FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION OBLIGATIONS OWED TO CERTAIN FOREIGN VENDORS AND LIEN CLAIMANTS AND (II) GRANT ADMINISTRATIVE STATUS FOR CERTAIN GOODS DELIVERED TO DEBTORS POSTPETITION

TK Holdings Inc. ("**TKH**") and its affiliated debtors in the above-captioned

chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the

"**Debtors**"), respectfully represent as follows in support of this motion (this "**Motion**"):

### Relief Requested

1.      By this Motion, pursuant to sections 105(a), 363(b), 503(b), and 507(a) of

title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors request interim and final

authority, but not direction, in the ordinary course of business, to satisfy prepetition claims

owing to (i) certain vendors, suppliers, service providers, independent contractors, and other

entities located outside of the United States (collectively, the "**Foreign Vendors**"), including

claims for goods or materials and services provided to the Debtors, as well as foreign tax

obligations, import and export fees, customs duties, or other similar fees related to such claims

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

(collectively, the "*Foreign Claims*"), and (ii) certain third party shippers, warehousemen, vendors, and other service providers that could, on account of their prepetition claims (collectively, the "*Lien Claims*" and, together with the Foreign Claims, the "*Claims*"), potentially assert liens against the Debtors' property on account of outstanding prepetition obligations of the Debtors (collectively, the "*Lien Claimants*").  In addition, pursuant to this Motion, the Debtors request authority to (i) grant administrative priority status to all undisputed obligations of the Debtors owing to third party vendors and suppliers arising from the postpetition delivery of goods ordered prior to the Petition Date (as defined herein) and (ii) authorize the Debtors to pay such obligations in the ordinary course of business.

2.      As of the Petition Date, the Debtors estimate that they owe approximately $16,280,000 for Foreign Claims, of which approximately $13,024,000 will come due in the first thirty (30) days of the chapter 11 cases.  The Debtors further estimate that, as of the Petition Date, they owe approximately $16,280,000 for Lien Claims, of which approximately $13,024,000 will come due in the first thirty (30) days of the chapter 11 cases.  A chart outlining the various categories and approximate amounts of the Claims that the Debtors are seeking authority to pay pursuant to this Motion, including those Claims that are entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, is set forth below.

RLF1 17750896V.1

| Category of Claims | Approx. Amount Seeking Authority to Pay on Interim Basis | Approx. Amount Seeking Authority to Pay on Final Basis |
|---|---|---|
| *Foreign Claims* | | |
| • Component Suppliers: | $8,160,000 | $10,200,000 |
| • Raw Material Suppliers: | $384,000 | $480,000 |
| • Other Production Suppliers: | $3,632,000 | $4,540,000 |
| • Customs Duties: | $848,000 | $1,060,000 |
| Foreign Claims Entitled to 503(b)(9) Administrative Expense Priority (total from each Foreign Claim category above): | $4,488,000 | $5,610,000 |
| **Total Foreign Claims:** | **$13,024,000** | **$16,280,000** |
| *Lien Claims* | | |
| • Shippers and Warehousemen: | $272,000 | $340,000 |
| • Equipment Manufacturers: | $136,000 | $170,000 |
| • Tool Makers: | $10,344,000 | $12,930,000 |
| • Miscellaneous Lien Claimants: | $2,272,000 | $2,840,000 |
| Lien Claims Entitled to 503(b)(9) Administrative Expense Priority (total from each Lien Claim category above): | $6,096,000 | $7,620,000 |
| **Total Lien Claims:** | **$13,024,000** | **$16,280,000** |

3.     Concurrently herewith, the Debtors have filed a separate motion seeking authority to pay, among other things, the prepetition claims of certain suppliers that are essential to maintain the going concern value of the Debtors' enterprise (the "***Critical Vendors Motion***" and, together with this Motion, the "***Vendor Motions***").  In support of the Vendor Motions, the Debtors submit the Declaration of Scott Simpton (the "***Simpton Declaration***"), the Debtors' Vice President of Supply Chain Management, which has been filed contemporaneously herewith.

4.     Proposed forms of order granting the relief requested herein on an interim basis and a final basis are annexed hereto as **Exhibit A** (the "***Proposed Interim Order***") and **Exhibit B** (the "***Proposed Final Order***"), respectively.

## Jurisdiction

5.       The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District*

*Court for the District of Delaware,* dated February 29, 2012.  This is a core proceeding pursuant

to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local***

***Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties,

cannot enter final orders or judgments consistent with Article III of the United States

Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

6.       On the date hereof (the "***Petition Date***"), each of the Debtors commenced

with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue

to operate their businesses and manage their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory

committee of creditors has been appointed in these Chapter 11 Cases.  Contemporaneously

herewith, the Debtors have filed a motion requesting joint administration of these Chapter 11

Cases pursuant to Bankruptcy Rule 1015(b).

7.       In coordination with the commencement of the Chapter 11 Cases,

contemporaneously to the date hereof, Takata Corporation, the Debtors' ultimate corporate

parent ("***TKJP***" and, together with its direct and indirect global subsidiaries, including TKH,

"***Takata***"), together with Takata Kyushi K.K. and Takata Service Corporation, commenced civil

rehabilitation proceedings under the Civil Rehabilitation Act of Japan in the 20th Department of

the Civil Division of the Tokyo District Court.

4

8.    Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the declaration of Scott E. Caudill, the Executive Vice President and Chief Operating Officer for TKH, filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "***Caudill Declaration***").[2]

## The Debtors' Relationship with the Foreign Vendors and the Lien Claimants

9.    As described in further detail in the Simpton Declaration, the Debtors and their non-debtor affiliates are a leading global developer and manufacturer of automotive safety and non-safety systems, including airbag systems, seat belts, steering wheels, child seats, and electronic devices such as satellite sensors and electronic control units.  As is commonplace throughout the automotive industry, the Debtors' businesses function under a tiered supply chain structure.  The Debtors produce the specialized component parts, service parts, and assembled goods utilized and incorporated by the OEMs into their platforms and vehicles.  In this regard, the automotive manufacturing industry necessarily has a customer base that demands highly specific and customized products.  The Debtors' constant pursuit of the development of proprietary automotive safety products and position as a leader in the research and development for the automotive safety industry affords them a unique position from which they are able to respond quickly to their Customers' requests for design reviews, product testing, and prototypes.

10.    As a Tier One supplier, the OEMs rely on the Debtors to provide a constant and steady supply of component goods and would be severely impacted if the Debtors were forced to suddenly cease producing such components for any reason.  This is especially true with respect to the ongoing recalls and the need to continuously manufacture and supply the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Caudill Declaration.

