## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                                                            :

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **TK HOLDINGS INC.,** *et al.*, | : | **Case No. 17-11375 (___)** |
| | : | |
| **Debtors.**[1] | : | **Joint Administration Requested** |
| | : | |

-------------------------------------------------------x

## DECLARATION OF SCOTT SIMPTON IN SUPPORT OF THE DEBTORS' MOTIONS TO PAY PREPETITION OBLIGATIONS OWED TO CERTAIN CRITICAL VENDORS, FOREIGN VENDORS, AND LIEN CLAIMANTS

I, Scott Simpton, make this declaration under 28 U.S.C. § 1746:

1.      I am the Vice President of Supply Chain Management of TK Holdings Inc. ("***TKH***"), which is headquartered in Auburn Hills, Michigan.  I have held this position with TKH since March 2, 2016 and am responsible for leading several key areas of TKH's business, including purchasing, supplier management, and logistics.  I joined an affiliate of TKH in 1991 and have held a variety of roles over the past twenty-six (26) years with TKH, or its affiliates, in both the United States and Mexico, including Director of Manufacturing for Seat Belts, Director of Purchasing, Vice President of Operations Support, Vice President of Seat Belt Operations, and certain positions with TKH's Global Logistics team.

2.      On June 25, 2017 (the "***Petition Date***"), TKH and certain of its North American affiliates and subsidiaries (collectively, the "***Debtors***") each commenced a case (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy***

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

*Code*").  As TKH's Vice President of Supply Chain Management, I am knowledgeable and familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records with respect to purchasing and supplier issues.  I am also intimately familiar with the Debtors' supply chain and the status of the Debtors' relationships with their various suppliers.

3.       I submit this declaration (the "***Declaration***") in support of the following motions filed by the Debtors contemporaneously herewith (collectively, the "***Vendor Motions***"):

(a)     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) for Interim and Final Authority to Pay Prepetition Obligations Owed to Certain Critical Vendors (the "***Critical Vendors Motion***"); and

(b)     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Obligations Owed to Certain Foreign Vendors and Lien Claimants and (II) Grant Administrative Status for Certain Goods Delivered to the Debtors Postpetition (the "***Foreign Vendors and Lien Claimants Motion***").

4.       I have reviewed the Vendor Motions or have otherwise had the contents of each such motion explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations so as to permit an effective transition into chapter 11 and preserve and maximize the value of the Debtors' estates.  As set forth below, the relief requested in the Vendor Motions is of the utmost importance in light of the unprecedented recalls involving certain of the Debtors' airbag inflators and the need to ensure a stable and continuous supply of replacement parts to the Debtors' original equipment manufacturer customers (the "***OEMs***" or the "***Customers***").  Additionally, the relief sought in the Vendor Motions is essential to preserving the diminishing value of the Debtors' estates and relationships with their Customers, vendors, and suppliers in connection with the proposed sale of substantially all of the Debtors' assets.

5.　　　Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' professionals, including Weil, Gotshal & Manges LLP ("*Weil*") and PricewaterhouseCoopers LLP ("*PwC*"), working with the Debtors, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the automotive safety industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

## The Debtors' Operations

6.　　　The Debtors and their non-debtor affiliates (collectively, "*Takata*") are a leading global developer and manufacturer of automotive safety and non-safety systems, including airbag systems, seat belts, steering wheels, child seats, and electronic devices such as satellite sensors and electronic control units.  Takata has production facilities on four continents and is a major Tier One automotive supplier to the largest OEMs in the world, including BMW, Daimler, FCA, Ford, General Motors, Honda, Toyota, and Volkswagen, as well as other global OEMs and Tier One suppliers.  The safety-critical and highly-engineered nature of the Debtors' products necessitates significant collaboration between the Debtors, their Customers, and the Debtors' suppliers during all stages of the manufacturing process, including the design, development, and testing stages.

## The Debtors' Business Model and Supply Chain

7.　　　As is commonplace throughout the automotive industry, the Debtors' businesses function under a tiered supply chain structure.  Under this structure, the Debtors produce the specialized component parts, service parts, and assembled goods utilized and incorporated by their Customers into their platforms and vehicles.  The automotive

RLF1 17750894V.1

manufacturing industry necessarily has a customer base that demands highly specific and customized products.

