UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

-------------------------------------------------------x
                                    :

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **TK HOLDINGS INC.**, *et al.*, | : | **Case No. 17-11375 (___)** |
| | : | |
| **Debtors.**[1] | : | **Joint Administration Requested** |
| | : | |

-------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 503, 506 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004, AND 9014 FOR ENTRY OF AN INTERIM AND FINAL ORDER (I) AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENT AND ACCESS AGREEMENT WITH CERTAIN CUSTOMERS, (II) GRANTING ADEQUATE PROTECTION IN CONNECTION THEREWITH, (III) MODIFYING THE AUTOMATIC STAY TO IMPLEMENT AND EFFECTUATE THE TERMS THEREOF, AND (IV) SCHEDULING A FINAL HEARING**

        TK Holdings Inc. ("***TKH***") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "***Debtors***"), respectfully represent as follows in support of this motion (this "***Motion***"):

**Preliminary Statement**

        1.      As set forth below, despite the many complexities and challenges that have resulted from unprecedented and highly publicized product recalls, the Debtors are close to finalizing the terms of a global sale transaction with a potential plan sponsor (the "***Global Transaction***") that has the support of a significant majority of their original equipment

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

manufacturer customers (the "***Consenting OEMs***") and that will pave the way for a relatively quick and successful emergence of the Debtors' business from restructuring.  In connection with the anticipated Global Transaction and as an indication of their support, the Consenting OEMs, the Debtors, and certain other Takata (as defined below) entities have reached an agreement in principle on an accommodation agreement, the Global Accommodation Agreement (as defined below), that will provide certain Takata entities, including the Debtors, with valuable accommodations, including accelerated payments, setoff waivers, and resourcing limitations. Negotiations with respect to the Global Accommodation Agreement are ongoing, and although the parties have reached an agreement in principle, the draft attached hereto as **<u>Exhibit A</u>** remains subject to change.  These accommodations will provide Takata and the Debtors with ample and sufficient liquidity to operate during these chapter 11 cases (the "***Chapter 11 Cases***") and avoid any disruptions in supply of replacement kits and other component parts, service parts, assemblies, components, and/or other products (individually, a "***Component Part***" and collectively, "***Component Parts***") to their customers.

2.      As described herein and in the Caudill Declaration (as defined below), the Global Accommodation Agreement, which is one of the lynchpins of the success of the Global Transaction and the Debtors' contemplated chapter 11 plan, will provide significant value to the Debtors.  The Global Accommodation Agreement will provide hundreds of millions of dollars in needed liquidity and foster customer loyalty and confidence.  The agreement contemplates that in exchange for the valuable accommodations and liquidity enhancements that the Consenting OEMs will be providing, including agreeing to forbear from exercising setoffs against their existing accounts payable to the Debtors, the Debtors will agree to continue to manufacture and supply parts and replacement kits during the Chapter 11 Cases and to provide adequate

2

protection, including replacement liens and superpriority claims, to those Consenting OEMs that have outstanding prepetition amounts owed to the Debtors in respect of Component Parts or services provided by the Debtors under the Purchase Orders (such outstanding amounts, the "***Customer Accounts***", and the Consenting OEMs with Customer Accounts, the "***Secured Accommodation Parties***").  Furthermore, as is customary in the automotive industry, the Debtors are expected to agree, pursuant to the Access Agreement (as defined below), to provide the Consenting OEMs with limited rights to access and utilize the Debtors' facilities and equipment in the event there is a continuing default under the Global Accommodation Agreement that results in a substantial likelihood that a Consenting OEM's production will be interrupted before approval of the Global Accommodation Agreement is in the best interest of the Debtors, their estates, and their stakeholders.

## Relief Requested

3.      Accordingly, by this Motion, pursuant to sections 105, 361, 362, 363, 503, 506 and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors request entry of an interim and final order: (i) authorizing the Debtors to enter into (a) an accommodation agreement substantially in the form of the Accommodation Agreement among the Debtors, certain of their affiliates (as described below), and the Consenting OEMs, attached hereto as **Exhibit A** (together with any exhibits or schedules thereto, and as may be modified or amended

in accordance with the terms thereof, the "*__Global Accommodation Agreement__*"),[2] and (b) an

access and security agreement substantially in the form of the access agreement among the

Debtors, certain of their affiliates (as described below), and the Consenting OEMs attached

hereto as __Exhibit B__ (the "*__Access Agreement__*" and, together with the Global Accommodation

Agreement, the "*__Agreements__*"); (ii) granting adequate protection to the Secured Accommodation

Parties in connection therewith; (iii) modifying the automatic stay imposed under section 362 of

the Bankruptcy Code to the extent necessary to implement and effectuate the relief requested

therein; and (iv) scheduling a hearing to consider the relief requested herein on a final basis

(the "*__Final Hearing__*").

      4.      A proposed form of order granting the relief requested herein on an

interim basis is attached hereto as __Exhibit C__ (the "*__Interim Order__*").

### Bankruptcy Rule 4001 and Local Rule 4001–2 Concise Statements

      5.      Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2(a), the

Debtors submit the below concise statement of material terms of the proposed Interim Order.[3]

---

[2] Capitalized terms used but not defined herein having the meanings given to them in the Global Accommodation Agreement.  The draft Global Accommodation Agreement summarized herein represents an agreement in principle between the parties, but the agreement remains subject to ongoing negotiation and change.  The parties contemplate that the Global Accommodation Agreement, once finalized, will be an agreement between Takata affiliates across the globe, other than the Japan Debtors, as well as Consenting OEMs from around the world; however, the parties have until July 7, 2017 to sign on to the agreement.

[3] Any summary of the terms of the Global Accommodation Agreement contained in this Motion is qualified in its entirety by reference to the provisions of the Global Accommodation Agreement.  Bankruptcy Rule 4001(d)(1)(B) requires that the concise statement of material terms describe the provisions required by Bankruptcy Rule 4001(c)(1)(B).  Consequently, the Summary of Material Terms in this Motion will refer to the provisions of Bankruptcy Rule 4001(c).  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001–2 herein.

| Summary of Material Terms | | Location |
|---|---|---|
| **Secured Accommodation Parties**[4]<br>Bankruptcy Rule 4001(c)(1)(B) | Those Consenting OEMs with Customer Accounts. | Recitals of Accomm. Agmt. |
| **Effective Date** | The agreement becomes effective (the "***Effective Date***") as to each Initial Consenting OEM and each Debtor upon (i) execution of the Global Accommodation Agreement by such party, and (ii) as to the Debtors only, entry of the Interim Order.<br><br>In the event that all Initial Consenting OEMs and all Supplier parties have not, on or before July 7, 2017, (i) executed the Global Accommodation Agreement, (ii) executed the Access Agreement, and (iii) the Final Japan Accommodation Agreement is not executed and approved in the Japan Proceedings on or before a date to be determined, the Global Accommodation Agreement shall automatically terminate as to all parties without further action of any kind. | §1 of Accomm. Agmt. |
| **Use of Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B) | In accordance with the terms and conditions set forth in the Interim Order, and in exchange for the valuable accommodations and additional liquidity to be provided by the Secured Accommodation Parties and the other Consenting OEMs, the Debtors will be authorized to use proceeds of accounts payable of the Secured Accommodation Parties, during the Term (as defined in section 1 of the Global Accommodation Agreement) in accordance with the Budget (as defined below), including to support continued operations and production of Component Parts for the Consenting OEMs and to pay costs and expenses of administering the Global Transaction and the related restructuring of the Debtors' liabilities (including, without limitation, the payment of the Debtors' professional fees and expenses). | §6(f) of Accomm. Agmt.<br><br>¶9(g) of Interim Order |
| **Accelerated Receivables**<br>Bankruptcy Rule 4001(c)(1)(B) | In exchange for the Adequate Protection Obligations (as defined below), after taking into account any setoffs permitted pursuant to the Global Accommodation Agreement, each Secured Accommodation Party will make payment of its respective bona fide accounts payable to Supplier that are generated prior to or during the Term on account of Component Parts, Tooling, or services received by such Consenting OEM on an accelerated basis (the "***Accounts Payable Acceleration***") in accordance with a monthly cash flow forecast prepared by Supplier and | §6 of Accomm. Agmt. |

[4] The Global Accommodation Agreement is contemplated to be binding on all Consenting OEMs; however, this summary of material terms focusses on the Secured Accommodation Parties, as the proposed Interim Order is only binding upon the Secured Accommodation Parties.

| Summary of Material Terms | Location |
|---|---|
| | reasonably acceptable to affected Consenting OEMs in each region (the "***Budget***") up to approximately net 15-day payment terms.  The Accounts Payable Acceleration required in respect of the Debtors for any given period will be based on all Secured Accommodation Parties (i) accelerating to the shortest then existing payment terms and then, if necessary (ii) accelerating such shortest then existing payment term by the same number of days for each Secured Accommodation Party in accordance with the Budget.<br><br>In the event of unanticipated constraints on liquidity not contemplated by the Budget such that the process set forth above will not be sufficient to satisfy the Debtors' minimum cash requirements, the Secured Accommodation Parties will work in good faith with the Debtors to evaluate further accelerating their accounts payable in order to maintain adequate liquidity and to avoid any interruption in the Debtors' operations or in the supply of Component Parts to the Secured Accommodation Parties, notwithstanding that such additional Accounts Payable Acceleration may not be included in the approved Budget. | |
| **Adequate Protection Obligations** Bankruptcy Rule 4001(c)(1)(B)(i)-(ii) | Each of the Secured Accommodation Parties is entitled to adequate protection of its Prepetition Setoff Rights (as defined below) and Customer Secured Claims for and equal in amount to the aggregate diminution in the amount of such Prepetition Setoff Rights (each, an "***Adequate Protection Claim***")<br><br>To induce each Secured Accommodation Party to enter into the Agreements and to accelerate the payment of accounts payable (forbearing from exercising its Prepetition Setoff Rights), in exchange for such payment and as adequate protection of the Adequate Protection Claims, the Debtors have agreed to provide the following to the Secured Accommodation Parties (collectively, the "***Adequate Protection Obligation***s"):<br><br><u>Adequate Protection Liens</u>.  Subject to the Carve-Out (as defined below), each of the Secured Accommodation Parties will receive (effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), on a *pari passu* basis and in the amount of such Secured Accommodation Party's Adequate Protection Claim, (i) a first-priority replacement lien on all accounts owing by such Secured Accommodation Party to the Debtors following the Petition Date (each, a "***Replacement Lien***" and, collectively, the "***Replacement Liens***") (ii) a valid, perfected junior security interest in and lien upon all property of the Debtors, whether owned on the Petition Date or acquired thereafter (including any proceeds thereof), except for property subject to the Replacement | ¶¶9(a), 9(b) of Interim Order |

| Summary of Material Terms | | Location |
|---|---|---|
| | Liens, that is subject to unavoidable, perfected liens in existence immediately prior to the Petition Date (or that is perfected subsequent to the Petition Date pursuant to Section 546(b) of the Bankruptcy Code); and (iii) a senior *pari passu* lien on and security interests in all property of the Debtors, whether owned on the Petition Date or acquired thereafter, (including any proceeds thereof) other than the property (but not the proceeds thereof) described in the immediately preceding clauses (i) and (ii), in each case other than the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "***Avoidance Actions***"), but, subject only to and effective upon entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("***Avoidance Proceeds***") (the liens granted to the Secured Accommodation Parties pursuant to the foregoing clauses (i), (ii) and (iii), collectively, the "***Adequate Protection Liens***"); | |
| | Section 507(b) Claim.  Subject to the Carve-Out, each of the Secured Accommodation Parties will receive a superpriority claim as provided for in section 507(b) of the Bankruptcy Code (each, a "***507(b) Claim***" and, collectively, the "***507(b) Claims***"), which 507(b) Claims shall have recourse to and be payable from all property of the Debtors other than Avoidance Actions (but including, effective upon entry of the Final Order, Avoidance Proceeds), whether owned on the Petition Date or acquired thereafter, (including any proceeds thereof). | |
| **Carve-Out** Bankruptcy Rule 4001(c)(1)(B) | The Interim Order provides (and the Final Order shall provide) a "Carve-Out" of certain statutory fees and allowed fees, costs and expenses of professionals employed by the Debtors or the official committee of unsecured creditors (if one is appointed) (the "***Creditors' Committee***"), whose retention is approved pursuant to sections 327 and 1103 of the Bankruptcy Code, all as detailed in the Interim Order | ¶9(c) of Interim Order |
| **Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Until the Final Order is entered or the Interim Order is reversed or vacated, the automatics stay will be vacated and modified to permit the Secured Accommodation Parties, to (a) at any time, exercise their setoff rights with respect to Allowed Setoffs, Professional Fee Setoffs, Tooling Setoffs and Materials Setoffs; (b) send any notices required or permitted to be sent under the Interim Order or the Agreements; (c) subject to the limitations set forth in the Global Accommodation Agreement, continue their ordinary course of dealings with the Debtors consistent with past practices, including to take possession of Tooling or other | ¶8 of the Interim Order |

| Summary of Material Terms | Location |
|---|---|
| property of the Secured Accommodation Parties, to the extent permitted under, and in accordance with, the terms of the Agreements and to resolve normal commercial issues consistent with the Global Accommodation Agreement; and (d) upon (i) the occurrence of the Outside Date, (ii) the termination of the Global Accommodation Agreement following the occurrence of a Consenting OEM Termination Event (as defined in the Global Accommodation Agreement), or (iii) with respect to any Secured Accommodation Party the termination of the Global Accommodation Agreement by such Secured Accommodation Party following the occurrence of an Event of Default, upon the giving of five days' prior written notice (which shall run concurrently with any notice required to be provided under the Global Accommodation Agreement) (the "***Remedies Notice Period***") to counsel to the Debtors, who shall then promptly notice the U.S. Trustee, counsel to the Creditors' Committee, and counsel to the Plan Sponsor unless the Court orders otherwise during the Remedies Notice Period upon a Remedies Hearing (as defined below), (A) exercise any then-remaining Prepetition Setoff Rights, (B) exercise any and all remedies under the Agreements, and (C) exercise remedies with respect to the assets of the Debtors subject to the Adequate Protection Liens. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | In addition to certain Events of Default and Consenting OEM Termination Rights that would entitle a Secured Accommodation Party or the Requisite Consenting OEMs, as applicable, to terminate the Global Accommodation Agreement, the Global Accommodation Agreement includes certain milestones relating to the Plan and other documents, including the following:<br><br>(i) Supplier and the Plan Sponsor shall substantially finalize definitive Acquisition Agreements for the Sale, in form acceptable to the Initial Consenting OEMs, on or before July 17, 2017 and such Acquisition Agreements shall be executed on or before July 31, 2017.<br><br>(ii) Supplier, the Plan Sponsor and the applicable Initial Consenting OEMs shall be substantially finalize the U.S. RSA, which includes the U.S. Reorganization Plan as an exhibit, and the Japan RSA, which includes the Japan Insolvency Plan as an exhibit, each such RSA in form acceptable to the Initial Consenting OEMs, on or before July 17, 2017, and such RSAs shall be executed on or before July 31, 2017.<br><br>(iii) Supplier and the applicable Initial Consenting OEMs shall substantially finalize the Settlement Agreements, including the EMEA Settlement Agreement, in form acceptable to the Initial Consenting OEMs, on or before | §§1, 25 of Accomm. Agmt; |

| Summary of Material Terms | | | Location |
|---|---|---|---|
| | | July 17, 2017, and such Settlement Agreements are executed on or before July 31, 2017. | |
| | (iv) | Entry of the Interim Adequate Protection Order and the Final Adequate Protection Order assuming the Global Accommodation Agreement (and the Access Agreement) and approving the Adequate Protection Rights in the U.S. Proceedings within three (3) calendar days and thirty-five (35) calendar days following the Petition Date, respectively; | |
| | (v) | Confirmation of, and occurrence of the effective date under, the U.S. Reorganization Plan; approval of the Section 42 Business Transfer, or, alternatively, approval and confirmation of the Japan Insolvency Plan; closing of the Sale to the Plan Sponsor (the "***Closing***"), and consummation of the Restructuring (collectively, the "***Consummation Date***") before February 27, 2018 (the "***Outside Date***"); <u>provided</u>, <u>however</u>, that if the deadline for the payment of the USD $850,000,000 restitution payment payable by Takata under the DOJ Plea Agreement (the "***DOJ Restitution Award***") is extended, the Outside Date shall be extended to the new date on which such restitution payment is due, subject to the consent of the Requisite Consenting OEMs; and, <u>provided further</u>, the Outside Date may not be extended beyond March 31, 2018 without the consent of all Initial Consenting OEMs. | |
| **Releases** Bankruptcy Rule 4001(c)(1)(B)(viii) | | Effective as of the entry of the Final Order, unless expressly and successfully challenged in a Challenge Proceeding (as defined below), each of the Debtors, on behalf of themselves and all of their respective officers, directors, employees, owners, agents, assigns, trustees, successors, and representatives, each in its capacity as such, hereby releases, acquits, and discharges each Consenting OEM and each Consenting OEM's officers, directors, employees, members, owners, agents, assigns, shareholders, successors, representatives, and their parents, subsidiaries, affiliates, joint ventures listed on **<u>Schedule 2</u>** to the Global Accommodation Agreement, each in its capacity as such, from all claims, liabilities, demands, actions, causes of action, losses, damages, costs, expenses, rights, compensation, of whatever kind or nature, at law or in equity, foreseen or unforeseen, contingent or liquidated, matured or unmatured, known or unknown, that exist now, have ever existed, or may exist in the future relating to or arising from any action or inaction prior to the Petition Date (collectively the "***Claims***"), including, but not limited to, Claims that relate directly or indirectly to a Consenting OEM's decision | §20 of Accomm. Agmt; ¶4(g) of the Interim Order |

| Summary of Material Terms | Location |
|---|---|
| to: (a) source, or not source, business to the Debtors; (b) terminate any Purchase Order prior to the Petition Date; (c) resource any business from the Debtors in a manner consistent with the Global Accommodation Agreement; or (d) any action, related directly or indirectly to the Restructuring, Sale, or PSAN Inflators (the "**Debtor Released Claims**"); *provided that*, no person or entity shall be released from any claim or obligation arising from or related to the Global Accommodation Agreement (or any right to or claim for payment under a Purchase Order) or any other agreement entered into in connection with the Sale or Restructuring including for the avoidance of doubt the Indemnity Agreement; and *provided further* that, no person or entity shall be released from any claim arising from or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct. | |

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| **Cross-Collateralization** Local Rule 4001–2(a)(i)(A) | The Interim Order does not provide for cross-collateralization, other than priming liens and replacement liens as adequate protection**.** | N/A |
| **Stipulations** Local Rule 4001–2(a)(i)(B) | The Debtors and each Secured Accommodation Party shall stipulate and agree to the following: (i) as of the Petition Date, the Secured Accommodation Parties owed outstanding amounts to the Debtors in respect of Component Parts or services provided by the Debtors to the Secured Accommodation Parties under the Purchase Orders (the "**Customer Accounts**"); (ii) pursuant to section 502 of the Bankruptcy Code, each Secured Accommodation Party has allowed claims against the Debtors arising from the Debtors' design, manufacture and sale of PSAN Inflators and PSAN Modules to such Secured Accommodation Party, including, but not limited to, Customer Indemnification Claims; (iii) the amount of each Secured Accommodation Party's Customer Indemnification Claims significantly exceeds such Secured Accommodation Party's Customer Account and no portion of the Customer Indemnification Claims or any payments made to the Secured Accommodation Parties or applied to or paid on account of the obligations owing under the Purchase Orders prior to the Petition Date is subject to any recharacterization, subordination, | ¶4 of the Interim Order |

RLF1 17750955v.1

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| | attack, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law, that such Customer Indemnification Claims are subject to, and file in accordance with, the Consenting OEM Claims Protocol; | |
| | (iv)    based on the foregoing, each Secured Accommodation Party has a valid and enforceable right of setoff against the Debtors equal in amount to such Secured Accommodation Party's Customer Accounts pursuant to section 553 of the Bankruptcy Code (each, a "***Prepetition Setoff Right***" and, collectively, the "***Prepetition Setoff Rights***"); | |
| | (v)    the Prepetition Setoff Rights entitle each Secured Accommodation Party to an allowed secured claim against the Debtors equal in amount to such Secured Accommodation Party's Customer Accounts, pursuant to section 506 of the Bankruptcy Code (each, a "***Customer Secured Claim***" and, collectively, the "***Customer Secured Claims***"); and | |
| | (vi)    the liens and security interests on the assets of the Debtors granted to the Secured Accommodation Parties pursuant to and in connection with the Access Agreement are: (i) valid, binding, perfected, enforceable liens and security interests in the Collateral (as defined in the Access Agreement) and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law. | |
| **Effect of Stipulations** Local Rule 4001–2(a)(i)(B) | The stipulations contained in the Interim Order are binding upon the Debtors and any successors. <br><br> Parties in interest have until the earlier of (a) seventy-five (75) days from entry of the Interim Order and (b) sixty (60 days after the appointment of a Creditors' Committee, if any, to investigate the stipulations set forth in the Interim Order. | ¶13 of the Interim Order |
| **Section 506(c) Waiver** Local Rule 4001–2(a)(i)(C) | Subject only to and effective upon entry of the Final Order, so long as any of the Adequate Protection Claims remain outstanding, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of | ¶12 of the Interim Order |

| Local Rule 4001-2 Concise Statements | | Location |
|---|---|---|
| | the Secured Accommodation Parties and no such consent shall be implied from any other action, inaction, or acquiescence by the Secured Accommodation Parties, and nothing contained in the Interim Order shall be deemed to be a consent by the Secured Accommodation Party to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. | |
| **Liens on Chapter 5 Causes of Action** Local Rule 4001–2(a)(i)(D) | The Interim Order provides for Adequate Protection Liens on the Debtors' Avoidance Actions, subject only to and effective upon entry of the Final Order. | ¶9(a) of the Interim Order |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt** Local Rule 4001–2(a)(i)(E) | The Interim Order does not contain any provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured credit's prepetition debt. | N/A |
| **Disparate Treatment of Professionals Under Carve-Out** Local Rule 4001–2(a)(i)(F) | The Interim Order contains no provision for disparate treatment for professionals retained by the Creditors' Committee, if any, with respect to the Carve-Out; provided that up to $50,000 will be made available to the Creditors' Committee for investigation costs, as described in paragraph 14 of the Interim Order. | ¶9(c) of the Interim Order |
| **Non-Consensual Priming Liens** Local Rule 4001–2(a)(i)(G) | The Interim Order does not provide for non-consensual priming of any existing secured lien. | N/A |
| **Section 552(b)(1) Waiver** Local Rule 4001–2(a)(i)(H) | The Interim Order does not provide for a waiver of the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1). | N/A |

## Jurisdiction

6.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant

to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

7.      On the date hereof (the "***Petition Date***"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8.      In coordination with the commencement of the Chapter 11 Cases, contemporaneously to the date hereof, Takata Corporation, the Debtors' ultimate corporate parent ("***TKJP***" and, together with its direct and indirect global subsidiaries, including TKH, "***Takata***"), together with Takata Kyushi K.K. and Takata Service Corporation, commenced civil rehabilitation proceedings under the Civil Rehabilitation Act of Japan in the 20th Department of the Civil Division of the Tokyo District Court.

9.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the declaration of Scott E. Caudill, the Executive Vice

President and Chief Operating Officer for TKH, filed contemporaneously herewith in support of

the Debtors' chapter 11 petitions and related first day relief (the "***Caudill Declaration***").[5]

### The Debtors' Need for Additional Liquidity

10.     As detailed in the Caudill Declaration, Takata's only viable path forward

and means of ensuring a stable supply of Component Parts (as defined below) to its Customers,

including replacement parts for vehicles subject to recall, is the successful consummation of the

Global Transaction.  Recognizing the importance of preserving Takata's operations, including

those of the Debtors, for the duration of the recalls and the need for a global coordinated go-

forward strategy to manage the mounting litigation and recall related claims against Takata and

the OEMs, the Consenting OEMs formed an informal group (the "***Customer Group***") to

negotiate and develop a restructuring plan with Takata.

11.     During the course of these lengthy negotiations with the Customer Group

and the Plan Sponsor, the Debtors' liquidity has declined.  Substantial indemnification and recall

expenses, mounting professional fees and expenses, and significant contraction from the

Debtors' suppliers and vendors have combined to have a negative impact on the Debtors'

financial position and created certain near term liquidity needs.  Furthermore, due to the

Customer Group's significant contribution and indemnification claims and rights of setoff

against the Debtors' receivables, the Debtors' ability to continue as going concern was (and is)

dependent on the Consenting OEMs' collective agreement to forebear enforcing those rights.

12.     The Debtors' situation is unique in the context of automotive restructuring

cases.  The Customer Group represents not only of the majority of the Debtors' customer base,

---

[5] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Caudill Declaration.

but also by far the Debtors' largest creditor constituency.  This created the unique result that the

Debtors' main source of liquidity, their customer receipts, are subject in their entirety to the

setoff rights of those same customers.

13.     In a traditional automotive restructuring case, a distressed supplier will

negotiate with its customers for other valuable accommodations.  Typically, these

accommodations, which are similar to those included in the Global Accommodation Agreement,

are designed to stabilize the supplier's business and protect the customers' continued source of

supply and enable the supplier to seek a third-party financing source to fund a restructuring

effort.  What sets these Chapter 11 Cases apart is that the customers are also the largest creditors

in the Chapter 11 Cases.  The Secured Accommodation Parties' Prepetition Setoff Rights give

those parties the right to withhold payments from the Debtors at the outset of the cases.

Consequently, in planning their restructuring, the Debtors faced two liquidity challenges: (i) a

near term liquidity need if the Secured Accommodation Parties sought to exercise their

prepetition rights of setoff on account of their Customer Accounts, and (ii) assuming the Secured

Accommodation Parties were willing to continue paying the Debtors in the ordinary course of

business, liquidity projections showing the Debtors' cash reserves declining below the Debtors'

minimum cash amount beginning in late 2017.  With respect to this second liquidity challenge,

absent additional financing, the Debtors expect that they will fall below their minimum cash

requirements later this year and will require approximately one hundred million dollars

($100,000,000) in additional liquidity through February of 2018.

