<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

</div>

-------------------------------------------------------x
                            :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **TK HOLDINGS INC.,** *et al.*, | : | **Case No. 17-11375 (___)** |
| | : | |
| **Debtors.**[1] | : | **Joint Administration Requested** |
| | : | |

-------------------------------------------------------x

<div align="center">

**DECLARATION OF SCOTT E. CAUDILL IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

</div>

I, Scott E. Caudill, pursuant to section 1746 of title 28 of the United States Code,

hereby declare that the following is true to the best of my knowledge, information, and belief:

1.  I am the Executive Vice President and Chief Operating Officer for TK

Holdings Inc. ("***TKH***") and have served in these capacities since being appointed to them in July,

2003 and January, 2016, respectively.  Prior to that, while employed by TKH, I oversaw global

seat belt production for Takata Corporation ("***TKJP***" and collectively with TKH and all of

TKJP's direct and indirect subsidiaries, "***Takata***" or the "***Company***") and many of its direct and

indirect subsidiaries, managing operations at twenty-six (26) plants in fourteen (14) countries.  I

have also served in various other capacities relating to production quality and engineering since

joining Takata in February, 1994.  Prior to joining Takata, I served as an Engineering

Coordinator for Honda of America Manufacturing.  I have over twenty-seven (27) years of

experience in the automotive and manufacturing industries.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

2.      Takata Americas ("*Takata Americas*"), TKH, and each of the other above-captioned debtors, as debtors in possession (collectively, the "*Debtors*"), are all direct or indirect subsidiaries of TKJP, a global manufacturer of automotive safety components, which is duly organized as a corporation under the laws of Japan.  Contemporaneously herewith, TKJP and two of its Japanese subsidiaries, Takata Kyushi K.K. and Takata Service Corporation (collectively with TKJP, the "*Japanese Debtors*"), commenced civil rehabilitation proceedings under the Civil Rehabilitation Act of Japan (the "*Japanese Proceedings*" and together with these Chapter 11 Cases, the "*Insolvency Proceedings*") in the 20th Department of the Civil Division of the Tokyo District Court (the "*Tokyo Court*").

3.      In addition to the commencement of these chapter 11 cases (the "*Chapter 11 Cases*"), the Debtors intend to seek recognition of the Chapter 11 Cases in Canada as foreign main proceedings under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended.

4.      I submit this declaration (the "*Declaration*") to assist the Court and other parties in interest in understanding the extraordinary circumstances and events that compelled the commencement of the Chapter 11 Cases and the Japanese Proceedings and in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*").  I am generally familiar with the Debtors' day-to-day operations, books and records, and business and financial affairs.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with other members of the Debtors' senior management, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of Takata and the Debtors,

RLF1 17750950V.1

and the automotive industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

5.     To minimize the adverse effects on their businesses, the Debtors have filed motions and pleadings on the date hereof (the "***Petition Date***") seeking various types of "first-day" relief (collectively, the "***First-Day Motions***").  The First-Day Motions seek relief intended to preserve the value of the Debtors and maintain continuity of the Debtors' operations—which, as set forth below, is of the utmost importance in these Chapter 11 Cases in light of the unprecedented recalls involving certain of the Debtors' airbag inflators, the need to ensure a stable and continuous supply of replacement parts to the Debtors' original equipment manufacturer customers (the "***OEMs***" or the "***Customers***"), and the need to preserve the diminishing value of the Debtors' estates until the sale of substantially all of their assets.  The First-Day Motions seek to accomplish these goals by, among other things, (i) preserving the Debtors' relationships with their Customers, vendors, suppliers, and employees, many of which are located in jurisdictions outside the United States (the "***U.S.***"); (ii) ensuring continued employee morale; (iii) providing adequate liquidity and preserving the Debtors' cash management systems; and (iv) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, these Chapter 11 Cases.  I am familiar with the contents of each First-Day Motion and believe that the relief sought therein is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and critical to achieving a successful outcome for these Chapter 11 Cases, including a quick and efficient sale of substantially all of the Debtors' assets and operations as described in more detail below.  The facts set forth in each First-Day Motion are incorporated herein by reference.

RLF1 17750950V.1

6.      This Declaration is organized into five (5) sections.  Section I is an

overview of the Debtors, the circumstances leading up to the filing of these Chapter 11 Cases,

and the proposed Global Transaction (as defined herein).  Section II provides background

information on Takata's businesses and operations.  Section III offers information on the

Debtors' prepetition ownership and capital structure.  Section IV describes the events leading to

the filing of these Chapter 11 Cases and the Japanese Proceedings, including the Debtors'

extensive prepetition marketing and sale process.  Section V summarizes the relief requested in,

and the legal and factual basis supporting, the First-Day Motions.

# I.

## Overview

7.      For well over fifty (50) years, Takata has been a pioneer in the

development and production of high quality safety systems; saving the lives of tens of thousands

of drivers and passengers with cutting-edge and innovative safety products and maintaining

strong relationships with their Customers.  Takata's products have saved countless lives.  Indeed,

over the past thirty (30) years, Takata's airbags have deployed safely in more than two million

(2,000,000) automobile accidents around the world.  Recently, however, despite this long history

of leadership and excellence in the active and passive automotive safety market, Takata has

experienced financial distress due to issues relating to certain of its products.  Specifically,

certain airbag inflators[2] containing phase-stabilized ammonium nitrate (the "***PSAN Inflators***")

manufactured by Takata have ruptured during deployment.  The rupture of these PSAN Inflators

prompted Takata, the National Highway Traffic Safety Administration ("***NHTSA***"), and several

major OEMs to take actions to initiate wide-ranging recalls of vehicles in the U.S. and overseas.

---

[2] An airbag inflator is a component part of an airbag that contains pyrotechnic propellants, stored high pressure
gases, or a combination of the two which, when ignited, rapidly releases gases to inflate the airbags.

What began as a limited set of focused recalls affecting a small number of vehicle makes and models has expanded to become the largest automotive recall campaign in U.S. history.  As of the date hereof, over sixty million (60,000,000) PSAN Inflators in the U.S. and more than sixty-four million (64,000,000) PSAN Inflators outside of the U.S., in each case, without desiccant,[3] have been recalled or will be subject to recalls based on announced schedules.  By December 31, 2019, all vehicles in the U.S. containing non-desiccated PSAN Inflators will be affected by NHTSA's recalls.[4]

8.     Despite the many complexities, risks, and challenges that have resulted from such an unprecedented and highly publicized product recall, the Debtors are close to finalizing the terms of a global sale transaction with a potential purchaser—and with the support of a significant majority of their Customers—that will pave a path for a relatively quick and successful emergence of the Company's business from restructuring.  Specifically, after many months of negotiations, Takata (including the Debtors) is on the verge of executing a transaction with Key Safety Systems, Inc. (the "***Plan Sponsor***") for the sale of substantially all of Takata's global operations, which is expected to have the support of Customers that, in the aggregate, purchased approximately ninety percent (90%) of PSAN Inflators sold by Takata as of March, 2017 and hold a substantial majority of the total unsecured claims against the Debtors' estates (the "***Consenting OEMs***").  The Debtors, the Plan Sponsor, and the Consenting OEMs have

---

[3] Desiccant is a chemical drying agent that has been proven to absorb moisture and mitigate the risk of rupture. PSAN Inflators that do contain desiccant are referred to herein as "desiccated PSAN Inflators" and those that do not are referred to herein as "non-desiccated PSAN Inflators."

[4] In or around February, 2005, the Debtors began incorporating desiccant into their PSAN Inflators to mitigate degradation and the risk of rupture.  As of the date hereof, there have been no recalls of desiccated PSAN Inflators relating to propellant degradation.  Under the Consent Order (as defined herein), TKH has until December 31, 2019 to make a showing to NHTSA regarding the safety and/or service life of desiccated PSAN Inflators.  Absent such a showing, NHTSA has reserved the right to expand the recalls to include desiccated PSAN Inflators.

agreed in principle to the sale of the Debtors' assets to the Plan Sponsor, which will be consummated pursuant to a chapter 11 plan (the "***Chapter 11 Plan***").

9.      In light of impending liquidity risks and to ensure ongoing stable supply to their Customers, the Debtors commenced these Chapter 11 Cases before the Global Transaction Documents (as defined herein) were finalized; however, negotiations regarding the Global Transaction and the final documentation of the terms thereof are nearly complete.  Accordingly, the Debtors anticipate filing a Stock and Asset Purchase Agreement for TK Americas, TKH, Takata Holdings de Mexico, S. de R.L. de C.V. ("***TK Holdings de Mexico***"), TK Mexico LLC, Industrias Irvin de Mexico, S.A. de C.V. ("***Industrias Irvin***"), Takata de Mexico, S.A. de C.V. ("***TK DM***"), and Strosshe-Mex de R.L. de C.V. ("***SMX***" and with respect to the Stock and Asset Purchase Agreement, the "***U.S. SAPA***") and the Chapter 11 Plan, as well as a restructuring support agreement with the Plan Sponsor, the Debtors, and the Consenting OEMs, within the next few weeks.  Indeed, as described below, the Global Accommodation Agreement (as defined herein), which the parties have agreed to in principle, will ensure that the Debtors have sufficient liquidity to operate during these Chapter 11 Cases and will establish certain milestones with respect to these Chapter 11 Cases.

10.      As described in the following paragraphs, the commencement of these Chapter 11 Cases comes after several years of diligent efforts by Takata to manage the recalls and ensure the safety of the end-users of those Takata airbags containing PSAN Inflators.  For the past several years, in response to the recalls and to promote the safety of drivers and passengers, the Debtors have dedicated substantial resources to the manufacture, assembly, and shipment of replacement parts (generally in the form of "replacement kits") to their Customers to be installed in vehicles subject to a recall at the vehicle owner's local dealership.  To date, the

Debtors and their affiliates have produced over sixty-three million (63,000,000) replacement kits for their Customers and anticipate that the Customers will require millions of additional replacement kits in the years ahead.[5]  In addition, TKH has implemented significant internal remedial oversight and compliance measures, including, among other measures, retaining the Independent Monitor (as defined herein); appointing a Chief Safety Assurance and Accountability Officer; and establishing (i) processes for TKH employees to report concerns to management, (ii) an enhanced product safety group with authority to investigate and address preemptively safety-related issues across TKH's product lines, and (iii) an independent quality assurance panel with a broad mandate to review TKH's practices and policies.

11.     Although substantial work has been done, and continues to be done, to implement and complete the unprecedented recalls of non-desiccated PSAN Inflators, Takata, including the Debtors, nevertheless faces insurmountable claims and liabilities arising out of or relating to the recalls.  Indeed, the recall-related indemnification and warranty liabilities that the Debtors owe to their Customers alone are in the billions of dollars and, based on the results of the marketing and sale process, exceed the enterprise value of the Debtors and their affiliates. These obligations are in addition to the up to $200 million civil penalty owed by TKH to NHTSA in connection with the recalls, which consists of $70 million in non-contingent penalties ($50 million of which remains due and outstanding as of the date hereof) and $130 million in penalties that are deferred and held in abeyance pending TKH's compliance with certain provisions of the Consent Order (as defined herein).  TKH is also preserving and will eventually manage the disposal of millions of recalled inflators under the Preservation Order (as defined herein) and any amendments thereto.  In addition, TKH, TKJP, and certain of their Debtor and

---

[5] Certain of the replacement kits contain inflators manufactured by other automobile manufacturing companies that are shipped to the Company to be incorporated into a Company-shipped replacement kit.

non-Debtor affiliates are also subject to significant ongoing and potential future litigation claims relating to airbags containing non-desiccated PSAN Inflators, including, without limitation, personal injury and wrongful death claims, economic loss class action claims, and deceptive trade practice claims brought by various state governmental agencies.

12.    As noted above, after a more than two-year criminal investigation of Takata, on January 13, 2017, TKJP, the Department of Justice, Criminal Division, Fraud Section (the "***DOJ***"), and the U.S. Attorney's Office for the Eastern District of Michigan (together with the DOJ, the "***Offices***") announced and submitted to the United States District Court for the Eastern District of Michigan (the "***District Court***") a plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure (the "***Plea Agreement***").  Pursuant to the Plea Agreement, TKJP pleaded guilty to one (1) count of wire fraud and agreed to pay a $25 million criminal fine to the Offices, as well $975 million in restitution payments to certain victims (the "***Restitution Payments***" and the funds established to administer such payments, the "***Restitution Funds***") to be administered by a special master appointed by the District Court (the "***Special Master***").[6]  On February 27, 2017, the District Court approved the Plea Agreement and entered a restitution order (the "***Restitution Order***") indicating, among other things, that the District Court would appoint the Special Master.  The Plea Agreement permits TKJP to seek reimbursement and/or contribution from its affiliates and subsidiaries, including the Debtors, for the Restitution Payments.

13.    Although the approval of the Plea Agreement and entry of the Restitution Order marked a pivotal milestone in Takata's restructuring process by fixing Takata's exposure

---

[6] As described in further detail below, in accordance with the Plea Agreement, the $25 million criminal fine and $125 million of the Restitution Payments were each paid prior to the Petition Date.  The outstanding $850 million in Restitution Payments is due by no later than five (5) days after the closing of any sale, merger, acquisition, or combination involving a transfer of control of TKJP, which must occur by no later than February 27, 2018.

to the U.S. government for criminal liabilities, the fines and penalties imposed thereunder are significant and must be satisfied in full for Takata to have any hope of continuing its operations going forward.  If the remaining $850 million in Restitution Payments are not satisfied in full by TKJP and/or its affiliates by March 4, 2018, the DOJ retains the right to withdraw the Plea Agreement and pursue criminal charges and penalties above and beyond those that were settled under the Plea Agreement against all Takata entities, including TKH.

14.     In early 2016, as liabilities were continuing to mount against Takata, it became clear to Takata and a significant number of its Customers that absent a substantial injection of capital or a sale of Takata's assets to a third party, Takata, including the Debtors, would be forced into a liquidation, which would result in thousands of employees being out of work, yield limited to no recoveries for creditors, and jeopardize ongoing efforts to get non-desiccated PSAN Inflators safely off the road.  In addition, a liquidation of Takata would put the stable and continuous supply to the OEMs of component parts, service parts, and assembled goods (the "**Component Parts**"), including replacement parts for vehicles subject to recall, at significant risk.

15.     Accordingly, in February 2016, TKJP's board of directors appointed an independent advisory committee consisting of five (5) business, legal, and financial professionals (the "**Steering Committee**") to facilitate, formulate, and negotiate the development of a restructuring plan for Takata through a fair and transparent process.  At around the same time, a number of OEMs that, in the aggregate purchased approximately ninety percent (90%) of PSAN Inflators sold by Takata as of March, 2017, formed an informal group to negotiate and develop a restructuring plan with Takata (the "**Customer Group**").[7]

---

[7] As of the date hereof, the Consenting OEMs are comprised solely of the members of the Customer Group.  The members of the Customer Group include representation from the following OEMs:  BMW, Daimler, Fiat Chrysler

16.     Shortly after the appointment of the Steering Committee, Takata, with the assistance of its professionals at Lazard Frères & Co. LLC ("*Lazard*"), Weil, Gotshal & Manges LLP ("*Weil*"), and PricewaterhouseCoopers LLP ("*PwC*"), as well as legal and financial advisors in Japan and Europe, launched a thorough and exhaustive prepetition marketing and sale process with an aim to select a sponsor or purchaser and develop a global restructuring strategy. Crucially, proceeds of the transaction had to be sufficient to satisfy the remaining $850 million in Restitution Payments or the DOJ could withdraw the Plea Agreement—a risk no purchaser or third-party investor would be willing to absorb.  During the marketing and sale process and the many months of negotiations leading up to the commencement of these Chapter 11 Cases, the Steering Committee and the Customer Group, which represent by a wide margin the Debtors' largest creditor group, were intimately involved and the Customer Group remains a key participant in the development of the proposed Global Transaction.

17.     After nearly one (1) year of intensive marketing, diligence, and negotiations between and among Takata and the Steering Committee, potential sponsors, and the Customer Group, the marketing and sale process ultimately culminated in the selection of the Plan Sponsor for the sale of substantially all of Takata's worldwide assets (the "*Global Transaction*" and the agreements, documents, and instruments executed and delivered in connection with the Global Transaction, as hereafter amended, supplemented, or otherwise modified, the "*Global Transaction Documents*").  As described in further detail below, the Global Transaction is expected to provide for the sale of substantially all of Takata's assets to the Plan Sponsor, other than certain excluded assets, which are primarily those assets dedicated to the manufacture of PSAN Inflators (collectively, the "*PSAN Excluded Assets*" and together with

---

Automobiles, Ford, General Motors, Honda, Jaguar Land Rover, Mazda, Mitsubishi, Nissan, Subaru, Toyota, Volkswagen, and AB Volvo.

certain other excluded assets, the "***Excluded Assets***"), through coordinated U.S. and Japanese insolvency proceedings and pursuant to a number of complimentary and interdependent agreements.  The sale of the Debtors' assets will be consummated pursuant to the Chapter 11 Plan and the sale of the Japanese Debtors' assets will be consummated pursuant to a business transfer implemented pursuant to sections 42 and 43 of the Civil Rehabilitation Code (the "***JP Business Transfer***") followed by a liquidating plan in accordance with the Civil Rehabilitation Act (the "***JP Plan***").  The remainder of Takata's assets will be sold or transferred by way of asset or equity sales outside of a formal insolvency proceeding.

18.    As set forth in more detail below, it is anticipated that the PSAN Excluded Assets will be carved out of the sale and remain with, or be transferred to, as applicable, TKH and certain of its subsidiaries upon TKH's emergence from chapter 11 (TKH, as reorganized, "***Reorganized TK Holdings***" and, collectively with its subsidiaries, "***Reorganized Takata***" and with respect to the carve out structure, the "***PSAN Carve Out***").  Reorganized Takata will own and operate the PSAN Excluded Assets until the later of (i) such time as production of PSAN Inflators is no longer necessary under the terms of the NHTSA Orders (as defined herein) or any other order by authorities relating to recall, to the extent applicable, and (ii) the earlier of five (5) years after the effective date of the Chapter 11 Plan and such time as production of PSAN Inflators is necessary to comply with the terms of the Debtors' contracts with the Consenting OEMs.  The primary purpose of Reorganized Takata will be to ensure the continued production of PSAN Inflators to those Customers that need such inflators, including to fulfill recalls.

RLF1 17750950V.1

19.     More specifically, the Global Transaction is expected to provide for, among other things, the following:

a.   The sale of substantially all of Takata's assets (other than the Excluded Assets) to the Plan Sponsor for $1.588 billion, subject to certain adjustments (the "***Purchase Price***");

b.   Payment from the Purchase Price proceeds of the remaining $850 million in Restitution Payments as required under the terms of the Plea Agreement and Restitution Order;

c.   The establishment of certain funds to provide distributions to the holders of allowed general unsecured claims, including personal injury and wrongful death claims;

d.   In exchange for the Plan Sponsor's participation in the Global Transaction and the post-closing production of PSAN Inflators by Reorganized Takata for the benefit of certain Consenting OEMs, the execution of certain separate agreements with the Plan Sponsor and the Consenting OEMs, to indemnify the Plan Sponsor for, among other things, certain claims relating to the manufacture and/or sale of the PSAN Inflators; and

e.   The continued employment of substantially all of Takata's employees, including over 14,500 employees of the Debtors, either with Reorganized Takata in connection with Reorganized Takata's post-closing PSAN Inflator production or with the Plan Sponsor following consummation of the Global Transaction.

20.     Despite being on the verge of finalizing the Global Transaction Documents, the Debtors determined that the Company's liquidity position was not sustainable in light of vendor reaction to news of pending bankruptcy filings and that filing without a fully executed deal, and continuing to negotiate and finalize the Global Transaction Documents post-filing, was in the best interests of their stakeholders.  The commencement of the Chapter 11 Cases gives the Debtors a much needed breathing spell—one of the fundamental tenets of chapter 11—and will allow the Debtors to finalize the Global Transaction Documents while also preserving global liquidity and ensuring the ongoing manufacture and supply of Component Parts, including replacement parts, to the OEMs.

RLF1 17750950V.1

21.     Notwithstanding the fact that the Global Transaction Documents are unsigned, the Consenting OEMs have an agreement in principle to provide critical accommodations to Takata, including, with respect to the Debtors, accelerated payments, setoff waivers, resourcing limitations, and inventory purchase commitments, to ensure that the Debtors have sufficient liquidity to operate during these Chapter 11 Cases.[8]  The Consenting OEMs agreed to provide such liquidity as a bridge to the closing of the Global Transaction and consummation of the Chapter 11 Plan.  To ensure continued momentum in that direction, the Global Accommodation Agreement establishes certain milestones with respect to finalizing and filing the remaining Global Transaction Documents, including a requirement that the Debtors, the Plan Sponsor, and the Consenting OEMs substantially finalize a restructuring support agreement, which will include the Chapter 11 Plan as an exhibit by no later than July 17, 2017.

22.     With the benefit of the breathing spell afforded by these Chapter 11 Cases, the Debtors expect they will progress expeditiously towards finalizing the terms of the Global Transaction in a manner that is fair, equitable, and in the best interests of the Debtors' estates and the safety of the driving public.  To facilitate the foregoing, the Debtors respectfully request that the Court approve the relief requested in the First-Day Motions and allow the Debtors to progress expeditiously towards confirmation of the Chapter 11 Plan and consummation of the proposed Global Transaction.

---

[8] The terms of the accommodations and liquidity support being provided by the Consenting OEMs for the Debtors and their affiliates (other than the Japanese Debtors) are set forth in that certain accommodation agreement, filed contemporaneously herewith (the "*Global Accommodation Agreement*").  The Global Accommodation Agreement is contemplated to also set forth those accommodations being provided in Europe and the rest of the world (other than Japan).  Pursuant to the terms thereof, the parties have until July 7, 2017 to become party to the Global Accommodation Agreement.  Certain of the Consenting OEMs have separately entered into an accommodation agreement with the Japanese Debtors to provide them with liquidity support and other accommodation during the Japanese Proceedings (the "*Japan Accommodation Agreement*" and, together with the Global Accommodation Agreement, the "*Accommodation Agreements*")**.**

13

## II.
## Takata's Businesses

**A.    Overview**

23.    Takata is one of the world's leading automotive safety systems companies, supplying nearly all the world's major automotive manufacturers with a product range that includes seat belts and airbag systems, as well as steering wheels, child restraint systems, and electronic devices such as satellite sensors and electronic control units.  Founded in 1933 as a textile company in Shiga Prefecture, Japan, Takata began to focus on automotive safety systems in the early 1950s.  Over the following decades, Takata became a leader in automotive safety systems and expanded around the globe.  Indeed, the Company has been and continues to be recognized for its high quality manufacturing by Customers, as well as by third-party organizations.  This is evidenced not only by the Company's receipt of over two hundred and fifty (250) awards for research and development, safety, quality, and delivery, but also by its strong and long-standing relationships with its Customers.  Many of Takata's Customers have had business relationships with Takata for over fifty (50) years, handling multiple product lines on a single vehicle platform.

