## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **TK HOLDINGS INC.,** *et al.* | Case No. 17–11375 (BLS) |
| **Debtors.** [1] | Jointly Administered |
| TK HOLDINGS INC., *et al.* | Adv. Pro. No. 17-50880 (BLS) |
| **Plaintiffs,** | |
| **– against –** | |
| STATE OF HAWAI'I, by its Office of Consumer Protection, GOVERNMENT OF THE UNITED STATES VIRGIN ISLANDS, STATE OF NEW MEXICO, *ex rel.* HECTOR BALDERAS, Attorney General, *et al.*, | **Re: Docket Entry No. 2** **Hearing Date: August 9, 2017 at 10:00 am (ET)** |
| **Defendants.** | |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. § 105(a)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .....................................................................................................1

ARGUMENT ................................................................................................................................2

I.   THE STATE ACTIONS SHOULD BE STAYED UNDER SECTION
     105(A) .............................................................................................................................2

     A.   This Court May Enjoin the State Actions Under Section 105(a)
          Irrespective of the Police Power Exception. ...........................................................3

     B.   The Requirements of Section 105(a) Are Satisfied. ................................................6

          1.   The Debtors Have a Strong Likelihood of Restructuring. ...........................6

          2.   The Debtors Will Be Irreparably Harmed Absent an
               Injunction. ....................................................................................................7

          3.   A Balance of Harms Weighs in Favor of a Stay. .......................................11

          4.   Enjoining the State Actions is in the Public Interest..................................14

II.  THIS COURT SHOULD ENJOIN THE STATE AND INDIVIDUAL
     ACTIONS AGAINST NON-DEBTORS TKJP AND THE
     CONSENTING OEMS .................................................................................................15

     A.   This Court Should Enjoin the State Actions Against the Non-
          Debtors. .................................................................................................................15

     B.   This Court Has Subject Matter Jurisdiction Over the Individual
          Actions. .................................................................................................................16

          1.   The Consenting OEMs' Indemnification Claims Against
               the Debtors Arose Upon the Filing of the Applicable
               Complaints. .................................................................................................17

          2.   Allowing the Actions to Proceed Would Risk Prejudicing
               the Debtors in Subsequent Litigation and Adversely Affect
               the Estate. ...................................................................................................22

     C.   Because the Debtors Share an Identity of Interest with the
          Consenting OEMs, It would Be Appropriate to Extend the
          Automatic Stay Here...............................................................................................24

     D.   Allowing the Individual Actions to Proceed Would Benefit
          Individual Interests Rather than the Estates as a Whole. .......................................26

          1.   The Debtors Have a Strong Likelihood of Restructuring. .........................26

          2.   The Debtors Will Be Irreparably Harmed Absent an
               Injunction. ..................................................................................................26

i

3.      A Balance of Harms Weighs In Favor of a Stay.........................................28

4.      Enjoining the Actions is in the Public Interest...........................................29

CONCLUSION...........................................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
788 F.2d 994 (4th Cir. 1986) ..................................................................................20

*In re Alert Holdings, Inc.*,
148 B.R. 194 (Bankr. S.D.N.Y. 1992) ....................................................................4

*In re Am. Film Techs., Inc.*,
175 B.R. 847 (Bankr. D. Del. 1994) ..................................................................22, 23

*In re Baldwin-United Corp.*,
57 B.R. 759 (Bankr. S.D. Ohio 1985) .......................................................................7

*Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*,
488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ........................ *passim*

*Matter of Commonwealth Oil Refining Co.*,
805 F.2d 1175 (5th Cir. 1986) ............................................................................6, 7

*In re Crazy Eddie Secs. Litig.*,
104 B.R. 582 (S.D.N.Y. 1989) ................................................................................22

*Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.*,
54 B.R. 353 (Bankr. W.D. Wis. 1985) ......................................................................7

*In re Dow Corning*,
86 F.3d 482 (6th Cir. 1996) ...................................................................................24

*In re Enron*,
314 B.R. 524 (Bankr. S.D.N.Y. 2004) ...............................................................2, 11

*In re Federal-Mogul Global, Inc.*,
300 F.3d 368 (3d Cir. 2002) .............................................................................17, 21

*In re Federal-Mogul Global, Inc.*,
282 B.R. 301 (Bankr. D. Del. 2002) ........................................................................21

*In re First All. Mortg. Co.*,
264 B.R. 634 (C.D. Cal. 2001) ........................................................................ *passim*

*In re Iezzi*,
504 B.R. 777 (E.D. Pa. 2014) ................................................................................13

*In re Hunt*,
   93 B.R. 484 (Bankr. N.D. Tex. 1988), *Modified*, No. 388-35725-HCA-11, 1989 WL
   67827 (Bankr. N.D. Tex. Jan. 31, 1989).................................................................................11

*In re Metro Trans. Co.*,
   64 B.R. 968 (Bankr. E.D. Pa. 1986) .............................................................................3, 4, 5

*In re ML Barge Pool VII Partners - Series A*,
   98 B.R. 957 (E.D. Mo. 1989).................................................................................................7

*In re Monroe Well Service, Inc.*,
   67 B.R. 746 (Bankr. E.D. Pa. 1986) ....................................................................................20

*In re NWFX, Inc.*,
   864 F.2d 588 (8th Cir. 1988) .................................................................................................3

*In re Otero Mills, Inc.*,
   25 B.R. 1018 (D.N.M. 1982) ..........................................................................................16, 27

*Pacor Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984)..................................................................................................17

*Penn Terra Ltd. v. Dep't of Envtl. Res. of Pa.*,
   733 F.2d 267 (3d Cir. 1984)....................................................................................................3

*In re Phila. Newspapers, LLC*,
   407 B.R. 606 (E.D. Pa. 2009) .........................................................................................16, 23

*In re Sec. Gas & Oil, Inc.*,
   70 B.R. 786 (Bankr. N.D. Cal. 1987) ..................................................................................3, 6

*In re SemCrude, L.P.*,
   428 B.R. 82 (Bankr. D. Del. 2010) (Shannon, J.).......................................................17, 18, 20

*In re Union Trust Phila., LLC*,
   460 B.R. 644 (E.D. Pa. 2011) ..............................................................................................22

*United States v. Seitles*,
   106 B.R. 36 (S.D.N.Y. 1989), *vacated on other grounds*, 742 F. Supp. 1275
   (S.D.N.Y. 1990) ....................................................................................................................11

*In re W.R. Grace & Co.*,
   412 B.R. 657 (D. Del. 2009)......................................................................................... *passim*

*In re W.R. Grace & Co.*,
   591 F.3d 164 (3d Cir. 2009).................................................................................................17

*In re W.R. Grace & Co.*,
　　No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ........................20, 24

*W.R. Grace & Co. v. Chakarian*,
　　386 B.R. 17 (Bankr. D. Del. 2008) ................................................................................ *passim*

*In re Wedgewood Realty Group, Ltd.*,
　　878 F.2d (3d Cir. 1989).............................................................................................................26

**Statutes**

11 U.S.C. § 362(b)(4) ...............................................................................................4, 13, 14

11 U.S.C. § 105(a) ............................................................................................... *passim*

**Other Authorities**

3 *Collier on Bankruptcy*.............................................................................................13

<u>**PRELIMINARY STATEMENT**</u>[2]

In their Motion, the Debtors established that this Court has the jurisdiction and authority to issue a stay of the Actions. They also established that a stay is necessary and appropriate to allow the Debtors to focus their very limited resources, time, and energies on compliance with their restructuring and regulatory commitments and consummation of a Global Transaction that would benefit *all* of their creditors and the automotive public. None of the Objectors seriously disputes that a failure of the Debtors to consummate the Global Transaction and meet their commitments will result in dire consequences, not only for the Debtors and their tens of thousands of employees, but also for the massive recall efforts underway and the safety of the driving public.  Instead, the Objectors largely focus on attacking this Court's authority to issue the injunction and assert that individual interests should prevail to the detriment of the Debtors' estates and the public good.

