## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-------------------------------------------------------- x
                                                         :
In re                                                    :   Chapter 11
                                                         :
TK HOLDINGS INC., et al.,                                :   Case No. 17-11375 (BLS)
                                                         :
       Debtors.¹                                         :   Jointly Administered
                                                         :
                                                         :   Re: Docket Nos. 1116, 1130, 1143, 1149, 1164, 1165,
                                                         :       1182, 1185, 1313, 1400, 1338, 1363, 1371, 1466,
                                                         :       1474, 1475, 1476, 1477, 1478, 1479, 1480, 1481,
                                                         :       1482, 1483, 1485, 1486, 1496
                                                         :
-------------------------------------------------------- x
```

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF MOTION TO APPROVE
## DISCLOSURE STATEMENT AND RELATED SOLICITATION PROCEDURES

TK Holdings Inc. ("***TKH***") and its affiliated debtors in the above-captioned

chapter 11 cases (the "***Chapter 11 Cases***"), as debtors and debtors in possession (collectively,

the "***Debtors***"), hereby submit this omnibus reply ("***Reply***") to the objections, joinders, and

reservation of rights (collectively, the "***Objections***")² interposed to the *Motion of Debtors'*

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766) ("***TKAM***"); TK Finance, LLC (2753) ("***TKF***"); TK China, LLC (1312) ("***TKC***"); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A) ("***IIM***"); Takata de Mexico, S.A. de C.V. (N/A) ("***TDM***"); and Strosshe-Mex S. de R.L. de C.V. (N/A) ("***SMX***").  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

² The Objections include the objections, joinders, and reservations of rights filed by the following parties:  (i) the United States Trustee for Region 3 (the "***U.S. Trustee***") [Docket No. 1477], (ii) Roger Frankel in his capacity as the legal representative for individuals who sustain injuries related to PSAN Inflators after the Petition Date (the "***FCR***" and the FCR's constituents, the "***Future Claimants***") [Docket No. 1480], (iii) the Official Committee of Unsecured Tort Claimant Creditors (the "***Tort Claimants' Committee***") [Docket No. 1482], (iv) the Official Committee of Unsecured Creditors (the "***Creditors' Committee***" and, together with the Tort Claimants' Committee, the "***Committees***") [Docket No. 1485], (v) the Texas Commission on Environmental Equality ("***TCEQ***") [Docket No. 1466], (vi) the State of Hawai'i and the Government of the U.S. Virgin Islands (collectively, the "***States***") [Docket No. 1474], (vii) the plaintiffs and proposed classes represented in the multidistrict litigation action captioned *In re:  Takata Airbag Product Liability Litigation*, MDL No. 2599, 15-MD 2599-FAM (the "***MDL Plaintiffs***") [Docket No. 1476], (viii) Eric Green in his capacity as Special Master (the "***Special Master***") [Docket No. 1481], (ix) the Attorneys Information Exchange Group ("***AIEG***") [Docket No. 1478], (x) Confidential

*Pursuant to 11 U.S.C. §§ 105, 502, 1125, 1126, and 1128, Fed. R. Bankr. P. 2002, 3003, 3016,*

*3017,3018, and 9006, and Local Rules 2002-1, 3017-1, and 9006-1 for Entry of an Order*

*(I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice of a*

*Hearing Thereon, (II) Establishing Solicitation and Voting Procedures, and (III) Establishing*

*Notice and Objection Procedures for Confirmation of the Debtors' Plan* [Docket No. 1165]

(the "***Solicitation Procedures Motion***"),[3] and respectfully represent as follows:

### Preliminary Statement

1.      On November 15, 2017, nearly fifty (50) days prior to the Disclosure

Statement Hearing, the Debtors filed the Plan and the Disclosure Statement.  As has been stated

on numerous occasions, filing these documents marked a watershed moment for the Debtors and

represented the culmination of a robust prepetition marketing and sale process, as well as

vigorous good-faith negotiations with the Plan Sponsor and the Initial Consenting OEMs on the

Global Transaction.

2.      Soon after filing the Disclosure Statement, the Debtors reached out to the

Committees, the FCR, and numerous other parties and Objectors, well in advance of the

Objection Deadline, offering to discuss the Disclosure Statement in an effort to preemptively

address any disclosure concerns and narrow the issues before the Court.  Certain of the parties

and Objectors engaged with the Debtors and as a result many of their concerns were addressed in

the revised and amended Plan and Disclosure Statement filed by the Debtors on December 19,

2017.

---

Whistleblower A and Confidential Whistleblower B [Docket No. 1479] (the "***Whistleblowers***"), and (xi) certain individuals (or on behalf thereof) [Docket Nos. 1116, 1130, 1143, 1149, 1182, 1185, 1313, 1338, 1363, 1371, 1475, 1483, 1486, 1496] (each an "***Objector***" and, collectively, the "***Objectors***").

[3] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Solicitation Procedures Motion, the Plan (as amended), or the Disclosure Statement (as amended), as applicable.

3.     For example, at the request of the U.S. Trustee, the Debtors revised the Disclosure Statement to include a number of charts to illustrate the projected waterfall for the allocation of Cash Proceeds under the Plan and the projected cash that may be made available for distribution to holders of Allowed General Unsecured Claims.  The amended Disclosure Statement also included numerous other amendments and additional disclosures, including, among other things, additional disclosures regarding TK Global LLC (the entity that will be formed to be the parent holding company of Reorganized TK Holdings and the Warehousing Entity), the anticipated post-Closing Date fees and expenses of Reorganized Takata, the funding of reserves under the Plan, and certain financial projections and projected recoveries to holders of Allowed Claims under the Plan.

4.     The Tort Claimants' Committee, however, did not respond to the Debtors' offer or otherwise provide the Debtors with any feedback on the Disclosure Statement in advance of filing its Objection.  Instead, it chose to file a fifty (50) page objection along with a more than thirty (30) page exhibit containing proposed revisions to the Disclosure Statement (the "***TCC Revision Chart***").

5.     Contemporaneously herewith, the Debtors filed further revised and amended versions of the Plan and Disclosure Statement which address many of the disclosure concerns raised in the Objections.  Specifically, the Disclosure Statement now includes significant additional disclosures on various topics, including without limitation, the following:

a.     significant additional disclosures regarding the Plan Settlement;

b.     significant additional disclosure regarding the Channeling Injunction, including information on the recent agreement among the Initial Participating OEMs, the FCR, and counsel representing certain current holders of PSAN PI/WD Claims on an injury valuation schedule;

3

       c.       additional disclosures regarding the proof of claim filed by TKH in the Japanese Proceedings;

       d.       a description of certain pre-closing steps that must be commenced with respect to the Debtors' affiliates in China and Mexico; and

       e.       updated financials to account for the appraisal results and the agreed-upon treatment of Intercompany balances.

6.      Notwithstanding the Debtors' best efforts to resolve all of the Objectors' issues with the Disclosure Statement, many issues remain outstanding.  The Debtors, however, are continuing to work to narrow the outstanding issues in advance of the Disclosure Statement Hearing.  Despite the Debtors' resolve to achieve consensus for the Plan, at this point, the Committees and the FCR do not currently support confirmation of the Plan in its present form and the Debtors make this point throughout the Disclosure Statement.  In addition, the Debtors have offered to include a single, combined letter from the Committees and the FCR in the Solicitation Packages,[4] which will allow each to make their views on the Plan clear to voting claimants.

7.      Similar to out-of-the-money creditors in other chapter 11 cases, certain Objectors challenge the Debtors' determination that the Global Transaction and the Plan provide the best path forward for the Debtors, without providing any other viable alternative or recognizing that this transaction has been heavily vetted and determined to maximize value for stakeholders.  In a strategic effort to assert leverage over the process, these Objectors assert a litany of issues in their Objections that fall primarily into two (2) categories:  (a)  objections to the adequacy of the disclosures provided in the Disclosure Statement (the "***Disclosure Objections***"); and (b) objections to the confirmation of the Plan on the grounds that such

---

[4] In order to meet their deadline to commence solicitation, it is necessary that the combined letter be finalized and acceptable to the Debtors by the close of business on January 3, 2018.

objections render the Plan non-confirmable on its face—a heavy burden that none of the

Objectors has sustained (the "***Confirmation Objections***").

        8.      With respect to the Disclosure Objections, the Debtors considered each

request and, to the extent reasonable and appropriate, incorporated the suggested disclosure in

the Disclosure Statement.  Attached hereto as **Exhibit A** is a chart (the "***Objection Response***

***Chart***") identifying each of the Objections and the Debtors' responses thereto.[5]  As demonstrated

below, the Confirmation Objections are just that—objections to confirmation that should

appropriately be deferred until the Confirmation Hearing as none rise to the level of rendering

the Plan patently unconfirmable.

        9.      The Debtors believe that the Disclosure Statement unequivocally satisfies

the requirements of section 1125 of the Bankruptcy Code and, therefore, the Objections should

be overruled and the Disclosure Statement should be approved.

### The Court Should Approve the Disclosure Statement

**I.**      **The Disclosure Statement Meets the Applicable Standards for Approval Under Section 1125 of the Bankruptcy Code.**

        10.      Pursuant to section 1125 of the Bankruptcy Code, the proponent of a

chapter 11 plan must provide holders of impaired claims and interests entitled to vote on a plan

with "adequate information" regarding the plan.  *See* 11 U.S.C. § 1125(a)(1).  Section 1125(a)(1)

of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far
> as is reasonably practicable in light of the nature
> and history of the debtor and the condition of the
> debtor's books and records, including a discussion
> of the potential material Federal tax consequences
> of the plan to the debtor, any successor to the

---

[5] Any disclosure-related Objection not addressed in the body of this Reply is addressed in the Objection Response Chart.

> debtor, and a hypothetical investor typical of the
> holders of claims or interests in the case, that would
> enable such a hypothetical investor of the relevant
> class to make an informed judgment about the
> plan . . . .

11 U.S.C. § 1125(a)(1).

11.     The determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.").  The Global Transaction and the Plan are undoubtedly complex (an observation that many parties, including certain of the Objectors, have noted on countless occasions); however, contrary to the assertions by the MDL Plaintiffs and the Tort Claimants' Committee, this complexity is neither by design nor is it the product of nefarious motives on the part of the Support Parties or their advisors.  *See* MDL Plaintiffs Obj. at ¶ 7; Tort Claimants' Comm. Obj. at ¶¶ 2–5.  Rather, the Global Transaction and the Plan are the product of an appropriately tailored solution to an incredibly nuanced and complex set of circumstances.

12.     Recognizing these nuances and the complexity of the Global Transaction and the Plan, the Debtors made significant efforts to ensure that all claimants entitled to vote on the Plan have adequate information.  In particular, to provide parties reviewing the Disclosure Statement with a better understanding of the transaction, the Debtors included an Executive Summary describing at a high level the Global Transaction and the Plan.  In addition, the Debtors included the following exhibits to the Disclosure Statement to provide visual depictions of certain of the more complex aspects of the Global Transaction and provisions in the Plan, including:

- Exhibit B to the Disclosure Statement, which provides a pictorial organizational chart showing the post-Closing Date structure of TK Global LLC, Reorganized Takata, and the Warehousing Entity;

- Exhibit D to the Disclosure Statement, which provides an illustrative waterfall of the Purchase Price allocated to the Debtors and the uses of Cash Proceeds under the Plan;

- Exhibit E to the Disclosure Statement, which provides a visual depiction of the cash that is available for distributions to holders of General Unsecured Claims under the Plan; and

- Exhibit H to the Disclosure Statement, which provides a visual depiction of the Debtors' insurance coverage.

