**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>TK HOLDINGS, INC., *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | ) Chapter 11<br>)<br>) Case No.: 17-11375 (BLS)<br>)<br>) Jointly Administered<br>)<br>) **Re: Docket No. 1946** |

Hearing Date: February 16, 2018 at 10:30 a.m. (ET)

**REPLY TO OBJECTION OF MITSUI SUMITOMO INSURANCE COMPANY, LTD.
TO CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION BY THE
OFFICIAL COMMITTEE OF UNSECURED TORT CLAIMANT CREDITORS AND
<u>FUTURE CLAIMS REPRESENTATIVE</u>**

The Official Committee of Unsecured Tort Claimant Creditors (the "Tort Committee") and Future Claims Representative ("FCR") in the bankruptcy case of TK Holdings, Inc. and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, "TKH" or the "Debtors") submit this joint reply to the Objection of Mitsui Sumitomo Insurance Company, Ltd. ("MSI") To Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization (the "Plan").

**PRELIMINARY STATEMENT**

1.　　A cornerstone of the Plan—and the term sheet resolving the Tort Committee and FCR's potential objections to the Plan (the "Term Sheet")[2]—is the structure for resolving the PSAN PI/WD Claims. In accordance with sections 541(c)(1), 1123(a)(5)(B), and 1129(a)(1) of

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these Chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] *See* Notice of Filing of Settlement Term Sheets with Creditors' Committee, Tort Claimants' Committee, and Future Claims Representative Regarding Confirmation of Plan, Docket No. 2017 (Feb. 10, 2018).

the Bankruptcy Code, the Debtors will channel their liabilities for PSAN PI/WD Claims to a trust (the "PSAN PI/WD Trust"), which will evaluate and pay the claims pursuant to the Trust Agreement and Trust Distribution Procedures (the "TDPs"). The Trust will be funded, potentially in large part, by the rights and proceeds of the Debtors' products liability insurance policies. *See* Plan § 5.10(f); Term Sheet § 9. The face value of these proceeds totals hundreds of millions of dollars.

2. MSI objects to the Plan on the basis that it is not "insurance neutral." First, MSI argues that the transfer of insurance proceeds to the PSAN PI/WD Trust violates the policies' anti-assignment provisions ("Anti-Assignment Provisions"), which state that policy rights cannot be transferred without MSI's consent. According to MSI, such a transfer would (1) increase MSI's exposure by obligating it to pay claims made against non-insureds, and (2) result in an improper extraterritorial application of the Bankruptcy Code to a policy with Japanese contacts. Second, MSI argues that the Plan fails to address treatment of the policies' Japanese choice of law and forum provisions, claims-handling procedures, or payment of SIRs.

3. As explained below, MSI's arguments are meritless for the following reasons:

   i. It is well-established that the Bankruptcy Code preempts any purported anti-assignment restrictions in a debtor's insurance policies.

   ii. The Bankruptcy Code expressly provides for extraterritorial application to matters concerning the administration of insurance and other property of the Debtors' estate. In any event, the proposed transfer at issue is occurring in the U.S., and thus is not "extraterritorial."

   iii. Even if the Bankruptcy Code did not preempt the Anti-Assignment Provisions, the provisions would not apply to the Plan under state law,

        given that the assignment would result in no material increase in risk to MSI.

    iv.    Transferring the Debtors' liabilities, but not its corresponding insurance, would allow MSI to escape its obligations and reap a windfall by virtue of the bankruptcy. This contravenes public policy and the plain language of the policies, which require MSI to fulfill its coverage obligations regardless of the bankruptcy of the insured.

    v.    MSI's remaining arguments are coverage defenses preserved by the Plan's insurance neutrality provisions and properly raised with the PSAN PI/WD Trust post-confirmation.

4.    For these reasons, the Court should overrule MSI's objection and issue a finding of validity as to the transfer of insurance rights and proceeds, as set forth in the Term Sheet, the Plan, and the Confirmation Order.

