# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **TK HOLDINGS INC.**, *et al.*, | : | **Case No. 17-11375 (BLS)** |
|  | : |  |
| Debtors.[1] | : | **Jointly Administered** |
|  | : |  |
|  | : | Re: Docket No. 1629 |

-------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT
## OF CONFIRMATION OF THE FOURTH AMENDED JOINT
## CHAPTER 11 PLAN OF REORGANIZATION OF TK HOLDINGS INC. AND ITS
## AFFILIATED DEBTORS AND RESPONSE TO OBJECTIONS TO CONFIRMATION

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP | RICHARDS, LAYTON & FINGER, P.A. |
| Marcia L. Goldstein | Mark D. Collins (No. 2981) |
| Ronit J. Berkovich | Michael J. Merchant (No. 3854) |
| Matthew P. Goren | Amanda R. Steele (No. 5530) |
| Jessica Diab | Brett M. Haywood (No. 6166) |
| 767 Fifth Avenue | One Rodney Square |
| New York, New York  10153 | 920 N. King Street |
| Telephone:  (212) 310-8000 | Wilmington, Delaware 19801 |
| Facsimile:  (212) 310-8007 | Telephone:  (302) 651-7700 |
| | Facsimile:  (302) 651-7701 |

*Attorneys for Debtors*                    *Attorneys for Debtors*
*and Debtors in Possession*            *and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................1

JURISDICTION, VENUE, AND CORE PROCEEDING ...........................5

BACKGROUND ...................................................................................5

FACTS ..............................................................................................14

ARGUMENT ......................................................................................14

I.      The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation and Should be Approved. ...............................................................15

        A.      Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code.................................................15

        B.      Section 1122:  The Plan's Classification Structure is Proper. ...............16

        C.      Section 1123(a):  The Plan's Content is Appropriate. ...........................23

                1.      Section 1123(a)(1):  Designation of Classes of Claims and Interests. ...................................................................23

                2.      Section 1123(a)(2):  Specified Unimpaired Classes. ...................24

                3.      Section 1123(a)(3):  Specified Treatment of Impaired Classes. ...............24

                4.      Section 1123(a)(4):  Equal Treatment.........................................24

                5.      Section 1123(a)(5):  Implementation of the Plan......................26

                6.      Section 1123(a)(6):  Non-Voting Equity Securities..................28

                7.      Section 1123(a)(7):  Designation of Directors and Officers....................28

                8.      Section 1123(a)(8):  Postpetition Person Service Payments—Inapplicable Provision. ...............................................................29

        D.      Section 1123(b):  The Plan's Content is Permitted.................................29

                1.      Section 1123(b)(1):  Impairment/Unimpairment of Classes of Claims and Interests...................................................29

                2.      Section 1123(b)(2):  Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases. ...............30

                3.      Section 1123(b)(3):  Settlement and Retention of Claims and Causes of Action. ...............................................30

                        a.      Settlement of Claims.................................................30

                                1.      The Plan Settlement. .......................................32

                                2.      The Debtors' Releases. ...................................39

                        b.      Retention of Causes of Action and Reservation of Rights. ...........39

# TABLE OF CONTENTS
## (continued)

Page

4.    Section 1123(b)(4):  Sale of Substantially all Assets................................40

5.    Section 1123(b)(5):  Modification of Rights. ...........................................40

6.    Section 1123(b)(6):  Additional Plan Provisions. .....................................41

    a.    Establishment of Disputed Claims Reserves. ...............................42

    b.    Consensual Releases. ....................................................................44

    c.    Channeling Injunction....................................................................46

        1.    Standard for Imposition of the Channeling Injunction. ....................................................................49

        2.    Subject Matter Jurisdiction. ..............................................52

        3.    Propriety of the Channeling Injunction.............................56

    d.    Debtor Releases. ...........................................................................66

    e.    Exculpation. ..................................................................................68

E.    Section 1123(c):  Non-Debtor Proposed Sales—Inapplicable Provision. .............70

F.    Section 1123(d):  Cure of Defaults. ........................................................................70

G.    Section 1129(a)(2):  The Debtors' Compliance with the Bankruptcy Code..........70

    1.    Section 1125:  Postpetition Disclosure Statement and Solicitation. ..........71

    2.    Section 1126:  Acceptance of the Plan. ....................................................71

H.    Section 1129(a)(3):  The Plan has been Proposed in Good Faith. ........................73

I.    Section 1129(a)(4):  The Plan Provides that Fee Claims are Subject to Court Approval. .......................................................................................................76

J.    Section 1129(a)(5):  The Debtors have Disclosed all Necessary Information Regarding Directors, Officers, and Insiders. ...................................77

K.    Section 1129(a)(6):  Governmental Rate Approvals—Inapplicable Provision. ...............................................................................................................78

L.    Section 1129(a)(7):  The Plan is in the Best Interests of All Creditors and Interest Holders.....................................................................................................78

M.    Section 1129(a)(8):  The Plan is Expected to have been Accepted by Certain Impaired Classes Entitled to Vote.............................................................80

N.    Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims. ....................................................................................................81

O.    Section 1129(a)(10):  Acceptance of the Plan by an Impaired Class. ...................82

P.    Section 1129(a)(11):  The Plan is Feasible. ...........................................................82

Q.    Section 1129(a)(12):  All Statutory Fees Have or Will be Paid. ...........................85

R.    Section 1129(a)(13):  Continuation of Retiree Benefits. .......................................85

## TABLE OF CONTENTS
### (continued)

| | | | Page |
|---|---|---|---|

S.  Section 1129(a)(14), 1129(a)(15), and 1129(a)(16):  Inapplicable Provisions........................................................................................86

T.  Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements with Respect to the Rejecting Classes............................................87

    1.  The Plan Does Not Discriminate Unfairly.................................88

    2.  The Plan is Fair and Equitable. ..................................................90

U.  Section 1129(c):  The Plan is the Only Plan. ........................................92

V.  Section 1129(d):  The Principal Purpose of the Plan is not the Avoidance of Taxes.................................................................................92

W.  Section 1129(e):  Small Business Case Plans—Inapplicable Provision...............92

X.  Section 1127:  Modification of the Plan. ...............................................92

II.  Regulatory Approvals. ...................................................................................94

III.  The Objections to the Plan Should be Overruled............................................95

A.  The UST Objection. ...............................................................................95

B.  The States' Objection.............................................................................95

    1.  The Plan's Treatment of the States' Claims is Appropriate. ....................96

        a.  The Classification and Treatment of Subordinated Claims is Proper. .........................................................96

        b.  The States' Claims are Properly Classified in Class 9..................97

        c.  The Treatment of the NHTSA Claims is Appropriate. ...............103

    2.  The Plan Settlement is Appropriate and Should be Approved. ...............104

    3.  The Plan Properly Discharges the States' Claims and Enjoins Future Litigation on Account Thereof. ....................................105

C.  The Whistleblowers' Objection. .........................................................106

D.  AIEG Objection and PSAN/PIWD Claimant Objections....................108

IV.  Cause Exists to Waive Stay of the Confirmation Order. ...............................110

V.  Conclusion. ...................................................................................................110

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 710 Long Ridge Rd. Operating Co. II, LLC*,
  Case No. 13-13653 (DHS), 2014 WL 886433 (Bankr. D. N.J. Mar. 5, 2014) .................59, 62

*In re A.H. Robins Co.*,
  89 B.R. 555 (E.D. Va. 1988).........................................................................................99

*In re Adamson Co.*,
  42 B.R. 169 (Bankr. E.D. Va. 1984)..............................................................................83

*In re Adelphia Commc'ns Corp.*,
  364 B.R. 518 (Bankr. S.D.N.Y. 2007)...........................................................................50

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y.
  2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).....................................................................78

*Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*,
  258 B.R. 119, 123 (D. N.J. 2000) .................................................................................32

*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000)...........................................................................79

*Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*,
  519 F.3d 640 (7th Cir. 2008) .......................................................................................49

*In re Aleris Int'l., Inc.*,
  Case No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).............66, 106

*In re Allegheny Int'l. Inc.*,
  106 B.R. 75 (Bankr. W.D. Pa. 1989) .............................................................................99

*In re Am. Apparel, Inc.*,
  No. 15-12055 (BLS) (Bankr. D. Del. Jan. 27, 2016) (Docket No. 687)................................45

*In re Am. Capital Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)..........................................................................................82

*In re Am. Family Enters.*,
  256 B.R. 377 (D.N.J. 2000) .....................................................................................51, 61

*In re Am. Solar King*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)............................................................................77

*In re Amcast Auto. of Ind., Inc.*,
  No. 05-33322 (FJO), (Bankr. S.D. Ind. Apr. 10, 2007), ECF No. 1423.................................21

*In re Armstrong World Indus.*,
  348 B.R. 136 (D. Del. 2006) ...............................................................................................17

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) ...............................................................................15, 88, 96

*In re Armstrong World Indus.*,
  432 F.3d 507 (3rd Cir. 2005) ..............................................................................................90

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship (In re LaSalle)*,
  526 U.S. 434, 453 (1999).....................................................................................................74

*Bank of N.Y., Mellon Trust Co., N.A. v. Becker (In re Lower Bucks Hosp.)*,
  488 B.R. 303 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014) ...............................54

*In re Bicoastal Corp.*,
  134 B.R. 50 (Bankr. M.D. Fla. 1991) ...................................................................................99

*In re Blitz U.S.A., Inc.*,
  Case No. 11–13603, 2014 WL 2582976 (Bankr. D. Del. Jan. 30, 2014) ...................50, 58, 65

*Bowles v. Farmers Nat'l Bank*,
  147 F.2d 425 (6th Cir. 1945) .............................................................................................100

*Burden v. United States*,
  917 F.2d 115 (3d Cir. 1990)..............................................................................97, 98, 101

*In re Capmark Fin. Grp. Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010) .....................................................................................31

*In re Cellular Information Sys., Inc.*,
  171 B.R. 926, 950 (Bankr. S.D.N.Y. 1994).........................................................................36

*In re Celotex Corp.*,
  128 B.R. 478 (Bankr. M.D. Fla. 1991) .................................................................................99

*Celotex Corp. v. Edwards*,
  514 U.S. 300 (1995)..............................................................................................................53

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
  323 F.3d 228 (3d Cir. 2003)..................................................................................................97

*In re Clark-Cutler-McDermott Co.*,
  No. 16-41188 (CJP) (Bankr. D. Mass. Mar. 31, 2017), ECF No. 668....................................21

*Clarkson v Cooke Sales & Serv. Co (In re Clarkson)*,
   767 F.2d 417 (8th. Cir. 1985) ...............................................................83

*Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*,
   280 F.3d 648 (6th Cir. 2002) ...................................................18, 49, 51

*In re Coastal Broad. Sys., Inc.*,
   570 F. App'x 188 (3d Cir. 2014) ..........................................................16, 17

*In re Colin*,
   44 B.R. 806 (Bankr. S.D.N.Y. 1984) ..................................................98, 101

*In re Combustion Eng'g Inc.*,
   391 F.3d 190 (3rd Cir. 2004) .......................................................... *passim*

*In re Congoleum Corp.*,
   No. 03-51524, 2008 WL 4186899 (Bankr. D. N.J. Sept. 2, 2008) .........................................*28*

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ...................................................17, 31, 58, 73

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.
v. Chinery (In re Cybergenics Corp.)*,
   330 F.3d 548 (3d Cir. 2003)..........................................................48

*In re Deluca*,
   No. 95-11924, 1996 WL 910908 (Bankr. E.D. Va. Apr. 12, 1996) ......................................83

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,
Inc.)*,
   416 F.3d 136 (2d Cir. 2005)..........................................................51

*In re Dow Corning Corp.*,
   86 F.3d 482 (6th Cir. 1996) ..........................................................55

*In re Drexel Burnham Lambert Grp. Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................70, 79, 82, 106

*In re Emergency Monitoring Techs., Inc.*,
   366 B.R. 476 (Bankr. W.D. Pa. 2007) ..................................................98

*In re Energy Future Holdings Corp.*,
   Case No. 14-10979 (CSS) (Bankr. D. Del. Dec. 3, 2015) (Docket No. 7255) ........................61

*In re Energy Future Holdings Corp.*,
   No. 14- 10979 (CSS) (Bankr. D. Del. Dec. 7, 2015) (Docket No. 7244)................................46

*In re eToys, Inc.*,
331 B.R. 176 (Bankr. D. Del. 2005) ...................................................32

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .....................................................67

*In re Federal-Mogul Global Inc.*, 385 B.R. 560 (Bankr. D. Del. 2008) ......................................27

*FGH Realty Credit Corp. v. Newark Airport/Hotel L.P.*,
155 B.R. 93 (D.N.J. 1993) ..................................................................22

*First Fid. Bank v. McAteer*,
985 F.2d 114 (3d Cir. 1993)...............................................................44

*In re Frascella Enters., Inc.*,
360 B.R. 435 (Bankr. E.D. Pa. 2007) .................................................74

*Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*,
283 F.3d 159 (3d Cir. 2002)...............................................................32

*In re Genco Shipping & Trading Ltd.*,
513 B.R. 233 (Bankr. S.D.N.Y. 2014)......................................54, 59, 60

*In re Gen. Wireless Ops. Inc. dba Radioshack*, Case No. 17-10506 (BLS)
(Bankr. D. Del. Oct. 26, 2017) (Docket No. 1117)..............................45

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) .............................................57, 74

*Gillman v. Continental Airlines (In re Continental Airlines)*,
203 F.3d 203 (3d Cir. 2000)............................................... *passim*

*In re Global Indus. Techs., Inc.*,
645 F.3d 201 (3d Cir. 2011)........................................................49, 106

*In re Global Indus. Techs., Inc.*,
Case No. 02-21626, 2013 WL 587366 (Bankr. W.D. Pa. Feb. 13, 2013) ..............................50

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ....................................................16

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II
(In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ....................................15

*In re Hibbard Brown & Co.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998)...................................................31

*In re ICL Holdings Co., Inc.*,
802 F.3d 547 (3d Cir. 2015) ..............................................................26

RLF1 18889156V.1

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd*,
    662 F.3d 315 (5th Cir. 2011) .................................................................................16

*In re Indianapolis Downs, LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ........................................................... *passim*

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)..........................................................................17, 87

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*
    *(In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154 (3d Cir. 1993) ....................17, 21

*In-re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)..................................................................107

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC*
    *(In re Charter Commc'ns, Inc.)*,419 B.R. 221 (Bankr. S.D.N.Y. 2009),
    *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011),
    *aff'd*, 691 F.3d 476 (2d Cir. 2012) ............................................................62, 65, 77

*In re Kaiser Aluminum Corp.*,
    343 B.R. 88 (D. Del. 2006)..................................................................................27

*In re Kaiser Aluminum Corp.*,
    Case No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006),
    *aff'd*, 343 B.R. 88 (D. Del. 2006) .........................................................................50

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)....................................................................61, 82, 87

*Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*,
    162 B.R. 935 (Bankr. S.D.N.Y. 1994).................................................................99

*In re Key3Media Grp., Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*,
    No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006).......................31

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
    329 B.R. 491 (D.N.J. 2005), *aff'd sub nom.* 241 F. App'x 1 (3d Cir. 2007).........76

*In re Louise's Inc.*,
    211 B.R. 798 (Bankr. D. Del. 1997) ...................................................................31

*In re Marvel Entm't Grp., Inc.*,
    222 B.R. 243 (D. Del. 1998)................................................................................32

*In re Marvel Entm't Grp., Inc.*,
    273 B.R. 58 (Bankr. D. Del. 2002) ......................................................................67

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)......................................................... *passim*

*In re Medford Crossings N., LLC*,
    Case No. 07-25115, 2011 WL 182815 (Bankr. D. N.J. Jan. 20, 2011) ..................................54

*Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*,
    880 F.2d 694 (4th Cir. 1989) ......................................................................51

*In re Mercedes Homes, Inc.*,
    431 B.R. 869 (Bankr. S.D. Fla. 2009) ...........................................................58, 61

*In re Millennium Lab Holdings II, LLC*,
    242 F. Supp. 3d 322 (D. Del. 2017)................................................................52

*In re Millennium Lab Holdings II, LLC*,
    575 B.R. 252 (Bankr. D. Del. 2017) ...........................................................52, 105

*In re Mobile Steel Co.*,
    563 F.2d 692 (5th Cir. 1977) ......................................................................98

*In re Montgomery Ward Holding Corp.*,
    272 B.R. 836 (Bankr. D. Del. 2001), *overruled in part on other grounds
    by In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir. 2002)...........................................98

*Mullarkey v. Tamboer (In re Mullarkey)*,
    536 F.3d 215 (3d Cir. 2008).......................................................................55

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996)..................................................................... *passim*

*In re New Gulf Res., LLC*,
    No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) (Docket No. 514)...............................45

*In re NTP Marble, Inc.*,
    491 B.R. 208 (Bankr. E.D. Pa. 2013) ...............................................................98

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp.
    v. Chinery (In re Cybergenics Corp.)*,
    330 F.3d 548 (3d Cir. 2003)........................................................................48

*Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*,
    801 F.3d 530 (5th Cir. 2015) .....................................................................103

ix

*In re Oneida Ltd.*,
   351 B.R. 79 (Bankr. S.D.N.Y. 2006) ..................................................................69

*In re Orlando Investors, L.P.*,
   103 B.R. 593 (Bankr. E.D. Pa. 1989) ..............................................................106

*In re Overseas Shipholding Grp.*,
   No. 12-20000 (PJW) (Bankr. D. Del. July 18, 2014) (Docket No. 3683) .............46

*Owens Corning v. Credit Suisse First Boston*,
   322 B.R. 719 (D. Del. 2005) ............................................................................99

*Pacor, Inc. v. Higgins*,
   743 F.2d 984 (3d Cir. 1984) ............................................................................53

*In re Papercraft Corp.*,
   160 F.3d 982 (3d Cir.1998) ............................................................................101

*In re Penn Cent. Transp. Co.*,
   596 F.2d 1102 (3d Cir. 1979) ..................................................................31, 103

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
   761 F.2d 1374 (9th Cir. 1985) ........................................................................83

*In re PNG Ventures, Inc.*,
   Case No. 09-13162 (CSS) (Bankr. D. Del. Mar. 5, 2010) (Docket No. 368)..........62, 64

*Porter v. Montgomery*,
   163 F.2d 211 (3d Cir. 1947)....................................................................100, 102

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
   Anderson*, 390 U.S. 414 (1968) ..................................................................31, 32

*In re Prudential Energy Co.*,
   58 B.R. 857 (Bankr. S.D.N.Y 1986) ................................................................83

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)..............................................................69, 70, 73

*In re Quigley Co.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ............................................................22

*In re Residential Capital LLC*,
   508 B.R. 838 (Bankr. S.D.N.Y. 2014) ............................................................62

*In re Resorts Int'l, Inc.*,
   372 F.3d 154 (3d Cir. 2004)............................................................................53

x

*Schubert v. Lucent Techs. Inc. (In re Winstar)*,
    554 F.3d 382 (3d Cir. 2009)..........................................................................98

*Schultz Broadway Inn v. United States*,
    912 F.2d 230 (8th Cir. 1990) .......................................................................99

*In re Seaside Eng'g & Surveying, Inc.*,
    780 F.3d 1070 (11th Cir. 2005), *cert. denied sub nom. Vision-Park Props.*,
    *LLC v. Seaside Eng'g & Surveying, LLC*, 136 S.Ct. 109 (2015)................................49, 61, 65

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir. 1992)........................................................................51

*In re Sound Radio, Inc.*,
    93 B.R. 849 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part,* 103 B.R. 521
    (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990) (unpublished table decision)....................83

*In re Source Enters., Inc.*,
    392 B.R. 541 (S.D.N.Y. 2008).....................................................................25

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ........................................................45, 66, 67

*In re Specialty Equip. Co.*,
    3 F.3d 1043 (7th Cir. 1993) ........................................................................49

*In re Stone & Webster, Inc.*,
    286 B.R. 532 (Bankr. D. Del. 2002) .............................................................28

    100

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) .............................................................76

*Tex. Am. Oil Corp. v. U.S. Dep't of Energy*,
    44 F.3d 1557 (Fed. Cir. 1995)....................................................................100

*In re Texaco Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y 1988),
    *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988) ....................................................83

*Things Remembered, Inc. v. Petrarca*,
    516 U.S. 124 (1995).................................................................................53

*In re TK Holdings, Inc.*,
    Case No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017)...............................52, 54

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ..................................................................83

*In re Transit Group, Inc.*,
   286 B.R. 811 (Bankr. M.D. Fla. 2002) ...............................................................49

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del.) ..................................................................... *passim*

*In re Tribune Co.*,
   476 B.R. 843 (Bankr. D. Del. 2012), *aff'd as modified*,
   No. 08–13141 (KJC), 2014 WL 2797042 (D. Del. June 18, 2014),
   *aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015) ..................................16, 17

*In re TSIC, Inc.*,
   393 B.R. 71 (Bankr. D. Del. 2008) ....................................................................36

*In re U.S. Fidelis, Inc.*,
   481 B.R. 503 (Bankr. E.D. Mo. 2012) ..........................................................51, 105

*In re U.S. Truck Co.*,
   47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ....................83

*U.S. v. Energy Res. Co.*,
   495 U.S. 545 (1990) ....................................................................................48, 82

*United Artists Theatre Co. v. Walton*,
   315 F.3d 217 (3d Cir. 2003) ..........................................................................50, 56

*United States v. Noland*,
   517 U.S. 535 (1996) ..........................................................................................97

*In re W.R. Grace & Co.*,
   386 B.R. 17 (Bankr. D. Del. 2008) ....................................................................55

*In re W.R. Grace & Co.*,
   446 B.R. 96 (Bankr. D. Del. 2011), *aff'd*, 475 B.R. 34 (D. Del. 2012)..................64

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ......................................................................... *passim*

*In re W.R. Grace & Co.*,
   729 F.3d 311 (3rd Cir. 2013) ........................................................................17, 73

*W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*,
   591 F.3d 164 (3d Cir. 2009) ..............................................................................52

RLF1 18889156V.1

*In re Wash. Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011),
    *vacated in part* 2012 WL 1563880 (Bankr. D. Del Feb. 24, 2012) ...................................73, 74

*In re Wash. Mut. Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ................................................................32, 67, 69, 75

*In re Western Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) ................................................................................28

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,
    434 F.3d 639 (3d Cir. 2006)................................................................................................30

*In re Wool Growers Ctr. Storage Co.*,
    371 B.R. 768 (Bankr. N.D. Tex. 2007)................................................................................50

*In re World Health Alternatives, Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ...................................................................................31

*In re Zenith Elec. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................................................. *passim*

**Statutes**

11 U.S.C. § 105(a) .........................................................................................................................48

11 U.S.C. § 507(a)(2).....................................................................................................................84

11 U.S.C. § 510(c)(1).............................................................................................................97, 96, 99

11 U.S.C. § 541(a)(1).....................................................................................................................55

11 U.S.C. § 1109(b) .....................................................................................................................105

11 U.S.C. § 1122(a) .......................................................................................................................16

11 U.S.C. § 1123.................................................................................................................. *passim*

11 U.S.C. § 1125.............................................................................................................................70

11 U.S.C. § 1126(a), (f), (g)...........................................................................................................72

11 U.S.C. § 1129.................................................................................................................. *passim*

11 U.S.C. § 1141 (c) ...........................................................................................................103, 105

28 U.S.C. § 157(b) ..................................................................................................................5, 105

**Other Authorities**

Fed. R. Bankr. P. 3019(a) ...........................................................................92, 93

Fed. R. Bankr. P. 3020(e) ...............................................................................108

H.R. Rep. No. 95-595, at 412 (1977) ...............................................................16

H.R. Rep. No. 95–595 (1978) ...........................................................................70

S. Rep. No. 95-989 (1978) ................................................................................16

Steven M. Abromowitz, et al., *Making The Test For Unfair Discrimination More "Fair": A Proposal,* 58 Bus. Law. 83 (Nov. 2002) ...........................................................96

RLF1 18889156V.1

TK Holdings Inc. ("***TKH***") and its affiliated debtors in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), as debtors and debtors in possession (collectively, the "***Debtors***"), hereby submit this memorandum of law (the "***Memorandum***") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors*, filed simultaneously herewith (together with all schedules and exhibits thereto, and as may be modified, amended or supplemented from time to time, the "***Plan***")[2] pursuant to section 1129 of title 11 of the United States Code (the "***Bankruptcy Code***"), and this omnibus reply to Objections[3] to confirmation of the Plan, and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    The Debtors are pleased to be before the Court for confirmation of a largely consensual Plan—one that is supported by the Restructuring Support Parties, both

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such term in the Plan.

[3] "***Objections***" means the objections to confirmation of the Plan filed by the following parties (each an "***Objector***" and, collectively, the "***Objectors***"):  (a) the U.S. Trustee [Docket No. 1869] (the "***UST Objection***"); (b) the Texas Commission of Environmental Quality (the "***TCEQ***") [Docket No. 1918] (the "***TCEQ Objection***"); (c) certain confidential whistleblowers (collectively, the "***Whistleblowers***") [Docket Nos. 1920, 1945] (collectively, the "***Whistleblowers' Objection***"); (d) Xin Point North America Inc. ("***Xin Point***") [Docket No. 1922] (the "***Xin Point Objection***"); (e) the United States on behalf of the Internal Revenue Service (the "***IRS***") [Docket No. 1929] (the "***IRS Objection***"); (f) the Attorneys Information Exchange Group ("***AIEG***") [Docket No. 1930] (the "***AIEG Objection***"); (g) Special Master [Docket No. 1932] (the "***Special Master Objection***"); (h) Howard & Howard Attorneys PLLC ("***H&H***") [Docket No. 1937] (the "***H&H Objection***"); (i) Pacific Sintered Metals, Inc. ("***Pacific Sintered***") [Docket No. 1939] (the "***Pacific Sintered Objection***"); (j) Infor (US), Inc. [Docket No. 1942] (the "***Infor Objection***"); (k) Mitsui Sumitomo Insurance Company, Ltd. ("***MSI***") [Docket No. 1946] (the "***MSI Objection***"); (l) Automotive Coalition for Traffic Safety, Inc. ("***ACTS***") [Docket No. 1948] (the "***ACTS Objection***"); (m) the State of Hawai'i, the State of New Mexico, and the Government of the U.S. Virgin Islands (collectively, the "***States***") [Docket No. 1950] (the "***States Objection***"); (n) De Los Santos Olveda and certain other tort claimants ("***De Los Santos***") [Docket No. 1955] (the "***De Los Santos Objection***"); (o) Samuel M. Johnson ("***Johnson***") [Docket No. 1965] (the "***Johnson Objection***"); (p) the United States on behalf of the U.S. Environmental Protection Agency, the Michigan Department of Environmental Quality, and the Missouri Department of Natural Resources (collectively, the "***EPA***") [Docket Nos. 2008, 2011] (the "***EPA Objection***"); (q) several executory contract counterparties [Docket Nos. 1868, 1894, 1909, 1913, 1919, 1922, 1923, 1924, 1931, 1935, 1938, 1939, 1940, 1941, 1942, 1943, 1944, 1947, 1949, 1951, 1952, 1954, 1999, 2000, 2006, 2040, 2042] (collectively and including certain informal and not docketed objections, the "***Cure Objections***"); (r) certain PSAN PI/WD claimants (the "***PSAN PI/WD Claimants***") [Docket Nos. 1185, 1934, 1958] (the "***PSAN PI/WD Claimant Objections***"); and (s) several individuals (or parties on their behalf) [Docket Nos. 1116, 1130, 1143, 1149, 1182, 1313, 1338, 1371, 1493, 1634, 1779, 1862, 1964, 1980] (collectively and including certain informal and not docketed objections, the "***Pro Se Objections***").

