**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| TK HOLDINGS INC., *et al.*, | : | Case No. 17-11375 (BLS) |
|  | : |  |
| Debtors.[1] | : | Jointly Administered |
|  | : |  |
|  | : | **Hrg. Date: Feb. 16, 2018 at 10:30 a.m. (Eastern)** |
|  | : | **Related Docket No. 1629** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**STATEMENT OF PLAN SPONSOR IN SUPPORT OF**
**CONFIRMATION OF FOURTH AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

Joyson KSS Auto Safety S.A. (collectively, with one or more of its current or

future subsidiaries or affiliates, "**KSS**" or the "**Plan Sponsor**") respectfully submits this

statement (this "**Statement**") (i) in support of confirmation of the *Fourth Amended Joint Chapter*

*11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* (as may be further

amended, the "**Plan**"), and in response to certain objections thereto (collectively, the

"**Objections**" and the objectors, the "**Objectors**"), and (ii) to join in the arguments made in the

memorandum of law filed by the above-captioned debtors (the "**Debtors**") in support of

confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings

Inc. and its Affiliated Debtors and Response to Objections to Confirmation (the "**Debtors'**

**Brief**").  In support of this Statement, the Plan Sponsor relies upon and incorporates by reference

---

[1]    The debtors in these chapter 11 cases (collectively, the "**Debtors**"), along with the last four digits of each
Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC
(2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in
Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de
C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and
Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international
affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate
headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

the Declaration of Joseph Perkins in Support of Confirmation of Fourth Amended Joint Chapter 11 Plan Of Reorganization of TK Holdings Inc. and its Affiliated Debtors (the "**Perkins Declaration**") filed concurrently herewith.  In further support of confirmation of the Plan and in response to the Objections, the Plan Sponsor respectfully states as follows:[2]

## PRELIMINARY STATEMENT

1.      The Plan is the culmination of a tremendous effort on the part of the Debtors, the Consenting OEMs, the Plan Sponsor, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative to implement a global transaction that is among the most complex and ambitious restructuring transactions in history.

2.      After nearly two years of intensive marketing, diligence, and negotiations between Takata, potential sponsor candidates, and a group of fifteen of Takata's original equipment manufacturer customers, Takata selected the Plan Sponsor as the prevailing bidder for all of Takata's worldwide non–PSAN Assets for an aggregate purchase price of $1.588 billion, subject to certain adjustments in accordance with the U.S. Acquisition Agreement, plus the Plan Sponsor Backstop Funding, and the assumption of Assumed Liabilities.

3.      After, intense, arm's-length negotiations continuing throughout the spring, summer, and fall of 2017, the Plan Sponsor, the Consenting OEMs, and Takata substantially finalized the definitive documents governing the Global Transaction.  On November 3, 2017, the Debtors filed the first iteration of the Plan, an integral component to effectuating the Global Transaction.

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors [Docket No. 1630] (the "**Disclosure Statement**"), the Plan, or the Objections, as applicable.

4.      Since the execution of certain definitive documents governing the Global Transaction on November 16, 2017, and the filing of the Plan, the Debtors, the Plan Sponsor, and the Consenting OEMs have engaged in intensive, good-faith settlement negotiations with key stakeholders who had previously expressed opposition to the Plan, including the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative.

5.      For its part, the Plan Sponsor has made significant additional concessions, including:

- Agreeing, subject to certain exclusions, to assume all third-party executory contracts related to the non-PSAN acquired business;

- Contributing $2.5 million (inclusive of any remaining amount of the Cure Claims Cap) to fund recoveries to general unsecured creditors with non-contingent, liquidated claims; and

- Contributing $25 million, which amount is expected to be drawn under the backstop at closing, to the PSAN PI/WD Trust immediately following the repayment of such amount from post-closing dividends from TSAC to TKC.

These efforts culminated in consensual settlements with the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative, who now support the Plan.

6.      The Plan, as modified by these settlements, not only maximizes the going-concern value of Takata's businesses, and thereby creditor recoveries, but also (i) provides material benefits to the Debtors' suppliers and other businesses that depend on the go-forward business by assuming and assigning many of the Debtors' vendor and supplier contracts to the Plan Sponsor, (ii) preserves thousands of jobs, (iii) ensures that recalls will continue to be fulfilled, and (iv) ensures that customer supply is maintained seamlessly.

