**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                                   :    Chapter 11
:
:    Case No. 17-11375 (BLS)
TK HOLDINGS INC., *et al.*,                                :
:    Jointly Administered
Debtors.[1]                                                    :
:    **Hrg. Date: Feb. 13, 2018, at 10:00 a.m. (Eastern)**
:    **Related Docket Nos. 1629**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF JOSEPH PERKINS IN SUPPORT OF
CONFIRMATION OF FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

I, Joseph Perkins, under penalty of perjury pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a citizen of the United States and reside in the State of Michigan. I am the Senior Vice President and Chief Financial Officer of Key Safety Systems, Inc. ("**KSS**") and KSS Holdings, Inc. ("**Holdings**"), subsidiaries of Joyson KSS Auto Safety S.A. ("**JSS**")[2], which, collectively with one or more of JSS's current or future subsidiaries or affiliates, is referred to

---

[1]    The debtors in these chapter 11 cases (collectively, the "**Debtors**"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2]    JSS, a Luxembourg *société anonyme*, was formed in the third quarter of 2017 directly, or indirectly, by KSS's ultimate parent. JSS was formed to satisfy various planning objectives and is a holding company for the company's operating business.

herein as the "**Plan Sponsor**".[3] I make this declaration (this "**Declaration**") in connection with the above-captioned chapter 11 cases in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* [Docket No. 1629] (as amended, supplemented, or otherwise modified from time to time, the "**Plan**") and certain proposed findings of fact set forth in the proposed form of Confirmation Order.[4] I make this Declaration voluntarily. Except as otherwise indicated, I have personal knowledge of the facts stated herein, having been involved in the events and business dealings described below.

### I. Background

#### A. Declarant's Role in Global Transaction

2. In my capacity as Senior Vice President and Chief Financial Officer of KSS, I serve as one of the Plan Sponsor's lead negotiators, and I am a principal day-to-day representative of the Plan Sponsor in connection with the Global Transaction. I have been personally involved in the Global Transaction since summer 2016, and I am familiar with substantially all material business issues encompassed in the negotiation of the Global Transaction.

#### B. Plan Sponsor's Pursuit and Negotiation of the Global Transaction

3. KSS initiated its pursuit of the Global Transaction by submitting an initial, non-binding "Interest Letter" dated July 1, 2016. Takata then invited KSS and several other

---

[3]   Note that prior to September 12, 2017, the term Plan Sponsor referred to KSS and certain of its subsidiaries and affiliates, as JSS had not yet been formed.

[4]   Capitalized terms used but not defined herein shall have the meanings ascribed to them the Plan or, if not defined therein, in the U.S. Acquisition Agreement (as defined in the Plan).

candidates to submit initial, non-binding proposals. KSS responded with a preliminary, non-binding proposal dated September 16, 2016, which comprised a high-level discussion of potential transaction terms and elements, including a preliminary indication of potential value, accompanied by, among other exhibits, a marked term sheet describing the implementation of the Global Transaction. Takata asked KSS and several other candidates to continue participating in the marketing process and to conduct additional due diligence and engage in negotiations concerning the structure and terms of a potential transaction. A principal term of KSS's bid was a requirement for an indemnity and a release from the OEMs who purchased PSAN Inflators. Accordingly, in approximately the same timeframe, KSS commenced negotiations with the Consenting OEMs to explore the scope of indemnity and releases.

4. At Takata's invitation, KSS submitted a non-binding final-round bid on January 26, 2017. That bid comprised a more detailed presentation of proposed transaction terms, including a marked term sheet for the U.S. Acquisition Agreement. Shortly thereafter, Takata, the Consenting OEMs, KSS, and another strategic bidder met in Tokyo, Japan for a final round of bidding, after which the Plan Sponsor was selected as the prevailing plan sponsor candidate.

5. Intense, arm's-length negotiations continued throughout the spring, summer, and fall of 2017. The definitive documents governing the Global Transaction were substantially finalized on November 3, 2017, and executed by the Plan Sponsor, the Consenting OEMs, and Takata on November 16, 2017. The Plan Sponsor's board met on November 7, 2017, to consider and approve the Plan Sponsor's entry into the Global Transaction and execution of the definitive documents, which were by that time in substantially final form.