OEMs with replacement kits relating to vehicles equipped with non-desiccated PSAN Inflators manufactured by the Debtors and their affiliates.  The Debtors are often the sole manufacturer of certain essential component parts and vehicle systems utilized by their Customers.  Additionally, the Debtors' products are designed, tested, and specifically qualified for particular applications.  Typically, a Customer will contract with the Debtors to supply a specific product or system for a particular vehicle model or platform being built by the Customer.  As a result of this customization, the parts produced by the Debtors are often the end result of a lengthy and intensive development, testing, and manufacturing process.

11.    If outside suppliers are needed, after conducting a rigorous selection process, the Debtors will often contract with one vendor for a particular component part and rely on that vendor as their sole source supplier (*i.e.*, the only supply source for certain complex parts and specifically designed systems necessary to the Debtors' production process).  Sole sourcing is driven by a rigorous certification process that the Debtors and their suppliers must undertake for a significant portion of the parts integrated into the products shipped to the Customers and, ultimately, incorporated into a completed vehicle.  The parts sold to the Debtors, therefore, are often custom designed months or years in advance of production and built to fit the Debtors' and the OEMs' specified needs.  Using sole source suppliers allows the Debtors to reduce the costs of product start-up, tooling,[3] capital investment, and validation, which are necessary to make each part and to achieve consistent quality.  Sole sourcing is a normal practice in the automotive industry and is required to remain cost-competitive.

---

[3] In the ordinary course of their businesses, the Debtors must acquire the manufacturing components and machines needed for production of the parts and components they provide to the OEMs, which often includes unique tooling such as specific fixtures, jigs, gauges, molds, dies, cutting equipment, and patterns.  Accordingly, in the ordinary course of business, the Debtors acquire specialized tools and equipment on behalf of many of their Customers, though in many instances the Customers may own the tooling equipment and use the Debtors to subcontract the tool production work.

12.    Accordingly, the parts produced by the Debtors and the constituent components of these parts must meet demanding specifications mandated both by the Debtors and the Customers, as well as federally mandated safety standards, before they can be used in the Debtors' manufacturing process.  Due to these extensive design, development, and certification requirements, the process by which the Debtors and the OEMs select and certify a new supplier and a new program can take approximately eighteen to twenty-four months.  Any attempt by the Debtors to re-source a product or shift business to a different vendor after production is commenced would result in the loss of the Debtors' certification for that component part.  The Debtors would then be required to implement a de-sourcing process, including the "Production Part Approval Process," necessary for certain automotive parts to be approved for production. This requalification process can take approximately four to six months for standard products and up to eighteen months for highly engineered products.  Even if the Debtors were able to re-source a part, the process of seeking out an alternative supplier, transferring tooling from the old supplier to the new supplier, and renegotiating contractual provisions would create an expensive and time-consuming burden for the Debtors.  Additionally, to operate their businesses, the Debtors and their Customers rely, in many instances, on a daily or weekly "just-in-time" inventory supply system, making the Debtors highly dependent on the inventory and services supplied by the Foreign Vendors and Lien Claimants to meet the OEMs' needs for production. Certain of the Foreign Vendors, in particular, have developed certain capabilities and expertise specific to the Debtors' needs that cannot be easily replaced, if at all, and would be lost if the Debtors were forced to seek similar services elsewhere.

13.    In order for the Debtors to continue timely producing and supplying the OEMs with components, the Debtors will need to continue purchasing goods and services from

the Foreign Vendors and Lien Claimants.  Any delay or disruption in the flow of critical goods

and services to the Debtors would materially impact the Debtors' ability to supply parts to the

OEMs, including, without limitation, replacement kits for recalled non-desiccated PSAN

Inflators.  Additionally, it is critical to the Consenting OEMs and the Plan Sponsor to support a

transaction that minimizes disruption and impairment to the Debtors' supply base, including the

Foreign Vendors and Lien Claimants, as a result of these Chapter 11 Cases.  Disruption of the

Debtors' supply base could impair the Debtors' ability to fulfill their obligations to the

Consenting OEMs, which could, in turn, compel the Consenting OEMs to exercise their rights

and remedies under the contemplated Global Accommodation Agreement and ultimately threaten

the Debtors' ability to close the Global Transaction.

A.     **The Foreign Vendors**

14.     In light of the size, sophistication, and global nature of the Debtors'

airbag, seat belt, and other safety and non-safety manufacturing businesses, the Debtors regularly

transact business with vendors located outside of the United States.  The Debtors rely on their

Foreign Vendors, which are primarily located in Europe, Asia, and Mexico, to grant or supply

various goods or services that are crucial to the Debtors' ongoing manufacturing operations in

the United States and Mexico.  As of the Petition Date, the Debtors estimate that the amount of

Foreign Claims is approximately $16,280,000, of which approximately $13,024,000 is due

within 30 days of the Petition Date.  As described in more detail in the Simpton Declaration, the

Debtors' Foreign Vendors and the Foreign Claims include the following:

a)     Component Parts Suppliers.  The Debtors regularly utilize certain

suppliers located in China, Japan, the Czech Republic, France, Germany, Korea, Mexico, and

elsewhere in Europe and Asia to provide the Debtors with critical component parts that are

utilized in their production and manufacturing processes.  The Debtors then process and

8

assemble these components into finished products, including airbags, seat belts, and steering

wheels, for use by the Customers that incorporate the Debtors' products into their platforms.  As

described above, many of these Foreign Vendors supply component parts that either cannot be

obtained from other sources or cannot be obtained from other sources in sufficient quantity or

quality without causing significant delays or interruptions to the operations of the Debtors and,

as a result, the Customers.  Specifically, the development of a new component part and the

design of the manufacturing process take approximately eighteen to twenty-four months.  This

includes each component part undergoing the OEMs' rigorous approval process and validation

testing.  As such, if these goods are not obtained from the Foreign Vendors without interruption,

the Debtors likely would not be able to fulfill their obligations to the Customers.

    b) <u>Raw Material Suppliers</u>.  The Debtors utilize a significant amount of raw

materials in manufacturing parts for the OEMs, including rubber, plastic, magnesium, steel,

silicone, and wood.  While some of these raw materials are sourced from domestic companies,

certain of the Debtors' raw material suppliers are located outside of the United States.  The

Debtors could, potentially, seek out alternative raw material suppliers; however, any new

supplier would likely charge the Debtors significant premiums and price increases that would

negatively impact the Debtors' liquidity and prospects for a successful reorganization.

Additionally, if any of the raw material vendors refused to deliver without prepetition payment,

the Debtors would be forced to purchase necessary raw materials on the spot market, which

would subject the Debtors to product availability risks and the validation processes required by

their Customers. Therefore, the Debtors are seeking authority to pay these foreign raw material

suppliers in order to keep operating costs low during these Chapter 11 Cases and to ensure they

are able to fulfill their obligations to the OEMs.