8.    As a Tier One supplier, the OEMs rely on the Debtors to provide a constant and steady supply of component goods.  The Debtors' business relationships with the OEMs begin when the Debtors are awarded a new program, which generally occurs two to three years prior to the production launch.  The Debtors' products must then be designed, tested, and specifically qualified for the particular applications awarded by the OEMs.  This system allows for high revenue visibility and a large program backlog (subject to ultimate production volumes on a particular platform) and often leads to the Debtors being the sole manufacturer of certain essential component parts and vehicle systems utilized by their Customers.

9.    If outside suppliers are needed, the Debtors will engage with sub-suppliers for specialized and unique parts, materials, and services.  Many of the parts sold to the Debtors are custom designed months or years in advance of production and built to fit the Debtors' and the OEMs' specified needs.  Accordingly, the Debtors will often do business with one vendor for a particular component part and rely on that vendor as their sole source supplier (*i.e.*, the only supply source for certain complex parts and specifically designed systems necessary to the Debtors' production process).  Sole sourcing is driven by the rigorous certification process that the Debtors and their suppliers must undertake for a significant portion of the parts integrated into the products shipped to their Customers and, ultimately, incorporated into a completed vehicle.  Using sole source suppliers allows the Debtors to reduce the costs of product start-up, tooling,[2] capital investment, and validation, which are necessary to make each

---

[2] In the ordinary course of their businesses, the Debtors must acquire the manufacturing components and machines needed for production of the parts and components they provide to the OEMs, which often includes unique tooling such as specific fixtures, jigs, gauges, molds, dies, cutting equipment, and patterns.  Accordingly, in the ordinary course of business, the Debtors acquire specialized tools and equipment on behalf of many of their Customers, though in many instances the Customers may own the tooling equipment and use the Debtors to subcontract the tool production work.

part and to achieve consistent quality.  Sole sourcing is a normal practice in the automotive

industry and is required to remain cost-competitive.  Additionally, a number of the Debtors'

suppliers are "directed-buy" suppliers, which makes them equally as difficult to replace.  These

factors, in addition to the lengthy validation testing described below, impose significant obstacles

to the Debtors' ability to re-source goods to alternative suppliers, making certain vendors

essential to the success of the Debtors' businesses.

    10. More specifically, the parts produced by the Debtors and the constituent

components of these parts must meet demanding specifications mandated both by the Debtors

and the Customers, as well as federally mandated safety standards, before they can be used in the

Debtors' manufacturing process.  Due to these extensive design, development, and certification

requirements, the process by which the Debtors and the OEMs select and certify a new supplier

and a new program can take approximately eighteen (18) to twenty-four (24) months.  Any

attempt by the Debtors to re-source a product or shift business to a different vendor after

production is commenced would result in the loss of the Debtors' certification for that

component part.  The Debtors would then be required to implement a re-sourcing process,

including the "Production Part Approval Process," necessary for certain automotive parts to be

approved for production.  This requalification process can take approximately four (4) to six (6)

months for standard products and up to eighteen (18) months for highly engineered products.

Even if the Debtors were able to re-source a part, the process of seeking out an alternative

supplier, transferring tooling from the old supplier to the new supplier, and renegotiating

contractual provisions would create an expensive and time-consuming burden for the Debtors.

    11. Additionally, to operate their businesses, the Debtors and their Customers

rely, in many instances, on a daily or weekly "just-in-time" inventory supply system, making the

Debtors highly dependent on the inventory supplied by certain vendors to meet the OEMs' needs

for production.  This process is utilized to minimize inventory costs and allow for rapid shifts in manufacturing output based on consumer purchasing trends.  As a result, however, the Debtors and their Customers maintain a low inventory of finished parts and raw materials and may schedule deliveries of components directly to the assembly line.