14.     To address their liquidity needs, the Debtors initially focused their efforts

on securing debtor-in-possession financing ("***DIP Financing***") from traditional third-party

sources.  In early 2017, the Debtors solicited bids for third party financing from a number of

parties, and a dataroom was established for those financial institutions to commence preliminary diligence.  As negotiations with the Customer Group progressed, however, it became clear that the Debtors' financing needs could be satisfied through (i) the Secured Accommodation Parties agreeing to continue paying the Debtors' invoices in the ordinary course of business at the outset of the cases, and (ii) a simple acceleration of existing accounts payable later in the case, in each case combined with other standard industry accommodations.  Financing the Chapter 11 Cases in this manner would allow the Debtors to avoid having to pay the substantial fees and expenses associated with a third party DIP financing.  In addition, the Consenting OEMs and the Debtors agreed that introducing another party to this complex and fluid situation would only further complicate an already significantly complicated transaction and negotiation.

15.    Accordingly, over a period of six months, Takata and the Debtors negotiated with the members of the Customer Group on accommodations to support Takata's global operations and provide both the Debtors and the rest of Takata with the liquidity needed to consummate the Global Transaction.  Ultimately, the parties decided that it was most efficient and appropriate to enter into two separate accommodation agreements: one for TKJP and the other Japan Debtors (the "*JP Accommodation Agreement*") to be approved in the Japan Proceedings, and a second – the Global Accommodation Agreement – for the Debtors and the rest of Takata's global operations.  The difference in the laws of the two formal insolvency proceedings in the U.S. and Japan, as well as the additional liquidity needs of the Japan Debtors, which are unable to finance their cases on ordinary course payments and accelerated payables alone and will be seeking approval of third-party DIP financing in Japan, necessitated separate accommodation agreements.  The Global Accommodation Agreement attached hereto represents

16

an agreement in principle among the parties; however, it remains subject to finalization and execution by all parties on or before July 7, 2017.

## Summary of the Global Accommodation Agreement[6]

16.     As described above, the terms and conditions of the Global Accommodation Agreement were reached as a result of extended good faith and arms' length negotiations regarding the continued relationships between the Debtors and the Consenting OEMs, which include concessions on both sides.  The salient terms of the Global Accommodation Agreement are summarized below.  As described above, the form of Global Accommodation Agreement is an agreement in principle between Takata affiliates across the globe, other than the Japan Debtors, as well as Consenting OEMs from around the world.  Many of these global Takata affiliates and certain of the Consenting OEMs do business with the Debtors and/or have no connection with the United Sates and the Chapter 11 Cases.  Although the terms and descriptions below apply to all of the Takata entities and Consenting OEMs party to the Global Accommodation Agreement, the Motion seeks only approval of the terms of the Global Accommodation Agreement as between the Debtors and the Secured Accommodation Parties (*i.e.*, those Consenting OEMs that do business with the Debtors and have Customer Accounts).

*Consenting OEM Accommodations and Commitments*

(a)     Pricing on Replacement Kits.  The Consenting OEMs have agreed to maintain the currently applicable pricing for replacement kits

---

[6] The descriptions of the Global Accommodation Agreement set forth herein are intended for summary purposes only and are not intended to modify any of the terms of the Global Accommodation Agreement.  As such, the descriptions of the Accommodation Agreement set forth herein are qualified in all respects by the terms of Global Accommodation Agreement.  In the event of any conflict between the descriptions set forth in this Motion and the terms of the Global Accommodation Agreement, the terms of the Global Accommodation Agreement shall govern.

supplied during the term of the Global Accommodation Agreement.  Accomm. Agmt, at § 2.

(b)    <u>Resourcing Limitation</u>.  With certain exceptions, the Consenting OEMs have agreed not to resource the production of any programs currently on contract with the Debtors to any of their competitors other than in connection with certain agreed upon Permitted Resourcings.  *Id.* § 3.

(c)    <u>Limitations of Setoffs</u>.  Subject to the limitations described in the Global Accommodation Agreement, each of the Consenting OEMs has agreed not to exercise its rights to assert setoff, recoupment, or deduction against amounts owed to the Debtors other than those setoffs that are determined to be Allowed Setoffs, Materials Setoffs, Tooling Setoffs, and Professional Fee Setoffs, as set forth in the Global Accommodation Agreement.  In addition, the Consenting OEMs have also agreed to limit the total amount of any setoff to two percent (2%) of the face amount of the respective invoice or group of invoices.  The setoffs permitted above include setoffs for, among other things, raw materials provided to the Debtors, payments made to toolmakers on behalf of the Debtors, or for other ordinary course business issues (*e.g.*, billing errors).  The allowed professional fees setoff amounts relate to both prepetition and postpetition fees incurred by the Consenting OEMs and are limited based on a system of sub-caps described in the Global Accommodation Agreement and, subject to certain exceptions, are limited to the overall two percent (2%) Allowed Setoff cap.  *Id.* § 4.

(d)    <u>Inventory Purchase</u>.  Each Consenting OEM has committed, upon the occurrence of certain events, including a permitted resourcing, to purchase the Debtors' inventory of such Consenting OEM's parts and any dedicated raw materials related thereto.  *Id.* § 5.

(e)    <u>Accounts Payable Acceleration</u>.  The Consenting OEMs have agreed to make payment on their outstanding accounts payables owed to the Debtors on an expedited basis up to approximately net 15-day payment terms in accordance with a monthly cash flow forecast prepared by the Debtors.  *Id.* § 6.

*Debtors' Obligations*

(a)    <u>Continue to Manufacture</u>.  Under the Global Accommodation Agreement, the Debtors have agreed to continue to supply

18

Component Parts for each of the Consenting OEMs according to the terms of the Purchase Orders.  *Id.* § 7.

(b)    Resourcing Cooperation.  The Debtors have agreed to use commercially reasonable efforts to cooperate with each Consenting OEMs in connection with its preparation for any Permitted Resourcing[7] and will cooperate with a Consenting OEM's resourcing of production of its Component Parts as set forth in the Global Accommodation Agreement.  *Id.* § 8.

(c)    Tooling Acknowledgment.  The Debtors acknowledge and agree that Customer Tooling is (i) subject to the terms of the Global Accommodation Agreement, (ii) owned by the Consenting OEMs, and (iii) held as bailee-at-will by the Debtors and any third parties to which the Debtors have transferred possession of Customer Tooling.  In addition, the Global Accommodation Agreement provides for a mechanism to resolve any disputes regarding the ownership of any Tooling.  *Id.* § 9.

(d)    Claim Acknowledgment.  The Debtors have agreed to acknowledge (i) that certain of the Consenting OEMs' claims exceed the amount of such Consenting OEM's accounts payable owed to Supplier, and (ii) that, so long as such claims are subject to, and filed in accordance with an agreed upon claims protocol, the Debtors will not dispute the acknowledged claims on any basis. The Debtors have also agreed that certain Consenting OEMs' claims associated with the recalls are included in the acknowledged claims.  *Id.* § 10.

(e)    Inventory Bank.  The Debtors have agreed, subject to reasonable availability and adequate capacity, to take commercially reasonable steps to cooperate with each Consenting OEM to build for each Consenting OEM an inventory bank of Component Parts in accordance with inventory bank schedules and budgets mutually agreeable to the Debtors and such Consenting OEM; provided that the Debtors' obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations and (ii) availability of raw materials and supplies.  Each Customer will promptly pay all incremental costs incurred by the Debtors in manufacturing the inventory bank for such Customer.  *Id.* § 12.

---

[7] Under the terms of the Global Accommodation Agreement, the Consenting OEMs are permitted to resource business to an alternative supplier in certain limited events, including the occurrence of an Event Default or a Consenting OEM Termination Event which the Debtors fail to cure, or is not otherwise waived.

(f)     Access to Information.  The Debtors have agreed to provide the
        Consenting OEMs with commercially reasonable access to the
        Debtors' operations, books, and records during regular business
        hours, and outside normal business hours upon reasonable request
        and prior written notice, for the purposes set forth in the Global
        Accommodation Agreement.  *Id.* § 13.

(g)     Intellectual Property License.  The Debtors have agreed to grant
        the Consenting OEMs a license to Intellectual Property owned by
        the Debtors, and a sublicense to the Intellectual Property licensed
        to the Debtors (to the extent that the Debtors have the right to grant
        sublicenses therein) to do all things and exercise all rights in the
        licensed or sublicensed Intellectual Property that is necessary for
        production of the Component Parts.  Such a license may only be
        exercised by a Consenting OEM [upon a Resourcing Event of
        Default].  *Id.* § 14.

(h)     Equipment Option.  The Debtors have agreed to grant the
        Consenting OEMs an irrevocable and exclusive option to purchase,
        at fair market value, any equipment dedicated solely to the
        Debtors' production of Component Parts for the exercising
        Consenting OEM an any time within a 30-day period beginning on
        the occurrence of an Event of Default.  *Id.* § 15.

(i)     Access Agreement.  The Debtors have also agreed to enter into an
        Access Agreement that provides certain of the Consenting OEMs
        with limited rights to use and access the Debtors' facilities and
        equipment to continue to manufacture Component Parts in the
        event of a default under the Global Accommodation Agreement
        that results in a material and substantial threat to a Consenting
        OEM's production.  *Id. Recitals*.

(j)     Release.  Subject to certain exceptions, the Debtors have agreed to
        provide the Consenting OEMs with a release on behalf of
        themselves and certain other parties, of each Consenting OEM and
        certain other related parties from all claims, liabilities, demands,
        actions, causes of action, losses, damages, costs, expenses, rights,
        compensation, of whatever kind or nature, at law or in equity,
        foreseen or unforeseen, contingent or liquidated, matured or
        unmatured, known or unknown, that exist now, have ever existed,
        or may exist in the future relating to or arising from any action or
        inaction or other occurrence prior to the Effective Date of the
        Global Accommodation Agreement.  In addition, the Debtors have
        covenanted not to commence, aid, or, with certain exceptions,

20

participate in, any legal action or other proceeding based in whole or in part on the claims they have agreed to release.  *Id.* § 20.

*Termination Provisions*

(a)    Supplier Termination Events.  If a Consenting OEM fails to perform any material obligation under the Global Accommodation Agreement and such failure is not cured within ten (10) business days.  Upon the occurrence of a Supplier Termination Event, Supplier shall have the right to immediately terminate its obligations under the Global Accommodation Agreement as to the defaulting Consenting OEM(s), and the Global Accommodation Agreement shall terminate solely as to such defaulting Consenting OEM(s).  *Id.* § 26.

(b)    Events of Default.  The Global Accommodation Agreement provides for certain product-focused events of default that, subject to a five (5) business day cure period for certain defaults, trigger a termination of the Accommodation Agreement only with respect to the affected Consenting OEM.  Defaults include repudiation, rejection, or breach of a purchase order, repudiation or material breach of the Global Accommodation Agreement, and the occurrence of certain legal outcomes (*e.g.*, conversion of the Chapter 11 Cases to chapter 7 or a judgment rendering a material portion of the Global Transaction illegal).  *Id.* § 24.

(c)    Consenting OEM Termination Events.  The Global Accommodation Agreement provides for events of default that, subject to a five (5) business day cure period for certain defaults, trigger a termination of the Global Accommodation Agreement with respect to all Consenting OEMs unless a waiver or deferral is agreed to in writing by the Requisite Consenting OEMs.[8]  Defaults include, among other things, failure to meet certain milestones, withdrawal or amendment of the Chapter 11 Plan in a manner that materially adversely affects the Consenting OEMs, failure to meet certain financial covenants or provide certain financial reporting, or if the special master appointed in connection with Takata Corporation's plea agreement with the United States Department of Justice fails to adopt and approve the allocation methodology agreed to by the Consenting OEMs with respect to the DOJ Restitution Award.  *Id.* § 25.

---

[8] Under the terms of the Global Accommodation Agreement, Requisite Consenting OEMs means at least nine (9) of the Initial Consenting OEMs having at least seventy five percent (75%) in amount of allocation percentage as set forth on [Schedule 3 ] to the Global Accommodation Agreement

_Governing Law; Jurisdiction_

(a)     Governing Law for Secured Accommodation Parties.  All disputes or controversies between the Debtors and the Secured Accommodation Parties, in their capacity as such, arising out of or relating to the Interim Order or Final Order and the Adequate Protection Rights shall be governed by, and construed in accordance with, the laws of New York.  The Secured Accommodation Parties have also consented to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to any dispute or controversy with the Debtors arising out of or related to the Global Accommodation Agreement, the Adequate Protection Orders or the Adequate Protection Rights.  _Id._ § 29.

Governing Law for Other Consenting OEMs.  All disputes or controversies between parties that are not Debtors or Secured Accommodation Parties shall be governed by, and construed in accordance with, the laws of New York.  Disputes shall be resolved by arbitration in Geneva, Switzerland in accordance with the Swiss Rules of International Arbitration of Swiss Chambers' Arbitration Institution.  _Id._ § 29.

**The Secured Accommodation Parties' Setoff Rights and the Proposed Adequate Protection**

17.     In the ordinary course of business, the Secured Accommodation Parties purchase Component Parts from the Debtors in accordance with the terms and conditions of certain purchase agreements, supply contracts, purchase orders, general terms and conditions, and releases issued by a Secured Accommodation Parties to the Debtors (individually, a "**_Purchase Order_**" and collectively, "**_Purchase Orders_**").  The Secured Accommodation Parties' purchases of Component Parts generate the Customer Accounts.  The Debtors estimate that, based on their books and records, the Secured Accommodation Parties owe the Debtors approximately two hundred and ninety million dollars ($290,000,000) in Customer Accounts as of the Petition Date.

RLF1 17750955v.1

18.     Certain of the Component Parts include or included non-desiccated or desiccated phase-stabilized ammonium nitrate ("*PSAN*") inflators or components (collectively, the "*PSAN Inflators*").  As set forth in the Caudill Declaration, certain PSAN inflators and models of Takata's airbag systems manufactured with PSAN Inflators (collectively, the "*Subject Takata Airbags*") are the subject of ongoing recalls and related remedy programs (the "*Recalls*").  The Recalls are unprecedented in scale, and over one hundred million (100,000,000) vehicles have been recalled.  The Secured Accommodation Parties have and continue to incur costs and expenses relating to the PSAN Inflators and Subject Takata Airbags (the "*Customer Recall Costs and Expenses*") in connection with, among other requirements, complying with and administering the Recalls.  The Secured Accommodation Parties have claims, rights of reimbursement, indemnification, setoff and/or recoupment, and other similar rights against Takata for the Customer Recall Costs and Expenses, pursuant to each Secured Accommodation Party's Purchase Orders and applicable law.  In addition, the Secured Accommodation Parties have claims against Takata, including without limitation, for liabilities incurred by the Secured Accommodation Parties in connection with the various personal injury, wrongful death, state attorney general, and economic loss litigations and any other liabilities arising out of or relating to the PSAN Inflators and the Subject Takata Airbags, including, without limitation, Customer Recall Costs and Expenses and Customer Recall Claims (collectively, the "*Customer Indemnification Claims*").

19.     With respect to each Secured Accommodation Party, it is clear that the amount of such Secured Accommodation Party's Customer Recall Costs and Expenses and Customer Indemnification Claims far exceeds such Secured Accommodation Party's Customer Accounts.  As set forth in the Caudill Declaration sixty-one million (61,000,000) vehicles

containing Subject Takata Airbags have been recalled to date.  Each one of these recalled

vehicles represents a substantial cost to the OEMs for which the OEMs are entitled to indemnity

and reimbursement from the Debtors and other Takata entities.  In order to fall below the

approximately two hundred and ninety million dollars ($290,000,000) in Customer Accounts, the

Secured Accommodation Party's claims would need to be less than three dollars ($3) per vehicle,

which, on its face, is evidently not the case.  Based on the foregoing, each Secured

Accommodation Party has a valid and enforceable right of setoff against the Debtors equal in

amount to such Secured Accommodation Party's Customer Accounts, and each such Secured

Accommodation Party has a valid secured claim against the Debtors in the same magnitude.

20.     Under the terms of the Global Accommodation Agreement, the Secured

Accommodation Parties are agreeing to forebear from exercising their rights of setoff (with

certain limited exceptions) and release the Customer Accounts in the ordinary course of business

in exchange for the adequate protection package set forth in the proposed Interim Order

(the "***Proposed Adequate Protection***").  As described above, such adequate protection includes

the Replacement Liens and the Adequate Protection Liens, which ensure that the Secured

Accommodation Parties are adequately protected against the diminution in value of their secured

claims that will occur when the Secured Accommodation Parties release the Customer Accounts

to the Debtors.

<u>**Basis for Relief Requested**</u>

***The Global Accommodation Agreement, Including the***
***Proposed Adequate Protection is in the Best Interests of the Debtors,***
***<u>their Estates and all Parties in Interest and Should be Approved</u>***

21.     Approval of the Global Accommodation Agreement is critical, as it

represents the Debtors' lifeline in four respects: (i) it ensures that the Debtors' near-term

24

liquidity needs will be met by the Secured Accommodation Parties' agreement forebear from

exercising their right to setoff and release the Customer Accounts to the Debtors; (ii) it ensures

the Debtors' longer-term liquidity needs will be met by providing for an acceleration of

receivables as needed in accordance with the Budget; (iii) it provides industry-standard

accommodations, such as the setoff and resourcing limitations, that will further support the

Debtors' stability throughout the Chapter 11 Cases; and (iv) it, together with the JP

Accommodation Agreement, convey an important message of customer support and stability to

the market.

22.    Section 363(b)(1) of the Bankruptcy Code provides in relevant part that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate. . ."  Further, pursuant to section 105(a) of the Bankruptcy

Code, the "court may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."

23.    Under applicable case law in this and other circuits, if a debtor's proposed

use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the

debtor's reasonable business judgment, such use should be approved.  *See Myers v. Martin (In re*

*Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that, under normal circumstances, the court

defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re*

*Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound

business purpose" test to evaluate motions brought pursuant to section 363(b)); *Committee of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)

(requiring an "articulated business justification").

24.     If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858,872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. *In re Troll Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del. 2008).

25.     Approval of the Global Accommodation Agreement is in the best interest of the Debtors, their estates, and their stakeholders.  As described herein and in the Caudill Declaration, the Global Accommodation Agreement is one of the lynchpins of the success of the Plan and the Global Transaction and represents significant value to the Debtors, unlocking nearly three hundred million dollars ($300,000,000) in near term liquidity through the waiver of setoff, and guaranteeing that the Secured Accommodation Parties will, later in the Chapter 11 Cases, accelerate over one hundred million dollars ($100,000,000) in order to ensure that the Debtors operations continue and the Global Transaction can be consummated.  These benefits alone, without even considering the other valuable accommodations and message of stability to the market, far outweigh the minimal costs and burdens associated with the Global Accommodation Agreement.

A.      **Near Term Liquidity Support**

26.      The Secured Accommodation Parties' release of the Customer Accounts in exchange for the Proposed Adequate Protection will provide the Debtors with immediate access to necessary liquidity that, without the Global Accommodation Agreement, would not be available.  These receipts, though ordinary in nature, are rendered extraordinary because, due to the Debtors' particular circumstances, the Secured Accommodation Parties would be within their rights to withhold payment of their accounts payable to the Debtors pursuant to section 542(b) of the Bankruptcy Code.  The Secured Accommodation Parties' agreement to continue paying the Customer Accounts in the ordinary course of business allows the Debtors to pay current and ongoing expenses and fund the operations of their North American Debtor and non-Debtor affiliates and subsidiaries, including payment of postpetition wages and salaries, utility and vendor costs, among other things, in all cases subject to the Budget (subject to the variances permitted in the Global Accommodation Agreement).

27.      Compared to the alternative, third party DIP Financing, the Secured Accommodations Parties' ordinary course funding has many advantages: it is interest free, it does not come with significant fees, and it comes with much more flexible covenants than a typical debtor-in-possession loan would be expected to contain.  Furthermore, the Global Accommodation Agreement is more advantageous than any alternative because it does not require the Debtors to grant security over *additional* value in the same way DIP Financing would.  Rather than having approximately three hundred million dollars ($300,000,000) tied up by the Secured Accommodation Parties' rights of setoff and another three hundred million dollars ($300,000,000) of value pledged to a DIP Financing provider, the Global Accommodation Agreement allows the Debtors to preserve their assets and only provide liens as

27

a form of Adequate Protection to the extent of the Secured Accommodation Parties' diminution in value (such diminution is equal only to the prepetition accounts payable those Secured Accommodation Parties actually pay to the Debtors).

## B.    Longer Term Liquidity Support

28.    The Global Accommodation Agreement is also critical because it fulfills the Debtors' longer-term liquidity needs by guaranteeing that the Secured Accommodation Parties will pull forward receivables, as needed, and up to approximately net 15-day payment terms, pursuant to the Budget.  Based on the Debtors' declining cash position, the Debtors project a liquidity shortfall of approximately one hundred and ten million dollars ($110,000,000) starting in December 2017 through the expected closing of the Global Transaction in February 2018.  This longer term support amounts to a limited customer backstop to ensure these Chapter 11 Cases result in the successful consummation of a Global Transaction, and approval of the Global Accommodation Agreement is required in order to ensure that this incredibly valuable support remains committed.

## C.    Other Valuable Accommodations

29.    The other valuable accommodations in the Global Accommodation Agreement are valuable to the Debtors estate because they represent a commitment by the Secured Accommodation Parties to ensure "calm waters" – a continued business relationship with setoffs capped, resourcing limited, and, in the event a program is resourced, a commitment to purchase any existing inventory associated with that program.  These accommodations represent a significant benefit because the Secured Accommodation Parties are requesting little in return.  Though on its face the "Supplier Accommodations" in the Global Accommodation Agreement are significant, for the most part, they simply clarify the Secured Accommodation

Parties' existing rights rather than enhancing those rights, as the Purchase Orders already contain broad rights in favor of the Secured Accommodation Parties.  Furthermore, without the other valuable accommodations, and in particular the setoff limitation, the Debtors risk seeing their postpetition customer receipts reduced by customer expenses related to the Recalls that accrue postpetition.  Consequently, the industry standard accommodations inherent in the Global Accommodation Agreement represent a significant benefit to the Debtors' estates and creditors, and should be approved.

**D.      Strong Message of Customer Support to the Marketplace**

30.      By agreeing to provide Takata, including the Debtors, with accommodations, the Consenting OEMs have conveyed an important message of global customer support and stability to the market, including to the Debtors' employees and vendor base.  The importance of this intangible form of support cannot be overstated: it will help to calm market speculation about the Debtors' future, will potentially alleviate and minimize trade contraction, and generally conveys a message to the market that the Consenting OEMs are committed to a smooth restructuring process that culminates in a sale to the Plan Sponsor.  For this reason, the Global Accommodation Agreement should be approved.

31.      Immediate authority to enter into the Global Accommodation Agreements is necessary and justified by the facts and circumstances of these Chapter 11 Cases.  Absent approval by the Court of the Global Accommodation Agreement, the Chapter 11 Cases may be derailed from the start and all of the support the Debtors have worked diligently to obtain over the past year could unravel.  As described above, the Global Accommodation Agreement will provide the Debtors with not only immediate additional liquidity, but also a longer term commitment to support the Debtors throughout the cases.  Given the Debtors' perilous liquidity

position absent approval of the Global Accommodation Agreement, these accommodations are necessary to avoid any further decline to the Debtors' financial position.  As the Debtors have insufficient available liquidity to fund their operations even for a short period of time during the Chapter 11 Cases without the Secured Accommodation Parties' agreement not to set off, approval of the Global Accommodation Agreement is an absolutely critical first step to set these Chapter 11 Cases headed in the right direction.  The Global Accommodation Agreement constitutes the best possible arrangement for the continuation of business between the Debtors and the Secured Accommodation Parties and, thus, the agreement should be approved as a reasonable exercise of the Debtors' business judgment.  Interim approval of the Global Accommodation Agreement is reasonable and necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Court has authority to authorize the Global Accommodation Agreement based on section 363 of the Bankruptcy Code.

32.    Finally, the Court has the power to grant the relief requested under section 105, which says that the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

33.    Similar relief has been granted in other automotive supplier cases in this and other districts.  *See, e.g.*, Order Authorizing Entry Into an Accommodation Agreement with Chrysler Group LLC Pursuant to Bankruptcy Rule 9019 and Sections 363(b), 363(f), and 363(m) of the Bankruptcy Codbe, *In re Visteon Corp.*, No. 09-11786-CSS (Bankr. D. Del. Nov. 12, 2009); Final Order Pursuant to 11 U.S.C. §§ 363(b)(1) and 105(a) and FED. R. BANK. P. 9019 Authorizing Debtors to Enter Into Accommodation Agreements With Customers *In re Chassix Holdings, Inc.*, et al., No. 15-10578 (MEW) (Bankr. S.D.N.Y. April 10, 2015); Stipulation and Order Among Debtors, DIP Agent, Prepetition ABL Agent, and Certain Customers Regarding

Interim Order Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule

4001 of the Federal Rules of Bankruptcy Procedure (A) Authorizing Debtors to (I) Use Cash

Collateral of Prepetition Secured Lenders, (II) Obtain Postpetition Financing and (III) Provide

Adequate Protection to Prepetition Secured Lenders, (B) Authorizing Debtors to Enter Into, and

Approving, Accommodation Agreement with Certain Customers and (C) Providing Notice and

Scheduling Final Hearing, *In re Metaldyne Corporation,* et al., No. 09-13412 (MG) (Bankr.

S.D.N.Y. June 12, 2009); Order (I) Supplementing January 5, 2007 DIP Refinancing Order

(Docket No. 6461) and Authorizing Debtors to Enter Into and Implement Accommodation

Agreement with Agent and Participating Lenders and (II) Authorizing Debtors to (a) Enter Into

Related Documents and (b) Pay Fees in Connection Therewith, *In re Delphi Corporation*, et al.,

No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 3, 2008).

### ***The Secured Accommodation Parties Have Valid Rights of Setoff and Related Secured Claims***

34.     Section 553(a) provides, in relevant part, that the Bankruptcy Code "does

not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that

arose before the commencement of the case under this title against a claim of such creditor

against the debtor that arose before the commencement of the case."  Section 553 does not

establish an independent right to setoff, but it does preserve any right of setoff that may exist

under applicable non-bankruptcy law.  Here, the right of setoff arises under the terms of the

Purchase Orders.