24.    Since bringing Japan's first seat belt to the market in 1960, Takata has been driven by the pursuit of safety.  Significantly, Takata was responsible for being the first to market in a number of innovative and revolutionary advances in automotive safety including the following:

- 1960:  First in Japan to commercialize two-point seat belts;

- 1962:  First in Japan to conduct public seat belt crash tests;

- 1977:  First in Japan to commercialize child restraint systems;

- 1980:  First in the world to commercialize driver airbag modules;

- 1996:  First in Japan to commercialize force limiter seat belts;

- 2005:  First in the world to commercialize twin bag systems;

- 2006:  First in the world to commercialize motorcycle airbags;

- 2010:  First in the world to commercialize safety airbelts;

- 2012:  First in the world to commercialize front center airbags; and

- 2013:  First in the world to commercialize D-shape curtain airbag technology.

25.    Takata first expanded outside of Japan in the 1980s and is now a multinational corporation.  As of the Petition Date, Takata operates more than fifty (50) manufacturing plants and research & development centers in over twenty (20) countries on five (5) continents.[9]  The Debtors operate eleven (11) different production, testing, and other sales and administration facilities.  For management purposes, Takata's global operations are grouped into four (4) regions: Japan, Asia (excluding Japan), the Americas, and EMEA (Europe, the Middle East, and Africa).  A detailed summary of the Debtors' current organizational structure is attached hereto as **Exhibit A** (the "***Global Organizational Chart***").  Takata is one of the most vertically integrated manufacturers in the global automotive safety industry, manufacturing many of the Component Parts of its automotive safety products in-house, and the Debtors and their direct and indirect subsidiaries provide Component Parts and services to the entire Takata enterprise.

26.    For the twelve (12) months ended March 31, 2017, the audited and consolidated financial statements of TKJP and its Debtor and non-Debtor subsidiaries reflected

---

[9] The geographic footprint of Takata's manufacturing plants include: (i) in the Americas:  Picarraas, Cheraw, Monclova (manufactures PSAN Inflators), Monterrey, Acuña, Agua, Prieta, Torreon, Jundiai, Moses Lake (manufactures PSAN Inflators), Mateus Leme, Uruguay; (ii) in Asia:  Changxing (manufactures PSAN Inflator), Philippines, Hikone, Shanghai, Taku, Jinzhou, Tianjin, Hwaseong, Chachoengsao, Arita, Bekasi, Chennai, Neemrana, Selangor, and Echigawa; and (iii) in EMEA:  Arad, Freiberg (manufactures PSAN Inflators), Sibiu, Krzeszów, Elterlein, Ulyanovsk, Miskolc, Doebeln, Aschaggenburg, Durban, Tangier, and Rtyne.

total sales of approximately $6.1 billion and a net loss of approximately $733.8 million.  As of

March 31, 2017, the consolidated financial statements of Debtors and their direct and indirect

subsidiaries reflected total sales of approximately $2.0 billion and a net loss of approximately

$340 million.  Accordingly, the Debtors and their direct and indirect subsidiaries account for

approximately thirty-three percent (33%) of Takata's global sales.

27.    As of March 31, 2017, Takata's audited and consolidated financial

statements reflected assets totaling approximately $3.9 billion and liabilities totaling

approximately $3.7 billion, and the consolidated financial statements of the Debtors and their

direct and indirect non-Debtor subsidiaries reflected assets totaling approximately $1.7 billion

and liabilities totaling approximately $1.6 billion.

B.    **Takata's Products and Business Lines**

28.    Takata's product range encompasses a broad spectrum of passive and

active automotive safety technology, including seat belts, airbag systems, steering wheels, and

other electronic devices.  For the 2016 fiscal year, Takata's sales by product category were as

follows: airbag systems (36%), seat belts (34%), steering wheels (17%), and other products

(14%), including electronics and child seats.  The following diagram illustrates many of the

safety critical parts manufactured by Takata.[10]  Each of these product groups is discussed in

further detail below.

---

[10] This diagram illustrates both current Takata products and products under development.



- **Passenger airbags**
- **Vision sensors**
- **Occupant classification sensors**
- **Interior parts**
- **Side airbags**
- **Pedestrian head protection airbags**
- **Curtain airbags**
- **Child seats**
- **Satellite sensors**
- **Pop-up hood devices**
- **Steering wheels**
- **Rear seat belts (Airbelts)**
- **Knee airbags**
- **Front center airbags**
- **Driver airbags**
- **Driver/Passenger seat belts (Motorized seat belts)**
- **ECUs**

17

*Seat belts*



29.    Since commercializing Japan's first seat belt in 1960, Takata has continued to improve the effectiveness and comfort of seat belts through innovation in areas such as textiles and weaving technology.  Takata's seat belt business includes driver, passenger, and rear seat belts.  In 2010, Takata became the first company in the world to commercialize the airbelt, a new type of seat belt that inflates like an airbag in the event of a collision.  Recently, Takata modified its motorized seat belt to provide enhanced comfort and safety.  In addition to tightening automatically to restrain vehicle occupants when pre-crash sensors detect risk of collision, the new comfort function reduces the pressure exerted by the seat belt during normal driving, while holding vehicle occupants in position during sudden braking or sharp turns.  Takata has also developed a state-of-the-art inkjet printing technology that allows Takata to create seat belt webbing with patterns, words, or logos in a variety of colors.  Takata develops, designs, and produces seat belt systems and products, including webbing, in-house, as well as sourcing from third parties.  Takata's seat belts are produced or tested in at least twenty-eight (28) of Takata's plants, including seven (7) plants operated by the Debtors' and/or their direct and indirect non-debtor subsidiaries.

*Airbag Systems*



30.    In 1976, Takata became the first company in Japan to begin research and development related to airbags.  Takata commercialized the world's first driver airbags in 1980, which were supplied to Daimler Benz for use in its S-Class model.  In 1983, in

18

connection with a safety campaign sponsored by the U.S. Department of Transportation, Takata supplied eight hundred (800) airbags to various U.S. institutions, including police agencies. Since then, Takata has continued to enhance its capabilities in the development, design, and production of airbag systems and products, from airbag textiles to hazard detection control units and inflator technology.  Today, Takata is one of the few manufacturers of airbags with fully integrated development, design, and manufacturing capabilities for airbag systems.

31.    In addition to driver and passenger airbags, side airbags, curtain airbags, and knee airbags that protect the legs of front seat occupants, Takata has commercialized innovative products such as the D-shape curtain airbag, which protects the head region and helps prevent passenger ejection, and the Front Center Airbag, which inflates between the left and right seats and serves as an energy absorbing cushion between the driver and front seat passenger in both near and far side-impact crashes.  In 2013, Takata launched the world's first driver-side airbag with Flexible Venting Technology (FVT), which incorporates a "smart" pressure control mechanism that allows the air vent to be controlled by the airbag itself, rather than via sensors on the vehicle.  Takata develops, designs, and produces airbag systems and certain related Component Parts, including the inflator and inflator propellant, in-house.[11]

32.    Takata's airbag systems are produced and tested in over thirty-two (32) of Takata's plants, eight (8) of which are operated by the Debtors and/or their direct and indirect non-debtor subsidiaries.

***Steering Wheels***

33.    Takata's fully integrated steering wheel development and production system encompasses a variety of



---

[11] Takata also relies on certain third parties for inflator propellant.

processes, from die-cast magnesium inner frames to leather wrapping, switching systems, and final assembly.  Ongoing innovations, such as Takata's vacuum Folding Technology, have reduced the size of some driver airbags in Takata's product line-up, and introduced new features for safety and comfort.  This has enabled interior designers to explore new opportunities to enhance the driving environment and differentiate their vehicles for the needs of each market and consumer segment.  Takata has recently introduced the vibration steering wheel, featuring a unit inside the spoke of the wheel that vibrates to notify the driver of potential dangers such as inadvertent lane departure, traveling too close to the car in front, over-acceleration, and falling asleep at the wheel.

34.    Takata's production and testing of steering wheels occupies approximately seventeen (17) of Takata's plants, including at least two (2) plants which are operated by the Debtors and/or their direct and indirect non-debtor subsidiaries.

***Other Products***

35.    This category of Takata's products includes electronic devices such as vehicle occupant sensors, collision sensors, electronic control units (ECUs) for controlling airbag inflation, and child restraint systems.  In today's automotives, sophisticated electronics  form part of nearly every automotive safety feature and enable the integration of multiple passive and active safety functions to enhance total safety system effectiveness.  In addition to the use of electronics in conventional safety systems such as airbags and seat belt pretensioners, active pre-crash safety systems have opened up new realms of possibilities in safety, with highly developed sensors being used to identify hazards and help prevent accidents from occurring.

*Research & Development*

36.     Takata conducts analyses from a number of different perspectives to understand the various types of crash configurations and scenarios in automobile accidents, including examining the causes of accidents, the seriousness of injuries as a result of a collision, and other related topics, with the aim of developing systems that protect people, and uses computational crash simulation and dynamic crash testing for safety system development.

37.     Takata's research and development teams have also developed systems that help address dangerous driving situations by minimizing fatigue and making driving more pleasant and convenient.  By developing sensors that look outside the vehicle, these systems can warn the driver in advance of potentially dangerous situations.  In the event of an accident, Takata has developed systems which detect the magnitude of the collision and provide information on the condition of the passengers that can be useful to rescuers.  In addition, Takata also looks beyond the protection of occupants and has developed systems that can protect motorcyclists, bicycle riders, and pedestrians. Takata's facilities also include sled testing that can simulate the impact of collisions.

38.     For developing technology, Takata has established research and development centers in Japan, U.S., and Germany.  Takata entities share their high-level technology and other accumulated information throughout the global enterprise.

*Non-Automotive Safety*

39.     In addition to Takata's automotive safety operations, Takata, including certain of TKH's non-debtor subsidiaries, operates certain non-automotive safety business lines, including webbing fabrics and cushions, and non-automotive products, including school bus seats.  As of the Petition Date, Takata's non-automotive safety business includes Highland Industries, Inc. ("***Highland***") and Syntec Seating Solutions LLC ("***Syntec***"), each of which is a

21

wholly-owned subsidiary of TKH and is not a Debtor in these Chapter 11 Cases.  Highland

manufactures and sells airbag fabric, composites, and textiles to TKH as well as to other

automotive manufacturing companies.  Syntec, acquired by Takata in 2012, manufactures safety

systems (*e.g.*, seats and barriers) for school buses.  The non-automotive safety business operates

in six (6) independent facilities (Highland owns two (2) facilities and leases two (2) facilities and

Syntec owns one (1) facility and leases one (1) facility).

        40.      Prior to the commencement of the Chapter 11 Cases, to improve its

liquidity position, TKH sold certain of its non-automotive safety divisions to TransDigm Group,

Inc. (the "*NAS Purchaser*") for approximately $90 million, approximately $36 million of which

related to assets sold by Interiors in Flight, Inc. and Takata Protection Systems Inc. (the "*NAS*

*Sales*"), each of which is a wholly-owned subsidiary of TKH.  The NAS Sales closed on or about

February 22, 2017.[12]

***Mexican Operations***

        41.      Takata's "Americas" region includes Takata's operations in Mexico.

TKH indirectly owns six (6) entities incorporated in Mexico,[13] four (4) of which are

maquiladoras (the "*Maquiladoras*")[14] that manufacture and assemble inflators, seatbelts, and

---

[12] In connection with the NAS Sales, TKH and certain non-Debtor affiliates entered into certain agreements (collectively, the "*NAS Transition Services Agreements*") to provide certain limited transition services to the NAS Purchaser, including, without limitation, certain collection, distribution, and other treasure-related services, certain employee benefit and workforce services, and certain IT and connectivity related services (the "*NAS Transition Services*").  In exchange for such services, the NAS Purchaser has agreed to pay TKH and certain non-Debtor affiliates certain monthly fees ranging from approximately $2,000 to $10,000 per month for the various services.

[13] These entities include TK Holdings de Mexico, TK DM, Industrias Irvin, SMX, Falcomex SA De CV, and Equipo Automotoriz Americana S.A. De. C.V.  Of these six (6) entities, four (4) (TK Holdings de Mexico, TK DM, Industrias Irvin, and SMX) are Debtors.  The remaining two (2) entities are a Mexican holding company and a trading sales company that contracts for the sale of TKH's product to Mexican OEMs.

[14] A maquiladora generally refers to a Mexican corporation that is eligible for certain tax and customs benefits due to the fact that, among others, it develops products in Mexico using raw materials, machinery, and equipment primarily owned by a non-Mexican entity.  Maquiladoras export all of their product and are owned, at least in part, by a foreign investor.

RLF1 17750950V.1

steering wheels.[15]  As described below, the Mexican operations primarily serve to support the

production needs in the U.S.

C.     **The Debtors' Businesses and TKH's Business Model**

42.     The Debtors in these Chapter 11 Cases are Takata Americas, TKH, TK

Holdings de Mexico, TK DM, Industrias Irvin, SMX, TK Finance, LLC, TK China LLC ("***TK***

***China***"), TK Mexico Inc., TK Mexico LLC, Takata Protection Systems Inc., and Interiors in

Flight Inc.  Below is a brief description of each Debtor entity and its business(es):

- **Takata Americas** is a Delaware partnership that serves as the U.S. federal income tax payer for the Company.  Takata Americas owns over ninety-nine percent (99%) of the equity in TKH and generally has no assets other than the stock in its subsidiaries, which, in addition to TKH, include TK Finance LLC (a Debtor entity which indirectly owns Takata (Shangai) Automotive Component Co. Ltd., a non-debtor Chinese entity which may implement an asset sale under the Global Transaction) and Takata Brasil S.A. (a non-Debtor entity).

- **TKH** is a Delaware-incorporated operating company that manufactures and sells inflators, airbags and seat belts, and sells steering wheels (manufactured by its affiliates).  TKH operates five (5) facilities, including a plant in Moses Lake where TKH produces PSAN propellant, inflators, and airbag modules, and three (3) sales and administration offices.  TKH's revenues represent thirty-three percent (33%) of Takata's revenues on a global basis.  In addition to owning directly or indirectly each of the other Debtor entities (excluding Takata Americas), TKH also directly or indirectly owns the non-debtor Maquiladoras, Highland, and Syntec, as well as ALS Inc., a non-Debtor Japanese operating company that provides logistics and freight forwarding services (*i.e.*, exporting and importing parts and manufactured goods) to TKJP.

- **TK DM** is a Mexican incorporated Maquiladora that manufactures inflators and assembles airbag modules and replacement kits.  TK DM owns two (2) plants, including a plant in Monclova where TK DM manufactures PSAN Inflators.  Prior to 2014, TK DM contracted with Customers for the sale of airbag modules containing PSAN Inflators.

---

[15] The four (4) Maquiladoras are TK DM, Industrias Irvin, Falcomex SA De CV, and Equipo Automotoriz Americana S.A. De. C.V.

- **Industrias Irvin** is a Mexican incorporated Maquiladora that assembles airbag modules and seat belts and manufactures seat belt components. Industrias Irvin leases one (1) plant from an affiliate. Prior to 2014, Industrias Irvin contracted with Customers for the sale of airbag modules containing PSAN Inflators.

- **SMX** is a Mexican entity referred to as a "trading sales company" as it is in the business of contracting with Mexican OEMs for the sale of the Debtors' products, including airbags containing PSAN Inflators.

- **TK Holdings de Mexico** is a Mexican holding company that provides centralized administration services for its subsidiaries, including the four (4) Maquiladoras, in exchange for a management fee. The administration services include customs compliance, management of accounts receivable and payable, taxes, and certain payroll functions. TK Holdings de Mexico does not employ its own employees, but rather leases employees from TK DM in exchange for a monthly fee.

- **TK Finance, LLC, TK China LLC, TK Mexico Inc., and TK Mexico LLC** are each a holding company with no operations, third-party debt, or assets other than the equity in its respective subsidiaries.

- As noted above, **Takata Protection Systems Inc. and Interiors in Flight Inc.** sold substantially all of their assets to TransDigm Group prepetition and have no ongoing operations.

43.    As is commonplace throughout the automotive industry, the Debtors' businesses function under a tiered supply chain structure. Under this structure, upstream from the car manufacturers (*i.e.*, the OEMs) are Tier One suppliers, such as the Debtors, that produce the specialized Component Parts needed for new vehicles. The business relationships of TKH and its direct and indirect subsidiaries with their Customers begins when TKH is awarded a new program, which generally occurs two (2) or three (3) years prior to the production launch. This system allows for high revenue visibility and a large program backlog (subject to ultimate production volumes on a particular platform).

44.    Generally, each Component Part manufactured by the Debtors is engineered and designed in partnership with the applicable Customer. Key Component Parts must be designed, tested, and validated for quality and safety—a process that can take months or

years to complete.  In almost all cases, the Debtors are the sole manufacturer of the Component

Parts they supply for their Customers and, in many instances, the Debtors and their Customers

rely on a daily or weekly "just-in-time" inventory supply system.  In connection with the

Component Parts, the Debtors must acquire the manufacturing components and machines needed

for production of the Component Part, which often include unique tooling, including specific

fixtures, jigs, gauges, molds, dies, cutting equipment, and patterns.  Accordingly, in the ordinary

course of business, the Debtors acquire specialized tools and equipment on behalf of many of

their Customers, though in many instances the Customers may own the tooling equipment and

use the Debtors to subcontract the tool production work.

45.     The airbag, steering wheel, and other safety-critical products produced by

the Debtors and the constituent components of these products must meet demanding

specifications mandated by both the Debtors and the Customers, as well as federally mandated

safety standards, before they can be used in the Debtors' manufacturing process.  Due to these

extensive design, development, and certification requirements, the process by which the Debtors

and the OEMs select and certify a new supplier and a new program can take approximately

eighteen (18) to twenty-four (24) months.  Accordingly, any disruption in the Debtors'

production could immediately impact their Customers' ability to manufacture automobiles and

could result in a shutdown in production of many of the largest vehicle platforms in North

America.

## III.

### Debtors' Prepetition Ownership and Capital Structure

### A.    Ownership Structure

46.     TKJP is a public company listed on the Tokyo Stock Exchange.  On June

16, 2017, trading in the equity of TKJP was suspended upon media speculation of its impending

insolvency proceeding.  The Takada family continues to own a majority of the equity in TKJP.

As reflected on the Global Organizational Chart, all of the Debtors are direct or indirect

subsidiaries of TKJP and none of the Debtors are owned by third party (*i.e.*, non-Takata) entities.

B.    **Funded Debt Obligations**[16]

47.    As of the Petition Date, the Debtors have no outstanding funded debt

obligations.  By contrast, as of the Petition Date, TKJP, the Debtors' ultimate parent, has

outstanding funded debt obligations in an aggregate amount of approximately $590 million

consisting of (i) approximately $320 million in principal amount of bank debt and

(ii) approximately $269 million in principal amount of unsecured bonds.  The bank lenders do

not have any liens against Takata's assets in connection with borrowed funds, but they do have

the ability to offset borrowed funds against Takata's deposit accounts under certain

circumstances, including a payment default.

48.    In addition, as of the Petition Date, two (2) of the Debtors' non-debtor

affiliates have outstanding bank debt obligations:  (i) TAKATA Europe GmbH, in an aggregate

amount of approximately $150 million[17] and (ii) Takata Brasil S.A., in an aggregate amount of

approximately $13 million, in each case based on current currency exchange rates.

C.    **Trade Payables**

49.    In the ordinary course of business, the Debtors incur fixed, liquidated, and

undisputed payment obligations (the "***Trade Payables***") to various third-party providers of goods

and services that facilitate the Debtors' business operations (the "***Trade Creditors***").  As of the

date hereof, the Debtors estimate that the aggregate amount of Trade Payables outstanding is

---

[16] The dollar amounts set forth in this Section B are based on currency exchange rates as of June 25, 2017.

[17] Takata International Finance B.V. has provided a $5 million guarantee to one of the bank lenders in connection with this loan.

approximately $118 million.  The Debtors, the Consenting OEMs, and the Plan Sponsor each have an interest in supporting a transaction that minimizes any disruption or impairment to the Debtors' Trade Creditors.

D.      **Intercompany Transactions**

50.      In the ordinary course of business, the Debtors maintain business relationships between and among the Debtors and also with certain non-Debtor affiliates that generate intercompany receivables and payables (the "***Intercompany Claims***") from a variety of transactions, including intercompany services, reimbursement for shared business expenses, and intercompany loans (each, an "***Intercompany Transaction***").  The Intercompany Claims are tracked on a net basis on a schedule of intercompany balances.  There are three major categories of Intercompany Transactions:  (i) transactions between and among the Debtors and U.S. affiliates, (ii) transactions between TKH and its indirect Mexican subsidiaries (both Debtor and non-Debtor), and (iii) transactions between the Debtors and their international affiliates, including TKJP.

51.      As of the Petition Date, the Debtors owe, in the aggregate, approximately $43.6 million on account of Intercompany Claims (which amount reflects aggregate net amounts owed by the Debtors).  In particular, as of the Petition Date, TKH owes TKJP $33.4 million in intercompany trade claims (which amount reflects aggregate net amounts owed by TKH), of which $10 million relate to goods delivered within twenty (20) days of the Petition Date, and $80 million in intercompany loans pursuant to two separate intercompany loan agreements with TKJP:  the first, dated March 31, 2016, in the amount of $30 million and the second, dated March 18, 2016, in the amount of $50 million.

E.      **Other Liabilities**

52.     Certain of the Debtors' other obligations and liabilities, including

obligations owed to NHTSA, are described in Section IV.

**IV.**

**Events Leading to the Commencement of the Chapter 11 Cases**

53.     Historically, Takata has been a pioneer in the active and passive safety

market, introducing safety innovations that positively affect the lives and comfort of occupants

throughout the driving cycle.  Over the last several years, however, certain of Takata's PSAN

Inflators have failed to operate as intended.  In particular, certain PSAN Inflators have ruptured

upon deployment of the airbag causing considerable injury and, in some instances, death to

drivers and passengers involved in motor vehicle crashes.  The first incident involving the

rupture of a PSAN Inflator occurred in 2003 in Switzerland.  At that time, Takata believed that

the rupture was an isolated event caused by an overloading of propellant in the assembly of the

inflator.  Unfortunately, additional inflator ruptures occurred over the next several years,

prompting voluntary recalls by certain vehicle manufacturers and, ultimately, a nationwide recall

in the U.S. by NHTSA.  The rupturing of PSAN Inflators and the related recalls have resulted in

substantial and expansive claims against the Debtors and other Takata entities, as well as

resourcing of future business by the Customers.  Under these circumstances, and those described

in more detail below, Takata determined that an efficient sale of substantially all of Takata's

assets to the Plan Sponsor through coordinated insolvency proceeding in the U.S. and Japan

would provide the best recovery to creditors while also ensuring that the Debtors continue to

uphold recall-related and supply obligations to its Customers.