The Debtors are sympathetic to the significant (and in many cases tragic) circumstances of the Individual Plaintiffs. The Debtors, however, did not file this Motion to deprive or limit those parties of a recovery to which they may be entitled, or shield the Consenting OEMs from any alleged liability. Rather, the Debtors filed this Motion to seek a temporary stay of litigation so that they can focus their resources for the next several months on their obligations to public safety and this bankruptcy proceeding. As the MDL plaintiffs recognize, "the one goal all parties to these proceedings should be striving for" is "to have as many defective Takata inflators as possible replaced as quickly as possible." MDL Pls. Obj. (Adv. D.I. 26) at 39. The best way to meet that goal

---

[2] Capitalized terms used in this Reply and not otherwise defined, shall have the meanings defined in the Debtors' Moving Br. (Adv. D.I. 3). Unless otherwise noted, all emphasis is added and internal citations are omitted.

is to grant the Motion, temporarily pause the Actions, and allow the Debtors to focus on the Global Transaction.

## ARGUMENT

## I.    THE STATE ACTIONS SHOULD BE STAYED UNDER SECTION 105(A).

The States devote a substantial portion of their Objection to an argument the Debtors did not make—that the State Actions are exempt from Section 326's automatic stay provisions under the "police power exception." *See* Moving Br. at 2, 15 n.13; States Obj. (Adv. D.I. 29) at 11–15. Although the Court need not address this issue, the States are wrong. *See, e.g., In re Enron*, 314 B.R. 524, 534 (Bankr. S.D.N.Y. 2004) ("police or regulatory power" exception does not apply where primary purpose of government lawsuit is to seek money damages or other monetary relief for past conduct as opposed to prevent future harm to public health or safety). The State Actions are focused on capturing money for the States—not protecting the public from *ongoing* hazards. Any public policy benefit from the State Actions (*e.g.*, deterring wrongful conduct by the Debtors or others within the industry) is moot, as the complained-of conduct is no longer occurring and the Debtors are *already* complying with the well-publicized NHTSA recall requirements to remedy past conduct; thus, there is no future wrongful conduct to prevent. Therefore, the State Actions are subject to Section 362's automatic stay.

Even assuming that the State Actions are not subject to the automatic stay, these suits should still be enjoined under Section 105(a) of the Bankruptcy Code.[3] This injunction is necessary because the States have already sought, and will continue to seek,

---

[3] While the States characterize the relief sought by the Debtors as an "extraordinary remedy," (States Obj. at 15), this case *is* an exceptional one and the State Actions pose a direct threat to the Debtors' estate and their ability to successfully reorganize, thereby jeopardizing the supply of replacement inflators for ongoing recalls.

physical control over the estates' assets in conflict with this Court's exclusive jurisdiction over those assets. In addition, injunctive relief is necessary because the State Actions threaten the Debtors' reorganization. Nothing in the States' Objection shows otherwise.

**A.**     **This Court May Enjoin the State Actions Under Section 105(a) Irrespective of the Police Power Exception.**

Under Section 105(a), the Court has expansive equitable powers to fashion any order or decree, including against governmental units, which is in the interest of preserving or protecting the value of the debtor's assets. *See Penn Terra Ltd. v. Dep't of Envtl. Res. of Pa.*, 733 F.2d 267, 273 (3d Cir. 1984)[4]; *see also In re Sec. Gas & Oil, Inc.*, 70 B.R. 786, 793 (Bankr. N.D. Cal. 1987) ("[I]ssuance of an injunction under section 105 is appropriate where the threatened state activity would unduly interfere with the proper functioning of the Bankruptcy Code."); *In re Metro Trans. Co.*, 64 B.R. 968 (Bankr. E.D. Pa. 1986) (enjoining enforcement of state agency's ruling under section 105(a) where such ruling threatened to deplete the assets of the estate and effectively "ruin" the debtor's opportunity to operate as a going concern); *see also In re NWFX, Inc.*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern. Equitable principles must be directed toward the care and preservation of the estate."). Moreover, "[w]here there is a showing that the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate and reorganization prospects, the Bankruptcy Court may issue injunctive relief." *In re Alert Holdings, Inc.*, 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992).

---

[4] Although the States criticize the Debtors' reference to the "thirty-three year old Third Circuit" decision in *Penn Terra*, (*see* States Obj. at 19), this seminal case remains the prevailing law in the Circuit. *See W.R. Grace*, 412 B.R. 657, 665 (D. Del. 2009) (citing *Penn Terra*, 733 F. 2d at 273 ("Courts may apply § 105(a) on a case-by-case basis even if the 'bankruptcy code is not operative.'")).

Contrary to the States' assertions,[5] Third Circuit courts have used their broad powers under Section 105(a) to stay regulatory actions brought by a government entity where such actions threatened a debtor's reasonable opportunity to reorganize.  For example, in *In re W.R. Grace & Co.*, 412 B.R. 657 (D. Del. 2009), the court recognized that even where a regulatory action falls within the police power exception, an injunction may be appropriate and warranted. *Id.* at 665. ("Bankruptcy Court did not err in enjoining [state agency's] suit against [the debtor] and its former officers. Given the circumstances, issuance of an injunction was appropriate.").

Similarly, in *In re Metro Trans. Co.*, although acknowledging the regulatory agency's charge to "protect the public interest," the court reasoned that it was required to "consider the interests of the debtor and its creditors" in determining whether to enjoin the agency's action against the debtor. 64 B.R. at 972. In response, the agency argued, as the States do here, that its actions were regulatory in nature and could not be enjoined. *Id.* To determine whether a Section 105(a) injunction should issue even where Section 362(b)(4) excepted the state's action from the automatic stay, the court evaluated the extent to which the agency's action threatened the assets of the debtor's estate. *Id.* The court enjoined the agency's action, reasoning that the "assets of the [d]ebtor's estate [we]re . . . not only threatened, but almost assuredly [would] be lost" if the injunction was

---

[5] The States rely on three non-Third Circuit decisions to claim that Section 105(a) cannot be used to "enjoin the State Actions that are exempt from the automatic stay." *See* States Obj. at 18 (*citing In re 1820–1838 Amsterdam Equities, Inc.*, 191 B.R. 18, 21 (S.D.N.Y.1996); *In re Compton Corp.*, 90 B.R. 798, 806–07 (N.D.Tex.1988); *In re S.T.R. Corp.*, 66 B.R. 49, 51 (Bankr. N.D. Ohio 1986)). These cases were called into question by *In re First All. Mortg. Co.*, 264 B.R. 634, 652 n.18 (C.D. Cal. 2001) (cited by the States), where the court found that "given that the circuit courts that have addressed the issue squarely have upheld the use of § 105 in such circumstances . . . this Court follows the lead of these circuit courts and holds that § 105 may be used to enjoin a regulatory or police powers action.").

not granted. *Id.* at 973. Moreover, the court found that the fact that the debtor "would be ruined as a going business should, in itself, be sufficient to merit" the relief requested. *Id.*

The continuation of the State Actions would also interfere with the policies and provisions of the Bankruptcy Code and threaten the Debtors' estates. *First*, despite the States' claim that none of their actions seek to exert control over the estates' assets, the record shows the opposite. The United States Virgin Islands, up to the filing of the bankruptcy petitions, tried to seize control of the Debtors' assets. *See* Moving Br. at Section I.B.2 (describing efforts by USVI to force Takata to pay more than $8 million into escrow). But for the USVI Court staying the action, the USVI would, no doubt, have continued its efforts to take possession of and sequester the Debtors' assets.[6] And though the States now assert that the USVI does not intend to challenge the decision staying the escrow order, other states may have a different strategy. And since the USVI and Hawaii are represented by the *same* outside counsel, it is reasonable to expect that Hawaii might employ similar tactics to seize the Debtors' assets. Such conduct justifies this Court exercising its equitable powers under Section 105(a) to enjoin the State Actions. Indeed, it is the grounds which the States concede would allow for issuance of an injunction. *See* States Obj. at 16 (injunctive relief is appropriate where state action seeks control over estate assets).