13.    Importantly, despite suggestions to the contrary in the Objections, "adequate information" as defined in section 1125 of the Bankruptcy Code does not require that the Disclosure Statement include information about every aspect of the Debtors' business, the Plan, or the Global Transaction, but rather is limited to "information of a kind, and in sufficient detail, as far as is reasonably practicable [. . .] that would *enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.*"  11 U.S.C. § 1125; *see also The Bank of New York, Mellon Trust Co. v. Leonard Becker (In re Lower Bucks Hosp.)*, 488 B.R. 303, 317 (Bankr. E.D. Pa. 2013) ("What constitutes "adequate information" is determined on a case-by-case basis, with the ultimate determination within the discretion of the bankruptcy court.") (citing *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.)*, 844 F.2d 1142, 1156–57 (5th Cir. 1988)).  Information that will have no bearing on a "hypothetical investor's" vote to accept or reject the Plan need not be included in the Disclosure Statement in order for the Disclosure Statement to comply with section 1125 of the Bankruptcy Code.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (noting that "certain categories of information which may be necessary in one case may be omitted in another"); *In re*

*River Village Assocs.*, 181 B.R. 795, 804 (Bankr. E.D. Pa. 1995) (explaining that courts should consider the specific needs of parties in interest).

14.    The Disclosure Statement, as currently proposed, provides more than adequate information for creditors entitled to vote to make an informed decision about whether to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code.  As set forth below and in the Objection Response Chart, with respect to the Disclosure Objections, the Debtors have either included the requested information in the Disclosure Statement or determined that additional disclosure was not necessary.[6]

A.    **The Disclosure Statement Provides Adequate Information Regarding the Proposed Channeling Injunction, the Treatment of PSAN PI/WD Claims, and the Funding and Governance of the PSAN PI/WD Trust.**

15.    Certain of the Objectors object to the Disclosure Statement on the basis that it does not contain sufficient information regarding the treatment of PSAN PI/WD Claims or the funding and governance of the PSAN PI/WD Trust.  *See* FCR Obj. at ¶¶ 25–30 and the Tort Claimants' Comm. Obj. at 59–60.  However, as set forth below, these topics were either adequately addressed in the first instance or have been addressed through additional disclosures in the Disclosure Statement.  Specifically, the Disclosure Statement now includes significant additional information regarding the Channeling Injunction as a result of the recent agreement on an injury valuation schedule among the Initial Participating OEMs, the FCR, and counsel representing certain current holders of PSAN PI/WD Claims.  In addition, the Debtors, in consultation with the Plan Sponsor, have clarified that for purposes of the third-party releases

---

[6] In addition, as noted above, the Tort Claimants' Committee's Objection included the more than thirty (30) page TCC Revision Chart.  As reflected on the redline of the Disclosure Statement, filed contemporaneously herewith, the Debtors have incorporated many of these revisions.  To the extent a revision was not incorporated, the Debtors determined that such revision was incorrect, unnecessary, duplicative, and/or irrelevant for purposes of providing a creditor voting on the Plan with adequate information.  The Objection Response Chart does not address each of the proposed revisions listed on the TCC Revision Chart.

and the Channeling Injunction, the "Plan Sponsor Parties" include Joyson KSS Auto Safety, S.A. and its current and future subsidiaries and affiliates, as well as the following debt and equity investors in the Plan Sponsor:  Deutsche Bank AG, Tokyo Branch; Mizuho Bank, Ltd.; China Merchants Bank Co., Ltd., New York Branch; Industrial and Commercial Bank of China Limited; Ningbo Joyson Electronic Corp; and Bain Capital.

>               a.      **The Treatment of PSAN PI/WD Claims is Adequately Disclosed.**

16.     With respect to the treatment of PSAN PI/WD Claims, the FCR contends that "it will be impossible for PSAN PI/WD Claimants to determine what they will receive under the Plan on account of their claims" and argues that there is "no information for PSAN Inflator Victims, present or future, regarding the likely values of claims, the criteria that will be considered in evaluating and valuing such claims."  FCR Obj. at ¶ 25.

17.     The Disclosure Statement provides an estimate for all PSAN PI/WD Claims in the amount of One Billion Fifty Million Dollars ($1.05 Billion) and an estimated percentage recovery thereon of 0.01%-0.03%.  The FCR argues, however, that without information regarding how different injuries will be treated and valued, the holders of PSAN PI/WD Claims have insufficient information to evaluate their recoveries under the Plan.  *Id.* at ¶ 26.

18.     Attached as Exhibit F to the Disclosure Statement, and as described in sections 1.2(b)(vi) and 1.2(j) of the Disclosure Statement, is a description of the PSAN PI/WD Claims that are subject to the Channeling Injunction and an injury valuation schedule.[7]  The injury valuation schedule was negotiated, finalized, and agreed upon by the Initial Participating

---

[7] As noted in the Objection Response Chart, the inclusion of Exhibit F to the Disclosure Statement also addresses those Objections relating to inadequate disclosure of the "top-up" — a concept that has evolved as part of the Initial Participating OEMs' negotiations with the FCR and the Motley Rice firm.

OEMs, the FCR, and counsel representing certain current holders of PSAN PI/WD Claims on or around December 22, 2017.  The Debtors and their advisors, including Ankura, are in the process of reviewing the injury valuation schedule.

19.    The injury valuation schedule provides information on how PSAN PI/WD Claims against the Participating OEMs will be evaluated and ultimately compensated from the PSAN PI/WD Trust based on injury type.  In the Disclosure Statement, the Debtors incorporated a statement acknowledging that they agree with the general structure and substance of the injury valuation schedule that has been agreed upon by the Initial Participating OEMs, the FCR, and counsel representing certain current holders of PSAN PI/WD Claims, and continue to evaluate the adoption of such structure and injury valuation schedules in order to resolve and administer all PSAN PI/WD Claims, including those against the Debtors.  *See* Discl. Stmt. § 1.2(j).

20.    The injury valuation schedule that will be used to evaluate and compensate PSAN PI/WD Claims against the Debtors and the Protected Parties will be set forth in the PSAN PI/WD TDP, which will be filed with the Plan Supplement by no later than January 23, 2018—fourteen (14) days prior to the Voting Deadline.

### b.    The Governance of the PSAN PI/WD Trust is Adequately Disclosed.

21.    Certain of the Objectors take issue with the exclusion of the PSAN PI/WD TDP and PSAN PI/WD Trust Agreements from the Disclosure Statement arguing that absent such documents, creditors do not have adequate information regarding the governance of the PSAN PI/WD Trust.  These assertions are misplaced.

22.    *First*, the documents that govern the structure of the PSAN PI/WD Trust have no impact on the proposed recoveries to holders of Allowed PSAN PI/WD Claims (which are disclosed) and, therefore, are not critical to informing a claimant as to how to vote on the

Plan.  *Second*, and more importantly, the Disclosure Statement provides a detailed description of the PSAN PI/WD Trust.  Sections 1.2(b)(vi) and 6.4(j) of the Disclosure Statement provide material information about the structure, funding, governance, and functions of the PSAN PI/WD Trust.  The terms of the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDPs will be consistent with the descriptions set forth in the Disclosure Statement and contained in the Plan.  While the Debtors have provided sufficient information regarding the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDPs, the Debtors are unable to provide drafts of such documents with the Disclosure Statement because they are still subject to active negotiation among the Participating OEMs, the FCR, and Resolution Counsel.  *Third*, and finally, the Objectors ignore that claimants will have access to those governance documents before the Voting Deadline.  Given that the PSAN PI/WD Trust will function consistently with the description set forth in the Disclosure Statement and the applicable PSAN PI/WD Trust documents will be filed with the Plan Supplement on January 23, 2018, parties are provided sufficient time to review the documents prior to the Voting Deadline and to raise objections to the terms of the documents themselves.

> c. **The Funding of the PSAN PI/WD Trust is Adequately Disclosed.**

23.    The Tort Claimants' Committee, the FCR, and the MDL Plaintiffs argue that the Disclosure Statement lacks adequate information regarding the Debtors' insurance policies and available insurance proceeds for PSAN PI/WD Claims.  Section 3.4 of the Disclosure Statement, however, provides a detailed description of Takata's claims-made liability policies for products liability claims, and a coverage chart depicting Takata's global PL Insurance from March 31, 2009 through March 31, 2018 is attached to the Disclosure Statement as Exhibit H.

24. In addition to providing a summary of the terms of the PL Insurance policies, including their aggregate limits, the Disclosure Statement includes information regarding payments that have been made by either Takata's insurers or through Takata's captive reinsurance program on account of PSAN PI/WD Claims starting in early 2009, as well as an estimate of amounts that may be available to satisfy certain PSAN PI/WD Claims filed during the 2014–15 policy period.  Given that the PL Insurance policies are subject to certain limitations, including consent to assignment clauses of the insurers, and, in certain cases, being subject to, Japanese law, the Debtors took a conservative approach in estimating funds available for distribution to PSAN PI/WD Claims and excluded estimates for available insurance. Accordingly, the Debtors submit that Section 3.4 of the Disclosure Statement provides creditors with adequate information regarding the Debtors' insurance coverage.  *See e.g., In re U.S. Brass Corp.*, 194 B.R. 420, 425–26 (Bankr. E.D. Tex. 1996) (overruling certain objecting parties' assertions that the extent of available insurance coverage was not adequately disclosed in the disclosure statement, where the disclosure statement made clear that the extent of such coverage was highly contested, and where the debtors stated in the disclosure statement that they were unable to provide an estimate of the valuation of available insurance coverage due to the factual and legal complexity of potential claims).

**B.      The Disclosure Statement Provides Adequate Financial Disclosures and Sufficient Notice Thereof.**

25. Certain of the Objectors have taken issue with the fact that the Disclosure Statement, including certain financial projections and the Liquidation Analysis, was filed eight (8) days prior to the Objection Deadline and assert that the Disclosure Statement, even as amended, does not provide sufficient financial disclosure.  These assertions are without merit.

26.    The Disclosure Statement provides adequate financial disclosure,

including the:

- Liquidation Analysis (*see* <u>Exhibit J</u> to the Disclosure Statement, originally filed on December 19, 2017);

- Projections for Reorganized Takata and the Warehousing Entity (*see* <u>Exhibit K</u> to the Disclosure Statement, originally filed on December 19, 2017);

- Plan Sponsor Backstop Funding Agreement (*see* <u>Exhibit 4</u> to the Plan; originally filed as <u>Exhibit 3</u> to the Plan on November 15, 2017);

- Customer Allocation Schedule (*see* <u>Exhibit 1</u> to the Plan);

- Entity Allocated Amount (*see* <u>Exhibit I</u> to the Disclosure Statement; originally filed on December 19, 2017 with the title "Relative NAV Allocated Amount");

- Estimated Purchase Price Adjustments (*see* Section 7 of the Disclosure Statement; originally filed on December 19, 2017);

- Allocation of DOJ Restitution Claim (*see* Section 7 of the Disclosure Statement; originally filed on December 19, 2017); and

- Illustrative Cash Proceeds Waterfall (*see* <u>Exhibit D</u> to the Disclosure Statement, filed on December 19, 2017).