## ARGUMENT

### I. FUNDAMENTAL PRINCIPLES OF BANKRUPTCY AND INSURANCE LAW ALLOW FOR THE TRANSFER OF INSURANCE RIGHTS AND PROCEEDS TO THE TRUST.

5.    MSI argues that the Anti-Assignment Provisions prohibit the Plan's transfer of proceeds of MSI policies to the Trust. This argument is entirely without merit and has been rejected squarely by Third Circuit bankruptcy courts and non-bankruptcy courts alike.

    **A.**    **Section 1123(a)(5)(B) Expressly Preempts MSI's State Law Argument Based on the Anti-Assignment Provisions.**

6.    Section 1123(a) provides that "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . (5) provide adequate means for the plan's implementation, such as . . . (B) transfer of all or any part of the property to the estate to one or more entities,

3

whether organized before or after the confirmation of such plan." 11 U.S.C. § 1123(a)(5)(B).[3] This section expressly preempts all non-bankruptcy laws that otherwise would impair the implementation of the Debtors' plan, including any such law that otherwise would prevent the transfer of the rights to insurance or proceeds to a post-bankruptcy personal injury trust. *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 19 (1993) ("notwithstanding" is a clear statement of intent "to supersede all other laws"); *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (holding that "[t]he plain language of § 1123(a) evinces Congress's clear intent to preempt state law" with respect to transfer of the Debtor's insurance rights in bankruptcy) ("*Federal-Mogul*").

7. Consistent with these principles, the U.S. Court of Appeals for the Third Circuit has held squarely that section 1123(a)(5)(B) permits an insurance-rights transfer similar to the one here and preempts any anti-assignment policy provision that otherwise would apply to prevent that transfer. In *Combustion Engineering*, certain insurers objected to confirmation, just as MSI has here, by arguing that the Plan impaired its rights under the anti-assignment provisions of certain of their insurance policies. 391 F.3d at 218. The Third Circuit expressly overruled that objection and held that "even if the subject insurance policies purported to prohibit assignment of Combustion Engineering's insurance proceeds, these provisions would not prevent the assignment of proceeds to the bankruptcy trust." *Id.* at 218 n.27; *see also Federal-Mogul*, 385 B.R. 560, 567 (2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies may be assigned to a trust or other entity.")

8. Numerous other bankruptcy courts, both in this Circuit and nationwide, have similarly confirmed that the transfer of a debtor's insurance rights to a personal injury trust is

---

[3] Similarly, section 541 prohibits restrictions on the interests of the debtor, which includes the Debtors' insurance policies. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218–19 (3d Cir. 2004), *as amended* (Feb. 23, 2005).

valid and enforceable pursuant to section 1123(a)(5) of the Bankruptcy Code, notwithstanding any anti-assignment provisions in such insurance policies.  *See In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006) (under *Combustion Engineering*, section 1123(a)(5) preempts anti-assignment clauses in insurance policies); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *2 (Bankr. D.N.J. Sept. 2, 2008) ("a plan of reorganization may assign insurance policies to a personal injury trust despite the existence of anti-assignment clauses in those policies"); *In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) (same); *In re Western Asbestos Co.*, 313 B.R. 832, 858 (Bankr. N.D. Cal. 2003) (same).

      **B.**      **Preemption Under Section 1123(a) is Not Limited Only to Transfer of Insurance in the Asbestos Context.**

      9.      MSI argues that the Bankruptcy Code preempts anti-assignment clauses only in the context of trusts established pursuant to 11 U.S.C. § 524(g), which deals exclusively with asbestos liabilities.  That is inaccurate.  MSI cites no case in which a court has ruled that preemption is limited only to the asbestos context.  While courts have noted that section 524(g) is consistent with a finding of preemption, their holdings were based on (i) the express text and legislative history of sections 541(c) and 1123(a)(5) of the Bankruptcy Code, which deal broadly with the administration of all assets of the estate, and (ii) the "overall purpose of the Bankruptcy Code, most notably, the goals of obtaining a 'fresh start' through bankruptcy reorganization and harmonizing the interests of debtors and creditors alike."  *In re W.R. Grace & Co.*, 475 B.R. 34, 198 (D. Del. 2012), *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re W.R. Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ("*W.R. Grace*") (citing *In Federal–Mogul*, 684 F.3d at 368).