Committees, the Future Claims Representative (each as defined below), and, although voting is

still ongoing, a significant number of voting creditors.  The Plan is the culmination of extensive

negotiations among the Debtors and multiple creditor constituencies, and represents tireless

efforts by all parties involved.

2.     The Plan implements the Global Transaction (as defined below) with

respect to the Debtors and, among other things, ensures (a) the continued operation of the

Debtors' PSAN production for a limited period of time post-emergence to facilitate the recalls of

PSAN Inflators, (b) the satisfaction of the DOJ Restitution Claim, (c) the sale and transfer of the

Debtors' non-PSAN businesses as a going concern to the Plan Sponsor, including the continued

employment of substantially all of the Debtors' fourteen thousand (14,000) employees and the

assumption or assumption and assignment of a significant number of the Debtors' vendor and

supplier contracts, and (d) the distribution of significant value to the Debtors' various groups of

creditors, including to holders of Allowed General Unsecured Claims.  In addition, the Plan

provides for the consensual resolution and settlement of numerous Claims and controversies

between the Consenting OEMs, the Plan Sponsor, the Committees, the Future Claims

Representative, and their respective constituents with respect to, among other things, (a) the

validity and amount of the Consenting OEM's General Unsecured Claims, (b) the validity and

amount of the Adequate Protection Claims, (c) the release of Claims and causes of action subject

to the Challenge Period, (d) resolution of all disputes by the Committees relating to the Global

Transaction, including, without limitation, certain provisions of the U.S. Acquisition Agreement,

(e) the treatment of contracts and leases, (f) the treatment of the NHTSA Claims, (g) the

treatment of Other PI/WD Claims, (h) the estimated amount of current and future PSAN PI/WD

Claims, (i) the Trust Distribution Procedures, (j) the assignment of the Debtors' rights in

RLF1 18889156V.1

Takata's product liability insurance, (k) the netting and treatment of Intercompany Claims, (l) the governance of the Reorganized TK Holdings Trust, and (m) the Debtors' release of the Consenting OEMs.  In connection with, and as consideration for, these and other settlements, the Debtors have amended the Plan to provide for the following:

a.  The classification and allowance of the NHTSA Claim as a Class 6 Other General Unsecured Claim against TKH instead of being paid in full, which provides the Debtors' General Unsecured Creditors with an additional Fifty Million Dollars ($50 Million) in Available Cash to be distributed on account of their Claims;

b.  The establishment of a new Class—Class 7 (Other PI/WD Claims)—specifically for General Unsecured Claims relating to a personal injury or harm caused by a Takata Product, other than the Debtors' PSAN Inflator-related products;

c.  The contribution by the Plan Sponsor of Twenty-Five Million Dollars ($25 Million) (the "***Plan Sponsor Contribution Amount***") to the PSAN PI/WD Trust for the benefit of PSAN PI/WD Claims and Other PI/WD Claims as soon as practicable after the Plan Sponsor receives repayment of up to Twenty-Five Million Dollars ($25 Million) drawn on the Plan Sponsor Backstop Funding Agreement by TKAM (on behalf of TSAC);

d.  The establishment of a fund by the Consenting OEMs (the "***Plan Settlement Fund***") in which the Consenting OEMs contribute their rights to certain recoveries as and when such amounts would otherwise be paid or payable to the Consenting OEMs under the Plan, with such contributed recoveries in the Plan Settlement Fund being transferred pursuant to the Plan to the PSAN PI/WD Trust for the benefit of holders of PSAN PI/WD Claims and Other PI/WD Claims:

(i)  Eighty percent (80%) of the Consenting OEM GUC Recoveries until the Consenting OEMs have contributed Five Million Dollars ($5 Million) to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety (90%) of Consenting OEM GUC Recoveries until the Consenting OEM GUC Recovery Threshold is met (which is the Consenting OEMs' Pro Rata share of the first Eighty-Nine Million Nine Hundred Thousand Dollars ($89.9 Million) of Available Cash);

(ii)     Twenty-five percent (25%) of the Consenting OEM GUC Recoveries in excess of the Consenting OEM GUC Recovery Threshold (the Consenting OEM Additional GUC Recoveries);

(iii)    Eighty percent (80%) of the incremental amount of Consenting OEM GUC Recoveries resulting from or attributable to the NTHSA Claims being treated as Other General Unsecured Claims and/or the TKJP 503(b)(9) Claim being setoff or otherwise eliminated until the Consenting OEMs have contributed Five Million Dollars ($5 Million) to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety percent (90%) of such "Consenting OEM Incremental GUC Recoveries;" and

(iv)     Eighty percent (80%) of any amounts that the Consenting OEMs would be entitled to receive on account of the Business Incentive Plan Payment, excluding any amounts of the Business Incentive Plan Payment that are allocable to TKAM;

e.     The establishment of a single coordinated process through which the holders of PSAN PI/WD Claims are able to access funds from both the PSAN PI/WD Trust and the DOJ PI/WD Restitution Fund;

f.     The establishment of a fund by the Consenting OEMs and the Plan Sponsor (the "***Support Party Creditor Fund***"), funded in an amount not less than Seven Million Five Hundred Thousand Dollars ($7.5 Million)—with Five Million Dollars ($5 Million) to be contributed by the Consenting OEMs and not less than Two Million Five Hundred Thousand ($2.5 Million), inclusive of any remaining amount of the Five Million Dollars ($5 Million) Cure Claims Cap, to be contributed by the Plan Sponsor—for the benefit of settling Eligible Creditors (as defined below) in Class 6; and

g.     The Plan Sponsor's agreement to assume all third-party executory contracts related to the Purchased Assets, subject to certain exclusions.

3.     The Debtors view the above-referenced Plan modifications as favorable

changes that allow for additional funding to Estate creditors without any decrease in the value

available for, or redistribution of value away from, any specific Class.  Accordingly, as such

4

changes will only result in increasing the amount of Available Cash available for distribution to holders of Allowed Claims, the Debtors submit that none of the modifications warrant re-solicitation of the Plan.

4.      For each of the reasons set forth herein, in the Supporting Declarations (as defined herein), and as will be established at the Confirmation Hearing, the Plan satisfies each applicable requirement of the Bankruptcy Code.  Accordingly, each Objection with respect to the Plan should be overruled and the Plan should be confirmed.[4]

## JURISDICTION, VENUE, AND CORE PROCEEDING

5.      The Court has jurisdiction over the Debtors' Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto.  Further, the Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the Bankruptcy Code.

## BACKGROUND

6.      On June 25, 2017 (the "***Petition Date***"), as a result of the unprecedented recalls resulting from certain of the Debtors' airbag inflators containing phase-stabilized ammonium nitrate ("***PSAN Inflators***") rupturing during deployment, each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases

---

[4] As set forth below, with respect to those parties that filed Cure Objections, to the extent not otherwise resolved prior to the Confirmation Hearing, such Cure Disputes should be adjourned and set for a further hearing in accordance with Section 8.2(c) of the Plan.

RLF1 18889156V.1

have been jointly administered for procedural purposes only pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and Rule 1015-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "***Local Rules***").

       7.      On the Petition Date, in coordination with the commencement of the

Chapter 11 Cases, Takata Corporation, the Debtors' ultimate corporate parent ("***TKJP***" and,

together with its direct and indirect global subsidiaries, including TKH, "***Takata***"), together with

Takata Kyushu Corporation and Takata Service Corporation (collectively, the "***Japan Debtors***"),

commenced civil rehabilitation proceedings under the Civil Rehabilitation Act of Japan (the

"***Japan Proceedings***") in the 20th Department of the Civil Division of the Tokyo District Court

(the "***Tokyo District Court***").  On August 9, 2017, the Japan Debtors filed petitions with this

Court seeking recognition of the Japan Proceedings.  On November 14, 2017, the Court granted

the Japan Debtors' petitions and entered an order recognizing the Japan Proceedings.

       8.      On June 28, 2017, the Debtors commenced an ancillary proceeding under

the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the

"***CCAA***") in the Ontario Superior Court of Justice (Commercial List) (the "***Canadian Court***") in

Ontario, Canada seeking recognition of the Chapter 11 Cases.  Similarly, on August 25, 2017,

the Debtors petitioned the Tokyo District Court for recognition of these Chapter 11 Cases under

Article 17(1) of the Act on Recognition of and Assistance for Foreign Insolvency Proceedings.

On September 6, 2017, the Tokyo District Court granted the Debtors' petition.

       9.      On July 7, 2017, the United States Trustee for Region 3 (the "***U.S.***

***Trustee***") appointed the statutory committee of unsecured creditors pursuant to section

1102(a)(1) of the Bankruptcy Code (the "***Creditors' Committee***") and the statutory committee of

tort claimant creditors pursuant to section 1102(a)(2) of the Bankruptcy Code (the "***Tort Claimants' Committee***").  On September 6, 2017, the Court, pursuant to sections 105 and 1109(b) of the Bankruptcy Code, appointed Roger Frankel as the legal representative (the "***Future Claims Representative***") for individuals who sustain injuries related to PSAN Inflators after the Petition Date (such individuals, "***Future Claimants***").  No bankruptcy trustee or examiner has been appointed in the Chapter 11 Cases.

10.     On August 9, 2017, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively and as may be modified, amended or supplemented from time to time, the "***Schedules***").  Thereafter, the Debtors filed amended Schedules on August 28, 2017 and October 12, 2017.

11.     On October 2, 2017, the Court entered an order [Docket No. 959] (the "***Bar Date Order***") establishing certain deadlines and procedures associated with the filing of Claims in the Chapter 11 Cases, including, without limitation, special procedures for providing actual and constructive notice of such deadlines and procedures to approximately eighty-three million (83 million) individuals who own, or may have owned, vehicles equipped with PSAN Inflators manufactured or sold by the Debtors (each such individual a "***Potential PSAN Inflator Claimant***" or a "***PPIC***" and, collectively, the "***PPICs***") pursuant to a Court-approved 6" x 9" postcard form of notice (the "***PPIC Combined Notice***").  Pursuant to the Bar Date Order, the Court established (a) November 27, 2017 as the deadline for creditors other than Governmental Units (as defined in section 101(27) of the Bankruptcy Code) and PPICs to file proofs of claim against the Debtors (the "***General Bar Date***"), (b) December 22, 2017 as the deadline for Governmental Units to file proofs of claim against the Debtors (the "***Governmental Bar Date***"),

RLF1 18889156V.1

and (c) December 27, 2017 as the deadline for all PPICs to file proofs of claim against the

Debtors (the "*PPIC Bar Date*" and collectively with the General Bar Date and the Governmental

Bar Date, the "*Bar Dates*").  Further, the Bar Date Order approved a customized proof of claim

form for PPICs (the "*PPIC Proof of Claim*") for any prepetition Claim for injuries (including

death), losses, or asserted damages arising out of or relating to the manufacture or sale of an

airbag containing a PSAN Inflator (each a "*PPIC Claim*") and authorized the Debtors to permit

PPICs to submit PPIC Proofs of Claim in an electronic format.

        12.     The Debtors served notice of the Bar Dates on all traditional creditors in

the Chapter 11 Cases (the "*General Bar Date Notice*") and executed an expansive publication

and noticing protocol, which included the publication of the notice of the Bar Dates (the "*Bar

Date Publication Notice*") in ten (10) publications in the United States and fifty-eight (58)

publications in thirty-eight (38) foreign countries, as well as the mailing of the PPIC Combined

Notice, which provided creditors with actual notice and information regarding (a) the process for

obtaining replacement airbags, (b) the commencement of the Japan Proceedings, (c) the

Disclosure Statement and Confirmation Hearing dates and objection deadlines, (d) the fact that a

claimant's interests may be affected by a chapter 11 plan of reorganization, through releases,

injunctions, discharges, sale "free and clear" orders, or otherwise, and (e) the website maintained

by the Debtors' noticing agent (www.TKRestructuring.com), where PPICs and other creditors

could file proofs of claim, register their email addresses to receive further notices about the

Chapter 11 Cases, and view other key documents and pleadings filed in the Chapter 11 Cases.

        13.     Further, on December 18, 2017, the Court entered an order [Docket No.

1395] establishing February 6, 2018 (the "*Supplemental PPIC Bar Date*") as the supplemental

deadline for PPICs who purchased vehicles containing a PSAN Inflator that uses 2004 non-

desiccated or desiccated PSAN as propellant between August 2, 2017 through December 19, 2017 to file proofs of claim in the Chapter 11 Cases for past or future monetary losses, personal injuries (including death), or damages arising out of or relating to an airbag containing PSAN Inflators, or their component parts, manufactured or sold by the Debtors or their affiliates. Notice of the Supplemental PPIC Bar Date was provided in connection with the notice of Confirmation Hearing in substantially the same publications as set forth above with respect to the Bar Date Publication Notice.

14.     On November 16, 2017, after nearly two years of intensive marketing, diligence, and negotiations between and among Takata, potential sponsor candidates, and a group of fifteen (15) of Takata's original equipment manufacturer customers (each a "***Customer***" or an "***OEM***" and each OEM that is a party to the U.S. RSA (as defined herein), a "***Consenting OEM***" and, collectively, the "***Consenting OEMs***"),[5] who collectively account for a substantial portion of the PSAN Inflators sold by Takata as of March 2017 and hold a substantial majority of the total unsecured Claims against the Estates, the Debtors entered into that certain Asset Purchase Agreement (the "***U.S. Acquisition Agreement***") with Joyson KSS Auto Safety S.A. ("***KSS***" and, collectively with one or more of its current or future subsidiaries or affiliates, the "***Plan Sponsor***") and the Cross-Conditioned Agreements (as defined in the U.S. Acquisition Agreement), whereby the Plan Sponsor agreed to purchase substantially all of Takata's worldwide assets (excluding PSAN Inflator-related assets), free and clear of all Claims, interests,

---

[5] The initial Consenting OEMs consist of the following parties and their affiliates and subsidiaries listed on Schedule 1 to the U.S. RSA:  (i) BMW Manufacturing Co., LLC, (ii) Daimler Trucks North America LLC and Mercedes-Benz U.S. International, Inc., (iii) FCA US LLC f/k/a Chrysler Group LLC, FCA Group Purchasing Srl in the name and on behalf of its principals (FCA Italy SpA and FCA Melfi Srl), FCA Fiat Chrysler Automóveis Brasil Ltda., and FCA Automobiles Argentina S.A., (iv) Ford Motor Company, (v) General Motors Holdings LLC, (vi) Honda North America Inc., (vii) Mazda Motor Corporation, (viii) Mitsubishi Motors Corporation, (ix) Nissan North America, Inc. and Nissan Mexicana, S.A. de C.V., (x) Subaru Corporation, (xi) Toyota Motor Corporation, (xii) Volkswagen Group of America, Inc., (xiii) Volvo Group North America LLC and Mack Trucks, Inc., (xiv) Jaguar Land Rover, Ltd (For Voting Purposes Only), and (xv) PSA Automobiles SA (For Voting Purposes Only).

Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, except for the Assumed Liabilities and Permitted Liens, for an aggregate purchase price of One Billion Five Hundred Eighty-Eight Million Dollars ($1.588 Billion) (the "*Global Transaction*" and the agreements, documents, and instruments executed and delivered in connection with the Global Transaction, as hereafter amended, supplemented, or otherwise modified, the "*Global Transaction Documents*").  To demonstrate their commitment for the Global Transaction and the Plan, the Debtors, the Consenting OEMs, and the Plan Sponsor (collectively, the "*Support Parties*") entered into that certain Restructuring Support Agreement dated November 16, 2017 (together with all schedules, exhibits, or attachments thereto, and as may be modified, amended or supplemented from time to time, the "*U.S. RSA*"), which was thereafter approved by the Court by order dated December 13, 2017 [Docket No. 1359].

15.    On January 3, 2018, the Court held a hearing (the "*Disclosure Statement Hearing*") at which it approved the *Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors*, filed on January 5, 2018, [Docket No. 1630] (together with all schedules and exhibits thereto, and as may be modified, amended or supplemented from time to time, the "*Disclosure Statement*") and thereafter, on January 5, 2018, entered an order [Docket No. 1639] (the "*Solicitation Procedures Order*") with respect thereto.

16.    Pursuant to the Solicitation Procedures Order, the Court established certain procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan, including, without limitation, procedures with respect to PPICs, (b) voting to accept or reject the Plan, and (c) filing objections to the Plan (the "*Solicitation and Voting Procedures*").  The

10

Solicitation Procedures Order also set February 6, 2018 at 4:00 p.m. (prevailing Eastern Time) as the deadline to (a) vote to accept or reject the Plan (the "***Voting Deadline***"), (b) opt out of providing the releases set forth in Section 10.6(b) of the Plan, (c) object to the confirmation of the Plan, and (d) object to the assumption or rejection of an executory contract or unexpired lease, or the Debtors' proposed Cure Amount.  The Voting Deadline was thereafter extended by the Debtors to February 9, 2018 at 4:00 p.m. (prevailing Eastern Time) and, subsequently, to February 14, 2018 at 8:00 p.m. (prevailing Eastern Time) [Docket Nos. 1907, 2018].

17.     On or before January 12, 2018, in accordance with the Solicitation Procedures Order, the Debtors, through their administrative agent, Prime Clerk LLC the "***Solicitation Agent***"), caused the relevant Solicitation Packages (as defined in, and approved by, the Solicitation Procedures Order) to be transmitted to and served on Claim and Interest holders. *See Affidavit of Service of Solicitation Materials*, dated January 19, 2018 [Docket No. 1761] (the "***Solicitation Affidavit***").  In particular, through regular or electronic mail, the Debtors solicited votes on the Plan from the holders of Claims in the Classes of Claims entitled to vote to accept or reject the Plan—Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), and Class 7 (Other PI/WD Claims)[6]—(each, a "***Voting Class***" and, collectively, the "***Voting Classes***").  *See generally Solicitation Affidavit*.  In addition, the Debtors published notice of the Confirmation Hearing in substantially the same publications as set forth above with respect to the Bar Date Publication Notice.  *Affidavit of Publication*, dated February 6, 2018 [Docket No. 1961] (the "***Publication Affidavit***").

---

[6] As set forth above, Class 7 (Other PI/WD Claims) was established after the Debtors commenced solicitation of the Plan.  The Debtors subsequently identified those individuals with Other PI/WD Claims that were previously solicited in either Class 5 (PSAN PI/WD Claims) or Class 6 (Other General Unsecured Claims) and directed the Solicitation Agent to count their votes to accept or reject the Plan within the new Class 7 (Other PI/WD Claims).

18.     In connection with the potential assumption, assumption and assignment, and rejection of executory contracts and unexpired leases under the Plan, the Debtors filed and served the following documents and notices prior to the date hereof (collectively, the "**Contract Schedules**"):

a.      *Notice of Filing of Proposed Cure Costs for Executory Contracts and Unexpired Leases*, dated January 12, 2018 [Docket No. 1703] (as thereafter amended on January 31, 2018 [Docket No. 1859] and as may be further amended, modified, or supplemented from time to time, the "**Schedule of Cure Amounts**");

b.      *Notice of Assumption of Executory Contracts and Unexpired Leases by Reorganized Takata*, dated January 30, 2018 [Docket No. 1857] (as may be further amended, modified, or supplemented from time to time, the "**Schedule of RTK Assumed Contracts**");

c.      *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases to the Warehouse Entity*, dated January 30, 2018 [Docket No. 1858] (as may be amended, modified, or supplemented from time to time, the "**Schedule of Warehouse Entity Assumed Contracts**" and, together with the Schedule of RTK Assumed Contracts, the "**Schedule of Assumed Contracts**"); and

d.      *Notice of Rejection of Executory Contracts and Unexpired Leases*, dated January 30, 2018 [Docket No. 1860] (as may be amended, modified, or supplemented from time to time, the "**Schedule of Rejected Contracts**").

19.     On January 23, 2018, the Debtors filed a supplement to the Plan [Docket No. 1789] (together with all schedules and exhibits thereto, and as amended on February 11, 2018 [Docket No. 2019], and as may be further modified, amended, or supplemented from time to time, the "**Plan Supplement**"), which included the following documents:  (a) Updated Post-Closing Date Structure for Reorganized Takata, Warehousing Entity, and TK Global LLC; (b) List of Material Definitive Documents Relating to Restructuring Transactions; (c) Schedule of Allowed OEM Claims of Consenting OEMs; (d) Indemnity Agreement; (e) TK Global Operating Agreement; (f) Plan Administrator Agreement; (g) Plan Administrator Qualification;

(h) Transition Services Agreement; (i) Shared Services Agreement; (j) Reorganized TK Holdings Organizational Documents; (k) Reorganized TK Holdings Trust Agreement; (l) Schedule of Causes of Action (Including Avoidance Actions) not Acquired by Plan Sponsor or Waived Pursuant to Section 10.11 of the Plan; (m) PSAN PI/WD Trust Agreement; (n) PSAN PI/WD Trust Distribution Procedures; (o) Participating OEM Contribution Agreement; (p) Ankura PSAN PI/WD Claim Estimation Reports; (q) Ankura Seat Belt PI/WD Claim Analysis; and (r) Identity Disclosures.

20.    After months of negotiations, the Debtors, the Consenting OEMs, the Plan Sponsor, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative reached agreements to resolve the objections of the Committees and the Future Claims Representative to the Plan, which resulted in those parties agreeing to support the Plan, as modified and amended to incorporate those settlements and agreements.  As a result of those significant achievements, on February 10, 2018, the Debtors filed certain settlement term sheets [Docket No. 2017] (collectively, the "***Settlement Term Sheets***") by and among (a) the Debtors, the Restructuring Support Parties, and the Creditors' Committee (the "***UCC Settlement***") and (b) the Debtors, the Restructuring Support Parties, the Tort Claimants' Committee, and the Future Claims Representative (the "***TCC Settlement***"), the terms of which have been incorporated in the Plan.  Soon after filing the Settlement Term Sheets, the Debtors reached out to each of the Objectors offering to discuss the terms of the Settlement Term Sheets in the hopes of resolving certain of the Objections and narrow the issues before the Court.  Certain of the Objectors, including the States, accepted the Debtors' offer.

21.    As set forth in the Solicitation Procedures Order, the deadline for filing objections to the Plan was February 6, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "***Plan***

*Objection Deadline*"), which deadline was subsequently extended for several parties in interest.

The Objections, and the Debtors' responses to them, are set forth in more detail in the chart

(the "*Objection Summary Chart*") attached hereto as __Exhibit A__ and in Part III below.

## FACTS

22.     Except as set forth herein, the pertinent and salient facts relating to these

Chapter 11 Cases and the Plan are set forth in the Plan, the Disclosure Statement, and the Plan

Supplement.  In addition, contemporaneously with or shortly following the filing of this

Memorandum, the following certifications and declarations have been, or will soon be, filed in

support of confirmation of the Plan:

> a.      *Certification of Christina Pullo with Respect to the Tabulation of Votes on the Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors*  (the "*Voting Certification*");
>
> b.      *Declaration of Kenneth Bowling in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* (the "*Bowling Declaration*");
>
> c.      *Declaration of Andrew Yearly in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* (the "*Yearly Declaration*");
>
> d.      *Declaration of Thomas Vasquez in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* (the "*Vasquez Declaration*"); and
>
> e.      *Declaration of Stephen Fleming in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* (the "*Fleming Declaration*" and, collectively with the Bowling Declaration, the Yearly Declaration, and the Vasquez Declaration, the "*Supporting Declarations*").

## ARGUMENT

23.     This Memorandum is divided into five (5) parts.  Part I addresses the

requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and

demonstrates the Plan's satisfaction of each requirement and achievement of the objectives of

chapter 11. Part II provides information about certain necessary regulatory approvals associated

with the Global Transaction. Part III addresses the Objections, to the extent not already

addressed in Part I, and establishes why each should be overruled and the Plan confirmed.

Part IV addresses the Debtors' request for a waiver of the fourteen (14) day stay imposed by

operation of Bankruptcy Rule 3020(e). Part V presents the Debtors' conclusions and

summarizes the relief requested herein.

## I.      THE PLAN SATISFIES THE BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED.

24.     To obtain confirmation of the Plan, the Debtors must demonstrate that the

Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a

preponderance of the evidence. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D.

Del. 2006) ("In the context of a cramdown, the debtor's standard of proof that the requirements

of § 1129 are satisfied is preponderance of the evidence.") (citing *Heartland Fed. Sav. & Loan*

*Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir.

1993)).

25.     Through filings with the Court, the Supporting Declarations, the Voting

Certification, the record of these Chapter 11 Cases, and additional testimonial evidence that may

be adduced at the Confirmation Hearing, the Debtors will demonstrate, by a preponderance of

the evidence, that the Plan satisfies all applicable subsections of section 1129 of the Bankruptcy

Code.

### A.      Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code.

26.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply

with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative

RLF1 18889156V.1

history of section 1129(a)(1) indicates that this provision encompasses the requirements of

sections 1122 and 1123 of the Bankruptcy Code, which, respectively, govern the classification of

claims and the contents of a plan. *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989,

at 126 (1978); *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J.

2000) ("The legislative history reflects that the applicable provisions of chapter 11 includes

sections such as section 1122 and 1123, governing classification and contents of plan.") (internal

quotation marks omitted).

27.    As demonstrated below, the Plan fully complies with the requirements of

sections 1122 and 1123 of the Bankruptcy Code.

**B.    Section 1122:  The Plan's Classification Structure is Proper.**

28.    Bankruptcy Code section 1122 provides that:

> (a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  A plan proponent has significant flexibility in classifying claims and

interests into multiple classes, provided that there is a reasonable basis to do so and all claims or

interests within a given class are substantially similar. *See In re Coastal Broad. Sys., Inc.*, 570 F.

App'x 188, 193 (3d Cir. 2014); *see also In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex.