7.       Despite the now largely consensual Plan, certain Objectors continue to oppose the Plan primarily as to its release and injunction provisions.[3]  Additionally, as it relates to the Plan Sponsor, certain counterparties to the Debtors' executory contracts sought adequate assurance of future performance with respect to Purchased Contracts, and the Plan Sponsor is pleased to report that all of these objections have been resolved or are expected to be resolved by the Confirmation Hearing.

8.       The remaining objections to the Plan are meritless and should be overruled. Specifically, the release and injunction provisions in favor of the Plan Sponsor Parties are appropriate.  In exchange for releases and injunctions, the Plan Sponsor Parties have undoubtedly made substantial contributions that will serve as the funding source for creditor recoveries, including, among other things, (i) providing consideration for the Purchased Assets, which includes not only the Base Purchase Price under the U.S. Acquisition Agreement, but also significant sources of potential additional value, including the Plan Sponsor Backstop Funding, the Business Incentive Plan Payment, up to $5 million from the Cure Claims Cap to fund Cure Claims, and the assumption of Assumed Liabilities, (ii) subject to certain exclusions, assuming all third-party executory contracts related to the non-PSAN acquired business, (iii) contributing any remaining amount of the $5 million Cure Claims Cap to the creditor fund that will fund recoveries to general unsecured creditors with non-contingent, liquidated claims, and guaranteeing the creditor fund receives at least $2.5 million, and (iv) contributing $25 million to the PSAN PI/WD Trust.  The releases and injunctions in favor of the Plan Sponsor Parties were the subject of express negotiation and were an indispensable inducement for the Plan Sponsor's

---

[3]      The body of this Statement responds to the principal arguments raised by the objecting parties. As to objections and arguments not specifically addressed in this Statement, the Plan Sponsor joins in and incorporates by reference the Debtors' Brief, filed substantially contemporaneously herewith.

participation in the Global Transaction and the settlements to be effectuated pursuant to the Plan.

The Plan Sponsor would not make such contributions without receiving the benefits of the

releases and injunctions contained in the Plan, which ensure that the Plan Sponsor assumes only

those liabilities that it has expressly agreed to assume under the U.S. Acquisition Agreement.

Absent the Plan Sponsor's contributions, the Global Transaction, the Plan and the settlements

contained therein would not be viable and there would be minimal funds, if any, to distribute to

the Debtors' creditors.

9.      Moreover, while the Plan Sponsor is sympathetic to the losses and financial

hardship suffered by PSAN Inflator claimants, the gravamen of their objections—that the

Debtors' non-PSAN assets should not be sold to the Plan Sponsor free and clear of their

claims—must be rejected.  The Bankruptcy Code explicitly provides that "the property dealt with

by the plan is free and clear of all claims and interests,"  11 U.S.C. § 1141(c), recognizing that

"free and clear" sales maximize the value of a debtor's estate for the benefit of creditors.  *See In

re White Motor Credit Corp.*, 75 B.R. 944, 951 (Bankr. N.D. Ohio 1987) ("The successor

liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to

accept less on sales to compensate for this potential liability.").

10.      These protections against liability were a critical inducement to the Plan

Sponsor's participation in the Global Transaction and are justified here both as a matter of policy

and of practical necessity.

11.      The Objectors raise additional objections to confirmation, which will not be

addressed in this Statement, but to which the Debtors respond in the Debtors' Brief.  For the

reasons set forth in the Debtors' Brief and herein, and as will be further shown at the

Confirmation Hearing, the Plan meets the statutory requirements of section 1129 of the

Bankruptcy Code.  Accordingly, the Objections should be overruled and the Plan confirmed.

## STATEMENT

### I.    The Injunction and the Release Provisions of the Plan Are Appropriate.

12.    The Plan incorporates certain releases and injunctions that bar the assertion of

claims relating to the Debtors, their non-Debtor affiliates, and the Global Transaction, including,

without limitation, PSAN PI/WD Claims, against the Plan Sponsor Parties, including, without

limitation, the Acquired Non-Debtor Affiliates, and certain of their respective related persons.