6. Since the execution of the definitive documents governing the Global Transaction on November 16, 2017, the Plan Sponsor has continued to deploy substantial resources toward the completion of numerous critical workstreams essential to the timely implementation of the Global Transaction. These include integration planning, tax structuring, regulatory review and clearances, and many others.

7. The Plan Sponsor has also engaged in intensive, good-faith settlement negotiations with key stakeholders who had previously expressed opposition to the Global Transaction, including the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative. Through the course of many in-person and telephonic settlement conferences, and the exchange of numerous iterations of various settlement term sheets, the Plan Sponsor worked collaboratively with each stakeholder and sought to identify constructive solutions to the concerns raised. These efforts culminated in a consensual settlement with all major stakeholders, including settlements reached with the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative on or about February 9, 2018.

**II.  The Proposed Findings of Fact Relating to the Sale of the Purchased Assets Are Fair and Accurate.**

8. I understand that the Debtors' proposed form of Confirmation Order seeks various findings of fact concerning the sale of the Purchased Assets to the Plan Sponsor pursuant to the U.S. Acquisition Agreement and other applicable definitive documentation including, among others, findings that:

- the Global Transaction as it relates to the Debtors was negotiated in good faith and at arms' length and provides the Debtors reasonably equivalent and fair value for the Purchased Assets;

- the Plan Sponsor is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code;

- the Plan Sponsor will not be a "successor" to the Debtors;

- the Plan Sponsor Parties have provided a substantial contribution in exchange for the Plan's releases and injunctions in their favor and such releases and injunctions are critical to the Global Transaction; and

- the sale of the Purchased Assets to the Plan Sponsor will be free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, except for the Assumed Liabilities and Permitted Liens, in accordance with the terms of the Plan and the U.S. Acquisition Agreement.

The Plan Sponsor requires these findings to support the transaction, including in regards to the sale free and clear protections, Plan Injunction, Releases, and Channeling Injunction. I have reviewed and am familiar with these findings of fact and consider that they are true and correct to the best of my knowledge, information, and belief.

  **A.** **The Global Transaction, Including the U.S. Acquisition Agreement, Was Negotiated in Good Faith and at Arm's Length and Provides the Debtors Fair and Reasonably Equivalent Value for the Purchased Assets.**

  9. The U.S. Acquisition Agreement and the other definitive documents governing the Global Transaction as it relates to the Debtors are the products of intensive, good-faith, and arm's-length business negotiations among the Plan Sponsor, the Debtors, the Consenting OEMs, and other stakeholders. As detailed above, the Plan Sponsor was selected as such after participating in a robust, multistage competitive process coordinated by Takata and its advisors. I understand that the Plan Sponsor prevailed in Takata's formal sale process because its bid presented the greatest overall value to the Debtors and the other Takata entities, considering not

5

only the aggregate consideration offered, but also other critical factors such as execution certainty and customer support.[5] Notably, the aggregate consideration under the U.S. Acquisition Agreement includes not only the Base Purchase Price under the U.S. Acquisition Agreement (that is, the Debtors' regional share of $1.588 billion, or approximately $878.9 million), but also significant sources of potential additional value, including the Plan Sponsor Backstop Funding, the Business Incentive Plan Payment, and the assumption of the Assumed Liabilities, all of which will inure to the benefit of the Debtors' estates and creditors. Accordingly, I believe that the Plan Sponsor has offered reasonably equivalent and fair consideration for the purchase of the Purchased Assets under the U.S. Acquisition Agreement.