RLF1 17750896V.1

c) <u>Other Production Suppliers</u>.  In the ordinary course of their businesses, the Debtors also rely on a number of production suppliers.  Many of these suppliers provide specialty materials utilized in the production process that cannot be easily replaced and are sole source providers.

d) <u>Customs Duties</u>.  The Debtors make payments on account of customs duties, import-related taxes, and other similar expenses (collectively, the "***Customs Duties***") to the U.S. Customs and Border Protection Agency (the "***U.S. Customs Service***") and to non-U.S. customs authorities in connection with imported goods purchased from Foreign Vendors (collectively, the "***Imported Goods***").  In certain instances, the Debtors pay the Customs Duties upon arrival of the goods into the domestic port.  The Imported Goods include component parts and raw materials vital to the Debtors' business operations that the Debtors could not readily obtain from other suppliers.  If the Customs Duties are not timely paid, the U.S. Customs Service and non-U.S. customs authorities may demand liquidated damages, assess interest, or impose other sanctions, including the assertion of liens against the Imported Goods under 19 C.F.R. § 141.1 (2005), which would be costly to the Debtors and their estates.

15.     Because of the nature of the Debtors' businesses, many of the Foreign Vendors will make, or have made, credible actionable threats that, unless paid on account of their prepetition claims, they will cease to supply the Debtors with the specialized goods and services necessary for the Debtors to maintain their operations in the United States.  As set forth above, any interruption in the Debtors' flow of goods and services could have disastrous consequences on the Debtors' operations due to the lack of alternative suppliers or the amount of time needed to locate and convert to alternative supply sources.  Without the Foreign Vendors, the Debtors

10

will be unable to operate their businesses efficiently and effectively, which will substantially diminish the value of the Debtors' assets.

16.     Further, most of the Foreign Vendors lack minimum contacts with the United States.  Although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtors believe that there is a serious risk that the Foreign Vendors holding claims against the Debtors may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay provisions of the Bankruptcy Code, and engage in conduct that would disrupt the Debtors' domestic and international operations. Foreign entities that believe the automatic stay does not govern their actions may exercise self-help, which could include shutting down the Debtors' access to essential goods and services.

### B.     The Shippers, Warehousemen, and Other Lien Claimants

#### i.     The Shippers and Warehousemen

17.     In operating their businesses, the Debtors use and make payments to various common carriers, shippers, and other transportation service providers (collectively, the "***Shippers***") to ship, transport, and deliver raw materials and other component parts used in the Debtors' manufacturing activities and the Debtors' finished products to their Customers.  The Debtors also utilize certain third party warehouses and storage facilities (collectively, the "***Warehousemen***") to store excess raw materials, supplies, and finished products, as well as goods in transit.

18.     The services provided by the Shippers and Warehousemen are critical to the Debtors' day-to-day operations and for the Debtors to meet their delivery deadlines.  The automotive supply industry is shipping intensive, and the Debtors rely on frequent, often daily, shipments of goods.  Specifically, the Debtors utilize the services of the Shippers to transport goods directly to the OEMs and to their distribution centers for pick-up by the OEMs.  The

11

Debtors also utilize the Shippers for inbound deliveries of certain raw materials, component parts, tooling supplies, and other items necessary for the Debtors' production processes.  At any given time, the Debtors may owe the Shippers fees related to a number of different shipments and the Shippers may, in turn, have multiple vehicles in transit carrying goods on behalf of the Debtors.  Further, the Debtors require countless shipments of goods between the various locations within their distribution and supply network.  For example, the Debtors transport inflator propellant from their Moses Lake, Washington manufacturing facility to their Eagle Pass, Texas distribution center.  In turn, the Debtors transport the propellant from Eagle Pass to the Debtors' manufacturing facilities in Mexico, which then utilize the propellant to assemble inflators and ship them overseas.

19.    Under some state laws, a Shipper or Warehouseman may have a possessory lien on the goods in its possession, which secures payment of the charges and related expenses incurred in connection with the transportation or storage of goods.[4]  The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices or have accrued but unbilled charges for goods that were delivered to or sent by the Debtors prior to the Petition Date (the "***Shipping and Warehousing Charges***").  As a result, certain Shippers and Warehousemen could argue that they are entitled to possessory liens for transportation and storage, as applicable, of the goods in their possession and may refuse to deliver or release such goods before their claims have been satisfied and their liens redeemed.  In addition, pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection for valid possessory liens.  Even if the Shippers

---

[4] For example, Michigan's Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  Mich. Comp. Laws § 440.7307.

and Warehousemen did not have valid liens, their possession and retention of any goods would impact multiple different product lines and severely impact the Debtors' manufacturing capabilities and relationships with the OEMs.

20.     The value of the goods in the possession of the Shippers and Warehousemen, and the potential injury to the Debtors if the goods are not released, is likely to exceed the amount of the Shipping and Warehousing Charges.  Accordingly, the Debtors believe that it is necessary and essential to preserving the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Charges.

*ii.     The Other Lien Claimants*

21.     In addition to the Shippers and Warehousemen, the Debtors routinely engage a number of other third parties, including equipment manufacturers, tool makers, service technicians, materialmen, and other service providers (collectively, the "***Other Lien Claimants***"), that may be able to assert and perfect liens, including mechanic's liens, artisan's liens, materialman's liens, shipper's liens, warehouseman's liens, and other similar liens,[5] against the Debtors' property and, in some cases, the OEMs' property, if the Debtors fail to pay for the goods or services rendered.  The Other Lien Claimants perform a number of services for the Debtors, including the manufacturing of equipment, manufacturing and repair of tools, molds, and other parts or components that are integral to the Debtors' manufacturing processes.