12.     In order for the Debtors to continue producing and supplying the OEMs with components in a timely manner, the Debtors will need to continue purchasing goods and services from those vendors that have developed capabilities and expertise specific to the Debtors' needs that cannot be easily replaced, if at all, and would be lost if the Debtors were forced to seek similar services elsewhere.  Any delay or disruption in the flow of critical goods and services to the Debtors would materially impact the Debtors' ability to supply parts to the OEMs and have a severe impact on the OEMs and their ability to continue their production lines.  This is especially true with respect to the ongoing recalls and the need to continuously manufacture and supply the OEMs with replacement kits.  The OEMs' ability to assemble cars, therefore, is directly dependent on the Debtors' ability to deliver component parts on schedule.

13.     Based on their books and records as of the Petition Date, the Debtors estimate that they have approximately 1,400 vendors and service providers with outstanding thirty party accounts payable prepetition claims in the amount of approximately $118,000,000.  As set forth below, the Debtors are not seeking authorization to pay all claims of prepetition vendors pursuant to the Vendor Motions.  Rather, the Debtors are seeking authority to pay the prepetition claims of those vendors and service providers who are critical and necessary to ensure the Debtors' operations go uninterrupted.  Furthermore, as set forth below and in the Vendor Motions, in most cases payment to such vendors will be conditioned on receipt of favorable trade terms.  Accordingly, approval of the relief requested in the Vendor Motions is

essential to avoiding an interruption in the supply of component parts to the Debtors' Customers, including a continuous and stable supply of replacement kits.

## The Vendor Motions

### A.    The Critical Vendors Motion

14.    Pursuant to the Critical Vendors Motion, the Debtors are requesting authority to pay prepetition obligations of certain vendors, suppliers, service providers, and other similar entities that provide goods or services critical to the ongoing operation of the Debtors' businesses (the "*Critical Vendors*," whose claims are the "*Critical Vendor Claims*") in the ordinary course in an amount not to exceed $35,580,000 on an interim basis and $47,440,000 on a final basis.  As discussed above, the Debtors operate in a highly specialized industry that requires them to rely heavily on certain Critical Vendors to provide raw materials, unique parts and equipment, and specialized services necessary to manufacture the Debtors' automotive products.  Without these goods and services, the Debtors' businesses would suffer sever disruption, jeopardizing the Debtors' continued operations.

15.    With the assistance of Weil and PwC, the Debtors spent significant time prior to the Petition Date reviewing and analyzing their books and records, open accounts payable systems, and prepetition vendor lists to identify those vendors and suppliers that are in fact critical to the Debtors' operations.  In addition to considering whether a vendor operates under a long-term supply contract, the Debtors primarily  considered the following criteria to identify the Critical Vendors:

(a)    Sole Source Providers.  To meet production requirements and demands, the Debtors utilize a number of lower-tiered sole source suppliers that cannot be timely and/or efficiently replaced given the specialized nature of the goods they provide.  Using sole source suppliers reduces product variation, keeps production costs down, and optimizes the efficiency of the Debtors' supply chain.

(b)     Directed-Buy Suppliers.  A number of the Debtors' component parts suppliers are "directed-buy suppliers," which means that the Debtors are directed by their Customers to utilize the component parts of such suppliers.  In addition, a number of the component parts purchased by the Debtors are custom-designed and built to meet the specific needs of the Customers in accordance with applicable agreements.

(c)     Highly Engineered Component Parts.  Any time a new component part is introduced into production, the part must undergo a detailed validation testing process.  In addition, before completion, component parts must undergo a lengthy, time-consuming, and intensive design and development process.  For example, because most of the component parts are safety-critical, they must be homologated, or crash-tested, in accordance with rigorous federal safety standards.  As a result, many of the component parts supplied by the Debtors' vendors require substantial lead time to develop and cannot be replaced in an efficient manner.

(d)     Advantageous Pricing.  In certain instances, the Debtors receive advantageous pricing or other terms from their vendors as a result of the business history that has developed between the vendor and the Debtors.  If such suppliers were to refuse to deliver goods, the Debtors would be forced to purchase supplies on the spot market.  The price differential between raw materials or other supplies procured from suppliers with whom the Debtors have a long standing relationship and receive favorable pricing and raw materials procured on the spot market could, in some instances, create an increase in operating costs that would detrimentally affect the Debtors' operations.