35.     Section 553 "applies 'whenever a creditor seeks to exercise *any* purported

setoff right – including one created by contract – in a case under the Bankruptcy Code.'" *In re*

*American Home Mortgage, Holdings, Inc.*, 501 B.R. 44, 55 (Bankr. D. Del. 2013) (quoting *In re*

*Lehman Brothers Inc.*, 458 B.R. 134, 139 (2011)); *see also In re SemCrude, L.P.*, 399 B.R. 388,

393 (Bankr. D. Del. 2009).  To be eligible for setoff under section 553, (1) the amount owed by

the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be

prepetition; and (3) the debtor's claim against the creditor and the debt owed the creditor must be

mutual. *Id.*  Here, all three requirements are satisfied: (1) it is undisputed that the Secured

Accommodation Parties have valid *prepetition* claims against the Debtors for, among other

things, the Customer Recall Costs and Expenses and Customer Indemnification Claims (2) the

Customer Accounts all relate to the *prepetition* sale of Component Parts to the Secured

Accommodation Parties, and (3) the Customer Recall Claims and Customer Indemnification

Claims are owed by the same Debtor entity to the same Secured Accommodation Party.

Consequently, the Secured Accommodation Parties have a valid right of setoff to the extent of

their claims.

      36.    Section 506(a)(1) of the Bankruptcy Code provides, in relevant part, that

"an allowed claim of a creditor . . . that is subject to setoff under section 553 of this title, is a

secured claim . . . to the amount subject to setoff."  Though the specific amount of each Secured

Accommodation Party's claims against the Debtors could be disputed, it is clear that magnitude

of such claims far exceeds each such Secured Accommodation Party's mutual Customer

Accounts.  Consequently, each Secured Accommodation Party has a secured claim in the amount

of such Secured Accommodation Party's Customer Accounts.

      37.    Pursuant to section 542(b) of the Bankruptcy Code, the Debtors cannot

compel the Secured Accommodation Parties to turn over such amounts, as they are subject to

valid right of setoff under section 553 of the Bankruptcy Code.

**_The Proposed Adequate Protection Should be Approved_**

38.    Section 361 of the Bankruptcy Code provides, in relevant part, that when

adequate protection of an interest of an entity is required under section 363 of the Bankruptcy

Code, such adequate protection may be provided by, among other things:

> (1) requiring the trustee to make a cash payment or periodic cash
> payments to such entity, to the extent that the stay under section
> 362 of this title, use, sale, or lease under section 363 of this title, or
> any grant of a lien under section 364 of this title results in a
> decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the
> extent that such stay, use, sale, lease, or grant results in a decrease
> in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to
> compensation allowable under section 503(b)(1) of this title as an
> administrative expense, as will result in the realization by such
> entity of the indubitable equivalent of such entity's interest in such
> property.

39.    The replacement liens that are part of the Proposed Adequate Protection

fall within the language of Section 361(2), and the superpriority administrative expense claims

fall within the language of Section 361(3).  In addition, section 363(e) of the Bankruptcy Code

applies, as the Secured Accommodation Parties have requested that the Debtors provide them

with adequate protection in order to get them comfortable with forbearing from enforcing their

setoff rights.  The Secured Accommodation Parties have agreed to fulfill the Debtors' near-term

liquidity needs by agreeing to forebear from exercising their Prepetition Setoff Rights.

Consequently, each of the Secured Accommodation Parties is entitled to adequate protection of

its Customer Secured Claims for and equal in amount to the diminution in value of such

Prepetition Setoff Rights.  By paying the Customer Accounts to the Debtors instead of holding

them and seeking the Court's permission to set off, the Secured Accommodation Parties will be

RLF1 17750955v.1

diminuting their Customer Secured Claims, and the Secured Accommodation Parties' Adequate

Protection Claims will be limited in amount to the amount of such diminution.  In other words,

the Adequate Protection Claims will be limited to the amount of Customer Accounts (*i.e.*,

prepetition accounts receivable) that the Secured Accommodation Parties *actually advance* to the

Debtors during the Chapter 11 Cases.

        40.      The Debtors' proposed adequate protection includes replacement liens on

postpetition accounts payable, adequate protection liens on other property of the Debtors (junior

to any valid, existing prepetition liens), and superpriority administrative expense claims.  This

request for liens and a superpriority claim is a fair trade for the critical liquidity the Secured

Accommodation Parties are providing.  In addition, a third-party debtor-in-possession lender

advancing the same amount of cash would require, among other protections, a lien on the same

property, a superpriority claim of the same priority as the Secured Accommodation Parties are

requesting, as well as payment in full of not only the principal amount advanced but also interest

thereon and additional fees.  Consequently, approval of the Proposed Adequate Protection is

reasonable and necessary to avoid immediate and irreparable harm to the Debtors and their

estates and the Court has authority to authorize the requested protections based on section 363 of

the Bankruptcy Code.  Further, the Court has authority to grant the Secured Accommodation

Parties an administrative expense claim for any amounts advanced to the Debtors pursuant to the

Global Accommodation Agreement pursuant to section 503(b)(1)(A) of the Bankruptcy Code as

a necessary expense of preserving the estate.  The court has authority to imbue that claim with

superpriority status pursuant to section 105(a) of the Bankruptcy Code.

41.    Based on the foregoing, the Debtors respectfully submit that they have exercised reasonable business judgment in their decision to enter into the Global Accommodation Agreement and that approval of the agreement is in the best interest all of parties in interest.  Accordingly, the Court should grant the relief requested.

## Reservation of Rights

42.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## The Automatic Stay Should Be Modified on a Limited Basis

43.    The relief requested herein contemplates a modification of the automatic stay to permit the Secured Accommodation Parties, upon the occurrence of the Outside Date, provided that the Consummation Date has not occurred (each such term as defined in the Global Accommodation Agreement), (ii) the termination of the Global Accommodation Agreement following the occurrence of a Consenting OEM Termination Event (as defined in the Global Accommodation Agreement) or (iii) with respect to any Consenting OEM, the termination of the Global Accommodation Agreement by such Consenting OEM following the occurrence of an Event of Default, upon the giving of five days' prior written notice (which shall run concurrently with any notice required to be provided under the Agreement) (the "***Remedies Notice Period***") to the Debtors, counsel to the Debtors, U.S. Trustee, counsel to the Creditors'

35

Committee (if one is appointed), and counsel to the Plan Sponsor unless the Court orders

otherwise during the Remedies Notice Period upon a hearing regarding any exercise of rights or

remedies under the Agreements, (A) exercise any then-remaining Prepetition Setoff Rights, (B)

exercise any and all remedies under the Agreements and (C) exercise remedies with respect to

the assets of the Debtors subject to the Adequate Protection Liens.  Stay modifications of this

kind are ordinary and standard features for analogous debtor-in-possession financing facilities,

and in the Debtors' business judgment, are reasonable and fair under the present

circumstances.

## Bankruptcy Rule 6003 Has Been Satisfied

44.    Bankruptcy Rule 6003 provides that, to the extent relief is necessary to

avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion

to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a

motion to pay all or part of a claim that arose before the filing of the petition" before twenty-

one (21) days after filing of the petition.  As described herein and in the Caudill Declaration, the

Global Accommodation Agreement provides the Debtors with valuable accommodations that

will infuse much needed liquidity into the Debtors' estates during the early stages of these

Chapter 11 Cases and the Secured Accommodation Parties' ongoing support is required to allow

the Debtors to continue to operate during the Chapter 11 Cases.  Accordingly, the Debtors

submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and,

therefore, Bankruptcy Rule 6003 is satisfied.

## Request for Bankruptcy Rule 6004 Waivers

45.    The Debtors request a waiver of the notice requirements under Bankruptcy

Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to

Bankruptcy Rule 6004(h).  As explained above and in the Caudill Declaration, the relief

requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Unless

the Secured Accommodation Parties's prepetition secured claims are adequately protected, they

will cease making any payments on account of their Customer Accounts, which would trigger a

liquidity crisis for the Debtors and may force the Debtors and their subsidiaries to cease

operations.  Such an outcome would cause immense disruption (including a potential shutdown

of the global automotive manufacturing supply chain), cause the Debtors to lose their customers,

derail the Global Transaction, and therefore result in irreparable harm to Takata's business.  The

liquidity provided as a result of the Adequate Protection provided in the Interim Order will

enable the Debtors to continue to satisfy the needs of their customers, pay the Debtors'

employees, and operate their businesses in the ordinary course, and in an orderly and reasonable

manner, which will preserve and enhance the value of the Debtors' estates for the benefit of all

parties in interest.  Accordingly, ample cause exists to justify the waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy

Rule 6004(h), to the extent such notice requirements and stay apply.

## Notice

46.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the District of Delaware (Attn: David Buchbinder, Esq. and Jane Leamy,

Esq.); (ii)  the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the

Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Offices of the

United States Attorney for each of the District of Delaware and the Eastern District of Michigan;

(vi) NHTSA; (vii) each of the Consenting OEMs; (viii) Skadden, Arps, Slate, Meagher & Flom

LLP, 155 N. Wacker Drive, Chicago, IL 60606 (Attn: Ron E. Meisler, Esq.), counsel to Key

Safety Systems, Inc., as Plan Sponsor; and (x) any other party entitled to notice pursuant to Local Rule 9013–1(m).  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

47.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the proposed Interim Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 25, 2017
      Wilmington, Delaware

                        */s/ Michael J. Merchant*
                        RICHARDS, LAYTON & FINGER, P.A.
                        Mark D. Collins (No. 2981)
                        Michael J. Merchant (No. 3854)
                        Amanda R. Steele (No. 5530)
                        Brett M. Haywood (No. 6166)
                        One Rodney Square
                        920 N. King Street
                        Wilmington, Delaware 19801
                        Telephone:  (302) 651-7700
                        Facsimile:  (302) 651-7701

                        -and-

                        WEIL, GOTSHAL & MANGES LLP
                        Marcia L. Goldstein
                        Ronit J. Berkovich
                        Matthew P. Goren
                        767 Fifth Avenue
                        New York, New York  10153
                        Telephone:  (212) 310-8000
                        Facsimile:  (212) 310-8007

                        *Proposed Attorneys for the Debtors*
                        *and Debtors in Possession*

**Exhibit A**

**<u>Accommodation Agreement</u>**

Draft Reflecting Agreement in Principle
Subject to Change

## ACCOMMODATION AGREEMENT

Each of the following on behalf of themselves and their respective subsidiaries and/or affiliates as described on **Schedule 1** (collectively, the "Schedule 1 Entities"):   BMW Manufacturing Co., LLC ("BMW"), Daimler AG ("Daimler"), FCA US LLC f/k/a Chrysler Group LLC, FCA Group Purchasing Srl in the name and on behalf of its principals (FCA Italy SpA and FCA Melfi Srl), FCA Fiat Chrysler Automóveis Brasil Ltda., and FCA Automobiles Argentina S.A. (collectively, "FCA"), Ford Motor Company ("Ford"), General Motors Holdings LLC ("GM"), Honda Motor Co., Ltd. ("Honda"), Jaguar Land Rover Ltd. ("JLR"), Mazda Motor Corporation ("Mazda"), Mitsubishi Motors Corporation ("Mitsubishi"), Nissan Motor Co., Ltd. ("Nissan"), [Peugeot SA ("PSA")], Subaru Corporation ("Subaru"), Toyota Motor Corporation ("Toyota"), Volkswagen AG ("Volkswagen"), Aktiebolaget Volvo (Volvo") (each of the foregoing, an "Initial Consenting OEM" and, collectively the "Initial Consenting OEMs," and, together with the Schedfule 1 Entities and any Joining Consenting OEMs (as defined herein), each a "Consenting OEM" and collectively the "Consenting OEMs"), and Takata Americas, TK Holdings Inc., Takata de Mexico, S.A. de C.V., Industrias Irvin de Mexico S.A. de C.V., Strosshe-Mex S. de R.L. de C.V., TK China LLC, TK Finance LLC, TK Holdings de Mexico S. de R.L. de C.V., TK Mexico Inc., TK Mexico LLC, Takata Protection Systems, Inc., and Interiors In Flight, Inc. (collectively, the "U.S. Debtors"), TAKATA Aktiengesellschaft, TAKATA Sachsen GmbH, TAKATA Europe GmbH (collectively, the "German Entities"), Takata International Finance B.V. ("TIF"), and each of the other direct and indirect subsidiaries of Takata Corporation ("TKJP") listed on **Schedule 2** (together with the U.S. Debtors, the German Entities, and TIF, collectively, "Supplier") enter into this Accommodation Agreement (this "Agreement") as of June [  ], 2017.

The Consenting OEMs and Supplier are sometimes referred to collectively as the "Parties" or individually as a "Party".  The term "Requisite Consenting OEMs" means at least ten (10) of the Initial Consenting OEMs having at least 70% in amount of allocation percentage set forth in **Schedule 3;** provided, however, that for purposes of determining whether the consent of the requisite number of Initial Consenting OEMs has been obtained, the separate entities comprising FCA shall be treated as a single Initial Consenting OEM.  Supplier together with the Japan Debtors (as defined herein) are collectively referred to as "Takata".  If any Consenting OEM entity does not have any Purchase Orders with, does not purchase any Component Parts from, and does not have any claims against, any Takata entity, then this Agreement will not apply to and will not be enforceable against such Consenting OEM entity.

## RECITALS

A.      Each Consenting OEM purchases component parts, service parts, assemblies, components, and/or other products (individually, a "Component Part" and collectively, "Component Parts") from Takata in accordance with the terms and conditions of certain purchase agreements, supply contracts, purchase orders, general terms and conditions, and releases issued by a Consenting OEM to Takata (individually, a "Purchase Order" and collectively, "Purchase Orders").

B.      Certain of the Component Parts include or included non-desiccated or desiccated

phase-stabilized ammonium nitrate ("PSAN") inflators or components. As used herein, the term "PSAN Inflators" means, collectively, any airbag inflators that use non-desiccated or desiccated PSAN as a propellant and any components of such inflators (including the propellant, but excluding: (i) the airbag modules into which such inflators are incorporated; and (ii) any igniters for PSAN Inflators produced by Takata pre-Closing (as defined herein), and any such ignitors that will continue to be produced by the Plan Sponsor (as defined herein) or one of its affiliates post-Closing) developed, designed, manufactured and/or sold (including any such inflators or components thereof sold directly to tier one suppliers) by Takata (but excluding any ammonium nitrate inflators designed and produced by third parties other than Takata).

C.    Certain of the PSAN Inflators and models of Takata's airbag systems manufactured with PSAN Inflators (collectively, the "Subject Takata Airbags") are now (and in the future may be) the subject of vehicle recalls and related remedy programs under regulations promulgated by the National Highway Traffic Safety Administration ("NHTSA") or other similar governmental or regulatory authorities under U.S. federal or state law, or the law of any other country or non-U.S. state with jurisdiction to impose, require or regulate a vehicle recall or related remedy program relating to the PSAN Inflators or conducted on a voluntary basis (collectively, "Recalls"). The Consenting OEMs have and continue to incur costs and expenses relating to the PSAN Inflators and Subject Takata Airbags (the "Customer Recall Costs and Expenses") in connection with, among other requirements, complying with and administering the Recalls and implementing the Replacement Kits (as defined herein). The Consenting OEMs have claims, rights of reimbursement, indemnification, setoff and/or recoupment, and other similar rights against Takata for the Customer Recall Costs and Expenses, pursuant to each Consenting OEM's Purchase Orders, applicable law, and/or as acknowledged hereunder (the "Customer Recall Claims").

D.    Supplier and certain of the Consenting OEMs are named defendants in certain civil lawsuits relating to the PSAN Inflators and the Subject Takata Airbags, including, without limitation: (i) certain personal injury and wrongful death actions pending in jurisdictions worldwide, including U.S. state courts and federal courts (the "PI/WD Actions"); (ii) putative class actions asserting economic loss, including without limitation (x) actions consolidated for pretrial purposes before the U.S. District Court for the Southern District of Florida captioned *In re Takata Airbag Products Liability Litigation*, (y) a putative class action proceeding in the Mexican District Court captioned as *Acciones Colectivas de Sinaloa, A.C. vs. Takata de Mexico, S.A. de C.V.* and others, and (z) a putative class action pending in the Ontario Superior Court of Justice at Case No. CV-16-543766-00CP captioned as *Donald D'Haene, Keith Sanford, Mary Salmon, Michael Vettese, Arlene Stevenson, Nidhi Prashar, Mira Melien and Jose'e Gaulin vs. Takata Corporation, T K Holdings, Inc., et al.* (collectively, the "Economic Loss Class Actions"); and (c) actions brought by U.S. state or territorial governments on behalf of state or territorial residents (the "State Actions"), and Takata and/or any Consenting OEMs may be named as defendants in future litigation relating to PSAN Inflators and Subject Takata Airbags (whether before or after the Effective Date (as defined herein), collectively with the PI/WD Actions, the Economic Loss Class Actions, and the State Actions, the "Covered Litigation"). The Consenting OEMs have claims against Takata, including without limitation, for liabilities incurred by the Consenting OEMs in connection with the Covered Litigation and any other liabilities arising out of or relating to the PSAN Inflators and the Subject Takata Airbags,

including, without limitation, Customer Recall Costs and Expenses and Customer Recall Claims (collectively, the "Customer Indemnification Claims").

E.       As a result of the foregoing, Takata is facing financial constraints which threaten its ability to maintain its going concern value, comply with its contractual and regulatory obligations with respect to the Recalls, and to continue ongoing operations and supply of Component Parts to the Consenting OEMs.

F.       Takata is negotiating certain purchase agreements (the "Acquisition Agreements"), and the U.S. Debtors are considering the commencement of proceedings under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the U.S. (the "U.S. Proceedings") and TKJP, Takata Kyushu K.K. and Takata Service Corporation (collectively, the "Japan Debtors") are considering commencing civil rehabilitation proceedings in Japan (the "Japan Proceedings" and together with the U.S. Proceedings, collectively, the "In-Court Proceedings"), in order to (i) consummate a sale of substantially all of its assets other than the assets exclusively related to the manufacture and production of PSAN Inflators (the "Sale") to Key Safety Systems, Inc. ("KSS" and, collectively with one or more of its current or newly formed subsidiaries and designated affiliates, the "Plan Sponsor") and (ii) reorganize its PSAN Inflator operations and assets (the "Restructuring") so that the entity(ies) created as a result of or emerging out of (a) the U.S. Proceedings ("U.S. Reorganized Takata"); and (b) asset sales in the rest of the world (collectively, "ROW Reorganized Takata" and together with U.S. Reorganized Takata, collectively "Reorganized Takata") can continue to manufacture and sell PSAN Inflators to each Consenting OEM that requires PSAN Inflator production and sale from Reorganized Takata after the Closing (in such capacity and only for so long as such Consenting OEM is acquiring PSAN Inflators from Reorganized Takata, a "PSAN Consenting OEM").

G.       Additionally, to facilitate the Sale and the Restructuring, and in connection with the In-Court Proceedings: (i) Takata, certain of the Initial Consenting OEMs and the Plan Sponsor are negotiating a U.S. Restructuring Support Agreement (the "U.S. RSA") and Japan Restructuring Support Agreement (the "Japan RSA" and together with the U.S. RSA, collectively the "RSAs"), providing for the Initial Consenting OEMs' support for the Sale and the Restructuring through the chapter 11 plan of reorganization (in the form to be attached to the U.S. RSA or as otherwise reasonably acceptable to the Initial Consenting OEMs (the "U.S. Reorganization Plan")) and (x) a business transfer pursuant to Section 42 of the Japan Civil Rehabilitation Act, and (y) a liquidating plan in the Japan Proceedings (in each case substantially on the terms as set forth in the term sheet attached to the Japan RSA or as otherwise reasonably acceptable to the Initial Consenting OEMs ((x) and (y), respectively, the "Section 42 Business Transfer" and the "Japan Insolvency Plan")), respectively; (ii) upon any filing of the U.S. Proceedings, the U.S. Debtors will seek entry of interim and final orders (a) authorizing the U.S. Debtors to enter into this Agreement, the U.S. RSA (or, to the extent Supplier, the Plan Sponsor, and the Requisite Consenting OEMs mutually agree not to seek approval of the RSA, a motion to approve the Break-Up Fee and Expense Reimbursement (as defined in the U.S. RSA), and the Access and Security Agreement executed by certain of the Parties contemporaneously herewith (the "Access Agreement"); and (b) granting certain of the Consenting OEMs the corresponding Adequate Protection Rights (as defined herein); (iii) upon any filing of the Japan Proceedings, the Japan Debtors will seek, on an expedited basis, consent from the supervisor in the Japan Proceedings to assumption of, or entry into, the Japan Accommodation Agreement, the Japan

RSA, and the Access Agreement; and (iv) Takata and certain of the Consenting OEMs are negotiating settlement agreements with the German Entities and various Takata entities outside the U.S., Japan, and Germany (the "ROW Entities") in respect of certain Customer Recall Costs and Expenses, Customer Recall Claims and/or Customer Indemnification Claims (collectively, "Settlement Agreements"), including, but not limited to, the Takata EMEA OEM Settlement Agreement (the "EMEA Settlement Agreement").

H.    The negotiation of the Acquisition Agreements, U.S. RSA, Japan RSA, the Settlement Agreements, and other terms of the Sale and Restructuring are ongoing; however, Supplier has communicated to the Consenting OEMs the existence of one or more financial constraints on Supplier and the potential impact thereof on Supplier's ongoing operations and supply of Component Parts to the Consenting OEMs, and, as a result, Supplier has requested, and the Consenting OEMs have agreed to provide, certain financial support and other accommodations to Takata (collectively, the "Customer Accommodations"), as set forth in this Agreement and in the interim Accommodation Agreement entered into with the Japan Debtors executed contemporaneously herewith (the "Interim Japan Accommodation Agreement") and the final Accommodation Agreement to be entered into with the Japan Debtors within [ ] days after the filing of the Japan Proceedings (the "Final Japan Accommodation Agreement" and, together with the Interim Japan Accommodation Agreement, collectively, the "Japan Accommodation Agreement"), in order to provide Supplier with sufficient liquidity to maintain its going concern value, comply with its contractual and regulatory obligations with respect to the Recalls, and to continue its operations and ensure a stable and secure source of supply to the Consenting OEMs during the Term (as defined herein).

I.    In return for the Customer Accommodations by the Consenting OEMs, Supplier, among other things, shall provide certain supply protection, acknowledgements, and financial assurances to the Consenting OEMs, as set forth herein, which will include the Adequate Protection Rights.

**BASED ON THE FOREGOING RECITALS,** which are incorporated as representations and warranties of the Parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Consenting OEMs and Supplier agree as follows:

<u>**TERMS AND CONDITIONS**</u>

1.    **Effective Date and Term.**

a.    Effective Date.  This Agreement will become effective (the date of such effectiveness, the "Effective Date") as to each Initial Consenting OEM (and its respective subsidiaries and/or affiliates as described on **Schedule 1**) and each Supplier party upon timely satisfaction of the following conditions:

i.    Execution of this Agreement by such Party (or, in the case of the Schedule 1 Entities, on behalf of); and

ii.    As to the U.S. Debtors only, entry of the Interim Adequate Protection

Order (as defined herein).

In the event that (A) all Initial Consenting OEMs and all Supplier parties have not executed this Agreement on or before July 7, 2017, (B) Supplier has not delivered to the Initial Consenting OEMs of a fully executed copy of the Access Agreement on or before July 7, 2017, and (C) the Final Japan Accommodation Agreement is not executed and approved in the Japan Proceedings on or before [ ], this Agreement shall automatically terminate as to all Parties without further action of any kind being required by any Party.

In addition, with respect to the German Entities and the entities marked with an asterisk on **Schedule 2** (collectively, the "EMEA Entities"), the effectiveness of the provisions set forth in Sections 2, 3, 5, 6, 8, 9, 10, 11, 14, 15, and 20 (and all rights and obligations set forth in such provisions) shall be conditioned upon the execution of the EMEA Settlement Agreement by the affected Initial Consenting OEMs and TKJP, TIF, TAKATA Aktiengesellschaft, TAKATA Sachsen GmbH, TAKATA Europe GmbH, TAKATA Parts s.r.o., TAKATA South Africa (Pty) Ltd., TAKATA Safety Systems Hungary Kft., TAKATA Rus LLC and Takata Istanbul Automotive Safety Systems Production and Trading Ltd. Notwithstanding the immediately preceding sentence, with respect to the EMEA Entities, the effectiveness of Section 20 shall be conditioned upon the effectiveness of the waiver, release, standstill or similar arrangement, as the case may be, with regard to the Customer Recall Costs and Expenses, Customer Recall Claims and/or Customer Indemnification Claims against the EMEA Entities to be provided for in the EMEA Settlement Agreement; provided, however, for purposes of the foregoing, any condition to such waiver, release, standstill or similar arrangement, as the case may be, not to be performed or procured by any of the EMEA Entities shall be deemed satisfied.

b.    Term. Unless otherwise provided herein or extended by written agreement of Supplier and the Initial Consenting OEMs, the term of the Agreement (the "Term") shall commence on the Effective Date and continue through the earliest to occur of:

i.    The Requisite Consenting OEMs having sent a written notice, in accordance with, and subject to any applicable cure periods provided for in, Section 25, to all other Parties of a Consenting OEM Termination Event (as defined herein) and their election to terminate this Agreement on account of such Consenting OEM Termination Event;

ii.    As to each Consenting OEM, such Consenting OEM having sent written notice in accordance with, and subject to any applicable cure periods provided for in, Section 24, to all other Parties of an Event of Default (as defined herein) and its election to terminate this Agreement on account of such Event of Default solely as to such Consenting OEM;

iii.    Confirmation of, and occurrence of the effective date under, the U.S. Reorganization Plan; approval of the Section 42 Business Transfer and

approval and confirmation of the Japan Insolvency Plan; closing of the Sale to the Plan Sponsor (the "Closing"); and consummation of the Restructuring (collectively, the "Consummation Date"), each in accordance with the relevant transaction documents and the Rule 11 Plea Agreement, dated January 13, 2017, between the Department of Justice, Criminal Division, Fraud Section (the "DOJ") and the United States Attorney's Office for the Eastern District of Michigan, and Takata (as may be amended or as otherwise agreed in writing, with the consent of the Initial Consenting OEMs, the "DOJ Plea Agreement"); and

iv.   February 27, 2018 (the "Outside Date"); provided, however, that if the deadline for the payment of the USD $850,000,000 restitution payment payable by Takata under the DOJ Plea Agreement (the "DOJ Restitution Award") is extended, the Outside Date shall be extended to the new date on which such restitution payment is due, subject to the consent of the Requisite Consenting OEMs; and, provided further, the Outside Date may not be extended beyond March 31, 2018 without the consent of all Initial Consenting OEMs.