A.      **NHTSA Orders Civil Penalties and Initiates Expansive Recalls of PSAN Inflators**

54.     On June 11, 2014, after receiving multiple complaints regarding Takata airbag inflator ruptures, NHTSA opened a formal defect investigation into the PSAN Inflators—the first step to what would eventually become one of the largest consumer product recalls in U.S. history.  Several months later, on February 25, 2015, NHTSA issued the Preservation Order and Testing Control Plan (the "***Preservation Order***"), which requires, among other things, that TKH take reasonable steps to prevent the destruction of and preserve all recalled or returned PSAN Inflators, ruptured inflators, and other ammonium nitrate-containing inflators in the U.S., as well as documents, data, and tangible things reasonably anticipated to be relevant to the subject of NHTSA's defect investigation into PSAN inflators.  In addition, the Preservation Order requires that TKH set aside ten percent (10%) of recalled or returned inflators for testing by private litigants, and the remaining inflators must be available to the OEMs for inspection, testing, and analysis.

55.     Thereafter, on November 3, 2015, NHTSA issued a consent order (as amended on May 4, 2016, as described below, and as may be further amended and supplemented, the "***Consent Order***") and companion coordinated remedy order (the "***Coordinated Remedy Order***" and collectively with the Preservation Order and the Consent Order, as each may be amended, the "***NHTSA Orders***").  Pursuant to the Consent Order, TKH agreed to pay a civil penalty in the amount $70 million payable in six (6) installments, of which $20 million has already been paid, with the final installment due and payable by October 2020.  TKH also agreed to accept a deferred contingent civil penalty in the amount of $130 million which will become due only if TKH fails to comply with certain obligations in the Consent Order and the Coordinated Remedy Order.  As of the date hereof, TKH is in compliance with the

Consent Order.  In addition to the monetary fines and penalties, the Consent Order provides that

TKH will implement a series of actions, including the phasing out of the manufacture and sale of

non-desiccated PSAN Inflators by the end of 2018 ($60 million of the $130 million deferred civil

penalty will become due if TKH fails to meet deadlines for the phase-out of its production of

certain PSAN Inflators by December 31, 2018).  TKH also agreed not to enter into any new

contracts to provide products containing PSAN Inflators (the remaining $70 million of the

deferred civil penalty will become due only if TKH enters into any new contracts for production

of products containing PSAN Inflators or if NTHSA discovers additional violations of safety

regulations).  The Coordinated Remedy Order establishes a schedule, based on relative risk of

rupture, by which certain OEMs must have sufficient parts on hand to replace PSAN Inflators in

affected vehicles.  Pursuant to the Coordinated Remedy Order, Takata must cooperate with

NHTSA to coordinate and accelerate such remedy programs.

        56.     In connection with the Consent Order and the Coordinated Remedy Order,

NHTSA appointed John Buretta, a partner at the law firm Cravath, Swaine & Moore LLP, as an

independent monitor (the "***Independent Monitor***") to assist NHTSA in overseeing and assessing

Takata's compliance with the NHTSA Orders.  Takata has been working closely with the

Independent Monitor to ensure compliance with the NHTSA Orders.  The Independent

Monitor's term is for five (5) years and is scheduled to conclude around the end of 2020 (subject

to extension or early termination as may be ordered by NHTSA in its discretion).  In accordance

with the NHTSA Orders, the Debtors pay the Independent Monitor's fees and expenses.

        57.     NHTSA commissioned three (3) independent research organizations to

administer scientific evaluations and report on the "root cause" of the rupture of non-desiccated

frontal Takata air bag inflators containing PSAN.  Based on these reports, NHTSA concluded

that the likely root cause of the rupturing of such inflators is a function of time, temperature

cycling, and environmental moisture and that, at some point in the future, all non-desiccated

frontal Takata PSAN inflators will reach a threshold level of degradation that could result in the

inflator becoming unreasonably dangerous.  Accordingly, on May 4, 2016, NHTSA issued an

amendment to the Consent Order requiring Takata to file defect information reports ("***DIRs***")

triggering recall obligations for all non-desiccated frontal PSAN Inflators, including any like-for-

like replacement, on a defined, phased schedule broken down by vehicle model, year, and

location, concluding by December 31, 2019.  As of the date hereof, NHTSA has not initiated any

recalls of non-desiccated PSAN Inflators relating to propellant degradation.  Under the Consent

Order, TKH has until December 31, 2019 to demonstrate that desiccated PSAN Inflators are safe

and should not be subject to recalls.

58.     The recalls initiated by NHTSA, as well as the voluntary recalls initiated

independently by the OEMs, have resulted in mounting claims for reimbursement by the OEMs

against the Takata entities with which the OEMs contract.  Pursuant to many of the OEMs'

contracts with TKH, the OEMs are entitled to reimbursement for costs associated with

administering the recalls and installing replacement parts.  As of the Petition Date, the Debtors

estimate such recall-related reimbursement claims against the Debtors to be in the billions of

dollars.

**B.      Takata Responds Cooperatively to NHTSA Orders**

59.     To comply with the NHTSA Orders, Takata has implemented meaningful

remedial oversight and compliance measures within the organization globally.  As provided for

in the Consent Order and stated above, TKH has agreed to substantial oversight by the

Independent Monitor and has established processes for TKH employees to report concerns

31

anonymously to the Independent Monitor.  TKH also has appointed a Chief Safety Assurance

and Accountability Officer and created an enhanced Product Safety Group with authority to

investigate and address preemptively safety-related issues across TKH's product lines.

60.    In December 2014, Takata commissioned an independent Quality

Assurance Panel (the "*Panel*") with a broad mandate to review Takata's practices and policies

for the safe production of airbag inflators and to provide recommendations.  Following an

extensive review and evaluation of Takata's processes and policies, the Panel submitted a report

in February 2016 setting forth fifteen (15) recommendations of concrete actions relating to

quality concerns, design and manufacturing processes, and the Company's "quality culture."  I,

along with the assistance of other employees of Takata, developed a plan of action to implement

each of the Panel's recommendations.  On June 12, 2017, the Panel held a status meeting at

which Takata reported that ten (10) of the fifteen (15) recommendations have been fully

implemented, two (2) are significantly complete, and three (3) are partially complete.  I expect

that by the end of 2017, the two (2) additional recommendations will be fully complete, and the

Company will have fully implemented all of the Panel's recommendations within one (1) year

from the date hereof.  Following the status meeting, Samuel K. Skinner, Chairman of the Panel,

reported in a letter, dated June 15, 2017, that in the Panel's view, "the Takata team in many

instances has not only met the Panel's expectations but in doing so has set a new standard for the

industry […] the Panel believes that Takata has done an outstanding job in accepting, adopting

and implementing the Panel's recommendations."

61.    TKH has also been working cooperatively with NHTSA, world-class

technical experts, and Customers to initiate recalls and administer replacement of affected airbag

inflators to remedy safety concerns relating to non-desiccated PSAN Inflators nationwide.  TKH

has funded and developed vigorous "Get the Word Out" campaigns to maximize the recall completion rates and has conducted substantial consumer advertising to encourage car owners receiving recall notices to bring their cars in to dealers for prompt replacement.  As of the Petition Date, the Debtors have expended approximately $18 million towards communicating and noticing vehicle owners of the recalls and risks associated with non-desiccated PSAN Inflators.

### C.    Significant Litigation Actions Commenced Against the Debtors

***Personal Injury and Wrongful Death Actions***

62.    Approximately one hundred (100) personal injury and wrongful death lawsuits relating to the PSAN Inflators are currently pending in state and federal courts within the U.S.  The lawsuits allege product liability claims based in almost all instances on inflator ruptures, deployments with excessive force, and failures to deploy, primarily against TKH and TKJP, with some claims also being made against certain of their Debtor and non-Debtor affiliates (collectively, the "***PI/WD Actions***").  Nearly all of the PI/WD Actions allege that the Takata defendants and the relevant OEM (*e.g.*, the OEM that manufactured the vehicle in which the plaintiff was allegedly injured) are jointly and severally liable for the alleged injuries.  Many of the OEMs assert contractual or common law claims for indemnification and/or contribution against the Takata entity from which they purchased the malfunctioning PSAN Inflator.

63.    On February 5, 2015, several private civil actions relating to PSAN Inflators proceeding in federal courts in the U.S. against TKH—all class actions alleging economic losses—were centralized in a multi-district litigation (the "***MDL***") proceeding in the Southern District of Florida.  In that centralization order, the Judicial Panel on Multidistrict Litigation also recognized that PI/WD Actions could be included in the MDL and many PI/WD Actions have subsequently been transferred to the MDL.  A number of PI/WD Actions remain

pending in various state courts.  As of the date hereof, there have been no trials or verdicts

against TKH, TKJP, or any of their affiliates in any PI/WD Action.

64.      There are approximately one hundred and fifty (150) claims against the

Debtors that have not presently resulted in filed PI/WD Actions.  The Debtors expect that

additional PI/WD Actions will be filed in the future, given the number of pending claims and the

large population of vehicles containing PSAN inflators that have not yet been repaired pursuant

to recall.  In addition to the PI/WD Actions relating to the PSAN Inflators, TKH, certain Takata

affiliates, and certain OEMs are also defendants in approximately fifteen (15) personal injury

lawsuits alleging product liability claims unrelated to PSAN Inflators.

65.      In the aggregate, the existing PI/WD Actions seek damages in the tens of

millions of dollars; however, the Debtors strongly dispute the validity of certain of the claims

asserted and damages sought in connection with PI/WD Actions.

***U.S. Economic Loss Class Actions***

66.      In addition to the PI/WD Actions, TKH, TKJP, and certain OEMs have

also been named defendants in a putative nationwide consumer class action currently pending in

the MDL (the "***U.S. Economic Loss Class Action***").  The consolidated U.S. Economic Loss

Class Action, which aggregated roughly eighty (80) separately filed consumer class actions,

purports to represent (i) approximately fifty million (50,000,000) consumers who purchased or

leased vehicles with recalled PSAN Inflators prior to the recalls and, following the recall, still

owned or leased the vehicle, sold the vehicle, or received some value for the vehicle after an

accident and (ii) automotive recyclers that purchased vehicles containing airbags with recalled

PSAN Inflators prior to the recalls and following the recall either continued to possess the airbag

or sold the airbag to Takata or an OEM.  The consolidated complaint asserts claims for economic

losses largely based on the theory that the recall of PSAN Inflators has reduced the market value

of those vehicles and/or airbags containing recalled PSAN Inflators.  The plaintiffs are seeking to recover compensation for lost value (*i.e.*, diminution of value of vehicles or airbag parts in vehicles), out-of-pocket and loss-of-use expenses (*e.g.*, reimbursement for repairs, time off from work, substitute transportation, childcare); disgorgement of profits; punitive damages; and attorneys' fees and costs.[18]  The OEMs, TKH, and TKJP may be jointly and severally liable with respect to certain of the claims asserted in the U.S. Economic Loss Class Action.  The Debtors strongly dispute the validity of the claims asserted in connection with the U.S. Economic Loss Class Action and any associated liability.  Each of the OEMs that has been named as a defendant in the U.S. Economic Loss Class Action has asserted cross-claims against TKH and/or TKJP, including claims for contractual or common law indemnification and/or contribution.

       67.     On May 18, 2017, four (4) of the OEMs filed a motion seeking approval of separate settlement agreements resolving the economic loss claims asserted against them in the U.S. Economic Loss Class Action for a total amount of $553 million, as well as, among other things, consent to implement certain outreach methods and reimbursement of class members' fees in connection with administering the recall.  In exchange, class members are agreeing to grant a broad release to the settling OEMs as well as certain of their related parties with respect to the subject matter of the class action.  As of the date hereof, these settlements have been preliminarily approved by the MDL court and the final hearing to approve these settlement agreements is scheduled for October 25, 2017.  These settlements do not resolve claims against Takata.  With respect to the remaining claims against Takata and the other OEMs, as of the date

---

[18] In addition to the class actions incorporated into the consolidated U.S. Economic Loss Class Action complaint, there are multiple economic loss class actions that are part of the MDL that name as defendants TKH and/or TKJP and certain other OEMs.  These cases have been placed in "civil suspense" by the MDL court.

hereof, no motion for class certification has been filed and no deadline for the filing of such

motion has been set.

*Canadian Class Actions*

68.     In addition to the U.S. Economic Loss Class Action, TKH, TKJP, and

certain non-debtor subsidiaries, as well as certain OEMs, were named defendants in fourteen

(14) class actions across four (4) Canadian provinces (British Columbia, Saskatchewan, Quebec,

and Ontario) based on theories similar to those asserted in the U.S. Economic Loss Class Action.

As of the date hereof, four (4) of the class actions have been dismissed, five (5) of the class

actions are currently in abeyance, and five (5) of the class actions have been consolidated into

national class actions proceeding in Ontario (collectively, the "***Canadian Class Actions***").  The

Canadian Class Actions are on behalf of consumers in Canada who purchased or leased vehicles

with airbags containing PSAN Inflators that are subject to recalls, as well as persons in Canada

who have suffered injuries or damages caused by PSAN Inflators.[19]  The Canadian Class Actions

have been stayed as against TKJP.  The Canadian Class Actions assert an aggregate of CDN $3.5

billion in damages for, among other things, economic loss based on the reduced value of

claimants' vehicles and expenses incurred in connection with replacements and repairs.  The

Debtors strongly dispute both the asserted damages and the validity of the claims asserted in

connection with the Canadian Class Actions and any associated liability.

69.     While joint and several liability has not been expressly pleaded in the

Canadian Class Actions, the Canadian court may find that the parties are liable on a joint and

several basis absent an express assertion in a pleading and a number of the OEM defendants have

asserted cross-claims against TKH and TKJP.  Accordingly, the OEMs that are named

---

[19] As of the date hereof, the Debtors are aware of two (2) personal injury lawsuits pending in Canada, but no known instances of inflator rupture.

defendants in the Canadian Class Actions may assert contractual or common law claims for indemnification and/or contribution against the Takata entity from which they purchased the PSAN Inflator with respect to the Canadian Class Actions.

70. The Canadian Class Actions have not been certified. It was anticipated that certification motions would be scheduled at the case management conference currently scheduled for mid-August.

*Mexican Class Action*

71. A class action was also commenced in Mexico by Acciones Colectivas de Sinaloa, A.C. ("*ACS*") against, among others, TKH, TK DM, Industrias Irvin, certain OEMs, and certain car dealerships (the "*Mexican Class Action*") in the Ninth Federal Court in the state of Sinaloa, Mexico (the "*Mexican Class Action Court*"). ACS is a non-profit association whose purpose is to, among other things, promote and defend the interests and rights of consumers and to commence corresponding class actions in order to enforce the claims of such persons. ACS is seeking, among other things, a declaration that the airbags produced and sold by the defendants are defective, an order obligating the defendants to replace the defective airbags free of charge, an order obligating the defendant to refrain from producing airbags until, in the view of the Mexican Class Action Court, they are no longer defective, and an award of damages to each individual member of the class for diminution in value of the vehicles and personal injuries. Under Mexican law, as a non-profit association, ACS is not required to indicate the specific number of individual members seeking damages in the Mexican Class Action and, therefore, as of the date hereof, the number of individual class members is unknown. Further, as of the date hereof, the amount of damages claimed by ACS on behalf of the class has not yet been quantified. As is the case with the U.S. Economic Loss Class Action and Canadian Class

Actions, the Debtors strongly dispute the validity of the claims asserted in the Mexican Class Action and any associated liability.

72.    Under Mexican law, if ordered to pay damages, each of the defendants that caused the specific damage in question may be held jointly and severally liable.  Those defendants that satisfy the judgment are entitled to file a claim for recovery from other defendants that are determined to have caused or participated in causing the damage.  Once again, those OEMs that are named defendants in the Mexican Class Action may assert contractual or common law claims for indemnification and/or contribution against the Takata entity from which they purchased the PSAN Inflator with respect to the Mexican Class Action.  As of the date hereof, the class has not yet been certified.  TK DM and Industrias Irvin's motion to dismiss are pending, and TKH has not been served.

### State Civil Enforcement Actions

73.    Consumer protection actions have also been filed by applicable government authorities in Hawaii, the U.S. Virgin Islands, and New Mexico against TKJP, TKH, and certain OEMs seeking a combination of civil penalties, administrative fines, restitution for consumers, disgorgement of profits, and injunctive relief.  Some of the complaints assert liability based upon legal theories other than consumer protection.  In the U.S. Virgin Islands action, the government filed a motion for a preliminary injunction at the time it filed the complaint, which sought to have the court order TKH to pay into an escrow fund monies that could be used to satisfy any damages ultimately awarded to the Virgin Islands against TKH.  On June 25, 2017, after press reports suggesting that Takata may commence insolvency proceedings on or around June 25th or June 26th, the court ordered an *ex parte* order requiring TKH to pay "forthwith" approximately $8 million into the court's escrow account.  This payment has not been made.

74.     Certain OEMs have also raised cross-claims or third-party claims against TKJP and TKH for indemnification, contribution, fraud, and misrepresentation in connection with the consumer protection actions.  As of the date hereof, the Hawaii action is in the discovery phase.  The U.S. Virgin Islands action has not yet proceeded to discovery.  TKJP and TKH's motion to dismiss the New Mexico action is pending.  Responsive pleadings are not yet due with respect to the OEMs' cross- and third-party claims in the various jurisdictions.

*U.S. Antitrust Class Actions*

75.     Additionally, unrelated to the malfunctioning of PSAN Inflators, TKH and TKJP also are named defendants in four (4) antitrust putative class actions currently proceeding as a multi-district litigation pending for pre-trial purposes before the District Court.  These actions purport to be on behalf of certain direct and indirect purchaser plaintiff groups alleging antitrust-related claims relating to the sale of certain occupant safety systems, including airbags, seat belts, steering wheels, and electronic safety systems.  Other defendants originally named in some of those actions are certain of Takata's competitors, namely Autoliv, Inc., TRW Automotive Holdings Corporation, Tokai Rika Co., Ltd., Toyoda Gosei Co., Ltd. and certain affiliates of those corporations.  To date, Autoliv, Inc. and TRW Automotive Holdings Corporation, and certain of their affiliates (the "***Competitor Defendants***"), have settled with each plaintiff group.  As of the date hereof, the parties are finalizing a discovery schedule and each plaintiff group has until October 17, 2018 to file a motion seeking class certification.

*Canadian Antitrust Class Actions*

76.     TKH and TKJP, along with certain OEMs, are defendants in putative antitrust class actions in four (4) Canadian provinces (British Columbia, Ontario, Saskatchewan, and Quebec) based on theories similar to those asserted in the U.S. antitrust class actions.  The Canadian antitrust class actions purport to be on behalf of certain consumers in Canada who

allege antitrust claims relating to the sale of occupant safety systems, including airbags, seat

belts, and steering wheels.  In each of these actions, also named as defendants are certain of

Takata's competitors, including the Competitor Defendants.  To date, TRW Automotive

Holdings Corporation and its affiliates have settled with three (3) of the four (4) plaintiff groups.

No deadlines for class certification motions have been set in any of the actions.

***Potential for Future Litigation Claims***

        77.     Prior to the Petition Date, TKH embarked on an expansive campaign to

notify owners of vehicles with PSAN Inflators of the risk associated with such inflators and to

encourage owners of such vehicles to visit their local dealers to have a replacement kit installed.

The OEMs and NHTSA have independently contributed to such noticing efforts.  Nevertheless,

vehicles containing PSAN Inflators remain and will continue to remain on the roads in the U.S.

and around the world.  Additionally, as noted above, the risks associated with PSAN Inflators

containing desiccant are undetermined, and vehicles containing such inflators may be subject to

recalls in the future.  Accordingly, there is a significant risk that additional personal injury,

wrongful death, and economic loss claims will be asserted against the Debtors, other Takata

affiliates, and the OEMs arising from pre-and post-closing sale of PSAN Inflators.  As discussed

below, the Chapter 11 Plan proposes various mechanisms for addressing such claims as against

the Debtors.

**D.**      **Formation of the Customer Group and Appointment of the Steering Committee**

        78.     The rupturing of PSAN Inflators and the related recalls have had and

continue to have a serious impact on the OEMs that have been administering the recalls and

those that are named defendants in the various litigations.  Recognizing the importance of

preserving Takata's operations for the duration of the recalls and the need for a global

coordinated go-forward strategy to manage the mounting litigation and recall related claims

40

against Takata and the OEMs, certain of such OEMs formed the Customer Group to negotiate

and develop a restructuring plan with Takata.

79. As noted above, around the time that the Customer Group was formed, the

board of directors of TKJP appointed the Steering Committee. The Steering Committee is

comprised of the following five (5) independent members each with significant corporate

restructuring experience in Japan:

- **Hideaki Sudo (Chairman)**: Mr. Sudo is an attorney-at-law admitted in Japan and managing partner at Fuji Law Office (Tokyo). Mr. Sudo has served as a corporate reorganization trustee, corporate reorganization examiner, and a civil rehabilitation supervisor. He is the former chairman of the Study Committee on the Bankruptcy Law System of the Japan Federation of Bar Associations and an adjunct profession at Nihon University Law School.

- **Masami Hashimoto**: Mr. Hashimoto is a certified public accountant and former partner of Arthur Andersen and KMPG. He is a member of the Management Renewal Committee of Toshiba.

- **Kosei Watanabe**: Mr. Watanabe is an attorney-at-law admitted in Japan and the State of New York. Mr. Watanabe is a partner at Fuji Law Office (Tokyo). Mr. Watanabe has experience serving as corporate reorganization trustee in a number of large bankruptcy cases.

- **Nobuaki Kobayashi**: Mr. Kobayashi is an attorney-at-law admitted in Japan and partner at Nagashima Ohno & Tsunematsu. He is the current chairman of the Study Committee of the Bankruptcy Law System of the Japan Federation of Bar Associations and has extensive experience handling high-profile restructuring proceedings in Japan, representing debtors and creditors.

- **Tomoo Tasaku**: Mr. Tasaku is a senior advisor at PricerwaterhouseCoopers Co., Ltd. and has served as a member of the study group on debtor-in-possession financing organized by the Ministry of Economy, Trade and Industry, the Turnaround Task Forces for Japan Airline, and the committee of Industrial Revitalization Corporation of Japan.

80. The Steering Committee meets on a weekly basis with Takata's advisors.

TKJP's board of directors empowered the Steering Committee to prepare the restructuring plan

independent from incumbent management and TKJP is expected to approve of such restructuring plan unless doing so would be in conflict with their respective duties and obligations under applicable law.  The formation of the Customer Group and the appointment of the Steering Committee set in motion the development of Takata's restructuring strategy.