*Second*, as shown below, the State Actions would "unduly interfere with the proper functioning of the Bankruptcy Code." *In re Sec. Gas & Oil, Inc.*, 70 B.R. 786, 793

---

[6] Although the States claim the USVI Court "found that the money to be escrowed was obtained through fraud," that order was entered without notice to Takata and an opportunity for it to be heard. This "finding" was entered by the USVI court, *sua sponte*, the day *before* a hearing on the State's preliminary injunction motion was scheduled. Moreover, the Escrow Order purports to make legal conclusions that are for this Court, alone, to address. The Debtors also reject the notion that the State's claims are not subject to discharge and will address that contention at the appropriate time.

(Bankr. N.D. Cal. 1987). That is because a continuation of the State Actions would threaten the Debtors' estates and their ability to reorganize, and could also foster an impermissible race to the courthouse amongst other states. Thus, injunctive relief is necessary to ensure that the restructuring proceeds in an orderly and systematic fashion without the distraction of litigation. *See id.* at 795 (injunction appropriate where state action "would interfere unduly with the adjudication of the Bankruptcy case" because "the policy of Chapter 11 is to permit successful rehabilitation of debtors").

### B.    The Requirements of Section 105(a) Are Satisfied.

As shown in the Debtors' Moving Brief, the test for injunctive relief is met here. *See* Moving Br. at Section I.B.

### 1.    The Debtors Have a Strong Likelihood of Restructuring.

Contrary to the States' assertion, courts in the Third Circuit have held that the relevant inquiry regarding the likelihood of success is whether the debtor is likely to reorganize. *See W.R. Grace & Co. v. Chakarian*, 386 B.R. 17, 33 (Bankr. D. Del. 2008); *In re Sec. Gas & Oil, Inc.*, 70 B.R. at 793 n.3 ("In the context of an action seeking relief under section 105, the likelihood of success on the merits logically must refer to whether the debtor can show that enforcement of the state laws will unduly interfere with the bankruptcy adjudication."). In fact, "[t]he concept of success on the merits is not limited to whether there is a defense to the threatened action under nonbankruptcy law." *Id.* *Matter of Commonwealth Oil Refining Co.*, 805 F.2d 1175 (5th Cir. 1986) (cited by the States), is not to the contrary. There, the bankruptcy court never "addressed the issue of success on the merits" because, unlike here, the debtor did not dispute its failure to comply with federal environmental statutes. *In re ML Barge Pool VII Partners - Series A*, 98 B.R. 957, 959 (E.D. Mo. 1989) (discussing *Commonwealth Oil*). Indeed, in affirming

the issuance of an injunction, the district court in *ML Barge* declined the United States Department of Maritime Administration's invitation to follow *Commonwealth Oil* and found that the bankruptcy court properly considered the "merits" of the "pivotal later proceeding" to be the likelihood of plan confirmation. *See ML* Barge, 98 B.R. at 959–60; *see also In re Baldwin-United Corp.*, 57 B.R. 759, 767 (Bankr. S.D. Ohio 1985) ("[T]he probability of the debtor effecting a successful plan of reorganization may be a proper way for determining the likelihood of success on the merits for the purposes of issuing a 105 injunction.").

Here, this factor weighs in favor of the Debtors. Absent interference from the States, not only do the Debtors have a good chance to restructure, but they have also demonstrated that the State Actions threaten their estates and will unduly interfere with their reorganization efforts. *See* Moving Br. at 16–17.

### 2.    *The Debtors Will Be Irreparably Harmed Absent an Injunction.*

This Court should enjoin the State Actions to prevent irreparable harm to both the Debtors and estate creditors. *See Dore & Assocs. Contracting, Inc. v. Am. Druggists' Ins. Co.,* 54 B.R. 353, 357 (Bankr. W.D. Wis. 1985) ("Irreparable harm in the bankruptcy context refers to either irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate."); Moving Br. at Section I.B.2. Aside from maintaining daily operations—which employ 23,000 people—the Debtors are, at once, coordinating with, and answering to, the Independent Monitor and Quality Assurance Panel to ensure compliance with NHTSA and DOJ mandates, finalizing the various interrelated and complementary agreements needed to execute the Global Transaction, and undergoing a complex restructuring. The Debtors are already stretched thin and seek the requested

relief so that they may continue to balance these responsibilities in the face of looming deadlines without the added burden ongoing litigation would impose.

The Debtors' employees—officers, directors, senior leadership, and key engineers—are working hard to maintain a delicate balance of operating the Debtors' day-to-day business, while also devoting a significant portion of their time and efforts dealing with complex matters relating to the Chapter 11 Cases. *See, e.g.*, Tsekerides Reply Decl., Ex. A ("*Caudill Tr.*") at 32:12–16; 33:25–34:4. This tightrope, however, is fraying. As bankruptcy-related obligations mount, the Debtors continue to engage in complex negotiations with the Plan Sponsor, the Customer Group, two separate creditors' committees, and other Takata Customers that might become Consenting OEMs, develop business and financial plans, and finalize agreements with those parties as deadlines under NHTSA's Orders draw closer. *See id.* at 48:25–49:3 ("I would submit that any additional load on this organization is an extreme tax for the organization."); *see also id.* at 94:2–7 ("Negotiations surrounding the specific agreements continue at length; they have been going on for months. The value of the company continues to decrease, all of which put the deal and the deal timeline at risk.").[7] Mr. Caudill described the increasing burden placed on the Debtors:

> I have a general understanding of the current demands of operating the business, trying to complete the—the recall . . . [T]he demands of the business are very simple. Operating the business today, 19 locations of facilities throughout North America, 23,000 employees servicing hundreds of customers, and trying to replace product throughout North America and the rest of the world; and on top of that, managing the largest recall in the automotive history in the United States. I'd like to add on top of that working with an independent monitor for quality assurance

---

[7] The Debtors de-designate this portion of the Caudill deposition.

> panel specifically; and add on top of that the process and
> demands associated with the sale of the company which
> require diligence requirements production on a number of
> things specific to the sale process itself; add on top of that
> filing and dealing with the bankruptcy proceedings itself
> have the entire organization exceptionally well-tasked.

*See id.* at 46:15–47:13.

In addition to the efforts needed to complete the Chapter 11 Plan, the Debtors'

key engineers are also working to comply with the NHTSA Consent Orders, including

overseeing the production of millions of parts necessary for the recall, which cannot be

obtained elsewhere in the necessary timeframe, and engaging in testing activity regarding

certain inflators that have not been recalled. *See id.* at 44:2-10 ("Mr. Schubert is primarily

responsible under the consent order to determine the valuable life or the workable life or

the service life as it's referred to of our desiccated product. That's a requirement under

the consent order. He leads that entire work—that volume of work for our

organization."). In the absence of a stay of the State Actions, the Debtors would not be

able to maintain this careful balance given that time spent addressing issues in the State

Actions would be time taken from operating the business, ensuring compliance with the

NHTSA recalls, and working to restructure and complete the Global Transaction. *See id.*

at 53:12–17 ("One minute taken away from any of the activity to either supply

replacement kits, meet the requirements under the consent order, ensure supply to the

automotive market is a threat to [the Debtors].");  *see also id.* at 33:25–34:4; 23:14–16.

The pace of the State Actions and the States' recent actions confirm that, in the

absence of a stay, the Debtors would face additional demands in preparing pleadings,

participating in discovery, and attending hearings—all of which would involve members

of the Debtors' senior management having to weigh in on strategic decisions. As just one

example, prompted by the *ex parte* conduct of the USVI in the hours before the Debtors filed their bankruptcy petitions, the court asked all parties to participate in an emergency call. *See* States Obj. at 7. In addition, the States note that "document discovery is expected to commence shortly" in the New Mexico action, thus further burdening the Debtors during this critical phase of the bankruptcy. And other state Attorneys General or governmental agencies may initiate more proceedings against the Debtors.[8] All of this will cause additional irreparable harm to the estates.[9]

Even if only counsel must to attend a hearing (at least sometimes), counsel only act at the behest of, and after discussions with, their client. It is, therefore, unquestionable that, should the State Actions continue, management of the Debtors would be forced to address the myriad of issues that would arise—including, no doubt, additional "emergency" hearings—taking their focus from the issues facing the Debtors.