27.    The Debtors and their advisors worked diligently and continuously to

prepare and finalize the numerous disclosures in and schedules to the Disclosure Statement.  As

noted by the U.S. Trustee and the Tort Claimants' Committee, several disclosures and schedules

were filed on December 19th—fifteen (15) days prior to the Disclosure Statement Hearing, and

one (1) schedule was filed contemporaneously herewith in the further revised Disclosure

Statement.  Importantly, all of the necessary financial disclosures are now filed and will be

included in the Solicitation Packages sent to creditors entitled to vote on the Plan.

28.    Due to the complicated nature of the Plan and the Global Transaction, the

financial projections and Liquidation Analysis required additional time to complete and file with

the Court; however, parties in interest will have sufficient time to comment on and review those documents and projections in advance of the Confirmation Hearing.  In addition, it is routine practice for a debtor to file amended versions of a disclosure statement (and often a plan as well) in advance of a disclosure statement hearing to address concerns raised by other parties and narrow the open issues before the Court.  Indeed, courts often approve disclosure statements despite the filing of certain financial disclosures after the original disclosure statement and on less than twenty-eight (28) days' notice.  *See e.g.*, *In re Triangle USA Petroleum Corp.*, Case No. 16-11566 (MFW) (Bankr. D. Del. Jan. 13, 2017) [Docket No. 597] (approving disclosure statement despite anticipated range of recoveries, estimates of claims, anticipated federal income tax consequences, and liquidation analysis being filed twenty-one (21) days prior to disclosure statement hearing); *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Dec. 4, 2015) [Docket No. 529] (approving disclosure statement despite financial projections and liquidation analysis being filed fourteen (14) days prior to disclosure statement hearing); *In re Laboratory Partners, Inc.*, Case No. 13-12769 (PJW) (Bankr. D. Del. May 30, 2014) [Docket No. 521] (approving disclosure statement despite liquidation analysis being filed seven (7) days prior to disclosure statement hearing); *In re Perkins & Marie Callender's, Inc.*, Case No. 11-11795 (KG) (Bankr. D. Del. Sept 9, 2011) [Docket No. 935] (approving disclosure statement despite financial projections, valuation analysis, and liquidation analysis being filed five (5) days prior to disclosure statement hearing).

### C.    The Disclosure Statement Provides Adequate Information Regarding the Plan Settlement.

29.    Several Objectors called into question the benefits of the Plan Settlement to the Debtors' Estates and requested additional information regarding its terms.  *See* States Obj. at ¶¶ 24–28; Tort Claimants' Comm. Obj. at ¶¶ 31–47; Creditors' Comm. Obj. at ¶¶ 14–21.

With respect to the requests for additional information, the Debtors provided additional disclosures regarding the significant value that has been and will be provided to the Debtors' Estates in connection with the Plan Settlement in the Disclosure Statement, as reflected in the Objection Response Chart, which the Debtors submit provides creditors with adequate information to make an informed choice about the Plan.

30.     More specifically, the Plan Settlement fully resolves the Settled OEM Claims,[8] which the Debtors estimate to be at least Eight Billion Eight Hundred Million Dollars ($8.8 Billion) (with the Consenting OEM's Adequate Protection Claims constituting approximately Two Hundred Ninety-Five Million Dollars ($295 Million) and the Consenting OEM PSAN Cure Claims constituting approximately Eight Billion Five Hundred Million Dollars ($8.5 Billion)), in exchange for a payment from the Debtors' Estates to the Consenting OEMs in the approximate amount of Two Hundred Forty-Six Million Dollars ($246 Million), as well as the Business Incentive Plan Payment.

31.     In addition to the substantial monetary value the Debtors' Estates will realize from the Plan Settlement as a result of resolving the Settled OEM Claims, which are secured and/or entitled to administrative priority, the Consenting OEMs and the Plan Sponsor have agreed to provide additional consideration in connection with the Global Transaction. These contributions include the Consenting OEMs' post-Effective Date commitments to the Plan Sponsor's business and the Plan Sponsor's obligations to provide the Plan Sponsor Backstop Funding in accordance with the Plan Sponsor Backstop Funding Agreement and the Business Incentive Plan Payment.

---

[8] The Settled OEM Claims include the Consenting OEMs' Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN Administrative Expense Claims against the Debtors that are settled pursuant to the Plan Settlement in Section 5.16 of the Plan.

32.     With respect to the questions raised regarding the propriety of the Plan Settlement itself, the Debtors submit that such questions are confirmation issues that should be preserved for, and addressed at, the Confirmation Hearing. *See, e.g.*, *In re Waterville Timeshare Grp.*, 67, B.R. 412, 414 (Bankr. D. N.H. 1986) ("Much of the conflict between the objecting general partners and the Chapter 11 trustee revolves around the wisdom of the compromise with Columbia University that is an integral part of the pending Joint Plan. . . . However, the wisdom of that compromise will be a prime issue at the confirmation hearing on the Joint Plan, and the objecting partners as well as any other party in interest will have a full opportunity to voice and have heard their objections to the compromise at that time."). Accordingly, the Debtors submit that the Disclosure Statement contains adequate and robust disclosure regarding the Plan Settlement.

**D.      The Liquidation Analysis Provides Creditors with Adequate Information Regarding Potential Creditor Recoveries in a Hypothetical Liquidation.**

33.     In their Objections, the Tort Claimants' Committee challenges certain of the underlying assumptions set forth in the Liquidation Analysis and the Creditors' Committee references certain unspecified "deficiencies" with the Liquidation Analysis, which they allege prevent them from being able to determine whether the Plan is in the best interests of creditors. In response to these Objections, and as set forth in the Objection Response Chart, the Debtors have provided additional information in the Liquidation Analysis regarding the assumptions underlying the Liquidation Analysis as well as the Tort Claimants' Committee's disagreement with certain of those assumptions.[9]

---

[9] In its Objection, the Tort Claimants' Committee repeatedly claims that the Debtors' professionals did not respond to or "even acknowledge" the Tort Claimants' Committee's immediate request for additional information regarding the Liquidation Analysis. *See* Tort Claimants' Comm. Obj. at ¶¶ 3, 25, and 49. These claims are simply not correct. On December 19, 2017, Weil attorneys corresponded by email and by phone with attorneys for the Tort Claimants' Committee regarding information request that the Debtors' financial advisor, PwC, received from the Tort

34.     Nevertheless, the Tort Claimants' Committee's disagreement with certain

of the Debtors' assumptions does not mean that the Liquidation Analysis is "flawed" or

otherwise inadequate under section 1125 of the Bankruptcy Code as the Tort Claimants'

Committee suggests.  Such objections are, by their very nature, confirmation objections that are

not ripe for consideration at a disclosure statement hearing.  *See In re W.P. Hickman Sys., Inc.*,

No. ADV 10-2289JAD, 2012 WL 2905446, at *6 (Bankr. W.D. Pa. July 16, 2012) ("For

example, the basis for an objection to a disclosure statement and its liquidation analysis would be

that it contained inadequate information, not that the liquidation analysis was inaccurate.").

35.     Furthermore, in situations where courts have found at the disclosure

statement stage that a debtor has failed to meet its burden of satisfying the best interests of

creditors test it is because the debtor has either failed to file a liquidation analysis or filed a

wholly inadequate liquidation analysis—neither of which is the case here.  *See, e.g.*, *In re

Daniels*, No. 92-13051-JNF, 1994 WL 470213, at *8 (Bankr. D. Mass. Apr. 25, 1994) ("The

Court's review of the Debtor's Second Amended Disclosure Statement compels the conclusion

that it is inadequate.  The most glaring omission is a detailed liquidation analysis—an omission

noted by the United States Trustee in his objection to the Debtor's original disclosure

statement."); *In re Zaruba*, 384 B.R. 254, 257 (Bankr. D. Alaska 2008) (declining to approve a

disclosure statement where "the debtors appear to have dispensed with an appropriate liquidation

analysis because most creditors have voted for the plans").

36.     The Debtors have provided a full and detailed narrative describing their

Liquidation Analysis, as well as a full and detailed waterfall depicting expected creditor

recoveries, and will be prepared to support the Liquidation Analysis at the Confirmation

---

Claimants' Committee's financial advisor, Alvarez & Marsal, and a call between PwC and Alvarez & Marsal was
swiftly scheduled and held on December 20, 2017.

Hearing.  Accordingly, the Debtors submit that the Disclosure Statement contains adequate information to allow a creditor to determine whether it will receive more under the Plan than under a liquidation.

> **E.     The Disclosure Statement Provides Adequate Information Regarding the Classification and Treatment of Claims under the Plan.**

37.     Several Objectors raised questions regarding the classification and treatment of the NHTSA Claims, the Mexico Labor Claims, and the Mexico Class Action Claims.  In response to these Objections, the Debtors revised the Disclosure Statement to provide additional information regarding the basis for the treatment of these Claims under the Plan.[10]  *See* Discl. Stmt. § 1.2(d).

38.     With respect to the NHTSA Claims, the Debtors clarified that the Plan Sponsor will pay a portion of the Purchase Price to NHTSA in the amount of Fifty Million Dollars ($50 Million) on account of TKH's obligations to NHTSA.  *See* Discl. Stmt. §§ 1.2(d), 6.1(e); U.S. Acquisition Ag. § 3.3(b).  As of the date hereof, and as described below, given the need for NHTSA's ongoing support for and cooperation with the Global Transaction, the Debtors and the Plan Sponsor believe that it is important that the NHTSA Claims are satisfied in

---

[10] The States take issue with the definition of Subordinated Claims asserting that the Debtors should explain why subordination under section 726(a)(4) applies in chapter 11 cases.  The Debtors submit, however, that there is applicable authority for subordinating claims under section 726(a)(4) of the Bankruptcy Code in a chapter 11 plan. *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 724 (D. Del. 2005) ("[I]f subordination of punitive damage claims is mandated in Chapter 7 liquidations, it seems entirely appropriate to subordinate such claims in the Chapter 11 setting."); *In re New York Med. Grp., P.C.*, 265 B.R. 408, 416 (Bankr. S.D.N.Y. 2001) ("Like tax penalty claims, punitive damage claims are subordinated to general unsecured claims in a chapter 7 liquidation, see 11 U.S.C. § 726(a)(4), and hence, fare differently under the 'best interest of creditors' test.  This difference may justify the separate classification of punitive damage claims, or if classified with unsecured claims, their subordination to the payment of the unsecured claims.  The Supreme Court left this possibility open . . . ."); 7 Collier on Bankruptcy § 1129.02 (stating that "section 726(a)(4) also provides a basis for different classification of claims in a chapter 11 plan . . . . if a chapter 11 plan proposes to pay such a class of penalty claims less than other unsecured claims, this treatment would not be a basis for denying confirmation so long as the proposed plan treatment gives such a penalty class at least as much as it would have received in a chapter 7 distribution."); *see also In re Wash. Mut., Inc*., Case No. 08-12229 (MFW) (Bankr. D. Del. Feb. 24, 2012) [Docket No. 9759] (order confirming chapter 11 plan providing for the subordination of penalty claims pursuant to section 726(a)(4) of the Bankruptcy Code); *In re Refco Inc.*, Case No. 05-60006 (RDD) (Bankr. S.D.N.Y. Dec. 15, 2006) [Docket No. 3971] (same); *In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. July 15, 2004) [Docket No. 19759] (same).