5

10. Based on these principles, courts outside the insurance context have found that section 1123(a) preempts contractual provisions in private contracts. For example, in *In re FCX, Inc.*, 853 F.2d 1149 (4th Cir. 1988), the Fourth Circuit affirmed a bankruptcy court's authorization of a debtor to surrender patronage certificates in satisfaction of a creditor's secured claim, despite the fact that state law and the creditor's by-laws granted the creditor's board discretionary power over such redemptions. In so holding, the court noted that section 1132(a)(5) is "an empowering statute" that enlarges the scope of a debtor's pre-petition rights in order to "enhanc[e] the ability of a trustee or debtor in possession to deal with property of the estate." *See id.* at 1155; *see also In re Antonelli*, 148 B.R. 443, 448 (D. Md. 1992) (plan could assign management rights in real estate partnership notwithstanding anti-assignment provisions of partnership agreements and state law), *aff'd* 4 F.3d 984 (4th Cir. 1993).

### C. Even if the Anti-Assignment Provisions Were Not Preempted, the Provisions Do Not Apply Here.

#### 1. The Transfer of Insurance Rights or Proceeds to the Trust Does Not Result in a Material Increase in Risk for MSI.

11. Even if the Bankruptcy Code did not preempt the Anti-Assignment Provisions, those provisions would not be implicated by the Plan's limited transfer of insurance rights or proceeds to the Trust, as the events giving rise to the Debtors' liability already have occurred.

12. As MSI acknowledges, it is well-established under state law that the applicability of an anti-assignment clause to a transfer of insurance turns on whether the assignment materially increases the insurer's risk of an insured injury occurring during the policy period. *See, e.g.*, *CNH Am., LLC v. Am. Cas. Co. of Reading, Pennsylvania*, C.A. No. N12C-07-108 JTV, 2014 WL 626030, at *7–8 (Del. Super. Ct. Jan. 6, 2014) ("In Delaware, an anti-assignment provision in an insurance contact is meant to 'protect the insurer against the possibility of increased risks that might attend a change in the identity of the insured if the policy

were assigned before the insured-against loss has occurred.'") (quoting *Int'l Rediscount Corp. v. Hartford Acc. & Indem. Co.*, 425 F. Supp. 669, 672 (D. Del. 1977); *see also generally*, Restatement (Second) of Contracts §§ 317, 322.

13.     Courts have agreed—both inside and outside the bankruptcy context, and both inside and outside the asbestos context—that no such material increase in risk is present where the events giving rise to a loss already have occurred. *See, e.g.*, *Federal-Mogul*, 684 F.3d at 379 ("[A]fter events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.") (quoting 3 *Couch on Insurance* § 35.8).[4] As the Third Circuit noted in *Federal-Mogul*, such a transfer merely shifts liabilities "for which the insurers were already potentially responsible" to the trust. *Id.*

14.     MSI attempts to distinguish *Federal-Mogul* and other leading bankruptcy cases on this issue by arguing that the "quantum of liability" being assigned here is substantially unknown, meaning that the insurers' risk could be "staggeringly increased" by the creation of a post-confirmation trust.