2009) ("[A] plan may provide for multiple classes of claims or interests so long as each claim or

interest within a class is substantially similar to other claims or interests in that class."),

*subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011).

29.    Section 1122 is permissive in that "it does *not* provide that *all* similar

claims must be placed in the same class."  *In re Tribune Co.*, 476 B.R. 843, 854–55 (Bankr. D.

Del. 2012), *aff'd as modified*, No. 08–13141 (KJC), 2014 WL 2797042 (D. Del. June 18, 2014),

16

*aff'd in part, rev'd in part*, 799 F.3d 272 (3d Cir. 2015); *see also In re Jersey City Med. Ctr.*, 817

F.2d 1055, 1061 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping

of similar claims in different classes."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348

(Bankr. D. Del. 2004) ("Section 1122 of the Code provides that claims that are not 'substantially

similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially

similar' claims in separate classes.  In fact, the Third Circuit has approved separate classification

of unsecured claims.") (citation omitted).  Plan proponents are permitted to separately classify

similar claims so long as the basis for such classification is reasonable.  *See In re Coastal Broad.*

*Sys., Inc.*, 570 Fed. App'x at 193 ("Although not explicit in § 1122, a corollary to that rule is that

the 'grouping of similar claims in different classes' is permitted so long as the classification is

'reasonable.'"); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37*

*Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir. 1993) (concluding that separate classification

of similar claims is permissible where there is a reasonable basis for it); *In re Armstrong World*

*Indus.*, 348 B.R. 136, 159–60 (D. Del. 2006); *In re Tribune*, 476 B.R. at 856–57.  Accordingly,

the "Bankruptcy Court has 'broad discretion' to decide if a plan satisfies [section 1122], and [the

United States Court of Appeals for the Third Circuit] will uphold a plan's classification scheme

so long as it is 'reasonable' and does not 'arbitrarily designate classes.'"  *In re W.R. Grace &*

*Co.*, 729 F.3d 311, 326 (3rd Cir. 2013) (quoting *Jersey City Med.*, 817 F.2d at 1061).

        30.     With the exception of Administrative Expense Claims, Adequate

Protection Claims, and Priority Tax Claims (all of which need not be classified pursuant to

section 1123(a)(1) of the Bankruptcy Code), Article III of the Plan provides for the separate

classification of Claims against, and Interests in, each of the Debtors based upon differences in

the legal nature and/or priority of such Claims and Interests.  The Plan designates the following

nine (9) Classes of Claims and Interests at the applicable Debtors noted below:

| Class | Type of Claim or Interest |
|---|---|
| **Class 1** | **Other Secured Claims** |
| Class 1(a) | Other Secured Claims against TKAM |
| Class 1(b) | Other Secured Claims against TKF |
| Class 1(c) | Other Secured Claims against TKC |
| Class 1(d) | Other Secured Claims against the TKH Debtors[7] |
| Class 1(e) | Other Secured Claims against IIM |
| Class 1(f) | Other Secured Claims against TDM |
| Class 1(g) | Other Secured Claims against SMX |
| **Class 2** | **Other Priority Claims** |
| Class 2(a) | Other Priority Claims against TKAM |
| Class 2(b) | Other Priority Claims against TKF |
| Class 2(c) | Other Priority Claims against TKC |
| Class 2(d) | Other Priority Claims against the TKH Debtors |
| Class 2(e) | Other Priority Claims against IIM |
| Class 2(f) | Other Priority Claims against TDM |
| Class 2(g) | Other Priority Claims against SMX |
| **Class 3** | **Mexico Class Action Claims and Mexico Labor Claims** |
| Class 3(a) | Mexico Class Action Claims and Mexico Labor Claims against IIM |
| Class 3(b) | Mexico Class Action Claims and Mexico Labor Claims against TDM |
| **Class 4** | **OEM Unsecured Claims** |
| Class 4(a) | OEM Unsecured Claims against the TKH Debtors |
| Class 4(b) | OEM Unsecured Claims against IIM |
| Class 4(c) | OEM Unsecured Claims against TDM |
| Class 4(d) | OEM Unsecured Claims against SMX |

---

[7] For voting and distribution purposes, each Class of Claims or Interests against the TKH Debtors is deemed to contain sub-classes for each of the TKH Debtors, to the extent applicable.

RLF1 18889156V.1

| Class | Type of Claim or Interest |
|---|---|
| **Class 5** | **PSAN PI/WD Claims**[8] |
| Class 5(a) | PSAN PI/WD Claims against the TKH Debtors |
| Class 5(b) | PSAN PI/WD Claims against IIM |
| Class 5(c) | PSAN PI/WD Claims against TDM |
| Class 5(d) | PSAN PI/WD Claims against SMX |
| **Class 6** | **Other General Unsecured Claims** |
| Class 6(a) | Other General Unsecured Claims against TKAM |
| Class 6(b) | Other General Unsecured Claims against TKF |
| Class 6(c) | Other General Unsecured Claims against TKC |
| Class 6(d) | Other General Unsecured Claims against the TKH Debtors |
| Class 6(e) | Other General Unsecured Claims against IIM |
| Class 6(f) | Other General Unsecured Claims against TDM |
| Class 6(g) | Other General Unsecured Claims against SMX |
| **Class 7** | **Other PI/WD Claims** |
| Class 7(a) | Other PI/WD Claims against the TKH Debtors |
| Class 7(b) | Other PI/WD Claims against IIM |
| Class 7(c) | Other PI/WD Claims against TDM |
| Class 7(d) | Other PI/WD Claims against SMX |
| **Class 8** | **Intercompany Interests** |
| Class 8(a) | Intercompany Interests in TKAM |
| Class 8(b) | Intercompany Interests in TKF |
| Class 8(c) | Intercompany Interests in TKC |
| Class 8(d) | Intercompany Interests in the TKH Debtors |
| Class 8(e) | Intercompany Interests in IIM |
| Class 8(f) | Intercompany Interests in TDM |
| Class 8(g) | Intercompany Interests in SMX |

---

[8] To the extent that any PSAN PI/WD Claims against a Debtor arise from vehicles manufactured by any Participating OEM, such PSAN PI/WD Claims may be deemed to be in a separate Class from all other PSAN PI/WD Claims against such Debtor that are not entitled to receive PSAN PI/WD Top-Up Funds.

RLF1 18889156V.1

| Class | Type of Claim or Interest |
|-------|---------------------------|
| **Class 9** | **Subordinated Claims** |
| Class 9(a) | Subordinated Claims against TKAM |
| Class 9(b) | Subordinated Claims against TKF |
| Class 9(c) | Subordinated Claims against TKC |
| Class 9(d) | Subordinated Claims against the TKH Debtors |
| Class 9(e) | Subordinated Claims against IIM |
| Class 9(f) | Subordinated Claims against TDM |
| Class 9(g) | Subordinated Claims against SMX |

31.     The Claims or Interests in each particular Class are substantially similar to the other Claims or Interests, as the case may be, in such Class.  In addition, to the extent that Claims or Interests of equal priority are placed in different Classes, as set forth below and in the Bowling Declaration, a valid business, factual, and/or legal reason exists for such separate classification.

32.     The Plan provides for five (5) Classes of general unsecured Claims— Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), and Class 7 (Other PI/WD Claims).  Class 3 exists only at Mexico Debtors IIM and TDM and contains the unsecured litigation Claims of Mexican creditors against these Mexican Debtors, Class 4 contains the general unsecured Claims of the Debtors' OEM customers, which are the Debtors primary source of revenue and are critical to the Debtors' ongoing business operations, Class 5 contains the general unsecured Claims of the individuals who have (or may) suffer a personal injury or harm related to the Debtors' PSAN Inflators, Class 6 contains the general unsecured Claims of all the Debtors' trade and other creditors, including contingent, unliquidated, and disputed litigation Claims and any Claims asserted by individuals alleging to have suffered an

economic loss related to the Debtors' PSAN Inflators, and Class 7 contains the general

unsecured Claims of individuals who have suffered a personal injury or harm caused by a Takata

Product, other than the Debtors' PSAN Inflator-related products.

33.     Each of these Classes of creditors represent "a voting interest that is

sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed

reorganization should proceed." *In re Route 37 Bus. Park Assoc.*, 987 F.2d at 159.  First, the

OEMs are the Debtors' customers and primary source of revenue—without their business the

Debtors would not have a business to reorganize or sell.  The Consenting OEMs have made

unique contributions to these Chapter 11 Cases, providing financial accommodations to the

Debtors, agreeing to volume commitments with the Plan Sponsor, and agreeing to the Plan

Settlement, including the resolution of the Settled OEM Claims pursuant to the Plan Settlement

and material contributions to the Plan Settlement Fund and the Support Party Creditor Fund.

Accordingly, affording the OEMs their own voice in these Chapter 11 Cases is both reasonable

and appropriate.  *Cf. In re Amcast Auto. of Ind., Inc.*, No. 05-33322 (FJO), (Bankr. S.D. Ind. Apr.

10, 2007), ECF No. 1423 (order confirming plan of debtor automotive supplier which classified

the general unsecured claims of General Motors—the debtor's largest customer and revenue

source—separately from other general unsecured claims); *In re Clark-Cutler-McDermott Co.*,

No. 16-41188 (CJP) (Bankr. D. Mass. Mar. 31, 2017), ECF No. 668 (same).

34.     Second, the unique shared interest that holders of PSAN PI/WD Claims

and holders of Other PI/WD Claims have in these Chapter 11 Cases is of significant importance.

These claimants, due to the personal (and sometimes severe) nature of the injuries that gave (or

will give) rise to their Claims against the Debtors, deserve an independent voice in these cases,

especially because they may otherwise be outnumbered by the Debtors' other creditors, most of

RLF1 18889156V.1

whom have only suffered monetary losses. *Cf. In re Combustion Eng'g Inc.*, 391 F.3d 190, 244

(3rd Cir. 2004) (discussing the dangers of gerrymandering in the context of asbestos cases where

"[a] distinct minority—for example, those tort claimants with especially serious injuries and

strong cases—might get outvoted by a large number of holders of small claims who favor a

quick pay-out of relatively small amounts with little proof required"). Further, because PSAN

PI/WD Claims are potentially subject to the Channeling Injunction, it is reasonable and

appropriate that these Claims constitute a separate Class from Other PI/WD Claims.

35.    Third, as the Mexico Labor Claims and the Mexico Class Action Claims

are filed by and against foreign entities (*i.e.*, IIM and TDM), such Claims are legally dissimilar

from other unsecured Claims at these Debtors because of the potential recourse against these

Debtors available to such claimants, *i.e.*, these Mexican creditors may be able to obtain a Lien or

seize Assets pursuant to a judgment rendered by a Mexican court not obligated to recognize

these proceedings. *See FGH Realty Credit Corp. v. Newark Airport/Hotel L.P.*, 155 B.R. 93,  99

(D.N.J. 1993) ("The similarity of claims is determined by their legal status in relation to the

debtor."); *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ("Claims are similar if

they have substantially similar rights to the debtor's assets.") (internal quotation marks omitted).

36.    In contrast, Class 6 (Other General Unsecured Claims) includes Claims

arising out of, or relating to, contingent, unliquidated, and/or disputed litigation Claims

(including, with respect to TKH, the Mexico Class Action Claims), trade and vendor Claims,

certain employee Claims, and Claims arising out of, or relating to, the rejection of executory

contracts and unexpired leases. Accordingly, the separate classification of OEM Unsecured

Claims, PSAN PI/WD Claims, Other PI/WD Claims, and, solely with respect to IIM and TDM,

Mexico Labor Claims and Mexico Class Action Claims, from Other General Unsecured Claims

is proper and the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code and should be approved.[9]

### C.    Section 1123(a):  The Plan's Content is Appropriate.

37.    Section 1123(a) of the Bankruptcy Code sets forth seven (7) applicable requirements with which every chapter 11 plan must comply.  Pursuant to this provision a plan must (1) designate classes of claims and interests; (2) identify classes of claims and interests that are not impaired under the plan; (3) specify the treatment of classes of claims and interests that are impaired under the plan; (4) provide the same treatment for each claim or interest within a particular class, unless the holder of a particular claim or interest agrees to less favorable treatment; (5) provide adequate means for the plan's implementation; (6) provide for the inclusion of a prohibition against the issuance of nonvoting shares in the debtor's charter; and (7) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan.  *See* 11 U.S.C. § 1123(a)(1)–(7).  As demonstrated herein, the Plan complies with each of these requirements.

### 1.    *Section 1123(a)(1):  Designation of Classes of Claims and Interests.*

38.    Section 1123(a)(1) of the Bankruptcy Code requires a plan to designate, subject to section 1122 and certain exceptions, classes of claims and equity interests.  As discussed above, the Plan designates nine (9) Classes of Claims and Interests—Class 1 (Other Secured Claims); Class 2 (Other Priority Claims); Class 3 (Mexico Class Action Claims and Mexico Labor Claims); Class 4 (OEM Unsecured Claims); Class 5 (PSAN PI/WD Claims), including any deemed separate Classes for PSAN PI/WD Claims against a Debtor that arise from

---

[9] A detailed discussion of the classification and treatment of Class 9 (Subordinated Claims) is provided in Part III below in reply to the States' Objection.

vehicles manufactured by a Participating OEM; Class 6 (Other General Unsecured Claims); Class 7 (Other PI/WD Claims); Class 8 (Intercompany Interests); and Class 9 (Subordinated Claims).  *See* Plan, Arts. III, IV.  Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### 2.    *Section 1123(a)(2):  Specified Unimpaired Classes.*

39.    Section 1123(a)(2) of the Bankruptcy Code requires a plan to specify which classes of claims or interests are unimpaired by the plan.  Section 3.2 of the Plan specifies that Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code.  *See* Plan, § 3.2. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### 3.    *Section 1123(a)(3):  Specified Treatment of Impaired Classes.*

40.    Section 1123(a)(3) of the Bankruptcy Code requires a plan to specify how it will treat impaired classes of claims or interests.  Article IV of the Plan sets forth the treatment for each Class of Claims and Interests under the Plan, of which the following Classes are Impaired within the meaning of section 1124 of the Bankruptcy Code:  Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), Class 7 (Other PI/WD Claims), Class 8 (Intercompany Interests), and Class 9 (Subordinated Claims).  *See* Plan, Art. IV. Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### 4.    *Section 1123(a)(4):  Equal Treatment.*

41.    Section 1123(a)(4) of the Bankruptcy Code requires a plan to provide the same treatment for each claim or interest within a particular class, unless a holder of a claim or interest agrees to receive treatment that is less favorable to the treatment afforded to the other class members.  Pursuant to the Plan, each Claim against, or Interest in, a Debtor in each

24

respective Class receives the same treatment from the Debtors as every other Claim or Interest in such Class.

42.     As described in greater detail below, pursuant to the terms of the UCC Settlement, Article IV of the Plan provides that, in addition to recoveries received from the Debtors' Estates, Eligible Creditors in Class 6 will receive their Pro Rata Share of Support Party Funds held in the Support Party Creditor Fund.  Eligible Creditors include a significant number of vendors and suppliers that may not be parties to executory contracts, but with whom the Plan Sponsor, the Reorganized Debtors, and/or the Consenting OEMs may, directly or indirectly, continue to do business going forward.  In connection with the UCC Settlement, the Plan Sponsor and the Consenting OEMs agreed to provide additional consideration to these parties. Functionally, this structure is an alternative to the Plan Sponsor assuming some but not all of these Claims.  Accordingly, the Support Party Creditor Fund—which will be established and funded by the Plan Sponsor and the Consenting OEMs—is not a distribution from the Debtors' Estates.  Accordingly, although this consideration is being provided only to a subset of Class 6, this treatment is nevertheless consistent with section 1123(a)(4) because the Support Party Funds are being contributed by the Restructuring Support Parties and not by the Debtors.[10]  *See In re ICL Holdings Co., Inc.*, 802 F.3d 547, 555–58 (3d Cir. 2015) (finding that, in connection with a 363 sale, a contribution by the purchaser to general unsecured creditors was not property of the estate, and rejecting the argument that such a contribution would violate priority and equal treatment provisions where "the Bankruptcy Code's creditor-payment hierarchy only becomes an issue when distributing *estate* property.") (emphasis added); *see also In re Source Enters., Inc.*,

---

[10] Although the terms of the UCC Settlement do provide that, in certain remote and limited circumstances, the Debtors may be called upon to contribute certain limited amounts to the Support Party Creditor Fund (*i.e.*, Additional Support Party Funds) pursuant to Section 5.19(g)(iii) of the Plan, the Debtors submit that the likelihood of such obligation being triggered is extremely remote given the analysis and identification of contracts and Claims conducted to date.

392 B.R. 541, 556-57 (S.D.N.Y. 2008) (holding an agreement between unsecured creditor and preferred shareholders/DIP lender where unsecured creditor received the right to purchase a portion of the equity in the reorganized debtor from a preferred shareholders/DIP lender and the right to designate one director was an agreement between third parties and did not discriminate among unsecured creditors in the same class and therefore did not violate section 1123(a)(4)).

43.     Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

**5.      *Section 1123(a)(5):  Implementation of the Plan.***

44.     Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation."  11 U.S.C. § 1123(a)(5).  The Plan and the various documents and agreements set forth in the Plan Supplement as well as the exhibits and schedules to the Plan provide adequate and proper means for the implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including, without limitation, (a) the sale of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, in accordance with the terms of the Plan and the U.S. Acquisition Agreement, (b) the vesting of the PSAN Assets in Reorganized Takata, (c) the vesting of the Warehoused PSAN Assets and Other Excluded Assets in the applicable Legacy Entity, (d) the continued corporate existence of the Reorganized Debtors, (e) the Plan Settlement Payment, (f) the execution of the Reorganized TK Holdings Trust Agreement, (g) the establishment of TK Global LLC and the Warehousing Entity, (h) the establishment of the PSAN PI/WD Trust, (i) the creation of the Claims Reserves and the Recovery Funds to make Distributions to holders of Allowed General Unsecured Claims, and (j) the taking of all necessary or appropriate actions by the Debtors or the Reorganized Debtors, as applicable, to effectuate the Restructuring Transactions and the Plan.

RLF1 18889156V.1

45.     In addition, Article V of the Plan implements the terms of the Plan

Settlement.  As discussed in further detail below, the Plan Settlement (a) provides for the

resolution of the Claims and controversies relating to the Consenting OEMs' Adequate

Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN

Administrative Expense Claims and (b) incorporates the terms of the UCC and TCC Settlements,

as well as agreements of the Plan Sponsor with respect to the Plan Sponsor Backstop Funding

Agreement.  The Plan Settlement is the lynch pin of the Plan and has made the distributions to

unsecured creditors in these Chapter 11 Cases possible.

46.     As part of the TCC Settlement, the Debtors are assigning their rights in

Takata's product liability insurance to the PSAN PI/WD Trust.  Although these policies contain

certain anti-assignment provisions, numerous courts, including courts in this Circuit, have held

that the transfer of the debtor's insurance rights to a personal injury trust is valid and enforceable

pursuant to section 1123(a)(5) of the Bankruptcy Code, notwithstanding any anti-assignment

provisions in such insurance policies.  *See Combustion Engineering*, 391 F. 3d at 218 n.17

(providing that "even if the subject insurance policies purported to prohibit assignment of

Combustion Engineering's insurance proceeds, these provisions would not prevent the

assignment of proceeds to the bankruptcy trust"); *see also Federal-Mogul*, 385 B.R. 560, 567

(2008) ("[Section] 1123(a)(5)(B) expressly contemplates that the debtor's interests in the policies

may be assigned to a trust or other entity."); *In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D.

Del. 2006) (under *Combustion Engineering*, section 1123(a)(5) preempts anti-assignment clauses

in insurance policies); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *2 (Bankr.

D. N.J. Sept. 2, 2008) ("a plan of reorganization may assign insurance policies to a personal

injury trust despite the existence of anti-assignment clauses in those policies"); *In re Stone &*

RLF1 18889156V.1

*Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) (same); *In re Western Asbestos Co.*, 313

B.R. 832, 858 (Bankr. N.D. Cal. 2003) (same).

47.     Accordingly, the Plan, together with the documents and agreements set

forth in the Plan Supplement, provide the means for implementation of the Plan as required by

section 1123(a)(5).

> ### 6.     Section 1123(a)(6):  Non-Voting Equity Securities.

48.     Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of

nonvoting equity securities and requires amendment of a debtor's charter to so provide.  The

certificate of incorporation, articles of incorporation, limited liability company agreement,

operating agreement, or similar governing document, as applicable, of each Debtor has been or

will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity

securities in compliance with section 1123(a)(6).

> ### 7.     Section 1123(a)(7):  Designation of Directors and Officers.

49.     Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain

only provisions that are consistent with the interests of creditors and equity security holders and

with public policy with respect to the manner of selection of any officer, director, or trustee

under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).

Consistent with section 1123(a)(7), Sections 5.7, 5.8, and 5.9 of the Plan contain provisions with

respect to the manner of selection of directors and officers of TK Global LLC, Reorganized

Takata, and the Warehousing Entity, that are consistent with the interests of creditors, equity

security holders, and public policy.  *See* Plan §§ 5.7, 5.8, 5.9.  Further, to the extent available, the

Debtors have identified in the Plan Supplement the individuals selected to serve as directors and

officers of each Reorganized Debtor.  *See* Plan Supplement Ex. R.  Accordingly, the Plan

satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

RLF1 18889156V.1

### 8. Section 1123(a)(8): Postpetition Person Service Payments— Inapplicable Provision.

50.     The Debtors are not "individuals" (as that term is defined in the

Bankruptcy Code) and, accordingly, section 1123(a)(8) of the Bankruptcy Code is inapplicable

to the Plan.

**D.     Section 1123(b):  The Plan's Content is Permitted.**

51.     Section 1123(b) of the Bankruptcy Code sets forth six (6) permissive

provisions that define what may be incorporated into a chapter 11 plan.  Pursuant to this

provision a plan may (1) impair or leave unimpaired any class of claims or interests, (2) provide

for the assumption, assignment, or rejection of executory contracts and unexpired leases,

(3) provide for the settlement of claims and/or the retention of claims or causes of action,

(4) provide for the sale of all or substantially all of the debtor's property, (5) modify or leave

unaffected the rights of holders of claims, and (6) include any other appropriate provision not

inconsistent with the Bankruptcy Code.  *See* 11 U.S.C. § 1123(b)(1)–(6).  As demonstrated

herein, the Plan is consistent with section 1123(b).

### 1. Section 1123(b)(1): Impairment/Unimpairment of Classes of Claims and Interests.

52.     Section 1123(b)(1) of the Bankruptcy Code provides that a plan may

"impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  11

U.S.C. § 1123(b)(1).  As discussed above, consistent with section 1123(b)(1) of the Bankruptcy

Code, Articles III and IV of the Plan classify and describe the treatment for each Impaired and

Unimpaired Class.

RLF1 18889156V.1

**2.      *Section 1123(b)(2):  Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases.***

53.      Section 1123(b)(2) of the Bankruptcy Code permits a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases, subject to section 365 of the Bankruptcy Code.  Section 8.1 of the Plan provides that, as of, and subject to, the occurrence of the Effective Date, each of the Debtors' executory contracts and unexpired leases will be deemed assumed by, and assigned to, the Plan Sponsor, except for an executory contract or unexpired lease that:  (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (b) is specifically designated on (i) the Schedule of Assumed Contracts, or (ii) the Schedule of Rejected Contracts;[11] (c) is being assumed, assumed and assigned, or otherwise assigned pursuant to Section 8.4 of the Plan; (d) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date; or (e) is the subject of a pending Cure Dispute.  Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

**3.      *Section 1123(b)(3):  Settlement and Retention of Claims and Causes of Action.***

a.      <u>Settlement of Claims</u>.

54.      Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, a debtor is permitted to incorporate the settlement of claims belonging to the debtor or the estate into a plan.  Settlements are generally favored and encouraged in bankruptcy proceedings.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges

---

[11] Pursuant to the terms of the UCC Settlement and Section 5.19 (h) of the Plan, additional modification of the Schedule of Rejected Contracts is subject to certain limitations and restrictions.

must carefully examine settlements before approving them."); *In re Penn Cent. Transp. Co.*, 596

F.2d 1102, 1113 (3d Cir. 1979) ("[i]n administering reorganization proceedings in an economical

and practical manner it will often be wise to arrange the settlement of claims as to which there

are substantial and reasonable doubts.") (alteration in original) (quoting *Protective Comm. for*

*Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

55.     The decision of whether to approve a particular settlement lies entirely

within the sound discretion of the bankruptcy court. *In re World Health Alternatives, Inc.*, 344

B.R. 291, 296 (Bankr. D. Del. 2006).  In evaluating the settlement, the Court should consider

whether "the compromise is fair, reasonable, and in the best interest of the estate." *In re Louise's*

*Inc.*, 211 B.R. 798, 801 (Bankr. D. Del. 1997).  Importantly, the bankruptcy court's discretion

should be exercised "in light of the general public policy favoring settlements." *In re Capmark*

*Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) (quoting *In re Hibbard Brown & Co.*,

217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)).  In considering the merits of the settlement, a

bankruptcy court does not need to be convinced that the settlement is the best possible outcome

for the parties; rather, the court need only "canvass the issues and see whether the settlement

falls below the lowest point in the range of reasonableness." *In re W.R. Grace & Co.*, 475 B.R.

34, 78 (D. Del. 2012) (citing *Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258

B.R. 119, 123 (D. N.J. 2000)); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del.

2005), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006); *see also In re*

*Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).

56.     In determining whether to exercise discretion to approve a settlement,

courts in this circuit consider the following four (4) "*Martin*" factors: "(1) the probability of

success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation

involved, and the expense, inconvenience and delay necessarily attending it; and (4) the

paramount interest of the creditors." *Martin*, 91 F.3d at 393; *see also Fry's Metals, Inc. v.*

*Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *In re Tribune Co.*, 464 B.R.

126, 158 (Bankr. D. Del.), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011) (using the

*Martin* factors to determine the reasonableness of a proposed settlement under Rule 9019); *In re*

*eToys, Inc.*, 331 B.R. 176, 198 (Bankr. D. Del. 2005).  "The court must also consider 'all other

factors relevant to a full and fair assessment of the wisdom of the proposed compromise.'" *In re*

*Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *Protective Committee for*

*Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,  424 (1968)).

Accordingly, at its core, "the ultimate inquiry [is] whether 'the compromise is fair, reasonable,

and in the interest of the estate.'" *Id.* (quoting *In re Louise's, Inc.*, 211 B.R. at 801); *see also In*

*re Washington Mut. Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation

[whether to approve a settlement], the court must determine whether 'the compromise is fair,

reasonable, and in the best interest of the estate.'") (citation omitted).