13.    Several parties object to the release and injunction provisions contained in the

Plan to the extent they apply to non-debtor parties.[4]  As discussed further herein, and in the

Perkins Declaration, the releases and injunctions in favor of the Plan Sponsor Parties and their

respective related persons constitute an essential inducement for the Plan Sponsor's participation

in the Global Transaction as it relates to the Debtors and are material to the settlements to be

effectuated pursuant to the Plan.  Confirmation of the Plan and its terms is critical to ensuring

that the Plan Sponsor receives the benefits for which it has contracted in exchange for providing

a substantial contribution, which will ensure meaningful recoveries for creditors in this case.

The Debtors' Releases, the Consensual Third-Party Release, and the Release and Channeling

Injunction (each as defined below) are fair and equitable to unsecured creditors and other parties-

in-interest, appropriate under the circumstances, and consistent with the law in the Third Circuit

---

[4]    The United States Trustee for Region 3 ("**United States Trustee**") filed an objection to the third-party release, among other provisions [Docket No. 1869] (the "**U.S. Trustee Objection**"). The Attorneys Information Exchange Group (the "**AEIG**") also objected to the third-party release and channeling injunction [Docket No. 1930] (the "**AEIG Objection**"). The Estate of Denis Herlihy, Kimberly Beaumont, and Omar Salih joined in the AEIG Objection  [Docket No. 1934]. Denise Antoinette Wilson, a personal injury claimant, objected to the Channeling Injunction [Docket No. 1958] (the "**Wilson Objection**").

and the Bankruptcy Code.  Therefore, objections to the release and injunction provisions should be overruled and the Plan confirmed.

### A.    The Debtors' Releases

14.    Section 10.6(a) of the Plan provides for a release of claims against the Plan Sponsor Parties by the Debtors of claims arising out of the Chapter 11 Cases, the restructuring transactions, the transaction documents, the Plan and related agreements (the "**Debtors' Releases**").

15.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  "[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."  *In re Spansion, Inc.*, 426 B.R. 114, 142–43 (Bankr. D. Del. 2010).  "Courts in this district have held that a plan may provide for releases by a debtor of non-debtor third parties after considering the specific facts and equities of each case."  *Id.*

16.    In determining whether a debtor release is appropriate, courts in this jurisdiction typically consider a number of factors, including: whether there is an identity of interest between the debtor and the third party, whether the third party has made a substantial contribution to the debtor's reorganization, whether the release is essential to the debtor's reorganization, whether a substantial majority of creditors support the release, and whether the plan provides for payment of all or substantially all of the claims in the class or classes impacted by the release.  *See In re Indianapolis Downs, LLC.*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999)).  The *Zenith* factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."

7

*In re Tribune Co.*, 464 B.R. 126, 186 (Bankr. D. Del. 2011); *see also Indianapolis Downs*, 486
B.R. at 303 ("These factors are neither exclusive nor are they a list of conjunctive
requirements.").

17.     The release by the Debtors of the Plan Sponsor Parties is fair, reasonable, and in
the best interests of the Debtors' estates.  As set forth in more detail below, the *Zenith* factors
weigh in favor of granting a release to the Plan Sponsor Parties.  *See infra* Part I.C.  The Plan
Sponsor Parties have made substantial contributions—payment of the Debtors' regional share of
the Base Purchase Price (approximately $878 million as of December 31, 2017), commitments of
up to $75 million in Plan Sponsor Backstop Funding and the Debtors' regional share of up to
$400 million in Business Incentive Plan Payments, the assumption of Assumed Liabilities, and
additional contributions, including $25 million to the PSAN PI/WD Trust, which were essential
to reaching settlements with the Creditors' Committee, Tort Claimants' Committee, and the
Future Claims Representative—in exchange for the releases and injunctions contained in the
Plan.  These contributions greatly benefit the Debtors' creditors, who would receive little to
nothing without the Plan Sponsor's infusion of value.

18.     The Debtors' Releases are also essential to the restructuring and a critical element
of the deal that the Plan Sponsor has negotiated with the Debtors.  As noted in the Perkins
Declaration, the Plan Sponsor has spent months intensely negotiating the terms of the Global
Transaction and would not have undertaken that commitment without the assurance of  releases
by the Debtors.  Further, because the Plan Sponsor was "actively involved in negotiating and
formulating the Plan[, i]t is a valid exercise of the Debtors' business judgment to include a
settlement of any claims it might own against such parties as a discretionary provision of the
plan." *Spansion*, 426 B.R. at 143.