10. Upon its selection as the successful bidder, the Plan Sponsor commenced months of rigorous negotiations, comprising innumerable in-person and telephonic meetings, with Takata (including the Debtors) and the Consenting OEMs to structure and document the Global Transaction. The parties devoted substantial resources, including the dedication and time of the Plan Sponsor's management and executive teams to these negotiations and were represented throughout by sophisticated counsel and financial advisors. The negotiations culminated in three separate purchase agreements, including the U.S. Acquisition Agreement, plus dozens of additional agreements and other definitive documents, most of which went through countless iterations until their finalization and execution. Indeed, I would identify the Global Transaction

---

[5] *See* Declaration of Scott E. Caudill in Support of Debtors' Chapter 11 Petitions and First Day Relief ¶ 92 [Docket No. 19].

as the most sophisticated and intensely bargained acquisition transaction of the many in which I have participated in my career as an automotive-industry executive.

        **B.**        **The Plan Sponsor Is Not an Insider or Affiliate of the Debtors.**

11.    I understand from counsel that the Bankruptcy Code may deem a person an "insider" or "affiliate" of a debtor on the basis of various relationships between them, including, by way of example, if that person controls 20 percent or more of the voting securities of the debtor; is an officer, director, or general partner of the debtor; or holds certain other specified relationships with the debtor. The Plan Sponsor is not an "insider" or "affiliate" of the Debtors as so defined. As of the date hereof, the Plan Sponsor does not (and, immediately prior to the Effective Date will not) hold any voting securities of, or otherwise exercise control over, any of the Debtors, and there is no common identity of incorporators, directors, officers, or controlling equity holders between the Plan Sponsor and the Debtors.

        **C.**        **The Plan Sponsor Is Not a Successor to the Debtors.**

12.    Although the Plan Sponsor intends to purchase substantial assets from the Debtors, the Plan Sponsor will not be a successor to, continuation of, or alter ego of the Debtors. The Plan Sponsor will not acquire all assets and businesses of the Debtors, nor assume any liabilities of the Debtors other than those expressly designated in the U.S. Acquisition Agreement as Assumed Liabilities. Indeed, the exclusion of the Debtors' PSAN Inflator Business and all liabilities related thereto is a fundamental premise of the Global Transaction. Nor will the Plan Sponsor hold itself out to the public as a continuation of Takata's business. To the contrary, Takata after the Effective Date will continue manufacturing PSAN Inflators for limited purposes as Reorganized Takata, while the Plan Sponsor will operate the Purchased Assets under its own

name and, as noted above, without any continuity or common identity of officers or directors. Accordingly, the Global Transaction is not a mere continuation of Takata's business, nor does it represent a de facto merger or consolidation of Takata's and the Plan Sponsor's respective businesses. Finally, as noted above, the transaction was negotiated in good faith, for bona fide purposes, and offers the Debtors reasonably equivalent and fair consideration for the Purchased Assets.

**III.  The Plan Sponsor Parties Have Provided a Substantial Contribution in Exchange for the Releases and Injunctions in Their Favor, Which Are Indispensable to the Plan Sponsor's Participation in the Global Transaction.**

13.    The Plan incorporates certain releases and injunctions that bar the assertion against the Plan Sponsor Parties, including, without limitation, the Acquired Non-Debtor Affiliates and certain of their respective related persons, of claims relating to the Debtors, their non-Debtor affiliates, and the Global Transaction, including, without limitation, PSAN PI/WD Claims. The releases and injunctions in favor of the Plan Sponsor Parties and their respective related persons constitute an essential inducement for the Plan Sponsor's participation in the Global Transaction as it relates to the Debtors and are material to the settlements to be effectuated pursuant to the Plan. Indeed, the Tort Claimants' Committee and Future Claims Representative's support for the Channeling Injunction and third-party releases was a key inducement for the Plan Sponsor's settlement with these parties. These provisions are critical to ensure that the Plan Sponsor receives the benefit of its bargain: that it assumes only those liabilities that are expressly defined as Assumed Liabilities under the U.S. Acquisition Agreement and bears no liability for the Excluded Liabilities. Without these assurances, the Plan Sponsor would not undertake the Global Transaction. It is equally critical that the protections