22.     As described in the Simpton Declaration, the Other Lien Claimants include the following: (i) equipment manufacturers who make specialized equipment and parts needed to support the production of the Debtors' safety and non-safety automotive and other

---

[5] Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, might be excluded from the automatic stay.  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).

products; (ii) tool makers who require significant lead time for their selection and the design and manufacture of the tools; and (iii) miscellaneous lien claimants.

a)    Equipment Manufacturers.  In the ordinary course of their businesses, the Debtors are required to contract with certain equipment manufacturers (the "***Equipment Manufacturers***") to make specialized equipment and parts needed to support production of the Debtors' safety and non-safety automotive and other products.  The Debtors require the Equipment Manufacturers' services when, for example, the Debtors need to expand production to support new business or need to replace existing equipment to improve their operating efficiency.  To the extent that the Debtors are unable to fulfill their payment obligations to the Equipment Manufacturers, the Equipment Manufacturers may choose to assert liens against the partially or fully constructed equipment in their possession.  Such actions could severely hinder the Debtors' ability to fulfill production obligations to their Customers on both existing and new programs.

b)    Tool Makers.  The Debtors also contract with a limited number of independent tool makers (the "***Tool Makers***"), on behalf of both the Debtors and the Customers, for the production of specialized tools, moldings, fixtures and special machines necessary for the production of the Debtors' various products.  In most cases, there is significant lead time that goes into the selection of a Tool Maker and the design and manufacture of the tools.  Indeed, it is not uncommon for this process to take a year or more.  Because the Debtors often take possession of tools prior to paying the Tool Makers in full for such tools so that all necessary quality and performance-related tests can be performed, the majority of the tools being produced by the Tool Makers have not yet been fully paid for.  The Debtors believe that, upon the commencement of these Chapter 11 Cases, certain of the Tool Makers may, in enforcing their

14

state law rights,[6] refuse to deliver new tooling or to return tooling that they are servicing, unless the Tool Makers are paid in full for such tools or provided assurance of future payment.

      c)  <u>Miscellaneous Lien Claimants</u>.  The Debtors operate 11 different North American production, test, and other sales and administration facilities.  Numerous third parties, in addition to the Tool Makers, render services at these locations or offsite related to the Debtors' property and the Customers' property, including component parts and production supply vendors that are in possession of specialized tooling owned by the Debtors or the Customers.  Certain of these third parties may have the right to assert or perfect state law statutory liens or mechanics' liens on the Debtors' property and, thus, may be able to hinder the Debtors' use of property needed to operate their businesses.

      23.    If the Debtors are unable to pay the Lien Claims, they risk being unable to fully operate their businesses, which could prevent them from maximizing recoveries for all stakeholders in these Chapter 11 Cases. Accordingly, the Debtors seek authority, in their sole discretion, to pay the Lien Claims that the Debtors believe have created, or could give rise to, a Lien against the Debtors' property, regardless of whether the related Lien Claimants have already perfected their interests.

<b><u>Customary Trade Terms</u></b>

      24.    The Debtors propose conditioning the payment of Foreign Claims and Lien Claims on the agreement of the Foreign Vendors and the Lien Claimants, as applicable, to

---

[6] Many states, including Michigan, have legislatively granted Tool Makers security interests in finished or unfinished tools. *See, e.g.* Mich. Comp. Laws §§ 5790.541 *et seq.* (defining "special tool" for which a statutory lien is granted as "tools, dies, jigs, gauges, gauging fixtures, special machinery, cutting tools, or metal castings manufactured by a special tool builder" and "special tool builder" as "a person who designs, develops, manufactures, or assembles special tools for sale").  These statutory liens often allow such parties to retain possession of the tools, or impair title of the tool by filing a security interest, until the debtor satisfies the outstanding amounts owed.  Arguably, these statutory liens may also be unaffected by the automatic stay under section 362 of the Bankruptcy Code.

continue to supply goods and services to the Debtors that are consistent with the most favorable

historical trade terms in effect between the parties in the twenty-four (24) month period

preceding the Petition Date (the "***Customary Trade Terms***").  The Debtors propose that the

Customary Trade Terms will apply for the remaining term of each Foreign Vendor's and each

Lien Claimant's agreement with the Debtors, as long as the Debtors agree to pay for such goods

in accordance with such terms.  The Debtors also reserve the right to negotiate trade terms with

any Foreign Vendor or Lien Claimant, as a condition to payment of any Foreign Claim or Lien

Claim, that vary from the Customary Trade Terms to the extent the Debtors determine that such

terms are necessary to procure essential goods or services or are otherwise in the best interests of

the Debtors' estates.

        25.      If any Foreign Vendor or Lien Claimant is paid its prepetition claim and,

thereafter, does not continue to provide goods or services to the Debtors on Customary Trade

Terms, any payment made will be deemed an avoidable postpetition transfer under section 549

of the Bankruptcy Code and will be recoverable by the Debtors in cash upon written request.

Upon recovery by the Debtors, the Foreign Claim or Lien Claim will be reinstated as a

prepetition claim in the amount recovered.  The Debtors also seek authorization, but not

direction, to obtain written verification before issuing payment to a Foreign Vendor or Lien

Claimant that such vendor will continue to provide goods and services to the Debtors on

Customary Trade Terms as described above; *provided*, *however*, that the absence of such written

verification will not limit the Debtors' rights and relief sought herein.

### **Prepetition Orders**

        26.      In addition to the relief requested with respect to the Foreign Vendors and

Lien Claimants, as of the Petition Date, the Debtors have certain prepetition purchase orders (the

"*Prepetition Orders*") outstanding with various third party vendors and suppliers (the

"*Vendors*") for goods ordered by the Debtors that have not yet been delivered to the Debtors'

facilities.  These Vendors may be concerned that, because the Debtors' obligations under the

Prepetition Orders arose prior to the Petition Date, such obligations will be treated as general

unsecured claims in these Chapter 11 Cases.  Accordingly, certain Vendors may refuse to

provide goods to the Debtors (or may recall shipments thereof) purchased pursuant to the

Prepetition Orders unless the Debtors issue substitute purchase orders postpetition or obtain an

order of the Court providing that all undisputed obligations of the Debtors arising from the

postpetition delivery of goods subject to Prepetition Orders are afforded administrative expense

priority status under section 503(b) of the Bankruptcy Code.

### Basis for Relief Requested

27.     To minimize the disruption that the Debtors' (and, ultimately, the Plan

Sponsor's) business operations will suffer if prepetition obligations owed to Foreign Vendors

and Lien Claimants are not paid, the Debtors respectfully request that the Court authorize the

Debtors to pay and honor the Foreign Claims, including the Customs Duties, and the Lien

Claims pursuant to sections 105(a), 363(b), 503(b)(9), and 507(a)(8)(F) of the Bankruptcy Code.

Additionally, the Debtors respectfully request that the Court grant all undisputed obligations of

the Debtors arising from the postpetition delivery of goods subject to the Prepetition Orders

administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code and

authorize the Debtors to satisfy such obligations in the ordinary course of business.

**A.      Payment of the Foreign Claims and Lien Claims is Warranted Under
          Sections 363(b) and 105(a) of the Bankruptcy Code.**

28.     Courts may authorize debtors to pay certain prepetition obligations

pursuant to section 363(b) of the Bankruptcy Code.  *See In re Ionosphere Clubs, Inc.*, 98 B.R.