(e)     The Vendor May Face Its Own Liquidity Crisis.  Certain of the Debtors' vendors may face their own liquidity crisis due to such vendor's operational or cash flow issues if the Debtors were to withhold payment on account of such vendor's prepetition claims.

16.     Based on these criteria, the Debtors identified a limited roster of Critical Vendors that generally fall into one of the following categories: (i) production material suppliers, which supply the Debtors with component parts and raw materials utilized in the chain of production and specialized tools that are integral to the Debtors' manufacturing processes ("**Production Material Suppliers**"), and (ii) maintenance, repair, and operations providers, which provide the Debtors with equipment and materials relating to the Debtors' specialized manufacturing equipment and machinery, as well as freight logistics services ("**MRO Providers**").

17.    The Production Material Suppliers generally consist of component parts suppliers, tool makers, and raw material supplies, which are described in further detail below.

(a)    <u>Component Parts Suppliers and Tool Makers.</u>    To meet production requirements and demand, the Debtors utilize a number of lower-tiered component parts providers, a large portion of which are sole source suppliers. Certain of the sole source component suppliers are also "directed-buy suppliers" where the Debtors are directed by their Customers to utilize the components of a specific sub-supplier.  The Debtors often do business with a large number of these component parts suppliers for the production of specialized tools, moldings, fixtures, and special machines necessary for the production of the Debtors' various products.  Accordingly, at any given time, a number of component parts suppliers may be in the process of producing both parts and tools that the Debtors will need to continue existing lines of business or to launch new production programs.  Many of these component parts suppliers have demanded that the Debtors satisfy their prepetition obligations as a condition to continuing performance on a postpetition basis. Indeed, certain of the component parts suppliers have already refused to deliver parts and new tooling to the Debtors or to return tooling that they are servicing absent payment of their outstanding invoices and modifications to their ongoing payment terms.  As discussed above, a significant amount of the component parts and tools supplied by the Critical Vendors require substantial lead time to develop.  Because a portion of the Debtors' business is positioned in a "just-in-time" nature, delay or stoppage in shipment may significantly delay, or even halt, an entire production line.  Finding replacements parts and tooling that meet both the Debtors' and the OEMs' specifications in a timely and cost-effective manner is virtually impossible and simply not an option for the Debtors given the critical and ongoing need for the Debtors' production of replacement kits for recalled inflators.

(b)    <u>Raw Materials and Other Production Suppliers</u>.  In the ordinary course of their businesses, the Debtors also utilize a number of production suppliers and rely on the timely delivery of materials, including raw materials and certain chemical compounds, which are necessary to fulfill Customer demands. Many of these suppliers provide specialty materials utilized in the production process that cannot be easily replaced and are sole source providers. Additionally, if any of the raw material vendors refused to deliver without prepetition payment, the Debtors would be forced to purchase necessary raw materials, including rubber, plastic, magnesium, steel, silicone, and wood, on the spot market.  The Debtors believe that the price differential between raw materials procured from suppliers with whom the Debtors have a long standing relationship and receive favorable pricing and raw materials procured on the spot market could create an increase in operating costs that would detrimentally effect the Debtors' operations.  Further, if the Debtors are forced to procure raw materials on the spot market, they would be subject to product availability risks and the validation processes required by their Customers.

18.     The MRO Providers generally consist of essential operational service providers and dedicated third party logistic providers, which are described in further detail below.

(a)     <u>Essential Operational Service Providers</u>.  The Debtors rely on certain service providers to assist with some of their most critical business functions, such as equipment maintenance, information technology work, and work pertaining to their crash and other testing simulation software.  Demand for these particular services is high and the availability of qualified personnel is often extremely limited.  If the Debtors were required to suddenly change service providers, it would likely require a significant amount of time, capital, and other resources to locate qualified replacements, to the extent such replacements exist.