## CUSTOMER ACCOMMODATIONS

2.   **Replacement Kit Pricing.**

a.   For any Replacement Kit (as defined herein) supplied by Supplier during the Term, the Replacement Kit Costs (as defined herein) shall be paid directly by each or any applicable Consenting OEM at the currently applicable pricing.

b.   "Replacement Kit" means the package of Component Parts necessary to effectuate a Recall.

c.   "Replacement Kit Costs" means the cost and expense of Supplier to resource, package, and deliver the Replacement Kit.

3.   **Resourcing Limitation.**   During the Term, each Consenting OEM agrees that it will not resource its Component Parts or programs currently on contract with Supplier or awarded to Supplier and communicated by a Consenting OEM to the Plan Sponsor prior to March 7, 2017, which the Consenting OEM understood was to be included in the Plan Sponsor's Business Plan, and which has been confirmed as between each Consenting OEM and Plan Sponsor in separate, confidential written schedules within fourteen (14) days following the later of the Effective Date and such Consenting OEM's joinder to this Agreement (the "Plan Sponsor's Business Plan") except for a Permitted Resourcing (as defined herein), nor will they encourage or coordinate resourcing by other customers (such agreement, the "Resourcing Limitation").   Notwithstanding the foregoing, each Consenting OEM may take any action that it deems necessary or useful, in its sole discretion, to prepare for a resourcing of production of its Component Parts or programs on contract with Supplier, including, without limitation: (a)

discussing, negotiating, and executing agreements with an alternative supplier(s); or (b) purchasing sample or prototype Component Parts from an alternative supplier(s). The Resourcing Limitation does not prohibit a Consenting OEM from reducing or ceasing orders for Component Parts being produced for current model platforms by Supplier temporarily or permanently because of: (i) normal business fluctuations, including, without limitation, reductions in consumer demand; (ii) product, engineering, program, and model changes; (iii) program or vehicle platform cancellations or modifications due to a major refresh or major redesign of the program or the Component Part itself that renders Supplier's production of such Component Parts obsolete; or (iv) the expiration of the term of any Purchase Order, including pursuant to the issuance of a notice of non-renewal from a Consenting OEM prior to March 7, 2017 in respect of any automatically renewing Purchase Order.

      a.    "Permitted Resourcing" means, as to any particular Component Part, the resourcing of such Component Part from Supplier to a third party that: (i) the Plan Sponsor has confirmed in writing is not a Component Part that is accounted for in the Plan Sponsor's Business Plan; (ii) relates to any resourcing communicated by a Consenting OEM to the Plan Sponsor prior to March 7, 2017 and that the Consenting OEM understood was not to be included in the Plan Sponsor's Business Plan; (iii) occurs after Supplier breaches any of its obligations to a Consenting OEM under that Consenting OEM's Purchase Orders for such Component Parts during the Term, and such breach is substantially likely to result in an interruption in production or operations at one or more of the Consenting OEM's assembly facilities or plants; (iv) occurs after Supplier repudiates its obligations to a Consenting OEM under that Consenting OEM's Purchase Orders for the supply of such Component Parts during the Term, including, without limitation, any admission by Supplier of an inability to meet the technical or other requirements related to such Component Part; (v) is a resourcing of Excluded Parts (as defined herein); (vi) occurs after the occurrence of an Event of Default (as defined herein), which Supplier fails to cure or the applicable Consenting OEM does not agree to waive within the applicable cure period; (vii) occurs after the occurrence of a Consenting OEM Termination Event, which Supplier fails to cure or the Requisite Consenting OEMs do not agree to waive within the applicable cure period; (viii) occurs after a Consenting OEM has terminated its obligations under the U.S. RSA, the Japan RSA, the Settlement Agreements, the U.S. Reorganization Plan, the Japan Insolvency Plan, or the Japan Accommodation Agreement; or (ix) occurs after Takata elects to pursue an Alternative Transaction (as defined herein)  (any of the foregoing events, a "Permitted Resourcing Event"). The Parties reserve all of their respective rights with respect to the allocation of any costs and expenses incurred in connection with any Permitted Resourcing Event.

      b.    "Excluded Parts" means: (i) PSAN Inflators and (ii) airbag modules or assemblies that incorporate the PSAN Inflators ("PSAN Modules"); provided, however, a PSAN Module is an Excluded Part only if: (x) such PSAN Module resourcing is or has been disclosed to the Plan Sponsor and the Plan Sponsor has confirmed that such resourcing will not result in the Plan Sponsor refusing to close the Sale or reducing the purchase price for the Sale; (y) to the extent that the resourcing results in the Plan Sponsor refusing to close the Sale, the Consenting OEM provides replacement business at the required volumes and pricing such that the Plan Sponsor is prepared to close the Sale;

7

or (z) to the extent that the Plan Sponsor is prepared to close the Sale at a reduced purchase price notwithstanding the resourcing of a PSAN Module, the Consenting OEM provides the Plan Sponsor with economic equivalent value for the lost business such that the resourcing does not result in a reduction in the portion of the purchase price that would have otherwise been distributed to the other Consenting OEMs.  Notwithstanding anything else in this Agreement to the contrary, this Agreement is not intended to, and will not, limit any Consenting OEM's right or ability to resource production of Excluded Parts, and the Resourcing Limitation shall not apply in any respect to Excluded Parts.

c.     For purposes of this Section 3 as it applies to the EMEA Entities, the term "Event of Default" shall be limited to the occurrence of an Event of Default set forth in Sections 24(a), (b), (e) or (f) and only if the occurrence of such Event of Default is related to the EMEA Entities; provided, however, such Event of Default shall be deemed not to have occurred if, in case of Sections 24(b), (e) or (f), as applicable, the EMEA Entities are able to establish that the Event of Default occurred without any fault of the EMEA Entities. Notwithstanding the immediately preceding sentence, an Event of Default shall be deemed to have occurred if such Event of Default is reasonably likely to result in an interruption in production or operations at one or more of the relevant Consenting OEM's assembly facilities or plants. The relevant Consenting OEM shall support in good faith the EMEA Entities in their attempt to cause their suppliers to continue supply to the EMEA Entities to avoid any interruption in production or operations; provided that such support shall in any event exclude additional financial support of any nature.

d.     Section 3.c above shall not apply if (i) the relevant Consenting OEM's annual purchase order volume from the EMEA Entities during the last full calendar year prior to the Effective Date is (x) [●]% or less of such Consenting OEM's global purchases from Supplier and (y) less than USD $[●] million and (ii) the affected vehicle architecture or vehicle program of such Consenting OEM is assembled or manufactured in more than one of Takata's organizational regions.

**4.     Setoff Rights and Limitations.**  Supplier acknowledges and agrees that the Consenting OEMs are entitled, pursuant to the terms of the Purchase Orders and otherwise applicable law, to exercise rights of setoff, recoupment and deduction in respect of, among other things, Allowed Setoffs, Professional Fee Setoffs, Tooling Setoffs, and Materials Setoffs (each as defined herein).  To the extent the terms of any of the Purchase Orders do not expressly provide for the Consenting OEMs to exercise rights of setoff, recoupment and deduction in respect of Allowed Setoffs, Professional Fee Setoffs, Tooling Setoffs, and Materials Setoffs, Supplier agrees to each Consenting OEM exercising such rights on the terms set forth herein as consideration for the Customer Accommodations provided pursuant to this Agreement.  During the Term, each Consenting OEM will not exercise its rights of setoff, recoupment, or deduction against its bona fide accounts payable to Supplier that are generated prior to or during the Term on account of Component Parts, Tooling (as defined herein) or services received by such Consenting OEM, except for Allowed Setoffs, Professional Fee Setoffs, Tooling Setoffs, and Materials Setoffs.

a.      "Allowed Setoffs" means setoffs, recoupments, or deductions for any and all defective or nonconforming products, quality problems, recall costs, warranty costs, unordered or unreleased parts that a Consenting OEM returns to Supplier, short shipments, misshipments, premium freight charges that were not caused by a Consenting OEM, improper invoices, mispricing, duplicate payments, or billing errors; provided that, Allowed Setoffs for any specific invoice or group of invoices may not exceed 2% of the aggregate face value of any bona fide invoice or group of invoices (the "Allowed Setoff Cap").   Allowed Setoffs specifically exclude: (i) Customer Indemnification Claims, Customer Recall Claims, Customer Recall Costs and Expenses, Replacement Kit Costs, and any other costs or expenses arising out of or related to the Recalls; and (ii) consequential, incidental or special damages arising from any prior, existing or future defaults under the Purchase Orders or arising under otherwise applicable law, in each case, related to PSAN Inflators or PSAN Modules, in respect of any breach or repudiation of any agreement between a Consenting OEM and Supplier.

b.      "Materials Setoffs" means setoffs, recoupments, or deductions on account of: (i) payments made by a Consenting OEM to any third party to purchase materials, services, or components to be used by Supplier in connection with the production of Component Parts for such Consenting OEM; (ii) the actual cost of materials, services, or components supplied to Supplier by a Consenting OEM to be used by Supplier in connection with the production of Component Parts for such Consenting OEM; or (iii) payments made by a Consenting OEM to any third party as a result of any guaranty of Supplier's accounts payable to such third party for materials, services, or components to be used by Supplier in connection with the production of Component Parts for such Consenting OEM.

c.      "Professional Fee Setoffs" means setoffs, recoupments, or deductions for payments made by a Consenting OEM to one or more of the financial and/or legal advisors retained by such Consenting OEM for reasonable and documented, out-of-pocket fees, costs, and expenses, and the out-of-pocket travel and related costs of such Consenting OEM's employees, incurred in connection with the Sale or the Restructuring or otherwise from Takata's financial distress, but excluding in all cases any fees and costs incurred in connection with litigation related to PSAN Inflators against such Consenting OEM ("Professional Fees"); provided that invoices for any such fees, costs, and expenses shall be provided to Supplier in summary form (without underlying time entry detail) reflecting a description of the work performed and the hours and rate of the applicable professionals.   For Professional Fees incurred from the later of (x) March 1, 2016 and (y) the date on which such Initial Consenting OEM officially joined the organized group of OEM customers (as applicable to each Initial Consenting OEM, the "Start Date") through the date of execution by the Initial Consenting OEMs of the Indemnity and Release Agreement to be entered into among the Consenting OEMs and the Plan Sponsor (such Professional Fees, the "Pre-Signing Date Fees", such date, the "Signing Date", and such agreement, the "Indemnity Agreement"), each Initial Consenting OEM's Professional Fee Setoffs are limited to the greater of (i) USD $100,000 per month and (ii) the aggregate of (A) 2% of up to USD $250,000,000 of bona fide accounts payable due from such Initial Consenting OEM to Takata in the ordinary course of business ratably during each twelve

(12) month period (or portion of such period) following the Start Date, and (B) 1% of the total of such bona fide accounts payable, if any, in excess of USD $250,000,000 due from such Initial Consenting OEM to Takata ratably during each twelve (12) month period (or portion of such period) following the Start Date (the "<u>Pre-Signing Date Professional Fee Cap</u>"), taking into account any Pre-Signing Date Fees that such Initial Consenting OEM has recovered by setoff prior to the Signing Date; <u>provided</u>, <u>however</u>, Professional Fee Setoffs that are less than or equal to USD $100,000 per month may be taken even if such setoffs exceed the Allowed Setoff Cap.  For Professional Fees incurred after the Signing Date (the "<u>Post-Signing Date Fees</u>"), each Initial Consenting OEM's Professional Fee Setoffs are limited to the greater of (y) USD $100,000 per month and (z) 1% of any invoice or group of invoices due from such Initial Consenting OEM to Takata following the Signing Date (the "<u>Post-Signing Date Professional Fee Cap</u>" and together with the Pre-Signing Date Professional Fee Cap, the "<u>Professional Fee Cap</u>"). For purposes of determining the amount and timing of any individual Professional Fee Setoff for Post-Signing Date Fees, Professional Fee Setoffs for Post-Signing Date Fees shall be a subset of the Allowed Setoff Cap.  Each Joining Consenting OEM's Professional Fee Setoffs for Professional Fees incurred from and after the date such Joining Consenting OEM becomes a Consenting OEM shall be limited to $50,000, taking into account any Professional Fees that such Initial Consenting OEM has recovered by setoff prior to becoming a Consenting OEM.  Each Consenting OEM agrees, subject to no OEM Termination Event or Event of Default having occurred and the Requisite Consenting OEMs or such Consenting OEM, respectively, having terminated this Agreement or its obligations under this Agreement as a result thereof, and other than as part of its recovery as a general unsecured creditor pursuant to the U.S. Reorganization Plan and Japan Insolvency Plan, as applicable, or as allowed by the Bankruptcy Court (as defined herein) in connection with an Alternative Transaction, such Consenting OEM shall not seek any reimbursement of Professional Fees in excess of that permitted by the Professional Fee Cap.  For purposes of calculating the amount of the Professional Fee Cap, each Consenting OEM and its Schedule 1 Entities shall be treated as a single Consenting OEM.  Each Consenting OEM also hereby agrees that it will not take a Professional Fee Setoff against any EMEA Entity if, and to the extent that, such EMEA Entity would become, as a result of such Professional Fee Setoff, "illiquid" within the meaning of section 17 of the German Insolvency Code or the equivalent provisions in other applicable jurisdictions without taking into consideration any amounts due and payable under the financial indebtedness of the EMEA Entities; <u>provided</u> <u>that</u>, if this limitation results in a reduction (but not an elimination) of Professional Fee Setoffs against such EMEA Entity, then such reduction will ratably apply to each applicable Consenting OEM.

     d.     "<u>Tooling Setoffs</u>" means setoffs, recoupments, or deductions on account of payments made by a Consenting OEM to any third party for all or part of the purchase price or the repair price of Tooling used by Supplier in connection with the manufacture, assembly, or transportation of Component Parts for such Consenting OEM, if the Consenting OEM determines that such payments are necessary or helpful to secure release of, or prevent the assertion of, a valid lien on the Tooling or is required to obtain possession of the Tooling.

e.    If a Consenting OEM is unable to recover the full amount of its Allowed Setoffs or Professional Fee Setoffs from any given payment of an invoice or group of invoices because of the Allowed Setoff Cap or Professional Fee Cap, any unrealized portion of the Allowed Setoffs or Professional Fee Setoffs may be carried forward to and applied against subsequent payments of subsequent invoices or groups of invoices, so long as the Consenting OEM does not exceed the Allowed Setoff Cap or Professional Fee Cap, as applicable, against any given payment with respect to Allowed Setoffs or Professional Fee Setoffs.

f.    Each Consenting OEM and Supplier agree to use commercially reasonable efforts to cooperate, in good faith, to expeditiously resolve any disputed setoffs, recoupments and deductions.  Each Consenting OEM reserves and does not waive any rights and interests it may have or would have but for this Agreement, including the right to assert affirmative claims against Supplier, file and prosecute, or otherwise assert, claims in the U.S. Proceedings, and to assert any of its rights of setoff and recoupment for defensive purposes.  Supplier reserves and does not waive any rights and interests it may have or would have but for this Agreement, including the right to dispute or contest the validity of any Tooling Setoff, Material Setoff, Professional Fee Setoff, or Allowed Setoff.  The order approving this Agreement in the U.S. Proceedings will modify the automatic stay under 11 U.S.C. § 362 so as to permit each Consenting OEM to effectuate the rights of setoff, recoupment and deduction provided herein against the U.S. Debtors.

g.    As to each Consenting OEM that is a party to a Settlement Agreement, and as to the corresponding Supplier parties that are party to the applicable Settlement Agreement with such Consenting OEM(s), to the extent of any conflict between this Section 4 and the terms of such Settlement Agreement, the terms of the applicable Settlement Agreement shall govern and control.

h.    With regard to the EMEA Entities, Professional Fee Setoffs, Tooling Setoffs, and Materials Setoffs may only be exercised provided that (i) no Consenting OEM shall declare any setoff without first having given Supplier five (5) business days' advance notice of its intention to declare a such setoff detailing the applicable relevant setoff claims; and (ii) each Consenting OEM may declare a setoff only twice per calendar month and only as of the 15th and the last day of such calendar month; provided, however, the first setoff after the date hereof may be declared as of the eighth (8th) business day after the date hereof observing the five (5) business days' notice period provided for in subsection (i) above.

**5.    Inventory Purchase.**  Upon the occurrence of an Inventory Purchase Trigger Date (as defined herein), each Consenting OEM will purchase and pay for, in cash, all "useable" and "merchantable" raw materials dedicated to, and usable only for, production of its Component Parts and any finished goods Component Part inventory (collectively, the "Inventory") to the extent, and for which, such Consenting OEM has Unsatisfied Releases (as defined herein). Following the occurrence of an Inventory Purchase Trigger Date, Supplier shall use commercially reasonable efforts to minimize work-in-process that (once converted to finished goods inventory) would be subject to such Consenting OEM's Inventory purchase requirement

hereunder.  Supplier shall use commercially reasonable efforts to convert all work-in-process dedicated to a Consenting OEM to finished goods Inventory within ten (10) days following an Inventory Purchase Trigger Date, and such finished goods inventory shall constitute Inventory subject to the Consenting OEMs' Inventory purchase requirements hereunder.

      a.    Inventory purchases made pursuant to this <u>Section 5</u> will be for a cash purchase price equal to the following amounts, without setoff, recoupment, deduction or reduction of any kind except for Allowed Setoffs (the "<u>Inventory Purchase Price</u>"): (i) for dedicated raw materials, one hundred percent (100%) of Supplier's actual and documented third-party cost thereof; and (ii) for finished goods, one hundred percent (100%) of the purchase price for such Component Parts set forth on the applicable Purchase Order.  Supplier will complete a physical inventory at the affected plant or plants within ten (10) business days after the Inventory Purchase Trigger Date.  Each of the Consenting OEMs will pay the Inventory Purchase Price within ten (10) business days after the time that the Inventory and a written invoice have been delivered to the applicable Consenting OEM.  The Consenting OEMs will take possession of the Inventory at the applicable Supplier facility.  Inventory will be delivered free and clear of all liens, claims, encumbrances and security interests not later than ten (10) business days after the applicable Inventory Purchase Trigger Date; <u>provided</u>, <u>however</u>, the Consenting OEM liens granted as Adequate Protection Rights will attach to the proceeds of such Inventory.  In the event that Inventory is not delivered to a Consenting OEM on a free and clear basis within the timeframe established in the foregoing sentence, such Consenting OEM will have the right, but not the obligation, to purchase such Inventory.  Supplier will assign all rights against third parties which Supplier has in connection with the Inventory that is delivered or bought pursuant to this paragraph.

      b.    For purposes of this Agreement, the term "<u>useable</u>" means all Inventory that is not obsolete, as reasonably determined in accordance with applicable industry standards for the specific Inventory, and that is reasonably useable in the production of Component Parts for which a Consenting OEM has Unsatisfied Releases to Supplier on the Inventory Purchase Trigger Date.  The term "<u>merchantable</u>" means merchantable as defined in U.C.C. § 2-314 and in conformance with all applicable Purchase Order specifications for the Component Part.  The determination of whether Inventory is "useable" and "merchantable" will be made on the date that the Inventory is made available for delivery to a Consenting OEM free and clear of all liens, claims and encumbrances (the "<u>Determination Date</u>").

      c.    "<u>Inventory Purchase Trigger Date</u>" means the occurrence of any one or more of the following: (i) a Permitted Resourcing Event, in which case, the resourcing Consenting OEM is obligated to purchase only that Inventory to which the Permitted Resourcing relates and, for the avoidance of doubt, no other Consenting OEM will be obligated to purchase Inventory in the absence of another Inventory Purchase Trigger Date; or (ii) at the option of each Consenting OEM, unless the Sale and Restructuring have been substantially consummated, the Outside Date; <u>provided</u>, <u>however</u>, that if the Consenting OEMs and Takata subsequently enter into restructuring agreements providing for an Alternative Transaction, the occurrence of the Outside Date shall not constitute an

Inventory Purchase Trigger Date and the terms and conditions of such Alternative Transaction agreements shall control as to the inventory purchase obligations of the Consenting OEMs.

       d.     The term "Unsatisfied Releases" means the quantity of Component Parts provided in Purchase Orders, call-offs by the relevant Consenting OEM, firm releases or fabrication, raw material or similar authorizations issued directly or indirectly (i.e., whether such Component Parts are shipped by Supplier directly to a Consenting OEM or to a Consenting OEM's supplier) by a Consenting OEM and in effect on the Determination Date, less the quantities of Component Parts shipped by Supplier after receipt of those releases or similar authorizations.

**6.      Accounts Payable Acceleration.**

       a.     In exchange for the adequate protection provided for below, and after taking into account any setoffs permitted pursuant to Section 4 of this Agreement, each Consenting OEM will make payment of its respective bona fide accounts payable to Supplier that are generated prior to or during the Term on account of Component Parts, Tooling or services received by such Consenting OEM on an accelerated basis (the "Accounts Payable Acceleration") in accordance with a monthly cash flow forecast prepared by Supplier and reasonably acceptable to affected Consenting OEMs in each region (the "Budget") up to approximately net 15-day payment terms.  The Accounts Payable Acceleration required in a particular region for any given period will be based on all Consenting OEMs in such region (i) accelerating to the shortest then existing payment terms of any Consenting OEM in such region and then, if necessary (ii) accelerating such shortest then existing payment term by the same number of days for each Consenting OEM in such region in accordance with the Budget.

       b.     The Budget will provide for certain regional and/or entity level minimum cash thresholds as agreed to by the Initial Consenting OEMs and Supplier ("Minimum Cash Requirements").  The initial Budget through March 31, 2018 (the "Initial Budget Period") is attached as **Exhibit A**.  Supplier will provide an update of the Budget by the 15th of each month, if necessary, indicating any modification to the Budget for the duration of the Budget Period (as defined herein), which shall be deemed a "Budget" only upon approval by the Initial Consenting OEMs, such approval not to be unreasonably withheld.  An Initial Consenting OEM shall be deemed to have approved such update of the Budget, unless within 5 business days of receipt of such update of the Budget such Initial Consenting OEM has provided notice to Supplier and the other Initial Consenting OEMs of its objection to such update of the Budget.  On or before January 15, 2018, Supplier will provide a Budget for the period through June 30, 2018 (the "Extended Budget Period" and together with the Initial Budget Period, collectively, the "Budget Period"), unless the parties agree otherwise.

       c.     If the Budget as updated in any month reflects a liquidity shortfall in any region (taking into account any applicable Minimum Cash Requirements) for the month beginning at least 45 days after the Budget submission date, the applicable Consenting

OEMs with accounts payable to Supplier entities in such region will begin to accelerate their respective accounts payable, as required by the updated Budget, at least 30 days prior to the beginning of the month in which the liquidity shortfall is forecast in order to cure such projected liquidity shortfall and thereby avoid any potential interruption in Supplier's operations or production of the Component Parts for the applicable Consenting OEMs.  For example, if the Budget submission on December 15, 2017 shows a liquidity need for the month of February 2018, the Consenting OEMs will begin to accelerate their respective accounts payable as of January 1, 2018, 30 days prior to the beginning of the month of February.  For clarity, the Budget will specify the required Accounts Payable Acceleration for the Consenting OEMs in each region for the applicable period.

       d.      In the event of unanticipated constraints on liquidity not contemplated by the Budget in any region such that the process set forth above will not be sufficient to satisfy the Supplier's Minimum Cash Requirements, the applicable Consenting OEMs will work in good faith with Supplier to evaluate further accelerating their accounts payable in order to maintain adequate liquidity and to avoid any interruption in Supplier's operations or in the supply of Component Parts to the Consenting OEMs, notwithstanding that such additional Accounts Payable Acceleration may not be included in the approved Budget.  For clarity, and solely as an example, if the Budget contemplates a 10-day pull-forward of Consenting OEM accounts payable but, due to unanticipated liquidity constraints, a 20-day pull-forward is required, the Consenting OEMs will work in good faith to achieve such 20-day pull-forward.  For the avoidance of doubt, the Accounts Payable Acceleration does not contemplate, and no Consenting OEM will be required to, prepay or otherwise pay in advance for Component Parts.

       e.      The Parties agree that all Consenting OEM accounts payable, whether arising prior to the Effective Date or during the Term, will be paid to accounts with banks that do not hold any Debt and over which no entity has any lien or security interest other than liens granted in connection with the Adequate Protection Rights and customary liens of credit institutions on the basis of the relevant general terms and conditions of the relevant credit institutions.  Supplier agrees that it will not transfer any proceeds of Consenting OEM accounts payable, or any other funds, to accounts with banks that hold any Debt or over which any entity has a lien or security interest (other than customary liens of credit institutions on the basis of the relevant general terms and conditions of the relevant credit institutions), including payment of any intercompany payables or dividends or other transfers between affiliates.  To the extent it has not already done so, Supplier will immediately open new bank accounts to accomplish the foregoing.

       f.      Supplier agrees that it will only use the proceeds of accounts payable of the Consenting OEMs solely in accordance with the Budget, including to support continued operations and production of Component Parts for the Consenting OEMs and to pay the costs and expenses of administering the Restructuring (including, without limitation, payment of Supplier's professional fees and expenses).

       g.      Notwithstanding anything in Section 29 to the contrary, the Secured Accommodation Parties (as defined in the Adequate Protection Order) consent to an

emergency hearing, on not less than twenty four (24) hours' notice to the Consenting OEMs, before the court in the U.S. Proceeding (the "<u>Bankruptcy Court</u>") to the extent of any failure of a Consenting OEM to comply with the Accounts Payable Acceleration set forth herein as to the U.S. Debtors.