E.    **Takata Commences Global Prepetition Marketing & Sale Process**

81.    In May 2016, the Steering Committee empowered Lazard to commence an expansive marketing and sale process for Takata to identify either a third-party investor or a purchaser for Takata's global assets and operations.  After careful review and analysis of the Debtors' operations, Lazard, with the assistance of Weil and PwC, determined that, due to the strong interdependencies among and between the global regions, a sale on a region-by-region basis would be value destructive and would not be in the best interests of the Debtors' estates.  Accordingly, Lazard pursued the marketing and sale process on behalf of the global enterprise to secure a purchaser or investor interested in keeping the global operations intact.

82.    By July 2016, forty (40) potential sponsor candidates had expressed interest in Takata.  This list included those potential sponsor candidates from which Lazard had directly solicited interest, as well as certain sponsor candidates that independently approached Lazard having heard of the marketing and sale process in the press.  The forty (40) potential sponsor candidates consisted of nineteen (19) strategic partners, eighteen (18) financial investors, and three (3) trading houses.  This initial list of potential sponsors was narrowed down to eighteen (18) potential sponsor candidates (eight (8) strategic and ten (10) financial) based on feedback from the Customer Group, financial profile, management team, global presence, and ability to execute transaction efficiently.  These remaining potential sponsor candidates received a "teaser" to provoke interest in a potential transaction involving Takata.

RLF1 17750950V.1

83.     Following this official launch of the marketing and sale process, nine (9) candidates (five (5) strategic and four (4) financial) submitted qualification letters.  Six (6) of the candidates that submitted qualification letters were selected to advance in the process and were provided with access to due diligence, detailed presentations prepared by management and, in most cases, global site visits, in each case, subject to applicable antitrust law.  On September 16, 2016, Lazard received preliminary proposals from five (5) potential sponsors (three (3) strategic, one (1) financial, and one (1) consortium (joint bid from a strategic and financial sponsor)).  Lazard, the Customer Group, the Steering Committee, and Takata's other advisors met to review, evaluate, and discuss the proposals and the potential sponsors and, based on feedback from the Customer Group, four (4) potential sponsors were selected to present to and meet with the Customer Group.  By November 2016, three (3) candidates remained (two (2) strategic and one (1) newly formed consortium) in the process and proceeded to final rounds of diligence, including additional site visits, workshops, and Q&A sessions with management.  In this final round of diligence, Takata and its advisors addressed approximately eight hundred (800) questions through an online portal and conducted twelve (12) diligence workshops globally.

## F.     TKJP Enters Plea Agreement with DOJ

84.     On January 13, 2017, in the midst of Takata's extensive marketing and sale process, the Offices and TKJP announced and submitted to the District Court the Plea Agreement and proposed Restitution Order, which were entered on February 27, 2017. [20]

85.     The Plea Agreement and Restitution Order resolve a criminal investigation that commenced in November 2014 when the U.S. Attorney's Office in Manhattan served a

---

[20]  In addition, on the date the Plea Agreement was announced, an indictment was unsealed charging three (3) Takata executives with wire fraud and conspiracy to commit wire fraud in relation to the same conduct underlying TKJP's plea.  These executives—Shinichi Tanaka, Hideo Nakajima, and Tsuneo Chikaraishi—were employed by TKJP and terminated in or around the fall of 2015.

grand jury subpoena on TKH alleging potential violations of 18 U.S.C §§ 1001 (false

statements); 1341 (mail fraud); and 1343 (wire fraud) and requesting a variety of information

relating to knowledge of risks posed by PSAN Inflators.  The investigation was later transferred

to the U.S. Attorney's Office in Detroit in or around May 2015, and the Criminal Division in

Washington, D.C. also became involved.

86.    Pursuant to the Plea Agreement, TKJP pleaded guilty to wire fraud in

violation of 18 U.S.C. § 1343 and agreed to pay a criminal fine of $25 million, which was paid

on March 29, 2017.  In addition, pursuant to the Plea Agreement and Restitution Order, TKJP is

required to pay, directly or through its affiliates or subsidiaries, the Restitution Payments as

follows:  (i) $850 million to automobile manufacturers, which amount must be paid within five

(5) days after the closing of a sale of TKJP, which must occur by no later than February 27,

2018[21] and (ii) $125 million to recompense individuals who suffered (or will suffer) personal

injury caused by the malfunction of a PSAN Inflator, which amount was paid to the Offices on or

around March 29, 2017, as required by the Plea Agreement.

87.    On April 6, 2017, pursuant to the Restitution Order, the District Court

filed a Notice of Intent to Appoint Robert S. Mueller, III as "Special Master" to determine the

proper administration and disbursement of the Restitution Payment.  The Debtors and their

professionals spoke with Mr. Mueller and met with Mr. Mueller's advisors to discuss, among

other things, allocation issues with respect to the Restitution Funds, Restitution Fund mechanics,

and coordinating noticing and other fund administration issues.  Shortly thereafter, Mr. Mueller

accepted an appointment by the U.S. Department of Justice to serve as special counsel to oversee

---

[21] Pursuant to the Plea Agreement, of the $850 million, $481,848,850 is to be paid to those automobile
manufacturers who were defrauded in connection with their purchase of the PSAN Inflators and the remaining
$368,151,150 is to be paid to all automobile manufacturers that purchased the PSAN Inflators from Takata or any of
its subsidiaries, regardless of location.

44

an investigation into the current administration's potential dealings with Russian officials and informed the District Court that he could no longer serve as the Special Master.  As of the date hereof, the District Court has not appointed a candidate to replace Mr. Mueller as Special Master.

88.     In connection with the Plea Agreement, TKJP agreed to implement an effective compliance program, including developing and promulgating compliance policies and procedures designed to reduce violations of data integrity and to appoint an independent compliance monitor for a period of three (3) years who will, among other things, assess and monitor Takata's compliance with its legal and ethical obligations.  On or around April 27, 2017, the District Court appointed John Buretta, the Independent Monitor appointed pursuant to the Consent Order and the Coordinated Remedy Order, as the independent compliance monitor under the Plea Agreement.

89.     In exchange for the guilty plea of TKJP and the complete fulfillment of all obligations under the Plea Agreement and Restitution Order, the Offices agreed not to file additional criminal charges against TKJP or any of its direct or indirect affiliates, subsidiaries, or joint ventures based on the conduct underlying the guilty plea.  Notably, however, if TKJP fails to perform or fulfill its obligations under the Plea Agreement, Takata may be subject to criminal prosecution and additional fines and penalties, including criminal prosecution for conduct otherwise settled by way of the Plea Agreement.  As discussed above, the risk that the Plea Agreement could be rescinded, thereby subjecting TKJP and its affiliates (including TKH and the other Debtors) to criminal liability and additional fines and penalties, means that for any transaction to be successful, the Restitution Payments must be made, because no purchaser or sponsor, including the Plan Sponsor, was or would be willing to close a sale transaction without the assurance that the sale proceeds would be applied first to those obligations owed to the DOJ.

RLF1 17750950V.1

G.      **Takata Finalizes Marketing & Sale Process**

90.      The entry of the Plea Agreement and Restitution Order was an important milestone in the marketing and sale process of the Takata enterprise as each of the potential sponsor candidates had previously indicated that resolution of the DOJ's investigation of Takata would be an absolute prerequisite to consummation of any transaction. In addition, the Plea Agreement and Restitution Order established both a ceiling on Takata's criminal liability to the U.S. government and a floor for a proposed purchase price—at least $850 million—as the proposed purchasers have every incentive to ensure that the obligations owed by Takata under the Plea Agreement and Restitution Order are satisfied in full.

91.      Shortly after the announcement of the Plea Agreement, but prior to approval of the Plea Agreement and the entry of the Restitution Order, on January 13, 2017, an updated process letter was sent to the three (3) remaining candidates requesting final bids by January 25, 2017. Only two (2) of the three (3) remaining sponsors submitted final bids (one (1) strategic and one (1) consortium). At the end of January 2017, the Customer Group, certain additional OEMs, Takata management, the Steering Committee, and Takata's advisors convened to discuss and evaluate the two (2) final proposals. In addition, each of the remaining bidders met with the Customer Group and Takata's advisors to negotiate further the terms of the bid.

92.      Following these discussions, on February 3, 2017, the Steering Committee recommended to Takata's board of directors that it proceed with the bid submitted by the Plan Sponsor,[22] without exclusivity, as it was the highest and best offer submitted for Takata's assets by a significant margin. In addition to the substantial purchase price (which exceeded the bid submitted by the other candidate by a significant margin), there was concern that the bid

---

[22] The Plan Sponsor's bid was that of the consortium.

RLF1 17750950V.1

submitted by the other remaining candidate faced substantial hurdles to secure certain regulatory approvals, which likely would result in a lengthy and uncertain review process by various governmental entities in multiple jurisdictions, could require significant asset dispositions in connection with the applicable antitrust approval, and potentially would not secure the necessary approvals. Accordingly, Takata's board of directors accepted the Steering Committee's recommendation, and Takata and the Plan Sponsor continued on to final diligence and documentation of the transaction.

93. The prepetition marketing and sale process led by Lazard with the support of Takata's other advisors was comprehensive and robust, involving solicitation of interest from a diverse set of potential strategic and financial partners that would be capable of participating in Takata's restructuring efforts. For those potential purchasers that proceeded to diligence rounds, diligence was inclusive and thorough, including document review, discussions with Takata employees, and site visits, in each case, to the extent permitted by applicable antitrust law. The Customer Group, which observed and participated in the prepetition marketing and sale process expressed collective support for the Plan Sponsor. For many reasons, including, most importantly, the fact that no purchaser, whether strategic or financial, would be willing to participate in a transaction without clear support from their primary revenue source (*i.e.*, the OEMs), the OEMs' endorsement of the Plan Sponsor as their successful candidate is strong indication that the prepetition marketing and sale process produced the best result for Takata.

94. Based on my own participation in the prepetition marketing and sale process and my discussions with Takata's legal and financial advisors, I believe that the process was exhaustive and fair and was conducted with the goal of maximizing value for the Debtors and their stakeholders. I do not believe that a postpetition marketing and sale process would

produce a better result for the Debtors or their stakeholders.  By contrast, a postpetition

marketing and sale process would be costly, duplicative, and would be a waste of estate

resources and time—both of which are extremely finite at this critical juncture with only eight

(8) months left before the deadline to pay the remaining Restitution Payments to the Offices.

Based on the duration and exhaustive nature of the prepetition marketing and sale process, as

well as the complexity of the Debtors' business and their significant existing and potential

liabilities, I expect that the due diligence period alone for any potential purchaser participating in

a postpetition marketing and sale process, excluding time required for structuring, negotiating,

and documenting a new transaction, will gravely delay implementation of a restructuring

transaction and jeopardize the Company's ability to satisfy the Restitution Payments owed to the

Offices on March 4, 2018, as well as the Company's ability to comply with the NHTSA Orders

and ensure the safe, stable supply of replacement kits to its Customers.  For these reasons, the

Debtors do not intend to implement a postpetition marketing and sale process.  Instead, the

Debtors intend to finalize and file the Chapter 11 Plan and other necessary Global Transaction

Documents in short order and proceed towards plan confirmation in an expedited fashion to

ensure a successful implementation of the Global Transaction, compliance with the Plea

Agreement and Restitution Order, and ongoing supply of safe and quality Component Parts,

including replacement kits, to the OEMs.

**H.**    **Summary of Global Transaction**

95.    Since selecting the Plan Sponsor as the successful bidder, Takata, the

Consenting OEMs, and the Plan Sponsor have engaged in many months of substantive, good

faith and, at times, protracted negotiations.  As noted at the outset, the parties are close to a fully

executed deal that reflects the parties shared common goals of developing a consensual

48

transaction structure that will (i) ensure ongoing compliance with the NHTSA Orders, the Plea
Agreement, and the Restitution Order, (ii) comply with the insolvency laws in applicable
jurisdictions, including the confirmation standards set forth in section 1129 of the Bankruptcy
Code, (iii) provide for the prompt emergence from the Insolvency Proceedings, and (iv) provide
quality and safe Component Parts to the OEMs, including replacement kits.

      96.     The framework for the Global Transaction is the product of certain
conditions imposed by the Plan Sponsor and the Customer Group.  From the outset, the Plan
Sponsor clearly indicated that it would not be willing to assume any liabilities, including
contingent liabilities relating to pre- or post-closing production of PSAN Inflators, relating to the
manufacturing of PSAN Inflators whether desiccated or non-dessicated, without a full indemnity
from the OEMs.  The OEMs, unwilling to consent to blanket indemnity obligations, but in many
instances, in need of ongoing and post-closing production of PSAN Inflators for either series
production, replacement kits, or service parts, have been engaging in robust negotiations with the
Plan Sponsor on the precise contours of their indemnification obligations and on methods to
mitigate the Plan Sponsor's exposure and reduce the need for a full indemnity.  To that end, and
to satisfy the ongoing production needs of the OEMs as well as the ongoing recall obligations
relating to PSAN Inflators, Takata, the Consenting OEMs, and the Plan Sponsor developed the
PSAN Carve Out whereby all PSAN specific assets will be carved out or transferred, as
applicable, into a separate company (*i.e.*, Reorganized Takata) to produce PSAN propellant and
PSAN Inflators post-closing.

      97.     Against this backdrop, the parties have been negotiating the Global
Transaction and the terms of the Global Transaction Documents, as described below, with a

particular focus on the Debtors' proposed method for implementing the Global Transaction with

respect to the Debtors and through these Chapter 11 Cases.[23]

*Sale of Non-PSAN Related Takata Assets*

98.     It is anticipated that the Global Transaction will provide for a sale of

substantially all of the assets of the Debtors, the Japanese Debtors, TAKATA Europe GmbH

("*TK EUR*"), TAKATA Aktiengesellschaft ("*TKAG*"), TAKATA Saschen GmbH ("*TK

Sachsen*"), and potentially certain other Takata entities (collectively, the "*Sellers*") except for

certain Excluded Assets, including any equity interests in other Sellers, to the Plan Sponsor

pursuant to a number of interdependent asset and stock purchase agreements (the "*APAs*").

99.     As consideration for the assets sold to the Plan Sponsor under the APAs,

the Plan Sponsor has agreed to a base purchase price of $1.588 billion, subject to certain

adjustments, including a reduction for specified financial debt of the Company that is being

assumed or paid by the Plan Sponsor at closing.  In addition to the purchase price, the Plan

Sponsor has agreed to an "earn out" payment to Takata of up to $400 million depending upon

achievement of certain financial metrics post-closing.

*The Chapter 11 Plan*

100.     Consistent with the U.S. SAPA, it is anticipated that the Chapter 11 Plan

will provide for the sale of substantially all of the Debtors' assets, other than the Excluded

Assets, to the Plan Sponsor and set forth the provisions for the establishment, governance, and

operating terms of Reorganized Takata, which will continue to own and operate the PSAN

Excluded Assets.

---

[23] The descriptions of the Global Transaction set forth herein are preliminary and subject to change.  Accordingly, to the extent there is any conflict between the summaries of the Global Transaction as described herein and the terms of the Global Transaction Documents, the terms of the Global Transaction Documents shall control.

101.   With respect to distributions to the Debtors' prepetition creditors, the Chapter 11 Plan will provide for the treatment of all prepetition claims against each respective Debtor through the establishment and funding of certain recovery funds at each Debtor entity for the benefit of such entity's creditors.  The sale proceeds allocated to each Debtor will be available for distribution to the recovery funds on a pro rata basis after satisfaction of closing expenses, negative purchase price adjustments, payment of the NHTSA fine, payment of any administrative or priority claims, including payment of the OEMs' adequate protection claims, as well as after setting aside funds for various post-closing reserves for the capitalization of Reorganized Takata and the wind-down and administration of the Debtors' estates, including claims resolution, in each case, as applicable.

102.   Prior to the Petition Date, Weil, on behalf of TKH, retained Thomas Vasquez of Ankura Consulting Group ("***Ankura***") to provide certain consulting and analytical services, including estimating personal injury, wrongful death, or other similar claims arising out of or relating to an injury caused by non-desiccated or desiccated PSAN Inflators (the "***PSAN PI/WD Claims***").  In particular, Ankura has analyzed and will provide an estimate of potential future PSAN PI/WD Claims against TKH in the U.S. and globally arising from (i) the sale of product prior to the Petition Date (treated under the Chapter 11 Plan as prepetition claims and channeled to a recovery fund), (ii) the sale of product after the Petition Date, but prior to the closing date (treated under the Chapter 11 Plan as administrative claims and for which amounts will be reserved), and (iii) the sale of product by Reorganized Takata (reserved for by Reorganized Takata).  The Debtors intend to file a motion to appoint a future claims representative (the "***FCR***") to represent the interests of those claimants who will be injured in the future from a product sold prior to the closing date.

51

103.    It is anticipated that the effectiveness of the Chapter 11 Plan will be conditioned upon, among other things:  (i) entry of an order by the Court confirming the Chapter 11 Plan; (ii) approval of the JP Business Transfer and JP Plan by the Tokyo Court; (iii) payment of the outstanding Restitution Payments; (iv) all conditions precedent to the closing of the U.S. SAPA having been waived or satisfied; (v) execution of the Indemnification & Waiver Agreements (as defined herein); and (vi) receipt of any necessary regulatory or related approvals.

### *Reorganized Takata and the PSAN Carve Out*

104.    As noted above, under the proposed Global Transaction Structure, it is anticipated that the PSAN Excluded Assets will remain with Reorganized Takata, which will continue the manufacture and sale of PSAN Inflators until the later of (i) such time as the production of PSAN Inflators is no longer necessary to implement the terms of the NHTSA Orders or any other order by authorities related to recall and (ii) the earlier of (a) five (5) years after the effective date of the Chapter 11 Plan and (b) such time as production of PSAN Inflators is no longer necessary to comply with the terms of the Debtors' existing contracts or newly executed contracts between Reorganized Takata and the PSAN Consenting OEM (as defined herein).  Takata currently manufactures PSAN Inflators in the following four (4) locations: Changxing, China (plant owned by TK (Changxing) Safety Systems Co., Ltd. ("*TCX*")), Freiberg, Germany (plant owned by TK Sachsen), Moses Lake, U.S. (plant owned by TKH), and Monclova, Mexico (plant owned by TK DM).  In addition, all PSAN propellant is produced at the Moses Lake plant.  The PSAN Inflator assets in Germany, *i.e.*, the Freiberg plant, are currently not expected to be transferred to Reorganized TK Holdings as production of PSAN Inflators at that plant is expected to be phased out by closing.

105.    In connection with the PSAN Carve Out, Reorganized Takata will continue to manufacture and sell PSAN Inflators to the OEMs directly and the Plan Sponsor will

52

assemble such PSAN Inflators into the modules at the direction of the OEMs and assemble the replacement kits.  In addition, Reorganized TK Holdings and the Plan Sponsor will enter into a transition services agreement (the "***Transition Services Agreement***"), also referred to as a "Buyer Support Agreement," whereby the Plan Sponsor will provide Reorganized Takata with support and access to certain shared services and assets in order to facilitate the ongoing operations of Reorganized Takata (*e.g.*, plant level accounting, IT services, purchasing).

106.    The parties anticipate that the Chapter 11 Plan will provide for the establishment of Reorganized Takata and the appointment of a plan administrator (the "***Plan Administrator***") who will operate Reorganized Takata and supervise the manufacture, assembly, sale and/or distribution of the PSAN Inflators, and an oversight committee that is comprised of three (3) members (two (2) members selected by those Consenting OEMs who will require production of PSAN Inflators post-closing (the "***PSAN Consenting OEMs***") and one (1) member selected by the Debtors (subject to the reasonable consent of a percentage of the PSAN Consenting OEMs to be determined by the PSAN Consenting OEMs, subject to Takata's consent)), provided that such appointee is not an "insider" of Takata, the Consenting OEMs, or the Plan Sponsor.  On the effective date of the Chapter 11 Plan, the Debtors will set aside funds to provide for the initial capitalization for Reorganized Takata and the anticipated winddown costs of the Debtors' estates.  The Reorganized Takata projections will ensure sufficient funds remaining for the payment of any future PSAN PI/WD Claim arising out of or relating to the post-closing production of PSAN Inflators by Reorganized Takata based on Ankura's estimates.  As demand for PSAN Inflators decreases, the employees of Reorganized Takata and the PSAN Excluded Assets will be transferred to the Plan Sponsor.  At the time of transfer and in exchange

for each PSAN Excluded Asset, the Plan Sponsor shall pay Reorganized Takata the amount designated in the U.S. SAPA.

*OEM Indemnification & Waiver Agreements*

107.    In exchange for the Plan Sponsor's participation in the Global Transaction and the post-closing production of PSAN Inflators by Reorganized Takata for the benefit of the Consenting OEMs (if applicable), it is anticipated that the Consenting OEMs will enter into separate agreements with the Plan Sponsor (the "*Indemnification and Waiver Agreements*") to indemnify the Plan Sponsor for, among other things, certain claims relating to the manufacture and/or sale of PSAN Inflators.

*Accommodation Agreements*

108.    Finally, as noted above, the Consenting OEMs have agreed in principle to enter into accommodation agreements to, among other things, provide Takata liquidity during the Insolvency Proceedings and to serve as a bridge to the closing of the Global Transaction and consummation of the Chapter 11 Plan.  Contemporaneously herewith, the Debtors have filed a motion seeking approval of the Global Accommodation Agreement.  Pursuant to the Global Accommodation Agreement, during the Chapter 11 Cases, the Customers will agree to provide the Debtors with, among other accommodations, (a) significant liquidity enhancement from the acceleration of payment terms on outstanding purchase orders from the Consenting OEMs' standard payment terms; (b) restrictions on the Consenting OEMs' ability to resource parts and programs to the Debtors' competitors during the term of the Global Accommodation Agreement; (c) certain limitations on the Consenting OEMs' ability to assert setoffs against the Debtors' accounts receivable; and (d) a commitment from the Consenting OEMs to purchase raw materials and furnished goods at established prices in the event of certain trigger events.

109.    In exchange for these accommodations, the Debtors will commit to continue to produce and deliver Component Parts to the Consenting OEMs and to provide other limited accommodations to safeguard the production of Consenting OEMs.  In exchange for agreeing to make payment on their outstanding accounts payable and forgo valuable rights of setoff, the Debtors will also agree to provide the Consenting OEMs adequate protection, including postpetition replacement liens, superpriority administrative expense claims, and other related protections with respect to the Debtors.  As is customary, the Debtors will further agree, pursuant to an access and security agreement, to provide the Consenting OEMs with limited rights to access and utilize the Debtors' facilities and equipment in the event there is a continuing default under the Global Accommodation Agreement which has resulted in a substantial likelihood that a Consenting OEM's production will be interrupted.  As noted above, the Global Accommodation Agreement will set forth certain milestone dates related to finalizing, executing, and filing the Global Transaction Documents, including a milestone date for finalizing the U.S. SAPA and RSA on July 17, 2017.  The failure to meet a milestone set forth in the Global Accommodation Agreement will constitute a breach thereunder entitling a requisite number of the Consenting OEMs to terminate the Global Accommodation Agreement.