The demands of these State Actions will disrupt the Debtors' efforts to effectuate their reorganization plan—a plan that would benefit *all* creditors in these proceedings and not just residents of Hawaii, USVI, and New Mexico. In the absence of a stay, the Debtors would be forced to expend funds, otherwise available to creditors, in defense of

---

[8] Although the States claim that there is no basis for this concern, the Debtors are aware of a multistate investigation being conducted by 44 state Attorneys General. Indeed, earlier this year, the "Multistate Working Group" presented the Debtors with terms of discussion, which the Group proposed would form the basis of a proposed Consent Judgment and would contain releases by the Multistate Working Group. Given that no such Consent Judgment was entered, it is reasonable to believe that some or all of these **44** states could pursue claims against the Debtors, if no stay is entered.. *See* Tsekerides Reply Decl. ¶18.

[9] *See* Caudill Tr. 53:3–17 ("Q: Sure. Is there anything that's going on with the state litigation that is interfering with the Debtors' ability to do the restructuring and production tasks that the debtors need to do at present? . . . A: I would specifically refer you back to my explanation relative to the load that's presently on this organization. One minute taken away from any activity to either supply replacement kits, meet the requirements under the consent order, [or] ensure supply to the automotive market[,] is a threat to my organization.").

the State Actions.[10] In addition, both the creditors and the estates would suffer irreparable harm from disruption of this Court's exclusive authority to manage these Chapter 11 Cases. *See In re Hunt*, 93 B.R. 484, 495–97 (Bankr. N.D. Tex. 1988)[11] (enjoining CFTC action because the need for "orderly and consistent administration of" the debtors' estates mandated that the bankruptcy court resolve the CFTC's claims "without any interference by another tribunal"). Thus, the State Actions would irreparably harm Debtors by disrupting their efforts to complete the Global Transaction and restructure—harming all creditors and the public at large.

> 3.    *A Balance of Harms Weighs in Favor of a Stay.*

Unlike the irreparable harm that would befall the Debtors, the States did not show that they would suffer any prejudice as a result of the requested stay. *First*, the complained-of conduct in the State Actions is *not* ongoing; therefore, the State Actions are not necessary to stop any wrongful or illegal conduct. As in *Enron*, the injunctive relief sought by the States is, thus, a "meaningless request." *See* 314 B.R. at 537; *see also United States v. Seitles*, 106 B.R. 36, 39 (S.D.N.Y. 1989), *vacated on other grounds*, 742 F. Supp. 1275 (S.D.N.Y. 1990) (exception to stay does not apply where there is no continuing harm or threat to public health; conclusory allegations that suit is brought for

---

[10] Contrary to the Tort Committee' claims, Scott Caudill did not admit "that a significant portion" of the Debtors' resources are "actually being paid for by insurance companies." Dean Decl. (Adv. D.I. 28) ¶17. *See* Caudill Tr. 164:163:19–164:6 ("Q:  Isn't it true that a large portion of your personal injury and economic loss litigation expenses are funded by insurance companies that hold insurance policies that are obligated to defend your company? . . . A: My understanding is that there is some insurance. My understanding is also that the primary resources is [*sic*] coming from the company."). In fact, while insurers have paid some expenses of local counsel and contributed to some settlements of claims first made in 2014 and 2015, they have not contributed to any other settlements and have paid none of the costs of national counsel for the Debtors.  In addition, insurers are not paying any costs associated with the State Actions, nor have they acknowledged any obligation to pay any fees related to the economic loss class actions. Tsekerides Reply Decl.¶21.

[11] *Modified*, No. 388-35725-HCA-11, 1989 WL 67827 (Bankr. N.D. Tex. Jan. 31, 1989), and *modified*, 95 B.R. 442 (Bankr. N.D. Tex. 1989).

purposes of deterrence are insufficient to avoid the stay). Indeed, the Debtors are not asserting that they, or any future wrongdoers, are not required to comply with the relevant regulations. Rather, the Debtors assert that they are *already* complying with those regulations and that they are actually doing *more* to ensure safety.

In developing a recall schedule, Takata has worked closely with NHTSA to define the highest priority (highest risk) vehicles and geographic regions. Because the malfunction of Takata airbag inflators has been linked with an aging propellant caused by a combination of humidity and high temperature, the recall zones are prioritized based upon temperature and humidity. *See* Takata Recall Expansion: What Consumers Need to Know, Retrieved August 03, 2017, from https://www.nhtsa.gov/takata-air-bags/takata-recall-expansion-what-consumers-need-know. USVI and Hawaii are in "Zone A: Hot & Humid" and New Mexico is in "Zone B: Less Hot & Humid." In other words, NHTSA has already recognized that Hawaii and USVI are particularly important regions and prioritized accordingly. Thus, the States' argument that their actions are necessary to effectuate the recall in their respective states, is baseless. Rather, Takata is already required, and will continue, to cooperate with NHTSA to coordinate and accelerate the recall in the very regions that the States represent.

The Debtors are also working closely with NHTSA, the NHTSA-appointed Independent Monitor, and local organizations to help increase recall completion rates. They have undertaken extensive efforts to educate the public, including residents of Hawaii, USVI, and New Mexico, about the potential risk posed by Takata airbag inflators. Specifically, to maximize recall-completion rates, the Debtors launched airbagrecall.com and vigorous "Get Out the Word" campaigns—which include

substantial advertising on digital billboards and online apps in major markets and high-risk zones—to encourage car owners to bring their vehicles to dealerships for prompt replacement. *See* First Day Decl. ¶61. In addition, they have taken steps to monitor websites, such as Craigslist, to reach out to owners of vehicles that may be under recall. As of the bankruptcy filing, the Debtors had spent nearly $18 million in connection with these consumer-communication efforts. *See id.*; *see also* Tsekerides Reply Decl. ¶¶19–20. Thus, a stay of the State Actions, would not detract from the Debtors continuing to carry out federally-supervised recall efforts and implement a wide-ranging public education campaign—addressing the non-monetary relief sought by the States.

*Second*, because the States also seek statutory fines, there is no practical benefit in allowing the State Actions to continue because even if the police powers exception applied, it specifically *prohibits* enforcement of a *money judgment*. *See* 11 U.S.C. § 362(b)(4). Therefore, even if a government continues to pursue a police or regulatory action, including one seeking a money judgment, it "may enforce only those judgments and orders that *do not require payment* or authorize the government to exercise control over property of the estate." 3 *Collier on Bankruptcy*, ¶362[5][b] at 362–60. As explained in *In re Iezzi*, "even if the proceeding generally is not stayed, the bankruptcy court also may have to determine whether the governmental unit is attempting to enforce a money judgment, *which is stayed* notwithstanding the provision of § 362(b)(4)." 504 B.R. 777, 784 (E.D. Pa. 2014). As the only remaining relief sought would constitute a monetary judgment (because the injunctive relief is already being provided), to the extent that the States seek to pursue their pecuniary interests during the pendency of the bankruptcy, the

State Actions should be stayed pursuant to Section 362(b)(4), even if that provision applied (which the Debtors contend it does not).

Third, by their own admission, because the State Actions are in their nascent stages, the States will not be prejudiced if this Court granted the Debtors' requested relief. The fact that the State Actions are in their "infancy and any judgment against the debtor is several years in the future" demonstrates that the States would not be harmed by the preliminary injunction. See States Obj. at 16–17 ("First HI Action is merely in the fact discovery phase, and no pretrial statement has been filed . . . .  The NM Action and the First USVI Action have not even entered discovery, with the First USVI Action being presently stayed as a result of the Debtors' notice of bankruptcy filing.").