a manner acceptable to NHTSA.  Moreover, as indicated in the Debtors' Schedules, the NHTSA

Consent Order may constitute an executory contract that must be assumed by Reorganized

Takata in order to permit Reorganized Takata's post-closing operations.  If treated as such, the

Debtors are obligated to pay any outstanding amounts owed thereunder in full to assume such

contract.  As set forth in greater detail below, the Debtors have sound legal and equitable

justifications for the treatment of the NHTSA Claims, which they will be prepared to defend at

the Confirmation Hearing.

   39. With respect to the Mexico Labor Claims (which are asserted against

Mexican Debtors IIM and TDM) and the Mexico Class Action Claims (which are asserted

against TKH, IIM, and TDM), the Disclosure Statement identifies as a risk the possibility that a

discharge of these obligations issued by this Court may not be enforceable under Mexican law as

against the Mexican Debtors IIM and TDM.  Accordingly, in order to ensure that the Mexico

Labor Claims and the Mexico Class Action Claims do not negatively impact and burden IIM and

TDM after the Closing Date, and thereby threaten feasibility, the Mexican Debtors must reserve

for these obligations, after paying other costs owed by TDM and IIM in furtherance of the

Global Transaction.

   40. As set forth below, the Debtors will be prepared to defend the treatment of

these Claims at confirmation; however, at this time, the Debtors submit that the Disclosure

Statement contains adequate information regarding the classification and treatment of the

NHTSA Claims, the Mexico Labor Claims, and the Mexico Class Action Claims.  In addition,

the Disclosure Statement clearly provides that certain of the Objectors take issue with the

treatment of the NHTSA Claims, the Mexico Labor Claims, and the Mexico Class Action

Claims.

**F.**   **The Disclosure Statement Provides Adequate Information Regarding the Indemnity Agreement and the Limited Redactions of the Indemnity Agreement are Reasonable and Appropriate.**

41.     The U.S. Trustee has taken the position that "[s]ealing portions of *an* Indemnity Agreement unequivocally intended to be part of the Plan is inappropriate and should not be permitted."  U.S. Trustee Obj. at ¶ 25 (emphasis added).  The U.S. Trustee's broad brush is not appropriate here.  The Debtors are not party to the Indemnity Agreement; rather, it is an agreement between the Initial Consenting OEMs and the Plan Sponsor that sets forth the contours of the Initial Consenting OEMs obligation to indemnify the Plan Sponsor for certain liabilities relating to PSAN Inflators; its terms have no impact on creditor recoveries under the Plan.  Nor does it provide for the indemnification of any obligation for the Debtors. Nevertheless, the Disclosure Statement provides a full description of Indemnity Agreement's terms.  *See* Discl. Stmt. § 5.14.

42.     As set forth in the *Motion of Debtors for Entry of an Order Authorizing Debtors to File Under Seal Certain Portions of the Indemnity Agreement, Attached as Exhibit 2 to the Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 1402] (the "**Sealing Motion**"), only limited portions of the Indemnity Agreement that pertain to commercially sensitive pricing, resourcing, and indemnification information of the Plan Sponsor and Consenting OEMs are redacted.

43.     The U.S. Trustee's position that *any* redaction in *any* indemnification agreement that is attached to a plan is categorically "adverse to the notion of adequate disclosure" is not only untenable but is also not supported by any of the cases cited in U.S. Trustee's Objection.  *See*, *e.g., Orion Pictures Corp. v. Video Software Dealers Assoc.*, 21 F.3d 24, 27–28 (2d Cir. 1994) (approving redaction of agreement containing competitive information that if disclosed would have given competitors unfair advantage); *In re Continental Airlines,* 150

20

B.R. 334, 340–41 (D. Del. 1993) (not permitting the redaction of fee reports created by *court appointed fee examiner* containing inferences drawn from publically filed fee application); *In re MUMA Servs., Inc.*, 279 B.R. 478, 485 (Bankr. Del. 2002) (not permitting redaction of lease agreements where *only* justification provided for request was that it was "standard business practice [ ] not make public the terms of negotiated agreements"); *In re Alterra Healthcare Corp.*, 353 B.R. 66, 76 (Bankr. D. Del. 2006) (not permitting the redaction of a settlement agreement *between the debtor and its creditors*).

44.    Courts in this District have approved motions to seal plan exhibits containing commercially sensitive information.  *See, e.g., In re First Rain, Inc.*, No. 17-11249 (LSS) (Bankr. D. Del. Jul. 26, 2017) [Docket No. 163] (order authorizing debtors to file under seal an exhibit to the plan that disclosed commercially sensitive contract terms); *In re Southern Air Holdings, Inc.*, No. 12-12690 (CSS) (Bankr. D. Del. Mar. 14, 2013) [Docket No. 661] (order authorizing debtors to file under seal exhibit to plan supplement containing certain fee letters); *In re USI Senior Holdings, Inc.*, No. 09-11150 (MFW) (Bankr. D. Del. Jun. 25, 2009) [Docket No. 181] (order authorizing debtors to file under seal exhibit to plan supplement containing information regarding employee compensation); *In re ABB Lummus Global Inc.*, No. 06-10401 (JKF) (Bankr. D. Del. Aug. 17, 2006) [Docket No. 326] (order authorizing debtor to file under seal exhibit to plan identifying names of settling personal injury claimants).

45.    Accordingly, for each of the reasons set forth in the Sealing Motion, the Debtors submit that good cause exists to authorize the Debtors to file under seal the limited provisions of the Indemnity Agreement containing commercially sensitive pricing, resourcing, and indemnification information pursuant to sections 105(a) and 107(b) of the Bankruptcy Code,

Bankruptcy Rule 9018, and Local Rule 9018-1.  Furthermore, the Disclosure Statement contains adequate information regarding the Indemnity Agreement and should be approved.

**G.  The Disclosure Statement Provides Adequate Information Regarding the Treatment of Executory Contracts.**

46.    The Bankruptcy Code permits the Debtors to assume, assume and assign, or reject executory contracts at any time prior to confirmation of the Plan.  *See* 11 U.S.C. § 365(d)(2); *see also In re Travelot Co.*, 286 B.R. 462, 466 (Bankr. S.D. Ga. 2002), *as modified* (Aug. 20, 2002), *order clarified on reconsideration*, No. 02-40020, 2002 WL 34705804 (Bankr. S.D. Ga. Aug. 26, 2002) (finding a chapter 11 debtor-in-possession may assume or reject an executory contract "at any time before the confirmation of a plan" unless the court otherwise orders).

47.    As a disclosure matter, the Disclosure Statement clearly states the Debtors' current intention to assume and assign PSAN-related contracts to either Reorganized Takata or the Warehousing Trust, as applicable, and to assume and assign substantially all other non-PSAN-related contracts to the Plan Sponsor.  *See* Discl. Stmt. § 6.7(d)(ii).  Furthermore, the Debtors will soon file their schedule of proposed cure amounts which, following approval of the Disclosure Statement, will be sent out to all executory contract counterparties further informing them of the proposed treatments under the Plan and the deadlines for objecting to the assumption, assumption and assignment, or rejection of their respective agreements.

48.    The Debtors submit that it is premature to require them to make a binding commitment to assume, assume and assign, or reject particular executory contracts at this time and that the disclosure of the Debtors' intentions regarding executory contracts provides adequate information for creditors to make an informed decision on whether to approve or reject the Plan.  Moreover, this timeline is consistent with precedent in this Circuit.  *See, e.g., In re*

22

*Optim Energy, LLC*, No. 14-10262 (BLS) (Bankr. D. Del. Sept. 8, 2015) [Docket No. 1248] (order overruling disclosure statement objection asserting that debtors were required to disclose their intention to assume or reject certain executory contracts in their disclosure statement).

49.     The Disclosure Statement provides adequate information regarding the treatment of executory contracts under the Plan and the other topics and issues raised by the Objectors as set forth herein and in the Objection Response Chart.  Accordingly, the Disclosure Statement should be approved.

## II.     The Plan is Confirmable on its Face and Confirmation Objections Should be Determined at the Confirmation Hearing.

50.     The vast majority of the Objections are not objections to the adequacy of the information provided in the Disclosure Statement; rather, they are objections to the Plan that should be deferred and determined at the Confirmation Hearing.  *See, In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) ("The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings.") (citation omitted); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("[T]he Court will not look behind the disclosure statement to decide [confirmation] issues at the hearing on the adequacy of the disclosure statement.").

51.     Indeed, considering objections to confirmation of the Plan at this time would effectively convert the hearing on the Disclosure Statement into a confirmation hearing, without the benefit of the evidentiary record necessary to determine confirmation issues.  *See, e.g.*, *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting[.]"); *see also In re Quigley Co.*, 377 B.R. 110,

119 (Bankr. S.D.N.Y. 2007) (noting that the debtor's parent's prepetition settlement with certain asbestos plaintiffs raised, *inter alia*, questions regarding good faith, improper voter manipulation, and voter designation, but finding that these were, nevertheless, "confirmation issues that require an evidentiary hearing," and approving the debtor's disclosure statement).

52.     A very limited exception exists in cases "where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). A plan is patently unconfirmable only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 155 (citations omitted); *see also In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) ("[T]he objections considered must be limited to defects which could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."). This limited exception is triggered where the objecting party proves as a matter of law that the plan is "is so fatally flawed that confirmation is impossible." *Cardinal Congregate I*, 121 B.R. at 764 (citations omitted); *accord In re U.S. Brass Corp.*, 194 B.R. 420, 428 (Bankr. E.D. Tex. 1996).

53.     The Confirmation Objections do not raise any issues that rise to the level of patent unconfirmability. Rather, each is of a kind properly heard at the hearing on confirmation of a proposed plan. Moreover, even if the Court were to entertain the Objectors invitation to address the merits of the Confirmation Objections, none render the Plan patently

unconfirmable and confirmation of the Plan is far from "impossible."  The primary Confirmation

Objections are addressed below.

### A.    The Classification Scheme in the Plan is Proper.

54.    Certain of the Objectors take issue with the classification of unsecured

creditors under the Plan.  In particular, the Tort Claimants' Committee objects to the separate

classification of the OEM Unsecured Claims, while the Creditors' Committee proposes the

separate classification of trade claims from Other General Unsecured Claims.

55.    Section 1122 of the Bankruptcy Code provides that the claims or interests

within a given class must be "substantially similar" to the other claims or interests in that class:

> (a) Except as provided in subsection (b) of this
> section, a plan may place a claim or an interest in a
> particular class only if such claim or interest is
> substantially similar to the other claims or interests
> of such class.
>
> (b) A plan may designate a separate class of claims
> consisting only of every unsecured claim that is less
> than or reduced to an amount that the court
> approves as reasonable and necessary for
> administrative convenience.