15.     This argument is meritless. As in *Federal-Mogul*, the events giving rise to potential covered losses under the policies—the manufacture and/or design of the defective PSAN inflators at issue in the PSAN PI/WD Claims—already have occurred. The risks for which the Trust would seek coverage—claims arising from bodily injury suffered in connection

---

[4] *See also In re ACandS, Inc.*, 311 B.R. 36, 41 (Bankr. D. Del. 2004) (applying Pennsylvania law, policies may be vested in personal injury trust because loss giving rise to liability already accrued); *CNH Am.*, 2014 WL 626030, at *7–8 (refusing to enforce transferred policy's anti-assignment clause in the context of a corporate transaction based on finding that "[a]n anti-assignment provision intends only to limit the assignability of an interest in the policy before the insured-against loss has occurred"); *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 103 (Del. Ch. 2009) (anti-assignment clauses cannot be "erected as a barrier to the transfer of "post-loss claims," that is to say claims for losses that have already happened."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.*, No. C.A. 87C-SE-11, 1991 WL 138431, at *11 (Del. Super. Ct. July 15, 1991) ("[A]nti-assignability" clauses are generally interpreted to limit the assignability of insurance contracts before the insured-against loss has occurred."); *OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. 06-167, 2006 WL 1473004 at *2–3 (D. Minn. 2006) (noting general consensus among courts that assignment of loss does not expand insurer's risk; simply allows change in identity to "reconnect the policy's coverage to the insured loss").

7

with the use of the defective PSAN inflators—are the exact same risks that the policies insured at the time they were issued. The identity of the entity seeking coverage for the PSAN PI/WD Claims has changed, but the risks for which that entity is seeking coverage have not.[5]

16.    MSI's attempt to argue that the PSAN PI/WD Trust would face the same "staggering increase" in liabilities purportedly generated by the silica trust in *In re Global Industries Technologies*, 645 F.3d 201 (3d Cir. 2011) ("*GIT*") is unavailing. In *GIT*, the court permitted the insurers to object to the plan based on evidence that the parties negotiating the establishment of the silica trust had engaged in fraud and collusion. Here, MSI makes no suggestion that such fraud or collusion is present. Moreover, the district court in *GIT* ultimately approved the transfer of insurance to the silica trust as insurance neutral on remand. *See In re Glob. Indus. Techs., Inc.*, No. BR 02-21626-JKF, 2013 WL 587366, at *40 (Bankr. W.D. Pa. Feb. 13, 2013).

        **D.**    **Inclusion of Non-Debtor Third Parties in the Channeling Injunction Does Not Increase MSI's Risk.**

17.    MSI's argument that inclusion of non-debtor third parties in the channeling injunction will increase MSI's risk similarly fails. MSI's liability is fixed regardless of what parties are included in channeling injunction. The Trust will seek coverage for, and MSI undoubtedly will only agree to pay, claims falling within the scope of coverage under the MSI policies. The question of which claims fall within the policies' scope of coverage is an issue properly resolved by the parties post-transfer and provides no basis on which to invalidate the transfer of the insurance rights or proceeds. *See Federal-Mogul*, 385 B.R. 560, 568 (Bankr. D. Del. 2008) (finding that Bankruptcy Code preempted policies' anti-assignment provisions and

---

[5] MSI's argument is further belied by the fact that both the Debtors and the FCR engaged experts to estimate the potential number and value of claims against the Debtors based on events that already have occurred. The Debtors, the FCR, and the Tort Committee would not have agreed to stipulate to the value of current and future PSAN PI/WD Claims in the Term Sheet absent credible expert analysis. *See* Term Sheet § 9.

declining to consider insurers' arguments regarding scope of coverage on the basis that "[c]overage issues . . . are all preserved" by the plan's insurance neutrality provision).

18. Indeed, this scenario is the same MSI would face in the tort system, where tort claimants regularly bring their claim against joint tortfeasors in the same suit (and indeed may be required to do so). The fact that insureds and non-insureds resolve their liability in the same case does not increase an insurer's risk and is perfectly appropriate. *See Federal-Mogul*, 684 F.3d at 379 (rejecting insurers' argument that transfer of policy rights "allows claims that would be barred in the tort system").[6]

### E. The Transfer Does Not Violate the Presumption Against Extraterritoriality.

19. The court's application of bankruptcy law to effectuate the transfer of the Debtors' insurance assets despite the policies' Anti-Assignment Provisions does not violate the "presumption against extraterritoriality."