1.     The Plan Settlement.

57.     Consistent with these provisions, Section 5.19(a) of the Plan provides that

> The provisions of the Plan (including provisions relating to the
> Plan Settlement Payment, the Plan Settlement Fund, the Support
> Party Creditor Fund, and the release and injunctive provisions
> contained in Article X of the Plan to the extent applicable to a
> Consenting OEM or the Plan Sponsor) and the other documents
> entered into in connection with the Restructuring Transactions
> constitute a good faith compromise and settlement among the
> Debtors, the Plan Sponsor, the Consenting OEMs, the Creditors'
> Committee, the Tort Claimants' Committee, and the Future Claims
> Representative of all Claims and controversies among such parties,
> including Claims subject to the investigation in connection with
> the Challenge Period and Claim and controversies relating to the
> Settled OEM Claims, the Consenting OEM Unsecured Claims, and
> the U.S. Acquisition Agreement, and are also in consideration of
> the significant value provided to the Estates by the Restructuring

32

Support Parties in connection with the Restructuring Transactions, including, without limitation (i) the Consenting OEMs' obligations under the Indemnity Agreement (without which the Plan Sponsor would have been unwilling to enter into the Restructuring Transactions and pay the Purchase Price for the Purchased Assets), (ii) the Consenting OEMs' post-Effective Date commitments to the Plan Sponsor's business, (iii) the Consenting OEMs' agreement to certain modifications to the OEM Assumed Contracts and to have such OEM Assumed Contracts be assigned to the Plan Sponsor, (iv) the Plan Sponsor's entry into the Restructuring Transactions, (v) the Plan Sponsor's obligation to provide the Plan Sponsor Backstop Funding in accordance with the terms and subject to the conditions of the Plan Sponsor Backstop Funding Agreement and this Plan, (vi) the Business Incentive Plan Payment, (vii) the Plan Sponsor's agreement to enter into the Transition Services Agreement, (viii) the Consenting OEMs' contributions to the Plan Settlement Fund, as set forth in sections 5.19(b)(iv) and 5.19(e) of the Plan, (ix) the Plan Sponsor Parties' payment of the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust, as set forth in section 5.19(e)(iii) of the Plan, (x) the Consenting OEMs' contributions to the Support Party Creditor Fund as set forth in section 5.19(g) of the Plan, (xi) the Plan Sponsor's contributions to the Support Party Creditor Fund, as set forth in section 5.19(g) of the Plan, and (xii) the commitments of Reorganized Takata and the Plan Sponsor to assume certain executory contracts pursuant to section 5.19(h).  The Plan shall be deemed a motion to approve the Plan Settlement and the good faith compromise and settlement of all of the Claims and controversies described in the foregoing sentence pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

Plan § 5.19(a).  Pursuant to this provision, all Claims and controversies among the Debtors, the

Restructuring Support Parties, the Committees, and the Future Claims Representative will be

settled, including the Claims and controversies relating to the Consenting OEMs' Adequate

Protection Claims (currently estimated to be approximately Two Hundred Eighty-Five Million

Dollars ($285 Million)), Consenting OEM PSAN Cure Claims (currently estimated to be

approximately Four Billion Dollars ($4 Billion)), and Consenting OEM PSAN Administrative

RLF1 18889156V.1

Expense Claims (which Claims are contingent and unliquidated) (collectively, the "***Settled OEM Claims***"), which will be resolved and extinguished in exchange for receipt by the Consenting OEMs of (a) a Distribution in an amount equal to (i) the positive difference between the Eight Hundred Fifty Million Dollar ($850 Million) DOJ Restitution Claim and the aggregate amount of (1) all actual payments to the Special Master from any other source on account of the DOJ Restitution Claim and (2) any amounts received by the OEMs that are credited by the Special Master against such OEMs' share of the DOJ Restitution Claim, plus (ii) the Plan Settlement Turnover Amount, which is up to Four Hundred Thousand Dollars ($400,000) payable by the Debtors in accordance with the payment waterfall set forth in section 5.19(c) of the Plan, which may constitute Available Cash for IIM, SMX, TDM, and the TKH Debtors (collectively, the "***Plan Settlement Payment***") and (b) payment of the Business Incentive Plan Payment under the terms of the U.S. Acquisition Agreement, as modified by Section 5.19(b) of the Plan.  The Plan Settlement Payment on account of the Settled OEM Claims is currently estimated to be approximately Two Hundred Forty-Six Million Dollars ($246 Million).

58.    In addition, the Plan Settlement incorporates the terms of the TCC Settlement whereby the Consenting OEMs contribute to the Plan Settlement Fund their rights to certain recoveries as and when such amounts would otherwise be paid or payable to the Consenting OEMs under the Plan, with such contributed recoveries in the Plan Settlement Fund being transferred pursuant to the Plan to the PSAN PI/WD Trust for the benefit of holders of PSAN PI/WD Claims and Other PI/WD Claims as follows:

- Eighty percent (80%) of the Consenting OEM GUC Recoveries until the Consenting OEMs have contributed Five Million Dollars ($5 Million) to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety (90%) of Consenting OEM GUC Recoveries until the Consenting OEM GUC Recovery Threshold is met (which is the Consenting OEMs'

share of the first Eighty-Nine Million Nine Hundred Thousand Dollars ($89.9 Million) of Available Cash);

- Twenty-five (25%) of the Consenting OEM GUC Recoveries in excess of the Consenting OEM GUC Recovery Threshold (the Consenting OEM Additional GUC Recoveries);

- Eighty percent (80%) of the incremental amount of Consenting OEM GUC Recoveries resulting from or attributable to the NTHSA Claims being treated as Other General Unsecured Claims and/or the TKJP 503(b)(9) Claim being setoff or otherwise eliminated until the Consenting OEMs have contributed Five Million Dollars ($5 Million) to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety percent (90%) of such "Consenting OEM Incremental GUC Recoveries;" and

- Eighty percent (80%) of any amounts that the Consenting OEMs would be entitled to receive on account of the Business Incentive Plan Payment, excluding any amounts of the Business Incentive Plan Payment that are allocable to TKAM.

In addition, the Plan Sponsor has agreed to contribute the Plan Sponsor Contribution Amount of Twenty-Five Million Dollars ($25 Million) to the PSAN PI/WD Trust as soon as practicable after the Plan Sponsor receives repayment of up to Twenty-Five Million Dollars ($25 Million) drawn on the Plan Sponsor Backstop Funding Agreement by TKAM (on behalf of TSAC). All funds contributed by the Plan Settlement Fund to the PSAN PI/WD Trust will be shared Pro Rata by holders of Class 5 (PSAN PI/WD Claims) and Class 7 (Other PI/WD Claims).

59.    Lastly, the Plan Settlement incorporates the terms of the UCC Settlement and provides for the establishment and funding by the Consenting OEMs and the Plan Sponsor, for the benefit of Eligible Creditors, of the Support Party Creditor Fund with not less than Seven Million Five Hundred Thousand Dollars ($7.5 Million)—with Five Million Dollars ($5 Million) to be contributed by the Consenting OEMs and Two Million Five Hundred Thousand ($2.5 Million), inclusive of any remaining amount of the Five Million Dollars ($5 Million) Cure Claims Cap, to be contributed by the Plan Sponsor. The UCC Settlement also provides for

35

certain limitations on the Debtors' and the Plan Sponsor's ability to reject additional executory contracts going forward.

60.     As established below, the Plan Settlement resolves a litany of Claims and controversies and accordingly satisfies the *Martin* factors and should be approved.

<u>*Probability of Success in Litigation*</u>

61.     The purpose in addressing the first *Martin* factor is "not to make findings of fact and conclusions of law, but to canvass the issues to assess the risks associated with prosecuting the [litigation]." *In re Tribune Co.*, 464 B.R. at 159 (quoting *In re Cellular Information Sys., Inc.,* 171 B.R. 926, 950 (Bankr. S.D. N.Y. 1994)).  The Plan Settlement resolves over Four Billion Dollars ($4 Billion) in Claims on account of the Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN Administrative Expense Claims in exchange for an estimated Two Hundred Forty-Six Million Dollar ($246 Million) Plan Settlement Payment.  Litigating the Debtors' liability for these Claims with the Consenting OEMs would be both extremely time consuming and expensive with the outcome only serving to crystalize the magnitude of the Consenting OEMs' Claims against the Debtors' Estates.  *See In re TSIC, Inc.*, 393 B.R. 71, 79 (Bankr. D. Del. 2008) ("The first factor, the probability of success, is satisfied because, as stated earlier, the probability for success of litigation was far from certain.  Considering the possible outcomes, only one would have been advantageous to the Debtor, additional money being paid to the Debtor's estate.  However, the expense the Debtor would incur to litigate any controversy would almost certainly have reduced, and quite possibly eliminated, the value of any gain.").  Further, the Plan Settlement resolves significant confirmation disputes related to the treatment of General Unsecured Claims and the propriety of the Channeling Injunction and the other Release Provisions (as defined below)— issues if litigated by the Committees and the Future Claims Representative could have resulted in

36

the incurrence of substantial administrative expenses to the direct detriment of unsecured

creditors.

<u>Difficulties Associated with Collection</u>

62.    This factor is not implicated as the disputed obligations are all owed by

the Debtors.  However, the inapplicability of this factor does not detract from the reasonableness

of the Plan Settlement under the other factors of the *Martin* test.

<u>Complexity of Litigation and Attendant Expense, Inconvenience and Delay</u>

63.    Under the facts and circumstances of these Chapter 11 Cases, the delay

that litigating the Debtors' liability for, and the amount of, the Settled OEM Claims, as well as

the treatment of General Unsecured Claims and the propriety of the Channeling Injunction and

the other Release Provisions under the Plan, could have been fatal to the Debtors' ability to

consummate the Global Transaction.  *See, e.g., id.* ("Given the dire financial position the Debtor

was in at the time, any delay in the sale of the Debtor's assets could have proven fatal.").  The

Plan Settlement avoids protracted, complicated and expensive litigation involving fifteen (15)

OEMs, two (2) Committees, and the Future Claims Representative and provides a significant

level of certainty regarding confirmation of the Plan.  Simply put, the Plan Settlement allows the

Debtors to conserve their limited financial resources in order to reorganize, pay creditors, and

produce replacement kits, rather than to engage in costly and protracted litigation.

<u>Paramount Interest of Creditors</u>

64.    In addition to the resolution of the Settled OEM Claims, the treatment of

General Unsecured Claims, and the propriety of the Channeling Injunction and the other Release

Provisions, the Plan Settlement provides for (a) the funding in full of the Post-Closing Reserve

and the Warehousing Entity Reserve in accordance with the Plan, (b) the Consenting OEMs'

obligations under the Indemnity Agreement, without which the Plan Sponsor would have been

unwilling to enter into the Global Transaction, (c) the Consenting OEMs' post-Effective Date

commitments to the Plan Sponsor's business, (d) the Plan Sponsor's obligation to provide the

Plan Sponsor Backstop Funding subject to the terms of the Plan Sponsor Backstop Funding

Agreement, (e) the Plan Sponsor's commitment to provide the Business Incentive Plan Payment

subject to the terms of the U.S. Acquisition Agreement, (f) the Plan Sponsor's Agreement to

enter into the Transition Services Agreement, (g) the Consenting OEMs' contributions to the

Plan Settlement Fund, (h) the Plan Sponsor Parties' payment of the Plan Sponsor Contribution

Amount to the PSAN PI/WD Trust, and (i) the contributions by the Plan Sponsor and the

Consenting OEMs to the Support Party Creditor Fund.  Without these benefits, consummation of

the Global Transaction, and the resulting creditor recoveries provided for under the Plan, would

not be possible.  *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 79 (D. Del. 2012), *aff'd,* 532 F.

App'x 264 (3d Cir. 2013) ("A resolution of all these issues is highly valuable to Grace because it

injects its bankruptcy estate with much-needed funding and 'abstract' non-monetary value,

which consequently help Grace to reorganize itself under Chapter 11.  This infusion of tangible

and abstract value into Grace's bankruptcy estate, in turn, is in the paramount interest of Grace's

creditors because it enlarges the pool of funds available to *all* creditors and ensures greater

guaranteed recovery.").  For example, without the Consenting OEMs agreeing to settle their

billions of dollars of secured and priority Claims for a fraction of their potential value, the

Debtors would be administratively insolvent and unable to confirm a Plan.  The Consenting

OEMs would be entitled to substantially all of the value of the Debtors' Estates and other

unsecured creditors would likely recover nothing on account of their Claims.  In contrast, as a

result of the satisfaction of the Settled OEM Claims pursuant to the Plan Settlement, significant

funds are now available for the benefit of unsecured creditors.

65.     Finally, the Plan Settlement (a) facilitates the sale of the Debtors' non-PSAN businesses as a going-concern, thereby maximizing creditor recoveries, (b) provides material benefits to the Debtors' suppliers and other businesses that depend on the go-forward business by assuming and assigning many of the Debtors' vendor and supplier contracts to the Plan Sponsor, (c) preserves fourteen thousand (14,000) jobs, and (d) facilitates the uninterrupted supply of replacement kits to PSAN Consenting OEMs.

66.     Accordingly, the Plan Settlement is consistent with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and should be approved.

### 2.      The Debtors' Releases.

67.     As discussed in Section I.D.6(d) below, Sections 5.19(j) and 10.6(a) of the Plan respectively provide for the release of any and all Claims against the Consenting OEMs and the Released Parties (as defined herein) by the Debtors, the Reorganized Debtors, and the Debtors' Estates (subject to certain limited exceptions outlined in the Plan).  For each of the reasons set forth in Section I.D.6(d), these releases are permissible under, and consistent with, section 1123(b)(3)(A) of the Bankruptcy Code.

### b.      Retention of Causes of Action and Reservation of Rights.

68.     Section 1123(b)(3)(B) of the Bankruptcy Code permits a chapter 11 plan to provide for the retention and enforcement of any claim or interest by the debtor, a trustee, or a representative of the estate.  Pursuant to Section 10.11 of the Plan, all Avoidance Actions that relate to the continued operation of the Business (as defined in the U.S. Acquisition Agreement), Reorganized Takata, or the Warehousing Entity, including with respect to ongoing trade vendors, suppliers, licensors, manufacturers, strategic or other business partners, customers, employees, or counterparties to all Purchased Contracts to be acquired by the Plan Sponsor, assumed by Reorganized Takata, or assumed and assigned to the Warehousing Entity will be waived and

RLF1 18889156V.1

released on the Effective Date. *See* Plan § 10.11. Further, pursuant to Section 10.12 of the Plan, but except as expressly provided in Section 10.11 of the Plan and subject to Sections 10.5, 10.6, 10.7, and 10.8 of the Plan, the Plan preserves and vests in the Reorganized TK Holdings Trust any rights, Claims, Causes of Action (including Avoidance Actions), rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. *Id.* §§ 10.5, 10.6, 10.7, 10.8, 10.11, 10.12. Accordingly, the Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### 4.    *Section 1123(b)(4):  Sale of Substantially all Assets.*

69.    Section 1123(b)(4) of the Bankruptcy Code permits a plan to provide for the sale of all or substantially all of a debtor's property. Pursuant to Section 5.2 of the Plan, on the Effective Date, the Debtors will consummate the sale and transfer of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities. *See* Plan § 5.2. Accordingly, the Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

### 5.    *Section 1123(b)(5):  Modification of Rights.*

70.    Section 1123(b)(5) permits a plan to modify or leave unaffected the rights of holders of any class of claims. In accordance and in compliance with section 1123(b)(5) of the Bankruptcy Code, Article IV of the Plan modifies the rights of holders of Claims in Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), Class 7 (Other PI/WD Claims), and Class 9 (Subordinated Claims), and leaves unaffected the rights of holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims).

40

### 6.     *Section 1123(b)(6):  Additional Plan Provisions.*

71.     Section 1123(b)(6) permits a plan to include "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(6).  In accordance with section 1123(b)(6), the Plan provides for (a) the establishment of Disputed Claims Reserves (as defined herein), (b) releases of Claims held by certain *consenting* creditors and interest holders of the Debtors (the "***Consensual Releases***")[12] against certain non-Debtor third parties (collectively, the "***Released Parties***"),[13] (c) a release and permanent injunction of certain PSAN PI/WD Claims (collectively, the "***Channeling Injunction***")[14] against certain non-Debtor third parties (the "***Protected Parties***"),[15] (d) releases of certain Claims held by the Debtors and their Estates (the "***Debtor Releases***" and, together with the Consensual Releases and the Channeling Injunction, the "***Release Provisions***")[16] against the

---

[12] *See* Plan § 10.6(b).

[13] "***Released Parties***" means, collectively, (i) the Debtors, (ii) the Future Claims Representative, (iii) the Plan Sponsor Parties, (iv) the Debtors' non-Debtor affiliates (including the Acquired Non-Debtor Affiliates), and (v) with respect to each of the foregoing Persons in clauses (i) through (iv), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.  In addition, (x) any Consenting OEM that elects, in a timely-submitted ballot for voting on the Plan, to provide a release of the Debtors and certain related parties in form and substance to be agreed by the Debtors and the Consenting OEMs, and (y) with respect to such Consenting OEM, the parties set forth in clause (v) above, shall also be Released Parties solely for purposes of section 10.6(a) of the Plan.  For the avoidance of doubt, except for the foregoing sentence, no Consenting OEM shall be considered a Released Party under the Plan.  Plan § 1.1.

[14] *See* Plan §§ 10.6(c), 10.7.

[15] "***Protected Party***" means any of the following Persons:  (i) Debtors' non-Debtor affiliates (including the Acquired Non-Debtor Affiliates) other than TKSAC and the Japan Debtors, (ii) Reorganized Takata, (iii) the Participating OEMs, subject to the terms of section 5.10(v) of the Plan, (iv) the Plan Sponsor Parties, and (v) with respect to each of the foregoing Persons in clauses (i) through (iv), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, as applicable.  Plan § 1.1.

[16] *See* Plan § 10.6(a).

Consenting OEMs and the Released Parties, and (e) an exculpation of the Debtors and certain

Estate fiduciaries (the "*Exculpated Parties*").[17]

> a.    Establishment of Disputed Claims Reserves.

72.    The Plan contemplates that the Debtors will establish and adequately fund

four (4) separate disputed claims reserves—the IIM Disputed Claims Reserve,[18] the SMX

Disputed Claims Reserve,[19] the TDM Disputed Claims Reserve,[20] and the TKH Disputed Claims

Reserve[21]—for the benefit of holders of Allowed General Unsecured Claims at IIM, SMX,

TDM, and the TKH Debtors, as applicable (collectively the "*Disputed Claims Reserves*"), with

amounts in such Disputed Claims Reserves being released to holders of Allowed General

Unsecured Claims or the applicable Claims Administrator as Disputed Claims are resolved.

Specifically, pursuant to Section 7.1 of the Plan, the Claims Administrator shall:

---

[17] "*Exculpated Parties*" means, collectively, (i) the Debtors, (ii) the Committees and their respective members, solely in their capacity as such, (iii) the Future Claims Representative, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees.  Plan § 1.1.

[18] "*IIM Disputed Claims Reserve*" means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with IIM Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against IIM for distribution in accordance with the procedure set forth in Article VII of the Plan.  The IIM Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.  *Id.*

[19] "*SMX Disputed Claims Reserve*" means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with SMX Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against SMX for distribution in accordance with the procedures set forth in Article VII of the Plan.  The SMX Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.  *Id.*

[20] "*TDM Disputed Claims Reserve*" means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with TDM Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against TDM for distribution in accordance with the procedure set forth in Article VII of the Plan.  The TDM Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.  *Id.*

[21] "*TKH Disputed Claims Reserve*" means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with the TKH Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against the TKH Debtors for distribution in accordance with the procedures set forth in Article VII of the Plan.  The TKH Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.  *Id.*

> Consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from the Available Cash an aggregate amount equal to the Pro Rata Share of each Distribution that would have been made to a holder of a Disputed Claim from the Recovery Funds in accordance with the Distribution Formula and allocate such amount to the applicable Disputed Claims Reserve in accordance with the Distribution Formula as if such Disputed Claim were an Allowed Claim against the Debtors in an amount equal to the least of (i) the filed amount of such Disputed Claim, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claim, (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the applicable Claims Administrator, and (iv) with respect to Disputed PSAN PI/WD Claims, the estimate for all future PSAN PI/WD Claims, in the aggregate, as set forth in the Claims Estimation Report.

Plan § 7.1.  Accordingly, the Claims Administrator will set aside a reserve amount for all Disputed Claims prior to making any distributions under the Plan.  In addition, Section 7.4 of the Plan provides a procedure by which the Debtors (or, as applicable, the Claims Administrator(s)) may request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code.[22]

---

[22] Specifically, Section 7.4 of the Plan provides that the Debtors (before the Effective Date) or the applicable Claims Administrator (on or after the Effective Date) may, at any time:

> request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Claim that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates a Disputed Claim, that estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserve, or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the applicable Claims Administrator may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

*See* Plan § 7.4.

RLF1 18889156V.1

73.     On February 7, 2018, the Debtors filed a motion [Docket No. 1978] (the "***Disputed Claims Reserve Motion***") seeking to estimate the Disputed Claims in Class 6 (collectively, not individually) and set the amounts of the Disputed Claims Reserves.  The Disputed Claims Reserve Motion is scheduled to be heard by the Court on February 26, 2018.

b.     <u>Consensual Releases</u>.

74.     Section 10.6(b) of the Plan provides for the consensual release of certain Claims against the Released Parties held by certain Claim and Interest holders.  Specifically, Section 10.6(b) of the Plan provides that the following parties will be determined to have consented to the Consensual Releases:  (a) holders of Claims who vote to accept the Plan; (b) holders of Claims that are Unimpaired under the Plan; (c) holders of Claims whose vote to accept or reject the Plan is solicited but who do not vote either to accept or reject the Plan; (d) the holders of Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein; (e) the holders of Claims and Interests who are given notice of the opportunity to opt out of granting such releases but who do not opt of granting the releases; and (f) all other holders of Claims and Interests to the maximum extent permitted by law.

75.     Courts in the Third Circuit "have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."  *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013).  Indeed, under established Third Circuit law, where releasing parties have consented to a provision in a plan of reorganization that releases claims against non-debtors, such releases will typically be approved on the basis of general principles of contract law.  *See, e.g.*, *First Fid. Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993) (noting that a consensual non-debtor release is no different from any other settlement or contract and does not implicate section 524(e) of the Bankruptcy Code).

RLF1 18889156V.1

76.     Even in the absence of express consent, however, courts have repeatedly recognized that non-debtor releases are consensual and appropriate where holders of claims or interests are provided with detailed instructions on how to opt out of providing the releases but nevertheless do not opt out, either by abstaining from voting or by voting against the plan but not otherwise opting out of the releases.  *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *see also In re Gen. Wireless Ops. Inc. dba Radioshack*, Case No. 17-10506 (BLS) (Bankr. D. Del. Oct. 26, 2017) [Docket No. 1117] (order confirming plan and approving third-party releases by creditors who had consented by not opting out of the release, either by abstaining from voting or by voting against the plan without affirmatively electing to opt out); *In re New Gulf Res., LLC*, No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) [Docket No. 514] (same); *In re Am. Apparel, Inc.*, No. 15-12055 (BLS) (Bankr. D. Del. Jan. 27, 2016) [Docket No. 687] (same).

77.     In addition, courts in this jurisdiction have similarly found that non-debtor releases may appropriately be deemed consensual where affected claimants or interest holders are unimpaired and are deemed to accept the plan.  *See Indianapolis Downs*, 486 B.R. at 306 (finding third party releases consensual that bind unimpaired creditors who are deemed to accept the plan because they were being paid and full and received consideration for the releases); *In re Spansion, Inc.*, 426 B.R. 114, 145 (Bankr. D. Del. 2010) (finding that deemed acceptance of the releases by unimpaired classes was not "over-reaching" because the unimpaired classes were

RLF1 18889156V.1

being paid in full and have received adequate consideration for the release); *see also In re Energy Future Holdings Corp.*, No. 14- 10979 (CSS) (Bankr. D. Del. Dec. 7, 2015) [Docket No. 7244] (order confirming plan that provided that all holders of claims or interests deemed to accept the plan also consented to the plan's release provision); *In re Overseas Shipholding Grp.*, No. 12-20000 (PJW) (Bankr. D. Del. July 18, 2014) [Docket No. 3683] (order confirming plan which contained releases by holders of unimpaired claims deemed to accept the plan).  Here, the Debtors' solicitation materials provided clear conspicuous notice of both the Consensual Releases and the process for opting out of the Consensual Releases.  *See* Solicitation Procedures Order, Ex. 3, 4-2, 4-3.  Accordingly, the Consensual Releases are in accord with applicable legal precedent and should be approved.

c.    <u>Channeling Injunction</u>.

78.     Section 10.6(c) and Section 10.7 of the Plan provide for the release and permanent injunction of certain PSAN PI/WD Claims against the Protected Parties.  The Protected Parties consist of the following:  (i) the Debtors and their non-Debtor affiliates; (ii) the Participating OEMs (but no other OEMs),[23] only to the extent certain conditions are met; and (iii) the Plan Sponsor Parties and the Acquired Non-Debtor Affiliates;[24] as well as each of the foregoing parties' directors, officers, principals, employees, professionals, and other related parties.  Specifically, the Plan provides that PSAN PI/WD Claims against such Protected Parties are released and channeled to the PSAN PI/WD Trust.  As explained below, the Channeling Injunction should be approved as an essential component of the Plan, one that is appropriate under the circumstances, and consistent with similar injunctions issued by courts in this Circuit.

---

[23] As of the date of this filing, only American Honda Motor Co., Inc. and its subsidiaries and affiliates have elected to become Participating OEMs.

[24] As the Acquired Non-Debtors are being acquired by the Plan Sponsor pursuant to the Plan, the Acquired Non-Debtors and Plan Sponsor Parties are analyzed together for purposes of this section.

79.     Pursuant to the Channeling Injunction, PSAN PI/WD Claims that are released pursuant to Section 10.6(c) of the Plan, are enjoined and channeled to the PSAN PI/WD Trust.  Pursuant to the Plan Settlement, the Consenting OEMS and the Plan Sponsor Parties are contributing more than One Hundred Thirty Million Dollars ($130 Million) in additional value to the Plan Settlement Fund, which includes amounts paid to the PSAN PI/WD Trust to pay PSAN PI/WD Claims asserted against the Takata Defendants (the "***TD Claims***").[25]

80.     Claimants with TD Claims will recover from the PSAN PI/WD Trust Funds, based on the Points Schedule employed by the Special Master in administering claims against the DOJ PI/WD Restitution Fund.  The Points Schedule provides a methodology for classifying injuries into a manageable process, thereby ensuring the consistent and fair treatment of current and future claimants.  By applying the same methodology, the process allows PSAN PI/WD Claimants to use the same claim form to recover from both the PSAN PI/WD Trust and the DOJ PI/WD Restitution Fund.  The Special Master of the DOJ PI/WD Restitution Fund will serve as the Trustee of the PSAN PI/WD Trust.