8

19.    This Court, therefore, should find that the Debtors have satisfied their burden in proving the fairness, necessity, and consideration for the release of the Plan Sponsor Parties provided for in the Plan and grant these releases, which are essential to the Plan and part and parcel of the arm's-length bargain that the Plan Sponsor, the Debtors, and parties-in-interest have labored for months to form.

**B.    The Consensual Third-Party Release**

20.    Section 10.6(b) of the Plan provides for a release of claims against the Plan Sponsor Parties by consenting creditors and equity holders of the Debtors (the "**Consensual Third-Party Release**").

21.    "Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected." *Indianapolis Downs*, 486 B.R. at 305; *Spansion*, 426 B.R. at 144 (finding that third-party releases contained in a plan are valid, if consensual); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004) (stating that "to the extent creditors or shareholders voted in favor of [the plan], which provides for the release of claims they may have against [non-debtors], they are bound by that"); *Zenith*, 241 B.R. at 111 (approving non-debtor releases by creditors that voted in favor of plan).  A chapter 11 plan may provide for a release of claims by third parties against non-debtor parties by those who (i) affirmatively vote to accept the Plan, (ii) are unimpaired pursuant to the Plan and therefore deemed to accept the Plan, (iii) are entitled to vote on the Plan and do not indicate their desire to opt out of the releases.  *See Indianapolis Downs*, 486 B.R. at 304–06.

22.    Here, the release by consenting creditors and equity holders against the Plan Sponsor Parties and their respective related persons comports with the applicable standards governing consensual releases in this district.  All affected parties have received sufficient notice

of the release and had ample time to object or opt out of the release. Section 10.6(b) of the Plan allows for third parties to opt out of the release, and the ballots explicitly stated that parties voting on the Plan were entitled to opt out of the release. Holders of Claims in deemed-rejecting Classes were also provided notices of non-voting status that conspicuously disclosed their right to opt out of the release. The instructions were clear that failure to return a ballot (or, in the case of deemed-rejecting Classes, an opt-out election form) that affirmatively opted out of the release bound the holder of the claim or interest to the release. Therefore, the releases are consensual and fully supported by the law in this jurisdiction. *See Indianapolis Downs*, 486 B.R. at 306 (permitting third-party releases where creditors failed to opt out of the releases, either by abstaining from voting or by voting against the plan but not otherwise opting out of the releases).

23.     Even assuming, *arguendo*, that the releases by consenting creditors and equity holders against the Plan Sponsor Parties are determined to be non-consensual, the same extraordinary circumstances that justify approval of the Release and Channeling Injunction support the grant of releases by creditors and equity holders contained in Section 10.6(b) of the Plan.

### C.     Release and Channeling Injunction

24.     In additional to the Consensual Third-Party Release, Sections 10.6(c) and 10.7 of the Plan provide for the release and injunction of PSAN PI/WD Claims against the Plan Sponsor Parties (the "**Release and Channeling Injunction**").

25.     In the Third Circuit, Courts have recognized the propriety of issuing permanent injunctions and non-consensual releases in certain exceptional circumstances. *See In re Cont'l Airlines*, 203 F.3d 203, 213 (3d Cir. 2000) (discussing cases in which courts have granted permanent injunctions and releases when "co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made those reorganizations feasible"); *In re*

*Lower Bucks Hosp.*, 571 F. App'x 139, 144 (3d Cir. 2014) ("[S]ome small subset of non-consensual third-party releases might be confirmable where the release is "both necessary [to the plan of confirmation] and given in exchange for fair consideration.").

26.     The "hallmarks" of an appropriate non-consensual third-party release are "fairness, necessity to the reorganization, and specific factual findings to support those conclusions." *Cont'l Airlines*, 203 F.3d at 214; *see also In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) ("In the Third Circuit, nonconsensual third party releases are permissible in plans of reorganization if they meet the *Continental* standard of fairness and necessity to the reorganization.").

27.     As with debtor releases, courts have articulated certain factors to consider in allowing a release of a third party as part of a plan of reorganization, including:

> (1)     an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> (2)     substantial contribution by the non-debtor of assets to the reorganization;
>
> (3)     the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;
>
> (4)     an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and
>
> (5)     provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Zenith*, 241 B.R. at 110 (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994)).