afforded by the Plan's release and injunction provisions extend not just to the Plan Sponsor itself but also to the Plan Sponsor Parties, including any person who makes a loan to or investment in the Plan Sponsor for purposes of consummating the sale of the Purchased Assets, and including the Acquired Non-Debtor Affiliates and certain of their respective related persons described in the definition of "Released Parties." The Plan Sponsor Parties that make a loan to or investment in the Plan Sponsor are making a substantial contribution and therefore are requesting the benefit of the releases as well. I believe they merit the benefit of the releases and injunctions because their participation is vital to this transaction. Similarly, it is critical that the Plan's release and injunction provisions encompass the Plan Sponsor Parties' respective related persons in order to foreclose the possibility of a disgruntled claimant seeking to circumvent such releases and injunctions by asserting claims against such related persons pursuant to theories of successor liability or otherwise.

14.   As noted, Takata selected the Plan Sponsor as the prevailing bidder in its formal marketing process after concluding that the Global Transaction sponsored by the Plan Sponsor would maximize recoveries to creditors of the Debtors and the other Takata entities. In this regard, I believe that the Plan Sponsor has made a substantial contribution to the Debtors' restructuring, and the incremental value resulting from the settlements with the Creditors' Committee, Tort Claimants' Committee, and the Future Claims Representative is further support of the Plan Sponsor's substantial contribution. The Global Transaction will allow the Debtors to realize the highest and best value for the Purchased Assets, and the consideration provided by the Plan Sponsor—which includes not only the Base Purchase Price under the U.S. Acquisition Agreement, but also significant sources of potential additional value, including the Business

Incentive Plan Payment and the Plan Sponsor Backstop Funding Agreement—will fund substantial recoveries for creditors. Under the Plan Sponsor Backstop Funding Agreement, the Plan Sponsor agreed to backstop up to $75 million, subject to certain limitations, to assist with, for purposes of the Debtors in the Chapter 11 Cases, the DOJ Restitution Claim and PSAN Legacy Costs, thereby increasing the likelihood that the Debtors would have sufficient liquidity to fund certain elements that are critical to the Global Transaction. Moreover, while the first tranche of the backstop functions as an advance payment for the PSAN Assets that the Plan Sponsor is required to purchase pursuant to section 7.12 of the U.S. Acquisition Agreement, the net asset value of those assets is estimated to be only approximately $5 million. Nevertheless as described in paragraph 16, in connection with the Tort Claimants' Committee, Future Claims Representative, and Creditors' Committee settlements, the Plan Sponsor has agreed to redirect the full $25 million of the first tranche of the backstop, even if not triggered or required under the Plan Sponsor Backstop Funding Agreement.

15.  The Plan Sponsor's contributions were essential to reaching settlements with the Committees and the Future Claims Representative. Further, the Plan Sponsor has agreed in the settlement with the Creditors' Committee to, subject to certain exclusions, assume all third-party executory contracts related to the non-PSAN acquired business and contribute any remaining amount of the $5 million Cure Claims Cap to the creditor fund that will fund recoveries to general unsecured creditors with non-contingent, liquidated claims. If the remaining amount of the Cure Claims Cap is less than $2.5 million, the Plan Sponsor will contribute the difference so that the creditor fund receives at least $2.5 million.

16. Additionally, as described above, the Plan Sponsor has agreed in the settlement with the Debtors, Consenting OEMs, the Tort Claimants' Committee, and the Future Claims Representative, in exchange for the Releases and Channeling Injunction in favor of the Plan Sponsor Parties, to contribute $25 million, which amount is expected to be drawn under the backstop at closing and ultimately transferred to the PSAN PI/WD Trust following the repayment of such amount from post-closing dividends from TSAC. Each of the other Plan Sponsor Parties have likewise made substantial contributions to the Debtors' restructuring, for their proposed investments of debt or equity capital in the Plan Sponsor is necessary to finance the Global Transaction.

17. These contributions are integral elements of the Debtors' Plan and provide for significant distributions to general unsecured creditors that would otherwise not be available.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

DATED: Sterling Heights, Michigan
February 14, 2018

By: _____
Joseph Perkins

*[Signature Page to Declaration of Joseph Perkins]*

1103496.02-CHISR02A - MSW