17

174, 175 (Bankr. S.D.N.Y. 1989).  Specifically, section 363(b)(1) of the Bankruptcy Code

authorizes courts, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than

in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  To approve

the use of assets outside the ordinary course of business, courts require only that a debtor "show

that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*,

242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36

(Bankr. D. Del. 1987).   If a debtor articulates a reasonable basis for its business decisions,

"courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air,*

*Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).  Courts have properly relied on section 363(b) of the

Bankruptcy Code to authorize debtors to pay prepetition claims of foreign creditors in

circumstances where, as here, the estate will obtain more value for all creditors by making the

prepetition payments.  *See, e.g., In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr.

M.D. Fla. 2005) (authorizing debtor to pay, pursuant to 363(b), certain foreign creditors'

prepetition claims where the payments were "necessary" and "appropriate" to debtor's

reorganization).

        29.      Additionally, the Court may authorize the Debtors to pay any prepetition

amounts that may be owed to the Foreign Vendors or Lien Claimants pursuant to section 105(a)

of the Bankruptcy Code, which provides that a "court may issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. §

105(a).  Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court may exercise its

broad grant of equitable powers to permit the payment of prepetition obligations when such

payment is essential to the continued operation of a debtor's business.  *See, e.g., In re Just for*

*Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (holding that a court may authorize the payment of prepetition claims prior to the confirmation of a reorganization plan pursuant to the doctrine of necessity).

30.    Courts have consistently permitted the postpetition payment of prepetition obligations "where the payment is necessary to permit the effectuation of the rehabilitative purposes of the Bankruptcy Code." *In re Sharon Steel Corp.*, 159 B.R. 730, 736 (Bankr. W.D. Penn. 1993); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to continued operation of the debtor); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition claims and explaining that the "ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept"). The rationale for making payments to prepetition creditors under the doctrine of necessity is consistent with chapter 11's paramount rehabilitative goals. *Ionosphere Clubs*, 98 B.R. at 176.

31.    The Debtors have strong business purposes for paying both the Foreign Claims and the Lien Claims. As set forth above, if the Foreign Vendors are unwilling to provide essential goods and services to the Debtors postpetition because of their outstanding prepetition claims, the Debtors' operations would suffer dramatically. Due to the extensive design,

19

development, and certification requirements, any attempt by the Debtors to re-source a product

or shift business to a different vendor would take significant time and resources and likely result

in a disruption of parts and supply to the OEMs, which would result in further damages and

losses imposed on the Debtors' estates.   Similarly, the Lien Claimants provide valuable

shipping, warehousing, and other services to the Debtors and may currently hold goods,

including raw materials, finished product, tooling and other equipment, that are necessary to the

Debtors' continued operations.  If the Debtors are unable to access these goods or the services

provided by the Lien Claimants, their business operations would be drastically disrupted, which

would inhibit the Debtors' ability to meet the OEMs' needs.  Additionally, any delay in payment

of the Customs Duties could result in the U.S. Customs Service or non-U.S. customs authorities

asserting liens against the Imported Goods or imposing fines, which would impact the delivery

of goods to the Debtors.

32.    The critical need for the continued receipt and distribution of goods that

the Lien Claimants may hold on the Petition Date or assert liens against amply justifies the relief

sought in this Motion.  The prompt payment, therefore, of the Debtors' prepetition obligations

owed to the Foreign Vendors and Lien Claimants is absolutely crucial to the preservation and

protection of the Debtors' estates and will contribute significantly to the Debtors' revenue-

generating capabilities and the Debtors' ability to consummate a sale transaction.  Additionally,

the relief requested herein may help avoid the institution and prosecution of numerous

reclamation claims, suits, and motions by the Foreign Vendors and Lien Claimants that would

disrupt and distract from the Debtors' efforts to maximize the value of these estates.

33.    As discussed further in the Caudill Declaration, the Debtors are in the

midst of the largest recall in U.S. automotive history relating to vehicles equipped with certain

non-desiccated PSAN Inflators manufactured by the Debtors and their affiliates.  Maintaining the

goods and services provided by the Foreign Vendors and Lien Claimants is essential to ensuring

a stable and continuous supply of replacement kits and to removing recalled non-desiccated

PSAN Inflators from circulation as quickly as possible.  Recognizing this need to ensure a stable

and continuous supply of replacement kits and other component parts, the Consenting OEMs and

the Plan Sponsor support and encourage the payment of the Foreign Vendors and Lien Claimants

and other trade claimants in full.

34.    Further, based on the Debtors' experience in the automotive

manufacturing industry and their familiarity with the Foreign Vendors, the Debtors believe there

is a significant risk that Foreign Vendors may consider themselves to be beyond the jurisdiction

of the Court, disregard the automatic stay, and engage in conduct that is harmful to the Debtors'

business operations unless paid in the ordinary course.[7]  Specifically, the Foreign Vendors may

attach or foreclose on the Debtors' assets outside the United States, shut down the Debtors'

access to essential goods and services needed to maintain the Debtors' businesses as a going

concern, cut off trade, or demand onerous trade terms.  Such conduct would lead to litigation in

foreign courts and inevitably force the Debtors to incur additional and unnecessary expenses to

the detriment of all parties in interest.  Permitting the Debtors to pay the Foreign Claims of those

Foreign Vendors who agree to provide goods or services on Customary Trade Terms will help

preserve the value of the Debtors' estates by minimizing disruptions to their business operations.

---

[7] Notwithstanding the self-executing and global nature of the automatic stay, not all parties affected or potentially affected by the commencement of these Chapter 11 Cases are aware of its significance and impact.  As a result, in an exercise of prudence, the Debtors are seeking an order enforcing the automatic stay in the *Motion of Debtors Pursuant to 11 U.S.C. § 105 for Entry of an Order Enforcing the Protections of 11 U.S.C. §§ 362, 365, 525, and 541(c)*, filed contemporaneously herewith.

**B.    Certain of the Foreign Claims and Lien Claims are Entitled to Administrative Priority Treatment Under Section 503(b)(9) of the Bankruptcy Code.**

35.    Section 503(b)(9) of the Bankruptcy Code provides that, "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  The Debtors will be required to pay in full all claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code to confirm any chapter 11 plan filed in these cases.  *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority).

36.    Although section 503(b)(9) of the Bankruptcy Code does not specify a time for payment of these expenses, bankruptcy courts have the discretion to allow for distributions to administrative claimants prior to confirmation if the debtor has the ability to pay and there is a need to do so.  *See In re Global Home Prods.*, LLC, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of that administrative expense claim is left to the discretion of the Court.").  Indeed, nothing in the Bankruptcy Code prohibits the Debtors from paying such claims sooner if it chooses to do so, or this Court from exercising its discretion to authorize the postpetition payment of such obligations prior to confirmation of a chapter 11 plan.  *See In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").