(b)     <u>Dedicated Third-Party Logistic Providers</u>.  The Debtors employ the services of certain third-party logistics providers that provide a range of supply chain services, including highly engineered solutions and high-value-add contract logistics, to the Debtors.  The logistics providers arrange for the transportation and delivery of goods from the Debtors' manufacturing facilities to the OEMs and from the Debtors' suppliers to the Debtors' facilities.  During the twelve (12) months prior to the Petition Date, approximately 68% of the Debtors' freight logistics costs were incurred by, and paid to, XPO Logistics, Inc. ("*XPO*").  With respect to the freight carriers and transportation service providers that the Debtors do not contract with directly, the Debtors remit payment to XPO and XPO subsequently pays the freight carriers.  Accordingly, if XPO's invoices remain unpaid, there is a risk that the freight carriers' invoices will not be paid.  In such an event, the freight carriers may try to assert possessory liens for transportation or storage costs and may refuse to deliver or release goods in their possession until their claims are satisfied, notwithstanding that the Debtors do not contract with them directly.  Further, XPO serves the Debtors' businesses with dedicated personnel and equipment physically located at the Debtors' San Antonio facility in two capacities.  First, XPO runs a call center on site at the San Antonio, Texas facility staffed with approximately twelve (12) employees to track inflator return inventory at dealerships across the country.  Second, XPO has dedicated approximately twelve (12) employees for its logistics coordination services, which are run out of the San Antonio, Texas facility.  XPO is, therefore, highly integrated into the Debtors' business operations, manufacturing processes, and delivery schedules and is familiar with the OEMs.  Absent the continued services provided by XPO, the Debtors would risk disruption in their supply and delivery chain and would be unable to transport their products in a timely and cost-effective manner

19.     Following their prepetition identification of the Critical Vendors, the Debtors and their advisors developed and implemented a detailed protocol (the "*Payment*

RLF1 17750894V.1

*Protocol*") to route all requests for Critical Vendor treatment through a team comprised of certain members of the Debtors' purchasing and finance teams, Weil, and PwC (the "*Vendor Contingency Team*").  To minimize the amount of payments required, the Debtors will utilize the Payment Protocol annexed to the Critical Vendor Motion as **Exhibit A** to identify Critical Vendors and pay Critical Vendor Claims.  The Debtors' Payment Protocol can be generally summarized as follows:

(a)     All aspects of any proposed payment to a Critical Vendor will be scrutinized for, among other things, the amount of payment at issue, the terms offered by the particular vendor, and the business need for the goods or services at issue.

(b)     Requests for Critical Vendor treatment, or suppliers refusing shipment due to non-payment of prepetition claims, will first be received by members of the Debtors' purchasing team and forwarded to the appropriate employee based on the payment thresholds listed in paragraph (c) below.  In certain circumstances, requests for Critical Vendor treatment may be forwarded to the Debtors' Vice President of Supply Chain Management, who will determine whether the requests should be escalated and routed to the Vendor Contingency Team, which includes professionals from the Debtors' financial advisors and restructuring counsel, for review.

(c)     Material business terms (including proposed payments) require approval by (i) specifically-designated buyers, for proposed payments under $5,000, (ii) specifically-designated directors, for proposed payments of $5,000 up to $25,000, (iii) the Debtors' Vice President of Supply Chain Management, for proposed payments of $25,000 up to $150,000, and (iv) the Debtors' Chief Financial Officer, for proposed payments over $150,000.

(d)     Unless otherwise agreed by the Debtors' Vice President of Supply Chain Management or the Vendor Contingency Team, all proposed payments must be documented pursuant to an executed vendor agreement.

(e)     Payment may be executed by specifically-designated members of the Debtors' finance department when the Payment Protocol has been completed and upon presentation of completed documentation.

20.     Although the Debtors have effectively "pre-screened" certain vendors who have satisfied the criteria for Critical Vendor treatment, the Debtors are keenly aware they must be prepared to address new or additional exigencies should they emerge, particularly in light of the size and scope of the Debtors' operations.  Thus, the Debtors' Payment Protocol includes

RLF1 17750894V.1

specific processes by which vendors may be designated as "Critical Vendors" on a case-by-case basis.  This process will also be routed through the Debtors' Vendor Contingency Team, with executive level of approvals required for such Critical Vendors to receive payment on account of a prepetition claim.  The Debtors have also educated lower-level procurement, payables, and operations personnel on the process.  Accordingly, the Debtors have put into place detailed procedures for identifying and selecting Critical Vendors and ensuring that only Critical Vendors will be paid on account of their prepetition claims.