## SUPPLIER ASSURANCES

**7.** **<u>Continue to Manufacture</u>.** During the Term, Supplier will continue to manufacture and deliver the Component Parts for each of the Consenting OEMs in accordance with the terms of the Purchase Orders. Supplier agrees to notify a Consenting OEM of any threat to continued timely shipment of such Consenting OEM's Component Parts promptly upon learning of that threat. Supplier will allocate its capacity and resources equitably among the Consenting OEMs, with no one Consenting OEM receiving priority allocation. For the avoidance of doubt, (i) the U.S. Debtors will not reject or terminate any Purchase Orders with the Consenting OEMs during the Term and (ii) Supplier will not terminate any Purchase Orders with the Consenting OEMs during the Term.

**8.** **<u>Resourcing Cooperation</u>.** Subject to the Resourcing Limitation, during the Term, Supplier will use commercially reasonable efforts to cooperate with each of the Consenting OEMs in preparation for any Permitted Resourcing. In connection with any Permitted Resourcing, and upon the occurrence of a Permitted Resourcing Event, Supplier will take commercially reasonable efforts to cooperate with each Consenting OEM's resourcing of production of any one or more of its Component Parts to any one or more alternative suppliers. Resourcing cooperation in this context shall include, without limitation, providing each Consenting OEM and its agents, representatives, designees, consultants, employees and potential successor suppliers (subject to reasonable confidentiality protections to protect confidential or trade secret information): (a) copies of tool line-ups, tool processing sheets, bill of materials, PPAP packages and tool drawings; and (b) reasonable access to Supplier's manufacturing facilities for the purpose of inspecting, preparing to transport and removing Customer Tooling (including access to Supplier's books and records relating to such Customer Tooling), viewing current production of applicable Component Parts, and preparing for or, if permitted, resourcing Component Part production. In addition, Supplier will allow each Consenting OEM to utilize Supplier's employees, machinery, and equipment as reasonably necessary to accomplish the foregoing and as is necessary to complete its resourcing, so long as such Consenting OEM's reasonable access and utilization is not substantially likely to result in an interruption in Supplier's production or operations and is permissible under any applicable laws and regulations.

**9.** **<u>Tooling Acknowledgement</u>.**

a. Supplier acknowledges that, excluding Unpaid Tooling and Supplier Tooling (each as defined herein), all tooling, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds, and related documentation (including engineering specifications, PPAP books, and test reports), together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances (collectively, "<u>Tooling</u>") that have been, are, or may be used by Supplier exclusively in connection with the manufacture, assembly, or transportation of Component Parts for a

15

Consenting OEM are owned by such Consenting OEM and is being held by Supplier or one or more third parties (to the extent transferred by Supplier to third parties) as bailees at will (collectively, "Customer Tooling").

b.     Neither Supplier nor any other person or entity other than the applicable Consenting OEM has any legal or equitable right, title, or interest in the Customer Tooling other than Supplier's right, subject to the applicable Consenting OEM's unfettered discretion, to use the Customer Tooling to manufacture, assemble, or transport Component Parts in accordance with such Consenting OEM's Purchase Orders.  Each Consenting OEM and its designee(s) shall have the right to take possession of its Customer Tooling at any time, without notice, court order, commencement of court proceedings, or payment of any kind to Supplier except to the extent there is an unpaid tooling invoice.  At a Consenting OEM's request and subject to the occurrence of a Permitted Resourcing Event, Supplier will take all reasonable efforts to cooperate with such Consenting OEM in the Consenting OEM's taking possession of its Customer Tooling, including, without limitation: (i) providing the Consenting OEM or its designee(s) with reasonable access to Supplier's manufacturing operations to inspect current production processes; (ii) providing the Consenting OEM or its designee(s) with reasonable access to Supplier's facilities to inspect, prepare to transport, and remove its Customer Tooling, including access to Supplier's books and records relating to the Customer Tooling; and (iii) assisting the Consenting OEM or its designee(s) in preparing, loading, and removing its Customer Tooling from Supplier's facilities, including allowing the Consenting OEM to utilize Supplier's employees, machinery, and equipment as reasonably necessary to remove its Customer Tooling, so long as such Consenting OEM's reasonable access and utilization is not substantially likely to result in an interruption in Supplier's production or operations.  Supplier authorizes each Consenting OEM to record on Supplier's behalf any notice or financing statements concerning its Customer Tooling if the Consenting OEM determines that such statements are reasonably necessary to reflect its interests in the Customer Tooling.  Supplier authorizes each Consenting OEM to affix any plate, stamp, or other evidence of its ownership upon each item of its Customer Tooling.

c.     If during the Term there is a dispute over whether any Tooling is Customer Tooling, Unpaid Tooling, or Supplier Tooling, the Tooling subject to the dispute (the "Disputed Tooling") will be presumed to be Customer Tooling, pending resolution of the dispute, provided that the Consenting OEM pays into escrow the lesser of the disputed amount or the unpaid purchase price of such Disputed Tooling, and the Consenting OEM will have the right to immediate possession of such Disputed Tooling, so long as it is utilized exclusively for such Consenting OEM, and Supplier may not deny such Consenting OEM possession of such Disputed Tooling.  Supplier will take commercially reasonable steps to cooperate with each Consenting OEM in its taking possession of Disputed Tooling pending resolution of the dispute.  Such cooperation will include, without limitation, allowing the applicable Consenting OEM reasonable access to Supplier's facilities.  Disputed Tooling transferred to a Consenting OEM will remain subject to any valid lien or claim held by Supplier for the disputed amounts related to such Disputed Tooling notwithstanding the fact that Supplier has relinquished possession.

d.     "<u>Supplier Tooling</u>" means Tooling that has not been paid for by a Consenting OEM and is not Unpaid Tooling.

e.     "<u>Unpaid Tooling</u>" means Tooling for which the applicable Consenting OEM has issued a Tooling Purchase Order and has not paid the applicable Tooling Purchase Order price in full.  If a Consenting OEM or its designee pays the outstanding Tooling Purchase Order price for any item of Unpaid Tooling, such item will be Customer Tooling.

f.     The rights and obligations contained in this <u>Section 9</u> are in addition to, and not in lieu of, each Consenting OEM's rights under the Purchase Orders and applicable law, and will continue in effect notwithstanding the expiration or termination of this Agreement.  To the extent that a Consenting OEM's Purchase Orders and this <u>Section 9</u> conflict, this Section's terms will control.

10.    <u>**Consenting OEM Claim Acknowledgement.**</u>    Supplier acknowledges the Customer Indemnification Claims, Customer Recall Claims, Customer Recall Costs and Expenses, and Replacement Kit Costs (collectively, the "<u>Acknowledged Claims</u>"), and agrees that (a) as of the Effective Date, each Consenting OEM's Acknowledged Claims significantly exceed the amount of such Consenting OEM's accounts payable owed to Supplier (the "<u>Consenting OEM Secured Claim</u>") and (b) it will not dispute the Acknowledged Claims on any basis, including, but not limited to, Supplier's ability or inability to identify the final root cause of any PSAN Inflator ruptures or deployments; provided that as to the U.S. Debtors, such Acknowledged Claims in excess of the Consenting OEM Secured Claim are subject to, and filed in accordance with the Consenting OEM Claims Protocol to be annexed as an exhibit to the U.S. RSA (the "<u>Consenting OEM Claims Protocol</u>").  Supplier further acknowledges each Consenting OEM's Purchase Orders and the rights of each Consenting OEM thereunder. Supplier acknowledges and agrees that the Acknowledged Claims include, without limitation, to the extent incurred by the applicable Consenting OEM, claims for reimbursement against Supplier for costs related to and arising out of the need to retain external advisors on the subject of (i) the Recalls, (ii) the evaluation of the safety of PSAN Inflators, including undertaken as a result of PSAN Inflator field ruptures, (iii) the Restructuring and Sale, and (iv) any litigation related to the Recalls.  The Parties acknowledge that the Acknowledged Claims give rise to Consenting OEM rights of setoff, recoupment and deduction, and that the Consenting OEMs have agreed to limit such rights as specified in <u>Section 4</u> of this Agreement solely as an accommodation to Supplier to ensure ongoing production of the Component Parts, to enable Supplier to comply with its regulatory obligations and to assist the supplier to realize the going concern value of its businesses.  As to each Consenting OEM that is a party to a Settlement Agreement, and as to the corresponding Supplier parties that are party to the applicable Settlement Agreement with such Consenting OEM(s), to the extent of any conflict between this <u>Section 10</u> and the terms of such Settlement Agreement, the terms of the applicable Settlement Agreement shall govern and control.

11.    <u>**Service Parts.**</u>    In addition to Supplier's obligations under the Purchase Orders, Supplier will, subject to reasonable availability and adequate capacity, take commercially

reasonable steps to cooperate with each Consenting OEM to manufacture "all-time buys" for service parts (including both current model and past model service parts) as may be requested by each Consenting OEM. Each Consenting OEM and Supplier shall cooperate in good faith and agree upon a completion date on or before which such all-time buys are to be completed. Supplier will allocate its resources to manufacture service parts, subject to reasonable availability and adequate capacity, equitably among the Consenting OEMs.

      12.    **Inventory Bank.**  In addition to Supplier's obligations under the Purchase Orders, subject to reasonable availability and adequate capacity, Supplier will take commercially reasonable steps to cooperate with each Consenting OEM to build for such Consenting OEM an inventory bank of Component Parts in accordance with inventory bank schedules and budgets mutually agreeable to Supplier and such Consenting OEM; provided, however, that Supplier's obligation to build inventory bank parts will be subject to, among other items: (a) reasonably applied internal capacity and liquidity limitations of Supplier as determined in Supplier's reasonable discretion; and (b) availability of raw materials and supplies for Component Parts. Supplier will ship inventory bank Component Parts as such parts are produced to such location designated by such Consenting OEM, and such Consenting OEM will pay for Component Parts in accordance with existing Purchase Orders and/or other agreements between the parties except to the extent otherwise modified by this Agreement. Each Consenting OEM will promptly pay all incremental costs incurred by Supplier in manufacturing the inventory bank for such Consenting OEM in accordance with its Purchase Orders, as modified by this Agreement. Supplier will not manufacture any inventory banks for customers who are not Parties to this Agreement unless such other customer agrees to provide accommodations of equivalent economic impact as those provided by the Consenting OEMs. Supplier will allocate its resources in building inventory banks, subject to reasonable availability of raw materials and supplies and adequate capacity, equitably among the Consenting OEMs; provided, however, the applicable Supplier entities will allocate priority to production of inventory banks for NADI Component Parts.

      13.    **Access to Information.**  Supplier agrees that each Consenting OEM, and its designees, agents and representatives shall (subject to reasonable confidentiality protections to protect confidential or trade secret information and the requirement to minimally disrupt Supplier's business), have reasonable access to Supplier's operations, books and records and to Supplier's representatives during regular business hours, or outside of regular business hours upon reasonable request and prior written notice by such Consenting OEM, for purposes of: (a) inspecting and, if otherwise permitted under this Agreement, resourcing Component Parts and Customer Tooling; (b) monitoring production of Component Parts; (c) monitoring Supplier's financial and operational performance; and (d) monitoring Supplier's compliance with the terms of this Agreement (solely as pertaining to such Consenting OEM) and any other agreements and contracts between Supplier and such Consenting OEM, including, without limitation, the Purchase Orders. Supplier shall maintain all product information (including model and serial numbers), drawings, and test reports regarding the PSAN Inflators and PSAN Modules to the extent such information is necessary to track and identify such PSAN Inflators. This information shall be provided by Supplier to the applicable Consenting OEM upon request.

      14.    **License.**

a.     Supplier grants to each Consenting OEM and such Consenting OEM's assignees and designees an irrevocable, fully-paid, royalty-free, worldwide, non-exclusive, sub-licensable (i) license and (ii) sublicense (subject to the terms of any applicable existing licenses or other applicable agreements and to any licensor's or third party's consent to such license or sublicense, if applicable, other than affiliates or insiders of Supplier), to make, have made, use, have used, modify, improve, reproduce, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the Intellectual Property (as defined herein) owned or licensed by Supplier that is necessary to the manufacture, assembly, or transportation of such Consenting OEM's Component Parts or necessary to use Tooling or Dedicated Equipment (as defined herein) for purposes of producing such Consenting OEM's Component Parts (the "License").

b.     The License to each Consenting OEM shall apply to the specific Component Parts (i.e., the specific part number) supplied or to be supplied under such Consenting OEM's existing Purchase Orders with Supplier (including in the production of new vehicles by such Consenting OEM and service obligations for past-model and used Consenting OEM vehicles under such Purchase Orders) affected by (i) an Event of Default as to all Supplier entities other than the EMEA Entities or (ii) an EMEA Resourcing Event of Default (as defined herein) as to the EMEA Entities.  The License shall also apply to any (A) new model year changes with respect to such affected Component Parts, (B) mid-cycle enhancements with respect to such affected Component Parts and (C) refreshes with respect to such affected Component Parts, in each case incorporating such Intellectual Property.  The License is granted and irrevocable on the Effective Date and (x) is only exercisable upon the occurrence of (1) a Permitted Resourcing Event as to all Supplier entities other than the EMEA Entities and (2) an EMEA Resourcing Event of Default as to the EMEA Entities, in each case of (1) and (2), limited to the specific Component Parts affected by such Permitted Resourcing Event or EMEA Resourcing Event of Default; (y) is not a limitation, but rather an expansion of, any rights of a Consenting OEM under its Purchase Orders or this Agreement; and (z) is not an admission by any Consenting OEM of the validity of Supplier's claimed rights in intellectual property related to the Component Parts.

c.     Notwithstanding that the License is irrevocable, (i) any License that is not exercised in accordance with clause (x) of Section 14(b) above prior to the Consummation Date shall terminate automatically upon the Consummation Date and (ii) any License that is exercised in accordance with clause (x) of Section 14(b) above, but on account of which the affected Component Parts are resourced to Plan Sponsor, shall terminate upon the applicable Consenting OEM entering into a contract with Plan Sponsor for the production of such Component Parts.  The Consenting OEM will handle the Intellectual Property in accordance with the same practices employed by the Consenting OEM to safeguard its own intellectual property against unauthorized use and disclosure.

d.     The term "Intellectual Property" for purposes of this Agreement shall

19

mean: (i) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, trade secrets, and copyright applications); (ii) all intellectual property licensed to Supplier; and (iii) any other intellectual property over which Supplier has the right to grant license or sublicense rights, and which is, in the case of (i), (ii), and (iii), used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, regardless of whether such items are registerable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly or indirectly sells to the applicable Consenting OEM.

e.      For purposes of this <u>Section 14</u> as it applies to rights and Intellectual Property owned or held by the EMEA Entities, the term "Event of Default" shall be limited to the occurrence of an Event of Default set forth in <u>Section 24(a)</u>, <u>(b)</u> or <u>(e)</u>; provided, <u>however</u>, that such Event of Default shall be deemed not to have occurred, if, in case of <u>Section 24 (b)</u> and <u>(e)</u>, the entities are able to establish that the Event of Default occurred without any fault of Supplier and only if the occurrence of such Event of Default is related to the EMEA Entities (an "<u>EMEA Resourcing Event of Default</u>"). Notwithstanding the immediately preceding sentence, an EMEA Resourcing Event of Default shall be deemed to have occurred if such Event of Default is reasonably likely to result in an interruption in production or operations at one or more of the relevant Consenting OEM's assembly facilities or plants. The relevant Consenting OEM shall support in good faith the EMEA Entities in their attempt to cause their suppliers to continue supply to the EMEA Entities to avoid any interruption in production or operations; <u>provided</u> <u>that</u> such support shall in any event exclude additional financial support of any nature. Any License granted by an EMEA Entity hereunder shall only be exercisable by the applicable Consenting OEM for the specific Component Parts (or any components thereof) that are subject to the Purchase Orders as to which the applicable EMEA Resourcing Event of Default relates.

15.      <u>Option</u>.  Supplier grants to each Consenting OEM an irrevocable and exclusive option (the "<u>Equipment Option</u>") to purchase any returnable containers or dunnage solely used for transportation of parts for such Consenting OEM, any Supplier Owned Tooling that is dedicated solely to the production of Component Parts for such Consenting OEM, and any Supplier-owned dedicated machinery or equipment (along with any related accessions, attachments, parts, accessories, substitutions, replacements, documents, software, and appurtenances, as applicable) that is used solely in connection with the manufacture, assembly or transportation of Component Parts for such Consenting OEM (collectively, "<u>Dedicated Equipment</u>").  The Equipment Option purchase price is the fair market value for the Dedicated Equipment as determined by an appraiser acceptable to Supplier and such Consenting OEM.  All Dedicated Equipment purchased using the Equipment Option will be sold to the Consenting OEM free and clear of all liens, claims, encumbrances, and security interests.  A Consenting OEM may exercise the Equipment Option at any time within the 30-day period beginning on the occurrence of a Permitted Resourcing Event as to the particular Dedicated Equipment affected by such Permitted Resourcing Event, and any unexercised Equipment Options will automatically

terminate upon the Consummation Date.  Supplier acknowledges that the Equipment Option purchase price constitutes a commercially reasonable price for the Dedicated Equipment (including the related License) and that any sale of Dedicated Equipment will be deemed to be commercially reasonable in all respects, including, method, time, place and terms. Upon exercise of the Equipment Option and payment of the Equipment Option purchase price, the Consenting OEM or its designee(s) will have the right to take immediate possession of the applicable Dedicated Equipment and use the License without further payment of any kind and to own, operate, use, enjoy, sell, assign, transfer and/or convey the same, and Supplier agrees to cooperate with the Consenting OEM or its designee(s) in its taking possession and control of the subject Dedicated Equipment.  The Equipment Option is exercisable by a Consenting OEM in its sole discretion, subject to the terms set forth herein.  If the Sale closes notwithstanding the exercise of the Equipment Option, the Consenting OEMs agree that, if requested by the Plan Sponsor, the Plan Sponsor will be entitled to a deduction to the Sale purchase price in an amount equal to the Equipment Option purchase price paid to Supplier in connection with a Consenting OEM's exercise of the Equipment Option to the extent the Consenting OEM has not granted replacement business in an acceptable amount as set forth herein.  For purposes of this Section 15 as it applies to Dedicated Equipment owned or held by the EMEA Entities, the term "Event of Default" shall be limited to the occurrence of an EMEA Resourcing Event of Default. Notwithstanding the immediately preceding sentence, an EMEA Resourcing Event of Default shall be deemed to have occurred if such Event of Default is reasonably likely to result in an interruption in production or operations at one or more of the relevant Consenting OEM's assembly facilities or plants. The relevant Consenting OEM shall support in good faith the EMEA Entities in their attempt to cause their suppliers to continue supply to the EMEA Entities to avoid any interruption in production or operations, provided that such support shall in any event exclude additional financial support of any nature.

**16.     Other Customer Accommodations and Most Favored Nation Status.**  Supplier will use commercially reasonable efforts to obtain from each of Supplier's customers that is not a Consenting OEM accommodations substantially similar to those provided in this Agreement. Supplier will not enter into any agreement containing terms more favorable to its other customers that are not Consenting OEMs than the terms set forth in this Agreement.

**17.     Limitation on Distributions.**   During the Term, Supplier will not make payments, dividends, equity distributions, or any other distributions of any kind or nature, including, but not limited to, management fees, performance bonuses, management incentive payments, or other related fees to its owners, shareholders, members, or other related parties of Supplier, except as provided in the Budget or as otherwise approved by the Initial Consenting OEMs.  For avoidance of doubt, the immediately preceding sentence shall not limit or restrict Supplier's ability, in the ordinary course, to make intercompany transfers between Takata entities or to pay ordinary course management fees, performance bonuses or management incentive payments to Supplier's employees, in each case solely to the extent provided for in the Budget. The Budget shall include separate, specific line-item detail reflecting any management fees, performance bonuses, management incentive payments or other related fees.

**18.     Standstill Agreements and Grant of Security.**  During the Term, with respect to any (a) bonds issued to or on behalf of Supplier or (b) Supplier's bank debt (collectively, the

"Debt") for which principal is payable, Supplier shall, and shall cause its direct and indirect subsidiaries to, have in effect a forbearance or standstill agreement for such Debt, in form and substance acceptable to the Initial Consenting OEMs.  During the Term, no Supplier entity will (i) provide any guaranties on (A) any Debt or (B) any other obligations of any other Supplier entity outside the ordinary course of business or (ii) grant any liens or security interest in any of its assets (y) on account of any Debt or (z) outside the ordinary course of business.

19.    **Financial Reporting.**  Supplier shall provide each of the Consenting OEMs with: (a) financial and operational reports upon reasonable request; (b) periodic updates on the status of the Sale and Restructuring upon reasonable request; and (c) by the 25th of each month, the reporting contemplated as part of the Adequate Protection Rights under the Adequate Protection Order, which will include the following: (i) actual monthly income statements and balance sheets for each major legal entity for the prior month; (ii) updated monthly forecasts of income statements; (iii) updated monthly balance sheets and cash flows for each region based on Takata's current reporting processes; and (iv) the items reflected in (ii) and (iii) above as to each major legal entity.  As soon as practicable after becoming aware of any lawsuit or other action that may interfere with Supplier's ability to perform its obligations under this Agreement, Supplier shall notify the Consenting OEMs of such event.

20.    **Release.**  As of the Effective Date, Supplier and each of Supplier's affiliates, on behalf of themselves and, as to all Supplier entities other than the EMEA Entities, all of their respective officers, directors, employees, owners, agents, assigns, affiliates, joint ventures, trustees, successors, and representatives, each in its capacity as such, hereby releases, acquits, and discharges each Consenting OEM and each Consenting OEM's officers, directors, employees, members, owners, agents, assigns, shareholders, successors, and representatives, each in its capacity as such, from all claims, liabilities, demands, actions, causes of action, losses, damages, costs, expenses, rights, compensation, of whatever kind or nature, at law or in equity, foreseen or unforeseen, contingent or liquidated, matured or unmatured, known or unknown, that exist now, have ever existed, or may exist in the future relating to or arising from any action or inaction prior to the Effective Date (collectively the "Claims"), including, but not limited to, Claims that relate directly or indirectly to a Consenting OEM's: (a) decision to source, or not source, business to Supplier; (b) decision to terminate any Purchase Order; (c) decision to resource any business from Supplier in a manner consistent with this Agreement and any other agreement among any of the Consenting OEMs; or (d) action, related directly or indirectly to the Restructuring, Sale, or PSAN Inflators (the "Supplier Released Claims"); provided that, no person or entity shall be released from any claim arising from or related to this Agreement (or any right to or claim for payment arising in the ordinary course under a Purchase Order) or any other agreement entered into in connection with the Sale or Restructuring including, for the avoidance of doubt, the Indemnity Agreement; and provided further that, no person or entity shall be released from any claim arising from or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct.  Notwithstanding the foregoing, solely as to the U.S. Debtors, the release set forth in this Section shall be subject to entry of the Adequate Protection Order and the requirements set forth therein.  Supplier warrants that it has neither assigned nor sold any portion of any Supplier Released Claim and that it is the sole and exclusive owner of all Supplier Released Claims.  Supplier agrees not to commence, aid, or participate in (except to the extent required by order or legal process issued by a court or governmental agency

of competent jurisdiction without action, direct or indirect, by Supplier) any legal action or other proceeding based in whole or in part on the Supplier Released Claims (the "Supplier Covenant Not to Sue"). Any breach of the Supplier Covenant Not to Sue will be a breach of this Agreement and, in addition to all rights and remedies under this Agreement and applicable law, will obligate Supplier and its affiliates to pay each Consenting OEM its reasonable attorneys' fees and expenses incurred in connection with defending such a lawsuit.