110.    The accommodations embodied in the Global Accommodation Agreement are central to the Debtors' ability to continue to operate during the Chapter 11 Cases.  Without the Consenting OEMs' concessions provided for in the Global Accommodation Agreements, and the accommodation agreement in Japan, the Global Transaction would not be possible.

**The Japanese Proceeding**

111.    As noted at the outset, contemporaneously hereto, the Japanese Debtors commenced a civil rehabilitation proceeding under the Civil Rehabilitation Act with the Tokyo Court.  The Japanese Debtors remain in place as debtors-in-possession; however, the Japanese

Proceedings are supervised by a court-appointed supervisor.  The Japanese Debtors are seeking

to have their cases jointly administered by the Tokyo Court.

112.    The Japanese Debtors will seek approval to implement the Global

Transaction and, in particular, to sell to the Plan Sponsor substantially all of the assets of the

Japanese Debtors, other than those excluded assets identified in the stock and asset purchase

agreement for the Japanese Debtors, free and clear of all liens, claims, and encumbrances,

pursuant to sections 42 and 43 of the Civil Rehabilitation Act.  Following consummation of the

JP Business Transfer, the Japanese Debtors will seek approval of the JP Plan.

## I.     Impact on Ongoing Business and Need for Expedited Transaction

113.    The future of Takata has been in a period of uncertainty for over three (3)

years.  During this period of uncertainty, Takata and its employees have gone to great lengths to

protect and maintain ongoing operations and to preserve future operations.  Nevertheless,

Takata's Customers have de-sourced not only their airbag production needs, but also production

for other automotive parts.  Indeed, although the PSAN Inflator issues are limited in scope and

relate to only one product line, Takata's entire business has suffered as a result of the recalls and

the uncertainty of Takata's future.  As discussed above, this is particularly concerning in the

automotive industry where business is booked two (2) to three (3) years in advance.  The losses

Takata is experiencing today will continue to be felt in the years to come.  Additionally, as is

often the case with companies in distress, a number of the Debtors' suppliers and vendors are

contacting management and demanding changes in payment and credit terms.  Certain of the

Debtors' vendors have negotiated reduction in trade terms while others have demanded that the

Debtors pay cash in advance as a condition for further deliveries.  Although the Debtors have

been working diligently with their advisors to resolve open vendor issues and avoid supply chain

interruption, the actions taken by these vendors over the past year has further diminished the

Debtors' cash position.  For all of these reasons, the Debtors' value is decreasing with time, to

the detriment of all of its stakeholders.  Accordingly, finalizing and implementing the Global

Transaction expeditiously is of the utmost importance and in the best interests of the Debtors and

all of the Debtors' stakeholders.

<div align="center">

**V.**

**<u>Summary of First-Day Motions</u>**

</div>

114.    Contemporaneously herewith, the Debtors have filed (or will soon file) a

number of motions and applications seeking various relief from the Court and authorizing the

Debtors to maintain their operations in the ordinary course.[24]  Such relief is designed to ensure a

seamless transition between the Debtors' prepetition and postpetition business operations,

facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to

the Debtors' operations, which is of critical importance in light of the Debtors' ongoing

obligations to supply replacement kits in connection with the ongoing recalls of PSAN Inflators.

The following is a brief overview of the relief the Debtors intend to seek on the Petition Date to

maintain their operations in the ordinary course.

**A.**    **Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases**

115.    The Debtors are requesting entry of an order (i) directing joint

administration of their Chapter 11 Cases for procedural purposes only pursuant to Rule 1015(b)

of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and (ii) providing that

---

[24] Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First-Day Motion.

<div align="center">57</div>

the Court maintain one file and one docket for all of the Debtors' Chapter 11 Cases under the lead case, *In re TK Holdings, Inc., et al.*

116.    I understand that a court may order the joint administration of multiple chapter 11 cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.  Takata Americas owns a ninety-nine and six-tenths percent (99.6%) interest in TKH, and each of the other Debtors is a direct or indirect subsidiary of Takata Americas and TKH.  Accordingly, I understand that the Debtors are "affiliates" and this Court is authorized to order joint administration of their estates.  Joint administration of the Chapter 11 Cases will allow for the efficient and convenient administration of the Debtors' interrelated chapter 11 cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

117.    The Debtors operate as an integrated business with common ownership and control.  The Debtors also share a number of financial and operational systems.  As a result, many of the motions and orders that will be filed and entered in the Chapter 11 Cases almost certainly will affect each Debtor.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  I believe the relief requested in this motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

**B.    Application of Debtors Pursuant to 28 U.S.C. §§ 156(c), 11 U.S.C. § 105(a), and Local Rule 2002-1(f) for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent**

118.    By this application, pursuant to section 156(c) of title 28 of the United States Code, section 105(a) of the Bankruptcy Code, and Rule 2002-1(f) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "***Local Rules***"), the Debtors are requesting entry of an order appointing Prime

Clerk as the Claims and Noticing Agent for the Debtors and their Chapter 11 Cases, including

assuming full responsibility for the distribution of notices and the maintenance, processing, and

docketing of proofs of claim filed in the Chapter 11 Cases.  Although the Debtors have not yet

filed their schedules of assets and liabilities, they anticipate that there will be in excess of 80,000

entities to be noticed.  In view of the number of anticipated claimants and the complexity of the

Debtors' businesses, I believe that the appointment of Prime Clerk as claims and noticing agent

is in the best interests of both the Debtors' estates and their creditors.

**C.**     **Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, and 507 and Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 for Entry of Order (i) Authorizing Debtors to Enter into Accommodation Agreement with Certain Customers, (ii) Granting Adequate Protection to Certain Consenting OEMs in Connection Therewith, (iii) Modifying the Automatic Stay to Implement and Effectuate the Terms of the Interim Order, and (vi) Scheduling a Final Hearing**

119.     By this motion, pursuant to sections 105, 361, 362, 363, 503, and 507 of

the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rule

4001-2, the Debtors are requesting entry of interim and final orders: (i) authorizing the Debtors

to enter into (a) the Global Accommodation Agreement, and (b) the Access Agreement;

(ii) granting adequate protection to the Secured Accommodation Parties in connection therewith;

(iii) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the

extent necessary to implement and effectuate the relief requested therein; and (iv) scheduling a

final hearing.

120.     The Global Accommodation Agreement, which the Debtors and the

Consenting OEMs have agreed to in principle, is one of the lynchpins of the success of the

Global Transaction and the Debtors' contemplated chapter 11 plan.[25]  It is my understanding that the Global Accommodation Agreement will provide hundreds of millions of dollars in needed liquidity for the Debtors and foster customer loyalty and confidence.  In exchange for the valuable accommodations and liquidity enhancements the Consenting OEMs will be providing, including agreeing to forbear from exercising setoffs against their existing accounts payable to the Debtors, the Debtors will be agreeing to continue to manufacture and supply parts and replacement kits during the Chapter 11 Cases and to provide adequate protection, including replacement liens and superpriority claims, to those Consenting OEMs that have outstanding prepetition amounts owed to the Debtors in respect of Component Parts or services provided by the Debtors under the Purchase Orders (such outstanding amounts, the "*Customer Accounts*", and the Consenting OEMs with Customer Accounts, the "*Secured Accommodation Parties*").  It is my understanding that the Debtors will also be entering into an Access Agreement, which I understand to be customary in the automotive industry, to provide the Consenting OEMs with limited rights to access and utilize the Debtors' facilities and equipment in the event there is a continuing default under the Global Accommodation Agreement that results in a substantial likelihood that a Consenting OEM's production will be interrupted.  A more detailed summary of the terms and conditions of the Accommodation Agreements, as agreed to in principle by the parties, is set forth in the motion.  I believe that approval of the Global Accommodation Agreement is in the best interest of the Debtors, their estates, and their stakeholders.

      121.    As described above, during the course of the lengthy negotiations with the Customer Group and the Plan Sponsor, the Debtors' liquidity has declined.  Substantial

---

[25] As described above, the parties contemplate that the Global Accommodation Agreement will be an agreement between Takata affiliates across the globe, other than the Japan Debtors, as well as Consenting OEMs from around the world; however, the parties have until July 7, 2017 to sign on to the agreement.

indemnification and recall expenses, mounting professional fees and expenses, and significant contraction from the Debtors' suppliers and vendors have combined to have a negative impact on the Debtors' financial position and created certain near-term liquidity needs. Furthermore, due to the Customer Group's significant contribution and indemnification claims and rights of setoff against the Debtors' receivables, the Debtors' ability to continue as going concern was (and is) dependent on the Consenting OEMs' collective agreement to forbear enforcing those rights.

122.     The Secured Accommodation Parties' Prepetition Setoff Rights give those parties the right to withhold payments from the Debtors at the outset of the cases. Consequently, in planning their restructuring, the Debtors faced two liquidity challenges: (i) a near term liquidity need if the Secured Accommodation Parties sought to exercise their prepetition rights of setoff on account of their Customer Accounts, and (ii) assuming the Secured Accommodation Parties were willing to continue paying the Debtors in the ordinary course of business, liquidity projections showing the Debtors' cash reserves declining below the Debtors' minimum cash amount beginning in late 2017. With respect to this second liquidity challenge, absent additional financing, it is my understanding that the Debtors will fall below their minimum cash requirements later this year and will require approximately $100,000,000 in additional liquidity through February of 2018.

123.     Although the Debtors initially considered traditional debtor-in-possession financing for the Chapter 11 Cases, as negotiations with the Customer Group progressed, it became clear that the Debtors' financing needs could be satisfied through (i) the Secured Accommodation Parties agreeing to continue paying the Debtors' invoices in the ordinary course of business at the outset of the cases, and (ii) a simple acceleration of existing accounts payable later in the case, in each case combined with other standard industry accommodations.

Financing the Chapter 11 Cases in this manner would allow the Debtors to avoid having to pay the substantial fees and expenses associated with a third-party DIP financing.  In addition, the Consenting OEMs and the Debtors agreed that introducing another party to this complex and fluid situation would only further complicate an already significantly complicated transaction and negotiation.

124.    Approval of the Global Accommodation Agreement is critical, as it represents the Debtors' lifeline in four (4) respects: (i) it will ensure that the Debtors' near-term liquidity needs will be met by the Secured Accommodation Parties' agreement forebear from exercising their right to setoff and release the Customer Accounts to the Debtors; (ii) it will ensure the Debtors' longer-term liquidity needs will be met by providing for an acceleration of receivables as needed in accordance with the Budget; (iii) it will provide other valuable industry-standard accommodations, such as the setoff and resourcing limitations, that will further support the Debtors' stability throughout the Chapter 11 Cases; and (iv)  together with the JP Accommodation Agreement, it will convey an important message of customer support and stability to the market.

125.    The Global Accommodation Agreement represents significant value to the Debtors, unlocking nearly $300,000,000 in near term liquidity through the waiver of setoff, and ensuring that the Secured Accommodation Parties will, later in the Chapter 11 Cases, accelerate over $100,000,000 in order to safeguard the Debtors operations continue and the Global Transaction can be consummated.  These benefits alone, without even considering the other valuable accommodations and message of stability to the market, far outweigh the minimal costs and burdens associated with the Global Accommodation Agreement.  I believe that absent the additional accommodations to be provided under the Global Accommodation Agreement, the

RLF1 17750950V.1

Debtors would lack the liquidity to maintain key business relationships with vendors, suppliers, and customers, provide working capital to operate during the Chapter 11 Cases, and effectively implement the Global Transaction.

**D.      Motion of Debtors Pursuant To 11 U.S.C. §§ 105(A), 345(B), 363(B), 363(C), 364(A), and 503(B) and Fed. R. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Provide Certain Postpetition Claims Administrative Expense Priority, (D) Continue Intercompany Funding of Certain Non-Debtors, and(E) Maintain Existing Bank Accounts and Business Forms; And(II) Extending Time to Comply With Requirements Of 11 U.S.C. § 345(B)**

126.    By this motion, the Debtors are requesting interim and final authority, pursuant to sections 105(a), 346(b), 363(b), 363(c). 364(a), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, to (i)(a) continue operating their existing cash management system (the "***Cash Management System***"), including the continued maintenance of existing bank accounts (the "***Bank Accounts***") at the existing banks (the "***Banks***") consistent with their prepetition practices, (b) honor certain prepetition obligations related to the Cash Management System, (c) provide certain postpetition claims administrative expense priority, (d) continue intercompany funding of certain Non-Debtor Affiliates consistent with their prepetition practices and as described in the Cash Management Motion and, (e) maintain existing business forms; and (ii) extend the time to comply with the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank Accounts on an interim basis, and, subject to a final order, waiving such requirements.

127.    As described in the motion, the Debtors support their operations by using a complex Cash Management System to collect, concentrate, and disburse funds generated by the manufacture and sale of a broad range of automotive safety and non-safety products.  The Cash Management System provides the Debtors with efficiencies in (i) funding their operations and

the operations of certain Non-Debtor Affiliates, (ii) monitoring and forecasting their cash needs, (iii) tracking the collection and disbursement of funds, and (iv) maintaining control over the administration of their Bank Accounts.

128.    It is my understanding, based on conversation with personnel in the Debtors' treasury department (the "***Treasury Staff***"), that the Cash Management System is divided into two centralized sub-systems.  The first cash management sub-system (the "***U.S. Cash Management System***") is for TKH, Takata Americas, TK Finance, LLC, TK China, Takata Protection Systems Inc., Interiors in Flight Inc., TK Mexico Inc., and TK Mexico LLC (collectively, the "***U.S. Debtors***") and their U.S. Non-Debtor Affiliates Highland, SynTec, and ALS, Inc. ("***ALS***" and the U.S. Debtors, Highland, Syntec, and ALS, collectively, the "***U.S. Cash Management Entities***").  The second cash management sub-system (the "***Mexican Cash Management System***") is for TK Holdings de Mexico, Industrias Irvin, TK DM, and SMX (TK Holdings de Mexico, Industrias Irvin, TK DM, and SMX, collectively, the "***Mexican Debtors***") and their Mexican Non-Debtor Affiliates Equipo Automotriz S.A. de C.V. ("***Equipo***") and Falcomex S.A. de C.V. ("***Falcomex***", and the Mexican Debtors, Equipo, and Falcomex, collectively, the "***Mexican Cash Management Entities***", and the Mexican Cash Management Entities together with the U.S. Cash Management Entities, collectively, the "***Cash Management Entities***").

129.    Although much of the Debtors' Cash Management System is automated, personnel in the Treasury Staff monitor the system and manage the proper collection and disbursement of funds.  Given the substantial economic scale of the Debtors' business operations, I believe that any disruption to the Cash Management System could significantly

interfere with the Debtors' businesses, impede a successful reorganization, and potentially

threaten the Global Transaction.

130.    The U.S. Cash Management System.  It is my understanding that the U.S.

Cash Management System is comprised of approximately fifty-six (56) Bank Accounts and is

divided into fifteen (15) operating divisions (the "***Cash Management Divisions***")

131.    **Cash Collection**.  I understand that the U.S. Cash Management Entities'

primary source of income derives from the direct and indirect sale of their broad range of

automotive safety and non-safety products.  The revenues and receipts of these entities enter the

U.S. Cash Management System through several transfer methods, including check, wire transfer,

and automated clearing house ("***ACH***") payment.  Depending on the type of transfer method and

the source of the payment, funds may go to one of several collection accounts.  Certain Cash

Management Divisions have a lockbox account (a "***Lockbox Account***") to receive checks.  ACH

and wire transfers are received directly by concentration accounts (each, a "***Concentration***

***Account***") utilized by the Cash Management Divisions.  In addition, certain of the Debtors

receive management fees and certain other amounts from affiliates through direct transfers to

their Concentration Account.

132.    **Cash Concentration**.  I further understand that all of the collections of the

U.S. Cash Management Entities are ultimately transferred into a centralized Concentration

Account held by TKH (the "***U.S. Master Account***"), which functions as a centralized repository

of cash in the U.S. Cash Management System.  On a daily basis, funds from every account at

each Cash Management Division, including the Lockbox Accounts, if applicable, are

automatically transferred (or "swept") into that Cash Management Division's Concentration

Account.  The funds in each Cash Management Division's Concentration Account is, in turn, manually swept periodically into the U.S. Master Account.

133.  **Cash Disbursements**.  The majority of payments made from the U.S. Cash Management System, including payroll, employee health and welfare benefits, wire transfers, tax payments, and operating expenses, are made through each Cash Management Division's Concentration Account.  In addition, the Debtors maintain a limited number of specialized disbursement accounts (each, a "***Disbursement Account***" and, collectively, the "***Disbursement Accounts***").  When a disbursement is planned and the relevant Cash Management Division does not have sufficient cash on hand, that Cash Management Division's Concentration Account is funded with sufficient cash from the U.S. Master Account.

134.  *Payroll*.  The Cash Management Divisions at the U.S. Cash Management Entities typically use their Concentration Accounts for payroll and other related expenses.  The Debtors process their payroll in-house using a payroll system known as Infinium.  Certain employees are paid directly from the divisional Concentration Account via direct deposit.  The Debtors also pay various payroll related expenses, including employee benefits, from the divisional Concentration Accounts via either wire transfer or ACH payment.  There are five (5) Cash Management Divisions that maintain special-purpose Disbursement Accounts for payroll and other related expenses that need to be paid by check; however, these accounts are rarely used.  When they are needed, these special-purpose accounts are funded directly from the relevant Cash Management Division's Concentration Account.

135.  *Manager Accounts*.  The U.S. Cash Management Entities maintain special-purposes Disbursement Accounts at certain Cash Management Divisions for limited payments made by checks written by authorized managers to certain trade vendors, suppliers,

and other holders of accounts payable at the discretion of the manager (the "***Manager Accounts***").  The Manager Accounts are manually funded from the relevant Cash Management Division's Concentration Account up to the relevant manager's approved spend amount (typically $10,000) upon request of the relevant manager.

136.    *Petty Cash* Accounts.  The U.S. Cash Management Entities maintain a Disbursement Account at each Cash Management Division for unanticipated operating expenses and check requests (the "***Petty Cash Accounts***") as well as small amounts of cash on hand at the U.S. Entities' plants and facilities.  The Petty Cash Accounts are non-zero balance accounts and maintain nominal cash balances.

137.    **Additional Payment Methods and Other Accounts**.  The U.S. Cash Management Entities use certain additional cash management tools in support of the ordinary course operation of their businesses, including the Corporate Credit Card Program (as defined herein), the Currency Exchange Account (as defined herein), and the Pledged Comerica Account (as defined herein).

138.    *Corporate Credit Card Program*.  The Debtors maintain corporate credit card programs with American Express, Comerica, and Bank of America (the "***Corporate Credit Card Program***") in the ordinary course of business.  The Corporate Credit Card Program provides a convenient way to allow employees to make purchases for the business where a wire, check, or ACH payment is not possible or is otherwise inconvenient.  In addition, the Debtors' procurement group uses specialized purchasing cards to purchase various supplies, consumables, and off-the-shelf parts. The Corporate Credit Card Program consists of sixty-eight (68) American Express corporate, purchasing, and travel cards, forty-eight (48) Comerica corporate cards, and one (1) Bank of America corporate card.  The average monthly expenses associated

with the Corporate Credit Card Program for the U.S. Cash Management Entities are approximately $850,000.

139.    TKH and Highland each maintain a certificate of deposit with American Express Bank (the "**Amex Bank CDs**") to secure their obligations to American Express in respect of their corporate, purchasing, and travel cards.  The Amex Bank CD at TKH is for a principal amount of $600,000.  The Amex Bank CD at Higland is for a principal amount of $750,000.

140.    *Currency Exchange Account*.  TKH maintains a currency exchange account (the "**Currency Exchange Account**") at Bank of Tokyo Mitsubishi UFJ ("**BTMU**") for the specific purpose of converting foreign currencies (primarily Euros) into U.S. Dollars.  Such swaps are priced at a market rate set by BTMU on the day of the trade.  TKH performs these trades in the ordinary course of business to convert Euro denominated receipts from one of the Debtors' European affiliates, TK Sachsen, into U.S. Dollars before they are transferred to the U.S. Master Account.  TKH does not use these transactions to hedge against fluctuations in currency prices.

141.    *The Comerica Pledged Account*.  TKH granted a security interest to Comerica Bank ("**Comerica**") in one of its Concentration Accounts (account number ending in 3869-5) maintained at Comerica, which has a balance of approximately $1,450,000 (the "**Pledged Comerica Account**") to secure all obligations of TKH to Comerica, including without limitation obligations with respect to corporate credit cards issued by Comerica and reimbursement obligations with respect to a letter of credit issued by Comerica for the account of TKH in relation to certain surety bonds described in more detail in the Debtors' motion to continue its insurance programs filed contemporaneously herewith.  In accordance with its

68

agreements with Comerica, TKH may not withdraw any funds from the Pledged Comerica Account without the prior written consent of Comerica.

142.   <u>The Mexican Cash Management System</u>.  The Mexican Cash Management System is comprised of thirty-nine (39) Bank Accounts and is divided into six (6) operating divisions – one division for each Mexican Cash Management Entity (the "***Mexican Cash Management Divisions***").

143.   **Cash Collection**.  My understanding is that the Mexican Entities two primary sources of income are (i) the sale of a broad range of automotive safety and non-safety products to the Mexican affiliates and subsidiaries of the OEMs and (ii) the fees charges by TK DM, Equipo, and Industrias Irvin (collectively, the "***Maquiladoras***") to TKH for their provision of assembly services to TKH (the "***Maquiladora Fee***").  The Maquiladora Fee represents the Maquiladora's costs to assemble TKH's products, including all labor, real estate, and capital costs, plus a modest margin.  The Mexican Cash Management Entities' revenues and receipts enter the Mexican Cash Management System through several transfer methods, including check, wire transfer, and ACH payment and are received directly into each Mexican Cash Management Division's Concentration Account.

144.   **Cash Concentration**.  All of the collections of the Mexican Cash Management Entities are ultimately transferred into a centralized Concentration Account held by TK Holdings de Mexico (the "***Mexican Master Account***"), which functions as a centralized repository of cash in the Mexican Cash Management System.  Funds are swept on a daily basis from every account at each Mexican Cash Management Division into the Mexican Master Account.  In addition to the Mexican Master Account, the Mexican Debtors also maintain an investment account at TK Holdings de Mexico where excess cash is invested in a money-market

fund for the benefit of the Mexican Entities.  Proceeds of such investment activities are allocated

to each Mexican Cash Management Entity according to its net positive balance in the Mexican

Cash Management System.

145.    **Cash Disbursements**.  The majority of payments made from the Mexican

Cash Management System, including payroll, employee health and welfare benefits, and

operating expenses, are made through several different Disbursement Accounts.  The

Disbursement Accounts are automatically funded on a transaction basis from the Mexican

Master Account in an amount equal to the payments made from the Disbursement Accounts for

that day.  In certain situations, where it is more convenient, disbursements are made directly

from the Mexican Master Account.