> 4.    *Enjoining the State Actions is in the Public Interest.*

Contrary to the States' assertion, enjoining the State Actions is in the public interest. Unlike most bankruptcies, this restructuring is critical for public safety—*i.e.*, getting unsafe cars off the road. The proposed Global Transaction, which has been negotiated for over a year, is the Debtors' best chance at achieving that goal. If the deal collapses, it is unclear whether the Debtors could either find another buyer before the DOJ's February 2018 deadline or maintain their operations long enough to satisfy their obligations under the recalls—which may take years. In fact, in some cases, Takata is the only entity that can produce the necessary replacement kits. So, if the Debtors do not survive, it may be that no other supplier would have the capacity or ability to produce the parts necessary to continue the public-safety campaign. Simply put, every dollar and minute allocated toward the State Actions detracts from the Debtors' ability to ensure that the already-fragile Global Transaction and Plan are consummated, inuring to the benefit of all creditors and the Debtors' estates.

In any event, at their core, the State Actions relate to claims for money damages against the estates. Their continuation, while the Debtors focus their efforts on the restructuring and recalls, is not in the public interest. And even though the States argue that they have an interest in seeing that their laws are obeyed, injunctive relief is warranted because Takata has already taken the steps required to comply with each State's law under orders from federal authorities.

## II.    THIS COURT SHOULD ENJOIN THE STATE AND INDIVIDUAL ACTIONS AGAINST NON-DEBTORS TKJP AND THE CONSENTING OEMS.

### A.    This Court Should Enjoin the State Actions Against the Non-Debtors.

The States claim there is "no legal basis" to enjoin the State Actions against non-Debtors TKJP and the Consenting OEMs. States Obj. at 26–27. This is, of course, incorrect. *See* Moving Br. at 29-30. The District Court for the District of Delaware has upheld the use of an injunction to stay state actions against non-debtors. *See In re W.R. Grace & Co.*, 412 B.R. at 657.[12] That injunction prevented the New Jersey Department of Environmental Protection from suing non-debtors because the outcome of the suit would have affected the debtor's bankruptcy. *See id.* As shown below, allowing the State Actions to continue against TKJP and the Consenting OEMs would cause significant harm to the Debtors' estates and would materially threaten their ability to successfully reorganize. Moreover, contrary to the States' assertion, the Debtors *do* share an identity of interest with the Consenting OEMs because each State Action arises out of or relates to a Takata inflator. Thus, any adverse rulings entered in the State Actions would negatively affect the Debtors in later proceedings related to defective Takata airbag

---

[12] There, as here, the debtor owed the non-debtors express indemnification obligations. *See W.R. Grace*, 412 B.R. at 668.

inflators. Therefore, this Court should stay the State Actions against TKJP and the Consenting OEMs.

### B.     This Court Has Subject Matter Jurisdiction Over the Individual Actions.

The Objectors, individually and collectively, seem to misunderstand the Debtors' jurisdictional arguments, and have adopted differing interpretations of the Debtors' arguments, none of which are correct. For example, the Tort Committee criticizes the Debtors' "narrow focus" on contractual indemnity, yet ignores the Debtors' arguments regarding litigation prejudice—*i.e.*, collateral estoppel and record taint.[13] Tort Committee Obj. (Adv. D.I. 24) at 15–18.[14] And the MDL Plaintiffs artificially limit the scope of their contractual-indemnification-based analysis to avoid grappling with cases they cannot distinguish, like *Bank of N.Y. v. Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 315 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014), arguing instead (and without any basis) that there are no applicable contractual indemnification obligations owed by the Debtors to the Consenting OEMs. *See* MDL Pls. Obj. at 14–28 ("[N]one of the indemnity provisions produced by the Debtors contemplate indemnification of the MDL OEMs for their own negligence and intentional malfeasance.").[15]

---

[13] At the other end of the spectrum, the Suarez Objection ignores the Debtors' contractual indemnity argument altogether and focuses exclusively on litigation prejudice. *See* Suarez Obj. (Adv. D.I. 31) at 6–9.

[14] The Tort Committee also accuses the Debtors of "confusing" two analytically distinct issues—the jurisdictional standard and the test for whether the injunction should issue. But the Debtors in fact agree that these inquiries are distinct. That is why the Moving Brief separates them. *See* Moving Br. §§ III.A–III.C. In so doing, the Debtors apply a more rigorous test than *In re Otero Mills, Inc.*, 25 B.R. 1018 (D.N.M. 1982), where the court exercised related-to jurisdiction and granted the injunction, and upon which the Tort Committee relies. In any event, "the facts necessary to support the Court's determination at each step of the analysis may overlap." *In re Phila. Newspapers, LLC*, 407 B.R. 606, 611 (E.D. Pa. 2009).

[15] Additionally, the Turk and Bazzal Objections oppose the Motion on the grounds that the Debtors are not named defendants in their Individual Actions. *See* Turk Obj. (Adv. D.I. 20) at 2–5; Bazzal Obj. (Adv. D.I. 21) at 2, 7. As noted, "[t]he fact that the action does not name Debtor is not dispositive" for this Court's analysis. Moving Br. at 28 (citing *Harbison-Walker Refractories Co. v. ACE Prop. & Cas. Ins. Co. (In re Global Indus. Techs.)*, 303 B.R. 753, 760 (Bankr. W.D. Pa. 2004)).

To be clear, this Court has related-to jurisdiction over the Individual Actions because allowing them to proceed would adversely impact the Debtors' estate and restructuring efforts. Under the terms of the Debtors' sales agreements with the Consenting OEMs, each OEM's claim for indemnification arises upon the filing of a claim arising out of or relating to, among other things, Takata inflators. In addition, due to the subject matter of each Action, there is a risk that the Debtors would suffer litigation prejudice—*i.e.*, the negative effects of collateral estoppel or record taint—in a later proceeding. As a result, the Debtors could not avoid diverting resources—time, effort, and money—away from the restructuring to burdensome litigation to protect estate assets, and the interests of *all* creditors.

1.    *The Consenting OEMs' Indemnification Claims Against the Debtors Arose Upon the Filing of the Applicable Complaints.*

The Debtors agree that the proper interpretation of the *Pacor Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), test is whether a lawsuit against a non-debtor can conceivably affect the bankruptcy without "the intervention of another lawsuit." *In re W.R. Grace & Co.*, 591 F.3d 164, 172 (3d Cir. 2009); *In re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002); *In re SemCrude, L.P.*, 428 B.R. 82, 98 (Bankr. D. Del. 2010) (Shannon, J.); *In re Lower Bucks*, 488 B.R. at 314. And the Debtors do not contend that "contractual indemnity rights are in themselves sufficient to bring a dispute within the ambit of related-to jurisdiction." *W.R. Grace*, 591 F.3d at 174 n.9; *SemCrude*, 428 B.R. at 99; *Lower Bucks*, 488 B.R. at 314.

Rather, *Lower Bucks* and *SemCrude* support exercising related-to jurisdiction where, as here, a third party has a right to contractual indemnification against the debtor. In *Lower Bucks*, the district court (and the Third Circuit thereafter) affirmed the

bankruptcy court's exercise of related-to jurisdiction where the relevant provision indemnified against "any and all *claims*, losses, damages or liabilities." 488 B.R. at 316. In other words, it "imposed an indemnity obligation *regardless* of whether the claims *ultimately* result[ed] in a finding of liability." *Id.* And even though certain types of claims were exempt from the debtor's indemnification obligations—namely, gross negligence or willful misconduct—the non-debtor's indemnification claim against the debtor "at least in part, was triggered upon the filing of the" action against the non-debtor. *Id.* Therefore, the relevant indemnities need not be "unconditional," as the Objectors assert, (*see* MDL Pls. Obj. at 23–24), to affect the bankruptcy estate and confer related-to jurisdiction. And in *SemCrude*, this Court recognized that, due to the relevant contractual indemnifications, the effect "would be to adjust the amount of money owed by and to the Debtors' estate." *SemCrude*, 428 B.R. at 99. Therefore, any determination of the claims against the non-debtors there would have necessarily affected the distribution to other creditors. *See id.* ("The potential effect on the Debtors' estate thus goes far beyond the inchoate common law indemnity claims found insufficient in *W.R. Grace*.").