11 U.S.C. § 1122.  Although section 1122(a) of the Bankruptcy Code prohibits the inclusion of

dissimilar claims in the same class, it does not require the placement of all similar claims in one

class.  *See In re Jersey City Med. Ctr.*, 817 F. 2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with

the general view which permits the grouping of similar claims in different classes."); *In re*

*Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D. Del. 2012) ("Section 1122(a) is mandatory in one

respect:  only substantially similar claims may be classified together.  Yet, Section 1122(a) is

permissive is (sic) this respect:  it does *not* provide that *all* similar claims must be placed in the

same class."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) ("Section

1122 of the Code provides that claims that are not 'substantially similar' may not be placed in

the same class; it does not expressly prohibit placing 'substantially similar' claims in separate

classes.  In fact, the Third Circuit has approved separate classification of unsecured claims.")

(citation omitted).  Indeed, the case law is clear that separate classification of similar claims is

permitted when the classification is reasonable.  *See In re Coastal Broad. Sys.*, 570 Fed. App'x

188, 193 (3d Cir. 2014) ("Although not explicit in § 1122, a corollary to that rule is that the

'grouping of similar claims in different classes' is permitted so long as the classification is

'reasonable.'"); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assoc. (In re Route 37*

*Bus. Park Assoc.)*, 987 F.2d 154, 158–59 (3d Cir. 1993) (concluding that separate classification

of similar claims is permissible where there is a reasonable basis for it).

56.     As set forth below, the Debtors have a rationale and reasonable

justification for the classification of Claims proposed under the Plan.

### a.     The Separate Classification of OEM Unsecured Claims is Proper.

57.     With respect to the U.S. Debtors, the Plan provides for three (3) classes of

General Unsecured Claims—Class 4 OEM Unsecured Claims, Class 5 PSAN PI/WD Claims,

and Class 5 Other General Unsecured Claims.  Class 4 contains the unsecured Claims of the

Debtors' OEM customers, who are the Debtors primary source of revenue and are critical to the

Debtors' ongoing business operations, Class 5 contains the unsecured Claims of the individuals

who have (or may) suffer a personal injury or harm related to the Debtors' PSAN Inflators, and

Class 6 contains the unsecured Claims of all the Debtors' trade and other creditors, including

those who have suffered an economic loss related to the Debtors' PSAN Inflators.  Each of these

Classes of creditors represent "a voting interest that is sufficiently distinct and weighty to merit a

separate voice in the decision whether the proposed reorganization should proceed."  *In re Route*

*37 Bus. Park Assoc.*, 987 F.2d at 159.

58.    The OEMs are the Debtors' customers and primary source of revenue—without their business the Debtors would not have a business to reorganize or sell.  Accordingly, affording the OEMs their own voice in these Chapter 11 Cases is both proper and appropriate, and does not render the Plan patently unconfirmable.  *Cf. In re Amcast Auto. of Ind.*, No. 05-33322 (FJO), (Bankr. S.D. Ind. Apr. 10, 2007) [Docket No. 1423] (order confirming plan of debtor automotive supplier which classified the general unsecured claims of General Motors—the debtor's largest customer and revenue source—separately from other general unsecured claims); *In re Clark-Cutler-McDermott Co.*, No. 16-41188 (CJP) (Bankr. D. Mass. Mar. 31, 2017) [Docket No. 668] (same).  Also of important weight is the unique shared interest that holders of PSAN PI/WD Claims have in these Chapter 11 Cases.  These claimants, due to the personal (and sometimes severe) nature of the injuries that gave rise to their Claims against the Debtors, deserve an independent voice in these cases, especially because they may otherwise be outnumbered by the Debtors' other creditors, most of whom have only suffered monetary losses. *Cf. In re Combustion Eng'g Inc.*, 391 F.3d 190, 244 (3rd Cir. 2004) (discussing the dangers of gerrymandering in the context of asbestos cases where "[a] distinct minority—for example, those tort claimants with especially serious injuries and strong cases—might get outvoted by a large number of holders of small claims who favor a quick pay-out of relatively small amounts with little proof required") (citation omitted).  In addition, only the PSAN PI/WD Claims are potentially subject to the Channeling Injunction and have the likely potential to manifest many years in the future.  For these reasons, the Debtors submit that the separate classification of OEM Unsecured Claims and PSAN PI/WD Claims from Other General Unsecured Claims is proper and does not render the Plan patently unconfirmable.  Indeed, the Tort Claimants' Committee's

objection to the separate classification of OEM Unsecured Claims should be overruled at the

Confirmation Hearing.

> **b.      The Classification of Trade Claims as Other General
> Unsecured Claims under the Plan is Proper.**

59.     The Debtors submit that the Creditors' Committee's assertion that the

Debtors' classification scheme is inequitable because trade creditors are classified together with

unsecured litigation creditors is without merit.  Section 1122(a) of the Bankruptcy Code

"explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though,

address the presence of similar claims in different classes."  *Jersey City Med. Ctr.*, 817 F. 2d at

1060.  Thus, while trade claims *may* be classified separately from other unsecured claims,

separate classification is not required.  *See FGH Realty Credit Corp. v. Newark Airport/Hotel*

*Ltd. P'ship*, 155 B.R. 93, 99 (D.N.J. 1993) ("The similarity of claims is determined by their legal

status in relation to the debtor.  Accordingly, unsecured claims will, generally speaking,

comprise one class, whether trade, tort, publicly held debt, or a deficiency of a secured creditor

because they are claimants of equal legal rank entitled to share pro rata in values remaining after

payment of secured and priority claims.") (citations omitted).  Indeed, the one case that the

Committee cites in support of its position merely reiterates the principle that the separate

classification of trade claims is permissible—it does not say it is legally mandated.  *See In re*

*Adelphia Commc'ns Corp.*, 368 B.R. 140, 247 (Bankr. S.D.N.Y. 2007) ("The classification

structure in the Plan is based on the requirement that the Debtors recognize the similar legal

character of the claims and equity interests grouped together, and the different legal character of

those Claims and Equity Interests that are classified separately. . . . Such motivation is more than

sufficient reason for the classification structure embodied in the Plan, and I find, as a fact or

mixed question of fact and law, that the classification structure was not established to

gerrymander an impaired assenting class.").  Accordingly, the Creditors' Committee's objection

to the classification of trade is a confirmation objection that should be overruled at the

Confirmation Hearing for the reasons set forth herein and those that will be argued in connection

with confirmation of the Plan.

> **c.     The Classification of the Mexican Labor Claims and the
> Mexican Class Action Claims at TDM and IIM is Proper.**

60.     As discussed above, the chapter 11 discharge of the Mexico Labor Claims

and the Mexico Class Action Claims may not be enforceable under Mexican law vis-à-vis TDM

and IIM.  As a result, the Debtors believe that these Claims are legally dissimilar from other

unsecured Claims at these Debtors because of the potential recourse against the Debtors

available to these claimants.  *See FGH Realty Credit*, 155 B.R. at 99 ("The similarity of claims is

determined by their legal status in relation to the debtor.").  Further, even if not dissimilar, the

Debtors believe that the separate classification of these Claims is justified because these Claims

are not substantially similar to the Claims of the Debtors' other creditors.  *See In re Quigley Co.*,

377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("Claims are similar if they have substantially similar

rights to the debtor's assets.") (internal quotations omitted).  Accordingly, the Debtors submit

that the separate classification of the Mexico Labor Claims and the Mexico Class Action Claims

at TDM and IIM is proper.

> **d.     The DOJ Restitution Claim is Not a Claim Against the Debtors
> and, Therefore, Should Not Be Classified under the Plan.**

61.     Only claims against a debtor are the proper subject of a chapter 11 plan.

Accordingly, section 1123(a)(1) of the Bankruptcy Code only applies to claims against a debtor;

claims against non-debtors should not be classified in a chapter 11 plan.  The Debtors are not

liable for the DOJ Restitution Claim—it is not a Claim against the Estates, nor are the Debtors

proposing to make any payments on account of such claim under the Plan.  Thus, the DOJ

29

Restitution Claim is properly excluded from the Plan's classification scheme, in compliance with section 1123(a)(1) of the Bankruptcy Code.  Accordingly, the Creditors' Committee's Objection regarding the classification of the DOJ Restitution Claim should be overruled.[11]

**B.    The Plan Satisfies the Requirements for "Cram Down."**

62.    Section 1129(b) of the Bankruptcy Code provides a mechanism whereby a plan proponent can confirm a plan in circumstances where not all impaired classes of claims and equity interests accept the plan.  This mechanism is colloquially known as "cram down."

63.    Section 1129(b) provides in pertinent part that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims

---

[11] In its Objection, the Creditors' Committee misstates *Combustion Engineering* to stand for the proposition that the equal treatment requirement of section 1123(a)(4) applies to claims in separate classes.  *See* Creditors' Comm. Obj. at ¶ 32.  This is inaccurate, what *Combustion Engineering* states is the following:

> The Bankruptcy Code furthers the policy of "equality of distribution among creditors" by requiring that a plan of reorganization provide similar treatment to similarly situated claims.  Several sections of the Code are designed to ensure equality of distribution from the time the bankruptcy petition is filed.  Section 1122(a) provides that only "substantially similar" claims may be classified together under a plan of reorganization.  Section 1123(a)(4) requires that a plan of reorganization "provide the same treatment for each claim or interest of a particular class."  And § 524(g) states that "present claims and future demands that involve similar claims" must be paid "in substantially the same manner."

391 F. 3d at 239.  Accordingly, as certain of the Creditors' Committee's allegations of section 1123(a)(4) violations could perhaps (generously) be recharacterized as allegations of unfair discrimination, the Debtors address those allegations below and submit that the Court should overrule the Creditor Committee's Objection regarding section 1123(a)(4) of the Bankruptcy Code because none pertain to any disparity in treatment (perceived or actual) vis-à-vis members of the same Class.

or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  As set forth below, and as will be further demonstrated in connection with confirmation of the Plan, the Debtors submit that the Plan satisfies the requirements for "cram down."

### a.    The Plan Does Not Discriminate Unfairly.

64.    Contrary to the assertion of inequitable and unfair treatment asserted by the Creditors' Committee, the Plan does not unfairly discriminate against any creditors.  *See* Creditors' Comm. Obj. at ¶ 35.

65.    The unfair discrimination standard of section 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (Bankr. D. Del. 2006) ("Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes.") (quoting *In the Matter of Johns–Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986)).  Section 1129(b)(1) does not prohibit all discrimination between classes; rather, it prohibits only discrimination that is unfair.  *See In re Armstrong*, 348 B.R. at 121 ("The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair.'") (citation omitted); *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980) ("A bankruptcy court can permit discrimination when the facts of the case justify it."); *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 238 (Bankr. N.D. Tex. 2015) ("A determination of whether a plan unfairly

discriminates involves consideration of differential treatment as between similarly situated classes and whether the treatment, though different, is fair under the given facts.").