20. Third Circuit courts apply a two-part inquiry to determine whether the presumption applies. First, a court must "identify[ ] the conduct proscribed or regulated by the particular legislation in question," and consider whether that conduct "occurred outside of the borders of the U.S." *In re FAH Liquidating Corp.*, 572 B.R. 117, 123 (Bankr. D. Del. 2017). Second, if the presumption is implicated, a court must determine whether Congress "intended to extend the coverage of the relevant statute to such extraterritorial conduct." *Id.* at 124.

21. With respect to the first prong, the "particular legislation in question"—sections 541(a) and 1123(a)(5) of the Bankruptcy Code—regulate the administration of the property of the estate and the implementation of the plan. Here, that administration and implementation

---

[6] MSI also argues that the Plan's contemplated transfer of insurance "proceeds," rather than insurance "rights," increases its risk. While the Tort Committee and the FCR do not agree with this proposition, MSI's argument is now moot, as the Debtors, the Tort Committee, and the FCR have agreed to amend the Plan to transfer the Debtors' "rights" to the policies. *See* Term Sheet § 9.

9

includes the transfer of U.S. Debtors' insurance rights or proceeds to a post-bankruptcy trust for the benefit of U.S. tort claimant-creditors, specifically those that could bring their tort claim in a U.S. court. The transfer at issue clearly is a domestic application of the Bankruptcy Code.

22. Even if extraterritorial conduct were at issue here, Congress clearly "intended to extend the coverage" of the relevant bankruptcy statutes "to such extraterritorial conduct." *In re FAH*, 572 B.R. at 124. Under the express terms of Section 541, bankruptcy courts have jurisdiction over the property of the estate, "wherever located and by whomever held." *See* 11 U.S.C. § 541(a); *In re Simon*, 153 F.3d 991, 996 (9th Cir. 1998) (citing *Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.*, 700 F.2d 1279, 1282 (9th Cir. 1983). Based on this express language, courts have agreed that "Congress intended extraterritorial application of the Bankruptcy Code as it applies to property of the estate." *Id.*; *see also In re FAH*, 572 B.R. at 125; *In re Icenhower*, 757 F.3d 1044, 1051 (9th Cir. 2014).

23. Similarly, Section 1123(a) dictates that a plan shall provide for the "transfer of all or any part of the property of the estate to one more entities . . . notwithstanding any otherwise applicable nonbankruptcy law." 11 U.S.C. § 1123(a)(5)(B). MSI fails to identify any instances in which Congress or any court has distinguished between U.S. and non-U.S. nonbankruptcy law with respect to the preemptive power of section 1123(a).

24. Indeed, the sole bankruptcy case MSI cites in support of its argument affirms the Bankruptcy Code's extraterritorial application to property of the estate. In *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 606 (Bankr. S.D.N.Y. 2017), the court declined to apply the Bankruptcy Code's fraudulent conveyance statute extraterritorially to avoid the debtor's pre-petition assignment of assets to an Israeli law firm. *See id.* (citing 11 U.S.C. § 548). In so holding, the court expressly acknowledged that the Bankruptcy Code applies extraterritorially to

10

"property of the estate," but found that, because the property at issue was transferred pre-petition, it did not qualify as part of the estate. Further, unlike the case at issue, *Ampal* involved a transfer of Israel-based property between two Israel-based entities. *Id.*[7]

25. To the extent MSI is suggesting that the presumption should apply because the policies contain a foreign choice of law provision, this argument is meritless. As an initial matter, MSI has failed to demonstrate that Japanese law conflicts with U.S. bankruptcy law on these issues, which it is required to do if it is seeking to make a choice of law argument. *See Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (noting that if "there is a 'false conflict,' [then] the Court should avoid the choice-of-law analysis altogether") (citing *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006)). Indeed, MSI fails to cite any Japanese law whatsoever.