81.     In addition, pursuant to the terms of the Plan and the PSAN PI/WD TDP, and in exchange for the Channeling Injunction, Consenting OEMs that elect to become Participating OEMs will contribute additional, uncapped funds to resolve PSAN PI/WD Claims that have been asserted against such OEMs (the "***P-OEM Claims***").[26]  In doing so, each PSAN

---

[25] For the remainder of this section, capitalized terms used but not otherwise defined in the Memorandum or in the Plan shall have the meaning ascribed to them in the PSAN PI/WD Trust Distribution Procedures, filed with the Court on February 11, 2018 [Docket No. 2019-1] (the "***PSAN PI/WD TDP***").  In the event of any conflict between the descriptions provided herein and the PSAN PI/WD TDP or the PSAN PI/WD Trust Agreement, the terms of the PSAN PI/WD TDP or the PSAN PI/WD Trust Agreement, respectively, shall govern.

[26] All claims against non-Participating OEMs are preserved and all PSAN PI/WD Claimants shall retain full rights to proceed against such non-Participating OEMs in the tort system.

47

PI/WD Claimant with a P-OEM Claim will receive recovery of the full amount of their P-OEM

Claim, as determined by the Trustee and in accordance with the PSAN PI/WD TDP.

82.     The Channeling Injunction facilitates a comprehensive process for

resolving PSAN PI/WD Claims, including both TD Claims and P-OEM Claims, in a speedy,

transparent, and fair manner.  Indeed, once a PSAN PI/WD Claim has been filed with the PSAN

PI/WD Trust, it will be evaluated on the basis of clear, evidence-based criteria, to determine

compensability.  The Trustee has significant flexibility to ensure that PSAN PI/WD Claims are

treated fairly in light of the severity of the injury.  Where warranted, the Trustee may evaluate a

PSAN PI/WD Claim pursuant to an Extraordinary Review Process or an Individual Review

Process in accordance with the PSAN PI/WD TDP.  Holders of TD Claims may seek

supplemental review of the Trustee's determination of the TD Claims, on the basis of both

compensability and valuation, from the Future Claims' Representative for upward adjustment in

accordance with the PSAN PI/WD TDP.

83.     With respect to P-OEM Claims, after the Trustee has made his

determination, the PSAN PI/WD Trust provides for a Valuation Schedule and a Scheduled Claim

Process, as well as an Individual Review Process.  The Trustee's determination with respect to P-

OEM Claims may be appealed to a Review Panel consisting of reviewers from around the

country—including from NHTSA's "Zone A" areas with high heat and humidity where PSAN

PI/WD Claims are more likely to arise.

84.     Importantly, at the conclusion of the PSAN PI/WD Trust evaluation

process, as relates to the P-OEM Claims, each PSAN PI/WD Claimant may elect to opt-out of

the PSAN PI/WD Trust and file a lawsuit in the tort system against the applicable Participating

OEM.[27]  PSAN PI/WD Claimants may do so without fear of being subject to defenses such as

contributory negligence or the statute of limitations or statute of repose.

> 1.    Standard for Imposition of the Channeling Injunction.

85.    Bankruptcy courts, "as courts of equity, have broad authority to modify

creditor-debtor relationships."  *U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).  To effectuate

these broad equitable powers, section 105(a) of the Bankruptcy Code vests a bankruptcy court

with broad authority to "issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."  *See* 11 U.S.C. § 105(a); *see also Official Comm. of

Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery (In re

Cybergenics Corp.)*, 330 F.3d 548, 568 (3d Cir. 2003) (recognizing that bankruptcy courts "are

able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code,

effect the result the Code was designed to obtain.").[28]

86.    Consistent with the court's broad equitable authority under section 105(a),

non-debtor releases and channeling injunctions are appropriate where extraordinary

circumstances warrant such relief.  *See Gillman v. Continental Airlines (In re Continental

Airlines)*, 203 F.3d 203, 212–14 (3d Cir. 2000) (examining the propriety of non-debtor release

---

[27] Claimants may not seek punitive or exemplary damages in connection therewith.

[28] In their Objections, AIEG and certain PSAN PI/WD Claimants argue that the Channeling Injunction is contrary to section 524(e) of the Bankruptcy Code; however, this is simply not the case.  *See* AIEG Objection ¶ 13; PSAN PI/WD Objection [Docket No. 1934] ¶ 13.  As the majority of courts to consider the issue have recognized, "[S]ection 524(e) provides only that a *discharge* does not affect the liability of third parties.  This language does not purport to limit or restrain the power of the bankruptcy court to *otherwise* grant a release to a third party."  *In re Specialty Equip. Co.*, 3 F.3d 1043, 1047 (7th Cir. 1993) (emphasis added).  Accordingly, section 524(e) does not bar a court from issuing a non-debtor release or channeling injunction, as the case may be, under appropriate circumstances.  *See In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1078 (11th Cir. 2005), *cert. denied sub nom. Vision-Park Props., LLC v. Seaside Eng'g & Surveying, LLC*, 136 S.Ct. 109 (2015) ("In particular, we respectfully disagree with the position of the minority circuits with respect to § 524(e) . . . § 524(e) says nothing about the authority of the bankruptcy court to release a non-debtor from a creditor's claims."); *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*, 519 F.3d 640, 656 (7th Cir. 2008) ("The natural reading of this provision does not foreclose a third-party release from a creditor's claims."); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657 (6th Cir. 2002) ("[T]his language explains the effect of a debtor's discharge.  It does not prohibit the release of a non-debtor.").  Accordingly, the section 524(e) arguments raised in the AIEG and applicable PSAN PI/WD Objections should be overruled.

and permanent injunction provisions).[29]  Under the standard set forth in *Continental*, courts in

this Circuit may approve non-consensual third party releases, including related channeling

injunctions,[30] where specific findings support the following "hallmarks":  (a) fairness,

(b) necessity to the reorganization, and (c) fair consideration given in exchange for the release.

*Continental*, 203 F.3d at 214.[31]

       87.    Courts in this Circuit have approved non-debtor releases and channeling

injunctions where the *Continental* hallmarks were present.  *See, e.g.*, *In re Blitz U.S.A., Inc.*, Case

No. 11–13603, 2014 WL 2582976, *19–21 (Bankr. D. Del. Jan. 30, 2014) (releasing and

channeling to a trust personal injury and wrongful death claims related to explosions involving

debtor-manufacturer's defective gasoline cans asserted against, among others, the debtors'

subsidiaries and affiliates, debtors' directors and officers, and the debtors' largest customer); *In

re Global Indus. Techs., Inc.*, Case No. 02-21626, 2013 WL 587366, at *40 (Bankr. W.D. Pa.

---

[29] In their Objections, AIEG and certain PSAN PI/WD Claimants contend that that the Channeling Injunction fails to satisfy the requirements of Section 524(g) of the Bankruptcy Code; however, this argument misses the mark.  *See* AIEG Objection ¶ 13; PSAN Claimant Objection [Docket No. 1934] at ¶ 13.  The Debtors are not seeking approval of the Channeling Injunction pursuant to section 524(g); rather, as described in greater detail herein, they are seeking approval under section 105(a).  *See generally In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) ("For the Plan to be approved as designed (*i.e.*, with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a) . . . ."); *In re Transit Group, Inc.*, 286 B.R. 811, 816 (Bankr. M.D. Fla. 2002) (explaining that "[s]ection 105(a) permits non-debtor releases if the debtor establishes that the releases are necessary or appropriate to carry out the purposes of Chapter 11" and citing cases).  Accordingly, the section 524(g) arguments raised in the AIEG and applicable PSAN PI/WD Objections should be overruled.

[30] While a non-debtor release and a channeling injunction are distinct legal concepts, the high degree of similarity of their effect renders them largely interchangeable.  *See generally In re Adelphia Commc'ns Corp.*, 364 B.R. 518, 528 (Bankr. S.D.N.Y. 2007) (explaining that a proposed channeling injunction shared many important characteristics with a non-debtor release as it proscribed litigation between non-debtor entities and would in substance release the protected party from any further obligations to creditors); *In re Wool Growers Ctr. Storage Co.*, 371 B.R. 768, 778 (Bankr. N.D. Tex. 2007) (characterizing a "release that, in effect, channels the creditors' recovery to a source other than the debtor" as a "channeling release").  Moreover, as discussed below, courts considering approval of non-debtor releases and channeling injunctions apply an equivalent legal framework.

[31] The Third Circuit's decision in *Continental* did not explicitly identify "fair consideration" as a "hallmark" for a non-debtor release or channeling injunction; however, the Third Circuit's subsequent decision in *United Artists* discussed *Continental* and clarified that "[a]dded to these requirements [i.e., *Continental's* three hallmarks,] is that the releases 'were given in exchange for fair consideration.'"  *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (quoting *Continental*, 203 F.3d at 215).

RLF1 18889156V.1

Feb. 13, 2013) (releasing and channeling to a trust silica personal injury claims related to debtor-

manufacturer's refractory products and materials asserted against, among others, debtors'

subsidiaries and affiliates, debtors' directors and officers, and transferees of debtors' assets

(including any party providing financing in connection therewith)); *In re Kaiser Aluminum*

*Corp.*, Case No. 02-10429, 2006 WL 616243, at *25 (Bankr. D. Del. Feb. 6, 2006) (releasing and

channeling to a trust personal injury claims related to debtor-aluminum producer's (1) silica dust,

(2) coal tar pitch volatile products, and (3) noise (which induced hearing loss) asserted against,

among others, debtors' subsidiaries and affiliates, debtors' directors and officers, and transferees

of debtors' assets (including any party providing financing in connection therewith)), *aff'd*, 343

B.R. 88 (D. Del. 2006); *In re Am. Family Enters.*, 256 B.R. 377, 406-08 (D.N.J. 2000) (releasing

and channeling to a trust consumer fraud claims related to debtor-publishing company's

sweepstakes mailing and billing practices asserted against, among others, debtors' subsidiaries

and affiliates, debtors' directors and officers, and debtors' general partners).

        88.    Moreover, courts outside of this Circuit have repeatedly recognized,

consistent with *Continental*, that non-debtor releases and channeling injunctions are appropriate

where "extraordinary circumstances" justify the relief.  *See, e.g.*, *Deutsche Bank AG v.*

*Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141–43

(2d Cir. 2005); *In re Dow Corning Corp.*, 280 F.3d at 657–59 (releasing and channeling to a trust

personal injury claims related to debtor-manufacturer's defective silicone gel breast implants

asserted against, among others, debtors' subsidiaries and affiliates, debtors' directors and

officers, and certain third party physicians and health care providers); *SEC v. Drexel Burnham*

*Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285 (2d Cir. 1992)

(releasing and channeling to a trust securities claims related to debtor-investment banking firm's

illegal transactions in "junk bonds" asserted against debtors' directors and officers); *Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir. 1989) (releasing and channeling to a trust personal injury claims related to debtor-manufacturer's defective "Dalkon Shield" birth control devices asserted against, among others, debtors' subsidiaries and affiliates and debtors' directors and officers); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 535 (Bankr. E.D. Mo. 2012) (releasing and channeling to a trust consumer fraud claims related to debtor-automobile warranty company's marketing of vehicle service contracts asserted against, among others, debtor's directors and officers and debtor's principal financier of said vehicle service contracts).

### 2.   Subject Matter Jurisdiction.

89.   Before evaluating the propriety of a proposed non-debtor release or channeling injunction, courts must first determine whether they have subject matter jurisdiction to grant the requested relief.  *See, e.g.*, *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*, 591 F.3d 164, 170 (3d Cir. 2009) ("[B]efore considering the merits of any § 105(a) injunction, a bankruptcy court must establish that it has subject matter jurisdiction to enter the injunction.") (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 n.35 (3d Cir. 2004) (describing same as the bankruptcy court's "threshold jurisdictional inquiry")).[32]  This Court has already determined that it may exercise "related to" jurisdiction over PSAN Inflator-related

---

[32] In their Objections, AIEG and certain of the PSAN PI/WD Claimants cite to the court's decision in *In re Millennium Lab Holdings II, LLC*, 242 F.Supp 3d 322 (D. Del. 2017) for the erroneous proposition that this Court must also determine whether it has constitutional authority to grant the Channeling Injunction. *See* AIEG Objection ¶ 12; PSAN PI/WD Objection [Docket No. 1934] ¶ 12.  However, what AIEG and these PSAN PI/WD Claimants fail to recognize is that the constitutional authority at issue in *Millennium* was ultimately remanded to the bankruptcy court for further consideration, and that the bankruptcy court later determined that it had constitutional authority to grant the injunction in question. *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252 (Bankr. D. Del. 2017).  Regardless, the Plan provides that the "Debtors shall seek an order by the District Court approving the Channeling Injunction" to the extent that one is required.  Plan § 10.7(f).  Accordingly, the jurisdictional arguments raised in the AIEG and applicable PSAN PI/WD Claimant Objections should be overruled.

52

actions against non-debtor third parties.[33]   Accordingly, this Court has jurisdiction to grant the

Channeling Injunction and enjoin third parties from bringing claims against the Protected Parties

related to the Debtors' PSAN Inflators in non-bankruptcy forums.

90.     An action is "related to" a bankruptcy case where "*the outcome of that*

*proceeding could conceivably have any effect on the estate being administered in bankruptcy*,"

meaning that "the outcome could alter the debtor's rights, liabilities, options, or freedom of

action (either positively or negatively) and which in any way impacts upon the handling and

administration of the bankrupt estate."  *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)

(emphasis in original);[34] *see also Combustion Eng'g*, 391 F.3d at 226.  As the United States

Supreme Court has stated, "'Congress intended to grant comprehensive jurisdiction to the

bankruptcy courts so that they might deal efficiently and expeditiously with all matters

connected with the bankruptcy estate, and that the 'related to' language of § 1334(b) must be

read to give district courts (and bankruptcy courts under § 157(a)) jurisdiction over more than

simply proceedings involving the property of the debtor or the estate.'"  *Celotex Corp. v.*

*Edwards*, 514 U.S. at 308 (quoting *Pacor*, 743 F.2d at 994) (internal citations omitted).

91.     Pursuant to certain master purchase agreements, supply contracts,

purchase orders, general terms and conditions, releases, and/or other contracts (collectively, the

"***Purchase Orders***") between the Debtors and the Participating OEMs, the Debtors have supplied

---

[33] "The court's subject matter jurisdiction to enjoin the state actions as to the OEMs and TKJP, less on the related to jurisdiction analysis that the court must perform as to the individual actions, which I will discuss in a moment.  And in which I can conclude that the court does, in fact, possess related to jurisdiction to support the entry of the injunctive relief to stay pending litigation against non-debtors."  *Hr'g Tr.* 11:15-11:22:, *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017).

[34] Although certain aspects of the *Pacor* decision were overruled by the U.S. Supreme Court in *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995), the analysis of "related to" jurisdiction in *Pacor* remains good law that continues to be cited favorably by the Third Circuit and other courts around the country.  *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 164 n.6 (3d Cir. 2004).  Indeed, the Supreme Court agreed with the *Pacor* court's analysis of the scope of "related to" jurisdiction in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995).

RLF1 18889156V.1

such Participating OEMs with PSAN Inflators.  Under the terms of the Purchase Orders, these

parties have various rights of indemnification, reimbursement, setoff, deduction, and/or

recoupment against the Debtors for, *inter alia*, PSAN PI/WD Claims.  Accordingly, any PSAN

PI/WD Claims asserted against these parties would give rise, and indeed have given rise, to

Claims being asserted against the Debtors' Estates for the cost of defending such Claims and for

indemnification of losses.  Because these Participating OEMs' contractual indemnity Claims

would automatically create liabilities for the Debtors' Estates in favor of such parties, this Court

has "related to" jurisdiction to enjoin third parties from commencing litigation that would give

rise to such Claims and thereby impact the administration of these Chapter 11 Cases—as this

Court has already recognized.[35]  *See, e.g., Bank of N.Y., Mellon Trust Co., N.A. v. Becker (In re*

*Lower Bucks Hosp.)*, 488 B.R. 303, 312 (E.D. Pa. 2013), *aff'd*, 571 F. App'x 139 (3d Cir. 2014)

("We conclude that the Bankruptcy Court had 'related to' jurisdiction over the third party release

provision as part of LBH's plan of reorganization.  This is because the filing of the class action

against BNYM had an immediate effect on LBH's bankruptcy estate when it triggered BNYM's

claim for defense costs against LBH."); *In re Medford Crossings N., LLC*, Case No. 07-25115,

2011 WL 182815, at *13 (Bankr. D. N.J. Jan. 20, 2011) ("[T]he potential liability arising from

express indemnification provisions herein described as well as the identity of interests of Debtors

and other third parties, confer related to jurisdiction in this case.").

       92.    With respect to the Debtors' directors and officers, the Court similarly has

"related to" jurisdiction over PSAN Inflator-related actions asserted against these individuals as

they too have rights of indemnification and reimbursement against the Debtors pursuant to one or

---

[35] "Thus, the court finds that it possesses related to jurisdiction on the grounds that, first, the contractual indemnification obligations between the debtors and the OEMs support a finding that there is an identity of interest between the debtors and the OEMs and TKJP.  And, second, I am satisfied that the continued prosecution of the state actions and the individual actions will adversely impact the debtors' efforts to reorganize."  *Hr'g Tr.* at 19:19-20:1:, *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Aug. 16, 2017).

more of the following:  (a) specific board actions or resolutions; (b) articles of incorporation or articles of organization (as applicable); (c) bylaws and operating agreements; (d) employment agreements; or (e) statute or common law.  *See, e.g., In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) ("Thus, the Court will approve third party releases to align with indemnification obligations of the Debtors that existed before the filing of these bankruptcy cases by virtue of employment agreements, bylaws, retentions, or other loan agreements.").

93.     In addition to the above, the Debtors are named under the same products liability and officer and director insurance policies as certain of their non-Debtor affiliates, and share in the proceeds thereof.  Accordingly, the assertion of PSAN Inflator-related actions against such entities or their directors and officers would deplete Assets that would otherwise form part of the Estates, and the Court therefore has "related to" jurisdiction to enjoin such actions and preserve valuable Estate Assets.  *See, e.g.*, *In re W.R. Grace & Co.*, 386 B.R. 17, 29 (Bankr. D. Del. 2008) ("These two avenues, insurance indemnification and separate insurance paid for by the Debtors, further establish the direct impact on the estates occasioned by the Montana Actions against BNSF.  Thus, the court has jurisdiction to consider whether to expand the preliminary injunction."); *In re Dow Corning Corp.*, 86 F.3d 482, 495 (6th Cir. 1996) ("Dow Corning's interest in the insurance policies at issue is property of its estate under the expansive definition set forth in 11 U.S.C. § 541(a)(1).  The threat posed to those insurance policies if claims pending against Dow Chemical and Corning Incorporated are permitted to go forward in a separate manner supports a finding of 'related to' jurisdiction under Section 1334(b)").

94.     Accordingly, as a lawsuit against the Protected Parties would be equivalent to a lawsuit against the Debtors, this Court has jurisdiction to approve the Channeling

Injunction established under the Plan.  In addition, it is axiomatic that a bankruptcy court has jurisdiction to provide for the sale of a debtor's assets free and clear of all claims.  *See Mullarkey v. Tamboer (In re Mullarkey)*, 536 F.3d 215, 220 (3d Cir. 2008) ("A bankruptcy court has subject matter jurisdiction over 'all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . .'") (quoting 28 U.S.C. § 157(b)(1)).  Therefore, the Court also has jurisdiction to release and channel the PSAN PI/WD Claims as against the Plan Sponsor Parties and related parties.  Furthermore, because of the uncontroverted power of the Court to issue a "free and clear" order in favor of the Plan Sponsor, as a purchaser of the Debtors' assets pursuant to section 1141(c) of the Bankruptcy Code, the Debtors submit that the Channeling Injunction as to the Plan Sponsor Parties and related parties is not a "non-debtor release" that should be analyzed under the factors described in this section; rather, it is merely an enforcement mechanism for the free and clear order.

95.     Accordingly, as a lawsuit against the Protected Parties would be equivalent to a lawsuit against the Debtors, this Court has jurisdiction to approve the Channeling Injunction established under the Plan.

### 3.     Propriety of the Channeling Injunction.

96.     As described above, a chapter 11 plan that includes a non-debtor release or channeling injunction is permissible under section 105(a) of the Bankruptcy Code provided that an adequate record is presented demonstrating (a) exceptional circumstances warranting such relief and (b) that the non-debtor release and/or channeling injunction satisfy the hallmarks of fairness, necessity to the chapter 11 plan, and are given in exchange for fair consideration.  *See Continental*, 203 F.3d at 214–15; *United Artists*, 315 F.3d at 227 (citing *Continental*, 203 F.3d at 217 n.17).  Here, the evidence before the Court overwhelmingly demonstrates that the

Channeling Injunction satisfies the aforementioned requirements and, accordingly, the

Channeling Injunction should be approved.

> 97.     In evaluating whether the requirements articulated by the court in

*Continental* have been satisfied, courts in this Circuit have considered the following factors:

- • an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

- • substantial contribution by the non-debtor of assets to the reorganization;

- • the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

- • an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

- • provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv.*

*Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)); *see also In re Genesis Health Ventures,*

*Inc.*, 266 B.R. at 607–08.[36]  "These factors are neither exclusive nor conjunctive requirements,

but simply provide guidance in the Court's determination of fairness."  *In re Tribune Co.*, 464

B.R. at 186.  Accordingly, if the record sufficiently demonstrates that the protections of the

Channeling Injunction are fair, necessary to the reorganization, and being given for fair

consideration, as evidenced by their satisfaction of the *Master Mortgage* factors, this Court has

the authority to grant the Channeling Injunction.

---

[36] In *Continental*, the Court of Appeals for the Third Circuit referenced the *Master Mortgage* factors as relevant to the determination of whether a non-debtor's claims against another non-debtor could be enjoined under a chapter 11 plan on a non-consensual basis. *See Continental*, 203 F.3d at 217 n.17 (citing *Master Mortgage*, 168 B.R. at 935).

98.     As described herein, an adequate record exists to establish the hallmarks required under *Continental*, as evidenced by the Channeling Injunction's satisfaction of the *Master Mortgage* factors, to support a finding that the Channeling Injunction is appropriate and should be approved as to each of the Protected Parties.

<u>*Identity of Interest*</u>

99.     The Debtors and the Protected Parties clearly have an identity of interest with respect to the Channeling Injunction.  As explained above, the Protected Parties have either contractual rights to indemnification pursuant to Purchase Orders or the Debtors' organizational documents, or share in the proceeds of the Debtors' insurance policies.  *See, e.g.*, *Blitz U.S.A.*, 2014 WL 2582976, at *6 (finding an identity of interest between the debtor and several other parties due to, among other things, indemnification obligations and shared insurance proceeds); *Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release."); *In re Mercedes Homes, Inc.*, 431 B.R. 869, 880 (Bankr. S.D. Fla. 2009) ("[T]he Court concludes that the reorganized Debtors' indemnification obligations establish an identity of interest between the Debtors and the Directors and Officers such that a suit against the Directors and Officers is, in essence, a suit against the Debtors.").  As a result, any PSAN PI/WD Claims that are asserted against the Protected Parties are tantamount to Claims against the Debtors, which Claims will result in the Protected Parties asserting indemnity Claims against the Estates and thereby depleting resources and creditor recoveries.

100.     Furthermore, the Debtors and the Protected Parties jointly formulated the Plan over an arduous two (2) year period and share a unified interest in having the Plan—a chapter 11 plan that provides for the channeling of costly, risky, and uncertain PSAN PI/WD Claims while providing for the sale of the Debtors' operations as a going concern—confirmed.

Due to the Debtors' and the Protected Parties' common goal of implementing a mutually

beneficial restructuring, the Debtors and the Protected Parties share a further identity of interest.

*See In re Tribune Co.*, 464 B.R. at 187 (debtors and releasees "share the common goal" of

confirming a plan dependent on settlement of complex multi-party litigation resulted in an

"identity of interest" for purposes of the *Master Mortgage* factors); *In re Coram Healthcare*

*Corp.*, 315 B.R. at 335 ("Although the noteholders do not share an identity of interest with the

estate on the matter of the litigation (unlike a debtor's insurance carrier or directors and officers

who may have indemnification agreements with the debtor), as the largest creditors and preferred

shareholders they do share a common goal of achieving a reorganization of the Debtors."); *In re*

*Zenith Elec. Corp.*, 241 B.R. at 110 ("identity of interest" found where releasees "instrumental in

formulating the [p]lan" shared with the debtor the goal of "seeing that the Plan succeed and the

company reorganize").

*Substantial Contribution*

101.    Collectively, the Protected Parties have agreed to compromise billions of

dollars in Claims in order to facilitate the Debtors' successful restructuring.  In addition to claims

waived in connection with the Plan Settlement, TKJP and TKSAC, two non-Debtor affiliates of

the Debtors that do not constitute Acquired Non-Debtor Affiliates shall not be included as

Protected Parties unless such affiliates agree to waive all net intercompany payables owed by the

Debtors in excess of Four Million Dollars ($4 Million).[37]  The waiver or compromising of claims

against a debtor's estate constitutes a substantial contribution to the estate.  *See, e.g.*, *Zenith*

*Elec.*, 241 B.R. at 111 (finding substantial contribution by creditor who funded plan and agreed

to compromise claims against estates); *In re 710 Long Ridge Rd. Operating Co. II, LLC*, Case

---

[37] Such waiver is similarly a condition of such entities inclusion as a Released Party entitled to the protection of the
Debtor Releases described herein.

No. 13-13653 (DHS), 2014 WL 886433, at *16 (Bankr. D. N.J. Mar. 5, 2014) (finding that a waiver of claims held by certain non-debtor affiliates, among other things, constituted a substantial contribution because such waiver allowed for "enhanced distribution to general unsecured creditors"); *Genco Shipping*, 513 B.R. at 272 (finding that certain creditors made a substantial contribution where, among other things, they forewent consideration "to which they would otherwise be entitled" and provided "a distribution of warrants to existing equity holders").

102.     The Participating OEMs also provided the Debtors with substantial liquidity by agreeing to provide valuable postpetition accommodations including, among other things, acceleration of payables (only as necessary), limitations on setoffs, limitations on resourcing, and other accommodations and liquidity enhancements.  In addition, the Plan Sponsor's contributions include not only the Base Purchase Price under the U.S. Acquisition Agreement, but also significant sources of potential incremental value, including the Business Incentive Plan Payment and the Plan Sponsor Backstop Funding.  Courts in several circumstances have held that the provision of postpetition financing, such as that provided by these parties, to a debtor constitutes substantial contribution for purposes of approving a release of claims.  *See, e.g.*, *Zenith Elec.*, 241 B.R. at 111 (finding substantial contribution by creditor who funded the plan and agreed to compromise claims against estates); *Genco Shipping*, 513 B.R. at 272 (finding that certain creditors made a substantial contribution where, among other things, they provided new value to debtors in form of an agreement to backstop a rights offering).