28.     While the factors are instructive guideposts, no one factor is outcome determinative. *See Millennium Lab Holdings II*, 575 B.R. at 272 ("The *Master Mortgage* factors,

like the *Dow* factors (or any other standard in circuits that permit third party releases), are a federal, judicially-created yardstick against which a third party release is measured"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (explaining that the analysis "is not a matter of factors and prongs"). Rather, courts must consider whether exceptional circumstances warrant such relief, and whether they meet the *Continental* standard of fairness and necessity to the reorganization.

29. Courts have found that channeling injunctions and third-party releases are appropriate when a plan involves a global settlement and funds are established to pay "massive" tort liabilities and without such injunction and funds, a restructuring would not be possible. *See Cont'l Airlines*, 203 F.3d at 212–13; *Secs. and Exch. Comm'n. v. Drexel Burnham Lambert Grp., Inc.* (*In re Drexel Burnham Lambert Grp., Inc.*), 960 F.2d 285, 293 (2d Cir. 1992); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 702 (4th Cir. 1989); *Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 640, 649 (2d Cir. 1988); *In re Blitz*, Case No. 11-13603 (PJW), 2014 WL 2582976 at *6 (Bankr. D. Del. Jan. 30, 2014) (confirming a plan containing nonconsensual releases and a channeling injunction after finding such were fair, necessary and "[a]fter months of arms-length, contentious negotiations" the parties "came to terms on a global settlement that formed the foundation of the Plan. These extensive efforts and substantial contributions . . . constitute extraordinary circumstances").

### (i) This Court Has Subject-Matter Jurisdiction to Grant the Release and Channeling Injunction.

30. "[B]efore considering the merits of any § 105(a) injunction, a bankruptcy court must establish that it has subject matter jurisdiction to enter the injunction." *In re W.R. Grace & Co.*, 591 F.3d 164, 170 (3d Cir. 2009).

31.     Section 157(b)(1) of the Judiciary Code authorizes bankruptcy courts to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). Bankruptcy courts have core jurisdiction over "orders approving the sale of property." 28 U.S.C. § 157(b)(2)(N). Likewise, a proceeding to enforce a bankruptcy court's order approving the sale of a debtor's assets is a "core" bankruptcy matter because it invokes a substantive right created by federal bankruptcy law. *See In re Petrie Retail, Inc.,* 304 F.3d 223, 229-30 (2d Cir. 2002) (bankruptcy court has core subject matter jurisdiction under sections 1334 and 157 to hear and determine action by non-debtor buyer/assignee against non-debtor lessor seeking to enforce the bankruptcy court's sale order which enjoined the lessor from asserting claims for breach of the lease against the buyer/assignee in an attempt to terminate the lease); *In re Chateaugay Corp.*, 213 B.R. 633, 638 (S.D.N.Y. 1997) (bankruptcy court has inherent or ancillary jurisdiction to enforce sale order in favor of purchaser); *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("As a proceeding ancillary to an order of sale, defined as a core proceeding under Section 157(b)(2)(N) of Title 28, the proceeding at bar is within the court's core jurisdiction."); *In re N.Y. Int'l Hostel, Inc.,* 157 B.R. 748, 751-52 (S.D.N.Y. 1993) (bankruptcy court has core subject matter jurisdiction over action brought by asset purchaser under Section 363 sale order to enforce order's free and clear provisions against third party lessee); *see also In re Lafayette Radio Elecs. Corp.*, 761 F.2d 84, 89 n.3 (2d Cir. 1985) (action to enforce bankruptcy court's order "arises in" a case under title 11).

32.     The Plan provides for the sale and transfer of substantially all of the Debtors' non-PSAN assets to the Plan Sponsor. Confirmation of the Plan will vest the assets in Plan Sponsor free and clear of any and all Claims, interests, Liens, other encumbrances, and liabilities of any

kind, other than Assumed Liabilities and Permitted Liens. *See* 11 U.S.C. § 1141(c) ("[A]fter confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor."). It bears emphasis that the Plan Sponsor has no pre-existing PSAN-related liabilities, is not acquiring the Debtors' PSAN-related assets, or assuming their PSAN-related liabilities. In this regard, the Release and Channeling Injunction does not bar any rights and remedies holders of PSAN PI/WD Claims otherwise would have, but merely enforces the effect of Bankruptcy Code section 1141 so as to protect the Plan Sponsor Parties from litigation relating to liability the Plan Sponsor has not acquired. Thus, the Release and Channeling Injunction with respect to the Plan Sponsor Parties merely functions as an extension of Bankruptcy Code section 1141.