37.    Here, certain of the Foreign Vendors and Lien Claimants that the Debtors seek authority to pay delivered goods to the Debtors in the ordinary course within the twenty (20) days prior to the Petition Date.  As set forth above, the Debtors estimate that approximately

22

(i) $5,610,000 owed to Foreign Vendors, representing approximately 34% of the total amount of Foreign Claims, and (ii) $7,620,000 owed to Lien Claimants, representing approximately 47% of the total amount of Lien Claims, are on account of goods that were received during the 20-day period before the Petition Date, and therefore, may be afforded administrative priority.  Payment to any Foreign Vendor or Lien Claimant on account of such deliveries at the onset of these Chapter 11 Cases merely accelerates the timing of payment and not the ultimate treatment of such claims.  Accordingly, the Debtors would have to pay the Foreign Claims and the Lien Claims in full, to the extent they fall within the scope of section 503(b)(9) of the Bankruptcy Code, regardless of the timing of such payment.  Therefore, the Debtors are only requesting authority to pay approximately $19,330,000 on account of Foreign Claims and Lien Claims that would not otherwise be entitled to priority of payment and payment in full under the Bankruptcy Code.

**C.      Certain of the Customs Duties are Entitled to Priority Under Section 507(a)(8)(F) of the Bankruptcy Code.**

38.      Section 507(a)(8)(F) of the Bankruptcy Code affords eighth priority in payment to the allowed unsecured claims of governmental units for:

(F) a customs duty arising out of the importation of merchandise –

(i) entered for consumption within one year before the date of the filing of the petition;

(ii) covered by an entry liquidated or reliquidated within one year before the date of the filing of the petition; or

(iii) entered for consumption within four years before the date of the filing of the petition but unliquidated on such date . . . if information needed for the proper appraisement or classification of such merchandise was not available to the appropriate customs officer before such date.

11 U.S.C. § 507(a)(8)(F)(i)-(iii).

RLF1 17750896V.1

39.     A substantial portion, if not all, of the Customs Duties sought to be paid hereunder would be entitled to priority pursuant to section 507(a)(8)(F) of the Bankruptcy Code. As priority claims, the Customs Duties must be paid in full before the Debtors make any distributions to holders of general unsecured claims in connection with a chapter 11 plan. Accordingly, the proposed relief most likely will affect only the timing to the payment of the Customs Duties and, therefore, will not prejudice the rights of general unsecured creditors.

40.     For the foregoing reasons, payment of the Foreign Claims and the Lien Clams is a sound exercise of the Debtors' business judgment, is necessary to avoid irreparable harm to the Debtors' estates in connection with the Debtors' sale process, is in the best interests of the Debtors and their respective estates and creditors, and is warranted under the circumstances.

**D.      The Obligations Owed Under the Prepetition Orders are Administrative Priority Claims under Section 503(b) of the Bankruptcy Code.**

41.     Pursuant to section 503(b) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of necessary goods and services are afforded administrative expense priority because they benefit the estate postpetition.  11 U.S.C. § 503(b)(1)(A); *see also In re Waste Systems Intern., Inc.*, 280 B.R. 824, 826 (Bankr. D. Del. 2002) (holding that a non-debtor party to a prepetition consulting agreement was entitled to an administrative expense claim equal to the value of any postpetition benefit conferred on the estate); *In re Chateaugay Corp.*, 10 F.3d 944, 956 (2d. Cir. 1993) (holding that an obligation arising from the postpetition performance relating to a prepetition transaction is entitled to administrative expense priority).  Accordingly, granting the relief sought herein with respect to the Prepetition Orders will not provide the Vendors with any greater priority than they would otherwise be entitled to, and will not prejudice any part in interest.  Absent such relief, the

24

Debtors may be required to expend substantial time and effort reissuing the Prepetition Orders to provide the Vendors with assurance of administrative priority.  This disruption to the continuous flow of goods and services to the Debtors would seriously impact the Debtors' ability to operate their businesses.  Without the support of the Vendors, the Debtors will incur significant costs and loose valuable business relationships to the detriment of all parties in interest.  Therefore, the obligations owed under the Prepetition Orders relating to goods delivered postpetition should be explicitly granted administrative expense status.

**Applicable Banks Should be Authorized to Receive, Process, Honor, and Pay
Checks Issued and Transfers Requested to Pay the Foreign Claims and Lien Claims**

42.      The Debtors further request that the Court authorize, but not direct, applicable banks and financial institutions to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Foreign Claims or the Lien Claims. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic fund transfers in replacement of any checks or transfer requests on account of any prepetition Foreign Claims or Lien Claims dishonored or rejected as a result of these Chapter 11 Cases.

**Reservation of Rights**

43.      Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

RLF1 17750896V.1

order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Bankruptcy Rule 6003 Has Been Satisfied

44.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition.  Based on their experience, the Debtors believe that some of the Foreign Vendors will demand that the Debtors satisfy their prepetition obligations as a condition to doing business on a go-forward basis and that some of the Lien Claimants may take detrimental actions, including the assertion of liens, against the Debtors' property in their possession absent the payment of their prepetition claims.  As described above, the efficient and effective operation of the Debtors' business requires the uninterrupted provision of goods and services by the Foreign Vendors and the Lien Claimants.  Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003.

### Request for Bankruptcy Rule 6004 Waivers

45.     The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the Caudill Declaration and the Simpton Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

**Notice**

46.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware (Attn: David Buchbinder, Esq. and Jane Leamy, Esq.); (ii)  the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Offices of the United States Attorney for each of the District of Delaware and the Eastern District of Michigan; (vi) NHTSA; (vii) each of the Consenting OEMs; (viii) the Plan Sponsor; and (ix) any other party entitled to notice pursuant to Local Rule 9013–1(m).  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

47.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and the Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 25, 2017
       Wilmington, Delaware

*/s/ Michael J. Merchant*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                               :

In re                      :       **Chapter 11**
                               :

**TK HOLDINGS INC.,** *et al.,*    :       **Case No. 17-11375 (___)**
                               :

          **Debtors.**[1]        :       **(Jointly Administered)**
                               :

-------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 503(b), AND 507(a) AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION OBLIGATIONS OWED TO CERTAIN FOREIGN VENDORS AND LIEN CLAIMANTS AND (II) GRANT ADMINISTRATIVE STATUS FOR CERTAIN GOODS DELIVERED TO THE DEBTORS POSTPETITION

Upon the motion, dated June 25, 2017 (the "***Motion***"),[2] of TK Holdings Inc. and

its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"), pursuant

to sections 105(a), 363(b), 503(b), and 507(a) of title 11 of the United States Code (the