> ### B.    The Foreign Vendors and Lien Claimants Motion

21.    Pursuant to the Foreign Vendors and Lien Claimants Motion, the Debtors are requesting authority to pay prepetition obligations of certain foreign vendors (the "*Foreign Vendors*," whose claims are the "*Foreign Claims*") and shippers, warehousemen, mechanics, and other similar claimants that may have or be capable of asserting liens against the Debtors' property (collectively, the "*Lien Claimants*," whose claims are the "*Lien Claims*").[3]  The Debtors are seeking to pay the Foreign Vendor Claims in the ordinary course in an amount not to exceed $13,024,000 on an interim basis and $16,280,000 on a final basis.  Additionally, the Debtors are seeking to pay the Lien Claims in the ordinary course in an amount not to exceed $13,024,000 on an interim basis and $16,280,000 on a final basis.

22.    The Debtors identified the Foreign Vendors and Lien Claimants based on the following criteria:

(a)    Foreign Vendors.  In light of the size, sophistication, and global nature of the Debtors' airbag, seat belt, and other safety and non-safety manufacturing businesses, the Debtors regularly transact business with vendors and service providers located outside of the United States.  The Debtors rely on the Foreign Vendors, which are primarily located in Europe, Asia, and Mexico, to grant or supply various goods or services that are crucial to the Debtors' ongoing manufacturing operations in the United States and Mexico. The Foreign

---

[3] The Critical Vendors, Foreign Vendors, and Lien Claimants are collectively referred to herein as the "*Vendors*" and claims of the Vendors to be paid pursuant to the Vendor Motion are referred to herein as "*Vendor Claims*."

Vendors are generally comprised of: (i) suppliers located in China, Japan, the Czech Republic, France, Germany, Korea, Mexico, and elsewhere in Europe and Asia that provide the Debtors with critical component parts that are utilized in their production and manufacturing processes; (ii) raw materials suppliers located outside of the United States; and (iii) certain international production suppliers that provide the Debtors specialty materials utilized in the Debtors' production processes.

(b)     <u>Shippers and Warehousemen</u>.    In operating their businesses, the Debtors use and make payments to various common carriers, shippers, and other transportation service providers (collectively, the "***Shippers***") to ship, transport, and deliver raw materials and other component parts used in the Debtors' manufacturing activities and the Debtors' finished products to their Customers.    The Debtors also utilize certain third party warehouses and storage facilities (collectively, the "***Warehousemen***") to store excess raw materials, supplies, and finished products, as well as goods in transit.    As of the Petition Date, the Debtors estimate the value of goods and supplies they have in transit with the Shippers and in storage with the Warehousemen is $35,000,000 and $2,000,000, respectively.

(c)     <u>Other Lien Claimants</u>.    The Debtors routinely engage a number of other third parties, including equipment manufacturers, tool makers, service technicians, materialmen, and other service providers (collectively, the "***Other Lien Claimants***").    The Other Lien Claimants generally include the following: (i) equipment manufacturers who make specialized equipment and parts needed to support the production of the Debtors' safety and non-safety automotive and other products; (ii) tool makers that require significant lead time for their selection and the design and manufacture of the tools; (iii) suppliers that utilize specialized tooling owned by the Debtors to produce component parts; and (iv) miscellaneous lien claimants.    As of the Petition Date, the Debtors estimate that approximately $15,940,000 has accrued and remains unpaid in account of prepetition services performed by the Other Lien Claimants.