## CONSENTING OEM CONTRACTS

21.    **Assumption and Modification of Purchase Orders.**  This Section 21 is subject to the execution of the Acquisition Agreements and the Indemnity Agreement, and to the Consenting OEMs' separate written authorization for Supplier to conduct the activities set forth herein.  The effectiveness of any severing, amendment, assumption, assignment, termination or rejection of any Purchase Orders, and any related releases, as provided in this Section 21, will only be effective upon the Closing.  Subject to the foregoing, the Supplier agrees to perform, or cause to be performed, the obligations set forth in this Section 21.

   a. Certain Definitions.

     i. "Assumed PSAN Contracts" means, collectively, Modified Assumed PSAN Contracts and Standalone PSAN Assumed Contracts.

     ii. "Modified Assumed OEM Contract" means any existing Purchase Orders and/or current and past Component Part programs with Consenting OEMs that are not stand-alone Purchase Orders and cover both the manufacture or sale of PSAN Inflators and other products, including, but not limited to, related airbag modules.

     iii. "Modified Assumed PSAN Contract" means a Modified Assumed OEM Contract that relates to PSAN Inflators, if the Consenting OEM is a PSAN Consenting OEM.

     iv. "Modified Rejected PSAN Contract" means a Modified Assumed OEM Contract that relates to PSAN Inflators, if the Consenting OEM is a Non-PSAN Consenting OEM.

     v. "Non-PSAN Consenting OEM" means any Consenting OEM that is not a PSAN Consenting OEM.

     vi. "OEM Assumed Contracts" means, collectively, all Modified Assumed OEM Contracts and Standalone OEM Assumed Contracts.

     vii. "Standalone OEM Assumed Contracts" means all Consenting OEM Purchase Orders relating solely to Acquired Assets and/or current and past non-PSAN Inflator Component Part programs of Consenting OEMs.

viii. "<u>Standalone PSAN Assumed Contracts</u>" means all PSAN Consenting OEM Purchase Orders relating solely to PSAN Inflators and/or current and past PSAN Inflator Component Part programs of PSAN Consenting OEMs.

ix. "<u>Standalone PSAN Rejected Contracts</u>" means all Non-PSAN Consenting OEM Purchase Orders relating solely to PSAN Inflators and/or current and past PSAN Inflator Component Part programs of Non-PSAN Consenting OEMs

b. <u>Standalone OEM Assumed Contracts</u>.

i. All Standalone OEM Assumed Contracts with the U.S. Debtors shall be assumed by the U.S. Debtors and assigned to the Plan Sponsor (and/or one of its subsidiaries) as of the Closing (regardless of whether such Standalone OEM Assumed Contracts are executory) under the U.S. Reorganization Plan on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than to substitute the Plan Sponsor (or its applicable subsidiary) for the applicable Takata entity.

ii. All Standalone OEM Assumed Contracts with the German Entities and ROW Entities will be (A) if the German Entity or ROW Entity that is a counterparty sells its assets as part of the Sale, assigned to the Plan Sponsor (and/or one of its subsidiaries) as of the Closing on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than to substitute the Plan Sponsor (or its applicable subsidiary) for the applicable Takata entity and (B) if the equity of the German Entity or ROW Entity that is a counterparty is purchased (directly or indirectly) as part of the Sale, left in place at such German Entity or ROW Entity on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price.

iii. Each Consenting OEM's Standalone OEM Assumed Contracts, respectively, include, but are not necessarily limited to, the contracts to be listed on the relevant schedules to the relevant Acquisition Agreement, which shall be subject to each applicable Consenting OEM's approval. Those schedules will also list the applicable Plan Sponsor party being substituted for Takata in connection with the assignment.

c. <u>Standalone PSAN Assumed Contracts</u>.

    i.   All Standalone PSAN Assumed Contracts with the U.S. Debtors shall be assumed by the U.S. Debtors and assigned to Reorganized Takata as of the Consummation Date (regardless of whether such Standalone PSAN Assumed Contracts are executory) under the U.S. Reorganization Plan on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than to substitute Reorganized Takata (or its applicable subsidiary) for the applicable Takata entity.

    ii.   All Standalone PSAN Assumed Contracts with the German Entities and ROW Entities will be assigned to Reorganized Takata as of the Consummation Date on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than to substitute Reorganized Takata (or its applicable subsidiary) for the applicable Takata entity.

    iii.   Each Consenting OEM's Standalone PSAN Assumed Contracts, respectively, will be listed on the relevant schedules to the relevant Acquisition Agreement, which shall be subject to each applicable PSAN Consenting OEM's approval.  Those schedules will also list the applicable Reorganized Takata party being substituted for Takata in connection with the assumption.

  d.   <u>Modified Assumed OEM Contracts</u>.

    i.   All Modified Assumed OEM Contracts with the U.S. Debtors shall be severed prior to the Closing (including pursuant to separate motions filed in the U.S. Proceedings, if necessary), and (A) as it relates to non-PSAN Inflator products, assumed by the U.S. Debtors and assigned to the Plan Sponsor (and/or one of its subsidiaries) as of the Closing (regardless of whether such Modified Assumed OEM Contracts are executory) under the U.S. Reorganization Plan on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than (1) as necessary to separate the manufacture and sale of the PSAN Inflators and release the Plan Sponsor from all liabilities and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement, and such released obligations shall be transferred to, and the related contract novated with, Reorganized Takata, and (2) to substitute the Plan Sponsor (or its applicable subsidiary) for the applicable Takata entity, and (B) as it relates to Modified Assumed PSAN Contracts, assumed by the U.S. Debtors and assigned to Reorganized Takata

(and/or one of its subsidiaries) as of the Consummation Date (regardless of whether such Modified Assumed OEM Contracts are executory) under the U.S. Reorganization Plan on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than (1) as necessary to separate the manufacture and sale of the non-PSAN Inflators and release Reorganized Takata from all liabilities and obligations thereunder unrelated to PSAN Inflators on the terms set forth in the Indemnity Agreement, and such released obligations shall be transferred to, and the related contract novated with, the Plan Sponsor, and (2) to substitute Reorganized Takata (or its applicable subsidiary) for the applicable Takata entity.

ii.  All Modified Assumed OEM Contracts with the German Entities and ROW Entities shall be severed prior to the Closing and (A) (1) if the German Entity or ROW Entity that is a counterparty sells its assets as part of the Sale, as it relates to non-PSAN Inflator products, assigned to the Plan Sponsor (and/or one of its subsidiaries) as of the Closing on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than (y) as necessary to separate the manufacture and sale of the PSAN Inflators and release the Plan Sponsor from all liabilities and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement, and such released obligations shall be transferred to, and the related contract novated with, Reorganized Takata, and (z) to substitute the Plan Sponsor (or its applicable subsidiary) for the applicable Takata entity, and (2) if the equity of the German Entity or ROW Entity that is a counterparty is purchased (directly or indirectly) as part of the Sale, as it relates to non-PSAN Inflator products left in place at such German Entity or ROW Entity on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than as necessary to separate the manufacture and sale of the PSAN Inflators and release the Plan Sponsor from all liabilities and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement, and such released obligations shall be transferred to, and the related contract novated with, Reorganized Takata, and (B) as it relates to Modified Assumed PSAN Contracts, assigned to Reorganized Takata and/or one of its subsidiaries on an "as is" basis (and without regard to any accommodations provided pursuant to this Agreement) without modification of any kind, including as to terms or price, other than (1) as necessary to separate the manufacture and sale of the non-PSAN Inflators and release Reorganized Takata from all liabilities and obligations thereunder unrelated to PSAN Inflators on the terms set forth herein, and such

released obligations shall be transferred to, and the related contract novated with, the Plan Sponsor, and (2) to substitute Reorganized Takata (or its applicable subsidiary) for the applicable Takata entity.

    iii.   Each OEM's Modified Assumed OEM Contracts, respectively, will be listed on the relevant schedules to the relevant Acquisition Agreement. Those schedules will also list (x) the applicable Plan Sponsor party being substituted for Takata in connection with the assignment and (y) the applicable Reorganized Takata party being substituted for Takata in connection with the assumption.

e.    <u>Rejected Contracts</u>.

    i.   All Standalone PSAN Rejected Contracts with the U.S. Debtors shall be rejected by the U.S. Debtors as of the Consummation Date under the U.S. Reorganization Plan.

    ii.   All Standalone PSAN Rejected Contracts with the German Entities and ROW Entities will be (A) if the German Entity or ROW Entity that is a counterparty sells its assets as part of the Sale, left in place at such German Entity or ROW Entity and (B) if the equity of the German Entity or ROW Entity that is a counterparty is purchased, terminated, and each non-PSAN Consenting OEM party to any Standalone PSAN Rejected Contract will release the Plan Sponsor from all liabilities and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement.

    iii.   All Modified Rejected PSAN Contracts with the U.S. Debtors shall be rejected by the U.S. Debtors as of the Consummation Date under the U.S. Reorganization Plan.

    iv.   All Modified Rejected PSAN Contracts with the German Entities and ROW Entities will be (A) if the German Entity or ROW Entity that is a counterparty sells its assets as part of the Sale, left in place at such German Entity or ROW Entity and (B) if the equity of the German Entity or ROW Entity that is a counterparty is purchased, terminated, and each non-PSAN Consenting OEM party to any Modified Rejected PSAN Contract will release the Plan Sponsor from all liabilities and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement.

f.    Except as otherwise agreed to between the Plan Sponsor and a Consenting OEM, Supplier will assign to the Plan Sponsor all obligations, including Service Parts and warranty obligations, under the OEM Assumed Contracts (which for purposes of clarity shall include all current and past non-PSAN Inflator Component Part programs of Consenting OEMs regardless of whether such contracts are executory or for Component

Parts or Service Parts no longer in current production (i.e., past-model parts)), other than obligations related to the manufacture or sale of PSAN Inflators.

g.      A separate written document executed by the Consenting OEMs and Supplier authorizing the amendments set forth in this Section 21 shall constitute an amendment to the applicable OEM Assumed Contracts and Assumed PSAN Contracts to incorporate the provisions set forth herein, and no additional amendments to such contracts shall be necessary to effectuate any of the provisions hereof.

## ADEQUATE PROTECTION

### 22.      Adequate Protection Rights.

a.      The U.S. Debtors shall prepare and file a "first-day" motion in the U.S. Proceedings seeking entry of an interim order in the form attached hereto as **Exhibit B** or otherwise acceptable in form and substance to the Initial Consenting OEMs (the "Interim Adequate Protection Order") and a final order in form and substance acceptable to the Initial Consenting OEMs (the "Final Adequate Protection Order" and together with the Interim Adequate Protection Order, collectively, the "Adequate Protection Orders"), in each case limited to the Initial Consenting OEMs participating in any hearing on such Adequate Protection Orders, approving this Agreement and the Access Agreement as postpetition agreements binding on the U.S. Debtors, and reflecting the terms on which each Consenting OEM has agreed to pay its outstanding accounts payable to the U.S. Debtors as of the commencement of the U.S. Proceedings (the "Petition Date") and during the Term pursuant to Sections 4 and 6 above and, in exchange for such payment, be granted adequate protection (within the meaning of 11 U.S.C. §361), as described in **Exhibit B** (the "Adequate Protection Rights"). Each Consenting OEM agrees that it will not enforce any lien granted to it as part of the Adequate Protection Rights in a manner that would interrupt the production of another Consenting OEM's Component Parts.

b.      Adequate Protection Covenants. The Supplier shall (i) maintain with insurance companies that the Supplier believes (in the good faith judgment of its management) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by entities in the same or similar businesses, (ii) maintain a cash management system customarily utilized by entities in the same or similar businesses (provided, for the avoidance of doubt, that the Supplier's existing cash management system shall satisfy such requirement), (iii) preserve, maintain and protect all of its material properties and equipment—including, for the avoidance of doubt, the Collateral (as defined in the Adequate Protection Order)—necessary in the operation of its businesses in good working order, repair and condition, (iv) not sell, transfer or dispose of any material asset or assets outside the ordinary course of business without the consent of the Requisite Consenting OEMs and each directly affected Consenting OEM, if any, (v) preserve and maintain in full force and effects each of their legal existence under the laws of the jurisdiction of their respective organizations, (vi) take all reasonable action to preserve, renew and maintain in full force and effect all

corporate rights, privileges (including their good standing), business relationships, commercial contracts and intellectual property rights that are, in the Supplier's reasonable business judgment, necessary in the normal conduct of its businesses.

**23.**    **Payment of Professional Fees.**    In the event not recovered by setoff by the applicable Consenting OEM, Supplier shall reimburse each Consenting OEM for its Professional Fees, subject to and determined in accordance with the Professional Fee Cap.  Any claim for reimbursement of such Professional Fees, subject to and determined in accordance with the Professional Fee Cap, shall be entitled to administrative expense priority pursuant to 11 U.S.C. §§ 361, 362, 363, 503(b) and 507(a)(2) and (b), junior to any adequate protection claims granted to the Consenting OEMs.

## EVENTS OF DEFAULT

**24.**    **Events of Default.**    The occurrence and continuance of any one or more of the following during the Term will be an "Event of Default" under this Agreement unless a waiver or deferral is agreed to in writing by the affected Consenting OEM(s); provided, however, that solely with respect to the Events of Default in subsections c, h and i of this Section 24, Supplier shall have five (5) business days to cure such Event of Default unless Supplier contests the occurrence of such Event of Default and a court of competent jurisdiction finds in Supplier's favor prior to the expiration of such applicable period:

a.    Supplier repudiates or rejects its obligations under the provisions of any Purchase Order.

b.    Supplier breaches its obligations under the provisions of any Purchase Order (other than a breach arising out of or relating to the design of the Subject Takata Airbags) and such breach is substantially likely to result in an interruption in production or operations at one or more of such Consenting OEM's assembly facilities or plants.

c.    Supplier repudiates or materially breaches its obligations under this Agreement.

d.    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Sale or the Restructuring or any material portion thereof, and either (i) such ruling, judgment or order has been issued at the request of or with the acquiescence of Supplier, or (ii) in all other circumstances, such ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days after such issuance.

e.    Supplier requests a material modification to the terms of a Purchase Order(s) or this Agreement (other than as contemplated in connection with the Accounts Payable Acceleration) and indicates Supplier's inability or refusal to perform under the terms of the Purchase Order(s) or this Agreement, as the case may be, unless the Consenting OEM accedes to such modification.

f.      Supplier fails to provide adequate assurance of timely and proper completion of services or delivery of goods in any respect in accordance with a Purchase Order or this Agreement, as the case may be, upon the applicable Consenting OEM's written demand for the same.

g.      Any court of competent jurisdiction has entered a final non-appealable judgment or order declaring this Agreement unenforceable.

h.      The U.S. Proceedings are converted to cases under Chapter 7 of the Bankruptcy Code or dismissed, the Japan Proceedings are converted to liquidation-type proceedings or dismissed, or any of the German Entities or ROW Entities voluntarily commences a case or cases, or has a case or cases commenced against it, under applicable insolvency law in the relevant jurisdiction, which case is a liquidation-type of insolvency proceeding or is converted to a liquidation-type of insolvency proceeding.

i.      Filing by any U.S. Debtor of a motion, pleading, application, objection or adversary proceeding challenging the validity or amount of the Acknowledged Claims; provided that such Acknowledged Claims in excess of the Consenting OEM Secured Claims are subject to, and filed in accordance with, the Consenting OEM Claims Protocol.

j.      Unless otherwise agreed to by the Initial Consenting OEMs, Supplier makes any payment of (i) default interest, or (ii) principal, on any Debt.

k.      Supplier breaches or repudiates, or the applicable parties amend or modify in violation of the applicable restrictions on amendment or modification in such documents, any of the U.S. RSA, the Japan RSA, the Settlement Agreements, the U.S. Reorganization Plan, the Japan Insolvency Plan, the Japan Accommodation Agreement, or this Agreement, in a manner that materially and adversely alters a Consenting OEM's litigation rights, or disproportionately, materially and adversely affects a Consenting OEM's liabilities, obligations, or right to recoveries relative to the other Consenting OEMs.

Upon the occurrence of an Event of Default and such Event of Default not having been cured within any applicable cure period for such Event of Default, in addition to any rights the affected Consenting OEM(s) may have under the Purchase Orders, this Agreement, or otherwise applicable law, the affected Consenting OEM(s) shall have the right to immediately terminate its obligations under this Agreement, and this Agreement shall terminate solely as to such Consenting OEM(s).

**25.    Consenting OEM Termination Events.**  The occurrence and continuance of any one or more of the following during the Term will be a "Consenting OEM Termination Event" under this Agreement unless a waiver or deferral is agreed to in writing by the Requisite Consenting OEMs; provided, however, that solely with respect to the Consenting OEM Termination Events in subsections b, j, k, l, m, n, o, and q of this Section 25, Supplier shall have

30

five (5) business days to cure such Consenting OEM Termination Event unless Supplier contests the occurrence of such Consenting OEM Termination Event and a court of competent jurisdiction finds in Supplier's favor prior to the expiration of such applicable period.

      a.      Failure to achieve any of the following milestones:

      i.      Supplier and the Plan Sponsor substantially finalize definitive Acquisition Agreements for the Sale, in form acceptable to the Initial Consenting OEMs, on or before July 17, 2017 and such Acquisition Agreements are executed on or before July 31, 2017.

      ii.      Supplier, the Plan Sponsor and the applicable Initial Consenting OEMs substantially finalize the U.S. RSA, which includes the U.S. Reorganization Plan as an exhibit, and the Japan RSA, which includes the Japan Insolvency Plan as an exhibit, each such RSA in form acceptable to the Initial Consenting OEMs, on or before July 17, 2017, and such RSAs are executed on or before July 31, 2017.

      iii.      Supplier and the applicable Initial Consenting OEMs substantially finalize the Settlement Agreements, including the EMEA Settlement Agreement, in form acceptable to the Initial Consenting OEMs, on or before July 17, 2017, and such Settlement Agreements are executed on or before July 31, 2017.

      iv.      Entry of the Interim Adequate Protection Order and the Final Adequate Protection Order assuming this Agreement (and the Access Agreement) and approving the Adequate Protection Rights in the U.S. Proceedings within three (3) calendar days and thirty-five (35) calendar days following the Petition Date, respectively.

      b.      Supplier repudiates or materially breaches its obligations under this Agreement, the Access Agreement, the Japan Accommodation Agreement, or the DOJ Plea Agreement, or, once executed, the U.S. RSA, the Japan RSA, or any of the Settlement Agreements.

      c.      The U.S. Debtors (i) withdraw the U.S. Reorganization Plan after it is filed, (ii) announce or otherwise inform any of the Parties of their intention not to support the U.S. Reorganization Plan, (iii) move for the Bankruptcy Court to approve a transaction other than the Sale (including any transaction that fails to provide for the payment in cash in full of the DOJ Restitution Award) (an "Alternative Transaction"), or (iv) agree to pursue (including, for the avoidance of doubt, as evidenced by a term sheet, letter of intent or similar document) or publicly announce their intention to pursue an Alternative Transaction.

      d.      The U.S. Debtors file any amendment or modification to the U.S. Reorganization Plan that adversely affects the Consenting OEMs without the prior

consent of the Requisite Consenting OEMs.

e.      This Agreement or the Japan Accommodation Agreement or, once executed, the U.S. RSA or the Japan RSA, is validly terminated as to all Consenting OEMs; provided, however, if the Requisite Consenting OEMs and Takata subsequently enter into restructuring agreements for an Alternative Transaction within 10 days, the termination of the U.S. RSA or Japan RSA will not constitute a Consenting OEM Termination Event.

f.      The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Sale or the Restructuring or any material portion thereof, and either (i) such ruling, judgment or order has been issued at the request of or with the acquiescence of Supplier, or (ii) in all other circumstances, such ruling, judgment or order has not been reversed or vacated within thirty (30) calendar days after such issuance.

g.      The court in the U.S. Proceedings enters an order modifying (other than extending) or terminating the U.S. Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization.

h.      Supplier requests a material modification to the terms of this Agreement and indicates Supplier's inability or refusal to perform under the terms of this Agreement, unless the Consenting OEMs accede to such modification.

i.      Any court of competent jurisdiction has entered a final non-appealable judgment or order declaring this Agreement unenforceable.

j.      Supplier fails to meet the following monthly budget covenants: the Supplier shall maintain an actual cash balance (i) in excess of the Minimum Cash Requirements and (ii) of at least 80% of the budgeted cash balance; *provided* that in the event that (x) the aggregate amount of accounts payable that are actually paid by the Consenting OEMs to Supplier between the Effective Date and such date falls short of (y) the aggregate amount of accounts payable that the Consenting OEMs are supposed to have paid to Supplier pursuant to the then-effective Budget, such shortfall shall reduce the actual cash balance that Supplier is required to maintain pursuant to the foregoing clauses (i) and (ii) above.

k.      Supplier fails to provide any required financial or operational reporting required by this Agreement.

l.      Supplier fails, in any material respect, to observe or perform any covenant under this Agreement.

m.      The U.S. Debtors create, incur or suffer any claim which is *pari passu* or senior to the Adequate Protection Claims (as defined herein).

n.    Supplier creates, incurs or suffers any post-petition lien or security interest worth more than USD $1,000,000, other than a post-petition lien, security interest, easement, or other encumbrance imposed by statute or operation of law arising in the ordinary course of business, including, without limitation, warehousemen's, mechanics', materialmen's, repairmen's, and other similar liens.

o.    Unless otherwise agreed to by the Requisite Consenting OEMs, the court in the U.S. Proceedings grants relief from the automatic stay with respect to any asset or assets of the U.S. Debtors worth more than USD $1,000,000.

p.    Unless otherwise agreed to by the Requisite Consenting OEMs, the U.S. Proceedings are converted to cases under Chapter 7 of the Bankruptcy Code or dismissed, the Japan Proceedings are converted to liquidation-type proceedings or dismissed, or any of the German Entities or ROW Entities voluntarily commences a case or cases, or has a case or cases commenced against it, under applicable insolvency law in the relevant jurisdiction, which case is a liquidation-type of insolvency proceeding or is converted to a liquidation-type of insolvency proceeding.

q.    The filing by any U.S. Debtor of a motion, pleading, application, objection or adversary proceeding challenging the validity or amount of the Acknowledged Claims; provided that such Acknowledged Claims in excess of the Consenting OEM Secured Claims are subject to, and filed in accordance with, the Consenting OEM Claims Protocol.

r.    The special master appointed pursuant to the Plea Agreement fails to adopt and approve the allocation methodology agreed to by the Consenting OEMs with respect to the DOJ Restitution Award or such other methodology acceptable to the Consenting OEMs on or before the date that is three (3) business days prior to the voting date on the U.S. Reorganization Plan.

Upon the occurrence of a Consenting OEM Termination Event and such Consenting OEM Termination Event not having been cured within any applicable cure period for such Consenting OEM Termination Event, in addition to any rights the Consenting OEMs may have under the Purchase Orders, this Agreement or otherwise applicable law, upon written notice of the Consenting OEM Termination Event(s) to all other Parties, the Requisite Consenting OEMs shall have the right to immediately terminate this Agreement in its entirety.

**26.    Supplier Termination Events.**  The occurrence and continuance of the following during the Term will be a "Supplier Termination Event" under this Agreement unless a waiver or deferral is agreed to in writing by Supplier:  A Consenting OEM fails to perform any material obligation under this Agreement and such failure is not cured within ten (10) business days. Upon the occurrence of a Supplier Termination Event and such Supplier Termination Event not having been cured within any applicable cure period for such Supplier Termination Event, in addition to any rights Supplier may have under the Purchase Orders, this Agreement or otherwise applicable law, Supplier shall have the right to immediately terminate its obligations under this

Agreement as to the defaulting Consenting OEM(s), and this Agreement shall terminate solely as to such defaulting Consenting OEM(s).

**GENERAL TERMS**

27. **Section Headings.** The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

28. **Representations and Warranties.** Each Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that as of the date of this Agreement that:

a. it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

b. the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part; and

c. the execution, delivery and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation, or bylaws, or other organizational documents.

29. **Governing Law; Jurisdiction.** This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of laws or principles thereof. If the Parties are unable to resolve any dispute within thirty (30) days (or such longer period as agreed to by the Parties) after notice of dispute is given, each Party irrevocably consents and agrees (on behalf of itself and its respective affiliates and representatives) that such dispute shall be fully and finally resolved by binding arbitration in accordance with the Swiss Rules of International Arbitration of Swiss Chambers' Arbitration Institution. The Parties agree to venue for such arbitration in Geneva, Switzerland, unless otherwise agreed by the Parties. Notwithstanding the foregoing, the Secured Accommodation Parties (as defined in the Adequate Protection Orders), in their capacity as such, (i) agree that all disputes or controversies with the U.S. Debtors arising out of or relating to the Adequate Protection Orders and the Adequate Protection Rights shall be governed by, and construed in accordance with, the laws of New York, without regard to conflicts of laws or principles thereof, and (ii) consent to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to any dispute or controversy with the U.S. Debtors arising out of or related to this Agreement, the Adequate Protection Orders or the Adequate Protection Rights.

30.    **Injunctive Relief.**  Notwithstanding Section 29 above:

a.    Supplier agrees that any actual, anticipatory, or threatened breach of this Agreement or the Purchase Orders by Supplier will result in irreparable harm to each Consenting OEM and that money damages would be an inadequate remedy. Accordingly, Supplier agrees that each Consenting OEM shall be entitled to equitable relief, including without limitation, injunctive relief to restrain any breach or threatened breach of this Agreement without any requirement to prove irreparable injury or post bond as a condition of such relief or to such other and further relief as a court of competent jurisdiction may deem proper under the circumstances.

b.    The Consenting OEMs agree that any failure by the Consenting OEMs, or any one of them, to comply with the Accounts Payable Acceleration obligation under this Agreement will result in irreparable harm to Supplier and that money damages would be an inadequate remedy.  Accordingly, each Consenting OEM agrees that Supplier shall be entitled to equitable relief, including without limitation, injunctive relief to compel compliance with the Accounts Payable Acceleration obligation under this Agreement without any requirement to prove irreparable injury or post bond as a condition of such relief or to such other and further relief as a court of competent jurisdiction may deem proper under the circumstances.

31.    **Severability.**  Should any provision of this Agreement be held to be invalid or unenforceable, the remainder of this Agreement will not be affected thereby.

32.    **Purchase Orders Continue.**  Except as expressly provided for in this Agreement, this Agreement is not intended to modify the terms and conditions of any of the Consenting OEMs' Purchase Orders, which terms and conditions otherwise remain in full force and effect and are incorporated herein by reference.  During the Term, in the event of any inconsistency between the terms of this Agreement and the terms of a Customer's Purchase Orders, the terms of this Agreement will control.

33.    **Non-Waiver of Rights.**  No delay or failure of any party to exercise any right, power, or privilege hereunder will affect such right, power, or privilege, nor will any single or partial exercise thereof preclude any further exercise thereof, nor the exercise of any other right, power, or privilege.

34.    **Binding Agreement; Assignment.**  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties and their respective successors and assigns; provided, however, each Party must obtain the prior written consent of the other Party to assign or transfer, directly or indirectly, any of its rights or obligations this Agreement. Any such assignment made by any such party without such prior written consent shall be null and void.  Notwithstanding the foregoing, GM may, without obtaining the consent of any Party, assign those of its rights and obligations under this Agreement related to its European operations to a separate entity as part of the sale of its European operations, and such assignment shall constitute a novation of all such rights and obligations as to GM.

**35.    Counterparts.**    To the greatest extent permissible under applicable law, this Agreement may be executed in two or more counterparts, all of which shall be considered one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.    Any additional customer of Supplier that signs a joinder to this Agreement in the form attached hereto as **Exhibit C** and that becomes a party to the other documents referenced therein shall become a "Joining Consenting OEM" and be deemed to be a Consenting OEM and a Party for all purposes under this Agreement.

**36.    Electronic Signatures.**    To the greatest extent permissible under applicable law, this Agreement may be delivered by electronic means, which shall constitute an original for all purposes.