146.    *Payroll*.  The Mexican Cash Management Entities maintain special-

purpose disbursement accounts (each, a "***Payroll Account***") for payroll and other related

expenses.  The Payroll Accounts are zero-balance accounts.  The Mexican Debtors process their

payroll in-house through a system known as "Giro," and employees are paid directly from the

Payroll Account via direct deposit or check.  The Mexican Debtors also pay various payroll

related expenses, including employee benefits, from the Payroll Account via either wire transfer

or ACH payment.

147.    *A/P Accounts*.  The Mexican Cash Management Entities maintain A/P

Accounts, which are zero-balance accounts.  The payments paid out of the A/P Accounts are

funded on a transaction basis.

148.    *Petty Cash*.  The Mexican Cash Management Entities maintain nominal

amounts of petty cash onsite at their operating facilities in a lockbox or safe.

149.    *The Mexico Savings Fund*.  The Debtors allow eligible employees to contribute up to ten percent (10%) of their monthly pre-tax income into an escrowed account established by the Mexican Debtors for the benefit of the contributing employees (the "***Mexico Savings Fund***").  The Mexican Debtors match employee contributions to the Mexico Savings Fund up to a maximum of twice Mexico's monthly minimum wage, and participating employees may withdraw amounts from the Mexico Savings Fund on an annual basis.

150.    Intercompany Transactions and Claims.  As noted above, in the ordinary course of business, the Debtors maintain business relationships between and among affiliated Debtors and also with the Non-Debtor Affiliates.  These business relationships generate Intercompany Claims from a variety of Intercompany Transactions.  The Intercompany Claims are tracked on a net basis on a schedule of intercompany balances (such Intercompany Claims, as netted, the "***Intercompany Balances***", and the schedule where Intercompany Balances are tracked, the "***Intercompany Balance Schedule***").  Certain Intercompany Transactions between and among the U.S. Cash Management Entities and Mexican Cash Management Entities are typically cash settled (*e.g.*, purchases of product or charges for services rendered), while others (*e.g.*, shared services, short term intercompany loans) are accrued on the Intercompany Balance Schedule and only cash settled when it is deemed convenient or necessary by the Treasury Staff.

151.    The Debtors engage in four (4) primary categories of Intercompany Transactions: (i) transactions among the Cash Management Entities within each of the U.S. and Mexico, other than intercompany vendor transactions; (ii) transactions between TKH and the Mexican Cash Management Entities, other than intercompany vendor transactions; and (iii) transactions between the U.S. Cash Management Entities and their international affiliates,

including TKJP, other than intercompany vendor transactions, and (iv) intercompany vendor transactions.

152.    **Intercompany Transactions Between Cash Management Entities**.  A variety of Intercompany Transactions occur in the ordinary course of business between and among the Cash Management Entities (the "***Intercompany Cash Management Transactions***"), including intercompany allocations, intercompany services, disbursements, intercompany sale of product, and other transactions.

153.    *Intercompany Allocations.*  In the ordinary course of business, certain expenses are allocated from one Cash Management Entity, both Debtor and non-Debtor, to the other.  These include allocations for items such as building rent, IT, and certain other day-to-day intercompany expenses.

154.    *Intercompany Services.*  In the ordinary course of business, certain of the Cash Management Entities provide services for various Debtor and Non-Debtor Affiliates.  For example, TKH charges Highland management fees of approximately $115,000 per month for shared administrative services.  Such fees accrue monthly and are billed quarterly, with 30-day terms.  In addition, in the ordinary course of business, TK Holdings de Mexico charges each of the other Mexican Cash Management Entities a management fee for its provision of a variety of centralized administrative services for the Mexican Entities.

155.    *Disbursements.*  In certain situations, one U.S. Cash Management Entity will make disbursements on behalf of another U.S. Cash Management Entity or one Mexican Cash Management Entity will make disbursements on behalf of another Mexican Cash Management Entity.  When such a payment is made, an intercompany payable is created between the two entities.

156.     *Other Transactions.*  Certain other Intercompany Transactions are tracked among the Cash Management Entities, including short and long term intercompany loans, and intercompany payables and receivables booked on account of asset transfers among the entities. For example, one North American Cash Management Entity may transfer a piece of equipment to another North American Cash Management Entity, which would generate an intercompany account payable on the books of the transferee and an intercompany payable on the books of the transferor.  Another example is TKH's intercompany funding support for Syntec in the ordinary course of business at certain times of the year when Syntec's business slows down (typically June and July).  On an annual basis, Syntec is typically profitable and its value accretes to TKH.

157.     **Intercompany Transactions Between TKH and the Mexican Cash Management Entities**.  In the ordinary course of business, TKH transacts with the Maquiladoras for the production and assembly of component parts (the "***Maquiladora Transactions***").  TKH arranges to have raw materials and sub-assemblies it owns shipped to the Maquiladoras, which assemble and process the components to produce larger sub-assemblies, and, in some cases, finished goods, which in all cases remain the property of TKH.  In exchange for these services, the Maquiladoras each charge TKH a Maquiladora Fee, which total approximately $25,000,000 per month.  As of the Petition Date, TKH owes the Maquiladoras approximately $43,500,000 in accrued and unpaid Maquiladora Fees.  The Maquiladora arrangement is common in the automotive industry, confers certain tax benefits, and allows TKH to have its products assembled as cost-efficiently as possible.  Each of Takata's Maquiladora entities, Equipo, Industrias Irvin, and TK DM, have a special "IMMEX authorization," which authorizes those entities to operate manufacturing facilities with the Maquiladora status.

RLF1 17750950V.1

158.    The Maquiladora Fees are cash settled in the ordinary course of business, and are a critical part of the Debtors' ability to continue operating in the ordinary course of business.  The Maquiladora Fee is essentially a formulaic fee of the "cost" of providing the assembly services plus three percent (3%).  Without the Maquiladora Fees paid by TKH, the Maquiladora entities would not be able to pay their employees or fund their operations.

159.    The Maquiladora Transactions enable TKH to manufacture and assemble product on a cost-efficient basis.  As such, continuation of the Maquiladora Transactions postpetition in the ordinary course is warranted.

160.    Moreover, and any disruption to the ordinary course payment of the Maquiladora Fee would have a disastrous effect on the Debtors' businesses.  As explained above, the Maquiladoras obtain all of their funding from TKH.  Simply put, without the payment Maquiladora Fees, the Maquiladoras would not be able to pay their employees or continue their operations.  As the operations of the Maquiladoras exist solely to provide critical manufacturing and assembly services to the Debtors, the Debtors' ability to supply their Customers would be severely interrupted if the Maquiladoras were to shut down.  With over twenty thousand employees located in Mexico, a disruption in Mexico would almost certainly threaten the Debtors' ability to continue operating in the ordinary course of business elsewhere in North America, and it is highly likely that a severe disruption in Mexico would cascade and trigger a series of events that would likely threaten the Global Transaction.

161.    In addition, TKH also benefits from paying these amounts because the value of all three (3) Maquiladoras (two (2) of which are Debtors) ultimately flows up to TKH. As such, I believe that continuation of the Maquiladora Transactions and payment of the Maquiladora Fees are warranted.

162.     **Intercompany Transactions with International Non-Debtor Affiliates**.
The Debtors also transact business with their global affiliates, including TKJP.  These
transactions include intercompany loans (the "***Intercompany Loans***"), as well as more ordinary
course transactions (the "***Intercompany International Transactions***"), such as the provision of
engineering services between regions, and allocations of insurance and IT expense.  Longer term
Intercompany Loans are typically documented in a formal note or loan agreement, while the
ordinary course Intercompany International Transactions are recorded as Intercompany Balances
on the Intercompany Balance Schedule.

163.     The Debtors and certain of their international Non-Debtor Affiliates
engage in ordinary course Intercompany International Transactions, including the provision of
engineering services and shared services.  The Debtors believe that the continuation of such
transactions, which enables the Debtors and their affiliates to provide key services to one another
and share services on an efficient and fair basis, provides value to them and their affiliates and
should be permitted to continue in the ordinary course.  The justifications for these transactions
are similar to those for the Intercompany Cash Management Transactions described above.  The
Debtors are not seeking authority to continue to enter into Intercompany Loans with their
international Non-Debtor Affiliates or to pay any prepetition claims of such affiliates (except in
connection with the International Vendor Transactions described below).

164.     **Intercompany Vendor Transactions**.  Given the global nature of the
Debtors' businesses, the Debtors purchase goods, services, and vital components from certain
Non-Debtor Affiliates, including Highland and TKJP on a regular basis (the "***Intercompany
Vendor Transactions***").

RLF1 17750950V.1

165.    Before accounting for setoffs, the Debtors owe Non-Debtor Affiliates $23,000,000 on account of goods sold to the Debtors in the twenty (20) days prior to the Petition Date.  This total includes approximately $9,000,000 owed to Highland, $10,000,000 owed to TKJP, approximately $1,500,000 owed to TKH's Brazilian Non-Debtor affiliate Takata Brasil S.A., and approximately two million five hundred thousand dollars $2,500,000 owed to the Debtors' European and Asian Non-Debtor affiliates (excluding Japan).  Payment of these amounts is necessary to ensure that those entities are able to continue operating in the ordinary course of business while the Global Transaction is consummated.

166.    The Debtors have communicated with their Non-Debtor Affiliates and carefully evaluated what amounts related to the intercompany sale of product in the twenty (20) days before bankruptcy are actually necessary to be paid on an interim basis in order to avoid irreparable harm to the Debtors' businesses.  The outcome of those discussions is that the Debtors can defer $18,500,000 to a final order, and are only seeking to pay on an interim basis, in the ordinary course of business as invoices come due, up to $4,500,000 to Highland on account of goods sold to TKH in the twenty (20) days before the petition.  Payment of these limited amounts is critical to support Highland's ability to continue to operate in the ordinary course of business, and although Highland is a Non-Debtor Affiliate, it is a solvent wholly owned subsidiary of TKH and therefore its value ultimately flows up to TKH.  In addition, Highland is a net contributor to the Cash Management System.

167.    Because of the centralized nature of the Debtors' payment systems, the Debtors' operations would be severely impaired if they were not able to continue making Intercompany Transactions in the ordinary course of business consistent with past practices.  In particular, product purchases from global affiliates are a critical component of the Debtors'

global supply chain, and the inability to buy products from, and sell products to, the Debtors' global affiliates would create significant supply disruptions.

168.    The Debtors' failure to continue purchasing goods from their Non-Debtor Affiliates consistent with past practices will impair the ability of the Non-Debtor Affiliates to meet their obligations and, in certain cases, would put the Non-Debtor Affiliates out of business. The value of the Non-Debtor Affiliates, both generally and to the Debtors, would decline. The component parts and supplies sold to the Debtors by their Non-Debtor Affiliates are critical to the Debtors' ability to manufacture automotive safety products for their Customers.  Any disruption of parts to the Debtors as a result of the Non-Debtor Affiliates not being able to satisfy their obligations could result in a disruption of the Debtors being able to supply product to the OEMs, leading to significant damages and entitling the OEMs to assert further significant claims against the estates.  A failure to supply component parts to the Debtors customers could also potentially result in the termination of the valuable liquidity enhancements and accommodations that the Debtors' customers have agreed in principle to provide to the Debtors during the Chapter 11 Cases.  These circumstances could severely impair, if not derail, the Global Transaction to the detriment of all stakeholders, including the creditors and all parties in interest in these Chapter 11 Cases.

169.    Bank Fees.  In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain service charges and other related fees, costs, and expenses charged by the Banks (collectively, the "***Bank Fees***").  To the extent the balance in the applicable Bank Account decreases below a threshold amount established by the applicable Bank, the Debtors may incur additional fees for sending and receiving wire transfers, clearing checks, ACH transfers, and other transactions.  I understand

that the Debtors have an arrangement with Comerica where their Bank Fees vary depending on

the amount of cash held at Comerica and are approximately $30,000 per month.  As of the

Petition Date, the Debtors estimate that approximately $25,000 in Bank Fees are accrued and

unpaid and will become due in the first thirty (30) days after the Petition Date.  The Debtors are

seeking to pay such amounts as they come due in the ordinary course of business.

170.    The Debtors' Existing Business Forms and Checks.  In the ordinary course

of business, the Debtors use a variety of business forms, including letterhead, purchase orders,

invoices, and checks (collectively, the "***Business Forms***").  To minimize the expense to the

Debtors' estates associated with developing and/or purchasing entirely new forms, the delay in

conducting business prior to obtaining such forms, and the confusion of suppliers and other

vendors, the Debtors are seeking authority to continue using their Business Forms substantially

in the forms used immediately prior to the Petition Date, without reference therein to the

Debtors' status as "Debtor-in-Possession."

171.    Transition Services for NAS Sales.  In connection with the NAS Sales, the

Debtors entered into the NAS Transition Services Agreements to provide the NAS Transition

Services.  The agreement to provide the treasury-related services expired on June 22, 2017.

Notwithstanding the expiration, I understand that there may be certain limited matters that arise

in relation to these services during the first few weeks of these Chapter 11 Cases.  Consequently,

maintenance of the Debtors' existing Cash Management Service is necessary to allow the

Debtors' to continue to discharge their surviving obligations under the NAS Transition Services

Agreement.  Accordingly, in the Cash Management Motion the Debtors have requested that they

be allowed to continue taking all necessary actions and making any necessary transfers,

disbursements, or collections in connection with the Cash Management System as required to discharge their surviving obligations under the NAS Transition Services Agreements.

172.    The operation of the Debtors' businesses requires the continuation of the Cash Management System during the pendency of these Chapter 11 Cases.  Strict enforcement of the U.S. Trustee Guidelines in these Chapter 11 Cases would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies and creating unnecessary expenses. Absent the relief requested in the motion, the Debtors would be unable to effectively and efficiently maintain their financial operations, which would cause significant harm to the Debtors and their estates and creditors.

173.    As a practical matter, because of the Debtors' corporate and financial structure, I believe that it would be extremely difficult and expensive to establish and maintain a separate cash management system for each Debtor and Non-Debtor Affiliate.  Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases, or to extract the Debtors from the Cash Management System, would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of their global network.  Based on the foregoing, I believe that the relief requested in the cash management motion is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**E.    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(A), 363(B), and 507 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority to (I) Pay Prepetition Wages, Salaries, and Other Compensation and Benefits, and (II) Maintain Employee Benefit Programs and Pay Related Administrative Obligations**

174.    By this motion (the "***Employee Wage Motion***"), the Debtors are requesting entry of interim and final orders authorizing, but not directing, the Debtors to (i) pay, in their sole discretion, all prepetition amounts required under or related to the Debtors'

Compensation Obligations, Employee Incentive Programs, Reimbursable Expenses, Withholding

Obligations, Payroll Maintenance Fees, Severance Obligations, Mexico Union Obligations,

Employee Benefit Programs, Foreign Employee Programs, Supplemental Workforce Obligations

(each as defined in the Employee Wage Motion and, together with any costs or related

administrative expenses, the "***Prepetition Employee Obligations***") and (ii) continue their

prepetition practices, programs, and policies for their Employees, as those practices, programs,

and policies were in effect as of the date hereof and as those practices, programs, and policies

may be modified, amended, or supplemented from time-to-time in the ordinary course of the

Debtors' businesses, and honor any related administrative costs and obligations arising

thereunder.  Further, the Debtors are requesting that the Court authorize applicable banks and

financial institutions to receive, process, honor, and pay all checks issued or to be issued and

electronic fund transfers requested or to be requested relating to the Prepetition Employee

Obligations.

175.    As of the Petition Date, the Debtors employ approximately 14,700

Employees, including approximately (i) 13,140 hourly Employees, regularly scheduled to work a

minimum of forty hours per week, and (ii) 1,560 salaried Employees, most of who are also

employed to work a minimum of forty hours per week.  Approximately 95 percent (95%) of the

Debtors' Employees are retained at the plant level and perform work in the Debtors' various

manufacturing facilities located throughout the United States and Mexico.

176.    The Employees perform a variety of critical functions for the Debtors

including, without limitation, tasks pertaining to management, product manufacturing, facility

and machine maintenance, quality assurance, purchasing and sales administration, finance and

accounting, human resources, customer service, security, and other areas crucial to the Debtors'

automotive safety and non-safety systems businesses.  Due to the highly technical and

specialized nature of the automotive industry, the skill and "know how" of the Employees are

fundamental to the success of the Debtors' businesses and operations and, as a result, the success

of the Global Transaction and the Chapter 11 Cases.

177.    In addition to their Employees, the Debtors employ approximately

seventy-seven (77) independent contractors to assist with their operations, as well as

approximately 1,600 temporary workers who are employed through staffing agencies to work at

the Debtors' various manufacturing facilities.

178.    The Debtors believe that, as of the Petition Date, the aggregate amount of

their Prepetition Employee Obligations is approximately $18,173,000 million.  It is my

understanding that, the Debtors are not seeking authority, pursuant to the Employee Wage

Motion to pay to any amount in excess of the statutory priority cap imposed by

sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code pursuant to the Interim Order.  The

various components of the Prepetition Employee Obligations are described in further detail in the

Employee Motion.

179.    The Debtors' Personnel are the lifeblood of the Debtors' manufacturing

and production businesses—without them, the Debtors' operations would come to a halt.

Indeed, due to the highly technical and specialized nature of the automotive industry, the

Debtors' must maintain a uniquely skilled and knowledgeable workforce whose "know how" is

critical to the Debtors' businesses and ongoing operations and, as a result, critical to the success

of the Global Transaction and the safe stable supply of product, including replacement parts.

180.    For the past three (3) years, the Debtors' Personnel have been managing

the increased demands and pressures resulting from the highly publicized recalls and a complex

restructuring process, including an exhaustive prepetition marketing and sale process, in addition to their typical duties.  Notwithstanding the fact that Takata is now close to finalizing the Global Transaction with Key Safety Systems, Inc. (the "Plan Sponsor") and the support of the Customer Group, considerable uncertainty remains for the Debtors' Personnel.  Sensing the fragility of the Debtors' current situation, the Debtors' competitors are actively trying to hire away key Employees such as engineers and project managers and have poached valuable Employees away from the Debtors.  Moreover, a significant number of the Debtors' workforce is located outside of the United States and completely unfamiliar with the chapter 11 process, which may exacerbate the sense of uncertainty and concern among the Debtors' Personnel upon the commencement of these Chapter 11 Cases.

181.    Given the Debtors' ongoing obligation to manufacture replacement kits and Component Parts in connection with the recalls, the need to preserve the value of the Debtors' operations until consummation of the Global Transaction, as well as the sense of vulnerability and uncertainty among the Debtors' Personnel, the importance of honoring the Prepetition Employee Obligations and maintaining the Employee Benefit Programs consistent with past practice simply cannot be overstated.  The various components of the Prepetition Employee Obligations are described in further detail below

182.    I understand that the Debtors are bound by applicable law to (i) continue several of the Employee Benefit Programs and (ii) pay certain Prepetition Employee Obligations. In Mexico, the Mexican Debtors are required by law to continue the Mexico Profit Sharing Program, and Mexico Severance Program.  Similarly, in the United States and Mexico, the Debtors seek authority to pay Withholding Obligations, which principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction

from Employees' paychecks.  Indeed, certain Withholding Obligations, including contributions

to the Employee Benefit Programs and child support and alimony payments, are not property of

the Debtors' estates because they have been withheld from Employees' paychecks on another

party's behalf.  Further, federal and state laws require the Debtors and their officers to make

certain tax payments that have been withheld from their Employees' paychecks.

183.    Payment of the Prepetition Employee Obligations is warranted and

justified by the facts and circumstances of these Chapter 11 Cases.  The Employees are vital to

the continued operation of the Debtors' businesses and necessary for the success of these Chapter

11 Cases.  The majority of the Employees rely exclusively on the Employee Compensation and

Benefits Programs to satisfy their daily living expenses.  Consequently, Employees will be

exposed to significant financial difficulties if the Debtors are not permitted to honor obligations

for unpaid Prepetition Employee Obligations.  Moreover, honoring the Prepetition Employee

Obligations and continuing the Employee Benefit Programs will help maintain morale and

minimize the adverse effect of the commencement of these Chapter 11 Cases on the Debtors'

ongoing business operations.

184.    Further, the Debtors have substantial business justification for satisfying

the obligations set forth in the Employee Motion.  For instance, the Debtors have sound business

reasons for continuing the Severance Program in the ordinary course, including: (i) maintaining

Employee morale, (ii) disincentivizing Employees to pursue other employment opportunities,

(iii) securing releases of severed Employees (which is a condition to receiving severance

payments under the U.S. Severance Program), and (iv) reassuring Employees that the Debtors

intend to honor their obligations to Employees—both during and after their tenure with the

Debtors.

RLF1 17750950V.1

185.    Similarly, the Employee Incentive Programs are critical components of Employee compensation and bring substantial value to the Debtors' estates because they align Employee incentives with those of the Debtors.  These programs are imperative to attract and retain talented employees during the critical period leading up to consummation of the Global Transaction and in light of the Debtors' ongoing obligations in connection with the PSAN Inflator recalls.

186.    Moreover, the Debtors believe that if the Supplemental Workforce Obligations go unpaid, independent contractors, consultants, and temporary workers may stop providing services to the Debtors.  Accordingly, the Debtors request authority to, in their sole discretion, continue to procure services of independent contractors, consultants, and temporary workers and pay, in their sole discretion, any unpaid compensation for or on account of the independent contractors, consultants, or temporary workers, in each case, in the ordinary course of business and consistent with past practice.  The Debtors do not believe that any individual independent contractor, consultant, or temporary worker is owed compensation in an amount exceeding the $12,850 cap imposed by section 507(a)(4) of the Bankruptcy Code.

187.    Payment of the Reimbursement Expenses is also necessary because any other treatment of Employees would be highly inequitable.  Employees who have incurred Expenses should not be forced personally to bear the cost of the Expenses, especially because the Employees incurred the Expenses for the Debtors' benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

188.    The Debtors also believe that it is necessary to pay the administrative costs owed to third-party vendors, including the HR Vendors, who provide compensation and other

benefit-related services and products.  Absent the relief requested, the Debtors will be unable to maintain their compensation and benefit programs in an efficient and cost-effective manner.

189.    The Employees have frequent interactions with the Debtors' Customers and suppliers—on whose continued support and loyalty the Debtors rely—and are integral to the Debtors' ability to produce Component Parts for the OEMs, including replacement kits in connection with the ongoing PSAN Inflator recalls.  Instability among the Debtors' Employees and the resultant harm to the Debtors' business and production would reduce the value of the Debtors' businesses, diminish the price the Debtors anticipate receiving in connection with the Global Transaction, and lower creditor recoveries.  Additionally, the importance of maintaining stability among the Debtors' Employees is heightened here by the Debtors' obligations to continue providing replacement parts in connection with the ongoing non-desiccated PSAN inflator recalls.