The Debtors are contractually obligated to indemnify the Consenting OEMs. *See* Accommodation Agreement (D.I. 289) § 10; *see also* Tsekerides Decl. ¶¶7–31. Indeed, under the very agreement allowing the Debtors to remain in business during the restructuring, they acknowledge, and do not dispute, the Consenting OEMs' contractual indemnification claims submitted through a claims protocol. *See* Accommodation Agreement § 10. Thus, each and every adverse ruling against a Consenting OEM will

increase the size of the Customer Indemnification Claims[16] against the estates, and, as a result, proportionally reduce the distributions to all other creditors.[17]

Moreover, contrary to the Objectors' claim, not one indemnification clause is "contingent upon a finding of liability." *Lower Bucks*, 488 B.R. at 316; *see, e.g.*, MDL Pls. Obj. at 16. Nor are they as "limited" as the MDL Plaintiffs would have this Court believe. *See* MDL Pls. Obj. 15–28.[18] Each provision creates certain rights upon the filing of a claim against the respective OEM.[19] In other words, because the Actions arise out of or relate to Takata inflators, the Consenting OEMs' rights to assert indemnification *claims* arose upon the filing of each complaint. Even if the Consenting OEMs are never found liable, they will have claims against the Debtors for their costs and fees in defending these actions. Thus, because a "liability" determination is not a condition

---

[16] As defined in the Accommodation Agreement (D.I. 289).

[17] The MDL Plaintiffs' claim that the Debtors are trying to "manufacture" subject matter jurisdiction by entering into the Accommodation Agreement, (*see* MDL Pls. Obj. at 30–32), lacks merit. Both Judge Fitzgerald, in *W.R. Grace*, and Judge Savage, in *Lower Bucks*, extended related-to jurisdiction over claims against non-debtors based on agreements entered into by the respective debtors during the bankruptcy proceedings. *See W.R. Grace & Co. v. Chakarian*, 386 B.R. 17, 28 (Bankr. D. Del. 2008) (indemnities to insurers were part of settlement with insurers); *Lower Bucks*, 488 B.R. at 318 (releases were part of global settlement). And even absent the Accommodation Agreement, there is no avoiding the existence of the prepetition contractual indemnification provisions that are attached to the Tsekerides Declaration.

[18] The MDL Plaintiffs contend that some of the Consenting OEMs may have entered into indemnification agreements with non-Debtor Takata entities. *See* MDL Pls. Obj. at 20–28. Putting aside the fact this contention applies to only some OEMs, the Accommodation Agreement, to which all Consenting OEMs are parties, moots that argument in its entirety. In any event, the Debtors established the indemnification rights held by each Consenting OEM in their moving papers. *See* Tsekerides Decl., Exs. E–P. Moreover, any effort to single out Takata Inc. or Takata Restrain Systems Inc. as supposed non-Debtors that contracted with a Consenting OEM is futile because both of those entities merged into TKH, a Debtor. *See* Tsekerides Reply Decl., Exs. N and O, respectively.

[19] *See, e.g.*, Tsekerides Decl. Ex. E (Honda) Art. 6.1 (among other things, relates to "claims" against the purchaser); Ex. F (Nissan) Art. 12.1 (same); Ex. G.1 (Volkswagen) Art. XI (same); Ex. G.2 (Volkswagen) Art. 15 (same); Ex. G.3 (Volkswagen) Art. XI (same); Ex. G.4 (Audi) Art. XI (same); Ex. G.5 (Audi) Art. XI (same); Ex. H.1 (BMW) Provision 11.2 (same); Ex. H.2 (BMW) Provision 11.2 (same); Ex. H.3 (BMW) Provision 11.2 (same); Ex. H.4 (BMW) Provision 11.2 (same); Ex. H.5 (BMW) Provision 11.2 (same); Ex. I (Fiat Chrysler) Art. 11(b) (same); Ex. J.1 (Toyota) Art. 5.5 (same); Ex. J.2 (Toyota) Art. 5.4 (same); Ex. K.1 (Ford) § 25.02 (same); Ex. K.2 (Ford) Art. 13 (same); Ex. L.1 (GM) Art. 25 (same); Ex. L.2 (GM) Art. 25 (same); Ex. M (Mazda) Art. 17(3) (same); Ex. N (Mitsubishi) Art. 22; Ex. O.1 (Subaru) Art. 13.1 (same); Ex. P (Mercedes Benz) § 24.1 (same).

precedent to their enforcement, "additional intervening adjudication," (Tort Committee Obj. at 17), of the Actions is not required. Therefore, as in *SemCrude*, it cannot be said that the Actions "in no way affect the [D]ebtors' liability." 428 B.R. at 100. Indeed, should the Actions proceed, whatever the States and Individual Plaintiffs are able to recover against the Consenting OEMs "will likely have a direct effect on the estate's obligations to the" Consenting OEMs—the Debtors' largest creditors—thus supporting the exercise of related-to jurisdiction over the Actions. *Id.*

The Objectors' arguments to the contrary do not alter that conclusion. For example, the Tort Committee incorrectly claims that this Court lacks jurisdiction over the Actions against the non-Debtors because the requested relief "does not seek to protect insiders or insurers." Tort Committee Obj. at 16. But the law imposes no such requirement. *See W.R. Grace & Co. v. Chakarian*, 386 B.R. 17 (Bankr. D. Del. 2008) (extending automatic stay to non-debtor BNSF railroad); *In re W.R. Grace & Co.*, No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) (enjoining actions against purchaser of debtors' subsidiary); *In re Monroe Well Service, Inc.*, 67 B.R. 746 (Bankr. E.D. Pa. 1986) (enjoining lien creditors from compelling payments from non-debtor "First Purchasers" of debtor's oil). In fact, in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986)—the seminal case in this area of the law—one of the non-debtor defendants was a corporate outsider, Dr. Hugh J. Davis, the inventor of the Dalkon Shield. *See id.* at 996, 1007 ("Dr. Davis was the beneficiary of an express contract of indemnification.").

The Third Circuit's jurisdictional analysis in *Federal-Mogul*, also does not dictate a different result. Contrary to the Objectors' claims, the Third Circuit did not hold that a

20

"boilerplate indemnity agreement," (Tort Committee Obj. at 16; *see* MDL Pls. Obj. at 17), was not enough to find jurisdiction. Rather, the movants failed to provide *any* contractual indemnity agreements to the court. *See Federal-Mogul*, 300 F.3d at 376 ("The movants have produced no evidence whatsoever of even a bare agreement to indemnify running between the debtors and the solvent co-defendants."). Here, the Debtors *have provided* the *actual indemnification provisions* from relevant agreements governing their relationship with *each* Consenting OEM. *See* Tsekerides Decl., Exs. E–P. Further, the reason the district court questioned the "validity" of the indemnities and held that the purchase orders were insufficient to confer related-to jurisdiction was because their specific terms were never "presented" to the debtor suppliers. *In re Federal-Mogul Global, Inc.*, 282 B.R. 301, 311 (Bankr. D. Del. 2002). In other words, the court had no idea whether the debtor ever agreed to be bound. *See id.* But here, there is no doubt that the Debtors owe indemnification obligations to each OEM.[20]

Finally, the MDL Plaintiffs assert that this Court lacks jurisdiction because, they allege, the Consenting OEMs are independently liable. *See* MDL Pls. Obj. at 18–28.[21] Just as that is no barrier to the Consenting OEMs' indemnification claims against the Debtors, it is no barrier to related-to jurisdiction. *See W.R. Grace & Co.*, 386 B.R. 17, 30 (Bankr. D. Del. 2008); *In re Am. Film Techs., Inc.*, 175 B.R. 847, 853 (Bankr. D. Del. 1994), In *W.R. Grace*, Judge Fitzgerald held that jurisdiction existed over the

---

[20] *See* Caudill Tr. 179:17–180:3, 180:19–22 (Q: Have you read any of the contracts referenced in that sentence to determine whether a right of reimbursement exists? A: My understanding, as I said generally speaking, OEMs have the right of offset for these types of issues. Historically, if the OEM incurs a claim as a result of something by a supplier, they would typically—I can't think of a case where someone hasn't sought reimbursement. . . . A: I can't speak to the individual language of the contracts. I haven't read them all. Generally speaking, the OEMs hold the right of offset and enforce them); First Day Decl. ¶11 ("[T]he recall-related indemnification and warranty liabilities that the Debtors owe to their Customers alone are in the billions of dollars."); Accommodation Agreement (D.I. 289) § 10.