66.    The weight of judicial authority holds that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similar classes are treated differently without a reasonable basis for the disparate treatment. *See In re Furlow*, 70 B.R. 973, 978 (Bankr. E.D. Pa. 1987) ("[D]ifferent treatment is permissible if and only if the debtor is able to prove a reasonable basis for the degree of discrimination contemplated by the Plan."). Accordingly, as between two classes of claims, there is no unfair discrimination where the facts and circumstances of the case justify disparate treatment. While the Plan does provide for limited disparate treatment between the unsecured Classes at TKH, such treatment is not discriminatory or unfair; rather, under the facts and circumstances of these Chapter 11 Cases it is both necessary and appropriate, and certainly does not render the Plan patently unconfirmable.[12]

67.    As the Objectors point out, the Class 4 OEM Unsecured Class is exempted from granting the release provided in Section 10.6(b) of the Plan and members of the other unsecured Classes are required to affirmatively opt-out of providing the release if they do not wish to provide it, this disparity in treatment is not presumptively unfair. *See id.* (holding that a rebuttable presumption of unfair discrimination arises where there is a difference in treatment that results in either "a *materially lower* percentage recovery for the dissenting class" or the allocation of "*materially greater* risk to the dissenting class in connection with its proposed

---

[12] The Creditors' Committee also asserts that the treatment of the Mexican Labor Claims and the Mexico Class Action Claims at TDM and IIM is discriminatory vis-à-vis the other general unsecured creditors with Claims against such Mexican Debtors. As explained above, the chapter 11 discharge of the Mexican Labor Claims and the Mexico Class Action Claims, which are claims held by Mexican creditors, may not be enforceable under Mexican law. The Debtors do not believe there are any other *Mexican creditors* with general unsecured claims against TDM and IIM that have not otherwise submitted to the jurisdiction of this Court. On this basis, the risk that the discharge of the other general unsecured claims against the Mexican Debtors will not be enforced vis-à-vis TDM and IIM is significantly less than the Mexico Class Action Claims and the Mexican Labor Claims and thereby establishes a justifiable basis for the disparate treatment among such classes of general unsecured creditors.

distribution") (emphasis added).  Here, the difference in recovery that the Creditors' Committee

points to is the value that "confused" creditors might give up by mistakenly failing to vote and/or

opt-out.  *See* Creditors' Comm. Obj. at ¶ 35.  Such difference—to the extent it can reasonably be

described as a difference in recovery—cannot reasonably be said to be material.

68.    The Debtors submit that the Creditors' Committee's objections to the Plan

on the basis that there is unfair discrimination is a confirmation objection which the Debtors

believe should be overruled at the time of confirmation.

### b.    The Plan is Fair and Equitable and Does Not Violate the Absolute Priority Rule.

69.    Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan is

fair and equitable with respect to a class of impaired unsecured claims that did not accept such

plan if, pursuant to the plan, no holder of a claim or interest that is junior to the interests of such

class will receive or retain any property on account of their junior interest.  11 U.S.C.

§ 1129(b)(2)(B)(ii).  This requirement is often referred to as the "absolute priority rule."

70.    The Creditors' Committee maintains that the Plan is patently

unconfirmable because it violates the absolute priority rule, asserting that the Debtors are

"paying a huge claim" of TKJP on account of its Interest in the Debtors.[13]  *See* Creditors' Comm.

Obj. at ¶ 41.  However, as the Debtors have repeatedly stated throughout these Chapter 11 Cases,

the Debtors are not proposing to pay the DOJ Restitution Claim under the Plan.  Rather, the Plan

---

[13] The Creditors' Committee's Objection makes reference to certain "gifting" cases.  *See* Creditors' Comm. Obj. at ¶¶ 40–41.  These cases involve circumstances where a senior creditor contributes or "gifts" a portion of its recovery under a chapter 11 plan to a junior stakeholder of the debtor.  *See, e.g., In re Armstrong World Indus., Inc.*, 432 F.3d 507 (prohibiting gifting of warrants directly by unsecured creditors to an equity holder over the objection of a senior creditor class); *In re DBSD North Am., Inc.*, 634 F.3d 79, 93–94 (2d Cir. 2011) (prohibiting a class of senior noteholders from gifting shares and warrants directly to equity holders under the plan when a class of creditors rejected the plan and objected to such gifting).  As the Debtors will demonstrate at confirmation, there is no value flowing *from* the Debtors to TKJP; rather, the Debtors are paying the Consenting OEMs the Plan Settlement Payment on account of valid and enforceable secured and/or administrative Claims *and the Consenting OEMs are* deeming that payment to also satisfy TKJP's obligation to pay them their portion of the DOJ Restitution Claim.

provides for the payment of the superpriority or priority Claims of the Consenting OEMs on account of their Settled OEM Claims, which Claims **must** be paid in order for the Debtors to confirm a plan.  The Committees may contest the amount of the Settled OEM Claims, but they cannot contest that the valid Settled OEM Claims have priority over General Unsecured Claims.

71.     The fact that the Consenting OEMs will deem the Debtors' payment of the Settled OEM Claims as satisfying TKJP's obligation to pay them their portion of the DOJ Restitution Claim does not change this conclusion.  The Debtors are not liable for the DOJ Restitution Claim and its satisfaction does not constitute the satisfaction of a Claim of the Debtors.  Accordingly, the Plan does not violate the absolute priority rule and the Debtors will be prepared to demonstrate just that at confirmation.

C.     **The Treatment of the NHTSA Claims is Appropriate.**

72.     NHTSA's support for the Global Transaction, and consent to modify provisions of the NHTSA Consent Order are fundamental to the success of the Global Transaction.  Indeed, the U.S. Acquisition Agreement requires the execution, as a condition to closing, of a written agreement between the Plan Sponsor and NHTSA with respect to certain modifications to the NHTSA Consent Order, including modifications relating to successor-liability and monitor oversight.  *See* U.S. Acquisition Ag. § 9.1(o).  If such agreement is not obtained on or before January 2, 2018, the Plan Sponsor has five (5) Business Days to terminate the U.S. Acquisition Agreement.  *See id*. at § 4.4(d)(xv).  NHTSA has no obligation to support the Global Transaction or Reorganized Takata, or to cooperate with the Plan Sponsor's request for modification of the NHTSA Consent Order and certainly would be less likely to do so if the Debtors do not satisfy the NHTSA Claims in a manner acceptable to NHTSA.  Accordingly, section 3.3(b) of the U.S. Acquisition Agreement provides that on the Closing Date, the Plan Sponsor will pay a portion of the Purchase Price to NHTSA in the amount of Fifty Million

Dollars ($50 Million).[14]  The Plan Sponsor could have instead lowered the purchase price by

Fifty Million Dollars ($50 Million) and paid NHTSA directly, and unsecured creditors would

have been no better off.

73.    Moreover, the Debtors have sound legal bases to support the treatment of

the NHTSA Claims under the Plan, including, without limitation, that the NHTSA Consent

Order may be an executory contract, subject to assumption or rejection.  In addition to the

payment obligations outstanding under the NHTSA Consent Order, TKH has significant

continuing and unperformed nonmonetary obligations, including obligations relating to testing,

reporting, and administering recalls, obligations that are in furtherance of important public safety

interests.  Likewise, NHTSA has ongoing and unperformed nonmonetary obligations under the

NHTSA Consent Order, including continuing to monitor and review TKH's phase out of PSAN

Inflators and reviewing any reports submitted by the monitor.  To the extent the NHTSA Consent

Order is, or is deemed to be, an executory contract, the Debtors will be obligated to assume such

contract in order to continue to satisfy their public safety obligations (and also for Reorganized

Takata to operate as contemplated under the Plan) and the monetary obligations owed thereunder

will be required to be paid in full prior to assumption.[15]

---

[14] In its Objection, the Tort Claimants' Committee makes certain inflammatory and baseless statements regarding the genesis of certain requirements under the U.S. Acquisition Agreement.  Specifically, the Tort Claimants' Committee posits that discovery is likely to show that the requirement that the DOJ Restitution Payment be satisfied prior to closing was a creation of the OEMs and TKJP.  *See* Tort Claimants' Comm. Obj. at ¶¶ 4–5, 21, 64.  These statements are inaccurate and do not merit a response.

[15] The NHTSA Consent Order was issued pursuant to NHTSA's "authority under the Safety Act, 49 U.S.C. § 30101, *et seq*."  *See* NHTSA Consent Order at ¶ 6.  Congress modified title 49 of the United States Code in 2015 to add provisions intended to "broaden[] a company's recall obligations in the event of bankruptcy," noting that "[a]n essential part of improving vehicle and roadway safety is increasing accountability among automotive companies." H.R. Rep. 114–357, at 523 (2015).  Accordingly, section 30120A of that title was drafted to explicitly provide that "[a] manufacturer's filing of a petition in bankruptcy under chapter 7 or chapter 11 does not negate the manufacturer's duty to comply with [49 U.S.C. §§ 30112 and 30115–30120]."  49 U.S.C. § 30120A.  In addition to requiring compliance during a bankruptcy, the statute also grants a broad priority for a "manufacturer's *obligations* under [49 U.S.C. §§ 30112 and 30115–30120]" so as to, in the direct words of the statute, "ensure that consumers are adequately protected from any safety defect or noncompliance determined to exist in the manufacturer's products."  *Id.* (emphasis added).  Specifically, such claims "are given priority pursuant to [31 U.S.C.

74.    In view of the foregoing, the Objectors have not satisfied their burden of demonstrating that the Plan is patently unconfirmable due to the treatment of the NHTSA Claims and the Debtors believe that the treatment of the NHTSA Claim is a matter for the Confirmation Hearing.

## III.    The Release Provisions in the Plan are Proper.

75.    The Debtors' Plan provides for (i) releases of claims held by the Debtors and their estates (the "***Debtor Releases***")[16] against certain non-Debtor third parties (collectively, the "***Released Parties***"),[17] (ii) releases of claims held by certain *consenting* creditors and interest holders of the Debtors (the "***Consensual Releases***")[18] against the Released Parties, and (iii) a release and permanent injunction of certain PSAN PI/WD Claims (collectively, the "***Channeling Injunction***" and together with the Debtor Releases and the Consensual Releases, the "***Release Provisions***")[19] against certain non-Debtor third parties (the "***Protected Parties***").[20]  In

---

§ 3713(a)(1)(A)], notwithstanding [31 U.S.C. § 3713(a)(2)]." *Id*.  Moreover, this priority was expressly granted to both prepetition and postpetition obligations:  "This section shall apply equally to actions of a manufacturer taken before or after the filing of a petition in bankruptcy." *Id*.

[16] Plan § 10.6(a).

[17] The Released Parties are, collectively, (i) the Debtors, (ii) the FCR, (iii) the Plan Sponsor Parties, (iv) the Debtors' non-Debtor affiliates (including the Acquired Non-Debtor Affiliates), and (v) with respect to each of the foregoing Persons in clauses (i) through (iv), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.  In addition, (x) any Consenting OEM that elects, in a timely-submitted ballot for voting on the Plan, to provide a release of the Debtors and certain related parties in form and substance to be agreed to by the Debtors and the Consenting OEMs, and (y) with respect to such Consenting OEM, the parties set forth in clause (v) above, shall also be Released Parties solely for purposes of section 10.6(a) of this Plan.  For the avoidance of doubt, except for the foregoing sentence, no Consenting OEM shall be considered a Released Party under the Plan.