26. Even if MSI could show a conflict between U.S. and Japanese law, this argument fails. As noted above, the relevant Bankruptcy Code provisions apply to property of the estate "wherever located," and "notwithstanding any otherwise applicable nonbankruptcy law." To apply foreign law in the face of these express statutory directives would frustrate the bankruptcy scheme, as it would allow a contract entered into by a U.S. debtor to be exempt from otherwise generally applicable bankruptcy law principles based on a choice of law or forum provision. Recognizing this principle, courts have "declined to honor contractual selections of forums" where, as here, the matters at issue constitute core proceedings." *In re Icenhower*, 757 F.3d at 1051; *In re Iridium Operating LLC*, 285 B.R. 822, 836–37 (S.D.N.Y.2002) (citing cases).[8]

---

[7] In any event, Third Circuit courts have expressly disagreed with *Ampal*'s finding that the presumption against extraterritoriality applied to actions under the fraudulence conveyance statute. *See In re FAH*, 572 B.R. at 117 n.6.

[8] The implementation of a plan via transfer of estate property clearly constitutes a core proceeding. *See* 28 U.S.C. § 157(b)(2) (setting forth non-exhaustive list of core proceedings, including "matters concerning the administration of the estate"); *In re Touch Am. Holdings, Inc.*, 401 B.R. 107, 117 (Bankr. D. Del. 2009 (finding that cases under Title 11, including matters under section 541, constitute "core" proceedings); *In re Reliance Grp. Holdings, Inc.*, 273 B.R. 374, 395 (Bankr. E.D. Pa. 2002) ("'[A] determination of what is property of the estate and concurrently, of

11

## II. THE PLAIN LANGUAGE OF THE POLICIES PROVIDES THAT THE INSURERS REMAIN OBLIGATED TO PAY NOTWITHSTANDING ANY BANKRUPTCY OF THE POLICYHOLDER.

27. Most of the policies here contain so-called bankruptcy clauses, which provide "[b]ankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part." *See, e.g.,* MSI Policy No. NE69376832, NE69378135, at Sec. IV.1. The purpose of this provision is to ensure that injured plaintiffs receive compensation from available insurance in the event that the defendant-policyholder becomes insolvent. *See, e.g.*, *In re Sudbury, Inc.*, 153 B.R. 776, 780 (Bankr. N.D. Ohio 1993) (noting that not requiring an insurer to pay would result in "an economic loss on claimants that the Bankruptcy Clause[ ] [was] designed to avoid"). In this case, assignment of the insurance rights and proceeds to the Trust is the only way to effectuate that intent.

28. The bankruptcy clause also serves as a method of insuring that the insurers do not receive a windfall as a result of the policyholder's bankruptcy. *See UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1104 (7th Cir. 1991) (citing Bankruptcy Clause and noting that not requiring payment by the insurer "would confer a windfall on [the insurer] at the expense of the asbestos victims"); *cf. Houston v. Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1995) ("[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge."); *Owaski v. Jet Florida Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989) ("The 'fresh start' policy is not intended to provide a method by which an insurer can escape its obligations based simply on the financial misfortunes of the insured.").[9]

---

what is available for distribution to creditors of that estate, is precisely the type of proceeding over which the bankruptcy court has exclusive jurisdiction.'") (quoting *In re Ascher*, 128 B.R. 639, 642–43 (Bankr. N.D. Ill. 1991)).