103.     In addition to these substantial contributions, as specific consideration for the Channeling Injunction, the Participating OEMs are also effectively agreeing to pay <u>in full</u>

their respective portion of the PSAN PI/WD Claims affected by the Channeling Injunction. The Participating OEMs, along with all Consenting OEMs, which retain the right to become Participating OEMs, also agreed to contribute significant recoveries to the Plan Settlement Fund for the benefit of holders of PSAN PI/WD Claims.

104.    Further, the Plan Sponsor is agreeing to contribute the Plan Sponsor Contribution Amount (*i.e.*, Twenty Five Million Dollars ($25 Million)) to the PSAN PI/WD Trust, in exchange for the protections of the Release Provisions, including the Channeling Injunction, to enhance further the recoveries of PSAN PI/WD Claims. These contributions, which are for the benefit of holders of channeled claims, constitute a substantial contribution in the context of approving the Channeling Injunction. *See, e.g., In re Am. Fam. Enters.*, 256 B.R. at 392, 406–08 (finding Seventy Million Dollar ($70 Million) contribution of third party to fund, in part, a settlement fund for consumer fraud victims was a substantial contribution warranting the issuance of a channeling injunction); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640-41 (2d Cir. 1988) (finding third party insurer's contribution of almost Seven Hundred Eighty Million Dollars ($780 Million) to a victim fund was a substantial contribution).

105.    Last, but certainly not least, the Protected Parties, including their directors and officers, have devoted untold resources over the past two (2) years toward negotiating and facilitating the implementation and execution of the Debtors' restructuring, which contributions the Court may likewise determine to be substantial for the purposes of approving the Channeling Injunction. *See, e.g.*, *Zenith Elec.*, 241 B.R. at 111 (finding substantial contribution by officers and directors who, among other things, negotiated the financial restructuring); *Hr'g Tr.* at 68*, In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Dec. 3, 2015) (Docket No. 7255) (finding that debtors' directors and officers made critical contribution to plan

based on extensive participation in board and committee meetings); *Seaside Eng'g*, 780 F.3d at

1079–80 (debtors' professionals provided substantial contribution in the form of labor and

services); *Mercedes Homes*, 431 B.R. at 881 (finding substantial contribution in the form of

debtors' directors' and officers' expertise and knowledge).

### *Essential to the Reorganization*

106.    From the outset of the negotiations surrounding the Debtors' restructuring,

it was clear that the substantial benefits conferred upon the Debtors' Estates—namely, (a) the

compromise of significant Claims, (b) the provision of valuable accommodations, financing, and

other contributions, (c) the provision of substantial value including the Base Purchase Price, the

Business Incentive Plan Payment, and the Plan Sponsor Backstop Funding, and (d) the support of

the Protected Parties—were conditioned upon structuring the Plan to adequately address PSAN

PI/WD Claims.  Adequately addressing the liabilities associated with PSAN PI/WD Claims was

a principal motivating factor in structuring and implementing the Debtors' Plan and

restructuring, particularly for the Plan Sponsor, for whom limiting exposure to PSAN Inflator-

related liability was a precondition to the Global Transaction.[38]  Because the aforementioned

contributions were critical to the Debtors' restructuring and were long-premised on the resolution

of PSAN PI/WD Claims as ultimately embodied in the Channeling Injunction, the Channeling

Injunction is essential to the Debtors' restructuring.  *See, e.g.*, *710 Long Ridge*, 2014 WL

886433, at *15–16 (approving third-party releases, in part, because "[s]imply put, without the

releases, there is no chance of reorganization or recovery for any creditor"); *see also Hr'g Tr.* at

---

[38] As described above, the Plan Sponsor is purchasing substantially all of Takata's worldwide assets (excluding PSAN Inflator-related assets), free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities pursuant to section 1141(c) of the Bankruptcy Code and the Channeling Injunction is intended only as an additional layer of protection—the Debtors do not believe that there are any material Claims that would be impacted by the Channeling Injunction as against the Plan Sponsor.

75, *In re PNG Ventures, Inc.*, Case No. 09-13162 (CSS) (Bankr. D. Del. Mar. 5, 2010) (Docket

No. 368) (approving third-party release where "plan would not happen" in their absence); *In re*

*Residential Capital LLC*, 508 B.R. 838, 849 (Bankr. S.D.N.Y. 2014) (approving non-debtor

release that was the "lynchpin of the Plan, without which the cases would devolve into endless

litigation, the Plan would not be confirmable or feasible, and the recoveries currently

contemplated by the Plan would not exist"); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns*

*Operating LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 259 (Bankr. S.D.N.Y. 2009),

*appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 476 (2d Cir. 2012) (approving

non-debtor releases that were an "integral part of the plan" where the releases were included in

the first strawman restructuring proposal and were never negotiated away).

### *Creditor Support*

107.    The Debtors' Plan including, significantly, the Channeling Injunction

contemplated therein, is supported by the Creditors' Committee, the Tort Claimants' Committee,

and the Future Claims Representative—the parties tasked with ensuring that the interests of the

claimants most impacted by the Channeling Injunction are adequately represented.[39]  Moreover,

as set forth below, the Debtors expect the final voting results to confirm that a significant

majority of holders of Claims in Class 5 (PSAN PI/WD Claims), at each of the applicable

Debtors, voted in favor of the Plan and expressed support for the Channeling Injunction.

108.    In addition, as to each Participating OEM, the support of a significant

number of each Participating OEM's own respective PSAN PI/WD Claimants (on an individual

Participating OEM basis), as well as the Future Claims Representative, is a precondition to the

---

[39] Indeed, the Channeling Injunction as ultimately embodied in the Plan was the product of intense, good faith, and arms-length negotiations between the Debtors and these constituencies aimed at ensuring that affected claimants received fair treatment.

Case 17-11375-BLS    Doc 2050    Filed 02/14/18    Page 79 of 126

effectiveness of the Channeling Injunction with respect to each such Participating OEM.

Specifically, Section 10.7(f) of the Plan provides as follows:

> the effectiveness of the Channeling Injunction and Releases by holders of PSAN PI/WD Claims for the benefit of Participating OEMs shall be subject to (x) the consent of the Future Claims Representative and (y) the Bankruptcy Court or the District Court (as applicable) having determined that holders of PSAN PI/WD Claims in Classes 5(a)-(d) voting on the Plan have voted to accept the Plan in a sufficient number in support of the Plan to support issuance of the Channeling Injunction for the benefit of the Participating OEMs.[40]

Plan § 10.7(f).

109.    Accordingly, the Channeling Injunction clearly satisfies the requirements of this *Master Mortgage* factor and the overwhelming support of all relevant parties in interest, both on a global and individualized basis, weighs heavily in favor of its approval.  *See Master Mortgage*, 168 B.R. at 938 (suggesting that overwhelming support should be viewed as the "single most important factor" in determining whether to approve a non-debtor release or channeling injunction).

### *Payment in Full of Substantially All Affected Claims*

110.    The Plan affords substantial recoveries to holders of Claims affected by the Channeling Injunction that would otherwise be unavailable.  Specifically, the Plan provides for significant payments to holders of PSAN PI/WD Claims by the Protected Parties in a manner that avoids the otherwise significant litigation costs associated with the liquidation of these PSAN PI/WD Claims.  In addition, as stated above, the Participating OEMs are agreeing to pay the full value of all PSAN PI/WD Claims that would be impacted by the Channeling Injunction as it applies to them.  Accordingly, the Channeling Injunction satisfies this *Master Mortgage*

---

[40] In connection with this requirement, the Debtors' Class 5 ballots requested that each Claimant elect either to support or not to support the Channeling Injunction as it would pertain to the OEM that manufactured such Claimant's PSAN Inflator-containing vehicle.

RLF1 18889156V.1

factor as well.  *See, e.g., In re W.R. Grace & Co.*, 446 B.R. 96, 138–39 (Bankr. D. Del. 2011), *aff'd*, 475 B.R. 34 (D. Del. 2012) (approving non-consensual third-party release provision in plan of reorganization where, absent the release and settlement, substantial expenses would be incurred by the estate and where creditors' recovery after litigation was uncertain but recovery under the plan would be certain and significant); *Hr'g Tr.* at 73–74, *In re PNG Ventures, Inc.*, Case No. 09-13162 (CSS) (Bankr. D. Del. Mar. 5, 2010) (Docket No. 368) (approving nonconsensual third-party release where, absent such release and settlement, unsecured creditors—who otherwise would be "out of the money"—would receive a distribution under the plan); *Seaside Eng'g*, 780 F.3d at 1079–81 (noting that the proposed "plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction" and finding that "[t]his factor weighs heavily in favor of the releases") (citations omitted).

*Extraordinary Circumstances*

111.    Finally, in addition to each of the reasons set forth above, approval of the Channeling Injunction is warranted by the extraordinary circumstances surrounding the Debtors' Chapter 11 Cases.  The Debtors are involved in the largest automotive safety recall in United States history—a significant undertaking that they have been navigating while simultaneously working to sell as a going concern a global business with over fourteen thousand (14,000) employees.  The Protected Parties have been intimately involved with the Debtors' reorganization process for the past two (2) years—negotiating, formulating, and preparing to implement the Plan.  This process has been long, painstaking, and exceedingly complex, and the Protected Parties have been instrumental and, indeed, invaluable throughout it.  These extraordinary circumstances and the significant contributions provided by the Protected Parties are factors that strongly weigh in favor of the approval of the Channeling Injunction.  *See Blitz U.S.A.*, 2014 WL2582976, at *19–20 (considering whether "Extraordinary Circumstances" exist

65

as an additional factor in evaluating a proposed release and finding that "[a]fter months of arms-

length, contentious negotiations . . . the Debtors, the Committee and the Protected Parties came

to terms on a global settlement that formed the foundation of the Plan. These extensive efforts

and substantial contributions . . . constitute extraordinary circumstances warranting the Releases

and Channeling Injunction set forth in the Plan"); *Charter Commc'ns*, 419 B.R. at 258–59

(noting that a settlement containing third-party releases was "negotiated at the height of the so-

called 'Great Recession'" with parties who "were uniquely able to support the structure of the

Plan" and that the Debtors' "structure is complex, its debt load enormous, and its bankruptcy is

one of the largest prearranged cases ever filed" and concluding that "the unique manner in which

value is being created, the sheer magnitude of the cases, and the once-in-a-lifetime market

conditions in which this creative restructuring took place, in combination, justify approval of the

Third Party Releases").

       112.    Accordingly, for all of the reasons set forth above, the Channeling

Injunction is both appropriate and necessary, and should be authorized by the Court.

             d.    <u>Debtor Releases</u>.

       113.    As noted in Section I.D.3(a) above, Sections 5.19(j) and 10.6(a) of the

Plan respectively provide for the release of any and all Claims by the Debtors against the

Released Parties, including the Consenting OEMs, subject to certain limited exceptions outlined

in the Plan. As compromises of Claims belonging to the Debtors and their Estates, the Debtor

Releases constitute settlements permissibly incorporated into the Plan pursuant to section

1123(b)(3)(A) of the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(3)(A). Accordingly, as with

other proposed settlements, a release of an estate cause of action in the context of a chapter 11

plan will generally be approved "if the release is a valid exercise of the debtor's business

judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426

B.R. 114, 143 (Bankr. D. Del. 2010), *appeal dismissed,* Nos. 10-369(RBK), 10-385 (RBK), 2011

WL 3420441 (D. Del. Aug. 14, 2011); *In re Aleris Intern., Inc.*, Case No. 09-10478 (BLS), 2010

WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an

active part of plan negotiation and formulation process, it is a valid exercise of the debtor's

business judgment to include a settlement of any claims a debtor might own against third parties

as a discretionary provision of the plan.").

114.     As an exercise of its business judgment, a debtor's decision to release

claims against third parties under a plan is afforded deference.  *See, e.g.*, *In re Spansion*, 426

B.R. at 140 ("It is not appropriate to substitute the judgment of [ ] objecting creditors over the

business judgment of the Debtors."); *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (Bankr. D.

Del. 2002) ("'[U]nder the business judgment rule . . . a court will not interfere with the judgment

of a board of directors unless there is a showing of gross and palpable overreaching.' Thus, under

the business judgment rule, a board's 'decisions will not be disturbed if they can be attributed to

any rational purpose' and a court 'will not substitute its own notions of what is or is not sound

business judgment.'") (citations omitted).

115.     In evaluating the appropriateness of a debtor's releases, some courts in this

Circuit have also applied the *Master Mortgage* factors described above.  *See In re Zenith Elec.

Corp.*, 241 B.R. at 110 (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935); *In re

Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Master Mortgage* factors); see also *In re

Washington Mut. Inc.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive

requirements, but simply provide guidance in the Court's determination of fairness."); *In re

*Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Master Mortgage* factors are not exclusive or conjunctive requirements).[41]

116.     Here, the Debtors, in their business judgement, have determined that the Debtor Releases are fair, reasonable, and in the best interests of the Debtors and the Estates.  The Debtor Releases are also integral to the overall Plan Settlement, including the Plan Sponsor's and the Consenting OEM's contributions in connection therewith, the latter of which being premised in substantial part upon receiving the benefit of the Debtor Releases.  Moreover, the Debtors do not believe that they are releasing any material Claims pursuant to the Debtor Releases.  Indeed, the Debtors' belief in this regard is further evidenced by the fact that both the Creditors' Committee and the Tort Claimants' Committee—*i.e.*, the primary creditor groups that have been investigating the Claims that would be released pursuant to the Debtor Releases throughout the Challenge Period (and which have conducted substantial discovery in connection therewith)— have determined to support the Debtor Releases.  Accordingly, because the contributions the Debtors have secured in exchange for the Debtor Releases are significant, and the value of the Claims to be released are comparatively minimal, the Debtors submit that the Court approve the Debtor Releases as a valid exercise of the Debtors' business judgment.

e.     Exculpation.

117.     Section 10.8 of the Plan exculpates the Exculpated Parties (which parties consist only of Estate fiduciaries)[42] on account of any act or omission in connection with or arising out of (a) the administration of the Chapter 11 Cases; (b) the negotiation and pursuit of

---

[41] To this end, the Debtors submit that the same factual findings discussed above justifying the issuance of the Channeling Injunction likewise support the approval of the Debtor Releases.

[42] Previous versions of the Plan included the Consenting OEMs as Exculpated Parties, however, to resolve the Objection of the U.S. Trustee, the Debtors modified the Plan to remove the Consenting OEMs, and to include the Committees, as Exculpated Parties.

RLF1 18889156V.1

(i) the Disclosure Statement (including any information provided or statements made in the

Disclosure Statement or omitted therefrom), (ii) the Restructuring Transactions, (iii) the Global

Accommodation Agreement, (iv) the U.S. RSA, and (v) the Plan, and the solicitation of votes

for, and confirmation of, the Plan; the funding of the Plan; (c) the occurrence of the Effective

Date; (d) the administration of the Plan and the property to be distributed under the Plan; (e) the

wind-down of the Reorganized Debtors and Reorganized Takata; (f) the issuance of securities

under or in connection with the Plan; and (g) the transactions in furtherance of any of the

foregoing; except for breaches of fiduciary duty, fraud, gross negligence, willful misconduct,

failure to comply with the Confirmation Order and failure to distribute Assets according to the

Plan.  *See* Plan § 10.8.

118.    This exculpation, including the carve out for gross negligence and willful

misconduct, is consistent with established practice in this jurisdiction and others and should be

approved.  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 235, 245 (3d Cir. 2000) (approving

plan provision that released claims except as to willful misconduct or gross negligence, and

characterizing such a provision as "commonplace . . . in Chapter 11 plans"); *In re Oneida Ltd.*,

351 B.R. 79, 94 & n.22 (Bankr. S.D.N.Y. 2006) (approving exculpation provision that covered

prepetition lenders, DIP lenders, creditors committees and their members, and the respective

affiliates of each, except in cases of gross negligence, willful misconduct, fraud or criminal

conduct); *In re Washington Mut. Inc.*, 442 B.R. at 350 (noting that the "Third Circuit has held

that a creditors' committee, its members, and estate professionals may be exculpated under a

plan for their actions in the bankruptcy case except for willful misconduct or gross negligence").

Accordingly, the exculpation provided to the Exculpated Parties is appropriate and should be

approved.

E.    **Section 1123(c):  Non-Debtor Proposed Sales—Inapplicable Provision.**

119.    The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(c) of the Bankruptcy Code is inapplicable to the Plan.

F.    **Section 1123(d):  Cure of Defaults.**

120.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default[,] the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."  11 U.S.C. § 1123(d).  Section 8.3 of the Plan provides for the satisfaction of default Claims associated with each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code.  Plan § 8.3.  All Cure Amounts, as set forth in the Schedule of Cure Amounts mailed to each applicable counterparty to an executory contract or unexpired lease with the Debtors, were determined in accordance with the underlying agreements and applicable bankruptcy and nonbankruptcy law.  *See Affidavits of Service* [Docket Nos. 1750, 1905, 1917].  Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

G.    **Section 1129(a)(2):  The Debtors' Compliance with the Bankruptcy Code.**

121.    Section 1129(a)(2) of the Bankruptcy Code requires plan proponents to comply with the applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95–595, at 412 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In*

*re PWS Holding Corp.*, 228 F.3d at 248; *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

        **1.**       ***Section 1125:  Postpetition Disclosure Statement and Solicitation.***

        122.      Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . .

11 U.S.C. § 1125(b).

        123.      By entry of the Disclosure Statement Order on January 5, 2018, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b).  As will be set forth in the Voting Certification, the Debtors solicited votes on the Plan from holders of Claims in the Voting Classes consistent with the Court-approved Solicitation and Voting Procedures.  In compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from any holder of a Claim or Interest prior to entry of the Disclosure Statement Order.

        124.      Lastly, the Debtors provided an eight (8) day extension of the Voting Deadline, during which time the Debtors filed the Settlement Term Sheets.  This extension of the Voting Deadline permitted holders of Claims in the Voting Classes with an opportunity to change their vote in light of the agreed terms set forth therein and ultimately incorporated into the Plan.

        **2.**       ***Section 1126:  Acceptance of the Plan.***

        125.      Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof.  Pursuant to section

1126, only holders of allowed claims or equity interests, as the case may be, in impaired classes

of claims or equity interests that will receive or retain property under a plan on account of such

claims or equity interests may vote to accept or reject such plan.  Section 1126 provides, in

pertinent part, that:

> (a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.
>
> \*       \*       \*
>
> (f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.
>
> (g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f), (g).

126.    As will be set forth in the Voting Certification, the Debtors solicited

acceptances of the Plan from the holders of Claims against the Debtors in each Voting Class

under the Plan in accordance with section 1126 of the Bankruptcy Code.  The Voting Classes

include Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM

Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims),

and Class 7 (Other PI/WD Claims).

127.    The Debtors did not solicit votes for the Plan from any holder of Claims in

Class 1 (Other Secured Claims) or Class 2 (Other Priority Claims), as such Classes are

Unimpaired and, therefore, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Further, the Debtors also did not solicit votes for the Plan by any holder of Claims or Interests, as applicable, in Class 8 (Intercompany Interests) or Class 9 (Subordinated Claims), as such Classes will not receive or retain any property on account of their Claims or Interests and, therefore, are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.

128.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

129.    Although final voting results were not available prior to the filing of this Memorandum, preliminary voting results suggest that Class 5 (PSAN PI/WD Claims) at TKH, IIM, TDM, and SMX and Class 6 (Other General Unsecured Claims) at TKH have not voted to accept the Plan.

130.    Based upon the foregoing, the Debtors submit that the requirements of section 1129(a)(2) of the Bankruptcy Code have been satisfied.

**H.    Section 1129(a)(3):  The Plan has been Proposed in Good Faith.**

131.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). The United States Court of Appeals for the Third Circuit has held that for a plan to be proposed in good faith it must "fairly achieve a result consistent with the objectives and purposes of the

73

Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir.2000); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) (citing same), *aff'd* 532 F. App'x 264 (3d Cir. 2013), and *aff'd* 729 F.3d 311 (3d Cir. 2013) and *aff'd* by 729 F.3d 332 (3d. Cir. 2013); *In re Wash. Mut., Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011) (same), *vacated in part* 2012 WL 1563880 (Bankr. D. Del Feb. 24, 2012); *In re Combustion Engineering, Inc.*, 391 F.3d 190, 247 (D. Del. 2004) (same).  The determination of whether a plan has been proposed in good faith requires a factual inquiry into the totality of the circumstances surrounding the plan's proposal. *W.R. Grace*, 475 B.R. at 87.  Accordingly, the examination must be done on a case-by-case basis and the court is given "considerable discretion in finding good faith." *Id.* (citing *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001)).  In this Circuit, to establish that a plan was proposed in good faith a plan proponent must establish that "(1) [the plan] fosters a result consistent with the Bankruptcy Code's objectives; (2)  has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and (3) exhibited a fundamental fairness in dealing with the creditors." *Id.*, 475 B.R. at 87–88 (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)); *Wash. Mut.*, 461 B.R. at 239; *accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007). Here, each of these factors is met.

132.    First, the Plan fosters a result consistent with both of the Bankruptcy Code's two primary objectives:  reorganization and value maximization.  *See W.R. Grace*, 475 B.R. at 88 ("The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as:  (1) preserving going concerns; and (2) maximizing property available to satisfy creditors.") (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship (In re LaSalle)*, 526 U.S. 434, 453 (1999)).  Here, the Plan maximizes the value of the Debtors' Estates

for the benefit of creditors by facilitating the sale of the Debtors' non-PSAN businesses to the

Plan Sponsor as a going-concern, and preserving the Debtors' PSAN Inflator business to ensure

ongoing production of replacement kits for use in connection with the ongoing PSAN Inflator

recalls.

133.    Second, "[i]n analyzing whether a plan has been proposed for honest and

good reasons, courts routinely consider whether the debtor intended to abuse the judicial process,

whether the plan was proposed for ulterior motives, or if no realistic probability for effective

reorganization exists." *Id.*  Here, the Plan (including the Plan Supplement and all other

documents necessary to effectuate the Plan) was negotiated at arms' length among

representatives of the Debtors, the Restructuring Support Parties, the Committees, the Future

Claims Representative, and their respective professionals solely for the purposes outlined above

and the facts support no other conclusion.[43]  *See id.* at 89 ("There is no evidence that Grace was

dishonest or had ulterior motives when it proposed the Joint Plan.  Nor is there any indication

that Grace intended to abuse the judicial process.  Rather, the record shows that the Joint Plan

was the result of years of litigation and extensive arms-length negotiations."); *see also In re*

*Tribune*, 464 B.R. at 156 ("Without any tangible evidence of actual wrongdoing or harm to the

Debtors, suspicion of a potential conflict is not sufficient to demonstrate bad faith.") (*citing*

*Wash. Mut.*, 442 B.R. at 327).

---

[43] Certain of the PSAN PI/WD Objections include allegations that the Plan unlawfully and inequitably "shield[s]" OEMs from their own independent misconduct;" however, these allegations are simply false.  *See* PSAN PI/WD Objections [Docket Nos. 1185, 1958] ¶ 8(a).  As established above, the Channeling Injunction meets the requirements for approval under *Master Mortgage*, including, crucially, the requirement that the Participating OEMs provide "substantial contribution" to the Debtors' restructuring.  Here, the Participating OEMs contributions are legion.  They include, among other things, the waiver of significant Claims against the Estates, the provision of valuable postpetition accommodations, and significant and ongoing support necessary to structure and implement the Plan.  Most significantly, however, Participating OEMs are contributing the net liquidated value of all PSAN PI/WD Claims against such Participating OEMs to the PSAN PI/WD Trust, as well as establishing and funding the Plan Settlement Fund.  Simply put, the Participating OEMs are making significant contributions under the Plan for the benefit of holders of PSAN PI/WD Claims which justify the Channeling Injunction.

134.    Third, the Restructuring Support Parties, as well as the Committees and
Future Claims Representative, support confirmation of the Plan.  That the Plan has such wide
support from the Debtors' significant creditor constituencies is alone sufficient to demonstrate
that the Plan is fundamentally fair to creditors.  *See e.g.*, *id.* ("Further, the Creditor Committee's
participation in the settlement negotiations is highly relevant when considering whether the DCL
Plan Settlements were negotiated in good faith.").[44]  Accordingly, the Debtors have proposed the
Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

**I.      Section 1129(a)(4):  The Plan Provides that Fee Claims are Subject to Court
Approval.**

135.    Section 1129(a)(4) requires that "[a]ny payment made or to be made by
the [plan] proponent . . . for services or for costs and expenses in or in connection with the case,
or in connection with the plan and incident to the case, has been approved by, or is subject to the
approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been
construed to require that all payments of professional fees that are made from estate assets be
subject to review and approval as to their reasonableness by the court.  *See Lisanti v. Lubetkin*
*(In re Lisanti Foods, Inc.)*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan
should not be confirmed unless fees and expenses related to the Plan have been approved, or are
subject to the approval, of the Bankruptcy Court."), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir.
2007); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its

---

[44] The AIEG Objection and certain of the PSAN PI/WD Objections assert that the Plan is not fundamentally fair to
creditors because the Channeling Injunction does not comport with due process.  *See* AIEG Objection ¶ 11; PSAN
PI/WD Objections [Docket No. 1934] ¶ 11.  As support for this proposition, these objectors cite to the court's
decision in *W.R. Grace*, where the court held that debtor W.R. Grace's plan was proposed in good faith, despite
objections to the contrary.  475 B.R. at 90–91.  In dispensing with similar objections, the court there noted that "the
Bankruptcy Code does not require that all creditors participate in plan negotiations" and further that "a debtor's plan
may satisfy good faith even if it 'may not be one which the creditors would themselves design and indeed may not
be confirmable.'"  *Id.* at 90 (citations omitted).  Here, the Channeling Injunction is the product of extensive arms-
length negotiations between not only the Debtors and the Protected Parties, but also the Tort Claimants' Committee
and the Future Claims Representative.  Accordingly, the good faith arguments raised in the AIEG and applicable
PSAN PI/WD Objections should be overruled.

clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'").