33.    Because this Court has jurisdiction to issue an order authorizing a sale free and clear in the Plan Sponsor's favor, it also has jurisdiction to issue the Release and Channeling Injunction which enforces the free and clear protections. *See In re Signal Int'l, Inc.*, Case No. 15-11498 (MFW) (Bankr. D. Del. Nov. 24, 2015) [Docket No. 555] (issuing a channeling injunction in favor of purchaser of debtor's assets); *see also In re Paris Indus.*, 132 B.R. 504, 508 (D. Me. 1991) (finding inherent jurisdiction to enjoin state law successor liability action against purchaser of debtor's assets); *In re White Motor Credit Corp.*, 75 B.R. 944, 947–48 (Bankr. N.D. Ohio) (same); *In re All American*, 56 B.R. 186, 191 (Bankr. N.D. Ga. 1986) (same), aff'd, 805 F.2d 1515 (11th Cir. 1986).

> (ii)    ***Extraordinary Circumstances Warrant Granting the Release and Channeling Injunction.***

34.    The exigencies of these Chapter 11 Cases present precisely the exceptional circumstances contemplated by the Third and other circuits that would warrant such extraordinary relief. The Debtors filed these Chapter 11 Cases in the face of mounting mass-tort

liabilities arising out of PSAN Inflators, recognizing that a sale of substantially all of the Debtors' non-PSAN assets through coordinated insolvency proceedings and the protections available thereunder would maximize recoveries to creditors.  *See* Decl. of Scott E. Caudill in Support of Debtors' Chapter 11 Petitions and First Day Relief [Docket No. 19] ¶¶ 53–77.  The releases and injunctions provided for in the Plan to the Plan Sponsor Parties served precisely that purpose and were critical to the Plan Sponsor's participation in the Global Transaction and the Plan Settlement, which presents the greatest overall value to the Debtors.  *Id*. ¶ 92.  Confirmation of the Plan including these key terms is necessary to ensure that the Plan Sponsor receives the benefits for which it has contracted in exchange for providing a contribution, which will ensure meaningful recoveries for creditors in this case.

### (iii) *The* **Zenith** *Factors Support Granting the Release and Channeling Injunction.*

35.    The *Zenith* factors also weigh in favor of the relief requested.

36.    **Identity of Interest**. The Plan Sponsor Parties share a unified interest in formulating and confirming the plan, thereby establishing an identity of interest with the Debtors.  *See Zenith*, 241 B.R. at 110 ("LGE, as the funder of the Plan . . . who w[as] instrumental in formulating the Plan, similarly share[s] an identity of interest with [the debtor] in seeing that the Plan succeed . . . .").

37.    **Substantial Contribution**.  The contribution provided by the Plan Sponsor is undoubtedly substantial.  The Plan Sponsor's contributions include not only the Base Purchase Price under the U.S. Acquisition Agreement, but also significant sources of potential additional value, including the Business Incentive Plan Payment and the Plan Sponsor Backstop Funding, all of which will fund substantial recoveries for creditors.  *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (holding that non-debtor third-party releases are

acceptable for persons involved in unique transactions, such as a buyer who makes a substantial financial contribution to the estate). Under the Plan Sponsor Backstop Funding Agreement, the Plan Sponsor agreed to backstop up to $75 million, subject to certain limitations, to assist with, for purposes of the Debtors in the Chapter 11 Cases, the DOJ Restitution Claim and PSAN Legacy Costs, thereby increasing the likelihood that the Debtors will have sufficient liquidity to fund certain elements that are critical to the Global Transaction.

38.     The Plan Sponsor also provided additional contributions that were essential to reaching settlements with the Creditors' Committee, Tort Claimants' Committee, and the Future Claims Representative. In the settlement with the Debtors, the Consenting OEMs, the Tort Claimants' Committee, and the Future Claims Representative, in exchange for the Release and Channeling Injunction in favor of the Plan Sponsor Parties, the Plan Sponsor has agreed to contribute $25 million, which amount is expected to be drawn under the backstop at closing, to the PSAN PI/WD Trust following the repayment of such amount from post-closing dividends from TSAC to TKC.