"***Bankruptcy Code***") for entry of interim and final orders authorizing the Debtors to (i) satisfy

certain prepetition obligations owed to (a) certain vendors, suppliers, service providers,

independent contractors, and other entities located outside of the United States (collectively, the

"***Foreign Vendors***"), including claims for goods or materials and services provided to the

Debtors, as well as foreign tax obligations, import and export fees, customs duties, or other

similar fees related to such claims (collectively, the "***Foreign Claims***"), and (b) certain third

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

party shippers, warehousemen, vendors, and other service providers that could, on account of their prepetition claims (collectively, the "***Lien Claims***" and, together with the Foreign Claims, the "***Claims***"), potentially assert liens against the Debtors' property for prepetition amounts that the Debtors owe to them (collectively, the "***Lien Claimants***"); and (ii) (a) grant administrative priority status to all undisputed obligations of the Debtors arising from the postpetition delivery of goods ordered prior to the Petition Date ("***Prepetition Orders***") and (b) authorize the Debtors to pay such obligations in the ordinary course of business, all as more fully set forth in the Motion; and upon consideration of the Caudill Declaration and the Simpton Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the parties listed therein, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held a hearing on the Motion; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in interests; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

2

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis, as provided herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), 503(b)(9), and 507(a)(8)(F) of the Bankruptcy Code, to satisfy prepetition Foreign Claims, including the Customs Duties, in the ordinary course of business, upon such terms and in the manner provided in this Interim Order and the Motion; *provided*, *however*, that the prepetition amounts authorized to be paid pursuant to this paragraph shall not exceed $13,024,000 pending entry of a final order on the Motion.

3.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code, to satisfy prepetition Lien Claims, including the Shipping and Warehousing Charges, in the ordinary course of business, upon such terms and in the manner provided in this Interim Order and the Motion; *provided*, *however*, that the prepetition amounts authorized to be paid pursuant to this paragraph shall not exceed $13,024,000 pending entry of a final order on the Motion.

4.      In exchange for payment of the Foreign Claims and Lien Claims, unless otherwise waived by the Debtors in their sole discretion, the Foreign Vendors and the Lien Claimants shall be required to continue to provide goods and services to the Debtors on the most favorable terms in effect between such Foreign Vendor or Lien Claimant and the Debtors in the twenty-four (24) month period preceding the Petition Date or on such other terms no less favorable to the Debtors as the Foreign Vendor or the Lien Claimant and the Debtors may otherwise agree (the "***Customary Trade Terms***").  The Customary Trade Terms shall apply for the remaining term of the Foreign Vendors' or Lien Claimants' agreements with the Debtors, as

3

long as the Debtors pay for the goods and services in accordance with the payment terms provided in the agreement.

5.      The Debtors are authorized, but not directed, to obtain written verification, before issuing payment to a Foreign Vendor or Lien Claimant, that such Foreign Vendor or Lien Claimant will, if applicable, continue to provide goods and services to the Debtors on Customary Trade Terms for the remaining term of the Foreign Vendor's or Lien Claimant's agreement with the Debtors; *provided*, *however*, that the absence of such written verification shall not limit the Debtors' rights hereunder.

6.      If any Foreign Vendor or Lien Claimant is paid with respect to its Foreign Claim or Lien Claim and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, the Debtors reserve their rights to and may seek approval of this Court to (i) deem such payment to apply to postpetition amounts payable to such Foreign Vendor or Lien Claimant, if applicable, or (ii) take any and all appropriate steps to cause such Foreign Vendor or Lien Claimant to repay payments made to it on account of its prepetition Foreign Claim or Lien Claim to the extent that such payments exceed the postpetition amounts then owing to such Foreign Vendor or Lien Claimant.  Upon recovery by the Debtors, the Foreign Claim or the Lien Claim shall be reinstated as a prepetition claim in the amount recovered.

7.      The Debtors are authorized, but not directed, to pay Lien Claimants, regardless of whether their claims arose prior to or after the Petition Date, if such Lien Claimants have perfected one or more liens in respect of such claims, or if the Debtors determine, in their business judgment, that the Lien Claimants are capable of perfecting such liens; *provided, however,* that no such payment shall be deemed to be a waiver of rights regarding the extent, validity, perfection, or possible avoidance of any such liens.

4

8.     For any payments made to Lien Claimants on account of liens obtained by the Lien Claimants, the Lien Claimants receiving the payments shall take whatever action is necessary to remove such liens, if any, at such Lien Claimant's sole cost and expense.

9.     All undisputed obligations of the Debtors arising from the postpetition delivery or shipment by Vendors of goods under the Prepetition Orders are granted administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, to pay such obligations in the ordinary course of business consistent with the parties' customary practices in effect prior to the Petition Date.

10.     Applicable banks and financial institutions are authorized, but not directed, at the Debtors' request, to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued or electronic fund transfers requested or to be requested by the Debtors relating to the Foreign Claims and the Lien Claims.

11.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the Foreign Claims and the Lien Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of the Debtors' Chapter 11 Cases.

12.     Nothing contained in this Interim Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

5

13.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

14.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder shall be subject to the same limitations and restrictions as are provided for in any order of this Court approving the Debtors' entry into any accommodation or similar agreements with the Consenting OEMs and granting the Consenting OEMs adequate protection in connection therewith (each a "***Adequate Protection Order***").  To the extent there is any conflict between this Interim Order and any Adequate Protection Order, the terms of such Adequate Protection Order shall control.

15.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

16.     The requirements of Bankruptcy Rules 4001(d) and 6004(a) are waived.

17.     Notwithstanding the provisions of Bankruptcy Rules 4001(a)(3) and 6004(h), this Interim Order shall be immediately effective and enforceable upon its entry.

18.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Interim Order.

19.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Interim Order.

RLF1 17750896V.1

20.     A final hearing to consider the relief requested in the Motion shall be held on _____, _____ at _____ (**Prevailing Eastern Time**) and any objections or responses to the Motion shall be filed and served so as to be actually received on or prior to **____ , _____ at 4:00 p.m. (Prevailing Eastern Time)**.