23.     It is essential for the Debtors' ongoing business operations to maintain constant, reliable, and efficient manufacturing, supply, and delivery systems.  Because the Foreign Vendors lack minimum contacts with the United States, they will likely consider themselves to be beyond of jurisdiction of the Court and disregard the automatic stay.  The Foreign Vendors would, therefore, be able to immediately pursue remedies and seek their prepetition payments from the Debtors.  In the absence of enforcement of the automatic stay, the Foreign Vendors may also attach or seize the Debtors' assets even before obtaining a judgment. Additionally, certain Shippers and Warehousemen that hold goods for  delivery to or from the

Debtors may refuse to release the goods pending receipt of payment for their prepetition services.  It is my understanding that, under some state laws, a Shipper or Warehouseman may have a possessory lien on the goods in its possession, which secures payment of the charges and related expenses incurred in connection with the transportation or storage of goods.  I further understand that many of the Other Lien Claimants may be able to assert and perfect liens, including mechanic's liens, artisan's liens, and materialman's liens against the Debtors' property and, in some cases, the OEMs' property, if the Debtors fail to pay for the goods or services rendered.   The asserting of liens over or withholding delivery of the Debtors' goods would disrupt the Debtors' production and cause immediate loss in production and irreparable economic harm.

## The Relief Requested Pursuant to the Vendor Motions Should Be Granted

24.    As noted above and in the Vendor Motions, the Debtors have a highly sensitive supply chain that could easily be disrupted by a vendor that refuses to continue to provide the Debtors with essential parts, goods, and services.   Any such disruption would jeopardize the Debtors' ability to fulfill commitments to their Customers and have an immediate and catastrophic effect on the Debtors' operations.  Maintaining the goods and services provided by the Vendors is essential to ensuring a stable and continuous supply of replacement kits and to removing recalled inflators from circulation as quickly as possible to minimize public risk. Additionally, maintaining a stable source of supply and good relationships with the supply base is vital to the Debtors' ability to consummate a going-concern sale transaction for the benefit of all stakeholders.

25.    I believe that the Debtors must satisfy certain prepetition payables to the Vendors early in these Chapter 11 Cases to avoid a disruption in supply to our Customers and the disastrous effects that would result therefrom.  Indeed, in the months immediately preceding the

14

Petition Date, a significant number of suppliers contacted TKH management and demanded changes in payment and credit terms. Some of these suppliers have already refused to ship product to the Debtors altogether unless the Debtors complied with their restrictive payment terms, including cash in advance and cash on demand. Accordingly, the Debtors have been forced, based on threats of non-shipment, to accelerate payment terms with more than 145 of their vendors and suppliers, which negatively impacted the Debtors' cash and liquidity by approximately $46,000,000. This includes a diminishment to the Debtors' cash position by approximately $31,200,000 in the past twelve (12) months. These threats will inevitably increase with news of the commencement of these Chapter 11 Cases, and the Debtors believe, based on their experience, that some of the vendors they deem to be critical to their operations will demand payment of their prepetition obligations as a condition to doing business on a go-forward basis as a result.

26.     Allowing the Debtors to selectively pay the prepetition claims of the Vendors, in accordance with the procedures and terms detailed in the Vendor Motions, will serve the purpose of maintaining the Debtors' operations and facilitating the success of these Chapter 11 Cases. Additionally, the Debtors and their advisors have developed a rigorous process to ensure that payments are made only to those vendors that are truly critical. Given the customized nature of the Debtors' businesses and the demonstrated benefits to be obtained in exchange for any payments to the Vendors discussed herein, such expenditure of estate funds is minimal when compared to the value of the Debtors' enterprise at risk. Further, the payment caps proposed in the Vendor Motions accurately and fairly represent the aggregate amount that will suffice to ensure the success of the Debtors' ongoing operations.

27.     If authorized to pay the Vendor Claims, the Debtors will use commercially reasonable efforts to require the applicable Vendors to provide favorable trade terms consistent

with historical practice.  Specifically, where appropriate and practicable, the Debtors will seek to condition payment of a Vendor Claim on such Vendor's agreement to continue providing supplies or services to the Debtors in accordance with those practices and programs most favorable to the Debtors in place in the twenty-four (24) months prior to the Petition Date or such other favorable terms as the Debtors and such Vendor may mutually agree.

28.    Based on the foregoing, I submit that the relief requested in the Vendor Motions is necessary to preserve the value of the Debtors' estates and is in the best interests of the Debtors and all of their stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: June 25, 2017                              /s/ Scott Simpton
      Auburn Hills, Michigan          By: Scott Simpton
                                 Title: VP, Supply Chain Management

RLF1 17750894V.1