**37.    Notices.**    Any notice or other instrument to be given under this Agreement must be in writing and, except as otherwise provided in this Agreement, shall be deemed to be duly given if mailed, delivered by hand or sent by email to the Consenting OEM to whom the communication is intended to be given and any notice so delivered or sent shall be deemed to have been given at the time of service on the day on which it was delivered or sent, and if mailed, shall be deemed to be given three (3) days following the date of mailing. Until changed by notice in the manner described above, the addresses of the Consenting OEMs for the purpose of notice shall be:

If to BMW:                    BMW Manufacturing Co., LLC
                              1400 Highway 101 South
                              Greer, SC  29605
                              Attention:  Seann Tzouvelekas
                              Associate General Counsel
                              Email:  seann.tzouvelekas@bmwmc.com

With a copy to:               BMW Aktiengesellschaft
                              Knorrstrasse 147
                              80788 München
                              Attention: Sven Hofmann, MZ-14
                              Risk Management
                              Email: sven.sh.hofmann@bmw.de

                              and

                              BMW Aktiengesellschaft
                              Dostlerstraße 3
                              80809 München
                              Attention: Dr. Stephan Wollbrink, AJ-1
                              Legal Counsel
                              Email: stephan.wollbrink@bmw.de

                              and

                              David A. Rosenzweig
                              Norton Rose Fulbright US LLP
                              1301 Avenue of the Americas
                              New York, NY 10019
                              Email: david.rosenzweig@nortonrosefulbright.com

If to Daimler:                Daimler AG
                              HPC: G036
                              Schickardstr. 30
                              D- 71034 Böblingen
                              Attention: Götz Rachner
                              Senior Manager
                              Risk & Restructuring Management (MP/SR)
                              Mercedes-Benz Procurement & Supplier Quality
                              Email: goetz.rachner@daimler.com

With a copy to:               White & Case LLP
                              1221 Avenue of the Americas
                              New York, NY 10020-1095
                              Attention: Thomas Lauria
                              Email: tlauria@whitecase.com

If to FCA US:

If to FCA:                          FCA US LLC
                                    800 Chrysler Drive
                                    Auburn Hills, MI  48326
                                    CIMS 484-01-26
                                    Attention: Sigmund E. Huber
                                    Global Director, Supplier Relations & Risk
                                    Management
                                    Email: sig.huber@fcagroup.com

With a copy to:                     FCA US LLC
                                    1000 Chrysler Drive
                                    Auburn Hills, MI  48326
                                    CIMS 485-14-07
                                    Attention: Mark Werling
                                    Email: mark.werling@fcagroup.com

                                    and

                                    Sullivan & Cromwell LLP
                                    125 Broad Street
                                    New York, New York 10004
                                    Attention: Brian Glueckstein
                                    Email: gluecksteinb@sullcrom.com

If to Ford:                         Ford Motor Company
                                    Town Center Offices
                                    18900 Michigan Avenue
                                    Dearborn, MI 48126
                                    Attention:  Dennis Barrish
                                    Email:  dbarrish@ford.com

With a copy to:                     McGuireWoods LLP
                                    625 Liberty Avenue
                                    23rd Floor
                                    Pittsburgh, PA 15222
                                    Attention: Mark E. Freedlander, Esq.
                                    Email: mfreedlander@mcguirewoods.com

If to GM:                           General Motors LLC
                                    Vehicle Engineering Center
                                    29755 Louis Chevrolet Rd.
                                    Warren, MI 48090-9020
                                    M/C 480-210-85
                                    Attention: Mark W Fischer
                                    Email: mark.w.fischer@gm.com

With a copy to:                     General Motors LLC

38

Vehicle Engineering Center
29755 Louis Chevrolet Rd.
Warren, MI 48090-9020
M/C 480-210-8N
Attention: Aaron M. Silver
Email: aaron.silver@gm.com

and

Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
Attention:  Joseph R. Sgroi
Email:  jsgroi@honigman.com

and

Wellensiek Rechtsanwälte PartG mbB
Guiollettstrasse 54
D - 60325 Frankfurt am Main, Germany
Attention: Till Hafner
Email: till.hafner@wellensiek.de

| | |
|---|---|
| If to Honda: | Honda North America<br>24000 Honda Parkway<br>Marysville, OH 43040<br>Attention:  Tom Lake<br>Email:  tom_lake@ham.honda.com |
| With a copy to: | Vorys, Sater, Seymour & Pease<br>52 East Gay Street<br>Columbus, OH 43215<br>Attention:  Rob Bell<br>Email:  rabell@vorys.com |
| If to JLR: | Jaguar Land Rover Limited<br>Registered Office: Abbey Road, Whitley, Coventry CV3 4LF<br>Registered in England No: 1672070<br>Attention: Antony Cunningham<br>Email: ACunning@jaguarlandrover.com |
| With a copy to: | Jaguar Land Rover North America, LLC<br>555 MacArthur Boulevard<br>Mahwah, NJ 07430Attention: Anna-Lisa Corrales<br>Email: acorral8 @jaguarlandrover.com |
| If to Mazda: | |

39

If to Mazda:                            Mazda Motor Corporation
                                        3-1 Shinchi, Fuchu-cho, Aki-gun,
                                        Hiroshima
                                        730-8670 Japan
                                        Attention: Mr. Tetsuto Nakamura, General
                                        Manager, Purchasing Division
                                        Email:  nakamura.tet@mazda.co.jp

If to Mitsubishi:                       Mitsubishi Motors Corporation
                                        1, Nakashinkiri, Hashime-cho
                                        Okazaki, Aichi Pref., Japan
                                        Attention: Toshifumi Kimura, General Manager,
                                        Interior Parts and Aftersales Purchasing Dept.
                                        Email: toshifumi.kimura@mitsubishi-motors.com

With a copy to:                         Paul, Weiss, Rifkind, Wharton & Garrison LLP
                                        1285 Avenue of the Americas
                                        New York, NY 10019
                                        Attention: Kevin O'Neill
                                        Email: koneill@paulweiss.com

If to Nissan:                           Nissan North America, Inc.
                                        39001 Sunrise
                                        Farmington Hills, MI 48331
                                        Attention:  Donald P. Parshall, Jr.
                                        Email:  don.parshall@nissan-usa.com

                                        and

                                        Nissan Motor Co., Ltd.
                                        1-1, Takashima 1-chome, Nishi-ku
                                        Yokohama-shi, Kanagawa 220-8686 Japan
                                        Attention: David K. Takeuchi
                                        Email: dtakeuchi@mail.nissan.co.jp

With a copy to:                         Jones Day
                                        600 Brickell Avenue, Suite 3300
                                        Miami, FL 33131
                                        Attention: Pedro A. Jimenez
                                        Email: pjimenez@jonesday.com

If to PSA:                              _____
                                        _____
                                        _____
                                        _____

With a copy to:                         _____
                                        _____

If to Subaru:

_____
_____
_____

If to Subaru:             Subaru Corporation
Ebisu Subaru Bldg., 1-20-8, Ebisu, Shibuya-ku, Tokyo
150-8544
Japan
Attention: Naoko Taniguchi, Legal Department
Email: taniguchi.naoko@subaru.co.jp

and

Subaru of America, Inc.
2235 Marlton Pike W.
Cherry Hill, NJ 08002
Attention: Terri Woodard Claybrook, Director-Associate General Counsel
Email: tclaybrook@subaru.com

and

Subaru of Indiana Automotive, Inc.
5500 State Road 38 E
Lafayette, IN 47905
Attention: Douglas R. Meyer, Senior Manager and General Counsel Legal/HR/CSR
Email: doug.meyer@subaru-sia.com

With a copy to:      Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention: Adam Rogoff and Anupama Yerramalli
Email: arogoff@kramerlevin.com
ayerramalli@kramerlevin.com

If to Toyota:        Toyota Motor Engineering and Manufacturing North America
25 Atlantic Avenue
Erlanger, KY  41018
Attention:  Jim Holloway
Email: jim.holloway@tema.toyota.com

and

41

Toyota Motor Engineering and Manufacturing
North America
25 Atlantic Avenue
Erlanger, KY 41018
Attention:  Cortney Romans
Email: cortney.romans@tema.toyota.com

Toyota Motor Corporation
1, Toyota-cho
Toyota, Aichi 471-8571
Attention:  Takuo Nomura
Email: takuo_nomura@mail.toyota.co.jp

With a copy to:                 Frost Brown Todd LLC
                                150 Third Avenue South, Suite 1900
                                Nashville, TN 37201- 2043
                                Attention:  Robert Sartin, Esq.
                                Email:  rsartin@fbtlaw.com

                                and

                                Orrick, Herrington & Sutcliffe LLP
                                51 West 52nd Street
                                New York, NY 10019-6142
                                Attention:  Lorraine S. McGowen, Esq.
                                Email:  lmcgowen@orrick.com

If to Volkswagen:               Volkswagen AG
                                Brieffach 1618
                                D-38436 Wolfsburg, Germany
                                Attention: Dr. Dirk Taeger
                                Email: dirk.taeger@volkswagen.de

With a copy to:                 Davis, Polk and Wardwell LLP
                                450 Lexington Avenue
                                New York, NY 10017
                                Attention: Timothy Graulich
                                Email: timothy.graulich@davispolk.com

If to Volvo:                    Volvo Group Truck Operations
                                Dept. BE83000, GC2N
                                40508 Gothenburg, Sweden
                                Attention:  Alessandro Galluzzi
                                Email:  alessandro.galluzzi@volvo.com

With a copy to:                 Baker Hostetler LLP
                                Key Tower, 127 Public Square

42

                                        Suite 2000
                                        Cleveland, OH 44114-1214
                                        Attention:  Eric R. Goodman, Esq.
                                        Email:  egoodman@bakerlaw.com

If to Supplier:                         TK Holdings Inc.
                                        2500 Takata Drive
                                        Auburn Hills, MI 48326
                                        Attention: Scott Caudill and Ken Bowling
                                        Email:  Scott.Caudill@Takata.com
                                        Ken.Bowling@Takata.com

                                        and

                                        Takata AG
                                        Bahnweg 1
                                        63743 Aschaffenburg, Germany
                                        Attention: Sven Petersen
                                        Email: Sven.Petersen@eu.Takata.com

With a copy to:                         Weil, Gotshal & Manges LLP
                                        767 Fifth Ave.
                                        New York, NY 10153
                                        Attention: Marcia L. Goldstein, Esq.,
                                        Ronit J. Berkovich, Esq.
                                        Matthew P. Goren, Esq.
                                        Email:  marcia.goldstein@weil.com,
                                        Ronit.Berkovich@weil.com
                                        matthew.goren@weil.com

                                        and

                                        Freshfields Bruckhaus Deringer LLP
                                        Hohe Bleichen 7
                                        20354 Hamburg, Germany
                                        Attention: Lars Westpfahl
                                        Email: lars.westpfahl@freshfields.com

      **38.**    **Confidentiality.**  Unless otherwise required by applicable law, the Parties agree to keep this Agreement confidential; provided, however, each of the Parties has the right to disclose all information and analyses within their respective organization and with their respective outside advisors; and, provided further, notwithstanding the foregoing, this Agreement may be filed with the Bankruptcy Court in connection with any motion to approve the assumption hereof, subject to the right of any Party to seek to have any commercially sensitive information contained herein filed under seal.  This Section 38 will survive termination of this Agreement.

39. **General Terms.** This Agreement constitutes the entire understanding of the Parties in connection with the subject matter hereof and may not be modified, altered, or amended except by an agreement in writing signed by the Parties. The Parties executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporations that they represent and that their signatures bind said corporations and each corporation's subsidiaries and affiliates set forth in the preamble to this Agreement.

40. **Amendments.** Unless otherwise provided in this Agreement, this Agreement may not be modified, altered or amended, except by an agreement in writing signed by the Parties.

41. **Relationship Among Parties.** Notwithstanding anything in this Agreement to the contrary, the duties and obligations of the Consenting OEMs under this Agreement shall be several, not joint.

42. **Acknowledgments. THIS AGREEMENT HAS BEEN FREELY AND VOLUNTARILY ENTERED INTO BY THE PARTIES, WITHOUT ANY DURESS OR COERCION, AND AFTER THE PARTIES HAVE EITHER CONSULTED WITH COUNSEL OR HAVE BEEN GIVEN AN OPPORTUNITY TO DO SO, AND THE PARTIES ACKNOWLEDGE THAT THEY HAVE CAREFULLY AND COMPLETELY READ AND UNDERSTAND ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.**

43. **Waiver of Jury Trial. THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT. NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

**[SPACE LEFT INTENTIONALLY BLANK; SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the Effective Date.

**BMW Manufacturing Co., LLC**

By:_____

Print Name: _____

Title: _____

**Daimler AG**

By:_____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name: _____

Title: _____

**FCA Group Purchasing Srl**

By:_____

Print Name: _____

Title: _____

**FCA Fiat Chrysler Automóveis Brasil Ltda.**

By:_____

Print Name: _____

Title: _____

**FCA Automobiles Argentina S.A.**

By:_____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name: _____

Title: _____

**Ford Motor Company**


By:_____

Print Name: _____

Title: _____

**General Motors Holdings LLC**


By:_____

Print Name: _____

Title: _____

**Honda Motor Co., Ltd.**

By:_____

Print Name: _____

Title: _____

**Jaguar Land Rover Ltd.**


By:_____

Print Name: _____

Title: _____

**Mazda Motor Corporation**

By:_____

Print Name: _____

Title: _____

**Mitsubishi Motors Corporation**


By:_____

Print Name: _____

Title: _____

**Nissan Motor Co., Ltd.**

By:_____

Print Name: _____

Title: _____

**Subaru Corporation**


By:_____

Print Name: _____

Title: _____

**Toyota Motor Corporation**

By:_____

Print Name: _____

Title: _____

**Aktiebolaget Volvo**


By:_____

Print Name: _____

Title: _____

**Volkswagen AG**

By:_____

Print Name: _____

Title: _____

**Shanghai General Motors Co., Ltd.**

By:_____

Print Name: _____

Title: _____

**Adam Opel AG**

By:_____

Print Name: _____

Title: _____

**Equipo Automotriz Americana, S.A. de C.V.**


By:_____

Print Name: _____

Title: _____

**Falcomex, S.A. de C.V.**


By:_____

Print Name: _____

Title: _____

**Highland Industries Inc.**


By:_____

Print Name: _____

Title: _____

**Industrias Irvin de Mexico, S.A. de C.V.**


By:_____

Print Name: _____

Title: _____

**Interiors in Flight Inc.**


By:_____

Print Name: _____

Title: _____

**Strosshe-Mex, S. de R.L. de C.V.**


By:_____

Print Name: _____

Title: _____

**SynTec Seating Solutions LLC**


By:_____

Print Name: _____

Title: _____

**Takata Americas**


By:_____

Print Name: _____

Title: _____

**Takata Brasil LTDA**


By:_____

Print Name: _____

Title: _____

**Takata de Mexico, S.A. de C.V.**


By:_____

Print Name: _____

Title: _____

**Takata Protection Systems Inc.**

By:_____

Print Name: _____

Title: _____

**Takata Uruguay S.A.**


By:_____

Print Name: _____

Title: _____

**TK China, LLC**

By:_____

Print Name: _____

Title: _____

**TK Finance, LLC**

By:_____

Print Name: _____

Title: _____

**TK Holdings de Mexico, S. de R.L. de C.V.**


By:_____

Print Name: _____

Title: _____

**TK Holdings Inc.**


By:_____

Print Name: _____

Title: _____

**TK Mexico Inc.**

By:_____

Print Name: _____

Title: _____

**TK Mexico LLC**

By:_____

Print Name: _____

Title: _____

**Takata AG**

By:_____

Print Name: _____

Title: _____

**Takata Deta S.R.L.**

By:_____

Print Name: _____

Title: _____

**Takata Europe GmbH**


By:_____

Print Name: _____

Title: _____

**Takata GmbH Inflator Systems**


By:_____

Print Name: _____

Title: _____

**Takata Ignition Systems GmbH**

By:_____

Print Name: _____

Title: _____

**Takata Istanbul Automotive Safety Systems
Production and Trading Ltd.**


By:_____

Print Name: _____

Title: _____

**Takata Jibou S.R.L.**

By:_____

Print Name: _____

Title: _____

**Takata Maroc S.A.R.L.**


By:_____

Print Name: _____

Title: _____

**Takata Orsova S.R.L.**


By:_____

Print Name: _____

Title: _____

**Takata Parts Polska Sp. z o.o**


By:_____

Print Name: _____

Title: _____

**Takata Parts s.r.o.**


By:_____

Print Name: _____

Title: _____

**Takata PlasTec GmbH**


By:_____

Print Name: _____

Title: _____

**Takata Romania S.R.L.**


By:_____

Print Name: _____

Title: _____

**Takata Rus LLC**

By:_____

Print Name: _____

Title: _____

**Takata Sachsen GmbH**

By:_____

Print Name: _____

Title: _____

**Takata Safety Systems Hungary Kft.**


By:_____

Print Name: _____

Title: _____

**Takata Sibiu S.R.L.**


By:_____

Print Name: _____

Title: _____

**Takata South Africa (Pty) Ltd.**


By:_____

Print Name: _____

Title: _____

**Takata Spólka z o.o.**

By:_____

Print Name: _____

Title: _____

**ALS Inc.**

By:_____

Print Name: _____

Title: _____

**European Automotive Systems Limited**

By:_____

Print Name: _____

Title: _____

**PT.TAKATA AUTOMOTIVE SAFETY SYSTEMS**

By:_____

Print Name: _____

Title: _____

**RTA Holdings, Inc.**


By:_____

Print Name: _____

Title: _____

**RTA Properties, Inc.**

By:_____

Print Name: _____

Title: _____

**Takata (Changxing) Safety Systems Co., Ltd.**


By:_____

Print Name: _____

Title: _____

**Takata (Jingzhou) Automotive Component Co., Ltd.**

By:_____

Print Name: _____

Title: _____

**Takata (Philippines) Corporation**

By:_____

Print Name: _____

Title: _____

**Takata (Shanghai) Automotive Component Co., Ltd.**


By:_____

Print Name: _____

Title: _____

**Takata (Shanghai) Vehicle Safety Systems
Technical Center Co., Ltd.**


By:_____

Print Name: _____

Title: _____

**Takata (Tianjin) Automotive Component
Co., Ltd.**


By:_____

Print Name: _____

Title: _____

**TAKATA ASIA Pte Ltd**

By:_____

Print Name: _____

Title: _____

**Takata Automotive Electronics Shanghai**


By:_____

Print Name: _____

Title: _____

**Takata Automotive Safety Systems (M) Sdn.
Bhd.**


By:_____

Print Name: _____

Title: _____

**Takata CPI Singapore Pte Ltd**


By:_____

Print Name: _____

Title: _____

**Takata India Private Limited**


By:_____

Print Name: _____

Title: _____

**Takata International Finance B.V.**

By:_____

Print Name: _____

Title: _____

**Takata Korea Co., Ltd.**


By:_____

Print Name: _____

Title: _____

**TAKATA Reinsurance Inc.**


By:_____

Print Name: _____

Title: _____

**Takata** – **TOA CO., Ltd.**


By:_____

Print Name: _____

Title: _____

**Exhibit B**

**Access Agreement**

**[TO COME]**

**Exhibit C**

**<u>Proposed Interim Order</u>**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------x
                              :

In re                        :       **Chapter 11**

                              :

**TK HOLDINGS INC.,** *et al.,*   :      **Case No. 17-11375 (\_\_\_)**

                              :

       **Debtors.**[1]       :       **Joint Administration Requested**

                              :
---------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 503, 506 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004, AND 9014 GRANTING MOTION FOR ENTRY OF AN INTERIM AND FINAL ORDER (I) AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENT AND ACCESS AGREEMENT WITH CERTAIN CUSTOMERS, (II) GRANTING ADEQUATE PROTECTION IN CONNECTION THEREWITH, (III) MODIFYING THE AUTOMATIC STAY TO IMPLEMENT AND EFFECTUATE THE TERMS THEREOF; AND (IV) SCHEDULING A FINAL HEARING**

Upon the motion (the "**Motion**") of TK Holdings, Inc. ("**TKH**") and the subsidiaries of TKH that are debtors and debtors in possession in the above-captioned cases (collectively with TKH, the "**Debtors**"), pursuant to sections 105, 361, 362, 363, 503, 506 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**"), seeking, among other things:

A.     authorization for the Debtors to enter into (a) that certain Accommodation Agreement, which was attached to the Motion as Exhibit A (together with any exhibits or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

schedules thereto, and as may be amended or modified in accordance with the terms thereof,

the "***Accommodation Agreement***"),[2] and (b) the Access and Security Agreement, [which was

attached to the Motion as Exhibit B] (together with any exhibits or schedules thereto, and as may

be amended or modified in accordance with the terms thereof, the "***Access Agreement***" and,

together with the Accommodation Agreement, the "***Agreements***"); (ii) granting adequate

protection to those Consenting OEMs with Customer Accounts (the "***Secured Accommodation

Parties***")[3] in connection therewith; (iii) modifying the automatic stay imposed under section 362

of the Bankruptcy Code to the extent necessary to implement and effectuate the relief requested

therein; and (iv) scheduling a hearing to consider the relief requested herein on a final basis (the

"***Final Hearing***").

B.      the grant of adequate protection to the Secured Accommodation Parties in respect

of the Customer Secured Claims (as defined below) subject to the Carve-Out (as defined below)

and the terms of this Interim Order;

C.      approval of certain stipulations in paragraph 4 of this Interim Order by the

Debtors with respect to, among other things, (a) the Customer Accounts (as defined below) owed

to the Debtors by each Secured Accommodation Party as of the date (the "***Petition Date***") of the

commencement of the Debtors' chapter 11 cases (the "***Cases***"), (b) the amount, validity and

priority of the Customer Secured Claims, and (c) the validity and enforceability of the

Prepetition Setoff Rights (as defined below) of the Secured Accommodation Parties in respect of

the Customer Secured Claims;

---

[2] Capitalized terms used but not defined herein having the meanings given to them in the Accommodation Agreement.

[3] Among others, the following Consenting OEMs are not Secured Accommodation Parties: BMW AG and Daimler AG.

D.      subject only to and effective upon entry of the Final Order, so long as any of the

Adequate Protection Claims remain outstanding, the waiver of the Debtors' right to surcharge the

Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

E.      modification of the automatic stay to the extent set forth herein and in the

Accommodation Agreement;

F.      pursuant to Bankruptcy Rule 6003, a hearing (the "***Hearing***") on the Motion to be

held before this Court to consider entry of an order granting the Motion (this "***Interim Order***"),

on an interim basis; and

G.      that this Court schedule a final hearing (the "***Final Hearing***") to be held within 35

days of the entry of this Interim Order to consider entry of a final order granting the Motion

(the "***Final Order***") on a final basis; and due and appropriate notice of the Motion and the

Hearing having been served by the Debtors on (i) the Office of the United States Trustee for the

District of Delaware ("***U.S. Trustee***") (Attn: David Buchbinder, Esq. and Jane Leamy, Esq.);

(ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities

and Exchange Commission; (iv) the Internal Revenue Service; (v) the Offices of the United

States Attorney for the District of Delaware and the Eastern District of Michigan; (vi) the

National Highway Traffic Safety Administration ("***NHTSA***"); (vii) the Consenting OEMs; (viii)

the Plan Sponsor; (ix) all of the Debtors' landlords, and owners and/or operators of premises at

which any of the Debtors inventory and/or equipment is located; and (x) any other party entitled

to notice pursuant to Local Rule 9013–1(m), and it appearing that no other or further notice need

be provided; and this Court having reviewed the Motion; and this Court having held a hearing on

the Motion; and this Court having determined that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and it appearing that the relief requested

in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their

estates as contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors,

their estates, creditors, and all parties in interests; and upon all of the proceedings had before this

Court and after due deliberation and sufficient cause appearing therefor, and upon the record

made by the Debtors in the Motion, the declaration of Scott E. Caudill, the Executive Vice

President and Chief Operating Officer for TKH, filed in support of the Debtors' chapter 11

petitions and related first day relief (Docket No. [__]) (the "***Caudill Declaration***"), and at the

Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Disposition.*  The relief requested in the Motion is granted on an interim basis in

accordance with the terms of this Interim Order.  Any objections to the Motion with respect to

the entry of this Interim Order that have not been withdrawn, waived or settled, and all

reservations of rights included therein, are hereby denied and overruled on the merits.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion and the

property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.  Proper, timely, adequate and sufficient notice of the Motion has been

provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local

Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Interim Order

shall be required, except as set forth in paragraph 26 below. The interim relief granted herein is

necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the

Final Hearing.

4.      *Debtors' Stipulations.*  Without prejudice to any other party in interest (but subject to the limitations thereon contained in paragraphs 12 through 14 below), the Debtors admit, stipulate and agree that:

(a)      as of the Petition Date, the Secured Accommodation Parties owed outstanding amounts to the Debtors in respect of Component Parts or services provided by the Debtors to the Secured Accommodation Parties under the Purchase Orders (the "***Customer Accounts***");

(b)      pursuant to section 502 of the Bankruptcy Code, each Secured Accommodation Party has claims against the Debtors arising from the Debtors' design, manufacture and sale of PSAN Inflators and PSAN Modules to such Secured Accommodation Party, including, but not limited to, Customer Indemnification Claims;

(c)      the amount of each Secured Accommodation Party's Customer Indemnification Claims significantly exceeds such Secured Accommodation Party's Customer Accounts and no portion of the Customer Indemnification Claims or any payments made to the Secured Accommodation Parties or applied to or paid on account of the obligations owing under the Purchase Orders prior to the Petition Date is subject to any recharacterization, subordination, attack, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law, *provided* that such Customer Indemnification Claims are subject to, and filed in accordance with, the Consenting OEM Claims Protocol;

(d)      based on the foregoing paragraphs 4(a) through 4(c), each Secured Accommodation Party has a valid and enforceable right of setoff against the Debtors equal in amount to such Secured Accommodation Party's Customer Accounts pursuant to section 553 of

5

the Bankruptcy Code (each, a "***Prepetition Setoff Right***" and, collectively, the "***Prepetition Setoff Rights***");

   (e) the Prepetition Setoff Rights entitle each Secured Accommodation Party to an allowed secured claim against the Debtors equal in amount to such Secured Accommodation Party's Customer Accounts pursuant to section 506 of the Bankruptcy Code (each, a "***Customer Secured Claim***" and, collectively, the "***Customer Secured Claims***");

   (f) the liens and security interests on the assets of the Debtors granted to the Secured Accommodation Parties pursuant to and in connection with the Access Agreement (the "***Access Agreement Liens***") are: (i) valid, binding, perfected, enforceable liens and security interests in the Collateral (as defined in the Access Agreement) and (ii) not subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable non-bankruptcy law;

   (g) Effective as of the entry of the Final Order, unless expressly and successfully challenged in a Challenge Proceeding (as defined below), each of the Debtors, on behalf of themselves and all of their respective officers, directors, employees, owners, agents, assigns, trustees, successors, and representatives, each in its capacity as such, hereby releases, acquits, and discharges each Consenting OEM and each Consenting OEM's officers, directors, employees, members, owners, agents, assigns, shareholders, successors and representatives each in its capacity as such, from all claims, liabilities, demands, actions, causes of action, losses, damages, costs, expenses, rights, compensation, of whatever kind or nature, at law or in equity, foreseen or unforeseen, contingent or liquidated, matured or unmatured, known or unknown, that exist now, have ever existed, or may exist in the future relating to or arising from any action or inaction prior to the Petition Date (collectively the "***Claims***"), including, but not limited to,

Claims that relate directly or indirectly to a Consenting OEM's (a) decision to source, or not source, business to the Debtors; (b) decision to terminate any Purchase Order prior to the Petition Date; (c) decision to resource any business from the Debtors in a manner consistent with the Accommodation Agreement and any other agreement among any of the Consenting OEMs; or (d) action, related directly or indirectly to the Restructuring, Sale, or PSAN Inflators (the "**_Debtor Released Claims_**"); *provided that*, no person or entity shall be released from any claim or obligation arising from or related to the Accommodation Agreement (or any right to or claim for payment arising in the ordinary course under a Purchase Order) or any other agreement entered into in connection with the Sale or Restructuring including for the avoidance of doubt the Indemnity Agreement; and *provided further* that, no person or entity shall be released from any claim arising from or related to any act or omission that constitutes fraud, gross negligence, or willful misconduct.