**F.    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) for Interim and Final Authority to Pay Prepetition Obligations Owed to Certain Critical Vendors**

190.    By this motion, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code, the Debtors are requesting entry of interim and final orders authorizing them to pay the prepetition claims (the "***Critical Vendor Claims***") of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to maintaining the going concern value of the Debtors' business (the "***Critical Vendors***").

191.    As a major Tier One supplier to the largest automotive manufacturers in the world, the Debtors rely heavily on the Critical Vendors to provide them with the specialized and unique parts, materials, and services necessary to manufacture the seatbelts, airbags, and other critical safety and non-safety components and parts that the Debtors produce for the OEMs. The Critical Vendors generally fall into the following two (2) main categories: (i) production

material suppliers, which supply the Debtors with, among other things, Component Parts and raw materials utilized in the chain of production and specialized tools that are integral to the Debtors' manufacturing processes, and (ii) maintenance, repair, and operations providers, which provide the Debtors with, among other things, equipment and materials relating to the Debtors' specialized manufacturing equipment and machinery, as well as freight logistics services.

192.    Because most of the Component Parts manufactured by the Debtors are safety critical and must adhere to rigorous federal safety standards, many of the goods sourced by the Debtors from third-party vendors and suppliers are highly specialized and must undergo a lengthy and detailed validation and testing process.  Such goods require substantial lead time to develop and cannot be replaced in a timely or efficient manner.  Additionally, a significant number of the Debtors' suppliers are either sole source suppliers (*i.e.*, the only supply source for certain complex parts and specifically designed systems necessary to the Debtors' production process) or "directed-buy" suppliers (*i.e.*, the Debtors are directed by their Customers to utilize the Component Parts of such sub-suppliers) that cannot be timely or efficiently replaced given the highly-engineered nature of the Component Parts they provide.  For these reasons, among others, the Debtors are highly dependent on the inventory and services provided by the Critical Vendors to meet their Customers' needs for production.

193.    The need to ensure a continuous and stable source of parts and supply in these Chapter 11 Cases, however, goes beyond the ordinary rationales of avoiding production disruptions and maximizing value.  As discussed above, the Debtors are in the midst of the largest recall in U.S. automotive history relating to vehicles equipped with non-desiccated PSAN Inflators manufactured by the Debtors and their affiliates.  In connection with these recalls, the Debtors have dedicated substantial resources to manufacturing, assembling, and shipping

replacement inflator parts and kits to the Customers so that non-desiccated PSAN Inflators can be removed from circulation as quickly as possible. Accordingly, to ensure a continuous and stable supply of replacement kits and the efficient removal of non-desiccated PSAN Inflators from circulation, it is a matter of public safety that the Debtors' supply chain not be disrupted.

194.    It is my understanding that, as is typical in distressed situations, vendors have been increasingly unwilling to extend trade credit to the Debtors. Anticipating this situation, the Debtors, with the assistance of their advisors, spent significant time prior to the Petition Date reviewing and analyzing their books and records, open accounts payable systems, and prepetition vendor lists to identify those vendors and suppliers that are in fact critical to the Debtors' operations. Information on the Critical Vendors, including the detailed process that was set in place for identifying those potential claimants, the protocol the Debtors have put in place to ensure that only those claims that are truly essential to maintaining the Debtors' operations get paid, and the immediate and irreparable harm that would be incurred by the Debtors, their Customers and all parties in interest absent the relief requested in this motion, is set forth in the declaration of Scott Simpton, Vice President of Supply Chain Management (the "**_Simpton Declaration_**").

195.    I further understand that the Debtors are not seeking to pay all prepetition claims of the Critical Vendors, but rather to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices. Payments to the Critical Vendors will be contingent on their agreement to continue to sell goods or provide services to the Debtors on terms at least as favorable as those in effect during the twenty-four (24) month prior to the Petition Date. Accordingly, I understand that the critical vendor relief requested by the Debtors is similar to that received by other distressed automotive

suppliers and other companies heavily reliant on supply chain continuity to preserve the viability of a going-concern enterprise.

196.    In order for the Debtors to continue timely producing and supplying the OEMs with components, the Debtors will need to continue purchasing goods and services from the Critical Vendors.  The Debtors believe that any delay or disruption in their flow of critical goods and services would cause irreparable harm to the Debtors' businesses and materially impact the Debtors' ability to supply parts to the OEMs, including replacement kits for recalled non-desiccated PSAN Inflators.  The Debtors also believe that a portion of the Critical Vendor Claims arise from goods received by the Debtors in the ordinary course of business within the twenty (20) days immediately preceding the Petition Date.  I understand that under section 503 of the Bankruptcy Code, such claims may be entitled to priority treatment.  Allowing the Debtors to pay certain prepetition claims of Critical Vendors, therefore, will serve the purposes of facilitating the Debtors' sale efforts and will not impair the Debtors' other creditors.

197.    Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**G.    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Obligations Owed to Certain Foreign Vendors and Other Lien Claimants and (II) Grant Administrative Status for Certain Goods Delivered to Debtors Postpetition**

198.    By this motion, pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code, the Debtors are requesting entry of interim and final orders authorizing them to satisfy prepetition claims owing to (i) certain vendors, suppliers, service providers, independent contractors, and other entities located outside of the U.S. (collectively, the "***Foreign Vendors***"), including claims for goods or materials and services provided to the Debtors, as well

as foreign tax obligations, import and export fees, customs duties, or other similar fees related to such claims (collectively, the "***Foreign Claims***"), and (ii) certain third party shippers, warehousemen, vendors, and other service providers that could, on account of their prepetition claims, potentially assert liens against the Debtors' property on account of outstanding prepetition obligations of the Debtors (collectively, the "***Lien Claimants***").  Additionally, by this motion, the Debtors are requesting authority to (i) grant administrative priority status to all undisputed obligations of the Debtors owing to third party vendors and suppliers arising from the postpetition delivery of goods ordered prior to the Petition Date and (ii) authorize the Debtors to pay such obligations in the ordinary course of business.  It is my understanding that the Debtors are not seeking to pay all prepetition claims of Foreign Vendors and Lien Claimants.  Instead, the Debtors seek to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices  Additional information on the Foreign Vendors and Lien Claimants, including the process that was set in place for identifying those potential claimants and the immediate and irreparable harm that would be incurred by the Debtors, their Customers and all parties in interest absent the relief requested in this motion, is set forth in the Simpton Declaration.

199.    <u>The Foreign Vendors.</u>  In light of the size, sophistication, and global nature of the Debtors' airbag, seat belt, and other safety and non-safety manufacturing businesses, the Debtors regularly transact business with vendors located outside of the United States.  The Debtors rely on their Foreign Vendors, which are primarily located in Europe, Asia, and Mexico, to grant or supply various goods or services that are crucial to the Debtors' ongoing manufacturing operations in the United States and Mexico.  It is my understanding on conversations with members of the Debtors' purchasing and supplier teams, that the Foreign

Vendors and the Foreign Claims generally fall into the following three main categories:

(i) Component Parts suppliers, (ii) raw material suppliers, and (iii) customs duties.

200.    Because of the nature of the Debtors' businesses, many of the Foreign Vendors will make, or have made, credible actionable threats that, unless paid on account of their prepetition claims, they will cease to supply the Debtors with the specialized goods and services necessary for the Debtors to maintain their operations.  Without the Foreign Vendors, the Debtors will be unable to operate their businesses efficiently and effectively, which will substantially diminish the value of the Debtors' assets.  Further, I understand that most of the Foreign Vendors lack minimum contacts with the United States.  It has been explained to me by counsel that, although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, as it has been explained to me, the Debtors believe that there is a serious risk that the Foreign Vendors holding claims against the Debtors may consider themselves to be beyond the jurisdiction of the Court, disregard the automatic stay provisions of the Bankruptcy Code, and engage in conduct that would disrupt the Debtors' domestic and international operations.  Foreign entities that believe the automatic stay does not govern their actions may exercise self-help, which could include shutting down the Debtors' access to essential goods and services.

201.    In light of the potential for serious and potentially irreparable consequences if the Foreign Vendors do not continue to make uninterrupted and timely deliveries—and the lack of any enforcement mechanism against them—I submit that payment of certain Foreign Claims is essential to avoiding costly disruptions to the Debtors' operations.

202.    <u>The Lien Claimants</u>.  In operating their businesses, the Debtors use and make payments to a number of Lien Claimants, including, shippers, common carriers,

warehousemen, tool makers, equipment manufacturers, service technicians, materialmen, and

other service providers.  The services provided by the Lien Claimants are critical to the Debtors'

day-to-day operations.

203.    To meet their delivery deadlines and maintain uninterrupted operations,

the Debtors rely heavily on third parties, including shippers that transport goods for the Debtors

(collectively, the "***Shippers***") and warehousemen that store the Debtors' or the Customers' goods

while they are in transit (collectively, the "***Warehousemen***").  It is my understanding that based

on discussions with counsel and other parties that, under the laws of some states, a shipper or

warehouseman may have a possessory lien on the goods in its possession, which secures

payments of the charges and related expenses incurred in connection with the transportation or

storage of such goods.  In addition, I understand that pursuant to section 363(e) of the

Bankruptcy Code, a shipper or warehouseman, as a bailee, may be entitled to adequate protection

of a valid possessory lien.  As a result, the Debtors expect that certain Shippers and

Warehousemen may argue that they are entitled to possessory liens for transportation and

storage, as applicable, of the goods in their possession as of the Petition Date and may refuse to

deliver or release such goods before their claims have been satisfied and their liens redeemed.

204.    In addition to the Shippers and Warehousemen, the Debtors routinely

engage a number of other third parties, including equipment manufacturers, tool makers, service

technicians, materialmen, suppliers that utilize specialized tooling owned by the Debtors to

produce Component Parts, and other service providers (collectively, the "***Other Lien

Claimants***"), that may be able to assert and perfect liens, including mechanic's liens, artisan's

liens, materialman's liens, and other similar liens, against the Debtors' property and, in some

cases, the OEMs' property, if the Debtors fail to pay for the goods or services rendered.  The

Other Lien Claimants perform a number of services for the Debtors, including the manufacturing of equipment, manufacturing and repair of tools, molds, and other parts or components that are integral to the Debtors' manufacturing processes.

205.    If the Debtors are unable to pay their prepetition obligations to the Lien Claimants, they risk being unable to fully operate their businesses, which could prevent them from maximizing recoveries for all stakeholders in these Chapter 11 Cases.  Accordingly, I believe it is imperative that the Debtors be authorized to pay the prepetition claims of the Lien Claimants if the Debtors determine payment is necessary to ensure the uninterrupted shipment, delivery, and manufacture of goods.

206.    Prepetition Orders.  As of the Petition Date, the Debtors also have certain prepetition purchase orders (the "***Prepetition Orders***") outstanding with various third-party vendors and suppliers for goods ordered by the Debtors that have yet to be delivered to the Debtors' facilities.  I believe that these vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Petition Date, any claims related to the Prepetition Orders will be treated as general unsecured claims.  Accordingly, such vendors may refuse to deliver goods to the Debtors (or may recall shipments thereof) unless the Debtors reissue the Prepetition Orders postpetition.  In light of the significant administrative burden that re-issuing the Prepetition Orders would impose upon the Debtors, the Debtors request an order explicitly affording claims arising under the Prepetition Orders administrative expense status and authorizing the Debtors to pay such claims in the ordinary course.  I have been informed that any such claims are afforded administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.  Accordingly, I understand that the relief requested will not provide vendors with any greater priority than they would otherwise have in these Chapter 11 Cases.

207.    Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**H.    Motion of Debtors Pursuant to 11 U.S.C. §§ 363 and 105(A) for Interim and Final Authority to (I) Continue Tooling and Warranty Programs in the Ordinary Course of Business and Pay Prepetition Obligations Related Thereto, and (II) Authorize Banks to Honor and Process Related Checks and Transfers**

208.    By this motion (the "***Tooling Motion***"), the Debtors are requesting entry of interim and final orders authorizing the Debtors, in their business judgment, to (a) perform and honor their prepetition obligations related to their Tooling and Warranty Programs as they deem appropriate, and (b) continue, renew, replace, implement new, and/or terminate the Tooling and Warranty Programs as they deem appropriate, in the ordinary course of business, without further application to the Court.

209.    Under the Tooling Programs, the Debtors purchase tooling equipment on behalf of many of their Customers Programs. The Debtors need to acquire such specialized tooling equipment in order to produce the specific Component Parts ordered by their Customers. In such instances, the Customers will ultimately own the tooling equipment and use the Debtors to sub-contract the tool production work, perform quality control assessments, or retain the tooling at the Debtors' facilities to be used in the production of the Component Parts for the Customers. If the tooling is to be owned by the Customers, the Debtors seek reimbursement for funds that they have previously paid to third-party tool makers. In these cases, the Debtors may not have an equitable interest in the tooling. Therefore, the Debtors request authority to continue their tooling programs, regardless of whether any payments involve prepetition or postpetition transfers.

RLF1 17750950V.1

210.    Under the Warranty Programs, the Debtors, customary with industry standards, are subject to the standard terms and conditions of their Customers ("**Customer Terms**"), when supplying components, modules, and other products to the Customers.  Customer Terms typically include references to warranty clauses that encompass the workmanship of the Debtors' products.  To the extent that the Customers identify workmanship issues with the Debtors' products, either upon initial receipt of such products, during the production process, through the post-production period, or subsequent to the final sale of the Customers' vehicles to end-consumers, the Debtors may be held liable to remedy any identified workmanship defects.  Typically, remedies are in the form of replacement parts, or monetary damages levied by the Customers.

211.    As evidenced by the ongoing recalls, it is of critical importance that the Debtors be authorized to continue their warranty program in the ordinary course.  The replacement parts supplied by the Debtors are critical safety parts, which must be provided on an expedited basis for the recall program to successfully protect consumers from at-risk vehicles.  Failure by the Debtors to fulfill their warranty obligations may jeopardize the Debtors' relationships with their Customers and suppliers, which are the lifeblood of the Debtors' business and critical to the success of the Global Transaction and these Chapter 11 Cases.  Any disruptions thereto would reduce the value of the Debtors' businesses, diminish the sale price paid for the Debtors' assets, and lower creditor recoveries.  Further, failure by the Debtors to continue to honor their warranty obligations and supply replacement parts may violate the terms of the NHTSA Orders that obligate the Debtors to continue to cooperate with the ongoing recalls, which could result in further fines, penalties or administrative actions that would negatively

impact the Debtors' estates. Therefore, the Debtors request authority to continue their warranty programs in the ordinary course.

212. Because the Debtors' Customers are the lifeblood of their businesses, their loyalty and continued support and patronage are critical to the success of these Chapter 11 Cases. The continuation of the Tooling and Warranty Programs on an uninterrupted basis is critical to maintain this support and loyalty which is of the utmost importance for any purchaser of the Debtors' assets. Indeed, if the Debtors were not granted the relief requested in the Tooling Motion, the consequences would be draconian. The Debtors' Customers would lose confidence, question the Debtors' ability to survive, and likely immediately begin resourcing the programs maintained with the Debtors to alternative suppliers. Such resourcing would reduce the value of the Debtors' businesses, diminish the sale price paid for the Debtors' assets in connection with the Global Transaction, and lower creditor recoveries. Moreover, as discussed more fully herein, millions of consumers rely on the Debtors for replacement airbags, and failing to honor the warranty programs would severely impair the Debtors' ability to comply with their ongoing recall obligations. Simply stated, the obvious disruption and damage that will ensue if Tooling and Warranty Programs are not honored and continued far exceed the costs associated with honoring the related prepetition obligations and continuing these practices.

I. **Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) and Fed. R. Bankr. P. 4001, 6003, and 6004 for Interim and Final Authority to Continue Insurance and Surety Bond Programs and Pay All Obligations With Respect Thereto**

213. By this motion, pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, the Debtors are requesting entry of interim and final orders authorizing them to (i) continue the Debtors' workers' compensation program and various liability, property, and other insurance programs

(collectively, the "**Insurance Programs**" and all premiums and other obligations related thereto, including any broker or advisor fees, taxes, or other fees, collectively, the "**Insurance Obligations**") through several insurance carriers (each, an "**Insurance Carrier**") and the Surety Bond Program (as defined herein) and (ii) pay any prepetition obligations arising under the Insurance Programs or the Surety Bond Program.

214.    The Workers' Compensation Program.  It is my understanding that, under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation insurance coverage (the "**Workers' Compensation Program**") for their employees for claims arising from or related to employment by the Debtors.  The Debtors pay annual premiums to maintain the Workers' Compensation Program for each coverage period, which the Debtors pay prospectively in full.  It is my understanding that the Workers' Compensation Program is a guaranteed cost policy with Liberty Insurance Corporation that is not subject to any deductibles.  Notwithstanding the foregoing, the Workers' Compensation Program for certain prior coverage periods was subject to a $250,000 per claim deductible, which Liberty Insurance Corporation ("**Liberty Mutual**") may advance any part or all of on behalf of the Debtors.  In connection with this advancement, the Debtors collateralized Liberty Mutual's deductible-related exposure by posting a commercial letter of credit issued by Bank of Tokyo-Mitsubishi for the benefit of Liberty Mutual.  As of the Petition Date, the face value of the letter of credit is approximately $1,700,000, which secures the Debtors' obligations relating to past incurred but unpaid Workers' Compensation Claims.  As of the Petition Date, no prepetition amounts are outstanding on account of the Workers' Compensation Program.

215.    The Liability and Property Insurance Programs.  I understand that the Debtors maintain twenty-two (22) liability and property insurance policies, which provide the

Debtors with insurance coverage for liabilities relating to, among other things, property damage, general domestic and international commercial claims, employment practices, commercial automobile claims, aviation products liability, umbrella, and various other property-related and general liabilities, as well as excess policies related to the same (collectively, the "***Liability and Property Insurance Programs***").  Pursuant to the Liability and Property Insurance Programs, the Debtors are required to pay premiums based upon a fixed rate established and billed by each Insurance Carrier, in addition to various deductibles.  The Liability and Property Insurance Programs each have annual premiums, which the Debtors generally pay prospectively in full.  TKH typically remits the premium payments for the Liability and Property Insurance Programs on behalf of itself and its affiliated Debtors and non-debtor domestic and Mexican subsidiaries.  TKH then allocates and bills certain percentages of the premiums to the other named insureds on an intercompany basis at the beginning of each coverage period.  These allocations are recorded and paid in the ordinary course of business as intercompany payables by the named insureds being billed by TKH and as intercompany receivables due to TKH.  It is my understanding that, as of the Petition Date, the Debtors are not aware of any outstanding premiums or other amounts owed to the various Insurance Carriers for the Liability and Property Insurance Programs.

   216. <u>The D&O and PL Insurance Programs</u>.  I understand that the Debtors also participate in nine (9) insurance policies that are purchased and maintained by TKJP, which provide the Debtors with insurance coverage for directors' and officers' liability (the "***D&O Insurance***") and products liability (the "***PL Insurance***," and together with the D&O Insurance, the "***D&O and PL Insurance Programs***").  Pursuant to an agreement with TKH and to reduce overall underwriting costs, TKJP allocates and bills a percentage of the premiums for the D&O and PL Insurance Programs on an intercompany basis to TKH.  This allocation is based on total

regional sales for products liability and asset ratio for directors' and officers' liability.  For the current coverage periods, TKJP allocated approximately forty-four percent (44%) of the premium for PL Insurance and approximately twenty-seven percent (27%) of the go-forward premiums for D&O Insurance to TKH, as well as approximately forty-two percent (42%) of the premium for individual, Side-A coverage for TKH's directors and officers.  It is my understanding that, as of the Petition Date, the Debtors are not aware of any outstanding premiums or other amounts owed to TKJP for the D&O and PL Insurance Programs.

217.    Insurance Broker.  The Debtors utilize Willis of New York, Inc. ("**Willis**") as their insurance broker to assist with, among other things, the procurement and negotiation of the Workers' Compensation Program and the Liability and Property Insurance Programs and to remit payment to the Insurance Carriers on behalf of the Debtors for the current policy periods.  In connection with these services, the Debtors pay Willis a fee of $270,000, which is paid prospectively in full.  It is my understanding that, as of the Petition Date, the Debtors do not believe that they have any outstanding obligations owed to Willis.

218.    Surety Bond Program.  In the ordinary course of business, the Debtors are required to provide surety bonds, performance bonds, and other undertakings to certain third parties, including governmental units and other public agencies, to secure the payment or enforcement of certain obligations of the Debtors and a non-Debtor affiliate (the "**Surety Bond Program**").  In nearly every case, the surety's right to recover from the Debtors is collateralized by cash or a letter of credit or subject to an indemnity agreement that sets forth the surety's right to recover from the Debtors (the "**Surety Indemnity Agreements**").  The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis and payment is remitted by the

98

Debtors when the bonds are issued and annually upon each renewal.  It is my understanding that, as of the Petition Date, the Debtors' estimate that the total principal amount on all current surety bonds is approximately $750,000.

219.    In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets from such risks, I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program and pay all Insurance Obligations and Surety Bond Obligations during the course of these Chapter 11 Cases.  Without authority to maintain and pay amounts owing in connection with the Insurance Programs and the Surety Bond Program, the ability of the Debtors to conduct operations in many locations would come to a halt to the detriment and prejudice of all parties in interest.  Additionally, based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew or replace their existing Insurance Programs or Surety Bond Program on more favorable terms. Furthermore, the Debtors must maintain most of the Insurance Programs to comply with the U.S. Trustee's operating guidelines.  Based on the foregoing, I believe that the relief requested in this motion is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**J.      Motion of Debtors Pursuant to 11 U.S.C. §§ 105(A), 363(B), 507(A),  and 541 and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Authority to (I) Pay Certain Prepetition Taxes and Assessments, and (II) Authorize Banks to Honor and Process Related Checks and Transfers**

220.    By this motion, the Debtors request entry of  interim and final orders authorizing them to satisfy, in their discretion, all Taxes and Assessments due and owing to various local, state, and foreign taxing authorities (collectively, the "***Taxing Authorities***") that arose prior to the Petition Date, including all Taxes and Assessments subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date.

221.    The Debtors must continue to pay the Taxes and Assessments to continue operating in certain jurisdictions and to avoid costly distractions during the Chapter 11 Cases. Specifically, it is my understanding that the Debtors' failure to pay the Taxes and Assessments could adversely affect the Debtors' business operations because the governmental authorities could assert liens on the Debtors' property, assert penalties and/or significant interest on past-due taxes, or possibly bring personal liability actions against directors, officers, and other employees in connection with non-payment of the Taxes and Assessments, thus distracting the Debtors' management and employees from their important reorganization efforts, and potentially causing immediate and irreparable harm to the Debtors.  As of the Petition Date, the Debtors estimate that approximately $2,046,200 in Taxes and Assessments are due and owing to the various Taxing Authorities, of which approximately $1,156,200 will come due within the first thirty (30) days following the Petition Date.