[21] The Suarez Objection makes this argument, too, and should be rejected for the same reasons.

"independent duty" claims lodged against non-debtor BNSF railroad because "the contractual indemnity agreements will involve a direct impact on these pre-confirmation estates by requiring Debtors to defend the actions and any judgment against BSNF as the result of the Montana Actions will have a direct effect on the *res* of the estates." *W.R. Grace*, 386 B.R. at 30.[22] Similarly, in *American Film*, the court rejected the argument that third-party suits should be permitted to proceed where the non-debtor's alleged liability "rests upon his own breach of duty." *Am. Film*, 175 B.R. at 853. Rather, the existence of a contract imputing the liability of the non-debtor parties to the debtors created an important distinction, rendering inapplicable cases that declined to enjoin suits against the non-debtor. *See id.* (distinguishing *In re Crazy Eddie Secs. Litig.*, 104 B.R. 582, 584 (S.D.N.Y. 1989)).

    2.    *Allowing the Actions to Proceed Would Risk Prejudicing the Debtors in Subsequent Litigation and Adversely Affect the Estate.*

Of course, this Court need not adjudicate the merits of the indemnity claims in order to exercise related-to jurisdiction over suits against non-debtors where allowing the actions to proceed might prejudice the debtor. *See In re Union Trust Phila., LLC*, 460 B.R. 644, 655–57 (E.D. Pa. 2011) (holding that "taken together" the debtor's "arguable" indemnification obligations, diversion of resources, and possibility that the debtor would be bound to critical facts and legal issues determined in the underlying proceedings created an "adequate basis" to exercise related-to jurisdiction); *In re Phila. Newspapers,*

---

[22] Suarez's attempt to distinguish *W.R. Grace* falls flat. It does not matter that the claims against the Consenting OEMs arose prepetition. The Actions would still impact the Debtors' pre-confirmation estate. Moreover, the notice and demand arguments are immaterial because the Consenting OEMs have asserted hundreds of cross- and third-party claims against the Debtors in the Actions. *See, e.g.*, Tsekerides Reply Decl., Exs. B–M.

*LLC*, 407 B.R. 606, 614–15 (E.D. Pa. 2009) (same, even though it was "premature" to construe the relevant indemnification clause).

In arguing to the contrary, the Objectors miss the point. For example, the Tort Committee cites cases for the proposition that no court has *extended the automatic stay— i.e.*, the ultimate relief sought by the Debtors—*solely* because of an anticipated later use of offensive collateral estoppel. *See* Tort Committee Obj. at 20–21. But this proposition does not address the Debtors' argument that this Court has *jurisdiction* over the Actions against the non-Debtors because allowing them to proceed would adversely impact the estate by, *among other things*, prejudicing the Debtors in subsequent litigation through collateral estoppel and record taint. *See* Moving Br. at 31–32. At the opposite extreme, the MDL Plaintiffs challenge this argument on the narrow basis that the Debtors have failed to satisfy the specific requirements of collateral estoppel. *See* MDL Pls. Obj. at 28–30. Tellingly, however, the MDL Plaintiffs stop well short of promising never to attempt to use factual or legal findings, or introduce evidence, obtained while the automatic stay is in place, against the Debtors in later proceedings. Further, it matters not that the MDL Plaintiffs might only prosecute claims for the OEMs' alleged misconduct. Just as in *American Film*, those claims remain to be proven and the evidence demonstrating those claims—who knew what and when they knew it—all concern knowledge of the Debtors' inflators, and therefore implicate the Debtors' conduct regarding the *same* information. 175 B.R. at 855. For that reason, absent the preliminary injunction, the Debtors' estates (and the Court) will no doubt be inundated with countless requests for relief from the automatic stay in connection with those alleged claims against the OEMs.

**C.      Because the Debtors Share an Identity of Interest with the Consenting OEMs, It would Be Appropriate to Extend the Automatic Stay Here.**

In opposing the Motion, the MDL Plaintiffs again misconstrue the law in arguing that the relationship between the Debtors and the Consenting OEMs falls outside of three prescribed categories of "unusual circumstances" that purportedly alone can give rise to an "identity of interests." *See* MDL Pls. Obj. at 32-33. This argument fails for multiple reasons. As numerous courts have held, a debtor and non-debtor share an identity of interest where the debtor's conduct is "at the core of the issues raised" in the actions against the non-debtor. *W.R. Grace*, 386 B.R. at 30–31 (debtors shared an identity of interest with non-debtor because "the Debtors' operations and conduct at the Libby mines that [was] at the core of the issues raised in the Montana Actions filed against [the non-debtor]"); *see also In re W.R. Grace & Co.*, No. 01-01139 (JFK), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) (identity of interest existed where non-debtor entitled to contractual indemnification and debtors' subsidiary's actions constituted the basis for the claims against the non-debtor); *In re Dow Corning*, 86 F.3d 482 (6th Cir. 1996) (debtor and non-debtors related where claims against non-debtors all based on use in a singular product of a material that originated with the debtor, they asserted cross-claims against each other, and non-debtors intended to file claims for contribution and indemnification against debtor). The MDL Plaintiffs disregard the relevant "identity of interests" standard applied in these cases and offer no support for their self-serving conclusion that "unusual circumstances" are limited to the three situations they identify.[23]

---

[23]The Debtors do not, as the MDL Plaintiffs claim, rely on *W.R. Grace* to argue that "the indemnity agreements in this case, by themselves, create a sufficient identity of interests." MDL Pls. Obj. at 33. This is a strawman constructed by the MDL Plaintiffs to mask the central holding of that case: that identity of interests exists where the debtor's conduct is "at the core of the issues raised" in the actions against the non-debtor. Nevertheless, even if the MDL Plaintiffs' argument were accepted, the Debtors and Consenting OEMs fall into one of these three categories based on the Debtors' contractual indemnity obligations. As

This standard is easily satisfied here because Takata airbag inflators are at the core of all Actions against the Consenting OEMs. *See* Moving Br. at 33-34. This is true regardless of (i) the type of relief sought in a particular action, (ii) whether Takata is named as a defendant, or (iii) whether the Consenting OEMs are "independently culpable." For instance, the Lemon Law actions, like those seeking relief for personal injury and economic injury, are premised on the use of defective PSAN inflators. Moreover, the Objectors admit that any "independent culpability" stems from the Consenting OEMs' alleged knowledge *regarding the defective PSAN inflators designed, manufactured, and sold by Takata* and how the OEMs treated that information. *See* Tort Committee Obj. at 7; MDL Plaintiffs' Obj. at 29. In fact, the MDL Plaintiffs' assertion that these issues "have no bearing on the Debtors' liability" is belied by the Consenting OEMs' position that all liability should fall on Takata. *See* Tsekerides Reply Decl., Exs. B–M.