[18] Plan § 10.6(b).

[19] Plan §§ 10.6(c) and 10.7.

[20] The Protected Parties are, collectively, (i) the Debtors' non-Debtor affiliates (including the Acquired Non-Debtor Affiliates), (ii) Reorganized Takata, (iii) the Participating OEMs, subject to the terms of Section 5.10(r) of the Plan, (iv) the Plan Sponsor Parties, and (v) with respect to each of the foregoing Persons in clauses (i) through (iv), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors,

accordance with Bankruptcy Rule 3016(c), the Debtors have described "in specific and

conspicuous language (bold, italic, or underlined text)" each of the Release Provisions and

identified "the entities that would be subject to the injunction."[21]  In addition, the Debtors have

included additional descriptions of the Channeling Injunction—the only non-consensual release

under the Plan[22]—in Section 1.2(h) of the Disclosure Statement.

76.     While the inclusion of the Release Provisions in the Plan has resulted in

no shortage of objections from the Objectors, the appropriateness of the Release Provisions is a

matter to be addressed at the Confirmation Hearing.  *See* Hr'g Tr. at 67:12, 14-15, *In re*

*Molycorp, Inc.*, No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) (noting that potential issues

with releases should be dealt with at confirmation); *In re Innkeepers USA Tr.*, 448 B.R. 131, 148

(Bankr. S.D.N.Y. 2011) (holding objections asserting that "release provisions [were] overly

broad and should not be approved absent the consent of each releasing party" were "best

categorized as confirmation objections").

77.     Accordingly, many of the Objections related to the Release Provisions are

premature and do not warrant a full response at this time.  Rather, the Debtors will prove at the

Confirmation Hearing that each of the Release Provisions is appropriate under applicable Third

Circuit law.  Moreover, as described below, none of the Objectors satisfy their burden of

demonstrating that the Release Provisions render the Plan patently unconfirmable.

---

attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons'
respective heirs, executors, estates, and nominees, as applicable.

[21] Discl. Stmt. § 6.9(e).  The MDL Plaintiffs argue that the Debtors must identify each of the Debtors' non-Debtor
affiliates, the subsidiaries of Reorganized TK Holdings, and the Participating OEMs.  The Debtors are not aware of,
and the MDL Plaintiffs fail to cite to, any authority requiring the Debtors to provide this entity-level type disclosure
with respect to the released parties.  In any case, Schedule B of the Plan lists the Participating OEMs as of the date
hereof.  The Debtors' non-Debtor affiliates can easily be identified from the Global Organizational Chart annexed to
the Disclosure Statement as Exhibit G.  In addition, the Debtors have revised the Disclosure Statement to include the
definition of "Protected Parties" in section 1.2(j) therein.

[22] Discl. Stmt. §§ 6.9(e)(3), (vi).

A.   **The Channeling Injunction Complies with Applicable Law and Does Not Render the Plan Patently Unconfirmable.**

78.    Section 10.6(c) and Section 10.7 of the Plan provide for the release and permanent injunction of certain PSAN PI/WD Claims against the Protected Parties.  In this Circuit, non-debtor releases and channeling injunctions are appropriate where exceptional circumstances warrant such relief.  *See Gillman v. Continental Air. (In re Continental Air.)*, 203 F.3d 203, 212-14 (3d Cir. 2000) (examining the propriety of nondebtor release and permanent injunction provisions).[23]  The United States Court of Appeals for the Third Circuit has instructed that the "hallmarks" of a permissible non-debtor release are "fairness, necessity to the reorganization and specific factual findings to support these conclusions."  *Id.* at 214; *see also In re Global Indus. Techs., Inc.*, 645 F.3d 201, 205 (3d Cir. 2011).  The determination of whether a plan's injunction provisions are ultimately appropriate is an issue of *fact* to be determined by the circumstances of each case.[24]  *See, e.g.*, *In re Continental Air.*, 203 F.3d at 214 (noting that specific factual findings were necessary to determine whether non-consensual third party releases were appropriate).

---

[23] While a non-debtor release (*i.e.*, third party release) and a channeling injunction are distinct legal concepts, the high degree of similarity of effect renders these largely interchangeable concepts.  *See generally In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 528 (Bankr. S.D.N.Y. 2007) (explaining that a proposed channeling injunction shared many important characteristics with a non-debtor release as it proscribed litigation between non-debtor entities and would in substance release the protected party from any further obligations to creditors); *In re Wool Growers Centr. Storage Co.*, 371 B.R. 768, 778 (Bankr. N.D. Tex. 2007) (characterizing a "release that, in effect, channels the creditors' recovery to a source other than the debtor" as a "channeling release").  Moreover, case law considering approval of non-debtor releases and channeling injunctions apply an equivalent legal framework.

[24] Courts evaluating the propriety of a proposed injunction provision have often considered the following factors: (i) the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) substantial contribution by the non-debtor of assets to the reorganization; (iii) the essential nature of the injunction to the reorganization such that, without the injunction, the reorganization stands little likelihood of success; (iv) an agreement by a substantial majority of creditors to support the injunction, specifically the impacted class or classes; and (v) the plan provides a mechanism to pay for all, or substantially all, of the claims of the class or classes affected by the injunction.  *See, e.g.*, *In re Continental Air.*, 203 F.3d at 217 n.17.

79.     Despite assertions to the contrary by the MDL Plaintiffs, courts in this Circuit have approved both non-debtor releases *and channeling injunctions* in extraordinary cases where the *Continental* hallmarks were present.  *See, e.g.*, *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW), 2014 Bankr. LEXIS 2461, at *12-20 (Bankr. D. Del. Jan. 30, 2014) (approving a channeling injunction for tort claims relating to the debtors' manufactured gasoline cans); *In re Global Indus. Techs., Inc.*, Case No. 02-21626 (JKF), 2013 WL 587366, at *39 (Bankr. W.D. Pa. Feb. 13, 2013) (approving channeling injunction for tort claims relating to silica products); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JKF), 2006 WL 616243, at *17-20 (Bankr. D. Del. Feb. 6, 2006) (approving three separate channeling injunctions for mass tort claims relating to silica and coal tar pitch volatile products and noise-induced hearing loss).[25]  Courts have recognized that non-debtor releases and channeling injunctions "may be authorized under § 105(a) and § 1123(b)(6) of the Bankruptcy Code . . . where [such injunctions] would play 'an important part in the debtor's reorganization plan.'"  *In re Global Indus. Techs., Inc.*, 645 F.3d at 205, n.10 (quoting *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) (authorizing channeling injunction for securities class action claims)).

80.     Clearly, despite assertions to the contrary by the Objectors, there is applicable Third Circuit precedent for approving a non-debtor release and channeling injunction where the factual record satisfies the foregoing standard.  Unsurprisingly, the factual record in

---

[25] The MDL Plaintiffs cite to the court's decision in *In re Millennium Lab Holdings II, LLC*, 242 F.Supp 3d 322 (D. Del. 2017) for the erroneous proposition that a non-debtor release or channeling injunction may only be appropriately granted by an Article III court.  *See* MDL Plaintiffs Obj. at ¶ 23 n.34 .  The MDL Plaintiffs fail to recognize, however, that the Article III issue in that case was ultimately remanded to the bankruptcy court for further consideration, and that the bankruptcy court later determined that it had authority to grant the injunction in question.  *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252 (Bankr. D. Del. 2017).  In any case, the Plan provides that the "Debtors shall seek an order by the District Court approving the Channeling Injunction" rendering the MDL Plaintiff's assertion they will not consent to the Bankruptcy Court's entry of a final order on this point moot.  *See* Plan § 10.7(e).

support of the non-debtor release and channeling injunction is in dispute,[26] which—on its own—precludes a finding that the Channeling Injunction renders the Plan patently unconfirmable.  *See Am. Capital Equip.,* 688 F.3d at 155 (holding that a plan is patently unconfirmable only where "all material facts are not in dispute or have been fully developed at the disclosure statement hearing").

81.    Moreover, the fact that that the Channeling Injunction may not ultimately be approved by the Court at the Confirmation Hearing does not preclude the Court's approval of the Disclosure Statement.  To the contrary, courts have recognized that objections to the breadth of injunction provisions should be resolved at confirmation and that the resolution for such issues may simply include modifications to the plan at the confirmation hearing.  *See, e.g.*, Hr'g Tr. at 57:3-8, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. Sept. 21, 2015) ("To say that releases [are] an issue for confirmation doesn't make the Proposed Plan patently unconfirmable.  It can either be addressed in one of two ways and we'll figure that out when we get to confirmation.  And I think that really goes to the heart of all of the confirmation, certainly patently unconfirmable confirmation objections.").

82.    The Debtors believe that extraordinary circumstances and significant contributions made by the Protected Parties support approval of the Channeling Injunction and will offer a factual record in support thereof at the Confirmation Hearing.

---

[26] The FCR, for instance, expresses concerns regarding the adequacy of the consideration that the Protected Parties have provided or will provide in exchange for the Channeling Injunction.  *See* FCR Obj. at ¶¶ 31–33.  The Tort Claimants' Committee, on the other hand, questions, *inter alia*, whether sufficiently exceptional circumstances exist to justify the Channeling Injunction and whether its approval would ultimately be fair given that the Protected Parties are allegedly not providing any consideration to affected claimants.  *See* Tort Claimants' Comm. Obj. at ¶ 96.  The U.S. Trustee, for his part, admits that the propriety of the Release Provisions is a question for the Confirmation Hearing, but warns that such injunctions must satisfy the factors discussed above.  *See* U.S. Trustee Obj. at ¶¶ 34–40.

B.    **The Debtor Releases are Appropriate and Do Not Render the Plan Patently Unconfirmable.**

83.    In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, Section 10.6(a) of the Plan contains a release of certain Claims or causes of action of the Debtors, the Reorganized Debtors, and the Estates against the Released Parties.  When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, courts will generally consider whether the releases represent a valid exercise of the debtor's business judgment and are otherwise fair, reasonable, and in the best interests of the debtor's estate.  *See, e.g., U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."); *see also In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of the plan").

84.    As an exercise of its business judgment, a debtor's decision to release claims against third parties pursuant to a plan is afforded deference.  *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of [] objecting creditors over the business judgment of the Debtors."); *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (Bankr. D. Del. 2002) ("'[U]nder the business judgment rule . . . a court will not interfere with the judgment of a board of directors unless there is a showing of gross and palpable overreaching.'  Thus, under the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to any rational purpose' and a court 'will not substitute its own

41

notions of what is or is not sound business judgment.'") (citations omitted).  As with non-debtor

releases, the determination of whether a proposed debtor release is appropriate in a particular

case is a necessarily fact specific inquiry.  And, as discussed above, the facts necessary for the

Court to evaluate whether the Debtor Releases constitute an appropriate exercise of the Debtors'

business judgement or are otherwise appropriate under applicable Third Circuit law will be fully

developed in connection with the Confirmation Hearing.