[9] In addition, many states have statutes that are a virtually identical codification of the so-called bankruptcy clause; these statutes can specifically allow for a direct action by an injured creditor against an insurer of an insolvent entity. *See, e.g.*, Ark. Code Ann. § 23-89-102 (1997); Cal. Ins. Code § 11580 (West 1997); Ill. Rev. Stat. Ch. 215 5/388; Ind. Code Ann. § 27-1-13-7 (Burns 1997); La. Rev. Stat. Ann. § 22:655 (1997); Md. Code Ann. Ins. § 19-102 (1997); Mich. Stat. Ann. § 24.13006 (1997); Minn. Stat. § 60A.08 (1997); Mo. Rev. Stat. § 379.195 (1997); N.J.

12

Here, MSI undoubtedly would receive such a windfall if the proceeds are not transferred to the Trust.

### III. ASSIGNMENT IS ESSENTIAL TO THE PLAN'S STRUCTURE FOR RESOLVING PSAN PI/WD CLAIMS.

29.     Contrary to MSI's suggestion, assignment of insurance is an integral part of the resolution of disputed issues among the Debtors and the creditor constituencies. The Tort Committee and the FCR would not have agreed to withdraw their objections to the Plan's treatment of PSAN PI/WD Claims absent such agreement to assign the rights to insurance and proceeds. *See* Term Sheet § 9.

30.     Assignment of the insurance is essential to resolution of the PSAN PI/WD Claims. The Debtors' coverage program potentially represents hundreds of millions of dollars of additional funding for PSAN PI/WD Claims. There is no basis to extinguish this asset for the benefit of the insurers. As discussed in Section II, *supra*, the Bankruptcy Code reflects a strong policy that the discharge of a debt should not affect the liability of other parties on the same debt.

### IV. MSI'S REMAINING ARGUMENTS REGARDING THE NEUTRALITY OF THE PLAN ARE PREMATURE.

31.     Finally, MSI argues that the Plan is not neutral because it does not address how the PSAN PI/WD Trust will handle the policies' claims-handling requirements, jurisdiction clauses, or fulfillment of SIRs.

32.     These issues do not address the assignability of the insurance proceeds; they are coverage arguments preserved by the Plan's insurance neutrality provisions and properly raised with the PSAN PI/WD Trust post-confirmation. *See Federal-Mogul*, 385 B.R. 560, 568 (Bankr.

---

Rev. Stat. § 17:28-2 (1997); N.Y. Ins. Law § 3420 (McKinney 1997); Ohio Rev. Code Ann. § 3929.05 (Anderson 1998); Or. Rev. Stat. § 742.031 (1996); Pa. Stat. Ann. Tit. 40 § 117 (1997); Va. Code Ann. § 38.2-2200 (Michie 1997); Wis. Stat. § 632.22 (1995–1996).

D. Del. 2008) (declining to consider insurers' coverage defense on the basis that [c]overage issues . . . are all preserved" by the plan's insurance neutrality provision).

33.    Even if MSI's arguments were properly raised now, MSI's assertions as to the policies' claims-handling requirements and jurisdiction clauses hold no weight.  With respect to the handling and settlement of claims under the Trust Agreement and TDPs, these documents are the result of good faith, arms-length negotiations between the Debtors and creditor representatives, consistent with bankruptcy practice and procedure.  MSI has the obligation to consent to such reasonable settlements of the Debtors' liabilities.[10]  To raise a defense to coverage on this basis, MSI bears the burden of proving that any alleged failure to afford it adequate participation in the claims settlement process "resulted in material and substantial prejudice" to them.  *See Consul. Stores Int'l Corp. v. London Ins. & Reins. Mkt. Assoc.*, No. C-296-1047, 2001 WL 1681139, at *5.  (S.D. Ohio 2001).  MSI has shown no such prejudice here.