136.    All payments made or to be made by the Debtors for services or for costs and expenses of the Debtors' professionals in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court as reasonable.  Specifically, Section 2.5 of the Plan subjects payment of all Professional Persons to the filing and approval of final fee applications before the Court.  *See* Plan § 2.5.  Further, Section 11.1(a)(ix) of the Plan provides that the Court shall retain jurisdiction to hear and determine all Fee Claims.  *See* Plan § 11.1(a)(ix).  Based on the foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

**J.    Section 1129(a)(5):  The Debtors have Disclosed all Necessary Information Regarding Directors, Officers, and Insiders.**

137.    Section 1129(a)(5) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent that there are any insiders that will be retained or employed by the reorganized debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5).  If, at the time of confirmation, the debtor is unable to identify these individuals by name a debtor still satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.  *See In re Charter Commc'ns*, 419 B.R. at 260 n.30 ("Although section

1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *In re Am. Solar King*, 90 B.R. 808, 815 (Bankr. W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

138.    As disclosed in the Plan Supplement, the Debtors have proposed David Michael Rains as both the Plan Administrator and the Chief Executive Officer of TK Global LLC, which entity will be the owner of the sole equity interest in Reorganized TK Holdings, as well as all the equity interests in the Warehousing Entity.  *See* Plan Supplement, Ex. F, G; Plan § 5.7.

### K.    Section 1129(a)(6):  Governmental Rate Approvals—Inapplicable Provision.

139.    Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  The Plan does not provide for rate changes by any of the Reorganized Debtors.  Accordingly, the Debtors submit that section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.

### L.    Section 1129(a)(7):  The Plan is in the Best Interests of All Creditors and Interest Holders.

140.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity holders.  This requirement is commonly referred to as the "best interests" test.  The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of

the effective date of the plan, not less than the amount such holder would receive or retain if the

debtor were liquidated under chapter 7 of the Bankruptcy Code.  11 U.S.C. § 1129(a)(7).

> 141.    Under the best interests test,
>
> the court must measure what is to be received by rejecting
> creditors . . . under the plan against what would be received by
> them in the event of liquidation under chapter 7.  In doing so, the
> court must take into consideration the applicable rules of
> distribution of the estate under chapter 7, as well as the probable
> costs incident to such liquidation.

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007), *appeal dismissed*,

371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).  The Court must evaluate the

liquidation analysis cognizant of the fact that "[t]he hypothetical liquidation entails a

considerable degree of speculation about a situation that will not occur unless the case is actually

converted to chapter 7."  *In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000)

(citation omitted).  "As § 1129(a)(7) makes clear, the liquidation analysis applies only to non-

accepting impaired claims or interests.  If a class of claims or interests unanimously accepts the

plan, then the best interests test is automatically satisfied for all members of that class."  *In re*

*Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 761.  Accordingly, the best interests test does

not apply to the holders of Claims or Interests in the Unimpaired Classes.

> 142.    As set forth in the liquidation analysis attached to the Disclosure

Statement as Exhibit J (the "***Liquidation Analysis***") and in the Fleming Declaration, the best

interests test is satisfied as to each non-accepting holder of a Claim against or Interest in each

Debtor.  Specifically, the Liquidation Analysis demonstrates that all Classes of Claims or

Interests will recover value equal to or in excess of what such Claims or Interests would receive

in a hypothetical chapter 7 liquidation.  Notably, the holders of General Unsecured Claims are

not expected to recover any property in a hypothetical liquidation whereas, as of December 31,

2017, approximately Sixty-Nine Million Dollars ($69 Million) is being made available for unsecured creditors under the Plan, assuming a Closing Date of February 27, 2018.[45]  *See* Disclosure Statement, Ex. J (Liquidation Analysis).

143.    As set forth in the Fleming Declaration, the Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' Assets and the satisfaction of their Claims, based upon the knowledge and expertise of the Debtors' advisors.  Accordingly, and for the reasons set forth in the Fleming Declaration, the Plan satisfies the requirements of 1129(a)(7) and is in the best interests of all creditors.

**M.    Section 1129(a)(8):  The Plan is Expected to have been Accepted by Certain Impaired Classes Entitled to Vote.**

144.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either accept the plan or not be impaired by the plan.  As set forth above, the holders of Claims or Interests in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

145.    Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-third in amount and more than one-half in number of the claims in their respective class that have voted.  11 U.S.C. § 1126(c).  As set forth above, final voting results were not available prior to the filing of this Memorandum.  Based on the preliminary results available to the Debtors at the time of filing, the Debtors expect each of the following Classes to have voted to accept the Plan in accordance with

---

[45] As noted above, Class 7 (Other PI/WD Claims) was established after the Debtors solicited creditors and thus after the Liquidation Analysis was prepared.  Accordingly, the Claims in this Class are captured in the Liquidation Analysis in Class 6 (Other General Unsecured Claims).

section 1126 of the Bankruptcy Code:  Class 3 (Mexican Class Action Claims and Mexican Labor Claims);[46] Class 4 (OEM Unsecured Claims); Class 6 (Other General Unsecured Claims) at all applicable Debtors except TKH; and Class 7 (Other PI/WD Class).  Accordingly, the Debtors expect Section 1129(a)(8) to be satisfied with respect to these Classes.

146.    Likewise, based on the preliminary voting results available, the Debtors expect each of the following Classes to vote to reject the Plan in accordance with section 1126 of the Bankruptcy Code:  Class 5 (PSAN PI/WD Claims) at TKH, IIM, TDM, and SMX and Class 6 (Other General Unsecured Claims) at TKH.  In addition, pursuant to section 1126(g) of the Bankruptcy Code, impaired classes that neither receive nor retain property under a plan are deemed to have rejected the plan.  11 U.S.C. § 1126(g).  Holders of Claims or Interests, as applicable, in Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) are not entitled to receive or retain any property on account of their Interests in the Debtors and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  As discussed in detail in Section I.T below, the Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code with respect of each of the rejecting (and expected to be rejecting) Classes, therefore, the Court may confirm the Plan notwithstanding the rejection of these Classes.

**N.    Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims.**

147.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to

---

[46] As the Mexican Class Action Claims and the Mexican Labor Claims were listed as contingent, unliquidated, and/or disputed on the Debtors' Schedules, holders of these Claims were required to file a proof of claim in order to vote on the Plan.  However, as no holders filed a proof of claim, the Debtors did not solicit or receive any votes in Class 3.

such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must

provide.  11 U.S.C. § 1129(a)(9).

148.    Pursuant to Articles II and IV of the Plan, and in accordance with sections

1129(a)(9)(A) and (B), the Plan provides that all Allowed Administrative Expense Claims,

Adequate Protection Claims, Fee Claims, and Other Priority Claims will be paid in full, except as

otherwise agreed by the parties.  Likewise, pursuant to Section 2.6 of the Plan, all Priority Tax

Claims under section 507(a)(8) of the Bankruptcy Code will be paid in full, except as otherwise

agreed by the parties.  Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of

the Bankruptcy Code.

**O.    Section 1129(a)(10):  Acceptance of the Plan by an Impaired Class.**

149.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative

acceptance of a plan by at least one class of impaired claims, "determined without including any

acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As set forth above, although

the final voting results were not available prior to the filing of this Memorandum, the Debtors are

confident that at least one impaired Class at each Debtor has voted to accept the Plan, even

excluding the acceptance of the Plan by any insiders in such Classes.  The Plan therefore satisfies

section 1129(a)(10) of the Bankruptcy Code.

**P.    Section 1129(a)(11):  The Plan is Feasible.**

150.    Section 1129(a)(11) of the Bankruptcy Code requires the bankruptcy court

to determine that a plan is feasible as a condition precedent to confirmation.  Specifically, the

bankruptcy court must determine that confirmation is not likely to be followed by liquidation, or

the need for further financial reorganization, of the debtor (or any successor thereto), unless such

liquidation or reorganization is proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility

test set forth in section 1129(a)(11) requires the bankruptcy court to determine whether a plan

may be implemented and has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp.*, 843 F.2d at 649).  Section 1129(a)(11) does not, however, require a guarantee of a plan's success; rather, the appropriate inquiry is whether a plan offers a reasonable assurance of success.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012); *In re Tribune Co.*, 464 at 185; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 762 ("*It is not necessary that success be guaranteed*, but only that the plan present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success. . . . The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.").

151.    The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed.  In assessing feasibility courts have identified, among others, the following probative factors:  (a) the reorganized debtor's capital structure and earning power; (b) economic conditions; (c) the debtor's ability to meet its capital expenditure requirements; and (d) the ability of management and the likelihood that current management will continue.  *See, e.g., In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y 1986); *see also Clarkson v Cooke Sales & Serv. Co (In re Clarkson)*, 767 F.2d 417, 420 (8th. Cir. 1985); *In re Deluca*, No. 95-11924, 1996 WL 910908, at *18 (Bankr. E.D. Va. Apr. 12, 1996); *In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D.N.J. 1988), *aff'd in part*, *remanded in part,* 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990) (unpublished table decision); *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1988); *In re Adamson Co.*, 42 B.R. 169, 174 (Bankr. E.D. Va. 1984); *In re Toy & Sports Warehouse, Inc.* 37 B.R. 141, 151 (Bankr. S.D.N.Y. 1984).  As noted by the United States Court of Appeals for the Ninth Circuit:  "The purpose of section 1129(a)(11) is to prevent confirmation

of visionary schemes which promise creditors and equity security holders more under a proposed

plan than the debtor can possibly attain after confirmation." *See Pizza of Haw., Inc. v. Shakey's,*

*Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985). However, just as

speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot

defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on

feasibility grounds. *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800

F.2d 581 (6th Cir. 1986).

        152.    As established in the Bowling Declaration, the Plan is the opposite of a

visionary scheme. Rather the Plan embodies a meticulously-negotiated restructuring that will

provide for a value-maximizing sale of the Purchased Assets to the Plan Sponsor and the ring-

fencing of the Debtors' PSAN Inflator business so as to ensure the ongoing production of

replacement kits for use in connection with the ongoing PSAN Inflator recalls. Further, as

detailed in the Bowling Declaration, the Global Transaction is likely to close and the Debtors are

able to perform timely all of their obligations described in the Plan, including with respect to

each of (a) obligations to pay creditors and fund various reserves on the Effective Date, (b) the

sufficiency of the funding of Reorganized Takata and the Warehousing Entity, and (c) the

sufficiency of the Reorganized TK Holdings Trust Reserve—which will each be funded by

proceeds from the Global Transaction, including the Plan Sponsor Backstop Funding (if

necessary), and the Debtors' cash on hand that is not acquired by the Plan Sponsor. In addition,

as discussed in Part II below, the Debtors are confident that they will timely receive all

governmental approvals necessary to close the Global Transaction.

        153.    Accordingly, the Plan provides for an achievable scheme of

reorganization, which exceeds the Debtors' burden of showing that the Plan carries a reasonable

likelihood of success.  Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy

Code.

### Q.    Section 1129(a)(12):  All Statutory Fees Have or Will be Paid.

154.    Section 1129(a)(12) requires the payment of "[a]ll fees payable under

section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan

. . . ."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and

charges assessed against the estate under [section 1930] of title 28" are afforded priority as

administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and

1129(a)(12) of the Bankruptcy Code, Section 12.5 of the Plan provides that on the Effective

Date, and thereafter as may be required, such fees, together with interest, if any, shall be paid by

the Reorganized Debtors.  Plan § 12.5.

### R.    Section 1129(a)(13):  Continuation of Retiree Benefits.

155.    Section 1129(a)(13) requires that:

The plan provides for the continuation after its effective date of
payment of all retiree benefits, as that term is defined in section
1114 of this title, at the level established pursuant to subsection
(e)(1)(B) or (g) of section 1114 of this title, at any time prior to
confirmation of the plan, for the duration of the period the debtor
has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13).

156.    The Plan provides that retiree benefit plans "relating or provided to a

former employee of the Debtors who is retired as of the Effective Date shall be rejected with

respect to such former employee except to the extent prohibited by section 1114 of the

Bankruptcy Code."  *See* Plan § 8.7.  However, all claims held against the Debtors for retiree

benefits (as defined in section 1114 of the Bankruptcy Code) were resolved pursuant to the

*Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 1114(e) and Fed. R. Bankr. P.*

*9019(a) (I) Authorizing Debtors to Enter into Settlement and Release Agreements with the Covered Executives and (II) Authorizing Debtors to Terminate or Cease Providing Retiree Benefits* [Docket No. 1737] (the "***1114 Motion***"), entered by order of the Court on February 1, 2018 [Docket No. 1879] (the "***1114 Order***").

157.    As discussed in detail in the 1114 Motion, as of the Petition Date, TKH provided certain health benefits to seventeen (17) former executives (the "***Former Executives***") and, if applicable, their covered dependents.  Of the seventeen Former Executives, ten (10) were determined to not be entitled to the protections afforded by section 1114 of the Bankruptcy Code and seven (7) (the "***Covered Executives***") were determined to be so entitled.  Pursuant to the 1114 Order, the Debtors were authorized to enter into settlement and release agreements (collectively, the "***1114 Agreements***") with the Covered Executives, pursuant to which each of the Covered Executives agreed to waive his or her rights to receive any benefits protected by section 1114 of the Bankruptcy Code (the "***Retiree Benefits***") in exchange for a lump-sum payment to be paid within thirty (30) days following entry the 1114 Order.  The Debtors will continue to provide the Retiree Benefits to the Covered Executives until the Covered Executives receive their lump-sum payments.

158.    As set forth in the 1114 Order, the 1114 Agreements constitute valid and binding modifications of the Retiree Benefits pursuant to section 1114(e)(1)(b) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**S.    Section 1129(a)(14), 1129(a)(15), and 1129(a)(16):  Inapplicable Provisions.**

159.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply.

RLF1 18889156V.1

160.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code).  The Debtors are not "individuals" and, accordingly, section 1129(a)(15) is inapplicable.

161.    Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.  The Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable.

**T.    Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements with Respect to the Rejecting Classes.**

162.    Section 1129(b) of the Bankruptcy Code provides a mechanism whereby a plan proponent can confirm a plan in circumstances where not all impaired classes of claims and equity interests accept the plan.  This mechanism is colloquially known as "cram down."

163.    Section 1129(b) provides in pertinent part that:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.  By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors that rejects a plan.  Accordingly, a dissenting creditor in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.  *See Kane v. Johns-Manville Corp.*, 843 F.2d at 650 (refusing to consider objection of dissenting

creditor in accepting class because 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d at 1062 (overruling cramdown objection because objecting party was a member of an accepting class and therefore 1129(b)(1) afforded no protection to such party).

164.    As noted above, Class 5 (PSAN PI/WD Claims) at TKH, IIM, TDM, and SMX and Class 6 (Other General Unsecured Claims) at TKH are expected to vote to reject the Plan and Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) were deemed to have rejected the Plan at all Debtors.[47]    Accordingly, as demonstrated below, the Plan satisfies section 1129(b) with respect to these Classes.

### 1.    *The Plan Does Not Discriminate Unfairly.*

165.    The unfair discrimination standard of section 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes. *See In re Armstrong World Indus., Inc.*, 348 at 121.  The standard does not, however, prohibit discrimination between classes.  Rather, it prohibits discrimination that is unfair.  Under section 1129(b) of the Bankruptcy Code, "a rebuttable presumption of unfair discrimination arises when there is:  (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all

---

[47] As of the time of drafting, approximately eighty-five percent (85%) of creditors in Class 6 (Other General Unsecured Claims) voted to accept the Plan, however this Class is nevertheless expected to reject the Plan on account of a single vote cast in the amount of approximately One Billion Eight Hundred Million Dollars ($1.8 Billion) by the Commonwealth of Puerto Rico ("***Puerto Rico***") on account of alleged civil penalties, restitution, and disgorgement Claims arising from alleged violations of certain consumer protection statutes under Title 10, Section 259 and Section 269 of the Laws of Puerto Rico.  *See* Proof of Claim No. 4215.  As discussed in Part III, this and other similar consumer protection Claims are properly classified in Class 9 (Subordinated Claims), and not in Class 6 (Other General Unsecured Claims).

payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *Id.* (citing *Dow Corning*, 244 B.R. at 702). However, "[t]he Court need only reach the question of whether the discrimination is unfair and utilize the rebuttable presumption test if it first finds that the Plan discriminates at all." *Id.* at 122.

166. The Plan provides for an approximate recovery of 0.1% to 0.4% to holders of General Unsecured Claims from the Debtors' Estates (based on estimates as of the date of the Disclosure Statement), regardless of whether such Claims are included in Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), or Class 7 (Other PI/WD Claims). Accordingly, as each of these Classes is expected to receive the same percentage recovery from the Debtors' Estates, there is no discrimination, let alone a presumption of unfair discrimination, amongst these Classes. The contributions of the Consenting OEMs and the Plan Sponsor Parties of the applicable Plan Settlement Funds and the Plan Sponsor Contribution Amount, respectively, to the PSAN PI/WD Trust for the benefit of, and Pro Rata distribution to, holders of Class 5 (PSAN PI/WD Claims) and Class 7 (Other PI/WD Claims), does not change this analysis as such contributions are not coming from the Debtors' Estates and accordingly do not "result in," or otherwise cause there to be, a materially lower recovery to any other Class. In the case of the Plan Sponsor Contribution Amount, such contribution is the consideration paid by the Plan Sponsor for the benefit of a being a Protected Party. In addition, with respect to the contributions from the Consenting OEMs, these contributions are justified by, among other things, the fact that the Consenting OEMs have the opportunity to become a "Participating OEM" and become eligible to participate in the

Channeling Injunction, as well as the fact that at least one Consenting OEM is a co-defendant with the Debtors in all litigations asserting PSAN PI/WD Claims.

167.    With respect to the Debtors IIM and TDM, the Plan provides for an approximate recovery of 1% to 76.9% and 4.7% to 100%, respectively, for Class 3 (Mexican Class Action Claims and Mexican Labor Claims).  Yet, although seemingly presumptively unfair with respect to Class 5 (which is expected to reject the Plan at these Debtors), this treatment is not in fact unfair because the payment of these Claims protects the Assets of IIM and TDM— Assets from which replacement kits will be manufactured until Reorganized Takata is wound down, at which time such Assets will be liquidated for the benefit of all creditors—from attachment by foreign litigation creditors not subject to the jurisdiction of this Court.

168.    With respect to Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims), no other Classes of equal priority are provided for under the Plan. Accordingly, there is no presumption of unfair discrimination with respect to these Classes and the Plan does not "discriminate unfairly" with respect to any Impaired Classes of Claims or Interests.

### 2.    *The Plan is Fair and Equitable.*

169.    Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired unsecured claims that did not accept such plan if, pursuant to the plan, no holder of a claim or interest that is junior to the interests of such class will receive or retain any property on account of their junior interest.  11 U.S.C. § 1129(b)(2)(B)(ii).  Similarly, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired interests that did not accept the plan if, pursuant to the plan, no holder of an interest that is junior to the interests of such class will

receive or retain any property on account of their junior interest.  11 U.S.C. § 1129(b)(2)(C)(ii).

These requirements are often referred to as the "absolute priority rule."

170.    Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule.  With respect to rejecting Classes of General Unsecured Claims, no Claims or Interests junior to these Classes will receive recoveries under the Plan on account of such Claims or Interests.[48]  Specifically, Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) will not recover or retain any property on account of their respective Interests and Claims under the Plan.  Similarly, with respect to Class 8 (Intercompany Interests) no Classes of Interests junior to this Class exists and with respect to Class 9 (Subordinated Claims), the only junior Class is Class 8 (Intercompany Interests) and such Class is not receiving any recoveries under the Plan.[49]

171.    Accordingly, the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

---

[48] In addition to being compatible with the unfair discrimination prong of section 1129(b), the Plan Settlement Fund, the Support Party Creditor Fund, and Plan Sponsor Contribution Amount contributions are also consistent with the absolute priority rule as no incremental value is flowing to a Class junior to Class 6 (Other General Unsecured Claims).  *Compare with In re Armstrong World Industries*, 432 F.3d 507 (3rd Cir. 2005) ("Under the plan at issue here, an unsecured class would receive and automatically transfer warrants to the holder of equity interests in the event that its co-equal class rejects the reorganization plan.  We conclude that the absolute priority rule applies and is violated by this distribution scheme.").

[49] Although not specifically raised in any of the Objections, for the avoidance of doubt, the Plan Settlement Payment's deemed satisfaction of the DOJ Restitution Claim is not an impermissible payment by the Debtors of a debt owed by TKJP being paid on account of TKJP's Interest in the Debtors.  The Debtors are not paying the DOJ Restitution Claim under the Plan.  The Plan provides for the payment of the superpriority or priority Claims of the Consenting OEMs on account of their Settled OEM Claims, which Claims **must** be paid in order for the Debtors to confirm a plan.  The fact that the Consenting OEMs will deem the Debtors' payment of the Settled OEM Claims as satisfying a portion of the DOJ Restitution Claim that they are ultimately entitled to receive does not change this conclusion.  There is no value flowing *from* the Debtors to TKJP; rather, the Debtors are paying the Consenting OEMs the Plan Settlement Payment on account of valid and enforceable secured and/or administrative Claims *and the Consenting OEMs are* deeming that payment to also satisfy a portion of the DOJ Restitution Claim.  In addition, as discussed Part III below, all arguments suggesting that the Plan violates the absolute priority rule as a result of the treatment of the NHTSA Claims is now moot given the amended treatment of such Claims under the Plan.

**U.      Section 1129(c):  The Plan is the Only Plan.**

172.     The Plan is the only plan filed in these Chapter 11 Cases and, accordingly,

section 1129(c) of the Bankruptcy Code does not apply.

**V.      Section 1129(d):  The Principal Purpose of the Plan is not the Avoidance of Taxes.**

173.     The principal purpose of the Plan is not the avoidance of taxes or the

avoidance of section 5 of the Securities Act of 1933, and no governmental unit has objected to

confirmation of the Plan on any such grounds.  The Plan, therefore, satisfies the requirements of

section 1129(d) of the Bankruptcy Code.

**W.      Section 1129(e):  Small Business Case Plans—Inapplicable Provision.**

174.     The provisions of section 1129(e) of the Bankruptcy Code apply only to

"small business cases."  These Chapter 11 Cases are not "small business cases" as defined in the

Bankruptcy Code.  Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these

cases.

**X.      Section 1127:  Modification of the Plan.**

175.     Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may

modify a plan at any time before confirmation so long as the plan, as modified, satisfies the

requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the

modification complies with section 1125 of the Bankruptcy Code.  In addition, with respect to

modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019

provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the
> proponent may file a modification of the plan.  If the court finds
> after hearing on notice to the trustee, any committee appointed
> under the Code, and any other entity designated by the court that
> the proposed modification does not adversely change the treatment
> of the claim of any creditor or the interest of any equity security

holder who has not accepted in writing the modification, it shall be
deemed accepted by all creditors and equity security holders who
have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

176.    Here, the Debtors modified the Plan on February 14, 2018 to, among other
things, (a) provide for the classification of the NHTSA Claims as Class 6(d) (Other General
Unsecured Claims), the Allowance of such Claims in the amount of Fifty Million Dollars ($50
Million Dollars), and the survival of the NHTSA Consent Order (as modified by the Plan) with
respect to Reorganized TK Holdings; (b) establish a new Class—Class 7 (Other PI/WD
Claims)—specifically for General Unsecured Claims relating to a personal injury or harm caused
by a Takata Product, other than the Debtors' PSAN Inflator-related products; (c) revise the Plan
Settlement to implement the terms of the TCC and UCC Settlements, including the establishment
and funding of the Plan Settlement Fund and the Sponsor Party Creditor Fund, and the
contribution of the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust; (d) assign and
transfer whatever rights the Debtors have in Takata's products liability insurance policies to the
PSAN PI/WD Trust, subject to applicable law; (e) provide for the selection of Joseph J. Farnan,
Jr. as the Legacy Trustee and the appointment of a Claims Oversight Committee with three
members (two selected by the Tort Claimants' Committee and one selected by the Creditors'
Committee) to represent the interests of certain holders of Other General Unsecured Claims and
to review the resolution of certain Claims by the Reorganized TK Holdings Trust; (f) stipulate to
an estimated amount of current and future PSAN PI/WD Claims in the amount of One Billion
Three Hundred Million Dollars ($1.3 Billion) and to an amount of Allowed Consenting OEM
Claims of approximately Thirty-Eight Billion Dollars ($38 Billion); (g) remove the reallocation
of Available Cash under the Distribution Formula to give effect to recoveries to holders of PSAN

93

PI/WD Claims from insurance proceeds; and (h) reflect various clean up changes, such as entering missing docket numbers and correcting typographical errors.

177.    As described above, the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code.  Accordingly, the requirements of section 1127 have been satisfied. Moreover, Bankruptcy Rule 3019 is satisfied because the modifications do not "adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification."  Fed. R. Bankr. P. 3019(a).

## II.    REGULATORY APPROVALS.

178.    The Debtors have received or expect to receive all regulatory approvals required for consummation of the Global Transaction, including approval by the Committee on Foreign Investment in the United States ("**CFIUS**").  The *Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States*, filed February 9, 2018 [Docket No. 2012] (the "**CFIUS Notice**") describes the process for CFIUS approval.  Based on discussions that the Debtors and the Plan Sponsor have had with CFIUS and the terms of the U.S. Acquisition Agreement, which requires that Plan Sponsor take any and all actions necessary to achieve CFIUS approvals, including any required divestitures (without an adjustment to the purchase price),[50] the Debtors submit that CFIUS approval is not likely to be an obstacle to closing the Global Transaction.

---

[50] *See* U.S. Acquisition Agreement § 7.4(h).

### III.    THE OBJECTIONS TO THE PLAN SHOULD BE OVERRULED.[51]

179.    As set forth above, notwithstanding the overwhelming support for the Plan, certain parties filed Objections to the Plan and/or the Contract Schedules.  With respect to those parties that filed Cure Objections, to the extent not otherwise resolved prior to the Confirmation Hearing, such Cure Disputes should be adjourned and set for a further hearing in accordance with Section 8.2(c) of the Plan.  All other Objections should be overruled, and the Plan confirmed, for each of the reasons set forth below and on the Objection Summary Chart.

#### A.    The UST Objection.

180.    In its Objection, the U.S. Trustee asserts that the Debtors must justify the Channeling Injunction and the Debtor Releases for each respective Protected Party and Released Party and requests that the Debtors narrow the scope of the Exculpated Parties to include only Estate fiduciaries.  For the reasons set forth in Section I above, and the facts established in the Bowling Declaration, the Debtors have demonstrated the appropriateness of the Channeling Injunction and the Debtor Releases for each respective Protected Party and Released Party.  In addition the Debtors have narrowed the scope of Exculpated Parties to include only estate fiduciaries (including the Committees) and to remove the Consenting OEMs as Exculpated Parties.  Accordingly, the Debtors submit that the Court should overrule the U.S. Trustee's Objection in its entirety.