39.     The Plan Sponsor has agreed in the settlement with the Creditors' Committee to, subject to certain exclusions, assume all third-party executory contracts related to the non-PSAN acquired business, and contribute any remaining amount of the $5 million Cure Claims Cap to the creditor fund that will fund recoveries to general unsecured creditors with non-contingent, liquidated claims. If the remaining amount of the Cure Claims Cap is less than $2.5 million, the Plan Sponsor will contribute the difference so that the creditor fund receives at least $2.5 million.

40.     Each of the other Plan Sponsor Parties have likewise made substantial contributions to the Debtors' restructuring, for their proposed investments of debt or equity capital in the Plan Sponsor is necessary to finance the Global Transaction. Absent these

investments, the Plan Sponsor would not be in a position to undertake the Global Transaction or make contributions of additional value under the Plan.

41.     These contributions are integral elements of the Debtors' Plan and provide for significant distributions to general unsecured creditors that would otherwise not be available.

42.     **Necessity to the Plan**.  The releases and injunctions in favor of the Plan Sponsor Parties and their respective related persons are indispensable elements of the Plan and settlements contained therein.  There are massive tort liabilities related to the PSAN Inflators and such liabilities would likely eliminate any ability of the Debtors to restructure in a way that provides recovery to creditors absent a third-party sale.  The Plan Sponsor emerged as the party that would allow the Debtors to realize the highest and best value for the Purchased Assets necessary to fund recovery for creditors.  However, as set forth in the Perkins Declaration, the Plan Sponsor would not be willing to invest in the Global Transaction if it undertook liabilities related to the PSAN assets it was not purchasing.  Moreover, the Committees' and Future Claims Representative's support for the releases and injunctions were critical to the Plan Sponsor's settlement with these parties.  These provisions are critical to ensure that the Plan Sponsor receives the benefit of its bargain: that it assumes only those liabilities that are expressly defined as Assumed Liabilities under the U.S. Acquisition Agreement and bears no liability for the Excluded Liabilities.

43.     The United States Trustee objects to the releases and injunctions to the extent that they cover "Extended Releasees" absent an evidentiary basis.[5]  UST Obj. ¶¶ 6, 9-13.  But, as set

---

[5]     The Extended Releasees include the Plan Sponsor Parties' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees.  UST Obj. ¶ 6.

forth in the Perkins Declaration, it is equally critical that the protections afforded by the Plan's release and injunction provisions extend not just to the Plan Sponsor itself but also to the Plan Sponsor Parties, including any person who makes a loan to or investment in the Plan Sponsor for purposes of consummating the sale of the Purchased Assets, and the Acquired Non-Debtor Affiliates and certain of their respective related persons described in the definition of "Released Parties."  The Plan Sponsor Parties that make a loan to or investment in the Plan Sponsor are making a substantial contribution and therefore are requesting the benefit of the releases as well. As set forth in the Perkins Declaration, they merit the benefit of the releases and injunctions because their participation is vital to the Global Transaction.  Similarly, it is critical that the Plan's release and injunction provisions encompass the Plan Sponsor Parties' respective related persons in order to foreclose the possibility of a disgruntled claimant seeking to circumvent such releases and injunctions by asserting claims against such related persons pursuant to theories of successor liability or otherwise.  Moreover, a suit against the Plan Sponsors' directors, officers, and advisors is tantamount to a suit against the Plan Sponsor because the Plan Sponsor owes contractual duties of indemnification to these parties.

44.     Without the Base Purchase Price and other significant contributions from the Plan Sponsor, and its lenders and investors, the Debtors would not be able to fund recoveries to creditors and cannot confirm the Plan.  And any alternative Plan likely would result in reduced recoveries to the Debtors' creditors.  *See* Disclosure Statement at 219–20.