Dated: _____, 2017
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 17750896V.1

**<u>Exhibit B</u>**

**Proposed Final Order**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x
                                    :

In re                            :        **Chapter 11**

                                      :

**TK HOLDINGS INC.,** *et al.,*    :        **Case No. 17-11375 (___)**

                                      :

                **Debtors.**[1]      :        **(Jointly Administered)**

                                      :
-------------------------------------------------------x

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
503(b), AND 507(a) AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION
OBLIGATIONS OWED TO CERTAIN FOREIGN VENDORS AND LIEN
CLAIMANTS AND (II) GRANT ADMINISTRATIVE STATUS FOR
CERTAIN GOODS DELIVERED TO THE DEBTORS POSTPETITION**

Upon the motion, dated June 25, 2017 (the "***Motion***"),[2] of TK Holdings Inc. and

its affiliated debtors, as debtors and debtors in possession (collectively, the "***Debtors***"), pursuant

to sections 105(a), 363(b), 503(b), and 507(a) of title 11 of the United States Code (the

"***Bankruptcy Code***") for entry of interim and final orders authorizing the Debtors to (i) satisfy

certain prepetition obligations owed to (a) certain vendors, suppliers, service providers,

independent contractors, and other entities located outside of the United States (collectively, the

"***Foreign Vendors***"), including claims for goods or materials and services provided to the

Debtors, as well as foreign tax obligations, import and export fees, customs duties, or other

similar fees related to such claims (collectively, the "***Foreign Claims***"), and (b) certain third

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

party shippers, warehousemen, vendors, and other service providers that could, on account of

their prepetition claims (collectively, the "*Lien Claims*" and, together with the Foreign Claims,

the "*Claims*"), potentially assert liens against the Debtors' property for prepetition amounts that

the Debtors owe to them (collectively, the "*Lien Claimants*"); and (ii) (a) grant administrative

priority status to all undisputed obligations of the Debtors arising from the postpetition delivery

of goods ordered prior to the Petition Date ("*Prepetition Orders*") and (b) authorize the Debtors

to pay such obligations in the ordinary course of business, all as more fully set forth in the

Motion; and upon consideration of the Caudill Declaration and the Simpton Declaration; and the

Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28

U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States

District Court for the District of Delaware dated February 29, 2012; and consideration of the

Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to the parties listed therein, and it appearing

that no other or further notice need be provided; and the Court having reviewed the Motion; and

the Court having held a hearing on the Motion on [__], 2017; and the Court having granted

interim relief on the Motion on [__], 2017 (Docket No. [__]); and the Court having held a final

hearing on the Motion on [__], 2017; and all objections to the Motion having been withdrawn,

resolved or overruled; and the Court having determined that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and it appearing that the relief

requested in the Motion is in the best interests of the Debtors, their estates, creditors, and all

parties in interests; and upon all of the proceedings had before the Court and after due

deliberation and sufficient cause appearing therefor,

RLF1 17750896V.1

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on a final basis, as provided herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), 503(b)(9), and 507(a)(8)(F) of the Bankruptcy Code, to satisfy all (i) Foreign Claims, including the Customs Duties, and (ii) Lien Claims, including the Shipping and Warehousing Charges, in an amount not to exceed $16,280,000 and $16,280,000, respectively, in the ordinary course of business.

3.      In exchange for payment of the Foreign Claims and Lien Claims, unless otherwise waived by the Debtors in their sole discretion, the Foreign Vendors and the Lien Claimants shall be required to continue to provide goods and services to the Debtors on the most favorable terms in effect between such Foreign Vendor or Lien Claimant and the Debtors in the twenty-four (24) month period preceding the Petition Date or on such other terms no less favorable to the Debtors as the Foreign Vendor or the Lien Claimant and the Debtors may otherwise agree (the "***Customary Trade Terms***").  The Customary Trade Terms shall apply for the remaining term of the Foreign Vendors' or Lien Claimants' agreements with the Debtors, as long as the Debtors pay for the goods and services in accordance with the payment terms provided in the agreement.

4.      The Debtors are authorized, but not directed, to obtain written verification, before issuing payment to a Foreign Vendor or Lien Claimant, that such Foreign Vendor or Lien Claimant will, if applicable, continue to provide goods and services to the Debtors on Customary Trade Terms for the remaining term of the Foreign Vendor's or Lien Claimant's agreement with the Debtors; *provided*, *however*, that the absence of such written verification shall not limit the Debtors' rights hereunder.

RLF1 17750896V.1

5.      If any Foreign Vendor or Lien Claimant is paid with respect to its Foreign Claim or Lien Claim and thereafter does not continue to provide goods or services to the Debtors on Customary Trade Terms, the Debtors reserve their rights to and may seek approval of this Court to (i) deem such payment to apply to postpetition amounts payable to such Foreign Vendor or Lien Claimant, if applicable, or (ii) take any and all appropriate steps to cause such Foreign Vendor or Lien Claimant to repay payments made to it on account of its prepetition Foreign Claim or Lien Claim to the extent that such payments exceed the postpetition amounts then owing to such Foreign Vendor or Lien Claimant.  Upon recovery by the Debtors, the Foreign Claim or the Lien Claim shall be reinstated as a prepetition claim in the amount recovered.

6.      The Debtors are authorized, but not directed, to pay Lien Claimants, regardless of whether their claims arose prior to or after the Petition Date, if such Lien Claimants have perfected one or more liens in respect of such claims, or if the Debtors determine, in their business judgment, that the Lien Claimants are capable of perfecting such liens; *provided, however,* that no such payment shall be deemed to be a waiver of rights regarding the extent, validity, perfection, or possible avoidance of any such liens.

7.      For any payments to Lien Claimants on account of liens obtained by the Lien Claimants, the Lien Claimants receiving the payments shall take whatever action is necessary to remove such liens, if any, at such Lien Claimant's sole cost and expense.

8.      All undisputed obligations of the Debtors arising from the postpetition delivery or shipment by Vendors of goods under the Prepetition Orders are granted administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and the Debtors are authorized, but not directed, to pay such obligations in the ordinary course of business consistent with the parties' customary practices in effect prior to the Petition Date.

RLF1 17750896V.1

9.      Applicable banks and financial institutions are authorized, but not directed, at the Debtors' request, to receive, process, honor and pay, to the extent of funds on deposit, any and all checks issued or to be issued or electronic fund transfers requested or to be requested by the Debtors relating to the Foreign Claims and the Lien Claims.

10.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the Foreign Claims and the Lien Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of the Chapter 11 Cases.

11.      Nothing contained in this Final Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Final Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

12.      Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

13.      Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder shall be subject to the same limitations and restrictions as are provided for in any order of this Court approving the Debtors' entry into any accommodation or similar agreements with the Consenting OEMs and granting the Consenting OEMs adequate protection in connection therewith (each a "***Adequate Protection Order***").  To

RLF1 17750896V.1

the extent there is any conflict between this Final Order and any Adequate Protection Order, the terms of such Adequate Protection Order shall control.

14.     Notwithstanding the provisions of Bankruptcy Rule 6004(h), this Final Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all steps necessary or appropriate to carry out this Final Order.

16.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Final Order.

Dated: _____, 2017
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 17750896V.1