5.      *Findings Regarding the Agreements*

(a)      Good and sufficient cause has been shown for the entry of this Interim Order.

(b)      The Debtors have an immediate need for the accommodations provided by certain of the Consenting OEMs pursuant to the Agreements, including the payment by the Secured Accommodation Parties of the Customer Accounts in the ordinary course (notwithstanding the Prepetition Setoff Rights), the commitment to limit the resourcing of business, the commitment to limit setoffs, and the commitment to accelerate payment of certain of the Customer Accounts, as well as certain post-Petition Date accounts payable to the Debtors, pursuant to the Accommodation Agreement, in order to, among other things, (i) permit the orderly continuation of the operation of their businesses, (ii) maintain business relationships with

7

vendors, suppliers and customers, (iii) make payroll and to satisfy other working capital and operational needs (iv) pay the costs and expenses of administering the Restructuring (including, without limitation, payment of the Debtors' professional fees and expenses) and (v) comply with their regulatory obligations, including pursuant to the DOJ Plea Agreement, the Preservation Order and Testing Control Plan issued by NHTSA dated February 24, 2015 and the Consent Order issued by NHTSA dated November 2, 2015 and, as a condition to entering into the Accommodation Agreement, certain of the Consenting OEMs have required that the Debtors enter into the Access Agreement to ensure the continuity of supply of Component Parts and grant Adequate Protection Obligations herein.  The access of the Debtors to sufficient working capital and liquidity through payment of the Customer Accounts, including the accelerated payment of certain Customer Accounts, is necessary and vital to the preservation and maintenance of the going concern values of the Debtors and the success of the Cases.

(c)     Pursuant to section 542(b) of the Bankruptcy Code, but for the agreement of the Secured Accommodation Parties, in exchange for, *inter alia*, the grant of the Adequate Protection Liens (as defined below) and the other Adequate Protection Obligations (as defined below), the Secured Accommodation Parties would not be required to pay the Customer Accounts when due.

(d)     The Consenting OEMs have acted in good faith regarding the Agreements.

(e)     The Secured Accommodation Parties are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent

value and fair consideration for, among other accommodations, the agreement of the Secured

Accommodation Parties to accelerate the payment of certain of the Customer Accounts and

thereby forbear from exercising their Prepetition Setoff Rights; *provided* that nothing in this

Interim Order or the Agreements shall prejudice, limit or otherwise impair the rights of any of

the Secured Accommodation Parties to seek, upon a material change in circumstance, new,

different or additional adequate protection.

   (f) The Secured Accommodation Parties are entitled to the adequate

protection provided in this Interim Order as and to the extent set forth herein pursuant to sections

362 and 363 of the Bankruptcy Code.  Based on the Motion and on the record presented to the

Court, the terms of the proposed adequate protection arrangements are fair and reasonable,

reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent

value and fair consideration for, among other accommodations, the agreement of the Secured

Accommodation Parties to accelerate the payment of certain of the Customer Accounts and

thereby forbear from exercising their Prepetition Setoff Rights.

   (g) The Debtors have requested immediate entry of this Interim Order

pursuant to Bankruptcy Rule 6003 and Local Bankruptcy Rule 4001-2.  Absent granting the

relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably

harmed.  Entry into, and approval of,  the Agreements, in accordance with the terms thereof and

this Interim Order, and granting the adequate protection provided herein, is therefore in the best

interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary

duties.

6.      *Approval of the Agreements.*

(a)      The Debtors are authorized, on an interim basis, to (i) enter into the Agreements, (ii) comply with the terms of the Agreements; and (iii) effect the relief granted herein.

(b)      Effective as of the date of entry of this Interim Order, the Agreements are hereby approved, on an interim basis, pursuant to section 363(b) of the Bankruptcy Code.

(c)      The Agreements shall be binding, on an interim basis, and specifically enforceable against the parties thereto in accordance with their terms.

(d)      The Debtors are authorized to enter into amendments to, modifications of or waivers of the terms of the Agreements, from time to time as necessary, subject to the terms and conditions set forth in the Agreements, without further order of the Court.  Within two business days of the effective date of each such amendment, the Debtors will file a notice attaching a copy of any such amendment with the Court.

(e)      The Agreements shall be solely for the benefit of the parties thereto, and no other person or entity shall be a third-party beneficiary of the Agreements.

7.      *Non-Impairment of Access*.  Any parties with liens on, claims against or interests in property subject to the Consenting OEMs' right of access under the Access Agreement shall not take any action to impair such right of access, and all such liens, claims or interests are subject to the terms of the Access Agreement.

8.      *Automatic Stay*.  Until the Final Order is entered or this Interim Order is reversed or vacated, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby vacated and modified to the extent necessary to permit the Consenting OEMs, to (a) at any time, exercise their setoff rights with respect to Allowed Setoffs, Professional Fee Setoffs, Tooling

Setoffs and Materials Setoffs, (b) send any notices required or permitted to be sent under this

Interim Order or the Agreements, (c) subject to the limitations set forth in the Accommodation

Agreement, continue their ordinary course of dealings with the Debtors consistent with past

practices, including to take possession of Tooling or other property of the Consenting OEMs, to

the extent permitted under, and in accordance with, the terms of the Agreements and to resolve

normal commercial issues consistent with the Accommodation Agreement and (d) upon (i) the

occurrence of the Outside Date, (ii) the termination of the Accommodation Agreement following

the occurrence of a Consenting OEM Termination Event (as defined in the Accommodation

Agreement) or (iii) with respect to any Consenting OEM, the termination of the Accommodation

Agreement by such Consenting OEM following the occurrence of an Event of Default,

(A) subject to any applicable cure period set forth in the Accommodation Agreement, exercise

any then-remaining Prepetition Setoff Rights, (B) subject to any applicable cure period set forth

in the Accommodation Agreement, exercise any and all remedies under the Agreements and

(C) upon the giving of five days' prior written notice (which shall run concurrently with any

notice required to be provided under the Agreements) (the "***Remedies Notice Period***") to the

counsel to the Debtors, who shall then promptly provide notice to the U.S. Trustee, Plan Sponsor

and counsel to the official committee of unsecured creditors (if one is appointed) (the "***Creditors'***

***Committee***"), unless the Court orders otherwise during the Remedies Notice Period upon a

Remedies Hearing (as defined below), exercise remedies with respect to the assets of the Debtors

subject to the Adequate Protection Liens (as defined below).  In any hearing regarding any

exercise of rights or remedies under the Agreements (a "***Remedies Hearing***"), the only issue that

may be raised by any party in opposition thereto shall be whether, in fact, a Consenting OEM

Termination Event or Event of Default, as applicable, has occurred and (to the extent required by

the Accommodation Agreement for the exercise of the rights in question) is continuing, and the

Debtors hereby waive their right to and shall not be entitled to seek relief, including, without

limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any

way impair or restrict the rights and remedies of the Consenting OEMs set forth in this Interim

Order or the Accommodation Agreement.  In no event shall the Secured Accommodation Parties

be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the

Collateral (as defined below).  The failure of any party to exercise its rights or remedies under

this Interim Order, the Agreements or applicable law shall not constitute a waiver of any of such

party's rights.

9.      *Adequate Protection of the Secured Accommodation Parties*.  Each of the Secured

Accommodation Parties is entitled, pursuant to sections 362, 363(e) and 507 of the Bankruptcy

Code, to adequate protection of its Prepetition Setoff Rights and Customer Secured Claims for

and equal in amount to the aggregate diminution in the amount of such Prepetition Setoff Rights

and Customer Secured Claims, including, without limitation, any such diminution resulting from,

the contractual forbearance set forth in the Accommodation Agreement, the imposition of the

automatic stay pursuant to section 362 of the Bankruptcy Code, and the payment of such Secured

Accommodation Party's Customer Accounts (each, an "***Adequate Protection Claim***").  For the

avoidance of doubt, there shall be no diminution and therefore no Adequate Protection Claim to

the extent setoffs (including setoffs permitted under the Accommodation Agreement) are

actually taken against Customer Accounts or to the extent a Secured Accommodation Party's

Customer Accounts are otherwise not paid to the Debtors.  In order to induce each Secured

Accommodation Party to enter into the Agreements and to accelerate the payment of accounts

payable (thereby forbearing from exercising its Prepetition Setoff Rights), in exchange for such

payment and as adequate protection of the Adequate Protection Claims, the Secured

Accommodation Parties are hereby granted the following (collectively, the "***Adequate***

***Protection Obligations***"):

        (a)      <u>Adequate Protection Liens.</u>  Subject to the Carve-Out, each of the Secured

Accommodation Parties is hereby granted, on an interim basis, (effective and perfected upon the

date of this Interim Order and without the necessity of the execution of any mortgages, security

agreements, pledge agreements, financing statements or other agreements), on a *pari passu* basis

and in the amount of such Secured Accommodation Party's Adequate Protection Claim, (i) a

first-priority replacement lien on all accounts owing by such Secured Accommodation Party to

the Debtors following the Petition Date (each, a "***Replacement Lien***" and, collectively, the

"***Replacement Liens***") (ii) a valid, perfected junior security interest in and lien upon all property

of the Debtors, whether owned on the Petition Date or acquired thereafter, (including any

proceeds thereof) except for property subject to the Replacement Liens, that is subject to

unavoidable, perfected liens in existence immediately prior to the Petition Date (or that is

perfected subsequent to the Petition Date pursuant to Section 546(b) of the Bankruptcy Code) (for

clarity, the Replacement Liens shall be junior to any perfected and unavoidable security interest in

existence immediately prior to the Petition Date of Comerica Bank in that certain deposit (ending in 3869-

5) maintained at Comerica Bank which has a balance of approximately one million four hundred and fifty

thousand dollars ($1,450,000) and which secures all obligations of TK Holdings Inc. to Comerica Bank);

and (iii) a senior *pari passu* lien on and security interest in all property of the Debtors, whether

owned on the Petition Date or acquired thereafter (including any proceeds thereof) other than the

property (but not the proceeds thereof) described in the immediately preceding clauses (i) and

(ii), in each case other than the Debtors' claims and causes of action under sections 502(d), 544,

545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the

Bankruptcy Code (collectively, "***Avoidance Actions***"), but, subject only to and effective upon entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("***Avoidance Proceeds***") (the liens granted to the Secured Accommodation Parties pursuant to the foregoing clauses (i), (ii) and (iii), collectively, the "***Adequate Protection Liens***");

(b)    <u>Section 507(b) Claim</u>.  Subject to the Carve-Out, each of the Secured Accommodation Parties is hereby granted, on an interim basis, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code (each, a "***507(b) Claim***" and, collectively, the "***507(b) Claims***"), which 507(b) Claims shall have recourse to and be payable from all property of the Debtors other than Avoidance Actions (but including, effective upon entry of the Final Order, Avoidance Proceeds), whether owned on the Petition Date or acquired thereafter, (including any proceeds thereof);

(c)    <u>Carve-Out</u>.  For purposes hereof, the "***Carve-Out***" shall mean (i) fees owing to the U.S. Trustee incurred in connection with the Chapter 11 Cases, in an unlimited amount and (ii) to the extent ultimately allowed by the Court, claims for unpaid fees, costs and expenses, professional fees, expenses, and disbursements incurred by professional persons employed by the Debtors or the Creditors' Committee whose retention is approved by the Court pursuant to sections 327 and 1103 of the Bankruptcy Code (but excluding any fees and expenses of the members of the Creditors' Committee) ("***Professional Fees and Expenses***"), subject to the terms of this Interim Order, the Final Order and any compensation order entered by the Court, that are incurred (a) on and after the Petition Date and before the occurrence of a Carve-Out Trigger Date (defined below), in an unlimited amount and (b)  after the occurrence of a Carve-Out Trigger Date, in an amount not to exceed eight million dollars ($8 million) (the "***Post-***

14

***Trigger Date Carve-Out***").  For the purposes hereof, a "***Carve-Out Trigger Date***" means the business day after a Consenting OEM Termination Event or Event of Default (each, an "***Accommodation Agreement Event of Default***") has occurred and the Requisite Consenting OEMs have provided notice thereof (via email or otherwise) to counsel to the Debtors; *provided* that any success or transaction fees that may become due and payable to Professional Persons shall not be included in or payable from the Post-Trigger Date Carve-Out; *provided*, *further*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation on any grounds.

        (d)        Upon the occurrence of the Carve-Out Trigger Date, the Debtors shall deposit into an interest-bearing escrow account at a financial institution acceptable to the Requisite Consenting OEMs (the "***Carve-Out Account***") an amount equal to the sum of (a) all fees and expenses required to be paid pursuant to section 9(c)(i) above; (b) all billed and unpaid Professional Fees and Expenses (including outstanding holdbacks) incurred on or after the Petition Date and prior to the Carve-Out Trigger Date; (c) all unbilled Professionals Fees and Expenses incurred on or after the Petition Date and prior to the Carve-Out Trigger Date and (d) the amount of the Post-Trigger Date Carve-Out.  The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. The Secured Accommodation Parties shall retain automatically perfected and continuing first priority Adequate Protection Liens in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefiting from the Carve-Out (the "***Residual Carve-Out Amount***").  Promptly (but in no event later than five (5) business days) following the satisfaction in full of all obligations benefiting from the Carve-Out, the Debtors shall deliver the Residual Carve-Out Amount, if any, to the Consenting OEMs.

(e)    <u>Monthly Budgets</u>.  The initial Budget (as defined below) through March 31, 2018 (the "<u>Initial Budget Period</u>"), which is attached to the Accommodation Agreement as **<u>Exhibit A</u>**, is hereby approved.  The Debtors will provide an update of the Budget by the 15th of each month, if necessary, indicating any modification to the Budget for the duration of the Budget Period (as defined below), which shall be deemed a "***Budget***" only upon approval as provided in the Accommodation Agreement.

(f)    <u>Monthly Budget Covenants</u>.  At all times, the Debtors shall maintain an actual cash balance (i) in excess of the Minimum Cash Requirements and (ii) of at least 80% of the budgeted cash balance; *provided* that in the event that (x) the aggregate amount of accounts payable that are actually paid by the Consenting OEMs to the Debtors between the Petition Date and such date falls short of (y) the aggregate amount of accounts payable that the Secured Accommodation Parties are supposed to have paid to the Debtors pursuant to the then-effective Budget, such shortfall shall reduce the actual cash balance that the Debtors are required to maintain pursuant to the foregoing clauses (i) and (ii).

(g)    <u>Compliance with Budget</u>. The Debtors shall use the proceeds of accounts payable of the Consenting OEMs solely in accordance with the Budget (subject to any permitted variances under the Accommodation Agreement), including to support continued operations and production of Component Parts for the Consenting OEMs and to pay the costs and expenses of administering the Restructuring (including, without limitation, payment of the Debtors' professional fees and expenses).

(h)    <u>Receipts and Disbursements</u>.  Each month, no later than the fifteenth (15th) calendar day of such month, the Debtors shall provide the Secured Accommodation Parties with a report setting forth the Debtor's actual receipts and disbursements in the prior month and a

reconciliation of actual receipts and disbursements with those set forth in the prior month's Budget by type of receipt and disbursement;

10. *Reservation of Rights of Secured Accommodation Parties*.  Under the circumstances and given that the Secured Accommodation Parties have consented to the adequate protection provisions set forth in this Interim Order and that the above-described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Secured Accommodation Parties; *provided* that any of the Secured Accommodation Parties may request further or different adequate protection, and the Debtors or any other party may contest any such request.

11. *Preservation of Rights Granted Under This Interim Order.*

(a) Other than the claims and liens expressly granted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Secured Accommodation Parties shall be granted or allowed while any of the Adequate Protection Claims remain outstanding, and, except as otherwise expressly provided in paragraph 9(a) of this Interim Order, the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (iii) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b)    Notwithstanding any order that may be entered dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the 507(b) Claims and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Claims shall have been indefeasibly paid in full in cash (and such 507(b) Claims and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Secured Accommodation Parties of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the Adequate Protection Liens.  Notwithstanding any such reversal, modification, vacation or stay, any Adequate Protection Obligations, prior to the actual receipt of written notice by the Secured Accommodation Parties of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the original provisions of this Interim Order, and the Secured Accommodation Parties shall be entitled to all the rights, remedies, privileges and benefits granted in this Interim Order and the Agreements.

(d)    Except as expressly provided in this Interim Order or in the Agreement, the Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the Secured Accommodation Parties granted by the provisions of this Interim Order

and the Agreements shall survive, and shall not be modified, impaired or discharged by: (i) the

entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the

Cases, terminating the joint administration of these Cases or by any other act or omission; (ii) the

entry of an order approving the sale of any property of the Debtors that is subject to the Adequate

Protection Liens (the "*Collateral*") pursuant to section 363(b) of the Bankruptcy Code (except to

the extent permitted by this Interim Order); or (iii) the entry of an order confirming a chapter 11

plan in any of the Cases (except pursuant to a plan that is acceptable to the Consenting OEMs).

The terms and provisions of this Interim Order and the Agreements shall continue in these Cases,

in any successor cases if these Cases cease to be jointly administered and in any superseding

chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens and the Adequate

Protection Obligations and all other rights and remedies of the Secured Accommodation Parties

granted by the provisions of this Interim Order and the Agreements shall continue in full force

and effect until the Restructuring is consummated or the Adequate Protection Claims are

indefeasibly paid in full in cash.

12.    *Limitation on Charging Expenses Against Collateral*.  Subject only to and

effective upon entry of the Final Order, so long as any of the Adequate Protection Claims remain

outstanding, except to the extent of the Carve-Out, no costs or expenses of administration of the

Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or

other proceedings under the Bankruptcy Code, shall be charged against or recovered from the

Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any

similar principle of law, without the prior written consent of the Secured Accommodation Parties

and no such consent shall be implied from any other action, inaction, or acquiescence by the

Secured Accommodation Parties, and nothing contained in this Interim Order shall be deemed to

be a consent by the Secured Accommodation Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

13.     *Effect of Stipulations on Third Parties*.  The stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 trustee, chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances.  The stipulations, admissions, agreements and releases contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any Creditors' Committee and any other person or entity acting or seeking to act on behalf of the Debtors' estates, in all circumstances for all purposes unless (A) such party in interest (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), in each case, with requisite standing granted by the Court, has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph 13) by the earlier of (i) the date that is the later of (x) 75 days after entry of this Interim Order, (y) 60 days after the appointment of the Creditors' Committee, if any, and (z) 20 days after the appointment of a chapter 7 or chapter 11 trustee, if any, is appointed before the expiration of the time periods set forth in clauses (x) and (y) and (ii) such later date (x) as has been agreed to, in writing, by the applicable Consenting OEMs that would be a defendant in its sole discretion or (y) as has been ordered by the Court upon a motion filed and served within any applicable period of time set forth in this paragraph (the "***Challenge Period***"), (i) challenging the amount, validity, enforceability, priority or extent of the Customer Accounts, the Customer Indemnification Claims, the Prepetition Setoff Rights, the Customer Secured

Claims or the Access Agreement Liens or (ii) otherwise asserting or prosecuting any action for

preferences, fraudulent transfers or conveyances, other avoidance power claims or any other

claims, counterclaims or causes of action, objections, contests or defenses

(collectively, "*Challenge Proceedings*") against any of the Consenting OEMs or their respective

predecessors, successors and assigns, affiliates, subsidiaries, directors, officers, members,

employees, partners, managers, agents, representatives, principals, attorneys, and other

professional advisors, each solely in their capacity as such) (each a "*Representative*" and,

collectively, the "*Representatives*") in connection with matters related to the Purchase Orders,

the Agreements, the Customer Accounts, the Customer Indemnification Claims, the Prepetition

Setoff Rights, the Customer Secured Claims or the Access Agreement Liens, and (B) there is a

final non-appealable order in favor of the plaintiff in any such Challenge Proceeding; *provided*

that any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for

such challenge or claim and any challenges or claims not so specified prior to the expiration of

the Challenge Period shall be deemed forever waived, released and barred.  If no such Challenge

Proceeding is timely and properly filed during the Challenge Period or the Court does not rule in

favor of the plaintiff in any such proceeding then: (a) the Debtors' stipulations, admissions,

agreements and releases contained in this Interim Order, including, without limitation, those

contained in paragraph 4 of this Interim Order shall be binding on all parties in interest,

including, without limitation, the Creditors' Committee; (b) the Customer Secured Claims shall

constitute allowed secured claims not subject to defense, claim, counterclaim, recharacterization,

subordination, offset or avoidance, for all purposes in these Cases, and any subsequent chapter 7

case(s); and (c) the Customer Accounts, the Customer Indemnification Claims, the Prepetition

Setoff Rights, and the Customer Secured Claims and the Access Agreement Liens shall not be

subject to any other or further claim or challenge by the Creditors' Committee, any non-statutory

committees appointed or formed in these Cases or any other party in interest acting or seeking to

act on behalf of the Debtors' estates and any defenses, claims, causes of action, counterclaims

and offsets by the Creditors' Committee, any non-statutory committees appointed or formed in

these Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, whether

arising under the Bankruptcy Code or otherwise, against any of the Consenting OEMs and their

Representatives arising out of or relating to the Purchase Orders or the Agreements shall be

deemed forever waived, released and barred.  If any such Challenge Proceeding is timely filed

during the Challenge Period, the stipulations, admissions, agreements and releases contained in

this Interim Order, including, without limitation, those contained in paragraph 4 of this Interim

Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of

this paragraph) on the Creditors' Committee and on any other person or entity, except to the

extent that such stipulations, admissions, agreements and releases were expressly and

successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable

order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any

Person (as defined in the Bankruptcy Code), including the Creditors' Committee or any non-

statutory committees appointed or formed in these Cases, standing or authority to pursue any

claim or cause of action belonging to the Debtors or their estates, including, without limitation,

Challenge Proceedings with respect to the Purchase Orders, the Agreements, the Customer

Accounts, the Customer Indemnification Claims, the Prepetition Setoff Rights, the Customer

Secured Claims or the Access Agreement Liens.

      14.    *Limitation on Use of Proceeds of Consenting OEMs' Accounts Payable*.

Notwithstanding anything herein or in any other order by this Court to the contrary, neither the

proceeds of Consenting OEMs' accounts payable nor the Carve-Out may be used: (a) for

professional fees and expenses incurred for (i) any litigation or threatened litigation (whether by

contested matter, adversary proceeding or otherwise, including any investigation in connection

with litigation or threatened litigation) against the Consenting OEMs or for the purpose of

objecting to or challenging the amount, validity, perfection, enforceability, extent or priority of

any claim, lien or security interest held or asserted by any of the Consenting OEMs or (ii)

asserting any defense, claim, cause of action, counterclaim, or offset with respect to the

Customer Accounts, the Customer Indemnification Claims, the Prepetition Setoff Rights, the

Customer Secured Claims or the Access Agreement Liens (including, without limitation,

pursuant to section 105, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-

bankruptcy law or otherwise) against any of the Consenting OEMs or their respective

Representatives; (b) to prevent, hinder or otherwise delay any of the Secured Accommodation

Parties' assertion, enforcement or realization on the Collateral in accordance with the

Agreements or this Interim Order other than to seek a determination that a Consenting OEM

Termination Event or Event of Default, as applicable, has not occurred or is not continuing; (c)

to seek to modify any of the rights granted to the Secured Accommodation Parties under this

Interim Order or under the Agreements, in each of the foregoing cases without such parties' prior

written consent, which may be given or withheld by the Secured Accommodation Parties in the

exercise of their respective sole discretion; or (d) pay any amount on account of any claims

arising prior to the Petition Date unless such payments are approved by an order of this Court

(including, without limitation, hereunder); *provided* that notwithstanding anything to the contrary

herein, no more than an aggregate of fifty thousand dollars ($50,000) of Consenting OEMs'

accounts payable or proceeds thereof may be used by the Creditors' Committee during the

Challenge Period to investigate the claims and setoff rights of the Consenting OEMs

(the "***Committee Investigation Budget***").

15. *Exculpation.* Nothing in this Interim Order, the Agreement, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Consenting OEMs of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.

16. *Order Governs.* In the event of any inconsistency between the provisions of this Interim Order and the Agreements, the provisions of this Interim Order shall govern.

17. *Binding Effect; Successors and Assigns.* Subject to paragraph 13, if applicable, the Agreements and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, Secured Accommodation Parties, Creditors' Committee, any non-statutory committees appointed or formed in these Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Consenting OEMs and the Debtors and their respective successors and assigns.

18. *Limitation of Liability.* In entering into the Agreements and exercising their rights and remedies thereunder, the Consenting OEMs shall not (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; and (iii) be deemed to be acting as a "Responsible Person" or "Owner"

or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

19.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

20.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

21.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003, 6004, and 9014 in each case to the extent applicable, are satisfied by the contents of the Motion.

22.     *Necessary Action*.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

23.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

24.     *Final Hearing*.  The Final Hearing is scheduled for _____, 2017 at _____ __.m. before this Court.

25.     *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve written objections, which objections shall be served upon [ ].[4]

26.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee after the same has been appointed, or such Creditors' Committee's counsel, if the same shall have been appointed.

Dated:    Wilmington, Delaware

_____, 2017

_____
UNITED STATES BANKRUPTCY JUDGE

---

[4] [To come]