**K.      Motion of Debtors Pursuant to 11 U.S.C. §§ 366 and 105(a) for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service**

222.    By this Motion, the Debtors are requesting entry of an interim and final order (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing utility service on account of outstanding prepetition invoices.

223.    To operate their seat belt, airbag, and various other safety and non-safety businesses and manage their properties, including their headquarters, manufacturing plants and R&D facilities, the Debtors obtain telecommunications, satellite, waste disposal, water, gas, electricity, and other utility services (collectively, the "***Utility Services***").  Preserving Utility

Services on an uninterrupted basis is essential to the Debtors' ongoing operations and

restructuring process.  Indeed, any interruption in Utility Services—even for a brief period of

time—would disrupt the Debtors' ability to continue operations and service their Customers.  As

a Tier One automotive supplier, the Debtors supply their Customers with critical automotive

safety systems and other essential components.  Any interruption in Utility Services could

disrupt the Debtors' ability to supply their Customers with these critical safety parts.

Furthermore, as described above, the Debtors are in the midst of the largest recall in automotive

history relating to PSAN Inflators.  The Debtors continue to dedicate substantial resources to

manufacture and ship replacement parts to their Customers in order to get the recalled airbags

out of circulation.  Any disruption to their Utility Services could prevent the Debtors from

providing their Customers with the necessary replacement parts on a timely basis and could

seriously jeopardize the recall process as a whole.  Any disruptions, therefore, could reduce the

value of the Debtors' businesses, diminish the sale price paid for the Debtors' assets in

connection with the Global Transaction, and lower creditor recoveries.  Therefore, it is critical

that Utility Services continue uninterrupted during these Chapter 11 Cases.

**L.      Motion of Debtors Pursuant to 11 U.S.C. § 105 for Entry of an Order Enforcing the
Protections of 11 U.S.C. §§ 362, 365, 525, and 541(c)**

224.      By this Motion, the Debtors request entry of an order enforcing the

protections of sections 362, 365, 525, and 541(c) of the Bankruptcy Code to aid in the

administration of these Chapter 11 Cases and to help ensure that the Debtors' global seat belt,

airbag, and other safety and non-safety manufacturing and production operations are not

disrupted.  As previously noted, the Debtors conduct significant operations in foreign countries

and, as a result, incur obligations to foreign customers, employees, independent contractors,

vendors, service providers, utility companies, taxing authorities and other entities.  Many of the

RLF1 17750950V.1

Debtors' foreign creditors and contract counterparties do not transact business on a regular basis with companies that have filed for chapter 11 protection and, therefore, may be unfamiliar with the scope of a debtor in possession's authority to conduct its business and may be unaware of the protections of the automatic stay and other provisions of the Bankruptcy Code that assist debtors in possession during their Chapter 11 Cases and restructuring efforts.

225.    I have been informed that the protections afforded by sections 362, 365, 541, and 525 of the Bankruptcy Code are self-executing and global; however, I believe that not all parties affected or potentially affected by the commencement of these Chapter 11 Cases are aware of these statutory provisions or their significance and impact. I believe that it is prudent to obtain an order of the Court confirming and reinforcing the relevant sections of the Bankruptcy Code so that the Debtors may advise such parties of the existence, reach, and effects of these sections of the Bankruptcy Code.

226.    I believe that, absent an order from this Court, parties might attempt to take improper actions against the Debtors or property of their estates. Accordingly, the Court should approve the motion.

**M.    Motion of Debtors Pursuant to 11 U.S.C. § 1505 for Entry of an Order Authorizing TK Holdings Inc. to Act as Foreign Representative on Behalf of the Debtors' Estates**

227.    Pursuant to section 1505 of the Bankruptcy Code, the Debtors are seeking authority for TKH to act as Foreign Representative on behalf of the Debtors' estates in any judicial or other proceedings in a foreign country, including the Canadian Proceedings discussed below. The Debtors are further requesting that, as Foreign Representative, TKH shall be expressly authorized to (i) seek recognition of the Chapter 11 Cases in Canada, (ii) request that the Canadian Court lend assistance to this Court in protecting the property of the Debtors'

estates, and (iii) seek any other appropriate relief from the Canadian Court that is just and proper in furtherance of the protection of the Debtors' estates.

228.    As described herein, TKH and TKJP are named defendants in fourteen (14) class actions in four (4) Canadian provinces (British Columbia, Saskatchewan, Quebec, and Ontario).  Although nine (9) of the Canadian Actions have been formally dismissed or are currently being held in abeyance, five (5) remain pending against TKH.  The Canadian Actions are brought by putative representative plaintiffs who allege that they are consumers who purchased/leased vehicles in Canada with airbags containing PSAN Inflators that are subject to recalls.  The putative representative plaintiffs assert claims for economic losses largely based on the theory that the recall of PSAN Inflators has reduced market value of vehicles and/or airbags containing PSAN Inflators and that they experienced losses arising from their inability or unwillingness to use their vehicles until the inflators were replaced and the expenses associated with such replacement.  As of the date hereof, the Debtors are aware of two (2) personal injury lawsuits pending in Canada; however, there have been no known instances of inflator ruptures in Canada.  Claims in the continuing Canadian Actions total an aggregate of approximately CDN $3.5 billion and are all at the pre-certification stage.  As a result of the pending Canadian Actions against TKH, it is necessary to ensure that these Chapter 11 Cases as well as certain orders of the Court issued herein are recognized and enforced in Canada.

229.    TKH (as the proposed Foreign Representative), will shortly seek ancillary relief in Canada on behalf of the Debtors' estates in the Ontario Superior Court of Justice (Commercial List) (the "***Canadian Court***") in Toronto, Ontario, Canada.  I understand that the purpose of the ancillary proceedings is to request that the Canadian Court recognize these Chapter 11 Cases as a "foreign proceeding" under the applicable provisions of the CCAA in

RLF1 17750950V.1

order to, among other things, ensure that the protections of the automatic stay are enforced with respect to the Canadian Actions to provide clarity and structure to potential creditors in Canada.

230.    To commence the Canadian Proceedings, the Debtors require authority for a Debtor entity to act as the "foreign representative" on behalf of the Debtors' estates.  The Debtors request authority to appoint TKH as such Foreign Representative.  Authorizing TKH to act as the Foreign Representative on behalf of the Debtors' estates in the Canadian Proceedings will allow coordination of these Chapter 11 Cases and the Canadian Proceedings, and provide an effective mechanism to protect and maximize the value of the Debtors' assets and estates. Because TKH is a defendant in the Canadian Actions, it is critical that a stay similar to the automatic stay imposed pursuant to section 362 of the Bankruptcy Code be granted in Canada, and that certain of this Court's orders also be recognized in Canada.  As a Debtor in these Chapter 11 Cases, TKH is well-positioned to represent the Debtors as Foreign Representative in the Canadian Proceedings.

**N.    Motion of Debtors Pursuant to 11 U.S.C. § 105(a), Fed. R. Bankr. P. 2002, 5005, and 9007, and Local Rules 2002-1(d) and 5005-4 for Entry of an Order Implementing Certain Notice Procedures and Approving the Form and Manner of Notice of Commencement**

231.    By this motion, the Debtors are seeking entry of an order (i) approving the form and manner of the notice of commencement (the "***Notice of Commencement***") of the Debtor's Chapter 11 Cases and meeting of creditors pursuant to section 341 of the Bankruptcy Code; (ii) limiting the notice the Debtors and other persons filing papers in these Chapter 11 Cases are required to provide to individuals who own or may have owned vehicles containing PSAN Inflators manufactured by the Debtors that may be the subject of ongoing or future recalls, pending further order of the Court directing the manner of notice to such parties; and (iii)

authorizing the release to the Debtors certain motor vehicle records necessary to implement

special noticing procedures for such individuals.

232.    The Debtors estimate they have approximately 80,000 creditors on a

combined basis, however, this number is exclusive of the significant number of individuals that

own, or may have owned, vehicles equipped with airbags containing PSAN Inflators

manufactured by the Debtors that are the subject of ongoing or, potentially, future recalls who

may be entitled to notice in these Chapter 11 Cases (any such individual, a "***PPIC***" and,

collectively, the "***PPICs***").  As set forth above, as of the date hereof, approximately sixty-one

million (61,000,000) automobiles containing airbags with PSAN Inflators in the United States

and approximately an additional sixty-four million (64,000,000) automobiles globally have been

recalled or will be subject to recalls based on announced schedules and, by December 31, 2019,

all airbags in the U.S. containing non-desiccated PSAN Inflators will be subject to recall in the

U.S..

233.    As set forth in the motion, due to the staggering number of potential

parties in interest, the costs of providing traditional notice on all PPICs in the Chapter 11

Cases—*i.e,* mailing printed copies of pleadings via first class mail—is simply not feasible and

would effectively subsume any proceeds from the Global Transaction that may be available for

creditor distributions.  Indeed, Prime Clerk, the Debtors' proposed claims and noticing agent,

estimates that the costs of providing physical notice to such parties would increase the cost of

preparing and mailing the Notice of Commencement alone by more than $70 million.  In order to

alleviate this burden, and to conserve the limited resources available in these cases, the Debtors

are proposing the Noticing Procedures set forth in the motion for (i) serving the Notice of

Commencement on all parties other than PPICs that are entitled to receive notice in these

Chapter 11 Cases, which include the traditional notice parties such as the Debtors' lenders and other financial creditors, suppliers, vendors, trade creditors, employees, litigation claimants, and other traditional creditors and parties in interest in these Chapter 11 Cases (collectively, the "***Traditional Notice Parties***"), and (ii) providing notice to PPICs during the Chapter 11 Cases, including notice of the commencement of the Chapter 11 Cases.  The Debtors submit that the Noticing Procedures will maximize the efficiency and orderly administration of these Chapter 11 Cases, while at the same time ensuring that appropriate notice is provided, particularly to parties who have expressed an interest in these Chapter 11 Cases, and I agree.

234.    Pursuant to the Noticing Procedures, the Debtors are proposing that Prime Clerk serve the Notice of Commencement, substantially in the form attached as an exhibit to the motion, by regular mail, postage prepaid on all Traditional Notice Parties entitled to receive such notice pursuant to Bankruptcy Rule 2002 within five (5) business days of entry of an order granting the relief requested herein or as soon as reasonably practicable thereafter.  With respect to the PPICs, it is my understanding that, notwithstanding any requirements of the Bankruptcy Code, the Debtors are not intending to serve the Notice of Commencement on any PPIC unless such party or individual has filed a notice of appearance in accordance with Local Rule 2002-1 or is otherwise identified on the Debtors' Schedules as having a claim against any of the Debtors, including contingent, unliquidated or disputed claims (*i.e.,* litigation parties or parties otherwise known to be creditors of the Debtors).

235.    Rather than incurring the additional cost and expense of mailing a separate Notice of Commencement to PPICs, in connection with the Debtors' motion seeking authority to establish deadlines for creditors and other parties in interests to file proofs of claim in the Chapter 11 Cases (the "***Bar Date Motion***"), it is my understanding that the Debtors intend to

request authority to provide notice to PPICs of the commencement of the Chapter 11 Cases

pursuant to a combined notice to be served in connection with the notice establishing the

deadline for PPICs to file proofs of claims in the Chapter 11 Cases (the "***PPIC Combined***

***Notice***").  With the exception of the PPIC Combined Notice, which, I understand, the Debtors

intend to mail to a substantial and clearly defined subset of PPICs (the "***PPIC Notice Parties***") in

accordance with the relief it will seek pursuant to the Bar Date Motion, all updates and other

notices sent to PPIC Notice Parties shall be delivered electronically in accordance with the PPIC

Electronic Opt-In Procedures.

236.    In order to serve the PPIC Combined Notice as the Debtors anticipate

pursuant to the Bar Date Motion, it is my understanding that the Debtors require certain vehicle

registration information (including the owner names and addresses, years, makes, models and

VIN Numbers of the Subject Vehicles) from IHS Markit and its subsidiary R.L. Polk and Co.

(collectively, "***IHS***"), which specializes in obtaining such information from, *inter alia*, the

applicable departments of motor vehicles.  Due to confidentiality restrictions, however, IHS is

not permitted to release such information to the Debtors or their professionals absent a court

order compelling them to do so.  Once they receive the necessary information regarding the

Subject Vehicles from IHS, subject to receipt and review of such data and information, Prime

Clerk estimates that it will take approximately three (3) weeks to mine the necessary information

and manipulate it into the required format to conduct their mailings.  Accordingly, to facilitate

and streamline the eventual mailing of the PPIC Combined Notice, the Debtors are requesting

the Court order and direct IHS, and any applicable state or territory department of motor vehicles

or similar governmental agency, to provide the Debtors and their professionals with the

necessary information to send the PPIC Combined Notice to current registered owners of Subject

Vehicles and registered owners of Subject Vehicles from January 1, 2013 onward, including, with respect to all periods, owners' full names and all address information, whether residential or other.

237.    The Debtors submit that, in light of the PPIC Combined Notice, widespread press and news coverage regarding the commencement of these Chapter 11 Cases, the Debtors' proposed publication of the Notice Commencement in the national editions of the of each of *The Wall Street Journal*, *The New York Times*, and *USA Today*, as well as in the *Automotive News*, and additional supplemental noticing procedures, including the creation of a website and toll-free number, internet banner advertising, sponsored search listing, information release, and social media campaign, that all parties and interests will receive due and proper notice of the commencement of these Chapter 11 Cases.  Furthermore, the Debtors intend, in connection with the Bar Date Motion, to serve, or caused to be served, notice of any such deadline on all creditors and parties in interests as required under the Bankruptcy Code and Bankruptcy Rules, including on parties and individuals that own or may have owned vehicles containing PSAN Inflators.  The Debtors submit that these measures collectively will give all parties in interest due and proper notice of the commencement of these Chapter 11 Cases, and I agree.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of June, 2017

*/s/ Scott E. Caudill*
Scott E. Caudill
Executive Vice President & Chief Operating Officer

*Signature Page to First-Day Declaration*

**Exhibit A**

**Global Organizational Chart**

JAPAN
Takata Corporation (Japan) Incorporated: Nov 19, 1956 1002 [TKJP]
Capital ¥41,862,008,251
APIC ¥42,579,261,893
Total ¥84,441,270,144
EUROPE
AMERICAS
ASIA
Takata International Finance B.V. (Netherlands) 1011[TIF] EUR 435,989,470
TAKATA Reinsurance Inc.(U.S.A.) Incorporated: Aug 30, 2010 1089 [TKRI] USD 34,208,555
Takata Kyushu K.K. (Japan) Incorporated: May 20, 1991 1003 [TK9] JPY 70,000,000
Takata Service K.K. (Japan) Incorporated: Dec 5, 1979 1004 [TKS] JPY 40,000,000
TAKATA Europe GmbH (Germany) Incorporated: Apr 23, 1991 1052 [TKEUR] EUR 390,064,651
Takata Rus LLC (Russia) Incorporated: Jul 28, 2010 1088 [TKRU] RUB 1,331,808,663
TAKATA PlasTec GmbH (Germany) Incorporated: Mar 24,2006 1080 [TKPT] EUR 25,000
TAKATA Maroc S.A.R.L. (Morocco) Incorporated: Mar 10,2010 1085 [TKMR] EUR 1,185,074
Takata Istanbul Automotive Safety Systems Production and Trading Ltd. (Turkey) Incorporated: Spe 3, 2008 TRY 280,000
Takata Safety Systems Hungary Kft. (Hungary) Incorporated: Oct 11, 2013 2021 [TKHU] EUR 45,803,883
TAKATA Ignition Systems GmbH (Germany) Incorporated:Sep 26, 2012 EUR 25,000
European Automotive Systems Limited (U.K.) Incorporated: Jun 30, 1988 1012 [EASL] GBP 24,489,149
TAKATA Sachsen GmbH (Germany) Incorporated: Jul 13, 1995 1054 [TKSAC] EUR 25,565,010
TAKATA Orşova S.R.L. (Romania) Incorporated: Apr 15, 2010 1086 [TKOR] RON 82,372
TAKATA Sibiu S.R.L. (Romania) Incorporated: Aug 9, 2004 1068 [TKSR] EUR 9,000,500
TAKATA Deta S.R.L. (Romania) Incorporated:Apr 15, 2010 1087 [TKDR] RON 82,372
TAKATA AG (Germany) Acquired: Jun 8, 2000 4500 [TKAG] EUR 206,442,587
TAKATA Jibou S.R.L. (Romania) Incorporated:Jul 13, 2011 1092 [TKJR] RON 84,438
Dalphi Metal Espana S.A. Madrid, Spain
TAKATA Parts s.r.o. (Czech Rep.) Acquired: Jun 8, 2000 1057 [TKPS] EUR 1,485,590
TAKATA Parts Polska Sp. z o.o. (Poland) Acquired: Jun 8, 2000 1058 [TKPP] EUR 31,824,476
TAKATA Spólka z o.o (Poland) Acquired: Jun 8, 2000 1059 [TKSP] EUR 5,990,413
TAKATA Romania S.R.L. (Romania) Acquired: Jun 8, 2000 1060 [TKRO] EUR 32,824,527
TAKATA GmbH Inflator Systems (Germany) Acquired: Jun 8, 2000 1061 [TKIS] EUR 25,600
TAKATA South Africa (Pty.) Ltd. (South Africa) Acquired: Jun 8, 2000 1062 [TKSAF] ZAR 83,554,579
Dalphi Metal Sequridad S.A. Madrid, Spain
Dalphi Metal International S.A. Madrid, Spain
Dalphi Metal Portugal S.A. Vila Nova d.C., Portugal
TAKATA AMERICAS (U.S.A.) Incorporated: Mar 28, 2003 1014 [TKAM] USD 456,331,510
Takata Uruguay S.A. (Uruguay) Incorporated: Feb 14, 2011 1091 [TKU] USD 9,968,020
TK HOLDINGS INC. (U.S.A.) Incorporated: Nov 13, 1989 1019 [TKH] 602,202,796 USD
TAKATA BRASIL LTDA (Brazil) Acquired: Mar 28, 2003 1056 [TKBR] BRL 189,659,094
TK Finance LLC (U.S.A.) Incorporated: May 9, 2003 1015 [TKF] USD 10,802,566
Syntec Seating Solution LLC (U.S.A.) North Carolina Acquired: Jun 15, 2012 1084 [SSS] USD 7,850,000
TK China LLC (U.S.A.) Incorporated: May 9, 2003 1016 [TKC] USD 18,602,566
Highland Industries,Inc. (U.S.A.) Incorporated:Mar 8,1988 1026 [HII] USD 40,000,000
ALS Inc. (Japan) Acquired: Jun 13, 2000 1037 [ALS] JPY 25,000,000
TK Mexico Inc. (America) Incorporated: Aug 6, 2004 1075 [TKMI] USD 73,500,100
Takata Protection Systems, Inc. (U.S.A.) Acquired: Mar 6, 2012 1095 [TPSI] USD 9,110,270
TK Mexico LLC (America) Incorporated: Aug 6, 2004 1076 [TKML] USD 236,261
TK HOLDINGS DE MEXICO S.DE R.L. DE C.V. (Mexico) Incorporated: Aug 2, 2004 1077 [TKHM] MXN 949,231,060
Interiors In Flight, Inc (U.S.A.) Acquired: Jul 24, 2013 1102 [IIF] USD 2,600,000
EQUIPO AUTOMOTORIZ AMERICANA S.A. DE C.V. (Mexico) Incorporated:Dec 17,1973 MXN 46,051,650
INDUSTRIAS IRVIN DE Mexico, S.A. DE C.V. (Mexico) Incorporated: Jan 23, 1989 1022 [IIM] MXN 10,492,500
FALCOMEX SA DE CV (Mexico) Incorporated: Jan 23, 1989 1024 [FALC] MXN 33,734,640
TAKATA DE MEXICO S.A. DE C.V. (Mexico) Incorporated: Jun 3,1994 1040 [TDM] MXN 99,934,900
STROSSHE-MEX S.DE R.L. DE C.V. (Mexico) Incorporated: Jul, 2004 1074 [SMX] MXN 3,000
Takata (Changxing) Safety Systems Co., Ltd. (China) Incorporated: Dec 1, 2005 1078 [TCX] 202,242,527 CNY
Takata Automotive Electronics Shanghai (China) Incorporated: May 22, 2008 1082 [TAES] CNY 34,850,799
Takata (Tianjin) Automotive Component Co. ,Ltd. (China) Incorporated: April 30, 2012 1094 [TTAC] CNY 124,390,400
Takata (Jingzhou) Automotive Component Co.,Ltd. (China) Incorporated: Aug 13, 2013 1099 [TJAC] CNY 100,000,000
Takata (Shanghai) Automotive Component Co., Ltd. (China) Incorporated: Sep 12, 2003 1066 [TSAC] CNY 165,539,250
Takata (Shanghai) Vehicle Safety Systems Technical Center Co.,Ltd. (China) 1093 [TSTC] CYN 15,000,000
RTA Holdings, Inc. (Philippines) Incorporated: Oct 29, 1997 1045 [RTAH] PHP 25,000,000
RTA Properties, Inc. (Philippines) Incorporated: Nov 18, 1997 1046 [RTAP] PHP 40,000,000
Takata (Philippines) Corporation (Philippines) Incorporated: Apr 11, 1997 1044 [TPC] USD 35,941,384
TAKATA ASIA Pte Ltd (Singapore) Incorporated: Apr 16, 1992 1041 [TKA] SGD 18,485,229
Takata CPI Singapore Pte., Ltd (Singapore) Incorporated: Mar 2, 1999 1043 [TKCPI] USD 8,000,059
Takata-TOA CO., Ltd. (Thailand) Incorporated: Jun 5, 1995 1047 [TTC] THB 200,000,000
Takata Korea Co., Ltd. (S.Korea) Incorporated: Dec 1, 2001 1049 [TKK] KRW 49,828,256,960
Takata Automotive Safety Systems (M) Sdn.Bhd. (Malaysia) Incorporated:Aug 9,2001 1050 [TSM] MYR 500,000
Takata India Private Limited (India) Incorporated: Jul 20, 2007 1081 [TKI] INR 2,744,000,000
PT.TAKATA AUTOMOTIVE SAFETY SYSTEMS INDONESIA (Indonesia) Incorporated: Nov 1, 2010 1090 [TASSI] IDR 53,538,000,000
TIF: Advanced Material Engineering Pte. Ltd.: 4,080,030 USD 3,920,029 USD
TIF: TOA Paint (Thailand) Co., Ltd.: 146,666,667 THB 3,000,000 THB
※3 TKJP: 9,533 JPY
TIF: ANAND AUTOMOTIVE SYSTEMS LIMITED: 505,000,000 INR 18,333,300 INR
※3 TKJP: 6,104,382 JPY