Put another way, there would be no need to discover "what the MDL OEMs knew, when they knew it, and whether they breached any duties to the MDL Plaintiffs by failing to disclose it"—as, indeed, there would be nothing to "know"—if not for the underlying allegation that Takata designed, manufactured, and sold defective airbag inflators. MDL Plaintiffs' Obj. at 29. Thus, because the Debtors' product and related

---

discussed in Section II.B.1, the Objectors seek to impose a narrow interpretation of the "identity of interests" requirement as it relates to a debtor's contractual indemnity obligations to a third party. The case law does not, as the Objectors' suggest, require that every potential ambiguity or dispute as to scope raised by a contractual indemnity claim be resolved in order for identity of interests to exist between a debtor-indemnitor and indemnitee. *See Lower Bucks*, 488 B.R. at 316. The Debtors have shown that the actions against the Consenting OEMs involve the Debtors' contractual indemnification obligations. As such, even accepting the MDL Plaintiffs' narrow definition of "unusual circumstances," the identity of interests factor is satisfied.

conduct is "at the core of the issues raised" in all actions against the Consenting OEMs, the identity of interests factor is satisfied.

> ### D. Allowing the Individual Actions to Proceed Would Benefit Individual Interests Rather than the Estates as a Whole.

As with the State Actions, discussed *supra* Section I.B, the requirements of Section 105(a) are satisfied with respect to a stay of the Individual Actions against the non-Debtors. The Debtors have demonstrated that there is a substantial likelihood of successfully reorganizing if temporarily protected from the resource strain and distraction of allowing the Actions to proceed; the Debtors will suffer irreparable harm if the Actions are allowed to continue; that such harm to the Debtors outweighs any harm to the public by virtue of a slight delay; and that injunctive relief would not violate the public interest. *See In re Wedgewood Realty Group, Ltd.*, 878 F.2d at 701 (3d Cir. 1989).

> #### 1. The Debtors Have a Strong Likelihood of Restructuring.

As discussed above, the relevant inquiry regarding the likelihood of success is whether the debtor is likely to successfully reorganize—and, as such, whether the activity sought to be enjoined will threaten the Debtors' reorganization. *See supra* Section I.B; *see also* Moving Br. Section I.B. This factor weighs strongly in favor of the Debtors because they are likely to successfully reorganize *if* they are shielded from the burdens of the Actions, and they have shown that the hundreds of Actions will threaten the Debtors' estate and interfere with their efforts to reorganize.

> #### 2. The Debtors Will Be Irreparably Harmed Absent an Injunction.

As noted previously, a preliminary injunction enjoining the Actions is necessary to prevent irreparable harm to the Debtors and their chances for successfully reorganizing. *See supra* Section I.B.2; *see also* Moving Br. Section at I.B.2. To be sure,

the Debtors are already fully taxed by the ongoing restructuring and a litany of other requirements (*e.g.*, managing the largest recall in American automotive history, operating 19 facilities (employing 23,000 individuals) in order to preserve enough global liquidity to execute the Global Transaction, coordinating with the Independent Monitor and Quality Assurance Panel to meet the Debtors' obligations to NHTSA and the DOJ, all while trying to sell a substantial majority of the company's assets in the midst of a complex bankruptcy proceeding). *See supra* at 8–9. Any additional demands on senior management's time or resources could well be the straw that breaks the camel's back.

The Tort Committee and MDL Plaintiffs claim that Mr. Caudill could not point to a specific litigation task that would impact the restructuring.[24] This argument misses the point; no single action threatens to derail the restructuring. Rather, it is the cumulative effect of all the Actions, and the demands they would place on the Debtors, that would divert resources from, and impact, the restructuring.[25] Moreover, if as the Objectors suggest, not much is happening in the underlying litigations, then they should have no objection to a temporary stay so that the Debtors can focus on their restructuring and attendant commitments. And, if, as certain of the Objectors suggest, there are events that cannot be postponed, claimants can raise those issues with the Debtors, and all parties can coordinate to seek appropriate relief from this Court on a one-off basis.[26] But allowing all

---

[24] As shown by the Bazzal and Turk Objections, many plaintiffs intend to press their claims in the immediate future. *See* Bazzal Obj. at 2 ("[M]ost hearings on the [motions for summary judgment] and Trials are scheduled *very* soon, with some hearings already scheduled as early as *the beginning of August*.") (emphasis in original); Turk Obj. at 2 ("This case is ready for trial."). These representations make the MDL Plaintiffs' claim that there will not be any "pressing, strategic events that could impact the Debtors' interests" over the next several months ring hollow. MDL Pls. Obj. at 38.

[25] *In re Otero Mills, Inc.*, 25 B.R. 1018, 1022 (D.N.M. 1982) ("At the beginning of the reorganization process, a court must work with less evidence than might be desirable and should resolve issues in favor of reorganization.").

[26] Similarly, there is no reason to halt settlement discussions with the non-settling OEMs in the MDL.

of the cases to proceed *en masse* would strain the Debtors' resources and force the Debtors to engage in a multitude of litigation issues, while simultaneously trying to address numerous bankruptcy-related issues. Such a situation would jeopardize the Debtors' restructuring.[27]

### 3.    A Balance of Harms Weighs In Favor of a Stay.

The Objectors mischaracterize the relief sought by the Debtors. The Debtors do not seek to "derail the MDL Plaintiffs' claims against the OEMs." MDL Pls. Obj. at 9. Nor do the Debtors intend to deny the plaintiffs the ability to pursue their claims.[28] Instead, the Debtors seek a temporary stay after which, the plaintiffs will be free to continue their cases against the OEMs. This interim period is critical to allow the Debtors to remain focused on what should be the overarching goal: successfully restructuring to allow a continued supply of replacement inflators for the safety and protection of the motoring public. While Debtors are sympathetic to the injured plaintiffs that have raised objections to the relief sought, the immediate desire to continue litigation is outweighed by the need for a successful restructuring that will provide a critical supply of replacement inflators to prevent future injuries. In the end, the Debtors ask the Court to consider the larger picture as it balances the disparate interests expressed by the different constituencies: the reasonable delay sought by the Debtors of the Actions versus the significant risk that the Debtors' restructuring fails, causing a ripple effect throughout an

---

[27] The Objectors also suggest that because the Debtors were able to negotiate agreements and take other actions despite ongoing litigation demands in the years pre-petition, the same must be true now.  But, such a premise ignores reality. Now that the Debtors have filed for bankruptcy, the demands upon their senior management—and the concomitant need to focus on restructuring activities—have grown exponentially in light of the bankruptcy and regulatory requirements, ongoing commitments to NHTSA and corresponding looming deadlines, which must be met for the Global Transaction to succeed.

[28] *See also* Franco Obj. (Adv. D.I. 22) at 2 ("The injunctive relief sought is a concoction by the Consenting OEMs to delay and avoid their legal responsibilities to their customers . . . .").

automobile industry that is unable to replace the millions of airbag inflators that must be replaced, which could, unfortunately, lead to additional ruptures in the future and even more injuries. *See W.R. Grace*, 386 B.R. at 35–36 (granting injunction, even though "sick and dying claimants [would] continue to suffer without compensation," in light of importance of reorganization and the fact that the court could always consider an emergency motion for relief from the injunction in exigent circumstances). Indeed, were these actions proceeding just against the Debtors, they would be subject to the Bankruptcy Code's automatic stay. This reflects Congress' considered judgment that, even the claims of injured plaintiffs, must yield to the Debtors' need to focus their efforts in the bankruptcy court.

### 4.    *Enjoining the Actions is in the Public Interest.*

Enjoining the Actions is in the public interest because it improves the likelihood that the Debtors will successfully reorganize and it ensures that recall efforts can continue apace. There are tens of millions of airbags in vehicles today subject to recall; the Debtors are working to provide replacement inflators to satisfy those recalls. Distracting the Debtors and siphoning dwindling financial resources from the estates on continued litigation at this stage will only serve to inhibit the replacement of inflators, which will harm consumers who have not yet had their vehicles fixed—an outcome which is not in the public interest.

## **CONCLUSION**

For the above reasons, and those stated in the Moving Brief, the Debtors respectfully request that this Court preliminarily enjoin the continued prosecution of the Actions.

Dated: August 7, 2017
Wilmington, Delaware

_/s/ Brett M. Haywood_____
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Russell Silberglied (No. 3462)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Theodore E. Tsekerides
Konrad Cailteux
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

_Attorneys for the Debtors_
_and Debtors in Possession_