     **C.**     **The Opt-Out Release Mechanism Is Consistent With Applicable Law And Does Not Preclude Approval of the Disclosure Statement or the Solicitation and Voting Procedures.**

     85.     Section 10.6(b) of the Plan also provides for certain releases, on a

consensual basis only, of claims against the Released Parties held by certain creditors and

interest holders.  Specifically, Section 10.6(b) of the Plan and, correspondingly, the Solicitation

and Voting Procedures, provide that the following parties shall be determined to have consented

to the Consensual Releases:  (i) holders of Claims who vote to accept the Plan; (ii) holders of

Claims that are Unimpaired under the Plan; (iii) holders of Claims whose vote to accept or reject

the Plan is solicited but who do not vote either to accept or reject the Plan; (iv) the holders of

Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the

releases set forth therein; (v) the holders of Claims and Interests who are given notice of the

opportunity to opt out of granting such releases but who do not opt of granting the releases; and

(vi) all other holders of Claims and Interests to the maximum extent permitted by law.  The Tort

Claimants' Committee contends that this construction is inappropriate, particularly with respect

to (i), (iii), and (v), and, as a result, that the Solicitation and Voting Procedures may not be

approved.  *See* Tort Claimants' Comm. Obj. at ¶ 101.  However, as discussed below, the Tort

Claimants' Committee's position stands in stark contrast to ample precedent within the Third

Circuit.

86.     Courts in this Circuit "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013).  Indeed, under established Third Circuit law, where releasing parties have consented to a provision in a plan of reorganization that releases claims against non-debtors, such releases will typically be approved on the basis of general principles of contract law.  *See, e.g.*, *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (noting that a consensual non-debtor release is no different from any other settlement or contract and does not implicate section 524(e) of the Bankruptcy Code).

87.     Even in the absence of express consent, however, courts have repeatedly recognized that non-debtor releases may appropriately be deemed consensual where holders of claims or interests do not opt out of the releases, either by abstaining from voting or by voting against the plan but not otherwise opting out of the releases, where such creditors were provided detailed instructions on how to opt out.  *See, e.g.*, *In re Indianapolis Down LLC*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *see also In re Gen. Wireless Ops. Inc. dba Radioshack*, Case No. 17-10506 (BLS) (Bankr. D. Del. Oct. 26, 2017) [Docket No. 1117] (confirming plan and approving third-party releases by creditors who had consented by not opting out of the release, either by abstaining from voting or by voting against the plan without affirmatively electing to opt out); *In re New Gulf Res.*, LLC, Case No. 15-12566 (BLS) (Bankr. D. Del. Apr.

20, 2016) [Docket No. 514] (same); *In re Am. Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr.

D. Del. Jan. 27, 2016) [Docket No. 687] (same).

88.     In addition, courts have similarly found that non-debtor releases may

appropriately be deemed consensual where affected claimants or interest holders are unimpaired

and deemed to accept the debtor's plan.  *See, e.g.*, *In re Energy Future Holdings Corp.*, No. 14-

10979 (CSS) (Bankr. D. Del. Dec. 7, 2015) [Docket No. 7244] (order confirming plan that

provided that all holders of claims or interests deemed to accept the plan also consented to the

plan's release provision); *In re Overseas Shipholding Grp.*, No. 12-20000 (PJW) (Bankr. D. Del.

July 18, 2014) [Docket No. 3683] (order confirming plan which contained releases by holders of

unimpaired claims deemed to accept the plan).

89.     In the instant case, the Debtors' solicitation materials provide clear

conspicuous notice of both the Consensual Releases and the process for opting out of the

Consensual Releases (the "***Opt-Out Release Mechanism***").  Specifically, the Debtors' Ballot

provides:

> AS A HOLDER OF AN IMPAIRED CLAIM
> UNDER THE PLAN, YOU ARE DEEMED TO
> PROVIDE THE RELEASES CONTAINED IN
> SECTION 10.6(B) OF THE PLAN, AS SET
> FORTH ABOVE.  YOU MAY CHECK THE BOX
> BELOW TO OPT OUT OF THE RELEASE
> **ONLY IF** YOU VOTE TO **REJECT** THE PLAN.
> IF YOU (I) VOTE TO ACCEPT THE PLAN,
> (II) DO NOT SUBMIT A BALLOT TO ACCEPT
> OR REJECT THE PLAN, OR (III) REJECT THE
> PLAN BUT DO NOT OPT OUT OF THE
> RELEASE PROVISIONS OF THE PLAN, YOU
> WILL BE DEEMED TO HAVE GRANTED THE
> RELEASES IN SECTION 10.6(B) OF THE PLAN.

Ballot Item 4.

90.     Such notice, and the related Opt-Out Release Mechanism, is consistent with the disclosure of similar consensual release and opt-out mechanisms in solicitation materials previously approved in the Third Circuit.  *See, e.g.*, *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Aug. 28, 2015) [Docket No. 940] (order approving disclosure statement and ballots that described in bold font the consequences of abstaining or not checking the opt out box); *In re Dendreon Corp.*, No. 14-12515 (LSS) (Bankr. D. Del. Apr. 15, 2015) [Docket No. 596] (same); *In re CWC Liquidation Inc.*, No. 14-10867 (BLS) (Bankr. D. Del. Aug. 8, 2014) [Docket No. 839] (same).

91.     For the foregoing reasons, the Consensual Releases and the Opt-Out Release Mechanism are appropriate, comply with applicable law, and should not preclude approval of the Disclosure Statement.

## IV.     The Solicitation and Voting Procedures are Reasonable and Appropriate.

92.     Certain of the Objections raised issues or concerns with the Debtors proposed Solicitation and Voting Procedures.  As set forth below and in the Objection Response Chart, the Debtors have made every effort to address any concerns and to clarify provisions where reasonable or appropriate and, as a result, contemporaneously herewith the Debtors filed a revised Proposed Order (the "***Revised Proposed Order***").  To the extent any objections to the Solicitation and Voting Procedures remain outstanding, they should be overruled for the reasons set forth below and in Objection Response Chart.[27]

---

[27] As set forth in the Objection Response Chart, the States take issue with the proposed February 12, 2018 deadline for the Debtors and other parties in interest to file responses to Plan objections, arguing instead that parties should be required to file replies no later than February 8, 2018 as per the Local Rules.  Given the size and complexity of these Chapter 11 Cases, however, it is highly likely that  parties in interest will file responsive pleadings in connection with confirmation.  The proposed timeline, which allows the Debtors' less than six (6) days to respond, will afford the Debtors the opportunity to resolve objections to confirmation and narrow the issues before the Court at the Confirmation Hearing.  Accordingly, the proposed timeline is appropriate and cause exists to allow the Debtors and other parties in interests additional time to file replies as proposed in the Solicitation Procedures Motion.

A.      **The Solicitation and Voting Procedures for PPICs are Fair and Equitable.**

93.      As the Court is undoubtedly aware, pursuant to the Bar Date Order, the Debtors undertook one of the largest legal noticing campaigns in United States bankruptcy history, providing notice and the opportunity to file claims to approximately eighty-three million (83 million) PPICs.  In order to process, audit, and classify the significant number of PPIC Claims that have been filed, the Solicitation Agent requested an additional six (6) business days to complete the solicitation of all PPICs, including PPICs listed on the Schedules and PPICs that returned paper proofs of claim.

94.      Now that the PPIC Bar Date has passed and the Solicitation Agent has more information regarding the filed proofs of claim, the Debtors have modified their Solicitation and Voting Procedures to provide that the mailing of all paper Solicitation Packages (including paper Solicitation Packages to be sent to PPICs that failed to register email addresses) will be completed by the General Solicitation Date.  *See* Rev. Proposed Order at ¶ 13.  In addition, the Solicitation Agent will work to send the electronic Solicitation Packages to Registered PPICs on a rolling basis ahead of the PPIC Solicitation Date.  The Debtors submit that these procedures are fair and equitable and will afford PPICs with adequate time to consider and vote on the Plan.  *Cf. In re Aspect Software Parent, Inc.*, No. 16-10597 (MFW) (Bankr. D. Del. Apr. 26, 2016) [Docket No. 254] (order approving solicitation procedures with twenty (20) day solicitation period); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Dec. 21, 2016) [Docket No. 1399] (order approving solicitation procedures with twenty-three (23) day solicitation period).

B.      **Due Process Does Not Necessitate that the FCR be Entitled to Vote.**

95.      The FCR asserts that he must be given the opportunity to vote to accept or reject the Plan on behalf of all Future Claimants in order to afford them due process.  *See* FCR

Obj. at ¶ 36.  While the Debtors share the FCR's desire to provide appropriate due process to

Future Claimants, the Debtors do not believe that due process requires that the FCR be allowed

to vote.  To the contrary, it is typical in this Circuit and others that, in lieu of voting on a plan, a

future claims representative will represent the interests of future claimants by filing a

confirmation brief or declaration that sets forth whether or not he/she supports the plan.  *See,*

*e.g., In re Yarway Corp.*, No. 13-11025 (BLS) (Bankr. D. Del) [Docket Nos. 756, 843] (order

approving solicitation procedures which did not entitle future claims representative to vote and

declaration in support of confirmation filed by such future claimants' representative); *In re*

*Specialty Products Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del.) [Docket Nos.

5112, 5238] (same); *In re ABB Lumus Global Inc.*, No. 06-10401 (MFW) (Bankr. D. Del.)

[Docket Nos. 199, 268] (same); *In re The Flintkote Co. and Flintkote Mines Ltd.*, No. 04-11300

(JKF) (Bankr. D. Del.) [Docket Nos. 3615, 4607] (same); *In re Motors Liquidation Co.*, No. 09-

50026 (REG) (Bankr. S.D.N.Y.) [Docket Nos. 8043, 9338] (same).

   96.  Nevertheless, if this Court determines that, in the context of these Chapter

11 Cases, due process would best be served by permitting the FCR to vote on the Plan, the FCR

should be entitled to cast one (1) vote in the aggregate amount of One Dollar ($1.00), for voting

purposes only, on behalf of all Future Claimants.  Such treatment would be consistent with the

Revised Proposed Order which provides that any PPIC Claim, regardless of whether such PPIC

Claim is wholly or partially contingent, liquidated, or disputed, shall receive one (1) vote valued

at One Dollar ($1.00), for voting purposes only.  *See* Rev. Proposed Order at ¶ 7(g).  Moreover,

given the projected number of Future Claimants (over seven hundred (700) claimants with

Claims valued at over One Billion Dollars ($1 Billion)), it would be perverse to provide Future

Claimants, who have not been injured and whose Claims are speculative, greater voting rights

than current holders of PSAN PI/WD Claims.  Allowing the FCR to vote more than once and for more than One Dollar ($1.00) would significantly compromise the voice of current holders of PSAN PI/WD Claims.

## Conclusion

97.    As established above and in the Objection Response Chart, none of the Objectors raise any issue that warrants a finding that the Plan is fatally flawed and not confirmable as a matter of law.  Rather, while there may be litigable issues relating to confirmation, those issues should be raised and addressed at that time.  Accordingly, the Debtors respectfully request that the Court defer all such Objections until the Confirmation Hearing and enter the Revised Proposed Order approving the Disclosure Statement, the Solicitation and Voting Procedures, and the Ballot.  The Debtors submit that such approval and the commencement of solicitation of the Plan is in the best interests of the Debtors, their Estates, and all parties in interest.

Dated: January 2, 2018
       Wilmington, Delaware

*/s/ Mark D. Collins*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*