34.    Similarly, the applicability of the policies' Japanese choice of law and forum provision is by no means settled.  Such provisions may not apply where, as here, a U.S. policyholder is seeking coverage for U.S. claims, particularly if the issues being litigated are "core" bankruptcy matters, or if such enforcement would be unreasonable or unjust.  *See In re Icenhower*, 757 F.3d at 1051 (courts have "declined to honor contractual selections of forums" where, as here, the matters at issue constitute core proceedings);[11] *In re Bavaria Yachts USA,*

---

[10] *See Trahan v. Cent. Mut. Ins. Co.*, 219 So. 2d 187, 193 (La. App. 3d Cir. 1969) ("[T]he implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose that duty") (citing with approval *Communale v. Traders Gen. Ins. Co.*, 50 Cal. 2d 654 (Cal. 1958)); *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983) (insurer owes duty of good faith to policyholder in payment and settlement of claims); *see also Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 323 A.2d 495, 504–505 (N.J. 1974) (insurer acts in bad faith when it refuses to consent to reasonable resolution of policyholder's liability).

[11] Courts have found that a range of insurance issues qualify as "core" proceedings.  *See, e.g.*, *In re Am. Capital Equip., LLC*, 325 B.R. 372, at 377–78 (W.D. Pa. 2005) (finding that insurer's declaratory judgment regarding its obligation to defend/indemnify Chapter 11 debtor on asbestos-related personal injury claims constituted core proceeding); *In re Grogg*, 295 B.R. 297, 304 (Bankr. C.D. Ill. 2003) (noting that, because insurance proceeds are

14

*LLLP*, 575 B.R. 540, 558 (Bankr. N.D. Ga. 2017) (declining to enforce forum selection clause where party established that such enforcement would be unreasonable or unjust).

## CONCLUSION

Based on the foregoing, the Court should overrule MSI's objection and issue a finding of validity as to the transfer of insurance rights and proceeds, as set forth in the Plan and Confirmation Order.

Dated:  February 14, 2018
Wilmington, Delaware

                          */s/ Laura Davis Jones*
                          **PACHULSKI STANG ZIEHL & JONES LLP**
                          Laura Davis Jones (Bar No. 2436)
                          James I. Stang (CA Bar No. 94435)
                          919 North Market Street, 17th Floor
                          P.O. Box 8705
                          Wilmington, DE 19899 (Courier 19801)
                          Tel:  (302) 652-4100
                          Fax:  (302) 652-4400
                          ljones@pszjlaw.com
                          jstang@pszjlaw.com

                              -and-

                          **GILBERT LLP**
                          Kami E. Quinn (DC Bar No. 500295)
                          Emily P. Grim (DC Bar No. 1006597)
                          1100 New York Avenue NW, Suite 700
                          Washington, DC 20005
                          Tel:  (202) 772-2200
                          Fax:  (202) 772-3333
                          quinnk@gotofirm.com
                          grime@gotofirm.com

                          *Counsel to the Official Committee of Unsecured Tort Claimant Creditors*

---

part of the estate, case law supports resolution of insurance rights of debtor as a core proceeding); *Matter of Celotex Corp.*, 152 B.R. 667, 675 (Bankr. M.D. Fla. 1993) (finding determination of insurance rights a core bankruptcy proceeding because "their intended use to fund the major class of Debtor's claimants [makes them] property of the estate under § 541 of the Bankruptcy Code").

15

*/s/ Karen B. Skomorucha Owens*
**ASHBY & GEDDES, P.A.**
William P. Bowden (Bar No. 2553)
Karen B. Skomorucha Owens (Bar No. 4759)
Katharina Earle (Bar No. 6348)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899-1150
Tel:  (302) 654-1888
Fax: (302) 654-2067
wbowden@ashbygeddes.com
kowens@ashbygeddes.com
kearle@ashbygeddes.com

-and-

**FRANKEL WYRON LLP**

Richard H. Wyron (admitted *pro hac* vice)
2101 L St., NW
Suite 800
Washington, DC  20037
Tel:  (202) 903-0700
Fax: (202) 627-3002
rwyron@frankelwyron.com

*Counsel for the Future Claimants' Representative*