#### B.    The States' Objection.

181.    In their Objection the States proffer three muddled theories of why the Plan should not be confirmed.  The first theory is that the classification of their Claims as Subordinated Claims is determinative of whether the subordinated treatment of a subordinated

---

[51] Capitalized terms used in this Section but not otherwise defined in the Memorandum or in the Plan have the meanings ascribed to them in the applicable Objection.

class is proper.  The second is that uncertainty as to the value of a controversy that is proposed to

be settled weighs against (as opposed to in favor of) approval of the compromise.  And the third

is that the Plan, for no stated reason, "must not" affect the States' "rights to litigate and obtain

judgments against TKH."  For each of the reasons outlined below, each of these arguments fail

and should be overruled.

> **1.** **The Plan's Treatment of the States' Claims is Appropriate.**

>> a. The Classification and Treatment of Subordinated Claims is Proper.

182.    As set forth above, the Plan provides for the separate classification of

Claims against, and Interests in, each of the Debtors based upon differences in the legal nature

and/or priority of such Claims and Interests.  It is uncontroversial that the Bankruptcy Code

establishes a priority scheme in which certain claims are entitled to be paid in full prior to other

claims receiving any recoveries.  Class 9 (Subordinated Claims) was established under the Plan

to capture any Claims that, pursuant to the priority scheme set forth under the Bankruptcy Code,

were not entitled to receive distributions until holders of all other Claims were paid in full.

183.    As set forth in the Plan, only Claims that are "subject to subordination

under section 510 of the Bankruptcy Code" or "[constitute] a Claim for a fine, penalty, forfeiture,

multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory

damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the

Bankruptcy Code *or otherwise*," can be classified in Class 9.  *See* Plan § 1.1 (emphasis added).

For these Claims, Article IV of the Plan provides, in relevant part, that they will be

"subordinated pursuant to [the] Plan and section 510 of the Bankruptcy Code" and will "not

receive or retain any property under this Plan on account of such Claims."  *Id*. Art. IV.

Accordingly, the subordinated treatment afforded to Class 9 is pursuant to, and consistent with,

RLF1 18889156V.1

section 510 of the Bankruptcy Code, which is uncontroversially applicable in chapter 11 cases. *See* 11 U.S.C. § 510.

184.    Further, the treatment afforded Class 9 is consistent with section 1129(b) of the Bankruptcy Code, which, as laid out in detail above, prevents unfair discrimination vis-à-vis classes of the same priority.  *See In re Armstrong World Indus., Inc.*, 348 B.R. at 121.  Here, there is no Class of the same priority as Class 9.  Accordingly, contrary to the States' assertions, there is no rebuttable presumption of unfair discrimination as there is no "[other] class of the *same* priority."  *Id.* (emphasis added) (adopting the rebuttable presumption test of then Professor Bruce A. Markell and other circuits requiring "another class of the same priority" to trigger the rebuttable presumption); *see also* Steven M. Abromowitz, et al., *Making The Test For Unfair Discrimination More "Fair":  A Proposal*, 58 Bus. Law. 83, 106 (Nov. 2002) (adopting a variation of Professor Markell's rebuttable presumption test requiring "another class comprised of the same legal status" to trigger the presumption).  Thus, the States' comparison between the expected recoveries for Class 6 and Class 9 is inappropriate, irrelevant, and inconsistent with longstanding precedent in this and other circuits.

b.    The States' Claims are Properly Classified in Class 9.

185.    In addition to establishing a Class of Subordinated Claims (as described above), the Plan provides that

> The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance

with any contractual, legal, or equitable subordination relating
thereto.

Plan § 10.10.

186.    In accordance with Section 10.10 of the Plan, the Debtors have classified

the States' Claims as Class 9 (Subordinated Claims) pursuant to section 510(c) of the Bankruptcy

Code and intend to classify and/or reclassify, as applicable, the Claims of Puerto Rico and other

governmental units with similar consumer protection Claims in the same manner. *See* Disputed

Claims Reserve Motion ¶¶ 38–39.

187.    Section 510(c) allows a court, "under principles of equitable

subordination, [to] subordinate for purposes of distribution all or part of an allowed claim to all

or part of another allowed claim or all or part of an allowed interest to all or part of another

allowed interest."  11 U.S.C. § 510(c)(1); *see also Citicorp Venture Capital, Ltd. v. Comm. of*

*Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003) ("In the exercise of its

powers as a court of equity, the bankruptcy court may subordinate claims for cause, applying

traditional principles of equitable subordination.").  When considering whether to equitably

subordinate claims, courts in this Circuit have adopted a case-by-case approach that explores the

facts and circumstances of the particular claims at hand.  *See Burden v. United States*, 917 F.2d

115, 120 (3d Cir. 1990) (holding that the court must weigh the equities on a case-by-case basis in

the context of equitable subordination); *cf. United States v. Noland*, 517 U.S. 535, 540–41 (1996)

(stating that the court's equity jurisdiction "permits a [bankruptcy] court to make exceptions to a

general rule when justified by particular facts," rather than making "a categorical distinction at a

legislative level of generality").

188.    In determining whether to subordinate a claim under section 510(c), courts

generally look at the following three (3) factors:  (a) whether the claimant has engaged in some

type of inequitable conduct, (b) whether the misconduct has resulted in injury to other creditors and conferred an unfair advantage on the claimant, and (c) whether equitable subordination of the claim is consistent with the provisions of the Bankruptcy Code.  *See Schubert v. Lucent Techs. Inc. (In re Winstar)*, 554 F.3d 382, 411–12 (3d Cir. 2009) (citing *In re Mobile Steel Co*., 563 F.2d 692, 699-700 (5th Cir. 1977)).  However, the United States Court of Appeals for the Third Circuit has expressly concluded that "creditor misconduct is not a prerequisite for equitable subordination."  *Burden*, 917 F.2d at 120 (holding that section 510(c) permitted the subordination of a non-pecuniary loss tax penalty claim despite the absence of any government misconduct); *see also In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 845 (Bankr. D. Del. 2001) (relying on *Burden* to hold that "the Third Circuit recognizes a claim of 'no fault' equitable subordination"), *overruled in part on other grounds by In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir. 2002); *In re Emergency Monitoring Techs., Inc.*, 366 B.R. 476, 506 (Bankr. W.D. Pa. 2007) (finding that "'creditor misconduct is not a prerequisite for equitable subordination' in the Third Circuit after the Third Circuit's decision in *In re Burden*"); *In re Colin*, 44 B.R. 806, 810 (Bankr. S.D.N.Y. 1984) (subordinating a claim for punitive damages pursuant to section 510(c) despite a lack of creditor misconduct because a failure to do so would harm innocent creditors); *In re NTP Marble, Inc*., 491 B.R. 208, 214 (Bankr. E.D. Pa. 2013) ("[M]ost courts [that] have considered 'no fault' equitable subordination claims have waived the misconduct requirement . . . [in cases involving] tax penalties, stock redemption claims, and punitive damages claims.")  Thus, "Congress contemplated that section 510(c)(1) would be used to subordinate claims involving *either* inequitable conduct *or* claims such as penalties." *Schultz*, 912 F.2d 230, 233 (8th Cir. 1990).

189.    Accordingly, courts in this and other circuits have been reluctant to allow creditors to recover nonpecuniary penalties in chapter 11 cases.  *See Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 724 (D. Del. 2005) ("[If] subordination of punitive damage claims is mandated in Chapter 7 liquidations, it seems entirely appropriate to subordinate such claims in the Chapter 11 setting."); *In re A.H. Robins Co.*, 89 B.R. 555, 561–62 (E.D. Va. 1988) (finding that punitive damages must be disallowed if the company is to be given the opportunity to reorganize successfully and function as a viable company); *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.*), 162 B.R. 935, 947 (Bankr. S.D.N.Y. 1994) ("[The debtor] correctly argues that a Bankruptcy Court can subordinate, disallow or limit punitive damage claims."); *In re Bicoastal Corp.*, 134 B.R. 50, 54 (Bankr. M.D. Fla. 1991) ("It is clear that even though Chapter 11 of the Bankruptcy Code does not specifically provide for the treatment of claims based on a fine, penalty, or punitive damages, the Code traditionally has not favored such claims."); *In re Celotex Corp.*, 128 B.R. 478, 484 n.12 (Bankr. M.D. Fla. 1991) ("Although Section 726(a)(4) is inapplicable to Chapter 11 reorganizations, it is well-established that bankruptcy courts have inherent equitable power to disallow, limit, or subordinate claims for punitive damages in Chapter 11 reorganizations.") (citations omitted); *In re Allegheny Int'l. Inc.*, 106 B.R. 75, 79 (Bankr. W.D. Pa. 1989) (stating that a bankruptcy court's equitable powers allow it to eliminate, subordinate, or limit claims for punitive damages).

190.    Here, the States seek payment and allowance of various fines and penalties, as well as certain "damages" alleged to have been suffered by consumers in their States.  As the States themselves have represented to this Court on multiple occasions, the State Actions in which these Claims are being pursued and liquidated are law enforcement actions brought on behalf of the State and not on behalf of individual consumers.  *See Sur-Reply Brief of*

*Defs. State of Hawaii, Gov't of the United States Virgin Islands and State of New Mexico in Opp'n to Intervening OEMS' Reply in Supp. of the Debtors' Mot. for Summ. J., TK Holdings Inc. et al v. State of Hawaii*, Adv. No. 17-51886-BLS (Bankr. D. Del. 2017), [Docket No. 21] (the "***States' Sur-Reply***") at 2–3; *see also* Hr'g Tr. at 42:19–21, Jan. 29, 2018 ("Second, the states are seeking, above all, civil penalties and fines.  Those civil penalties and fines certainly are not on behalf of any particular consumer . . . How this can be said to be on behalf of or standing in the shoes of any individual consumer is simply absurd."); *see also* States Objection ¶ 13.

191.    Accordingly, the Claims arising from the State Actions constitute penalties.  *See* States' Sur-Reply at 3 n.9 ("Further, civil penalties and disgorgement are not to compensate individual consumers, but tools available only to law enforcement to penalize corporate wrongdoers for breaking the law."); *see also Tex. Am. Oil Corp. v. U.S. Dep't of Energy*, 44 F.3d 1557, 1570–71 (Fed. Cir. 1995) (holding that the Department of Energy's claim was not for restitution as it was not for compensation for actual pecuniary loss suffered by the holder of the claim); *Bowles v. Farmers Nat'l Bank*, 147 F.2d 425, 428 (6th Cir. 1945) ("[I]f a sum of money is to be recovered by a third person for violation of a statute instead of a person injured . . . it constitutes a penalty rather than damages."); *In Porter v. Montgomery*, 163 F.2d 211, 215 (3d Cir. 1947) ("[A] civil action is for damages if it is brought for the compensation of the injured individual.  It is for a penalty if it seeks to obtain a sum of money for the state, an entity which has not suffered direct injury by reason of any prohibited action.").  Clearly, with respect to the States' Claims, there is no relationship between the person injured and the recipient of the recovery as the States are not attempting to recover damages for individuals allegedly harmed.  Further, in the State Actions the States do not even allege that they *themselves* have been the subject of any alleged wrongdoing by the Debtors.  Hr'g Tr. 42:15–22, Jan. 29, 2018

("[T]he state, in seeking these civil penalties, these penalties, as the statutory language in the underlying state cases show[,] are being sought, 'On behalf of the state.'  That is language that is in the Hawaii and the New Mexico statutes that is paid to the state for violations of state law.").

192.    When considering whether certain penalty claims should be subordinated under section 510(c), courts analyze whether the allowance of such claims would harm innocent creditors by reducing the funds available for distribution.  *See Matter of Colin*, 44 B.R. 806, 810 (Bankr. S.D.N.Y. 1984) (stating that allowance of punitive damages claims would force innocent creditors sharing in estate assets to pay for the debtor's wrongdoing because the punitive damages would limit the funds available for distribution to creditors); *Burden*, 917 F.2d at 117 (stating that the doctrine of equitable subordination is remedial, and the goal "is to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results"); *see also In re Papercraft Corp.*, 160 F.3d 982, 991 (3d Cir.1998) (stating that the purpose of equitable subordination is "to compensate in a manner that will permit a . . . remedy to the injury that has been suffered by those [creditors] who will benefit from the subordination").  In the unique context of these Chapter 11 Cases where creditors are expected to recover cents on the dollar, it is certainly equitable for this Court to subordinate the States' Claims as penalties.

193.    Here, there is no doubt that the allowance of the States' "ginned up" Ten Billion Dollar ($10 Billion) Claims would directly harm, and reduce the recoveries for, other creditors.  Allowing punitive claims of this magnitude would be wholly inequitable to the Debtors' other creditors, many of whom include victims of the alleged misconduct of the Debtors that is the basis for the State Actions.  It would be contrary to case law and equity, as well as subversive to the purposes of the Bankruptcy Code, to allow the States to recover for

injuries that they did not suffer at the expense of other claimants, including the individual

claimants whose alleged injuries form the bases for the States' Claims.[52]

195.    Accordingly, the Debtors respectfully submit that the Court has the

authority to, and should, classify and treat the States' Claims as Class 9 (Subordinated Claims).

c.    The Treatment of the NHTSA Claims is Appropriate.

195.    As discussed in Part I above, the Debtors modified the Plan to classify and

Allow the NHTSA Claims as Class 6 (Other General Unsecured Claims) as part of an overall

resolution with NHTSA.  Accordingly, the States' objections with respect to these Claims are

now moot for the reasons set forth in subsections (a) and (b) above.  Further, to the extent that

the States object to the Allowance of the NHTSA Claims in Class 6, the Debtors submit that the

equitable factors that weigh in favor of the subordination of the States' Claims are not present

with respect to the NHTSA Claims.  First, NHTSA is the Debtors' regulator and the NHTSA

Claims stem directly from violations of the Debtors' reporting duties to it.  Second, the Plan

Sponsor's obligation to consummate the Global Transaction is conditioned on NHTSA's consent

to the transaction.  Third, there were several bases on which NHTSA—as the Debtors' regulator

and a party with consent rights on the Global Transaction—could have insisted that the Debtors

pay its Claims in full (including requiring the Debtors to assume the NHTSA Consent Order as

---

[52] The same analysis applies to Puerto Rico's Claim, which seeks almost One Billion Eight Hundred Million Dollars ($1.8 Billion) in civil penalties, restitution, and disgorgement Claims for alleged "unfair and deceptive acts or practices in trade or commerce."  *See* Proof of Claim No. 4215:

> The Commonwealth of Puerto Rico seeks $5,000 per violation in civil penalties for Takata Corporation's unfair and deceptive acts or practices in trade or commerce by falsely representing and/or fraudulently concealing material information related to its dangerous PSAN airbags, for an estimated 341,100 airbags (with each airbag representing a violation) in Puerto Rico, under Title 10, Section 259 and Section 269 of the Laws of Puerto Rico Annotated, together with restitution and disgorgement, for a total of $1,799,753,250, with pre- and post- judgment interest to be determined.  (Restitution is calculated at an average of $250 per affected consumer for an estimated 295,149 consumers and disgorgement is calculated at an average of $60 per PSAN airbag inflator for 341,100 airbags.)

an executory contract), but as part of an overall compromise, NHTSA agreed not to object to the treatment of its Claims as Other General Unsecured Claims, which allowed substantial additional value to flow to other creditors as compared to what would have flown to them if the NHTSA Claims were treated as priority Claims.  The consensual resolution of the NHTSA Claims and the treatment of the NHTSA Consent Order under the Plan provided significant benefits to the Debtors and their creditors.  Accordingly, for all the reasons stated above, the Debtors submit that the equities do not weigh in favor of subordinating the NHTSA Claims.

### 2.    The Plan Settlement is Appropriate and Should be Approved.

196.    As discussed in detail in Part I above, the Plan Settlement satisfies each of the applicable *Martin* factors and should be approved.  Contrary to the States' assertions, the fact that there is uncertainty around aspects of the controversies being settled, including the precise monetary value being exchanged, is not itself a basis for disapproving the settlement.  Indeed, such uncertainty is often a primary reason for approving compromises.  *See In re Penn Cent. Transp. Co.*, 596 F.2d at 1113 (3d Cir. 1979) ("[I]t will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.").  As the Court of Appeals for the Fifth Circuit aptly put it, "[i]n evaluating a Rule 9019 settlement, a bankruptcy court need not 'conduct a mini-trial to determine the probable outcome of any claims waived in the settlement.'"  *Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*, 801 F.3d 530, 541 (5th Cir. 2015).

197.    It is important to note that the Plan Settlement Payment, albeit being paid to satisfy three (3) types of priority Claims held by the Consenting OEMs—Adequate Protection Claims, PSAN Cure Claims, *and* PSAN Administrative Expense Claims—is less than the amount of the Adequate Protection Claims alone—satisfying a Two Hundred Eighty-Five Million Dollar ($285 Million) priority Claim for an estimated Two Hundred Forty-Six Million

Dollars ($246 Million), an almost Forty Million Dollar ($40 Million) discount.  As such, the

Consenting OEM PSAN Cure Claims and Consenting OEM PSAN Administrative Expense

Claims are essentially not receiving *any recovery* from the Debtors.  Thus, the actual dollar value

of these Claims is not particularly relevant, as they are being waived by the Consenting OEMs

for a Zero Dollar ($0) recovery.  Indeed, if the Plan Settlement did not provide for the

satisfaction of Consenting OEM PSAN Cure Claims and instead treated these Claims as General

Unsecured Claims, there would be less value available to other unsecured creditors of the

Estates, as the amount of Consenting OEM General Unsecured Claims (which currently does not

include any Claims that would otherwise constitute PSAN Cure Claims) would be even higher,

further diluting creditor recoveries.

198.    Accordingly, for each of the reasons set forth above and in Part I, the Plan

Settlement results in substantial benefits to the Debtors and their creditors and should therefore

be approved.

### 3.    The Plan Properly Discharges the States' Claims and Enjoins Future Litigation on Account Thereof.

199.    Section 1141 of the Bankruptcy Code clearly states what the effects of

confirmation are—among which are the discharge of all claims and the vesting of all assets in the

reorganized debtor free and clear of all claims and interests.  *See* 11 U.S.C. § 1141.  In strict

accordance with this statute, the Plan provides that "each holder (as well as any trustee or agent

on behalf of such holder) of a Claim or Interest and any successor, assign, and affiliate of such

holder shall be deemed to have forever waived, released, and discharged the Debtors, to the

fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims,

Interests, rights, and liabilities that arose prior to the Effective Date."  Plan § 10.2.  The Plan

likewise provides that "[o]n the Effective Date, and if applicable, pursuant to sections 1141(b)

105

and 1141(c) of the Bankruptcy Code, all PSAN Assets shall vest in each of the Reorganized

Debtors which, as Debtors, owned such PSAN Assets as of the Effective Date, free and clear of

all Claims, Interests, Liens, other encumbrances, and liabilities of any kind . . ." *Id*. § 5.4.  Yet,

the States take issue with these provisions and categorically assert, without reference to any law,

that "[t]he Plan must not adversely affect the States' rights to litigate and obtain judgements

against TKH, to assert that those judgements are non-dischargeable and to pursue and collect on

such judgments." States' Objection ¶ 51.

        200.    The Bankruptcy Code and its provisions apply to all claimants—including

governmental units—and the States are no exception.  The Court is authorized to discharge the

States' Claims, vest property in the Reorganized Debtors free and clear of the States' Claims,

and enjoin future litigation by the States.  The States' apparent reliance on section 362(b)(4) of

the Bankruptcy Code is of no avail, as the Court's authority under section 1141 is not subject to,

or limited by, such provision.

        201.    Accordingly, for each of the reasons set forth above and in Part I, the

States' Objection should be overruled in its entirety, the States' Claims classified in Class 9

(Subordinated Claims), the Plan Settlement approved, and the Plan confirmed.

        **C.**    **The Whistleblowers' Objection.**

        202.    The Whistleblowers' assertions that this Court does not have jurisdiction

to confirm the Plan, including the provisions of the Plan Settlement, is misplaced both legally

and procedurally.  First, this Court has jurisdiction to approve the Plan Settlement pursuant to

section 157(b) of title 28 of the United States Code, which provides the Bankruptcy Court with

the authority to enter a final judgment confirming the Plan and approving sale and use of Estate

property. *See* 28 U.S.C. § 157(b) (enumerating the core proceedings subject to bankruptcy court

jurisdiction, which include plan confirmation and approval of sale and use of property); *see also*

*In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 270 (Bankr. D. Del. 2017) (noting that

confirmation of plans of reorganization, in which settlements are often integral, is within the

bankruptcy court's core jurisdiction).  Accordingly, the Bankruptcy Court not only has

jurisdiction to approve the Plan Settlement and confirm the Plan, but also to declare the property

dealt with thereunder to be free and clear of all claims and interests.  *See* 11 U.S.C. § 1141(c).

The Whistleblowers provide no legal or statutory basis for their assertions to the contrary.

           203.     Second, the Whistleblowers are not parties in interest in these Chapter 11

Cases and therefore lack standing to object to confirmation of the Plan.  *See* 11 U.S.C. § 1109(b)

("A party in interest, including the debtor, the trustee, a creditors' committee, an equity security

holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and

may appear and be heard on any issue in a case under this chapter."); *see also U.S. Fidelis*, 481

B.R. at 515 ("This section does not mean that every creditor is a party in interest.  It means that a

creditor *may* be party in interest.  A 'party in interest' is a person who holds a pecuniary interest

that could be adversely affected by the outcome of the proceeding.") (citation omitted).  "In the

context of a confirmation hearing, creditors 'have standing *only* to challenge those parts of a

reorganization plan that affect their direct interests.'"  *Indianapolis Downs*, 486 B.R. at 304

(quoting *In re Orlando Investors, L.P.*, 103 B.R. 593, 596–97 (Bankr. E.D. Pa. 1989)); *see also*

*Global Indus. Techs.*, 645 F.3d at 211–12 ("The question, then, is whether Hartford and Century

have demonstrated some injury-in-fact, *i.e.*, some 'specific, identifiable trifle of injury,' or

'personal stake in the outcome of [the] litigation,' that is fairly traceable to the GIT Plan.")

(citations omitted).  The Plan Settlement Payment's deemed satisfaction of a portion of the DOJ

Restitution Claim does not create a payment obligation in favor of the Whistleblowers against

the Estates.  Indeed, if the Secretary of Transportation subsequently finds that the

Whistleblowers' are entitled to an award from the OEM Restitution Fund, their remedy would be recoupment from the OEMs, not the Debtors or their Estates.  Simply put, the Debtors do not have a dog in this fight.

204.    Finally, the Special Master's consent to the deemed satisfaction of the DOJ Restitution Claim by the Plan Settlement Payment is not prohibited by any law, court order, or statute.  The Whistleblowers provide no legal basis for their assertions to the contrary. Moreover, uncertainty as to the ability to satisfy a closing condition is not the death knell to confirmation that the Whistleblowers make it out to be.  As stated above, a plan need only present a workable scheme of reorganization in order to be feasible—"[j]ust as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility."  *In re Aleris Int'l., Inc.*, Case No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (citing *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 762 ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.")).

205.    Accordingly, the Whistleblower Objection should be overruled in its entirety and the Plan confirmed.

**D.    AIEG Objection and PSAN/PIWD Claimant Objections.**

206.    Similar to the Whistleblowers, the AIEG does not have standing to object to confirmation of the Plan as it is not a creditor of the Debtors nor is it able to assert any equitable Claim against the Debtors' Estates.  *See Indianapolis Downs*, 486 B.R. at 304 ("Accordingly, the third party release does not affect any of the Oliver Parties' direct interests, given that they are not releasing any Released Parties.  As a result, the Oliver Parties lack standing to object to the third party releases and their objection in this regard is overruled."); *see also In-re Johns-Manville Corp.*, 68 B.R. 618, 623 (Bankr. S.D.N.Y. 1986) ("[N]o party may

successfully prevent the confirmation of a plan by raising the rights of third parties who do not

object to confirmation.").  Conceivably for this reason, it appears that members of this

consortium have prepared and submitted nearly identical objections on behalf of various clients

(*i.e.*, the PSAN PI/WD Claimants).  Regardless of the name on the pleadings, the message is

clear:  this "organization of over 800 attorneys" is acutely concerned with the Channeling

Injunction.

207.    To this end, AIEG and certain of the PSAN PI/WD Claimants raise a

litany of alleged issues relating to the Channeling Injunction in their Objections, most of which

have been addressed above, and all of which should be overruled.  These parties' assertions that

the Debtors have not provided sufficient information for claimants to evaluate the Channeling

Injunction are without merit.  The Plan Supplement, which the Debtors filed on January 23, 2018

and subsequently amended on February 11, 2018, provides the requested disclosures relating to

PSAN PI/WD Top-Up Funds, the PSAN PI/WD Trust Agreement, and the process for resolving

Claims that are subject to the Channeling Injunction.  In addition, the Plan Supplement includes

three (3) reports prepared by Ankura Consulting Group, LLC that explain the methodology

behind the Debtors' estimates for future PSAN PI/WD Claims and Other PI/WD Claims.

208.    In addition, certain of the PSAN PI/WD Claimants assert that the Trust

Distribution Procedures deny claimants the ability to access the tort system to pursue their

Claims against co-defendant OEMs.  These Objections are mistaken.  First, in the event that a

claimant alleges an injury relating to a vehicle manufactured by a Participating OEM, the Trust

Distribution Procedures provide for a clear path to the tort system.  *See* Plan Supplement Ex. N

(Trust Distribution Procedures) § 6.4(a).  Similarly, where a claimant alleges an injury relating to

a vehicle manufactured by a non-Participating OEM, the Trust Distribution Procedures do not in

any way impact such claimant's ability to pursue their Claim in the tort system against the co-defendant OEM.

209.    Accordingly, for each of the reasons set forth above and in Part I, the AIEG Objection and the PSAN PI/WD Claimants Objections, to the extent not already resolved, should be overruled in their entirety.

## IV.    CAUSE EXISTS TO WAIVE STAY OF THE CONFIRMATION ORDER.

210.    Bankruptcy Rule 3020(e) provides that:  "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  The Debtors request that the Bankruptcy Court direct that the Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).

211.    Under the circumstances and to conserve estate resources and fees, it is appropriate for the Bankruptcy Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order.  Such relief is in the best interests of the Debtors' Estates and creditors, and will not prejudice any parties in interest.

## V.    CONCLUSION.

212.    The Plan complies with and satisfies all the requirements of section 1129 of the Bankruptcy Code.  The Plan and the settlements incorporated therein also comply with Bankruptcy Rule 9019.  The Objections should, therefore, be overruled, each of the compromises and settlements embodied in the Plan should be approved, and the Plan should be confirmed.

RLF1 18889156V.1

Dated: February 14, 2018
Wilmington, Delaware

/s/ Mark D. Collins
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
Jessica Diab
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*
*and Debtors in Possession*