45.     **Support of Affected Creditors**.  While the results of voting on the Debtors' Plan are not available at the time of filing of this Statement, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative affirmatively support the release and injunction provisions in favor of the Plan Sponsor Parties, and the Creditors' Committee has

recommended that holders of Other General Unsecured Claims vote in favor of the Plan. *See* Creditors' Committee Term Sheet at 4, and Tort Claimants' Committee and Future Claims Representative Term Sheet at 9, attached as Exhibits A & B to Notice of Filing of Settlement Term Sheets With Creditors' Committee, Tort Claimants' Committee, and Future Claims Representative Regarding Confirmation of the Plan [Docket No. 2017].  These entities serve as fiduciaries to the classes of creditors impacted by the release and injunction provisions, and therefore the fourth *Zenith* factor is also satisfied.

46.    **Fair Consideration**.  The Plan provides a mechanism to pay fair consideration to affected creditors by providing distributions under the Plan, establishing a Support Party Creditor Fund, and establishing a PSAN PI/WD Fund.  Specifically, Section 10.7 of the Plan provides for the establishment of a PSAN PI/WD Fund administered by the PSAN PI/WD Trust.  After the Effective Date, PSAN PI/WD Claims will be channeled to the PSAN PI/WD Trust and may thereafter be asserted only against the PSAN PI/WD Trust, protecting the parties contributing to the PSAN PI/WD Fund.  As noted above, the Plan Sponsor is making substantial contributions to both the PSAN PI/WD Fund and the Support Party Creditor Fund.

47.    **Record Supports Specific Factual and Legal Findings**.  The Perkins Declaration and other evidence to be submitted in support of confirmation and at the Confirmation Hearing provide adequate support to demonstrate the specific factual and legal findings necessary to justify the injunctions and releases contained in the Plan.

## II.    All Objections Concerning Adequate Assurance of Future Performance of the Purchased Contracts Have Been Consensually Resolved.

48.    While, the Debtors have thousands of vendors, only six vendors raised the issue of adequate assurance, and even those six objections were set forth in a conclusory fashion

largely to reserve rights. [6]  The Plan Sponsor is pleased to report that all of the objections have been consensually resolved or are expected to be resolved by the Confirmation Hearing, and therefore  adequate assurance is not contested.

### JOINDER

49.    The Plan Sponsor joins in all other arguments set forth in the Debtors' Brief and urges this Court to confirm the Plan.

---

[6]    In particular, LMC Industries, Inc. ("**LMC**") [Docket No. 1943] asserts that the Debtors and/or the Plan Sponsor have not provided adequate assurance of future performance (the "**LMC Objection**").  In addition, five other Objectors reserved their rights on this issue in summary form, including Sigma International Inc. [Docket No. 1931] (the "**Sigma Limited Objection**"), Harrington Industrial Plastics LLC [Docket No. 1919] (the "**Harrington Objection**"), Danhil Containers, LLC and Danhil de Mexico SA de CV [Docket No. 2000] (the "**Danhil Limited Objection**"), XPO Logistics Worldwide, Inc. [Docket No. 1941] (the "**XPO Limited Protective Objection**"), and Infor (US), Inc. ("**Infor**") [Docket No. 1942] (the "**Infor Limited Objection**").  The Plan Sponsor understands that the Sigma Objection, the Harrington Objection, the Danhil Objection and the XPO Limited Protective Objection are resolved.  In addition, the Plan Sponsor is working with LMC and Infor in an attempt to resolve their objections, and expects them to be resolved prior to the Confirmation Hearing.

**CONCLUSION**

WHEREFORE, The Plan Sponsor respectfully requests that this Court (i) enter an order confirming the Plan, (ii) overrule all Objections, and (iii) grant such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
   February 14, 2018

       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

       */s/ Jason M. Liberi*
       Jason M. Liberi (I.D. No. 4425)
       One Rodney Square
       P.O. Box 636
       Wilmington, Delaware 19899-0636
       Telephone: (302) 651-3000
       Fax: (302) 651-3001

       – and –

       Christine A. Okike
       Four Times Square
       New York, New York 10036
       Telephone: (212) 735-3000
       Fax: (212) 735-2000

       – and –

       Ron E. Meisler
       Felicia G. Perlman
       Justin M. Winerman
       Christopher M. Dressel
       155 N. Wacker Drive
       Chicago, Illinois 60606-1720
       Telephone: (312) 407-0700
       Fax: (312) 407-0411

       *Counsel for the Plan Sponsor*