## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

-------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **TK HOLDINGS INC.,** *et al.,* | : | **Case No. 17-11375 (BLS)** |
|  | : |  |
| **Debtors.**[1] | : | **Jointly Administered** |
|  | : |  |

-------------------------------------------------------x

## FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS

WEIL, GOTSHAL & MANGES LLP
Marcia L. Goldstein
Ronit J. Berkovich
Matthew P. Goren
Jessica Diab
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors
and Debtors in Possession*

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brett M. Haywood (No. 6166)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Attorneys for the Debtors
and Debtors in Possession*

Dated: February 14, 2018
    Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

**Table of Contents**

ARTICLE I          DEFINITIONS AND INTERPRETATION. ................................................1

   1.1          Definitions. ...........................................................................................1

   1.2          Interpretation; Application of Definitions; Rules of Construction. ...........44

   1.3          Reference to Monetary Figures. ..........................................................44

   1.4          Consent Rights of Restructuring Support Parties, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative. ......................................................................................44

   1.5          Controlling Document. ........................................................................44

ARTICLE II          ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS. ....................................................................45

   2.1          Administrative Expense Claims Bar Date. ...........................................45

   2.2          Allowance of Administrative Expense Claims. .....................................45

   2.3          Payment of Allowed Administrative Expense Claims. ...........................46

   2.4          Adequate Protection Claims. ...............................................................47

   2.5          Treatment of Fee Claims. ....................................................................47

   2.6          Treatment of Priority Tax Claims. .......................................................48

ARTICLE III          CLASSIFICATION OF CLAIMS AND INTERESTS. .............................48

   3.1          Classification in General. ....................................................................48

   3.2          Summary of Classification of Claims and Interests. ..............................49

   3.3          Elimination of Vacant Classes. ...........................................................51

   3.4          Voting Classes; Presumed Acceptance by Non-Voting Classes. ..............51

   3.5          Voting; Presumptions; Solicitation. .....................................................52

   3.6          Cramdown. .........................................................................................52

   3.7          No Waiver. .........................................................................................52

ARTICLE IV          TREATMENT OF CLAIMS AND INTERESTS. ....................................52

   4.1          Claims and Interests against TKAM. ...................................................52

   4.2          Claims and Interests against TKF. .......................................................55

   4.3          Claims and Interests against TKC. .......................................................57

   4.4          Claims and Interests against the TKH Debtors. ....................................59

   4.5          Claims and Interests against IIM. ........................................................63

   4.6          Claims and Interests against TDM. ......................................................68

   4.7          Claims and Interests against SMX. ......................................................72

| 4.8 | Debtors' Rights in Respect of Unimpaired Claims | 77 |
|---|---|---|
| 4.9 | Treatment of Vacant Classes. | 77 |
| ARTICLE V | MEANS FOR IMPLEMENTATION. | 77 |
| 5.1 | Restructuring Transactions. | 77 |
| 5.2 | Sale of Purchased Assets. | 77 |
| 5.3 | Plan Sponsor Backstop Funding. | 78 |
| 5.4 | Vesting of Assets. | 78 |
| 5.5 | Allocation of Purchase Price. | 79 |
| 5.6 | The Reorganized TK Holdings Trust. | 85 |
| 5.7 | TK Global LLC. | 89 |
| 5.8 | Reorganized Takata. | 91 |
| 5.9 | The Warehousing Entity. | 94 |
| 5.10 | The PSAN PI/WD Trust | 98 |
| 5.11 | TKC Restructuring Transaction. | 112 |
| 5.12 | TSAC DOJ Restitution Claim Funding Deficiency. | 112 |
| 5.13 | Mexico Restructuring Transaction. | 113 |
| 5.14 | Charters; By-laws. | 114 |
| 5.15 | Cancellation of Notes, Interests, Instruments, Certificates, and Other Documents. | 114 |
| 5.16 | Separate Plans. | 114 |
| 5.17 | Merger; Dissolution; Consolidation; Discharge. | 114 |
| 5.18 | Closing of the Chapter 11 Cases. | 115 |
| 5.19 | Plan Settlement. | 115 |
| ARTICLE VI | DISTRIBUTIONS. | 121 |
| 6.1 | Distributions Generally. | 121 |
| 6.2 | Distribution Formula. | 121 |
| 6.3 | Contributions Distribution Formula. | 123 |
| 6.4 | Available Cash. | 123 |
| 6.5 | Initial Distribution of Available Cash. | 123 |
| 6.6 | Date of Distributions. | 123 |
| 6.7 | Disbursing Agent. | 124 |
| 6.8 | Rights and Powers of Disbursing Agent. | 124 |
| 6.9 | Expenses of Disbursing Agent. | 124 |

WEIL:\96446450\6\76903.0004

6.10       Delivery of Distributions. .................................................................124

6.11       Undeliverable and Unclaimed Distributions.............................................125

6.12       Distribution Record Date. ...............................................................125

6.13       Manner of Payment under Plan..........................................................125

6.14       Minimum Cash Distributions............................................................125

6.15       Setoffs and Recoupment. ................................................................126

6.16       Distributions after Effective Date. ......................................................126

6.17       Interest and Penalties on Claims. .......................................................126

6.18       No Distribution in Excess of Amount of Allowed Claim......................126

6.19       Satisfaction of Claims. ..................................................................126

6.20       Withholding and Reporting Requirements. ...........................................126

ARTICLE VII       PROCEDURES FOR DISPUTED CLAIMS. .............................127

7.1        Disputed Claims Reserves. ..............................................................127

7.2        Claim Objections. .........................................................................128

7.3        No Distribution Pending Allowance.....................................................128

7.4        Estimation of Claims......................................................................128

7.5        Distribution After Allowance. ...........................................................128

7.6        Resolution of Claims......................................................................129

7.7        Periodic Distributions from the Disputed Claims Reserves. ...................129

7.8        Distributions on the Non-PSAN PI/WD Claims Termination Date. .......129

7.9        Property Held in the Disputed Claims Reserves.....................................129

7.10       Claims Resolution Procedures Cumulative. ..........................................130

7.11       No Postpetition Interest...................................................................130

7.12       Disputed Contributions Reserve. .......................................................130

7.13       Claims Oversight Committee.............................................................131

ARTICLE VIII       EXECUTORY CONTRACTS AND UNEXPIRED LEASES..................131

8.1        Assumption and Rejection of Executory Contracts and Unexpired Leases...........................................................................................131

8.2        Determination of Cure Disputes and Deemed Consent. .........................132

8.3        Payments Related to Assumption of Contracts and Leases....................134

8.4        OEM Contracts. ............................................................................134

8.5        Rejection Claims. ..........................................................................137

8.6        Survival of the Debtors' Indemnification Obligations............................137

WEIL:\96446450\6\76903.0004

8.7          Compensation and Benefit Plans. .........................................................137

8.8          Insurance Policies. ..............................................................................138

8.9          Reservation of Rights. ..........................................................................138

ARTICLE IX       CONDITIONS PRECEDENT TO CONFIRMATION OF THE
                 PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE. ..........139

9.1          Conditions Precedent to Confirmation. ...................................................139

9.2          Conditions Precedent to the Effective Date. ...........................................139

9.3          Waiver of Conditions Precedent. ..........................................................141

ARTICLE X        EFFECT OF CONFIRMATION ...............................................................142

10.1         Binding Effect. .....................................................................................142

10.2         Discharge of Claims against and Interests in the Reorganized
             Debtors. ...............................................................................................142

10.3         Pre-Confirmation Injunctions and Stays. ...............................................142

10.4         Injunction against Interference with Plan. ..............................................143

10.5         Plan Injunction. ...................................................................................143

10.6         Releases. ..............................................................................................144

10.7         Channeling Injunction. ..........................................................................147

10.8         Exculpation. ........................................................................................150

10.9         Injunction Related to Releases and Exculpation. ....................................150

10.10        Subordinated Claims. ...........................................................................150

10.11        Avoidance Actions. ..............................................................................150

10.12        Retention of Causes of Action and Reservation of Rights. ....................151

10.13        Ipso Facto and Similar Provisions Ineffective. .....................................151

10.14        No Successor Liability. .........................................................................151

10.15        Special Provisions for Governmental Units. ...........................................152

ARTICLE XI       RETENTION OF JURISDICTION ...........................................................154

11.1         Retention of Jurisdiction. ......................................................................154

ARTICLE XII      MISCELLANEOUS PROVISIONS ...........................................................156

12.1         Exemption from Certain Transfer Taxes. ...............................................156

12.2         Dates of Actions to Implement This Plan. ..............................................157

12.3         Amendments. ........................................................................................157

12.4         Revocation or Withdrawal of Plan. ........................................................157

12.5         Payment of Statutory Fees. ...................................................................158

iv

12.6      Restructuring Expenses.....................................................................158

12.7      Severability. ....................................................................................158

12.8      Governing Law. ...............................................................................159

12.9      Immediate Binding Effect.................................................................159

12.10     Successors and Assigns.....................................................................159

12.11     Entire Agreement. ............................................................................159

12.12     Computing Time. ..............................................................................159

12.13     Exhibits to Plan. ...............................................................................160

12.14     Notices. .............................................................................................160

12.15     Reservation of Rights........................................................................161

WEIL:\96446450\6\76903.0004

Each of Takata Americas, TK Finance, LLC, TK China, LLC, TK Holdings Inc., Takata Protection Systems Inc., Interiors in Flight Inc., TK Mexico Inc., TK Mexico LLC, TK Holdings de Mexico, S. de R.L. de C.V., Industrias Irvin de Mexico, S.A. de C.V., Takata de Mexico, S.A. de C.V., and Strossle-Mex, S. de R.L. de C.V. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in section 1.1 below.

# ARTICLE I          DEFINITIONS AND INTERPRETATION.

## 1.1     *Definitions.*

The following terms shall have the respective meanings specified below:

***Access Agreement*** means that certain access and security agreement dated August 9, 2017, entered into by certain Consenting OEMs and certain Takata entities, including the Debtors [Docket No. 953].

***Acquired Non-Debtor Affiliates*** means each of the affiliates of the Debtors, the capital stock or other equity interests of which will be acquired by the Plan Sponsor pursuant to the U.S. Acquisition Agreement or any Cross-Conditioned Agreement (as defined in the U.S. Acquisition Agreement), as set forth on **Schedule A** hereto.

***Additional Support Party Funds*** means funds, if any, contributed by the Debtors to the Support Party Creditor Fund to pay any Allowed Other General Unsecured Claims arising from the rejection of an executory contract or unexpired lease in accordance with section 5.19(g) of the Plan in a sufficient amount to ensure that there is no dilutive effect to the Pro Rata Share each Eligible Creditor would have received from the Support Party Creditor Fund as of the Effective Date absent the rejection of such executory contract or unexpired lease, with such funds to be paid from the applicable Claims Reserve.

***Adequate Protection Claim*** has the meaning assigned in the Adequate Protection Order.

***Adequate Protection Order*** means, collectively, the interim and final orders of the Bankruptcy Court, dated June 27, 2017 and October 3, 2017 [Docket Nos. 107 & 953], respectively, authorizing the Debtors to, among other things, enter into the Global Accommodation Agreement and granting the Adequate Protection Claims.

***Administrative Expense Claim*** means any Claim, other than an Adequate Protection Claim, for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) Fee Claims, (iii) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, (iv) all Allowed Claims that are to be treated as

Administrative Expense Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy Code, (v) Cure Claims, and (vi) Administrative Expense OEM Claims.

***Administrative Expense Claims Bar Date*** means the deadline for filing requests for payment of certain Administrative Expense Claims, which shall be the first Business Day that is sixty (60) days following the Effective Date, unless otherwise ordered by the Bankruptcy Court.

***Administrative Expense OEM Claim*** means any Claim of an OEM against the Debtors arising out of or relating to a Takata product sold or supplied to an OEM on or after the Petition Date, but prior to the Closing Date, including any Consenting OEM PSAN Administrative Expense Claims.

***Administrative Expense PI/WD Claim*** means any Claim, other than an Administrative Expense PSAN PI/WD Claim, for alleged personal injury, wrongful death, or other similar Claim or Cause of Action against the Debtors arising out of or relating to an injury or death allegedly caused by a Takata Product sold or supplied to an OEM or any other Person on or after the Petition Date, but prior to the Closing Date, regardless of whether the injury occurs before or after the Closing Date.

***Administrative Expense PSAN PI/WD Claim*** means any Claim for alleged personal injury, wrongful death, or other similar Claim or Cause of Action against the Debtors arising out of or relating to an injury or death allegedly caused by a PSAN Inflator sold or supplied to an OEM or any other Person on or after the Petition Date, but prior to the Closing Date, regardless of whether the injury occurs before or after the Closing Date.

***Agreed Allocation*** means the method of allocating recoveries on account of certain Allowed Claims among the Consenting OEMs, as described in the Customer Allocation Schedule attached hereto as **Exhibit 1**.

***Allocable Share*** means, as applicable under the circumstances, (i) the percentage of Purchase Price received by each of IIM, SMX, TDM, or the TKH Debtors under the U.S. Acquisition Agreement, as applicable, relative to the aggregate Purchase Price received by all such Debtors, (ii) the percentage of Purchase Price received by each of the Debtors under the U.S. Acquisition Agreement, as applicable, relative to the aggregate Purchase Price received by all Debtors, or (iii) amounts in the Legacy Entities Reserves or the Post-Closing Reserve attributable to a particular Debtor in the reasonable discretion of the Legacy Trustee (in the case of the Reorganized TK Holdings Trust Reserve) or the Plan Administrator (in the case of the Warehousing Entity Reserve and the Post-Closing Reserve), based on the assets of such Debtor contributed to or monetized by the Legacy Entities or Reorganized Takata.

***Allowed*** means, with respect to any Claim against or Interest in a Debtor (other than a PSAN PI/WD Claim), (i) any Claim to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order, (ii) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a

2

Final Order of the Bankruptcy Court, (iii) any Claim that is listed in the Schedules as liquidated, non-contingent, and undisputed, (iv) any Claim or Interest arising on or before the Effective Date as to which no objection to allowance has been interposed within the time period set forth in the Plan, and (v) any Claim or Interest expressly allowed hereunder; *provided, however,* that the Reorganized Debtors shall retain all Claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.

*Amended By-Laws* means, with respect to a Reorganized Debtor, other than Reorganized TK Holdings, such Reorganized Debtor's amended and restated by-laws or operating agreement, a substantially final form of which shall be contained in the Plan Supplement to the extent they contain material changes to the existing documents.

*Amended Certificate of Incorporation* means, with respect to each Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation or certificate of formation, a substantially final form of which shall be contained in the Plan Supplement.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property.

*Assumed Liabilities* has the meaning assigned in the U.S. Acquisition Agreement.

*Assumed PSAN Contracts* means, collectively, the Modified Assumed PSAN Contracts and the Standalone PSAN Assumed Contracts.

*Authorized Purposes* means those actions that the Plan Administrator (through TK Global LLC, Reorganized Takata, the Warehousing Entity, or otherwise) is authorized to perform solely as follows: (i) continue the operations of Reorganized Takata during the Operating Term, (ii) supervise the construction, manufacture, assembly, sale, and/or distribution to the PSAN Consenting OEMs of PSAN Inflators related to the NHTSA Consent Order or any similar order by other regulatory authorities related to recalls, to the extent applicable, and pursuant to the terms of any Assumed PSAN Contract and any renewals or extensions thereof or in respect of production of current model series, (iii) upon expiration of the Operating Term or as any such assets are no longer needed to support production of PSAN Inflators by Reorganized Takata, liquidate the PSAN Assets, (iv) perform its obligations under the Transition Services Agreement, the Shared Services Agreement, and the Plan Sponsor Backstop Funding Agreement, (v) pay the costs and fees of the Special Master (including the Special Master Retainer), which shall be subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Michigan, the DOJ Monitor, and the NHTSA Monitor, (vi) serve as chief executive officer of TK Global LLC, (vii) cause Reorganized Takata to reject or assume executory contracts and unexpired leases in accordance with section 5.19(h) of the Plan; and (viii) carry out the purposes and obligations of the Warehousing Entity as set forth in the Plan.

*Available Cash* means, collectively, the IIM Available Cash, the SMX Available Cash, the TDM Available Cash, the TKAM Available Cash, the TKC Available Cash, the TKF Available Cash, and the TKH Available Cash.

3

***Avoidance Actions*** means any and all actual or potential Claims or Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes and common law.

***Backstop Expiration Date*** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

***Backstop Funding Cap*** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

***Backstopped Claims*** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

***Bar Date Order*** means, collectively, (i) the order of the Bankruptcy Court, dated October 4, 2017 [Docket No. 959], establishing deadlines by which proofs of Claim must be filed with respect to certain Claims and (ii) the order of the Bankruptcy Court, dated December 18, 2017 [Docket No. 1395], establishing a supplemental deadline by which proofs of Claim must be filed by parties that became registered owners of vehicles containing the Debtors' PSAN Inflators subsequent to the Petition Date.

***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

***Business Incentive Plan Payment*** has the meaning assigned in the U.S. Acquisition Agreement.

***Cash*** means legal tender of the United States of America.

**Cash Proceeds** means, collectively, the IIM Cash Proceeds, the SMX Cash Proceeds, the TDM Cash Proceeds, the TKAM Cash Proceeds, the TKC Cash Proceeds, the TKF Cash Proceeds, and the TKH Cash Proceeds.

**Cause of Action** means any action, class action, Claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, at law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes: (i) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breaches of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any Claim or cause of action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code; (iv) any Claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any Claims under any state or foreign law, including any fraudulent transfer or similar claims.

**Challenge Period** has the meaning assigned to such term in the Stipulation Amending the Accommodation Agreement and Further Extending the Challenge Period, dated as of February 9, 2018 [Docket No. 2016-1].

**Channeling Injunction** means the permanent injunction provided for in section 10.7 of this Plan with respect to PSAN PI/WD Claims against the Protected Parties to be issued pursuant to the Confirmation Order.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code, and styled *In re TK Holdings Inc., et al.*, Ch. 11 Case No. 17-11375 (BLS).

**Civil Rehabilitation Court** means the 20th Department of the Civil Division of the Tokyo District Court, or any other Japanese court having jurisdiction over the Japan Proceedings.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

**Claims Administrator(s)** means individually or collectively, the Legacy Trustee, the OEM Claims Administrator, and the PSAN PI/WD Trustee, some or all of whom may be the same Person or the Special Master.  If not already provided, the identity of each Claims Administrator shall be disclosed as part of the Plan Supplement.

**Claims Estimation Report** means the report produced by the claims estimation expert retained by the Debtors to estimate existing and future PSAN PI/WD Claims, Administrative Expense PSAN PI/WD Claims, and Post-Closing PSAN PI/WD Claims.

**Claims Oversight Committee** means the committee of three members, two members to be selected by the Tort Claimants' Committee and one member to be selected by the Creditors' Committee, to review the resolution of certain Claims by the Reorganized TK Holdings Trust in accordance with section 7.13 of the Plan.

**Claims Reserves** means, collectively, the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, the TKAM Claims Reserve, the TKC Claims Reserve, the TKF Claims Reserve, and the TKH Claims Reserve.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Closing Date** has the meaning assigned in the U.S. Acquisition Agreement.

**Committees** means, collectively, the Creditors' Committee and the Tort Claimants' Committee.

**Component Parts** means component parts, Service Parts, assemblies, components, and/or other Products.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Plan Settlement.

**Consenting OEM Additional GUC Recoveries** means Consenting OEM GUC Recoveries in excess of the Consenting OEM GUC Recovery Threshold.

**Consenting OEM Bailor** means each Consenting OEM (or its applicable Consenting OEM Tier One or Consenting OEM Contract Manufacturer) that requires Module Production, Kitting Operations, or PSAN Service Parts production (each as defined in the Indemnity Agreement) and that bails to Plan Sponsor or any Acquired Non-Debtor Affiliate, PSAN Inflators purchased prior to the Closing Date by such Consenting OEM (or its applicable Consenting OEM Tier One or Consenting OEM Contract Manufacturer) from the Debtors.

**Consenting OEM Contract Manufacturer** means a third party (that is not itself a Consenting OEM) that (i) manufactures or assembles, or manufactured or assembled, automobiles for a Consenting OEM and (ii) is or was at any point in time previously a party to a Purchase Order with the Debtors for the manufacture or sale of Products that have been or will be incorporated into a Consenting OEM's automobiles.  For clarity, any such third party shall be deemed to be a Consenting OEM Contract Manufacturer only with respect to the applicable Consenting OEM for which it manufactures or assembles, or manufactured or assembled, automobiles containing Products.

6

*Consenting OEM Contributions* means all amounts contributed by the Consenting OEMs to the Plan Settlement Fund as set forth in clause (iv) of section 5.19(b) and section 5.19(e)(i) of the Plan.

*Consenting OEM GUC Recoveries* means, other than any Consenting OEM Incremental GUC Recoveries, any Available Cash the Consenting OEMs are or become entitled to receive on account of Consenting OEM Unsecured Claims at any time on or after the Effective Date, including from (i) Effective Date Available Cash, (ii) the Plan Settlement Turnover Amount, (iii) Surplus Reserved Cash from the Claims Reserves that is made available to the Recovery Funds or Disputed Claims Reserves in accordance with section 5.5(d)(i) of the Plan, or (iv) Residual Value funded by or allocable to the Debtors.  For the avoidance of doubt, Consenting OEM GUC Recoveries do not include (i) recoveries on account of the Consenting OEMs' rights to payment of the Business Incentive Plan Payment, (ii) recoveries on account of Consenting OEMs' rights to indemnification, contribution, or subrogation as set forth in section 5.10(e) of the Plan, (iii) the funding of the PSAN Legacy Costs, and (iv) any amounts received by any Consenting OEM on account of General Unsecured Claims in other regions or sources, in each case, to the extent independent of the Plan.

*Consenting OEM GUC Recovery Threshold* means an aggregate amount of Consenting OEM GUC Recoveries equal to the Consenting OEMs' share, determined in accordance with the Distribution Formula, of the first $89.9 million of Available Cash; *provided*, *however*, that in computing the Consenting OEM GUC Recovery Threshold, any amounts that become available to the Plan Settlement Fund or the PSAN PI/WD Trust resulting from or attributable to any of the following shall not be included in such computation, regardless of how such amounts become available to the PSAN PI/WD Trust: (i) NHTSA Claims being treated as Other General Unsecured Claims, (ii) the Plan Sponsor Contribution Amount, (iii) the TKJP Contribution Amount or the TKJP 503(b)(9) Claim being setoff against Claims of the Debtors against TKJP, disallowed, other eliminated, subordinated, or treated as an Other General Unsecured Claim, (iv) the reallocation to the Plan Settlement Fund of a portion of the Consenting OEMs' entitlement to the Business Incentive Plan Payment pursuant to section 5.19(b) of the Plan, or (v) PI/WD Insurance Proceeds.

*Consenting OEM Incremental GUC Recoveries* means the incremental amount of Available Cash the Consenting OEMs receive or become entitled to receive on account of Consenting OEM Unsecured Claims at any time on or after the Effective Date, including from (i) Effective Date Available Cash, (ii) the Plan Settlement Turnover Amount, (iii) Surplus Reserved Cash from the Claims Reserves that is made available to the Recovery Funds or Disputed Claims Reserves in accordance with section 5.5(d)(i) of the Plan, or (iv) Residual Value funded by or allocable to the Debtors, resulting from or attributable to (i) the NHTSA Claims being treated as Other General Unsecured Claims, rather than being paid in full pursuant to the Plan and/or (ii) the TKJP 503(b)(9) Claim being setoff against Claims of the Debtors against TKJP, disallowed, otherwise eliminated, subordinated, or treated as an Other General Unsecured Claim, rather than being paid in full pursuant to the Plan.

*Consenting OEM PSAN Administrative Expense Claim* means any Claim of a Consenting OEM arising out of or relating to a Takata product containing a non-desiccated or

7

desiccated PSAN Inflator sold or supplied to an OEM on or after the Petition Date, but prior to the Closing Date.

   ***Consenting OEM PSAN Contract Manufacturer*** means a third party (that is not itself a Consenting OEM) that (i) manufactures or assembles, or manufactured or assembled, automobiles for a Consenting OEM and (ii) is or was a party to a Purchase Order with the Debtors for the manufacture or sale of PSAN Inflators that are or were at any point in time previously incorporated into the Consenting OEM's automobiles.  For clarity, any such third party shall be deemed to be a Consenting OEM PSAN Contract Manufacturer only with respect to the applicable Consenting OEM for which it manufactures or assembles, or manufactured or assembled, automobiles containing PSAN Inflators.

   ***Consenting OEM PSAN Cure Claim*** means any Cure Claim with respect to an Assumed PSAN Contract.

   ***Consenting OEM PSAN PI/WD Trust Reserves*** means each Consenting OEM's trust reserve established pursuant to section 5.10(n) of the Plan.

   ***Consenting OEM PSAN Tier One*** means, for any Consenting OEM, any Consenting OEM Tier One, including a Directed PSAN Tier One, solely to the extent that it sources or uses or at any point in time previously sourced or used PSAN Inflators from the Debtors that are or were supplied to, or incorporated into Component Parts of, such Consenting OEM.  For clarity, any such supplier shall be deemed to be a Consenting OEM PSAN Tier One only with respect to the applicable Consenting OEM to which it supplies or supplied, or into whose Component Parts it incorporates or incorporated, PSAN Inflators from the Debtors.

   ***Consenting OEM Tier One*** means, for any Consenting OEM, a supplier, including a Directed Tier One, to such Consenting OEM solely to the extent that such supplier sources or uses or at any point in time previously sourced or used components, parts, or assemblies from the Debtors that are, were, or will be supplied to, or incorporated into, Component Parts of such Consenting OEM; *provided*, *however*, that no Consenting OEM shall itself be a Consenting OEM Tier One.  For clarity, any such supplier shall be deemed to be a Consenting OEM Tier One only with respect to the applicable Consenting OEM to which it supplies or supplied such components, parts, or assemblies.

   ***Consenting OEM Unsecured Claims*** means any OEM Unsecured Claim of a Consenting OEM against any of the Debtors (except for TKAM, TKC, and TKF).  For the avoidance of doubt, the term "Consenting OEM Unsecured Claims" shall not include the DOJ Restitution Claim or any Adequate Protection Claim.

   ***Consenting OEMs*** means those OEMs that purchase or have purchased PSAN Inflators from the Debtors that are party to the Indemnity Agreement and the Global Settlement Agreement and are subject to the Agreed Allocation, or that become party to the Indemnity Agreement and the Global Settlement Agreement and are subject to the Agreed Allocation prior to the Effective Date; *provided*, *however*, that for purposes of any consent or approval right of the Consenting OEMs set forth in this Plan, "Consenting OEMs" shall mean the "Initial

Consenting OEMs" (as defined in the U.S. RSA) that have voting rights under the U.S. RSA at the time such consent or approval right is exercised.

*Contributions Distribution Formula* means the distribution formula for Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount provided for in section 6.3 of the Plan, including its subparagraphs.

*Creditors' Committee* means the statutory committee of unsecured creditors appointed by the U.S. Trustee on July 7, 2017 pursuant to section 1102(a)(1) of the Bankruptcy Code.

*Cure Amount* means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Cure Amount Notice* means the notice of proposed Cure Amount provided to counterparties to executory contracts and unexpired leases pursuant to the Solicitation Procedures Order.

*Cure Claim* means a Claim for cure in connection with the assumption or assumption and assignment of an executory contract or unexpired lease under section 365(a) of the Bankruptcy Code, including any Consenting OEM PSAN Cure Claim.

*Cure Claims Cap* has the meaning assigned in the U.S. Acquisition Agreement.

*Cure Dispute* means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues related to assumption of an executory contract or unexpired lease.

*Debtor(s)* has the meaning set forth in the introductory paragraph of this Plan.

*Direct Expense Payment* means a Debtor's direct payment to an advisor or other third party providing services to the Plan Sponsor in connection with the Restructuring Transactions for such advisor's or other third party's expenses in accordance with section 12.6 of this Plan.

*Directed PSAN Tier One* means a Consenting OEM PSAN Tier One that is or was at any point in time previously directed pursuant to a formal agreement with the applicable Consenting OEM to source or use PSAN Inflators from the Debtors (including under any purchase agreement, supply contract, purchase order, or other contract providing for such directed sourcing relationship). For clarity, any such supplier shall be deemed to be a Directed PSAN Tier One only with respect to the applicable Consenting OEM with which it has or had a formal directed-buy agreement in respect of PSAN Inflators (including under any purchase agreement, supply contract, purchase order, or other contract providing for such directed sourcing relationship).

9

**Directed Tier One** means a Consenting OEM Tier One that is or was at any point in time previously directed pursuant to a formal agreement with the applicable Consenting OEM to source or use components, parts, or assemblies from the Debtors (including under any purchase agreement, supply contract, purchase order, or other contract providing for such directed sourcing relationship).  For clarity, any such supplier shall be deemed to be a Directed Tier One only with respect to the applicable Consenting OEM with which it has or had a formal directed-buy agreement (including under any purchase agreement, supply contract, purchase order, or other contract providing for such directed sourcing relationship) to source or use components, parts, or assemblies from the Debtors.

**Disallowed** means any Claim, or any portion thereof, that (i) has been disallowed by a Final Order or a settlement, (ii) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order, or otherwise deemed timely filed under applicable law, or (iii) is not Scheduled and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**Disbursing Agent** means any Entity in its capacity as a disbursing agent under sections 6.7 and 6.8 hereof, including the applicable Claims Administrator, that acts in such a capacity to make Distributions pursuant to the Plan.

**Disclosure Statement** means the disclosure statement for this Plan, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, and other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**Disputed** means any Claim that is not yet Allowed or Disallowed.

**Disputed Claims Reserves** means, collectively, the IIM Disputed Claims Reserve, the SMX Disputed Claims Reserve, the TDM Disputed Claims Reserve, and the TKH Disputed Claims Reserve.

**Disputed Contributions Reserve** means the reserve established and maintained by the PSAN PI/WD Trustee, which shall be funded by Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount based on the Contributions Distribution Formula, which reserve shall be held for the benefit of holders of PSAN PI/WD Claims and subsequently Allowed Other PI/WD Claims against the Debtors for contribution to the PSAN PI/WD Funds and the Other PI/WD Funds, respectively, in accordance with section 7.12 of the Plan.  The Disputed Contributions Reserve shall be held by the PSAN PI/WD Trust.

**Disputed Cure Claim** means the amount that a counterparty to a Cure Dispute alleges must be paid in order for an executory contract or unexpired lease to either be assumed by the Debtors or assumed by the Debtors and assigned to the Plan Sponsor.

WEIL:\96446450\6\76903.0004

**Disputed Cure Claims Reserve** means the amount of IIM Cash Proceeds, SMX Cash Proceeds, TDM Cash Proceeds, and TKH Cash Proceeds, based on the percentage of each of IIM's, SMX's, TDM's, and the TKH Debtors' Disputed Cure Claims, as applicable, relative to the aggregate amount of such Debtors' Disputed Cure Claims, to be reserved in a segregated account in the applicable Debtor's Claims Reserve in the reasonable discretion of the Debtors, after consultation with the Plan Sponsor, necessary to pay (i) the aggregate amount of Disputed Cure Claims for Purchased Contracts less (y) the amount equal to the Cure Claims Cap less any other Cure Claims paid by the Plan Sponsor on the Effective Date, or (ii) such lower amount as ordered by the Bankruptcy Court.

**Dissolution Date Cash** means any Cash in the Reorganized TK Holdings Trust, Reorganized Takata, or the Warehousing Entity, including Cash in the Post-Closing Reserve and the Legacy Entities Reserves (as applicable) and Post-Closing Cash, remaining upon dissolution of any such entity pursuant to this Plan.

**Distribution** means any initial or periodic payment or transfer of consideration to holders of Allowed Claims and Interests made under this Plan.

**Distribution Date** means any of the Initial Distribution Date or the Periodic Distribution Dates.

**Distribution Formula** means the distribution formula provided for in section 6.2 of the Plan, including its subparagraphs.

**Distribution Record Date** means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

**District Court** means the United States District Court for the District of Delaware.

**DOJ** means the United States Department of Justice.

**DOJ Monitor** means the independent compliance monitor appointed pursuant to the DOJ Plea Agreement.

**DOJ OEM Restitution Fund** means the $850 million OEM restitution fund established under paragraphs 1 and 2 of the DOJ Restitution Order.

**DOJ PI/WD Restitution Fund** means the $125 million personal injury and wrongful death restitution fund established under paragraphs 3 and 4 of the DOJ Restitution Order.

**DOJ Plea Agreement** means the Rule 11 Plea Agreement, dated January 13, 2017, among the DOJ, the United States Attorney's Office for the Eastern District of Michigan, and TKJP.

WEIL:\96446450\6\76903.0004

***DOJ Restitution Claim*** means the $850 million in restitution payable for the benefit of OEMs pursuant to paragraphs 1 and 2 of the DOJ Restitution Order.

***DOJ Restitution Order*** means the Joint Restitution Order entered by the United States District Court for the Eastern District of Michigan on February 27, 2017 in the case captioned *U.S. v. Takata Corporation*, Case No. 16-cr-20810 (E.D. Mich.).

***Economic Loss Claim*** means any Claim or Cause of Action, whether individual, class, or collective, against the Debtors for damages, including actual, compensatory, general, special, punitive, incidental, consequential, expectation, nominal, equitable, restitutionary, and statutory damages, arising out of or related to any recalls or the presence of one or more PSAN Inflators in a vehicle.  Economic Loss Claims do not include PSAN PI/WD Claims, Administrative Expense PSAN PI/WD Claims, Administrative Expense PI/WD Claims, OEM Claims, Administrative Expense OEM Claims, Cure Claims, Other PI/WD Claims, the Mexico Class Action Claims, or the Mexico Labor Claims.

***Effective Date*** means the date which is the first Business Day on which (i) all conditions precedent to the effectiveness of this Plan set forth in section 9.1 hereof have been satisfied or waived in accordance with the terms of this Plan and (ii) no stay of the Confirmation Order is in effect.

***Effective Date Available Cash*** means, collectively, the IIM Effective Date Available Cash, the SMX Effective Date Available Cash, the TDM Effective Date Available Cash, the TKAM Effective Date Available Cash, the TKC Effective Date Available Cash, the TKF Effective Date Available Cash, and the TKH Effective Date Available Cash.

***Eligible Creditor*** means any holder of an Other General Unsecured Claim that is Allowed as of the Effective Date, except for any holder of an Other General Unsecured Claim based on any litigation threatened or pending against the Debtors, including any PPIC Claim (as defined in the Bar Order).

***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

***EPA*** means the United States Environmental Protection Agency.

***Estate(s)*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

***Excess Amount*** means any remaining amount of the Cure Claims Cap payable by the Plan Sponsor under the U.S. Acquisition Agreement.

***Excluded Assets*** has the meaning assigned in the U.S. Acquisition Agreement.

***Excluded Contracts*** means, collectively, (i) all contracts related to Excluded Assets (including (a) contracts related to PSAN Inflators, (b) contracts with non-Consenting OEMs and related supply contracts that exclusively supply such non-Consenting OEMs, (c) contracts related to Transdigm Inc., Schroth Safety Systems LLC, Takata Protection Systems Inc., and Interiors in Flight Inc., and (d) all Insurance Policies), (ii) all contracts with Consenting

12

OEM PSAN Tier Ones, other than contracts that the Plan Sponsor is required to take assignment of under section 8.4(e) of the Plan and contracts with Directed Tier Ones, where the Plan Sponsor does not receive a release from the Consenting OEM PSAN Tier One or indemnification from the applicable Consenting OEM on behalf of such Consenting OEM PSAN Tier One in accordance with the terms of the Indemnity Agreement, (iii) contracts related to employees that are not Transferred Employees, (iv) contracts related to the Debtors' employee benefit plans, (v) the executory contracts and unexpired leases set forth on the Schedule of Rejected Contracts, (vi) contracts relating to Intellectual Property (as defined in the U.S. Acquisition Agreement) that are not assignable to the Plan Sponsor, and (vii) up to ten percent (10%) of Intellectual Property contracts that are assignable to the Plan Sponsor.

*Excluded MB Claims means* the Claims asserted in (i) proof of claim number 3444 by Mercedes-Benz U.S. International, Inc., in an unliquidated amount and (ii) proof of claim number 3499 by Daimler Trucks North America LLC in an unliquidated amount, in each case, as such proofs of claim may be amended, supplemented, or modified from time to time.

*Exculpated Parties* means, collectively, (i) the Debtors, (ii) the Committees and their respective members, solely in their capacity as such, (iii) the Future Claims Representative, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers, directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees.

*Extended Opt-In Period* means, with respect to each Consenting OEM, the period beginning on the first day after the expiration of the Initial Opt-In Period and ending upon the earlier of (i) the four (4) year anniversary of the date of expiration of the Initial Opt-In Period and (ii) the forty-sixth (46th) day after the occurrence of an Opt-In Trigger Event with respect to the applicable Consenting OEM.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date by Professional Persons.

*Fee Escrow Account* means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date.

*Final Order* means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (ii) if a timely appeal shall have been filed or sought, either (A) (1) no stay of the order shall be in effect and (2) the appeal would not reasonably be expected to prevent or materially impede the consummation of the Restructuring Transactions or have a material adverse effect on the discharge granted under this Plan, or the releases, injunctions, or exculpations granted under this Plan in favor of the Plan Sponsor, or (B) if such a stay shall have been granted, then (1) (x) the stay shall have been dissolved or lifted and (y) the appeal would not reasonably be expected to prevent or materially impede the consummation of the Restructuring Transactions or have a material adverse effect on the discharge granted under

13

this Plan, or the releases, injunctions, or exculpations granted under this Plan in favor of the Plan Sponsor, or (2) a Final Order of the district court, circuit court, or other applicable court having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired; *provided*, *however*, that no order shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to sections 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 or any similar motion brought outside the United States may be filed with respect to such order.

*Future Claims Representative* means the legal representative appointed by the *Order Appointing Roger Frankel as Legal Representative for Future Personal Injury Claimants Nunc Pro Tunc to July 20, 2017* [Docket No. 703], which was entered by the Bankruptcy Court on September 6, 2017 (as may be amended by further order of the Bankruptcy Court), for Future Claimants (as defined therein).

*General Unsecured Claims* means any OEM Unsecured Claim, any PSAN PI/WD Claim, any Other PI/WD Claim, and any Other General Unsecured Claim.

*Global Accommodation Agreement* means the Accommodation Agreement between certain Consenting OEMs and certain Takata entities outside of Japan, including the Debtors, dated July 18, 2017, as amended, modified, and supplemented from time to time.

*Global Settlement Agreement* means the settlement agreement between the Consenting OEMs and certain Takata entities, which provides for payment of such Consenting OEMs' claims in exchange for a release in favor of Plan Sponsor and the applicable Takata entity.

*Governmental Unit* means any governmental unit as defined in section 101(27) of the Bankruptcy Code.

*IIM* means Industrias Irvin de Mexico, S.A. de C.V.

*IIM Available Cash* means (i) IIM Effective Date Available Cash, (ii) $100,000 of the Plan Settlement Turnover Amount, solely in the event that the Mexico Class Action Claims have not been fully resolved (through adjudication, settlement, or otherwise) prior to the Effective Date, (iii) IIM Surplus Reserved Cash from the IIM Claims Reserve that is made available to the IIM Recovery Funds and the IIM Disputed Claims Reserves in accordance with section 5.5(d)(i) of the Plan, and (iv) any Residual Value funded by or allocable to IIM.

*IIM Cash Proceeds* means the Purchase Price allocated to IIM either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of IIM not acquired by the Plan Sponsor.

*IIM Claims Reserve* means the amount of IIM Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) IIM's share of the Disputed Cure Claims Reserve, (ii) IIM's share of the Additional Support Party Funds, (iii) Other Secured Claims, (iv) Administrative Expense Claims (including (a) Administrative Expense PI/WD

WEIL:\96446450\6\76903.0004

Claims and (b) Administrative Expense PSAN PI/WD Claims, as estimated pursuant to the Claims Estimation Report), (v) Priority Claims, (vi) the Mexico Class Action Claims, and (vii) the Mexico Labor Claims, all as against IIM.  The IIM Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

*IIM Disputed Claims Reserve* means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with IIM Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against IIM for distribution in accordance with the procedure set forth in ARTICLE VII.  The IIM Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.

*IIM Effective Date Available Cash* means the IIM Cash Proceeds, less (i) the IIM Claims Reserve, (ii) IIM's Allocable Share of the PSAN PI/WD Trust Reserve, (iii) IIM's Allocable Share of the Legacy Entities Reserves, and (iv) the Plan Settlement Payment paid from the IIM Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

*IIM OEM Fund* means the fund established under this Plan to make Distributions on account of Allowed OEM Unsecured Claims against IIM and funded with IIM Available Cash in accordance with the Distribution Formula.

*IIM Other Creditors Fund* means the fund established pursuant to this Plan to make Distributions on account of Allowed Other General Unsecured Claims against IIM and funded with IIM Available Cash in accordance with the Distribution Formula.  The IIM Other Creditors Fund shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

*IIM Other PI/WD Fund* means the fund established pursuant to this Plan to make Distributions on account of Allowed Other PI/WD Claims against IIM and funded with (i) IIM Available Cash in accordance with the Distribution Formula and (ii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.  The IIM Other PI/WD Fund shall be held by the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee.

*IIM PSAN PI/WD Fund* means the fund established pursuant to this Plan to make Distributions on account of PSAN PI/WD Claims against IIM in accordance with the PSAN PI/WD TDP and funded with (i) PSAN PI/WD Insurance Proceeds, (ii) IIM Available Cash in accordance with the Distribution Formula, and (iii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.

*IIM Recovery Funds* means, collectively, the IIM OEM Fund, the IIM Other Creditors Fund, the IIM Other PI/WD Fund, and the IIM PSAN PI/WD Fund.

*IIM Surplus Reserved Cash* means a surplus in funding of (i) the IIM Claims Reserve, (ii) IIM's Allocable Share of the PSAN PI/WD Trust Reserve, (iii) IIM's Allocable Share of the Post-Closing Reserve, and (iv) IIM's Allocable Share of the Legacy Entities Reserves.

15

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnity Agreement* means the Indemnity and Release Agreement between the Consenting OEMs and certain Plan Sponsor entities, dated November 16, 2017. A copy of the Indemnity Agreement will be included with the Plan Supplement.

*Independent Consultant* means the independent consultant engaged to conduct an assessment and make a report to the PSAN Consenting OEMs on a quarterly basis of Reorganized Takata's operations pursuant to section 5.8(k) of the Plan.

*Independent Member* means the member of the Oversight Committee selected by the Debtors, subject to the reasonable consent of the Warehouse Consenting OEMs, which member shall not be an "insider" (as defined in section 101(31) of the Bankruptcy Code) of the Debtors, any Consenting OEM, or the Plan Sponsor.

*Initial Distribution Date* means the date occurring on or as soon as reasonably practicable after the Effective Date, but in no event more than thirty (30) days after the Effective Date, on which the Disbursing Agent makes an initial Distribution to holders of Allowed General Unsecured Claims.

*Initial Opt-In Period* means, with respect to the initial period for a Consenting OEM to become a Participating OEM, the period ending on the eighteen (18) month anniversary of the Effective Date.

*Initial Participating OEM(s)* means the Participating OEM(s) listed on **Exhibit 2** attached hereto that have indicated their election to become a Participating OEM at or before the conclusion of the hearing with respect to the Disclosure Statement, subject to the terms and conditions set forth on **Exhibit 2**.

*Insurance Policies* means any insurance policy issued to the Debtors or under which the Debtors have sought or may seek coverage, including the PSAN PI/WD Insurance Policies.

*Insurance Rights Transfer* means the transfer, assignment, and vesting of PI/WD Insurance Rights described in section 5.10(f) of the Plan.

*Insurers* means all entities that are providing or have provided insurance under the Insurance Policies to the Debtors or any parent, subsidiary, affiliate, or predecessor of the Debtors.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor or an affiliate of a Debtor, other than the TKJP 503(b)(9) Claim.

*Intercompany Interest* means an Interest in a Debtor held by another Debtor or an affiliate of a Debtor or an Interest in an affiliate of a Debtor held by a Debtor.

16

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in a Debtor or direct or indirect subsidiary of a Debtor, including all shares, common stock or units, preferred stock or units, or other instrument evidencing any fixed or contingent ownership interest in any Debtor or any direct or indirect subsidiary of a Debtor, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor or direct or indirect subsidiary of a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

*Internal Revenue Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Japan Debtors* means TKJP, Takata Kyushu Corporation, and Takata Service Corporation.

*Japan Proceedings* means the civil rehabilitation proceedings of the Japan Debtors.

*Key Employee Bonus Plan* has the meaning assigned in the U.S. Acquisition Agreement.

*Legacy Cost Report* means a report prepared by TKH, with the input and consent of the Takata entities party to the Plan Sponsor Backstop Funding Agreement, prior to the Closing Date regarding the categories of the PSAN Legacy Costs in form and substance acceptable to the Consenting OEMs and disclosed to the Plan Sponsor with an opportunity for input, which shall be reasonably considered by Takata and the Consenting OEMs.

*Legacy Entities* means, collectively, the Reorganized TK Holdings Trust and Warehousing Entity.

*Legacy Entities Post-Closing Cash* means, collectively, the Reorganized TK Holdings Trust Post-Closing Cash and the Warehousing Entity Post-Closing Cash.

*Legacy Entities Reserves* means the Reorganized TK Holdings Trust Reserve and the Warehousing Entity Reserve.

*Legacy Trustee* means the Person to be appointed pursuant to the Plan to, among other things, (i) act as trustee of the Reorganized TK Holdings Trust pursuant to the terms of the Reorganized TK Holdings Trust Agreement, (ii) manage and make Distributions from the Other Creditors Funds and the Support Party Creditor Fund, (iii) administer, dispute, object to, compromise, or otherwise resolve all Claims (other than (a) PSAN PI/WD Claims, (b) after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims, and (c) OEM Unsecured Claims) against the Debtors, (iv) make Distributions to holders of Allowed Claims (other than Allowed (a) PSAN PI/WD Claims, (b) after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims and, (c) OEM Unsecured Claims), the PSAN PI/WD Trust, and the OEM Funds; and (v) manage and administer the Claims Reserves.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*MDEQ* means the Michigan Department of Environmental Quality.

*MDNR* means the Michigan Department of Natural Resources.

*Mexico Class Action Claims* means Claims based on the class action brought by Acciones Colecctivas de Sinaloa, A.C. against TDM, IIM, TKH, and others before the Ninth Federal Judge in the state of Sinaloa, Mexico, captioned *ACS v. Takata de México, S.A. de C.V. et al*, Acción colectiva 95/2016.

*Mexico Labor Claims* means Claims asserted by current or former employees of IIM and TDM arising from or related to their employment with either IIM or TDM.

*Modified Assumed OEM Contract* means any Non-Standalone OEM Contract that has been modified as set forth in the Indemnity Agreement at or prior to the Closing Date to apply only to non-PSAN Inflator Products.

*Modified Assumed PSAN Contract* means any Non-Standalone OEM Contract of a PSAN Consenting OEM, Consenting OEM PSAN Contract Manufacturer, or Consenting OEM PSAN Tier One that has been modified as set forth in the Indemnity Agreement at or prior to the Closing Date to apply only to PSAN Inflators.

*NHTSA* means the National Highway Transportation Safety Administration.

*NHTSA Claims* means any Claim of NHTSA for unpaid civil penalties arising under paragraph 19(a) of the NHTSA Consent Order.

*NHTSA Consent Order* means, collectively, the Consent Orders dated November 3, 2015 and May 18, 2015 and the Amendment, dated May 4, 2016, to the November 3, 2015 Consent Order, as they may be further amended, modified, or supplemented, issued by NHTSA in the NHTSA proceeding captioned *In re EA 15-001 Air Bag Inflator Rupture*.

*NHTSA Monitor* means the independent monitor appointed in connection with the NHTSA Consent Order.

*NHTSA Preservation Order* means that certain Preservation Order and Testing Control Plan issued by NHTSA to TKH, dated February 24, 2015, as may be amended, modified, or supplemented.

*No Plan Notice* means a written notice that may be given by the Debtors, the Creditors' Committee, the Tort Claimants' Committee, or the Future Claims Representative stating that the sending party has reasonably determined that no plan in conformance with the terms of either the TCC/FCR Term Sheet or the UCC Term Sheet, as applicable, can or will be confirmed or consummated.

*Non-PSAN PI/WD Claims Termination Date* means the date on which all of the following have occurred: (i) all Claims (other than (a) PSAN PI/WD Claims, (b) Administrative

18

Expense PI/WD Claims, and (c) Administrative Expense PSAN PI/WD Claims) against the Debtors have been resolved, such that there are no more Disputed Claims (other than (a) PSAN PI/WD Claims, (b) Administrative Expense PI/WD Claims, and (c) Administrative Expense PSAN PI/WD Claims); (ii) the Operating Term has concluded and Reorganized Takata has wound down all operations and liquidated all Assets; and (iii) the Legacy Entities have completed the purposes for which they were established and been wound down in accordance with the Plan.

***Non-Standalone OEM Contracts*** means Purchase Orders of Consenting OEMs, Consenting OEM Contract Manufacturers, and Consenting OEM Tier Ones that (i) are not standalone Purchase Orders and (ii) cover the manufacture or sale of both PSAN Inflators and other Products, including related airbag modules.

***OEM*** means an original equipment manufacturer of automobiles.

***OEM Assumed Contracts*** means, collectively, the Modified Assumed OEM Contracts and the Standalone OEM Assumed Contracts.

***OEM Claim*** means any Claim of an OEM (including, but not limited to, a Claim related to tooling, engineering, development, design, and other services) arising from or relating to a Takata product, including, but not limited to, any product consisting of or containing a non-desiccated or desiccated PSAN Inflator, developed, designed, manufactured, stored, transported, disposed of, sold, supplied, distributed, or supported by Takata prior to the Petition Date; *provided*, *however*, that OEM Claims shall not include (i) the Excluded MB Claims and (ii) the Consenting OEMs' rights to indemnification, contribution, or subrogation as more fully set forth in section 5.10(e) of the Plan. For the avoidance of doubt, the term "OEM Claim" (x) shall not include the DOJ Restitution Claim and (y) shall include the Adequate Protection Claims.

***OEM Claims Administrator*** means the Special Master or, if the Special Master resigns, is terminated, or is otherwise unable to serve as OEM Claims Administrator for any reason, another individual to be identified in the Plan Supplement, to be appointed pursuant to the Plan to, among other things, (i) manage the OEM Funds, (ii) administer, dispute, object to, compromise, or otherwise resolve OEM Unsecured Claims against the Debtors, and (iii) make Distributions to holders of Allowed OEM Unsecured Claims.

***OEM Funds*** means, collectively, the IIM OEM Fund, the SMX OEM Fund, the TDM OEM Fund, and the TKH OEM Fund. The OEM Funds shall be merged with the DOJ OEM Restitution Fund and administered by the Special Master in accordance with the terms of the Plan.

***OEM Unsecured Claim*** means an OEM Claim, to the extent such OEM Claim is not (i) a Secured Claim or Priority Claim, (ii) Allowed Setoffs, Tooling Setoffs, Materials Setoffs, or Professional Fee Setoffs (each under and as defined in the Global Accommodation Agreement) or (iii) a Claim or liability assumed by the Plan Sponsor under the U.S. Acquisition Agreement. For the avoidance of doubt, the term "OEM Unsecured Claim" shall not include the DOJ Restitution Claim, any Adequate Protection Claim, Cure Claim, or Administrative Expense Claim.

WEIL:\96446450\6\76903.0004

**Operating Term** means the term for the continuation of Reorganized Takata's Authorized Purposes, which shall cease upon the earlier of (i) such time as production of PSAN Inflators is no longer necessary to comply with the terms (including any extensions or renewals) of the Assumed PSAN Contracts and any renewals or extensions thereof in respect of production for any current model series (including current and past model Service Parts) and (ii) five years after the Effective Date; *provided*, *however*, that the Operating Term will be automatically extended if necessary to implement the terms of the NHTSA Consent Order or any other order by authorities related to recall, to the extent applicable.

**Opt-In Trigger Event** means, with respect to any Consenting OEM, when the Consenting OEM has been named as a defendant in a third litigation case, commenced after the Effective Date, asserting PSAN PI/WD Claims against such Consenting OEM that is not dismissed within sixty (60) days of the filing of such case.

**Other Creditors Funds** means, collectively, the IIM Other Creditors Fund, the SMX Other Creditors Fund, the TDM Other Creditors Fund, and the TKH Other Creditors Fund.

**Other Excluded Assets** means any Excluded Assets other than (i) the PSAN Assets, (ii) the Warehoused PSAN Assets, and (iii) any contracts or leases that are rejected by the Debtors or the Reorganized Debtors, pursuant to the Plan or otherwise.

**Other General Unsecured Claim** means any unsecured Claim against the Debtors not entitled to priority of payment under section 507(a) of the Bankruptcy Code, other than an OEM Unsecured Claim, a PSAN PI/WD Claim, an Other PI/WD Claim, or any Claim assumed by the Plan Sponsor under the U.S. Acquisition Agreement. Other General Unsecured Claims include, but are not limited to, any Claim brought by a State or Territory of the United States, any Economic Loss Claim, any antitrust class action Claims, any Intercompany Claims, the NHTSA Claims, the Excluded MB Claims, and any Mexico Class Action Claims solely as against TKH; *provided*, *however*, that any Claim that satisfies the definition of a Subordinated Claim shall be a Subordinated Claim notwithstanding that such Claim would otherwise be an Other General Unsecured Claim.

**Other PI/WD Claim** means any Claim, other than a PSAN PI/WD Claim, for alleged personal injury, wrongful death, or other similar Claim or Cause of Action against the Debtors arising out of or relating to an injury or death allegedly caused by a Takata Product sold or supplied to an OEM or any other Person prior to the Petition Date, regardless of whether the injury occurs prepetition or postpetition, including on or after the Closing Date, which, to the extent possible, shall be included on a Schedule attached hereto. For the avoidance of doubt, "Other PI/WD Claims" shall not include Economic Loss Claims.

**Other PI/WD Claims Expenses** means any and all costs, expenses, fees, taxes, disbursements, debts, or obligations incurred in connection with the reconciliation and administration of Other PI/WD Claims, to be paid by the PSAN PI/WD Trust.

**Other PI/WD Funds** means, collectively, the IIM Other PI/WD Fund, the SMX Other PI/WD Fund, the TDM Other PI/WD Fund, and the TKH Other PI/WD Fund.

WEIL:\96446450\6\76903.0004

*Other Priority Claim* means any Claim other than an Administrative Expense Claim, an Adequate Protection Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim against a Debtor other than a Priority Tax Claim or an Adequate Protection Claim.

*Oversight Committee* means the three (3) member oversight committee of TK Global LLC, which shall have certain governance rights over Reorganized Takata and the Warehousing Entity.

*Participating OEM* means a Consenting OEM that elects to become a Participating OEM in accordance with section 5.10(w) of the Plan and contributes its respective PSAN PI/WD Top-Up Amount to the PSAN PI/WD Top-Up Funds in accordance with a Participating OEM Contribution Agreement.

*Participating OEM Contribution Agreement* means an agreement, substantially in the form to be filed with the Plan Supplement, to be entered into on the Effective Date or such later date that a Consenting OEM becomes a Participating OEM in accordance with section 5.10(w) of the Plan, between the PSAN PI/WD Trustee and the applicable Participating OEM with respect to such Participating OEM's commitment to fund its PSAN PI/WD Top-Up Amount.

*Periodic Distribution Date* means periodically as determined by the applicable Claims Administrator in its reasonable discretion, but unless otherwise ordered by the Bankruptcy Court, (i) the first Periodic Distribution Date shall be no later than the first Business Day that is 180 days after the Initial Distribution Date, (ii) until the second anniversary of the Effective Date, every subsequent Periodic Distribution Date shall be no later than the date that is the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date, and (iii) after the second anniversary of the Effective Date, every subsequent Periodic Distribution Date shall be no later than the first Business Day that is 365 days after the immediately preceding Periodic Distribution Date.

*Permitted Liens* has the meaning assigned in the U.S. Acquisition Agreement.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

*Petition Date* means June 25, 2017.

*PI/WD Insurance Company* means any insurance company, other Entity, or any such company's or Entity's successor or assign, that has issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under or with respect to, any PI/WD Insurance Policy.

21

**PI/WD Insurance Policies** means any insurance policy that was issued or allegedly issued that does or may afford the Debtors rights, benefits, indemnity, or insurance coverage with respect to any Trust Claims.

**PI/WD Insurance Proceeds** means any proceeds recovered under the PI/WD Insurance Policies.

**PI/WD Insurance Rights** means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under or attributable to any and all PI/WD Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

**Plan** means this amended joint chapter 11 plan of reorganization for the Debtors, including all appendices, exhibits, schedules, and supplements hereto, as it may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof.

**Plan Administrator** means the Person appointed under this Plan to perform the Authorized Purposes, who shall serve as chief executive officer of TK Global LLC.

**Plan Administrator Agreement** means the plan administrator agreement governing the Plan Administrator.  The Plan Administrator Agreement shall be filed with the Plan Supplement.

**Plan Document** means any of the documents of the Debtors, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

**Plan Injunction** means the injunctions issued pursuant to section 10.5 of the Plan.

**Plan Objection Deadline** means the deadline for filing and serving objections or responses to confirmation of the Plan as set forth in the Solicitation Procedures Order, as it may be extended from time to time.

**Plan Settlement** means the settlement of certain Claims and controversies between the Debtors, the Plan Sponsor, the Consenting OEMs, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative pursuant to section 5.19 of the Plan.

**Plan Settlement Fund** means the fund established pursuant to the Plan for the purpose of administering the Consenting OEM Contributions in accordance with the Plan Settlement, as described in section 5.19(e) of the Plan.

**Plan Settlement Payment** means Cash in an amount equal to (i) the positive difference between (A) $850 million and (B) the aggregate amount of (I) all payments made to (or at the direction of) the Special Master from any source, including any payment made to (or at the direction of) the Special Master in any other insolvency proceeding, or any payments by

22

OEMs to (or at the direction of) the Special Master in connection with the Restructuring Transactions, in each case (x) solely on account of the DOJ Restitution Claim and (y) excluding any payments made to (or at the direction of) the Special Master pursuant to this Plan and (II) any amounts received by the OEMs that are credited by the Special Master against such OEMs' share of the DOJ Restitution Claim in accordance with the Agreed Allocation, plus (ii) the Plan Settlement Turnover Amount.

**Plan Settlement Payment Waterfall** means the waterfall for payment of the Plan Settlement Payment by the Debtors set forth in section 5.19(c) of this Plan.

**Plan Settlement Turnover Amount** means up to $400,000 of the Plan Settlement Payment payable by the Debtors pursuant to the Plan Settlement Payment Waterfall, which shall constitute Available Cash for IIM, SMX, TDM, and the TKH Debtors; *provided, however*, that if the Mexico Class Action Claims have been fully resolved (through adjudication, settlement, or otherwise) prior to the Effective Date, the Plan Settlement Turnover Amount shall be $200,000 of the Plan Settlement Payment and shall not constitute IIM Available Cash or TDM Available Cash.

**Plan Sponsor** means, collectively, Joyson KSS Auto Safety, S.A., a Luxembourg *société anonyme*, and one or more of its current or future Subsidiaries or Affiliates (each as defined in the U.S. Acquisition Agreement).

**Plan Sponsor Backstop Funding** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

**Plan Sponsor Backstop Funding Agreement** means that certain backstop agreement entered into by the Plan Sponsor, KSS Holdings, Inc., TKJP, the Debtors, certain other Takata entities, and the Consenting OEMs, dated as of November 16, 2017, as amended, modified, or supplemented, a copy of which is attached hereto as **Exhibit 3**.

**Plan Sponsor Backstop Funding Payments** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

**Plan Sponsor Backstop Funding Repayment** means the repayment of the amount of any Plan Sponsor Backstop Funding Payments and any unreimbursed Restructuring Expenses in accordance with section 5.a. of the Plan Sponsor Backstop Funding Agreement.

**Plan Sponsor Contribution Amount** means Cash in an amount equal to $25 million, which shall be contributed by the Plan Sponsor Parties to the PSAN PI/WD Trust in accordance with the Plan Settlement.

**Plan Sponsor Party** or **Plan Sponsor Parties** means, individually or collectively, the Plan Sponsor and any Person that makes a loan to or investment in the Plan Sponsor for purposes of consummating the sale of the Purchased Assets to the Plan Sponsor pursuant to this Plan.  The Plan Sponsor Parties include the Persons set forth in **Schedule B** hereto.  For the avoidance of doubt, no OEM shall be or become a Plan Sponsor Party hereunder.

WEIL:\96446450\6\76903.0004

*Plan Supplement* means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court no later than fourteen (14) days prior to the deadline set to file objections to confirmation of the Plan, which shall include (i) an updated post-Closing Date structure for Reorganized Takata, the Warehousing Entity, and TK Global LLC, as applicable, (ii) the TK Global Operating Agreement, (iii) Reorganized TK Holdings Organizational Documents, (iv) any Amended By-Laws, (v) any Amended Certificate of Incorporation, (vi) the Plan Administrator Agreement and the Plan Administrator's qualifications, (vii) the Transition Services Agreement, (viii) Shared Services Agreement, (ix) the identity of each member of the Oversight Committee, (x) the identity of each Claims Administrator, as applicable, (xi) the Legacy Trustee's proposed compensation, (xii) the Reorganized TK Holdings Trust Agreement, (xiii) the PSAN PI/WD Trust Agreement, (xiv) the PSAN PI/WD TDP, (xv) any Participating OEM Contribution Agreement, (xvi) the identity of the initial members of the PSAN PI/WD Trust Advisory Committee and the PSAN PI/WD OEM Advisory Committee, (xvii) a schedule of the Allowed OEM Claims of the Consenting OEMs, (xviii) the schedule of any Causes of Action (including Avoidance Actions) not acquired by the Plan Sponsor or waived pursuant to section 10.11 of the Plan, (xix) the Indemnity Agreement, and (xx) a list of material definitive documents relating to the Restructuring Transactions.

*Post-Closing Cash* means, collectively, the Legacy Entities Post-Closing Cash and the Reorganized Takata Post-Closing Cash.

*Post-Closing PSAN PI/WD Claim* means any Claim for alleged personal injury, wrongful death, or other similar Claim or Cause of Action against the Reorganized Debtors arising out of or relating to an injury or death allegedly caused by a PSAN Inflator sold or supplied to an OEM or any other Person on or after the Effective Date.

*Post-Closing Reserve* means Cash in an amount necessary for the post-Effective Date operations, working capital, and wind-down of Reorganized Takata, including any costs incurred by TK Global LLC related solely to the post-Closing Date production of PSAN Inflators, and the costs and fees of the Special Master (including the Special Master Retainer but excluding, for the avoidance of doubt, costs and fees of the Special Master incurred in the Special Master's capacity as PSAN PI/WD Trustee, which shall be payable from the PSAN PI/WD Trust in accordance with section 5.10(r) of the Plan), the DOJ Monitor, and the NHTSA Monitor, including, without limitation, in connection with any oversight of the Plan Sponsor (including the Acquired Non-Debtor Affiliates) to the extent arising out of the Sale (as defined in the U.S. RSA) or the Restructuring (as defined in the Global Accommodation Agreement), to be (i) reserved on the Effective Date from the TKH Cash Proceeds and the TDM Cash Proceeds, (ii) funded on the Effective Date by non-Debtor affiliates, (iii) funded, to the extent necessary, by the Plan Sponsor Backstop Funding in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and this Plan, (iv) funded periodically from Surplus Reserved Cash and Post-Closing Cash in accordance with section 5.5 of this Plan, and (v) funded from Dissolution Date Cash in accordance with sections 5.6(m) and 5.9(j) of the Plan.  The Post-Closing Reserve shall be administered by the Plan Administrator.

*Priority Claim* means any Priority Tax Claim or Other Priority Claim.

*Priority Tax Claim* means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata Share* means, with respect to an Allowed Claim (i) within the same Class, the proportion that an Allowed Claim bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class, (ii) among Classes 3 through 7, the proportion that a Class of Allowed Claims bears to the aggregate amount of Allowed Claims in such Classes, or (iii) the proportion that an Other General Unsecured Claim held by an Eligible Creditor bears to the aggregate amount of all such Other General Unsecured Claims held by the Eligible Creditors.

*Products* means any and all products developed, designed, manufactured, marketed or sold, in research or development, or supported by, Takata, including under any Purchase Order, whether work in progress or in final form, including any products containing desiccated or non-desiccated PSAN Inflators.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Protected Party* means any of the following Persons: (i) Debtors' non-Debtor affiliates (including the Acquired Non-Debtor Affiliates) other than TKSAC and the Japan Debtors, (ii) Reorganized Takata, (iii) the Participating OEMs, subject to the terms of section 5.10(w) of this Plan, (iv) the Plan Sponsor Parties, and (v) with respect to each of the foregoing Persons in clauses (i) through (iv), such Persons' predecessors, successors, assigns, subsidiaries, affiliates (excluding TKSAC and the Japan Debtors, except as otherwise provided below), current and former officers, directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, as applicable.  In addition, to the extent that TKSAC consents to waive or otherwise eliminate its Intercompany Claims prior to the Effective Date, TKSAC shall become a Protected Party under the Plan with notice of such occurrence to be provided in either the Confirmation Order or the notice of the occurrence of the Effective Date.  To the extent that (i) treatment of the TKJP 503(b)(9) Claim and the Japan Debtors' Intercompany Claims, (ii) the treatment of the Japan Debtors' rights in the PI/WD Insurance Policies, and (iii) any amendments to the Plan Sponsor Backstop Funding Agreement that require the Japan Debtors' consent are, in each case, resolved prior to the Effective Date in a manner reasonably acceptable to the Tort Claimants' Committee, the Future Claims Representative, and the Consenting OEMs and, solely with respect to clause (iii), the Plan Sponsor, the Japan Debtors shall become Protected Parties under the Plan with notice of such occurrence to be provided in either the Confirmation Order or the notice of the occurrence of the Effective Date.

*PSAN* means phase-stabilized ammonium nitrate, which is used as a component of the propellant in certain airbag inflators.

**PSAN Assets** has the meaning assigned in the U.S. Acquisition Agreement and includes, for the avoidance of doubt, Modified Assumed PSAN Contracts and Standalone PSAN Assumed Contracts, but excluding the Warehoused PSAN Assets.

**PSAN Assets Advance Payment** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

**PSAN Consenting OEM** means each Consenting OEM identified on **Schedule C** to the Plan that may require PSAN Inflator production and sale from Reorganized Takata after the Closing Date and that has, prior to December 31, 2017 (or such later date as may be agreed to by the Requisite PSAN Consenting OEMs as of such deadline and the Debtors), entered into an agreement with the Debtors that is mutually agreeable to the Debtors and such Consenting OEM that sets forth, among other things, (i) such potential post-Closing Date production requirements, as may be reduced by PSAN Inflators sold to such Consenting OEM on or after December 1, 2017 through the Closing Date, and (ii) such Consenting OEM's obligations in respect of any cancellation of its projected post-Closing Date requirements (or portion thereof) of PSAN Inflators, after taking into account PSAN Inflators sold to such Consenting OEM on or after December 1, 2017 through the Closing Date.  For the avoidance of doubt, in no event will such Consenting OEMs be required to purchase any PSAN Inflators from Reorganized Takata that are not needed by such Consenting OEMs.

**PSAN Inflator** has the meaning assigned in the U.S. Acquisition Agreement.

**PSAN Inflator Defect** means a manufacturing and/or design defect that occurs in certain Takata inflators because of propellant degradation due to environmental exposure.

**PSAN Legacy Costs** has the meaning assigned in the Plan Sponsor Backstop Funding Agreement.

**PSAN PI/WD Claim** means (i) any Claim asserted against the Debtors or the Protected Parties other than the Participating OEMs for alleged personal injury, wrongful death, or other similar Claim or Cause of Action arising out of or relating to an injury or death allegedly caused by a PSAN Inflator sold or supplied to an OEM or any other Person prior to the Petition Date, regardless of whether the injury occurs prepetition or postpetition, including on or after the Closing Date, or (ii) a Claim asserted against a Participating OEM for alleged personal injury, wrongful death, or similar Claim or Cause of Action arising out of or relating to a personal injury or death allegedly caused by the PSAN Inflator Defect in a Product sold or supplied to a Participating OEM or any other Person prior to the Petition Date, regardless of whether the injury occurs prepetition or postpetition and such Claim (a) is brought by a citizen of the United States, wherever the injury occurs, (b) arises from an incident occurring in the United States or its territories, whether or not such Claim is brought by a citizen of the United States, or (c) involves a vehicle registered in the United States or its territories or possessions.

**PSAN PI/WD Funds** means, collectively, the IIM PSAN PI/WD Fund, the SMX PSAN PI/WD Fund, the TDM PSAN PI/WD Fund, the TKH PSAN PI/WD Fund, any PSAN PI/WD Insurance Proceeds made available to the Debtors from any PSAN PI/WD Insurance Policies, the Consenting OEM Contributions in the Plan Settlement Fund, and the Plan Sponsor

Contribution Amount.  The PSAN PI/WD Funds shall be held by the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee in accordance with the terms of the Plan and the PSAN PI/WD Trust Agreement.

**PSAN PI/WD Insurance Company** means any insurance company, other Entity, or any such company's or Entity's successor or assign, that has issued, or that has any actual, potential, demonstrated or alleged liabilities, duties, or obligations under or with respect to any PSAN PI/WD Insurance Policy.

**PSAN PI/WD Insurance Policies** means any insurance policy that was issued or allegedly issued that does or may afford the Debtors rights, benefits, indemnity, or insurance coverage with respect to any PSAN PI/WD Claims.

**PSAN PI/WD Insurance Proceeds** means any proceeds recovered under the PSAN PI/WD Insurance policies.

**PSAN PI/WD Insurance Rights** means any and all rights, titles, privileges, interests, claims, demands, or entitles of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under or attributable to any and all PSAN PI/WD Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured, or unmatured, disputed or undisputed, fixed or contingent.

**PSAN PI/WD OEM Advisory Committee** means the trust advisory committee representing the interests of the Participating OEMs created pursuant to the Plan and the PSAN PI/WD Trust Agreement, as may be reconstituted from time to time in accordance with the terms thereof and section 5.10(s) of this Plan.

**PSAN PI/WD Privileged Information** means any privileged information that relates, in whole or in part, to any Takata product, any PSAN PI/WD Claim, or any other matters assumed by or assigned to the PSAN PI/WD Trust, including, without limitation, (i) the Debtors' books and records transferred to the PSAN PI/WD Trustee in accordance with section 5.10(t) of this Plan, (ii) any privileged information containing a factual or legal analysis or review of any PSAN PI/WD Claim, (iii) any privileged information evaluating the reasonableness, effectiveness, or confirmability of the Plan or any other plan of reorganization or plan of liquidation filed or that could be filed in the Chapter 11 Cases, (iv) any privileged information that was created in connection with a Participating OEM becoming a Participating OEM, (v) any privileged information exchanged by the Debtors or their professionals, on the one hand, and any official creditors' committee(s), the Consenting OEMs, non-Debtor affiliates, or their respective professionals, on the other hand, related to the Plan, the Plan Documents, any Participating OEM Contribution Agreements or the PSAN PI/WD Claims, and (vi) any privileged information containing a factual or legal analysis of the Debtors' or any Consenting OEMs' obligations or potential exposure in connection with any Takata product, PSAN PI/WD Claim or any litigation related thereto.

**PSAN PI/WD TDP** means the distribution procedures to be implemented by the PSAN PI/WD Trust pursuant to the terms and conditions of the Plan, as they may be amended from time to time.

WEIL:\96446450\6\76903.0004

**PSAN PI/WD Top-Up Amount** means, with respect to each Participating OEM, the amount of consideration such Participating OEM shall contribute to the PSAN PI/WD Trust in accordance with the Participating OEM Contribution Agreement applicable to such Participating OEM.

**PSAN PI/WD Top-Up Funds** means, collectively, funds established by the PSAN PI/WD Trustee with respect to each individual Participating OEM to hold the PSAN PI/WD Top-Up Amounts contributed by such Participating OEM.

**PSAN PI/WD Trust** means the trust established to administer the PSAN PI/WD Funds.

**PSAN PI/WD Trust Advisory Committee** means the trust advisory committee representing current holders of PSAN PI/WD Claims created pursuant to the Plan and the PSAN PI/WD Trust Agreement, as may be reconstituted from time to time in accordance with the terms thereof and section 5.10(s) of this Plan.

**PSAN PI/WD Trust Agreement** means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the PSAN PI/WD Trust, as it may be amended from time to time.

**PSAN PI/WD Trust Expenses** means any and all costs, expenses, fees, taxes, disbursements, debts, or obligations incurred for the administration of the PSAN PI/WD Trust pursuant to the PSAN PI/WD Trust Agreement, to be paid by the PSAN PI/WD Trust pursuant to the PSAN PI/WD Trust Agreement or, if not sufficient, from the corpus of the PSAN PI/WD Trust; provided, that in no event shall funds contributed by a Participating OEM for payment of liquidated PSAN PI/WD Claims asserted against such Participating OEM, which such funds are to be held by the PSAN PI/WD Trustee in segregated account(s) pursuant to the applicable Participating OEM Contribution Agreement, be used by the PSAN PI/WD Trustee to pay any PSAN PI/WD Trust Expenses except as expressly permitted under the terms of the Participating OEM Contribution Agreement.

**PSAN PI/WD Trust Reserve** means the amount payable to the PSAN PI/WD Trust from the IIM Cash Proceeds, SMX Cash Proceeds, TDM Cash Proceeds, and TKH Cash Proceeds, pursuant to each Debtor's Allocable Share to provide funding to the PSAN PI/WD Trust to compensate for projected PSAN PI/WD Trust Expenses and the Other PI/WD Claims Expenses.

**PSAN PI/WD Trust Termination Date** means the date on which the PSAN PI/WD Trust is terminated as determined pursuant to the terms of the PSAN PI/WD Trust Agreement.

**PSAN PI/WD Trustee** means, individually or collectively, (i) Eric D. Green, who shall be appointed pursuant to the Plan, to act as the initial trustee of the PSAN PI/WD Trust pursuant to the terms of the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP and (ii) any successor trustee appointed in accordance with the PSAN PI/WD Trust Agreement.

28

*PSAN Tier One Agreements* means OEM Assumed Contracts relating to Module Production, Kitting Operations, and PSAN Service Parts production (each as defined in the Indemnity Agreement).

*PSAN Warehouse* means any warehouse used to store PSAN Inflators as of the Closing Date, as required by the NHTSA Preservation Order or other applicable law or regulation, or which have been put in place voluntarily by Takata prior to the Closing, in each case as contemplated by the Legacy Cost Report.

*Purchase Orders* has the meaning assigned in the U.S. Acquisition Agreement.

*Purchase Price* has the meaning assigned in the U.S. Acquisition Agreement.

*Purchased Assets* has the meaning assigned in the U.S. Acquisition Agreement.

*Purchased Contracts* has the meaning assigned in the U.S. Acquisition Agreement.

*Recovery Funds* means, collectively, the IIM Recovery Funds, the SMX Recovery Funds, the TDM Recovery Funds, and the TKH Recovery Funds.

*Releases* means the releases provided for in section 10.6 of the Plan, including its subparagraphs.

*Released Claims* means any Claims released pursuant to section 10.6(b) of the Plan.

*Released Parties* means, collectively, (i) the Debtors, (ii) the Future Claims Representative, (iii) the Plan Sponsor Parties, (iv) the Committees and their respective members, solely in their capacity as such, (v) the Debtors' non-Debtor affiliates (including the Acquired Non-Debtor Affiliates) other than TKSAC and the Japan Debtors, and (vi) with respect to each of the foregoing Persons in clauses (i) through (v), such Persons' predecessors, successors, assigns, subsidiaries, affiliates (excluding TKSAC and the Japan Debtors, except as otherwise provided below), current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. In addition, (x) any Consenting OEM that elects, in a timely-submitted ballot for voting on the Plan, to provide a release of the Debtors and certain related parties in form and substance to be agreed to by the Debtors and the Consenting OEMs, and (y) with respect to such Consenting OEM, the parties set forth in clause (vi) above, shall also be Released Parties solely for purposes of section 10.6(a) of this Plan.  For the avoidance of doubt, except for the foregoing sentence, no Consenting OEM shall be considered a Released Party under the Plan.  In addition, to the extent that TKSAC consents to waive or otherwise eliminate its Intercompany Claims prior to the Effective Date, TKSAC shall become a Released Party under the Plan with notice of such occurrence to be provided in either the Confirmation Order or the notice of the occurrence of the Effective Date.  To the extent that (i) treatment of the TKJP 503(b)(9) Claim and the Japan Debtors' Intercompany Claims, (ii) the treatment of the Japan Debtors' rights in the PSAN

29

PI/WD Insurance Policies, and (iii) any amendments to the Plan Sponsor Backstop Funding Agreement that require the Japan Debtors' consent are, in each case, resolved prior to the Effective Date in a manner reasonably acceptable to the Tort Claimants' Committee, the Future Claims Representative, and the Consenting OEMs and, solely with respect to clause (iii), the Plan Sponsor, the Japan Debtors shall become Released Parties under the Plan with notice of such occurrence to be provided in either the Confirmation Order or the notice of the occurrence of the Effective Date.

*Reorganized Debtor(s)* means individually, any Debtor and, collectively, all Debtors, in each case as reorganized as of the Effective Date in accordance with this Plan.

*Reorganized Takata* means Reorganized TK Holdings and its subsidiaries.

*Reorganized Takata Business Model* means a business model prepared by TKH, with the input of certain Takata entities, prior to the Closing Date regarding the anticipated operations of Reorganized Takata during its estimated Operating Term and acceptable to the PSAN Consenting OEMs.

*Reorganized Takata Post-Closing Cash* means Cash recovered by the Plan Administrator as a result of continued operations of Reorganized Takata after the Closing Date or the liquidation of any remaining assets of Reorganized Takata, including distributions after the Effective Date on account of Intercompany Interests held by Reorganized TK Holdings as set forth in sections 5.5(e)(ii) and 5.17 of the Plan; *provided, however*, that the foregoing shall not include any distributions after the Effective Date on account of Intercompany Interests held by TKAM, TKC, and TKF.

*Reorganized TK Holdings* means TKH, on and after the Effective Date, which shall be the parent holding company of the Reorganized Debtors, the equity of which shall be issued to TK Global LLC.

*Reorganized TK Holdings Organizational Documents* means the amended and restated certificate of incorporation and amended and restated by-laws of Reorganized TK Holdings.  The Reorganized TK Holdings Organizational Documents shall be filed with the Plan Supplement.

*Reorganized TK Holdings Trust* means that certain trust to be created on the Effective Date to, among other things, (i) own the sole equity interest in Reorganized TK Holdings, (ii) be a beneficial owner of the Warehousing Entity, (iii) hold the Other Creditors Funds, (iv) hold the Other Excluded Assets, and (v) administer Claims (other than (a) PSAN PI/WD Claims, (b) after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims, and (c) the OEM Unsecured Claims) after the Effective Date.

*Reorganized TK Holdings Trust Agreement* means that certain trust agreement that, among other things, establishes and governs the Reorganized TK Holdings Trust.

*Reorganized TK Holdings Trust Assets* means (i) the Other Creditors Funds, (ii) the Claims Reserves, (iii) the Disputed Claims Reserves, (iv) the Reorganized TK Holdings

WEIL:\96446450\6\76903.0004

Trust Reserve, (v) any Causes of Action (including Avoidance Actions) not acquired by the Plan Sponsor or waived pursuant to section 10.11 of the Plan, (vi) the sole equity interest of TK Global LLC, and (vii) the Other Excluded Assets.

 ***Reorganized TK Holdings Trust Post-Closing Cash*** means Cash recovered by the Reorganized TK Holdings Trust and proceeds from the liquidation of assets in the Reorganized TK Holdings Trust, such as the pursuit of Causes of Action retained by the Reorganized TK Holdings Trust and distributions after the Effective Date on account of Intercompany Interests held by TKC, TKF, and TKAM as set forth in sections 5.5(e)(i) and 5.17 of the Plan.  The Legacy Trustee shall account for the Reorganized TK Holdings Trust Post-Closing Cash as allocable to particular Reorganized Debtors based on each Debtor's Allocable Share.

 ***Reorganized TK Holdings Trust Reserve*** means Cash in an amount necessary to fund the administration of the Reorganized TK Holdings Trust on and after the Effective Date, to be (i) reserved on the Effective Date from the Cash Proceeds, (ii) funded periodically from Surplus Reserved Cash and Post-Closing Cash in accordance with section 5.5 of this Plan, and (iii) funded from Dissolution Date Cash in accordance with sections 5.8(l) and 5.9(j) of the Plan. The Reorganized TK Holdings Trust Reserve shall be held by the Reorganized TK Holdings Trust and managed by the Legacy Trustee.

 ***Requisite Consenting OEMs*** has the meaning assigned in the U.S. RSA.

 ***Requisite PSAN Consenting OEMs*** has the meaning assigned in the U.S. RSA.

 ***Residual Value*** means any Dissolution Date Cash in the Reorganized TK Holdings Trust, Reorganized Takata, or the Warehousing Entity that is not needed to satisfy Claims against Reorganized  Takata or the Warehousing Entity (as applicable) upon dissolution thereof or to fund the Post-Closing Reserve, the Legacy Entities Reserves, or the Claims Reserves and is either made available to the Recovery Funds and the Disputed Claims Reserves or becomes TKAM Available Cash, TKC Available Cash, or TKF Available Cash, as applicable, in accordance sections 5.6(m), 5.8(l), and 5.9(j) of the Plan.

 ***Resolution Reserve*** means the up to ten percent (10%) of (i) Consenting OEM GUC Recoveries until the Consenting OEM GUC Recovery Threshold is met and (ii) Consenting OEM Incremental GUC Recoveries that, in each case, may be committed to holders of Claims by the Consenting OEMs on or prior to the Effective Date, subject to consultation with the Tort Claimants' Committee and the Future Claims Representative and Bankruptcy Court approval (if necessary), which, in each case, shall be a reduction to either the ninety percent (90%) of the Consenting OEM GUC Recoveries to be contributed to the Plan Settlement Fund until the Consenting OEM GUC Recovery Threshold is met or to the ninety percent (90%) of the Consenting OEM Incremental GUC Recoveries to be contributed to the Plan Settlement Fund, pursuant to section 5.19(e)(i)(A) and (C) of this Plan.

 ***Restructuring Expenses*** means the Expenses (as defined in the U.S. Acquisition Agreement).

*Restructuring Support Parties* means, collectively, the Plan Sponsor and the Consenting OEMs.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including (i) the sale of the Purchased Assets to the Plan Sponsor pursuant to the U.S. Acquisition Agreement free and clear of any and all Claims, Interests, Liens, other encumbrances, and liabilities of any kind, other than Assumed Liabilities and Permitted Liens, (ii) the vesting of the PSAN Assets in Reorganized Takata free and clear of any and all Claims, Interests, Liens, other encumbrances, and liabilities of any kind, (iii) the vesting of the Warehoused PSAN Assets and Other Excluded Assets in the applicable Legacy Entity free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind, and (iv) the creation of the Claims Reserves and the Recovery Funds to make Distributions to holders of Allowed General Unsecured Claims.

*RSA Order* means the *Order (I) Authorizing Debtors to Enter Into and Perform Under Restructuring Support Agreement; (II) Approving Plan Sponsor Protections; and (III) Modifying the Automatic Stay* [Docket No. 1335], which was entered by the Bankruptcy Court on December 8, 2017 (which order was corrected on December 13, 2017 [Docket No. 1359]).

*RTK Loan* means the loan to be provided by Reorganized TK Holdings from the Post-Closing Reserve to TKC in the amount of the TSAC DOJ Restitution Claim Funding Deficiency, less $25 million of the PSAN Assets Advance Payment, less the amount in the Post-Closing Reserve and the Warehousing Entity Reserve on account of PSAN Legacy Costs in excess of $200 million, if any.

*RTKHT Loan* means the loan to be provided by the Reorganized TK Holdings Trust from the TKH Claims Reserve to TKC in the amount of the TSAC DOJ Restitution Claim Funding Deficiency, less $25 million of the PSAN Assets Advance Payment, less the RTK Loan.

*Schedule of Assumed Contracts* means the schedule of executory contracts and unexpired leases to either be assumed by the applicable Debtor (other than any Assumed PSAN Contracts, which shall be assumed (or, to the extent not executory, assigned) automatically under section 8.4 hereof) or assumed by the applicable Debtor and assigned to the Warehousing Entity.

*Schedule of Rejected Contracts* means the schedule of executory contracts and unexpired leases, in form reasonably acceptable to the Plan Sponsor, to be rejected by the applicable Debtor.

*Scheduled* means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

*Schedules* means the schedules of Assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

**Secured Claim** means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

**Securities Act** means the Securities Act of 1933, as amended.

**Service Parts** means any Consenting OEM's, Consenting OEM Contract Manufacturer's, Consenting OEM Tier One's, or Consenting OEM Bailor's service parts requirements (including current model service parts and past model service parts, but excluding PSAN Inflators).

**Settled OEM Claims** means the Consenting OEMs' Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN Administrative Expense Claims against the Debtors that are settled pursuant to the Plan Settlement in section 5.19 of the Plan.

**Shared Services Agreement** means the agreement entered into by TK Global LLC and each of Reorganized Takata and the Warehousing Entity regarding the sharing of services among each of the parties thereto.

**SMX** means Strosshe-Mex, S. de R.L. de C.V.

**SMX Available Cash** means (i) SMX Effective Date Available Cash, (ii) $100,000 of the Plan Settlement Turnover Amount, (iii) SMX Surplus Reserved Cash from the SMX Claims Reserve that is made available to the SMX Recovery Funds and the SMX Disputed Claims Reserves in accordance with section 5.5(d)(i) of the Plan, and (iv) any Residual Value funded by or allocable to SMX.

**SMX Cash Proceeds** means the Purchase Price allocated to SMX either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of SMX not acquired by the Plan Sponsor.

**SMX Claims Reserve** means the amount of SMX Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) SMX's share of the Disputed Cure Claims Reserve, (ii) SMX's share of the Additional Support Party Funds, (iii) Other Secured Claims, (iv) Administrative Expense Claims (including (a) Administrative Expense PI/WD Claims and (b) Administrative Expense PSAN PI/WD Claims, as estimated pursuant to the Claims Estimation Report), and (v) Priority Claims, all as against SMX.  The SMX Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

**SMX Disputed Claims Reserve** means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with SMX Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against SMX for

33

distribution in accordance with the procedures set forth in ARTICLE VII.  The SMX Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.

       **SMX Effective Date Available Cash** means the SMX Cash Proceeds, less (i) the SMX Claims Reserve, (ii) SMX's Allocable Share of the PSAN PI/WD Trust Reserve, (iii) SMX's Allocable Share of the Legacy Entities Reserves, and (iv) the Plan Settlement Payment paid from the SMX Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

       **SMX OEM Fund** means the fund established under this Plan to make Distributions on account of Allowed OEM Unsecured Claims against SMX and funded with SMX Available Cash in accordance with the Distribution Formula.

       **SMX Other Creditors Fund** means the fund established pursuant to this Plan to make Distributions on account of Allowed Other General Unsecured Claims against SMX and funded with SMX Available Cash in accordance with the Distribution Formula.  The SMX Other Creditors Fund shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

       **SMX Other PI/WD Fund** means the fund established pursuant to this Plan to make Distributions on account of Allowed Other PI/WD Claims against SMX and funded with (i) SMX Available Cash in accordance with the Distribution Formula and (ii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.  The SMX Other PI/WD Fund shall be held by the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee.

       **SMX PSAN PI/WD Fund** means the fund established pursuant to this Plan to make Distributions on account of PSAN PI/WD Claims against SMX in accordance with the PSAN PI/WD TDP and funded with (i) PSAN PI/WD Insurance Proceeds, (ii) SMX Available Cash in accordance with the Distribution Formula, and (iii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.

       **SMX Recovery Funds** means, collectively, the SMX OEM Fund, the SMX Other Creditors Fund, the SMX Other PI/WD Fund, and the SMX PSAN PI/WD Fund.

       **SMX Surplus Reserved Cash** means a surplus in funding of (i) the SMX Claims Reserve, (ii) SMX's Allocable Share of the PSAN PI/WD Trust Reserve, (iii) SMX's Allocable Share of the Post-Closing Reserve, and (iv) SMX's Allocable Share of the Legacy Entities Reserves.

       **Solicitation Procedures Motion** means the Debtors' motion for entry of an order (i) approving the Disclosure Statement, (ii) establishing procedures for the assumption and assumption and assignment of executory contracts and unexpired leases under the Plan and the form of Cure Amount Notice and assumption notices related thereto, (iii) establishing the Voting Deadline, (iv) approving solicitation procedures, distribution of solicitation packages, and establishing a deadline and procedures for temporary allowance of Claims for voting purposes, (v) approving the form of ballots and voting instructions, and (vi) approving the form and manner of notice of the Confirmation Hearing and related issues.

WEIL:\96446450\6\76903.0004

*Solicitation Procedures Order* means an order of the Bankruptcy Court approving the Solicitation Procedures Motion.

*Special Master* means the special master appointed under the DOJ Restitution Order.

*Special Master Retainer* means the $5 million payment that the Plan Administrator shall make to the Special Master, by wire transfer, on the Effective Date or as soon as reasonably practicable thereafter from the Post-Closing Reserve to be held as a retainer for the fees and expenses of the Special Master and his professionals.

*Standalone OEM Assumed Contracts* means all Purchase Orders of Consenting OEMs, Consenting OEM Contract Manufacturers, and Consenting OEM Tier Ones relating solely to non-PSAN Inflator Component Part programs of Consenting OEMs.

*Standalone PSAN Assumed Contracts* means all Purchase Orders of PSAN Consenting OEMs, Consenting OEM PSAN Contract Manufacturers, and Consenting OEM PSAN Tier Ones relating solely to PSAN Inflators.

*Subordinated Claim* means (i) any Claim that is subject to subordination under section 510 of the Bankruptcy Code and (ii) a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

*Support Party Creditor Fund* means the fund established pursuant to the Plan Settlement to fund the settlement payment to Eligible Creditors, which fund shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

*Surplus Reserved Cash* means either (i) a surplus in funding of the Post-Closing Reserve, the Legacy Entities Reserves, or the Claims Reserves, as applicable, or (ii) the IIM Surplus Reserved Cash, the SMX Surplus Reserved Cash, the TDM Surplus Reserved Cash, the TKAM Surplus Reserved Cash, the TKC Surplus Reserved Cash, the TKF Surplus Reserved Cash, and the TKH Surplus Reserved Cash, collectively.

*Takata* means, collectively, TKJP and its worldwide direct and indirect subsidiaries, including TKH, TAKATA Aktiengesellschaft, and TKSAC.

*TCC/FCR Term Sheet* means that term sheet filed with the Bankruptcy Court on February 10, 2018 [Docket No. 2017-2] that memorializes the terms of the settlement among the Debtors, the Plan Sponsor, the Consenting OEMs, the Tort Claimants' Committee, and the Future Claims Representative.

*TCEQ* means the Texas Commission on Environmental Quality.

*TCEQ Settlement* means the settlement agreement between the Debtors and the TCEQ in resolution of the *Request of Texas Commission on Environmental Quality for Declaratory Judgment and Injunctive Relief* filed in the Chapter 11 Cases as Adversary

35

Proceeding No. 18-50282 (BLS) dated February 7, 2018 [Docket No. 1]. The TCEQ Settlement shall be memorialized in the Confirmation Order.

**TDM** means Takata de Mexico, S.A. de C.V.

**TDM Available Cash** means (i) TDM Effective Date Available Cash, (ii) $100,000 of the Plan Settlement Turnover Amount, solely in the event that the Mexico Class Action Claims have not been fully resolved (through adjudication, settlement, or otherwise) prior to the Effective Date, (iii) TDM Surplus Reserved Cash from the TDM Claims Reserve that is made available to the TDM Recovery Funds and the TDM Disputed Claims Reserves in accordance with section 5.5(d)(i) of the Plan, and (iv) any Residual Value funded by or allocable to TDM.

**TDM Cash Proceeds** means the Purchase Price allocated to TDM either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of TDM not acquired by the Plan Sponsor.

**TDM Claims Reserve** means the amount of TDM Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) TDM's share of the Disputed Cure Claims Reserve, (ii) TDM's share of the Additional Support Party Funds, (iii) Other Secured Claims, (iv) Administrative Expense Claims (including (a) Administrative Expense PI/WD Claims and (b) Administrative Expense PSAN PI/WD Claims, as estimated pursuant to the Claims Estimation Report), (v) Priority Claims, (vi) the Mexico Class Action Claims, and (vi) the Mexico Labor Claims, all as against TDM. The TDM Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

**TDM Disputed Claims Reserve** means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with TDM Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against TDM for distribution in accordance with the procedure set forth in ARTICLE VII. The TDM Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.

**TDM Effective Date Available Cash** means the TDM Cash Proceeds, less (i) the TDM Claims Reserve, (ii) TDM's Allocable Share of the PSAN PI/WD Trust Reserve, (iii) TDM's Allocable Share of the Legacy Entities Reserves, (iv) TDM's Allocable Share of the Post-Closing Reserve, and (v) the Plan Settlement Payment paid from the TDM Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

**TDM OEM Fund** means the fund established under this Plan to make Distributions on account of Allowed OEM Unsecured Claims against TDM and funded with TDM Available Cash in accordance with the Distribution Formula.

**TDM Other Creditors Fund** means the fund established pursuant to this Plan to make Distributions on account of Allowed Other General Unsecured Claims against TDM and funded with TDM Available Cash in accordance with the Distribution Formula. The TDM Other Creditors Fund shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

36

***TDM Other PI/WD Fund*** means the fund established pursuant to this Plan to make Distributions on account of Allowed Other PI/WD Claims against TDM and funded with (i) TDM Available Cash in accordance with the Distribution Formula and (ii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.  The TDM Other PI/WD Fund shall be held by the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee.

***TDM PSAN PI/WD Fund*** means the fund established pursuant to this Plan to make Distributions on account of PSAN PI/WD Claims against TDM in accordance with the PSAN PI/WD TDP and funded with (i) PSAN PI/WD Insurance Proceeds, (ii) TDM Available Cash in accordance with the Distribution Formula, and (iii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.

***TDM Recovery Funds*** means, collectively, the TDM OEM Fund, the TDM Other Creditors Fund, the TDM Other PI/WD Fund, and the TDM PSAN PI/WD Fund.

***TDM Surplus Reserved Cash*** means a surplus in funding of (i) the TDM Claims Reserve, (ii) TDM's Allocable Share of the PSAN PI/WD Trust Reserve, (iii) TDM's Allocable Share of the Post-Closing Reserve, and (iv) TDM's Allocable Share of the Legacy Entities Reserves.

***TK Global LLC*** means a limited liability company organized under the laws of Delaware, which shall be formed as of the Effective Date to be the parent holding company of Reorganized Takata and the Warehousing Entity, the equity of which shall be issued to the Reorganized TK Holdings Trust.

***TK Global Operating Agreement*** means TK Global LLC's operating agreement, which shall govern TK Global LLC's operations and provide the Oversight Committee with certain governance rights over Reorganized TK Holdings and the Warehousing Entity.  A substantially final form of the TK Global Operating Agreement shall be filed with the Plan Supplement.

***TKAM*** means Takata Americas.

***TKAM Available Cash*** means (i) TKAM Effective Date Available Cash, (ii) TKAM Surplus Reserved Cash from the TKAM Claims Reserve that becomes TKAM Available Cash in accordance with section 5.5(d)(i) of the Plan, and (iii) any Residual Value funded by or allocable to TKAM.

***TKAM Cash Proceeds*** means the Purchase Price allocated to TKAM either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of TKAM not acquired by the Plan Sponsor.

***TKAM Claims Reserve*** means the amount of the TKAM Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) Other Secured Claims, (ii) Administrative Expense Claims, and (iii) Priority Claims, all as against TKAM.  The TKAM

Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

**TKAM Effective Date Available Cash** means the TKAM Cash Proceeds and any amounts distributed on the Effective Date to TKAM on account of its equity interests in subsidiaries, less (i) the TKAM Claims Reserve and (ii) the Plan Settlement Payment paid from the TKAM Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

**TKAM Surplus Reserved Cash** means a surplus in funding of the TKAM Claims Reserve, as determined by the Legacy Trustee.

**TKC** means TK China, LLC.

**TKC Available Cash** means (i) TKC Effective Date Available Cash, (ii) TKC Surplus Reserved Cash from the TKC Claims Reserve that becomes TKC Available Cash in accordance with section 5.5(d)(i) of the Plan, and (iii) any Residual Value funded by or allocable to TKC.

**TKC Cash Proceeds** means the Purchase Price allocated to TKC either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of TKC not acquired by the Plan Sponsor.

**TKC Claims Reserve** means the amount of the TKC Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) Other Secured Claims, (ii) Administrative Expense Claims, and (iii) Priority Claims, all as against TKC.  The TKC Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

**TKC Effective Date Available Cash** means the TKC Cash Proceeds and any amounts distributed on the Effective Date to TKC on account of its equity interests in subsidiaries, less (i) the TKC Claims Reserve and (ii) the Plan Settlement Payment paid from the TKC Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

**TKC Surplus Reserved Cash** means a surplus in funding of the TKC Claims Reserve, as determined by the Legacy Trustee.

**TKF** means TK Finance, LLC.

**TKF Available Cash** means (i) TKF Effective Date Available Cash, (ii) TKF Surplus Reserved Cash from the TKF Claims Reserve that becomes TKF Available Cash in accordance with section 5.5(d)(i) of the Plan, and (iii) any Residual Value funded by or allocable to TKF.

**TKF Cash Proceeds** means the Purchase Price allocated to TKF either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of TKF not acquired by the Plan Sponsor.

*TKF Claims Reserve* means the amount of the TKF Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) Other Secured Claims, (ii) Administrative Expense Claims, and (iii) Priority Claims, all as against TKF.  The TKF Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

*TKF Effective Date Available Cash* means the TKF Cash Proceeds and any amounts distributed on the Effective Date to TKF on account of its equity interests in subsidiaries, less (i) the TKF Claims Reserve and (ii) the Plan Settlement Payment paid from the TKF Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

*TKF Surplus Reserved Cash* means a surplus in funding of the TKF Claims Reserve, as determined by the Legacy Trustee.

*TKH* means TK Holdings Inc.

*TKH Available Cash* means (i) TKH Effective Date Available Cash, (ii) $100,000 of the Plan Settlement Turnover Amount, (iii) TKH Surplus Reserved Cash from the TKH Claims Reserve that is made available to the TKH Recovery Funds and the TKH Disputed Claims Reserves in accordance with section 5.5(d)(i) of the Plan, and (iv) any Residual Value funded by or allocable to the TKH Debtors.

*TKH Cash Proceeds* means the Purchase Price allocated to the TKH Debtors either directly or indirectly under the U.S. Acquisition Agreement and all Cash and Cash equivalents of the TKH Debtors not acquired by the Plan Sponsor.

*TKH Claims Reserve* means the amount of TKH Cash Proceeds to be used or reserved on the Effective Date necessary to pay, if any, (i) the RTKHT Loan, (ii) the TKH Debtors' share of the Disputed Cure Claims Reserve, (iii) the TKH Debtors' share of the Additional Support Party Funds, (iv) Other Secured Claims, (v) Administrative Expense Claims (including (a) Administrative Expense PI/WD Claims and (b) Administrative Expense PSAN PI/WD Claims, as estimated pursuant to the Claims Estimation Report), and (vi) Priority Claims, all as against the TKH Debtors.  The TKH Claims Reserve shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee, unless specified otherwise herein.

*TKH Debtors* means TKH, Takata Protection Systems, Inc., Interiors in Flight Inc., TK Mexico Inc., TK Mexico LLC, and TK Holdings de Mexico, S. de R.L. de C.V.

*TKH Disputed Claims Reserve* means the reserve to be established by the Debtors and maintained by the applicable Claims Administrator, which shall be funded with the TKH Available Cash based on the Distribution Formula, which reserve shall be held for the benefit of holders of subsequently Allowed General Unsecured Claims against the TKH Debtors for distribution in accordance with the procedures set forth in ARTICLE VII.  The TKH Disputed Claims Reserve shall be held by the Reorganized TK Holdings Trust.

*TKH Effective Date Available Cash* means the TKH Cash Proceeds and any amounts distributed on the Effective Date to TKH on account of its equity interests in subsidiaries, less (i) the TKH Claims Reserve, (ii) the TKH Debtors' Allocable Share of the

Post-Closing Reserve, (iii) the TKH Debtors' Allocable Share of the PSAN PI/WD Trust Reserve, (iv) the TKH Debtors' Allocable Share of the Legacy Entities Reserves, and (v) the Plan Settlement Payment paid from the TKH Cash Proceeds pursuant to the Plan Settlement Payment Waterfall.

*TKH OEM Fund* means the fund established under this Plan to make Distributions on account of Allowed OEM Unsecured Claims against the TKH Debtors and funded with TKH Available Cash in accordance with the Distribution Formula.

*TKH Other Creditors Fund* means the fund established pursuant to this Plan to make Distributions on account of Allowed Other General Unsecured Claims against the TKH Debtors and funded with TKH Available Cash in accordance with the Distribution Formula. The TKH Other Creditors Fund shall be held by the Reorganized TK Holdings Trust and administered by the Legacy Trustee.

*TKH Other PI/WD Fund* means the fund established pursuant to this Plan to make Distributions on account of Allowed Other PI/WD Claims against the TKH Debtors and funded with (i) TKH Available Cash in accordance with the Distribution Formula and (ii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula. The TKH Other PI/WD Fund shall be held by the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee.

*TKH PSAN PI/WD Fund* means the fund established pursuant to the Plan to make Distributions on account of PSAN PI/WD Claims against the TKH Debtors in accordance with the PSAN PI/WD TDP and funded with (i) PSAN PI/WD Insurance Proceeds, (ii) TKH Available Cash in accordance with the Distribution Formula, and (iii) the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula.

*TKH Recovery Funds* means, collectively, the TKH OEM Fund, the TKH Other Creditors Fund, the TKH Other PI/WD Fund, and the TKH PSAN PI/WD Fund.

*TKH Surplus Reserved Cash* means a surplus in funding of (i) the TKH Claims Reserve, (ii) the TKH Debtors' Allocable Share of the PSAN PI/WD Trust Reserve, (iii) the TKH Debtors' Allocable Share of the Post-Closing Reserve, and (iv) the TKH Debtors' Allocable Share of the Legacy Entities Reserves.

*TKHDM* means TK Holdings de Mexico, S. de R.L. de C.V.

*TKJP* means Takata Corporation.

*TKJP 503(b)(9) Claim* means TKJP's asserted Administrative Expense Claim arising under section 503(b)(9) of the Bankruptcy Code.

*TKJP Contribution Amount* means the amount of any recovery to which TKJP would be entitled on account of the TKJP 503(b)(9) Claim, solely to the extent that TKJP agrees to assign its rights to such recovery to the PSAN PI/WD Trust.

40

**TKSAC** means TAKATA Sachsen GmbH.

**Tort Claimants' Committee** means the statutory committee of tort claimant creditors appointed by the U.S. Trustee on July 7, 2017 pursuant to section 1102(a)(2) of the Bankruptcy Code.

**Transferred Employees** has the meaning assigned in the U.S. Acquisition Agreement.

**Transition Services Agreement** means that certain services agreement, entered into between each of TK Global LLC, Reorganized TK Holdings, the Warehousing Entity, and the Plan Sponsor as of the Closing Date, which agreement shall be acceptable to the Consenting OEMs, the Debtors, and the Plan Sponsor (notwithstanding anything to the contrary in the U.S. RSA), a substantially final form of which shall be filed with the Plan Supplement.

**Trust Administered Claims** means Other PI/WD Claims and, after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims.

**Trust Claims** means PSAN PI/WD Claims and the Trust Administered Claims.

**TSAC** means Takata (Shanghai) Automotive Component Co., Ltd.

**TSAC DOJ Restitution Claim Funding Deficiency** means the aggregate amount TSAC is unable to pay of its allocable share of the DOJ Restitution Claim in accordance with the Global Settlement Agreement, which amount may be assumed by TKC in accordance with the Plan.

**U.S. Acquisition Agreement** means that certain Asset Purchase Agreement, dated as of November 16, 2017, by and among TKH, TKAM, TK Holdings de Mexico S. de R.L. de C.V., TK Mexico LLC, IIM, SMX, TDM, Joyson KSS Auto Safety S.A., a Luxembourg *société anonyme*, and solely for purposes of Section 7.22 thereof, KSS Holdings, Inc., as amended, modified, and supplemented from time to time in accordance with its terms, a copy of which is attached hereto as **Exhibit 4**.

**U.S. RSA** means that certain Restructuring Support Agreement, dated as of November 16, 2017, by and among the Debtors, the Consenting OEMs, and the Plan Sponsor, as the same may be amended, restated, or otherwise modified in accordance with its terms.

**U.S. Trustee** means the United States Trustee for Region 3.

**UCC Term Sheet** means the term sheet filed with the Bankruptcy Court on February 10, 2018 [Docket No. 2017-1] that memorializes the terms of the settlement among the Debtors, the Creditors' Committee, the Plan Sponsor, and the Consenting OEMs.

**Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

WEIL:\96446450\6\76903.0004

**Updated Claims Estimation Report** means the Claims Estimation Report as updated on the Non-PSAN PI/WD Claims Termination Date solely with respect to Administrative Expense PSAN PI/WD Claims.

**Voting Deadline** means February 14, 2018 at 8:00 p.m. prevailing Eastern Time, or such date and time as may be set by the Bankruptcy Court.

**Warehouse Consenting OEM** means any Consenting OEM from whose branded vehicles PSAN Inflators were removed pursuant to recall or otherwise and preserved by Takata as of the Closing Date, as required by the NHTSA Preservation Order, other applicable law or regulation, or voluntarily.  The Warehouse Consenting OEMs are identified on **Schedule D** to the Plan.

**Warehoused PSAN Assets** means (i) the PSAN Inflators (a) preserved by Takata pursuant to the NHTSA Preservation Order, (b) otherwise preserved, voluntarily or involuntarily, by Takata, and/or (c) otherwise preserved as contemplated by the Legacy Cost Report, (ii) the leases for the PSAN Warehouses, and (iii) the machinery, equipment and other tangible assets, and a nonexclusive license (pursuant to the Intellectual Property License Agreement (as defined in the U.S. Acquisition Agreement)) to Acquired Intellectual Property (as such term is defined in the U.S. Acquisition Agreement and each Cross-Conditioned Agreement (as defined in the U.S. Acquisition Agreement), respectively) for which ownership is assigned to the Plan Sponsor, in each case that is necessary for compliance with the NHTSA Preservation Order, the preservation of PSAN Inflators as contemplated by the Legacy Cost Report, or operation of PSAN Warehouses.

**Warehousing Entity** means the Delaware corporation established under the Plan, and any of its subsidiaries, to administer and maintain the Warehoused PSAN Assets in accordance with the NHTSA Preservation Order, all applicable laws and regulations, and otherwise.

**Warehousing Entity Assets** means the Warehoused PSAN Assets, the Warehousing Entity Reserve, including the Warehousing Entity Disposal Trust Funds.

**Warehousing Entity Disposal Trust Funds** shall mean, collectively, the Warehousing Entity Michigan PSAN Disposal Trust Inflator Fund, the Warehousing Entity Missouri PSAN Inflator Disposal Trust Fund, and the Warehousing Entity Texas-Missouri PSAN Inflator Disposal Trust Fund.

**Warehousing Entity Disposal Trust Fund Beneficiaries** shall mean, as applicable, the MDEQ and the United States on behalf of EPA Region 5, the MDNR and the United States on behalf of EPA Region 7, and the TCEQ and the United States on behalf of Region 6.

**Warehousing Entity Michigan PSAN Inflator Disposal Trust Fund** means segregated Cash in the amount of not less than $21,468,116 to be held in trust by the Warehousing Entity as part of the Warehousing Entity Reserve solely to fund the disposal in accordance with applicable environmental law of PSAN Inflators returned to and warehoused by the Debtors in Michigan prior to the Effective Date.  The sole beneficiaries of the Warehousing

42

Entity Michigan PSAN Inflator Disposal Trust Fund shall be MDEQ and the United States on behalf of EPA Region 5.

**Warehousing Entity Missouri PSAN Inflator Disposal Trust Fund** means segregated Cash in the amount of not less than $6,804,988 to be held in trust by the Warehousing Entity as part of the Warehousing Entity Reserve solely to fund the disposal in accordance with applicable environmental law of PSAN Inflators returned to and warehoused by the Debtors in Missouri prior to the Effective Date.  The sole beneficiaries of the Warehousing Entity Missouri PSAN Inflator Disposal Trust Fund shall be the MDNR and the United States on behalf of EPA Region 7.

**Warehousing Entity Organizational Documents** means the certificate of incorporation and by-laws of the Warehousing Entity.

**Warehousing Entity Post-Closing Cash** means Cash recovered by the Warehousing Entity. The Plan Administrator shall account for the Warehousing Entity Post-Closing Cash as allocable to a particular Reorganized Debtor based on each Debtor's Allocable Share.

**Warehousing Entity Reserve** means Cash in an amount necessary to fund and administer any costs incurred by TK Global LLC (other than costs related solely to the post-Closing Date production of PSAN Inflators) and the Warehousing Entity, including the costs of the Product Safety Group of TKH and the maintenance, shipping, and disposal of the Warehoused PSAN Assets, on and after the Effective Date, to be (i) reserved on the Effective Date from the Cash Proceeds, (ii) funded on the Effective Date by non-Debtor affiliates, (iii) funded, to the extent necessary, by the Plan Sponsor Backstop Funding in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and this Plan, (iv) funded periodically from Surplus Reserved Cash and Post-Closing Cash in accordance with section 5.5 of this Plan, and (v) funded from Dissolution Date Cash in accordance with sections 5.6(m) and 5.8(l) of the Plan.  The Warehousing Entity Reserve shall include the Warehousing Entity Disposal Trust Funds.  The Warehousing Entity Reserve, including the Warehousing Entity Disposal Trust Funds, shall be held by the Warehousing Entity and managed by the Plan Administrator.

**Warehousing Entity Texas-Missouri PSAN Inflator Disposal Trust Fund** means segregated Cash in the amount of not less than $8,425,223 to be held in trust by the Warehousing Entity as part of the Warehousing Entity Reserve solely to fund the disposal in accordance with applicable environmental law of PSAN Inflators (i) returned to and warehoused by the Debtors in the Texas prior to the Effective Date and (ii) the disposal costs in accordance with applicable environmental law for any and all of the warehoused by the Debtors in Texas prior to the Effective Date that are relocated from Texas to Missouri in accordance with terms and conditions of the TCEQ Settlement.  The sole beneficiaries of the Warehousing Entity Texas-Missouri PSAN Inflator Disposal Trust Fund shall be the Texas Commission on Environmental Quality (TCEQ), the United States on behalf of Regions 6 and 7, and the Missouri Department of Natural Resources.

WEIL:\96446450\6\76903.0004

### 1.2     *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the U.S. RSA.  The words "herein," "hereof," or "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; *provided*, *however*, that the rule of interpretation set forth in this clause (ii) shall not be imputed to any contract, lease, instrument, release, indenture, or other agreement as to which the Restructuring Support Parties have consent rights pursuant to the U.S. RSA, and such consent rights shall be as set forth in the U.S. RSA and incorporated herein pursuant to section 1.4 of the Plan; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3     *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4     *Consent Rights of Restructuring Support Parties, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative.*

Notwithstanding anything herein to the contrary, any and all consent rights of the (i) Restructuring Support Parties set forth in the U.S. RSA, (ii) the Creditors' Committee as set forth in the UCC Term Sheet, and (iii) the Tort Claimants' Committee and the Future Claims Representative as set forth in the TCC/FCR Term Sheet, with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and the other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in section 1.1 hereof) and fully enforceable as if stated in full herein.

### 1.5     *Controlling Document.*

In the event of an inconsistency between ARTICLES I through XII of this Plan and the Plan Supplement or any other exhibit to this Plan, the terms of the relevant document in

44

the Plan Supplement or such exhibit shall control unless otherwise specified in such Plan Supplement document or exhibit.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, *however*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II        ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1        *Administrative Expense Claims Bar Date.*

Except as provided for herein or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Expense Claims (other than holders of Administrative Expense Claims paid in the ordinary course of business, holders of Administrative Expense Claims arising under section 1930 of chapter 123 of title 28 of the United States Code, holders of Fee Claims, holders of Cure Claims, holders of Consenting OEM PSAN Administrative Expense Claims, holders of Administrative Expense PSAN PI/WD Claims, and holders of Administrative Expense PI/WD Claims) must file and serve on the Debtors requests for the payment of such Administrative Expense Claims not already Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Expense Claims Bar Date or be forever barred, estopped, and enjoined from asserting such Claims against the Debtors or their assets or properties, and such Claims shall be deemed discharged as of the Effective Date.

### 2.2        *Allowance of Administrative Expense Claims.*

An Administrative Expense Claim, with respect to which a request for payment has been properly and timely filed pursuant to section 2.1 of this Plan, shall become an Allowed Administrative Expense Claim if no objection to such request is filed by the applicable Claims Administrator with the Bankruptcy Court on or before one hundred twenty (120) days after the Effective Date, or on such later date as may be fixed by the Bankruptcy Court.  If an objection is timely filed, the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or such Claim is settled, compromised, or otherwise resolved by the applicable Claims Administrator pursuant to section 7.6 of the Plan.

Notwithstanding the foregoing**,** all parties rights with respect to the TKJP 503(b)(9) Claim, including the rights of the Tort Claimants' Committee and the Future Claims Representative, to object to the TKJP 503(b)(9) Claim on any grounds, including on the grounds that such Claim should be setoff, subordinated, eliminated, treated as an Other General Unsecured Claim, or otherwise disallowed, shall be preserved (and the Tort Claimants' Committee shall have the standing and authority as of the Confirmation Date to control and

45

assert the Estates' rights with respect to any such objection and the PSAN PI/WD Trustee shall succeed to the Tort Claimants' Committee position after the Effective Date), and the TKJP 503(b)(9) Claim or Intercompany Claims of TKJP shall not be treated as Allowed Claims under the Plan for at least ninety (90) days following the Effective Date or longer if an unresolved objection or adversary proceeding has been filed as to such a Claim.

### 2.3    *Payment of Allowed Administrative Expense Claims.*

(a)    **Administrative Expense Claims.**  Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a Fee Claim, Consenting OEM PSAN Cure Claim, Consenting OEM PSAN Administrative Expense Claim, Administrative Expense PSAN PI/WD Claim, or Administrative Expense PI/WD Claim) agrees to a different treatment, the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim from the Debtors or from the Plan Sponsor (solely to the extent such Claim is an Assumed Liability), within thirty (30) days following the later to occur of (i) the Effective Date and (ii) the date on which such Administrative Expense Claim shall become an Allowed Claim; *provided*, *however*, that Allowed Administrative Expense Claims against any of the Debtors representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by either the Plan Sponsor to the extent such Allowed Administrative Expense Claims are Assumed Liabilities or the Reorganized TK Holdings Trust, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

(b)    **Consenting OEM PSAN Administrative Expense Claims.**  Subject to approval of the Plan Settlement by the Bankruptcy Court, the Consenting OEM PSAN Administrative Expense Claims shall be deemed fully and finally satisfied upon consummation of the Plan Settlement in accordance with section 5.19 of the Plan.

(c)    **Administrative Expense PI/WD Claims.**  Prior to the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims shall be paid in Cash in full as they are Allowed from the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, or the TKH Claims Reserve, as applicable, which shall include amounts sufficient to pay in full all Administrative Expense PI/WD Claims against IIM, SMX, TDM, and the TKH Debtors, respectively, for injuries that have not occurred as of the Closing Date, as estimated by the Debtors in their reasonable discretion.  After the Non-PSAN PI/WD Claims Termination Date, amounts equal to the total estimated amounts of Administrative Expense PI/WD Claims shall be transferred from the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, and the TKH Claims Reserve, as applicable, to a segregated account in the PSAN PI/WD Trust, and the PSAN PI/WD Trustee shall thereafter be responsible for resolving and paying Administrative Expense PI/WD Claims.  The IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, and TKH Claims Reserve, as applicable (prior to the Non-PSAN PI/WD Claims Termination Date), and the PSAN PI/WD Trust (on or after the Non-PSAN PI/WD Claims Termination Date) shall have all defenses, cross-claims, offsets, recoupments, and PI/WD Insurance Rights regarding Administrative Expense PI/WD Claims that the applicable Debtor has or would have had under applicable law.

WEIL:\96446450\6\76903.0004

(d) **Administrative Expense PSAN PI/WD Claims**.  Prior to the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PSAN PI/WD Claims shall be paid in Cash in full as they are Allowed from the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, or the TKH Claims Reserve, as applicable, which shall include amounts sufficient to pay in full all Administrative Expense PSAN PI/WD Claims against IIM, SMX, TDM, and the TKH Debtors, respectively, for injuries that have not occurred as of the Closing Date, as set forth in the Claims Estimation Report.  On the Effective Date, a segregated bank account shall be established in each of the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, and the TKH Claims Reserve, to the extent applicable, for the benefit of the holders of Allowed Administrative Expense PSAN PI/WD Claims against IIM, SMX, TDM, and the TKH Debtors and funded with amounts sufficient to pay in full all estimated Administrative Expense PSAN PI/WD Claims against IIM, SMX, TDM, and the TKH Debtors, respectively, as set forth in the Claims Estimation Report.  After the Non-PSAN PI/WD Claims Termination Date, amounts equal to the total estimated amount of Administrative Expense PSAN PI/WD Claims, as reevaluated and as may be subject to downward adjustment, based on the Updated Claims Estimation Report and by agreement of the Legacy Trustee and the PSAN PI/WD  Trustee or, if an agreement cannot be reached, an order of the Bankruptcy Court, shall be transferred from the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, and the TKH Claims Reserve, as applicable, to a segregated account in the PSAN PI/WD Trust, and the PSAN PI/WD Trustee shall thereafter be responsible for resolving and paying Administrative Expense PSAN PI/WD Claims.  In no event shall any Administrative Expense PSAN PI/WD Claim be asserted against the Plan Sponsor and any such Claim shall be asserted exclusively against the Reorganized TK Holdings Trust prior to the Non-PSAN PI/WD Claims Termination Date and the PSAN PI/WD Trust after the Non-PSAN PI/WD Claims Termination Date.  The IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, and the TKH Claims Reserve, as applicable (prior to the Non-PSAN PI/WD Claims Termination Date), and the PSAN PI/WD Trust (on or after the Non-PSAN PI/WD Claims Termination Date) shall have all defenses, cross-claims, offsets, recoupments, and PSAN PI/WD Insurance Rights regarding Administrative Expense PSAN PI/WD Claims that the applicable Debtor has or would have had under applicable law.

**2.4    _Adequate Protection Claims._**

Subject to approval of the Plan Settlement by the Bankruptcy Court, the Adequate Protection Claims shall be deemed fully and finally satisfied upon consummation of the Plan Settlement in accordance with section 5.19 of the Plan.

**2.5    _Treatment of Fee Claims._**

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  On the Effective

WEIL:\96446450\6\76903.0004

Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized TK Holdings Trust only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; *provided*, *however*, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with section 2.3 of this Plan (but for the avoidance of doubt shall not be subject to any Administrative Expense Claims Bar Date).  No Claims, Interests, Liens, other encumbrances, or liabilities of any kind shall encumber the Fee Escrow Account in any way.

### 2.6    *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, either Cash in an amount equal to the Allowed amount of such Claim or such other treatment as may satisfy section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III        CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions hereunder only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.  In no event shall any holder of an Allowed Claim be entitled to receive payments under this Plan that, in the aggregate, exceed the Allowed amount of such holder's Claim.

WEIL:\96446450\6\76903.0004

### 3.2    *Summary of Classification of Claims and Interests.*

        The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject this Plan:

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1(a) | Other Secured Claims against TKAM | Unimpaired | No (Presumed to accept) |
| Class 1(b) | Other Secured Claims against TKF | Unimpaired | No (Presumed to accept) |
| Class 1(c) | Other Secured Claims against TKC | Unimpaired | No (Presumed to accept) |
| Class 1(d) | Other Secured Claims against the TKH Debtors | Unimpaired | No (Presumed to accept) |
| Class 1(e) | Other Secured Claims against IIM | Unimpaired | No (Presumed to accept) |
| Class 1(f) | Other Secured Claims against TDM | Unimpaired | No (Presumed to accept) |
| Class 1(g) | Other Secured Claims against SMX | Unimpaired | No (Presumed to accept) |
| Class 2(a) | Other Priority Claims against TKAM | Unimpaired | No (Presumed to accept) |
| Class 2(b) | Other Priority Claims against TKF | Unimpaired | No (Presumed to accept) |
| Class 2(c) | Other Priority Claims against TKC | Unimpaired | No (Presumed to accept) |
| Class 2(d) | Other Priority Claims against the TKH Debtors | Unimpaired | No (Presumed to accept) |
| Class 2(e) | Other Priority Claims against IIM | Unimpaired | No (Presumed to accept) |
| Class 2(f) | Other Priority Claims against TDM | Unimpaired | No (Presumed to accept) |
| Class 2(g) | Other Priority Claims against SMX | Unimpaired | No (Presumed to accept) |
| Class 3(a) | Mexico Class Action Claims and Mexico Labor Claims against IIM | Impaired | Yes |
| Class 3(b) | Mexico Class Action Claims and Mexico Labor Claims against TDM | Impaired | Yes |
| Class 4(a) | OEM Unsecured Claims against the TKH Debtors | Impaired | Yes |

WEIL:\96446450\6\76903.0004

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 4(b) | OEM Unsecured Claims against IIM | Impaired | Yes |
| Class 4(c) | OEM Unsecured Claims against TDM | Impaired | Yes |
| Class 4(d) | OEM Unsecured Claims against SMX | Impaired | Yes |
| Class 5(a) | PSAN PI/WD Claims against the TKH Debtors | Impaired | Yes |
| Class 5(b) | PSAN PI/WD Claims against IIM | Impaired | Yes |
| Class 5(c) | PSAN PI/WD Claims against TDM | Impaired | Yes |
| Class 5(d) | PSAN PI/WD Claims against SMX | Impaired | Yes |
| Class 6(a) | Other General Unsecured Claims against TKAM | Impaired | Yes |
| Class 6(b) | Other General Unsecured Claims against TKF | Impaired | Yes |
| Class 6(c) | Other General Unsecured Claims against TKC | Impaired | Yes |
| Class 6(d) | Other General Unsecured Claims against the TKH Debtors | Impaired | Yes |
| Class 6(e) | Other General Unsecured Claims against IIM | Impaired | Yes |
| Class 6(f) | Other General Unsecured Claims against TDM | Impaired | Yes |
| Class 6(g) | Other General Unsecured Claims against SMX | Impaired | Yes |
| Class 7(a) | Other PI/WD Claims against the TKH Debtors | Impaired | Yes |
| Class 7(b) | Other PI/WD Claims against IIM | Impaired | Yes |
| Class 7(c) | Other PI/WD Claims against TDM | Impaired | Yes |
| Class 7(d) | Other PI/WD Claims against SMX | Impaired | Yes |

WEIL:\96446450\6\76903.0004

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 8(a) | Intercompany Interests in TKAM | Impaired | No (Deemed to reject) |
| Class 8(b) | Intercompany Interests in TKF | Impaired | No (Deemed to reject) |
| Class 8(c) | Intercompany Interests in TKC | Impaired | No (Deemed to reject) |
| Class 8(d) | Intercompany Interests in the TKH Debtors | Impaired | No (Deemed to reject) |
| Class 8(e) | Intercompany Interests in IIM | Impaired | No (Deemed to reject) |
| Class 8(f) | Intercompany Interests in TDM | Impaired | No (Deemed to reject) |
| Class 8(g) | Intercompany Interests in SMX | Impaired | No (Deemed to reject) |
| Class 9(a) | Subordinated Claims against TKAM | Impaired | No (Deemed to reject) |
| Class 9(b) | Subordinated Claims against TKF | Impaired | No (Deemed to reject) |
| Class 9(c) | Subordinated Claims against TKC | Impaired | No (Deemed to reject) |
| Class 9(d) | Subordinated Claims against the TKH Debtors | Impaired | No (Deemed to reject) |
| Class 9(e) | Subordinated Claims against IIM | Impaired | No (Deemed to reject) |
| Class 9(f) | Subordinated Claims against TDM | Impaired | No (Deemed to reject) |
| Class 9(g) | Subordinated Claims against SMX | Impaired | No (Deemed to reject) |

### 3.3     *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.4     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

51

3.5     *__Voting; Presumptions; Solicitation.__*

(a)     **Acceptance by Certain Impaired Classes.**  Only holders of Claims in Classes 3, 4, 5, 6, and 7 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 3, 4, 5, 6, and 7 shall receive ballots containing detailed voting instructions.

(b)     **Deemed Acceptance by Unimpaired Classes.**  Holders of Claims in Classes 1 and 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)     **Deemed Rejection by Certain Impaired Classes.**  Holders of Claims and Interests in Classes 8 and 9 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(d)     **Individual Creditor Voting Rights.**  Notwithstanding anything to the contrary in this Plan, the voting rights of holders of Claims in any Class shall be governed in all respects by the Solicitation Procedures Order.

3.6     *__Cramdown.__*

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

3.7     *__No Waiver.__*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Claim.

## ARTICLE IV            TREATMENT OF CLAIMS AND INTERESTS.

4.1     *__Claims and Interests against TKAM.__*

(a)     **Class 1(a): Other Secured Claims against TKAM.**

(i)     <u>Treatment:</u>  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against

52

TKAM are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against TKAM shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(ii)    <u>Impairment and Voting</u>:  Allowed Other Secured Claims against TKAM are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against TKAM are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)    **Class 2(a): Other Priority Claims against TKAM.**

(i)    <u>Treatment</u>:  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against TKAM are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against TKAM shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    <u>Impairment and Voting</u>:  Allowed Other Priority Claims against TKAM are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against TKAM are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

(c)    **Class 6(a): Other General Unsecured Claims against TKAM.**

(i)    <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against TKAM.  Unless otherwise agreed, each holder of an Allowed Other General

53

Unsecured Claim against TKAM, if any, shall receive its Pro Rata Share of the TKAM Available Cash up to the full amount of such Allowed Other General Unsecured Claim.

(ii)  <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against TKAM are Impaired.  Holders of Other General Unsecured Claims against TKAM are entitled to vote to accept or reject the Plan.

(d)  **Class 8(a): Intercompany Interests in TKAM.**

(i)  <u>Treatment</u>:  After consummation of the Restructuring Transactions, any Intercompany Interest in TKAM shall be cancelled.  Each holder of an Intercompany Interest in TKAM shall neither receive nor retain any property or interest in property on account of such Intercompany Interest; *provided*, *however*, that in the event all Allowed Claims against TKAM have been satisfied in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in TKAM shall receive its applicable share of any remaining TKAM Available Cash in accordance with sections 5.5(e)(i) and 5.17 of the Plan.

(ii)  <u>Impairment and Voting</u>:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in TKAM are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

(e)  **Class 9(a): Subordinated Claims against TKAM.**

(i)  <u>Treatment</u>:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against TKAM shall not receive or retain any property under this Plan on account of such Claims, and the obligations of TKAM and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(ii)  <u>Impairment and Voting</u>:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against TKAM are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such

WEIL:\96446450\6\76903.0004

holders shall not be solicited with respect to Subordinated Claims.

4.2    *__Claims and Interests against TKF.__*

(a)    **Class 1(b): Other Secured Claims against TKF.**

(i)    <u>Treatment:</u>  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against TKF are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against TKF shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(ii)    <u>Impairment and Voting</u>:  Allowed Other Secured Claims against TKF are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against TKF are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)    **Class 2(b): Other Priority Claims against TKF.**

(i)    <u>Treatment:</u>  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against TKF are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against TKF shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    <u>Impairment and Voting</u>:  Allowed Other Priority Claims against TKF are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against TKF are conclusively presumed to accept this Plan and are not entitled to vote to

WEIL:\96446450\6\76903.0004

accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

(c)     **Class 6(b): Other General Unsecured Claims against TKF.**

(i)     <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against TKF.  Unless otherwise agreed, each holder of an Allowed Other General Unsecured Claim against TKF, if any, shall receive its Pro Rata Share of the TKF Available Cash up to the full amount of such Allowed Other General Unsecured Claim.

(ii)    <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against TKF are Impaired.  Holders of Other General Unsecured Claims against TKF are entitled to vote to accept or reject the Plan.

(d)     **Class 8(b): Intercompany Interests in TKF.**

(i)     <u>Treatment</u>:  After consummation of the Restructuring Transactions, any Intercompany Interest in TKF shall be cancelled only when such Debtor is dissolved or merged out of existence in accordance with section 5.17 of the Plan.  Each holder of an Intercompany Interest in TKF shall neither receive nor retain any property or interest in property on account of such Intercompany Interest; *provided*, *however*, that in the event all Allowed Claims against TKF have been satisfied in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in TKF shall receive its applicable share of any remaining TKF Available Cash in accordance with sections 5.5(e)(i) and 5.17 of the Plan.

(ii)    <u>Impairment and Voting</u>:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in TKF are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

(e)     **Class 9(b): Subordinated Claims against TKF.**

(i)     <u>Treatment</u>:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against TKF shall not receive or retain any property under this Plan on account of

56

such Claims, and the obligations of TKF and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(ii)     <u>Impairment and Voting</u>:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against TKF are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

## 4.3     *Claims and Interests against TKC.*

(a)     **Class 1(c): Other Secured Claims against TKC.**

(i)     <u>Treatment:</u>  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against TKC are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against TKC shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(ii)     <u>Impairment and Voting</u>:  Allowed Other Secured Claims against TKC are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against TKC are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)     **Class 2(c): Other Priority Claims against TKC.**

(i)     <u>Treatment:</u>  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against TKC are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against TKC shall receive, on account of

WEIL:\96446450\6\76903.0004

such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)     <u>Impairment and Voting</u>:  Allowed Other Priority Claims against TKC are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against TKC are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

(c)     **Class 6(c): Other General Unsecured Claims against TKC.**

(i)     <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against TKC.  Unless otherwise agreed, each holder of an Allowed Other General Unsecured Claim against TKC, if any, shall receive its Pro Rata Share of the TKC Available Cash up to the full amount of such Allowed Other General Unsecured Claim.

(ii)     <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against TKC are Impaired.  Holders of Other General Unsecured Claims against TKC are entitled to vote to accept or reject the Plan.

(d)     **Class 8(c): Intercompany Interests in TKC.**

(i)     <u>Treatment</u>:  After consummation of the Restructuring Transactions, any Intercompany Interest in TKC shall be cancelled only when such Debtor is dissolved or merged out of existence in accordance with section 5.17 of the Plan.  Each holder of an Intercompany Interest in TKC shall neither receive nor retain any property or interest in property on account of such Intercompany Interest; *provided*, *however*, that in the event all Allowed Claims against TKC have been satisfied in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in TKC shall receive its applicable share of any remaining TKC Available Cash in accordance with sections 5.5(e)(i) and 5.17 of the Plan.

(ii)     <u>Impairment and Voting</u>:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in TKC are deemed to reject this Plan and are not entitled to

58

vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

(e)     **Class 9(c): Subordinated Claims against TKC.**

(i)     Treatment:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against TKC shall not receive or retain any property under this Plan on account of such Claims, and the obligations of TKC and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(ii)     Impairment and Voting:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against TKC are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

4.4     ***Claims and Interests against the TKH Debtors.***

(a)     **Class 1(d): Other Secured Claims against the TKH Debtors.**

(i)     Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against the TKH Debtors are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against the TKH Debtors shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(ii)     Impairment and Voting:  Allowed Other Secured Claims against the TKH Debtors are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against the TKH Debtors are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of

WEIL:\96446450\6\76903.0004

such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)     **Class 2(d): Other Priority Claims against the TKH Debtors.**

(i)     Treatment:  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against the TKH Debtors are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against the TKH Debtors shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    Impairment and Voting:  Allowed Other Priority Claims against the TKH Debtors are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against the TKH Debtors are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

(c)     **Class 4(a): OEM Unsecured Claims against the TKH Debtors.**

(i)     Treatment:  Unless otherwise agreed, each holder of an Allowed OEM Unsecured Claim against the TKH Debtors shall receive its Pro Rata Share of the TKH Available Cash allocated to the TKH OEM Fund; *provided*, *however*, that the Allowed OEM Unsecured Claims of Consenting OEMs shall be paid in accordance with the Agreed Allocation with certain recoveries on account of Allowed Consenting OEM Unsecured Claims to be contributed to the Plan Settlement Fund and the Support Party Creditor Fund to the extent required by sections 5.19(e) and 5.19(g) of the Plan.  Pursuant to the Plan Settlement, the OEM Unsecured Claims of the Consenting OEMs against the Debtors shall be Allowed for distribution purposes in the aggregate amount of $38,645,862,823.  A schedule of the OEM Claims of the Consenting OEMs will be filed as part of the Plan Supplement.

(ii)    Impairment and Voting:  Allowed OEM Unsecured Claims against the TKH Debtors are Impaired.  Holders of OEM

WEIL:\96446450\6\76903.0004

Unsecured Claims against the TKH Debtors are entitled to vote to accept or reject the Plan.

(d)     **Class 5(a): PSAN PI/WD Claims against the TKH Debtors.**

(i)     <u>Treatment</u>:  This Class consists of holders of PSAN PI/WD Claims against the TKH Debtors.  On the Effective Date, liability for all PSAN PI/WD Claims against the TKH Debtors shall be assumed by the PSAN PI/WD Trust without further act or deed and shall be satisfied from the PSAN PI/WD Trust as set forth in the PSAN PI/WD TDP and the PSAN PI/WD Trust Agreement.  Pursuant to the Channeling Injunction established pursuant to section 10.7 of this Plan, each holder of a PSAN PI/WD Claim against the TKH Debtors shall have its Claim permanently channeled to the PSAN PI/WD Trust, and such PSAN PI/WD Claim shall thereafter be asserted exclusively against the PSAN PI/WD Trust and resolved in accordance with the terms, provisions, and procedures of the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP.  Holders of PSAN PI/WD Claims against the TKH Debtors are, subject to the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP, enjoined from filing any future litigation, Claims, or Causes of Action arising out of or related to such PSAN PI/WD Claims against the Debtors or any of the Protected Parties, and may not proceed in any manner against the Debtors or any of the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their PSAN PI/WD Claims against the PSAN PI/WD Trust solely as provided in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.

(ii)    <u>Impairment and Voting</u>:  PSAN PI/WD Claims against the TKH Debtors are Impaired.  Holders of PSAN PI/WD Claims against the TKH Debtors are entitled to vote to accept or reject the Plan.  The Future Claims Representative shall represent the interests of future holders of PSAN PI/WD Claims.  Notwithstanding anything to the contrary herein, holders of PSAN PI/WD Claims against the TKH Debtors arising from vehicles manufactured by any Participating OEM may be deemed to be in a separate Class from all other holders of PSAN PI/WD Claims against the TKH Debtors that are not entitled to receive PSAN PI/WD Top-Up Funds solely for voting purposes.

61

(e)     **Class 6(d): Other General Unsecured Claims against the TKH Debtors.**

     (i)     <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against the TKH Debtors. Unless otherwise agreed, each holder of an Allowed Other General Unsecured Claim against the TKH Debtors shall receive its Pro Rata Share of the TKH Available Cash allocated to the TKH Other Creditors Fund.  The NHTSA Claims shall be Allowed as an Other General Unsecured Claim against TKH in the aggregate amount of $50 million.

     (ii)    <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against the TKH Debtors are Impaired. Holders of Other General Unsecured Claims against the TKH Debtors are entitled to vote to accept or reject the Plan.

(f)     **Class 7(a): Other PI/WD Claims against the TKH Debtors.**

     (i)     <u>Treatment</u>:  This Class consists of holders of Other PI/WD Claims against the TKH Debtors.  Unless otherwise agreed, each holder of an Allowed Other PI/WD Claim against the TKH Debtors shall receive its Pro Rata Share of the TKH Available Cash allocated to the TKH Other PI/WD Fund. Other PI/WD Claims against the TKH Debtors shall be transferred to the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee but shall not be subject to the Channeling Injunction set forth in section 10.7 of the Plan or liquidated pursuant to the PSAN PI/WD TDP.

     (ii)    <u>Impairment and Voting</u>: Other PI/WD Claims against the TKH Debtors are Impaired.  Holders of Other PI/WD Claims against the TKH Debtors are entitled to vote to accept or reject the Plan.

(g)     **Class 8(d): Intercompany Interests in the TKH Debtors.**

     (i)     <u>Treatment</u>:  In each case after consummation of the Restructuring Transactions, any Intercompany Interests in TKH shall be cancelled and any Intercompany Interests in the TKH Debtors, other than TKH, shall be cancelled only when such Debtors are dissolved or merged out of existence in accordance with section 5.17 of the Plan.  Each holder of an Intercompany Interest in the TKH Debtors shall neither receive nor retain any property or interest in property on account of such Intercompany Interest.

        (ii)      <u>Impairment and Voting</u>:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in the TKH Debtors are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

    (h)    **Class 9(d): Subordinated Claims against the TKH Debtors.**

        (i)      <u>Treatment</u>:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against the TKH Debtors shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the TKH Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

        (ii)      <u>Impairment and Voting</u>:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against the TKH Debtors are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

4.5    ***Claims and Interests against IIM.***

    (a)    **Class 1(e): Other Secured Claims against IIM.**

        (i)      <u>Treatment</u>:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against IIM are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against IIM shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

        (ii)      <u>Impairment and Voting</u>:  Allowed Other Secured Claims against IIM are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against IIM are conclusively

presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)     **Class 2(e): Other Priority Claims against IIM.**

(i)     <u>Treatment</u>:  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against IIM are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against IIM shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)     <u>Impairment and Voting</u>:  Allowed Other Priority Claims against IIM are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against IIM are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

(c)     **Class 3(a): Mexico Class Action Claims and Mexico Labor Claims against IIM.**

(i)     <u>Treatment</u>:  Unless otherwise agreed, holders of Allowed Mexico Class Action Claims and Allowed Mexico Labor Claims against IIM shall receive their Pro Rata Share of the amounts separately reserved for such Claims in the IIM Claims Reserve up to the full amount of such Allowed Mexico Class Action Claims and Allowed Mexico Labor Claims.

(ii)     <u>Impairment and Voting</u>:  Allowed Mexico Class Action Claims and Allowed Mexico Labor Claims against IIM are Impaired.  Holders of Mexico Class Action Claims and Mexico Labor Claims against IIM are entitled to vote to accept or reject the Plan.

(d)     **Class 4(b): OEM Unsecured Claims against IIM.**

(i)     <u>Treatment</u>:  Unless otherwise agreed, each holder of an Allowed OEM Unsecured Claim against IIM shall receive

64

its Pro Rata Share of the IIM Available Cash allocated to the IIM OEM Fund; *provided*, *however*, that the Allowed OEM Unsecured Claims of Consenting OEMs shall be paid in accordance with the Agreed Allocation with certain recoveries on account of Allowed Consenting OEM Unsecured Claims to be contributed to the Plan Settlement Fund and the Support Party Creditor Fund to the extent required by sections 5.19(e) and 5.19(g) of the Plan. Pursuant to the Plan Settlement, the OEM Unsecured Claims of the Consenting OEMs against the Debtors shall be Allowed for distribution purposes in the aggregate amount of $38,645,862,823. A schedule of the OEM Claims of the Consenting OEMs will be filed as part of the Plan Supplement.

(ii)   Impairment and Voting:  Allowed OEM Unsecured Claims against IIM are Impaired.  Holders of OEM Unsecured Claims against IIM are entitled to vote to accept or reject the Plan.

(e)   **Class 5(b): PSAN PI/WD Claims against IIM.**

(i)   Treatment:  This Class consists of holders of PSAN PI/WD Claims against IIM.  On the Effective Date, liability for all PSAN PI/WD Claims against IIM shall be assumed by the PSAN PI/WD Trust without further act or deed and shall be satisfied from the PSAN PI/WD Trust as set forth in the PSAN PI/WD TDP and the PSAN PI/WD Trust Agreement.  Pursuant to the Channeling Injunction established pursuant to section 10.7 of this Plan, each holder of a PSAN PI/WD Claim against IIM shall have its Claim permanently channeled to the PSAN PI/WD Trust, and such PSAN PI/WD Claim shall thereafter be asserted exclusively against the PSAN PI/WD Trust and resolved in accordance with the terms, provisions, and procedures of the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP.  Holders of PSAN PI/WD Claims against IIM are, subject to the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP, enjoined from filing any future litigation, Claims, or Causes of Action arising out of or related to such PSAN PI/WD Claims against the Debtors or any of the Protected Parties, and may not proceed in any manner against the Debtors or any of the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their PSAN PI/WD Claims against the

65

PSAN PI/WD Trust solely as provided in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.

(ii)     <u>Impairment and Voting</u>:  PSAN PI/WD Claims against IIM are Impaired.  Holders of PSAN PI/WD Claims against IIM are entitled to vote to accept or reject the Plan.  The Future Claims Representative shall represent the interests of future holders of PSAN PI/WD Claims.  Notwithstanding anything to the contrary herein, holders of PSAN PI/WD Claims against IIM arising from vehicles manufactured by any Participating OEM may be deemed to be in a separate Class from all other holders of PSAN PI/WD Claims against IIM that are not entitled to receive PSAN PI/WD Top-Up Funds solely for voting purposes.

(f)     **Class 6(e): Other General Unsecured Claims against IIM.**

(i)     <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against IIM.  Unless otherwise agreed, each holder of an Allowed Other General Unsecured Claim against IIM shall receive its Pro Rata Share of the IIM Available Cash allocated to the IIM Other Creditors Fund.

(ii)     <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against IIM are Impaired.  Holders of Other General Unsecured Claims against IIM are entitled to vote to accept or reject the Plan.

66

(g)    **Class 7(b): Other PI/WD Claims against IIM.**

    (i)    <u>Treatment</u>:  This Class consists of holders of Other PI/WD Claims against IIM.  Unless otherwise agreed, each holder of an Allowed Other PI/WD Claim against IIM shall receive its Pro Rata Share of the IIM Available Cash allocated to the IIM Other PI/WD Fund.  Other PI/WD Claims against IIM shall be transferred to the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee but shall not be subject to the Channeling Injunction set forth in section 10.7 of the Plan or liquidated pursuant to the PSAN PI/WD TDP.

    (ii)    <u>Impairment and Voting</u>: Other PI/WD Claims against IIM are Impaired.  Holders of Other PI/WD Claims against IIM are entitled to vote to accept or reject the Plan.

(h)    **Class 8(e): Intercompany Interests in IIM.**

    (i)    <u>Treatment</u>:  After consummation of the Restructuring Transactions, any Intercompany Interest in IIM shall be cancelled only when such Debtor is dissolved or merged out of existence in accordance with section 5.17 of the Plan.  Each holder of an Intercompany Interest in IIM shall neither receive nor retain any property or interest in property on account of such Intercompany Interest; *provided*, *however*, that in the event all Allowed Claims against IIM have been satisfied in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in IIM shall receive its applicable share of any remaining IIM Available Cash in accordance with section 5.17 of the Plan.

    (ii)    <u>Impairment and Voting</u>:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in IIM are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

(i)    **Class 9(e): Subordinated Claims against IIM**.

    (i)    <u>Treatment</u>:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against IIM shall not receive or retain any property under this Plan on account of

67

such Claims, and the obligations of IIM and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(ii) <u>Impairment and Voting</u>:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against IIM are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 4.6    *Claims and Interests against TDM.*

(a)    **Class 1(f): Other Secured Claims against TDM.**

(i) <u>Treatment</u>:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against TDM are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against TDM shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(ii) <u>Impairment and Voting</u>:  Allowed Other Secured Claims against TDM are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against TDM are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)    **Class 2(f): Other Priority Claims against TDM.**

(i) <u>Treatment</u>:  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against TDM are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against TDM shall receive, on account of

WEIL:\96446450\6\76903.0004

such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)     <u>Impairment and Voting</u>:  Allowed Other Priority Claims against TDM are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against TDM are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

(c)     **Class 3(b): Mexico Class Action Claims and Mexico Labor Claims against TDM.**

(i)     <u>Treatment</u>:  Unless otherwise agreed, holders of Allowed Mexico Class Action Claims and Allowed Mexico Labor Claims against TDM shall receive their Pro Rata Share of the amounts separately reserved for such Claims in the TDM Claims Reserve up to the full amount of such Allowed Mexico Class Action Claims and Allowed Mexico Labor Claims.

(ii)     <u>Impairment and Voting</u>:  Allowed Mexico Class Action Claims and Allowed Mexico Labor Claims against TDM are Impaired.  Holders of Mexico Class Action Claims and Mexico Labor Claims against TDM are entitled to vote to accept or reject the Plan.

(d)     **Class 4(c): OEM Unsecured Claims against TDM.**

(i)     <u>Treatment</u>:  Unless otherwise agreed, each holder of an Allowed OEM Unsecured Claim against TDM shall receive its Pro Rata Share of the TDM Available Cash allocated to the TDM OEM Fund; *provided*, *however*, that the Allowed OEM Unsecured Claims of Consenting OEMs shall be paid in accordance with the Agreed Allocation with certain recoveries on account of Allowed Consenting OEM Unsecured Claims to be contributed to the Plan Settlement Fund and the Support Party Creditor Fund to the extent required by sections 5.19(e) and 5.19(g) of the Plan. Pursuant to the Plan Settlement, the OEM Unsecured Claims of the Consenting OEMs against the Debtors shall be Allowed for distribution purposes in the aggregate amount of $38,645,862,823.  A schedule of the OEM

69

Claims of the Consenting OEMs will be filed as part of the Plan Supplement.

(ii) <u>Impairment and Voting</u>:  Allowed OEM Unsecured Claims against TDM are Impaired.  Holders of OEM Unsecured Claims against TDM are entitled to vote to accept or reject the Plan.

(e) **Class 5(c): PSAN PI/WD Claims against TDM.**

(i) <u>Treatment</u>:  This Class consists of holders of PSAN PI/WD Claims against TDM.  On the Effective Date, liability for all PSAN PI/WD Claims against TDM shall be assumed by the PSAN PI/WD Trust without further act or deed and shall be satisfied from the PSAN PI/WD Trust as set forth in the PSAN PI/WD TDP and the PSAN PI/WD Trust Agreement.  Pursuant to the Channeling Injunction established pursuant to section 10.7 of this Plan, each holder of a PSAN PI/WD Claim against TDM shall have its Claim permanently channeled to the PSAN PI/WD Trust, and such PSAN PI/WD Claim shall thereafter be asserted exclusively against the PSAN PI/WD Trust and resolved in accordance with the terms, provisions, and procedures of the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP.  Holders of PSAN PI/WD Claims against TDM are, subject to the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP, enjoined from filing any future litigation, Claims, or Causes of Action arising out of or related to such PSAN PI/WD Claims against the Debtors or any of the Protected Parties, and may not proceed in any manner against the Debtors or any of the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their PSAN PI/WD Claims against the PSAN PI/WD Trust solely as provided in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.

(ii) <u>Impairment and Voting</u>:  PSAN PI/WD Claims against TDM are Impaired.  Holders of PSAN PI/WD Claims against TDM are entitled to vote to accept or reject the Plan.  The Future Claims Representative shall represent the interests of future holders of PSAN PI/WD Claims. Notwithstanding anything to the contrary herein, holders of PSAN PI/WD Claims against TDM arising from vehicles manufactured by any Participating OEM may be deemed to be in a separate Class from all other holders of PSAN

70

PI/WD Claims against TDM that are not entitled to receive PSAN PI/WD Top-Up Funds solely for voting purposes.

(f)     **Class 6(f): Other General Unsecured Claims against TDM.**

(i)     <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against TDM.  Unless otherwise agreed, each holder of an Allowed Other General Unsecured Claim against TDM shall receive its Pro Rata Share of the TDM Available Cash allocated to the TDM Other Creditors Fund.

(ii)    <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against TDM are Impaired.  Holders of Other General Unsecured Claims against TDM are entitled to vote to accept or reject the Plan.

(g)     **Class 7(c): Other PI/WD Claims against TDM.**

(i)     <u>Treatment</u>:  This Class consists of holders of Other PI/WD Claims against TDM.  Unless otherwise agreed, each holder of an Allowed Other PI/WD Claim against TDM shall receive its Pro Rata Share of the TDM Available Cash allocated to the TDM Other PI/WD Fund.  Other PI/WD Claims against TDM shall be transferred to the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee but shall not be subject to the Channeling Injunction set forth in section 10.7 of the Plan or liquidated pursuant to the PSAN PI/WD TDP.

(ii)    <u>Impairment and Voting</u>: Other PI/WD Claims against TDM are Impaired.  Holders of Other PI/WD Claims against the TDM are entitled to vote to accept or reject the Plan.

(h)     **Class 8(f): Intercompany Interests in TDM.**

(i)     <u>Treatment</u>:  After consummation of the Restructuring Transactions, any Intercompany Interest in TDM shall be cancelled only when such Debtor is dissolved or merged out of existence in accordance with section 5.17 of the Plan.  Each holder of an Intercompany Interest in TDM shall neither receive nor retain any property or interest in property on account of such Intercompany Interest; *provided*, *however*, that in the event all Allowed Claims against TDM have been satisfied in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in TDM shall receive its applicable

71

share of any remaining TDM Available Cash in accordance with section 5.17 of the Plan.

(ii)     Impairment and Voting:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in TDM are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

(i)     **Class 9(f): Subordinated Claims against TDM.**

(i)     Treatment:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against TDM shall not receive or retain any property under this Plan on account of such Claims, and the obligations of TDM and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(ii)     Impairment and Voting:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against TDM are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

4.7     ***Claims and Interests against SMX.***

(a)     **Class 1(g): Other Secured Claims against SMX.**

(i)     Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims against SMX are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Secured Claim against SMX shall receive, on account of such Allowed Claim, (i) payment in full in Cash in accordance with section 506(a) of the Bankruptcy Code, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as may be necessary to render such Claim Unimpaired.

(ii)     Impairment and Voting:  Allowed Other Secured Claims against SMX are Unimpaired.  In accordance with section

72

1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims against SMX are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

(b)    **Class 2(g): Other Priority Claims against SMX.**

(i)    <u>Treatment</u>:  The legal, equitable, and contractual rights of holders of Allowed Other Priority Claims against SMX are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Other Priority Claim against SMX shall receive, on account of such Allowed Claim, (i) payment in full in Cash or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(ii)    <u>Impairment and Voting</u>:  Allowed Other Priority Claims against SMX are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims against SMX are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

WEIL:\96446450\6\76903.0004

(c)     **Class 4(d): OEM Unsecured Claims against SMX.**

(i)     Treatment:  Unless otherwise agreed, each holder of an Allowed OEM Unsecured Claim against SMX shall receive its Pro Rata Share of the SMX Available Cash allocated to the SMX OEM Fund; *provided*, *however*, that the Allowed OEM Unsecured Claims of Consenting OEMs shall be paid in accordance with the Agreed Allocation with certain recoveries on account of Allowed Consenting OEM Unsecured Claims to be contributed to the Plan Settlement Fund and the Support Party Creditor Fund to the extent required by sections 5.19(e) and 5.19(g) of the Plan. Pursuant to the Plan Settlement, the OEM Unsecured Claims of the Consenting OEMs against the Debtors shall be Allowed for distribution purposes in the aggregate amount of $38,645,862,823.  A schedule of the OEM Claims of the Consenting OEMs will be filed as part of the Plan Supplement.

(ii)    Impairment and Voting:  Allowed OEM Unsecured Claims against SMX are Impaired.  Holders of OEM Unsecured Claims against SMX are entitled to vote to accept or reject the Plan.

(d)     **Class 5(d): PSAN PI/WD Claims against SMX.**

(i)     Treatment:  This Class consists of holders of PSAN PI/WD Claims against SMX.  On the Effective Date, liability for all PSAN PI/WD Claims against SMX shall be assumed by the PSAN PI/WD Trust without further act or deed and shall be satisfied from the PSAN PI/WD Trust as set forth in the PSAN PI/WD TDP and the PSAN PI/WD Trust Agreement.  Pursuant to the Channeling Injunction established pursuant to section 10.7 of this Plan, each holder of a PSAN PI/WD Claim against SMX shall have its Claim permanently channeled to the PSAN PI/WD Trust, and such PSAN PI/WD Claim shall thereafter be asserted exclusively against the PSAN PI/WD Trust and resolved in accordance with the terms, provisions, and procedures of the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP.  Holders of PSAN PI/WD Claims against SMX are, subject to the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP, enjoined from filing any future litigation, Claims, or Causes of Action arising out of or related to such PSAN PI/WD Claims against the Debtors or any of the Protected Parties, and may not proceed in any manner against the Debtors or any of the Protected Parties in any

74

forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their PSAN PI/WD Claims against the PSAN PI/WD Trust solely as provided in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.

(ii)    <u>Impairment and Voting</u>:  PSAN PI/WD Claims against SMX are Impaired.  Holders of PSAN PI/WD Claims against SMX are entitled to vote to accept or reject the Plan.  The Future Claims Representative shall represent the interests of future holders of PSAN PI/WD Claims.  Notwithstanding anything to the contrary herein, holders of PSAN PI/WD Claims against SMX arising from vehicles manufactured by any Participating OEM may be deemed to be in a separate Class from all other holders of PSAN PI/WD Claims against SMX that are not entitled to receive PSAN PI/WD Top-Up Funds solely for voting purposes.

(e)    **Class 6(g): Other General Unsecured Claims against SMX.**

(i)    <u>Treatment</u>:  This Class consists of holders of Allowed Other General Unsecured Claims against SMX.  Unless otherwise agreed, each holder of an Allowed Other General Unsecured Claim against SMX shall receive its Pro Rata Share of the SMX Available Cash allocated to the SMX Other Creditors Fund.

(ii)    <u>Impairment and Voting</u>:  Allowed Other General Unsecured Claims against SMX are Impaired.  Holders of Other General Unsecured Claims against SMX are entitled to vote to accept or reject the Plan.

(f)    **Class 7(d): Other PI/WD Claims against SMX.**

75

(i)     Treatment:  This Class consists of holders of Other PI/WD Claims against SMX.  Unless otherwise agreed, each holder of an Allowed Other PI/WD Claim against SMX shall receive its Pro Rata Share of the SMX Available Cash allocated to the SMX Other PI/WD Fund.  Other PI/WD Claims against SMX shall be transferred to the PSAN PI/WD Trust and administered by the PSAN PI/WD Trustee but shall not be subject to the Channeling Injunction set forth in section 10.7 of the Plan or liquidated pursuant to the PSAN PI/WD TDP.

(ii)    Impairment and Voting: Other PI/WD Claims against SMX are Impaired.  Holders of Other PI/WD Claims against SMX are entitled to vote to accept or reject the Plan.

(g)     **Class 8(g): Intercompany Interests against SMX.**

(i)     Treatment:  After consummation of the Restructuring Transactions, any Intercompany Interest in SMX shall be cancelled only when such Debtor is dissolved or merged out of existence in accordance with section 5.17 of the Plan.  Each holder of an Intercompany Interest in SMX shall neither receive nor retain any property or interest in property on account of such Intercompany Interest; *provided*, *however*, that in the event all Allowed Claims against SMX have been satisfied in accordance with the Bankruptcy Code and the Plan, each holder of an Intercompany Interest in SMX shall receive its applicable share of any remaining SMX Available Cash in accordance with section 5.17 of the Plan.

(ii)    Impairment and Voting:  Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intercompany Interests in SMX are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Intercompany Interests.

(h)     **Class 9(g): Subordinated Claims against SMX.**

(i)     Treatment:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims against SMX shall not receive or retain any property under this Plan on account of such Claims, and the obligations of SMX and the

76

Reorganized Debtors on account of Subordinated Claims shall be discharged.

(ii)     Impairment and Voting:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims against SMX are deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 4.8    *Debtors' Rights in Respect of Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of an Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 4.9    *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under section 3.3 of this Plan shall receive no Distribution.

## ARTICLE V           MEANS FOR IMPLEMENTATION.

### 5.1    *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions consistent with this Plan and the U.S. RSA as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

### 5.2    *Sale of Purchased Assets.*

(a)     **Approval of Sale of Purchased Assets.**  As permitted by sections 1123(a)(5), 1123(b), and 1141(c) of the Bankruptcy Code, the Debtors have sought approval of the sale of the Purchased Assets to the Plan Sponsor in accordance with the terms of this Plan and the U.S. Acquisition Agreement.  Confirmation of the Plan by the Bankruptcy Court shall constitute approval of the proposed sale of the Purchased Assets.

(b)     **Sale of Purchased Assets.**  On the Effective Date, the Debtors shall consummate the sale and transfer of the Purchased Assets to the Plan Sponsor and, in exchange, the Plan Sponsor shall pay the Purchase Price, the Business Incentive Plan Payment, and the Plan Sponsor Backstop Funding in accordance with the terms of the U.S. Acquisition Agreement and this Plan.

(c)    **Sale Free and Clear.**  On the Effective Date, except for the Assumed Liabilities and the Permitted Liens, the Purchased Assets shall, in accordance with section 1141(c) of the Bankruptcy Code, be purchased by or otherwise transferred to the Plan Sponsor in accordance with the U.S. Acquisition Agreement free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities.  **The terms of this section 5.2(c) shall be binding on and enforceable against all Persons as a permanent injunction pursuant to section 10.5(b) hereof.**

### 5.3    *Plan Sponsor Backstop Funding.*

(a)    **Plan Sponsor Backstop Funding.**  The Plan Sponsor shall provide Plan Sponsor Backstop Funding up to the Backstop Funding Cap, solely to the extent of an existing or near-term deficiency in the funding of the Backstopped Claims, all upon the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and this Plan.

(b)    **Access to Information.**  Reorganized Takata, the Reorganized TK Holdings Trust, the Warehousing Entity, and the Plan Administrator shall keep the Plan Sponsor and the Consenting OEMs reasonably informed of all material developments that could reasonably be expected to increase the likelihood that the Plan Sponsor Backstop Funding would be triggered during the period commencing on the Closing Date and ending on the Backstop Expiration Date and shall promptly comply with any reasonable requests by the Plan Sponsor for financial information relating to its obligation to provide Plan Sponsor Backstop Funding.  Reorganized Takata, the Reorganized TK Holdings Trust, and the Warehousing Entity shall, and shall cause each of their subsidiaries (if any) during the period commencing on the Closing Date and ending on the Backstop Expiration Date to (i) keep proper books of record and accounts in which true and correct entries in conformity in all material respects with U.S. generally accepted accounting principles shall be made of all dealings and transactions in relation to its business and activities and (ii) permit any authorized representatives designated by the Plan Sponsor to visit and inspect any of the properties of Reorganized Takata, the Reorganized TK Holdings Trust, or the Warehousing Entity to inspect, copy, and take extracts from its and their financial and accounting records and to discuss its and their affairs, finances, and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested.

### 5.4    *Vesting of Assets.*

On the Effective Date, and if applicable, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all PSAN Assets shall vest in each of the Reorganized Debtors which, as Debtors, owned such PSAN Assets as of the Effective Date, free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind, except any such Claims, Interests, Liens, other encumbrances, and liabilities of any kind of the Consenting OEMs against the Debtors to which Reorganized Takata will remain obligated under the Plan or as otherwise provided herein.  For the avoidance of doubt, (i) no Warehoused PSAN Assets or Other Excluded Assets shall vest in any Reorganized Debtor and such assets shall instead be transferred to and vest in the Warehousing Entity and the Reorganized TK Holdings Trust,

78

respectively, and (ii) Reorganized Takata shall not acquire, own, or maintain the Warehoused PSAN Assets or be required to, or otherwise be authorized to, comply with the obligations under the NHTSA Preservation Order related to the Warehoused PSAN Assets.

### 5.5    *Allocation of Purchase Price.*

(a)    **Cash Proceeds.**  On the Effective Date, the Plan Sponsor shall pay the Purchase Price for the Purchased Assets.  The Purchase Price shall be allocated, either directly or indirectly, to each of IIM, SMX, TDM, TKAM, TKC, TKF, and the TKH Debtors based on an allocation methodology described in the Disclosure Statement.  From the Cash Proceeds and the Plan Sponsor Backstop Funding (in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and this Plan), the Debtors shall, pursuant to the Plan Settlement and the other terms of this Plan:

(i)    distribute the Plan Settlement Turnover Amount in accordance with section 5.19(b) of the Plan;

(ii)    establish the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, the TKAM Claims Reserve, the TKC Claims Reserve, the TKF Claims Reserve, and the TKH Claims Reserve from each applicable Debtor's Cash Proceeds;

(iii)    establish the PSAN PI/WD Trust Reserve from the IIM Cash Proceeds, the SMX Cash Proceeds, the TDM Cash Proceeds, and the TKH Cash Proceeds pursuant to each of IIM's, SMX's, TDM's, and the TKH Debtors' Allocable Shares;

(iv)    establish the Reorganized TK Holdings Trust Reserve from the IIM Cash Proceeds, the SMX Cash Proceeds, the TDM Cash Proceeds, and the TKH Cash Proceeds pursuant to each of IIM's, SMX's, TDM's, and the TKH Debtors' Allocable Shares;

(v)    establish the Warehousing Entity Reserve from (a) the IIM Cash Proceeds, the SMX Cash Proceeds, the TDM Cash Proceeds, and the TKH Cash Proceeds pursuant to each of IIM's, SMX's, TDM's, and the TKH Debtors' Allocable Shares in accordance with the Plan Settlement and (b) the Plan Sponsor Backstop Funding (in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and this Plan);

(vi)    establish the Post-Closing Reserve from (a) the TDM Cash Proceeds and the TKH Cash Proceeds pursuant to each of TDM's and the TKH Debtors' Allocable Shares in accordance with the Plan Settlement and (b) the Plan

79

Sponsor Backstop Funding (in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and this Plan); and

(vii)    make the Plan Settlement Payment, less the Plan Settlement Turnover Amount, pursuant to the Plan Settlement Payment Waterfall.

(b)    **Effective Date Available Cash.**  Effective Date Available Cash under the Plan shall consist of the Cash Proceeds less amounts to be (i) paid for the Plan Settlement Payment pursuant to the Plan Settlement Payment Waterfall and (ii) reserved for the Claims Reserves, the Legacy Entities Reserves, the PSAN PI/WD Trust Reserve, and the Post-Closing Reserve.

(c)    **Available Cash.**  Available Cash under the Plan shall consist of (i) Effective Date Available Cash, (ii) Surplus Reserved Cash from the Claims Reserves that is not needed to satisfy the Post-Closing Reserve or the Legacy Entities Reserves and that is made available to the Recovery Funds and Disputed Claims Reserves or otherwise becomes TKAM Available Cash, TKC Available Cash, or TKF Available Cash, as applicable, in accordance with section 5.5(d)(i) of the Plan, and (iii) any Residual Value attributable to or funded by the Debtors.  Additionally, $100,000 of the Plan Settlement Turnover Amount shall constitute Available Cash for each of IIM, SMX, TDM, and the TKH Debtors; *provided, however*, that the Plan Settlement Turnover Amount shall constitute Available Cash for each of IIM and TDM solely in the event that the Mexico Class Action Claims have not been fully resolved (through adjudication, settlement, or otherwise) prior to the Effective Date.  Subject to section 5.19(e) of the Plan, Available Cash shall be (i) in the case of IIM, SMX, TDM, and the TKH Debtors, allocated to the Recovery Funds and the Disputed Claims Reserves, as applicable, pursuant to the Distribution Formula and (ii) in the case of TKAM, TKC, and TKF, made available for Distribution to holders of Intercompany Interests in the applicable Debtor after payment in full of all holders of Allowed Claims against TKAM, TKC, and TKF, as applicable.  Available Cash allocated to the Recovery Funds shall be made available for Distribution to the holders of Allowed General Unsecured Claims.  For the avoidance of doubt, the Plan Sponsor Backstop Funding shall not constitute Available Cash.

(d)    **Surplus Reserved Cash.**

(i)    <u>Surplus Reserved Cash from Claims Reserves.</u> The applicable Claims Administrator shall determine on each six-month anniversary of the Effective Date whether the amounts available in any Claims Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established.  The Claims Administrators' determination of whether the amounts available in the Claims Reserves with respect to Administrative Expense PSAN PI/WD Claims are in excess of the amounts necessary to satisfy the purposes for which such reserves were established shall be based on the Claims Estimation

80

Report.  If the applicable Claims Administrator determines that a surplus exists in any Claims Reserve as of the date of such determination, such Surplus Reserved Cash shall (a)(1) first, be allocated to the Post-Closing Reserve and/or the Warehousing Entity Reserve to the extent that Reorganized Takata and/or the Warehousing Entity (as applicable) have not been dissolved and either such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, with such allocation of Surplus Reserved Cash to be in the discretion of the Legacy Trustee in consultation with the Plan Administrator, (2) second, be allocated to the Reorganized TK Holdings Trust Reserve to the extent such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, and (3) third, become Available Cash of the applicable Debtor and deposited into the applicable Recovery Funds and Disputed Claims Reserves pursuant to the Distribution Formula, if applicable; *provided*, *however*, that no Surplus Reserved Cash from the Claims Reserves shall become Available Cash or be deposited into the Recovery Funds or Disputed Claims Reserves without the consent of the Plan Sponsor and the Requisite Consenting OEMs unless the Warehousing Entity and Reorganized Takata have been dissolved; *provided*, *further*, that any Surplus Reserved Cash in the Claims Reserves attributable to the TKJP 503(b)(9) Claim or from the repayment of the RTKHT Loan shall become Available Cash of the applicable Debtor and deposited into the applicable Recovery Funds and Disputed Claims Reserves pursuant to the Distribution Formula notwithstanding anything to the contrary in this section 5.5(d)(i) of the Plan or otherwise; and (b) otherwise remain in the Claims Reserves.

(ii)     <u>Surplus Reserved Cash from Reorganized TK Holdings Trust Reserve.</u>  Prior to the dissolution of the Reorganized TK Holdings Trust, the Legacy Trustee shall determine on each six-month anniversary of the Effective Date whether the amounts available in the Reorganized TK Holdings Trust Reserve are in excess of the amounts necessary to satisfy the purpose for which such reserve was established. If the Legacy Trustee determines that a surplus exists in the Reorganized TK Holdings Trust Reserve as of the date of such determination, such Surplus Reserved Cash shall (a) be allocated (1) first, to the Post-Closing Reserve and/or the Warehousing Entity Reserve to the extent that Reorganized Takata and/or the Warehousing Entity (as applicable) have not been dissolved and either such reserve is insufficiently

81

funded to satisfy the purpose for which such reserve was established, with such allocation of Surplus Reserved Cash to be in the discretion of the Legacy Trustee in consultation with the Plan Administrator, and (2) second, to a Claims Reserve to the extent that it is insufficiently funded to satisfy the purpose for which such reserve was established, but solely as to the applicable Debtor's Allocable Share of such Surplus Reserved Cash and (b) otherwise remain in the Reorganized TK Holdings Trust Reserve.  The Legacy Trustee shall periodically determine whether the Claims Reserves with respect to Administrative Expense PSAN PI/WD Claims are insufficiently funded to satisfy the purposes for which such reserves were established based on the Claims Estimation Report.  Following the dissolution of the Reorganized TK Holdings Trust, any Surplus Reserved Cash from the Reorganized TK Holdings Trust Reserve shall be allocated in accordance with section 5.6(m) of the Plan.

(iii)    <u>Surplus Reserved Cash from Post-Closing Reserve</u>.  During the Operating Term, the Plan Administrator, in consultation with the Legacy Trustee, shall determine on each six-month anniversary of the Effective Date whether the amounts available in the Post-Closing Reserve are in excess of amounts necessary to satisfy the purpose for which such reserve was established.  If the Plan Administrator determines that a surplus exists in the Post-Closing Reserve as of the date of such determination, such Surplus Reserved Cash shall (a) be allocated to the Warehousing Entity Reserve to the extent that the Warehousing Entity has not been dissolved and such reserve is insufficiently funded to satisfy the purpose for which such reserve was established and (b) otherwise remain in the Post-Closing Reserve. After the expiration of the Operating Term and wind down of Reorganized Takata, any remaining Surplus Reserved Cash from the Post-Closing Reserve shall be allocated in accordance with section 5.8(l) of the Plan.

(iv)    <u>Surplus Reserved Cash from Warehousing Entity Reserve.</u> Prior to the dissolution of the Warehousing Entity, the Plan Administrator, in consultation with the Legacy Trustee, shall determine on each six-month anniversary of the Effective Date whether the amounts available in the Warehousing Entity Reserve are in excess of the amounts necessary to satisfy the purpose for which such reserve was established.  If the Plan Administrator determines that a surplus exists in the Warehousing Entity Reserve as of the

WEIL:\96446450\6\76903.0004

date of such determination, such Surplus Reserved Cash shall (a) be allocated to the Post-Closing Reserve to the extent that Reorganized Takata has not been dissolved and such reserve is insufficiently funded to satisfy the purpose for which such reserve was established and (b) otherwise remain in the Warehousing Entity Reserve.  Following dissolution of the Warehousing Entity, any Surplus Reserved Cash from the Warehousing Entity Reserve shall be allocated in accordance with section 5.9(j) of the Plan.

(e)     **Post-Closing Cash.**

(i)     <u>Reorganized TK Holdings Trust Post-Closing Cash.</u>  Prior to the dissolution of the Reorganized TK Holdings Trust, Reorganized TK Holdings Trust Post-Closing Cash shall, on each six-month anniversary of the Effective Date, be allocated (a) first, to the Post-Closing Reserve, the Reorganized TK Holdings Trust Reserve, and/or the Warehousing Entity Reserve to the extent that Reorganized Takata, the Reorganized TK Holdings Trust, and the Warehousing Entity (as applicable) have not been dissolved and any such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, with such allocation of Post-Closing Cash to be in the discretion of the Legacy Trustee in consultation with the Plan Administrator, (b) second, to a Claims Reserve to the extent that it is insufficiently funded to satisfy the purpose for which such reserve was established, but solely as to the applicable Debtor's Allocable Share of such Reorganized TK Holdings Trust Post-Closing Cash, and (c) third, to the Reorganized TK Holdings Trust Reserve regardless of whether such reserve is sufficiently funded to satisfy the purpose for which such reserve was established; *provided*, *however*, that Reorganized TK Holdings Trust Post-Closing Cash arising from distributions after the Effective Date on account of Intercompany Interests held by TKAM, TKC, and TKF shall (a) first, solely with respect to distributions from TKC's subsidiary, be used towards the repayment of the RTK Loan, the RTKHT Loan, the PSAN Assets Advance Payment, and the Plan Sponsor Backstop Funding Repayment (including repayment of any unreimbursed Restructuring Expenses) in accordance with the terms and subject to the conditions of the Plan Sponsor Backstop Funding Agreement and section 5.12 of the Plan and (b) second constitute Available Cash of such Debtor.  The Legacy Trustee shall periodically determine whether the Claims Reserves with respect to Administrative Expense

83

PSAN PI/WD Claims are insufficiently funded to satisfy the purposes for which such reserves were established based on the Claims Estimation Report.  Following the dissolution of the Reorganized TK Holdings Trust, any remaining Reorganized TK Holdings Trust Post-Closing Cash shall be allocated in accordance with section 5.6(m) of the Plan.

(ii)    <u>Reorganized Takata Post-Closing Cash</u>.  During the Operating Term, Reorganized Takata Post-Closing Cash shall, on each six-month anniversary of the Effective Date, be allocated (i) first, to the Post-Closing Reserve and/or the Warehousing Entity Reserve to the extent that the Warehousing Entity has not been dissolved and either reserve is insufficiently funded to satisfy the purpose for which such reserve was established, with such allocation of Post-Closing Cash to be in the discretion of the Plan Administrator in consultation with the Legacy Trustee and (ii) second, to the Post-Closing Reserve regardless of whether such reserve is sufficiently funded to satisfy the purpose for which such reserve was established.  After the expiration of the Operating Term and wind down of Reorganized Takata, any remaining Reorganized Takata Post-Closing Cash shall be allocated in accordance with section 5.8(l) of the Plan.

84

(iii) <u>Warehousing Entity Post-Closing Cash.</u>  Prior to the dissolution of the Warehousing Entity, Warehousing Entity Reserve Post-Closing Cash shall, on each six-month anniversary of the Effective Date, be allocated (a) first, to the Warehousing Entity Reserve and/or the Post-Closing Reserve to the extent that Reorganized Takata has not been dissolved and either such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, with such allocation of Post-Closing Cash to be in the discretion of the Plan Administrator in consultation with the Legacy Trustee and (b) second, to the Warehousing Entity Reserve regardless of whether such reserve is insufficiently funded to satisfy the purpose for which such reserve was established.  Following dissolution of the Warehousing Entity, any remaining Warehousing Entity Reserve Post-Closing Cash shall be allocated in accordance with section 5.9(j) of the Plan.

## 5.6   *The Reorganized TK Holdings Trust.*

(a)   **Execution of the Reorganized TK Holdings Trust Agreement**. On or before the Effective Date, the Reorganized TK Holdings Trust Agreement shall be executed by the Debtors and the Legacy Trustee, and all other necessary steps shall be taken to establish the Reorganized TK Holdings Trust for the benefit of (i) the holders of Allowed Claims (other than Trust Claims and OEM Unsecured Claims), (ii) the PSAN PI/WD Trustee, (iii) the Special Master in his capacity as OEM Claims Administrator, and (iv) the Plan Sponsor solely with respect to distributions, if any, from TKC's subsidiary on account of the Plan Sponsor Backstop Funding Repayment.  This section 5.6 sets forth certain of the rights, duties, and obligations of the Legacy Trustee with respect to the Reorganized TK Holdings Trust.  In the event of any conflict between the terms of the Plan and the terms of the Reorganized TK Holdings Trust Agreement, the terms of the Reorganized TK Holdings Trust Agreement shall govern.

(b)   **Purpose of the Reorganized TK Holdings Trust.**  The Reorganized TK Holdings Trust shall be established to administer certain post-Effective Date responsibilities under the Plan, including (i) resolving all Disputed Claims (other than Disputed Trust Claims and OEM Unsecured Claims), (ii) maintaining the Claims Reserves, (iii) making Distributions to holders of Allowed Claims (other than Allowed Trust Claims and OEM Unsecured Claims), and (iv) being the sole member of TK Global LLC for the benefit of holders of Claims.  The Reorganized TK Holdings Trust shall retain all rights to commence and pursue all Causes of Action (including Avoidance Actions) that are expressly preserved and not released under the Plan.  The Reorganized TK Holdings Trust shall have no objective to continue or engage in the conduct of a trade or business.  On the Effective Date, the Reorganized TK Holdings Trust shall become party to the Plan Sponsor Backstop Funding Agreement and possess all of the rights and be subject to all of the obligations of the Reorganized TK Holdings Trust under and as set forth in the Plan Sponsor Backstop Funding Agreement.

(c)      **Reorganized TK Holdings Trust Assets.**  The Reorganized TK Holdings Trust shall consist of the Reorganized TK Holdings Trust Assets.  On the Effective Date, the Debtors shall transfer all the Reorganized TK Holdings Trust Assets to the Reorganized TK Holdings Trust free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind.

(d)      **Appointment of the Legacy Trustee.**  The Legacy Trustee is set forth in the Reorganized TK Holdings Trust Agreement.  The appointment of the Legacy Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.  In accordance with the Reorganized TK Holdings Trust Agreement, the Legacy Trustee shall serve in such capacity through the earlier of (i) the date that the Reorganized TK Holdings Trust is dissolved in accordance with the Reorganized TK Holdings Trust Agreement and (ii) the date such Legacy Trustee resigns, is terminated, or is otherwise unable to serve for any reason.

(e)      **Role of the Legacy Trustee.**  In furtherance of and consistent with the purpose of the Reorganized TK Holdings Trust and the Plan, the Legacy Trustee shall have the power and authority to (i) hold, manage, sell, invest, and distribute the Reorganized TK Holdings Trust Assets to the holders of Allowed Claims (other than Allowed Trust Claims and OEM Unsecured Claims) and the PSAN PI/WD Trustee, (ii) hold the Reorganized TK Holdings Trust Assets for the benefit of holders of Allowed Claims (other than Allowed Trust Claims and OEM Unsecured Claims), (iii) hold, manage, sell, invest, and distribute the Reorganized TK Holdings Trust Assets obtained through the exercise of its power and authority,  (iv) maintain and administer the Claims Reserves and the Reorganized TK Holdings Trust Reserve, (v) prosecute and resolve objections to Disputed Claims (other than Disputed Trust Claims and OEM Unsecured Claims), (vi) perform such other functions as are provided in the Plan and the Reorganized TK Holdings Trust Agreement, (vii) solely as an administrative convenience to the parties to the Plan Settlement, administer and make distributions from the Support Party Creditor Fund, and (viii) administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, in all cases, consistent with this Plan.  The Legacy Trustee shall be responsible for all decisions and duties with respect to the Reorganized TK Holdings Trust and the Reorganized TK Holdings Trust Assets.  In all circumstances, the Legacy Trustee shall act in the best interests of all beneficiaries of the Reorganized TK Holdings Trust, in furtherance of the purpose of the Reorganized TK Holdings Trust, and in accordance with the Reorganized TK Holdings Trust Agreement.

(f)      **Periodic Reporting.**  The Legacy Trustee shall provide periodic reporting to the PSAN PI/WD Trustee of the determination and any re-determination, as applicable, of the total amounts allocated to the Claims Reserves, the Disputed Claims Reserves, and the Reorganized TK Holdings Trust Reserve, as well as any Residual Value in the Reorganized TK Holdings Trust upon dissolution.

(g)      **Transferability of Distribution Rights.**  Any right to receive a Distribution from the Reorganized TK Holdings Trust or any Claims Reserve or Recovery Fund shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Reorganized TK Holdings Trust by the Legacy Trustee.  Further, any right to receive a Distribution from the Reorganized

TK Holdings Trust or any Claims Reserve or Recovery Fund shall be nontransferable and non-assignable except by will, intestate, succession, or operation of law.  Any right to receive a Distribution from the Reorganized TK Holdings Trust or any Claims Reserve or Recovery Fund shall not constitute "securities" and shall not be registered pursuant to the Securities Act.  If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

(h)    **Costs and Expenses of Legacy Trustee and OEM Claims Administrator.**  The costs and expenses of the Reorganized TK Holdings Trust, including the fees and expenses of the Legacy Trustee, the OEM Claims Administrator, and their retained professionals, shall be paid out of the Reorganized TK Holdings Trust Reserve, subject to the terms of the Reorganized TK Holdings Trust Agreement.

(i)    **Compensation of Legacy Trustee and OEM Claims Administrator.**  The Legacy Trustee and the OEM Claims Administrator shall be entitled to reasonable compensation, subject to the terms of the Reorganized TK Holdings Trust Agreement.  The OEM Claims Administrator shall be compensated on an hourly basis at a rate no less or more than his standard hourly rate of $1,000.00.  In addition, the combined compensation payable to the members of the Claims Oversight Committee and to the Legacy Trustee shall not exceed $240,000 per year.  Such compensation shall be payable from the Reorganized TK Holdings Trust Reserve, subject to the terms of the Reorganized TK Holdings Trust Agreement.

(j)    **Retention of Professionals by the Legacy Trustee and OEM Claims Administrator.**  The Legacy Trustee and OEM Claims Administrator may retain and reasonably compensate counsel and other professionals to assist in their duties as Legacy Trustee and OEM Claims Administrator on such terms as the Legacy Trustee and OEM Claims Administrator deem appropriate without Bankruptcy Court approval, subject to the provisions of the Reorganized TK Holdings Trust Agreement.  The Legacy Trustee and the OEM Claims Administrator may retain any professional, including any professional who represented parties in interest such as the Debtors in the Chapter 11 Cases.  All fees and expenses incurred in connection with the foregoing shall be payable from the Reorganized TK Holdings Trust Reserve, subject to the terms of the Reorganized TK Holdings Trust Agreement.

(k)    **U.S. Federal Income Tax Treatment of the Reorganized TK Holdings Trust.**  The Reorganized TK Holdings Trust will be treated as a trust described in Subpart C of Subchapter J of the Internal Revenue Code and the regulations promulgated thereunder (a "complex trust").  The Reorganized TK Holdings Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Reorganized TK Holdings Trust that are required by any governmental unit, including IRS Form 1041, IRS Form 1041-ES, and IRS Schedule K-1.  The Legacy Trustee shall be responsible for payment, out of the Reorganized TK Holdings Trust Reserve, of any taxes imposed on the Reorganized TK Holdings Trust or the Reorganized TK Holdings Trust Assets, including estimated and annual U.S. federal income taxes.  The Legacy Trustee may request an expedited determination of taxes of the Reorganized TK Holdings Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on

WEIL:\96446450\6\76903.0004

behalf of, the Reorganized TK Holdings Trust for all taxable periods through the dissolution of the Reorganized TK Holdings Trust.

(l)     **Dissolution.**  The Reorganized TK Holdings Trust shall be dissolved and the Legacy Trustee shall be discharged from his/her/its duties with respect to the Reorganized TK Holdings Trust upon completion of their duties as set forth in the Reorganized TK Holdings Trust Agreement, including when (i) all Disputed Claims (other than Trust Claims) have been resolved, (ii) all Reorganized TK Holdings Trust Assets have been liquidated, (iii) when the Support Party Creditor Fund has been fully administered in accordance with section 5.19(g), and (iv) all Distributions required to be made by the Legacy Trustee under the Plan and the Reorganized TK Holdings Trust Agreement have been made, but in no event shall the Reorganized TK Holdings Trust be dissolved later than the Non-PSAN PI/WD Claims Termination Date or such shorter or longer period authorized by the Bankruptcy Court.

(m)     **Dissolution Date Cash and Residual Value**.  Any Dissolution Date Cash in the Reorganized TK Holdings Trust remaining upon dissolution of the Reorganized TK Holdings Trust pursuant to section 5.6(l) of the Plan shall be available (i) first, to the Post-Closing Reserve and/or Warehousing Entity Reserve to the extent that Reorganized Takata and/or the Warehousing Entity have not been dissolved and either such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, with such allocation of Dissolution Date Cash to be in the discretion of the Legacy Trustee in consultation with the Plan Administrator, (ii) second, to a Claims Reserve to the extent that it is insufficiently funded to satisfy the purpose for which such reserve was established, but solely as to the applicable Debtor's Allocable Share of such Dissolution Date Cash, and (iii) third, to the Post-Closing Reserve and/or the Warehousing Entity Reserve to the extent that Reorganized Takata and/or the Warehousing Entity have not been dissolved, with such allocation of Dissolution Date Cash to be in the discretion of the Legacy Trustee in consultation with the Plan Administrator.  The Legacy Trustee shall determine whether the Claims Reserves with respect to Administrative Expense PSAN PI/WD Claims are insufficiently funded to satisfy the purposes for which such reserves were established based on either the Claims Estimation Report or the Updated Claims Estimation Report, as applicable.  After Reorganized Takata and the Warehousing Entity have been dissolved, each Debtor's Allocable Share of the Residual Value of the Reorganized TK Holdings Trust shall become Available Cash of such Debtor and, as applicable, be deposited into such Debtor's Recovery Funds and Disputed Claims Reserves pursuant to the Distribution Formula.

(n)     **Indemnification of the Legacy Trustee.**  The Legacy Trustee shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Legacy Trustee or the Reorganized TK Holdings Trust, except those acts found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud, and shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Legacy Trustee or the Reorganized TK Holdings Trust, except for any actions or inactions found by Final Order to be arising out of its willful misconduct, bad faith, gross negligence, or fraud.  Any valid indemnification claim of the Legacy Trustee shall be satisfied from the Reorganized TK Holdings Trust Reserve.

### 5.7    *TK Global LLC*

(a)    **Ownership and Purpose of TK Global LLC**.  On or before the Effective Date, all necessary steps shall be taken to form TK Global LLC.  The Reorganized TK Holdings Trust shall be the sole member of TK Global LLC.  TK Global LLC shall be established to own the sole equity interest in Reorganized TK Holdings and all the equity interests in the Warehousing Entity, both for the benefit of holders of Claims.  The Plan Administrator and the Oversight Committee shall be appointed to TK Global LLC.

(b)    **The Plan Administrator.**

(i)    On the Effective Date, the Plan Administrator shall be appointed solely to perform the Authorized Purposes.  In furtherance of and consistent with the purpose of the TK Global Operating Agreement, the Plan Administrator shall act as the chief executive officer of TK Global LLC and oversee, along with the Oversight Committee, the management of TK Global LLC.  The Plan Administrator will be responsible for developing budgets, forecasts, and cash flow projections and reporting against budgets for TK Global LLC and its subsidiaries, each subject to review and approval by the Oversight Committee.

(ii)    The Plan Administrator shall be Michael Rains, the current Vice President of the Product Safety Group for TKH.  The Plan Administrator shall be retained pursuant to the Plan Administrator Agreement.  In the event the Plan Administrator resigns, is terminated, or is otherwise unable to serve for any reason, a successor shall be designated by the PSAN Consenting OEMs, as reasonably acceptable to the Debtors or Reorganized TK Holdings, as applicable, and the Consenting OEMs.  The PSAN Consenting OEMs will have the right (subject to the reasonable consent of the Warehouse Consenting OEMs) to request that the Oversight Committee replace the Plan Administrator if the Independent Consultant determines that (i) the Plan Administrator is not operating Reorganized Takata in a reasonable and prudent manner or (ii) Reorganized Takata is not complying with DOJ, NHTSA, or other regulatory requirements.  The Plan Administrator will have thirty (30) days to cure any deficiencies identified in such Consenting OEM report, if such deficiencies are capable of cure.

(iii)    The fees and expenses of the Plan Administrator shall be paid in accordance with the Plan Administrator Agreement from either (a) the Post-Closing Reserve, subject to the Reorganized Takata Business Model, as such fees and

expenses relate to the Plan Administrator's oversight and administration of Reorganized Takata or (b) the Warehousing Entity Reserve, as such fees and expenses relate to all other services provided by the Plan Administrator, including in connection with the oversight and administration of the Warehousing Entity.

(c)    **Periodic Reporting.**  The Plan Administrator shall provide periodic reporting to the PSAN PI/WD Trustee of the determination and any re-determination, as applicable, of the total amounts allocated to the Warehousing Entity Reserve and the Post-Closing Reserve.

(d)    **Oversight Committee.**  The Oversight Committee comprised of three (3) members shall be appointed to serve as the board of managers of TK Global LLC.  Two (2) members of the Oversight Committee shall be selected by the Warehouse Consenting OEMs and may include representatives of the Consenting OEMs.  The remaining Independent Member of the Oversight Committee shall be selected by the Debtors, subject to the reasonable consent of the Warehouse Consenting OEMs, and shall not be an "insider" of Takata, the Consenting OEMs, or the Plan Sponsor.  The Oversight Committee shall have governance rights over TK Global LLC.  The Oversight Committee, among other things, will review and approve budgets, forecasts, and cash flow projections of TK Global LLC and its subsidiaries, including Reorganized Takata and the Warehousing Entity.

(e)    **Exculpation of Plan Administrator and Oversight Committee.**  The Plan Administrator and the Oversight Committee shall be exculpated (subject, in each case, to exceptions for willful misconduct, bad faith, gross negligence, or fraud) to the fullest extent allowable by applicable law with respect to the operation and wind-down of TK Global LLC, Reorganized Takata's estates, and the Warehousing Entity, including the services the Plan Administrator provides to Reorganized Takata related to the manufacture and sale of PSAN Inflators to PSAN Consenting OEMs, the liquidation of Reorganized Takata's remaining assets, the services the Plan Administrator provides to the Warehousing Entity related to the warehousing, shipping, and disposal of the Warehoused PSAN Assets, and the liquidation of the Warehousing Entity's remaining assets.

(f)    **Shared Services Agreement.**  Certain services shall be provided by TK Global LLC to each of Reorganized Takata and the Warehousing Entity in accordance with the scope and the terms of the Shared Services Agreement.

(g)    **U.S. Federal Income Tax Treatment of TK Global LLC.**  TK Global LLC will be treated as an entity disregarded from its owner, the Reorganized TK Holdings Trust, for purposes of U.S. federal income tax.

(h)    **Dissolution.**  TK Global LLC, the Plan Administrator, and the Oversight Committee shall be dissolved or discharged, as applicable, upon completion of their duties, but in no event shall TK Global LLC be dissolved later than the Non-PSAN PI/WD Claims Termination Date or such shorter or longer period authorized by the Bankruptcy Court.

WEIL:\96446450\6\76903.0004

## 5.8    *Reorganized Takata.*

(a)    **Ownership and Governance of Reorganized Takata.**  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, TK Global LLC shall become the sole equity interest holder of Reorganized TK Holdings.  As of the Effective Date, the terms of the current members of the board of TKH shall expire without further action by any Person.  Except as provided herein or in the Plan Administrator Agreement, the management of Reorganized Takata shall be the responsibility of the Plan Administrator.

(b)    **The Authorized Purposes.**  Other than with respect to the Assumed PSAN Contracts and any renewals or extensions thereof or in respect of production of current model series (including current and past model Service Parts) as set forth herein and the continuation of any contracts between the Debtors' non-Debtor Affiliates and the PSAN Consenting OEMs for the manufacture and sale of PSAN Inflators, which such contracts shall be assumed by Reorganized TK Holdings or its applicable subsidiary as of the Effective Date in a manner similar to the assumption of Assumed PSAN Contracts and in accordance with the Global Accommodation Agreement, Reorganized Takata shall not enter into any new contracts for the sale of PSAN Inflators after the Effective Date, and Reorganized Takata shall not agree or consent to any amendment to the NHTSA Consent Order without the prior written consent of the Consenting OEMs.  In no event shall any Cash on hand or the Post-Closing Reserve be used by Reorganized Takata to manufacture PSAN Inflators for a non-Consenting OEM unless such non-Consenting OEM becomes a PSAN Consenting OEM as provided by this Plan.  In the event that any proposed modification to the NHTSA Consent Order may negatively affect the Plan Sponsor in respect of its obligations to provide the Services (as defined in the Transition Services Agreement) under the Transition Services Agreement, the Plan Administrator shall first consult with the Plan Sponsor.  On the Effective Date, Reorganized Takata shall become party to the Plan Sponsor Backstop Funding Agreement and possess all of the rights and be subject to all of the obligations of Reorganized Takata under and as set forth in the Plan Sponsor Backstop Funding Agreement.

(c)    **Post-Closing Reserve.**  The Post-Closing Reserve shall provide the initial capitalization for Reorganized Takata, and the Reorganized Takata Post-Closing Cash shall provide the working capital for Reorganized Takata.  The anticipated costs of winding down Reorganized Takata are to be covered from the Post-Closing Reserve (to the extent available) and the Reorganized Takata Post-Closing Cash.  The Post-Closing Reserve shall be held by Reorganized Takata and administered by the Plan Administrator.  Consenting OEMs that are not PSAN Consenting OEMs will not be required to support in any way the operations of Reorganized Takata.  Upon expiration of the Operating Term, the Plan Administrator shall transfer the remaining Cash in the Post-Closing Reserve allocated to the costs and fees of the Special Master and his professionals to the PSAN PI/WD Trust, to be held by the PSAN PI/WD Trustee for the costs and fees of the Special Master and his professionals.

(d)    **Special Master Retainer.**  The Special Master shall submit to the Plan Administrator monthly invoices setting forth in reasonable detail the work completed by the Special Master during such monthly period.  The Plan Administrator shall pay the fees and costs of the Special Master and his professionals in accordance with the terms and conditions in the Special Master's engagement agreement with TKJP, as approved by the United States District

Court for the Eastern District of Michigan on September 13, 2017.  In the event the Plan Administrator has not paid the Special Master all fees and costs within thirty (30) days upon receipt of a monthly invoice, the Special Master may immediately apply funds in the Special Master Retainer to make such payment; *provided*, *however*, that the foregoing shall not otherwise limit the Plan Administrator's ability to dispute any of the Special Master's fees or costs or the application of the retainer in the United States District Court for the Eastern District of Michigan.  In the event of overdue payment, the Plan Administrator shall pay the Special Master, by wire transfer, within ten (10) days of the Special Master giving notice to the Plan Administrator of the application of the Special Master Retainer, the funds necessary to restore the Special Master Retainer to its full value.

(e)     **Employees.**  Reorganized Takata shall retain or hire employees as necessary to manufacture and sell PSAN Inflators after the Effective Date, including equipment and machinery operators, safety and regulatory specialists and engineers.  Certain personnel of the Plan Sponsor shall resign from Plan Sponsor and shall be hired by Reorganized Takata, if necessary, pursuant to the Transition Services Agreement.  In some instances, services of certain employees of TK Global LLC shall be provided to Reorganized Takata pursuant to the terms of the Shared Services Agreement, and such employees shall be paid directly from the Post-Closing Reserve in accordance with the Reorganized Takata Business Model.

(f)     **Operating Term.**  Reorganized Takata's operations related to the production of PSAN Inflators shall continue solely for the Authorized Purposes during the Operating Term.  Reorganized Takata shall continue in existence solely for the purposes specified herein until all Claims, if any, against Reorganized Takata have been fully resolved, and all other duties and functions of the Plan Administrator with respect to Reorganized Takata as set forth in the Plan have been fully performed.

(g)     **Subordination of PSAN Consenting OEM Claims.**  Any Claims of PSAN Consenting OEMs against Reorganized Takata shall be subordinated to certain Claims and rights of the Plan Sponsor in accordance with section 5 of the Indemnity Agreement.

(h)     **Forbearance of PSAN Consenting OEM Claims.**  During the Operating Term, the PSAN Consenting OEMs shall forbear from exercising remedies with respect to any Claims arising from PSAN recalls and PSAN-related indemnity and monetary warranty Claims (excluding any other Claims, including Claims arising from non-conforming parts, short shipments, or other ordinary course Claims, and non-monetary warranty obligations) against Reorganized Takata.

(i)     **Reporting Requirements.**  Reorganized Takata shall be responsible for all disclosure, reporting, and warning obligations regarding the manufacture and sale of PSAN Inflators by Reorganized Takata to the extent required to be made to the PSAN Consenting OEMs and (without limiting the independent disclosure, reporting, and warning obligations of such PSAN Consenting OEMs) consumers and regulators; *provided*, *however*, that Reorganized Takata shall include the Plan Administrator and the Independent Member of the Oversight Committee in any meetings between Reorganized Takata and its applicable regulators.  The Plan Administrator will be responsible for developing budgets, forecasts, cash flow

WEIL:\96446450\6\76903.0004

projections, and reporting against budgets, each subject to review and approval by the Oversight Committee.

(j)     **Insurance.**  Subject to the reasonable consent of the Requisite PSAN Consenting OEMs, Reorganized Takata may fund an upfront premium payment to purchase products liability, economic loss, directors' and officers', and other liability cap insurance policies.

(k)     **Independent Consultant.**  The PSAN Consenting OEMs will have the right to engage the Independent Consultant if agreed by the Requisite PSAN Consenting OEMs to conduct an assessment and make a report to the PSAN Consenting OEMs on a quarterly basis of Reorganized Takata's operations, including quality control, safety, and manufacturing systems (including all systems from receiving to shipping).  Reorganized Takata shall pay for such Independent Consultant through the Post-Closing Reserve solely to the extent that the Plan Administrator believes that sufficient funds exist in the Post-Closing Reserve for such purpose.  Otherwise, the PSAN Consenting OEMs shall pay all costs associated with the Independent Consultant.  The Independent Consultant will also monitor Reorganized Takata's financial and general business affairs.  A copy of the reports produced by the Independent Consultant will be provided to the Oversight Committee.

(l)     **Dissolution Date Cash and Residual Value.**  Any Dissolution Date Cash in Reorganized Takata following expiration of the Operating Term and wind down of Reorganized Takata shall be available (i) first, to pay existing creditors of Reorganized Takata (including PSAN Consenting OEMs on account of any non-contingent recall related claims against Reorganized Takata and the Plan Sponsor on account of services provided to Reorganized Takata under the Transition Services Agreement) in accordance with section 5.8(g) of the Plan, (ii) second, to the Warehousing Entity Reserve to the extent that the Warehousing Entity has not been dissolved, (iii) third, to the Reorganized TK Holdings Trust Reserve to the extent that the Reorganized TK Holdings Trust has not been dissolved and such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, and (iv) fourth, to a Claims Reserve to the extent that it is insufficiently funded to satisfy the purpose for which such reserve was established, but solely as to an applicable Debtor's Allocable Share of such Dissolution Date Cash; *provided*, *however*, that no Dissolution Date Cash in Reorganized Takata contributed by a non-Debtor affiliate shall be allocated to the Reorganized TK Holdings Trust Reserve pursuant to subparagraph (iii) above.  The Legacy Trustee shall determine whether the Claims Reserves with respect to Administrative Expense PSAN PI/WD Claims are insufficiently funded to satisfy the purposes for which such reserves were established based on either the Claims Estimation Report or the Updated Claims Estimation Report, as applicable. After the Warehousing Entity has been dissolved, each Debtor's Allocable Share of the Residual Value of Reorganized Takata shall become Available Cash of such Debtor and, as applicable, be deposited into such Debtor's Recovery Funds and Disputed Claims Reserves pursuant to the Distribution Formula.  Any Residual Value in the Post-Closing Reserve that was contributed by a non-Debtor affiliate of the Debtors shall be returned to such affiliate based on its funded share of the Post-Closing Reserve.

(m)     **NHTSA Claims**.  Notwithstanding section 4.4(e) of this Plan, the NHTSA Consent Order shall otherwise survive, as modified herein and in the Confirmation

93

Order, and shall be binding upon Reorganized TK Holdings. For the avoidance of doubt, paragraphs 19(b) and (c) of the NHTSA Consent Order shall remain binding upon Reorganized TK Holdings; *provided*, *however*, that, on or prior to the Effective Date, the Debtors shall have the right to object to the contingent civil penalties arising under paragraph 47 (as incorporated by reference in paragraph 19(c)) of the NHTSA Consent Order as a contingent prepetition Claim subject to discharge and NHTSA shall have the right to respond to such objection on any grounds, substantive or procedural.

(n)    **Reorganized Takata Organizational Documents.** The organizational documents of Reorganized Takata, including the Reorganized TK Holdings Organizational Documents, shall require the consent of the Requisite PSAN Consenting OEMs to make certain material amendments to such documents.

(o)    **U.S. Federal Income Tax Treatment of Reorganized TK Holdings.** Reorganized TK Holdings will be treated as a corporation for U.S. federal income tax purposes. Reorganized TK Holdings shall file (or cause to be filed) statements, returns, or disclosures relating to Reorganized TK Holdings that are required by any governmental unit. The Plan Administrator shall be responsible for payment, out of Reorganized Takata Post-Closing Cash, of any taxes imposed on Reorganized TK Holdings, including estimated and annual U.S. federal income taxes. The Plan Administrator may request an expedited determination of taxes of Reorganized TK Holdings under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, Reorganized TK Holdings for all taxable periods through the dissolution of Reorganized TK Holdings.

(p)    **Access to Information.** Reorganized Takata shall maintain all product information (including model and serial numbers), drawings and test reports regarding the PSAN Inflators and airbag modules or assemblies that incorporate the PSAN Inflators, including both with respect to PSAN Inflators sold by any Debtor to or for the benefit of a Consenting OEM prior to the Effective Date (including prior to the Petition Date) and PSAN Inflators provided to the Plan Sponsor (or its applicable subsidiary) by Reorganized Takata after the Effective Date for Module Production, Kitting Operations, and PSAN Service Parts (each as defined in the Indemnity Agreement), solely to the extent that such information is necessary to track and identify such PSAN Inflators. Such information shall be provided by Reorganized Takata to (i) the Plan Sponsor (or its applicable subsidiary) and (ii) upon request, the applicable Consenting OEM that purchased such Products from the Debtors or Reorganized Takata. In conjunction with and prior to the wind-down of Reorganized Takata, Reorganized Takata shall transfer all such information to the Plan Sponsor (or its applicable subsidiary) to maintain in its capacity as a tier one supplier.

### 5.9    *The Warehousing Entity.*

(a)    **Ownership and Governance of the Warehousing Entity.** On or before the Effective Date, and in accordance with and pursuant to the terms of the Plan, TK Global LLC shall be the holder of all the equity interests of the Warehousing Entity. Except as provided herein or in the Plan Administrator Agreement, the management of the Warehousing Entity shall be the responsibility of the Plan Administrator.

WEIL:\96446450\6\76903.0004

(b)    **Warehousing Entity Organizational Documents.**  On or before the Effective Date, all necessary steps shall be taken to establish the Warehousing Entity, including the adoption of the Warehousing Entity Organizational Documents. In the event of any conflict between the terms of the Plan and the terms of the Warehousing Entity Organizational Documents, the terms of the Plan shall govern.

(c)    **Purpose of the Warehousing Entity.**  The Warehousing Entity shall be formed to acquire, own, maintain, operate, and control the Warehoused PSAN Assets and to comply with the obligations under the NHTSA Preservation Order and all applicable laws and regulations, to dispose of PSAN Inflators in accordance with applicable environmental law, and any other obligations related to the Warehoused PSAN Assets; *provided*, *however*, that the Warehousing Entity shall only be responsible for the maintenance, shipping, and disposal of PSAN Inflators returned to and warehoused by Takata prior to the Effective Date (which for all purposes herein shall include those PSAN Inflators that the Warehouse Consenting OEMs demonstrate, by documentation or otherwise, are in transit to Takata as of the Effective Date). Notwithstanding the foregoing, upon request by a Warehouse Consenting OEM, the Warehousing Entity and such Warehouse Consenting OEM shall enter into an agreement for the maintenance, shipping, and disposal of PSAN Inflators returned after the Effective Date as long as (i) such agreement is in form and substance acceptable to the Warehousing Entity and such Warehouse Consenting OEM and (ii) all related costs are the sole responsibility of and paid by such Warehouse Consenting OEM. The Warehousing Entity shall be responsible for the payment of the Debtors' share of the costs of maintenance, shipping, and disposal of the Warehoused PSAN Assets returned prior to the Effective Date. The Debtors' share of such costs shall be based on the percentage of warehousing, shipping, and disposal costs attributable to the Debtors relative to all global warehousing, shipping, and disposal costs attributable to Takata; *provided*, *however,* that the funding of the Warehousing Entity Reserve from the Cash Proceeds pursuant to the Plan Settlement shall not be limited to the Debtors' share of such costs to the extent that the Warehousing Entity Reserve is not otherwise fully funded on the Effective Date taking into account any amounts funded by the Debtors' non-Debtor affiliates. For the avoidance of doubt, except with respect to certain obligations of the Plan Sponsor set forth in the Plan Sponsor Backstop Funding Agreement and the Transition Services Agreement, the Plan Sponsor shall have no obligations related to the maintenance, warehousing, shipping, or disposal of PSAN Inflators. On the Effective Date, the Warehousing Entity shall become party to the Plan Sponsor Backstop Funding Agreement and possess all of the rights and be subject to all of the obligations of the Warehousing Entity under and as set forth in the Plan Sponsor Backstop Funding Agreement.

(d)    **United States Warehoused PSAN Inflator Cap**.  The Warehousing Entity shall be responsible for all costs relating to PSAN Inflators returned to and warehoused in the United States by Takata as of February 16, 2018.  The Warehousing Entity shall also be responsible for all costs relating to PSAN Inflators returned to and warehoused in the United States by Takata or the Warehousing Entity after February 16, 2018 as follows: (i) up to 200,000 per week on average (for clarity, such cap can be exceeded in any one week so long as the total of inflators returned does not exceed an average of 200,000 per week) for PSAN Inflators returned to Takata from February 16, 2018 through the Effective Date; and (ii) up to 1 million PSAN Inflators in transit from OEM dealers, directly or indirectly, on the Effective Date, which shall not include any unused recall kits.

95

(e)    **The Warehousing Entity Assets.** The Warehousing Entity shall consist of the Warehousing Entity Assets, including the Warehousing Entity Reserve.  On the Effective Date, the Debtors shall transfer all the Warehousing Entity Assets to the Warehousing Entity free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind but subject to section 10.15 of the Plan.  On the Effective Date, the Warehoused PSAN Assets held by the Debtors shall vest in and be assumed and assigned to the Warehousing Entity and, subject to any limitations under law or contract, the Warehoused PSAN Assets held by certain non-Debtor affiliates shall be transferred and assigned to the Warehousing Entity.

(f)    **The Warehousing Entity Disposal Trust Funds.**  The Warehousing Entity shall fund the Warehousing Entity Disposal Trust Funds, as part of the Warehousing Entity Reserve, in accordance with **Schedule E** attached hereto.   The Cash in the segregated Warehousing Entity Disposal Trust Fund for a State, including all interest, dividends, revenue, or other accretions thereto, shall be used exclusively for the disposal, in accordance with applicable environmental law, of PSAN Inflators returned to and warehoused by the Debtors in the applicable State prior to the Effective Date (including those in transit and/or in accord with the terms and conditions of the TCEQ Settlement) and may not be used for any other purpose, subject to the terms set forth in this section 5.9(e).  The Oversight Committee shall provide written quarterly reports to each Warehousing Entity Disposal Trust Fund Beneficiary setting forth information relating solely to the disposal of PSAN Inflators returned prior to the Effective Date, including expenditures to date, remaining funding, the aggregate number of PSAN Inflators disposed of, the aggregate number of PSAN Inflators remaining to be disposed of, the estimated cost of disposal of remaining PSAN Inflators, and copies of any contracts entered into for the disposal of PSAN Inflators.  At any time after the Effective Date, the Plan Administrator may, in writing by email or otherwise, request that a Warehousing Entity Disposal Trust Fund Beneficiary consent to the transfer of a specified portion of the Cash in the applicable Warehousing Entity Disposal Trust Fund that the Plan Administrator believes is not needed for the remaining disposal of PSAN Inflators warehoused in the applicable State, with any such request to be accompanied by supporting documentation demonstrating the basis of such request, to either (i) another Warehousing Entity Disposal Trust Fund or (ii) if all Warehousing Entity Disposal Trust Funds are believed to have adequate funding, the Warehousing Entity Reserve. The applicable Warehousing Entity Disposal Trust Fund Beneficiary shall use reasonable efforts to respond to the Plan Administrator's request in writing within fourteen (14) days of receipt of such request and, if the response is to deny approval of the request, shall provide the reasons for such denial.  Notwithstanding that such Cash was held in trust for a Warehousing Entity Disposal Trust Fund Beneficiary, the Plan Administrator is authorized to transfer Cash out of the Warehousing Entity Disposal Trust Funds as set forth in this paragraph 5.9(e) upon either (i) written consent of the applicable Warehousing Entity Disposal Trust Fund Beneficiary, which such consent shall not be unreasonably withheld and may be by email from a person who the Plan Administrator reasonably believes has the authority to provide such consent, or (ii) order of the Bankruptcy Court.  Upon the completion of the disposal of PSAN Inflators returned prior to the Effective Date warehoused in an applicable State, any remaining funds in the Warehousing Entity Disposal Trust Fund for such State shall be transferred to: (i) first, to any other Warehousing Entity Disposal Trust Fund if such fund is determined to have insufficient funds to accomplish its disposal obligations; and  (ii) second, if such other Warehousing Entity Disposal Trust Funds have sufficient funds, then to the Warehousing Entity Reserve, notwithstanding that such funds were held in trust for a Warehousing Entity Disposal Trust Fund Beneficiary.  The

Plan Administrator shall provide the Warehousing Entity Disposal Trust Fund Beneficiaries with access to the respective PSAN Warehouses for the purpose of inspection or for conducting response action at the PSAN Warehouses. The Warehousing Entity Disposal Trust Fund Beneficiaries shall not be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Warehousing Entity Disposal Trust Fund or any Warehousing Assets as a result of this Plan.

(g)     **Employees.** The Warehousing Entity shall retain or hire employees as necessary to administer and maintain the Warehoused PSAN Assets. In some instances, services of certain employees of TK Global LLC or Reorganized TKA shall be provided to the Warehousing Entity pursuant to the terms of the Shared Services Agreement, and such employees shall be paid directly from the Warehousing Entity Reserve.

(h)     **U.S. Federal Income Tax Treatment of Warehousing Entity.** The Warehousing Entity will be treated as a corporation for U.S. federal income tax purposes. The Warehousing Entity shall file (or cause to be filed) statements, returns, or disclosures relating to the Warehousing Entity that are required by any governmental unit. The Plan Administrator shall be responsible for payment, out of the Warehousing Entity Reserves, of any taxes imposed on the Warehousing Entity or the Warehousing Entity Assets, including estimated and annual U.S. federal income taxes. The Plan Administrator may request an expedited determination of taxes of the Warehousing Entity under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Warehousing Entity for all taxable periods through the dissolution of the Warehousing Entity.

(i)     **Dissolution.** The Warehousing Entity shall be dissolved upon completion of its purposes and obligations, including under any agreements entered into by the Warehousing Entity and Warehousing Consenting OEMs for the maintenance, shipping, and disposal of PSAN Inflators returned after the Effective Date and when all Warehousing Entity Assets have been liquidated, but in no event shall the Warehousing Entity be dissolved later than the Non-PSAN PI/WD Claims Termination Date or such shorter or longer period authorized by the Bankruptcy Court. Notwithstanding the foregoing, in no event shall the Warehousing Entity be dissolved prior to the disposal in accordance with applicable environmental law of all PSAN Inflators in the PSAN Warehouses.

(j)     **Dissolution Date Cash and Residual Value.** Any Dissolution Date Cash in the Warehousing Entity remaining upon dissolution of the Warehousing Entity pursuant to section 5.9(i) of the Plan shall be available (i) first, to pay all creditors of the Warehousing Entity, (ii) second, to the Post-Closing Reserve to the extent that Reorganized Takata has not been dissolved, (iii) third, to the Reorganized TK Holdings Trust Reserve to the extent that the Reorganized TK Holdings Trust has not been dissolved and such reserve is insufficiently funded to satisfy the purpose for which such reserve was established, and (iv) fourth, to a Claims Reserve to the extent that it is insufficiently funded to satisfy the purpose for which such reserve was established, but solely as to an applicable Debtor's Allocable Share of such Dissolution Date Cash; provided, however, that no Dissolution Date Cash in the Warehousing Entity contributed by a non-Debtor affiliate shall be allocated to the Reorganized TK Holdings Trust Reserve pursuant to subparagraph (iii) above. The Legacy Trustee shall determine whether the Claims Reserves with respect to Administrative Expense PSAN PI/WD

97

Claims are insufficiently funded to satisfy the purposes for which such reserves were established based on either the Claims Estimation Report or the Updated Claims Estimation Report, as applicable.  After Reorganized Takata has been dissolved, each Debtor's Allocable Share of the Residual Value of the Warehousing Entity shall become Available Cash of such Debtor and, as applicable, be deposited in the applicable Recovery Funds and Disputed Claims Reserves pursuant to the Distribution Formula. Any Residual Value in the Warehousing Entity Reserve that was contributed by a non-Debtor affiliate of the Debtors shall be returned to such affiliate based on its funded share of the Warehousing Entity Reserve.

### 5.10    *The PSAN PI/WD Trust*

(a)    **Establishment and Purpose of PSAN PI/WD Trust.**  On the Effective Date, the PSAN PI/WD Trust shall be established.  The PSAN PI/WD Trust shall:

(i)    assume the liability for all PSAN PI/WD Claims against the Debtors and the Protected Parties;

(ii)    administer, process, settle, resolve, and liquidate Trust Claims;

(iii)    use any applicable PI/WD Insurance Proceeds and the amounts transferred by the IIM Claims Reserve, the SMX Claims Reserve, the TDM Claims Reserve, and the TKH Claims Reserve to the PSAN PI/WD Trust on the Non-PSAN PI/WD Claims Termination Date to satisfy and make payments to holders of Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims;

(iv)    establish segregated bank accounts to hold funds estimated to be sufficient to pay in full all estimated Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims on the Non-PSAN PI/WD Claims Termination Date;

(v)    use the PSAN PI/WD Funds to satisfy and make payments to holders of PSAN PI/WD Claims that qualify for a recovery under this Plan (including section 5.10(g) of the Plan), all in accordance with the terms of the Plan (including section 5.10(i) hereof), the PSAN PI/WD Trust Agreement, the PSAN PI/WD TDP, and any Participating OEM Contribution Agreement, if applicable; *provided, however*, that each PSAN PI/WD Top-Up Amount shall only be used to fund distributions to holders of PSAN PI/WD Claims whose injuries resulted from a vehicle manufactured or sold by the applicable Participating OEM, and the PSAN PI/WD Trustee shall separately track,

98

account for, and maintain each PSAN PI/WD Top-Up Amount contributed by each Participating OEM in separate PSAN PI/WD Top-Up Funds, use the Other PI/WD Funds to satisfy and make payments to holders of Allowed Other PI/WD Claims;

(vi)     administer the Plan Settlement Fund, PSAN PI/WD Funds, Other PI/WD Funds, and the Disputed Contributions Reserve, subject to the Consenting OEM PSAN PI/WD Trust Reserves, to the extent applicable;

(vii)    use any applicable PI/WD Insurance Proceeds and the Other PI/WD Funds to satisfy and make payments to holders of Other PI/WD Claims; and

(viii)   establish a segregated bank account to hold any PI/WD Insurance Proceeds applicable to Other PI/WD Claims.

The PSAN PI/WD Trust shall administer, process, settle, resolve, liquidate, satisfy, and pay (from the designated funds therefor), as applicable, PSAN PI/WD Claims against the Debtors and the Protected Parties, Other PI/WD Claims against the Debtors, and, after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims, and Administrative Expense PSAN PI/WD Claims in such a way that the holders of Trust Claims are treated equitably and in a substantially similar manner, respectively, subject to the terms of the Plan, the PSAN PI/WD Trust Agreement, and the PSAN PI/WD TDP to the extent applicable. The PSAN PI/WD Claims against the Protected Parties shall be channeled to the PSAN PI/WD Trust pursuant to the Channeling Injunction set forth in section 10.7 of this Plan and may thereafter be asserted only and exclusively against the PSAN PI/WD Trust.  All such PSAN PI/WD Claims shall be liquidated and paid in accordance with the PSAN PI/WD Trust Agreement, the PSAN PI/WD TDP, this Plan, the Confirmation Order, and any Participating OEM Contribution Agreement, if applicable.  The PSAN PI/WD Trust shall be administered and implemented by the PSAN PI/WD Trustee as provided in the PSAN PI/WD Trust Agreement.

(b)     **PSAN PI/WD TDP.**  On the Effective Date, the PSAN PI/WD Trust shall implement the PSAN PI/WD TDP in accordance with the terms of the PSAN PI/WD Trust Agreement.  On or after the Effective Date, the PSAN PI/WD Trustee shall have the authority to administer, amend, supplement, or modify the PSAN PI/WD TDP in accordance with the terms thereof and the PSAN PI/WD Trust Agreement.  From and after the Effective Date, the PSAN PI/WD Trust shall liquidate and make distributions to holders of PSAN PI/WD Claims in accordance with the PSAN PI/WD TDP and PSAN PI/WD Trust Agreement.  From and after the Non-PSAN PI/WD Claims Termination Date, the PSAN PI/WD Trust shall liquidate and make distributions to holders of Allowed Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims from the segregated funds available for such purposes in the discretion of the PSAN PI/WD Trustee.

(c)     **Imposition of Channeling Injunction.**  From and after the Effective Date, all PSAN PI/WD Claims against the Protected Parties shall be subject to the

99

Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of this Plan and the Confirmation Order. From and after the Effective Date, the Protected Parties shall have no obligation with respect to any liability of any nature or description arising out of, relating to, or in connection with any PSAN PI/WD Claims; *provided*, *however*, that nothing in the Plan shall preclude any action by the PSAN PI/WD Trust to enforce the Plan. Further, nothing section in this section 5.10(c) of the Plan or the Channeling Injunction shall constitute or be deemed a waiver of any claim, right, or Cause of Action against any Entity that is not a Protected Party in connection with any Trust Claim or enjoin the PSAN PI/WD Trust from obtaining the PI/WD Insurance Rights or asserting any Claim, Cause of Action, debt, obligation or liability for payment from any PI/WD Insurance Company. For the avoidance of doubt, although the Other PI/WD Claims are being administered through the PSAN PI/WD Trust as provided herein, the Other PI/WD Claims are not subject to the Channeling Injunction

(d)    **Releases of Liabilities to Holders of PSAN PI/WD Claims.** Except as provided in the Plan, the transfer to, vesting in, and assumption by the PSAN PI/WD Trust of the PSAN PI/WD Funds as contemplated by the Plan shall, as of the Effective Date, bar recovery or any action against the Protected Parties and their respective estates, affiliates, and subsidiaries, for or in respect of all PSAN PI/WD Claims. The PSAN PI/WD Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all PSAN PI/WD Claims against the Debtors and the Protected Parties, and such Claims shall be liquidated, resolved, or paid by the PSAN PI/WD Trust from the PSAN PI/WD Funds.

(e)    **Administrative Obligations and Assumption of Liabilities.** In furtherance of the purposes of the PSAN PI/WD Trust, and subject to the PSAN PI/WD Trust Agreement, the PSAN PI/WD Trust shall expressly (i) assume all responsibility and liability for all (A) PSAN PI/WD Claims against the Debtors and the Protected Parties and (B) all PSAN PI/WD Trust Expenses (except as otherwise provided in any applicable Consenting OEM Contribution Agreement, the PSAN PI/WD Trust Agreement, or the PSAN PI/WD TDP, and (ii) undertake to administer and pay with the designated funds thereof (A) Other PI/WD Claims, (B) PSAN PI/WD Claims arising from rights of indemnification, subrogation, and/or contribution against the Debtors that were contingent and unliquidated as of the Petition Date for settlements entered into by a holder of a PSAN PI/WD Claim after the Petition Date, (C) Administrative Expense PSAN PI/WD Claims, (D) Administrative Expense PI/WD Claims (in the case of (C) through (D), after the Non-PSAN PI/WD Claims Termination Date). The PSAN PI/WD Trust shall have all defenses, cross-claims, offsets, and recoupments regarding PSAN PI/WD Claims, Other PI/WD Claims, and, after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PSAN PI/WD Claims, and Administrative Expense PI/WD Claims that the Protected Parties, Debtors or Reorganized Debtors have or would have had under applicable law and solely to the extent consistent with the PSAN PI/WD Trust Agreement and PSAN PI/WD TDP, as applicable; provided, however, that no such claims, defenses, or rights may be asserted against any Protected Party.

(f)    **Transfer of PI/WD Insurance Rights**. In furtherance of the purpose of the PSAN PI/WD Trust:

(i)    Effective on the Effective Date, the Debtors shall irrevocably transfer, grant, and assign to the PSAN PI/WD

Trust, and the PSAN PI/WD Trust shall receive and accept, any and all of the Debtors' PI/WD Insurance Rights.  To the extent any PI/WD Insurance Company consented to a prepetition settlement agreement of a PSAN PI/WD Claim or a Trust Administered Claim, or otherwise has consented to pay a PSAN PI/WD Claim or a Trust Administered Claim on behalf of one or more of the Debtors, the Debtors transfer and assign to the PSAN PI/WD Trust the right to enforce such PI/WD Insurance Company's obligation.  This Insurance Rights Transfer is made to the PSAN PI/WD Trust for the benefit of Persons that have a Claim for compensation for damages against the Debtors.

(ii)  The Insurance Rights Transfer is made free and clear of all Claims, Liens, encumbrances, or Causes of Action of any nature whatsoever, except available limits of liability for coverage of certain types of claims under one or more PI/WD Insurance Policies that may have been reduced by certain prepetition payments made by a PI/WD Insurance Company to or on behalf of one or more of the Debtors or the Debtors non-Debtor affiliates.

(iii)  The PSAN PI/WD Trust shall satisfy any retrospective premiums, deductibles, and self-insured retentions arising in any way out of any and all PSAN PI/WD Claims or Trust Administered Claims.

(iv)  The PSAN PI/WD Trust shall comply with any notice obligations required under the PI/WD Insurance Policies and applicable law.

(v)  The Insurance Rights Transfer is made to the maximum extent possibly under applicable law.

(vi)  The Insurance Rights Transfer is absolute and does not require any further action by the Debtors, the PSAN PI/WD Trust, the Bankruptcy Court, or any other Entity.

(vii)  The Insurance Rights Transfer is not an assignment of any insurance policy itself.

(viii)  The Insurance Rights Transfer shall be governed by, and construed in accordance with, the Bankruptcy Code and the laws of Delaware, without regard to its conflict of law principles.

(g)  **Funding of PSAN PI/WD Trust.**

101

(i)     PSAN PI/WD Funds.  Upon the Effective Date, the Debtors shall assign and transfer the PSAN PI/WD Funds to the PSAN PI/WD Trust; *provided*, *however*, that to the extent certain assets comprising the PSAN PI/WD Funds, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the PSAN PI/WD Trust on the Effective Date, such assets shall be automatically, and without further act or deed, transferred to, vested in, or assumed by the PSAN PI/WD Trust as soon as reasonably practicable after the Effective Date. Notwithstanding anything in the Plan to the contrary, no monies, choses in action, and/or assets comprising the PSAN PI/WD Funds that have been transferred, granted, assigned, or otherwise delivered to the PSAN PI/WD Trust shall be used for any purpose other than in accordance with the PSAN PI/WD TDP, the PSAN PI/WD Trust Agreement, and the Participating OEM Contribution Agreement(s), and for the payment, defense, or administration of the PSAN PI/WD Claims as set forth in the PSAN PI/WD Trust Agreement

(ii)    PI/WD Insurance Rights.  Any applicable PI/WD Insurance Proceeds recovered or received by the PSAN PI/WD Trust will be allocated as set forth in the PSAN PI/WD Trust Agreement.

(h)     **Estimate of PSAN PI/WD Claims.**  In connection with the Plan Settlement, the amount of PSAN PI/WD Claims to be used solely for the Distribution Formula shall be $1.3 billion, which amount has not been endorsed, approved, or accepted by any Consenting OEM other than for the express purpose set forth herein and shall not be binding on any Consenting OEM for any purpose or admissible in any legal or other proceeding.

(i)     **Payment of PSAN PI/WD Claims.**  The PSAN PI/WD Trust shall pay PSAN PI/WD Claims against the Debtors, the Reorganized Debtors, and the Protected Parties, up to the full amount of such Claims in accordance with the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP, from (i) the applicable PSAN PI/WD Insurance Proceeds, if any, (ii) the PSAN PI/WD Funds, (iii) the Consenting OEM Contributions and the Plan Sponsor Contribution Amount allocated to the PSAN PI/WD Funds in accordance with this Plan, and (iv) subject to the terms of the applicable Participating OEM Contribution Agreement, the PSAN PI/WD Top-Up Amounts with respect to any amount remaining to be paid on such PSAN PI/WD Claims after application of the funds described in clauses (i) through (iii); *provided*, *however* that such PSAN PI/WD Top-Up Amounts shall only be utilized to pay Claims related to vehicles sold by the applicable Participating OEM related to  vehicles manufactured or sold by the applicable Participating OEM, if any, subject to the terms of the applicable Participating OEM Contribution Agreement.  Each holder of a PSAN PI/WD Claim that qualifies for a recovery under this Plan, all in accordance with the terms of Plan, including the PSAN

PI/WD TDP, shall receive its Pro Rata Share of the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount allocated to the PSAN PI/WD Funds in accordance with the Contributions Distribution Formula.

(j)     **Payment of Other PI/WD Claims.**  The PSAN PI/WD Trust shall be used to pay Other PI/WD Claims against the Debtors from any portion of the IIM Available Cash, SMX Available Cash, TDM Available Cash, or TKH Available Cash allocated to the Other PI/WD Funds and any applicable PI/WD Insurance Proceeds in accordance with this Plan; *provided, however*, that such Other PI/WD Claims shall not be administered or liquidated pursuant to the PSAN PI/WD TDP.  Each holder of an Allowed Other PI/WD Claim shall receive its Pro Rata Share of the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount allocated to the Other PI/WD Funds in accordance with the Contributions Distribution Formula.

(k)     **Payment of Administrative Expense PSAN PI/WD Claims.** After the Non-PSAN PI/WD Claims Termination Date, the segregated bank account established in the PSAN PI/WD Trust for the benefit of the holders of Administrative Expense PSAN PI/WD Claims and funded with amounts equal to the total estimated amount of Administrative Expense PSAN PI/WD Claims, based on the Updated Claims Estimation Report and by agreement of the Legacy Trustee and the PSAN PI/WD Trustee or, if an agreement cannot be reached, by order of the Bankruptcy Court, shall be used to pay Administrative Expense PSAN PI/WD Claims in the full amount of such Claims.

(l)     **Payment of Administrative Expense PI/WD Claims**.  After the Non-PSAN PI/WD Claims Termination Date, the segregated bank account established in the PSAN PI/WD Trust for the benefit of holders of Administrative Expense PI/WD Claims and funded with amounts equal to the total estimated amount of Administrative Expense PI/WD Claims shall be used to pay Administrative Expense PI/WD Claims in the full amount of such Claims.

(m)     **Payment of Post-Closing PSAN PI/WD Claims**.  Based on the Claims Estimation Report produced by the Debtors' claims estimation expert, the Reorganized Debtors do not have any anticipated liability for Post-Closing PSAN PI/WD Claims.  As a result, no Cash Proceeds are being reserved for Post-Closing PSAN PI/WD Claims.

(n)     **Consenting OEM PSAN PI/WD Trust Reserves.**  On the Effective Date, if the aggregate Cash allocated to the PSAN PI/WD Funds, including Available Cash, Consenting OEM Contributions, the Plan Sponsor Contribution Amount, and PSAN PI/WD Insurance Proceeds but excluding PSAN PI/WD Top-Up Funds, is estimated to exceed $75 million on or after the Effective Date, the PSAN PI/WD Trust shall implement a limited period, diminishing Consenting OEM PSAN PI/WD Trust Reserve.  Each Consenting OEM PSAN PI/WD Trust Reserve shall be established, subject to any amendments or modifications, as follows: (i) two-thirds of each Consenting OEM's Consenting OEM Contributions (to be calculated in accordance with the Agreed Allocation) distributed to the PSAN PI/WD Trust, to be reduced by any amounts paid after the Effective Date by the PSAN PI/WD Trust on PSAN PI/WD Claims arising from an injury sustained in a vehicle sold or manufactured by such Consenting OEM, shall be reserved for Distributions on account of PSAN PI/WD Claims

103

relating to vehicles sold or manufactured by such Consenting OEM for three years after the Effective Date; (ii) each Consenting OEM PSAN PI/WD Trust Reserve shall be reduced to one-half in the fourth year after the Effective Date; (iii) each Consenting OEM PSAN PI/WD Trust Reserve shall be reduced to one-third in the fifth year after the Effective Date; and (iv) the Consenting OEM PSAN PI/WD Trust Reserves shall be eliminated at the conclusion of the fifth year after the Effective Date. The payment of PSAN PI/WD Claims relating to vehicles sold or manufactured by a particular Consenting OEM shall first reduce and be paid out of such Consenting OEM's Consenting OEM PSAN PI/WD Trust Reserve dollar-for-dollar until such reserve is fully depleted before the payment of PSAN PI/WD Claims is made from funds in the PSAN PI/WD Funds other than the Consenting OEM PSAN PI/WD Trust Reserves. If there are any PSAN PI/WD Claims relating to vehicles sold or manufactured by a Participating OEM during the five year period in which the Consenting OEM PSAN PI/WD Trust Reserves exist that would exceed the amount available to pay such PSAN PI/WD Claims after taking into account the estimated payment percentage for holders of PSAN PI/WD Claims and applicable Consenting OEM PSAN PI/WD Trust Reserves, such Participating OEM shall be required to pay such PSAN PI/WD Claims in full through its PSAN PI/WD Top-Up Amount. For vehicles not sold and manufactured by the same Consenting OEM, the PSAN PI/WD Trust shall accept joint instructions on how to apply and adjust the Consenting OEM PSAN PI/WD Trust Reserves for the applicable Consenting OEMs, provided that the PSAN PI/WD Trust and the holder of a PSAN PI/WD Claim shall not be adversely affected by such instructions. In the event such joint instructions are not timely provided following notice to the applicable Consenting OEMs, the PSAN PI/WD Trustee shall apply the Consenting OEM PSAN PI/WD Trust Reserves in a manner most favorable to the holders of PSAN PI//WD Claims. For the avoidance of doubt, the existence of the Consenting OEM PSAN PI/WD Trust Reserves is not intended to provide a greater recovery to any holder of PSAN PI/WD Claims based on whether such holder's injury was sustained in a vehicle manufactured by a specific Consenting OEM. No separate accounts are required to be established in connection with the Consenting OEM PSAN PI/WD Trust Reserves, which may be maintained as book entry reserves.

(o)      **Excess Assets in the PSAN PI/WD Trust.** On the PSAN PI/WD Trust Termination Date, after the payment of all PSAN PI/WD Claims that are entitled to a Distribution from the PSAN PI/WD Trust, Allowed Other PI/WD Claims, Allowed Administrative Expense PI/WD Claims, Allowed Administrative Expense PSAN PI/WD Claims, and PSAN PI/WD Trust Expenses that have been provided for and the liquidation of all assets then held by the PSAN PI/WD Trust, any remaining value in the PSAN PI/WD Funds and Other PI/WD Funds shall be distributed (i) first, to the Special Master for contribution to the DOJ PI/WD Restitution Fund and (ii) second, if the Special Master's appointment has concluded, then to a charity to be selected by the PSAN PI/WD Trustee. For the avoidance of doubt, nothing herein shall govern the distribution of any remaining value in the DOJ PI/WD Restitution Fund, whether or not merged with the PSAN PI/WD Funds as set forth in this Plan.

(p)      **PSAN PI/WD Trust Expenses and Other PI/WD Claims Expenses.** The PSAN PI/WD Trust shall pay all PSAN PI/WD Trust Expenses and Other PI/WD Claims Expenses from the PSAN PI/WD Trust Reserve, as provided for in the PSAN PI/WD Trust Agreement. The Protected Parties shall have no obligation to pay any PSAN PI/WD Trust Expenses, except as expressly provided in the PSAN PI/WD Trust Agreement and the Participating OEM Contribution Agreements (as applicable); *provided*, *however*, that neither

the PSAN PI/WD Trust Agreement nor the Participating OEM Contribution Agreements shall impose on the Plan Sponsor Parties any obligation to pay PSAN PI/WD Trust Expenses without their express consent.

(q)     **PSAN PI/WD Trustee.**   There shall be one (1) PSAN PI/WD Trustee.  On the Confirmation Date, the Bankruptcy Court shall appoint the PSAN PI/WD Trustee to serve in accordance with, and who shall have the functions and rights provided in, the PSAN PI/WD Trust Agreement.  Any successor PSAN PI/WD Trustee shall be appointed in accordance with the terms of the PSAN PI/WD Trust Agreement.  For purposes of any PSAN PI/WD Trustee performing his or her duties and fulfilling his or her obligations under the PSAN PI/WD Trust and the Plan, the PSAN PI/WD Trust and the PSAN PI/WD Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The PSAN PI/WD Trustee shall be the "administrator" of the PSAN PI/WD Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

(r)     **Compensation of the PSAN PI/WD Trustee and Retention of Professionals.**  The PSAN PI/WD Trustee shall be entitled to compensation as provided in the PSAN PI/WD Trust Agreement.  The PSAN PI/WD Trustee may retain and reasonably compensate, without Bankruptcy Court approval, counsel and other professionals as reasonably necessary to assist in his duties as PSAN PI/WD Trustee, subject to the terms of the PSAN PI/WD Trust Agreement.  All fees and expenses incurred in connection with the foregoing shall be payable from the PSAN PI/WD Trust in accordance with the terms of the PSAN PI/WD Trust Agreement.  For the avoidance of doubt, any professionals retained by the Special Master pursuant to the DOJ Restitution Order that are performing services relating to the DOJ Restitution Order shall be compensated pursuant to the DOJ Restitution Order and not by the PSAN PI/WD Trust.  The only costs and fees of the Special Master and his professionals paid by the PSAN PI/WD Trust shall be those that are necessary solely due to the Special Master's role as PSAN PI/WD Trustee and that would not have otherwise been provided.

(s)     **Future Claims Representative and the PSAN PI/WD Trust Committees.**

(i)     <u>Future Claims Representative</u>.  The PSAN PI/WD Trust Agreement shall provide for the continuation of the Future Claims Representative to represent the interests of holders of PSAN PI/WD Claims against the Debtors that will be asserted in the future based on injuries arising after the Petition Date.  The Future Claims Representative shall have the functions and rights set forth in the PSAN PI/WD Trust Agreement.  The initial Future Claims Representative shall be Roger Frankel so long as he is the Future Claims Representative in the Chapter 11 Cases as of the Effective Date.  The PSAN PI/WD Trustee shall consult with the Future Claims Representative on matters pertaining to the administration of the PSAN PI/WD Trust and must obtain the consent of the Future Claims Representative as set forth in the PSAN PI/WD Trust Agreement and the PSAN

105

PI/WD TDP.  The PSAN PI/WD Trustee shall meet with the Future Claims Representative no less frequently than quarterly.  The Future Claims Representative shall receive reasonable compensation for his services and may utilize professionals in the performance of his duties, and the Future Claims Representative and his professionals shall be entitled to reasonable reimbursement by the PSAN PI/WD Trust, subject to compliance with an agreed upon budget that shall be set forth in the PSAN PI/WD Trust Agreement.

(ii)     <u>PSAN PI/WD Trust Advisory Committee</u>.  The PSAN PI/WD Trust Agreement shall provide for the establishment of the PSAN PI/WD Trust Advisory Committee to represent the interests of holders of current PSAN PI/WD Claims.  The PSAN PI/WD Trust Advisory Committee shall have the functions and rights provided for in the PSAN PI/WD Trust Agreement.  The initial PSAN PI/WD Trust Advisory Committee shall consist of three members who shall be disclosed in the Plan Supplement.  The PSAN PI/WD Trust Agreement shall provide that the PSAN PI/WD Trustee shall consult with the PSAN PI/WD Trust Advisory Committee on matters pertaining to the administration of the PSAN PI/WD Trust and must obtain the consent of the PSAN PI/WD Trust Advisory Committee as set forth in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.  The PSAN PI/WD Trustee shall meet with the PSAN PI/WD Trust Advisory Committee no less frequently than quarterly.  The PSAN PI/WD Trust Advisory Committee shall receive reasonable compensation for its services and may utilize professionals in the performance of its duties, and the members of the PSAN PI/WD Trust Advisory Committee and their professionals shall be entitled to reasonable reimbursement by the PSAN PI/WD Trust, subject to compliance with an agreed upon budget that shall be set forth in the PSAN PI/WD Trust Agreement.

(iii)    <u>PSAN PI/WD OEM Advisory Committee</u>.  The PSAN PI/WD Trust Agreement shall provide for the establishment of the PSAN PI/WD OEM Advisory Committee to represent the interests of the Participating OEMs.  The PSAN PI/WD OEM Advisory Committee shall have the functions and rights provided for in the PSAN PI/WD Trust Agreement.  The initial PSAN PI/WD OEM Advisory Committee shall consist of the Initial Participating OEM(s) and any additional Participating OEM(s), if they elect to

106

serve. There shall also be up to three non-member, non-voting observer representatives that are non-Participating OEMs and that may attend meetings of the PSAN PI/WD OEM Advisory Committee and be consulted on matters specified in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP. The PSAN PI/WD Trust Agreement shall provide that the PSAN PI/WD Trustee shall obtain the consent of the PSAN PI/WD OEM Advisory Committee as set forth in the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP. The PSAN PI/WD Trustee shall meet with the PSAN PI/WD OEM Advisory Committee no less frequently than quarterly. For the avoidance of doubt, no fees or expenses of the PSAN PI/WD OEM Advisory Committee shall be payable or reimbursed by the PSAN PI/WD Trust.

(t)    **Cooperation; Transfer of Books and Records.**

(i)    On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall transfer and assign, or cause to be transferred and assigned, to the PSAN PI/WD Trustee, (a) all of the books and records of the Debtors that pertain to PSAN PI/WD Claims and Trust Administered Claims, (b) a copy of a database or other information as reasonably required to assist the PSAN PI/WD Trust in identifying the PSAN PI/WD Claims being channeled to the PSAN PI/WD Trust or Trust Administered Claims, (c) copies of all PI/WD Insurance Policies, (d) information relating to all Claims previously noticed, tendered, or submitted under the PI/WD Insurance Policies or paid by any PI/WD Insurance Company, and (e) any other information reasonably necessary to operate the PSAN PI/WD Trust and preserve, secure, or obtain the benefit of the PI/WD Insurance Rights. If, at any time, after the Effective Date, the Reorganized Debtors discover the existence of an insurance policy that provides or may provide coverage for PSAN PI/WD Claims or Trust Administered Claims, the Entity discovering such policy or evidence of the existence of such policy shall promptly inform the PSAN PI/WD Trust.

(ii)    The transfer or assignment of information, which may include PSAN PI/WD Privileged Information, to the PSAN PI/WD Trustee in accordance with this section 5.10(t)(ii) of the Plan shall not result in the destruction or waiver of any applicable privileges pertaining to PSAN PI/WD Privileged Information. Further, with respect to any privileges: (a) they are transferred to or contributed for the sole purpose of

107

enabling the PSAN PI/WD Trustee to perform its duties to administer the PSAN PI/WD Trust and for no other reason, (b) they are vested solely in the PSAN PI/WD Trustee and not in the PSAN PI/WD Trust, the PSAN PI/WD Trust Advisory Committee or any other Person, committee or subcomponent of the PSAN PI/WD Trust, or any other Person (including counsel and other professionals) who has been engaged by, represents or has represented any holder of a PSAN PI/WD Claim or any Person who alleges or may allege a Claim directly or indirectly relating to or arising from the Debtors' Products or operations, (c) they shall be preserved and not waived, (d) for the avoidance of doubt, any such transfer shall have no effect on any right, Claim or privilege of any Person other than the Debtors, TKJP, or any other non-Debtor Takata entities, and (e) no information subject to a privilege or a prior assertion thereof shall be publicly disclosed by the PSAN PI/WD Trustee or the PSAN PI/WD Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information.  Notwithstanding the foregoing, nothing herein shall preclude the PSAN PI/WD Trustee from providing information received pursuant to this section to any PI/WD Insurance Company as necessary to preserve, secure, or obtain the benefit of the PI/WD Insurance Rights.

(u)  **U.S. Federal Income Tax Treatment of the PSAN PI/WD Trust.**  The PSAN PI/WD Trust shall be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.  The PSAN PI/WD Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the PSAN PI/WD Trust that are required by any governmental unit.  The PSAN PI/WD Trustee shall be responsible for the payment of any taxes imposed on the PSAN PI/WD Trust or the PSAN PI/WD Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the PSAN PI/WD Trust Agreement.  The PSAN PI/WD Trustee may request an expedited determination of taxes on the PSAN PI/WD Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the PSAN PI/WD Trust for all taxable periods through the dissolution of the PSAN PI/WD Trust.

(v)  **Institution and Maintenance of Legal and Other Proceedings**.  As of the Effective Date, the PSAN PI/WD Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the PSAN PI/WD Trust.  The PSAN PI/WD Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors if deemed necessary or appropriate by the PSAN PI/WD Trustee.  The PSAN PI/WD Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from or associated with

108

any legal action or other proceeding brought pursuant to this section 5.10(e) of this Plan and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges which may arise from the receipt of the PI/WD Insurance Proceeds by the PSAN PI/WD Trust. For the avoidance of doubt, the PSAN PI/WD Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and representative, of the Debtors and their Estates for the retention, enforcement, settlement, or adjustment of all PSAN PI/WD Claims, Other PI/WD Claims and, after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PI/WD Claims and Administrative Expense PSAN PI/WD Claims.

   (w)  **Participating OEMs.**

      (i)  <u>Opt-In Election</u>.  Individual Consenting OEMs may elect to become Participating OEMs at any time during the Initial Opt-In Period.  In addition, any individual Consenting OEM that has no resolved or pending litigation raising PSAN PI/WD Claims against such Consenting OEM as of the Effective Date may elect to become a Participating OEM during the Extended Opt-In Period, subject to satisfaction of the option payment required by the PSAN PI/WD Trust Agreement in accordance with the terms thereof.  PSAN PI/WD Claims asserted against a Consenting OEM that elects to become a Participating OEM after the Effective Date in litigation that is pending at the time of such election shall not be channeled to the PSAN PI/WD Trust without the consent of all plaintiffs in such litigation; *provided*, that all PSAN PI/WD Claims against such Consenting OEM asserted after such election shall be channeled to the PSAN PI/WD Trust and the Participating OEM shall be released from liability subject to the terms of the Plan, the PSAN PI/WD Trust Agreement, and the Participating OEM Contribution Agreement.  A Participating OEM may limit its election to become a Participating OEM with respect to only its vehicles that are subject to recall and, in such event, shall agree to a consent order or other appropriate documentation expressly indicating the PSAN PI/WD Claims involving non-recalled vehicles are not released or channeled to the PSAN PI/WD Trust.  Consenting OEMs that are not Participating OEMs may make an irrevocable election at any time not to participate in the PSAN PI/WD Trust.  If a Consenting OEM elects to become a Participating OEM after the date of the Disclosure Statement hearing, then the Debtors (if before the Effective Date) or the PSAN PI/WD Trust (if after the Effective Date) shall provide notice of such election to all holders of pending PSAN PI/WD Claims relating to vehicles manufactured by such

Participating OEM, and all costs of such additional noticing shall be reimbursed to the Debtors or the PSAN PI/WD Trust, as applicable, by such new Participating OEM.

(ii)    <u>Support of Channeling Injunction</u>.  The ballots distributed to holders of PSAN PI/WD Claims pursuant to the Solicitation Procedures Order shall provide such holders the opportunity to indicate their support for the Channeling Injunction for the benefit of the Participating OEM (or potential Participating OEM) that manufactured the vehicle containing the PSAN Inflator that is alleged to have resulted in such holders' PSAN PI/WD Claims.

(iii)    <u>Participating OEM Funding</u>.  On the date the Channeling Injunction becomes effective with respect to an individual Participating OEM (or at such later date as may be otherwise agreed to by the PSAN PI/WD Trustee, with the consent of the PSAN PI/WD Trust Advisory Committee, the PSAN PI/WD OEM Advisory Committee, and the Future Claims Representative, and the applicable Participating OEM), each Participating OEM shall deliver an executed Participating OEM Contribution Agreement to the PSAN PI/WD Trust.  The Participating OEM Contribution Agreement shall require the Participating OEMs to make contributions as provided therein.  Subject to the terms and conditions of the applicable Participating OEM Contribution Agreement, if an individual Participating OEM defaults under its Participating OEM Contribution Agreement on its obligations to the PSAN PI/WD Trust, after a reasonable opportunity to cure, the Channeling Injunction and related releases provided for pursuant to the Plan shall be null and void with respect to such Participating OEM as provided in the Participating OEM Contribution Agreement; *provided*, *however*, that nothing herein shall limit the rights of the PSAN PI/WD Trust to seek any and all remedies against any such defaulting Participating OEM as set forth in the applicable Participating OEM Contribution Agreement.

(iv)    <u>Indemnification</u>.  The PSAN PI/WD Trust shall indemnify a Participating OEM, and any Person set forth in subpart (v) of the definition of "Protected Party" that is affiliated with such Participating OEM, for any loss, cost, fees, or expenses incurred by such Participating OEM or any such Person if,  after the payment of any portion or all of the PSAN PI/WD Top-Up Amount by the applicable Participating OEM, the Participating OEM or any such

110

Person is (a) held liable for any PSAN PI/WD Claim or (b) required to provide payment, reimbursement, or restitution under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the PSAN PI/WD Trust is otherwise based on the same events, facts, matters, or circumstances that gave rise to the PSAN PI/WD Claim, in each case in an amount not to exceed the applicable Participating OEM's PSAN PI/WD Top-Up Amount. The PSAN PI/WD Trust shall not be obligated to provide the indemnification set forth in this section 5.10(w)(iv) if, after exercising its best efforts, the PSAN PI/WD Trust is unable to obtain insurance for such obligations at a reasonable cost, with any such cost to be funded solely by the Participating OEMs.

(x)    **Insurance Neutrality.**

(i)    Nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any of the Insurers or (b) any rights or obligations of the Debtors arising out of or under any Insurance Policy. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any PI/WD Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of this Plan.

(ii)    None of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order or any findings and conclusions entered with respect to confirmation, nor (c) any estimation or valuation of any PSAN PI/WD Claims or Trust Administered Claims, either individually or in the aggregate in the Chapter 11 Cases, shall, with respect to any insurance company, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Trust Claim.

111

### 5.11    *TKC Restructuring Transaction.*

Upon entry of the Confirmation Order and prior to or on the Effective Date, TKC shall be authorized to assume, in one or more transactions, some or all of TSAC's obligations under the Global Settlement Agreement to pay or cause to be paid certain settlement amounts owed to the Consenting OEMs and/or certain of their affiliates.  TKC's assumed payment obligation(s) shall (i) constitute Administrative Expense Claims against TKC, (ii) be in an amount equal to any dividend(s) made by TSAC to TKC prior to the Effective Date plus the PSAN Assets Advance Payment, RTK Loan, and/or the RTKHT Loan, and (iii) be conditioned on receipt of any dividends.  Such dividend(s), the PSAN Assets Advance Payment, the RTK Loan, and/or the RTKHT Loan shall be used solely to pay the TSAC payment obligation(s) assumed by TKC under the Global Settlement Agreement.  For the avoidance of about, nothing in this section 5.10(x)(ii) of the Plan shall be construed as limiting or otherwise altering the Plan Sponsor's right to receive the Plan Sponsor Backstop Funding Repayment from distributions to TKC after the Effective Date on account of Intercompany Interests held by TKC in TSAC in accordance with section 5.12 of the Plan.

### 5.12    *TSAC DOJ Restitution Claim Funding Deficiency.*

To the extent that a TSAC DOJ Restitution Claim Funding Deficiency exists as of the Effective Date, such deficiency shall be funded in accordance with this section 5.12 of the Plan.

(a)    **PSAN Assets Advance Payment.**  TKAM (on behalf of TSAC) shall submit a Backstop Funding Request Certificate (as defined in the Plan Sponsor Backstop Funding Agreement) to the Plan Sponsor prior to the Effective Date for the full $25 million PSAN Assets Advance Payment to fund up to the first $25 million of the TSAC DOJ Restitution Claim Funding Deficiency.  Upon receipt of such Backstop Funding Request Certificate, the Plan Sponsor shall pay the full PSAN Assets Advance Payment to the Consenting OEMs in accordance with section 6 of the Plan Sponsor Backstop Funding Agreement.  The PSAN Assets Advance Payment shall be repaid to the Plan Sponsor and contributed to the Plan Settlement Fund in accordance with sections 5.5(e)(i), 5.17, and 5.19(e)(iii) of the Plan.  Upon the Plan Sponsor's payment of the PSAN Assets Advance Payment, $50 million of Plan Sponsor Backstop Payments shall continue to be available under the Plan Sponsor Backstop Funding Agreement in accordance with its terms.

(b)    **RTKHT Loan.**  On the Effective Date, if (x) there exists a TSAC DOJ Restitution Claim Funding Deficiency greater than $25 million and (y) the aggregate amount in the Post-Closing Reserve and the Warehousing Entity Reserve on account of PSAN Legacy Costs (inclusive of any amounts that fund the RTK Loan) exceeds $200 million, the Reorganized TK Holdings Trust shall provide the RTKHT Loan to TKC, which TKC shall use to pay a portion of the TSAC DOJ Restitution Claim Funding Deficiency in accordance with section 5.11 of the Plan.

(c)    **RTK Loan.**  On the Effective Date, if there exists a TSAC DOJ Restitution Claim Funding Deficiency greater than $25 million plus the amount of the RTKHT Loan exists, Reorganized TK Holdings Inc. shall provide the RTK Loan to TKC, which TKC

shall use to pay a portion of the TSAC DOJ Restitution Claim Funding Deficiency in accordance with section 5.11 of the Plan.

(d)        **Plan Sponsor Backstop Funding Payments.**  Until the RTK Loan is repaid, (i) the amount of the RTK Loan shall not count as funding in the Post-Closing Reserve or the Warehousing Entity Reserve, except to the extent that the RTK Loan is repaid and (ii) the amount of the RTKHT Loan shall be deducted from the amounts funded in the Post-Closing Reserve and the Warehousing Entity Reserve, in each case for purposes of the $200 million cap on PSAN Legacy Costs under the Plan Sponsor Backstop Funding Agreement. Notwithstanding anything to the contrary in the Plan Sponsor Backstop Funding Agreement or this Plan, each dollar of the RTK Loan repaid shall count towards the $200 million cap on PSAN Legacy Costs set forth in the Plan Sponsor Backstop Funding Agreement.  Upon repayment in full of the RTK Loan, the amount of the RTKHT Loan shall no longer be deducted from the aggregate amount funded in the Post-Closing Reserve and the Warehousing Entity Reserve for purposes of the $200 million cap on PSAN Legacy Costs.  To the extent that a Plan Sponsor Backstop Funding Payment is drawn and not yet reimbursed while the RTK Loan is outstanding, the Plan Sponsor Backstop Funding Repayment shall be senior in priority and right to the RTKHT Loan but junior in priority and right to the RTK Loan with respect to any dividend from TSAC to TKC; *provided*, *however*, that the first $25 million in dividends from TSAC to TKC shall in all cases be used towards repayment of the PSAN Assets Advance Payment and the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust as set forth in section 5.19(e)(iii) of the Plan.  For the avoidance of doubt, so long as (x) the RTKHT Loan is in an amount equal to the amount by which the sum of the DOJ Restitution Claim plus the PSAN Legacy Costs funded on the Effective Date is in excess of $1,050,000,000 and (y) the aggregate consideration used to pay the DOJ Restitution Claim plus the PSAN Legacy Costs funded on the Effective Date (inclusive of the amount of the RTK Loan) less the amount of the RTKHT Loan is equal to or less than $1,050,000,000, then the Plan Sponsor Backstop Payments, to the extent called for funding of PSAN Legacy Costs (with (i) the amount of the RTK Loan, to the extent unpaid, not counted and (ii) the RTKHT Loan amount deducted, in each case for purpose of testing against the $200 million cap on PSAN Legacy Costs), shall be used to fund PSAN Legacy Costs, which in turn shall be deemed to repay and reduce any balance outstanding under the RTK Loan.  For the avoidance of doubt, as between the RTK Loan and the RTKHT Loan, the RTK Loan shall be senior in priority and right to repayment with respect to any dividends from TSAC to TKC.

### 5.13    *Mexico Restructuring Transaction.*

Notwithstanding anything to the contrary in the *Order (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Provide Certain Postpetition Claims Administrative Expense Priority, (D) Continue Intercompany Funding of Certain Non-Debtors, and (E) Maintain Existing Bank Accounts and Business Forms; and (II) Waiving the Requirements of 11 U.S.C. 345(b)* [Docket No. 736], upon entry of the Confirmation Order, IIM, SMX, TDM, and TKHDM shall be authorized to take any and all steps necessary to prepare for the closing of the sale of the Purchased Assets to the Plan Sponsor pursuant to the U.S. Acquisition Agreement. Such steps may include (i) completing any remaining unperformed steps authorized by the Bankruptcy Court pursuant to the *Order for Authority to Effect Certain Pre-Restructuring Steps and Transactions with Respect to the Debtors' Mexican Affiliates Necessary for the Global*

*Transaction* [Docket No. 1314], including the sale of certain assets and liabilities of SMX, (ii) undertaking any changes to the cash management and cash pooling arrangement in Mexico that the Debtors deem necessary in furtherance of the Restructuring Transactions, (iii) satisfying some or all prepetition and postpetition Intercompany Claims owed by TKHDM to IIM, SMX, TDM, and the Debtors' non-Debtor Mexican affiliates in connection with the cash pooling arrangement in Mexico, and (iv) making, approving, or receiving intercompany transfers, dividends, or capital contributions between and among TKHDM, IIM, SMX, TDM and the Debtors' non-Debtor Mexican affiliates in furtherance of the Restructuring Transactions.

### 5.14    *Charters; By-laws.*

The charters, by-laws, and other organizational documents of the Reorganized Debtors shall be amended or amended and restated in a manner consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and the terms of this Plan, including section 5.8(n).

### 5.15    *Cancellation of Notes, Interests, Instruments, Certificates, and Other Documents.*

Except to the extent assumed by the Plan Sponsor in connection with the Restructuring Transactions or as otherwise provided herein, on the Effective Date, all notes, instruments, certificates evidencing debt to, or equity interests in, the Debtors shall be cancelled and obligations of the Debtors thereunder shall be discharged.

### 5.16    *Separate Plans.*

Notwithstanding the combination of separate plans of reorganization set forth in this Plan for purpose of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### 5.17    *Merger; Dissolution; Consolidation; Discharge.*

On or after the Effective Date, Reorganized TK Holdings or the Legacy Trustee may, subject to the terms of the Plan, the Amended Certificates of Incorporation and Amended By-Laws for the Reorganized Debtors, and the Reorganized TK Holdings Organizational Documents, (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, and (iii) engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing, within thirty (30) days after its completion of the acts required by the Plan, or as soon as reasonably practicable thereafter, each Reorganized Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of each Reorganized Debtor; *provided, however*, that each Reorganized Debtor, as applicable, shall file with the office of the Secretary of State or other appropriate office for the state of its organization a certificate of cancellation or dissolution. No corporate transaction undertaken pursuant to this section 5.17 shall excuse the Legacy Trustee or the Plan Administrator, as applicable, from repayment of the RTK Loan, the

WEIL:\96446450\6\76903.0004

RTKHT Loan, the PSAN Assets Advance Payment, and the Plan Sponsor Backstop Funding Repayment (including repayment of any unreimbursed Restructuring Expenses) in accordance with the terms and subject to the conditions of the Plan Sponsor Backstop Funding Agreement and section 5.12 of the Plan, and, in the case of any corporate transaction under this section 5.17 involving TKC, the terms and conditions of this Plan and the Plan Sponsor Backstop Funding Agreement shall apply mutatis mutandis to TKC's successor-in-interest or the assignee of TKC's payment receivable from its subsidiary.

Upon the liquidation and dissolution of any subsidiary of Reorganized TK Holdings, any proceeds thereof shall be treated as Reorganized Takata Post-Closing Cash.  In addition, any Reorganized TK Holdings Trust Post-Closing Cash arising from distributions after the Effective Date on account of Intercompany Interests held by TKAM, TKC, and TKF shall (i) first, solely with respect to distributions from TKC's subsidiary, be used towards the repayment of the RTK Loan, the RTKHT Loan, the PSAN Assets Advance Payment, and the Plan Sponsor Backstop Funding Repayment (including repayment of any unreimbursed Restructuring Expenses) in accordance with the terms and subject to the conditions of the Plan Sponsor Backstop Funding Agreement and section 5.12 of the Plan and (ii) second constitute Available Cash of such Debtor.

### 5.18    *Closing of the Chapter 11 Cases.*

When all Disputed Claims (other than Disputed PSAN PI/WD Claims) filed against the Debtors have become Allowed Claims or have been Disallowed, all of the Reorganized TK Holdings Trust Assets have been distributed in accordance with the Plan, and all Allowed Claims (other than PSAN PI/WD Claims) have been satisfied in accordance with the Plan, the Legacy Trustee shall seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### 5.19    *Plan Settlement.*

(a)    **Plan Settlement.**  The provisions of the Plan (including provisions relating to the Plan Settlement Payment, the Plan Settlement Fund, the Support Party Creditor Fund, and the release and injunctive provisions contained in Article X of the Plan to the extent applicable to a Consenting OEM or the Plan Sponsor) and the other documents entered into in connection with the Restructuring Transactions constitute a good faith compromise and settlement among the Debtors, the Plan Sponsor, the Consenting OEMs, the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative of all Claims and controversies among such parties, including Claims subject to the investigation in connection with the Challenge Period and Claim and controversies relating to the Settled OEM Claims, the Consenting OEM Unsecured Claims, and the U.S. Acquisition Agreement, and are also in consideration of the significant value provided to the Estates by the Restructuring Support Parties in connection with the Restructuring Transactions, including, without limitation (i) the Consenting OEMs' obligations under the Indemnity Agreement (without which the Plan Sponsor would have been unwilling to enter into the Restructuring Transactions and pay the Purchase Price for the Purchased Assets), (ii) the Consenting OEMs' post-Effective Date commitments to the Plan Sponsor's business, (iii) the Consenting OEMs' agreement to certain modifications to the OEM Assumed Contracts and to have such OEM Assumed Contracts be assigned to the Plan

115

Sponsor, (iv) the Plan Sponsor's entry into the Restructuring Transactions, (v) the Plan Sponsor's obligation to provide the Plan Sponsor Backstop Funding in accordance with the terms and subject to the conditions of the Plan Sponsor Backstop Funding Agreement and this Plan, (vi) the Business Incentive Plan Payment, (vii) the Plan Sponsor's agreement to enter into the Transition Services Agreement, (viii) the Consenting OEMs' contributions to the Plan Settlement Fund, as set forth in sections 5.19(b)(iv) and 5.19(e) of the Plan, (ix) the Plan Sponsor Parties' payment of the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust, as set forth in section 5.19(e)(iii) of the Plan, (x) the Consenting OEMs' contributions to the Support Party Creditor Fund as set forth in section 5.19(g) of the Plan, (xi) the Plan Sponsor's contributions to the Support Party Creditor Fund, as set forth in section 5.19(g) of the Plan, and (xii) the commitments of Reorganized Takata and the Plan Sponsor to assume certain executory contracts pursuant to section 5.19(h).  The Plan shall be deemed a motion to approve the Plan Settlement and the good faith compromise and settlement of all of the Claims and controversies described in the foregoing sentence pursuant to Bankruptcy Rule 9019, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that the Plan Settlement is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

(b)     **Plan Settlement Payment.**  Upon approval of the Plan Settlement by the Bankruptcy Court in the Confirmation Order and the occurrence of the Effective Date of the Plan:  (i) the Plan Settlement Payment, less the Plan Settlement Turnover Amount, shall be paid in full in Cash by the Plan Sponsor (in accordance with the Plan Settlement Payment Waterfall set forth in section 5.19(c) of this Plan) to the OEMs in accordance with the Agreed Allocation for the Consenting OEMs free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind, and such payment shall be deemed to be made both (x) on behalf of the Debtors on account of the Plan Settlement Payment and (y) with the consent of the Special Master, on behalf of the Special Master, on account of the DOJ Restitution Claim; (ii) $100,000 of the Plan Settlement Turnover Amount shall be contributed by the Consenting OEMs to each of the IIM Recovery Funds, the SMX Recovery Funds, the TDM Recovery Funds, and the TKH Recovery Funds for the benefit of holders of General Unsecured Claims; *provided, however*, that $100,000 of the Plan Settlement Turnover Amount shall be contributed by the Consenting OEMs to each of the IIM Recovery Funds and TDM Recovery Funds solely in the event that the Mexico Class Action Claims have not been fully resolved (through adjudication, settlement, or otherwise) prior to the Effective Date; (iii) the Post-Closing Reserve and the Warehousing Entity Reserve shall be fully funded in accordance with this Plan; and (iv) the Business Incentive Plan Payment shall be paid, when payable under the terms of the U.S. Acquisition Agreement, to the Consenting OEMs in accordance with the Agreed Allocation; *provided, however*, that eighty percent (80%) of any amounts that the Consenting OEMs would be entitled to receive on account of the Business Incentive Plan Payment pursuant to this clause (iv), excluding any amounts of the Business Incentive Plan Payment that are allocable to TKAM, shall be reallocated to the Plan Settlement Fund when such amounts would otherwise be payable to the Consenting OEMs in accordance with this clause (iv).  Notwithstanding anything to the contrary in this Plan, to the extent that the Post-Closing Reserve and the Warehousing Entity Reserve are not fully funded on the Effective Date taking into account any amounts funded by the Debtors' non-Debtor affiliates, the Cash Proceeds shall be used to fund such reserves in the full amount necessary to ensure that such reserves are sufficiently funded to satisfy the purposes

116

for which such reserves were established.  Such payments, transfers, and funding shall be made in full and final satisfaction of the Settled OEM Claims and shall be final.  For the avoidance of doubt, the Plan Settlement Payment and other payments and funding obligations set forth in this section 5.19(b)  shall not be deemed to be in satisfaction of any Claims of Consenting OEMs that do not constitute Settled OEM Claims, including (x) any OEM Unsecured Claims held by any Consenting OEM, (y) any Administrative Expense Claims or Cure Claims held by any Consenting OEM that do not constitute Settled OEM Claims, or (z) any Claims held by any Consenting OEM against any party other than the Debtors, including the Debtors' non-Debtor affiliates.

(c)      **Plan Settlement Payment Waterfall.**  The Consenting OEMs have directed that the Plan Settlement Payment, other than the Plan Settlement Turnover Amount, be paid by the Debtors from the Cash Proceeds as follows: (i) first, from the TKC Cash Proceeds; (ii) second, from the TKAM Cash Proceeds; (iii) third, from the TKF Cash Proceeds; (iv) fourth, from the IIM Cash Proceeds; (v) fifth, from the TDM Cash Proceeds; (vi) sixth, from the SMX Cash Proceeds, and (vii) seventh, from the TKH Cash Proceeds.  For the avoidance of doubt, the Plan Settlement Payment shall not be paid under clauses (ii) through (vii) hereof unless the applicable Debtor's Cash Proceeds in the immediately preceding clause are exhausted.  The Consenting OEMs have directed that the Plan Settlement Turnover Amount be paid by the TKH Debtors from the TKH Cash Proceeds.

(d)      **Assumed PSAN Contracts.**  Reorganized Takata is assuming the Assumed PSAN Contracts in accordance with section 8.4 of this Plan as part of the Plan Settlement and to ensure (i) continued production of PSAN Inflators for the PSAN Consenting OEMs and (ii) compliance with applicable NHTSA regulations and orders.  As part of the Plan Settlement, the PSAN Consenting OEMs are agreeing to settle any Consenting OEM PSAN Cure Claims arising under the Assumed PSAN Contracts in exchange for the treatment of the Settled OEM Claims set forth in section 5.19(b) above.

(e)      **Consenting OEM Contributions to Plan Settlement Fund.**

(i)      On the Effective Date, the Consenting OEMs shall be deemed to have contributed to the Plan Settlement Fund their rights to the following payments, and such payments shall be reallocated to the Plan Settlement Fund as and when such amounts would otherwise be paid or payable to the Consenting OEMs hereunder: (a) eighty percent (80%) of Consenting OEM GUC Recoveries until the Consenting OEMs have contributed $5 million to the Support Party Creditor Fund in accordance with section 5.18(g) below and, thereafter, ninety (90%) of Consenting OEM GUC Recoveries until the Consenting OEM GUC Recovery Threshold is met; (b) twenty-five (25%) of Consenting OEM Additional GUC Recoveries; and (c) eighty percent (80%) of any Consenting OEM Incremental GUC Recoveries until the Consenting OEMs have contributed $5 million to the Support Party Creditor Fund in accordance

117

with section 5.18(g) below and, thereafter, ninety (90%) of Consenting OEM Incremental GUC Recoveries; *provided*, *however*, that the Consenting OEM GUC Recoveries and the Consenting OEM Incremental GUC Recoveries shall be subject to the Resolution Reserve.

(ii)    All Consenting OEM Contributions in the Plan Settlement Fund shall be automatically contributed to the PSAN PI/WD Trust on the Effective Date or on the Distribution Date on which such amounts would otherwise by payable to the Consenting OEMs.   The PSAN PI/WD Trustee shall distribute the Consenting OEM Contributions, once contributed to the PSAN PI/WD Trust, to (i) the PSAN PI/WD Funds, (ii) the Other PI/WD Funds, and (iii) the Disputed Contributions Reserve pursuant to the Contributions Distribution Formula set forth in section 6.3 of the Plan and in accordance with section 7.12 of the Plan.

(iii)    The Consenting OEM Contributions shall not constitute or be construed as admissions of any fact or liability, stipulation or waiver, but rather are in furtherance of settlement negotiations in the Chapter 11 Cases and shall not be admissible against any Consenting OEM or holder of a PSAN PI/WD Claim or Other PI/WD Claim in any non-bankruptcy proceeding involving such party.

(f)    **Plan Sponsor Contribution Amount**.  In exchange for the release of the Plan Sponsor Parties pursuant to section 10.6(c) of the Plan and the Channeling Injunction in favor of the Plan Sponsor Parties pursuant to section 10.7 of the Plan, the Plan Sponsor shall contribute the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust.  The Plan Sponsor shall use reasonable best efforts to facilitate the payment of the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust as soon as practicable after the Plan Sponsor receives repayment by TKAM, TKF, or TKC of $25 million of the PSAN Assets Advance Payment drawn by TKAM (on behalf of TSAC) on the Effective Date.  The PSAN PI/WD Trustee shall then distribute the Plan Sponsor Contribution Amount to (i) the PSAN PI/WD Funds, (ii) the Other PI/WD Funds, and (iii) the Disputed Contributions Reserve pursuant to the Contributions Distribution Formula set forth in section 6.3 of the Plan and in accordance with section 7.12 of the Plan.

(g)    **Support Party Creditor Fund.**  On the Effective Date, the Support Party Creditor Fund shall be established and held by the Reorganized TK Holdings Trust, solely as an administrative convenience to the parties to the Plan Settlement.  The Support Party Creditor Fund shall be funded as follows: (i) the Consenting OEMs shall be deemed to have contributed to the Support Party Creditor Fund their rights to payment of an aggregate of $5 million from the Resolution Reserve and such amount shall be payable to the Support Party Creditor Fund on the Effective Date or as soon as such amount is paid or payable to the Consenting OEMs hereunder in connection with their Consenting OEM GUC Recoveries, (ii) the

118

Plan Sponsor shall contribute $2.5 million on the Effective Date, and (iii) to the extent required under section 5.19(h)(iii) hereof, the Debtors shall contribute the Additional Support Party Funds.  The Support Party Creditor Fund shall at no time be property of the Debtors' Estates. The funds in the Support Party Creditor Fund shall be distributed Pro Rata among the Eligible Creditors.  For the avoidance of doubt, each Eligible Creditor shall also receive its Pro Rata share of the Available Cash allocated to the Other Creditors Funds.

(h)      **Executory Contracts.**  Notwithstanding anything to the contrary herein but subject to section 8.4 of the Plan, the Debtors shall assume and assign to the Plan Sponsor all third-party executory contracts related to the Purchased Assets, except for the Excluded Contracts, provided that:

(i)      the Plan Sponsor may exclude from such assumption and assignment any Purchased Contract as long as the aggregate amount of Other General Unsecured Claims arising from the rejection of such contracts does not exceed $2 million, including any executory contracts or unexpired leases rejected by the Debtors pursuant to section 5.19(h)(iii) of the Plan;

(ii)      if the aggregate amount of Cure Claims exceeds $60 million, the Plan Sponsor and the Debtors shall have the right to reject executory contracts and unexpired leases in accordance with section 8.2(c) of the Plan and section 2.7(g) of the U.S. Acquisition Agreement as in effect on November 16, 2017; and

(iii)      with respect to executory contracts or unexpired leases, other than executory contracts for the supply of Component Parts, that were not disclosed on the Schedule of Rejected Contracts filed with the Bankruptcy Court on January 31, 2018 [Docket No. 1860] or to the Plan Sponsor on or prior to January 30, 2018, the Plan Sponsor shall have the right to decline the assumption and assignment of any such executory contract or unexpired lease, and the Debtors shall determine, in their discretion, whether to assume or reject any such declined executory contract or unexpired lease; *provided*, *however*, that if the Debtors reject any such executory contract or unexpired lease and such rejection results in Other General Unsecured Claims that, together with the Claims resulting from the rejection of executory contracts and unexpired leases in section 5.19(h)(i) of the Plan, exceed $2 million, the Debtors shall contribute the Additional Support Party Funds to the Support Party Creditor Fund, subject to Bankruptcy Court approval.

119

(i)      **Allowance of Consenting OEM Unsecured Claims.**  Pursuant to the Plan Settlement, the Consenting OEM Unsecured Claims shall be Allowed for distribution purposes in the aggregate amount of $38,645,862,823.

(j)      **Plan Settlement Release.**  Subject to approval of the Plan Settlement and the occurrence of the Effective Date, and as of the Effective Date, the Debtors, the Reorganized Debtors, and their Estates shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Consenting OEM (and its respective subsidiaries and affiliates) from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccured, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, against any Consenting OEM, based on acts or omissions occurring on or prior to the Effective Date of the Plan.  For the avoidance of doubt, as of the Effective Date, the Challenge Period shall automatically terminate and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever shall be released in all respects as set forth in the foregoing sentence. The Reorganized Debtors, the Reorganized TK Holdings Trust, and any other newly-formed entities that shall be administering the Excluded Assets and/or continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth in this section 5.19(i).

(k)      **Tolling of the Challenge Period**.  The Challenge Period shall be tolled until the earlier of (i) the Effective Date and (ii) thirty (30) days following the receipt of a No Plan Notice by either of the Committees or the Debtors.  On the Effective Date, the Challenge Period shall automatically terminate and all of the Committees' Claims, disputes, and Causes of Action subject to the Challenge Period shall be released with prejudice.  If, however, a No Plan Notice is received by either of the Committees or the Debtor, the Challenge Period will be reinstated.  If any party contests the issuance of a No Plan Notice, the Bankruptcy Court shall hold an emergency hearing to determine if the No Plan Notice was properly issued.  If the Bankruptcy Court holds that the No Plan Notice was not properly issued, then it shall be as if the No Plan Notice was never issued for all purposes.

WEIL:\96446450\6\76903.0004

**ARTICLE VI        DISTRIBUTIONS.**

### 6.1    *Distributions Generally.*

The Disbursing Agent shall make all Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of this Plan.  Except as otherwise provided herein, Distributions under this Plan shall be made only to the holders of Allowed Claims.

### 6.2    *Distribution Formula.*

Available Cash shall be allocated to the Recovery Funds, with respect to the applicable Debtor, as follows:

(a)    the percentage of IIM Available Cash to be allocated to each of the IIM PSAN PI/WD Fund, the IIM OEM Fund, the IIM Other Creditors Fund, the IIM Other PI/WD Fund, and the IIM Disputed Claims Reserve, respectively, shall be based on, as of the Effective Date or the applicable Periodic Distribution Date, as set forth in sections 6.5 and 7.7 of this Plan: (i) PSAN PI/WD Claims against IIM in the aggregate amount of $1.3 billion, (ii) Allowed OEM Unsecured Claims against IIM, (iii) Allowed Other General Unsecured Claims against IIM, (iv) Allowed Other PI/WD Claims against IIM, and (v) an aggregate amount equal to the least of, with respect to each Disputed OEM Unsecured Claim, Disputed Other General Unsecured Claim, and Disputed Other PI/WD Claim against IIM, (w) the filed amount of such Disputed General Unsecured Claim, (x) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed General Unsecured Claim, and (y) such other amount as may be agreed upon by the holder of such Disputed General Unsecured Claim and the applicable Claims Administrator, with each of the foregoing clauses (i) – (v) as a percentage of the aggregate of clauses (i) – (v).  For the avoidance of doubt, the PSAN PI/WD Top-Up Amounts shall not be taken into consideration in determining the allocation of IIM Available Cash among the Recovery Funds in accordance with this paragraph.

(b)    the percentage of SMX Available Cash to be allocated to each of the SMX PSAN PI/WD Fund, the SMX OEM Fund, the SMX Other Creditors Fund, the SMX Other PI/WD Fund, and the SMX Disputed Claims Reserve, respectively, shall be based on, as of the Effective Date or the applicable Periodic Distribution Date, as set forth in sections 6.5 and 7.7 of this Plan: (i) PSAN PI/WD Claims against SMX in the aggregate amount of $1.3 billion, (ii) Allowed OEM Unsecured Claims against SMX, (iii) Allowed Other General Unsecured Claims against SMX, (iv) Allowed Other PI/WD Claims against SMX, and (v) an aggregate amount equal to the least of, with respect to each Disputed OEM Unsecured Claim, Disputed Other General Unsecured Claim, and Disputed Other PI/WD Claim against SMX, (w) the filed amount of such Disputed General Unsecured Claim, (x) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed General Unsecured Claim, and (y) such other amount as may be agreed upon by the holder of such Disputed General Unsecured Claim and the applicable Claims Administrator, with each of the foregoing clauses (i) – (v) as a percentage of the aggregate of clauses (i) – (v).  For the avoidance of doubt, the PSAN PI/WD

Top-Up Amounts shall not be taken into consideration in determining the allocation of SMX Available Cash among the Recovery Funds in accordance with this paragraph.

(c)       the percentage of TDM Available Cash to be allocated to each of the TDM PSAN PI/WD Fund, the TDM OEM Fund, the TDM Other Creditors Fund, the TDM Other PI/WD Fund, and the TDM Disputed Claims Reserve, respectively, shall be based on, as of the Effective Date or the applicable Periodic Distribution Date, as set forth in sections 6.5 and 7.7 of this Plan: (i) PSAN PI/WD Claims against TDM in the aggregate amount of $1.3 billion, (ii) Allowed OEM Unsecured Claims against TDM, (iii) Allowed Other General Unsecured Claims against TDM, (iv) Allowed Other PI/WD Claims against TDM, and (v) an aggregate amount equal to the least of, with respect to each Disputed OEM Unsecured Claim, Disputed Other General Unsecured Claim, and Disputed Other PI/WD Claim against TDM, (w) the filed amount of such Disputed General Unsecured Claim, (x) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed General Unsecured Claim, and (y) such other amount as may be agreed upon by the holder of such Disputed General Unsecured Claim and the applicable Claims Administrator, with each of the foregoing clauses (i) – (v) as a percentage of the aggregate of clauses (i) – (v).  For the avoidance of doubt, the PSAN PI/WD Top-Up Amounts shall not be taken into consideration in determining the allocation of TDM Available Cash among the Recovery Funds in accordance with this paragraph; and

(d)       the percentage of TKH Available Cash to be allocated to each of the TKH PSAN PI/WD Fund, the TKH OEM Fund, the TKH Other Creditors Fund, the TKH Other PI/WD Fund, and the TKH Disputed Claims Reserve, respectively, shall be based on, as of the Effective Date or the applicable Periodic Distribution Date, as set forth in sections 6.5 and 7.7 of this Plan: (i) PSAN PI/WD Claims against the TKH Debtors in the aggregate amount of $1.3 billion, (ii) Allowed OEM Unsecured Claims against the TKH Debtors, (iii) Allowed Other General Unsecured Claims against the TKH Debtors, (iv) Allowed Other PI/WD Claims against the TKH Debtors, and (v) an aggregate amount equal to the least of, with respect to each Disputed OEM Unsecured Claim, Disputed Other General Unsecured Claim, and Disputed Other PI/WD Claim against the TKH Debtors, (w) the filed amount of such Disputed General Unsecured Claim, (x) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed General Unsecured Claim, and (y) such other amount as may be agreed upon by the holder of such Disputed General Unsecured Claim and the applicable Claims Administrator, with each of the foregoing clauses (i) – (v) as a percentage of the aggregate of clauses (i) – (v).  For the avoidance of doubt, the PSAN PI/WD Top-Up Amounts shall not be taken into consideration in determining the allocation of TKH Available Cash among the Recovery Funds in accordance with this paragraph.

WEIL:\96446450\6\76903.0004

### 6.3    Contributions Distribution Formula.

Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount shall be allocated between the PSAN PI/WD Funds, the Other PI/WD Funds, and the Disputed Contributions Reserve as follows:

(a)    the percentage of Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount to be allocated to each of the PSAN PI/WD Funds, the Other PI/WD Funds, and the Disputed Contributions Reserve, respectively, shall be based on, as of the Effective Date or the applicable Periodic Distribution Date, as set forth in sections 7.12of this Plan: (i) PSAN PI/WD Claims against the TKH Debtors in the aggregate amount of $1.3 billion, (ii) Allowed Other PI/WD Claims against the Debtors, and (iii) an aggregate amount equal to the least of, with respect to each Disputed Other PI/WD Claim against the Debtors, (w) the filed amount of such Disputed Other PI/WD Claim, (x) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Other PI/WD Claim, and (y) such other amount as may be agreed upon by the holder of such Disputed Other PI/WD Claim and the PSAN PI/WD Trustee, with each of the foregoing clauses (i) – (iii) as a percentage of the aggregate of clauses (i) – (iii); *provided*, *however*, that the aggregate amount of Other PI/WD Claims shall not exceed $10 million for purposes of the Contributions Distribution Formula.  In undertaking the foregoing allocation to the PSAN PI/WD Funds and the Other PI/WD Funds, the PSAN PI/WD Trustee shall perform such allocation separately for each of the TKH Debtors, IIM, SMX, and TDM based on the total amount of PSAN PI/WD Claims and Other PI/WD Claims asserted against such Debtors and in the PSAN PI/WD Trustee's discretion.

### 6.4    *Available Cash.*

Available Cash shall be used to fund (i) Distributions under the Plan to holders of Allowed General Unsecured Claims in each Class from the Recovery Funds on a Pro Rata Basis, and (ii) the Disputed Claims Reserves, all on the terms set forth herein.

### 6.5    *Initial Distribution of Available Cash.*

On the Initial Distribution Date, after the satisfaction in full (or the establishment of reserves sufficient for the satisfaction in full) of the Plan Settlement Payment, the Claims Reserves, the Legacy Entities Reserves, the Post-Closing Reserve, and the PSAN PI/WD Trust Reserve, the Disbursing Agent shall make an initial Distribution of the Available Cash in the Recovery Funds to holders of Allowed General Unsecured Claims against the Debtors in accordance with the provisions of this Plan.  After this initial Distribution, the applicable Claims Administrator shall make periodic Distributions of the Available Cash in the Recovery Funds to holders of Allowed General Unsecured Claims against the Debtors on the Periodic Distribution Dates.

### 6.6    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the

performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.7    *Disbursing Agent.*

All Distributions under the Plan by the Reorganized TK Holdings Trust or the PSAN PI/WD Trust shall be made by the Disbursing Agent (who may be the applicable Claims Administrator) on and after the Effective Date as provided herein.  The Disbursing Agent shall be deemed to hold all property to be distributed under this Plan in trust for the Persons entitled to receive the same.  The Disbursing Agent (other than the Plan Sponsor, to the extent the Plan Sponsor is appointed by the Special Master for the purpose of making distributions to the OEMs on account of the DOJ Restitution Claim) shall not hold an economic or beneficial interest in the property to be distributed under this Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 6.8    *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all Distributions contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise  comply with the terms of the Plan; *provided*, *however*, that the foregoing shall not affect the liability that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, intentional fraud, or criminal conduct of any such Person.

### 6.9    *Expenses of Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agents on or after the Effective Date shall be paid in Cash by the Reorganized TK Holdings Trust, except that fees and expenses incurred by the PSAN PI/WD Trustee shall be paid by the PSAN PI/WD Trust.

### 6.10    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address of such holder (i) as set forth on the Schedules filed with the Bankruptcy Court or (ii) on the books and records of the Debtors or their agents, as applicable, unless the Debtors or the applicable Claims Administrator has been notified in writing of a change of address, including, without limitation, by filing of a proof of Claim by such holder that

WEIL:\96446450\6\76903.0004

contains an address for such holder different than the address of such holder as set forth in the Schedules.

### 6.11    *Undeliverable and Unclaimed Distributions.*

In the event that any Distribution to any holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest; *provided*, *however*, that all Distributions under the Plan that are unclaimed for a period of six (6) months after the Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revest in either the Reorganized TK Holdings Trust or the PSAN PI/WD Trust, as applicable, and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred.

### 6.12    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the claims register shall be closed.  The applicable Claims Administrator shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of the close of business on the Distribution Record Date.

### 6.13    *Manner of Payment under Plan.*

At the option of the Disbursing Agent, any Cash payment to be made pursuant to the Plan may be made by a check or wire transfer or as otherwise required or provided in the Reorganized TK Holdings Trust Agreement.

### 6.14    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any Distributions of Cash less than $100, or such lower amount as determined by the Disbursing Agent, to any holder of an Allowed General Unsecured Claim; *provided*, *however*, that if any Distribution is not made pursuant to this section 6.14, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed General Unsecured Claims.  The Disbursing Agent shall not be required to make any final Distribution of Cash less than $25 to any holder of an Allowed General Unsecured Claim.  If the amount of any final Distribution to any holder of Allowed General Unsecured Claims would be $25 or less, then such Distribution shall be made available for distribution to all holders of Allowed General Unsecured Claims receiving final Distributions of at least $25, in accordance with the Distribution Formula.  Available Cash remaining in the Recovery Funds after all final Distributions to holders of Allowed General Unsecured Claims have been made in accordance with the Plan shall be distributed to the holders of Intercompany Interests in the applicable Debtor.

### 6.15    *Setoffs and Recoupment.*

Subject to sections 10.5 through 10.8 of the Plan, the applicable Claims Administrator may, but shall not be required to, setoff against or recoup from any Claim and from any payments to be made pursuant to the Plan in respect of such Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Claims Administrators of any such Claim it may have against such claimant.

### 6.16    *Distributions after Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### 6.17    *Interest and Penalties on Claims.*

Unless otherwise provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy law, no holder of a Claim shall be entitled to interest accruing on or after the Petition Date or penalties on any Claim.  Any such interest or penalty component of any such Claims, if Allowed, shall be paid only in accordance with section 726(b) of the Bankruptcy Code.

### 6.18    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim when combined with amounts received by such holders from other sources.

### 6.19    *Satisfaction of Claims.*

Unless otherwise provided herein, any Distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.20    *Withholding and Reporting Requirements.*

(a)    **Withholding Rights.**  In connection with the Plan, and all instruments or Interests issued in connection therewith and in consideration thereof, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld

126

property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  In the event any party issues any instrument or makes any non-Cash distribution pursuant to the Plan that is subject to withholding tax and such issuing or distributing party has not sold such withheld property to generate Cash to pay the withholding tax or paid the withholding tax using its own funds and retains such withheld property as described above, such issuing or distributing party has the right, but not the obligation, to not make a distribution until such holder has made arrangements reasonably satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    **Forms.**  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.  If such request is made by any Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors or Disbursing Agent and the holder fails to comply before the date that is three hundred sixty-five (365) calendar days after the request is made, the amount of such Distribution shall irrevocably revert to the Reorganized Debtors and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against the Reorganized Debtors or its property.

(c)    **Obligation.**  Notwithstanding the above, each holder of an Allowed Claim that is to receive a Distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution.

## ARTICLE VII    PROCEDURES FOR DISPUTED CLAIMS.

### 7.1    *Disputed Claims Reserves.*

From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the applicable Claims Administrator shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from the Available Cash an aggregate amount equal to the Pro Rata Share of each Distribution that would have been made to a holder of a Disputed Claim from the Recovery Funds in accordance with the Distribution Formula and allocate such amount to the applicable Disputed Claims Reserve in accordance with the Distribution Formula as if such Disputed Claim were an Allowed Claim against the Debtors in an amount equal to the least of (i) the filed amount of such Disputed Claim, (ii) the amount determined, to the extent permitted

127

by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the applicable Claims Administrator.

### 7.2    *Claim Objections.*

On or after the Effective Date, objections to Claims against the Debtors may be interposed and prosecuted only by the applicable Claims Administrator.  Except as otherwise provided in section 2.1 of the Plan with respect to Administrative Expense Claims, any objections to Claims shall be served on the respective Claim holder and filed with the Bankruptcy Court (i) on or before one hundred twenty (120) days following the later of (a) the Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) on such later date as may be fixed by the Bankruptcy Court; *provided*, *however*, that the foregoing time periods shall not apply to PSAN PI/WD Claims.

### 7.3    *No Distribution Pending Allowance.*

Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.4    *Estimation of Claims.*

The Debtors (before the Effective Date) or the applicable Claims Administrator (on or after the Effective Date) may, at any time, request that the Bankruptcy Court estimate, pursuant to section 502(c) of the Bankruptcy Code, any Disputed Claim that the Bankruptcy Court has jurisdiction to estimate in accordance with the Bankruptcy Code or other applicable law regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates a Disputed Claim, that estimated amount shall constitute either the Allowed amount of such Claim, the amount used to determine the Disputed Claims Reserve, or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the applicable Claims Administrator may elect to pursue any supplemental proceeding to object to any ultimate Distribution on account of such Claim.

### 7.5    *Distribution After Allowance.*

On the first Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim against a Debtor, the Disbursing Agent shall remit to the respective Recovery Fund, for Distribution to the holder of such Allowed Claim, the Available Cash retained in the applicable Disputed Claims Reserve in an amount equal to the amount that would have been distributed to the holder of such Claim from the Effective Date through and including the Distribution Date had such Claim been Allowed as of the Effective Date.  For the avoidance of doubt, the amount to be distributed pursuant to this section 7.5 shall be based on the

WEIL:\96446450\6\76903.0004

Distribution Formula as applied on the applicable Distribution Date and not the Distribution Formula as applied on the Effective Date.

### 7.6    *Resolution of Claims.*

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date, including the Confirmation Order, the Claims Administrators (on or after the Effective Date) shall have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date.  On and after the Effective Date, in accordance with the Plan, the Claims Administrators shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims against the Debtors and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, subject to the conditions and rights of the Claims Oversight Committee set forth in section 7.13 of the Plan.  If a Claims Administrator and a holder of a Disputed Claim are unable to reach a settlement on the Disputed Claim, such Disputed Claim shall be submitted to the Bankruptcy Court for resolution.  Absent the consent of the Tort Claimants' Committee and the Future Claims Representative from the Confirmation Date until the Effective Date and the PSAN PI/WD Trustee on or after the Effective Date, no settlements, Claim allowances, or other related actions that could or would materially reduce the funding for the PSAN PI/WD Trust may be undertaken other than from the Resolution Reserve.

### 7.7    *Periodic Distributions from the Disputed Claims Reserves.*

After the Initial Distribution Date, the applicable Claims Administrator shall make distributions on the Periodic Distribution Dates from the Disputed Claims Reserves to the Recovery Funds for holders of Allowed General Unsecured Claims against the Debtors as a result of resolving Disputed Claims and releasing Cash from the Disputed Claims Reserves into the Recovery Funds in accordance with the Distribution Formula, as re-applied at each Distribution Date.   The applicable Claims Administrator shall make Distributions on the Periodic Distribution Dates from the Recovery Funds to the holders of Allowed General Unsecured Claims against the Debtors in accordance with ARTICLE VI of this Plan.

### 7.8    *Distributions on the Non-PSAN PI/WD Claims Termination Date.*

On the Non-PSAN PI/WD Claims Termination Date, when all Disputed Claims (other than PSAN PI/WD Claims) are resolved and have either become Allowed or are Disallowed, a final Distribution of Available Cash in the Disputed Claims Reserves shall be deposited into the Recovery Funds pursuant to the then applicable Distribution Formula. Immediately thereafter, a final Distribution shall be made from the Recovery Funds to holders of Allowed Claims (other than PSAN PI/WD Claims) in accordance with ARTICLE VI of this Plan.

### 7.9    *Property Held in the Disputed Claims Reserves.*

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim shall have recourse only to the undistributed applicable Available Cash held in the Disputed Claims Reserves for satisfaction of the Distributions to which holders of Allowed Claims are entitled

129

under the Plan, and not against Reorganized Takata or the Legacy Entities, their property (including reserves), or any assets previously distributed on account of any Allowed Claim.

### 7.10    *Claims Resolution Procedures Cumulative.*

All of the objection, estimation, settlement, and resolution procedures set forth in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be established and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.11    *No Postpetition Interest.*

Unless otherwise specifically provided for in the Plan or Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Effective Date to the date a Distribution is made thereon on and after such Disputed Claim becomes an Allowed Claim.

### 7.12    *Disputed Contributions Reserve.*

From and after the Effective Date, and until such time as all Disputed Other PI/WD Claims have been compromised and settled or determined by a Final Order of the Bankruptcy Court, the PSAN PI/WD Trustee shall retain from the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount an aggregate amount equal to the Pro Rata Share of each contribution that would have been made to a holder of a Disputed Other PI/WD Claim from the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula and allocate such amount to the Disputed Contributions Reserve in accordance with the Contributions Distribution Formula as if such Disputed Other PI/WD Claim was an Allowed Other PI/WD Claim against the Debtors in an amount equal to the least of (i) the filed amount of such Disputed Other PI/WD Claim, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Other PI/WD Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Other PI/WD Claim and the PSAN PI/WD Trustee.  On the first Distribution Date following the date on which a Disputed Other PI/WD Claim becomes an Allowed Other PI/WD Claim against a Debtor, the PSAN PI/WD Trustee shall remit to the Other PI/WD Funds, for Distribution to the holder of such Allowed Other PI/WD Claim, the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount retained in the Disputed Contributions Reserve in an amount equal to the amount that would have been distributed to the holder of such Other PI/WD Claim from the Effective Date through and including the Distribution Date had such Other PI/WD Claim been Allowed as of the Effective Date.  For the avoidance of doubt, the amount to be contributed pursuant to this section 7.12 shall be based on the Contributions Distribution Formula as applied on the applicable Distribution Date and not the Contributions Distribution Formula as applied on the Effective Date.  After the Initial Distribution Date, the PSAN PI/WD Trustee shall make contributions on the Periodic Distribution Dates from the

WEIL:\96446450\6\76903.0004

Disputed Contributions Reserve to the Other PI/WD Funds and the PSAN PI/WD Funds for holders of Allowed Other PI/WD Claims and PSAN PI/WD Claims against the Debtors as a result of resolving Disputed Other PI/WD Claims and releasing Cash from the Disputed Contributions Reserve into the Other PI/WD Funds and the PSAN PI/WD Funds in accordance with the Contributions Distribution Formula, as re-applied at each Distribution Date.

### 7.13 *Claims Oversight Committee.*

Notwithstanding anything herein to the contrary, the Legacy Trustee shall notify the Claims Oversight Committee prior to settling, compromising, or allowing any Claim in a liquidated amount in excess of $1,000,000 for an Other General Unsecured Claim and $500,000 for a Priority Claim or a Secured Claim (including any such Claim originally scheduled or filed in an unliquidated amount).  The Claims Oversight Committee shall have a period of three (3) Business Days after receipt of such notice to review the proposed settlement or compromise and notify the Legacy Trustee of objections, if any, to the proposed settlement or compromise of such Claim.  Thereafter, the Claims Oversight Committee shall have ten (10) Business Days after providing notice to the Legacy Trustee, or such longer period of time as may be agreed, of any objections to file a motion with the Bankruptcy Court objecting to the proposed settlement or compromise of the Claim.  In the event the Claims Oversight Committee fails to timely file an objection with the Bankruptcy Court within the proscribed ten (10) Business Day period, the Legacy Trustee shall be authorized to enter into the settlement or compromise without further order of the Bankruptcy Court.  The combined compensation payable to the members of the Claims Oversight Committee and to the Legacy Trustee shall not exceed $240,000 per year.

## ARTICLE VIII    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1 *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtors are party shall be deemed assumed and assigned to the Plan Sponsor except for an executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is specifically designated on the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, which shall be filed and served on January 31, 2018 in accordance with the Solicitation Procedures Order, (iii) is being assumed, assumed and assigned, or otherwise assigned pursuant to section 8.4 of this Plan, (iv) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date, or (iv) is the subject of a pending Cure Dispute.  Notwithstanding anything to the contrary herein, the Debtors' rights to modify the treatment of any particular executory contract or unexpired lease pursuant to this Plan shall be (i) in all respects subject to the provisions of section 5.19(h) of the Plan and (ii) reasonably acceptable to the Plan Sponsor. Additionally, notwithstanding anything to the contrary in this ARTICLE VIII, all contracts described in clauses (i)(a), (i)(b), (i)(d), (ii), (iii), and (v) of the "Excluded Contracts" definition shall be rejected unless the Plan Sponsor otherwise instructs the Debtors in writing.

(b)     Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount, and the resolution of any Cure Dispute, the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections, assumptions, and assumptions and assignments provided for in the Solicitation Procedures Order and in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated or provided in a separate order of the Bankruptcy Court, rejections or assumptions or assumptions and assignments of executory contracts and unexpired leases pursuant to the Solicitation Procedures Order and this Plan are effective as of the Effective Date.  Each executory contract and unexpired lease assumed pursuant to this Plan or by order of the Bankruptcy Court but not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     Unless otherwise provided herein (including section 8.4 of this Plan) or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed or assumed and assigned shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the Schedule of Assumed Contracts.

(d)     Except as otherwise expressly set forth on the Cure Amount Notice, any contracts, engagement letters, retention agreements, and similar arrangements, in each case between the Debtors and any attorneys, accountants, financial advisors, investment bankers, or similar professionals, representatives, or advisors have not been included on the Cure Amount Notice and shall not be treated under the Plan as executory contracts subject to assumption, assumption and assignment, or rejection.  Counterparties to any such contracts, engagement letters, retention agreements, and similar arrangements were required to file proofs of claim by the General Bar Date (as defined in the Bar Date Order) and any Allowed Claims relating thereto shall be treated as Other General Unsecured Claims against the applicable Debtor.

**8.2     *Determination of Cure Disputes and Deemed Consent.***

(a)     The Debtors shall file and serve on all required parties, as directed in the Solicitation Procedures Order, the Cure Amount Notice no later than thirty (30) days prior to the Confirmation Hearing, which Cure Amount Notice shall be in form and substance reasonably acceptable to the Plan Sponsor.  If a counterparty to an executory contract or unexpired lease (excluding, for the avoidance of doubt, any OEM Assumed Contract) is not listed on such Cure Amount Notice, the proposed Claim Cure for such executory contract or unexpired lease shall be deemed to be zero dollars ($0); *provided*, *however*, that the foregoing shall not apply to those counterparties not listed on the Cure Amount Notice that otherwise file a proof of Claim with the Bankruptcy Court.

132

(b)      Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the Solicitation Procedures Order to object to the Cure Claims listed on the notice and to adequate assurance of future performance by the Plan Sponsor.

(c)      To the extent that a Cure Dispute is asserted in an objection filed in accordance with the Solicitation Procedures Order, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed effective as of the Effective Date; *provided*, *however*, subject to the terms of section 5.19(g) of the Plan, if any Claim subject to a Cure Dispute is Allowed in an amount greater than the Cure Amount for such Claim listed on the Cure Amount Notice, the Debtors reserve the right (and shall do so if directed by the Plan Sponsor with respect to any Purchased Contract) to reject such executory contract or unexpired lease for a period of seven (7) Business Days following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection with the Bankruptcy Court.

(d)      To the extent (i) any Cure Dispute with respect to a Purchased Contract has not been resolved prior to the Effective Date and (ii) (a) the aggregate amount of all Disputed Cure Claims with respect to the Purchased Contracts plus (b) the aggregate amount of all other Cure Claims paid by the Plan Sponsor on the Effective Date exceeds the Cure Claims Cap, the Debtors shall establish the Disputed Cure Claims Reserve.  Any amounts remaining in the Disputed Cure Claims Reserve after the resolution and payment, if applicable, of all Disputed Cure Claims with respect to the Purchased Contracts, shall be included in the Claims Reserve of the applicable Reorganized Debtor.  For the avoidance of doubt, the Plan Sponsor's obligation to pay Cure Claims in connection with assumption and assignment of the Purchased Contracts shall not exceed the Cure Claims Cap.  To the extent the total aggregate value of Cure Claims (including all Disputed Cure Claims) with respect to the Purchased Contracts exceeds the Cure Claims Cap, (i) the Plan Sponsor, in its sole discretion, shall determine the specific Cure Claims that it shall pay up to the Cure Claims Cap and (ii) the Debtors shall pay the excess of (x) the aggregate amount of such Cure Claims over (y) the Cure Claims Cap.

(e)      To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption of such contract or lease, notwithstanding any provision thereof that (a) prohibits, restricts, or conditions the transfer or assignment of such contract or lease, or (b) terminates or permits the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.

(f)      With respect to payment of any Cure Amounts or Cure Disputes, neither the Debtors, the Plan Sponsor, nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

WEIL:\96446450\6\76903.0004

**8.3**    ***Payments Related to Assumption of Contracts and Leases.***

(a)    Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or the Plan Sponsor (solely with respect to the Purchased Contracts and up to the Cure Claims Cap), as the case may be, upon assumption thereof.

(b)    Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment; *provided*, *however*, that nothing in this section 8.3(b) of the Plan or otherwise shall release the Plan Sponsor from any Assumed Liabilities as defined in the U.S. Acquisition Agreement.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Person.

**8.4**    ***OEM Contracts.***  Notwithstanding any other provision of this ARTICLE VIII:

(a)    Each Standalone OEM Assumed Contract shall be assumed by the applicable Debtor and assigned (and to the extent not executory, assigned) to the Plan Sponsor entity to which the applicable Consenting OEM consents (in its sole discretion), as of the Effective Date on an "as is" basis (and without giving effect to any accommodations provided pursuant to the Global Accommodation Agreement) without modification of any kind, including as to terms or price, other than (1) to substitute the Plan Sponsor entity to whom such Standalone OEM Assumed Contract is being assigned (with the consent of the applicable Consenting OEM, in its sole discretion) for the applicable Debtor and (2) for any Standalone OEM Assumed Contract of a Consenting OEM, incorporate the ROLR (as defined in the Indemnity Agreement) on the terms set forth in Section 10 of the Indemnity Agreement, to the extent such Standalone OEM Assumed Contract is not otherwise deemed amended in accordance with section 8.4(d) below.

(b)    All Standalone PSAN Assumed Contracts shall be assumed by Reorganized TK Holdings or its applicable subsidiary (and to the extent not executory, assigned to Reorganized TK Holdings or its applicable subsidiary) as of the Effective Date on an "as is" basis (and without giving effect to any accommodations provided pursuant to the Global Accommodation Agreement) without modification of any kind, including as to terms or price, other than to (i) substitute Reorganized TK Holdings (or its applicable subsidiary) for the applicable Debtor and (ii) account for pricing adjustments consistent with the Reorganized Takata Business Model on a cost basis.

(c)    Each Non-Standalone OEM Contract shall be automatically severed on the Effective Date (to the extent such severance has not occurred prior to the Effective Date) so as to create a Modified Assumed OEM Contract and, in the case of a Non-

134

Standalone OEM Contract of a PSAN Consenting OEM, Consenting OEM PSAN Contract Manufacturer, or Consenting OEM PSAN Tier One, severed so as to create a Modified Assumed OEM Contract and either a Modified Assumed PSAN Contract or a standalone contract for the sale of PSAN Inflators that shall be rejected in accordance with the below, as applicable.  Each such severed Non-Standalone OEM Contract shall be:  (i) as it relates to a Modified Assumed OEM Contract, assumed by the applicable Debtor and assigned (and to the extent not executory, assigned) to the Plan Sponsor entity to which the applicable Consenting OEM consents (in its sole discretion), "as is" (and without giving effect to any accommodations provided by the Global Accommodation Agreement), without modification of any kind, including as to terms or price, other than (A) as necessary to separate the manufacture and sale of the PSAN Inflators and release the Plan Sponsor (including the Acquired Non-Debtor Affiliates) from all Liabilities (as defined in the Indemnity Agreement) and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement (and such released obligations shall be (I) in the case of a Modified Assumed PSAN Contract, transferred to, and the severed portion of the contract related to such manufacture, sale, Liabilities (as defined in the Indemnity Agreement), and obligations novated to and assumed by, Reorganized TK Holdings (or its applicable subsidiary) as a Modified Assumed PSAN Contract; or (II) in all other cases, rejected as of the Effective Date), (B) to account for pricing adjustments for the PSAN Inflator production not being assumed by the Plan Sponsor, where such adjustments are to be resolved between the applicable Consenting OEM and the Plan Sponsor pursuant to normal commercial dealings, (C) to substitute the Plan Sponsor entity to whom the Modified Assumed OEM Contract is assigned (with the consent of the applicable Consenting OEM, in its sole discretion) for the applicable Debtor, and (D) for a Non-Standalone OEM Contract of a Consenting OEM, to incorporate the ROLR (as defined in the Indemnity Agreement) on the terms set forth in Section 10 of the Indemnity Agreement to the extent such Consenting OEM's Non-Standalone OEM Contract is not otherwise deemed amended in accordance with section 8.4 of the Plan; and (ii) as it relates to a Modified Assumed PSAN Contract, assumed by Reorganized TK Holdings or its applicable subsidiary (and to the extent not executory, assigned to Reorganized TK Holdings or its applicable subsidiary) "as is" (and without giving effect to any accommodations provided pursuant to the Global Accommodation Agreement) without modification of any kind, including as to terms or price, other than (A) as necessary to separate the manufacture and sale of the PSAN Inflators and release Reorganized Takata from all Liabilities (as defined in the Indemnity Agreement),and obligations thereunder unrelated to PSAN Inflators, and such released obligations shall be transferred to, and the severed portion of the contract related to such manufacture, sale, Liabilities (as defined in the Indemnity Agreement), and obligations novated to and assumed by, the Plan Sponsor entity to whom the Modified Assumed OEM Contract is assigned (with the consent of the applicable Consenting OEM, in its sole discretion) as a Modified Assumed OEM Contract, (B) to account for pricing adjustments consistent with the Reorganized Takata Business Model on a cost basis, and (C) to substitute Reorganized TK Holdings (or its applicable subsidiary) for the applicable Debtor.

(d)     This Plan shall constitute an amendment to the applicable OEM Assumed Contracts and Assumed PSAN Contracts to incorporate the provisions set forth herein, including, in the case of OEM Assumed Contracts, the ROLR on the terms set forth in Section 10 of the Indemnity Agreement, and no additional amendments to such contracts shall be necessary to effectuate any of the provisions hereof.

WEIL:\96446450\6\76903.0004

(e)     Notwithstanding the foregoing, in respect of any Non-Standalone OEM Contracts where a Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One is the counterparty, (i) the applicable Consenting OEM and Plan Sponsor will work cooperatively to cause the Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One to modify its Non-Standalone OEM Contracts consistent with this section 8.4 and the Plan shall not constitute a deemed amendment to such Non-Standalone OEM Contracts, and (ii) Plan Sponsor shall have no obligation to assume any Non-Standalone OEM Contract where a Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One is the counterparty unless (A) such counterparty modifies its Non-Standalone OEM Contract consistent with this section 8.4 and (B) either (x) such counterparty grants a release consistent with Sections 8.a, 8.b, and 8.e of the Indemnity Agreement and agrees to the contractual subordination terms set forth in the penultimate paragraph of Section 5 of the Indemnity Agreement or (y) the applicable Consenting OEM is required to, or agrees to, indemnify and hold harmless Joyson KSS Auto Safety S.A. pursuant to Section 6 of the Indemnity Agreement with respect to any related PSAN Claims (as defined in the Indemnity Agreement) asserted by such counterparty in respect of such Non-Standalone OEM Contract (to the extent such Claim relates to the applicable OEM's vehicles), it being understood that any Non-Standalone OEM Contract that Plan Sponsor does not assume as permitted by this section 8.4 shall not constitute an OEM Assumed Contract for any purposes hereunder and, notwithstanding anything to the contrary set forth in this Plan, neither Plan Sponsor nor any Acquired Non-Debtor Affiliate shall have any obligation under this Plan with respect to any such counterparty with respect to the applicable Non-Standalone OEM Contract.

(f)     Except as otherwise agreed to between the Plan Sponsor and the Consenting OEMs, the Plan Sponsor shall assume all Assumed Liabilities (as defined in the Indemnity Agreement) in accordance with Section 4.b of the Indemnity Agreement.

(g)     Subject to approval of the Plan Settlement by the Bankruptcy Court, the Consenting OEM PSAN Cure Claims shall be deemed fully and finally satisfied upon consummation of the Plan Settlement in accordance with section 5.19 of the Plan.

(h)     Notwithstanding anything herein to the contrary, any Cure Claims of Consenting OEMs, other than Consenting OEM PSAN Cure Claims, shall be assumed by the Plan Sponsor and paid to the respective Consenting OEM in the ordinary course of business. The Debtors shall have no obligations with respect to such Cure Claims, and such Cure Claims shall not be counted for determining the Disputed Cure Claims Reserve or included in or limited by the Cure Claims Cap.  Such Cure Claims shall not be subject to any Cure Claim procedures set forth in this Plan or the Solicitation Procedures Order.  Further, nothing in this Plan shall be deemed a waiver of such Cure Claims by the Consenting OEMs nor affect the assumption and assignment of the OEM Assumed Contracts on an "as is" basis as provided above.

(i)     All Purchase Orders and other executory contracts and unexpired leases between any Debtor and any OEM that purchased PSAN Inflators from the Debtors that is not a Consenting OEM shall be deemed rejected as of the Effective Date, to the extent not rejected prior to the Effective Date.  For the avoidance of doubt, any Purchase Orders between any Debtor and any OEM relating solely to PSAN Inflators not assumed or assumed and

136

assigned pursuant to this section 8.4 shall be deemed rejected as of the Effective Date, to the extent not rejected prior to the Effective Date.

### 8.5    *Rejection Claims.*

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors herein results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective Estates, properties or interests in property, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the later of (i) the Confirmation Date and (ii) the effective date of the rejection of such executory contract or unexpired lease.  Subject to section 5.19(g) of the Plan, any such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured Claims.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts that are rejected as of the Effective Date.

### 8.6    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements to indemnify current officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by this Plan; *provided*, *however*, that the Reorganized Debtors shall not indemnify any Person (i) for any Claims or Causes of Action arising out of or relating to any act or omission that is found by a Final Order of a court to constitute a criminal act or fraud, gross negligence, breach of fiduciary duty, or willful misconduct, including, in each case, in relation to the manufacture and sale of PSAN Inflators and (ii) that is a named defendant in any proceeding brought by the DOJ.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.7    *Compensation and Benefit Plans.*

Except with respect to any benefit plans, policies, or programs (i) for which the Debtors have received approval of the Bankruptcy Court to reject or terminate on or before the Effective Date, (ii) that are rejected or terminated pursuant to the Plan, (iii) that are subject to a pending motion to reject or terminate as of the Confirmation Hearing, or (iv) that are listed on the Schedule of Rejected Contracts, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to their respective employees, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and bonus plans (including, for the avoidance of doubt, any letter agreements with the PSAN Employees (as defined in the U.S. Acquisition Agreement) relating to the Key Employee Bonus Plan), and life and accidental

137

death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, shall be assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code; *provided, however*, that the Debtors shall not assume any obligations owed to Transferred Employees under the following benefit plans: the letter agreements relating to the Key Employee Bonus Plan, the TK Holdings Inc. Supplemental Management Retirement Plan, and the TK Holdings Inc. Executive Retirement Plan.

Pursuant to the U.S. Acquisition Agreement, the Plan Sponsor shall assume the letter agreements with the Transferred Employees relating to the Key Employee Bonus Plan and any obligations owed to the Transferred Employees under that certain TK Holdings Inc. Supplemental Management Retirement Plan and that certain TK Holdings Inc. Executive Retirement Plan.

Any employment and severance policies; compensation and benefit plans, policies, and programs; or life and accidental death and dismemberment insurance plans relating or provided to a former employee of the Debtors who is retired as of the Effective Date shall be rejected with respect to such former employee except to the extent prohibited by section 1114 of the Bankruptcy Code.

## 8.8    *Insurance Policies.*

On or prior to the Effective Date, the Debtors may fund an upfront premium payment to purchase "tail insurance" to continue the Debtors' existing directors' and officers' insurance subject to the reasonable consent of the Requisite Consenting OEMs.  All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts, shall be assumed by the applicable Debtor, and shall vest in the Reorganized Debtors (other than the PI/WD Insurance Policies) and continue in full force and effect thereafter in accordance with their respective terms.

## 8.9    *Reservation of Rights.*

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired lease.

(c)    Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease, including the PI/WD Insurance Policies.

138

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, subject to section 5.19(g) of the Plan.

**ARTICLE IX        CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE.**

**9.1      *Conditions Precedent to Confirmation.***

Confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied:

(a)      the Debtors, the Consenting OEMs, and the Plan Sponsor, as applicable, shall have approved of or accepted the Confirmation Order in accordance with their respective consent rights under the U.S. RSA, as incorporated by reference in section 1.4 of this Plan;

(b)      the Confirmation Order shall include a finding by the Bankruptcy Court that the Purchased Assets shall be purchased by and vested in the Plan Sponsor free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind, including rights or claims based on any successor or transferee liabilities other than Assumed Liabilities and Permitted Liens;

(c)      the U.S. RSA shall not have been terminated by the Debtors, the Plan Sponsor, or the Requisite Consenting OEMs (as defined in the U.S. RSA) and shall be in full force and effect with respect to such parties;

(d)      the Plan and the Plan Supplement, including any schedules, documents, supplements and exhibits thereto, shall (i) be in form and substance reasonably acceptable to the Debtors, the Consenting OEMs, and the Plan Sponsor, (ii) consistent in all material respects with the U.S. RSA, and (iii) consistent with the other provisions of this Plan; and

(e)      the Plan and the Confirmation Order shall not be inconsistent with the TCC/FCR Term Sheet or the UCC Term Sheet.

**9.2      *Conditions Precedent to the Effective Date.***

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)      entry of the Confirmation Order by the Bankruptcy Court and such Confirmation Order has not been stayed, modified, or vacated on appeal;

(b)        the U.S. RSA shall not have been terminated by the Debtors, the Plan Sponsor, or the Requisite Consenting OEMs (as defined in the U.S. RSA), and shall be in full force and effect with respect to such parties;

(c)        the Debtors, the Consenting OEMs, and the Plan Sponsor, as applicable, shall have approved of or accepted the Definitive Documentation (as defined in the U.S. RSA) in accordance with their respective consent rights under the U.S. RSA, as incorporated by reference in section 1.4 of this Plan;

(d)        all conditions precedent to the consummation of the U.S. Acquisition Agreement (other than effectiveness of the Plan) have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms thereof, and the U.S. Acquisition Agreement is in full force and effect and is binding on all parties thereto;

(e)        all conditions precedent to the consummation of any purchase agreement between non-Debtor affiliates of the Debtors and the Plan Sponsor (other than effectiveness of the Plan) have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms thereof, and any such purchase agreement is in full force and effect and is binding on all parties thereto;

(f)        the Closing Date shall have occurred (or shall occur simultaneously with the occurrence of the Effective Date);

(g)        receipt by the Consenting OEMs, or an account or accounts designated by the Consenting OEMs, of the Consenting OEMs' aggregate allocable share of the $850 million restitution fund under the DOJ Restitution Order (in the Chapter 11 Cases and the Japan Proceedings, free and clear of all Claims, Interests, Liens, other encumbrances, and liabilities of any kind) to be allocated among the Consenting OEMs in accordance with the Agreed Allocation;

(h)        execution of the Reorganized TK Holdings Trust Agreement;

(i)        the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP shall become effective in accordance with the terms of this Plan (except with respect to any provisions of the PSAN PI/WD Trust Agreement or PSAN PI/WD TDP that are expressly conditioned upon effectiveness of the Channeling Injunction);

(j)        the Legacy Entities Reserves shall be fully funded;

(k)        the PSAN PI/WD Trust has been established and funded in accordance with the Plan;

(l)        the Transition Services Agreement (i) shall have been executed and delivered to the Plan Sponsor by Reorganized TK Holdings, TK Global LLC, and the Warehousing Entity and (ii) shall be in full force and effect, and all conditions precedent to the effectiveness of the Transition Services Agreement shall have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms thereof;

140

(m)    the Indemnity Agreement (i) shall have been executed and delivered to the Plan Sponsor by each of the Consenting OEMs, (ii) shall be in full force and effect, and (iii) all conditions precedent to the effectiveness of the Indemnity Agreement shall have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms thereof;

(n)    the Global Accommodation Agreement and the Access Agreement shall have been terminated;

(o)    the Consenting OEMs shall have released all Liens granted under the Access Agreement and the Adequate Protection Order;

(p)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, ruling, or documents that are necessary to implement and effectuate the Plan (except for approval of the Channeling Injunction by the District Court in accordance with section 10.7(f) of the Plan);

(q)    all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed;

(r)    all professional fees and expenses approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in a professional fee escrow pending approval by the Bankruptcy Court;

(s)    the Restructuring Expenses shall have been paid in accordance with section 12.6 of the Plan;

(t)    the closing of the transactions contemplated by all purchase agreements between non-Debtor affiliates of the Debtors and the Plan Sponsor shall have occurred or shall occur contemporaneously with the effectiveness of this Plan;

(u)    a Canadian court of competent jurisdiction shall have entered a Final Order recognizing the Confirmation Order entered by the Bankruptcy Court; and

(v)    (i) the Civil Rehabilitation Court shall have entered an order approving the sale of the assets (other than specified excluded assets) of the Japan Debtors pursuant to a business transfer under Section 42 of the Japan Civil Rehabilitation Act, which shall remain in full force and effect and (ii) all conditions precedent to the effectiveness of the business transfer described in the preceding clause shall have been satisfied or waived by the party or parties entitled to waive them in accordance with the terms thereof.

### 9.3    *Waiver of Conditions Precedent.*

(a)    Each of the conditions precedent to confirmation of the Plan and the occurrence of the Effective Date may be waived subject to the written consent, which shall not be unreasonably withheld, of the Debtors, the Plan Sponsor, the Consenting OEMs, and solely with respect to section 9.1(e), the Creditors' Committee, the Tort Claimants' Committee,

and the Future Claims Representative.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine.  If this Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

      (b)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

## ARTICLE X          EFFECT OF CONFIRMATION

### 10.1    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under this Plan and whether such holder has accepted this Plan.

### 10.2    *Discharge of Claims against and Interests in the Reorganized Debtors.*

Upon the Effective Date and in consideration of the Distributions to be made under this Plan, except as otherwise provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by  section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in this Plan, upon the Effective Date, all such holders of Claims and Interests and their successors, assigns, and affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

### 10.3    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

WEIL:\96446450\6\76903.0004

### 10.4    *Injunction against Interference with Plan.*

Upon entry of the Confirmation Order, all holders of Claims and Interests shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided*, *however*, that the foregoing shall not enjoin any party to the U.S. RSA, the Definitive Documentation (as defined in the U.S. RSA), or the Global Documentation (as defined in the U.S. RSA) from exercising any of its rights or remedies under such agreements, as applicable, in each case in accordance with the terms thereof.

### 10.5    *Plan Injunction.*

(a)    **Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, to the maximum extent permitted under applicable law, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Parties mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Parties mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided*, *however*, that nothing contained herein shall preclude such Parties who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan and the Plan Documents.**

(b)    **Except as expressly permitted by the U.S. Acquisition Agreement and except as to Assumed Liabilities and Permitted Liens, all Persons, including all debt security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants, and other creditors, holding Claims, Liens, Interests, charges, encumbrances, and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in a Debtor or the Purchased Assets (whether legal or equitable,**

143

secured or unsecured, matured or unmatured, contingent or noncontingent, known or unknown), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Purchased Assets prior to the Effective Date, or the Restructuring Transactions, are forever barred, estopped and permanently enjoined from asserting against the Plan Sponsor Parties, their respective successors and assigns, their property or the Purchased Assets, such Person's Claims, Liens, Interests, charges, encumbrances, and other interests (including rights or Claims based on any successor or transferee liability), including, without limitation, by: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Plan Sponsor Party or the property of any Plan Sponsor Party, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Plan Sponsor Party or its property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing any encumbrance of any kind or asserting any Released Claims in any manner, directly or indirectly, against a Plan Sponsor Party or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan.

(c)     By accepting Distributions pursuant to this Plan, each holder of an Allowed Claim or Allowed Interest shall be bound by this Plan, including the injunctions set forth in this section 10.5.

10.6    *__Releases.__*

(a)    **Releases by the Debtors.**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and the obligations contemplated by the Restructuring Transactions, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action,

144

Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates (including, any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their non-Debtor affiliates (including the Acquired Non-Debtor Affiliates), or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the U.S. Acquisition Agreement, the Global Accommodation Agreement, the U.S. RSA, and the Plan and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.  The Reorganized Debtors and any newly-formed entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth in this section 10.6(a).

(b)    **Releases by Holders of Claims and Interests.**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order and the obligations contemplated by the Restructuring Transactions, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, except as otherwise provided herein, by (i) the holders of all Claims, other than the Consenting OEMs, who vote to accept the Plan, (ii) the holders of all Claims, other than the Consenting OEMs, that are Unimpaired under the Plan, (iii) the holders of all Claims, other than the Consenting OEMs, whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) the holders of all Claims, other than the

Consenting OEMs, or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (v) the holders of all Claims, other than the Consenting OEMs, and Interests who were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (vi) all other holders of Claims, other than the Consenting OEMs, and Interests to the maximum extent permitted by law, in each case from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates (including any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their non-Debtor affiliates (including the Acquired Non-Debtor Affiliates), the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the U.S. Acquisition Agreement, the Global Accommodation Agreement, the U.S. RSA, and the Plan and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes fraud, gross negligence or willful misconduct.  For the avoidance of doubt, no OEM shall receive a release from holders of Claims and Interests pursuant to this section 10.6(b), and the failure of any holder of a PSAN PI/WD Claim to opt out of granting the releases set forth in 10.6(b) of the Plan and the confirmation of the Plan shall not waive any such holder's right, if any, to participate in the DOJ PI/WD Restitution Fund.

(c)      **Releases by Holders of PSAN PI/WD Claims.**

        As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, to the maximum extent permitted under applicable law, the holders of PSAN PI/WD Claims shall be deemed to provide a full and complete discharge and release to the Protected Parties and their respective property and

146

successors and assigns from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such holders' PSAN PI/WD Claims. Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall release any OEM that is not a Participating OEM from liability for a PSAN PI/WD Claim.

        (d)      **Adequate Protection Order and Plan Settlement Releases.**

        Nothing in this Plan shall limit, modify, or affect in any way the releases granted under paragraph 4(g) of the Adequate Protection Order or section 5.19(i) of the Plan, and such releases shall remain in full force and effect through and after the Effective Date (in the case of releases under paragraph 4(g) of the Adequate Protection Order), and shall be in full force and effect from and after the Effective Date (in the case of releases under section 5.19(i) of the Plan).

        (e)      **Intercompany Claims/TKJP 503(b)(9) Claim**.

        Notwithstanding sections 10.6(a) and 10.6(b) of the Plan, the Claims of the Debtors against their Non-Debtor Affiliates and the Claims of the Non-Debtor Affiliates against the Debtors (including the TKJP 503(b)(9) Claim) shall not be released pursuant to such sections.  For the avoidance of doubt, the treatment of Intercompany Claims under this Plan shall apply only to Intercompany Claims that would not otherwise be acquired by the Plan Sponsor pursuant to the Final Joint Proposal (as defined in the U.S. Acquisition Agreement) as set forth in section 7.17 of the U.S. Acquisition Agreement.

        10.7      ***Channeling Injunction.***

        In order to supplement the injunctive effect of the Plan Injunction and the Releases set forth in sections 10.5 and 10.6 of the Plan for PSAN PI/WD Claims, the Confirmation Order shall provide for the following permanent injunction to take effect as of the Effective Date:

        (a)      **Terms.**  In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the Plan Injunction and the Releases described in sections 10.5 and 10.6 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and District Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, or that hold or assert any PSAN PI/WD Claim against the Protected Parties, or any of them, shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any such Protected Party with respect to any such PSAN PI/WD Claims, including:

        (i)      commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any

147

such PSAN PI/WD Claim, against or affecting any of the Protected Parties, or any property or interests in property of any Protected Party with respect to any such PSAN PI/WD Claim;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any of the Protected Parties or against the property of any Protected Party with respect to any such PSAN PI/WD Claim;

(iii)    creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any such PSAN PI/WD Claims;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Protected Party or against the property of any Protected Party with respect to any such PSAN PI/WD Claim; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to such PSAN PI/WD Claims.

(b)    Reservations.  Notwithstanding anything to the contrary in section 10.7 of the Plan, this Channeling Injunction shall not enjoin:

(i)    the rights of Entities to the treatment afforded them under the Plan, including the rights of Entities holding PSAN PI/WD Claims to assert such Claims in accordance with the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP solely against the PSAN PI/WD Trust whether or not there are funds to pay such PSAN PI/WD Claims;

(ii)    the rights of Entities to assert any Claim, debt, litigation, or liability for payment of PSAN PI/WD Trust Expenses solely against the PSAN PI/WD Trust whether or not there are funds to pay such PSAN PI/WD Trust Expenses; and

WEIL:\96446450\6\76903.0004

> (iii)    **the PSAN PI/WD Trust from enforcing its rights under the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.**

(c)    **Modifications**.  There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

(d)    **Non-Limitation Channeling Injunction**.  Nothing in the Plan or the PSAN PI/WD Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the PSAN PI/WD Trust's assumption of all liability with respect to PSAN PI/WD Claims.

(e)    **Bankruptcy Rule 3016 Compliance**.  The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

(f)    **Approval of Channeling Injunction and Related Releases**.  The Debtors shall seek an order by the District Court approving the Channeling Injunction and Releases by Holders of PSAN PI/WD Claims for the benefit of Participating OEMs and the Plan Sponsor as set forth in section 10.6(c) of this Plan; *provided*, *however*, that the requirement for District Court approval may be waived by the Debtors and (i) the Participating OEMs as it relates to the Channeling Injunction and Releases by Holders of PSAN PI/WD Claims for the benefit of the Participating OEMs or (ii) the Plan Sponsor as it relates to the Channeling Injunction and Releases by Holders of PSAN PI/WD Claims for the benefit of the Plan Sponsor. In addition, the effectiveness of the Channeling Injunction and Releases by holders of PSAN PI/WD Claims for the benefit of a Participating OEM shall be subject to (x) the consent of the Future Claims Representative and (y) the Bankruptcy Court or the District Court (as applicable) having determined that holders of PSAN PI/WD Claims in each applicable Class voting on the Plan in accordance with ARTICLE IV hereof have indicated their acceptance of the Channeling Injunction in a sufficient number within each such Class to support issuance of the Channeling Injunction for the benefit of the applicable Participating OEM.  For the avoidance of doubt, the effectiveness of the Channeling Injunction and Releases by Holders of PSAN PI/WD Claims for the benefit of any Protected Party is not a condition to the Effective Date.  In the event the Channeling Injunction and related provisions with respect to any Protected Party have not received requisite court approval as of the Effective Date, the Channeling Injunction and such related provisions set forth in the Plan shall be of no force and effect solely with respect to such Protected Party unless and until requisite court approval is obtained.  The notice of the occurrence of the Effective Date shall indicate whether and to what extent the Channeling Injunction is in effect as of the date thereof.

(g)    **No Duplicative Recovery.**  In no event will any holder of a PSAN PI/WD Claim against a Participating OEM be entitled to receive any duplicative payment, reimbursement or restitution from a Participating OEM under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the PSAN PI/WD Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the PSAN PI/WD Claim.

### 10.8 *Exculpation.*

**To the maximum extent permitted by applicable law, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, the Confirmation Order, and obligations contemplated by the Restructuring Transactions, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any Claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Disclosure Statement (including any information provided or statements made in the Disclosure Statement or omitted therefrom), the Restructuring Transactions, the Global Accommodation Agreement, the U.S. RSA, the Plan, and the solicitation of votes for, and confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan and the property to be distributed under the Plan; the wind-down of the Reorganized Debtors and Reorganized Takata; the issuance of securities under or in connection with the Plan; and the transactions in furtherance of any of the foregoing; except for breach of fiduciary duty, fraud, gross negligence, willful misconduct, failure to comply with the Confirmation Order and failure to distribute assets according to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

### 10.9 *Injunction Related to Releases and Exculpation.*

To the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, without limitation, the Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan and the Claims, Liens, Interests, charges, encumbrances, and other interests described in section 5.2(c) of this Plan.

### 10.10 *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11 *Avoidance Actions.*

All Avoidance Actions that relate to the continued operation of the Business (as defined in the U.S. Acquisition Agreement), Reorganized Takata, or the Warehousing Entity,

150

including with respect to ongoing trade vendors, suppliers, licensors, manufacturers, strategic or other business partners, customers, employees, or counterparties to all Purchased Contracts to be acquired by the Plan Sponsor, assumed by Reorganized Takata, or assumed and assigned to the Warehousing Entity shall be waived and released on the Effective Date.  The Reorganized TK Holdings Trust shall have the right to prosecute any and all Avoidance Actions that are not acquired by the Plan Sponsor or waived pursuant to this section 10.11.  Any Avoidance Actions retained by the Reorganized TK Holdings Trust shall be identified on a schedule to be filed as part of the Plan Supplement.

### 10.12    *Retention of Causes of Action and Reservation of Rights.*

Except as expressly provided in section 10.11 of this Plan, and subject to sections 5.19, 10.5, 10.6, 10.7, and 10.8 of this Plan, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action (including Avoidance Actions), rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  Subject to sections 5.19, 10.5, 10.6, 10.7, and 10.8 of this Plan, the Reorganized TK Holdings Trust shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action (including Avoidance Actions), rights of setoff, or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of an Unimpaired Claim may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  For the avoidance of doubt, no rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses of the Debtors against the Consenting OEMs are preserved under this Plan, and all such rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses of the Debtors against the Consenting OEMs are being released pursuant to section 5.19(j) of the Plan.

### 10.13    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Person based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of the Chapter 11 Cases; (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (iv) the Restructuring Transactions.

### 10.14    *No Successor Liability.*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or the U.S. Acquisition Agreement, each of the Plan Sponsor Parties (i) is not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or the assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the

151

knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character; *provided*, *however*, that the Plan Sponsor shall timely perform and discharge the obligations specified in the U.S. Acquisition Agreement, including the Assumed Liabilities.

### 10.15 *Special Provisions for Governmental Units.*

(a)    Notwithstanding anything to the contrary herein, nothing in this Plan shall release, bar, or discharge any liability of any OEM to any governmental unit, including any Claim by any state attorney general or similar governmental unit enforcing consumer protection laws or any other statutory or common law or principles of equity for any Claim against any OEM, whenever arising, and nothing in this Plan shall stay or enjoin any state attorney general or similar governmental unit from enforcing consumer protection laws or any statutory or common law or principles of equity for any Claim, whenever arising, against an OEM.  Further, notwithstanding any provision of this Plan, OEMs are not relieved from any obligations to address or comply with requests or inquiries from any state attorney general or similar governmental unit enforcing consumer protection laws.  Nothing in the Plan shall be a waiver or other limitation of any OEM's rights, Claims, and defenses with respect to any Claims or other Causes of Action by a governmental unit.

(b)    Notwithstanding anything to the contrary herein, nothing in the Plan or the Plan Documents:

(i)    (a) with respect to any Entity other than the Plan Sponsor and its affiliates, which shall be dealt with in (i)(b): discharges, releases, precludes, or enjoins (1) any liability to any Governmental Unit that is not a "claim" as defined in 11 U.S.C. § 101(5); (2) except as otherwise agreed to by a Governmental Unit, any claim of a Governmental Unit arising on or after the Effective Date; (3) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Effective Date; (4) any liability to a Governmental Unit on the part of any Entity other than the Debtors or Reorganized Debtors (including but not limited to any OEM or any warehouse owner or landlord).  Nor shall anything in this Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of the Bankruptcy Court, any liability described in the preceding sentence; *provided*, *however*, that all parties' rights and defenses under non-bankruptcy law with respect to (1)-(4) above are fully preserved; and (b) with respect to the Plan Sponsor and its affiliates: discharges, releases, precludes, or enjoins any (1) liability of the Plan Sponsor and its affiliates to a Governmental Unit under environmental statutes or regulations that the Plan Sponsor and its affiliates would be subject to as the

152

owner or operator of property after the Effective Date or (2) obligation by the Plan Sponsor and its affiliates to comply with any police and regulatory statutes or regulations that the Plan Sponsor and its affiliates would be subject to as the owner or operator of property after the Effective Date. Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of the Bankruptcy Court, any liability described in the preceding sentence; *provided, however*, that all parties' rights and defenses under non-bankruptcy law are fully preserved;

(ii)    authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law;

(iii)    affects any valid setoff or recoupment rights of any Governmental Unit against any of the Debtors or the Reorganized Debtors; *provided, however*, that the Debtors, the Reorganized Debtors, and the Plan Sponsor reserve all of their rights and defenses under applicable nonbankruptcy law with respect thereto;

(iv)    divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret the Plan or to adjudicate any defense asserted under the Plan; *provided, however*, that the Bankruptcy Court retains jurisdiction as set forth in and pursuant to the terms of the Plan, including jurisdiction, but not exclusive jurisdiction, to determine whether liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order, the Plan, or the Bankruptcy Code;

(v)    shall be construed to deprive the Plan Sponsor of the benefits of the Confirmation Order and sections 5.2(c) and 10.14 of the Plan; *provided, however*, that such provisions shall not be construed to override (b)(i)(b) above; and

(vi)    shall be interpreted to deem Plan Sponsor, Reorganized Takata, or the Warehousing Entity the successor to the Debtors under any state or federal law successor liability doctrine with respect to any liabilities under police or regulatory statutes, laws, or regulations, except solely with respect to Reorganized TK Holdings as set forth in section

153

5.8(m) of the Plan, for penalties for days of violation prior to the Effective Date or for liabilities relating to off-site disposal of wastes by the Debtors prior to the Effective Date, or be construed as a waiver by any party, including the Plan Sponsor, of any applicable rights or defenses under non-bankruptcy law or be construed to create for any Governmental Unit any substantive right that does not already exist under law.  For the avoidance of doubt, nothing in paragraph (b)(i)(a) applies to the Plan Sponsor or its affiliates.

## ARTICLE XI        RETENTION OF JURISDICTION

### 11.1    *Retention of Jurisdiction.*

(a)    Except for matters arising from or related to the costs and fees of the Special Master (including the Special Master Retainer), which shall be subject to the exclusive jurisdiction of the United States District Court for the Eastern District of Michigan, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)    to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(ii)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(iii)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(iv)    to ensure that Distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(v)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

154

(vi)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(vii)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(viii)   to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(ix)     to hear and determine all Fee Claims;

(x)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(xi)     to hear and resolve disputes related to the Insurance Rights Transfer or the PI/WD Insurance Rights, to the extent permitted under applicable law;

(xii)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(xiii)   to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release, exculpation, or injunction provisions, including the Channeling Injunction, set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(xiv)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

     (xv)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

     (xvi)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

     (xvii)    to recover all Assets of the Debtors and property of the Estates, wherever located;

     (xviii)    to hear and determine all matters relating to the UCC Term Sheet, including the funding, administration of, and distributions from, the Support Party Creditor Fund, and TCC/FCR Term Sheet; and

     (xix)    to enter a final decree closing each of the Chapter 11 Cases.

     (b)    The Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan to, among other things, hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this ARTICLE XI shall be deemed to be replaced by the "District Court." Notwithstanding anything in this ARTICLE XI to the contrary, the resolution of PSAN PI/WD Claims against the Debtors and the Protected Parties and, after the Non-PSAN PI/WD Claims Termination Date, Administrative Expense PSAN PI/WD Claims and Administrative Expense PI/WD Claims and the forum in which such resolution shall be determined shall be governed by and in accordance with the PSAN PI/WD TDP and the PSAN PI/WD Trust Agreement. Nothing contained in this section 11.1 shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII     MISCELLANEOUS PROVISIONS

### 12.1    *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments

executed in connection with any disposition of assets contemplated by the Plan, including the sale of the Purchased Assets to the Plan Sponsor under the U.S. Acquisition Agreement, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

### 12.2    *Dates of Actions to Implement This Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3    *Amendments.*

(a)    **Plan Modifications.**  This Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided*, *however*, that any such amendments, modifications, or supplements shall be made in accordance with the terms of the U.S. RSA, the UCC Term Sheet, and the TCC/FCR Term Sheet.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    **Certain Technical Amendments.**  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; *provided*, *however*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan.

### 12.4    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (iii) nothing contained in this Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (b) prejudice in any manner the rights of such Debtor or any other Person; or (c) constitute an admission of any sort by any Debtor or any other Person.

WEIL:\96446450\6\76903.0004

### 12.5   *Payment of Statutory Fees.*

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on or before the Effective Date by the Debtors.  Quarterly fees owed to the U.S. Trustee shall be paid when due in accordance with applicable law and the Debtors and Reorganized Debtors shall continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### 12.6   *Restructuring Expenses*

Subject to review by the U.S. Trustee, the Committees, and the Future Claims Representative for reasonableness in accordance with the RSA Order and the related procedures set forth in paragraph 9 thereof, the Debtors or the Reorganized Debtors, as applicable, shall pay the Restructuring Expenses in accordance with the terms of the U.S. Acquisition Agreement without the need for any application or notice to or approval by the Bankruptcy Court.  All Restructuring Expenses payable pursuant to this section 12.6 shall be paid as follows: (A) if and to the extent that at such time any advisor or other third party providing services to the Plan Sponsor in connection with the Restructuring Transactions has not been paid in full (including all estimated amounts for unbilled fees and expenses, subject to the terms hereof) by the Plan Sponsor, such payment shall be made directly to the applicable advisor or other third party in accordance with the documentation and written instructions of such advisors or other third parties; *provided*, *however*, that if the aggregate amounts owing to such advisors or other third parties exceed the amount of the applicable Restructuring Expenses required to be paid by the Debtors or the Reorganized Debtors under the U.S. Acquisition Agreement, then the Debtors or the Reorganized Debtors shall pay all such advisors and other third parties ratably based on their relative total percentage of recovery; and (B) with respect to any Restructuring Expenses not paid directly to advisors and other third parties pursuant to subpart (A) hereof, the payment shall be made directly to the Plan Sponsor as reimbursement for Restructuring Expenses previously paid.  In order to receive a Direct Expense Payment for unbilled fees and expenses, the advisors and other third parties entitled thereto shall, as part of the documentation provided to the Debtors or the Reorganized Debtors hereunder, estimate fees and expenses due for periods that have not been billed as of the Effective Date, it being understood that within forty-five (45) days after the Effective Date, an advisor or other third party receiving payment for the estimated period shall submit a detailed invoice covering such period and, if the estimated payment received by such third party or other advisor exceeds the actual fees and expenses for such period, this excess amount shall be paid over to the Plan Sponsor as reimbursement for Restructuring Expenses previously paid or, if all Restructuring Expenses subject to Direct Expense Payment or reimbursement to the Plan Sponsor have been paid or reimbursed in full, then such excess amount shall be returned to the Debtors or the Reorganized Debtors.

### 12.7   *Severability.*

Subject to section 5.16 of this Plan, if, prior to entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or

unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this section, is valid and enforceable pursuant to its terms.

### 12.8    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.9    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and insure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.10    *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.11    *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, the Confirmation Order, and the U.S. Acquisition Agreement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understanding, and representations concerning such documents, all of which have become merged and integrated into this Plan.

### 12.12    *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.13   _Exhibits to Plan._**

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are part of this Plan as if set forth in full herein.

**12.14   _Notices._**

All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors, as applicable, shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been  duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

TK HOLDINGS INC.
2500 Takata Drive
Auburn Hills, Michigan 48326
Attn: Keith Teel, Esq.

– and –

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Attn: Marcia L. Goldstein, Esq., Ronit J. Berkovich, Esq., and Matthew P. Goren, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

_Attorneys for the Debtors_

– and –

RICHARDS, LAYTON & FINGER, P.A.
920 N. King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins (No. 2981), Michael J. Merchant (No. 3854), Amanda R. Steele (No. 5530), and Brett M. Haywood (No. 6166)
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

_Attorneys for the Debtors_

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; provided, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of

WEIL:\96446450\6\76903.0004

entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

### 12.15 *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provisions of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claim or Interests prior to the Effective Date.

Dated:  February 14, 2018


By: /s/  Ken Bowling
Name: Ken Bowling
Title: Authorized Signatory

**TK HOLDINGS INC.**
**TAKATA AMERICAS**
**TK FINANCE LLC**
**TK CHINA, LLC**
**TAKATA PROTECTION SYSTEMS INC.**
**INTERIORS IN FLIGHT INC.**
**TK MEXICO INC.**
**TK MEXICO LLC**
**TK HOLDINGS DE MEXICO, S. DE R.L. DE C.V.**
**INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.**
**TAKATA DE MEXICO, S.A. DE C.V.**
**STROSSHE-MEX, S. DE R.L. DE C.V.**

161

**Exhibits and Schedules to the Plan**

**Exhibit 1**

**Customer Allocation Schedule**

|  | Allocation Percentage |
|---|---|
| *Consenting OEMs* | |
| AB Volvo | 0.0262715% |
| Aston Martin Lagonda Limited | 0.0035929% |
| AvtoVAZ | 0.7809270% |
| Beijing Benz Automotive Co., Ltd. | 0.2579882% |
| BMW Brilliance Automotive Limited | 0.0121577% |
| BMW Manufacturing Co., LLC | 5.7051499% |
| Changan Ford Automobile Co., Ltd | 0.2456295% |
| Changan Mazda Automobile Co., Ltd. | 0.1608375% |
| Changan PSA Automobiles Co.,Ltd. | 0.0398426% |
| Changchun Fengyue Company of Sichuan FAW Toyota Motor Co., Ltd. | 0.0165428% |
| Chery Jaguar Land Rover | 0.0209801% |
| China Motor Corporation | 0.0116514% |
| Chongqing Lifan Passenger Vehicle Co., Ltd | 0.1004922% |
| DAF Trucks NV | 0.0010931% |
| Daimler AG | 4.4693074% |
| Dongfeng Honda Automobile Co., Ltd. | 1.2000105% |
| Dongfeng Motor Company Limited | 0.6489813% |
| Dongfeng Passenger Vehicle Company | 0.1463592% |
| FAW Car Co. Ltd. | 0.9363337% |
| FCA US LLC | 6.3289228% |
| Ferrari S.p.A. | 0.0302433% |
| Ford Motor Company | 5.3296826% |
| GAC-FCA Automobile Co., Ltd | 0.0255468% |
| GAC Honda Automobile Co., Ltd. | 1.0220562% |
| GAC Toyota Motor Co., Ltd. | 0.1671380% |
| General Motors Holdings LLC | 10.5968637% |
| Honda North America, Inc. | 14.8277907% |
| Iveco S.p.A. | 0.0001493% |
| Jaguar Land Rover Ltd | 0.5060940% |
| Mazda Motor Corporation | 3.1263407% |
| McLaren Automotive | 0.0053663% |
| Mitsubishi Motors Corporation | 1.4131898% |
| National Electric Vehicle Sweden AB | 0.0001635% |

| | |
|---|---|
| Nissan North America, Inc. | 5.8731402% |
| PCMA Rus Ooo | 0.0064552% |
| Perusahaan Otomobil Kedua Sendirian Berhad | 0.0830497% |
| Renault | 0.0059243% |
| PSA Automobiles SA | 1.8935601% |
| SAIC General Motors Corporation Limited | 2.3666040% |
| Sichuan FAW Toyota Motor Co., Ltd. | 0.0760393% |
| Subaru Corporation | 1.4745446% |
| Tesla, Inc. | 0.0942962% |
| Tianjin FAW Toyota Motor Co., Ltd. | 0.8517936% |
| Toyota Motor Corporation | 13.5681391% |
| Volkswagen AG | 15.0799749% |
| **Aggregate Consenting OEMs** | **99.5372174%** |
| | |
| ***Non-Consenting OEMs*** | |
| Anhui Jianghuai Automobile Co., Ltd | 0.0389697% |
| Atiwe Autoteile Herstellungs- und Vertriebs GmbH | 0.0027888% |
| BAIC Motor Corporation, LTD. | 0.0002856% |
| Dongfeng Yulon Motor Co., Ltd | 0.0985566% |
| Forest River, Inc. | 0.0000214% |
| Fujian Benz Automotive Co., Ltd. | 0.0349843% |
| Gunagzhou Automobile Group Motor (HANGZHOU) Co., Ltd. | 0.0048742% |
| Jiangxi Changhe Suzuki Automobile Co., Ltd. | 0.0007794% |
| Karma Automotive LLC | 0.0019225% |
| Maruti Suzuki India Limited | 0.0033717% |
| SAIC Motor Corporation Limited Passenger Vehicle Co. | 0.0064286% |
| Shanghai LTI Automobile Co., Ltd. | 0.0010864% |
| Shenzhen DENZA New Energy Automotive Co., Ltd. | 0.0089928% |
| South East Fujian Motor Co., Ltd. | 0.0055823% |
| Spartan Motors, Inc. | 0.0000269% |
| Tan Chong Motor Assemblies Sdn Bhd | 0.0678964% |
| Tata Motors Limited | 0.0017323% |
| Zhejiang Geely Automobile Parts & Components Stock Co., Ltd. | 0.1311321% |
| Zhengzhou Nissan Automobile Co., Ltd. | 0.0533505% |
| **Aggregate Non-Consenting OEMs** | **0.4627825%** |
| | |
| **Aggregate All OEMs** | **100.0000000%** |

WEIL:\96446450\6\76903.0004

## Exhibit 2

### Initial Participating OEM(s)

The Consenting OEMs[1] listed below have elected to become Participating OEMs and, due to the timing of such election, are deemed to be Initial Participating OEMs under the terms of the Plan.  The election by each such Consenting OEM to become a Participating OEM (and an Initial Participating OEM) is subject in all respects to (i) the confirmation and effectiveness of the Plan in form and substance acceptable to the Participating OEM(s), (ii) the entry of the Confirmation Order by the Bankruptcy Court and, if required, the District Court (solely with respect to the Channeling Injunction) in form and substance acceptable to the Participating OEM(s), (iii) negotiation and execution of definitive documents governing the PSAN PI/WD Trust and the payment of such Participating OEM(s)' PSAN PI/WD Top-Up Amount, including the PSAN PI/WD Trust Agreement, the PSAN PI/WD TDP, and the Participating OEM Contribution Agreement, in each case in form and substance acceptable to the Participating OEM(s), and (iv) the appointment of Eric Green as the PSAN PI/WD Trustee or, if Eric Green declines or is unable to fill the appointment, the appointment of an initial PSAN PI/WD Trustee (if applicable) or a PSAN PI/WD Trustee that is acceptable to the Participating OEM(s).

Initial Participating OEMs:

American Honda Motor Co., Inc. and its subsidiaries and affiliates

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**<u>Exhibit 3</u>**

**Plan Sponsor Backstop Funding Agreement**

*Execution Copy*

**Joyson KSS Auto Safety S.A.**

November 16, 2017

| | | |
|---|---|---|
| Takata Corporation | TK Holdings Inc. | TK Holdings Inc. |
| 2-3-14 Higashishinagawa, | 2500 Takata Drive, | 2500 Takata Drive, |
| Shinagawa-ku, Tokyo | Auburn Hills, Michigan 48326 | Auburn Hills, Michigan 48326 |
| 140-0002, Japan | Attn: Ken Bowling and Keith | Attn: Ken Bowling and Keith |
| Attn: Tsutomu Yoshida and | Teel | Teel |
| Hiroshi Shimizu | Email: | Email: |
| Email: | Ken.Bowling@takata.com | Ken.Bowling@takata.com |
| Tsutomu.Yoshida@takata.co.jp | and Keith.Teel@takata.com | and Keith.Teel@takata.com |
| and Hiroshi- | | |
| JP.Shimizu@takata.co.jp | | |

| | | |
|---|---|---|
| TAKATA Europe GmbH | TAKATA Aktiengesellschaft | TAKATA Sachsen GmbH |
| Bahnweg 1 | Bahnweg 1 | Scheibenberger Straße 88 |
| 63743 Aschaffenburg | 63743 Aschaffenburg | 09481 Elterlein |
| Attn: Sven Petersen | Attn: Sven Petersen | Attn: Sven Petersen |
| Email: | Email: | Email: |
| Sven.Petersen@eu.Takata.com | Sven.Petersen@eu.Takata.com | Sven.Petersen@eu.Takata.com |

Ladies and Gentlemen:

Re:   **Plan Sponsor Backstop Funding**

This letter agreement (the "***Agreement")*** sets forth the agreement among (i) Takata Corporation ("***TKJP***"), a Japanese corporation (*kabushiki kaisha*), Takata Americas ("***TKAM***"), a Delaware general partnership, and its subsidiary Chapter 11 Debtors, TK Holdings, Inc. ("***TKH***"), a Delaware corporation, and its subsidiary Chapter 11 Debtors, TAKATA Europe GmbH ("***TK Europe***"), a limited liability company (*Gesellschaft mit beschränkter Haftung*) established under the laws of Germany registered with the commercial register (*Handelsregister*) at the lower court (*Amtsgericht*) of Aschaffenburg under registration number HRB 8513, TAKATA Aktiengesellschaft ("***TK AG***"), a stock corporation (*Aktiengesellschaft*) established under the laws of Germany registered with the commercial register at the lower court of Aschaffenburg under registration number HRB 120, and TAKATA Sachsen GmbH ("***TK Sachsen***"), a limited liability company established under the laws of Germany registered with the commercial register at the lower court of Chemnitz under registration number HRB 11841, collectively with their Affiliates (as defined below) and subsidiaries (collectively, "***Takata***"), (ii) Joyson KSS Auto Safety S.A., a Luxembourg société anonyme ("***Parent***," and collectively with one or more of its current or newly formed subsidiaries or affiliates that purchase Purchased Assets (as defined below) as of the Closing Date (as defined below) pursuant to the Acquisition Agreements (as defined below), the "***Plan Sponsor***") and KSS Holdings, Inc. a Delaware corporation (the "***Guarantor***"), and (iii) each of the following on behalf of themselves and their respective subsidiaries and/or affiliates as described on **Schedule 1** (collectively, the "***Schedule 1 Entities***"): BMW Manufacturing Co., LLC ("***BMW***"), Daimler AG ("***Daimler***"), FCA US LLC f/k/a Chrysler Group LLC, FCA Group Purchasing Srl in the name and on behalf of its principals (FCA Italy SpA and FCA Melfi Srl), FCA Fiat Chrysler Automóveis Brasil

Ltda., and FCA Automobiles Argentina S.A. (collectively, "***FCA***"), Ford Motor Company ("***Ford***"), General Motors Holdings LLC ("***GM***"), Honda Motor Co., Ltd. ("***Honda***"), Jaguar Land Rover Ltd. ("***JLR***"), Mazda Motor Corporation ("***Mazda***"), Mitsubishi Motors Corporation ("***Mitsubishi***"), Nissan Motor Co., Ltd. ("***Nissan***"), PSA Automobiles SA and Opel Automobile GmbH (collectively, "***PSA***"), Subaru Corporation ("***Subaru***"), Toyota Motor Corporation ("***Toyota***"), Volkswagen Aktiengesellschaft ("***Volkswagen***"), and Aktiebolaget Volvo ("***Volvo***") (each a "***Consenting OEM***" and, together with the Schedule 1 Entities, the "***Consenting OEMs***") with respect to the Plan Sponsor Backstop Funding (as defined below), all upon the terms and subject to the conditions set forth herein.  On the Closing Date, the Reorganized TK Holdings Trust, Reorganized Takata and the Warehousing Trust shall each become party to this Agreement and possess all of the rights and be subject to all of the obligations of the Reorganized TK Holdings Trust, Reorganized Takata and the Warehousing Trust, respectively, under this Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan (as defined below).

1. **Defined Terms.**

"***Acquired Cash***" shall have the meaning ascribed to it in the U.S. Acquisition Agreement.

"***Acquisition Agreements***" means, collectively, the U.S. Acquisition Agreement, the TKJP Acquisition Agreement, the TK Europe Acquisition Agreement and the TSAC Acquisition Agreement (as defined in the U.S. Acquisition Agreement), if applicable.

"***Administrative Claims***" means Allowed Administrative Expense Claims of a Professional Person (other than Professional Fee Recoveries) for compensation for professional services rendered or costs incurred after the Petition Date and on or prior to the Effective Date of the Plan.

"***Affiliates***" shall have the meaning ascribed to it in the U.S. Acquisition Agreement.

"***Aggregate Consideration***" means, with respect to each Acquisition Agreement, (i) the Purchase Price (as defined in such Acquisition Agreement) paid by the Plan Sponsor at the Closings, (ii) all Cash and Cash Equivalents (as defined in such Acquisition Agreement) of the Seller Entities (as defined in such Acquisition Agreement) that is not Acquired Cash, and (iii) any other value of the Seller Entities (as defined in each Acquisition Agreement), Reorganized Takata, the Reorganized TK Holdings Trust (for purposes of post-Closings funding requests and only to the extent a determination is made in accordance with sections 5.5 and 5.6 of the Plan that the amounts available in the Reorganized TK Holdings Trust Reserve are in excess of the amounts necessary to satisfy the purpose for which such reserve was established) and/or the Warehousing Trust, not acquired by the Plan Sponsor (excluding the PSAN Assets still in use by Reorganized Takata or transferred or to be transferred to Plan Sponsor), that has been monetized or could be monetized promptly without interfering with Reorganized Takata's production obligations or the Warehousing Trust's operations as determined at the time of determining the Plan Sponsor Backstop Funding amount required by an Authorized Entity, in each of case (i) through (iii), to the extent such amounts are permitted and available or could promptly be available to be applied towards funding of, or reserving for, all claims required to be paid in full, including without limitation, the Backstopped Claims.

"***Allocation Agreement***" means the Allocation Settlement Agreement among the Consenting OEMs dated July 18, 2017.

"***Authorized Entity***" means (i) prior to the Closings, TKJP, TKH, TKAM (on behalf of itself and TSAC), TK Europe, TK AG and TK Sachsen, (ii) after the Closings but prior to the confirmation and effectiveness of the Civil Rehabilitation Plan, TKJP and the Plan Administrator, and (iii) after the

2

confirmation and effectiveness of the Civil Rehabilitation Plan but prior to the liquidation of TKJP, one of TKJP, the liquidator, or such similar official appointed under the terms of the Civil Rehabilitation Plan and the Plan Administrator.

"*Backstop Expiration Date*" means the date on which the liquidation, dissolution and winding up of Reorganized Takata and the Warehousing Trust have been completed.

"*Backstop Funding Cap*" means $75,000,000; *provided* that such amount shall be reduced dollar-for-dollar to the extent that the aggregate amount of (x) Administrative Claims required to be paid upon or after the Closings and (y) Professional Fee Recoveries exceed $124,000,000; *provided, further, however* that the amount of Plan Sponsor Backstop Funding on account of the Catch-up Rule Amount shall in no event exceed $20,000,000.

"*Backstopped Claims*" means (i) the DOJ Restitution Claim, (ii) the PSAN Legacy Costs (including as those costs are to be funded from the Post-Closing Reserve and the Warehousing Trust Reserve, including (without duplication) the PSAN Legacy Costs Payment (as defined in the Global Settlement Agreement)), which for purposes of triggering the Plan Sponsor's obligation to provide Plan Sponsor Backstop Funding shall be in an amount not to exceed $200,000,000 in the aggregate, including any distributions funded from Aggregate Consideration together with any Plan Sponsor Backstop Funding to pay PSAN Legacy Costs, and (iii) the Catch-up Rule Amount; *provided* that any Plan Sponsor Backstop Funding (x) in respect of the Catch-Up Rule Amount shall be paid only after the Plan Sponsor Backstop Funding has been applied to any required funding on the Closing Date of the Backstopped Claims in clauses (i) and (ii) and (y) in respect of the PSAN Legacy Costs shall be paid only after the DOJ Restitution Claim has been paid in full.  For the avoidance of doubt, the caps with respect to certain claims and reserves set forth in this definition and in the defined term "Backstop Funding Cap" shall only be used for purposes of determining the triggering of the Plan Sponsor's obligation to provide Plan Sponsor Backstop Funding and shall not be binding on the parties hereto for any other purpose including with respect to the actual amount of Aggregate Consideration to be used to fund such claims and reserves.  For the purposes of this Agreement, the DOJ Restitution Claim shall include (without duplication) the Settlement Amounts (as defined in the Global Settlement Agreement) and the Plan Settlement Payment (other than the Plan Settlement Turnover Amount) under the Plan, to the extent such amounts satisfy the DOJ Restitution Claim.

"*Catch-up Rule Amount*" means the distribution contemplated by section 5(a)(ii) of the Japan RSA to be made to holders of allowed rehabilitation claims (other than the Consenting OEMs) in the Japan Proceedings in connection with approving the Japan Debtors' payment as of the Closings of their share of the DOJ Restitution Claim and the PSAN Legacy Costs.

"*Chapter 11 Debtors*" means TKAM, TK Finance, LLC, TK China, LLC, TKH, Takata Protection Systems Inc., Interiors in Flight Inc., TK Mexico Inc., TK Mexico LLC, TK Holdings de Mexico, S. de R.L. de C.V., Industrias Irvin de Mexico, S.A. de C.V., Takata de Mexico, S.A. de C.V., and Strosshe-Mex, S. de R.L. de C.V.

"*Civil Rehabilitation Plan*" means the liquidating civil rehabilitation plan for the Japan Debtors in the Japan Proceedings.

"*Closing Date*" means the date of the occurrence of the Closings.

"*Closings*" shall have the meaning ascribed to it in the U.S. Acquisition Agreement.

#90287165v1

"***DOJ Plea Agreement***" means that certain Rule 11 Plea Agreement, dated January 13, 2017, entered into between TKJP and the United States of America, by and through the Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of Michigan.

"***DOJ Restitution Claim***" means the $850 million in restitution payable for the benefit of OEMs pursuant to paragraphs 1 and 2 of the DOJ Restitution Order.

"***DOJ Restitution Order***" means the Joint Restitution Order entered by the United States District Court for the Eastern District of Michigan on February 27, 2017 in the case captioned *U.S. v. Takata Corporation*, Case No. 16-cr-20810 (E.D. Mich.).

"***Expenses***" means, collectively, the Expenses as defined in each Acquisition Agreement; *provided* that, for purposes of calculating the OEM Payover, in no event shall Expenses exceed $50,000,000.

"***Global Settlement Agreement***" means the Takata Global Settlement Agreement dated as of the date hereof between certain Consenting OEMs and certain Takata entities.

"***Japan Debtors***" means Takata Corporation, Takata Kyushu Corporation and Takata Service Corporation.

"***Japan RSA***" means the Restructuring Support Agreement dated as of October 30, 2017 among the Japan Debtors, the Plan Sponsor and certain Consenting OEMs.

"***Legacy Cost Report***" means a report prepared by TKH, with the input and consent of the Takata entities party to this Agreement, prior to the Closings regarding the categories of PSAN Legacy Costs in form and substance acceptable to the Consenting OEMs and disclosed to the Plan Sponsor with an opportunity for input, which shall be reasonably considered by Takata and the Consenting OEMs.

"***Non-PSAN Inflator Recoveries***" means recoveries that are unrelated to claims on account of PSAN Inflators and unrelated to claims related to PSAN Inflator recalls, including any cure payments for non-PSAN Inflator contracts.  For the avoidance of doubt, payments on account of OEM Full Recovery Claims are not Non-PSAN Inflator Recoveries.

"***OEM***" means an original equipment manufacturer of automobiles.

"***OEM Full Recovery Claims***" means any Adequate Protection Claims, Consenting OEM PSAN Cure Claims and Consenting OEM PSAN Administrative Expense Claims.

"***OEM Indemnity and Release Agreement***" means the Indemnity and Release Agreement dated as of the date hereof between the Consenting OEMs and the Plan Sponsor.

"***OEM Unsecured PSAN Claim***" means any claim of a Consenting OEM against the Chapter 11 Debtors or the Japan Debtors arising from or relating to a Takata product consisting of or containing a PSAN Inflator (as defined in the OEM Indemnity and Release Agreement).  To the extent that (1) each Consenting OEM has received full payment of its allocable share of the DOJ Restitution Claim in accordance with the Agreed Allocation through one or more of the payment mechanisms agreed to by the parties, (2) the Backstopped Claims have been paid in cash in full (without giving effect to any aggregate limits in the definition of Backstopped Claims) and (3) each Consenting OEM has been paid or reimbursed in full for its Professional Fees up to the amount it is or would be entitled to receive under the Global Accommodation Agreement, then for purposes of this Agreement only,

OEM Unsecured PSAN Claims shall also include any OEM Full Recovery Claims.  Notwithstanding the foregoing, in no event shall OEM Unsecured PSAN Claims include claims giving rise to Professional Fee Recoveries or Non-PSAN Inflator Recoveries.  For the avoidance of doubt, OEM Unsecured PSAN Claims shall not include the DOJ Restitution Claim.

"**_Plan_**" means the Joint Chapter 11 Plan of Reorganization of TK Holdings, Inc. and its Affiliated Debtors, as amended, supplemented or otherwise modified from time to time in accordance with its terms.

"**_Plan Sponsor Backstop Funding_**" means, collectively, the PSAN Assets Advance Payment, the First Plan Sponsor Backstop Payment and the Second Plan Sponsor Backstop Payment.

"**_Plan Sponsor Backstop Payments_**" shall have the meaning set forth in Section 2.c. hereof.

"**_Professional Fees_**" shall have the meaning ascribed to it in the Global Accommodation Agreement.

"**_Professional Fee Recoveries_**" means all Professional Fees of Consenting OEMs recovered by payment to the Consenting OEMs or by set-off permitted under the Global Accommodation Agreement.

"**_PSAN Assets_**" shall have the meaning ascribed to it in the U.S. Acquisition Agreement.

"**_PSAN Legacy Costs_**" means, collectively, any costs or expenses that have been accrued or that are estimated as of the Effective Date, and on a continuing basis for the duration of the Backstop Agreement, to be incurred in connection with (i) the ongoing oversight by the monitor pursuant to the NHTSA Consent Order (as it may be modified from time to time) or as otherwise required by NHTSA, of (a) Reorganized Takata, (b) the Warehousing Trust, and (c) Plan Sponsor and the Acquired Takata Entities (as defined in the Global Settlement Agreement) to the extent arising out of the Sale (as defined in the U.S. RSA) or the Restructuring (as defined in the Global Accommodation Agreement), (ii) the ongoing oversight by the monitor pursuant to the DOJ Plea Agreement (as it may be modified from time to time) or as otherwise required by the DOJ, of (a) Reorganized Takata, (b) the Warehousing Trust, and (c) Plan Sponsor and the Acquired Takata Entities to the extent arising out of the Sale or the Restructuring, (iii) the activities of the Special Master under the DOJ Plea Agreement, (iv) the continued operation of any PSAN Warehouse, as required by the NHTSA Consent Order, NHTSA Preservation Order, other applicable law or regulation, or otherwise and consistent with the Legacy Cost Report, (v) the shipping and disposal of PSAN Inflators (as defined in the U.S. Acquisition Agreement), including the shipping from any PSAN Warehouse to the place of disposal, as required by the NHTSA Consent Order, Preservation Order, other applicable law or regulation, or otherwise and consistent with the Legacy Cost Report, (vi) the performance of the recall awareness campaign and related activities as required by the NHTSA Consent Order, other applicable law or regulation, or otherwise, and (vii) the continued operation of the product safety group related to recalled PSAN Inflators consistent with the Legacy Cost Report.

"**_Purchased Assets_**" shall have the meaning ascribed to it in the OEM Indemnity and Release Agreement.

"**_TK Europe Acquisition Agreement_**" means that certain Asset Purchase Agreement dated as of the date hereof by and among TK Europe, TK AG, and TK Sachsen, and Joyson KSS Holdings No.2 S.à r.l., a limited liability company (_société à responsabilité limitée_) under the laws of Luxembourg, and solely for purposes of Section 7.22 thereof, the Guarantor.

5

#90287165v1

"***TKJP Acquisition Agreement***" means that certain Asset Purchase Agreement dated as of the date hereof by and among the Japan Debtors, Parent, and solely for purposes of Section 7.22 thereof, the Guarantor.

"***U.S. Acquisition Agreement***" means that certain Asset Purchase Agreement dated as the date hereof by and among TKH, Takata Americas, TK Holdings de Mexico S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*), TK Mexico LLC, a Delaware limited liability company, Industrias Irvin de Mexico, S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*), Strosshe Mex S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*), Takata de Mexico S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*), Parent, and solely for purposes of Section 7.22 thereof, Guarantor.

2. **PSAN Assets Advance Payment; Plan Sponsor Backstop Payments.**  To the extent that the total of the Aggregate Consideration payable under a Acquisition Agreement in a particular region (TKH, TKAM, EMEA and Japan) is for any reason insufficient to fund in full the Backstopped Claims in such region, then the Plan Sponsor will pay up to an aggregate amount not to exceed the Backstop Funding Cap to fund any deficiency in the payment of the Backstopped Claims to the applicable Takata entity obligated to pay or fund any reserve for Backstopped Claims as follows:

   a. up to $25 million will be provided (on a non-refundable and non-reimbursable basis) by the Plan Sponsor at the direction of an Authorized Entity, during the period commencing on the Closing Date and ending on the Backstop Expiration Date, which shall be credited against the payments required to be paid by the Plan Sponsor to purchase certain PSAN Assets pursuant to and in accordance with Section 7.12 of the U.S. Acquisition Agreement (collectively, the "***PSAN Assets Advance Payment***"), solely as and to the extent that there exists, at the time of such request, a present or near-term expected deficiency in the funding of the Backstopped Claims, as determined by the applicable Authorized Entity, in each case, subject to <u>Section 3</u> hereof;

   b. up to $25 million will be provided by the Plan Sponsor at the direction of an Authorized Entity on or after the twelve (12) month anniversary of the Closing Date until the Backstop Expiration Date (collectively, the "***First Plan Sponsor Backstop Payment***"), solely as and to the extent that there exists, at the time of such request, a present or near-term expected deficiency in the funding of the Backstopped Claims, as determined by the applicable Authorized Entity, in each case, subject to <u>Section 3</u> hereof; and

   c. up to $25 million will be provided by the Plan Sponsor at the direction of an Authorized Entity on or after the twenty-four (24) month anniversary of the Closing Date until the Backstop Expiration Date (collectively, the "***Second Plan Sponsor Backstop Payment***" and together with the First Plan Sponsor Backstop Payment, the "***Plan Sponsor Backstop Payments***"), solely as and to the extent that there exists, at the time of such request, a present or near-term expected deficiency in the funding of the Backstopped Claims, as determined by the applicable Authorized Entity in each case, subject to <u>Section 3</u> hereof;

   *provided* that, notwithstanding the timing requirements above, up to the full amount of the Backstop Funding Cap will be paid by the Plan Sponsor earlier, including on the Closing Date (other than with respect to Backstopped Claims on account of the Catch-up Rule Amount, which may not be funded until the Civil Rehabilitation Plan is confirmed and effective), to fund the Backstopped Claims as required by the Bankruptcy Court as necessary to confirm the Plan, or as confirmed by the Civil Rehabilitation Court as necessary to receive

6

approval of the Civil Rehabilitation Plan; *provided, further, however,* that the Plan Sponsor Backstop Funding shall never exceed the Backstop Funding Cap, and once the Plan Sponsor has funded an amount equal to the Backstop Funding Cap, the Plan Sponsor shall have no obligation to fund any additional amounts regardless of whether such amounts have been repaid to the Plan Sponsor under the Plan Sponsor Backstop Funding Repayment or the OEM Payover.

3. **Plan Sponsor Backstop Funding**.

    a.   Plan Sponsor Backstop Funding at the Closings.

        i.   If an Authorized Entity determines in good faith that a payment of the Plan Sponsor Backstop Funding is required to be made at the Closings in accordance with the terms of this Agreement, then such Authorized Entity shall deliver to the Plan Sponsor and the Consenting OEMs not less than ten (10) business days prior to the anticipated Closing Date a certificate (the "***Backstop Funding Request Certificate***") signed by an authorized officer or agent of such Authorized Entity that certifies and sets forth in reasonable detail the anticipated sources and uses of the proceeds of the Aggregate Consideration available in the applicable region (TKH, TKAM, EMEA or Japan) as of the close of business on the anticipated Closing Date, the amount of any deficiencies in the funding of the Backstopped Claims resulting in the triggering of the Plan Sponsor Backstop Funding, and the aggregate amount of the requested Plan Sponsor Backstop Funding required as a result thereof. The Backstop Funding Request Certificate and the determinations and calculations contained therein shall be prepared in good faith and in accordance with this Agreement, including the definitions set forth or incorporated herein. The Plan Sponsor, the Consenting OEMs and their respective representatives shall be provided with such reasonable access to the financial books and records of Takata, as well as any relevant information and work papers as they may reasonably request, to enable the Plan Sponsor, the Consenting OEMs and their respective representatives to evaluate the Backstop Funding Request Certificate. The form and content of the Backstop Funding Request Certificate shall be reasonably acceptable to the Consenting OEMs. Prior to submitting any Backstop Funding Request Certificate, the Authorized Entity requesting such funding shall provide a copy thereof to the Plan Sponsor and its counsel and provide the Plan Sponsor and its counsel two (2) business days, or longer if reasonably practicable, to review and comment on the content of such Backstop Funding Request Certificate; *provided* that the Authorized Entity is not required to accept any of Plan Sponsor's comments.

        ii.   In the event that the Plan Sponsor disputes the claims and/or amounts set forth in the Backstop Funding Request Certificate, then the Plan Sponsor shall send notice within three (3) business days of receipt of the Backstop Funding Request Certificate to counsel for each Authorized Entity and to counsel for each Consenting OEM signatory hereto setting forth in reasonable detail the basis for such dispute. To the extent that there is a dispute between Takata and the Plan Sponsor with respect to any Plan Sponsor Backstop Funding required at the Closings, the Plan Sponsor shall fund any undisputed amounts at the Closings and the obligation of the Plan Sponsor to pay any disputed portion of the Plan Sponsor Backstop Funding shall be conditioned upon a determination or confirmation by the Bankruptcy Court, the Civil Rehabilitation Court or Pricewaterhouse Coopers solely with respect to the adequacy of the Liquidation Reserve for the applicable Liquidating Entity (each such term as

defined in the Global Settlement Agreement and in accordance with the procedures set forth in the Global Settlement Agreement), as applicable, of the amount of the Plan Sponsor Backstop Funding, if any, required on the Closing Date, in order to satisfy, as applicable in each region, the Backstopped Claims, in connection with (i) the requirements for confirmation and effectiveness of the Plan in the Chapter 11 Cases (by taking into account all other payments to be made, as required by the Bankruptcy Court, in connection therewith) and/or (ii) approval of the Section 42 Business Transfer (as defined in the Japan RSA) and the Section 85(5) Motion (as defined in the Japan RSA) (by taking into account all other payments to be made, as required by the Civil Rehabilitation Court, in connection therewith) and/or (iii) the requirements under the TK Europe Acquisition Agreement (after giving effect to the payments contemplated under the Global Settlement Agreement and an adequate reserve for the solvent liquidation of the Liquidating Entities, subject to the dispute resolution mechanism for the Liquidation Reserve with respect to the Liquidating Entities (each such term as defined in the Global Settlement Agreement) set forth in the Global Settlement Agreement). The Plan Sponsor agrees not to object to any request by Takata to have such disputes heard by the applicable court on an expedited basis. All parties agree not to appeal any such determination by the applicable court. In the event of a dispute, the Plan Sponsor shall pay any disputed portion of the Plan Sponsor Backstop Funding required by this Section 3.a.ii on the later of (i) the Closing Date and (ii) three (3) business days following a determination or confirmation by the Bankruptcy Court, the Civil Rehabilitation Court or Pricewaterhouse Coopers, as applicable, of the amount of Plan Sponsor Backstop Funding, if any, required on the Closing Date.

b. Plan Sponsor Backstop Funding After the Closings.

    i. If an Authorized Entity determines in good faith that (1) the funding of any remaining PSAN Assets Advance Payment is required, (2) the funding of the First Plan Sponsor Backstop Payment is required or (3) the funding of the Second Plan Sponsor Backstop Payment is required, in each case, in accordance with Section 2 of this Agreement, then such Authorized Entity shall deliver to the Plan Sponsor and the Consenting OEMs not less than two (2) weeks prior to the date of the requested Plan Sponsor Backstop Funding, a Backstop Funding Request Certificate signed by an authorized officer or agent of such Authorized Entity that certifies and sets forth in reasonable detail any Aggregate Consideration available to such Authorized Entity as of the close of business on the Business Day immediately preceding the date of such Backstop Funding Request Certificate, the proposed uses for such Aggregate Consideration as of such date, the amount of any deficiencies in the payment of the Backstopped Claims resulting in the triggering of the Plan Sponsor Backstop Funding, and the aggregate amount of the requested Plan Sponsor Backstop Funding required as a result thereof.

    ii. During the two (2) week period between the delivery of the Backstop Funding Request Certificate and the date of the requested Plan Sponsor Backstop Funding, the Plan Sponsor, the Consenting OEMs and their respective representatives shall be provided with such reasonable access to the financial books and records of Reorganized Takata, the Reorganized TK Holdings Trust and the Warehousing Trust and their Affiliates, as well as any relevant information and work papers as they may reasonably request, to enable the Plan Sponsor, the Consenting OEMs and their respective representatives to evaluate the Backstop Funding Request Certificate.

8

iii. No later than two (2) weeks following the delivery by an Authorized Entity of the Backstop Funding Request Certificate, the Plan Sponsor shall notify such Authorized Entity, as applicable, and the Consenting OEMs and their counsel in writing whether it accepts or disputes the accuracy of the determination or the calculations set forth on the Backstop Funding Request Certificate. If the Plan Sponsor accepts the determinations and calculations set forth on the Backstop Funding Request Certificate, then the Plan Sponsor shall pay the Plan Sponsor Backstop Funding in accordance with the Backstop Funding Request Certificate.

iv. If the Plan Sponsor disputes the accuracy of any of the determinations or calculations set forth on the Backstop Funding Request Certificate, then the Plan Sponsor shall provide written notice to the Authorized Entity and the Consenting OEMs and their counsel no later than two (2) weeks following the delivery by such Authorized Entity to the Plan Sponsor of the Backstop Funding Request Certificate (the "*Dispute Notice*"), setting forth in reasonable detail those items that the Plan Sponsor disputes. During the two (2) week period following delivery of a Dispute Notice, the Plan Sponsor and Reorganized Takata, the Warehousing Trust, the Reorganized TK Holdings Trust or the Plan Administrator, as applicable, shall negotiate in good faith with a view to resolving their disagreements over the disputed items. If the parties fail to resolve their disagreements over the disputed items within such two (2) week period, then the Plan Sponsor and Reorganized Takata, the Warehousing Trust, the Reorganized TK Holdings Trust or the Plan Administrator, as applicable, shall forthwith jointly request that Deloitte and Touche LLP or another nationally recognized accounting firm agreed to by the parties (the "*Accounting Expert*") act as an expert, and not as an arbitrator, to make a binding determination as to the amount of the Plan Sponsor Backstop Funding, if any, required in order to satisfy, as applicable in each region, the Backstopped Claims, including, by taking into account, the requirements for confirmation and effectiveness of the Civil Rehabilitation Plan in the Japan Proceedings with respect to any payments required to satisfy the Catch-Up Rule Amount.

v. The Accounting Expert will under the terms of its engagement have no more than two (2) weeks from the date of referral and no more than five (5) business days from the final submission of information and presentations by the applicable Authorized Entity and the Consenting OEMs within which to render its written decision with respect to the disputed items (and only with respect to any unresolved disputed items set forth in the Dispute Notice) and the final determination of the Plan Sponsor's obligations with respect to such Plan Sponsor Backstop Funding shall be based solely on the resolution of such disputed items. The Accounting Expert shall review such submissions and base its determination solely on such submissions. In resolving any disputed item, the Accounting Expert may not assign a value to any item greater than the maximum value for such item claimed by either party or less than the minimum value for such item claimed by either party. Absent manifest error, the decision of the Accounting Expert shall be deemed final and binding upon the parties and enforceable by any court of competent jurisdiction. The fees and expenses of the Accounting Expert shall be allocated to be paid by the Plan Sponsor, on the one hand, and by the applicable Authorized Entity, on the other hand, based upon the percentage that the portion of the contested amount not awarded to each party bears to the amount actually contested by such party, as determined by the Accounting Expert.

9

vi. In the event the Plan Sponsor receives multiple Backstop Funding Request Certificates that (together with all previous Plan Sponsor Backstop Funding) exceed (together with any amount of any Plan Sponsor Backstop Funding already paid) the Backstop Funding Cap, the Plan Sponsor shall pay the Authorized Entity *first*, amounts requested in respect of clause (i) of the definition of "Backstopped Claims" to cure any deficiency in payment in full for such claims; *second*, amounts requested in respect of clause (ii) of the definition of "Backstopped Claims" to cure any deficiency for funding of such claims or reserves until funded in full subject to the applicable limitations in clause (ii) of the definition of "Backstopped Claims"; and *third*, amounts requested in respect of clause (iii) of the definition of "Backstopped Claims" subject to the applicable limitations in the Backstop Funding Cap.

4. **Information**. The Liquidating Entities (as defined in the Global Settlement Agreement), TKJP (solely with respect to the period after the Closing but prior to confirmation and effectiveness of the Civil Rehabilitation Plan), and one of TKJP, the liquidator or such similar official appointed under the terms of the Civil Rehabilitation Plan (solely with respect to the period after the confirmation and effectiveness of the Civil Rehabilitation Plan but prior to the liquidation of TKJP) shall be required to and the Plan shall provide that Reorganized Takata, the Reorganized TK Holdings Trust, the Warehousing Trust and the Plan Administrator shall be required to keep the Plan Sponsor and the Consenting OEMs reasonably informed of all material developments that could reasonably be expected to increase the likelihood that the Plan Sponsor Backstop Funding would be triggered during the period commencing on the Closing Date and ending on the Backstop Expiration Date, and that they will promptly comply with any reasonable requests by the Plan Sponsor for financial information relating to its obligation to provide Plan Sponsor Backstop Funding. The Liquidating Entities (as defined in the Global Settlement Agreement), TKJP (solely with respect to the period after the Closing but prior to confirmation and effectiveness of the Civil Rehabilitation Plan), and one of TKJP, the liquidator or such similar official appointed under the terms of the Civil Rehabilitation Plan (solely with respect to the period after the confirmation and effectiveness of the Civil Rehabilitation Plan but prior to the liquidation of TKJP) agree to and the Plan shall provide that Reorganized Takata, the Reorganized TK Holdings Trust and the Warehousing Trust agree, and agree to cause each of their subsidiaries during the period commencing on the Closing Date and ending on the Backstop Expiration Date, to (i) keep proper books of record and accounts in which true and correct entries in conformity in all material respects with the applicable generally accepted accounting principles shall be made of all dealings and transactions in relation to its business and activities and (ii) permit any authorized representatives designated by the Plan Sponsor to visit and inspect any of the properties of Reorganized Takata, the Reorganized TK Holdings Trust, the Warehousing Trust, the Liquidating Entities, TKJP (solely with respect to the period after the Closing but prior to confirmation and effectiveness of the Civil Rehabilitation Plan) or one of TKJP, the liquidator or such similar official appointed under the terms of the Civil Rehabilitation Plan (solely with respect to the period after the confirmation and effectiveness of the Civil Rehabilitation Plan but prior to the liquidation of TKJP) to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants, all upon reasonable notice and at such reasonable times during normal business hours and as often as may reasonably be requested. For the avoidance of doubt, nothing herein shall delay or prevent the liquidation of any of the Liquidating Entities.

5. **Plan Sponsor Backstop Funding Repayment.**

a. If the Plan Sponsor acquires the assets (but not the equity interests of) of Takata (Shanghai) Automotive Component Co., Ltd. ("**TSAC**") at the Closings, then upon a distribution of cash after the Closing Date from TSAC to TK China, LLC (or Reorganized TK Holdings) or any

of its affiliates that are not organized under the laws of China, Reorganized Takata, the Reorganized TK Holdings Trust, the Legacy Trustee or the Plan Administrator shall use such cash to repay the amount of any Plan Sponsor Backstop Payments and any unreimbursed Expenses (such payment, the "***Plan Sponsor Backstop Funding Repayment***"); *provided, however*, that only cash actually received by the Plan Sponsor shall be treated as a Plan Sponsor Backstop Funding Repayment.

b.  To the extent that (1) each Consenting OEM has received its allocable share of the full amount of the DOJ Restitution Claim in accordance with the Agreed Allocation, (2) the Backstopped Claims have been paid in cash in full (without giving effect to any aggregate limits in the definition of Backstopped Claims; *provided* that any distribution to the Consenting OEMs on account of OEM Unsecured PSAN Claims have been used to fund any deficiency in the funding of PSAN Legacy Costs), and (3) each Consenting OEM has been paid or reimbursed in full its Professional Fees up to the amount it is or would be entitled to receive under the Global Accommodation Agreement, then any amounts actually received by each Consenting OEM in excess of such allocable share and such full reimbursement (i) on account of its OEM Unsecured PSAN Claims in the Chapter 11 Cases or the Japan Proceedings or (ii) from the residual proceeds of the solvent liquidation pursuant to the Global Settlement Agreement, as the case may be, (for the avoidance of doubt, in each case not including any Non-PSAN Inflator Recoveries or Professional Fee Recoveries) shall be used to reimburse the Plan Sponsor for (x) any First Plan Sponsor Backstop Payment or Second Plan Sponsor Backstop Payment actually made and (y) any unreimbursed Expenses (such reimbursements, the "***OEM Payover***").  The OEM Payover shall be secondary to any amounts received or reasonably expected to be received from the Plan Sponsor Backstop Funding Repayment.

c.  Notwithstanding the OEM Payover, each Consenting OEM may negotiate, litigate, settle, manage or otherwise treat its respective OEM Unsecured PSAN Claims in any manner in its sole discretion and shall have no duty to account for, or any other duties to, the Plan Sponsor with respect thereto; *provided* that each Consenting OEM shall keep the Plan Sponsor reasonably apprised with respect to negotiations, litigations or settlements of its respective OEM Unsecured PSAN Claims and shall reasonably consider the Plan Sponsor's input with respect thereto.

d.  For the avoidance of doubt, the Plan Sponsor is entitled to only a single satisfaction of any amounts that the Plan Sponsor is entitled to be reimbursed for under the terms and conditions of this Agreement.  Under no other circumstances shall there be an obligation to repay the Plan Sponsor Backstop Funding.

6.  **Form of Payment**.

a.  Any payments of Plan Sponsor Backstop Funding required to be made pursuant to <u>Section 3.a.</u> shall be made by wire transfer of immediately available funds to (i) in the case of Plan Sponsor Backstop Funding required to be made to fund any deficiency in the funding of the DOJ Restitution Claim, to the Consenting OEMs in accordance with the applicable Acquisition Agreement or (ii) in the case of Plan Sponsor Backstop Funding required to be made to fund any deficiency in the funding of PSAN Legacy Costs or the Catch-Up Rule Amount, to an account designated in advance by the applicable Authorized Entity, and shall be made (A) in the case of undisputed payments required to be made under <u>Section 3.a.i.</u>, on the Closing Date and (B) in the case of disputed payments required to be made under <u>Section</u>

3.a.ii., on the later of (i) the Closing Date and (ii) three (3) business days following the final resolution of the applicable dispute.

b. Any payments of Plan Sponsor Backstop Funding required to be made pursuant to Section 3.b. shall be made by wire transfer of immediately available funds to an account designated in advance by the applicable Authorized Entity, and shall be made (i) in the case of undisputed payments required to be made under Section 3.b., on the requested funding date set forth in the Backstop Funding Request Certificate, and (ii) in the case of disputed payments required to be made under Section 3.b., on or prior to the fifth (5th) business day following the final resolution of the applicable dispute in accordance with Section 3.b.

c. Any payments required to be made pursuant to Section 5.a. shall be made by wire transfer of immediately available funds to an account designated in advance by the Plan Sponsor, and shall be made on or prior to the fifth (5th) business day following: (a) by TSAC after the Closing Date once TSAC has sufficient funds and regulatory approval, if required, to make a Plan Sponsor Backstop Repayment and repayment of any unreimbursed Expenses, or (b) by the Debtors or Reorganized TK Holdings after the Closing Date, upon receipt of funds from TSAC.

d. The OEM Payover shall be paid over to the Plan Sponsor in the same amount and form received by the applicable Consenting OEM within ten (10) business days of the later of (x) actual receipt thereof or (y) the date on which any OEM Payover amounts become due and payable in accordance with Section 5.b; *provided* that any Consenting OEM may, with the consent of the Plan Sponsor, direct that any amount that, upon receipt by such Consenting OEM, would be required to be used to reimburse the Plan Sponsor pursuant to Section 5.b shall be paid directly by the applicable Takata entity to the Plan Sponsor on behalf of such Consenting OEM.  The Consenting OEMs acknowledge and agree that amounts paid over to the Plan Sponsor in accordance with this Agreement shall be exempt from any requirement to be turned over to any escrow account on behalf of Consenting OEMs under any agreement regarding allocation of distributions among the Consenting OEMs

7. **Obligations of the Plan Sponsor Regarding Plan Sponsor Backstop Funding.**  The obligations set forth in this Agreement shall be binding on the Plan Sponsor and any successor to the Plan Sponsor.  Until the Backstop Expiration Date, the Plan Sponsor shall not merge or transfer greater than fifty percent (50%) of its assets in the aggregate to any party unless the successor agrees to be bound by this Agreement in advance of such merger or transfer in an executed document to be provided to the Plan Sponsor and filed with the Bankruptcy Court.

8. **Performance Guaranty.** The Guarantor guarantees the due, prompt and faithful payment, performance and discharge by, and compliance with, all of the obligations, covenants, agreements, terms, conditions and undertakings of the Plan Sponsor hereunder, including any such obligations, covenants, agreements, terms, conditions and undertakings that are required to be performed, discharged or complied with following the Closings by the Plan Sponsor.  Such guarantee is an absolute and unconditional guarantee of payment and performance and not merely of collectability, and is in no way conditioned or contingent upon any attempt to collect from, enforce performance or compliance by, or otherwise seek remedies from, the Plan Sponsor.

9. **Use of Funds.** Each recipient of Plan Sponsor Backstop Funding (including but not limited to each Authorized Entity, Reorganized Takata, the Warehousing Trust and the Plan Administrator) shall promptly use the proceeds of the Plan Sponsor Backstop Funding hereunder to fund any deficiency in

the funding of the Backstopped Claims, in accordance with the terms and conditions of this Agreement.

10. **Prohibition on Use of Funds.**  In the Chapter 11 Cases, Plan Sponsor Backstop Funding shall not be used directly or indirectly as a means to fund distributions to non-priority general unsecured creditors. The Plan Sponsor agrees that (i) the Plan attached to the U.S. RSA, including the Plan Settlement Turnover Amount, does not violate this <u>Section 10</u>, and (ii) any future Plan consented to in writing by the Plan Sponsor would not violate this <u>Section 10</u>.

11. **Assumption of Obligations at the Closings.**  Takata shall cause Reorganized Takata, the Reorganized TK Holdings Trust and the Warehousing Trust and each of their respective trustees to assume this Agreement at the Closings and to comply with the terms of this Agreement as and to the extent necessary to give effect to the terms and provisions hereof and the benefits and protections intended to be afforded to the parties hereunder.

12. **Termination.**  Except as set forth below, this Agreement will have an indefinite term.  This Agreement shall automatically terminate without further action of, or notice to, any of the parties hereto if the U.S. Acquisition Agreement terminates prior to the Closings.

13. **Amendments.**  This Agreement may not be modified, altered, or amended except by an agreement in writing signed by all of the parties or, with respect to <u>Section 5. b.-c.</u>, by the Plan Sponsor and the Consenting OEMs.  In the event that multiple legal entities in multiple jurisdictions are necessary to perform the operation of the Warehousing Trust in each jurisdiction, it is the intention of the parties that each such legal entity shall have the benefit of the Plan Sponsor Backstop Funding, and the parties agree to enter into such amendments to this Agreement as may be reasonably necessary to effectuate such intent.

14. **Binding Agreement; Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that (i) each of Reorganized Takata, the Warehousing Trust or the Reorganized TK Holdings Trust may assign its rights and obligations hereunder only with the Plan Sponsor's and the Consenting OEMs' written consent, which shall not be unreasonably withheld; (ii) the Plan Sponsor may assign its rights or obligations hereunder only with Reorganized Takata's, the Warehousing Trust's and the Consenting OEMs' consent, which shall not be unreasonably withheld; *provided, however*, that the Plan Sponsor may assign this Agreement and its rights, interests and/or obligations hereunder to one or more Affiliates of the Plan Sponsor or to any security trustee or collateral agent appointed by the Plan Sponsor's lenders for collateral security purposes without Reorganized Takata's, the Warehousing Trust's or the Consenting OEMs' consent; *provided, further, however*, that any such assignment shall not relieve the Plan Sponsor or the Guarantor of their respective obligations under this Agreement; and (iii) each Consenting OEM may assign its rights or obligations hereunder only with Reorganized Takata's, the Warehousing Trust's and the Plan Sponsor's consent, which shall not be unreasonably withheld.

15. **Governing Law; Jurisdiction.**  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of laws or principles thereof.  Except as otherwise explicitly set forth herein, if the parties are unable to resolve any dispute within thirty (30) days (or such longer period as agreed to by the parties) after notice of dispute is given, each party irrevocably consents and agrees that such dispute shall be fully and finally resolved by binding arbitration in accordance with the Swiss Rules of International Arbitration of Swiss Chambers' Arbitration Institution in force on the date on which the Notice of Arbitration is submitted in accordance with such Rules.  The number of arbitrators shall be three.  The

#90287165v1

language of the arbitration and of the Award shall be English.  The parties agree that the seat of such arbitration shall be Geneva, Switzerland, and that the hearing shall be in Geneva, unless otherwise agreed by the parties.  Award enforcement proceedings can be brought in any jurisdiction in which the party against whom enforcement is sought is subject to personal jurisdiction, under the rules applicable in the country in which enforcement is sought.

16. **Section Headings.** The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

17. **Severability.**  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement in the proceeding in which such provision(s) was deemed invalid or unenforceable.  In the event that any of the provisions of this Agreement shall be held by any reviewing court, governmental authority, arbitration panel or other similar party (a "***Reviewing Party***") to be invalid or unenforceable, such provisions shall be limited or eliminated in the applicable proceeding only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.  In the event of any such determination of invalidity or unenforceability, the Reviewing Party shall be permitted to reform the terms of this Agreement in the applicable proceeding to most closely give effect to the expressed intent of the Parties hereto while still complying with applicable law.  If any provisions of this Agreement are deemed invalid or unenforceable, or this Agreement is reformed in any manner by any Reviewing Party, at the request of the affected party(ies), the Agreement shall subsequently be submitted to arbitration pursuant to Section 15 for further reformation (including the reinsertion of any provision deemed invalid or unenforceable) by the arbitrators, which further reformed Agreement shall be controlling and binding upon the parties.

18. **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by electronic communications in portable document format (.pdf), each of which shall be deemed an original.

19. **Acknowledgments.  THIS AGREEMENT HAS BEEN FREELY AND VOLUNTARILY ENTERED INTO BY THE PARTIES, WITHOUT ANY DURESS OR COERCION, AND AFTER THE PARTIES HAVE EITHER CONSULTED WITH COUNSEL OR HAVE BEEN GIVEN AN OPPORTUNITY TO DO SO, AND EACH OF THE PARTIES ACKNOWLEDGES THAT IT (A) IS A SOPHISTICATED PARTY WITH RESPECT TO THE SUBJECT MATTER OF THIS AGREEMENT, (B) HAS ADEQUATE INFORMATION CONCERNING THE MATTERS THAT ARE THE SUBJECT OF THIS AGREEMENT, (C) HAS CAREFULLY AND COMPLETELY READ AND UNDERSTANDS ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT AND (D) HAS INDEPENDENTLY AND WITHOUT RELIANCE UPON ANY OTHER PARTY TO THIS AGREEMENT OR ANY OFFICER, EMPLOYEE, AGENT OR REPRESENTATIVE THEREOF MADE ITS OWN ANALYSIS AND DECISION TO ENTER INTO THIS AGREEMENT.**

20. **Waiver of Jury Trial.  THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.  THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT.**

#90287165v1

JOYSON KSS AUTO SAFETY S.A.

By: _____

Print Name: Jianfeng Wang

Title: Director

By: _____

Print Name: Yuxin Tang

Title: Director

**KSS HOLDINGS, INC.**

By: _____

Print Name: Yuxin Tang

Title: Executive Director & President

**Takata Corporation**

By: _____

Print Name: _Shigehisa Takata_

Title: _Chairman & CEO_

**TK Holdings Inc.**

By: _____

Print Name: Ken Bowling

Title: Vice President, Chief Financial Officer, Secretary

**Takata Americas**

By: _____

Print Name: Ken Bowling

Title: Secretary

**TK Finance LLC**

By: _____

Print Name: Ken Bowling

Title: Secretary

**TK China, LLC**

By: _____

Print Name: Ken Bowling

Title: Secretary

**Takata Protection Systems, Inc.**

By: _____

Print Name: Ken Bowling

Title: Corporate Secretary, Chief Financial Officer

**Interiors In Flight Inc.**

By: _____

Print Name: Ken Bowling

Title: Corporate Secretary, Chief Financial Officer

**TK Mexico Inc.**

By: _____

Print Name: Ken Bowling

Title: Secretary, Treasurer

Signature Page to Plan Sponsor Backstop Agreement

**TK Holdings de Mexico, S. de R.L. de C.V.**

By: _Yoichiro Nomura_

Print Name: Yoichiro Nomura

Title: Director

**Industrias Irvin de Mexico, S.A. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Industrias Irvin de Mexico, S.A. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Industrias Irvin de Mexico, S.A. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Takata de Mexico, S.A. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Takata de Mexico, S.A. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

Signature Page to Plan Sponsor Backstop Agreement

**Takata de Mexico, S.A. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Strosshe-Mex, S. de R.L. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director


By: _____

Print Name: Satoshi Seita

Title: Director

By: _____ *Valde* _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Strosshe-Mex, S. de R.L. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**Strosshe-Mex, S. de R.L. de C.V.**

By: _____

Print Name: Yoichiro Nomura

Title: Director

By: _____

Print Name: Satoshi Seita

Title: Director

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: Director

**TK Mexico LLC**

By: _____

Print Name: Carlos Alberto Valdez Andrade

Title: President

**TAKATA Europe GmbH**

By:_____

Print Name: Stephen Kimmich

Title: Managing Director

By:_____

Print Name: Tsutomu Yoshida

Title: Managing Director

By:_____

Print Name: Yoichiro Nomura

Title: Managing Director

**TAKATA Europe GmbH**

By: _____          By: _____

Print Name: Stephen Kimmich                   Print Name: Tsutomu Yoshida

Title: Managing Director                      Title: Managing Director


By: _____

Print Name: Yoichiro Nomura

Title: Managing Director

**TAKATA Sachsen GmbH**

By: _____

Print Name: Takao Yasuhara

Title: Managing Director

By: _____

Print Name: Claus Rudolf

Title: Managing Director

**TAKATA Aktiengesellschaft**

By: _____

Print Name: Takao Yasuhara

Title: Chairman of the Management Board, CEO

By: _____

Print Name: Claus Rudolf

Title: Member of the Management Board, COO

By: _____

Print Name: Stephen Kimmich

Title: Member of the Management Board, CFO

**BMW Manufacturing Co., LLC**

By: _____

Print Name: Knudt Flor

Title: Chief Executive Officer

By: _____

Print Name: Murat Aksel

Title: Vice President, Procurement

**Daimler AG**

By: _____

Print Name: _Dr. Klaus Zehender_

Title: _Executive Vice President_

By: _i. v. Rc_____    16.11.17_

Print Name: _RACHNER_

Title: _SENIOR MANAGER_

FCA US LLC f/k/a Chrysler Group LLC

By: _____

Print Name: SCOTT THIELE

Title: CPO

FCA Group Purchasing Srl

By: _____

Print Name: SCOTT THIELE

Title: CPO

FCA Fiat Chrysler Automóveis Brasil Ltda.

By: _____

Print Name: ANTONIO FILOSA

Title: Head of Purchasing FCA Latam

FCA Automobiles Argentina S.A.

By: _____

Print Name: ANTONIO FILOSA

Title: General Manager FCA Arg.

Emanuele Cappellano
CFO Latam

**Ford Motor Company**

By: _M E Wall_

Print Name: _Michael Wall_

Title: _Sr. Purchasing Mgr._

**General Motors Holdings LLC**

By: _____

Print Name: _____M. W. Fischer____

Title: _____DIRECTOR, SUPPLY RISK MGT____

Signature Page to Plan Sponsor Backstop Agreement

**Honda Motor Co., Ltd.**

By: _____

Print Name: _Naoto Matsui_

Title: _Operating Officer_

**Jaguar Land Rover Ltd.**

By: _____

Print Name: _____

Title: _____

**Mazda Motor Corporation**

By: _T. Nakamura_

Print Name: _Tetsuto Nakamura_

Title: _General Manager, Purchasing Div._

**Mitsubishi Motors Corporation**

By: _____

Print Name: Toshifumi Kimura

Title: General Manager
Interior Parts and Aftersales Purchasing Dept.

**Nissan Motor Co., Ltd.**

By: _____

Print Name: _Makoto UCHIDA_

Title: _Corporate Vice President_

**PSA Automobiles SA**

By: _____

Print Name: Gilles TESTU

Title: VP Stratégie, Processus, Systèm, Relation et Risque fournisseurs

Opel Automobile GmbH

By: _____

Print Name: Michelle Wen

Title: Purchasing Vice President

Ralph Greb

Lead Counsel

Signature Page to Plan Sponsor Backstop Agreement

**Subaru Corporation**

By: _____

Print Name: *Masakiva Kasai*

Title: *Corporate Executive Vice President.*

**Toyota Motor Corporation**

By: *M. Shirayanagi*

Print Name: Masayoshi Shirayanagi

Title: Managing Officer

**Aktiebolaget Volvo**

By: _____

Print Name: _ALESSANDRO GALLUZZI_

Title: _SENIOR VP PURCHASING_

**Volkswagen Aktiengesellschaft ,**
**Berliner Ring, 38436 Wolfsburg;**
**Deutschland**

i.V.

By: _____

Print Name: Rainer Stutz

Title: Leiter Konzernbeschaffung Interieur

i.V.

By: _____

Print Name: Dr. Frauke Eßer

Title: Leiter reaktives Risikomanagement
Beschaffung

**Schedule 1**

**Schedule 1 Entities**

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
| BMW | BMW AG |
| | BMW Consolidation Services Co., LLC |
| | BMW of North America, LLC |
| | BMW (UK) Manufacturing Ltd. |
| | BMW (South Africa) (Pty) Ltd. |
| | Rolls-Royce Motor Cars Ltd. |
| Daimler | Daimler Trucks North America LLC |
| | Mercedes-Benz U.S. International, Inc. |
| FCA | FCA Italy SpA |
| | FCA Melfi Srl |
| | FCA Mexico, S.A. de C.V. |
| Ford | Ford Motor Company SA DE CV |
| | Ford Argentina S.C.A. |
| | Ford Motor Co. Canada |
| | Ford Motor Company Brasilia |
| | Ford-Werke GmbH |
| GM | All of General Motors Holdings LLC's controlled subsidiaries and controlled affiliates, excluding SAIC General Motors Corporation Limited. For clarity, on August 1, 2017, General Motors Holdings LLC divested the following entities and such entities are no longer subsidiaries or affiliates of General Motors Holdings LLC: |
| | AFTERMARKET (UK) LTD |
| | AFTERMARKET ITALIA SRL |
| | General Motors Austria GmbH |
| | General Motors Belgium N.V. |

---

[1] Listed entities are included as Schedule 1 Entities because the Consenting OEM has authority or power to bind such entities but are included only to the extent they (i) have purchased Component Parts from Supplier, (ii) have claims against Supplier or (iii) receive Consenting OEM Recoveries; provided that any entities that are listed as "excluded" are not Schedule 1 Entities of the associated Consenting OEM.  Controlled subsidiaries and affiliates of Consenting OEMs that are not listed on this Schedule 1 are not Schedule 1 Entities of such Consenting OEM. Schedule 1 may be amended without the consent of the Parties to incorporate additional subsidiaries or affiliates of a Consenting OEM.

| Consenting OEM | Schedule 1 Entities[1] |
|---|---|
| | GENERAL MOTORS ESPAÑA, SLU |
| | GENERAL MOTORS EUROPE HOLDINGS |
| | General Motors Finland Oy |
| | General Motors France SAS |
| | General Motors GBS Hungary Kft |
| | General Motors Ireland Ltd. |
| | GENERAL MOTORS ITALIA SRL |
| | General Motors Nederland B.V. |
| | General Motors Poland Spolka zo.o. |
| | General Motors Portugal, Ltda. |
| | GENERAL MOTORS TURKIYE LTD |
| | GENERAL MOTORS UK LTD |
| | GM AUTOMOTIVE SERVICES BELGIUM N.V |
| | GM Automotive UK |
| | GM Global Purchasing and Supply Chain Romania SRL |
| | General Motors Hellas S.A. |
| | GM Holdings UK No 3 Limited |
| | General Motors Manufacturing Poland Sp. Zo o. |
| | IBC 2017 Pension Trustees Limited |
| | IBC VEHICLES LTD. |
| | Opel Automobile GmbH (fka Opel Sevice GmbH) |
| | Opel CIS LLC |
| | Opel Danmark A/S |
| | Opel Group Warehousing GmbH |
| | Opel Norge AS |
| | Opel Sonderdienste GmbH |
| | Opel Southeast Europe Ltd |
| | Opel Suisse S.A. |
| | OPEL SVERIGE AB |
| | Opel Szentgotthard Automotive Manufacturing Ltd. |
| | Opel Wien GmbH |

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
| | Vauxhall Defined Contribution Pension Plan Trustees Limited |
| | Vauxhall Motors Limited |
| | VHC SUB-HOLDINGS (UK) |
| | VML 2017 Pension Trustees Limited |
| Honda | Honda Motor Co., Ltd. |
| | American Honda Motor Co., Inc. |
| | Honda North America, Inc. |
| | Honda of America Mfg., Inc. |
| | Honda Manufacturing of Alabama, LLC |
| | Honda Manufacturing of Indiana, LLC |
| | Honda Canada Inc. |
| | Honda de Mexico, S.A. de C.V. |
| | Honda Motor Europe Ltd. |
| | Honda of the U.K. Manufacturing Ltd. |
| | Honda Turkiye A.S |
| | Honda Automobile Western Africa Ltd. |
| | Honda Motor (China) Investment Co., Ltd. |
| | Honda Automobile (China) Co., Ltd. |
| | Asian Honda Motor Co., Ltd. |
| | Honda Cars India Limited |
| | P.T. Honda Prospect Motor |
| | Honda Malaysia Sdn Bhd |
| | Honda Automobile (Thailand) Co., Ltd. |
| | Honda Vietnam Co., Ltd. |
| | Honda Atlas Cars (Pakistan) Limited |
| | Honda Cars Philippines, Inc. |
| | Honda South America Ltda. |
| | Honda Automoveis do Brasil Ltda. |
| | Honda Motor de Argentina S.A. |
| | Honda of South Carolina Mfg., Inc. |
| | Honda Taiwan Motor Co., Ltd. |

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
| | Honda Motor Europe Logistics N.V |
| | Honda Gulf FZE |
| | Honda Motor Southern Africa (PTY) Ltd |
| | Honda Motor India Private Ltd |
| | EXCLUDED ENTITIES |
| | CHINA JOINT VENTURES |
| | Dongfeng Honda Automobile Co., Ltd. |
| | GAC Honda Automobile Co., Ltd. |
| JLR | Jaguar Land Rover North America, LLC |
| Mazda | Mazda Motor Manufacturing de Mexico S.A. de C.V. |
| | Mazda Motor of America, Inc. |
| Mitsubishi | Mitsubishi Motors North America, Inc. |
| | Mitsubishi Motors (Thailand) Co., Ltd. |
| Nissan | Nissan Trading Co., Ltd. |
| | Nissan Mexicana, S.A. De C. V. |
| | Nissan North America, Inc. |
| | Nissan Do Brasil Automoveis Ltda. |
| | Nissan International S.A. |
| | Nissan Motor Manufacturing (UK) Ltd. |
| | Nissan Motor Iberica, S.A. |
| | Nissan Manufacturing RUS LLC. |
| | Nissan Trading China Co., Ltd. |
| | Nissan Motor India Private Limited. |
| | Nissan China Investment Co Ltd. |
| | P.T. Nissan Motor Indonesia |
| | Nissan Motor (Thailand) Co., Ltd. f/k/a Siam Nissan Automobile Co., Ltd. |
| PSA | Peugeot Citroen Automoviles Espana S.A. |
| | PCA Slovakia, S.R.O. |
| | Societe Europeenne de Vehicules Legers Du Nord-Sevelnord |
| | Peugeot Citroen Automoveis Portugal, SA |
| | Peugeot Citroen do Brasil Automoveis LTDA |

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
|  | Peugeot Citroen Argentina S.A. |
|  | Peugeot Citroen Automobiles Maroc |
|  | Opel Automobile GmbH, not only acting in its own name but also in the name and on behalf of any entity directly or indirectly controlled by it and involved in the procurement of PSAN parts or PSAN spare parts, including: |
|  | Opel Manufacturing Poland Sp.z.o.o |
|  | Opel España, S.L.U. |
|  | Vauxhall Motors Ltd. |
|  | IBC Vehicles Ltd. |
| Subaru | Subaru of America, Inc. |
|  | Subaru of Indiana Automotive, Inc. |
| Toyota | Toyota Kirloskar Motor Private Limited, and its successors and assigns |
|  | Toyota Motor Thailand, Co., Ltd. |
|  | Toyota Daihatsu Engineering & Manufacturing Co., Ltd. f/k/a Toyota Motor Asia Pacific Engineering & Manufacturing Co., Ltd. |
|  | PT. Toyota Motor Manufacturing Indonesia |
|  | Toyota Motors East Japan |
|  | Toyota Motor Kyushu, Inc. |
|  | Toyota Auto Works Co., Ltd. |
|  | Toyota Auto Body |
|  | Toyota Motor Europe N.V./S.A. |
|  | Toyota South Africa Motors (Pty.) Ltd. |
|  | Toyota Motor Manufacturing France S.A.S. |
|  | Toyota Motor Manufacturing Turkey Inc. |
|  | Toyota Motor Manufacturing (UK) Ltd. |
|  | Toyota Motor Engineering & Manufacturing North America, Inc. |
|  | Toyota Motor North America, Inc. |
|  | Toyota Motor Manufacturing de Baja California, S. de R.L. de C.V. |
|  | Toyota Motor Manufacturing, Indiana, Inc. |
|  | Toyota Motor Manufacturing, Kentucky, Inc. |
|  | Toyota Motor Manufacturing, Texas, Inc. |

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
| | Toyota Motor Manufacturing, Mississippi, Inc. |
| | New United Motor Manufacturing, Inc. |
| | Toyota Motor Manufacturing, California, Inc. |
| | Toyota Motor Sales, U.S.A., Inc. |
| | Toyota Motor de Mexico, S. de R.L. de C.V. |
| | Toyota Motor Sales de Mexico, S. De R.L. C.V. |
| | Toyota de Puerto Rico Corp. |
| | Toyota Motor Manufacturing Canada Inc. |
| | Toyota Canada Inc. |
| | Toyota do Brasil Ltda. |
| | Toyota Argentina S.A. |
| | Daihatsu Motor Co., Ltd. |
| | Daihatsu Motor Kyushu Co., Ltd. |
| | Hino Motors, Ltd. |
| | Hino Motors Manufacturing (Thailand) Ltd. |
| | PT. Astra Daihatsu Motor |
| | **Excluded Entities:** |
| | Perusahaan Otomobil Kedua Sendirian Berhad (Second Automobile Manufacturer Private Limited), also known as "Perodua" |
| | Assembly Services Sdn. Bhd. |
| | <u>CHINA JOINT VENTURES</u> |
| | GAC Toyota Motor Co., Ltd. |
| | Tianjin FAW Toyota Motor Co., Ltd. |
| | Sichuan FAW Toyota Motor Co., Ltd. |
| | Changchun Fengyue Company of Sichuan FAW Toyota Motor Co., Ltd. |
| Volkswagen | Volkswagen Group of America Inc. |
| | 2200 Ferdinand Porsche Drive, Herndon, VA 20171 , U.S.A. |
| | Volkswagen de Mexico S.A. de C.V. |
| | Autopista Mexico-Puebla, Km 116, San Lorenzo Almencatla, Cuautlancingo, Puebla 72700; Mexico |
| | Volkswagen do Brasil Indústria de Veículos Automotores Ltda |
| | Via Anchieta Km 23,5, São Bernardo do Campo, State of Sao Paulo, |

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
| | Federative Republic of Brasil (Reg. 59.104.422/0001-50) |
| | Volkswagen Argentina S.A. |
| | Avenida de las Industrias 3101, General Pacheco, Provincia Buenos Aires, Argentina  (Reg.Nr. Legajo 209677 - Matricula 121403) |
| | Volkswagen of South Africa (Pty) Ltd |
| | 103 Algoa Road, Uitenhage 6230, Republic of South Africa (Reg.Nr. 1946/023458/07) |
| | Volkswagen Group Rus |
| | Avtomobilnaya 1, 248926 Kaluga, Russian Federation (1025005336564) |
| | Audi AG |
| | Auto-Union-Straße 1, 85045 Ingolstadt, Germany |
| | AUDI HUNGARIA Zrt. |
| | 9027 Gyor, ut I, Hungary (Registry no. 08-10-00284) |
| | AUDI MÉXICO S.A. de C.V. |
| | Boulevard Q5 No. 1, San José Chiapa, Puebla, C.P. 75012, México |
| | Dr. Ing. h.c. F. Porsche Aktiengesellschaft |
| | Porscheplatz 1, 70435 Stuttgart, Germany |
| | Skoda Auto. a.s. |
| | Tr. Vaclava Klementa 869, 29360 Mlada Boleslav, Czech Republic (ID No.: 00177041, Prague, B332) |
| | Seat S.A. |
| | Autovía A-2, Km. 585, Apdo. de Correos 91, 08760 Martorell, Spain (C.I.F. A28049161) |
| | BENTLEY MOTORS LIMITED |
| | Pyms lane, Crewe, Cheshire, Cw1 3PL, United Kingdom (registered number: 00992897) |
| | Automobili Lamborghini S.p.A. |
| | Via Modena 12, 40019 Sant'Agata Bolognese, Italy |
| | MAN Truck & Bus AG |
| | Dachauer Str. 667 , 80995 München, Germany |
| | Scania CV AB |
| | SE-151 87 Södertälje, Sweden (RegNo. 556084-0976) |
| | SAIC Volkswagen Automotive Co. Ltd. |

| CONSENTING OEM | SCHEDULE 1 ENTITIES[1] |
|---|---|
| | 201805 7 Yu Tian Road, Anting, Shanghai 201805, P.R. China |
| | FAW-Volkswagen Automotive Co., LTD |
| | Dongfeng Street, Changchun, Jilin, P.R. China |
| Volvo | LLC Volvo Component |
| | Mack Trucks, Inc. |
| | Volvo do Brasil Veiculas Ltda. |
| | Volvo East Asia (PTE) Ltd. |
| | Volvo Group Belgium NV |
| | Volvo Group India Private Limited |
| | Volvo Group North America LLC |
| | Volvo Parts Corporation |
| | Volvo Truck Corporation |
| | Volvo (China) Investments Co., Ltd. |
| | UD Trucks Corporation |

**Exhibit 4**

**U.S. Acquisition Agreement**

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

BY AND AMONG

TK HOLDINGS INC.,
TAKATA AMERICAS,
TK HOLDINGS DE MEXICO S. DE R.L. DE C.V.,
TK MEXICO LLC,
INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.,
STROSSHE MEX S. DE R.L. DE C.V.,
TAKATA DE MEXICO S.A. DE C.V.,
JOYSON KSS AUTO SAFETY S.A.

AND

KSS HOLDINGS, INC.
(solely for purposes of Section 7.22)

Dated as of November 16, 2017

## Table of Contents

Page

ARTICLE I DEFINITIONS ...................................................................................3

1.1    Certain Definitions..................................................................................3
1.2    Terms Defined Elsewhere in this Agreement. ......................................25
1.3    Other Definitional and Interpretive Matters. ......................................29

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ........31

2.1    Purchase and Sale of Assets..................................................................31
2.2    Excluded Assets. ...................................................................................34
2.3    Assumption of Liabilities.......................................................................36
2.4    Excluded Liabilities. ..............................................................................37
2.5    Cure Claims. ..........................................................................................38
2.6    Consent to Certain Assignments...........................................................39
2.7    Contract Designation. ...........................................................................39
2.8    Further Conveyances and Assumptions.................................................42

ARTICLE III CONSIDERATION .......................................................................42

3.1    Consideration. .......................................................................................42
3.2    Purchase Price Deposit. ........................................................................46
3.3    Payments by the Plan Sponsor of Certain Portions of the Purchase Price........................47
3.4    Repaid Indebtedness. ............................................................................48
3.5    Backstop.................................................................................................48
3.6    Business Incentive Plan. ........................................................................48
3.7    Withholding. ..........................................................................................51

ARTICLE IV CLOSING AND TERMINATION ..................................................51

4.1    Closing. ..................................................................................................51
4.2    Deliveries by Sellers. .............................................................................52
4.3    Deliveries by the Plan Sponsor..............................................................54
4.4    Termination of Agreement.....................................................................55
4.5    Procedure Upon Termination.................................................................58
4.6    Break-Up Fee and Expense Reimbursement. ........................................58
4.7    Regulatory Termination Fee. .................................................................62
4.8    Effect of Termination.............................................................................63
4.9    Treatment of OEMs that Have Not Used PSAN. ...................................64

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS.................................64

5.1    Organization and Good Standing............................................................64
5.2    Acquired Subsidiaries; Ownership of Equity Interests...........................65
5.3    Authorization of Agreement. .................................................................65

i

5.4     Conflicts; Consents of Third Parties. ..........................................................66
5.5     Sufficiency of and Title to Purchased Assets. ............................................66
5.6     Financial Statements. ...................................................................................67
5.7     No Undisclosed Liabilities...........................................................................67
5.8     Absence of Certain Developments................................................................67
5.9     Taxes. ............................................................................................................68
5.10    Real Property. ...............................................................................................70
5.11    Condition of Facilities and Other Tangible Property....................................70
5.12    Intellectual Property......................................................................................71
5.13    Material Contracts. .......................................................................................72
5.14    Employee Benefits. .......................................................................................74
5.15    Labor..............................................................................................................76
5.16    Litigation.......................................................................................................77
5.17    Compliance with Laws; Permits. ..................................................................78
5.18    Automotive Regulatory/NHTSA Compliance. .............................................78
5.19    Compliance with FCPA, International Trade Laws and Sanctions. ...............78
5.20    Money Laundering Laws. ..............................................................................80
5.21    Insurance. ......................................................................................................80
5.22    Environmental Matters...................................................................................80
5.23    Customers and Suppliers................................................................................81
5.24    Warranty and Product Liability. ....................................................................81
5.25    Financial Advisors. .......................................................................................82
5.26    Affiliate Transactions....................................................................................82
5.27    PSAN Inflator Business.................................................................................82
5.28    Acquired Subsidiary Indebtedness................................................................82
5.29    Indemnification Arrangements. .....................................................................82

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PLAN SPONSOR .................82

6.1     Organization and Good Standing...................................................................82
6.2     Authorization of Agreement. ........................................................................82
6.3     Conflicts; Consents of Third Parties. ...........................................................83
6.4     Litigation.......................................................................................................83
6.5     Financial Advisors. .......................................................................................84
6.6     Bankruptcy.....................................................................................................84
6.7     Financial Capability.......................................................................................84
6.8     Ultimate Parent. ............................................................................................85
6.9     No Other Representations or Warranties. ......................................................85

ARTICLE VII COVENANTS ...............................................................................................85

7.1     Access to Information. ...................................................................................85
7.2     Conduct of the Business Pending the U.S. Closing. .....................................86
7.3     Consents.........................................................................................................90
7.4     Regulatory Approvals. ...................................................................................90
7.5     Bankruptcy Court Filings and Approvals. ....................................................93
7.6     Further Assurances; Separation of PSAN Assets. ........................................94

ii

7.7    Confidentiality. ........................................................................................................95
7.8    Preservation of Records. .........................................................................................96
7.9    Publicity. ..................................................................................................................96
7.10   Use of Name. ...........................................................................................................96
7.11   Competing Transaction. ..........................................................................................98
7.12   PSAN Assets. ...........................................................................................................99
7.13   Wrong Pocket ........................................................................................................100
7.14   Rule 11 Plea Agreement. .......................................................................................101
7.15   Financing. ..............................................................................................................101
7.16   Cooperation. ..........................................................................................................102
7.17   Termination of Affiliate and Intercompany Agreements .......................................103
7.18   Permits. ..................................................................................................................106
7.19   Global Settlement Agreement. ...............................................................................107
7.20   Certain Pre-Closing Restructurings. ......................................................................107
7.21   Expense Reimbursement During Bankruptcy Cases. .............................................110
7.22   Performance Guaranty. ..........................................................................................111
7.23   Delivery of Cash. ...................................................................................................111
7.24   Non-Consenting OEMs ..........................................................................................111
7.25   Severing PSAN Contracts. .....................................................................................111
7.26   Excess Cash. ..........................................................................................................111
7.27   Break-Up Fee and Expense Reimbursement Cooperation .....................................112
7.28   Joyson Shareholder Approval. ...............................................................................112
7.29   Equipment Option Notice. .....................................................................................112

ARTICLE VIII EMPLOYEES AND EMPLOYEE BENEFITS ..............................................112

8.1    Employment. ..........................................................................................................112
8.2    Mexico Employees .................................................................................................116
8.3    Employee Census. ..................................................................................................117

ARTICLE IX CONDITIONS TO CLOSING ..........................................................................118

9.1    Conditions Precedent to Obligations of the Plan Sponsor. ....................................118
9.2    Conditions Precedent to Obligations of Sellers. ...................................................120
9.3    Conditions Precedent to Obligations of the Plan Sponsor and Sellers. .................121
9.4    Frustration of Closing Conditions ..........................................................................121

ARTICLE X TAXES .................................................................................................................122

10.1   Transfer Taxes. ......................................................................................................122
10.2   VAT. .......................................................................................................................123
10.3   Real Property, Personal Property and Similar Ad Valorem Taxes .........................123
10.4   Section 338 Elections. ...........................................................................................124
10.5   Purchase Price Allocation. .....................................................................................125
10.6   Brazil Withholding Tax Matters. ............................................................................126
10.7   Mexican Tax Withholding Matters. ........................................................................127
10.8   Pre-Closing Actions. ..............................................................................................128

iii

10.9 Cooperation.................................................................................................128
10.10 Tax Treatment of Purchase Price Adjustments.............................................128
10.11 Tax Sharing Agreements................................................................................129
10.12 Exclusivity. ...................................................................................................129

ARTICLE XI MISCELLANEOUS .......................................................................129

11.1 Survival.........................................................................................................129
11.2 Expenses. ......................................................................................................129
11.3 Incorporation of Exhibits and Disclosure Schedule......................................129
11.4 Specific Performance. ...................................................................................129
11.5 Governing Law. .............................................................................................129
11.6 Submission to Jurisdiction; Service of Process. ...........................................130
11.7 WAIVER OF JURY TRIAL...........................................................................130
11.8 Entire Agreement; Amendments and Waivers. ............................................130
11.9 Notices. .........................................................................................................131
11.10 Severability. ..................................................................................................133
11.11 No Third Party Beneficiaries. .......................................................................133
11.12 Succession and Assignment...........................................................................133
11.13 Non-Recourse. ..............................................................................................133
11.14 Mutual Drafting. ...........................................................................................134
11.15 Disclosure Schedule.......................................................................................134
11.16 Joint Obligations. ..........................................................................................135
11.17 Counterparts; Electronic Signatures. ...........................................................135

iv

## ANNEXES, EXHIBITS AND SCHEDULES

Annexes

| | |
|---|---|
| Annex A | Base Purchase Price |
| Annex B | Acquired Cash Adjustment |

Exhibits

| | |
|---|---|
| Exhibit A | Restructuring Support Agreement |
| Exhibit B | Joint Chapter 11 Plan of Reorganization |
| Exhibit C | Bill of Sale, Assignment and Assumption Agreement |
| Exhibit D | Mexican Employees Transfer Agreement |
| Exhibit E | Backstop Agreement |
| Exhibit F | Regulatory Escrow Agreement Term Sheet |
| Exhibit G | Global Settlement Agreement |
| Exhibit H | OEM Indemnity and Release Agreement |
| Exhibit I | Voting and Support Agreement |

Schedules

| | |
|---|---|
| Schedule A | Consenting OEMs |
| Schedule B | Regional Shares |
| Schedule C | Exchange Rate Calculation |
| Schedule D | Seller Covered Persons |
| Schedule E | Share Purchase Subsidiaries |
| Schedule F | Retained Subsidiaries |
| Schedule G | Allocation Entities |
| Schedule H | Specified OEMs |
| Schedule I | Non-Consenting OEMs |
| Schedule J | Acquired Subsidiary Cash |
| Schedule K | Cash Allocation Shares |

WEIL:\96035900\75\76903.0003

## ASSET PURCHASE AGREEMENT

Asset Purchase Agreement, dated as of November 16, 2017 (this "**Agreement**"), by and among TK Holdings Inc., a Delaware corporation ("**TK Holdings**"), Takata Americas, a Delaware general partnership ("**Takata Americas**"), TK Holdings de Mexico S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*) ("**TK Holdings de Mexico**"), TK Mexico LLC, a Delaware limited liability company ("**TK Mexico LLC**"), Industrias Irvin de Mexico, S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*) ("**Industrias**"), Strosshe Mex S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*) ("**SMX**"), Takata de Mexico S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*) ("**TK de Mexico**" and, collectively with TK Holdings, Takata Americas, TK Holdings de Mexico, TK Mexico LLC, Industrias and SMX, "**Sellers**"), Joyson KSS Auto Safety S.A., a Luxembourg *société anonyme* ("**Parent**", and collectively with one or more of its current or future Subsidiaries or Affiliates, the "**Plan Sponsor**"), and solely for purposes of <u>Section 7.22</u>, KSS Holdings, Inc., a Delaware corporation ("**KSS Holdings**" or, the "**Guarantor**").  Sellers, and the Plan Sponsor are referred to collectively herein as the "**Parties**" and either Sellers, on the one hand, or the Plan Sponsor, on the other hand, are respectively referred to as a "**Party**".

W <u>I</u> T <u>N</u> E <u>S</u> S <u>E</u> T <u>H</u>:

WHEREAS, Sellers and certain of their respective Subsidiaries are debtors in possession (collectively, the "**U.S. Debtors**") under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on June 25, 2017 (the "**Bankruptcy Cases**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").`

WHEREAS, in connection with the Bankruptcy Cases, Sellers, certain of their Affiliates, and certain of the OEMs (as defined below) listed on <u>Schedule A</u> to this Agreement (the "**Initial Consenting OEMs**" and, together with any OEM that executes a counterpart or joinder to the OEM Indemnity and Release Agreement (as defined below), the Global Settlement Agreement (as defined below) and the OEM Allocation Agreement (as defined in the OEM Indemnity and Release Agreement) in accordance with the respective terms thereof and otherwise on or before the Closings, the "**Consenting OEMs**") entered into an Accommodation Agreement, dated July 18, 2017 (as may be further amended, the "**Accommodation Agreement**");

WHEREAS, in connection with the Bankruptcy Cases, Sellers, certain of their Affiliates, and certain of the Initial Consenting OEMs entered into an Access Agreement, dated August 9, 2017 (the "**Access Agreement**");

WHEREAS, Sellers and certain of their Affiliates engage in research and development with respect to, and the design, manufacture, marketing and sale of, steering wheels, motorized and non-motorized seatbelts, air bag modules, electronics, child seats, textiles, fabrics, lane departure warning devices, adaptive front steering devices, satellite sensors, seat weight sensors, pedestrian safety pop-up hood devices, Kitting Operations (as defined below), airbag inflators (including GuNi inflators and ammonium nitrate inflators made by third parties but excluding PSAN Inflators (as defined below)), igniters, other automotive safety and related Component

Parts, and any other Products, excluding, for the avoidance of doubt, PSAN Inflators (as defined below) and the PSAN Inflator Business (as defined below) (collectively, the "**Business**").

WHEREAS, Sellers and certain of their Affiliates also engage in the PSAN Inflator Business.

WHEREAS, Sellers desire to sell, transfer and assign to the Plan Sponsor, and the Plan Sponsor desires to purchase, acquire and assume from Sellers, all of the Purchased Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

WHEREAS, concurrently with the execution of this Agreement, TK Holdings, TKJP (as defined below), TK Europe (as defined below), TKAG (as defined below), Takata Sachsen (as defined below), Parent and the Escrow Agent (as defined below) are entering into the Escrow Agreement (as defined below) and Parent or an Affiliate of Parent, on behalf of Parent or current or future Subsidiaries or Affiliates of Parent designated to purchase the Purchased Assets, is posting the Escrow Amount as a deposit thereunder.

WHEREAS, concurrently with the execution of this Agreement, Parent and/or certain Affiliates of Parent and certain Affiliates of Sellers are entering into (a) the TKJP Purchase Agreement (as defined below) and (b) the TK Europe Purchase Agreement (as defined below).

WHEREAS, concurrently with the execution of this Agreement, the Consenting OEMs and Parent are entering into an Indemnity and Release Agreement in the form attached hereto as Exhibit H (the "**OEM Indemnity and Release Agreement**"), and Sellers, Parent and certain of the Consenting OEMs or certain of their Affiliates are entering into the Restructuring Support Agreement in the form attached hereto as Exhibit A (the "**RSA**").

WHEREAS, the approval by the affirmative vote (in person or by proxy) of holders holding two-thirds (2/3) of the voting power of shareholders present (in person or by proxy) and entitled to vote at a shareholders meeting of Ningbo Joyson Electronic Corp. ("**Joyson**") duly called and held for the purpose of approving the Global Transactions (as defined below) or any adjournment or postponement thereof in favor of the approval of the Global Transactions (the "**Joyson Shareholder Approval**") is required for the consummation of the Global Transactions.

WHEREAS, prior to or concurrently with the execution and delivery of this Agreement, and as a condition and inducement to Sellers' willingness to enter into this Agreement, Mr. Jianfeng Wang, a citizen of the People's Republic of China, and Joyson Holding Co., Ltd., a company established and existing under the laws of the People's Republic of China (collectively, the "**Joyson Shareholders**") entered into a voting and support agreement with TK Holdings, TKJP and TK Europe (the "**Voting and Support Agreement**"), the form of which is attached hereto as Exhibit I, pursuant to which, among other things, the Joyson Shareholders agreed to vote all of the shares of capital stock of Joyson that the Joyson Shareholders own or control (directly or indirectly) in favor of the approval of the Global Transactions.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

# ARTICLE I

# DEFINITIONS

1.1     Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"**Accounting Expert**" means Deloitte & Touche LLP.

"**Acquired Cash**" means the Cash and Cash Equivalents conveyed to or acquired directly or indirectly by the Plan Sponsor pursuant to this Agreement and the Cross-Conditioned Agreements (including Cash and Cash Equivalents held by the Acquired Subsidiaries) at the Closings.

"**Acquired Intellectual Property**" means (i) the Purchased Intellectual Property and (ii) all other Intellectual Property, Software or Technology used or held for use by any Seller Entity, and all tangible and intangible embodiments of any of the foregoing (in any form or media), except as provided under Section 2.2(l).

"**Acquired IP Licenses**" means (a) all Purchased IP Licenses and (b) subject to Section 2.7, all other Contracts pursuant to which any Seller Entity (i) has granted to any third Person any right to any other Acquired Intellectual Property or (ii) has been granted a right to a third Person's Intellectual Property, Software or Technology that is used or held for use by Seller Entities, in each case of (i) and (ii), including those set forth on Schedule 2.1(g) except as provided under Section 2.2(l).

"**Affiliate**" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract or otherwise.

"**Aggregate Appraisal Amount**" means an amount equal to the sum of (x) the TSAC Appraisal Amount plus (y) the EMEA Appraisal Amount plus (z) the Mexico Appraisal Amount.

"**Alternative Transaction**" means, in a single transaction or a series of related transactions, (i) a merger, reorganization, share exchange, consolidation, business combination, recapitalization, dissolution, liquidation or similar transaction involving all or substantially all of (A) Sellers and the Acquired Subsidiaries, (B) Sellers' Affiliates party to, or to be sold in an equity purchase pursuant to, the TKJP Purchase Agreement, or (C) Sellers' Affiliates party to, or to be sold in an equity purchase pursuant to, the TK Europe Purchase Agreement (each group of entities described in any of (A) through (C), a "**Deal Subject Entity Set**"), or (ii) the direct or indirect acquisition of assets, shares of capital stock or other equity interests, or any combination thereof, by any Person or group, representing (1) twenty percent (20%) or more of the aggregate book value of the assets of all Deal Subject Entity Sets, or (2) twenty percent (20%) or more of the aggregate revenues or net income of all Deal Subject Entity Sets. Notwithstanding the

3

foregoing, (i) an Alternative Transaction shall not include a liquidation sale or liquidation transfer of one or more Deal Subject Entity Sets unless all or a material portion of such liquidation sale or liquidation transfer is entered into for the purpose or with the intent of circumventing the obligations of Sellers under Section 4.6 and (ii) in determining whether or not a transaction or series of related transactions constitutes an Alternative Transaction, the inclusion or exclusion therefrom of all or any part of the PSAN Inflator Business shall not be considered.

"**Alternative Transaction Expense Reimbursement Amount**" means Sellers' Regional Share of $50,000,000.

"**Alternative Transaction Proposal**" means any proposal or offer from any Person (other than the Plan Sponsor or any of the Plan Sponsor's Affiliates or Representatives (in their capacity as such)) relating to any Alternative Transaction.

"**Antitrust Law**" means antitrust laws and all other laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, including: the Sherman Antitrust Act, as amended; the Clayton Antitrust Act of 1914, as amended; the HSR Act; the Federal Trade Commission Act of 1914, as amended; the EU Merger Regulation, as amended; the merger control laws of EU Member States; the Anti-monopoly Law of China, as amended; the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade of Japan, as amended; the Mexican Federal Antitrust Law (*Ley Federal de Competencia Económica*) as amended; and the applicable requirements of antitrust, competition or other similar Laws and judicial doctrines of jurisdictions other than the U.S., the European Union, the People's Republic of China, Mexico or Japan.

"**Assumed Employee Liabilities**" means all Liabilities (a) arising out of, resulting from or relating to (i) the employment or termination of employment of the Transferred Employees after the Closing Date, (ii) the Business Benefit Plans, (iii) the obligations to Transferred Employees under the TK Holdings Inc. Supplemental Management Retirement Plan and the TK Holdings Inc. Executive Retirement Plan, (iv) retention payment obligations under the Key Employee Bonus Plan and (v) post-retirement health and welfare benefits with respect to Transferred Employees or (b) that are expressly assumed by the Plan Sponsor pursuant to Article VIII.

"**Avoidance Actions**" means any and all claims and causes of action of Sellers pursuant to Chapter 5 of the Bankruptcy Code or similar state Law claims.

"**Backstop Agreement**" means that certain Backstop Agreement, dated as of the date hereof, by and among Parent, KSS Holdings, the U.S. Debtors, TKJP, TK Europe, TKAG, Takata Sachsen and the Consenting OEMs, in the form attached hereto as Exhibit E.

"**Brazil Subsidiary Contribution Amount**" means an amount equal to (i) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 8.5334505%; minus (ii) the product of (x) the total amount estimated to fund the Post-Closing Reserve and the Warehousing Trust Reserve, other than those costs specifically related to warehousing, shipping and disposal of PSAN Inflators in leased warehouses, as set forth in the Legacy Cost Report and

(y) 16.6531481% (in respect of TKBR and TSAC); minus (iii) the good faith estimate of TKBR's board of directors, as of December 15, 2017, of Taxes reasonably expected to be payable in Brazil relating to the Transaction; minus (iv) the Repaid Indebtedness of TKBR; minus (v) the Takata Americas Required Cash Amount.  The Parties agree that the percentage set forth in the foregoing clause (i) shall be adjusted (to the extent necessary) as agreed by the Parties and the parties to each of the Cross-Conditioned Agreements to reflect the treatment of Intercompany Balances in accordance with <u>Section 7.17</u> and the corresponding section of each Cross-Conditioned Agreement.

"**Break-Up Fee**" means three percent (3.0%) of the Base Purchase Price.

"**Business Benefit Plan**" means each Employee Benefit Plan that is solely sponsored or maintained by an Acquired Subsidiary.

"**Business Day**" means any day, other than a Saturday, Sunday and any day which is a legal holiday under the laws of Mexico, the State of Hesse/Germany, Japan, China or the State of New York or is a day on which banking institutions located in Mexico, Frankfurt/Germany, Japan, China or the State of New York are authorized or required by Law or other governmental action to close.

"**Business Resourcing Trigger Event**" means any of the following occurs prior to the U.S. Closing with respect to Component Parts set forth on the confidential written schedules agreed between each of the Consenting OEMs and the Plan Sponsor and referred to in Section 3 of the Accommodation Agreement: one or more Consenting OEMs (A) engage in Permitted Resourcing (as defined in, as applicable, the Accommodation Agreement or the Japan Accommodation Agreement, each as in effect on the date hereof) or (B) reduce or cease orders for such Component Parts, in each case, because of (1) product, engineering, program, and model changes that renders the applicable Seller Entity's production of such Component Parts obsolete or (2) program or vehicle platform cancellations or modifications resulting from a major refresh or major redesign of the applicable program or the Component Part itself that renders the applicable Seller Entity's production of such Component Parts obsolete, and, in the aggregate, all such events described in clauses (A) and (B) above represent more than (i) $400 million of estimated aggregate business revenue of Takata, on a consolidated basis, over the lesser of the life of the applicable Purchase Orders or duration of the applicable program life, from and after March 1, 2018 or (ii) $100 million of the estimated annual business revenue of Takata, on a consolidated basis, for the fiscal year ended March 31, 2019, in each case, based on IHS Markit Ltd. volume estimates, and without taking into account any rollover or extension terms; provided, however, that the aggregate amounts calculated pursuant to clauses (i) and (ii) immediately above shall be net of newly awarded business from March 7, 2017 until the U.S. Closing based on estimated revenue using IHS Markit Ltd. volume estimates for the lesser of the life of the applicable contract or applicable program life (collectively, "**New Revenue**").

"**Cash Allocation Share**" means, with respect to Sellers, the sellers under the TKJP Purchase Agreement, the sellers under the TK Europe Purchase Agreement and the sellers under the TSAC Purchase Agreement (if applicable), the percentages set forth on <u>Schedule K</u> hereto.

"**Cash and Cash Equivalents**" means all cash and cash equivalents, as determined in accordance with GAAP, including, for the avoidance of doubt, all checks, wires in transit and drafts that are dated prior to the Closing Date or were initiated or deposited for the account of any Seller Entity prior to the U.S. Closing that have not yet been received or cleared as of the U.S. Closing, underlined provided that such checks, wires in transit or drafts actually clear, but excluding (a) all checks, wires in transit and drafts that are dated prior to the Closing Date or were issued by or against the account of any Seller Entity prior to the U.S. Closing that have not yet been received or cleared as of the U.S. Closing, (b) all cash and cash equivalents posted as a deposit with, or held by, any third party to secure performance of any obligations of any Seller Entity or otherwise, in excess of $3,000,000.00 in the aggregate and (c) any prepaid accounts or expenses or deferred revenue.

"**CFIUS**" means the Committee on Foreign Investment in the United States.

"**CFIUS Clearance**" means that: (i) the Plan Sponsor and Sellers shall have received written notice from CFIUS that review under Section 721 of the Defense Production Act of 1950 (50 U.S.C. § 4565) as amended by the Foreign Investment and National Security Act of 2007 ("**DPA**") of the Transactions has concluded; and CFIUS shall have determined that there are no unresolved national security concerns with respect to the Transactions, and advised that action under said Section 721, and any investigation related thereto, has concluded with respect to such transaction; (ii) CFIUS has concluded that the Transactions are not covered transactions that are subject to review under the DPA; or (iii) CFIUS shall have sent a report to the President of the United States of America (the "**President**") requesting the President's decision on the CFIUS notice submitted by the Plan Sponsor and Sellers and either (A) the period under the DPA during which the President may announce his decision to take action to suspend, prohibit or place any limitations on the Transactions shall have expired without any such action being threatened, announced or taken or (B) the President shall have announced a decision not to take any action to suspend, prohibit or place any limitations on the Global Transactions.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Component Parts**" means component parts, Service Parts, assemblies, components and/or other Products.

"**Confidential Information**" shall have the meaning ascribed to it in the Confidentiality Agreement.

"**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan and approval of the Transactions, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means an order of the Bankruptcy Court that is acceptable to Sellers and reasonably acceptable to the Plan Sponsor.

"**Consenting OEM Contract Manufacturer**" means a third party (that is not itself a Consenting OEM) that (i) manufactures or assembles, or manufactured or assembled, automobiles for a Consenting OEM and (ii) is or was at any point in time previously a party to a Purchase Order with a Seller Entity for the manufacture or sale of Products that have been or will

6

be incorporated into a Consenting OEM's automobiles. For clarity, any such third party shall be deemed to be a Consenting OEM Contract Manufacturer only with respect to the applicable Consenting OEM for which it manufactures or assembles, or manufactured or assembled, automobiles containing Products.

"**Consenting OEM PSAN Contract Manufacturer**" means a third party (that is not itself a Consenting OEM) that (i) manufactures or assembles, or manufactured or assembled, automobiles for a Consenting OEM and (ii) is or was a party to a Purchase Order with a Seller Entity for the manufacture or sale of PSAN Inflators that are or were at any point in time previously incorporated into a Consenting OEM's automobiles.  For clarity, any such third party shall be deemed to be a Consenting OEM PSAN Contract Manufacturer only with respect to the applicable Consenting OEM for which it manufactures or assembles, or manufactured or assembled, automobiles containing PSAN Inflators.

"**Consenting OEM PSAN Tier One**" means, for any Consenting OEM, any Consenting OEM Tier One, including a Directed PSAN Tier One, solely to the extent that it sources or uses or at any point in time previously sourced or used PSAN Inflators from a Seller Entity that are or were incorporated, or incorporated into Component Parts of, such Consenting OEM.  For clarity, any such supplier shall be deemed to be a Consenting OEM PSAN Tier One only with respect to the applicable Consenting OEM to which it supplies or supplied, or into whose Component Parts it incorporates or incorporated, PSAN Inflators from a Seller Entity.

"**Consenting OEM Tier One**" means, for any Consenting OEM, a supplier, including a Directed Tier One, to such Consenting OEM solely to the extent that such supplier sources or uses or at any point in time previously sourced or used components, parts or assemblies from a Seller Entity that are, were or will be supplied to, or incorporated into, Component Parts of such Consenting OEM; provided that no Consenting OEM shall itself be a Consenting OEM Tier One. For clarity, any such supplier shall be deemed to be a Consenting OEM Tier One only with respect to the applicable Consenting OEM to which it supplies or supplied such components, parts or assemblies.

"**Contract**" means any written contract, indenture, note, bond, Real Property Lease, license, purchase order (including standalone purchase orders not governed by general terms and conditions or master agreements) or other agreement.

"**Cure Claims**" means, excluding the OEM Assumed Liabilities, amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Purchased Contracts to be assumed and assigned to the Plan Sponsor pursuant to <u>Section 2.7</u>. For the avoidance of doubt, the Cure Claims for the OEM Assumed Contracts will be included in the OEM Assumed Liabilities.

"**Cure Claims Cap**" means an amount equal to five million dollars ($5,000,000).

"**Debt Financing Source**" means any lending institution or other entities that have committed to provide or otherwise entered into agreements to provide the Debt Financing, including the banks party to the Debt Commitment Letters and any joinder agreements or credit

agreements (including the definitive agreements executed in connection with the Debt Commitment Letters) relating thereto and their respective successors and assigns.

"**Directed PSAN Tier One**" shall have the meaning ascribed to it in the OEM Indemnity and Release Agreement, as in effect on the date hereof, with any changes to such definition agreed to by Sellers.

"**Directed Tier One**" shall have the meaning ascribed to it in the OEM Indemnity and Release Agreement, as in effect on the date hereof, with any changes to such definition agreed to by Sellers.

"**DOJ Monitor**" means the independent compliance monitor established pursuant to the January 13, 2017 Plea Agreement entered into between the DOJ and TKJP.

"**DOJ Restitution Claim**" means the $850 million in restitution payable for the benefit of OEMs pursuant to paragraphs 1 and 2 of the DOJ Restitution Order.

"**DOJ Restitution Fund**" means the $850 million fund to be created pursuant to paragraphs 1 and 2 of the DOJ Restitution Order.

"**DOJ Restitution Order**" means the Restitution Order entered by the United States District Court for the Eastern District of Michigan on February 27, 2017 in the case captioned U.S. v. Takata Corporation, Case No. 16-cr-20810 (E.D. Mich.).

"**EAR**" means the U.S. Export Administration Regulations.

"**Effective Date**" means the Business Day on which all conditions to the consummation of the Plan have been either satisfied or waived and the day upon which the Plan is substantially consummated.

"**EMEA Appraisal Amount**" shall be the value set forth in the appraisal report provided in connection with the TK Europe Purchase Agreement.

"**Employee Benefit Plan**" means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, (ii) other benefit and compensation plan, Contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller Entity is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement, plan, practice, policy, contract, program, and arrangement, in each case, (x) which is sponsored or maintained by any Seller Entity or any of their ERISA Affiliates in respect of any current or former employees, directors, independent contractors, consultants or leased employees of any Seller Entity or (y) with respect to which any Seller Entity has any actual or contingent Liability.

8

"**Employees**" means all individuals as of the date hereof, whether or not actively at work as of the date hereof, who are employed by any Seller Entity, together with any individuals who are hired after the date hereof and prior to the U.S. Closing to the extent permitted by Section 7.2(b).

"**Environmental Claim**" means any Legal Proceeding or Order (other than those Legal Proceedings or Orders relating to Products or PI/WD Claims) by any Person alleging Liability (including Liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to: (i) the presence, Environmental Emission of or exposure to any Hazardous Materials; (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (iii) any other matters covered or regulated by, or for which liability is imposed under, Environmental Laws.

"**Environmental Emission**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching into the environment, or into or out of any property.

"**Environmental Law**" means any applicable Law, including common law, relating to pollution, the protection of the environment or natural resources or employee exposure to Hazardous Materials, including Laws relating to: (i) exposure to or Environmental Emission or threatened Environmental Emission of, Hazardous Materials; (ii) the generation, manufacture, processing, distribution, use, treatment, containment, disposal, storage, transport or handling of Hazardous Materials; or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials; provided, that Environmental Laws shall not include Laws relating to Products or Product safety except, in each case, to the extent such Laws relate to Hazardous Materials.

"**Equipment Option**" shall have the meaning ascribed to it in the Accommodation Agreement.

"**Equity Interest**" means any capital stock or voting securities of, or other equity or equity-linked interests in (including phantom stock and obligations to issue or grant equity or equity-linked interests to any Person), or any interest convertible into or exchangeable or exercisable for, any capital stock or voting securities of, or other equity interest in, any Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of the date hereof, by and among TK Holdings, TKJP, TK Europe, TKAG, Takata Sachsen, Parent, and the Escrow Agent.

"**Escrow Letter of Credit**" means a letter of credit established to satisfy the Plan Sponsor's deposit obligations under this Agreement and the Escrow Agreement.

"**Estimated Total Non-Recoverable VAT Amount**" means the aggregate amount of VAT expected to be due at or after the U.S. Closing, and expected not to be refundable, creditable or otherwise recoverable, as a result of the U.S. Closing and/or any pre-closing

restructurings contemplated by this Agreement, without regard to which party has the legal liability therefor, as reasonably determined by the Plan Sponsor as of the Closing Date.

"**Estimated Total Recoverable VAT Amount**" means the aggregate amount of VAT expected to be due at or after the Closings, and expected to be refundable, creditable or otherwise recoverable, as a result of the Closings and/or any pre-closing restructurings contemplated by this Agreement, the TSAC Purchase Agreement (if applicable), the TKJP Purchase Agreement, and/or, to the extent relating to the sale or transfer of Owned Properties, as defined in the TK Europe Purchase Agreement, from TKAG and Takata Sachsen to Lux Sarl, the TK Europe Purchase Agreement, without regard to which party has the legal liability therefor, as reasonably determined by the Plan Sponsor as of the Closing Date.

"**European Subsidiary Contribution Amount**" means an amount equal to the sum of (i) the value of Takata Safety Systems Hungary Kft. and (ii) the value of TAKATA South Africa (Pty.) Ltd., in each case as set forth in the appraisal report provided in connection with the TK Europe Purchase Agreement.

"**Event of Default**" shall have the meaning ascribed to it in the Accommodation Agreement.

"**Excess Cash**" means an amount equal to Maximum Acquired Cash plus the amount of any Expenses for which the Plan Sponsor is entitled to be reimbursed upon consummation of the Global Transactions pursuant to Section 7.21 and the corresponding provisions of the Cross-Conditioned Agreements.

"**Excluded Employee Liabilities**" means all Liabilities, other than Assumed Employee Liabilities, (i) arising out of, resulting from or relating to any current or former employee or service provider of any Seller, including any Liabilities arising out of, resulting from or relating to the PSAN Benefit Plans or (ii) that are expressly retained by any Seller pursuant to Article VIII.

"**Excluded Environmental Liabilities**" means any Liability under any Environmental Law arising from or related to: (i) facts or conditions that could form the basis of any "claim" (as defined by Section 101(5) of the Bankruptcy Code) against any U.S. Debtor in the Bankruptcy Cases; (ii) arising from or related to any Excluded Asset; (iii) as related to Sellers, the presence of any Hazardous Materials at or related to any location other than the Owned Property and the real property subject to the Real Property Leases, prior to the U.S. Closing; (iv) as related to Sellers, any exposure to Hazardous Materials prior to the U.S. Closing; or (v) as related to Sellers, monetary fines and penalties arising from violations of any Environmental Law occurring prior to the U.S. Closing.

"**Expense Reimbursement**" means the reimbursement of Expenses contemplated by Section 4.6(a), Section 4.6(b), Section 4.6(c), Section 4.6(d), Section 4.6(e) and Section 7.21.

"**Final Order**" means an Order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (ii) if a timely appeal shall have been filed or sought, either (A) (1) no stay of the Order shall be in effect and (2) the appeal would not reasonably be expected to prevent or

materially impede the consummation of the Transactions or have a material adverse effect on the discharge granted under the Plan, or the releases, injunctions, or exculpations granted under the Plan in favor of the Plan Sponsor, or (B) if such a stay shall have been granted, then (1) (x) the stay shall have been dissolved and (y) the appeal would not reasonably be expected to prevent or materially impede the consummation of the Transactions or have a material adverse effect on the discharge granted under the Plan, or the releases, injunctions, or exculpations granted under the Plan in favor of the Plan Sponsor, or (2) a final Order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired; provided, however, that no Order shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to sections 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Federal Rules of Bankruptcy Procedure may be filed with respect to such Order.

"**Fundamental Representations**" means the representations and warranties contained in Section 5.1 (Organization and Good Standing), Sections 5.2(a) and (b) (Acquired Subsidiaries; Ownership of Equity Interests), Section 5.3 (Authorization of Agreement), Section 5.10(a) (Real Property), Section 5.25 (Financial Advisors), and Section 5.28 (Acquired Subsidiary Indebtedness).

"**GAAP**" means U.S. generally accepted accounting principles, consistently applied; provided, that to the extent a calculation of any amount is required to be done in the aggregate for entities pursuant to this Agreement and the Cross-Conditioned Agreements (including the calculation of Acquired Cash, Excess Cash, Maximum Acquired Cash and Required Cash), GAAP for such purposes shall mean Japan generally accepted accounting principles, in each case, consistently applied.

"**Global Base Purchase Price**" means $1,588,000,000 (such amount representing the sum of (x) the Base Purchase Price plus (y) the sums of the Base Purchase Price under (and as defined in) each Cross Conditioned Agreement).

"**Global Transactions**" means the transactions contemplated by this Agreement, the Plan, the RSA, the TKJP Purchase Agreement, the Japan RSA (as defined in the TKJP Purchase Agreement), the Section 42 Business Transfer (as defined in the Japan RSA), the TK Europe Purchase Agreement and the TSAC Purchase Agreement (if applicable).

"**Governmental Authority**" means any federal, state, local or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department or other governmental entity.

"**Group Subsidiary Contribution Amount**" means an amount equal to the sum of (i) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 5.3483216% (in respect of Takata-TOA Co., Ltd.), plus (ii) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 2.7024686% (in respect of Takata Korea Co., Ltd.), plus (iii) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 1.2294892% (in respect of Takata Automotive Safety

WEIL:\96035900\75\76903.0003

Systems (M) Sdn. Bhd.), plus (iv) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 1.0982992% (in respect of Takata India Private Limited), plus (v) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 1.2024746% (in respect of Takata Rus LLC), plus (vi) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 0.3542667% (in respect of PT. Takata Automotive Safety Systems Indonesia). The Parties agree that the percentages set forth in each of the foregoing clauses (i) through (vi) shall be adjusted (to the extent necessary), as agreed by the Parties and the parties to each of the Cross-Conditioned Agreements to reflect the treatment of Intercompany Balances in accordance with <u>Section 7.17</u> and the corresponding section of each Cross-Conditioned Agreement.

"**Hazardous Material**" means any material, substance or waste that: (i) is defined, classified or otherwise characterized as "hazardous," "toxic" or "radioactive" or as a "pollutant" or "contaminant," or words of similar meaning or effect, under any Environmental Law or (ii) can form the basis of Liability under any Environmental Law, including asbestos, pesticides, polychlorinated biphenyls or petroleum and petroleum derivatives.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Indebtedness**" of any Person means, without duplication: (i) all obligations of such Person, including the principal and accrued interest of and premium, prepayment penalties, make-whole payments or breakage fees and related costs and expenses associated with the repayment of (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current Liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; (vi) any liability under currency exchange, commodities or other hedging transactions or arrangements; and (vii) all obligations of the type referred to in clauses (i) through (vi) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Independent Member**" shall have the meaning ascribed to it in the Plan.

"**Intellectual Property**" means all rights, title and interest in and to all intellectual property and industrial property of any kind or nature, anywhere throughout the world, including the following: (i) patents, patent applications and patent rights, including any such rights granted upon any reissue, reexamination, division, extension, provisional, continuation or continuation-in-part applications ("**Patents**"); (ii) trademarks, service marks, trade names, service names, brand names, logos and trade dress rights, together with the goodwill associated with any of the

12

foregoing, and all applications, registrations and renewals thereof, whether or not registered (collectively, "**Marks**"); (iii) Internet domain names and social media handles and identifiers ("**Domain Names**"); (iv) copyrights, copyrightable subject matter, database and design rights, whether or not registered, and all registrations and recordations thereof and applications for registration thereof ("**Copyrights**"); and (v) trade secrets, confidential information, know-how and proprietary information ("**Trade Secrets**").

"**International Trade Laws and Sanctions**" means (i) all trade, export control, economic or financial sanctions or anti-boycott requirements imposed, administered or enforced from time to time by the U.S. government, including those administered under the U.S. Arms Export Control Act of 1976, as amended, the International Emergency Economic Powers Act, as amended, the Trading with the Enemy Act of 1917, ITAR, or EAR, or those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce (including anti-boycott regulations), U.S. Customs and Border Protection, the U.S. Census Bureau; (ii) all trade, export control, financial sanctions or anti-boycott Laws administered by the United Nations Security Council, Her Majesty's Treasury of the United Kingdom or the European Union, including pursuant to Article 215 TFEU and/or any EU Common Position, Decision or Regulation (including Regulation (EC) No 428/2009, (EC) No 1236/2005 and (EU) 775/2014); and (iii) all trade, export control, financial sanctions or anti-boycott requirements under all Laws in any other country in which any Seller Entity operates, except to the extent the requirements of such Laws are prohibited or penalized under U.S. law.

"**IRS**" means the U.S. Internal Revenue Service.

"**ITAR**" means the U.S. International Traffic in Arms Regulations.

"**Japan Accommodation Agreement**" means that certain Accommodation Agreement Relating to Japan Proceedings, dated July 31, 2017, by and among TKJP, TK9, TKS and the Japan Consenting OEMs party thereto.

"**Japan Insolvency Plan**" shall have the meaning ascribed to it in the Accommodation Agreement.

"**Kitting Operations**" means the kitting operations associated with the Recall obligations of the Seller Entities and/or their Subsidiaries related to PSAN Inflators.

"**Knowledge of the Plan Sponsor**", "**the Plan Sponsor's Knowledge**" and any similar expression mean the actual knowledge, after reasonable inquiry, of those officers and directors of the Plan Sponsor listed on Schedule 1.1(b).

"**Knowledge of Sellers**", "**Sellers' Knowledge**" and any similar expression mean the actual knowledge, after reasonable inquiry, of those officers and directors of Sellers and their Affiliates listed on Schedule 1.1(c).

"**Law**" means any applicable federal, state, local or foreign law, statute, code, ordinance, rule, regulation, order, writ, injunction, directive, judgement, decree, executive order, policy or guideline having the force of law or other legal requirement (including the Bankruptcy Code).

"**Legacy Costs**" means, collectively, (i) the Post-Closing Reserve and (ii) the Warehousing Trust Reserve.

"**Legacy Cost Report**" shall have the meaning set forth in the Plan.

"**Legal Proceeding**" means any judicial, administrative, regulatory or arbitral actions, suits, proceedings (public or private) or claims, including those by or before a Governmental Authority.

"**Liability**" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising, and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, assignment, conditional sale or other title retention agreement, reservation of ownership or lease in the nature thereof, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance, or any option or agreement to give any of the items listed in this definition.

"**Liquidation Reserve**" shall have the meaning ascribed to it in the Global Settlement Agreement.

"**Lux Sarl**" means Joyson KSS Holdings No.2 S.à r.l., a limited liability company (*Société à responsabilité limitée*) under the laws of Luxembourg.

"**Material Adverse Effect**" means any event, change, condition, occurrence or effect that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the Business or the condition (financial or otherwise), assets, liabilities, revenues or results of operations of the Business or (b) prevents or materially impedes, or would reasonably be expected to prevent or materially impede, the performance by Sellers of their obligations under this Agreement or the consummation of the Global Transactions, other than, in the case of clause (a), any effect or change arising from or related to: (i) general business or economic conditions in any of the geographical areas in which the Seller Entities operate; (ii) any condition or occurrence affecting the automotive parts industry generally; (iii) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (iv) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any strike, labor dispute, civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado or other weather event; (vi) changes in Law or accounting rules; (vii) the taking of any action required by this Agreement or taken with the consent of the other Party; (viii) any effects or changes as a result of the announcement or pendency of this Agreement; (ix) any effects or changes arising from or related to the breach of the Agreement by the Plan Sponsor; (x) any effect resulting from the filing of the Bankruptcy Cases; or (xi) the taking of any action expressly permitted or

14

authorized by the Accommodation Agreement, Access Agreement, or the RSA as of the date hereof; provided, however, that any event, change, condition, occurrence or effect arising from or related to matters described in the foregoing clauses (i), (ii), (iii), (iv) and (v) may be taken into account in determining whether a Material Adverse Effect has occurred if such event, change, condition, occurrence or effect has a disproportionate impact on Sellers, taken as a whole, relative to other participants in the industries and markets in which the Business operates.

"**Maximum Acquired Cash**" means an amount equal to Required Cash *plus* $50,000,000.

"**Mexico Appraisal Amount**" means the fair market value of the applicable Purchased Assets in Mexico, as mutually agreed to by the Parties prior to the date hereof, subject to receipt from an independent valuation firm of an opinion to the effect that the fair market value of the Purchased Assets in Mexico as agreed to by the Parties is fair, from a financial point of view, to the Sellers of such Purchased Assets (for the avoidance of doubt, such fairness opinion shall take into account the assumption of the Assumed Liabilities of each Seller organized in Mexico, the liabilities of the applicable Acquired Subsidiaries organized in Mexico, and (to the extent applicable) the treatment of the Intercompany Balances in accordance with Section 7.17).

"**Modified Assumed OEM Contracts**" means Non-Standalone OEM Contracts that have, in each case, been modified as set forth in the OEM Indemnity and Release Agreement at or prior to the Closing to apply only to non-PSAN Inflator Products.

"**MOFCOM**" means the Ministry of Commerce of the People's Republic of China or its competent local counterparts.

"**NDRC**" means the National Development and Reform Commission of the People's Republic of China or its competent local counterparts.

"**NHTSA**" means the National Highway Traffic Safety Administration of the U.S.

"**NHTSA Consent Order**" means, collectively, the Consent Order entered into between NHTSA and TK Holdings on May 18, 2015 and the Consent Order entered into between NHTSA and TK Holdings on November 3, 2015, as amended May 4, 2016, and as may be further amended.

"**NHTSA Monitor**" means the Independent Monitor established pursuant to the November 3, 2015 Consent Order entered into between NHTSA and TK Holdings.

"**No-Fault Expense Reimbursement Amount**" means Sellers' Regional Share of $15,000,000.

"**Non-Standalone OEM Contracts**" means Purchase Orders of Consenting OEMs, Consenting OEM Contract Manufacturers and Consenting OEM Tier Ones that (i) are not standalone Purchase Orders, and (ii) cover the manufacture or sale of both PSAN Inflators and other Products, including related airbag modules.

"**Notice Protocol**" shall have the meaning set forth in the RSA.

WEIL:\96035900\75\76903.0003

"**OEM**" means an original equipment manufacturer of automobiles.

"**OEM Assumed Contracts**" means, collectively, the Modified Assumed OEM Contracts and the Standalone OEM Assumed Contracts.

"**OEM Assumed Liabilities**" means the Liabilities assumed by the Plan Sponsor under the OEM Assumed Contracts pursuant to Section 2.3(b).

"**Order**" means any order, writ, judgment (except in the Ordinary Course of Business), injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Ordinary Course of Business**" means the ordinary and usual course of normal day-to-day operations of the Business through the date hereof consistent with past practice, including, for the avoidance of doubt, with respect to research and development; provided, that notwithstanding anything to the contrary, "Ordinary Course of Business" for purposes of this Agreement shall not include any activity that is not in compliance with applicable Law.

"**Oversight Committee**" shall have the meaning ascribed to it in the Plan.

"**Permits**" means any approvals, authorizations, consents, licenses, permits, registrations, concessions, variances, filings, exemptions, notarizations, consents or certificates of, or granted or issued by, a Governmental Authority.  For purposes of this definition, any permit related to foreign trade and/or customs under Mexican Laws required for the operation of the Business shall be considered a Permit, including VAT certifications and IMMEX program authorization (authorizations to operate a *maquila* under Mexican Laws).

"**Permitted Lien**" means: (a) with respect to real property Taxes, Liens for Taxes not yet due and payable, and with respect to Taxes other than real estate Taxes, Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business and that are not material in amount or effect on the Business; (c) with respect to the Real Property Leases or leased or licensed personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) recorded easements, covenants, conditions, restrictions and other similar non-monetary matters of record affecting title to real property, other encroachments and title and survey defects that would be disclosed on an accurate survey of the real property and any non-monetary liens shown in any title commitment, report or policy obtained by or otherwise made available to the Plan Sponsor, or otherwise of record, provided that such items have not had, and would not reasonably be expected to have, a Material Adverse Effect and do not otherwise materially impair the occupancy or continued use or operation of the real property to which they relate in the conduct of the Business; (f) non-exclusive licenses to Intellectual Property granted in the Ordinary Course of Business (including under the Accommodation Agreement); (g) Liens

16

granted under the Access Agreement (provided that such Liens are released at the U.S. Closing in accordance with the terms of the Access Agreement); and (h) any adequate protection Liens granted under any order approving the Accommodation Agreement (provided that such Liens are released at the U.S. Closing in accordance with the terms of the Accommodation Agreement).

"**Permitted Resourcing**" shall have the meaning ascribed to it in the Accommodation Agreement.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Authority or any group of any of the foregoing.

"**Petition Date**" means the date on which Sellers commenced the Bankruptcy Cases.

"**PI/WD Claims**" means any claims or causes of action brought in connection with any Legal Proceeding to the extent asserting, arising from or seeking relief as a result of any personal injury, wrongful death or similar matter.

"**Plan**" means the joint chapter 11 plan of reorganization of Sellers substantially in the form attached hereto as <u>Exhibit B</u> or otherwise reasonably acceptable to the Plan Sponsor.

"**Plan Sponsor Backstop Funding**" shall have the meaning ascribed to it in the Backstop Agreement.

"**Plan Sponsor Backstop Payments**" shall have the meaning ascribed to it in the Backstop Agreement.

"**Post-Closing Reserve**" means Cash and Cash Equivalents in an amount necessary for the post-Effective Date operations, working capital, and wind-down of Reorganized Takata and the costs and fees of the Special Master and any monitor(s) appointed by the DOJ or NHTSA.

"**Products**" means any and all products developed, designed, manufactured, marketed or sold, in research or development, or supported by, any Seller Entity or any seller entity under any of the Cross-Conditioned Agreements, including under any Purchase Order, whether work in progress or in final form.

"**PSAN**" means phase-stabilized ammonium nitrate.

"**PSAN Assets Advance Payment**" shall have the meaning ascribed to it in the Backstop Agreement.

"**PSAN Benefit Plan**" means the Employee Benefit Plans other than the Business Benefit Plans.

"**PSAN Employees**" means all individuals, whether or not actively at work, who are: (i) employed as of the date hereof by any Seller Entity primarily in connection with the PSAN Inflator Business; (ii) hired after the date hereof and prior to the U.S. Closing primarily in connection with the PSAN Inflator Business; or (iii) designated by TK Holdings after the date

hereof in its reasonable discretion based on the management and administrative needs of the PSAN Inflator Business and who accept or, following the U.S. Closing, continue employment in connection with the PSAN Inflator Business.

"**PSAN Inflator**" means, collectively, any airbag inflators that use non-desiccated or desiccated PSAN as a propellant and any components of such inflators (including the propellant, but excluding (x) the airbag modules into which such inflators are incorporated by the Plan Sponsor after the Closing and (y) any igniters for PSAN inflators produced by Sellers or their Affiliates pre-Closing, and any such igniters that continue to be produced by the Plan Sponsor or its Affiliates post-Closing) developed, designed, manufactured and/or sold (including any such inflators or components thereof sold directly to tier one suppliers) by Sellers,  and their Affiliates, or Reorganized Takata (but excluding any ammonium nitrate inflators designed and produced by third parties other than Sellers, and their Affiliates, or Reorganized Takata).

"**PSAN Inflator Business**" means the research, development, design, manufacture, marketing, storage, transportation, testing, disposal, sale and support of PSAN Inflators; provided, that "PSAN Inflator Business" shall not include the Kitting Operations, airbag module assembly operations, stamping operations, igniter operations and the production of Service Parts other than PSAN Inflators.

"**PSAN Tier One Agreement**" shall have the meaning ascribed to it in the Plan.

"**Purchase Orders**" means purchase agreements, supply contracts, purchase orders, general terms and conditions, releases and other contracts (i) issued by an OEM to a Seller or an Acquired Subsidiary, (ii) entered into between an OEM and a Seller or an Acquired Subsidiary, (iii) entered into between a Seller or an Acquired Subsidiary and a Consenting OEM Contract Manufacturer as directed by a Consenting OEM or (iv) entered into between a Seller or an Acquired Subsidiary and a Consenting OEM Tier One, in each case, as may be modified from time to time after the date hereof, which for purposes of clarity shall include all current and past parts programs (including Service Parts) developed, designed, manufactured and/or sold by a Seller or an Acquired Subsidiary, regardless of whether (a) executory, (b) non-executory, (c) performance is due by both parties, (d) they can be assumed under applicable insolvency laws, or (e) if for Component Parts or Service Parts no longer in current production (i.e., past-model parts).

"**Purchased Contracts**" means all: (i) OEM Assumed Contracts (which will be assumed by the Plan Sponsor or its designated Affiliates that have been approved in advance by the applicable OEM (acting in a commercially reasonable manner) on an "as is" basis, without (x) regard to any accommodations provided in the Accommodation Agreement or (y) modification of any kind including as to terms or price (except with respect to the ROLR (as defined in the OEM Indemnity and Release Agreement) and with respect to pricing adjustments to account for PSAN Inflator production not being assumed or conducted by the Plan Sponsor or its Affiliates, with such adjustments to be resolved between the Plan Sponsor and the applicable Consenting OEMs pursuant to normal commercial dealings pursuant to Section 2.7(d)); and (ii) other Executory Contracts designated by the Plan Sponsor as Purchased Contracts, and not subsequently designated by the Plan Sponsor for removal and non-assignment, pursuant to Section 2.7(d).

"**Recalls**" means vehicle recalls and related remedy programs under regulations promulgated by NHTSA or similar governmental or regulatory authorities under U.S. federal or state law, or the law of any other country or non-U.S. state or locality with jurisdiction to impose, require or regulate a vehicle recall or related remedy program or any other type of sanction or remedy relating to the PSAN Inflators or conducted on a voluntary basis.

"**Regional Share**" means, as of the date hereof, with respect to Sellers and the respective sellers under the TKJP Purchase Agreement and the TK Europe Purchase Agreement, the percentages set forth on Schedule B.  The Parties acknowledge and agree that such percentages shall be adjusted to the extent that the amount of the Base Purchase Price is adjusted as provided in Section 3.1(b).

"**Regulatory Escrow Agreement**" means that certain Regulatory Escrow Agreement to be entered into at the Closing, by and among TKH, TKJP, TK Europe, TKAG, Takata Sachsen, the Plan Sponsor and the Escrow Agent, substantially on the terms set forth on Exhibit F hereto.

"**Regulatory Escrow Amount**" means the portions of the Total Recoverable VAT Amount and the Total Non-Recoverable VAT Amount refunded, recovered or credited and actually realized, whether prior to or after the Closing, in accordance with Section 10.2, not to exceed $50,000,000. In no event shall the cumulative Regulatory Escrow Amount deposited into the Regulatory Escrow exceed $50,000,000, other than as described in the following sentence. If, while the Regulatory Escrow is still in effect, an applicable Tax Authority reclaims any portion of the Regulator Escrow Amount, such reclaimed amount shall not be attributed to the Regulatory Escrow Amount for purposes of calculating the $50,000,000 cap. If, at any time, any portion of the Regulatory Escrow Amount is released to the Plan Sponsor from the Regulatory Escrow, such released amount shall remain attributable to the Regulatory Escrow Amount for purposes of calculating the $50,000,000 cap.

"**Regulatory Termination Fee**" means: (a) Four and One Half Percent (4.5%) of the amount set forth in Section 3.1(a)(A)(i) if the Regulatory Termination Fee is payable pursuant to Section 4.7(a); and (b) One Half Percent (0.5%) of the amount set forth in Section 3.1(a)(A)(i) if the Regulatory Termination Fee is payable pursuant to Section 4.7(a) because the conditions set forth in Section 9.3(c) or (solely as a result of an Order specified therein arising under CFIUS) Section 9.3(d) shall not have been satisfied.  If Sellers are entitled to a Regulatory Termination Fee pursuant to both clauses (a) and (b) of this definition, Sellers shall receive only the amount provided for pursuant to clause (a).  The Regulatory Termination Fee shall be reduced by Sellers' Regional Share of the Escrow Amount, which shall be released to Sellers by the Escrow Agent subject to and in accordance with Section 3.2 and the Escrow Agreement; provided, however, any portion of Sellers' Regional Share of the Escrow Amount that remains after satisfaction in full of the Regulatory Termination Fee shall be released and returned to the Plan Sponsor; provided, further, that if the Escrow Amount is in the form of an Escrow Letter of Credit, the Plan Sponsor, in its sole option, may deliver to Sellers a cash payment equal to the Regulatory Termination Fee, in which case Sellers and the Plan Sponsor shall jointly instruct the Escrow Agent to release and return the Escrow Letter of Credit to the Plan Sponsor.

"**Reorganized Takata**" means Reorganized TK Holdings, as defined in the Plan, together with its Subsidiaries at and after the Effective Date.

19

"**Representative**" means, when used with respect to a Person, the Person's controlled Affiliates (including such Person's Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel and accountants) and Debt Financing Sources.

"**Required Cash**" means an amount equal to $435,000,000; provided, that if Sellers consummate any transaction contemplated by the last sentence of Section 7.20(c), Required Cash shall be increased by the proceeds of such transaction (net of any related Taxes, fees, and expenses).

"**Retained Subsidiaries**" means the entities listed on Schedule F hereto.

"**Resourcing Limitation**" shall have the meaning ascribed to it in the Accommodation Agreement and Japan Accommodation Agreement, each as in force as of the date hereof, without regard to any subsequent amendments or modifications thereto.

"**Revenue of the Combined Businesses**" means the revenue of Parent and its Subsidiaries on a consolidated basis, determined in accordance with the accounting methodologies used by the Plan Sponsor in its principal financing reporting statements at the relevant date, or for the relevant period, of determination. For purposes of determining Revenue of the Combined Businesses, (a) all currency shall be denominated in U.S. dollars based on exchange rates that are calculated pursuant to the terms set forth on Schedule C and (b) Revenue of the Combined Businesses shall not include any of the following with respect to the applicable measurement period: (i) any net income, gains, or loss incurred from currency translation gains (including any related Tax effects); (ii) any income, gains, or loss from disposed, abandoned, transferred, closed or discontinued operations; or (iii) any income, gains, or loss attributable to asset dispositions or abandonments or the sale or other disposition of any capital stock other than in the Ordinary Course of Business.

"**SAFE**" means the State Administration of Foreign Exchange of the People's Republic of China or its competent local counterparts.

"**Sanctioned Territory**" means, at any time, a country or territory which is itself the subject or target of comprehensive Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"**Sanctions**" means U.S. and international economic and trade sanctions imposed, administered or enforced from time to time by relevant Governmental Authorities, including those administered by the U.S. government through OFAC or the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**Seller Breach Expense Reimbursement Amount**" means Sellers' Regional Share of $30,000,000.

"**Seller Breach Termination Triggers**" shall mean a termination of this Agreement pursuant to (i) Section 4.4(d)(i) (but only if such termination was due to a failure of a condition

set forth in <u>Section 9.1</u> or <u>Section 9.3</u> that cannot be satisfied on or prior to the Outside Date) or (ii) <u>Section 4.4(b)(v)</u> (but only if such termination was due to (w) a termination of the TSAC Purchase Agreement (if applicable) pursuant to the termination provision therein comparable to <u>Section 4.4(d)(i)</u> of this Agreement (but only if such termination was due to a failure of a condition set forth in the provisions therein comparable to <u>Section 9.1</u> or <u>Section 9.3</u> of this Agreement that cannot be satisfied on or prior to the Outside Date), (x) a termination of the TKJP Purchase Agreement pursuant to Section 4.4(d)(i) thereof due to a failure of a condition set forth in Section 9.1 or Section 9.3 thereof that cannot be satisfied on or prior to the Outside Date (as defined therein), (y) a termination of the TK Europe Purchase Agreement pursuant to Section 4.4(d)(i) thereof due to a failure of a condition set forth in Section 9.1 or Section 9.3 thereof that cannot be satisfied on or prior to the Outside Date (as defined therein), or (z) a material breach of the RSA, the Global Settlement Agreement or the Accommodation Agreement by Sellers, any Consenting OEM or any of their respective Affiliates).

"**Seller Covered Person**" means any of the Persons set forth on <u>Schedule D</u>.

"**Seller Entities**" means, collectively, all Sellers and all Subsidiaries of Sellers.

"**Seller Entity**" means any one of the Seller Entities.

"**Service Parts**" means any Consenting OEM's, Consenting OEM Contract Manufacturer's or Consenting OEM Tier One's, service parts requirements (including current model service parts and past model service parts, but excluding PSAN Inflators).

"**Settlement Subsidiary Contribution Amount**" means an amount equal to the sum of the Group Subsidiary Contribution Amount, the Brazil Subsidiary Contribution Amount, the European Subsidiary Contribution Amount, the SMX Contribution Amount, and the TSAC Contribution Amount. The contribution amount attributable to TK de Mexico and Industrias shall be deemed to be zero due to the actual and/or contingent Liabilities of TK de Mexico and Industrias.

"**SMX Contribution Amount**" means an amount equal to the difference between (x) the appraised value of the Purchased Assets of SMX net of Assumed Liabilities of SMX, minus (y) the good faith estimate of SMX's board of directors, as of December 15, 2017, of all Taxes and wind-down costs of SMX to be paid on or after the Closing Date.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"**Solicitation Procedures Motion**" means Sellers' motion for entry of an Order (i) approving the Disclosure Statement; (ii) scheduling a hearing to consider confirmation of the Plan; (iii) establishing a deadline and procedures for filing objections to confirmation of the Plan and asserted Cure Claim amounts; (iv) establishing procedures for the assumption and/or assignment of Executory Contracts under the Plan and the form of cure notices and assumption

notices related thereto; (v) establishing a voting deadline for receipt of ballots; (vi) approving solicitation procedures, distribution of solicitation packages and establishing a deadline and procedures for temporary allowance of claims for voting purposes; (vii) approving the form of ballots and voting instructions; and (viii) approving the form and manner of notice of hearing on confirmation and related issues, in form and substance reasonably satisfactory to the Plan Sponsor.

"**Solicitation Procedures Order**" means an Order of the Bankruptcy Court approving the Solicitation Procedures Motion.

"**Special Master**" means the Special Master appointed by the court in the case captioned *U.S. v. Takata Corporation*, No. 2:16-cr-20810 (E.D. Mich.).

"**Standalone OEM Assumed Contracts**" means all Purchase Orders of Consenting OEMs, Consenting OEM Contract Manufacturers and Consenting OEM Tier Ones, relating solely to non-PSAN Inflator Component Part programs of Consenting OEMs.

"**Subsidiary**" means, with respect to any Person, any other Person of which (i) a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by such first Person, (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the membership, partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by such first Person, and for this purpose such first Person owns a majority ownership interest in such a business entity (other than a corporation) if such first Person collectively shall be allocated a majority of such business entity's gains or losses or shall be a, or shall control any, managing director or general partner of such business entity (other than a corporation), (iii) such first Person or one or more of the other Subsidiaries of such first Person or a combination thereof are entitled, directly or indirectly, to appoint a majority of the board of directors or managers or comparable supervisory body of such second Person or (iv) such first Person or one or more of the other Subsidiaries of such first Person or a combination thereof may, through contract or otherwise, manage or control the day-to-day operations of such second Person.  For the avoidance of any doubt, the term "Subsidiary" shall include all Subsidiaries of a Subsidiary.

"**Superior Proposal**" means a bona fide Alternative Transaction Proposal for an Alternative Transaction of the type described in clause (i)(A) of the definition of Alternative Transaction (i) which the TK Holdings board of directors determines in good faith (after consultation with its financial advisor and outside legal counsel), taking into account all relevant legal, regulatory, financial and other aspects of such Alternative Transaction Proposal (including financing terms, conditionality and associated closing risk, including as a result of antitrust and other regulatory matters and financing risks), and after giving effect to, among other things, the Break-Up Fee and Expense Reimbursement, is on terms and conditions more favorable to the stakeholders of Sellers than those contemplated by this Agreement, (ii) the conditions to the consummation of which are all reasonably capable of being satisfied without undue delay and (iii) for which financing, to the extent required, is then committed and reasonably capable of being obtained.

"**Takata**" means TKJP and its Subsidiaries.

"**Takata Americas Required Cash Amount**" means an amount equal to, as of December 15, 2017, the greater of (A) zero and (B) the good faith estimate of Takata Americas of the difference between (1) the sum of (i) Takata Americas' Regional Share of Expenses of Plan Sponsor (to the extent reimbursable hereunder); plus (ii) Takata Americas' Regional Share of the Total Recoverable VAT Amount; minus (2) the sum of (i) Takata Americas' Cash Allocation Share of Excess Cash pursuant to Section 3.1(xi), plus (ii) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 0.1589307% (in respect of Takata Americas, excluding TKBR and TSAC).  The Parties agree that the percentage set forth in the foregoing clause (ii) shall be adjusted (to the extent necessary), as agreed by the Parties and the parties to each of the Cross-Conditioned Agreements to reflect the treatment of Intercompany Balances in accordance with <u>Section 7.17</u> and the corresponding section of each Cross-Conditioned Agreement.

"**Takata Sachsen**" means TAKATA Sachsen GmbH, a limited liability company established under the laws of Germany registered with the commercial register at the lower court of Chemnitz under registration number HRB 11841

"**Tax Authority**" means the IRS and any state, local or foreign government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"**Tax Return**" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes, including any amendment thereof.

"**Tax**" or "**Taxes**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other similar tax, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"**TCX**" means Takata (Changxing) Safety Systems Co., Ltd.

"**Technology**" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, research and development, technical data, programs, tools, dies, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatuses (including prototypes, test boards and similar items) and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the research, development, design, manufacture, marketing, sale or support of, any of the Products.

"**Threshold Contract**" means any Contracts providing for payments by or to any Seller Entity in excess of $250,000 in any twelve (12) month period.

"**TIF**" means Takata International Finance B.V.

WEIL:\96035900\75\76903.0003

"**TKAG**" means TAKATA Aktiengesellschaft, a stock corporation (*Aktiengesellschaft*) established under the laws of Germany registered with the commercial register at the lower court of Aschaffenburg under registration number HRB 120.

"**TKBR**" means Takata Brasil Ltda.

"**TK Europe**" means TAKATA Europe GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*) established under the laws of Germany registered with the commercial register (*Handelsregister*) at the lower court (*Amtsgericht*) of Aschaffenburg under registration number HRB 8513.

"**TK Europe Purchase Agreement**" means that certain Asset Purchase Agreement, dated as of the date of this Agreement, by and among TK Europe, TKAG, Takata Sachsen and Lux Sarl.

"**TKJP**" means Takata Corporation, a Japanese corporation (*kabushiki kaisha*).

"**TKJP Purchase Agreement**" means that certain Asset Purchase Agreement, dated as of the date of this Agreement, by and among TKJP, TK9, TKS and the Plan Sponsor and/or its designated Affiliate(s).

"**TKS**" means Takata Service Corporation, a Japanese corporation (*kabushiki kaisha*).

"**TK9**" means Takata Kyushu Corporation, a Japanese corporation (*kabushiki kaisha*).

"**Total Non-Recoverable VAT Amount**" means the actual aggregate amount of non-refundable, non-creditable, and not otherwise recoverable VAT arising from the U.S. Closing and/or any pre-closing restructurings contemplated by this Agreement, without regard to which party has the legal liability therefor, as reasonably determined by the Plan Sponsor from time to time, and finally on the date that is one hundred eighty (180) days after the Closing Date.

"**Total Recoverable VAT Amount**" means the actual aggregate amount of VAT arising from the Closings and/or any pre-closing restructurings contemplated by this Agreement, the TSAC Purchase Agreement (if applicable), the TKJP Purchase Agreement, and/or, to the extent relating to the sale or transfer of Owned Properties, as defined in the TK Europe Purchase Agreement, from TKAG and Takata Sachsen to Lux Sarl, the TK Europe Purchase Agreement, without regard to which party has legal liability therefor, that has been refunded, credited or otherwise recovered, or that is expected to be refundable, creditable or otherwise recoverable, as reasonably determined by the Plan Sponsor from time to time, and finally on the date that is one hundred eighty (180) days after the Closing Date.

"**Transactions**" means the transactions contemplated by this Agreement, the Plan, and the RSA.

"**TSAC Appraisal Amount**" means the fair market value of the TSAC Purchased Assets, as set forth in a valuation report by an independent valuation firm (for the avoidance of doubt, such fair market value shall take into account the liabilities assumed by the purchaser under the

TSAC Purchase Agreement and the treatment of the Intercompany Balances in accordance with Section 7.17).

"**TSAC Contribution Amount**" means an amount equal to (i) the TSAC Purchase Price (which, for the avoidance of doubt, shall take into account the value of TSAC's subsidiary); minus (ii) the good faith estimate of TSAC's board of directors, as of December 15, 2017, of all Taxes and wind-down costs (including the Liquidation Reserve) of TSAC to be paid on or after the Closing Date.

"**U.S.**" means the United States of America.

"**U.S. Chapter 11 Debtor Contribution Amount**" means 44.6075475% (in respect of TK Holdings, excluding TKBR and TSAC) multiplied by an amount equal to the difference of (x) $850 million minus (y) the Settlement Subsidiary Contribution Amount.

"**VAT**" means, to the extent applicable, (i) value added tax imposed by Mexico (*Impuesto al Valor Agregado*), (ii) value added tax imposed by the People's Republic of China and (iii) any other value added or other tax similar to (i) or (ii).

"**Warehoused PSAN Assets**" means: (i) the PSAN Inflators (a) preserved by the Seller Entities and their Affiliates pursuant to that certain Preservation Order and Testing Control Plan issued by NHTSA to TK Holdings, dated February 24, 2015 (the "**Preservation Order**"), (b) preserved by the Seller Entities and their Affiliates as contemplated by the Legacy Cost Report or (c) otherwise preserved, voluntarily or involuntarily, by the Seller Entities and their Affiliates; (ii) the leases for the PSAN Warehouses (as defined in the Plan); and (iii) the machinery, equipment, other tangible assets, and a nonexclusive license (pursuant to the Intellectual Property License Agreement) to Acquired Intellectual Property for which ownership is assigned to the Plan Sponsor, in each case that is necessary for compliance with the Preservation Order, the preservation of PSAN Inflators as contemplated by the Legacy Cost Report or operation of the PSAN Warehouses.

"**Warehousing Trust**" means the trust or other entity or entities, including a corporation or limited liability company, established under the Plan to administer and maintain the Warehoused PSAN Assets (as defined in the Plan) in accordance with the Preservation Order and otherwise.

"**Warehousing Trust Reserve**" means Cash and Cash Equivalents in an amount necessary to fund and administer the Warehousing Trust , including the costs of maintenance, shipping, and disposal of the Warehoused PSAN Assets (as defined in the Plan), on and after the Effective Date.

1.2    Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the Sections indicated:

| Term | Section |
| --- | --- |
| 180 Day Certificate | 3.1 |
| 338(g) Election | 10.4(b) |
| 338(h)(10) Election | 10.4(a) |

25

Access Agreement ............................................................................................ Recitals
Accommodation Agreement ............................................................................. Recitals
Acquired Subsidiaries .......................................................................................2.1(v)
Affiliate Transactions........................................................................................ 5.26
Aggregate Former PSAN Asset Book Value.....................................................7.11(c)
Agreement .................................................................................................... Preamble
Alien Employees.................................................................................................8.1(g)
Allocation Accounting Firm ............................................................................. 10.5(a)
ALS ................................................................................................................. 7.20(f)
Alternative Financing........................................................................................ 7.15
Apportioned Obligations.................................................................................... 10.3
Appraisers ........................................................................................................7.17(c)
Asset Acquisition Statement .............................................................................10.5(a)
Assumed Liabilities .......................................................................................... 2.3
Balance Sheet.................................................................................................... 5.6
Balance Sheet Date ........................................................................................... 5.6
Bankruptcy Cases............................................................................................. Recitals
Bankruptcy Code ............................................................................................. Recitals
Bankruptcy Court.............................................................................................. Recitals
Base Purchase Price .......................................................................................... 3.1
Bill of Sale, Assignment and Assumption Agreement .......................................4.2(a)
Business ............................................................................................................ Recitals
Business Incentive Plan Payment ......................................................................3.6(a)
Business Incentive Plan Payment Objection Notice ...........................................3.6(c)
Business Incentive Plan Payment Statement .....................................................3.6(b)
Claims ...............................................................................................................2.1(g)
Closing ..............................................................................................................4.1(a)
Closing Date......................................................................................................4.1(a)
Closing Statement .............................................................................................4.2(r)
Closing Tax Certificate ..................................................................................... 3.1
Closings.............................................................................................................4.1(a)
Commitment Letters ..........................................................................................6.7(a)
Confidentiality Agreement.................................................................................7.7(a)
Consenting OEMs............................................................................................. Recitals
Contracting Parties ........................................................................................... 11.13
Cooperation Expenses.......................................................................................7.16(d)
Copyrights.......................................................... 1.1 (in Intellectual Property definition)
Cross-Conditioned Agreement........................................................................... 9.3(f)
Cross-Conditioned Agreements ......................................................................... 9.3(f)
Cure Period .......................................................................................................4.4(d)(xii)
Deal Subject Entity Set ............................................ 1.1 (in Alternative Transaction definition)
Debt Commitment Letters ..................................................................................6.7(a)
Debt Financing ..................................................................................................6.7(a)
Disclosure Schedule.......................................................................................... Article V
Disclosure Statement ........................................................................................7.5(b)
Disputed Claim Account....................................................................................2.7(e)

26

Disputed Cure Claims ........................................................................................2.7(c)
Disputed Resourcing .....................................................................................4.4(d)(xii)
DOJ ...............................................................................................................7.4(d)
DOJ Payment Amount .....................................................................................3.3(a)
DOJ/NHTSA Outside Date ..........................................................................4.4(d)(xv)
Domain Names .......................................... 1.1 (in Intellectual Property definition)
DPA................................................................1.1 (in CFIUS Clearance definition)
Equipo ...........................................................................................................7.20(b)
Equity Commitment Letters...............................................................................6.7(a)
Equity Financing ..............................................................................................6.7(a)
Equity Source ...................................................................................................6.7(a)
ERISA Affiliate ...............................................................................................5.14(a)
Escrow Agent ...................................................................................................... 3.2
Escrow Amount .................................................................................................. 3.2
Estimated Purchase Price ................................................................................... 3.1
Excluded Assets ................................................................................................. 2.2
Excluded Contracts ..........................................................................................2.2(d)
Excluded Liabilities .......................................................................................... 2.4
Excluded PSAN Liabilities ..............................................................................2.4(a)
Executory Contract ..........................................................................................2.7(a)
Executory Contract List ...................................................................................2.7(a)
Expenses .......................................................................................................... 4.6
FCPA .............................................................................................................. 5.19(f)
Final Joint Proposal...........................................................................................7.17(c)
Financial Statements .........................................................................................5.6(a)
Financing...........................................................................................................6.7(a)
Former PSAN Assets .......................................................................................7.11(c)
Former Sellers' Marks .....................................................................................7.10(b)
FS Provisions ................................................................................................... 11.8
FTC ................................................................................................................7.4(d)
Global Settlement Agreement ........................................................................... 7.19
Guarantor ...................................................................................................... Preamble
HSR Filings ..................................................................................................... 7.4(f)
Industrias........................................................................................................ Preamble
Initial Consenting OEMs .................................................................................. Recitals
Intellectual Property License Agreement...........................................................4.2(e)
Intercompany Balances .....................................................................................7.17(c)
Intercompany Balances Outside Date...............................................................4.4(c)(iii)
Intercompany Balances Proposal......................................................................7.17(c)
Intercompany Guarantees ................................................................................7.17(c)
International Employee Benefit Plan .................................................................5.14(h)
IP Assignment Agreements...............................................................................4.2(d)
Joyson ............................................................................................................ Recitals
Joyson Shareholder Approval .......................................................................... Recitals
Joyson Shareholders........................................................................................ Recitals
KSS Holdings................................................................................................. Preamble

27

Marks ............................................................................. 1.1 (in Intellectual Property definition)
Material Contracts............................................................................................................5.13(a)
Mexican Employees Transfer Agreement ............................................................................ 8.2
Money Laundering Laws .................................................................................................. 5.20
New Mexico Trading Company.......................................................................................7.20(a)
New Revenue ........................................... 1.1 (in Business Resourcing Trigger Event definition)
NHTSA Payment Amount .................................................................................................3.3(b)
Non-Party Affiliates........................................................................................................ 11.13
Non-PSAN OEM ............................................................................................................... 4.9
Notice Period ................................................................................................................7.11(c)
OEM Indemnity and Release Agreement ....................................................................... Recitals
OFAC ...........................................................................................................................5.19(c)
Offer Employees ............................................................................................................ 8.1(a)
Other Closings ...............................................................................................................4.1(a)
Outside Date.............................................................................................................. 4.4(b)(i)
Owned Properties............................................................................................................5.10(a)
Owned Property ..............................................................................................................5.10(a)
Parent ....................................................................................................................... Preamble
Parties ...................................................................................................................... Preamble
Party ......................................................................................................................... Preamble
Patents ......................................................................... 1.1 (in Intellectual Property definition)
Phase-Out Period ..........................................................................................................7.10(a)
Plan Sponsor ............................................................................................................. Preamble
Plan Sponsor FSA Plan...................................................................................................8.1(i)
Plan Sponsor Plans.........................................................................................................8.1(e)
Plea Agreement.............................................................................................................. 7.14
Policies ........................................................................................................................ 5.21
Post-Closing Tax Period ................................................................................................. 10.3
PRC Regulatory Approvals.............................................................................................6.3(b)
Pre-Closing Tax Period...................................................................................................  10.3
Preservation Order ................................................. 1.1 (in Warehoused PSAN Assets definition)
President .............................................................................1.1 (in CFIUS Clearance definition)
PSAN Assets.................................................................................................................2.2(i)
PSAN End Date .............................................................................................................8.1(b)
PSAN Legacy Costs Payment.........................................................................................3.3(c)
Purchase Price ................................................................................................................. 3.1
Purchased Assets............................................................................................................ 2.1(f)
Purchased Intellectual Property ....................................................................................... 2.1(f)
Purchased IP Licenses.....................................................................................................2.1(g)
Real Property Lease ........................................................................................................5.10(a)
Real Property Leases.......................................................................................................5.10(a)
Regulatory Escrow.......................................................................................................... 10.2
Repaid Indebtedness ....................................................................................................... 3.4
Retained IP Licenses........................................................................................................2.2(l)
Revised Statements ........................................................................................................10.5(a)
RSA................................................................................................................................ Recitals

28

Seller FSA Plan........................................................................................................8.1(i)
Seller Retained IP ....................................................................................................2.2(l)
Sellers......................................................................................................... Preamble
Sellers' Marks......................................................................................................7.10(a)
Sellers' Properties.............................................................................................5.10(a)
SERP Policy ........................................................................................................2.1(s)
Services Agreement ............................................................................................ 4.2(f)
Share Purchase Subsidiaries .............................................................................2.1(v)
Shared Permits ...................................................................................................7.18(c)
SMX ........................................................................................................... Preamble
SMX Assumed Liabilities..................................................................................7.20(a)
SMX Transferred Assets....................................................................................7.20(a)
Takata Americas ....................................................................................... Preamble
Takata Brasil Quotas........................................................................................10.6(a)
TIF Subsidiaries................................................................................................7.20(e)
TK de Mexico ........................................................................................... Preamble
TK de Mexico and Industrias Transferred Assets.............................................7.20(b)
TK Holdings............................................................................................... Preamble
TK Holdings de Mexico........................................................................... Preamble
TK Mexico LLC ........................................................................................ Preamble
Top Ten Customers................................................................................................ 5.23
Top Ten Suppliers.................................................................................................. 5.23
Trade Secrets.............................................................. 1.1 (in Intellectual Property definition)
Transfer Taxes .................................................................................................. 10.1
Transferred Employees ......................................................................................8.1(a)
Transferred FSA Balances ..................................................................................8.1(i)
Transferred Mexican Employees ............................................................................ 8.2
TSAC ...................................................................................................................7.20(c)
TSAC Assumed Liabilities .................................................................................7.20(c)
TSAC Equity Sale ...............................................................................................7.20(c)
TSAC Purchase Agreement ................................................................................7.20(c)
TSAC Purchase Price..........................................................................................7.20(c)
TSAC Purchased Assets ......................................................................................7.20(c)
U.S. Closing .........................................................................................................4.1(a)
U.S. Debtors........................................................................................................ Recitals
USCIS ..................................................................................................................8.1(g)
Voting and Support Agreement ....................................................................... Recitals
WARN Act...........................................................................................................5.15(i)

1.3    <u>Other Definitional and Interpretive Matters</u>.  Unless otherwise indicated herein to the contrary, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement;

WEIL:\96035900\75\76903.0003

(b)    the words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation";

(c)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(d)    the word "if" and other words of similar import shall be deemed, in each case, to be followed by the phrase "and only if";

(e)    the use of "or" herein is not intended to be exclusive;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa;

(g)    all terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(h)    references herein to a Person are also to its successors and permitted assigns.  Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto;

(i)    any reference herein to "Dollars" or "$" shall mean U.S. dollars and all assets, liabilities and obligations recorded on the Seller Entities' books and records in, or required to be paid or satisfied through payment of, any currency other than U.S. dollars shall be converted to U.S. dollars for all purposes of this Agreement using the exchange rates set forth on <u>Schedule C</u> hereto;

(j)    references in this Agreement to materials or information "furnished to the Plan Sponsor," "made available to the Plan Sponsor," "provided to the Plan Sponsor" and other phrases of similar import mean that such materials or information was made available for viewing by the Plan Sponsor or its Representatives in the "Project Tea" electronic data room hosted by Intralinks, in each case prior to 12:00 a.m. eastern time on the date that is one day prior to the date of this Agreement, or provided to the Plan Sponsor or its Representatives in response to requests for materials or information;

(k)    references in this Agreement to "the Plan Sponsor" as an assignee or recipient of certain Purchased Assets or Purchased Contracts or as a party assuming the Assumed Liabilities mean the Plan Sponsor or, subject to <u>Section 11.12</u>, one or more of its assignees (for the avoidance of doubt, any such assignment shall not relieve the Plan Sponsor of its obligations hereunder); and

(l)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is

the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the U.S. Closing, the Plan Sponsor shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to the Plan Sponsor, all of Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens other than Permitted Liens.  "**Purchased Assets**" shall mean all of the assets, properties, contractual rights, Subsidiaries, goodwill, going concern value, rights and claims of Sellers, including those that are used or held for use by any Seller in connection with, or otherwise related to, the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of any Seller, which shall include (x) all of each Seller's assets (including raw materials, work-in-process and finished Component Parts) used primarily in connection with Purchase Orders of Consenting OEMs, Consenting OEM Contract Manufacturers and Consenting OEM Tier Ones and (y) all such Purchase Orders on an "as is" basis (without regard to any accommodations provided pursuant to the Accommodation Agreement, and except as otherwise provided herein with respect to PSAN Inflators), in each case related to Takata's (i) steering business, (ii) seatbelt business, (iii) airbag module production business, (iv) electronics business, (v) non-PSAN Inflator production business, including the sale of GuNi inflators designed and produced by third parties and the sale of ammonium nitrate inflators designed and produced by third parties, (vi) Kitting Operations, (vii) equipment for testing and support with respect to PSAN Inflators and (viii) businesses, if any, other than those listed above that do not involve the manufacture or sale of PSAN Inflators; provided, however, that the Purchased Assets shall not include any Excluded Assets.  Without limiting the generality of the foregoing, but subject to Section 2.2, the Purchased Assets shall include each of the following assets of Sellers:

(a)     all Cash and Cash Equivalents necessary to deliver Required Cash, to the extent Sellers hold such amount of Cash and Cash Equivalents, which Cash and Cash Equivalents may be delivered in the currency of any Seller to an Affiliate of the Plan Sponsor in the jurisdiction of such applicable Seller;

(b)     all accounts receivable and deposits and prepaid charges and expenses; provided that accounts receivable corresponding to Intercompany Balances shall only be acquired if Plan Sponsor has agreed pursuant to Section 7.17;

(c)     [intentionally omitted];

(d)     all tangible personal property, including all equipment, furniture, fixtures, tools, machinery and parts except as provided under Section 2.2(i);

(e)     all inventory, work in process, finished goods, raw materials, materials and components except as provided under Section 2.2(i);

31

(f)    all Patents, Marks, Copyrights, Domain Names, and Software (including all prior, interim, current or in development versions) set forth on <u>Schedule 2.1(f)</u>, and all other Intellectual Property, Software or Technology used or held for use by any Seller, and all tangible and intangible embodiments of any of the foregoing (in any form or media) except as provided in <u>Section 2.2(l)</u> (collectively, the "**Purchased Intellectual Property**");

(g)    subject to <u>Section 2.6</u> and <u>Section 2.7</u>, all (i) Contracts pursuant to which any Seller has granted to any third Person any right to any of the Acquired Intellectual Property and (ii) Contracts pursuant to which any Seller has been granted a right to a third Person's Intellectual Property, Software or Technology, in each case of (i) and (ii), excluding any such Contracts set forth on <u>Schedule 2.2(d)</u> and all Retained IP Licenses, but including those Contracts set forth on <u>Schedule 2.1(g)</u> (the "**Purchased IP Licenses**");

(h)    all documented technical information pertaining to the research, design, development, manufacturing, marketing, sale or support of the Products (other than PSAN Inflators) researched, designed, developed, manufactured, marketed, sold or supported by Sellers, including all control plans;

(i)    all originals (to the extent requested by the Plan Sponsor) and copies of all prosecution files and assignment documentation pertaining to any of the Acquired Intellectual Property and all documentation of the development, conception or reduction to practice thereof, in each case, under Sellers' possession or control;

(j)    all statutory and other claims, demands, and causes of action of any Seller for royalties, fees, or other income from, or infringement, misappropriation or violation of, any of the Acquired Intellectual Property, and all of the proceeds from the foregoing which are accrued and unpaid as of, and/or accruing after, the U.S. Closing;

(k)    subject to <u>Sections 2.6</u> and <u>2.7</u>, all Purchased Contracts;

(l)    the Owned Properties, and (i) all buildings and improvements located thereon, together with all easements, air, mineral and riparian rights, and all tenements, hereditaments, rights, licenses, interests, privileges and appurtenances thereto belonging or in any way appertaining thereto, (ii) any pending or future award made in condemnation or to be made in lieu thereof, and any unpaid award for damage to the Owned Properties, and (iii) the use of appurtenant easements, rights, privileges and interests, whether or not of record, strips and rights of way abutting, adjacent, contiguous, or adjoining the Owned Properties, to the extent assignable;

(m)    all Permits used or held for use by Sellers in connection with the Business, subject to <u>Section 7.18(c)</u>;

(n)    all vehicles;

(o)    all documents pertaining to the Purchased Assets;

(p)    all net insurance proceeds to be received in respect of the Purchased Assets (for the avoidance of doubt, excluding proceeds to be received in respect of any directors'

or officers' claims); provided, however, that any proceeds from insurance policies providing coverage for PI/WD Claims shall be Excluded Assets;

(q)     subject to Section 2.2(m), all rights, claims, causes of action, defenses and credits, including Avoidance Actions (collectively, "**Claims**") relating to the Business, any Purchased Asset, or Assumed Liability, but excluding those relating to any Claims pursuant to directors' or officers' insurance policies (the Parties agree that in the event that Claims constitute both Purchased Assets under this clause (q) and Excluded Assets under Section 2.2(m), the Parties shall cooperate in good faith to reasonably allocate such Claims between the Plan Sponsor and Sellers); provided that all such Avoidance Actions shall be deemed fully and irrevocably released as of the U.S. Closing.

(r)     all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(s)     the insurance policy in respect of any Transferred Employee under the TK Holdings Inc. Executive Retirement Plan (the "**SERP Policy**") as set forth on Schedule 2.1(s), and the Business Benefit Plans and all rights of each Seller in the Business Benefit Plans and any Contracts that constitute (or provide for services under) Business Benefit Plans and all assets held under or with respect to any Business Benefit Plan, but excluding all assets and insurance policies under any rabbi trust associated with any Business Benefit Plan or rights to proceeds thereof (other than the SERP Policy);

(t)     all rights of each Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products (other than PSAN Inflators) sold, or services provided, to Sellers or to the extent affecting any Purchased Assets;

(u)     all goodwill relating to the Business of Sellers to the extent not otherwise included in the Purchased Assets, all proceeds and Products (other than PSAN Inflators) of any and all of the foregoing, all supporting obligations in respect of any of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

(v)     the shares of capital stock and any other Equity Interests of the direct Subsidiaries of each Seller listed on Schedule E (the "**Share Purchase Subsidiaries**" and, together with the Subsidiaries of the Share Purchase Subsidiaries, the "**Acquired Subsidiaries**");

(w)     [intentionally omitted];

(x)     the assets acquired pursuant to Section 7.12, but only from and after the date of acquisition thereof;

(y)     all assets of each Seller relating to the Kitting Operations; and

(z)     all of the rights and claims of Sellers, including Avoidance Actions, that relate to the continued operation of the Business, including with respect to ongoing trade vendors, suppliers, licensors, manufacturers, strategic or other business partners of the Business,

customers, employees or counterparties to all Purchased Contracts, including any and all proceeds of the foregoing; provided that all such Avoidance Actions shall be deemed fully and irrevocably released as of the U.S. Closing.

2.2     Excluded Assets.  Nothing contained herein (including in Section 2.1) shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Plan Sponsor, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "**Excluded Assets**" shall mean each of the following assets:

(a)     all Cash and Cash Equivalents of Sellers, except as required by Section 2.1(a);

(b)     the shares of capital stock and other Equity Interests of Sellers, their direct Subsidiaries listed on Schedule F and Takata Reinsurance Inc.;

(c)     all of Sellers' and their Subsidiaries' (other than the Acquired Subsidiaries) deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(d)     the Contracts set forth on Schedule 2.2(d) (the "**Excluded Contracts**"), including any accounts receivable arising out of or in connection with any Excluded Contract and any associated deposits, prepaid charges or expenses; provided, however, in no event will any OEM Assumed Contracts constitute Excluded Contracts;

(e)     all (i) confidential personnel and medical records pertaining to any Employee, except for such records with respect to Transferred Employees, (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain, including Tax Returns, financial statements, and corporate or other entity filings (provided that Sellers shall deliver to the Plan Sponsor, and the Plan Sponsor shall be entitled to receive, true, correct and complete copies of such documents to the extent related to the Business, the Purchased Assets or as otherwise needed by the Plan Sponsor, in each case as and to the extent permitted under applicable Law), (iii) documents relating to proposals to acquire the Seller Entities' Business by Persons other than the Plan Sponsor, and (iv) all documents maintained by Sellers solely in connection with any Excluded Asset or Excluded Liability;

(f)     (i) any attorney-client privilege of Sellers associated with the Business and the operations of Sellers, or pertaining to this Agreement and the Transactions and (ii) all emails, correspondence, invoices, recordings, and other documents or files, evidencing or reflecting communications between any Seller and Sellers' counsel to the extent pertaining to Sellers or associated with the Business and operations of Sellers;

(g)     all assets and insurance policies under any rabbi trust associated with any Employee Benefit Plan or rights to proceeds thereof, other than the SERP Policy;

(h)     PSAN Benefit Plans and any rights of Sellers in the PSAN Benefit Plans and any Contracts that constitute (or provide for services under) PSAN Benefit Plans, and all assets held under or with respect to any PSAN Benefit Plan to the extent related to current or

34

former employees or service providers of Sellers and their Affiliates, other than the SERP Policy;

(i)      until acquired pursuant to Section 7.12, all assets (including assets of the type set forth in clauses (d), (e), (h), (i), (m), (o), (r), (t) and (u) of Section 2.1, but excluding, for clarity, assets of the type set forth in clauses (f) and (g) of Section 2.1) used exclusively in connection with the PSAN Inflator Business, or with respect to clause (m) of Section 2.1, reasonably required for the operation of, the PSAN Inflator Business and not required for the operation of Business, including: (i) the assets (including, the machinery, equipment, tooling, and other tangible and intangible assets) used exclusively in the manufacture, design, assembly, sale, distribution or handling of (1) non-desiccated PSAN Inflators and (2) desiccated PSAN Inflators; (ii) all desiccated PSAN Inflator and non-desiccated PSAN Inflator inventory, work in process, scrap, finished goods, raw materials, materials and components; (iii) other than OEM Assumed Contracts, Sellers' existing Contracts with the OEMs (or portions thereof, as modified between the date hereof and Closing to reflect the separation of Sellers' PSAN Inflator Business), exclusively for the manufacture and sale of (1) non-desiccated PSAN Inflators and (2) desiccated PSAN Inflators; (iv) any claims of Sellers to the extent related to the foregoing; (v) any permits related exclusively to the manufacture and sale of desiccated PSAN Inflators or non-desiccated PSAN Inflators; (vi) all assets set forth on Schedule 2.2(i)(vi); and (vii) any related tail insurance policies purchased by the Seller Entities or proceeds thereof (the assets in this Section 2.2(i), collectively, the "**PSAN Assets**"); provided, however, that, for the avoidance of any doubt, PSAN Assets shall not include (x) any directors or officers tail insurance policy or any other tail insurance policy purchased by the Plan Sponsor or (y) assets used in connection with the Kitting Operations, airbag module assembly operations, stamping operations, igniter operations and the production of Service Parts not involving the production of PSAN Inflators;

(j)      Warehoused PSAN Assets of Sellers;

(k)      all recalled PSAN Inflators;

(l)      all (i) Intellectual Property, Software, and Technology that is used by Sellers (or their Affiliates) exclusively in the conduct of the PSAN Inflator Business ("**Seller Retained IP**"), (ii) Contracts pursuant to which (A) any Seller has granted to any third Person any right to any Intellectual Property, or Technology and (B) any Seller has been granted a right to a third Person's Intellectual Property, Software or Technology, in each case of subclauses (A) and (B) related exclusively to either the Seller Retained IP or the PSAN Inflator Business, and (iii) any Contracts pursuant to which any Seller has been granted rights to a third Person's Intellectual Property, Software or Technology with respect to both the PSAN Inflator Business and the Business, but only to the extent of such rights with respect to the PSAN Inflator Business, and only to the extent such Contracts permit the retention in part of such Contract with respect to the PSAN Inflator Business while assigning in part such Contract with respect to the Business (such Contracts in subclauses (ii) and (iii), collectively, the "**Retained IP Licenses**"); in each case of clauses (i), (ii) and (iii) as set forth on Schedule 2.2(l);

(m)      all Claims of Sellers against third parties to the extent relating to any Excluded Asset or Excluded Liability (taking into account the second parenthetical in Section 2.1(q));

35

(n)     all Avoidance Actions that relate to the operation of the PSAN Inflator Business;

(o)     any insurance policies or rights to proceeds thereof (including those set forth in clause (vii) of Section 2.2(i)) except as set forth in Section 2.1(p);

(p)     solely to the extent related to the PSAN Inflator Business, all rights, claims or causes of action of Sellers or any of their Subsidiaries against third parties relating to any assets, properties, business or operations of any Seller arising out of events occurring on or prior to the Closing;

(q)     except in respect of the recovery of VAT, which shall be governed by the terms of the Regulatory Escrow Agreement, or as otherwise specified in this Agreement, all claims, rights or interests of any Seller or any of its Subsidiaries that is not an Acquired Subsidiary in or to any refund, deposit, prepayment, credit, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, and any other Tax assets (including any Tax attributes) of Sellers or any of their Subsidiaries that is not an Acquired Subsidiary, in each case, for any Tax period (or portion thereof) ending on or before the Closing Date; and

(r)     any accounts receivable corresponding to Intercompany Balances that Plan Sponsor does not acquire pursuant to Section 7.17.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the U.S. Closing, the Plan Sponsor shall assume, effective as of the U.S. Closing, the following (and only the following) Liabilities of Sellers (collectively, the "**Assumed Liabilities**"):

(a)     all Liabilities of Sellers under the Purchased Contracts, Purchased IP Licenses, and Purchased Intellectual Property to be performed on or after, or in respect of periods following, the U.S. Closing;

(b)     all Liabilities of Sellers under the OEM Assumed Contracts, including Service Parts, warranty and recall obligations (including obligations not subject to release pursuant to the OEM Indemnity and Release Agreement arising out of liquidated, contingent and unliquidated claims), whether accruing prior to, at, or after the U.S. Closing (which for purposes of clarity shall include (i) all sales of Products (other than PSAN Inflators) to Consenting OEMs (or, subject to Section 2.7(d), for the benefit of Consenting OEMs, to Consenting OEM Contract Manufacturers or Consenting OEM Tier Ones) in the Ordinary Course of Business and (ii) all current and past non-PSAN Inflator parts programs of Consenting OEMs (including Products of Sellers) regardless of whether such Contracts are executory or for parts no longer in current production (i.e., past-model parts), regardless of whether such Contracts can be assumed under any applicable insolvency Laws, other than obligations related to the manufacture or sale of PSAN Inflators);

(c)     the Cure Claims in connection with the assumption and assignment of the Purchased Contracts to be assumed and assigned to the Plan Sponsor, subject to the Cure Claims Cap;

36

(d)    all Assumed Employee Liabilities;

(e)    except as otherwise provided in <u>Section 2.3(b)</u>, all Liabilities of Sellers arising from the sale of Products (other than Products containing a PSAN Inflator) in the Ordinary Course of Business pursuant to product warranties, product returns, and rebates after the U.S. Closing;

(f)    all accounts payable incurred in the Ordinary Course of Business existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable, (ii) accrued but uninvoiced accounts payable and (iii) any accounts payable corresponding to Intercompany Balances that Plan Sponsor acquires pursuant to <u>Section 7.17</u>;

(g)    all Liabilities of Sellers under Environmental Laws, arising from or relating to the Purchased Assets, the Business or Sellers' Properties other than the Excluded Environmental Liabilities;

(h)    all Liabilities of Sellers relating to amounts required to be paid by the Plan Sponsor as consideration under this Agreement; and

(i)    the defense of existing litigation matters, patent and trademark office proceedings and other Legal Proceedings to the extent challenging the ownership, registrability, scope, validity or enforceability of Acquired Intellectual Property; <u>provided</u>, that, for clarity, the Plan Sponsor is not assuming any obligations or liabilities for infringement, misappropriation or other violation of any third party Intellectual Property to the extent arising prior to the Closing.

2.4    <u>Excluded Liabilities</u>.  The Plan Sponsor shall not assume, and shall be deemed not to have assumed, any Liabilities of any Seller other than the Assumed Liabilities, whether or not relating to the Business (collectively, the "**Excluded Liabilities**"), including the following specified Excluded Liabilities:

(a)    any and all Liabilities of Sellers arising out of or relating to the PSAN Inflator Business ("**Excluded PSAN Liabilities**");

(b)    any and all Liabilities of Sellers arising out of or relating to the execution, delivery or performance of this Agreement, including any liability or obligation of Sellers for payments of fees and/or expenses to a broker or finder;

(c)    any and all Liabilities of Sellers under any Contract of Sellers that is not a Purchased Contract or other Contract included in the Purchased Assets, whether accruing prior to, at, or after the U.S. Closing Date;

(d)    any and all accounts payable accrued prior to the U.S. Closing Date to the extent related to the PSAN Inflator Business (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(e)    any and all Liabilities for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, investment bankers,

consultants and other professionals retained by Sellers, and any official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders or OEMs incurred or owed in connection with the administration of the Bankruptcy Cases); (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the Transactions; and (iii) any and all costs and expenses arising out of or related to any third party claims against Sellers, pending or threatened, including any warranty or product claims except to the extent assumed in connection with a Purchased Contract;

(f)      any and all Liability relating to any Excluded Asset;

(g)      any and all Liability of Sellers for any fees, costs or expenses of the type referred to in Section 11.2;

(h)      any and all Cure Claims, including Disputed Cure Claims, of any Seller under the Purchased Contracts (other than OEM Assumed Contracts) in the amount by which such Cure Claims, in the aggregate, exceed the Cure Claims Cap;

(i)      any and all Excluded Environmental Liabilities;

(j)      (i) any and all Liabilities of Sellers for Taxes, (ii) any and all Liabilities for Taxes relating to the Purchased Assets attributable to any Tax period (or portion thereof) ending on or before the Closing Date (with Apportioned Obligations being prorated in accordance with Section 10.3) (for the avoidance of doubt, any Liability for Taxes of an Acquired Subsidiary shall remain a Liability of such Acquired Subsidiary) and (iii) any and all Liabilities for Transfer Taxes and VAT (subject to Section 10.2);

(k)      any and all Excluded Employee Liabilities;

(l)      any and all Liabilities of Sellers to any OEM that purchased PSAN Inflators from Sellers that is not a Consenting OEM;

(m)      any and all costs and expenses or other Liabilities of Sellers with respect to the DOJ Monitor and the NHTSA Monitor, except as set forth in the agreements referred to in Section 9.1(o);

(n)      any accounts payable corresponding to Intercompany Balances that Plan Sponsor does not acquire pursuant to Section 7.17.

2.5      Cure Claims.  At the U.S. Closing, pursuant to Section 365 of the Bankruptcy Code and the Confirmation Order, Sellers shall assume and assign the Purchased Contracts to the Plan Sponsor (other than any Purchased Contract subject to a Disputed Cure Claim as of the U.S. Closing).  The Cure Claims, other than OEM Assumed Liabilities, with respect to Purchased Contracts that are not subject to a Disputed Cure Claim as of the U.S. Closing shall be paid on or before the U.S. Closing (a) by the Plan Sponsor up to the Cure Claims Cap and (b) if the aggregate amount of Cure Claims exceeds the Cure Claims Cap, by Sellers in an amount equal to the excess of (x) the aggregate amount of Cure Claims over (y) the Cure Claims Cap.  Any

38

Purchased Contract that is subject to a Disputed Cure Claim as of the U.S. Closing will be treated in accordance with procedures set forth in Section 2.7.

2.6     Consent to Certain Assignments.

(a)     Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment (in whole or, to the extent relevant, in part) thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which any Seller is a party or by which it is bound, or in any way adversely affect the rights of Sellers or, upon transfer, the Plan Sponsor under such asset, claim or right, unless the applicable provisions of the Bankruptcy Code permits and/or the Confirmation Order authorizes the assumption and assignment (in whole or, to the extent relevant, in part) of such asset, claim, or right irrespective of the consent or lack thereof of a third party.  If, with respect to any Purchased Asset, such consent is not obtained or such assignment (in whole or, to the extent relevant, in part) is not attainable pursuant to the Bankruptcy Code or the Confirmation Order, then such Purchased Asset shall not be transferred hereunder, and the U.S. Closing shall proceed with respect to the remaining Purchased Assets for the full Purchase Price and Sellers shall use their commercially reasonable efforts, and the Plan Sponsor shall cooperate with Sellers, to obtain any such consent after the U.S. Closing.

(b)     If (i) notwithstanding the applicable provisions of Sections 363 and 365 of the Bankruptcy Code and the Confirmation Order and the commercially reasonable efforts of Sellers, any consent is not obtained prior to the U.S. Closing and as a result thereof the Plan Sponsor shall be prevented by a third party from receiving the rights and benefits with respect to a Purchased Asset intended to be transferred hereunder, or (ii) any Purchased Asset is not otherwise capable of sale and/or assignment (after giving effect to the Confirmation Order and the Bankruptcy Code), then, in each case, Sellers shall (at the Plan Sponsor's expense), subject to any approval of the Bankruptcy Court that may be required, at the request of the Plan Sponsor, reasonably cooperate with the Plan Sponsor in any lawful and commercially reasonable arrangement under which the Plan Sponsor would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to the Plan Sponsor.  Sellers shall promptly pay to the Plan Sponsor when received all monies received by Sellers under such Purchased Asset or any claim or right or any benefit arising thereunder and the Plan Sponsor shall promptly pay Sellers for all Liabilities of Sellers associated with such arrangement, if requested; provided, however, that nothing in this Section 2.6 shall entitle the Plan Sponsor to reduce the Purchase Price.

2.7     Contract Designation.

(a)     No later than ninety (90) days prior to the Confirmation Hearing, Sellers shall deliver to the Plan Sponsor a true, correct and complete list (as amended from time to time, the "**Executory Contract List**") of all Contracts related to the Purchased Assets or otherwise used, or held for use, in connection with the Business as it is conducted by Sellers (each, an "**Executory Contract**").  The Executory Contract List shall describe the monetary amounts that must be paid, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in

order for the Plan Sponsor to assume the Purchased Contracts (other than OEM Assumed Contracts) pursuant to this Agreement. Sellers shall use commercially reasonable efforts to provide the Plan Sponsor with true, correct and complete copies of each such Executory Contract.

(b)     Subject to the entry of the Solicitation Procedures Order and to the terms and provisions thereof, a copy of the cure notice listing the Cure Claims, which cure notice shall be in form and substance reasonably acceptable to the Plan Sponsor, shall be served on all required parties as directed in the Solicitation Procedures Order but in no event later than thirty (30) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract (other than an OEM Assumed Contract) included on the Executory Contract List shall have the time period prescribed by the Solicitation Procedures Order to object to the Cure Claims listed on the Executory Contract List and to adequate assurance of future performance by the Plan Sponsor.

(c)     To the extent a counterparty to an Executory Contract (other than an OEM Assumed Contract) objects or otherwise challenges or disputes the Cure Claim that Sellers determine is required in order for the Plan Sponsor to assume such Executory Contract pursuant to this Agreement, and such counterparty asserts a different monetary amount that must be paid and/or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, such amounts and/or nonmonetary obligations asserted by such counterparty shall be referred to as the "**Disputed Cure Claims**."

(d)     At any time and from time to time on or prior to the deadline set by the Bankruptcy Court for filing objections to confirmation of the Plan, the Plan Sponsor may designate in writing that any Executory Contract (other than OEM Assumed Contracts) shall be a Purchased Contract to be assumed and assigned (and to the extent not executory, assigned) pursuant to the Plan, this Agreement, and the Confirmation Order.  The Plan Sponsor shall be obligated to pay at the U.S. Closing any Cure Claims associated with the assumption of the Purchased Contracts that are Executory Contracts (other than OEM Assumed Contracts) up to the Cure Claims Cap or such other amount as agreed to between the Plan Sponsor and the counterparty; provided, however, that the Plan Sponsor's obligation to pay Cure Claims in connection with the Purchased Contracts (other than OEM Assumed Contracts) shall not exceed the Cure Claims Cap.  To the extent the total aggregate value of Cure Claims (including all Disputed Cure Claims) other than under OEM Assumed Contracts exceeds the Cure Claims Cap, (i) the Plan Sponsor, in its sole discretion, shall determine the specific Cure Claims that it shall pay up to the Cure Claims Cap and (ii) Sellers shall pay the excess of (x) the aggregate amount of Cure Claims over (y) the Cure Claims Cap, in accordance with Section 2.5.  To the extent any Purchased Contract (other than OEM Assumed Contracts) is subject to a Cure Claim payable by the Plan Sponsor, the Plan Sponsor shall pay such Cure Claim directly to the applicable counterparty.  Notwithstanding anything contained herein to the contrary, the Plan Sponsor shall only assume, and shall only be responsible for, Contracts designated by it as Purchased Contracts (which, for purposes of clarity, include all OEM Assumed Contracts), and which Purchased Contracts are in fact assigned to, and assumed by, the Plan Sponsor, pursuant to this Section 2.7 (it being expressly agreed by the Plan Sponsor and Sellers that all OEM Assumed Contracts will be assumed and assigned (and to the extent not executory, assigned) by Sellers to the Plan Sponsor at the U.S. Closing).  Notwithstanding the foregoing, for purposes of this Section 2.7(d), the Plan Sponsor shall have no obligation to assume any Non-Standalone OEM Contract where a

40

Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One is a counterparty unless (A) such counterparty modifies its Non-Standalone OEM Contract consistent with Section 4 of the OEM Indemnity and Release Agreement and (B) either (x) such counterparty grants a release consistent with Sections 8.a and 8.b of the OEM Indemnity and Release Agreement or (y) the applicable Consenting OEM is required to, or agrees to, indemnify and hold harmless the Plan Sponsor pursuant to Section 6 of the OEM Indemnity and Release Agreement with respect to any related PSAN Claims (as defined in the OEM Indemnity and Release Agreement) asserted by such counterparty in respect of such Non-Standalone OEM Contract (to the extent such claim relates to the applicable OEM's vehicles), it being understood that any Non-Standalone OEM Contract that Plan Sponsor does not assume as permitted by this Section 2.7(d) shall not constitute an OEM Assumed Contract for any purpose hereunder and, notwithstanding anything to the contrary set forth in this Agreement, neither Plan Sponsor nor any Acquired Subsidiary shall have any obligation under this Agreement with respect to any such counterparty with respect to the applicable Non-Standalone OEM Contract.

(e)     If a counterparty asserts a Disputed Cure Claim, the Cure Claim shall be paid following the later of (x) a reasonable period of time following the Effective Date if the dispute is resolved consensually between the applicable counterparty, Sellers and the Plan Sponsor prior to the Effective Date, or (y) a reasonable period of time following the entry of a Final Order adjudicating the dispute and approving the assumption and assignment of such Purchased Contract to the Plan Sponsor subsequent to the Effective Date; provided that if there is a dispute as to the amount of the Cure Claim that cannot be resolved consensually among the applicable counterparty, Sellers and the Plan Sponsor, then notwithstanding anything to the contrary herein or in the Confirmation Order, Sellers shall have the right (and shall do so if directed by the Plan Sponsor) to reject the contract or lease for a period of seven (7) days after entry of a Final Order establishing the Cure Claim in excess of that provided by Sellers. To the extent (i) any Disputed Cure Claims have not been resolved prior to the Effective Date and (ii) (a) the aggregate amount of all Disputed Cure Claims plus (b) the aggregate amount of all other Cure Claims paid by the Plan Sponsor at the U.S. Closing exceeds the Cure Claims Cap, Sellers shall establish a segregated account funded with cash sufficient to pay (1) (x) the aggregate amount of such Disputed Cure Claims less (y) the amount equal to the Cure Claims Cap less any other Cure Claims paid by the Plan Sponsor at the U.S. Closing, or (2) such other amount as ordered by the Bankruptcy Court (the "**Disputed Claim Account**").  Any amounts remaining in the Disputed Claim Account after the resolution and payment, if applicable, of all Disputed Cure Claims shall be returned to Sellers. For the avoidance of doubt, the Plan Sponsor's obligation to pay Cure Claims in connection with the Purchased Contracts shall not exceed the Cure Claims Cap.  To the extent the total aggregate value of Cure Claims (including all Disputed Cure Claims) exceeds the Cure Claims Cap, (i) the Plan Sponsor, in its sole discretion, shall determine the specific Cure Claims that it shall pay up to the Cure Claims Cap and (ii) Sellers shall pay the excess of (x) the aggregate amount of Cure Claims over (y) the Cure Claims Cap, in accordance with Section 2.5.

(f)     Sellers shall use commercially reasonable efforts to reduce, and shall use commercially reasonable efforts to cooperate with the Plan Sponsor in its efforts to reduce, the Disputed Cure Claims.

WEIL:\96035900\75\76903.0003

(g)    At any time and from time to time until the later of (i) two (2) Business Days prior to the U.S. Closing and (ii) seven (7) days after entry of a Final Order establishing the Cure Claim of a Disputed Cure Claim in accordance with Section 2.7(e), the Plan Sponsor, in its discretion by written notice to Sellers, may exclude from being assigned pursuant hereto any Executory Contracts (other than OEM Assumed Contracts), including any such Executory Contract previously designated by the Plan Sponsor as a Purchased Contract (other than OEM Assumed Contracts), and, in such circumstances, such Executory Contracts shall be rejected by Sellers, removed and not assumed by the Plan Sponsor, shall not constitute Purchased Contracts and shall be Excluded Assets, and the Plan Sponsor shall not acquire any rights or assume any Liabilities with respect thereto pursuant to Section 2.3(a); provided, however, that nothing in this Section 2.7(g) shall entitle the Plan Sponsor to (i) reduce the Purchase Price or (ii) exclude, or require Sellers to reject, any OEM Assumed Contract. Upon the Plan Sponsor's reasonable request, Sellers shall use commercially reasonable efforts to provide additional information as to the Liabilities under the Executory Contracts sufficient for the Plan Sponsor to make an informed assessment as to whether to designate such Executory Contracts as Excluded Assets.

2.8    Further Conveyances and Assumptions.

(a)    From time to time following the U.S. Closing, subject to Section 2.2(e), Sellers shall, or shall cause their Affiliates to, make available to the Plan Sponsor personnel records of Transferred Employees as is reasonably necessary for the Plan Sponsor to transition such employees into the Plan Sponsor's records.

(b)    From time to time following the U.S. Closing, Sellers and the Plan Sponsor shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and such other instruments, and shall take such further actions, as may reasonably be necessary or appropriate to assure fully to the Plan Sponsor and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to the Plan Sponsor under this Agreement and all other agreements contemplated hereby and to assure fully to Sellers and their Affiliates and their respective successors and permitted assigns, the assumption of the Liabilities and obligations intended to be assumed and assigned (and to the extent not executory, assigned) by the Plan Sponsor under this Agreement and all other agreements contemplated hereby, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)    For the avoidance of doubt, the Parties acknowledge and agree that, except as otherwise set forth in this Agreement, Sellers shall not have any Liability with respect to the ownership, operation or use by the Plan Sponsor of (i) the Purchased Assets from and after the U.S. Closing or (ii) the PSAN Assets from and after the acquisition thereof in accordance with Section 7.12.

## ARTICLE III

## CONSIDERATION

3.1    Consideration.

42

(a)    The aggregate consideration for the Purchased Assets shall be (A) an amount in cash equal to (i) $830,652,632 (as calculated in accordance with Annex A hereto and as may be adjusted as provided in Section 3.1(b), the "**Base Purchase Price**"), *minus* (ii) the aggregate amount of Repaid Indebtedness of the Acquired Subsidiaries, *minus* (iii) the aggregate amount of outstanding payment obligations of the Acquired Subsidiaries pursuant to the Global Settlement Agreement, *minus* (iv) the aggregate amount of accounts receivable of the Seller Entities that are paid prior to the U.S. Closing (whether before or after the date of this Agreement) on an accelerated schedule pursuant to the Accommodation Agreement (but only to the extent such accounts receivable would not have otherwise been paid prior to the U.S. Closing but for such acceleration), *minus* (v) if the Equipment Option is exercised by any Consenting OEM prior to the Closing Date pursuant to the Accommodation Agreement with respect to any Purchased Assets or any assets held by an Acquired Subsidiary, an amount equal to the purchase price paid by any such Consenting OEM in respect thereof, *minus* (vi) subject to and in accordance with Section 7.20(c), the TSAC Purchase Price, *minus* (vii) the amount, if any, of Transfer Taxes payable in connection with the Transactions that the Plan Sponsor reasonably determines are required to be paid, whether as a sole or joint obligation, by the Plan Sponsor or an Affiliate of the Plan Sponsor (including any Acquired Subsidiary after the U.S. Closing) (as determined in accordance with the immediately following two sentences), *minus* (viii) the Estimated Total Non-Recoverable VAT Amount, it being understood that such amount shall be used by the Plan Sponsor to satisfy the VAT due in connection with the transactions referred to in the definition of Estimated Total Non-Recoverable VAT Amount, *minus* (ix) Sellers' Regional Share of the Estimated Total Recoverable VAT Amount, it being understood that such amount shall be used by the Plan Sponsor to satisfy the VAT due in connection with the transactions referred to in the definition of Estimated Total Recoverable VAT Amount, *minus* (x) if the Acquired Cash is less than the Required Cash, Sellers' Cash Allocation Share of such deficit, *plus* (xi) if the Acquired Cash is greater than the Required Cash, Sellers' Cash Allocation Share of such excess up to Sellers' Cash Allocation Share of fifty million dollars ($50,000,000.00), *minus* (xii) the amount of the Expenses of Plan Sponsor to be deducted pursuant to Section 7.21, *minus* (xiii) the amount of any receivables of any Seller Entity set off by any OEM at Closing in respect of the DOJ Restitution Claim (the amount calculated pursuant to the formula set forth in this clause (A), the "**Purchase Price**"), (B) subject to and in accordance with Section 3.6, the Business Incentive Plan Payment, (C) the Plan Sponsor's assumption of the Assumed Liabilities and (D) the amounts paid pursuant to Section 7.12. As soon as reasonably practicable, but not less than fifteen (15) Business Days prior to the anticipated Closing Date, the Plan Sponsor shall deliver to Sellers a certificate signed by the Chief Financial Officer of KSS Holdings which demonstrates the calculation of the amount of Transfer Taxes described in clause (A)(vii) above, the calculation of the Estimated Total Non-Recoverable VAT Amount, and the calculation of the Estimated Total Recoverable VAT Amount, together with reasonable supporting documentation (the "**Closing Tax Certificate**"). Sellers hereby agree that they will cooperate in good faith and provide any assistance or information reasonably requested by the Plan Sponsor in connection with the preparation of the Closing Tax Certificate.  In the event Sellers dispute in good faith the Plan Sponsor's calculation of any amount shown on the Closing Tax Certificate, Sellers and the Plan Sponsor shall work in good faith to resolve such dispute. Not less than seven (7) Business Days prior to the anticipated Closing Date, Sellers shall deliver to the Plan Sponsor their good faith calculation of the Purchase Price (the "**Estimated Purchase Price**"), including the estimates for the various categories of the formula set forth in clause (a) of this Section 3.1.  In

the event the Plan Sponsor disputes in good faith any amounts provided by Sellers in respect of the Estimated Purchase Price, Sellers and the Plan Sponsor shall work in good faith to resolve such dispute. As soon as reasonably practicable, but no later than one hundred ninety five (195) days after the Closing Date, the Plan Sponsor shall deliver to Sellers a certificate signed by the Chief Financial Officer of KSS Holdings which demonstrates the calculation of the Total Non-Recoverable VAT Amount, the Total Recoverable VAT Amount, and the amount of Transfer Taxes actually paid to the applicable Tax Authorities by a Seller Entity, Plan Sponsor or an Affiliate of the Plan Sponsor (including an Acquired Subsidiary after the U.S. Closing) in connection with the Transactions as of one hundred eighty (180) days after the Closing Date, together with reasonable supporting documentation (the "**180 Day Tax Certificate**"). Sellers agree that they will cooperate in good faith and provide any assistance or information reasonably requested by the Plan Sponsor in connection with the preparation of the 180 Day Tax Certificate. In the event Sellers dispute in good faith the Plan Sponsor's calculation of any amount shown on the 180 Day Tax Certificate, Sellers and the Plan Sponsor shall work in good faith to resolve such dispute. Sellers and the Plan Sponsor shall resolve any disputes regarding amounts shown on the 180 Day Tax Certificate no later than two hundred twenty five (225) days after the Closing Date. In the event that the Estimated Total Recoverable VAT Amount exceeds the Total Recoverable VAT Amount (taking into account any prior payments to the applicable competent Tax Authority or to the Plan Sponsor with respect to VAT made or caused to be made by Sellers pursuant to this <u>Section 3.1</u>, or the sellers or any of their Affiliates pursuant to the provisions corresponding to this <u>Section 3.1</u> in any of the Cross-Conditioned Agreements), the Plan Sponsor shall refund, or cause to be refunded, to Sellers their Regional Share of such excess no later than two hundred twenty five (225) days after the Closing Date by wire transfer of immediately available funds to an account or accounts designated in writing by Sellers for such purpose. In the event that the Estimated Total Non-Recoverable VAT Amount exceeds the Total Non-Recoverable VAT Amount (taking into account any prior payments to the applicable competent Tax Authority or to the Plan Sponsor with respect to VAT made or caused to be made by Sellers pursuant to this <u>Section 3.1</u>), the Plan Sponsor shall refund, or cause to be refunded, the excess to Sellers no later than two hundred twenty five (225) days after the Closing Date by wire transfer of immediately available funds to an account or accounts designated in writing by Sellers for such purpose. In the event that the Estimated Total Recoverable VAT Amount is less than the Total Recoverable VAT Amount, Sellers shall pay their Regional Share of the amount of such deficiency to the Plan Sponsor (taking into account any prior payments to the applicable competent Tax Authority or to the Plan Sponsor with respect to VAT made or caused to be made by Sellers pursuant to this <u>Section 3.1</u>, or the sellers or any of their Affiliates pursuant to the provisions corresponding to this <u>Section 3.1</u> in any of the Cross-Conditioned Agreements, it being understood that if any such payments have exceeded such deficiency, Sellers' Regional Share of such excess shall be reimbursed to Sellers). In the event that the Estimated Total Non-Recoverable VAT Amount is less than the Total Non-Recoverable VAT Amount, Sellers shall pay the amount of such deficiency to the Plan Sponsor (taking into account any prior payments to the applicable competent Tax Authority or to the Plan Sponsor with respect to VAT made or caused to be made by Sellers pursuant to this <u>Section 3.1</u>, it being understood that if any such payments have exceeded such deficiency, such excess shall be reimbursed to Sellers). In each case where Sellers are paying any such deficiency, Sellers shall pay such amount by wire transfer of immediately available funds to an account or accounts designated in writing by the Plan Sponsor for such purpose at least two (2) Business Days prior to the due date for the payment of

the VAT underlying any such deficiency; provided, however, that the Plan Sponsor shall in each case pay or cause such VAT to be paid to the relevant Tax Authorities, and provide Sellers with reasonable notice prior to the due date for any such VAT.  If the Plan Sponsor or any of its Affiliates (including an Acquired Subsidiary after the Closings) actually realizes a refund, credit, or other recovery of either the Total Recoverable VAT Amount or the Total Non-Recoverable VAT Amount after the Regulatory Escrow Amount has reached the $50,000,000 cap in accordance with the definition of Regulatory Escrow Amount, then the Plan Sponsor shall promptly pay, or cause to be paid, to Sellers their Regional Share of such recovery (except in the case of a recovery of the Total Non-Recoverable VAT Amount, which shall be paid in its entirety to Sellers) by wire transfer of immediately available funds to an account or accounts designated in writing by Sellers for such purpose; provided, however, that such excess recovery will be paid only to the extent such amount was economically borne by a Seller Entity (excluding Acquired Subsidiaries after the U.S. Closing) or a seller or any Affiliate thereof under any Cross-Conditioned Agreement (excluding any acquired subsidiaries thereunder after the Closings) in connection with the Closings and/or any pre-closing restructurings contemplated by this Agreement and/or any Cross-Conditioned Agreement (whether by direct payment, reduction of the Purchase Price or the purchase price payable under any of the Cross-Conditioned Agreements, or otherwise).

(b)    The Parties acknowledge and agree that:

(i)    the Base Purchase Price shall be subject to adjustment following the final determination of each of (w) the EMEA Appraisal Amount, (x) the Mexico Appraisal Amount, (y) the TSAC Appraisal Amount, and (z) the treatment of the Intercompany Balances in accordance with Section 7.17 (such adjustment to be effected solely to the extent that such determinations, in the aggregate, would result in the Base Purchase Price being a value different from $830,652,632); provided, notwithstanding any provision in this Section 3.1(b), any such adjustment may be made only on or prior to the Intercompany Balances Outside Date and the appraisals referenced in in clauses (w) through (y) above must be completed prior to any such adjustment.  For the avoidance of doubt, in any event and under all circumstances, the Global Base Purchase Price shall be $1,588,000,000;

(ii)    the Base Purchase Price shall be adjusted in accordance with clause (i) above to be an amount equal to the sum of (A) the product of (x) the Global Base Purchase Price minus the Aggregate Appraisal Amount and (y) 54.9370503%, plus (B) the TSAC Appraisal Amount, plus (C) the Mexico Appraisal Amount; provided that the percentage set forth in the foregoing clause (A)(y) shall be adjusted (to the extent necessary) to reflect the treatment of Intercompany Balances in accordance with Section 7.17.  In making such adjustments to such percentage to reflect the treatment of Intercompany Balances, following resolution of the treatment of Intercompany Balances in accordance with Section 7.17, and determination of each of the EMEA Appraisal Amount, the Mexico Appraisal Amount, and the TSAC Appraisal Amount, the Plan Sponsor and the Sellers shall adjust the net asset values initially used for the calculation of the Base Purchase Price for each Seller Entity and each seller entity under the Cross-Conditioned Agreements (other than seller entities under the TK Europe Purchase Agreement, the applicable Seller Entities organized in Mexico, and other than in respect

45

of the TSAC Purchased Assets) in a fair and equitable manner to reflect any differences in the treatment of Intercompany Balances from the assumed treatment of such balances that was used by the Parties in establishing the Regional Share amounts set forth on Schedule B and the "Purchase Price" amounts set forth on Annex A, and jointly determine the adjustment to such percentage that is warranted thereby;

(iii)    Sellers and the Plan Sponsor shall use commercially reasonable efforts to resolve the treatment of Intercompany Balances in accordance with Section 7.17 as soon as practicable following the date hereof; and

(iv)    the "Base Purchase Price" as defined in each Cross-Conditioned Agreement shall be subject to equivalent adjustments to those set forth in clause (i) above, as provided therein.

3.2    Purchase Price Deposit. Without duplication of Plan Sponsor's obligations under Section 3.2 of each of the Cross-Conditioned Agreements, upon the execution of this Agreement, pursuant to the terms of the Escrow Agreement, Parent or one of its Affiliates shall immediately, on behalf of an applicable current or future Subsidiary (or Subsidiaries) of Parent designated to purchase certain of the Purchased Assets, deposit with Delaware Trust Company, in its capacity as escrow agent (the "**Escrow Agent**"), cash or an Escrow Letter of Credit in the amount of twenty-five million dollars ($25,000,000) (the "**Escrow Amount**"), with Sellers' Regional Share of such Escrow Amount deposited in an account exclusive to Sellers, to be returned to the Plan Sponsor or drawn by the Escrow Agent and Sellers' Regional Share of the proceeds thereof paid to Sellers, in accordance with the provisions of the Escrow Agreement. The Plan Sponsor, in its sole discretion, may at any time replace any Escrow Letter of Credit posted pursuant to this Section 3.2 with an equal amount of cash, in which case the Escrow Letter of Credit shall be promptly released and returned to the Plan Sponsor.  Pursuant to the Escrow Agreement, Sellers' Regional Share of the Escrow Amount (together with all accrued investment income thereon) shall be distributed as follows:

(a)    if the U.S. Closing shall occur, (x) if the Escrow Amount is in the form of cash, Sellers' Regional Share of the Escrow Amount, together with all accrued investment income thereon, if any, shall be applied towards the Purchase Price payable by the Plan Sponsor to Sellers under Section 3.3 and shall be delivered to Sellers at the U.S. Closing and (y) if the Escrow Amount is in the form of an Escrow Letter of Credit, either (A) such Escrow Letter of Credit shall provide for a draw down by the Escrow Agent in the amount of the Escrow Amount at the U.S. Closing, with Sellers' Regional Share of the Escrow Amount to be disbursed to Sellers or (B) the Plan Sponsor, in its sole option, may deliver to Sellers at the U.S. Closing a cash payment equal to the amount of Sellers' Regional Share of the Escrow Amount, in which case Sellers and the Plan Sponsor shall jointly instruct the Escrow Agent to release and return the Escrow Letter of Credit to the Plan Sponsor at the U.S. Closing;

(b)    if this Agreement is terminated pursuant to (i) Section 4.4(c)(i), Section 4.4(c)(ii) or Section 4.4(b)(v) (but only if such right of termination pursuant to Section 4.4(b)(v) is due to (x) a termination of the TKJP Purchase Agreement pursuant to Section 4.4(c)(i) or Section 4.4(c)(ii) thereof, (y) a termination of the TK Europe Purchase Agreement pursuant to Section 4.4(c)(i) or Section 4.4(c)(ii) thereof or (z) termination of the TSAC Purchase

46

Agreement (if applicable) pursuant to the termination provisions therein comparable to Section 4.4(c)(i) or Section 4.4(c)(ii) of this Agreement) or (ii) any of Sections 4.4(b)(i), 4.4(b)(ii) or 4.4(b)(v) in a circumstance in which the Regulatory Termination Fee pursuant to Section 4.7 is required, (x) if the Escrow Amount is in the form of cash, Sellers' Regional Share of the Escrow Amount, together with all accrued investment income thereon, if any, shall be released to Sellers or (y) if the Escrow Amount is in the form of an Escrow Letter of Credit, either (A) such Escrow Letter of Credit shall provide for a draw down by the Escrow Agent in the amount of the Escrow Amount, with Sellers' Regional Share of the Escrow Amount to be disbursed to Sellers or (B) the Plan Sponsor, in its sole option, may deliver to Sellers a cash payment equal to the amount of Sellers' Regional Share of the Escrow Amount, in which case Sellers and the Plan Sponsor shall jointly instruct the Escrow Agent to release and return the Escrow Letter of Credit to the Plan Sponsor (for the avoidance of doubt, notwithstanding the distribution of the Escrow Amount to Sellers pursuant to this Section 3.2(b), Sellers may seek damages (if any) against the Plan Sponsor under applicable Law if there is a breach by the Plan Sponsor of this Agreement); or

(c)    if this Agreement is terminated for any reason other than by Sellers pursuant to (i) Section 4.4(c)(i), (ii) Section 4.4(c)(ii) or (iii) any of Sections 4.4(b)(i), 4.4(b)(ii) or 4.4(b)(v) (but only if such right of termination pursuant to Section 4.4(b)(v) is due to a termination of the TKJP Purchase Agreement pursuant to Section 4.4(c)(i) or Section 4.4(c)(ii) thereof, (y) a termination of the TK Europe Purchase Agreement pursuant to Section 4.4(c)(i) or Section 4.4(c)(ii) thereof or (z) termination of the TSAC Purchase Agreement (if applicable) pursuant to the termination provisions therein comparable to Section 4.4(c)(i) or Section 4.4(c)(ii) of this Agreement) or in a circumstance in which the Regulatory Termination Fee pursuant to Section 4.7 is required, (x) if the Escrow Amount is in the form of cash, Sellers' Regional Share of the Escrow Amount, together with all accrued investment income thereon, if any, shall be released to the Plan Sponsor or, (y) if the Escrow Amount is in the form of an Escrow Letter of Credit, Sellers and the Plan Sponsor shall jointly instruct the Escrow Agent to release and return the Escrow Letter of Credit to the Plan Sponsor.

3.3    Payments by the Plan Sponsor of Certain Portions of the Purchase Price.

(a)    DOJ Payment.  On the Closing Date, pursuant to Sections 5.5(a) and 5.15 of the Plan, the Plan Sponsor shall pay the U.S. Chapter 11 Debtor Contribution Amount to the OEMs entitled thereto in accordance with the Agreed Allocation (as defined in the Plan), out of the Purchase Price and the Plan Sponsor Backstop Funding, if any, subject to and in accordance with Section 3.5 (the payment made pursuant to this Section 3.3(a), the "**DOJ Payment Amount**"). The DOJ Payment Amount shall be deemed to be made both (i) on behalf of Sellers on account of the Plan Settlement Payment (as defined in the Plan) and (ii) with the consent of the Special Master, on behalf of the Special Master on account of the DOJ Restitution Payment.

(b)    NHTSA Payment.  On the Closing Date, the Plan Sponsor shall pay a portion of the Purchase Price to NHTSA, by wire transfer of immediately available funds to the accounts(s) designated by NHTSA in an amount equal to $50,000,000 less payments made by Takata prior to the Closing (the "**NHTSA Payment Amount**").

(c)    PSAN Legacy Costs Payment.  On the Closing Date, pursuant to Section 5.15 of the Plan, the Plan Sponsor shall fund a portion of (i) the Post-Closing Reserve with an

amount equal to the product of (x) the total amount estimated to be needed to fund the Post-Closing Reserve as set forth in the Legacy Cost Report and (y) 33.3296072%, (ii) the Warehousing Trust Reserve with an amount equal to the product of (x) the total amount estimated to be needed to fund all costs of the Warehousing Trust Reserve other than those costs specifically related to warehousing, shipping, and disposal, as set forth in the Legacy Cost Report and (y) 33.3296072%, and (iii) the Warehousing Trust Reserve with an amount equal to the total cost of warehousing, shipping, and disposal of PSAN Inflators in the Sellers' leased warehouses as of the Closing Date, as set forth in the Legacy Cost Report, from the Purchase Price and the Plan Sponsor Backstop Funding, if any, subject to and in accordance with Section 3.5 (the "**PSAN Legacy Costs Payment**").

(d)     Certain Global Settlement Agreement Payments.  On the Closing Date, pursuant to Sections 4.a, 4.b and 4.c. of the Global Settlement Agreement, the Plan Sponsor shall pay out of the Base Purchase Price pursuant to Section 3.1(a)(A)(iii) hereof (in the case of TKBR) and Section 3.1(a)(A)(vi) hereof (in the case of TSAC), (i) on behalf of TKBR, the Brazil Subsidiary Contribution Amount payable by TKBR pursuant to the Global Settlement Agreement, in accordance with Schedule 6 thereof, (ii) on behalf of TKBR, the PSAN Legacy Costs Payment (as defined in the Global Settlement Agreement) of TKBR  payable by TKBR pursuant to the Global Settlement Agreement, in accordance with Schedule 7 thereof, and (iii) on behalf of TSAC, the TSAC Payment Contribution payable by TSAC pursuant to the Global Settlement Agreement, in accordance with Schedule 6 thereof, in each case, or as otherwise agreed among the Plan Sponsor and the parties to the Global Settlement Agreement.

3.4     Repaid Indebtedness.  At the U.S. Closing, all outstanding Indebtedness of the Acquired Subsidiaries under the loans or other financing arrangements set forth on Schedule 5.28 or incurred by an Acquired Subsidiary since the date of this Agreement in accordance with or in violation of Section 7.2(b)(xxiv), shall be fully repaid (the "**Repaid Indebtedness**") and such repayment shall be funded by the Plan Sponsor and deducted from the Purchase Price in accordance with Section 3.1.  No later than five (5) Business Days prior to U.S. Closing, Sellers shall provide to the Plan Sponsor (a) payoff letters with respect to the Repaid Indebtedness, in each case, (i) that set forth the amount to be paid on the Closing Date, together with wire transfer instructions and (ii) evidencing that the payment of such amount would result in the full repayment, satisfaction, release and discharge of the Repaid Indebtedness and (b) customary release documents providing for the release of all encumbrances on the transfer of Equity Interests and assets of the Acquired Subsidiaries and the Business (i) in respect of any Repaid Indebtedness and (ii) related to the Access Agreement among Sellers, the Seller Entities and the Consenting OEMs.  At the U.S. Closing, the Plan Sponsor, on behalf of the Acquired Subsidiaries, shall pay or cause to be paid all Repaid Indebtedness pursuant to such payoff letters.

3.5     Backstop.  The Plan Sponsor shall make, or cause to be made, the Plan Sponsor Backstop Funding if, and solely to the extent required pursuant to, and subject to and in accordance with the terms and conditions set forth in, the Backstop Agreement.

3.6     Business Incentive Plan.  After the Closings, at the times specified in this Section 3.6, the Plan Sponsor shall pay in accordance with the Plan an additional contingent aggregate

amount up to, and not to exceed, Sellers' Regional Share of Four Hundred Million Dollars ($400,000,000) (collectively, the "**Business Incentive Plan Payment**"), as follows:

      (i)    Promptly after the completion of the Plan Sponsor's audited financial statements for the fiscal year ending December 31, 2020, the Plan Sponsor shall pay to Sellers, by wire transfer of immediately available funds to the account designated by Sellers in writing for such purpose, an amount equal to Sellers' Regional Share of the product of (x) 0.05 multiplied by (y) the amount, if any, by which the Revenue of the Combined Businesses for the fiscal year ending December 31, 2020 is greater than Seven Billion Five Hundred Million Dollars ($7,500,000,000), subject to adjustment as described in <u>Section 3.6(d)</u>, below.

      (ii)    Promptly after the completion of the Plan Sponsor's audited financial statements for the fiscal year ending December 31, 2021, the Plan Sponsor shall pay to Sellers, by wire transfer of immediately available funds to the account designated by Sellers in writing for such purpose, an amount equal to Sellers' Regional Share of the product of (x) 0.05 multiplied by (y) the amount, if any, by which the Revenue of the Combined Businesses for the fiscal year ending December 31, 2021 is greater than Seven Billion Six Hundred Million Dollars ($7,600,000,000), subject to adjustment as described in <u>Section 3.6(d)</u>, below.

      (iii)    Promptly after the completion of the Plan Sponsor's audited financial statements for the fiscal year ending December 31, 2022, the Plan Sponsor shall pay to Sellers, by wire transfer of immediately available funds to the account designated by Sellers in writing for such purpose, an amount equal to Sellers' Regional Share of the product of (x) 0.05 multiplied by (y) the amount, if any, by which the Revenue of the Combined Businesses for the fiscal year ending December 31, 2022 is greater than Seven Billion Seven Hundred Million Dollars ($7,700,000,000), subject to adjustment as described in <u>Section 3.6(d)</u>, below.

      (iv)    Promptly after the completion of the Plan Sponsor's audited financial statements for the fiscal year ending December 31, 2023, the Plan Sponsor shall pay to Sellers, by wire transfer of immediately available funds to the account designated by Sellers in writing for such purpose, an amount equal to Sellers' Regional Share of the product of (x) 0.05 multiplied by (y) the amount, if any, by which the Revenue of the Combined Businesses for the fiscal year ending December 31, 2023 is greater than Seven Billion Eight Hundred Million Dollars ($7,800,000,000), subject to adjustment as described in <u>Section 3.6(d)</u>, below.

      (v)    Promptly after the completion of the Plan Sponsor's audited financial statements for the fiscal year ending December 31, 2024, the Plan Sponsor shall pay to Sellers, by wire transfer of immediately available funds to the account designated by Sellers in writing for such purpose, an amount equal to Sellers' Regional Share of the product of (x) 0.05 multiplied by (y) the amount, if any, by which the Revenue of the Combined Businesses for the fiscal year ending December 31, 2024 is greater than Seven Billion Nine Hundred Million Dollars ($7,900,000,000), subject to adjustment as described in <u>Section 3.6(d)</u>, below.

WEIL:\96035900\75\76903.0003

(b)     The Plan Sponsor shall use commercially reasonable efforts to finalize its audited financial statements for each applicable fiscal year hereunder, and to make all applicable Business Incentive Plan Payment, if any, payable hereunder on or before April 30 of the year following the completion of the subject fiscal year.  Concurrently with the delivery of each of the audited financial statements and any payments described in Section 3.6(a), the Plan Sponsor shall prepare and deliver to Sellers a statement setting forth the Revenue of the Combined Businesses for the applicable fiscal year and the Plan Sponsor's calculation of the amount of Business Incentive Plan Payment, if any, due to Sellers under this Section 3.6 in respect of the applicable fiscal year (each a "**Business Incentive Plan Payment Statement**").

(c)     The Plan Sponsor shall provide Sellers with reasonable access during normal business hours to the books, records and supporting work of the Plan Sponsor related to the Revenue of the Combined Businesses for the applicable fiscal year, the calculation of the Business Incentive Plan Payment and the preparation of the Business Incentive Plan Payment Statement.  Sellers shall have the right during the period of sixty (60) days following delivery of the Business Incentive Plan Payment Statement to provide written notice to the Plan Sponsor if Sellers reasonably determine in good faith that (i) the Business Incentive Plan Payment Statement does not reflect the Revenue of the Combined Businesses or (ii) mathematical errors to any item of calculation in the applicable Business Incentive Plan Payment Statement (the "**Business Incentive Plan Payment Objection Notice**").  If Sellers deliver an Business Incentive Plan Payment Objection Notice within sixty (60) days following delivery of the Business Incentive Plan Payment Statement, then Sellers and the Plan Sponsor shall attempt in good faith to resolve any disputes set forth in such Business Incentive Plan Payment Objection Notice.  If Seller and Plan Sponsor do not resolve any such Business Incentive Plan Payment Objection Notice within thirty (30) days after the date of delivery of the Business Incentive Plan Payment Objection Notice, which thirty (30) day period may be extended by written agreement of the Plan Sponsor and Sellers, such dispute shall be resolved in accordance by the Accounting Expert, as an expert, and not as an arbitrator, to make a binding determination as to the disputed items in accordance with this Agreement.  The Accounting Expert will, under the terms of its engagement, have no more than thirty (30) days from the date of referral and no more than ten (10) Business Days from the final submission of information and presentations by the Plan Sponsor and Sellers within which to render its written decision with respect to the disputed items (and only with respect to any unresolved disputed items set forth in the Business Incentive Plan Payment Objection Notice) and the final Business Incentive Plan Payment Statement shall be based solely on the resolution of such disputed items.  The Accounting Expert shall review such submissions and base its determination solely on such submissions.  In resolving any disputed item, the Accounting Expert may not assign a value to any item greater than the maximum value for such item claimed by either party or less than the minimum value for such item claimed by either party.  Absent manifest error, the decision of the Accounting Expert shall be deemed final and binding upon the parties and enforceable by any court of competent jurisdiction and the Accounting Expert's final Business Incentive Plan Payment Statement shall be final and binding.  The fees and expenses of the Accounting Expert shall be borne equally between the Plan Sponsor and Sellers.  If Sellers do not deliver a Business Incentive Plan Payment Objection Notice within sixty (60) days of receipt of the applicable Business Incentive Plan Payment Statement, the Business Incentive Plan Payment Statement shall be final and binding.

(d)  _Adjustments to Revenue Targets_.  Each of the revenue targets set forth in Sections 3.6(a)(i)-(v) shall be subject to equitable adjustment in respect of any acquisition or disposition of any business, assets or operations outside the Ordinary Course of Business, and any restructuring or other transaction that materially changes the projected combined business operations of the Plan Sponsor and its Subsidiaries after the U.S. Closing, in which case (i) the applicable revenue targets shall be increased by an amount equal to the revenue of the acquired business, assets or operations during the trailing twelve-month period prior to the applicable measurement date, and (ii) the applicable revenue targets shall be decreased by an amount equal to the revenue of disposed business, assets or operations during the trailing twelve-month period prior to the applicable measurement date.

(e)  _No Obligation to Run the Business in a Particular Manner_.  The Plan Sponsor shall have no obligation to Sellers or any other Person by virtue of this Agreement to operate the Business or sell Products in a particular manner, allocate additional resources to the Business or sale of Products, or otherwise attempt to maximize the Revenue of the Combined Businesses.

3.7  _Withholding_.  The Plan Sponsor shall be entitled to deduct and withhold from the amounts otherwise payable pursuant to this Agreement any such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, or any applicable provision of state, local or foreign Tax Law; _provided_, that the Plan Sponsor shall cooperate in good faith with Sellers to minimize any such withholding. With regard to any amounts so withheld in accordance with the foregoing, to the extent such amounts are remitted to the applicable Tax Authority such remitted amounts shall be treated for all purposes of this Agreement as having been paid to the payee in respect of which such deduction and withholding was made.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1  _Closing_.

(a)  The closing of the Transactions (the "**U.S. Closing**") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP located at 4 Times Square, New York, New York (or such other location as shall be mutually agreed upon by Sellers and the Plan Sponsor) commencing at (a) 10:00 am local time on a date that is seven (7) Business Days following the date upon which all of the conditions to the obligations of Sellers and the Plan Sponsor to consummate the Transactions set forth in Article IX (other than conditions that by their nature are to be satisfied at the U.S. Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived or (b) at such other time and date as shall be mutually agreed upon by Sellers and the Plan Sponsor prior thereto.  The date on which the U.S. Closing occurs is referred to herein as the "**Closing Date**". For purposes of this Agreement and the Transactions, the U.S. Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Purchased Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date.  The Parties acknowledge and agree that the U.S. Closing shall, to the greatest extent practicable, occur on the same date as the closing of the transactions

51

contemplated by the TKJP Purchase Agreement, the TSAC Purchase Agreement (if applicable) and the TK Europe Purchase Agreement (the closing of the transactions contemplated by the TKJP Purchase Agreement, the TSAC Purchase Agreement and the TK Europe Purchase Agreement, together, the "**Other Closings**" collectively with the U.S. Closing, the "**Closings**" and each, a "**Closing**").

(b)      All deliveries to be made or other actions to be taken at the U.S. Closing shall be deemed to occur simultaneously with the other deliveries and actions at the U.S. Closing, and no such delivery or action shall be deemed complete until all such deliveries and actions have been completed or the relevant parties have agreed to waive such delivery or action.

(c)      If any one or more of the Other Closings do not occur on the Closing Date (which, for this purpose, shall be deemed to include the same calendar day in the locations in which the Other Closings take place), any delivery made or other action taken at the U.S. Closing shall be deemed not to have occurred and be without force or effect.

(d)      In furtherance of Section 4.1(c), in the event any one or more of the Closings do not occur on the Closing Date (which, for this purpose, shall be deemed to include the same calendar day in the locations in which the Other Closings take place) following the completion of any elements of the Transactions, the Parties shall unwind the Transactions to the extent the Transactions had been completed at such time, and to place the Parties in the same economic position as if the Transactions had not been completed to any extent, to include any combination of the following steps as may be appropriate and agreed between the Parties: (i) the reimbursement of any amounts paid by a Party to the other Party, whether as consideration for share transfer, asset purchase or otherwise, to such bank account as may be designated by the Party to be reimbursed in writing; (ii) the consolidation, buy-back or redemption of any securities transferred, including any reduction of capital; (iii) the return or destruction of any certificates evidencing such securities; or (iv) the restoration of any registers of shareholders, owners or members. In accordance with such decision, each Party shall promptly execute and deliver (or cause its employees, agents or other Affiliates or representatives to execute and deliver) any and all such further agreements, instruments, certificates and other documents, and take any and all other actions as may be necessary or desirable to secure the full effect of Section 4.1(c) above and this Section 4.1(d). For the avoidance of doubt, Section 4.1(c) above and this Section 4.1(d) shall apply to any and all deliveries and actions to be made or taken at the U.S. Closing.

4.2      Deliveries by Sellers.  At the U.S. Closing, Sellers shall deliver, or cause to be delivered, to the Plan Sponsor:

(a)      an independent fairness opinion or appraisal issued by an independent financial advisor, which shall be reasonably acceptable to the Plan Sponsor, supporting the fairness, from a financial point of view, of (i) the pre-closing restructurings contemplated in Sections 7.20(a) and 7.20(b), and (ii) the portion of the Purchase Price allocated to the Purchased Assets located in Mexico and China;

(b)      the duly executed bill of sale, assignment and assumption agreement for the assignment and conveyance of the Purchased Assets from Sellers to the Plan Sponsor in

WEIL:\96035900\75\76903.0003

substantially the form of <u>Exhibit C</u> attached hereto (the "**Bill of Sale, Assignment and Assumption Agreement**");

        (c)    the duly executed special warranty deeds with respect to the Owned Properties to be transferred by Seller Entities to the Plan Sponsor pursuant to this Agreement, together with customary owner's affidavits and any certificates, other affidavits, public instruments and forms that are customary for presentation or submission when transferring real estate or recording deeds in jurisdictions where the Owned Properties are located duly filed for recordation in the corresponding public registry of each jurisdiction, as applicable;

        (d)    the duly executed assignments of (i) Patents, (ii) Marks and (iii) Copyrights included in the Purchased Intellectual Property, each of (i)-(iii) in a form suitable for recording in the U.S. Patent and Trademark Office or U.S. Copyright Office (or similar offices in foreign jurisdictions, as applicable) (the "**IP Assignment Agreements**");

        (e)    a duly executed intellectual property license agreement, in form and substance reasonably acceptable to Sellers, the Consenting OEMs, and the Plan Sponsor, by and between Parent and Reorganized Takata (the "**Intellectual Property License Agreement**");

        (f)    a duly executed services agreement, in form and substance acceptable to Sellers, the Consenting OEMs, and the Plan Sponsor, by and between Parent and Reorganized Takata (the "**Services Agreement**");

        (g)    a certified true, correct and complete copy of the Confirmation Order;

        (h)    the duly executed officer's certificate required to be delivered pursuant to <u>Sections 9.1(a)</u> and <u>9.1(b)</u>;

        (i)    to the extent applicable, certificates representing the shares of capital stock and other Equity Interests of the Share Purchase Subsidiaries, duly endorsed or accompanied by stock powers duly executed in blank and accompanied by such other documents as are necessary to transfer good and valid title to such shares and other Equity Interests to the Plan Sponsor, free and clear of any and all Liens;

        (j)    the corporate records of the Acquired Subsidiaries, including corporate books (*libros corporativos*) of the Acquired Subsidiaries organized in Mexico, the partners' or shareholders' meetings of the Acquired Subsidiaries, and copies of the entries on the stock corporate book (*libro de registro de acciones*) of each of the Acquired Subsidiaries organized in Mexico certifying the acquisition of such Acquired Subsidiaries hereunder;

        (k)    an amendment to the articles of association of TKBR contemplating the transfer by Takata Americas and TK Europe of their respective quotas in TKBR to the Plan Sponsor;

        (l)    from each Seller whose assets are being sold hereunder, a certificate pursuant to U.S. Treasury Regulations Section 1.1445-2(b), in a form reasonably acceptable to the Plan Sponsor, that such Seller (or such other entity that is treated as the Tax owner of such Seller's assets for purposes of such regulation) is not a foreign person within the meaning of

WEIL:\96035900\75\76903.0003

Section 1445 of the Code, duly executed by such Seller (or such other entity); or, if such Seller is a foreign person, an affidavit in a form reasonably acceptable to the Plan Sponsor that the assets being transferred by such Seller do not include any U.S. real property interests or stock of any domestic corporation; provided, however, that if any such certificate or affidavit is not provided, the Plan Sponsor shall be entitled to proceed with the U.S. Closing and to withhold the requisite amounts in accordance with Section 1445 of the Code;

(m)    from each of TK Holdings and Takata Americas, a certificate pursuant to U.S. Treasury Regulations Section 1.1445-2(b), in a form reasonably acceptable to the Plan Sponsor, that such entity is not a foreign person within the meaning of Section 1445 of the Code, duly executed by such entity; provided, however, that if any such certificate or affidavit is not provided, the Plan Sponsor shall be entitled to proceed with the U.S. Closing and to withhold the requisite amounts in accordance with Section 1445 of the Code;

(n)    an omnibus bill of sale or other instrument of transfer, duly executed by each of the Retained Subsidiaries pursuant to which the Retained Subsidiaries will convey, transfer, assign and deliver to the Plan Sponsor all assets (if any) of the Retained Subsidiaries that would constitute Purchased Assets if the Retained Subsidiaries were Sellers hereunder;

(o)    such other good and sufficient instruments of transfers as the Plan Sponsor may reasonably request in order to consummate the Transactions;

(p)    documentation providing the amount of the Purchase Price that shall be allocated to the purchase and sale of the shares of the entities listed on Schedule G hereto, as determined pursuant to Section 10.5(b);

(q)    TK Holdings de Mexico, Industrias, SMX and TK Mexico shall deliver electronic tax invoices (for the avoidance of doubt *comprobante fiscal digital por internet*) issued in accordance with the applicable Tax provisions, including, but not limited to, articles 29 and 29-A of the Mexican Federal Tax Code (*Código Fiscal de la Federación*) for the sale of Equity Interests in Equipo, Falcomex, S.A. de C.V., and New Mexico Trading Company;

(r)    the duly executed closing statement (the "**Closing Statement**") on which the Purchase Price shall be detailed and summarized; and

(s)    the duly executed Regulatory Escrow Agreement, on substantially the terms set forth on Exhibit F hereto.

4.3    Deliveries by the Plan Sponsor.    At the U.S. Closing, the Plan Sponsor shall deliver, or cause to be delivered, to Sellers:

(a)    (i) an amount equal to (A) the Purchase Price (subject to the provisions set forth in Annex B with regard to the Acquired Cash adjustment), *minus*, (B) Sellers' Regional Share of the Escrow Amount, *minus* (C) the DOJ Payment Amount (which shall be paid to the OEMs entitled thereto in accordance with Section 3.3(a)), *minus* (D) the NHTSA Payment Amount, *minus* (E) the PSAN Legacy Costs Payment (pursuant to and in accordance with the Plan) and (ii) any Plan Sponsor Backstop Funding required to be paid on the Effective Date under the Plan and the Backstop Agreement, in immediately available funds;

(b)     the duly executed Bill of Sale, Assignment and Assumption Agreement;

(c)     the duly executed IP Assignment Agreements;

(d)     the duly executed Intellectual Property License Agreement;

(e)     the duly executed Services Agreement;

(f)     the duly executed officer's certificate required to be delivered pursuant to Sections 9.2(a) and 9.2(b);

(g)     such other documents, instruments and certificates as Sellers may reasonably request;

(h)     the duly executed Closing Statement; and

(i)     the duly executed Regulatory Escrow Agreement, on substantially the terms set forth on Exhibit F hereto.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the U.S. Closing as follows:

(a)     by mutual written consent of Sellers and the Plan Sponsor;

(b)     by Sellers or the Plan Sponsor if:

(i)     the U.S. Closing shall not have occurred by the close of business on the earlier of (x) September 30, 2018 and (y) termination or expiration of the Plea Agreement (such applicable date, the "**Outside Date**"); provided, that if the U.S. Closing shall not have occurred on or before the Outside Date due to a material breach of (x) any representations and warranties made as of the date of this Agreement, (y) any covenants, or (z) any agreements contained in this Agreement by the Plan Sponsor or Sellers, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(b)(i);

(ii)     there is in effect a final nonappealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(iii)     the Bankruptcy Court enters an order that prohibits the consummation of the Transactions on substantially the terms and conditions set forth in this Agreement;

(iv)     Sellers enter into a definitive agreement with respect to a Superior Proposal; or

(v)     the TKJP Purchase Agreement, the TSAC Purchase Agreement (if applicable), the TK Europe Purchase Agreement, the Accommodation Agreement or the RSA is duly terminated in accordance with its terms, other than as a result of the

Closings; provided, however, that if the Plan Sponsor has elected to reform this Agreement pursuant to Section 4.6(c)(ii), Sellers shall not be entitled to terminate this Agreement pursuant to this Section 4.4(b)(v) due to a termination of the TKJP Purchase Agreement pursuant to Section 4.4(b)(iv) thereof until the date that is the twentieth (20th) Business Day following the date of termination of the TKJP Purchase Agreement (during which period Sellers and the Plan Sponsor shall negotiate the terms of such reformation in accordance with Section 4.6(c));

(c)    by Sellers if:

(i)    there is a breach by the Plan Sponsor of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would, individually or in the aggregate with other breaches, result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach cannot be cured or has not been cured by the earlier of (i) twenty (20) Business Days after the giving of notice by Sellers to the Plan Sponsor of such breach and (ii) the Outside Date;

(ii)    the Joyson Shareholder Approval has not been obtained by the date that is forty-five (45) days after the date of the Agreement; or

(iii)    Sellers and the Plan Sponsor are unable to agree on a treatment of Intercompany Balances by the Plan Sponsor in the Final Joint Proposal that is reasonably acceptable to both Sellers and the Plan Sponsor, as contemplated by Section 7.17, on or prior to December 15, 2017 (the "**Intercompany Balances Outside Date**"); provided, however, that Sellers may not terminate this Agreement pursuant to this Section 4.4(c)(iii) prior to the Intercompany Balances Outside Date or after the date that is five (5) Business Days after the Intercompany Balances Outside Date.  The Intercompany Balances Outside Date may be extended if the Plan Sponsor, the Sellers and the sellers under each of the Cross-Conditioned Agreements mutually agree.

(d)    by the Plan Sponsor if:

(i)    there is a breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement, which breach would, individually or in the aggregate with other breaches, result in a failure of a condition set forth in Section 9.1 or Section 9.3 and which breach cannot be cured or has not been cured by the earlier of (i) twenty (20) Business Days after the giving of notice by the Plan Sponsor to Sellers of such breach and (ii) the Outside Date;

(ii)    the OEM Indemnity and Release Agreement is not executed and delivered to the Plan Sponsor on or before November 30, 2017 by (i) each of the specified OEMs listed on Schedule H hereto and (ii) a sufficient number of the parties listed on Schedule I hereto, such that no more than 1,800,000 PSAN Inflators are attributable to parties listed thereto that have not become Consenting OEMs; provided, however, that the Plan Sponsor may not terminate this Agreement pursuant to this Section 4.4(d)(ii) prior to November 30, 2017 or after December 4, 2017;

56

(iii)    the Break-Up Fee and Expense Reimbursement are not approved by the Bankruptcy Court on or before December 6, 2017;

(iv)    the Disclosure Statement is not filed by Sellers on or before November 15, 2017 (or such later date as may reasonably be agreed by the Parties);

(v)    Sellers have not commenced solicitation of votes to accept the Plan on or before January 10, 2018 (or such later date as may reasonably be agreed by the Parties);

(vi)    the Bankruptcy Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code, and neither such dismissal nor conversion expressly contemplates the Transactions, or a chapter 11 trustee is appointed for Sellers and such chapter 11 trustee files a pleading or other document with the Bankruptcy Court indicating an affirmative intent not to pursue, or to abandon the pursuit of, the Transactions or indicating an intent to pursue an Alternative Transaction;

(vii)    the Confirmation Order is not entered by the Bankruptcy Court on or before February 15, 2018;

(viii)    the Confirmation Order, as entered by the Bankruptcy Court, is not reasonably satisfactory to the Plan Sponsor;

(ix)    any of the Access Agreement, the Global Settlement Agreement, or the Accommodation Agreement is amended or modified in a manner that itself, or when taken together with any other amendments or modifications to such agreement, materially adversely affects the Plan Sponsor without the prior written consent of the Plan Sponsor;

(x)    the Plan is amended or modified in a manner that materially adversely affects the Plan Sponsor without the prior written consent of the Plan Sponsor;

(xi)    there occurs a Business Resourcing Trigger Event;

(xii)    one or more Consenting OEMs breaches the Resourcing Limitation or the other terms and conditions of Section 3 of the Accommodation Agreement (the "**Disputed Resourcing**") and such breach is not cured within thirty (30) days following the Plan Sponsor's receipt of notice of such breach (the "**Cure Period**") (it being understood that the Plan Sponsor shall notify Sellers of such notice immediately after the receipt thereof), except to the extent (1) New Revenue provided by the applicable Consenting OEM(s) in response thereto *plus* (2) such other form of cure to be agreed upon in good faith by the applicable Consenting OEM(s) and the Plan Sponsor equals or exceeds the loss of business due to the Disputed Resourcing; provided, however, that if such breach is cured at any time following the Cure Period, the Plan Sponsor shall no longer be permitted to terminate this Agreement pursuant to this Section 4.4(d)(xii); and provided, further, that if such breach is not cured within the Cure Period, then Sellers and the Plan Sponsor shall engage in good faith discussions for fifteen (15) Business Days after the lapse of the Cure Period and, if the Parties jointly determine at any time

WEIL:\96035900\75\76903.0003

following such discussions that the Disputed Resourcing is not curable prior to the Outside Date, then Sellers shall be entitled to notify the Plan Sponsor in writing of such determination, and, if the Plan Sponsor has not exercised its right to terminate this Agreement pursuant to this Section 4.4(d)(xii) within fifteen (15) Business Days of receipt of such notice, the termination right set forth in this Section 4.4(d)(xii) shall be deemed to have been irrevocably waived;

(xiii)   any Event of Default occurs under the Accommodation Agreement and any Consenting OEM exercises remedies under the Accommodation Agreement, which remedies result in a Material Adverse Effect; provided, however, that if the Parties, acting reasonably and in good faith, jointly determine that the termination event pursuant to this Section 4.4(d)(xiii) has occurred, then Sellers shall be entitled to notify the Plan Sponsor in writing of such determination, and, if the Plan Sponsor has not exercised its right to terminate this Agreement pursuant to this Section 4.4(d)(xiii) within fifteen (15) Business Days of receipt of such notice, the termination right set forth in this Section 4.4(d)(xiii) shall be deemed to have been irrevocably waived;

(xiv)   any breach by Sellers of the Notice Protocol that is not cured within twenty-one (21) days following Sellers' receipt of notice of such breach;

(xv)   the condition set forth in Section 9.1(o) has not been satisfied or irrevocably waived by the Plan Sponsor on or before November 30, 2017 (the "**DOJ/NHTSA Outside Date**"); provided, however, that the Plan Sponsor may not terminate the Agreement pursuant to this Section 4.4(d)(xv) prior to the DOJ/NHTSA Outside Date or after the date that is five (5) Business Days after the DOJ/NHTSA Outside Date; or

(xvi)   Sellers and the Plan Sponsor are unable to agree on a treatment of Intercompany Balances by the Plan Sponsor in the Final Joint Proposal that is reasonably acceptable to both Sellers and the Plan Sponsor, as contemplated by Section 7.17,  on or prior to the Intercompany Balances Outside Date; provided, however, that the Plan Sponsor may not terminate this Agreement pursuant to this Section 4.4(d)(xvi) prior to the Intercompany Balances Outside Date or after the date that is five (5) Business Days after the Intercompany Balances Outside Date.

4.5   Procedure Upon Termination.  In the event of termination by the Plan Sponsor or Sellers, or both, pursuant to Section 4.4, notice thereof shall promptly be given to the other Party, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by the Plan Sponsor or Sellers.  If this Agreement is terminated as provided herein, each Party shall redeliver all documents, work papers and other material of the other Party relating to the Transactions, whether so obtained before or after the execution hereof, to the Party furnishing the same.

4.6   Break-Up Fee and Expense Reimbursement.

(a)   Superior Proposal.  In the event that this Agreement is terminated pursuant to Section 4.4(b)(iv), in consideration for the Plan Sponsor having expended considerable time

58

and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay the Plan Sponsor, in accordance with the terms hereof, (i) a break-up fee in an amount equal to the Break-Up Fee, *plus* (ii) Sellers' Regional Share of reasonable and documented out-of-pocket fees and expenses paid or incurred by the Plan Sponsor or its Affiliates in connection with the Global Transactions that have not yet been reimbursed by Sellers or their Affiliates (the "**Expenses**"); provided, however, that the aggregate amount of Expenses to be paid to the Plan Sponsor pursuant to this Section 4.6(a) shall not exceed the Alternative Transaction Expense Reimbursement Amount. All payments to be made by Sellers pursuant to this Section 4.6(a) shall be paid within two (2) Business Days following consummation of the transaction which gave rise to such termination and shall be paid to the account(s) directed by the Plan Sponsor in writing; provided, that in connection with the execution of a definitive agreement with respect to such transaction, Sellers shall provide in such definitive agreement that the Break-Up Fee and the Expenses to be paid pursuant to this Section 4.6(a) shall be paid concurrently with the consummation of the transaction.

(b)     Tail Period.  In the event that (x) this Agreement is terminated pursuant to any Seller Breach Termination Trigger, and at any time after the date of this Agreement and prior to such termination, a Superior Proposal or other Alternative Transaction Proposal shall have been publicly disclosed or otherwise communicated in writing to any Seller, any Seller's Affiliate, or the Bankruptcy Court, and shall not have been withdrawn, or (y) this Agreement is terminated pursuant to Section 4.4(b)(v) following the termination of the TKJP Purchase Agreement pursuant to Section 4.4(b)(iv) thereof, and, in either such case, on or prior to the date that is twelve (12) months after such termination, Sellers consummate an Alternative Transaction with any single buyer or group of related buyers, then Sellers shall pay to the Plan Sponsor the Break-Up Fee plus Expenses incurred by the Plan Sponsor prior to the termination of this Agreement up to the Alternative Transaction Expense Reimbursement Amount (provided that the aggregate amount of Expenses to be paid to the Plan Sponsor pursuant to this Section 4.6(b) shall not exceed the Alternative Transaction Expense Reimbursement Amount *minus* the amount of any Expenses previously paid pursuant to this Section 4.6). For purposes of this Section 4.6(b), the references to "twenty percent (20%)" in the definition of Alternative Transaction when used in determining the meaning of the term Alternative Transaction Proposal as used herein shall be deemed to be references to "fifty percent (50%)". All payments to be made by Sellers pursuant to this Section 4.6(b) shall be made within two (2) Business Days following consummation of the Alternative Transaction to the account(s) directed by the Plan Sponsor in writing.

(c)     Superior Proposal in Japan.   In the event that the TKJP Purchase Agreement is terminated pursuant to Section 4.4(b)(iv) thereof and this Agreement is not concurrently terminated pursuant to Section 4.4(b)(iv), the Plan Sponsor shall have the option to: (i) terminate this Agreement pursuant to Section 4.4(b)(v) (for the avoidance of doubt, without prejudice to the Plan Sponsor's rights pursuant to Section 4.6(b)) or (ii) require Sellers to negotiate in good faith with the Plan Sponsor to seek to reform this Agreement in order to consummate the transactions contemplated hereby on terms that are fair and reasonable to the Plan Sponsor and Sellers (it being understood that such reformed agreements shall give effect to the rights of the Plan Sponsor pursuant to Section 4.6(b)).  In the event that (x) the Plan Sponsor elects to terminate this Agreement pursuant to clause (i) above or (y) the Plan Sponsor elects to require Sellers to negotiate in good faith with the Plan Sponsor to seek to reform this Agreement

pursuant to clause (ii) above, but thereafter this Agreement is terminated pursuant to Section 4.4(b)(v) by Sellers because this Agreement has not been reformed within twenty (20) Business Days of the termination of the TKJP Purchase Agreement as contemplated by Section 4.4(b)(v), and on or prior to the date that is twelve (12) months after such termination of this Agreement Sellers consummate an Alternative Transaction with the party (or an Affiliate thereof) consummating the Superior Proposal pursuant to the TKJP Purchase Agreement, then Sellers shall pay to the Plan Sponsor the Break-Up Fee plus Expenses incurred by the Plan Sponsor prior to the termination of this Agreement up to the Alternative Transaction Expense Reimbursement Amount (provided that the aggregate amount of Expenses to be paid to the Plan Sponsor pursuant to this Section 4.6(c) shall not exceed the Alternative Transaction Expense Reimbursement Amount *minus* the amount of any Expenses previously paid pursuant to this Section 4.6). For purposes of this Section 4.6(c), the references to "twenty percent (20%)" in the definition of Alternative Transaction when used in determining the meaning of the term Alternative Transaction Proposal as used herein shall be deemed to be references to "fifty percent (50%)". All payments to be made by Sellers pursuant to this Section 4.6(c) shall be made within two (2) Business Days following consummation of the Alternative Transaction to the account(s) directed by the Plan Sponsor in writing.

(d)     Seller Termination Events.  In the event that this Agreement is terminated pursuant to (i) any Seller Breach Termination Trigger or (ii) Section 4.4(b)(ii), Section 4.4(b)(iii), Section 4.4(d)(iv), Section 4.4(d)(v) or Section 4.4(d)(vii), (but, with respect to each such termination event in this clause (ii), only if (x) such termination was a result of a material breach by Sellers of their obligations under the first sentence of Section 7.6(a), (y) the Plan Sponsor has provided notice to Sellers of such breach and (z) Sellers failed to cure such breach within thirty (30) days of receipt of such notice), in consideration for the Plan Sponsor having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers shall pay the Expenses, up to an aggregate amount equal to the Seller Breach Expense Reimbursement Amount, calculated as follows: (i) if this Agreement is terminated on or before December 31, 2017, up to an aggregate amount equal to two-thirds (2/3) of the Seller Breach Expense Reimbursement Amount for Expenses paid or incurred by the Plan Sponsor through and including December 31, 2017 and not reimbursed prior to termination of this Agreement; and (ii) if this Agreement is terminated following December 31, 2017, up to an aggregate amount equal to the Seller Breach Expense Reimbursement Amount, for Expenses incurred by the Plan Sponsor through and including the date of termination of this Agreement and not reimbursed prior to termination of this Agreement.  Such payment shall be made by Sellers directly to the Plan Sponsor or as the Plan Sponsor may direct within two (2) Business Days following a termination contemplated by this Section 4.6(d).

(e)     Other Termination Events.  In the event that this Agreement is terminated for any reason other than (i) those specified as giving rise to the payment of a Break-Up Fee or Expense Reimbursement pursuant to Section 4.6(a), Section 4.6(b), Section 4.6(c) or Section 4.6(d), (ii) pursuant to Section 4.4(c)(i), (iii) Section 4.4(c)(ii), (iv) pursuant to Section 4.4(b)(v) (but only if such termination pursuant to Section 4.4(b)(v) was a result of a material breach by the Plan Sponsor of its obligations under the Cross-Conditioned Agreements or the RSA), (v) pursuant to Section 4.4(d)(ii) (subject to the immediately following sentence), (vi) pursuant to Section 4.4(d)(xi), (vii) pursuant to Section 4.4(d)(xii), (viii) pursuant to Section 4.4(d)(xv), (ix) pursuant to Section 4.4(d)(xvi), (x) pursuant to Section 4.4(b)(i) (but solely under circumstances

60

in which, at the time of such termination, all of the conditions to the U.S. Closing have been satisfied (other than conditions that by their nature are to be satisfied at the U.S. Closing itself) except for the conditions set forth in <u>Section 9.1(c)</u> (but only if such failure of the conditions set forth in <u>Section 9.1(c)</u> was due to circumstances related exclusively to the Plan Sponsor's ineligibility to be issued or reissued Permits or the failure of the Plan Sponsor to comply with its obligations set forth in the first two sentences of <u>Section 7.18(a)</u>), <u>Section 9.1(p)</u> or <u>Section 9.1(q)</u>), or (xi) those which require payment of the Regulatory Termination Fee, in consideration for the Plan Sponsor having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Sellers shall pay the Expenses, up to an aggregate amount equal to the No-Fault Expense Reimbursement Amount, calculated as follows: (A) if this Agreement is terminated on or before December 31, 2017, up to an aggregate amount equal to two-thirds (2/3) of the No-Fault Expense Reimbursement Amount, for Expenses paid or incurred by the Plan Sponsor through and including December 31, 2017 and not reimbursed prior to termination of this Agreement; and (B) if this Agreement is terminated following December 31, 2017, up to an aggregate amount equal to the No-Fault Expense Reimbursement Amount, for Expenses paid or incurred by the Plan Sponsor through and including the date of termination of this Agreement and not reimbursed prior to termination of this Agreement.  In the event that this Agreement is terminated pursuant to <u>Section 4.4(d)(ii)</u> and each of the specified OEMs listed on <u>Schedule H</u> hereto have executed the OEM Indemnity and Release Agreement, Sellers shall pay the Expenses paid or incurred by the Plan Sponsor, up to an aggregate amount equal to one-third (1/3) of the No-Fault Expense Reimbursement Amount. Any payments to be made pursuant to this <u>Section 4.6(e)</u> shall be made by Sellers to the account(s) designated in writing by the Plan Sponsor within two (2) Business Days following a termination contemplated by this <u>Section 4.6(e)</u>.

      (f)    <u>Plan Sponsor Breach</u>.  Notwithstanding anything to the contrary herein, under no circumstances shall Sellers be obligated to pay any Expenses pursuant to <u>Section 4.6(d)</u> or <u>Section 4.6(e)</u> if, at the time of a termination by the Plan Sponsor contemplated by either Section, Sellers also have a right of termination pursuant to (i) <u>Section 4.4(c)(i)</u>, (ii) <u>Section 4.4(c)(ii)</u> or (iii) <u>Section 4.4(b)(v)</u> (but only if such right of termination pursuant to <u>Section 4.4(b)(v)</u> is due to (x) a termination of the TKJP Purchase Agreement pursuant to Section 4.4(c)(i) or Section 4.4(c)(ii) thereof or (y) a termination of the TK Europe Purchase Agreement pursuant to Section 4.4(c)(i) or Section 4.4(c)(ii) thereof).

      (g)    <u>Court Order and Priority</u>.  Sellers shall seek to obtain, no later than December 6, 2017, an order entered by the Bankruptcy Court approving the Break-Up Fee and Expense Reimbursement. Sellers shall seek to obtain in such order super-priority administrative claim status with regard to the Break-Up Fee and the Expense Reimbursement in the Bankruptcy Cases pursuant to section 507(b) of the Bankruptcy Code, which shall be (A) subordinate to any "carve-out" granted in favor of the professionals retained in the Bankruptcy Cases and (B) senior to all other administrative expense priority items; <u>provided</u>, <u>however</u>, that, if the U.S. Closing occurs (and in no other circumstances), the Expense Reimbursement shall be subordinate to the DOJ Restitution Fund and the Legacy Costs, as set forth in the Plan.  Except as otherwise provided in <u>Section 4.8(b)</u>, the payment by Sellers to the Plan Sponsor of the Break-Up Fee and/or Expense Reimbursement pursuant to this <u>Section 4.6</u> shall, in circumstances in which the Break-Up Fee and Expense Reimbursement are owed to the Plan Sponsor, be the sole and exclusive remedy of the Plan Sponsor for any loss suffered by the Plan Sponsor as a result of the

failure of the transactions contemplated herein to be consummated, and upon such payment thereof in accordance with this <u>Section 4.6</u>, Sellers shall not have any further liability or obligation relating to or arising out of this Agreement.  Any Break-Up Fee and/or Expense Reimbursement paid to the Plan Sponsor pursuant to this Agreement shall be paid by wire transfer of immediately available funds to an account or accounts designated in writing by the Plan Sponsor for such purpose.  The Parties acknowledge that the agreements contained in this <u>Section 4.6</u> are an integral part of the Transactions, and that without these agreements, the Parties would not enter into this Agreement and that any amounts payable pursuant to this <u>Section 4.6</u> do not constitute a penalty.

(h)     <u>Liability for Break-Up Fee and Expenses</u>.  Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire Break-Up Fee and Expense Reimbursement payable by Sellers pursuant to this <u>Section 4.6</u>.

4.7     <u>Regulatory Termination Fee</u>.

(a)     In the event that this Agreement is terminated by Sellers or the Plan Sponsor pursuant to <u>Section 4.4(b)(i)</u> or <u>Section 4.4(b)(ii)</u> and all of the conditions to the U.S. Closing of the Plan Sponsor set forth in <u>Article IX</u> (other than (A) the conditions set forth in <u>Section 9.3(c)</u>, <u>Section 9.3(d)</u> (solely with respect to or relating to Antitrust Laws or approvals or CFIUS Clearance) or <u>Section 9.3(e)</u> (with respect to or relating to Antitrust Laws or approvals) and (B) those other conditions that, by their nature, cannot be satisfied until the Closing Date, but, in the case of clause (B), which conditions would be capable of satisfaction if the Closing Date were the date of such termination, in each case other than any failures of such conditions to be satisfied or capable of being satisfied that result from a breach by the Plan Sponsor of this Agreement) have been satisfied or waived on or prior to the date of such termination, then the Plan Sponsor shall promptly, but in no event later than three (3) Business Days after the date of such termination, pay to Sellers the Regulatory Termination Fee, it being understood that in no event shall the Plan Sponsor be required to pay the Regulatory Termination Fee on more than one occasion. Any Regulatory Termination Fee paid to Sellers pursuant to this Agreement shall be paid by wire transfer of immediately available funds to an account or accounts designated in writing by Sellers for such purpose. The Parties acknowledge that the agreements contained in this <u>Section 4.7</u> are an integral part of the Transactions, and that without these agreements, the Parties would not enter into this Agreement and that any amounts payable pursuant to this <u>Section 4.7</u> do not constitute a penalty; accordingly, if the Plan Sponsor fails to promptly pay the amount due pursuant to this <u>Section 4.7</u> and, in order to obtain such payment, Sellers commence a Legal Proceeding that results in a judgment against the Plan Sponsor for any amounts due pursuant to this <u>Section 4.7</u>, the Plan Sponsor shall pay to Sellers' costs and expenses (including attorneys' fees) in connection with such Legal Proceeding, together with interest on the amount of such amount or portion thereof at the latest U.S. prime rate as published in The Wall Street Journal in effect on the date such payment was required to be made.

(b)     Notwithstanding anything herein to the contrary, except in the case of intentional fraud, willful misconduct or a willful and material breach by the Plan Sponsor of its obligations in <u>Section 7.4</u> with respect to or relating to CFIUS, Antitrust Laws or approvals or specific performance prior to termination of this Agreement, the Regulatory Termination Fee (together with the reimbursement contemplated by <u>Section 4.7(a)</u>) shall be the sole and exclusive

remedy of Sellers against the Plan Sponsor, its Affiliates and any of their respective former, current, or future stockholders, directors, officers, Affiliates or agents, for any losses or damages of whatsoever nature suffered as a result of any breach by the Plan Sponsor of its obligations in Section 7.4 with respect to or relating to Antitrust Laws or approvals, and upon payment of the Regulatory Termination Fee (together with the reimbursement contemplated by Section 4.7(a)) if and when due, (i) none of the Plan Sponsor, its Subsidiaries or any of their respective former, current, or future stockholders, directors, officers, Affiliates or agents shall have any further Liability or obligation relating to or arising out of this Agreement or the Transactions in connection with such breach by the Plan Sponsor, (ii) payment and receipt of the Regulatory Termination Fee (together with the reimbursement contemplated by Section 4.7(a)) shall extinguish any right of any Seller, on behalf of itself or any of its Subsidiaries, to sue or pursue any claim for any such losses or damages against the Plan Sponsor its Affiliates, any of its former, current, or future stockholders, directors, officers, Affiliates or agents with respect to, in connection with or arising out of such breach by the Plan Sponsor and (iii) Sellers shall terminate with prejudice any pending claims in litigation pursuing any such claim for such losses or damages commenced prior to receiving the Regulatory Termination Fee with respect to, in connection with, or arising out of such breach by the Plan Sponsor.

(c)    In the event one of the Cross-Conditioned Agreements is terminated in accordance with its terms, and any Regulatory Termination Fee (as defined therein) becomes payable pursuant to such terminated Cross-Conditioned Agreement, then the Plan Sponsor shall promptly pay the applicable Regulatory Termination Fee (together with the reimbursement contemplated by Section 4.7(a)) to Sellers.

4.8    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the Plan Sponsor, Sellers or Guarantor (solely for purposes of Section 7.22); provided, however, that the obligations of the Parties set forth in Section 4.6, Section 4.7, this Section 4.8, and Article XI shall survive any such termination and shall be enforceable hereunder.

(b)    Nothing in this Section 4.8 shall relieve the Plan Sponsor, Sellers or Guarantor (solely for purposes of Section 7.22), from liability for any breach of this Agreement occurring prior to the date of termination that, individually or in the aggregate with other breaches, is material; except that (i) under circumstances where the Plan Sponsor is required to pay the Regulatory Termination Fee as provided in Section 4.7(a), the Plan Sponsor's liability for any breaches occurring before the termination of this Agreement shall be capped at the Regulatory Termination Fee, and (ii) under circumstances where Sellers are required to pay the Break-Up Fee and Expense Reimbursement, as provided in Section 4.6, Sellers' liability for any breaches occurring before the termination of this Agreement shall be capped at the amount of such Break-Up Fee and Expense Reimbursement, other than with respect to clauses (i) and (ii), in the case of intentional fraud, willful misconduct, or willful and material breach of this Agreement by the Plan Sponsor or Sellers, respectively.

WEIL:\96035900\75\76903.0003

(c)     The Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms and nothing in this <u>Section 4.8</u> shall relieve the Plan Sponsor or Sellers of their obligations under the Confidentiality Agreement.

(d)     For the avoidance of doubt, under no circumstances shall Sellers be obligated to pay (i) the Break-Up Fee more than once or (ii) Expenses in excess of the applicable cap.

(e)     In the event that there is an adjustment to the percentages set forth on <u>Schedule B</u> (as contemplated by the definition of Regional Share), the amount of (i) the Expenses, (ii) the Break-Up Fee, and (iii) the Regulatory Termination Fee, in this Agreement and each Cross-Conditioned Agreement, shall be adjusted on a pro-rata basis.  For the avoidance of doubt, in the event of any such adjustment, the aggregate Expenses provided for in this Agreement and each of the Cross-Conditioned Agreements as of the date hereof, the aggregate Break-Up Fees provided for in this Agreement and each of the Cross-Conditioned Agreements as of the date hereof, and the aggregate Regulatory Termination Fees provided for in this Agreement and each of the Cross-Conditioned Agreements as of the date hereof shall not change.

4.9     <u>Treatment of OEMs that Have Not Used PSAN</u>.  Notwithstanding anything in this Agreement to the contrary, to the extent an OEM that is not listed on <u>Schedule I</u> and that is not a Consenting OEM (a "**Non-PSAN OEM**") takes an action that it would not have been permitted to take pursuant to the Accommodation Agreement, OEM Indemnity and Release Agreement or the Global Settlement Agreement had such Non-PSAN OEM been a Consenting OEM, (a) Plan Sponsor shall not have any termination right related to or resulting from any such action taken by such Non-PSAN OEM and (b) no such action taken by a Non-PSAN OEM shall be taken into account when determining whether any condition to the Plan Sponsor's obligations to consummate the Transactions has been satisfied.

## ARTICLE V

## <u>REPRESENTATIONS AND WARRANTIES OF SELLERS</u>

Sellers represent and warrant to the Plan Sponsor that the statements contained in this <u>Article V</u> are true and correct as of the date of this Agreement, except as set forth in the disclosure schedule accompanying this Agreement (the "**Disclosure Schedule**").

5.1     <u>Organization and Good Standing</u>.  Each Seller is duly organized, validly existing and in good standing under the laws of the state of its incorporation or formation (as applicable) and has, subject to the necessary authority from the Bankruptcy Court, all requisite organizational power and authority to own, lease and operate its assets and properties and to carry on its business as now conducted and to perform its obligations under this Agreement and all other agreements and certificates contemplated hereby to which it is a party.  Each Seller is duly qualified or authorized to do business and is, if applicable, in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing is the result of the filing of

the Bankruptcy Cases or as would not be material to the conduct of the Business or the Purchased Assets taken as a whole.  Other than with respect to the Bankruptcy Cases, there are no bankruptcy, reorganization or insolvency proceedings pending against or, to the Knowledge of Sellers, threatened against, the Seller Entities.

5.2     <u>Acquired Subsidiaries; Ownership of Equity Interests</u>.

(a)     Except as set forth on <u>Schedule 5.2(a)</u>, no Seller (i) has any Subsidiaries or (ii) owns, directly or indirectly, any Equity Interest in any Person, except, in each case, (A) other Sellers, (B) the Acquired Subsidiaries, and (C) the Retained Subsidiaries.  <u>Schedule 5.2(a)</u> sets forth a true, correct and complete list of (x) the Subsidiaries of Sellers and (y) the Equity Interests in the Acquired Subsidiaries. No Acquired Subsidiary is a participant in any joint venture, partnership or similar arrangement. No Acquired Subsidiary is obligated to make or bound by any agreement or obligation to make any investment in (including loans or other debt or equity investments) or capital contribution to any other Person.

(b)     All of the outstanding shares of capital stock, membership interests, partnership interests, voting securities or other Equity Interests in each of the Acquired Subsidiaries have been duly authorized, validly issued, fully paid and, as applicable, non-assessable and are owned by Sellers, free and clear of all Liens, and free of any other restriction (including any restriction on the right to vote, sell or otherwise dispose of such Equity Interests), except for restrictions imposed by applicable securities laws and as otherwise set forth on <u>Schedule 5.2(b)</u>.  There are no (i) options, warrants or other rights (including registration rights), agreements, arrangements or commitments to which any Seller or any of the Acquired Subsidiaries is a party relating to the issued or unissued capital stock, membership interests, partnership interests, voting securities or other Equity Interests of any of the Acquired Subsidiaries or obligating any Seller or any of the Acquired Subsidiaries to grant, issue or sell any shares of the capital stock, membership interests, partnership interests, voting securities or other Equity Interests of any of the Acquired Subsidiaries or subjecting any such share of capital stock, membership interests, partnership interests, voting securities or other Equity Interest to any right of first refusal, right of first offer, tag-along right, drag-along right or similar right; (ii) obligations, contingent or otherwise, of any Seller or any of the Acquired Subsidiaries to repurchase, redeem or otherwise acquire any shares of the capital stock, membership interests, partnership interests, voting securities or other Equity Interests of any of the Acquired Subsidiaries; or (iii) voting trusts, proxies or other agreements or understandings to which any Seller or any of the Acquired Subsidiaries is a party or by which any Seller or any of the Acquired Subsidiaries is bound with respect to the voting of any shares of capital stock, membership interests, partnership interests, voting securities or other Equity Interests of any of the Acquired Subsidiaries.

(c)     Immediately following the U.S. Closing, the Plan Sponsor will directly or indirectly own all Equity Interests of the Acquired Subsidiaries, free and clear of all Liens, and free of any other restriction (including any restriction on the right to vote, sell or otherwise dispose of such Equity Interests), except for restrictions imposed by applicable securities laws.

5.3     <u>Authorization of Agreement</u>.  Subject to the Bankruptcy Court's entry of the Confirmation Order, each Seller has all requisite power and authority to execute and deliver this

Agreement and all other agreements and certificates contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.   The execution, delivery, and performance of this Agreement and all other agreements and certificates contemplated hereby to which each Seller is a party have been duly authorized by such Seller.   Upon due execution hereof by each Seller, this Agreement and all other agreements and certificates contemplated hereby (assuming due authorization, execution and delivery by the other parties thereto) shall constitute, subject to the Bankruptcy Court's entry of the Confirmation Order, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and subject to applicable bankruptcy, reorganization, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

5.4     Conflicts; Consents of Third Parties.

(a)     Except as set forth on Schedule 5.4(a), none of (x) the execution and delivery by Sellers of this Agreement, (y) the consummation of the Transactions or (z) the compliance by Sellers with the terms hereof will (i) conflict in any material respect with or result in a material violation or default under the organizational documents of any Seller Entity, (ii) subject to the entry of the Confirmation Order, violate any Law or Order to which any Seller or any of the Purchased Assets is subject, or (iii) subject to the entry of the Confirmation Order, result in a breach of, constitute a default under, result in the creation of any Lien (other than Permitted Liens, excluding Intellectual Property, Software and Technology licenses), result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Material Contract to which any Seller Entity is a party or to which any of the Purchased Assets is subject, except, in the case of either clause (ii) or (iii), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     Except as set forth on Schedule 5.4(b), and other than (i) the applicable requirements of the HSR Act and other Antitrust Laws, (ii) as required by NHTSA, the DOJ, or any related third party or entity, including the NHTSA Monitor and the DOJ Monitor, (iii) CFIUS Clearance and (iv) as required or pursuant to the Bankruptcy Code or the Confirmation Order, no Seller Entity is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the Transactions.

5.5     Sufficiency of and Title to Purchased Assets.

(a)     The Purchased Assets are sufficient for the continued conduct of the Business after the U.S. Closing in substantially the same manner as conducted prior to the U.S. Closing and constitute all of the rights, property and assets necessary to conduct the Business in substantially the same manner as currently conducted.

(b)     Except as set forth on Schedule 5.5(b), the Seller Entities own, and will own as of the U.S. Closing, all rights, title and interests in and to the Purchased Assets free and clear of all Liens, other than Permitted Liens.   Pursuant to the Confirmation Order, at the U.S.

Closing, Sellers will convey such title to, interests in or rights to use, all of the Purchased Assets, free and clear of all Liens, other than Permitted Liens.

(c)    None of the Retained Subsidiaries own, directly or indirectly, any assets used in the operation of the Business.

5.6    Financial Statements.

(a)    Sellers have delivered to the Plan Sponsor (i) the unaudited consolidated balance sheets of the Seller Entities as at March 31, 2017 and March 31, 2016 and the related unaudited consolidated statements of income and of cash flows of the Seller Entities for the years then ended and (ii) the unaudited consolidated balance sheet of the Seller Entities as at June 30, 2017 (the "**Balance Sheet**" and such date, the "**Balance Sheet Date**") and the related unaudited consolidated statement of income and of cash flows of the Seller Entities for the three-months then ended (such unaudited statements, including the related notes and schedules thereto, are referred to herein as the "**Financial Statements**").

(b)    The Financial Statements (i) have been prepared on the basis of GAAP without modification of the accounting principles used in the preparation thereof throughout the periods presented and present fairly in all material respects the consolidated financial position, results of operations and cash flows of the Seller Entities as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements and (ii) have been prepared in accordance with the books and records of Sellers.

(c)    The Seller Entities maintain, and since April 1, 2015 have maintained, systems of internal accounting controls with respect to the Purchased Assets designed to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP in all material respects and to maintain accountability for items, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) recorded accountability for items is compared with actual levels at reasonable intervals and appropriate action is taken with respect to any differences.

5.7    No Undisclosed Liabilities.  Except as set forth on Schedule 5.7, no Seller Entity has incurred any Indebtedness, obligations or Liabilities of any kind that would have been required to be reflected in, reserved against or otherwise described in the Balance Sheet or the notes thereto in accordance with GAAP, other than (a) Liabilities reflected on the Balance Sheet, (b) Liabilities incurred in the Ordinary Course of Business since the Balance Sheet Date and Liabilities under this Agreement, the Accommodation Agreement, the Access Agreement or the RSA, (c) Liabilities incurred in connection with the Transactions, (d) Liabilities that would not reasonably be expected to be material to the Seller Entities and (e) bank guarantees or similar Liabilities.

5.8    Absence of Certain Developments.  Except as set forth on Schedule 5.8, and except as expressly contemplated by this Agreement, the Accommodation Agreement, or the

RSA, (i) since the Balance Sheet Date, the Business has been conducted in the Ordinary Course of Business; (ii) since the Balance Sheet Date, Sellers have not taken any action that, if taken after the date of this Agreement, would have required the consent of the Plan Sponsor pursuant to <u>Section 7.2(b)(i)(c)</u>, <u>Section 7.2(b)(vi)</u>, <u>(vii)</u>, <u>(xiv)</u> or <u>(xv)</u>; and (iii) since the Balance Sheet Date and prior to the date hereof, there has not been any Material Adverse Effect.

      5.9    <u>Taxes</u>.

      (a)    (i) All (A) Acquired Subsidiaries and (B) Sellers (solely with respect to the Purchased Assets) have timely filed all income and other material Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained), and all such Tax Returns were true, correct, and complete in all material respects; and (ii) all income and other material Taxes required to have been paid by each Acquired Subsidiary and, with respect to the Purchased Assets, each Seller, have been paid (other than any current Taxes not delinquent as of the date of the filing of the Bankruptcy Cases as to which subsequent payment was prohibited by Order of the Bankruptcy Court).

      (b)    Each Seller is not a foreign person within the meaning of Section 1445 of the Code or, if such Seller is a foreign person, it does not own any U.S. real property interests within the meaning of Section 897 of the Code.

      (c)    Except as set forth on <u>Schedule 5.9(c)</u>, no (i) Acquired Subsidiary or (ii) Seller (solely with respect to the Purchased Assets) is currently the beneficiary of any extension of time within which to file any income or other material Tax Return, and to the Knowledge of Sellers, no request for such an extension is currently outstanding. There are no outstanding extensions or waivers of statutes of limitations for the collection or assessment of income or other material Taxes due from any Acquired Subsidiary or from any Seller (solely with respect to the Purchased Assets), and further, to the Knowledge of Sellers, no written request for such an extension or waiver is currently outstanding.

      (d)    Except as set forth on <u>Schedule 5.9(d)</u>, no deficiency for any material amount of Tax has been asserted or assessed by a Tax Authority against any of the Acquired Subsidiaries or any Seller (solely with respect to the Purchased Assets) that has not been satisfied by payment, settled or withdrawn.

      (e)    Except as set forth on <u>Schedule 5.9(e)</u>, there are no pending Tax audits, investigations, examinations, administrative or judicial proceedings with respect to any income or other material Taxes or income or other material Tax Returns of any Acquired Subsidiary or any Seller (solely with respect to the Purchased Assets). No Acquired Subsidiary nor any Seller (solely with respect to the Purchased Assets) has received written notice from any Tax Authority that it intends to commence such an audit, examination, investigation or proceeding and, to the Knowledge of Sellers, no such audit, examination, investigation or proceeding has been threatened in writing within the past three (3) years.

      (f)    There are no Tax Liens on or pending against any of the Purchased Assets other than Permitted Liens.

(g)      No Acquired Subsidiary has been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code, or any comparable provision of state, local, or foreign Law in the two years prior to the date of this Agreement.  No Acquired Subsidiary (i) is or has been a member of an affiliated group filing a consolidated U.S. federal income Tax Return within the past five (5) years (other than the consolidated group of which Takata Americas is the common parent), nor (ii) has any liability for the Taxes of another Person under U.S. Treasury Regulation Section 1.1502-6 or any comparable provision of state, local or foreign Law (other than any Acquired Subsidiary, or any of their Affiliates), as a transferee or successor or by contract (other than agreements the primary subject of which is not Taxes).

(h)      No claim has been made in writing by a Tax Authority with respect to any Acquired Subsidiary in a jurisdiction where any such Acquired Subsidiary does not file Tax Returns that such entity is or may be subject to taxation by that jurisdiction.  No claim has been made in writing by a Tax Authority with respect to any Seller in a jurisdiction where any such Seller does not file Tax Returns that such entity is or may be subject to taxation by that jurisdiction or that taxes may be due in such jurisdiction with respect only to the Purchased Assets.

(i)      No Acquired Subsidiary is or has been a party to any transaction that is "listed transaction" as defined in Section 6707A of the Code and U.S. Treasury Regulation Section 1.6011-4(b)(2), or any comparable provision of state, local, or foreign Law.

(j)      Except as set forth on Schedule 5.9(j), no power of attorney which is currently in force has been granted by or with respect to any Acquired Subsidiary with respect to any matter relating exclusively to Taxes.

(k)      No Acquired Subsidiary will be required to include in any Tax period (or portion thereof) ending after the Closing Date any material taxable income attributable to income that accrued in a Tax period (or portion thereof) ending on or prior to the Closing Date but was not recognized for Tax purposes in such prior period (or to exclude from taxable income in any Tax period (or portion thereof) ending after the Closing Date any material deduction the recognition of which was accelerated from such post-U.S. Closing Tax period to a pre-U.S. Closing Tax period) as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting, Section 481 of the Code or Section 108(i) of the Code (or any comparable provisions of state, local or foreign Tax law).

(l)      No Acquired Subsidiary has entered into a closing agreement with the IRS under Section 7121 of the Code (or any comparable provision of state, local or foreign Tax law), and no Acquired Subsidiary is subject to any private letter ruling of the IRS or comparable ruling by any other Tax Authority.

(m)      No Acquired Subsidiary is party to, bound by or otherwise obligated with respect to any Tax allocation or sharing agreement or arrangement (other than agreements the primary subject of which is not Taxes) that will be binding on such Acquired Subsidiary with respect to any Tax period following the Closing Date.

(n)      Each Acquired Subsidiary has withheld and paid to the appropriate Tax Authority all material amounts of Taxes required to be withheld and paid in connection with any amounts owing to any employee, independent contractor, creditor, stockholder, or other party.

(o)      Schedule 5.9(o) sets forth a true, correct and complete list of each Acquired Subsidiary and the U.S. federal income Tax treatment of each such Acquired Subsidiary.

5.10    Real Property.

(a)      Schedule 5.10(a) sets forth a true, correct and complete list of (i) all real property and interests in real property owned in fee by any Seller Entity (individually, an "**Owned Property**" and collectively, the "**Owned Properties**"), and the particular entity that owns each such Owned Property, and (ii) all real property and interests in real property leased by any Seller Entity (individually, a "**Real Property Lease**" and collectively, the "**Real Property Leases**" and, together with the Owned Properties, being referred to herein collectively as the "**Sellers' Properties**") and the particular Seller Entity that is a lessor or lessee of each such Real Property Lease. The Seller Entities have good, valid and marketable fee title to all Owned Properties, and good and valid title to the leasehold estates in all Real Property Leases, in each case, free and clear of all Liens of any nature whatsoever, subject to the Permitted Liens. The Seller Entities are in peaceful and undisturbed possession of the space or estate under each Real Property Lease, all such Real Property Leases are in full force and effect and there are no material defaults by any Seller Entity, as lessees, or, to the Knowledge of Sellers, the applicable lessors, thereunder. To the Knowledge of Sellers, no Seller Entity has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller Entity under any of the Real Property Leases. Except as set forth on Schedule 5.10(a), no person or other entity has any right or option to acquire, lease, use or occupy all or any portion of the Owned Properties.

(b)      Except as set forth on Schedule 5.10(b), there is no pending or, to the Knowledge of Sellers, threatened appropriation, litigation, condemnation or like proceeding affecting any of Sellers' Properties in any material respect. Each of Sellers' Properties and their current use, occupancy, and operation by the Seller Entities and the buildings, facilities, improvements, and other structures located thereon do not (i) constitute a non-conforming use, parcel or structure under or violate in any material respect any applicable zoning law, regulation or other law, order, regulation or requirement, or (ii) otherwise violate, or conflict with, in any material respect, any covenants, restrictions, or other contractual obligations including the requirements of any Liens thereon. Sellers have no Knowledge of any contemplated zoning classification changes that would materially and adversely affect the use of any of Sellers' Properties in the Ordinary Course of Business.

(c)      Seller Entities have all material licenses (including final certificates of occupancy) necessary to operate Sellers' Properties for their current uses as required by all Governmental Authorities having jurisdiction over Sellers' Properties.

5.11    Condition of Facilities and Other Tangible Property.    To the Knowledge of Sellers, all facilities, machinery, equipment and other items of tangible personal property and

fixed assets owned or used by any Seller Entity or otherwise used or held for use in the Business (a) are in good operating condition and repair, subject to normal wear and maintenance, and (b) are adequate for use in the Ordinary Course of Business.

5.12    Intellectual Property.

(a)    Schedule 5.12(a) sets forth a true, correct and complete list of applications and registrations for Intellectual Property owned or purported to be owned by any (i) Acquired Subsidiaries and (ii) Retained Subsidiaries.  Sellers own, co-own or have valid rights to use all Intellectual Property, Software and Technology used in the conduct of the Business, except as would not be, individually or in the aggregate, material to the Business. Except as set forth on Schedule 5.12(a), the material Acquired Intellectual Property purported to be owned by the Seller Entities is owned solely and exclusively by Sellers and Acquired Subsidiaries, with no third party joint- or co-ownership rights.  The Intellectual Property registrations and applications for registration included in the Acquired Intellectual Property are subsisting.  The Seller Entities and Acquired Subsidiaries have complied in all material respects with all procedural requirements, including the duty of candor, in connection with such registrations and applications, and to the Knowledge of Sellers, except as would not be, individually or in the aggregate, material to the Business, such registrations are otherwise valid and enforceable.

(b)    The conduct of the Business does not infringe, misappropriate or otherwise violate or conflict in any material respect with (i) to the Knowledge of Sellers, Patents of any Person or (ii) any other Intellectual Property of any Person.  To the Knowledge of Sellers, no Person is infringing, misappropriating or otherwise violating any material Acquired Intellectual Property. Except as set forth on Schedule 5.12(b), there are not, and since April 1, 2015 there have not been, any claims, demands or assertions, pending, or threatened in writing asserting infringement, misappropriation or other violation of Intellectual Property rights, or challenging the ownership, registrability, validity or enforceability thereof, either by Seller Entities or against Seller Entities or the Acquired Intellectual Property purported to be owned by any of the Seller Entities.

(c)    Except as set forth on Schedule 5.12(c), there are no orders, writs, injunctions, decrees, settlements or coexistence arrangements to which any Seller Entity is subject with respect to any Intellectual Property, Software or Technology or the use thereof in any respect material to any of the Products or to the Business otherwise.

(d)    Except as set forth on Schedule 5.12(d), no Seller Entity received any written notice of any default, or of any event that with notice or lapse of time, or both, would constitute a material default under any material Acquired IP License.

(e)    Each Seller Entity takes and has taken commercially reasonable measures to protect their material Trade Secrets, including by using good faith efforts to require all third Persons having access thereto to execute written non-disclosure agreements.  To the Knowledge of Sellers, there has not been disclosure of material Trade Secrets of any Seller Entity (including any such information of any other Person disclosed in confidence to any Seller Entity) in a manner that has resulted or is likely to result in the loss of trade secret or other rights in and to such information.

(f)      Except as set forth on <u>Schedule 5.12(f)</u>, each Seller Entity's material information technology systems are each in good working condition in all material respects, and none of the material Acquired Intellectual Property purported to be owned by the Seller Entities is subject to open source license terms. Each Seller Entity undertakes commercially reasonable efforts to maintain the security and integrity of their information technology systems and to comply with applicable privacy and cybersecurity laws, policies and contractual obligations. There are not, and since April 1, 2015, there have not been, (i) to the Knowledge of Sellers, any material security breaches in any information technology systems of any Seller Entity or with respect to personally identifiable information, or (ii) any disruptions in any Seller Entity's information technology systems that caused any material disruptions to the Business.

5.13    <u>Material Contracts</u>.

(a)      <u>Schedule 5.13</u> sets forth each of the following Contracts (other than purchase orders) to which any Seller Entity is a party or by which it is bound or by which the Purchased Assets may be bound or affected (collectively, the "**Material Contracts**"):

(i)      [intentionally omitted];

(ii)     each Contract requiring any Seller Entity to indemnify or hold harmless any Person, other than those entered into in the Ordinary Course of Business, but including those entered into with any current or former officer, director or employee of any Seller Entity;

(iii)    material warranty, guarantee or other similar undertakings not consistent with the standard terms and conditions of purchase of customers of the Business with respect to a contractual performance extended by any Seller Entity to a customer of the Business, other than those entered into in the Ordinary Course of Business;

(iv)    Threshold Contracts comprising joint venture, partnership or other similar agreements or written arrangements involving co-investment or the sharing of material revenues, profits, losses, costs or Liabilities;

(v)     Contracts containing covenants that restrict or limit in any material respect the ability of the Business to engage or compete in any business or with any Person or in any geographic area;

(vi)    Contracts containing a requirement to deal exclusively with or grant exclusive rights or rights of first refusal to any customer, vendor, supplier, distributor, contractor or other party;

(vii)   Threshold Contracts involving the payment of royalties to a third party with respect to a Product;

(viii)  Acquired IP Licenses with respect to Intellectual Property, Software or Technology included in, or material to the research, design, development, production, manufacture or support of, Products (other than PSAN Inflators);

(ix)     Contracts with any labor union or association or works council representing any employees of any Seller Entity, including any industry wide agreements, works council agreements and any other collective bargaining agreements;

(x)      Threshold Contracts entered into during the five (5) year period prior to the date hereof for the sale of any of the assets of the Business, other than in the Ordinary Course of Business;

(xi)     Threshold Contracts entered into during the five (5) year period prior to the date hereof for the acquisition by any Seller Entity of any operating business or the capital stock of any other Person;

(xii)    Contracts relating to incurrence of Indebtedness or the making of any loans, promissory notes or other instruments related to the lending of money, in each case involving amounts in excess of $250,000;

(xiii)   Contracts that provide for "most favored nations" or similar provisions, including any guaranteed lowest pricing arrangements not consistent with the standard terms and conditions of purchase of customers of the Business;

(xiv)    Threshold Contracts that requires performance by any party more than one (1) year from the date hereof that, in either case, is not terminable by the applicable Seller Entities without penalty on less than sixty (60) days' notice;

(xv)     Threshold Contracts or group of Contracts with the same party under which the Business is expected to sell Products or services during the twelve (12) month period immediately following, or pursuant to which the Business has sold during the twelve (12) month period immediately preceding the date hereof, in the aggregate, a minimum of $500,000 of Products and/or services on an annual basis;

(xvi)    Contracts relating to Sellers' and their Subsidiaries' customers, indicating whether such Contract relates to PSAN or non-PSAN parts;

(xvii)   Contracts relating to the supply of replacement kits or similar Component Parts for PSAN Inflators;

(xviii)  Threshold Contracts that include guaranteed price reductions or price downs;

(xix)    all Contracts involving the tolling, forbearance or similar treatment of claims against any Seller Entity; or

(xx)     any Contract with a Governmental Authority that is material to the operation of the Business (other than Permits).

(b)      No Seller Entity has received any written notice or, to Sellers' Knowledge, otherwise been informed of any default or event that with notice or lapse of time or both would constitute a material default by any Seller Entity under any Material Contract.

WEIL:\96035900\75\76903.0003

(c)     Each Material Contract is in full force and effect and is valid, binding and enforceable against the applicable Seller Entities and, to the Knowledge of Sellers, the other parties thereto, in accordance with its terms, in each case, subject to applicable bankruptcy, reorganization, insolvency, reorganization, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

(d)     No Seller Entity nor, to the Knowledge of Sellers, any other party to a Material Contract is in breach or violation of, or default under, any Material Contract and no event has occurred that with or without notice or lapse of time or both would constitute a breach or default (whether by lapse of time or notice or both), except, in each case, as would not reasonably be expected, individually or in the aggregate, to be material to the Business.

5.14    Employee Benefits.

(a)     Schedule 5.14(a) contains a true, correct and complete list of each material Employee Benefit Plan, indicating which plans are Business Benefit Plans.  No Seller Entity, and no trade or business (whether or not incorporated) which are or have ever been under common control, or which are or have ever been treated as a single employer, with any Seller Entity under Section 414(b), (c), (m) or (o) of the Code (each, an "**ERISA Affiliate**"), maintains, sponsors, contributes to, or in the past six years had an obligation to maintain, sponsor or contribute to, or has any Liability with respect to, any (i) plan subject to Title IV of ERISA or Section 412 of the Code, (ii) a "multiemployer plan" (as defined in Section 3(37) of ERISA), or (iii) a "multiple employer plan" as defined in Section 210 of ERISA or Section 413(c) of the Code.

(b)     True, correct and complete copies of the following documents, with respect to each material Business Benefit Plan, have been made available to the Plan Sponsor: (i) as applicable, the most recent annual report on Form 5500 filed with the IRS, including all schedules thereto; (ii) the most recent determination letter, if any, from the IRS that is intended to qualify under Section 401(a) of the Code; (iii) the plan documents and most recent summary plan descriptions, or a written description of the terms that is not in writing; (iv) any related trust agreements, insurance contracts, and insurance policies; (v) any material, non-routine notices to or from the IRS or any office or representative of the U.S. Department of Labor or any similar Governmental Authority relating to any compliance issues; (vi) with respect to each International Employee Benefit Plan, to the extent applicable, (A) the most recent annual report or similar compliance documents required to be filed with any Governmental Authority with respect to such plan and (B) any document comparable to the determination letter referenced under clause (ii) above issued by a Governmental Authority relating to the satisfaction of applicable Law necessary to obtain the most favorable Tax treatment; and (vii) all other material Contracts relating to each Business Benefit Plan, including administrative service agreements.

(c)     Each of the Business Benefit Plans intended to qualify under Section 401 of the Code has been determined by the IRS to be so qualified and each trust created thereunder has been determined by the IRS to be exempt from Tax under the provisions of Section 501(a) of the Code, and, to the Knowledge of Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to adversely affect the qualified or exempt status of any such Business Benefit Plan or related trust.

(d)　　Except as would not, individually or in the aggregate, reasonably be expected to result in a material Liability to Sellers or their Subsidiaries, none of Sellers or their Subsidiaries, or, to the Knowledge of Sellers, any of their respective directors, officers, employees or agents has, with respect to any Business Benefit Plan, engaged in or been a party to any non-exempt "prohibited transaction," as such term is defined in Section 4975 of the Code or Section 406 of ERISA, which could reasonably be expected to result in the imposition of a penalty assessed pursuant to Section 502(i) of ERISA or a tax imposed by Section 4975 of the Code.

(e)　　Each Business Benefit Plan has been established, operated and maintained, in all material respects, in accordance with its terms and all provisions of applicable Law (including the timely payment of payments and insurance premiums).  Except as set forth on Schedule 5.14(e), there are no actions, suits or claims pending or, to the Knowledge of Sellers, threatened (other than routine claims for benefits) against any Business Benefit Plan or against the assets of any Business Benefit Plan.

(f)　　No Business Benefit Plan provides post-termination or retiree life insurance, health or other welfare benefits to any person, other than pursuant to Section 4980B of the Code or any similar applicable Law.

(g)　　Except as set forth on Schedule 5.14(g), neither the execution or delivery of this Agreement nor the consummation of the Transactions will, except as otherwise expressly provided by this Agreement, either alone or in conjunction with any other event, (i) result in any material payment or benefit becoming due or payable, or required to be provided, to any director, Employee, consultant or independent contractor of the Business under any Employee Benefit Plan, (ii) materially increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such director, Employee, consultant or independent contractor of the Business under any Employee Benefit Plan, (iii) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation under any Employee Benefit Plan, or (iv) result in the payment of any amount that would not be deductible by reason of Section 280G of the Code under any Employee Benefit Plan.  Except as set forth on Schedule 5.14(g), there is no contract, agreement, plan or arrangement to which any Seller Entity is a party or by which they are bound to compensate any current or former Employee or other disqualified individual for excise taxes that may be required pursuant to Section 4999 of the Code or any Taxes required by Section 409A of the Code.

(h)　　With respect to each Business Benefit Plan maintained for the benefit of any Employee or service provider (or former director, officer, employee or service provider) who performs services outside the United States (each, an "**International Employee Benefit Plan**"), and except as would not, individually or in the aggregate, reasonably be expected to result in a material Liability to any Seller Entity: (i) all employer and employee contributions to each International Employee Benefit Plan required by Law or by the terms of such plan (including contributions to all mandatory fund schemes) have been made or, if applicable, accrued in accordance with generally accepted accounting practices in the applicable jurisdiction; (ii) the fair market value of the assets of each International Employee Benefit Plan, the liability of each insurer for any International Employee Benefit Plan funded through insurance or the book reserve established for any such plan, together with any accrued contributions, is sufficient to

75

procure or provide for the accrued benefit obligations, as of the date of this Agreement, with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such International Employee Benefit Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; (iii) there has been no amendment to, written interpretation of or announcement (whether or not written) by any Seller Entity relating to, or change in participation or coverage under, any International Employee Benefit Plan that would materially increase the expense of maintaining such International Employee Benefit Plan above the level of expense incurred in respect thereof for the most recent fiscal year ended prior to the date of this Agreement; and (iv) each International Employee Benefit Plan has been maintained in good standing in all material respects with applicable Governmental Authorities.

      5.15   <u>Labor</u>.

      (a)    Except as listed on <u>Schedule 5.15(a)</u>, no Seller Entity is a party to any labor or collective bargaining agreement or any other labor-related agreements or arrangements with any labor union, labor organization or works council; there are no labor agreements, collective bargaining agreements or any other labor-related agreements or arrangements that pertain to any of the Employees; and no Employees are represented by any labor union, labor organization or works council with respect to their employment with any Seller Entity.

      (b)    No labor union, labor organization, works council, or group of Employees of any Seller Entity has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority.  Except as listed on <u>Schedule 5.15(b)</u>, to the Knowledge of Sellers, there have been no labor union organizing activities with respect to any employees of any Seller Entity since April 1, 2015.

      (c)    There are no, and since April 1, 2015 there have been no, (i) strikes, work stoppages, work slowdowns, lockouts, or other similar material labor disputes pending or, to the Knowledge of Sellers, threatened against or involving any Seller Entity, or (ii) unfair labor practice charges, material grievances, material complaints, or material arbitrations pending or, to the Knowledge of Sellers, threatened by or on behalf of any employee or group of employees of any Seller Entity.

      (d)    Each Seller Entity is and has been in material compliance with all applicable Laws respecting employment and employment practices, including all Laws respecting terms and conditions of employment, occupational health and safety, wages and hours, child labor, immigration, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations, employee leave issues and unemployment insurance.  To the Knowledge of Sellers, each outsourcing service provider engaged by each Seller Entity has complied with its social security and labor responsibilities.

(e)      Except as set forth on <u>Schedule 5.15(e)</u>, each Seller Entity is not and has not been: (i) a "contractor" or "subcontractor" (as defined by Executive Order 11246), (ii) required to comply with Executive Order 11246 or (iii) required to maintain an affirmative action plan.

(f)      Except as set forth on <u>Schedule 5.15(f)</u>, to the Knowledge of Sellers, no Employee is in any respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, non-competition agreement, restrictive covenant or other obligation: (i) to any Seller Entity or (ii) to a former employer of any such employee relating (A) to the right of any such employee to be employed by any Seller Entity or (B) to the knowledge or use of trade secrets or proprietary information.

(g)      <u>Schedule 5.15(g)</u> lists the number of PSAN Employees, by plant location, employed as direct or indirect labor as of the date hereof.

(h)      Except as set forth on <u>Schedule 5.15(h)</u>, no Seller Entity has received notice of (i) any charge or complaint with respect to or relating to Seller Entity or its employees, its contractors or its outsourced workers pending before the Equal Employment Opportunity Commission or any other Governmental Authority responsible for the prevention of unlawful employment practices with respect to employment or services in connection with any Seller Entity, (ii) the intent of any Governmental Authority responsible for the enforcement of labor, employment, wages and hours of work, child labor, immigration, or occupational safety and health Laws to conduct an investigation with respect to or relating to Seller Entity, its employees, its contractors or its outsourced workers (in connection with services to any Seller Entity) or notice that such investigation is in progress, or (iii) notice of any complaint, lawsuit or other proceeding pending or threatened against any Seller Entity in any forum by or on behalf of any present or former employee, contractor or outsourced worker of such Seller Entity, any applicant for employment of such Seller Entity or classes of the foregoing alleging breach of any express or implied contract of employment, any applicable Law governing employment or the termination thereof or other discriminatory, wrongful or tortuous conduct in connection with the employment relationship.

(i)      Each Seller Entity is and has been in compliance with all notice and other requirements under the Workers' Adjustment and Retraining Notification Act and any similar foreign, state or local Law relating to plant closings and layoffs (the "**WARN Act**").

5.16   <u>Litigation</u>.

(a)      <u>Schedule 5.16(a)</u> contains a true, correct and complete list of each material action, complaint, suit, charge, investigation, arbitration, inquiry, audit, investigation or administrative or other Legal Proceeding, or claims of any kind whatsoever (including labor and intellectual property claims), at Law or in equity, pending or, to the Knowledge of Sellers, threatened against any Seller Entity, or any of their respective properties or assets (or pending or, to the Knowledge of Sellers, threatened against, by or any of the officers, directors, employees or contractors of any Seller Entity).

(b)    Schedule 5.16(b) contains a true, correct and complete (except for the names of counterparties, which have been redacted) list of any and all settlements to which any Seller Entity is a party, or since April 1, 2015 has entered into, that require or required the payment of $250,000 or more.  All payments required to be made under each such settlement has been made in full and no Seller Entity has any continuing Liability in connection with any such settlement.

5.17    Compliance with Laws; Permits.

(a)    Each Seller Entity is, and, to the Knowledge of Sellers, since April 1, 2015 each has been, in compliance in all material respects with all Laws applicable to their respective operations or assets or the Business.  Except as set forth on Schedule 5.17(a), no Seller Entity has received any written notice of or been charged with a material violation of any Laws.

(b)    Except as set forth on Schedule 5.17(b), each Seller Entity has, and, to the Knowledge of Sellers, since April 1, 2015 each Seller Entity has had, all material Permits that are required for the operation of the Business as presently conducted.  Except as set forth on Schedule 5.17(b), no Seller Entity is, and, to the Knowledge of Sellers, since April 1, 2015 each has not been, in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any material Permit to which it is a party.

(c)    Schedule 5.17(c) sets forth a true and correct list of all material Permits used or held for use by the Seller Entities that are not assignable or otherwise transferable pursuant to applicable Law.

5.18    Automotive Regulatory/NHTSA Compliance.

(a)    Schedule 5.18(a)(i) sets forth all recalls and other forms of corrective actions (including service campaigns) undertaken by any Seller Entity, with or without agency involvement, since April 1, 2015.  Schedule 5.18(a)(ii) sets forth all recalls and other forms of corrective actions (including service campaigns) undertaken by any Seller Entity's customers that involved any Products, with or without agency involvement, since April 1, 2015.

(b)    Schedule 5.18(b) sets forth all material regulatory and other government proceedings pending, or opened but not pending, since April 1, 2015 involving any Products and brought directly against any Seller Entity.

(c)    Schedule 5.18(c) sets forth a true, correct and complete list, to Sellers' Knowledge, of any and all current Orders or Orders under negotiation, involving or entered into by or with NHTSA, involving any Products.

(d)    Schedule 5.18(d) sets forth a true, correct and complete list, to Sellers' Knowledge, of any and all current Orders, or Orders under negotiation, involving or entered into by or with any other automotive regulatory entity either in the U.S. or elsewhere, involving any Products.

5.19    Compliance with FCPA, International Trade Laws and Sanctions.

(a)      Each Seller Entity is, and since April 1, 2012 each has been, in compliance in all material respects with all applicable International Trade Laws and Sanctions.

(b)      There is no pending or, to the Knowledge of Sellers, threatened Legal Proceeding against, or investigation by a Governmental Authority of, any Seller Entity, nor is there any judgment imposed (or, to the Knowledge of Sellers, threatened to be imposed) upon any Seller Entity, by or before any Governmental Authority, in each case, in connection with an alleged violation of any International Trade Laws and Sanctions.

(c)      No Seller Entity, and none of the shareholders, directors (supervisory or management), officers, employees or members of any Seller Entity is, in each case, to the Knowledge of Sellers, nor since April 1, 2012 have they been, to the Knowledge of Sellers, (i) listed on any list of sanctioned Persons maintained by the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**") or the U.S. Department of State, the United Nations Security Council, Japan, the European Union, or any EU member state, (ii) operating, organized, or resident in any Sanctioned Territory or (iii) a Person owned or controlled by any such Person or Persons.

(d)      Each Seller Entity has in place adequate controls and systems to ensure compliance in all material aspects with any International Trade Laws and Sanctions in each of the jurisdictions in which any Seller Entity currently does business.

(e)      Sellers will not to Sellers' Knowledge use the proceeds from the sale of the Purchased Assets, directly or indirectly, or lend, contribute or otherwise make available such proceeds to any Seller Entity, any joint venture partner or any other Person, towards any sales or operations in violation of any International Trade Laws and Sanctions or, to the Knowledge of Sellers, for the purpose of financing the activities of any Person in violation of any International Trade Laws and Sanctions.  Sellers will not directly or indirectly use the proceeds of the sale of the Purchased Assets, or lend, contribute or otherwise make available such proceeds to any Seller Entity, any joint venture partner or any other Person or entity, for the purpose of financing the activities of any person or entity currently the target of any International Trade Laws and Sanctions.

(f)      No Seller Entity, nor any of their directors, officers, employees, or, to the Knowledge of Sellers, Affiliates or agents have violated the Foreign Corrupt Practices Act of 1977, as amended ("**FCPA**") or any other applicable anti-bribery or anti-corruption law, including directly or indirectly making, offering, promising or authorizing any payment or gift of any money or anything of value, corruptly to or for the benefit of any "foreign official" (as such term is defined in the FCPA), foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in order to assist any Seller or any of their Affiliates in obtaining or retaining business for or with, or directing business to, any person. No Seller, and none of their respective directors, officers, employees or, to the Knowledge of Sellers, Affiliates or agents have directly or indirectly made, offered, promised or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds in violation of any applicable anti-corruption law,

79

rule or regulation, including the FCPA and the U.K. Bribery Act 2010. Sellers maintain policies, procedures, practices, including employee training, that are designed to provide reasonable assurance of compliance with the FCPA, U.K. Bribery Act 2010 or any other applicable anti-bribery or anti-corruption law.  No Seller, and none any of their respective directors, officers or employees nor, to the Knowledge of Sellers, Affiliates or agents with respect to work on behalf of Sellers are the subject of any report, allegation, complaint, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA, the U.K. Bribery Act 2010 or any other applicable anti-corruption law, rule or regulation of Sellers.  Sellers maintain and keep books, records, and accounts in reasonable detail to accurately and fairly reflect the transactions and dispositions of Sellers' assets.

5.20    Money Laundering Laws.    The operations of Sellers and their controlled Affiliates, with respect to the Business, and the Purchased Assets, are and have been conducted at all times in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, "**Money Laundering Laws**") and no action by or before any Governmental Authority involving Sellers or their Affiliates, with respect to the Business or any of the Purchased Assets with respect to a violation of the Money Laundering Laws is pending or, to the Knowledge of Sellers, threatened.

5.21    Insurance.    Schedule 5.21 sets forth a true, correct and complete list of all insurance policies maintained by any Seller Entity for the benefit of the Business (the "**Policies**").  The Policies are in full force and effect and all premiums due to date thereunder have been paid in full.  No Seller Entity is in material breach or default with respect to any Policy, and no Seller Entity has taken any action or, to the Knowledge of Sellers, failed to take any action which, with notice or the lapse of time, would constitute such a breach or default, or permit termination or modification, of any of the Policies.  No written notice of cancellation or termination has been received by any Seller Entity with respect to any of the Policies.

5.22    Environmental Matters.

(a)      Except as set forth in Schedule 5.22 or as would not reasonably be expected to result in material Liabilities under Environmental Law with respect to the Business or Purchased Assets:

(i)      Except for matters which have been fully resolved, the operations of each Seller Entity, with respect to the Purchased Assets, are, and since April 1, 2015 have been, in compliance with all applicable Environmental Laws, which includes obtaining, maintaining and complying with all Permits required pursuant to Environmental Laws to operate the Business or Purchased Assets.

(ii)      There is no Environmental Claim pending or, to the Knowledge of Sellers, threatened which adversely affects, arises from or relates to the Purchased Assets or the Business.

80

(iii)    To the Knowledge of Sellers, there has been no Environmental Emission of any Hazardous Material at, to, from, or under any of the Purchased Assets or at any other location where Hazardous Materials generated by the Purchased Assets or the Business have been transported to or disposed of.

(b)    Sellers have delivered or otherwise made available for inspection to the Plan Sponsor true, complete and correct copies and results of any material, non-privileged correspondence, notices, reports, data, investigations, audits, assessments (including Phase I environmental site assessments and Phase II environmental site assessments) studies, analyses, tests or monitoring in the possession of or reasonably available to any Seller Entity pertaining to: (i) any material unresolved Environmental Claims; (ii) any Hazardous Materials in, on or beneath the Purchased Assets, which would reasonably be expected to result in material Liabilities with respect to the Business or Purchased Assets; or (iii) the Business's and Purchased Assets' material and unresolved non-compliance with applicable Environmental Laws.

5.23    <u>Customers and Suppliers</u>.  <u>Schedule 5.23</u> contains a true, correct and complete list of the top 10 customers (the "**Top Ten Customers**") and top 10 suppliers (the "**Top Ten Suppliers**") of the Business for the twelve (12) month period ended March 31, 2017 (in each case, determined on a consolidated basis based on, in the case of customers, the amount of revenues recognized by the Business), it being understood that "customers" refers to automotive original equipment manufacturer programs awarded to the Business. <u>Schedule 5.23</u> contains a true, correct and complete list, to the Knowledge of Sellers, of any and all occurrences since March 31, 2017 where the Business or any Seller Entity received any written or other indication that (a) any Top Ten Customer or Top Ten Supplier plans to stop or materially decrease the amount of business done with the Business, (b) any Top Ten Customer received a material decrease in the prices paid to the Business that is inconsistent with the terms of its existing agreement or order with the Business or (c) any Top Ten Supplier received a material increase in the prices charged to the Business that is inconsistent with the terms of its existing supply agreement with the Business. In addition, except as set forth on <u>Schedule 5.23</u>, the Business is not, and no Seller Entity is, involved with any material claim or dispute greater than $4,000,000 in aggregate for a twelve month period with respect to any Top Ten Customer or with any Top Ten Supplier.

5.24    <u>Warranty and Product Liability</u>. <u>Schedule 5.24</u> sets forth a true, correct and complete list, except for Liabilities for which there is an adequate reserve reflected in the Financial Statements, of (a) any and all material actual or, to the Knowledge of Sellers, potential claims currently or since April 1, 2015 outstanding, pending or, to the Knowledge of Sellers, threatened by a Governmental Authority or any private litigant involving a service provided or a product designed, manufactured, serviced, produced, modified, distributed or sold by or on behalf of the Business relating to an alleged defect in design, manufacture, materials or workmanship, performance, or alleged failure to warn, or an alleged breach of any guarantee or warranties or representations, other than notices or claims that have been settled or resolved prior to the date of this Agreement or that are within normal warranty experience or those that would not reasonably be expected, individually or in the aggregate, to be material to the Business and (b) to the Knowledge of Sellers, and except set forth on <u>Schedule 5.24</u>, any and all material design defects with respect to any of the Products, other than those that would not reasonably be expected, individually or in the aggregate, to be material to the Business.

5.25    <u>Financial Advisors</u>.   Except   for   Lazard   Freres   &   Co.   LLC   and PricewaterhouseCoopers LLP, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller Entity in connection with the Transactions and no Person is entitled to any fee or commission or like payment from the Plan Sponsor in respect thereof.

5.26    <u>Affiliate Transactions</u>.  <u>Schedule 5.26</u> sets forth (a) all Indebtedness, obligations or other Liabilities between any Seller Covered Person, on the one hand, and any Acquired Subsidiary, on the other hand, (b) all material assets, services or facilities that any Seller Covered Person provides or causes to be provided to any Acquired Subsidiary, (c) any material Contracts or other arrangements between any Seller Covered Person, on the one hand, and any Seller Entity, on the other hand (collectively, "**Affiliate Transactions**").

5.27    <u>PSAN Inflator Business</u>.  <u>Schedule 5.27</u> sets forth a true and correct list of (a) each Seller Entity that is engaged in, or has been engaged in, the PSAN Inflator Business, whether through the design, assembly, manufacture, sale, distribution or handling of PSAN Inflators, or otherwise, (b) each Seller Entity that is a party to any Contract with an unaffiliated third party involving the design, assembly, manufacture, sale, distribution or handling of PSAN Inflators, (c) each customer that has purchased PSAN Inflators from any Seller Entity and (d) the number of 2004 and 2004L PSAN Inflators sold by each Seller Entity in each jurisdiction.

5.28    <u>Acquired Subsidiary Indebtedness</u>.  <u>Schedule 5.28</u> sets forth all Indebtedness of the Acquired Subsidiaries under loans or other financing arrangements owed to a party other than Sellers and their Affiliates (including, for the avoidance of doubt, the Acquired Subsidiaries) as of the date of this Agreement.

5.29    <u>Indemnification Arrangements</u>.  Since December 31, 2016, no Seller Entity has entered into or otherwise effected, amended or modified any agreement or other arrangement (including, for the avoidance of doubt, entering into any Contract or amending any organizational documents) that expands the obligations of any Seller Entity or seller entity under any of the Cross-Conditioned Agreements, either by operation of law or pursuant to any contractual obligation, to indemnify any current or former officer, director, employee or other representative of any Seller Entity or seller entity under any of the Cross-Conditioned Agreements.

**ARTICLE VI**

**<u>REPRESENTATIONS AND WARRANTIES OF PLAN SPONSOR</u>**

The Plan Sponsor represents and warrants to each Seller that the statements contained in this <u>Article VI</u> are true and correct as of the date of this Agreement.

6.1    <u>Organization and Good Standing</u>.  Parent is duly incorporated and validly existing under the laws of Luxembourg and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as now conducted.

6.2    <u>Authorization of Agreement</u>.  Parent has all requisite power and authority to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution, delivery, and

82

performance of this Agreement and all other agreements and certificates contemplated hereby to which the Plan Sponsor is a party (a) have been duly authorized by the Plan Sponsor and (b) do not require the consent of any other Person.  This Agreement and all other agreements and certificates contemplated hereby (assuming due authorization, execution and delivery by the other parties thereto) constitutes the valid and legally binding obligation of the Plan Sponsor, enforceable against the Plan Sponsor in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, reorganization, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

6.3     Conflicts; Consents of Third Parties.

(a)     None of (x) the execution and delivery by Parent of this Agreement, (y) the consummation of the Transactions; or (z) the compliance by the Plan Sponsor with the terms hereof will (i) conflict with or result in a breach of the organizational documents of the Plan Sponsor, (ii) violate any Law or Order to which the Plan Sponsor is subject in respect of the Purchased Assets; or (iii) result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which the Plan Sponsor is a party or by which it is bound, except, in the case of either clause (ii) or clause (iii), for such conflicts, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the Plan Sponsor's ability to consummate the Transactions or perform its obligations hereunder on a timely basis.

(b)     Other than (i) the applicable requirements of the HSR Act and other Antitrust Laws, (ii) CFIUS Clearance, (iii) as required or pursuant to the Bankruptcy Code or the Confirmation Order, (iv) the filings with and/or approvals of NDRC with respect to the Transactions, (v) SAFE's registration and/or approvals in connection with the Transactions, including registration and/or approvals for conversion of RMB funds into U.S. dollar funds and transfer of U.S. dollar funds outside of China pursuant to or in connection with the Transactions (the filings, approvals, acceptances and/or registrations referred to in clauses (iv) and (v) of this Section 6.3(b) collectively, the "**PRC Regulatory Approvals**") and (vi) the Joyson Shareholder Approval, the Plan Sponsor is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the Transactions, except where the failure to give notice, file or obtain such authorization, consent or approval would not prevent or materially impair or delay the Plan Sponsor's ability to consummate the Transactions or perform its obligations hereunder on a timely basis.

6.4     Litigation.  There are no Legal Proceedings pending or, to the Knowledge of the Plan Sponsor, threatened against the Plan Sponsor, or to which the Plan Sponsor is otherwise a party, which, if adversely determined, would reasonably be expected to prevent or materially impair or delay the ability of the Plan Sponsor to consummate the Transactions or perform its obligations under this Agreement on a timely basis.  The Plan Sponsor is not subject to any Order of any Governmental Authority except to the extent the same would not, individually or in the aggregate, reasonably be expected to prevent or materially impair or delay the ability of the Plan Sponsor to consummate the Transactions or to perform its obligations under this Agreement on a timely basis. There is no Legal Proceeding pending or, to the Knowledge of the Plan

Sponsor, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the Transactions.

6.5    Financial Advisors.  Except for Jefferies Finance LLC and UBS Securities LLC, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Plan Sponsor in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

6.6    Bankruptcy.  There are no bankruptcy, reorganization or insolvency proceedings pending against or, to the Knowledge of the Plan Sponsor, threatened against, the Plan Sponsor.

6.7    Financial Capability.

(a)    As of the date of this Agreement, the Plan Sponsor has delivered redacted copies of (i) an executed commitment letter, dated the date hereof (the "**Equity Commitment Letter**"), pursuant to which, upon the terms and subject to the conditions set forth therein, Joyson, (the "**Equity Source**") has agreed to provide equity financing to the Plan Sponsor or its designated Affiliate in the aggregate amount set forth therein (the "**Equity Financing**") to fund a portion of the Purchase Price, together with all other amounts reasonably expected to be paid or repaid by the Plan Sponsor under this Agreement (whether payable on or after the U.S. Closing), and all of the Plan Sponsor's and its Affiliates' costs, fees and expenses associated with the Transactions to the extent not otherwise reimbursed and (ii) executed commitment letters, dated the date hereof (including the schedules, annexes, exhibits and supplements thereof, collectively, the "**Debt Commitment Letters**" and, together with the Equity Commitment Letter, the "**Commitment Letters**"), pursuant to which, upon the terms and subject to the conditions set forth therein, each of the Debt Financing Sources has agreed to provide the Plan Sponsor with debt financing in the aggregate amount set forth therein (the "**Debt Financing**").  The Debt Financing together with the Equity Financing is herein collectively referred to as the "**Financing**".  As of the date hereof, the Equity Commitment Letter and the Debt Commitment Letters, each in the form so delivered is (as to the Plan Sponsor and, to the Plan Sponsor's Knowledge, the other parties thereto), valid and in full force and effect (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity), such commitments have not been withdrawn, terminated or otherwise amended or modified in any respect, and no event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of the Plan Sponsor under any term or condition of the Equity Commitment Letter or the Debt Commitment Letters.  The Equity Commitment Letter and the Debt Commitment Letters (and any customary associated mandate letters or fee letters entered into in respect of the Debt Financing) are the only agreements relating to the Financing as of the date of this Agreement.  Other than as expressly set forth in the Commitment Letters, there are no other agreements, side letters, or arrangements relating to the Commitment Letters that could affect the amount, availability or conditionality of the Financing.

(b)    Upon receipt of the proceeds contemplated by the Commitment Letters, and subject to the registration and/or approvals referred to in clause (v) of Section 6.3(b), the Plan Sponsor will have access as of the U.S. Closing to sufficient cash funds to (i) repay certain existing indebtedness of certain Subsidiaries of the Plan Sponsor as contemplated by the Debt

Commitment Letters and (ii) pay all amounts contemplated by this Agreement to be paid by it (including the Purchase Price, any fees and expenses of, or payable by, the Plan Sponsor in connection with this Agreement and the Transactions or the Financing that have not otherwise been reimbursed) and to perform its obligations hereunder. As of the date of this Agreement, assuming the conditions set forth in <u>Section 9.1</u> and <u>Section 9.3</u> are satisfied, the Plan Sponsor does not have any reason to believe that (i) it or any other party thereto will be unable to satisfy on a timely basis any term of the Commitment Letters, (ii) any of the conditions to the Financing will not be satisfied or (iii) the Financing will not be available to the Plan Sponsor on the Closing Date.

6.8    <u>Ultimate Parent</u>.  Immediately following the U.S. Closing, KSS Holdings shall be a direct or indirect wholly owned Subsidiary of Parent.

6.9    <u>No Other Representations or Warranties</u>.  Notwithstanding anything contained in this Agreement to the contrary, the Plan Sponsor acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in <u>Article V</u> (as modified by the Disclosure Schedule), and Plan Sponsor acknowledges and agrees that, except for the representations and warranties contained in <u>Article V</u>, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis.  Any claims Plan Sponsor may have for breach of representation or warranty shall be based solely on the representations and warranties of Sellers set forth in <u>Article V</u> hereof (as modified by the Disclosure Schedule).  The Plan Sponsor further represents that neither Sellers nor any of their Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Seller Entities, the Business or the Transactions not expressly set forth in this Agreement, and, except in the case of intentional fraud or willful misconduct, none of Sellers, any of their Affiliates or any other Person will have or be subject to any liability to the Plan Sponsor or any other Person resulting from the distribution to the Plan Sponsor or its Representatives or the Plan Sponsor's use of, any such information, including any confidential memoranda distributed on behalf of Sellers relating to the Business or other publications or data room information provided to the Plan Sponsor or its Representatives, or any other document or information in any form provided to the Plan Sponsor or its Representatives in connection with the sale of the Business and the Transactions.

## ARTICLE VII

## COVENANTS

7.1    <u>Access to Information</u>.  Sellers agree that, from and after the date hereof, and subject to the Confidentiality Agreement, the Plan Sponsor shall be entitled, through its Representatives, to make such investigation of the properties, businesses and operations of Sellers and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances in a manner so as not to interfere with the ordinary business operations of Sellers and shall be subject to restrictions under applicable Law.  Sellers shall cause their Representatives to cooperate with the Plan

WEIL:\96035900\75\76903.0003

Sponsor and the Plan Sponsor's Representatives in connection with such investigation and examination, and the Plan Sponsor and its Representatives shall cooperate with Sellers and their Representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it (a) would require Sellers to disclose information subject to attorney-client privilege or (b) involves any sampling or analysis of soil, groundwater, building materials or other environmental media, without the written consent of Sellers, which may be withheld in Sellers' sole discretion.

7.2     <u>Conduct of the Business Pending the U.S. Closing</u>.

(a)     Prior to the U.S. Closing, except (i) as set forth on <u>Schedule 7.2(a)</u>, (ii) as required by, or would otherwise violate, applicable Law (including Antitrust Laws), or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of the Plan Sponsor (which consent shall not be unreasonably withheld, conditioned or delayed), Sellers shall and shall cause the other Seller Entities to:

(i)     conduct the Business only in the Ordinary Course of Business or as otherwise required by the Accommodation Agreement, Access Agreement, or RSA;

(ii)     use commercially reasonable efforts to (1) preserve the present business operations, organization and goodwill of the Business and Purchased Assets, and (2) preserve the present relationships with customers and suppliers of the Business and Purchased Assets;

(iii)     maintain the Purchased Assets in a state of repair and condition in the Ordinary Course of Business; <u>provided</u> that nothing in this <u>Section 7.2(a)(iii)</u> shall be deemed to require Sellers to upgrade the condition of the Purchased Assets relative to their condition on the date hereof;

(iv)     use commercially reasonable efforts to maintain the current levels of insurance coverage afforded Seller Entities under existing insurance policies related to the Business or the Purchased Assets; and

(v)     comply in all material respects with all Laws applicable to the operations of the Business or the Purchased Assets.

(b)     Prior to the U.S. Closing, except (i) as set forth on <u>Schedule 7.2(b)</u>, (ii) as required by, or would otherwise violate, applicable Law (including Antitrust Laws), or by order of the Bankruptcy Court, (iii) as otherwise expressly permitted by this Agreement, (iv) as required or permitted by the Access Agreement, Accommodation Agreement, or RSA, (v) with the prior written consent of the Plan Sponsor (which consent shall not be unreasonably withheld, conditioned or delayed), or (vi) in connection with any of the pre-Closing restructurings described in <u>Section 7.20</u>, Sellers shall not, and shall cause the other Seller Entities not to:

(i)     except in the Ordinary Course of Business, or as required under any existing Contract or by applicable Law, (A) enter into, adopt, amend (including acceleration of vesting), modify or terminate any Employee Benefit Plan, other than

86

routine amendments to health and welfare plans (other than severance plans) that do not materially increase benefits or result in a material increase in administrative costs; (B) enter into any (1) employment, consulting or severance agreement with any current or former director or Employee who has a gross annual base salary of at least $200,000 other than offer letters and employment agreements that are terminable at-will without severance obligations and the terms of which are consistent with similarly situated employees of the Seller Entities and past practices of the Seller Entities, (2) employment, consulting or severance agreement with any current or former director or Employee in Mexico other than offer letters or employment agreements without severance obligations and the terms of which are consistent with similarly situated employees of the Seller Entities and past practices of the Seller Entities, or (3) severance, termination or other agreement containing change of control provisions with any current or former director or Employee who has a gross annual base salary of at least $200,000; or (C) grant any increase in wages, salary, bonus or other compensation, remuneration or benefits of any current or former director or Employee who has a gross annual base salary of at least $200,000;

(ii)    except in the Ordinary Course of Business, (A) negotiate, amend or enter into any labor agreement, works council agreement or collective bargaining agreement or (B) through negotiation or otherwise, make any other commitment or incur any other liability or other obligation to any labor union, labor organization or works council;

(iii)    (A) hire any Person who would be entitled to gross annual base salary of at least $200,000 and that would be an Employee; (B) terminate the employment of any salaried Employee other than for cause; or (C) transfer any employees of any Seller or any of their Affiliates from one Seller or Affiliate to another Seller or Affiliate other than transfers of such employees to the PSAN Inflator Business based on the needs of such business or transfers of such Employees in the Ordinary Course of Business;

(iv)    to the extent it may affect or relate to the Business or any of the Purchased Assets or Acquired Subsidiaries, (A) commence a lawsuit other than for the routine collection of bills or (B) settle or agree to settle any pending or threatened lawsuit or other dispute, in each case involving more than $500,000 in the aggregate;

(v)    except in the Ordinary Course of Business or as contemplated by the Accommodation Agreement, Access Agreement or RSA, subject any of the Purchased Assets or assets of any Acquired Subsidiary to any Lien (other than a Permitted Lien) or Claim to the extent that such Lien or Claim would continue to encumber or affect the Purchased Assets post-U.S. Closing;

(vi)    cancel or compromise any material Indebtedness or claim or waive or release any right that constitutes a Purchased Asset (or any comparable right of an Acquired Subsidiary) other than customer accounts receivable compromised in the Ordinary Course of Business or as contemplated by the Accommodation Agreement, Access Agreement or RSA;

(vii)     change the manner in which it extends warranties, discounts or credits to customers of the Business, if such change, taken in the aggregate, would reasonably be expected to have an adverse effect on the Business in any material respect;

(viii)    make any material loans or advances to, or any investments in or capital contributions to, any Person that is not a Seller Entity or an Affiliate of a Seller Entity that could adversely affect the Business or any of the Purchased Assets;

(ix)     enter into any commitments for or make any capital expenditures which, in the aggregate, would be materially in excess of the aggregate capital expenditure budget made available to Plan Sponsor;

(x)      except in the Ordinary Course of Business, enter into any material joint marketing or marketing support agreement related to the Business;

(xi)     enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons (other than reseller agreements) related to or affecting the Business, the Purchased Assets or the Acquired Subsidiaries;

(xii)    except for transactions entered into in the Ordinary Course of Business between or among TKJP and/or its Subsidiaries, engage in any Affiliate Transaction except as otherwise expressly permitted by this Agreement;

(xiii)   enter into or materially modify any currency exchange, commodities or other hedging transactions or arrangements, or other investment or cash management transactions or arrangements related to or affecting the Business or the Purchased Assets or the Acquired Subsidiaries, other than banking arrangements and acquisitions of raw materials made in the Ordinary Course of Business;

(xiv)    sell, dispose of, transfer, lease, license or permit to lapse or authorize the sale, pledge, disposition, transfer, lease, license, or encumbrance of, any Purchased Assets, any assets of any Acquired Subsidiary or any Acquired Intellectual Property, other than in the Ordinary Course of Business (in the case of Acquired Intellectual Property, only nonexclusive licenses in the Ordinary Course of Business) or as contemplated by the Accommodation Agreement, Access Agreement or RSA, it being understood that, for purposes of this Section 7.2(b)(xiv), any such transaction that involves the direct or indirect acquisition by any Person or group of five percent (5%) or more of the aggregate book value of the assets of any Deal Subject Entity Set, or assets of any Deal Subject Entity Set representing five percent (5%) or more of any such Deal Subject Entity Set's revenues or net income including, in each case, securities of Subsidiaries of any such Deal Subject Entity Set, shall require the prior written consent of the Plan Sponsor, which the Plan Sponsor may withhold in its sole and absolute discretion;

(xv)     transfer, abandon or permit to lapse (except in accordance with the terms of an applicable Acquired IP License) any Intellectual Property rights included in the Acquired Intellectual Property, except for the abandonment or permitting to lapse of

88

Acquired Intellectual Property registrations or applications of de minimis value, in each case, in the Ordinary Course of Business;

(xvi)    except in the Ordinary Course of Business, enter into or assume any Material Contract or enter into or permit any material amendment, supplement, waiver or other material modification in respect thereof or seek Bankruptcy Court approval to do so;

(xvii)    (A) reject or terminate any Material Contract or seek Bankruptcy Court approval to do so or (B) fail to use commercially reasonable efforts to oppose any action by a third party to a Material Contract to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) such Material Contract so long as Sellers reasonably believe there is a proper basis to oppose such action, except in each case, in accordance with Section 2.7;

(xviii)    with respect to any Purchased Asset (A) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases; or (B) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(xix)    declare, set aside, or pay any dividend or other distribution with respect to any shares of its capital stock or interests, or split, combine, or reclassify any of its capital stock or interests, or repurchase, redeem, or otherwise acquire any shares of its capital stock or interests, in each case as and to the extent that it would reasonably be expected to (x) cause the aggregate Cash and Cash Equivalents of Sellers and their Affiliates to be less than the Required Cash as of the Closing, (y) cause any Seller Entity to fail to maintain any cash required to be held by Contract or applicable Law (including any minimum capital requirement or deposit amount) or (z) result in any material Tax or other liability to any Acquired Subsidiary;

(xx)    except in the Ordinary Course of Business, pay any liability or other obligation on behalf of any Affiliate, in either case where such action would reasonably be expected to (A) cause any Seller Entity to fail to maintain any cash required to be held by Contract or applicable Law (including any minimum capital requirement or deposit amount) or (B) result in any material Tax or other liability to any Acquired Subsidiary;

(xxi)    acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the Business;

(xxii)    except in connection with the Bankruptcy Cases (including inventory builds), enter into contracts or commitments for the purchase of raw materials, products, services, and supplies outside of the Ordinary Course of Business;

WEIL:\96035900\75\76903.0003

(xxiii) voluntarily pursue or seek, or fail to use commercially reasonable efforts to oppose any third party in pursuing or seeking a conversion of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, the appointment of a trustee under chapter 11 or chapter 7 of the Bankruptcy Code and/or the appointment of an examiner with expanded powers;

(xxiv) other than as provided in connection with the Accommodation Agreement, incur or guarantee any material Indebtedness for borrowed money;

(xxv) execute any lease agreement unless required to comply with certain obligations to obtain VAT certifications and IMMEX program authorizations (authorizations to operate a maquila under Mexican Laws), in which case Sellers shall, or shall cause the other Seller Entities to, notify the Plan Sponsor of such lease agreement within ten (10) Business Days prior to the execution of any such lease agreement; or

(xxvi) take or agree in writing or otherwise to take any action prohibited by this Section 7.2(b).

7.3    Consents.  Subject to Section 7.4, Sellers shall use (and shall cause each other Seller Entity to use) its commercially reasonable efforts, and the Plan Sponsor shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions; provided, however, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain such consent or approval.

7.4    Regulatory Approvals.The Plan Sponsor shall use its reasonable best efforts to take promptly, or cause to be taken, all actions necessary, proper or advisable and to do promptly, or cause to be done, and to assist and cooperate with Sellers in doing, all things necessary, proper or advisable under applicable Laws to consummate and make effective the Transactions, including (i) obtaining of all necessary consents, approvals or waivers from third parties (including Governmental Authorities, the NHTSA Monitor and the DOJ Monitor), (ii) defending of any lawsuits or other Legal Proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the Transactions and (iii) executing and delivering any additional instruments reasonably necessary to consummate the Transactions. The Plan Sponsor shall use its reasonable best efforts to ensure compliance with the deadlines set forth in the DOJ Restitution Order, entered on February 27, 2017.

(b)    With respect to review and clearance by CFIUS, pursuant to Section 721 of the DPA, the Plan Sponsor and Sellers shall use reasonable best efforts to promptly prepare and file a draft Joint Voluntary Notice for review by the CFIUS staff, not later than twenty (20) Business Days after execution of this Agreement unless the Plan Sponsor and Sellers agree otherwise in writing, and promptly submitting the formal Joint Voluntary Notice no later than five (5) Business Days after receipt of any comments from the CFIUS staff or confirmation that CFIUS has no further comment on the draft notice unless the Plan Sponsor and Sellers agree otherwise in writing.  The Plan Sponsor and Sellers shall, in connection with the CFIUS review, (i) cooperate in all respects and consult with each other in connection with the preparation and consideration of the CFIUS Joint Voluntary Notice, including by allowing the other Party to

have a reasonable opportunity to review in advance and comment on drafts of filings and submissions; (ii) promptly inform the other Party of any communication received by such Party from, or given by such Party to, CFIUS, by promptly providing true, correct and complete copies to the other of any such written communications, except for any exhibits to such communications providing the personal identifying information required by 31 C.F.R. § 800.402(c)(6)(vi) or that otherwise is requested by CFIUS to remain confidential from the other Party; and (iii) reasonably permit the other Party to review in advance any communication that it gives to, and consult with each other in advance of any meeting, substantive phone call or conference with CFIUS, and to the extent not prohibited by CFIUS, give the other Party the opportunity to attend and participate in any in-person meetings with CFIUS, in each of clauses (i), (ii) and (iii) of this <u>Section 7.4(b)</u>, subject to confidentiality considerations contemplated by the DPA or required by CFIUS. Each of the Plan Sponsor and Sellers shall respond to any request for information from CFIUS in the timeframe set forth in the CFIUS regulations, 31 C.F.R. Part 800; <u>provided</u>, <u>however</u>, that either Party, after consultation with the other Party, may request in good faith an extension of time pursuant to 31 C.F.R. 800.403(3) to respond to CFIUS requests for follow-up information, <u>provided</u> that under no circumstance may a Party request any extension that causes CFIUS to reject the voluntary notice filed by the Parties or modifies the time for completion of the CFIUS review or investigation.

(c)     The Plan Sponsor and Sellers shall take, or cause to be taken, all action necessary to receive the CFIUS Clearance so as to enable the Closing, including providing all such assurances as may be necessary, requested or imposed by CFIUS, including entering into a mitigation agreement, letter of assurance, national security agreement, proxy agreement, trust agreement or other similar arrangement or agreement in relation to the business and assets of Sellers or otherwise divesting or agreeing to divest assets of Sellers.

(d)     Notwithstanding anything contained in this Agreement to the contrary, the Plan Sponsor shall use its reasonable best efforts to take promptly, or cause to be taken, all actions reasonably necessary, proper or advisable to avoid or eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Authority, or any other Person with respect to the Transactions, so as to enable the consummation of the Transactions to occur as soon as practicable (and in any event no later than the Outside Date), including: (i) providing information; (ii) proposing, negotiating, committing to and/or effecting, by consent decree or decision, hold separate orders, or otherwise, the sale, divesture or disposition of, or holding separate (through the establishment of a trust, proxy agreement, special security agreement, voting trust agreement or otherwise) such of (A) the Plan Sponsor's (or any of its Affiliates') assets, properties or businesses and/or (B) Sellers' (or any of its Affiliates') assets, properties or businesses to be acquired by the Plan Sponsor pursuant hereto, and the entrance into such other arrangements, in each case, as are necessary, proper or advisable to obtain an approval or waiver from, or to avoid an action or proceeding by or before any Governmental Authority, the issuance by any Governmental Authority of a decision prohibiting the Transactions, or to effect the dissolution of any injunction, temporary restraining order or other Order in any suit or proceeding, which would otherwise have the effect of materially delaying or preventing the consummation of the Transactions prior to the Outside Date; (iii) creating, terminating or divesting relationships, ventures, contractual rights or obligations (including entering into, or offering or committing to enter into, any supply agreements involving the Plan Sponsor's (or any of its Affiliates') products or Products or imposing

restrictions on the Plan Sponsor's (or any of its Affiliates') Businesses or Sellers' Businesses), formally or informally requested by any Governmental Authority, in each case, as are necessary proper or advisable (A) to obtain any approval or waiver from, or to avoid any action or proceeding by or before, any Governmental Authority, or the issuance by any Governmental Authority of a decision prohibiting the Transaction, or (B) to effect the dissolution of any injunction, temporary restraining order or other Order in any suit or proceeding, which would otherwise have the effect of materially delaying or preventing the consummation of the Transactions prior to the Outside Date; provided, however, that the Plan Sponsor shall not be required to enter into any Contract for the manufacture or sale of PSAN Inflators; (iv) defending through litigation on the merits any claim asserted in any proceeding by any Person to avoid entry of, or to have vacated or terminated, any Order (whether temporary, preliminary or permanent) that would restrain or prevent the occurrence of the consummation of the Transactions prior to the Outside Date; and (v) taking, or causing to be taken, all other actions and doing, or causing to be done, all other things necessary, proper or advisable to consummate and make effective the Transactions, including taking all such further action as may be necessary to resolve such objections, if any, as the United States Federal Trade Commission (the "**FTC**"), the Antitrust Division of the United States Department of Justice (the "**DOJ**"), state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction, including the Philippine Competition Commission, the Mexican Federal Economic Competition Commission, the South African Competition Commission, the European Commission, MOFCOM, the Russian Federal Antimonopoly Office and the Turkish Competition Board, may assert under any Antitrust Law with respect to the Transactions.

(e)     The Plan Sponsor shall have the right to direct all matters with any Governmental Authority relating to any antitrust matter in a manner consistent with its obligations under this Agreement. In addition, the Plan Sponsor shall have the principal responsibility for devising and implementing the strategy for obtaining any necessary antitrust clearance and shall take the lead in all meetings and communications with any Governmental Authority in connection with obtaining any necessary antitrust clearances consistent with its obligations under this Agreement. Notwithstanding the foregoing, the Plan Sponsor will consult with Sellers with respect to antitrust matters on a regular basis and consider, in good faith, any comments or proposals from Sellers with respect thereto.

(f)     In furtherance and not in limitation of the foregoing, Sellers and the Plan Sponsor agree to (i) make an appropriate filing of a Notification and Report Form with the FTC and the DOJ pursuant to the HSR Act (the "**HSR Filings**") (and to make such other filings as are required by any foreign Governmental Authority (including the Philippine Competition Commission, the Mexican Federal Economic Competition Commission, the South African Competition Commission, the European Commission, MOFCOM, the Russian Federal Antimonopoly Office and the Turkish Competition Board) under applicable Antitrust Law) with respect to the Transactions as promptly as practicable (and with respect to the HSR Filings, within twenty (20) Business Days) after the date hereof, (ii) supply as promptly as practicable any additional information and documentary material that may be requested during the initial waiting period under the HSR Act or any other Antitrust Laws, (iii) in the event such Party receives any request for additional information issued by the FTC or the DOJ under the HSR Act and similar requests issued by any foreign Governmental Authority under other Antitrust Laws, comply with such requests as promptly as practicable and (iv) use its reasonable best efforts to

take or cause to be taken all actions necessary, proper or advisable consistent with this Section 7.4 to cause the expiration or early termination of the applicable waiting periods under the HSR Act and other applicable Antitrust Laws. The Plan Sponsor and Sellers agree that without the prior written consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed), it shall not, and shall cause its Representatives not to, take any action that will have or may have the effect of extending any waiting period under the HSR Act or other Antitrust Law. The Plan Sponsor and Sellers shall each pay one half of all filing fees or other payments to any Governmental Authority in connection with any filings under the HSR Act or such other filings as may be required under any other applicable Antitrust Law.

(g)     In furtherance and not in limitation of the foregoing, Sellers and the Plan Sponsor agree to (i) fully cooperate and consult with each other with respect to any filings or submissions to any Governmental Authority and (ii) keep each other fully informed as to the progress of any filings or submissions to any Governmental Authority. For the avoidance of doubt, prior to any filing or submission being made, the filing Party shall provide to the other Party a draft of the proposed filing or submission (with necessary redactions under applicable Antitrust Laws), and consider in good faith any comments reasonably made by the other Party with respect to such draft, provided, however, that neither Party shall be required to provide the other Party with documents submitted to the FTC, DOJ or any foreign Governmental Authority that relate to valuation of the Transactions. To the extent permitted by any Governmental Authority, Sellers and the Plan Sponsor shall provide the other Party with the opportunity to participate in any material meeting and shall keep the other Party apprised of all material discussions with any Governmental Authority with respect to any filings, investigation or other inquiry in connection with the Transactions; provided, however, that the Plan Sponsor, in its sole discretion, may have material discussions with any Governmental Authority without the participation of Sellers, if having such discussions will further the objective of obtaining any necessary antitrust clearance as provided herein.

(h)     Actions or agreements required of the Plan Sponsor pursuant to this Section 7.4 shall under no circumstances be considered a Material Adverse Effect. For the avoidance of doubt, the Plan Sponsor must take any and all steps necessary to consummate the Transactions, including divesting or agreeing to divest assets (including those of the Plan Sponsor and those to be acquired by the Plan Sponsor in the Transactions) to third parties in a manner acceptable to the FTC and DOJ, and any other applicable Governmental Authority. For the avoidance of doubt, there shall be no adjustment to the Purchase Price or any other payment obligation of the Plan Sponsor under this Agreement due to any divestiture or requirement to divest. The proceeds of any such divesture received by any Seller, net of all related expenses and an amount of any Taxes that would not have been paid or incurred by Sellers but for such divestiture or requirement to divest, shall be paid to the Plan Sponsor.

7.5     Bankruptcy Court Filings and Approvals.

(a)     Sellers and the Plan Sponsor acknowledge that the Transactions are subject to Bankruptcy Court approval.

(b)     As soon as reasonably practicable, but no later than November 15, 2017, Sellers shall file the Plan and a disclosure statement with respect to the Plan, which disclosure

statement shall be in a form and substance reasonably acceptable to the Plan Sponsor (the "**Disclosure Statement**"), with the Bankruptcy Court, along with the Solicitation Procedures Motion.

(c)    The Plan Sponsor shall promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Confirmation Order, including a finding of adequate assurance of future performance by the Plan Sponsor, including by furnishing affidavits or other non-confidential documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Plan Sponsor under this Agreement.

(d)    In the event an appeal is taken, or a stay pending appeal is requested, from the Confirmation Order, Sellers shall promptly notify the Plan Sponsor of such appeal or stay request and shall promptly provide to the Plan Sponsor a copy of the related notice of appeal or order of stay.  Sellers shall use reasonable best efforts to defend any such appeal.

(e)    After entry of the Confirmation Order, Sellers shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Confirmation Order.

(f)    To the extent reasonably practicable, prior to filing any material pleadings, motions or other document in the Bankruptcy Cases that relates, in material part, to this Agreement, Sellers shall (i) provide a copy thereof to the Plan Sponsor and its counsel, (ii) provide the Plan Sponsor and its counsel a reasonable opportunity to review and comment on such document, and any amendment or supplement thereto and (iii) reasonably consider any reasonable comments of the Plan Sponsor and its counsel, as determined in the sole discretion of Sellers and their counsel, into such document and any amendment or supplement thereto that are consistent with the terms of this Agreement and the Transactions.

(g)    Sellers shall provide notice in accordance with the Notice Protocol.

7.6    Further Assurances; Separation of PSAN Assets.

(a)    Sellers and the Plan Sponsor shall use their respective reasonable best efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.  The Plan Sponsor shall fully cooperate with Sellers and take all actions that may be reasonably necessary in connection with the separation of Sellers' PSAN Inflator Business from the Business (including any necessary assistance in amending or modifying any Contract of an Acquired Subsidiary, Purchased Contract or Excluded Contract). Sellers and the Plan Sponsor shall use their commercially reasonably efforts to consummate the Transactions and the separation of Sellers' PSAN Inflator Business in a manner that minimizes adverse Tax consequences.

(b)    Without limiting the generality of Section 7.6(a), neither the Plan Sponsor nor any Seller shall take any action, or permit any of their respective Subsidiaries to take any action, to materially diminish the ability of a Party to consummate, or materially delay a Party's ability to consummate, the Transactions, including any action that is intended or would

94

reasonably be expected to result in any of the conditions to a Party's obligations to consummate the Transactions set forth in Article IX to not be satisfied.

(c)     If at any time on or after December 31, 2017, the Parties and the Requisite Consenting OEMs (as such term is defined in the Accommodation Agreement) reasonably believe that the U.S. Closing is not likely to occur on or prior to the Outside Date the Parties and the Consenting OEMs shall negotiate in good faith for a reasonable period of time, not to exceed the Outside Date, in an effort to agree upon a mutually acceptable alternative transaction structure designed to achieve a more expedited closing.

7.7     Confidentiality.

(a)     The Plan Sponsor acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 7.1, and the consummation of the Transactions, is subject to the terms of the confidentiality agreement between TKJP and KSS Holdings dated July 20, 2016 (as amended the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference.  Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that the Plan Sponsor acknowledges that any and all other Confidential Information provided to them shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

(b)     On and after the Closing Date, Sellers and each of their respective Affiliates and Representatives shall maintain in confidence and not use or disclose to any third party any confidential or proprietary information regarding the Business or the Purchased Assets or Assumed Liabilities (including any information constituting Purchased Assets).  To the extent that any former Representative of Sellers or their Affiliates is subject to a confidentiality agreement with such Party with respect to confidential information subject to this Section 7.7, such Party shall, and shall cause its respective Affiliates to, enforce such confidentiality obligations and not waive such rights or release such former Representative from its obligations with respect thereto, and, to the extent reasonably practicable, enable and allow the Plan Sponsor to enforce such rights directly.

(c)     Sellers shall, and shall cause Sellers' Affiliates, within ninety (90) days after the U.S. Closing, notify the Plan Sponsor of, and provide copies of any software, proprietary Technology and other Purchased Intellectual Property that remain in its possession or control and, upon written confirmation from the Plan Sponsor, Sellers shall, and shall cause Sellers' Affiliates to, promptly purge any copies of any Purchased Intellectual Property in their possession or control, other than such Purchased Intellectual Property that either (i) is licensed to Sellers pursuant to the Intellectual Property License Agreement or (ii) copies of which are required to be retained in connection with current litigation matters or to comply with court orders.  Notwithstanding the foregoing, Sellers shall not be required to remove copies of Purchased Intellectual Property on back-up and disaster recovery media which would require significant effort to selectively purge, provided, that Sellers shall not, and shall not allow any other Person, to make any use of such copies, and shall permanently purge or destroy such copies

WEIL:\96035900\75\76903.0003

on any media once such media is to be reused or discarded, whichever occurs earlier, and Sellers shall remain responsible for protecting such media from any use or disclosure.

(d)     The covenants and undertakings contained in this <u>Section 7.7</u> relate to matters which are of a special, unique and extraordinary character and a violation of any of the terms of this <u>Section 7.7</u> will cause irreparable injury to the Party harmed by such violation, the amount of which will be impossible to estimate or determine and which cannot be adequately compensated.  Therefore, each Party will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction in the event of any breach of this <u>Section 7.7</u>.  The rights and remedies provided by this <u>Section 7.7</u> are cumulative and in addition to any other rights and remedies which a Party may have hereunder or at law or in equity.

7.8     <u>Preservation of Records</u>.  Sellers and the Plan Sponsor agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of the lesser of (i) six (6) years from the Closing Date and (ii) the duration of the operations of Reorganized Takata as contemplated by the Plan, and shall make such records and personnel available to the other as may reasonably be required by such Party in connection with, among other things, any insurance claims by, Legal Proceedings against or governmental investigations of Sellers or the Plan Sponsor or any of their Affiliates or in order to enable Sellers or the Plan Sponsor to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers or the Plan Sponsor wish to destroy such records before or after that time, such Party shall first give ninety (90) days written prior notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice. With respect to Tax matters, Sellers and the Plan Sponsor agree that each of them shall retain all books and records held by each of them or their Affiliates with respect to Tax matters pertinent to the Business or any Purchased Asset relating to any Tax period (or portion thereof) beginning before the Closing Date until the expiration of the applicable statute of limitations of the respective Tax period or Tax matter and abide by all record retention agreements entered into with any Tax Authority.

7.9     <u>Publicity</u>.  Neither Sellers nor the Plan Sponsor shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of the Plan Sponsor or Sellers, disclosure is otherwise required by applicable Law or by order of the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which the Plan Sponsor or Sellers lists securities; <u>provided</u> that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof; <u>provided</u>, <u>further</u>, that the foregoing shall not restrict press releases or other public announcements made by the Plan Sponsor and its Affiliates after the Closing Date related to the Business or the Plan Sponsor's acquisition thereof.

7.10     <u>Use of Name</u>.

(a)     The Plan Sponsor agrees that (i) subject to Section 7.10(a)(ii), after the Closing Date neither the Plan Sponsor nor any of its Affiliates shall have any rights in or to the Sellers' Marks (as defined below), (ii) it shall as promptly as reasonably practicable after the Closing Date but in no event later than twenty-four (24) months following the Closing Date (the "**Phase-Out Period**"), cease to make any use of any Marks, identifying symbols, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or Mark confusingly similar thereto and any other Mark, in each case, to the extent included in the Seller Retained IP (collectively, the "**Sellers' Marks**"), including in any corporate or other legal name and (iii) without limiting Section 7.10(a)(ii), immediately after the U.S. Closing, cease to hold itself out as having any affiliation with Sellers or any of their Affiliates.  In furtherance thereof, as promptly as practicable but in no event later than the conclusion of the Phase-Out Period, the Plan Sponsor shall remove, strike over or otherwise obliterate all Sellers' Marks from all customer- and public-facing materials, including any vehicles, machinery, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, Software and other materials.  Following the end of the Phase-Out Period, if Sellers discover any incident of usage of Sellers' Marks by the Plan Sponsor or its Affiliates in violation of this Section 7.10(a), promptly upon receipt of notice from Sellers, the Plan Sponsor shall or shall cause their Affiliates, as applicable, to promptly destroy or re-label the relevant materials incorporating Sellers' Marks.  For purposes of clarity, nothing in this Section 7.10(a) shall prohibit any uses of Sellers' Marks by the Plan Sponsor that are required under applicable Law or any nominative uses of Sellers' Marks to refer to Sellers and that would not cause confusion as to the origin of a good or service, and references to Sellers' Marks in historical, tax, and similar records.

(b)     Sellers agree that (i) subject to Section 7.10(b)(ii), after the Closing Date neither Sellers nor any of their Affiliates shall have any rights in or to Former Sellers' Marks, (ii) they shall as promptly as reasonably practicable after the Closing Date, but in no event later than the Phase-Out Period, cease to make any use of any Marks included in the Purchased Intellectual Property, identifying symbols, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or Mark confusingly similar thereto and any other Mark, in each case, to the extent not included in the Seller Retained IP (collectively, the "**Former Sellers' Marks**"), including in any corporate or other legal name and (iii) without limiting Section 7.10(b)(ii), immediately after the U.S. Closing, cease to hold itself out as having any affiliation with Plan Sponsor or any of its Affiliates or the Business.  In furtherance thereof, as promptly as practicable but in no event later than the conclusion of the Phase-Out Period, Sellers shall remove, strike over or otherwise obliterate all Former Sellers' Marks from all customer- and public-facing materials, including any vehicles, machinery, business cards, schedules, stationery, packaging materials, displays, signs, promotional materials, manuals, forms, Software and other materials.  Following the end of the Phase-Out Period, if the Plan Sponsor discovers any incident of usage of Former Sellers' Marks by Sellers or any of their Affiliates in violation of this Section 7.10(b), promptly upon receipt of notice from the Plan Sponsor, Sellers shall or shall cause their Affiliates, as applicable, to promptly destroy or re-label the relevant materials incorporating Former Sellers' Marks.  For purposes of clarity, nothing in this Section 7.10(b) shall prohibit any uses of Former Sellers' Marks by Sellers that are required or otherwise not prohibited under applicable Law, including uses of Former Sellers' Marks not in commerce, uses that would not cause confusion as to the origin of a good or service, and references to Former Sellers' Marks in historical, tax, and similar records.

WEIL:\96035900\75\76903.0003

7.11    <u>Competing Transaction</u>.    This Agreement is subject to approval by the Bankruptcy Court and, solely to the extent and for such time as required by the Bankruptcy Code and other applicable Law, remains subject to the consideration by Sellers of Superior Proposals in accordance with this <u>Section 7.11</u>:

(a)    Sellers shall immediately cease any discussions or negotiations with any parties that may be ongoing with respect to any Alternative Transaction Proposal, shall terminate access to any virtual data room or other source of confidential information, and shall seek to have returned to Sellers any confidential information that has been provided in any such discussions or negotiations.  Unless otherwise ordered by the Bankruptcy Court, from the date hereof until the Closings have occurred, Sellers shall not, and shall cause their respective Affiliates and Representatives not to, directly or indirectly, (i) solicit, initiate or knowingly encourage, or take any other action designed to facilitate, any inquiries or the making of any proposal which constitutes, or may reasonably be expected to lead to, an Alternative Transaction Proposal, (ii) engage in any discussions or negotiations regarding any Alternative Transaction Proposal, (iii) provide any confidential information or data to any Person in relation to an Alternative Transaction Proposal, (iv) approve or recommend, or propose publicly to approve or recommend, any Alternative Transaction Proposal or (v) approve or recommend, or propose publicly to approve or recommend, or execute or enter into, any letter of intent, agreement in principle, merger agreement, acquisition agreement, business combination agreement, option agreement or other similar agreement related to any Alternative Transaction Proposal (excluding any confidentiality agreements entered into in connection with any Alternative Transaction Proposal that constitutes, or would reasonably be expected to result in, a Superior Proposal) or propose publicly or agree to do any of the foregoing related to any Alternative Transaction Proposal; <u>provided</u>, <u>however</u>, that (x) Sellers may ascertain facts from the party making such Alternative Transaction Proposal for the sole purpose of Sellers' informing themselves about the Alternative Transaction Proposal and the party that made it and (y) if, following the receipt of an Alternative Transaction Proposal, Sellers determine in good faith, after consultation with outside advisors, that such Alternative Transaction Proposal constitutes, or would reasonably be expected to result in, a Superior Proposal and a failure to take action with respect to such Alternative Transaction Proposal would be inconsistent with the Bankruptcy Code or other applicable Law (including the fiduciary duties of the applicable board of directors), Sellers may, in response to such Alternative Transaction Proposal, subject to compliance with <u>Section 7.11(b)</u>, (i) furnish information with respect to Sellers to the party making such Alternative Transaction Proposal and its respective Representatives pursuant to a confidentiality agreement that contains provisions not less favorable to Sellers than those contained in the Confidentiality Agreement; <u>provided</u> that (A) such confidentiality agreement may not include any provision calling for an exclusive right to negotiate with Sellers and (B) Sellers shall advise Plan Sponsor of all such nonpublic information delivered to such party substantially concurrently with its delivery to such party, and shall provide the Plan Sponsor with copies of any such information not previously provided to the Plan Sponsor and (ii) engage in discussions or negotiations with such party and its Representatives regarding such Alternative Transaction Proposal.  Sellers shall not waive or fail to enforce any provision of any confidentiality or standstill agreement to which they are a party relating to a potential or actual Alternative Transaction Proposal unless Sellers determine in good faith, after consultation with outside legal counsel, that the failure to do so would be inconsistent with the Bankruptcy Code or other applicable Law (including the fiduciary duties of the applicable board of directors).

(b)  Sellers shall advise the Plan Sponsor orally and in writing within 24 hours following receipt by any Representative of Sellers or of Sellers' Affiliates of (i) any Alternative Transaction Proposal, (ii) any request for nonpublic information relating to any Affiliate of Sellers or access to the properties, books or records of any Affiliate of Sellers, other than requests in the Ordinary Course of Business and unrelated to an offer or proposal relating to an Alternative Transaction, or (iii) any inquiry or request for discussions or negotiations regarding an offer or proposal relating to an Alternative Transaction.  Sellers shall promptly (and in any event within 24 hours) provide the Plan Sponsor with a copy (if in writing) or, if made orally, a summary of the material terms of any such offer or proposal or request, in each case including the identity of the person making or considering such offer or proposal or making such request, and shall keep the Plan Sponsor apprised of any material developments, discussions and negotiations on a reasonably current basis (and in any event within 24 hours).

(c)  Notwithstanding anything in this Agreement to the contrary, prior to entering into an agreement in connection with any Superior Proposal, Sellers shall have (i) provided prior written notice to the Plan Sponsor, at least forty-eight (48) hours in advance (the "**Notice Period**"), of their intention to take such action with respect to such Superior Proposal, specifying the material terms and conditions of any such Superior Proposal (including the identity of the party proposing to effect such Superior Proposal) and furnishing to the Plan Sponsor a copy of the relevant proposed transaction agreements with the party proposing to effect such Superior Proposal and other material documents and (ii) during the Notice Period, and in any event prior to taking such action, negotiated, and have caused their financial and legal advisors to negotiate, with the Plan Sponsor in good faith (to the extent the Plan Sponsor desires to negotiate) to make such adjustments in the terms and conditions of this Agreement so that such proposal or offer for an Alternative Transaction ceases to constitute a Superior Proposal. The foregoing shall apply with respect to any and all subsequent bids and proposals as well.

7.12  PSAN Assets.

(a)  Schedule 7.12 sets forth the book value of the PSAN Assets listed thereon as of March 31, 2017. Following the date hereof, Sellers shall be permitted to update Schedule 7.12 to identify any assets that are no longer PSAN Assets (as determined in good faith by Sellers) ("**Former PSAN Assets**").  No fewer than ten (10) Business Days prior to the U.S. Closing, Sellers shall deliver a final Schedule 7.12, which shall identify all Former PSAN Assets as of the Closing Date and the aggregate book value thereof (the "**Aggregate Former PSAN Asset Book Value**").  All Former PSAN Assets shall constitute Purchased Assets at the Closing and, for the avoidance of any doubt, no additional consideration shall be paid at the U.S. Closing in respect of the Aggregate Former PSAN Asset Book Value.

(b)  From time to time, as Reorganized Takata determines that any PSAN Assets set forth on Schedule 7.12 are no longer needed (as determined in good faith by its Oversight Committee (including the affirmative vote of the Independent Member of its Oversight Committee) based upon then-anticipated production requirements of PSAN Consenting OEMs (as such term is defined in the Plan) as inflator production is transitioned from PSAN to GuNi or another alternative propellant, or is otherwise no longer needed), Reorganized Takata may deliver a written notice of sale to the Plan Sponsor with respect to such PSAN Assets.  The closing of the purchase and sale of such PSAN Assets shall occur within thirty (30) Business

Days following delivery of such notice. At each such closing, the Plan Sponsor shall pay to an account designated by Reorganized Takata cash in an amount equal to the net book value of such PSAN Assets as set forth opposite such assets on <u>Schedule 7.12</u>, and the parties shall execute and deliver customary documentation to evidence and effect the transfer of such PSAN Assets, the form and substance of which shall be reasonably acceptable to the parties thereto; <u>provided</u>, <u>however</u>, that if and to the extent that the Plan Sponsor makes any PSAN Assets Advance Payment, then such PSAN Assets Advance Payment shall be treated as an advance payment of, and shall be credited against, any amount required to be paid by the Plan Sponsor pursuant to this <u>Section 7.12</u>; <u>provided</u>, <u>further</u>, that the Plan Sponsor shall be permitted to set-off any debt, liability or other payment obligations of Reorganized Takata to the Plan Sponsor or any of its Affiliates (solely to the extent the applicable amount is not in dispute) as a credit against the purchase price otherwise payable hereunder in respect of such PSAN Assets. For the avoidance of doubt, (i) Reorganized Takata may deliver one or more notices pursuant to this <u>Section 7.12(b)</u> and (ii) the Plan Sponsor shall not purchase or otherwise acquire Warehoused PSAN Assets or contracts with PSAN Consenting OEMs for the manufacture and sale of PSAN Inflators.

(c)    On the fifth (5th) anniversary of the Closing Date, or on such earlier date that Reorganized Takata ceases operations with respect to the PSAN Assets, Reorganized Takata shall deliver a written notice to the Plan Sponsor with respect to any of the PSAN Assets listed on <u>Schedule 7.12</u> that have not been transferred and sold to the Plan Sponsor as of such date and for which no notice of sale has been delivered pursuant to <u>Section 7.12(b)</u>. The closing of the purchase and sale of such PSAN Assets shall occur within thirty (30) Business Days following delivery of such notice. At each such closing, the Plan Sponsor shall pay to an account designated by Reorganized Takata cash in an amount equal to the net book value of such PSAN Assets as set forth opposite such assets on <u>Schedule 7.12</u>, and the parties shall execute and deliver customary documentation to evidence and effect the transfer of such PSAN Assets, the form and substance of which shall be reasonably acceptable to the parties thereto; <u>provided</u>, <u>however</u>, that if and to the extent that the Plan Sponsor makes any PSAN Assets Advance Payment, then such PSAN Assets Advance Payment shall be treated as an advance payment of, and shall be credited against, any amount required to be paid by the Plan Sponsor pursuant to this <u>Section 7.12</u>; <u>provided</u>, <u>further</u>, that the Plan Sponsor shall be permitted to set-off any debt, liability or other payment obligations of Reorganized Takata to the Plan Sponsor or any of its Affiliates (solely to the extent the applicable amount is not in dispute) as a credit against the purchase price otherwise payable hereunder in respect of such PSAN Assets.

(d)    For purposes of this <u>Section 7.12</u>, "PSAN Assets" shall include the TCX Transferred Assets following the acquisition of such assets by New China Company pursuant to <u>Section 7.20(d)</u>.

7.13    <u>Wrong Pocket</u>.  If Sellers receive any payment related to any Purchased Asset after the U.S. Closing, Sellers agree to promptly remit (or cause to be promptly remitted) such funds to the Plan Sponsor to the extent related to such Purchased Asset, and the Plan Sponsor shall reimburse Sellers for their reasonable expenses incurred in connection therewith. If the Plan Sponsor or any Affiliate of the Plan Sponsor receives any payment related to any Excluded Asset after the U.S. Closing, the Plan Sponsor agrees to promptly remit (or cause to be promptly

100

remitted) such funds to Sellers to the extent related to such Excluded Asset, and Sellers shall reimburse the Plan Sponsor for its reasonable expenses incurred in connection therewith.

7.14    <u>Rule 11 Plea Agreement</u>.  Pursuant to that certain Rule 11 Plea Agreement, dated January 13, 2017, entered into by TKJP and the DOJ (the "**Plea Agreement**"), the Parties hereby agree to use commercially reasonable efforts to secure written agreements with the DOJ with respect to the matters set forth on <u>Schedule 9.1(o)</u>.

7.15    <u>Financing</u>.  The Plan Sponsor shall keep Sellers informed on a reasonably current basis in reasonable detail of the status of its efforts to arrange the Financing and shall not permit any amendment or modification to be made to the Commitment Letters without the prior written consent of Sellers if such amendment or modification would or would reasonably be expected to (i) materially delay or prevent the U.S. Closing, (ii) reduce the aggregate amount of the Financing from that contemplated by the Commitment Letters as in effect on the date of this Agreement in a manner that would adversely impact the Plan Sponsor's ability to pay, or cause to be paid, the Purchase Price on the Closing Date (unless the Equity Source has made a corresponding shareholder loan or increase to its commitment under the Equity Commitment Letter), (iii) impose new or additional conditions or otherwise expand, amend or modify any of the conditions to the receipt of the Financing in a manner materially adverse to the Plan Sponsor, (iv) adversely affect the ability of the Plan Sponsor to satisfy its obligations under this Agreement, or (v) adversely impact the ability of the Plan Sponsor to enforce its rights against the other parties to the Commitment Letters, it being understood that notwithstanding the foregoing, the Plan Sponsor may amend any Debt Commitment Letter to add lenders, lead arrangers, bookrunners, syndication agents or similar entities who had not executed such Debt Commitment Letter as of the date of this Agreement and to change the syndicate banks and the borrower or borrowers.   The Plan Sponsor shall provide notice to Sellers promptly upon receiving the Debt Financing and shall furnish true and correct copies of all documents with respect thereto to Sellers promptly upon their execution; <u>provided</u> that the fee letters may be redacted to remove economic terms. Upon any amendment or modification of the Commitment Letters in accordance with this <u>Section 7.15</u>, the Plan Sponsor shall furnish true, correct and complete copies of the definitive agreements with respect thereto to Sellers promptly upon their execution, and (i) references herein to "Debt Commitment Letter" and "Equity Commitment Letter" shall, in each case, include such document as amended or modified and (ii) references to "Debt Financing" and "Equity Financing" shall include the financing contemplated by the Debt Commitment Letter and the Equity Commitment Letter, respectively, as so amended. The Plan Sponsor acknowledges and agrees that its obligations to consummate the Global Transactions are not conditioned or contingent upon receipt of the Financing. The Plan Sponsor shall use its reasonable best efforts to cause the Debt Financing Sources to fund the Debt Financing on the Closing Date and shall diligently and in good faith enforce its rights under the Debt Commitment Letters. In the event that the Debt Financing becomes unavailable, the Plan Sponsor shall use its reasonable best efforts to obtain alternative debt financing (such financing, "**Alternative Financing**") in amounts necessary, together with the other consideration contemplated under this Agreement, to consummate the Transactions on terms not materially less beneficial to the Plan Sponsor, in the aggregate, than the Debt Commitment Letters as in effect on the date hereof; <u>provided</u>, that such Alternative Financing shall not, without the prior written consent of Sellers, have conditions to funding that are more expansive in any material respect than those set forth in the Debt Commitment Letter.

7.16    Cooperation.

(a)    From the date of this Agreement until the Closing Date, Sellers shall provide, shall cause each other Seller Entity to provide, and shall use reasonable best efforts to cause their respective Representatives to provide, on a timely basis, such cooperation as is reasonably required and customary in connection with the arrangement of the Debt Financing (or the issuance of debt securities in lieu thereof or any other permitted alternative financing), which cooperation may include using commercially reasonable efforts to: (i) upon reasonable advance notice, participate in a reasonable number of due diligence sessions with prospective Debt Financing Sources and their Representatives, and provide reasonable access to documents and other information in connection with customary due diligence investigations; (ii) upon reasonable advance notice, participate (including making members of management, with appropriate seniority and expertise, and other necessary representatives of the Seller and the Seller Entities available) in a reasonable number of requested meetings, presentations and road shows (including one-on-one meetings with the parties acting as lead arrangers or agents for, and prospective lenders and purchasers of, the Debt Financing or Alternative Financing) in connection with the syndication or other marketing of the Debt Financing or any debt securities issued in lieu thereof; (iii) reasonably assisting (including participating in drafting sessions) with the preparation of materials, in each case to the extent such materials relate to information concerning any Seller Entity for rating agency presentations, lender presentations, offering documents, private placement memoranda, bank information memoranda and similar documents customarily required in connection with the Debt Financing or any debt securities issued in lieu thereof; (iv) furnishing the Plan Sponsor with information required and reasonably requested in writing by the parties acting as lead arrangers for, or lenders under, the Debt Financing at least ten (10) Business Days prior to the Closing Date under applicable "know your customer" and anti-money laundering rules and regulations; (v) assisting the Plan Sponsor in obtaining accountants' comfort letters, including customary "negative assurance" comfort from Sellers' independent accountants on customary terms; (vi) cooperating with the Plan Sponsor and the Plan Sponsor's efforts to obtain customary corporate, facilities and securities ratings; (vii) providing customary authorization letters to the arrangers in respect of the Debt Financing authorizing the distribution of information to prospective lenders; (viii) cooperating with reasonable requests of the Plan Sponsor's and/or the Debt Financing Sources' legal counsel in connection with any legal opinions that such legal counsel may be required to deliver in connection with the Debt Financing or the Alternative Financing; (ix) providing and, if applicable, executing customary documents relating to the repayment of the Repaid Indebtedness of the Acquired Subsidiaries and the release of related encumbrances, including customary payoff letters and evidence that notice of such repayment has been timely delivered to the holders of such Repaid Indebtedness; (x) satisfying the conditions precedent set forth in the Debt Commitment Letters or any definitive documentation relating to the Debt Financing or any Alternative Financing to the extent the satisfaction of such conditions requires the cooperation of or is within the control of Sellers, the Seller Entities or their respective Affiliates, including causing officers of Sellers, the Seller Entities and their respective Affiliates to execute agreements, documents or certificates reasonably requested by the Plan Sponsor that facilitate the creation, perfection or enforcement of encumbrances securing the Debt Financing or the Alternative Financing (including original copies of all certificated securities (with transfer powers executed in blank), control agreements, perfection certificates, landlord consents and access letters) as are requested by the Plan Sponsor, its Subsidiaries or their Debt Financing

102

Sources (provided that no obligation under any such agreement, document or certificate shall be effective until the Closing); and (xi) cooperating with the Debt Financing Sources' due diligence investigation to the extent reasonable and not unreasonably interfering with the business.

(b)     Notwithstanding anything in this Agreement to the contrary, (i) no Seller Entity (prior to the U.S. Closing) shall be required to pay any commitment or other similar fee, provide any indemnitees, incur or reimburse any costs or expenses or incur any other liability or obligation of any kind in connection with the Financing (including any cooperation obligations described in <u>Section 7.16(a)</u>), (ii) no Seller Entity (prior to the U.S. Closing) shall be required to execute, enter into or perform any binding agreement or commitment, or adopt any resolution or otherwise take any corporate or similar action or deliver any certificate, in connection with the Financing (other than customary authorization letters pursuant to <u>Section 7.16(a)</u>) and (iii) nothing shall obligate any Seller Entity to provide, or cause to be provided, any legal opinion or to provide, or cause to be provided, any information or take, or cause to be taken, any action to the extent doing so could reasonably be expected to result in (x) a violation of applicable Law, any Seller Entity's organizational documents or any Contract binding on any Seller Entity or any confidentiality obligations binding on any Seller Entity or (y) the loss of any attorney-client privilege. The cooperation of the Seller Entities shall not unreasonably interfere with ongoing operations of the Seller Entities or otherwise materially impair the ability of any Representatives of the Seller Entities to carry out its duties to the Seller Entities.

(c)     All non-public or otherwise confidential information obtained by the Plan Sponsor, its Representatives or its Debt Financing Sources pursuant to this <u>Section 7.16</u> shall be kept confidential in accordance with the Confidentiality Agreement, except that the Plan Sponsor shall be permitted to disclose such information to the Debt Financing Sources, rating agencies and prospective lenders and investors during syndication of the Debt Financing or any permitted replacement, amended, modified or alternative financing subject to the ratings agencies and prospective lenders and investors entering into customary confidentiality undertakings reasonably satisfactory to Sellers with respect to such information (including through a notice and undertaking in a form customarily used in confidential information memoranda for senior credit facilities), and to potential investors in a customary offering memorandum and related materials used in connection with an offering of debt securities used to finance the consummation of the Transactions.

(d)     Plan Sponsor shall reimburse the Seller Entities for all reasonable and documented out-of-pocket expenses (including reasonable outside attorneys' fees) incurred by the Seller Entities in connection with the assistance required by this <u>Section 7.16</u> (the "**Cooperation Expenses**"); <u>provided</u>, <u>however</u>, that such reimbursement shall be paid as a credit against Sellers' Expense Reimbursement obligations set forth in <u>Section 4.6</u> and <u>Section 7.21</u>. In the event that (i) the Cooperation Expenses exceed Sellers' Expense Reimbursement obligations set forth in <u>Section 4.6</u> and <u>Section 7.21</u>, or (ii) this Agreement is terminated for any reason other than those specified as giving rise to any Expense Reimbursement obligations pursuant to <u>Section 4.6</u>, the Plan Sponsor shall promptly reimburse the Seller Entities for the amount of Cooperation Expenses due and payable following the Closing or termination of this Agreement, as applicable.

7.17    <u>Termination of Affiliate and Intercompany Agreements</u>.

(a)     Except (i) as set forth on Schedule 7.17(a), (ii) as provided below in this Section 7.17, or (iii) as otherwise determined by the Plan Sponsor, Sellers shall (and shall cause their applicable controlled Affiliates to) cause all Affiliate Transactions to be terminated prior to the Closing Date, and all Liabilities thereunder shall be satisfied prior to the Closing Date with no residual Liabilities or other obligations (including payment obligations) applicable against the Acquired Subsidiaries, the Plan Sponsor or any entity acquired by the Plan Sponsor or any Affiliate thereof pursuant to any Cross-Conditioned Agreement; provided, that the Plan Sponsor shall consider in good faith any requests by Sellers not to terminate such Affiliate Transactions.

(b)     No later than ten (10) days after the date hereof, Sellers shall provide to the Plan Sponsor a statement, as of September 30, 2017, true and correct in all material respects, of all Liabilities under guarantees, security, collateral, comfort letters, or similar instruments issued to any Seller or Retained Subsidiary or any third party, other than solely to secure Indebtedness that is owed by Acquired Subsidiaries or any Assumed Liabilities, that are applicable to any of the Acquired Subsidiaries or any entity to be acquired by the Plan Sponsor or any Affiliate of the Plan Sponsor pursuant to any Cross-Conditioned Agreement ("**Intercompany Guarantees**"). Except as otherwise determined by the Plan Sponsor, on or prior to December 15, 2017, in its sole discretion, Sellers shall (and shall cause their applicable controlled Affiliates to) cause all Intercompany Guarantees to be terminated at or prior to the Closing, and all Liabilities thereunder shall be satisfied at or prior to the Closing with no residual Liabilities or other obligations (including payment obligations) applicable against the Acquired Subsidiaries, the Plan Sponsor or any entity acquired by the Plan Sponsor or any Affiliate thereof pursuant to any Cross-Conditioned Agreement; provided, that the Plan Sponsor shall consider in good faith any requests by Sellers not to terminate such Intercompany Guarantees.

(c)     No later than ten (10) days after the date hereof, Sellers shall provide to the Plan Sponsor a statement, true and correct in all material respects, of all intercompany balances (other than Intercompany Guarantees) as of September 30, 2017 between (i) any Seller, on the one hand, and any other Seller or any seller under any of the Cross-Conditioned Agreements, on the other hand, (ii) any Seller, on the one hand, and any Retained Subsidiary or retained subsidiary under any of the Cross-Conditioned Agreements, on the other hand, (iii) any Retained Subsidiary, on the one hand, and any seller under any of the Cross-Conditioned Agreements, on the other hand, (iv) any Seller, on the one hand, and any Acquired Subsidiary or acquired subsidiary under any of the Cross-Conditioned Agreements, on the other hand, (v) any Retained Subsidiary, on the one hand, and any Acquired Subsidiary or acquired subsidiary under any of the Cross-Conditioned Agreements, on the other hand, (vi) any Acquired Subsidiary, on the one hand, and any seller under any of the Cross-Conditioned Agreements, on the other hand, (vii) any Acquired Subsidiary, on the one hand, and any retained subsidiary under any of the Cross-Conditioned Agreements, on the other hand, (viii) any Acquired Subsidiary, on the one hand, and any other Acquired Subsidiary or any acquired subsidiary under any of the Cross-Conditioned Agreements, on the other hand, and (ix) any Retained Subsidiary, on the one hand, and any other Retained Subsidiary or any retained subsidiary under any of the Cross-Conditioned Agreements, on the other hand (the intercompany balances described in subclauses (i) through (ix) above, the "**Intercompany Balances**"). The Plan Sponsor will evaluate all Intercompany Balances as promptly as reasonably practicable and will use commercially reasonable efforts to acquire at the Closing both the receivable portion and the payable portion of all Intercompany Balances; it being understood that the tax consequences, clawback risk and similar economic and

liability exposure impacts on the Plan Sponsor associated with acquiring any such Intercompany Balances shall be taken into account in determining commercial reasonableness, as well as the corresponding impacts on Sellers. The Plan Sponsor and Sellers shall jointly prepare a statement that sets forth the proposed treatment of all Intercompany Balances (the "**Intercompany Balances Proposal**") on or prior to December 4, 2017 to be submitted to the various appraisers engaged in connection with the TSAC Appraisal Amount, the EMEA Appraisal Amount and the Mexico Appraisal Amount, as applicable (collectively, the "**Appraisers**") (for the avoidance of doubt, the Plan Sponsor and Sellers shall not be deemed to have agreed on a treatment of Intercompany Balances by virtue of the Intercompany Balances Proposal for the purposes of Section 4.4(c)(iii) or Section 4.4(d)(xv)). To the extent Sellers and Plan Sponsor do not agree on an Intercompany Balances Proposal by December 4, 2017, Plan Sponsor shall have the right to submit its sole Intercompany Balances Proposal to the Appraisers. Following such preparation of the Intercompany Balances Proposal, the Plan Sponsor and Sellers shall engage in good faith discussions on the adjustment of Base Purchase Price as set forth in Section 3.1(b) based upon the Intercompany Balances Proposal and the related feedback from the Appraisers, and shall use commercially reasonable efforts to agree upon a mutually acceptable proposal, on or prior to December 15, 2017, with respect to the treatment of all Intercompany Balances (including identifying those Intercompany Balances that the Plan Sponsor will acquire and those that the Plan Sponsor will not acquire) (the "**Final Joint Proposal**"). Except for all such Intercompany Balances that the Plan Sponsor agrees to acquire in the Final Joint Proposal as provided above, Sellers shall (and shall cause their applicable controlled Affiliates to) cause all Intercompany Balances that affect the Plan Sponsor, any of the Acquired Subsidiaries or any entity acquired by the Plan Sponsor or any Affiliate of the Plan Sponsor pursuant to this Agreement or any Cross-Conditioned Agreement to be terminated at or prior to the Closing, and all Liabilities thereunder shall be satisfied at or prior to the Closing with no residual Liabilities or other obligations (including payment obligations) applicable against the Plan Sponsor, the Acquired Subsidiaries or any entity acquired by the Plan Sponsor or any Affiliate of the Plan Sponsor pursuant to this Agreement or any Cross-Conditioned Agreement; provided that the Plan Sponsor shall use commercially reasonable efforts to assist Sellers with the termination of any such Intercompany Balances not acquired by the Plan Sponsor so as to minimize any adverse effect thereof on Sellers.  For the avoidance of doubt, to the extent the Plan Sponsor agrees to acquire any accounts receivable corresponding to any Intercompany Balances, the Plan Sponsor shall also assume the applicable accounts payable corresponding to such Intercompany Balances, and vice versa.

(d)    Sellers and the Plan Sponsor will cooperate in good faith in the evaluation of the Intercompany Balances (including the provision of appropriate information by Sellers) and use their respective commercially reasonable efforts to minimize the aggregate economic impact from the resolution of the Intercompany Balances on both Sellers and the Plan Sponsor.  Sellers shall not (and shall cause their applicable controlled Affiliates not to) enter into or materially increase any Intercompany Balances after the date hereof, other than (i) Intercompany Balances in respect of transactions in the Ordinary Course of Business, (ii) Intercompany Balances that do not affect the Plan Sponsor, any of the Acquired Subsidiaries or any entity acquired by the Plan Sponsor or any Affiliate of the Plan Sponsor pursuant to this Agreement or any Cross-Conditioned Agreement, or (iii) with prior written consent of the Plan Sponsor (which consent shall not be unreasonably withheld, conditioned or delayed).

(e)      Each Seller shall cooperate with, and use its reasonable best efforts to assist, the other Sellers and the sellers under each of the Cross-Conditioned Agreements in fulfilling their respective obligations under this <u>Section 7.17</u> and the provisions comparable to <u>Section 7.17</u> of each of the Cross-Conditioned Agreements.

7.18    <u>Permits</u>.

(a)      Sellers and the Plan Sponsor shall cooperate with each other and, as promptly as practicable after the date of this Agreement, use reasonable best efforts to obtain the transfer, modifications, issuance or reissuance to the Plan Sponsor of all Permits used or held for use by Sellers in the Ordinary Course of Business. The Parties shall respond promptly to any requests for additional information made by such agencies, use their respective reasonable best efforts to participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer, modify, issue or reissue such Permits, and use respective reasonable best efforts to cause regulatory approval to be obtained at the earliest possible date after the date of filing. Each Party will bear its own costs of the preparation and review of any such filing. Sellers and the Plan Sponsor shall have the right to review in advance all characterizations of the information relating to the Transactions which appear in any filings to transfer the Permits and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

(b)      In the event that Sellers or the Plan Sponsor are unable, despite their respective reasonable best efforts, to obtain a transfer, modification, issuance, or reissuance of any Permit as of the Closing Date, the Plan Sponsor or its Affiliates may use the existing Permit issued to Sellers or any of their Affiliates, <u>provided</u> that (i) such use is not unlawful and it is expressly permitted under the applicable Law, (ii) the Plan Sponsor and Sellers continue to use reasonable best efforts to obtain a transfer, modification, issuance, or reissuance of such Permit after the Closing Date, and (iii) the Plan Sponsor indemnifies Sellers for any damages, losses, claims or penalties suffered by Sellers and shall hold Sellers harmless in connection with the Permit that is not transferred, modified, issued or reissued as of the Closing Date resulting from the Plan Sponsor's use of the existing Permit following the Closing Date.

(c)      In the event that any Permits are used or held for use by Sellers in connection with both the Business and the PSAN Inflator Business (such Permits, "**Shared Permits**"), the Parties shall cooperate with each other to determine, in good faith, whether it would be most practicable for Sellers to transfer, modify, or seek the issuance or reissuance of such Shared Permit to the Plan Sponsor and obtain a new Permit for use in connection with the PSAN Inflator Business, or for Sellers to retain such Shared Permit and the Plan Sponsor to obtain a comparable Permit, to the extent permitted under applicable Law.  In making such determination, the Parties shall consider in good faith all relevant factors, including (i) the costs and expenses of transferring or modifying such Shared Permit as compared to obtaining a new Permit (and the resulting impact on the other Party), (ii) the time required to transfer or modify a Shared Permit as compared to obtaining a new Permit, (iii) whether the Plan Sponsor already has a comparable Permit and (iv) any losses, claims or penalties that the Parties would suffer without an active Permit.  In the event that the Parties determine to transfer, modify, issue or reissue a Shared Permit, the Parties shall do so pursuant to the terms of <u>Sections 7.18(a)</u> and <u>(b)</u>. If the

106

Parties jointly determine in good faith that such transfer, modification, issuance or reissuance would be impracticable, Sellers shall be permitted to retain such Shared Permit.

(d)    In the event that (i) Sellers or the Plan Sponsor are unable, despite their respective reasonable best efforts, to obtain a transfer, modification, issuance or reissuance of any Permit as of the Closing Date and (ii) notwithstanding the provisions set forth elsewhere in this Agreement, the Plan Sponsor or its Affiliates are unable to use the existing Permit issued to Sellers or any of their Affiliates under applicable Law, the Parties agree that such event shall not itself be considered a breach or failure of any of the provisions of this Agreement so long as the inability to use an existing Permit could not reasonably be expected to cause a material adverse impact to Plan Sponsor or any Consenting OEM (including, for the avoidance of doubt, any material interruption in production or operations at an assembly facility or plant or any material disruption in the supply of Products to such Consenting OEM or the sale of such Consenting OEM's vehicles containing such Products). In such event, the Parties agree to negotiate in good faith an alternative option acceptable to the Consenting OEMs and the Parties in order not to delay the U.S. Closing.

7.19    <u>Global Settlement Agreement</u>.  Prior to the U.S. Closing, Sellers shall cause the applicable Acquired Subsidiaries to enter into and perform their respective obligations under the settlement and release agreement with the Consenting OEMs on the terms and subject to the conditions contemplated by the RSA and as set forth on <u>Exhibit G</u> hereto (the "**Global Settlement Agreement**").

7.20    <u>Certain Pre-Closing Restructurings</u>.

(a)    Prior to the Closing, (i) TK Holdings de Mexico, TK Mexico LLC and/or SMX shall, or shall cause one or more of their Affiliates approved by the Plan Sponsor to, incorporate a new Subsidiary in Mexico ("**New Mexico Trading Company**") for the purpose of acquiring all of SMX's right, title and interest in, to and under all assets of SMX that would constitute Purchased Assets if sold, transferred, assigned, conveyed and/or delivered directly to Plan Sponsor by SMX (collectively, "**SMX Transferred Assets**"), and assuming all liabilities and obligations of SMX that would otherwise constitute Assumed Liabilities (collectively, "**SMX Assumed Liabilities**"), (ii) SMX shall, and Sellers shall cause SMX to, contribute, sell, transfer, assign, convey and/or deliver, as applicable, to New Mexico Trading Company, all of SMX's right, title and interest in, to and under the SMX Transferred Assets, and (iii) Sellers and SMX shall cause New Mexico Trading Company to assume the SMX Assumed Liabilities, in each case, in a manner reasonably satisfactory to the Plan Sponsor, taking into account, in good faith, among other considerations, adverse Tax impacts, transactional costs and liability management. For the avoidance of any doubt, the shares of capital stock and any other Equity Interests of New Mexico Trading Company, including such Equity Interests that might be acquired by SMX pursuant to this <u>Section 7.20</u>, shall constitute Purchased Assets hereunder and the shares of capital stock and any other Equity Interests of SMX shall constitute Excluded Assets hereunder.

(b)    Prior to the U.S. Closing, Sellers shall cause Industrias and TK de Mexico to (i) contribute, sell, transfer, assign, convey and/or deliver, as applicable, to Equipo Automotriz Americana, S.A. de C.V. ("**Equipo**"), all of TK de Mexico's and Industrias' respective right, title

107

and interest in, to and under all assets of TK de Mexico and Industrias that would constitute Purchased Assets if contributed, sold, transferred, assigned, conveyed and/or delivered directly to Plan Sponsor by Industrias and TK de Mexico, respectively (collectively, "**TK de Mexico and Industrias Transferred Assets**"), and (ii) Equipo to assume all liabilities and obligations of TK de Mexico and Industrias that constitute Assumed Liabilities of TK de Mexico and Industrias if TK de Mexico and Industrias were Sellers hereunder, in each case, in a manner reasonably satisfactory to the Plan Sponsor, taking into account, in good faith, among other considerations, adverse Tax impacts, transactional costs and liability management. For the avoidance of any doubt, the shares of capital stock and any other Equity Interests of Equipo, including such Equity Interests that might be acquired by TK de Mexico and Industrias pursuant to this <u>Section 7.20</u>, shall constitute Purchased Assets hereunder and the shares of capital stock and any other Equity Interests of TK de Mexico and Industrias shall constitute Excluded Assets hereunder.

(c)     At the U.S. Closing, Sellers shall use reasonable best efforts to cause Takata (Shanghai) Automotive Component Co., Ltd. ("**TSAC**") to, directly or indirectly, sell, transfer, convey, assign and deliver to the Plan Sponsor all assets of TSAC that would constitute Purchased Assets of TSAC if TSAC were a Seller hereunder (collectively, "**TSAC Purchased Assets**"), and Plan Sponsor shall assume all liabilities and obligations of TSAC that would constitute Assumed Liabilities of TSAC if TSAC were a Seller hereunder (collectively, "**TSAC Assumed Liabilities**"), all pursuant to an agreement (the "**TSAC Purchase Agreement**") on terms that the parties determine in good faith to maximize the efficiency and value of such transfer and to manage liabilities in a manner reasonably acceptable to the parties and generally consistent with the terms and conditions set forth in this Agreement and the Cross-Conditioned Agreements.  In furtherance of the foregoing, Sellers shall, and shall cause their respective controlled Affiliates to, cooperate in good faith with the Plan Sponsor to determine the most efficient manner in which to, directly or indirectly, sell, transfer, convey, assign and deliver the TSAC Purchased Assets to the Plan Sponsor, and for the Plan Sponsor to assume the TSAC Assumed Liabilities. The purchase price to be paid for the TSAC Purchased Assets shall be the fair market value of the TSAC Purchased Assets, as determined by the Parties and subject to confirmation through delivery of a valuation report by an independent valuation firm, plus the assumption of the TSAC Assumed Liabilities, subject to adjustment in a manner consistent with the adjustments set forth in <u>Section 3.1</u> and subject to reduction, on a dollar-for-dollar basis, in respect of all accounts receivable of any non-Consenting OEM customers of TSAC, which shall be paid at the U.S. Closing (the "**TSAC Purchase Price**").  At the U.S. Closing, the Purchase Price payable hereunder shall be reduced by an amount equal to the TSAC Purchase Price as provided in <u>Section 3.1</u>. Notwithstanding the foregoing, in lieu of purchasing the TSAC Purchased Assets and assuming the TSAC Assumed Liabilities, in the event that the OEM Indemnity and Release Agreement shall have been executed and delivered to the Plan Sponsor by the Initial Consenting OEMs and each of the parties set forth on <u>Schedule H</u>, and the aggregate number of PSAN Inflators sold to non-Consenting OEMs by TSAC does not exceed 500,000, then the Plan Sponsor may elect to purchase the shares of capital stock and any other Equity Interests of the direct or indirect equityholders of TSAC, in which case Sellers shall, or shall cause their applicable Subsidiaries to, sell, transfer, convey, assign and deliver to the Plan Sponsor all such capital stock or other Equity Interests for a purchase price equal to the TSAC Purchase Price and on such other terms as may be set forth in the TSAC Purchase Agreement (such transaction, a "**TSAC Equity Sale**").  In the event of a TSAC Equity Sale that is effected through a sale of the Equity Interests of TSAC, TK China LLC or another indirect Subsidiary of

Sellers pursuant to a separate purchase agreement (and not pursuant to this Agreement by making the applicable seller a party hereto), the Purchase Price shall be reduced by the TSAC Purchase Price. Sellers shall, and shall cause TSAC and the other Seller Entities to, engage in any internal corporate restructuring, reorganization or similar transaction that is reasonably requested by the Plan Sponsor and not materially adverse to the Seller Entities or their stakeholders for purposes of effecting the purchase and sale of the TSAC Purchased Assets or a TSAC Equity Sale, as applicable. TSAC shall be treated in the TSAC Purchase Agreement as having the same obligations as a Seller pursuant to Section 4.6 hereof. Prior to the U.S. Closing, subject to the Plan Sponsor's approval (which approval shall not be unreasonably withheld, conditioned, or delayed), Sellers may engage in a sale leaseback financing transaction with a third party leasing company with respect to some or all of the TSAC Purchased Assets.

(d)     As contemplated by Section 7.20(a) of the TKJP Purchase Agreement, prior to the Japan Closing (as defined in the TKJP Purchase Agreement), (a) TK Holdings shall form New China Company (as defined in the TKJP Purchase Agreement) for the purpose of acquiring the TCX Transferred Assets (as defined in the TKJP Purchase Agreement) and assuming the TCX Transferred Liabilities (as defined in the TKJP Purchase Agreement), (b) TK Holdings shall use commercially reasonable efforts to cooperate with the applicable sellers under the TKJP Purchase Agreement to obtain all Permits required for New China Company to acquire and use the TCX Transferred Assets and operate after the Japan Closing in substantially the same manner as by TCX prior to the Japan Closing, and assume the TCX Transferred Liabilities, (c) TK Holdings shall cause New China Company to purchase, acquire and accept all of the applicable sellers' right, title and interest in, to and under the TCX Transferred Assets and (d) in consideration for the TCX Transferred Assets, TK Holdings shall cause New China Company to assume the TCX Transferred Liabilities; provided, however, that the Parties acknowledge that the transaction structure set forth above in clauses (a) through (d) may be changed upon mutual agreement among the Plan Sponsor, TK Holdings, and the sellers under the TKJP Purchase Agreement through good faith discussions taking into account all relevant Tax, legal, regulatory, financial and other aspects thereof.

(e)     Prior to the U.S. Closing, Sellers shall cooperate with and assist their Affiliates, the sellers under each of the Cross-Conditioned Agreements and any of such sellers' Affiliates in connection with the distribution, sale, contribution or other transfer of all of TIF's right, title and interest in, to and under its Equity Interests of TK Europe, Takata Asia Pte Ltd, Takata Istanbul Automotive Safety Systems Production and Trading Ltd. or European Automotive Systems Limited (collectively, the "**TIF Subsidiaries**") to another entity, other than an Acquired Subsidiary or any acquired subsidiary under any of the Cross-Conditioned Agreements, such that such TIF Subsidiaries shall not be acquired by Plan Sponsor, in such manner as is consented to by the Plan Sponsor (such consent not to be unreasonably withheld).

(f)     Takata Americas and TK Holdings shall cause ALS, Inc. ("**ALS**") to transfer its PSAN Assets (including any Warehoused PSAN Assets) and all related obligations and Liabilities, directly or indirectly,  to the Warehousing Trust on or prior to the Closing Date, such that Plan Sponsor will not indirectly acquire any PSAN Assets or anything that would constitute Excluded Liabilities if ALS were a Seller hereunder as a result of Plan Sponsor's acquisition of ALS. Prior to the Closing, to the extent Plan Sponsor determines that the acquisition of ALS could reasonably be expected to result in the incurrence of material liabilities

due to ALS's handling, storage, shipping or possession of PSAN Assets, the Plan Sponsor and Sellers shall engage in good faith discussions regarding whether ALS should become a Seller. Following such good faith discussions, if the Plan Sponsor reasonably determines on or prior to December 15, 2017, taking into account any related liability management concerns, that ALS should become a Seller, Takata Americas and TK Holdings shall cause ALS to become a Seller prior to the U.S. Closing such that ALS shall not sell, assign or transfer to the Plan Sponsor or any of its Affiliates, and neither the Plan Sponsor nor any of its Affiliates shall acquire purchase or assume from ALS, any PSAN Assets or other assets which, if held by the Sellers, would constitute Excluded Assets or any Liabilities which, if held by the Sellers, would constitute Excluded Liabilities.

(g)     From the date of this Agreement until the U.S. Closing or the earlier termination of this Agreement in accordance with its terms, in addition to and separately from the transactions contemplated by Sections 7.20(a)-(f), Sellers shall, and shall cause the Seller Entities to, engage in any internal corporate restructuring, reorganization or similar transaction that is reasonably requested by the Plan Sponsor (taking into account any potential delay of the U.S. Closing) and not materially adverse to the Seller Entities or their stakeholders.  If the transaction requested to be undertaken by the Plan Sponsor pursuant to this Section 7.20(e) would result in a material amount of incremental Taxes or other expenses imposed by any Governmental Authority that would not have arisen but for the transaction requested by the Plan Sponsor, as jointly determined in good faith by the Parties taking into account applicable Law based on the advice of tax advisors, then the transaction shall be deemed materially adverse to the Seller Entities. If any such transaction is undertaken, the Plan Sponsor shall promptly reimburse the Seller Entities for all reasonable and documented out-of-pocket fees and expenses paid or incurred by the Seller Entities in connection with any such additional transaction requested by the Plan Sponsor, including the amount of any incremental Taxes or other expenses imposed by any Governmental Authority that would not have been paid or incurred by the Seller Entities but for such transaction, as jointly determined in good faith by the Parties taking into account applicable Law based on the advice of tax advisors.  For the avoidance of doubt, this Section 7.20(e) does not apply to the conduct and/or transactions contemplated by Sections 7.20(a)-(f).

(h)     After the U.S. Closing, Sellers shall use reasonable best efforts to liquidate certain Seller Entities that are not Acquired Subsidiaries in accordance with the Plan.

7.21     Expense Reimbursement During Bankruptcy Cases.  If the U.S. Closing occurs, subject to payment in full of the DOJ Restitution Fund and Legacy Costs and entry of a Final Order of the Bankruptcy Court approving the Break-Up Fee and Expense Reimbursement as provided herein, all Expenses of the Plan Sponsor, in an aggregate amount not to exceed the Alternative Transaction Expense Reimbursement Amount, shall be deducted from the Purchase Price pursuant to Section 3.1(a)(A)(xii); provided that if Acquired Cash exceeds Maximum Acquired Cash, Sellers' Regional Share of such amount of Cash and Cash Equivalents that exceed Maximum Acquired Cash shall be credited against the amount of actual Expenses otherwise deducted from the Purchase Price pursuant to Section 3.1(a)(A)(xii) up to the Alternative Transaction Expense Reimbursement Amount.

7.22    Performance Guaranty.  The Guarantor hereby guarantees the due, prompt and faithful payment, performance and discharge by, and compliance with, all of the obligations, covenants, agreements, terms, conditions and undertakings of the Plan Sponsor under this Agreement in accordance with the terms hereof, including any such obligations, covenants, agreements, terms, conditions and undertakings that are required to be performed, discharged or complied with following the U.S. Closing by the Plan Sponsor. Such guarantee is an absolute and unconditional guarantee of payment and performance and not merely of collectability, and is in no way conditioned or contingent upon any attempt to collect from, enforce performance or compliance by, or otherwise seek remedies from, the Plan Sponsor. The Guarantor hereby makes the representations and warranties in Sections 6.1, 6.2, 6.3, 6.4, and 6.6 of this Agreement, *mutatis mutandis*.

7.23    Delivery of Cash.  In connection with Section 2.1(a), prior to the U.S. Closing, (i) Sellers shall use reasonable best efforts to cause each of the Acquired Subsidiaries to hold Cash and Cash Equivalents of not less than ninety percent (90%) of the amounts set forth on Schedule J hereto and (ii) Sellers shall reasonably consider in good faith (but shall not be obligated to effect) any reasonable requests by the Plan Sponsor to deliver the remaining amount of Sellers' Acquired Cash in such jurisdictions, entities and currencies as the Plan Sponsor may reasonably request.

7.24    Non-Consenting OEMs.  The Plan Sponsor shall seek to develop a reasonable strategy to obtain the execution and delivery of the Indemnity and Release Agreement by the parties set forth on Schedule I on or before November 30, 2017, and, in furtherance thereof, engage in good faith discussions and negotiations with such parties. The Plan Sponsor hereby agrees that it shall, as reasonably requested by Sellers, provide updates with respect to the status of such discussions and negotiations (including whether the Plan Sponsor believes that any such party will not in any event execute the Indemnity and Release Agreement).

7.25    Severing PSAN Contracts.  Prior to the U.S. Closing, Sellers shall use their commercially reasonable efforts to sever all Modified Assumed OEM Contracts as necessary to separate the manufacture and sale of the PSAN Inflators and release the Plan Sponsor from all liabilities and obligations thereunder with respect to PSAN Inflators in accordance with Section 21(d) of the Accommodation Agreement, including exercising any rights Sellers have under the Accommodation Agreement.

7.26    Excess Cash.  To the extent an Excess Cash notice provided pursuant to Section 9.2(e) indicates that the condition set forth in Section 9.2(e) is not expected to be satisfied on the Closing Date, Sellers, the Plan Sponsor and the Consenting OEMs will negotiate in good faith to attempt to agree on acceptable arrangements so that the Acquired Cash at the Closing will be less than or equal to the Excess Cash. To the extent that (i) Sellers, the Plan Sponsor and the Consenting OEMs are unable to agree on such arrangements or (ii) Sellers have failed to provide the notice contemplated by Section 9.2(e) and at the Closing the Acquired Cash is equal to or in excess of the Excess Cash, the Plan Sponsor shall use reasonable efforts to transfer Sellers' Cash Allocation Share of the Acquired Cash in excess of Sellers' Cash Allocation Share of the Excess Cash to Sellers within ten (10) days following determination of the Final Acquired Cash, net of any Taxes or other expenses imposed by a Governmental Authority incurred by the Plan Sponsor in connection with such transfer.

7.27    Break-Up Fee and Expense Reimbursement Cooperation.    Sellers shall use reasonable best efforts and take any action reasonably necessary to compel the sellers under the Cross-Conditioned Agreements to pay such sellers' applicable shares of the Break-Up Fee and Expenses under the Cross-Conditioned Agreements when such Break-Up Fee and Expenses are due, if applicable.

7.28    Joyson Shareholder Approval.    The Plan Sponsor shall use reasonable best efforts to cause Joyson to establish a record date for, duly call, give notice of, convene and hold, as promptly as practicable, a meeting of the shareholders of Joyson for the purpose of obtaining the Joyson Shareholder Approval.    The Plan Sponsor shall use reasonable best efforts to cause Joyson not to adjourn or otherwise postpone or delay such shareholders meeting. The Plan Sponsor and Sellers agree to provide such cooperation as may be reasonably requested by Joyson in order to prepare any disclosure materials needed for the solicitation of votes in connection with the Joyson Shareholder Approval and shall otherwise reasonably cooperate with Joyson in connection with Joyson's efforts to obtain the Joyson Shareholder Approval.

7.29    Equipment Option Notice.    If at any time prior to the U.S. Closing, any Consenting OEM exercises its Equipment Option, Sellers shall give prompt notice of such exercise to Plan Sponsor.

## ARTICLE VIII

## EMPLOYEES AND EMPLOYEE BENEFITS

8.1    Employment.

(a)    Transferred Employees.    As of the U.S. Closing, the Plan Sponsor shall or shall cause its Affiliate to (i) continue the employment of each Employee (including Alien Employees) of an Acquired Subsidiary employed immediately prior to the U.S. Closing and (ii) deliver, in writing, an offer of employment to each Employee (including Alien Employees) in the U.S. who is not employed by an Acquired Subsidiary (other than the PSAN Employees, temporary employees employed through a third party, contractors, advisors and outsourced or indirectly employed workers) who remains actively employed by Seller Entities immediately prior to the U.S. Closing (the "**Offer Employees**").  With respect to each Offer Employee who is not actively at work due to a leave of absence approved by a Seller Entity (not including individuals receiving long-term disability benefits), the Plan Sponsor will or will cause its Affiliate to provide such Offer Employee an offer of employment if, and at such time that, such Offer Employee is willing and able to return to active employment within six (6) months following the U.S. Closing or such longer period of time required by applicable Law, and upon commencing employment with Plan Sponsor or Plan Sponsor's Affiliate such Offer Employee shall be treated as a Transferred Employee (as defined below).  Each such offer or continuation of employment shall be in compliance with Section 8.1(d) and provide for a position and location of employment, that are substantially comparable to the position and location of employment in effect immediately prior to the U.S. Closing. Such individuals who continue in employment with an Acquired Subsidiary or who accept such offer by the Closing Date are hereinafter referred to as the "**Transferred Employees**."  Notwithstanding the foregoing, the terms and conditions for any Transferred Employees subject to a collective bargaining agreement, labor agreement or

works council agreement shall be in accordance with the applicable collective bargaining agreement, labor agreement or works council agreement to the extent required by such agreement or applicable Law.

(b)    <u>PSAN Employees</u>.  Sellers shall ensure that, not later than immediately prior to the Closing Date, no PSAN Employee is employed by an Acquired Subsidiary.  The Plan Sponsor or the Plan Sponsor's Affiliate shall, no later than ten (10) Business Days prior to the termination of a PSAN Employee in connection with the wind down of all or a portion of the PSAN Inflator Business (each termination date, respectively, a "**PSAN End Date**"), deliver, in writing, an offer of employment to each such PSAN Employee in the U.S., Mexico and China who remains actively employed immediately prior to such PSAN End Date, and not including temporary employees employed through a third party, contractors, advisors or outsourced or indirectly employed workers.    Upon acceptance of such offer of employment and commencement of employment with Plan Sponsor, such PSAN Employee shall be treated as a Transferred Employee and entitled to the rights and benefits provided for under this <u>Section 8.1</u>. The Plan Sponsor shall, or shall cause its Affiliate to, enter into an employment agreement with each such PSAN Employee in Mexico who accepts the Plan Sponsor's or the Plan Sponsor's Affiliate's offer effective on the applicable PSAN End Date, recognizing the PSAN Employee's original date of hire with Sellers for seniority purposes and an equal or similar compensation package in the aggregate. For the avoidance of doubt, neither the Plan Sponsor nor its Affiliates shall be responsible for paying such PSAN Employees' accrued benefits through the applicable PSAN End Date.

(c)    <u>Standard Procedure</u>.    For purposes of payroll taxes with respect to Transferred Employees in the U.S., the Parties shall use commercially reasonable efforts to treat the transaction contemplated herein as a transaction described in U.S. Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-1(b)(2) and the Parties further agree to implement this treatment by utilizing solely Section 4 of Revenue Procedure 2004-53, STANDARD PROCEDURE FOR PREDECESSORS AND SUCCESSORS.

(d)    <u>Compensation and Benefits</u>.  The Plan Sponsor shall provide, or cause to be provided, for a period of one (1) year following the Closing Date or such longer period of time required by applicable Law, (i) to each of the Transferred Employees, an annual base salary or wage rate that is at least equal to his or her annual base salary or wage rate as in effect immediately prior to the U.S. Closing, (ii) to each of the Transferred Employees, an annual target incentive or commission opportunity that is at least equal to his or her annual target incentive or commission opportunity as in effect immediately prior to the U.S. Closing, (iii) employee benefits that are substantially comparable in the aggregate to the employee benefits provided to the Transferred Employees immediately prior to the U.S. Closing and (iv) for those Transferred Employees in the United States, severance payments and benefits that are no less favorable than those provided to similarly situated employees of Plan Sponsor.

(e)    <u>Credited Services; Co-Pay and Deductibles</u>.  For purposes of eligibility and vesting (but not benefit accrual) under the employee benefit plans of the Plan Sponsor (or its Affiliates) providing benefits to Transferred Employees (the "**Plan Sponsor Plans**"), the Plan Sponsor shall credit, or cause to be credited, each Transferred Employee with his or her years of service with the Seller Entities and any predecessor entities, to the same extent as such

Transferred Employee was entitled immediately prior to the U.S. Closing to credit for such service under any similar Employee Benefit Plan (excluding for purposes of any defined benefit pension plan and retiree medical plan); provided, however, that such service shall not be recognized to the extent that such recognition would result in a duplication of benefits.  For the purposes of each Plan Sponsor Plan that provides for medical, dental, pharmaceutical, vision and or disability benefits, the Plan Sponsor shall use commercially reasonable efforts to (i) cause all waiting periods, pre-existing condition exclusions, evidence of insurability requirements and actively-at-work or similar requirements of such Plan Sponsor Plan to be waived for such Transferred Employee and his or her covered dependents and (ii) shall allow any eligible expenses incurred by such Transferred Employee and his or her covered dependents during the portion of the plan year of the Employee Benefit Plan ending on the date such employee's participation in the corresponding Plan Sponsor Plan begins to be given full credit under such Plan Sponsor Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such Plan Sponsor Plan.

(f)    Accrued Vacation.  Except as required by applicable Law, Plan Sponsor shall, or shall cause its Affiliate to, be responsible for all Liabilities with respect to Transferred Employees attributable to their accrued and unused vacation days through the Closing Date.

(g)    Immigration.  Sellers shall, and shall cause the other Seller Entities to, cooperate with Plan Sponsor and its Affiliates to allow for any foreign national Employees who require authorization from the U.S. Citizenship and Immigration Services ("**USCIS**") in order to work for the Plan Sponsor or its Affiliate in his or her current position (such foreign national Employees who have such authorization, the "**Alien Employees**") to continue to work in such position as a Transferred Employee following the Closing Date, or, as applicable, such later date that such Employee's employment transfers to the Plan Sponsor or its applicable Affiliate. The Plan Sponsor shall, or shall cause its Affiliate to: (i) employ Offer Employees who are Alien Employees in H-1B non-immigrant status as well as those Alien Employees for whom there are pending or approved Applications for Permanent Employment Certification (PERM) and/or I-140 immigrant petitions as of the Closing Date, in each case who receive and accept the Plan Sponsor's or its Affiliate's offer of employment, under terms and conditions, as applicable, that qualify the Plan Sponsor or its Affiliates as a "successor employer" under applicable United States immigration laws effective as of the Closing Date; (ii) employ Offer Employees who are Alien Employees, in any other non-immigrant status or those with employment authorization documents issued by the USCIS, who receive and accept the Plan Sponsor's or its Affiliate's offer of employment and (iii) assume all of the immigration related rights, obligations and liabilities relating to any immigration petitions, applications and filings filed with the USCIS and/or the U.S. Department of Labor by Sellers on behalf of Alien Employees in H-1B non-immigrant status, as well as those Alien Employees for whom there are pending or approved Applications for Permanent Employment Certification (PERM) and/or I-140 immigrant petitions as of the Closing Date, and, in the Plan Sponsor's discretion, any other Alien Employees, in each case who become Transferred Employees.

(h)     Key Employee Bonus Plan.  Plan Sponsor shall assume and honor all Liabilities under the Key Employee Bonus Plan awards for Transferred Employees, which are set forth on Schedule 8.1(h).

(i)     Flexible Spending Accounts.  The parties shall take all actions necessary or appropriate so that, effective as of the U.S. Closing Date, (i) the account balances (whether positive or negative) (the "**Transferred FSA Balances**") under the applicable flexible spending plan of the Seller Entities (collectively, the "**Seller FSA Plan**") of the Transferred Employees who are participants in the Seller FSA Plan shall be transferred to one or more comparable plans of Plan Sponsor (collectively, the "**Plan Sponsor FSA Plan**"); (ii) the elections, contribution levels and coverage levels of such Transferred Employees shall apply under the Plan Sponsor FSA Plan in the same manner as under the Seller FSA Plan; and (iii) such Transferred Employees shall be reimbursed from the Plan Sponsor FSA Plan for claims incurred at any time during the plan year of the Seller FSA Plan in which the U.S. Closing Date occurs that are submitted to the Plan Sponsor FSA Plan from and after the U.S. Closing Date on the same basis and the same terms and conditions as under the Seller FSA Plan.  As soon as practicable after the U.S. Closing Date, and in any event within ten (10) Business Days after the amount of the Transferred FSA Balances is determined, Sellers shall pay Plan Sponsor the net aggregate amount of the Transferred FSA Balances, if such amount is positive, and Plan Sponsor shall pay Seller the net aggregate amount of the Transferred FSA Balances, if such amount is negative.

(j)     WARN.  On or before the U.S. Closing, for each jurisdiction where the WARN Act applies, Sellers shall provide a true, correct and complete list, by site of employment, of any and all employees of any Seller Entity who, within ninety (90) days prior to the U.S. Closing, have experienced, or will experience, an employment loss or layoff as defined by the WARN Act. Sellers shall update this list up to and including the U.S. Closing.

(k)     Notice and Consultation.  Prior to the U.S. Closing, Sellers shall, and shall cause the other Seller Entities to, satisfy any and all obligations and requirements under any applicable collective bargaining agreement, labor agreement or works council agreement or applicable Laws to provide notice to, enter into any consultation procedure with, obtain an opinion from, or engage in bargaining with any group of employees or any labor union, labor organization, works council or other representative body, in connection with the Transactions.

(l)     Treatment of Employee Benefit Plans. Prior to the Closing Date, Sellers shall take all actions to effectuate the following as of the Closing Date:

(i)     all Transferred Employees shall cease to participate in and accrue benefits under the Employee Benefit Plans, except for the Business Benefit Plans.  Sellers shall retain all Liabilities under the Employee Benefit Plans, except for the Business Benefit Plans, for all periods on or prior to the Closing Date; and

(ii)     cause the Acquired Subsidiaries' withdrawal from participation in all Employee Benefit Plans, other than the Business Benefit Plans, to the extent any additional action is needed, in each case, without resulting in any actual or contingent Liability to the Acquired Subsidiaries, the Plan Sponsor or their respective Affiliates.

(m)    <u>Workers Compensation</u>.    The Plan Sponsor shall be responsible for providing benefits in respect of all claims for benefits in respect of workers compensation and any comparable liabilities that are based upon Transferred Employees' injuries or illnesses that arise after the Closing Date.  Sellers shall be responsible for providing benefits in respect of all claims for benefits in respect of workers compensation and any comparable liabilities that are based upon Transferred Employees' injuries or illnesses that arise at or prior to the Closing Date.

(n)    <u>Third Party Beneficiaries</u>.    Notwithstanding anything contained in the Agreement to the contrary, no provision of this Agreement is intended to, or does, require the Plan Sponsor or its Affiliates to keep any Person employed for any period of time or constitute the establishment or adoption of, or amendment to, any Employee Benefit Plan.  The provisions of this <u>Article VIII</u> are solely for the benefit of the respective Parties and nothing in this <u>Article VIII</u>, express or implied, shall confer upon any employee of any Seller Entity, or legal representative or beneficiary thereof or any other Person, any rights or remedies, including any right to employment or continued employment for any specified period, or compensation or benefits of any nature or kind whatsoever under this Agreement or a right in any employee or beneficiary of such employee or other Person under an Employee Benefit Plan that such employee or beneficiary or other Person would not otherwise have under the terms of that Employee Benefit Plan.

8.2    <u>Mexico Employees</u>.    Notwithstanding any provision of <u>Section 8.1</u>, any and all Employees, other than PSAN Employees, whose employment is governed by Mexican Laws (including pursuant to an employment agreement governed by such Laws) ("**Transferred Mexican Employees**") shall be governed by this <u>Section 8.2</u> and the documents referred to herein with respect to any Mexican labor matter regarding the Transactions; provided, however, Transferred Mexican Employees shall not include Employees employed by Equipo prior to the employer substitution described in this <u>Section 8.2</u> (the employment of whom, provided such Employees remain employed through the U.S. Closing, shall be continued in accordance with <u>Section 8.1(a)(i)</u>).  The Parties hereby agree that the terms, conditions and other aspects of the employment of the Transferred Mexican Employees shall be as set forth in the Mexican Employees Transfer Agreement substantially in the form attached hereto as <u>Exhibit D</u> (the "**Mexican Employees Transfer Agreement**").  The Mexican Employees Transfer Agreement shall be executed and delivered by the Parties concurrently with the execution of this Agreement. The Mexican Employees Transfer Agreement shall provide that Sellers undertake to effectuate an employer substitution with the Transferred Mexican Employees employed immediately prior to the U.S. Closing, pursuant to Article 41 of the Federal Mexican Labor Law and Article 290 of the Mexican Social Security Law and it shall include, among other provisions, the following:

(a)    <u>Transferred Mexican Employees</u>.    Transferred Mexican Employees involved with the Purchased Assets shall be transferred to Equipo prior to the U.S. Closing.

(b)    <u>Transferring Scheme</u>.    The Plan Sponsor acknowledges that because Equipo, which shall employ the Transferred Mexican Employees and hold the Purchased Assets (and the production lines required for the Business) following the employer substitution, shall be transferred to the Plan Sponsor upon the U.S. Closing, the Plan Sponsor is required following the U.S. Closing (pursuant to the requirements of an employer substitution under Mexican Laws) to cause Equipo, and hereby agrees that it shall cause Equipo, to continue the activities of the

116

Business without any interruption, using the same machinery and tools, occupying the same location and maintaining the same lines of business.

(c)     Collective Matters.  Prior to the employer substitution, (i) Sellers shall comply with all obligations under collective bargaining agreements covering the Transferred Mexican Employees to notify applicable unions of the Transactions (including a description thereof) and the employer substitution with respect to the Transferred Mexican Employees and (ii) the terms and conditions of the collective bargaining agreements covering the Transferred Mexican Employees before the U.S. Closing shall be replicated and included into the new collective bargaining agreement to be entered into by Equipo prior to the U.S. Closing.

(d)     Benefits and Compensation.  The Plan Sponsor shall provide, for an indefinite period of time, to each of the Transferred Mexican Employees, (i) a salary or wage rate that is at least equal to his or her salary or wage rate as in effect immediately prior to the U.S. Closing and (ii) benefits at least equal to those in effect immediately prior to the U.S. Closing.

(e)     Further Actions.  Sellers shall prepare the substitution letters and prepare and file notices with the Social Security Mexican Institute (IMSS per its acronym in Spanish), the National Fund for Workers Housing Institute (INFONAVIT per its acronym in Spanish), and the National Fund for Employee Consumption (FONACOT per its acronym in Spanish).  The employer substitution process to be executed before the aforementioned government offices (IMSS, INFONAVIT and FONACOT) must be fully consummated and in effect before the U.S. Closing.  The Plan Sponsor shall have the right to review and consent (which consent shall not be unreasonably withheld, conditioned or delayed) to any and all documents prepared in connection with the employer substitution, provided, however, that the Sellers shall be considered solely responsible for the completion of the employer substitution process.

(f)     Conflicts.  The Mexican Employees Transfer Agreement shall include the aforementioned provisions and any other provisions necessary to effectuate the employer substitution process to be carried out by Sellers. If there are inconsistences between the provisions of this Section 8.2 and the provisions set forth in the Mexican Employees Transfer Agreement, the latter shall prevail; provided, however, nothing in the Mexican Employees Transfer Agreement shall change Sellers' obligation to effectuate an employer substitution to transfer the Transferred Mexican Employees to Equipo prior to the U.S. Closing.

8.3     Employee Census.  Within thirty (30) days following the date hereof, Sellers shall provide the Plan Sponsor with a complete, accurate and current Employee census identifying each Employee and his or her employing entity, location, job title, date of hire, salary or wage, target bonus for the current year, exempt or non-exempt status, full-time or part-time status, active or inactive status, temporary or permanent status, whether such Employee is a PSAN Employee or not, and, for any Employee who requires a visa to work in the relevant jurisdiction, the visa category, visa expiration date, work authorization expiration date and total duration of time in visa category.  Such census shall be updated by Sellers sixty (60) days prior to the U.S. Closing and again immediately prior to the U.S. Closing.

117

## ARTICLE IX

## CONDITIONS TO CLOSING

9.1     <u>Conditions Precedent to Obligations of the Plan Sponsor</u>.  The obligation of the Plan Sponsor to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Plan Sponsor in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Sellers set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, shall be true and correct on and as of the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, <u>however</u>, that (i) the Fundamental Representations and (ii) with respect to material Purchased Assets, the representations and warranties set forth in <u>Section 5.5(b)</u>, shall be true and correct in all material respects as of the Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date); and the Plan Sponsor shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the foregoing effect;

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Sellers prior to the Closing Date; and the Plan Sponsor shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the foregoing effect;

(c)     Plan Sponsor and the Acquired Subsidiaries shall have all Permits required for Plan Sponsor and the Acquired Subsidiaries to continue to operate the Business immediately after the U.S. Closing in substantially the same manner as conducted immediately prior to the U.S. Closing, including without limitation those Permits set forth on <u>Schedule 9.1(c)</u> and any ECE-homologations, China Compulsory Certification permits and other Permits granted by automotive safety regulators or similar Governmental Authorities required either for (i) the homologation of the Consenting OEMs' vehicles and Component Parts produced by Plan Sponsor and the Acquired Subsidiaries after the Closing or (ii) the production, transport or sale of such Component Parts by the applicable Consenting OEM or applicable operating entity, in either case the failure of which to be obtained would result in the Plan Sponsor or any Acquired Subsidiary being prohibited by applicable Law governing automotive safety or similar matters from producing applicable Component Parts required to be produced by the Plan Sponsor or any Acquired Subsidiary after the U.S. Closing pursuant to OEM Assumed Contracts or a Consenting OEM being prohibited by applicable Law from selling vehicles incorporating such Component Parts, and all such Permits shall be in full force and effect at the Closing; it being acknowledged and agreed that the condition set forth in this <u>Section 9.1(c)</u> may be waived with respect to any automotive safety Permit referenced above only with the prior written consent of each Consenting OEM that reasonably would be expected to be adversely affected by such waiver  due to a resulting disruption in the supply of Component Parts to such Consenting OEM or the sale of such Consenting OEM's vehicles;

118

(d)    (i) each of the OEM Indemnity and Release Agreement and the Global Settlement Agreement shall be in full force and effect (other than those provisions that are dependent upon consummation of the U.S. Closing and the Other Closings, for which all conditions to effectiveness shall have been satisfied other than consummation of the U.S. Closing and the Other Closings in accordance with the terms of this Agreement and the Cross-Conditioned Agreements) and (ii) all other conditions to the continued effectiveness of each of the OEM Indemnity and Release Agreement and the Global Settlement Agreement from and after the U.S. Closing shall have been satisfied; provided that with respect to the Global Settlement Agreement, only the continued effectiveness with respect to the Acquired Subsidiaries must be satisfied;

(e)    the Bankruptcy Court shall have approved and authorized the assumption and assignment of the Material Contracts that are Purchased Contracts;

(f)    the Bankruptcy Court shall have approved and authorized the Notice Protocol;

(g)    a Canadian court of competent jurisdiction shall have entered an order recognizing the Confirmation Order entered by the Bankruptcy Court, which order shall be final and shall remain in full force and effect;

(h)    no Material Adverse Effect shall have occurred since the date of this Agreement;

(i)    the separation of Sellers' PSAN Inflator Business shall have been consummated in accordance with this Agreement or as otherwise agreed to by the Parties;

(j)    the Bankruptcy Court shall have entered the Solicitation Procedures Order in a form reasonably satisfactory to Plan Sponsor;

(k)    the Plan shall be in substantially the form attached hereto as Exhibit B or otherwise reasonably acceptable to the Plan Sponsor, and the Confirmation Order shall be reasonably acceptable to the Plan Sponsor;

(l)    except for those rights which expressly survive termination of the Accommodation Agreement, any and all rights granted to the Consenting OEMs under the Accommodation Agreement including with respect to tooling and licenses shall have been terminated;

(m)    any and all liens granted to the Consenting OEMs under the Access Agreement shall have been released;

(n)    the Acquired Cash shall equal or exceed ninety percent (90%) of the Required Cash and the Plan Sponsor shall have received a certificate signed by an authorized officer of Sellers, dated the Closing Date, to the foregoing effect, together with reasonable supporting documentation;

(o)    the Plan Sponsor shall have secured written agreements with the DOJ and NHTSA with respect to the matters set forth on Schedule 9.1(o); provided, that, if such agreements are not obtained by the DOJ/NHTSA Outside Date and this Agreement has not been terminated pursuant to Section 4.4(d)(xv) within five (5) Business Days after the DOJ/NHTSA Outside Date, the condition set forth in this Section 9.1(o) shall be deemed to have been irrevocably waived as of the date that is five (5) Business Days after the DOJ/NHTSA Outside Date;

(p)    the PRC Regulatory Approvals shall have been obtained;

(q)    the Joyson Shareholder Approval shall have been obtained;

(r)    Sellers shall have delivered, or caused to be delivered, to the Plan Sponsor all of the items set forth in Section 4.2; and

(s)    no right, title or interest in, to or under the Equity Interests of any TIF Subsidiary shall be held by TIF, any Acquired Subsidiary or any acquired subsidiary under any of the Cross-Conditioned Agreements.

9.2    Conditions Precedent to Obligations of Sellers.    The obligations of Sellers to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of the Plan Sponsor set forth in this Agreement, disregarding all qualifications and exceptions contained therein relating to materiality, shall be true and correct on and as of the date of this Agreement and on and as of Closing Date as if made on and as of the Closing Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct as would not, individually or in the aggregate, reasonably be expected to prevent the Plan Sponsor's ability to consummate the Transactions or perform its obligations hereunder on a timely basis, and Sellers shall have received a certificate signed by an authorized officer of the Plan Sponsor, dated the Closing Date, to the foregoing effect;

(b)    the Plan Sponsor shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Plan Sponsor on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of the Plan Sponsor, dated the Closing Date, to the foregoing effect;

(c)    the Confirmation Order shall be acceptable to Sellers;

(d)    the Plan Sponsor shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 4.3;

(e)    the Acquired Cash shall be less than or equal to the Excess Cash. If Sellers anticipate the condition set forth in this Section 9.2(e) will not be satisfied on the Closing Date, Sellers shall provide the Plan Sponsor with written notice at least ten (10) Business Days prior to

120

the anticipated Closing Date; <u>provided</u>, that to the extent the Plan Sponsor shall have the obligation to transfer Sellers' Cash Allocation Share of the Acquired Cash in excess of Sellers' Cash Allocation Share of the Excess Cash as contemplated by <u>Section 7.26</u> after the Closing, this <u>Section 9.2(e)</u> shall be deemed to have been irrevocably waived as of immediately prior to the Closing; and

(f)     the Seller Entities shall have all Permits required to operate the PSAN Inflator Business after the U.S. Closing, the failure of which to be obtained would result in the Seller Entities being prohibited by applicable Laws governing automotive safety or similar matters from producing any products required to satisfy the Seller Entities' contractual obligations with respect to the PSAN Inflator Business, and all such Permits shall be in full force and effect;

9.3     <u>Conditions Precedent to Obligations of the Plan Sponsor and Sellers</u>.    The respective obligations of the Plan Sponsor and Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Plan Sponsor and Sellers in whole or in part to the extent permitted by applicable Law):

(a)     all conditions to the effectiveness of the Plan shall have been satisfied or waived in accordance with their terms;

(b)     the entry of the Confirmation Order by the Bankruptcy Court, and the Confirmation Order shall be a Final Order;

(c)     CFIUS Clearance shall have been obtained;

(d)     there shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(e)     (i) the waiting period applicable to the Transactions under the HSR Act shall have expired or early termination shall have been granted and (ii) the approvals and consents required to consummate the Transactions under all other Antitrust Laws shall have been obtained or any applicable waiting period thereunder shall have expired or been terminated; and

(f)     the conditions to the Other Closings set forth in the TKJP Purchase Agreement, the TSAC Purchase Agreement (if applicable) and the TK Europe Purchase Agreement (each a "**Cross-Conditioned Agreement**" and collectively, the "**Cross-Conditioned Agreements**") shall have been satisfied or waived in accordance with their terms, with the exception of the condition in such respective Cross-Conditioned Agreement that the other Cross-Conditioned Agreements' conditions shall have been satisfied or waived.

9.4     <u>Frustration of Closing Conditions</u>.  Neither Sellers nor the Plan Sponsor may rely on the failure of any condition set forth in <u>Sections 9.1</u>, <u>9.2</u> or <u>9.3</u>, as the case may be, if such failure was caused by such Party's failure to comply with any provision of this Agreement.

# ARTICLE X

# TAXES

10.1    Transfer Taxes.  The Parties recognize and acknowledge that the sale, transfer, assignment and delivery of the Purchased Assets, the SMX Transferred Assets, the TK de Mexico and Industrias Transferred Assets, and any other internal corporate restructuring, reorganization or similar transactions contemplated by this Agreement may be exempt under Section 1146(c) of the Bankruptcy Code from any sales, use, stamp, documentary, filing, recording, transfer or similar fees or Taxes or governmental charges (including any Brazilian Financial Transaction (IOF) Tax, real property transfer Taxes, UCC-3 filing fees, real estate, aircraft and motor vehicle registration, title recording or filing fees and other amounts payable in respect of transfer filings, and including any interest and penalty thereon) payable in connection with the Transactions ("**Transfer Taxes**").  Any Tax Returns that must be filed in connection with Transfer Taxes (for the avoidance of doubt, other than VAT) shall be prepared and filed by the Party primarily or customarily responsible under applicable Law for filing such Tax Returns, and such Party will provide such Tax Returns to the other Party at least ten (10) Business Days prior to the date such Tax Returns are due to be filed (or, if such Tax Returns are due within ten (10) Business Days following the U.S. Closing, as soon as reasonably practicable).  The Plan Sponsor and Sellers shall cooperate in the timely completion and filing of all such Tax Returns. In the event that a Transfer Tax is, under applicable Law, a joint obligation of the Plan Sponsor and the Sellers, such a Transfer Tax shall be treated as an obligation of the Plan Sponsor for purposes of this Section 10.1.  The Plan Sponsor shall promptly pay, or cause to be paid, all Transfer Taxes due with respect to Tax Returns to be filed by the Plan Sponsor or an Affiliate of the Plan Sponsor (including any Acquired Subsidiary after the U.S. Closing) under this Section 10.1, and such payments shall, to the extent the Plan Sponsor reasonably determines as of the U.S. Closing that such amounts are required to be paid, be taken into account as a purchase price reduction pursuant to Section 3.1(a)(A)(vii).  Sellers shall promptly pay, or cause to be paid, all Transfer Taxes due with respect to Tax Returns to be filed by a Seller Entity under this Section 10.1.  In the event that a Transfer Tax is due and payable by the Plan Sponsor or by any of its Affiliates (including an Acquired Subsidiary after the U.S. Closing) and is not credited against the Purchase Price as provided in Section 3.1(a)(A)(vii), Sellers shall pay the amount of such Transfer Tax to the Plan Sponsor, by wire transfer of immediately available funds to an account or accounts designated in writing by the Plan Sponsor for such purpose at least two (2) Business Days prior to the due date for the filing of the Tax Return with which such payment is required to be made.  The Parties each agree to use reasonable best efforts to take any action reasonably necessary to mitigate, reduce, or eliminate any Transfer Tax that could be imposed upon any transfer undertaken pursuant to this Agreement. If the Plan Sponsor, or any Acquired Subsidiary after the U.S. Closing, as applicable, actually realizes a refund, credit, rebate or other recovery of any Transfer Tax (for the avoidance of doubt, other than VAT), or, if after one hundred eighty (180) days following the Closing Date the amount of Transfer Taxes included in Section 3.1(a)(A)(vii) exceeds the amount of Transfer Taxes actually paid to the applicable Tax Authorities by the Plan Sponsor or an Affiliate of the Plan Sponsor (including an Acquired Subsidiary after the U.S. Closing) and not otherwise reimbursed under this Section 10.1, the Plan Sponsor shall pay, or cause to be paid, to Sellers, by wire transfer of immediately available funds to an account or accounts designated in writing by Sellers for such purpose, any such refund, credit, rebate, other recovery or excess reduction in Purchase Price within five (5) Business Days

of receipt or expiration of such one hundred eighty (180) day period. Sellers, upon request of the Plan Sponsor, shall repay to the Plan Sponsor or an Affiliate of the Plan Sponsor (including an Acquired Subsidiary after the U.S. Closing) any amount paid over, or caused to be paid over, by the Plan Sponsor or an Affiliate of the Plan Sponsor (including an Acquired Subsidiary after the U.S. Closing) with respect to any such refund, credit, rebate or other recovery (plus any penalties, interest, or other charges imposed by the relevant Tax Authority) in the event that the Plan Sponsor or an Affiliate (including an Acquired Subsidiary after the U.S. Closing) is required to repay such refund, credit, rebate or other recovery to such Tax Authority. For the avoidance of doubt, this Section 10.1 (other than the first sentence) shall not apply to VAT, which shall be governed exclusively by Section 3.1 and Section 10.2.

10.2    VAT.    The Parties recognize and acknowledge that the Closings and the pre-Closing restructurings described in this Agreement, the TSAC Purchase Agreement (if applicable), the TKJP Purchase Agreement, and, to the extent relating to the sale or transfer of Owned Properties, as defined in the TK Europe Purchase Agreement, from TKAG and Takata Sachsen to Lux Sarl, the TK Europe Purchase Agreement, may result in VAT becoming payable by a Seller Entity, the Plan Sponsor or a Plan Sponsor Affiliate under applicable Law. From the proceeds deducted from the Purchase Price pursuant to Section 3.1 in respect of the Estimated Total Recoverable VAT Amount and the Estimated Total Non-Recoverable VAT Amount, the Plan Sponsor shall promptly pay, or cause to be paid, all VAT for which any Seller Entity, the Plan Sponsor or an Affiliate of the Plan Sponsor is responsible for paying under applicable Law. The Plan Sponsor shall establish an escrow account (the "**Regulatory Escrow**") into which the Plan Sponsor and, as applicable, the Sellers, the sellers under the TK Europe Purchase Agreement, the sellers under the TSAC Purchase Agreement (if applicable) and the sellers under the TKJP Purchase Agreement shall deposit, or cause to be deposited, any portion of the Regulatory Escrow Amount if, as, and when actually realized; provided, however, that such deposit will be paid only to the extent such amount was economically borne by a Seller Entity (excluding Acquired Subsidiaries after the U.S. Closing), a seller or any Affiliate thereof under any Cross-Conditioned Agreement (excluding any acquired subsidiaries thereunder after the Closings) in connection with the Closings and/or any pre-closing restructurings contemplated by this Agreement and/or any Cross-Conditioned Agreement (whether by direct payment, reduction of the Purchase Price or the purchase price payable under any of the Cross-Conditioned Agreements, or otherwise). If such recovery is subsequently denied by a Tax Authority, the Regulatory Escrow shall be adjusted accordingly so that the relevant party receives back any funds necessary to compensate such entity for the value of any such denied recovery (and any related penalties, interest, or other charges). The terms and conditions of the Regulatory Escrow shall be as set forth in the Regulatory Escrow Agreement pursuant to the Regulatory Escrow Term Sheet attached hereto as Exhibit F. The Parties each agree to use commercially reasonable efforts to take any action reasonably necessary to mitigate, reduce, or eliminate, and to promptly realize the recovery of, any VAT that could be imposed upon any transaction undertaken pursuant to this Agreement.

10.3    Real Property, Personal Property and Similar Ad Valorem Taxes.    All real property, personal property and similar ad valorem Taxes levied with respect to the Purchased Assets for a Tax period which includes (but does not end on) the Closing Date (collectively, the "**Apportioned Obligations**") shall be apportioned between Sellers and the Plan Sponsor based on the number of days of such Tax period ending on the Closing Date (such portion of such Tax

123

period, the "**Pre-Closing Tax Period**") and the number of days of such Tax period after the Closing Date (such portion of such Tax period, the "**Post-Closing Tax Period**"). Sellers shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period, and the Plan Sponsor shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period. Apportioned Obligations, if any, shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law, or as otherwise agreed by the Parties. The paying Party shall be entitled to <u>reimbursement</u> from the non-paying Party in accordance with this <u>Section 10.3</u>. Upon payment of any such Apportioned Obligation, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under this <u>Section 10.3</u>, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement by wire transfer in immediately available funds to an account or accounts designated in writing by the other Party within ten (10) days of receipt of such statement; <u>provided</u>, <u>however</u>, to the extent that the amount of any required reimbursement can be determined prior to the U.S. Closing, the amount to be so reimbursed shall be paid by the non-paying Party to the paying Party concurrently with and as part of the U.S. Closing.

      10.4   <u>Section 338 Elections</u>.

      (a)   If the Plan Sponsor elects and Sellers consent (such consent not to be unreasonably withheld, conditioned or delayed) to such election, then the applicable Sellers shall, and shall cause the other applicable Seller Entities to, join with the Plan Sponsor in making a timely election under Code Section 338(h)(10) (and any corresponding election under state, local and foreign Tax Law) with respect to the purchase and sale, whether directly or indirectly, of the equity interests of any Acquired Subsidiary that is treated as a corporation for U.S. federal income Tax purposes pursuant to this Agreement, including any Acquired Subsidiary that is purchased indirectly through the purchase and sale of the equity interests of such entity's direct or indirect parent (any such elections, the "**338(h)(10) Election**"), and Sellers shall not, and shall cause the other Seller Entities to not, take or assert any position inconsistent with such 338(h)(10) Election. The applicable Sellers and the Plan Sponsor shall, and Sellers shall cause the other applicable Seller Entities to, cooperate for the purpose of effectuating a timely and effective 338(h)(10) Election to which Sellers have consented, including the execution and filing of any other forms or returns. Any 338(h)(10) Election shall be filed based upon the purchase price allocation (as described in <u>Section 10.5</u>). In the event that Sellers consent to the 338(h)(10) Election, at least thirty (30) days prior to the last date on which the 338(h)(10) Election must be filed, the Plan Sponsor shall prepare and deliver to any applicable Seller Entities all forms and other documents required by Code Section 338 and the U.S. Treasury Regulations thereunder including IRS Form 8023 (together with any similar state, local or foreign forms). To the extent it has not already done so, the applicable Sellers shall, and shall cause the other applicable Seller Entities to, execute all such forms and other documents required to be executed by it in connection with any 338(h)(10) Election to which Sellers have consented, as set forth in the instructions provided by the Plan Sponsor and deliver the same to the Plan Sponsor for filing within fifteen (15) days of the receipt of such other forms and other documents from the Plan Sponsor.

WEIL:\96035900\75\76903.0003

(b)       The Plan Sponsor may, at its election but subject to the consent of Sellers (such consent not to be unreasonably withheld, conditioned or delayed), make elections under Code Section 338(g) (and any corresponding election under state, local, and foreign Tax Law) with respect to the purchase and sale, whether directly or indirectly, of the equity interests of any non-U.S. Acquired Subsidiary that is treated as a corporation for U.S. federal income Tax purposes pursuant to this Agreement (any such elections, the "**338(g) Election**"); provided, however, the Plan Sponsor shall be entitled, without the consent of Sellers, to make a 338(g) Election with respect to any such Acquired Subsidiary that is not a controlled foreign corporation within the meaning of Section 957 of the Code for the Tax period (or portion thereof) ending on the Closing Date.  Each Seller shall, and shall cause each other Seller Entity to, cooperate with the Plan Sponsor to enable the Plan Sponsor, if it so elects and Sellers consent (if applicable), to make a 338(g) Election.

(c)       Each Seller shall, and shall cause each other Seller Entity to, provide to the Plan Sponsor all data and information that the Plan Sponsor reasonably requests to enable the Plan Sponsor, in its sole discretion, to determine the consequences of making a 338(h)(10) Election or a 338(g) Election.

10.5     Purchase Price Allocation.

(a)       Sellers and the Plan Sponsor shall allocate the Purchase Price (including the Assumed Liabilities and all other relevant items) among the Purchased Assets, and further among the assets of any Acquired Subsidiary for which a 338(h)(10) Election or a 338(g) Election (if any) is made, in accordance with Section 1060 of the Code and the U.S. Treasury Regulations thereunder and U.S. Treasury Regulation Sections 1.338-6 and 1.338-7.  No later than one hundred and twenty (120) days after the Closing Date, the Plan Sponsor shall prepare and deliver to Sellers a draft allocation (the "**Asset Acquisition Statement**") for Sellers' review and comment.  Any reasonable comments provided by Sellers to the Plan Sponsor within thirty (30) days of receipt of the Asset Acquisition Statement shall be accepted by the Plan Sponsor unless the Plan Sponsor does not agree with such comments.  If the Plan Sponsor does not agree with any such comments, the Plan Sponsor and Sellers shall seek in good faith to resolve any such dispute.  If Sellers and the Plan Sponsor are unable to reach an agreement within thirty (30) days following the delivery of comments by Sellers to the Plan Sponsor, the Parties shall refer any disputed elements of the Asset Acquisition Statement to a nationally recognized independent accounting firm jointly selected by Sellers and the Plan Sponsor for resolution (the "**Allocation Accounting Firm**").  Sellers and the Plan Sponsor shall each pay one half of all fees and expenses of such independent accounting firm.  The Asset Acquisition Statement (as mutually agreed by Sellers and the Plan Sponsor, or as finally determined by the Allocation Accounting Firm) shall be conclusive and binding on the Parties.  The Plan Sponsor shall prepare and deliver to Sellers from time to time revised copies of the Asset Acquisition Statement (the "**Revised Statements**") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any, and to address any 338(h)(10) Election or 338(g) Election (if any) not previously addressed) consistent with the agreed upon allocation for Sellers' review and approval (subject to the dispute resolution provisions set forth above).  The Purchase Price (including the Assumed Liabilities and all other relevant items) shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, prepared in accordance with this Section 10.5, and all income Tax Returns and reports (including

125

IRS Form 8594 and any required exhibits thereto) filed by the Plan Sponsor and Seller Entities shall be prepared consistently with such allocation, except as provided by a change in applicable Tax Law or the good faith resolution of a Tax contest.

(b)     Prior to the Closing, the Plan Sponsor and Sellers shall work together in good faith to determine the amount of the Purchase Price that shall be allocated to the purchase and sale of the shares of the entities listed on <u>Schedule G</u> hereto. In the event that the Plan Sponsor and Sellers cannot agree on such allocation, they shall refer any disputed elements to the Allocation Accounting Firm with sufficient time to resolve the dispute prior to the U.S. Closing. For the avoidance of doubt, such allocation shall be completed prior to the U.S. Closing. The parties shall also work together to revise such completed allocation as necessary to reflect any adjustments to the Purchase Price.

(c)     Notwithstanding any of the aforementioned provisions, for purposes of complying with applicable Tax provisions under Mexican Law, the Parties agree that the Purchase Price allocation for the Purchased Assets sold in Mexico shall be at market value.

10.6    <u>Brazil Withholding Tax Matters</u>.

(a)     For the avoidance of doubt, the Plan Sponsor shall be entitled to deduct and withhold from the corresponding portion of the Purchase Price or any other payment made by it under this Agreement relating to the purchase and sale of TKBR quotas ("**Takata Brasil Quotas**") such amounts as it is required to deduct or withhold under applicable Law (including any Tax on financial transactions for the remittance from Brazil to abroad), and any amounts so deducted or withheld shall be treated for all purposes of this Agreement as having been paid to Sellers or other Person in respect of which such deduction or withholding was made; <u>provided</u>, that the Plan Sponsor shall cooperate in good faith with Sellers to minimize any such withholding.

(b)     At least twelve (12) Business Days prior to the Closing Date, the relevant Seller(s) to which the purchase and sale of Takata Brasil Quotas relates shall notify the Plan Sponsor in writing of the cost of its acquisition in respect of the Takata Brasil Quotas to be sold, providing documentary evidence (including all foreign exchange agreements, Brazilian Central Bank registries and relevant general assembly minutes) to support such acquisition cost to the reasonable satisfaction of the Plan Sponsor.

(c)     The Plan Sponsor, upon receipt of the information required pursuant to <u>Section 10.6(b)</u>, shall (i) provide notice to such Sellers on or before the seventh (7th) Business Day prior to the Closing Date of the estimated amounts, if any, to be deducted or withheld under this <u>Section 10.6</u> and <u>Section 3.7</u> (the final amount to be notified to such Sellers on such Closing Date) and (ii) promptly pay to the applicable Governmental Authority or Tax Authority the full amount, if any, required to be deducted or withheld, based on the applicable rate and terms set forth in the applicable Law at the time of payment of the relevant Purchase Price (or part thereof) or other payment to be made under this Agreement, and provide Sellers with an official receipt or other documentation reasonably necessary to evidence such payment, if any.

WEIL:\96035900\75\76903.0003

(d)    Sellers agree to comply with any and all reasonable requests made by or on behalf of the Plan Sponsor in connection with the deduction, withholding or payment of any amount under this Section 10.6.

10.7    Mexican Tax Withholding Matters.

(a)    For the avoidance of doubt, the Plan Sponsor shall be entitled to deduct and withhold from the corresponding portion of the Purchase Price or any other payment made by it under this Agreement relating to the purchase and sale of any Equity Interests in Mexico such amounts as it is required to deduct or withhold under applicable Law, and any amounts so deducted or withheld shall be treated for all purposes of this Agreement as having been paid to Sellers or other Person in respect of which such deduction or withholding was made; provided, that the Plan Sponsor shall cooperate in good faith with Sellers to minimize any such withholding.

(b)    At least fifteen (15) Business Days prior to the Closing Date, the relevant Seller(s) to which the purchase and sale of the Equity Interests in Mexico relates shall provide to the Plan Sponsor (i) such information and documentation that the Plan Sponsor needs, in its sole determination, subject to the following clause (ii), to determine whether any such purchase or sale results in any withholding Tax under Mexican Law and (ii) written notice of whether such Seller(s) will elect to be taxed on the capital gain, if any, in accordance with the provisions of article 161 of the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta)* and its regulations.

(c)    The Plan Sponsor, upon receipt of the information required pursuant to Section 10.7(b), shall (i) provide notice to such Sellers on or before the seventh (7th) Business Day prior to the Closing Date of the estimated amounts, if any, to be deducted or withheld under this Section 10.7 and Section 3.7 (the final amount to be notified to such Sellers on such Closing Date) and (ii) promptly pay to the applicable Governmental Authority or Tax Authority the full amount, if any, required to be deducted or withheld, based on the applicable rate and terms set forth in the applicable Law at the time of payment of the relevant Purchase Price (or part thereof) or other payment to be made under this Agreement, and provide Sellers with an official receipt or other documentation reasonably necessary to evidence such payment, if any.

(d)    Notwithstanding the foregoing sections (a)-(c) of this Section 10.7, pursuant to Section 10.7(b) above, if the relevant Seller(s) informs the Plan Sponsor that such Seller(s) will elect to be taxed on the capital gain, if any, in accordance with the provisions of article 161 of the Mexican Income Tax Law (*Ley del Impuesto Sobre la Renta)* and its regulations, such Seller(s) shall deliver to the Plan Sponsor: (i) at Closing, a copy of the corresponding tax return filed by such Seller(s) with the Mexican Tax Authorities; (ii) within 15 Business Days after Closing, a copy of Official Form 39 (*Aviso para presentar dictamen fiscal de enajenación de acciones*) submitted by such Seller(s) to the Mexican Tax authorities; and (iii) within 30 Business Days after Closing, a copy of the corresponding tax report (*dictamen fiscal de enajenación de acciones*) prepared by a public accountant registered before the Mexican Tax Authorities jointly with a copy of Official Form 40 (*Carta de presentación del dictamen de enajenación de acciones*) submitted by such Seller(s) with the Mexican Tax Authorities.

(e)     Sellers agree to comply with any and all reasonable requests made by or on behalf of the Plan Sponsor in connection with the deduction, withholding or payment of any amount under this <u>Section 10.7</u>.

10.8     <u>Pre-Closing Actions</u>.

(a)     Except (i) as required by applicable Law or by order of the Bankruptcy Court, (ii) with the prior written consent of the Plan Sponsor (which consent shall not be unreasonably withheld, conditioned or delayed), (iii) as would not be expected to have a material impact on the Plan Sponsor after the U.S. Closing, or (iv) in connection with the pre-Closing restructurings described in <u>Section 7.20</u>, Sellers shall not, (a) change or rescind any election relating to Taxes; (b) change any method of Tax accounting; (c) file any Tax Returns that have been prepared in a manner that is inconsistent with past practice; (d) file any amended Tax Return; (e) settle or compromise any claim, investigation, audit, or controversy relating to Taxes; (f) agree to an extension or waiver of the statute of limitations with respect to the assessment or determination of Taxes; (g) enter into any closing agreement with respect to any Tax; (h) surrender any right to claim a Tax refund; (i) file a claim for any Tax refund, credit, rebate or other recovery; or (j) take (or fail to take) any action that could result in any adverse Tax consequences (including any reduction in Tax attributes) to the Plan Sponsor or any of its Affiliates after the U.S. Closing, in each case, with respect to the Acquired Subsidiaries; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 10.8</u> shall preclude Sellers from carrying back any net operating losses, capital losses, Tax credits or similar items to any Tax period.

(b)     Except (i) as required by applicable Law or by order of the Bankruptcy Court or (ii) with the prior written consent or instruction, pursuant to <u>Section 7.20(e)</u>, of the Plan Sponsor (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller Entity shall take any action, or omit to take any action, that would reasonably be expected to result in the imposition of any Tax the payment of which is due by an Acquired Subsidiary unless the Seller Entity has made reasonable provision for the payment of such Tax.

10.9     <u>Cooperation</u>.  Sellers, on the one hand, and the Plan Sponsor, on the other hand, will provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return, claiming any refund of Taxes, determining a Liability for Taxes or a right to a refund of Taxes, or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax Authorities.  Any information obtained under this <u>Section 10.9</u> shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

10.10     <u>Tax Treatment of Purchase Price Adjustments</u>.  Except as otherwise required by applicable Tax Law, the Parties shall treat all post-U.S. Closing payments made by one Party to the other pursuant to this Agreement as adjustments to the Purchase Price for Tax purposes.

10.11 <u>Tax Sharing Agreements</u>.  All Tax sharing agreements or similar agreements involving any Acquired Subsidiary shall be terminated as of the Closing Date and, after the Closing Date, such Acquired Subsidiaries shall not be bound thereby or have any liability to any Person, including any Seller or any of its Affiliates, thereunder.

10.12 <u>Exclusivity</u>.  In the event of a conflict between the provisions of this <u>Article X</u> and the other provisions of this Agreement, <u>Article X</u> shall control with respect to Tax matters.

## ARTICLE XI

## <u>MISCELLANEOUS</u>

11.1 <u>Survival</u>.  Except for any covenant that by its terms is to be performed (in whole or in part) by a Party following the U.S. Closing, none of the representations, warranties, or covenants of a Party set forth in this Agreement (including in any certificate delivered in accordance with <u>Section 4.2</u> or <u>Section 4.3</u>) shall survive, and each of the same shall terminate and be of no further force or effect as of, the U.S. Closing.

11.2 <u>Expenses</u>.  Except as otherwise expressly set forth herein, and subject to <u>Section 4.6</u>, each Party will bear its own costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the Transactions.

11.3 <u>Incorporation of Exhibits and Disclosure Schedule</u>.  The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

11.4 <u>Specific Performance</u>.  The Plan Sponsor and Sellers acknowledge and agree that any non-breaching Party would be damaged irreparably in the event the breaching Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that the non-breaching Party may have under Law or equity, the non-breaching Party shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.  The Plan Sponsor and Sellers further acknowledge and agree that, if and to the extent that any court of competent jurisdiction grants injunctive relief to any party to the TKJP Purchase Agreement, the TSAC Purchase Agreement (if applicable) or the TK Europe Purchase Agreement to prevent any breaches of the provisions of such agreements and to enforce specifically any of those agreements and the terms and provisions thereof, then the Parties shall be required to comply with the terms of such injunctive relief in respect of the Transactions and shall not contest the application of such injunctive relief to the terms contemplated by this Agreement.

11.5 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of New York (without giving effect to any principles of conflict of laws of any jurisdiction that would cause the application of other jurisdictions' laws), except to the extent that such Laws are superseded by the Bankruptcy Code.

11.6    <u>Submission to Jurisdiction; Service of Process</u>.

(a)    Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Legal Proceeding arising out of or relating to this Agreement or the Transactions and agrees that all claims in respect of such Legal Proceeding may be heard and determined in such court.  Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or the Transactions in any other court.    Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Legal Proceeding so brought and waives any bond, surety or other security that might be required of the other Party with respect thereto.  Either Party may make service on the other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in <u>Section 11.9</u>; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 11.6</u> shall affect the right of a Party to serve legal process in any other manner permitted by Law or in equity.  Each Party agrees that a final judgment in any Legal Proceeding so brought shall be conclusive and may be enforced by litigation or in any other manner provided by Law or in equity.  The Parties intend that all foreign jurisdictions will enforce any decree of the Bankruptcy Court in any Legal Proceeding arising out of or relating to this Agreement or the Transactions.

(b)    Notwithstanding anything to the contrary in this <u>Section 11.6</u> or elsewhere in this Agreement, each of the Plan Sponsor and each of Sellers agrees that it will not bring or support any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against the Debt Financing Sources in any way relating to this Agreement, including any dispute arising out of the Debt Commitment Letter or the performance thereof or the Financing, in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York (and of the appropriate appellate courts therefrom).

11.7    <u>WAIVER OF JURY TRIAL</u>.    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND IN EACH CASE INCLUDING ANY LEGAL PROCEEDING AGAINST ANY DEBT FINANCING SOURCE ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED HEREBY, THE DEBT COMMITMENT LETTER, THE FINANCING OR THE PERFORMANCE OF SERVICES WITH RESPECT THERETO.

11.8    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and the Cross-Conditioned Agreements, the Confidentiality Agreement, the RSA, the OEM Indemnity and Release Agreement and the other agreements being entered into in connection with the Agreement or otherwise expressly contemplated by this Agreement constitute (or will constitute when entered into as contemplated by this Agreement) the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.  No

amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by a Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the second sentence of this Section 11.8 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of a Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof. Notwithstanding the foregoing, no amendment, modification or supplement shall be made to this Agreement that would adversely affect the rights of the Debt Financing Sources as set forth in Sections 7.16(a), 11.6(b), 11.7, 11.11, 11.12, 11.13 and this Section 11.8 (the "**FS Provisions**") without the prior written consent of the Debt Financing Sources. The Plan Sponsor agrees that it shall not agree to amend Section 3.3 or Section 3.5 of the TK Europe Purchase Agreement, Section 3.3 or Section 3.5 of the TKJP Purchase Agreement or the provisions therein comparable to Section 3.3 or Section 3.5 under this Agreement contained in the TSAC Purchase Agreement (if applicable) (in each case, including any of the definitions referenced therein) without the prior written consent of Sellers. Sellers agree that they shall not amend the definition of "Plan Settlement Payment" in the Plan or sections 5.5(a)(viii) or 5.15(b)(i) of the Plan without the prior written consent of the Plan Sponsor.

11.9    Notices.    All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given: (a) when delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) on the day such communication was sent by e-mail (with acknowledgement received); (d) five (5) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid; and (e) upon delivery when sent via email by way of a PDF attachment thereto of an executed document. Notices shall be sent to the appropriate Party at its address given below (or at such other address for such Party as shall be specified by notice given hereunder):

If to Sellers, to:

TK Holdings Inc.
2500 Takata Drive
Auburn Hills, MI 48326
Attention:      Scott Caudill
                Ken Bowling
Email:          Scott.Caudill@Takata.com
                Ken.Bowling@Takata.com

131

With a copy (which shall not constitute notice) to:

        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, NY 10153
        Attention:     Marcia Goldstein
                           Frederick S. Green
                           Gavin Westerman
        Email:         Marcia.Goldstein@weil.com
                           Frederick.Green@weil.com
                           Gavin.Westerman@weil.com

If to the Plan Sponsor, to:

        Joyson KSS Auto Safety S.A.
        c/o KSS Holdings, Inc.
        7000 Nineteen Mile Road
        Sterling Heights, Michigan 48314
        Attention:     Joe Perkins
        Email:         perkinsj@keysafetyinc.com

With a copy (which shall not constitute notice) to:

        Skadden, Arps, Slate, Meagher & Flom LLP
        4 Times Square
        New York, NY 10036
        Attention:     Steven J. Daniels
                           Ron E. Meisler
        Email:         Steven.Daniels@skadden.com
                           Ron.Meisler@skadden.com

If to Guarantor, to:

        KSS Holdings, Inc.
        7000 Nineteen Mile Road
        Sterling Heights, Michigan 48314
        Attention:     Joe Perkins
        Email:         perkinsj@keysafetyinc.com

With a copy (which shall not constitute notice) to:

        Skadden, Arps, Slate, Meagher & Flom LLP
        4 Times Square
        New York, NY 10036
        Attention:     Steven J. Daniels
                           Ron E. Meisler

Email:       Steven.Daniels@skadden.com
             Ron.Meisler@skadden.com

11.10  <u>Severability</u>.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.   In the event that any of the provisions of this Agreement shall be held by any Governmental Authority to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

11.11  <u>No Third Party Beneficiaries</u>.   Except as set forth in <u>Section 11.13</u>, this Agreement shall not confer any rights or remedies upon any Person other than the Plan Sponsor, each Seller, and their respective successors and permitted assigns, <u>provided</u>, that the Debt Financing Sources and each of their respective Affiliates and their respective current, former and future direct or indirect equity holders, controlling persons, stockholders, agents, Affiliates, members, managers, general or limited partners, assignees or representatives shall be express third party beneficiaries with respect to the FS Provisions, that each FS Provision shall expressly inure to the benefit of the Debt Financing Sources (or any security trustee or collateral agent appointed on behalf of the Debt Financing Sources) and that the Debt Financing Sources (or any security trustee or collateral agent appointed on behalf of the Debt Financing Sources) shall be entitled to rely on and enforce the FS Provisions; <u>provided</u>, <u>further</u>, that the Consenting OEMs shall be express third party beneficiaries with respect to <u>Section 9.1(c)</u>, that <u>Section 9.1(c)</u> shall expressly inure to the benefit of the Consenting OEMs and that the Consenting OEMs shall be entitled to rely on and enforce <u>Section 9.1(c)</u>.

11.12  <u>Succession and Assignment</u>.   This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.   No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Party; <u>provided</u>, <u>however</u>, that the Plan Sponsor may assign this Agreement and its rights, interests and/or obligations thereunder to one or more current or future Affiliates of the Plan Sponsor or to any of the Plan Sponsor's lenders or any security trustee or collateral agent appointed by the Plan Sponsor's lenders for collateral security purposes; <u>provided</u>, <u>further</u>, <u>however</u>, that any such assignment shall not relieve the Plan Sponsor of its obligations under this Agreement.

11.13  <u>Non-Recourse</u>.   All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "**Contracting Parties**").   In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other Person not an Affiliate of such Contracting Party as of the date hereof.   No Person who is not a Contracting Party, including (i) any Debt Financing Source and (ii) any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or Representative of, and any financial advisor or lender to, any of the foregoing ("**Non-Party Affiliates**"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any claims,

WEIL:\96035900\75\76903.0003

causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Cross-Conditioned Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Cross-Conditioned Agreements (except, in the case of the Plan Sponsor, reliance on the terms of Section 11.16).  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 11.13.

11.14  <u>Mutual Drafting</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring a Party by virtue of the authorship of any of the provisions of this Agreement.

11.15  <u>Disclosure Schedule</u>. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement.  The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule.  The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for purposes of all other sections of the Disclosure Schedule to which it is expressly indicated in the text of such disclosure that such matter relates or to which the relevance of other sections of the Disclosure Schedule is reasonably apparent on the face of such disclosure.  The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement.  All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced.  The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement. All references in the Disclosure Schedule to specific data room locations have been included for convenience purposes only and will not be deemed to incorporate by reference the document or documents located at the specified data room location.

11.16   <u>Joint Obligations</u>.  Any covenant, agreement or obligation of any Party hereunder shall be deemed to be and shall constitute a covenant, agreement and obligation of and by such Party to cause each controlled Affiliate of such Party, where reasonably required for performance (including, whether or not Affiliates are mentioned, all obligations to refrain from taking action detrimental to or potentially inhibiting or restraining the consummation of the Transactions), to perform and discharge such covenant, agreement or obligation (including obligations to refrain from taking actions).  Each Party shall be jointly and severally liable for the failure by such Party, or such Party's controlled Affiliates, to perform and discharge any of their respective covenants, agreements or obligations hereunder. Any covenant, agreement or obligation of a controlled Affiliate of any Party hereunder shall constitute a covenant, agreement or obligation of such Party to cause such Affiliate to take action or refrain from taking action, as applicable. The action, or failure to act, of any Party's controlled Affiliates in accordance with the terms of this Agreement and any breach by any Party' controlled Affiliates of their agreements, representations and warranties in this Agreement shall in each case be deemed to, for the purpose of interpretation of this Agreement, constitute the action, failure to act and breach, as applicable, of such Party.

11.17   <u>Counterparts; Electronic Signatures</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  This Agreement or any counterpart may be executed and delivered by electronic communications in portable document format (.pdf), each of which shall be deemed an original.

[Signature Page Follows]

WEIL:\96035900\75\76903.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

TK HOLDINGS INC.

By: _____

Name: Ken Bowling
Title: Vice President, Chief Financial Officer, Secretary

TAKATA AMERICAS

By:_____
    Name: Ken Bowling
    Title: Secretary

TK HOLDINGS DE MEXICO S. DE R.L. DE C.V.

By: _____

Name: Yoichiro Nomura
Title: Director

TK MEXICO LLC

By:_____
    Name: Carlos Alberto Valdez Andrade
    Title: President

[Signature Page to the United States Asset Purchase Agreement]

INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.

By: _____
    Name: Yoichiro Nomura
    Title: Director


By: _____
    Name: Satoshi Seita
    Title: Director


By: _____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.

By:_____
    Name: Yoichiro Nomura
    Title: Director


By:_____
    Name: Satoshi Seita
    Title: Director


By:_____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.

By:_____

    Name: Yoichiro Nomura
    Title: Director

By:_____

    Name: Satoshi Seita
    Title: Director

By:_____

    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

STROSSHE MEX S. DE R.L. DE C.V.

By: _____
    Name: Yoichiro Nomura
    Title: Director




By: _____
    Name: Satoshi Seita
    Title: Director




By: _____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

STROSSHE MEX S. DE R.L. DE C.V.

By:_____
    Name: Yoichiro Nomura
    Title: Director


By:_____
    Name: Satoshi Seita
    Title: Director


By:_____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

STROSSHE MEX S. DE R.L. DE C.V.


By:_____
    Name: Yoichiro Nomura
    Title: Director




By:_____
    Name: Satoshi Seita
    Title: Director




By:_____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

TAKATA DE MEXICO S.A. DE C.V.

By: _____
    Name: Yoichiro Nomura
    Title: Director




By: _____
    Name: Satoshi Seita
    Title: Director




By: _____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

TAKATA DE MEXICO S.A. DE C.V.

By:_____
     Name: Yoichiro Nomura
     Title: Director


By:_____
     Name: Satoshi Seita
     Title: Director


By:_____
     Name: Carlos Alberto Valdez Andrade
     Title: Director

[Signature Page to the United States Asset Purchase Agreement]

TAKATA DE MEXICO S.A. DE C.V.

By:_____
    Name: Yoichiro Nomura
    Title: Director

By:_____
    Name: Satoshi Seita
    Title: Director

By:_____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

[Signature Page to the United States Asset Purchase Agreement]

JOYSON KSS AUTO SAFETY S.A.

By: _____
    Name: Jianfeng Wang
    Title: Director


By: _____
    Name: Yuxin Tang
    Title: Director


KSS HOLDINGS, INC. (solely for purposes of Section 7.22)

By: _____
    Name: Yuxin Tang
    Title: Executive Director & President

[Signature page to the United States Asset Purchase Agreement]

JOYSON KSS AUTO SAFETY S.A.

By: _____
    Name: Jianfeng Wang
    Title: Director

By: _____
    Name: Yuxin Tang
    Title: Director


KSS HOLDINGS, INC. (solely for purposes of <u>Section 7.22</u>)

By: _____
    Name: Yuxin Tang
    Title: Executive Director & President

[Signature page to the United States Asset Purchase Agreement]

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

**FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "**First Amendment**"), is made and entered into as of the 13th day of December, 2017, by and among by and among TK Holdings Inc., a Delaware corporation ("**TK Holdings**"), Takata Americas, a Delaware general partnership ("**Takata Americas**"), TK Holdings de Mexico S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*) ("**TK Holdings de Mexico**"), TK Mexico LLC, a Delaware limited liability company ("**TK Mexico LLC**"), Industrias Irvin de Mexico, S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*) ("**Industrias**"), Strosshe Mex S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*) ("**SMX**"), Takata de Mexico S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*) ("**TK de Mexico**" and, collectively with TK Holdings, Takata Americas, TK Holdings de Mexico, TK Mexico LLC, Industrias and SMX, "**Sellers**"), Joyson KSS Auto Safety S.A., a Luxembourg *société anonyme* ("**Parent**", and collectively with one or more of its current or future Subsidiaries or Affiliates, the "**Plan Sponsor**"), and solely for purposes of Section 7.22 of the Agreement (as defined below), KSS Holdings, Inc., a Delaware corporation ("**KSS Holdings**"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Agreement (as defined below).

## RECITALS

**WHEREAS,** on November 16, 2017, Sellers, Parent, and, solely for purposes of Section 7.22 thereof, KSS Holdings, entered into an Asset Purchase Agreement (the "**Agreement**"); and

**WHEREAS,** Sellers, Parent and KSS Holdings, acting in accordance with Section 11.8 (Entire Agreement; Amendments and Waivers) of the Agreement, desire to amend the Agreement on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Sellers, Parent, Plan Sponsor and KSS Holdings hereby agree as follows:

1. Section 4.4(d)(ii) of the Agreement shall be amended and restated in its entirety as follows:

"the OEM Indemnity and Release Agreement is not executed and delivered to the Plan Sponsor on or before December 15, 2017 by (i) each of the specified OEMs listed on Schedule H hereto and (ii) a sufficient number of the parties listed on Schedule I hereto, such that no more than 1,800,000 PSAN Inflators are attributable to parties listed thereto that have not become Consenting OEMs; provided, however, that the Plan Sponsor may not terminate this Agreement pursuant to this Section 4.4(d)(ii) prior to December 15, 2017 or after December 19, 2017;"

2. Section 4.4(d)(xv) of the Agreement is hereby amended and restated in its entirety as follows:

"the condition set forth in Section 9.1(o) has not been satisfied or irrevocably waived by the Plan Sponsor on or before December 15, 2017 (the "**DOJ/NHTSA Outside Date**"); provided, however, that the Plan Sponsor may not terminate the Agreement pursuant to this Section 4.4(d)(xv) prior to the DOJ/NHTSA Outside Date or after the date that is five (5) Business Days after the DOJ/NHTSA Outside Date; or"

3. Section 7.24 of the Agreement is hereby amended and restated in its entirety as follows:

"Non-Consenting OEMs. The Plan Sponsor shall seek to develop a reasonable strategy to obtain the execution and delivery of the OEM Indemnity and Release Agreement by the parties set forth on Schedule I on or before December 15, 2017, and, in furtherance thereof, engage in good faith discussions and negotiations with such parties. The Plan Sponsor hereby agrees that it shall, as reasonably requested by Sellers, provide updates with respect to the status of such discussions and negotiations (including whether the Plan Sponsor believes that any such party will not in any event execute the OEM Indemnity and Release Agreement)."

4.    Except as expressly set forth herein, this First Amendment (i) shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the parties hereto, including without limitation any accrued to date, or any other party under the Agreement, or the documents delivered pursuant thereto, and (ii) shall not alter, modify, amend or in any way affect any of the terms or conditions contained in the Agreement, or the documents delivered pursuant thereto, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

5.    Upon the execution hereof, this First Amendment and the Agreement shall constitute one agreement. The term "Agreement", as used in the Agreement, shall mean the Agreement as amended by this First Amendment, although this change shall not alter the dates as of which any provision of the Agreement speaks, except as expressly provided herein. For example, phrases such as "as of the date hereof" and **"as of the date of this Agreement"** shall continue to refer to November 16, 2017, the date that the Agreement was executed, except as expressly provided herein.

[Signature Page Follows]

2

IN WITNESS WHEREOF, the parties hereto have caused this First Amendment to be executed as of the date first above written.

TK HOLDINGS INC.

By: _____

Name: Ken Bowling
Title: Vice President, Chief Financial Officer, Secretary

TAKATA AMERICAS

By: _____

Name: Ken Bowling
Title: Secretary

TK HOLDINGS DE MEXICO S. DE R.L. DE C.V.

By
Name: Yoichiro Nomura
Title: Director

[Signature page to US APA Amendment No. 1]

TK MEXICO LLC

By: _____

Name: Carlos Alberto Valdez Andrade
Title: President

INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.

By: _____
Name: Yoichiro Nomura
Title: Director

By: _____
Name: Satoshi Seita
Title: Director

By: _____
Name: Carlos Alberto Valdez Andrade
Title: Director

[Signature page to US APA Amendment No. 1]

STROSSHE MEX S. DE R.L. DE C.Y.

By: _____
Name: Yoichiro Nomura
Title: Director

By: _____
Name: Satoshi Seita
Title: Director

By: _____
Name: Carlos Alberto Valdez Andrade
Title: Director

[Signature page to US APA Amendment No. 1]

TAKATA DE MEXICO S.A. DE C.V.

By: _____
Name: Yoichiro Nomura
Title: Director

By: _____
Name: Satoshi Seita
Title: Director

By: _____
Name: Carlos Alberto Valdez Andrade
Title: Director

[Signature page to US APA Amendment No 1]

JOYSON KSS AUTO SAFETY S.A.

By: _____

Name: Jianfeng Wang
Title: Director

By: _____

Name: Yuxin Tang
Title: Director

KSS HOLDINGS, INC. (solely for purposes of <u>Section 7.22</u>)

By: _____

Name: Yuxin Tang
Title: Executive Director & President

JOYSON KSS AUTO SAFETY S.A.

By: _____
    Name: Jianfeng Wang
    Title: Director

By: _____
    Name: Yuxin Tang
    Title: Director


KSS HOLDINGS, INC. (solely for purposes of <u>Section 7.22</u>)

By: _____
    Name: Yuxin Tang
    Title: Executive Director & President

EXECUTION VERSION

## SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

**SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT** (this "**Second Amendment**"), is made and entered into as of the 25th day of December, 2017, by and among by and among TK Holdings Inc., a Delaware corporation ("**TK Holdings**"), Takata Americas, a Delaware general partnership ("**Takata Americas**"), TK Holdings de Mexico S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*) ("**TK Holdings de Mexico**"), TK Mexico LLC, a Delaware limited liability company ("**TK Mexico LLC**"), Industrias Irvin de Mexico, S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*) ("**Industrias**"), Strosshe Mex S. de R.L. de C.V., a Mexico limited liability company (*sociedad de responsibilidad limitada de capital variable*) ("**SMX**"), Takata de Mexico S.A. de C.V., a Mexico stock corporation (*sociedad anonima de capital variable*) ("**TK de Mexico**" and, collectively with TK Holdings, Takata Americas, TK Holdings de Mexico, TK Mexico LLC, Industrias and SMX, "**Sellers**"), Joyson KSS Auto Safety S.A., a Luxembourg *société anonyme* ("**Parent**", and collectively with one or more of its current or future Subsidiaries or Affiliates, the "**Plan Sponsor**"), and solely for purposes of Section 7.22 of the Agreement (as defined below), KSS Holdings, Inc., a Delaware corporation ("**KSS Holdings**"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Agreement (as defined below).

## RECITALS

**WHEREAS,** on November 16, 2017, Sellers, Parent, and, solely for purposes of Section 7.22 thereof, KSS Holdings, entered into an Asset Purchase Agreement (the "**Base Agreement**"); and

**WHEREAS,** on December 13, 2017, Sellers, Parent, and, solely for purposes of Section 7.22 thereof, KSS Holdings, entered into the First Amendment to Asset Purchase Agreement (together with the Base Agreement, the "**Agreement**"); and

**WHEREAS,** Sellers, Parent and KSS Holdings, acting in accordance with Section 11.8 (Entire Agreement; Amendments and Waivers) of the Agreement, desire to amend the Agreement on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Sellers, Parent, Plan Sponsor and KSS Holdings hereby agree as follows:

1.    Section 4.4(c)(iii) of the Agreement is hereby amended and restated in its entirety as follows:

"Sellers and the Plan Sponsor are unable to agree on a treatment of Intercompany Balances by the Plan Sponsor in the Final Joint Proposal that is reasonably acceptable to both Sellers and the Plan Sponsor, as contemplated by Section 7.17, on or prior to December 22, 2017 (the "**Intercompany Balances Outside Date**"); provided, however, that Sellers may not terminate this Agreement pursuant to this Section 4.4(c)(iii) prior to the Intercompany Balances Outside Date or after January 2, 2018.  The Intercompany Balances Outside Date may be extended if the Plan Sponsor, the Sellers and the sellers under each of the Cross-Conditioned Agreements mutually agree."

2.    Section 4.4(d)(ii) of the Agreement is hereby amended and restated in its entirety as follows:

"the OEM Indemnity and Release Agreement is not executed and delivered to the Plan Sponsor on or before January 2, 2018 by a sufficient number of the parties listed on Schedule I hereto, such that no more than 1,800,000 PSAN Inflators are attributable to parties listed thereto (but excluding the parties listed on Schedule H) that have not become Consenting OEMs; provided, however, that the Plan Sponsor may not terminate this Agreement pursuant to this Section 4.4(d)(ii) prior to January 2, 2018 or after the date that is five (5) Business Days after January 2, 2018;"

**3.**  <u>Section 4.4(d)(xv)</u> of the Agreement is hereby amended and restated in its entirety as follows:

"the condition set forth in <u>Section 9.1(o)</u> has not been satisfied or irrevocably waived by the Plan Sponsor on or before January 2, 2018 (the "**NHTSA Outside Date**"); <u>provided</u>, <u>however</u>, that the Plan Sponsor may not terminate the Agreement pursuant to this <u>Section 4.4(d)(xv)</u> prior to the NHTSA Outside Date or after the date that is five (5) Business Days after January 2, 2018; or"

**4.**  The phrase "after the date that is five (5) Business Days after the Intercompany Balances Outside Date" in <u>Section 4.4(d)(xvi)</u> of the Agreement is hereby replaced with the phrase "after January 2, 2018".

**5.**  The date "December 15, 2017" in <u>Section 7.17(b)</u> of the Agreement is hereby replaced with "December 22, 2017".

**6.**  The date "December 15, 2017" in <u>Section 7.17(c)</u> of the Agreement is hereby replaced with "December 22, 2017".

**7.**  The date "December 15, 2017" in <u>Section 7.24</u> of the Agreement is hereby replaced with "January 2, 2018".

**8.**  <u>Section 9.1(o)</u> of the Agreement is hereby amended and restated in its entirety as follows:

"the Plan Sponsor shall have secured written agreements with NHTSA with respect to the matters set forth on <u>Schedule 9.1(o)</u>; <u>provided</u>, that, if such agreements are not obtained by the NHTSA Outside Date and this Agreement has not been terminated pursuant to <u>Section 4.4(d)(xv)</u> by the date that is five (5) Business Days after January 2, 2018, the condition set forth in this <u>Section 9.1(o)</u> shall be deemed to have been irrevocably waived as of the date that is five (5) Business Days after January 2, 2018;"

**9.**  Except as expressly set forth herein, this Second Amendment (i) shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of the parties hereto, including without limitation any accrued to date, or any other party under the Agreement, or the documents delivered pursuant thereto, and (ii) shall not alter, modify, amend or in any way affect any of the terms or conditions contained in the Agreement, or the documents delivered pursuant thereto, all of which are ratified and affirmed in all respects and shall continue in full force and effect.

**10.**  Upon the execution hereof, this Second Amendment and the Agreement shall constitute one agreement. The term "Agreement", as used in the Agreement, shall mean the Agreement as amended by this Second Amendment, although this change shall not alter the dates as of which any provision of the Agreement speaks, except as expressly provided herein. For example, phrases such as "as of the date hereof" and "as of the date of this Agreement" shall continue to refer to November 16, 2017, the date that the Agreement was executed, except as expressly provided herein.

[Signature Page Follows]

2

IN WITNESS WHEREOF, the parties hereto have caused this Second Amendment to be executed the date first above written.

TK HOLDINGS INC.

By:_____

Name: Ken Bowling
Title: Vice President, Chief Financial Officer, Secretary

TAKATA AMERICAS

By: _____

Name: Ken Bowling

Title: Secretary

TK HOLDINGS DE MEXICO S. DE R.L. DE C.V.

By: _____

Name: Yoichiro Nomura
Title: Director

TK MEXICO LLC

By: _____

Name: Carlos Alberto Valdez Andrade

Title: President

INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.

By: _____
Name: Yoichiro Nomura
Title: Director

By: _____
Name: Satoshi Seita
Title: Director

By: _____
Name: Carlos Alberto Valdez Andrade
Title: Director

[Signature page to US APA Amendment No. 2]

INDUSTRIAS IRVIN DE MEXICO, S.A. DE C.V.

By: _____
Name: Yoichiro Nomura
Title: Director

By: _____
Name: Satoshi Seita
Title: Director

By: _____
Name: Carlos Alberto Valdez Andrade
Title: Director

STROSSHE MEX S. DE R.L. DE C.V.

By: _____
    Name: Yoichiro Nomura
    Title: Director

By: _____
    Name: Satoshi Seita
    Title: Director

By: _____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

STROSSHE MEX S. DE R.L. DE C.V.


By: _____
     Name: Yoichiro Nomura
     Title: Director



By: _____
     Name: Satoshi Seita
     Title: Director



By: _____
     Name: Carlos Alberto Valdez Andrade
     Title: Director

[Signature page to US APA Amendment No. 2]

TAKATA DE MEXICO S.A. DE C.V.

By: _____
Name: Yoichiro Nomura
Title: Director

By: _____
Name: Satoshi Seita
Title: Director

By: _____
Name: Carlos Alberto Valdez Andrade
Title: Director

TAKATA DE MEXICO S.A. DE C.V.

By: _____
    Name: Yoichiro Nomura
    Title: Director

By: _____
    Name: Satoshi Seita
    Title: Director

By: _____
    Name: Carlos Alberto Valdez Andrade
    Title: Director

JOYSON KSS AUTO SAFETY S.A.

By: _____
    Name: Jianfeng Wang
    Title: Director


By: _____
    Name: Yuxin Tang
    Title: Director


KSS HOLDINGS, INC. (solely for purposes of Section 7.22)


By: _____
    Name: Yuxin Tang
    Title: Executive Director & President

JOYSON KSS AUTO SAFETY S.A.

By: _____
      Name: Jianfeng Wang
      Title: Director

By: _____
      Name: Yuxin Tang
      Title: Director


KSS HOLDINGS, INC. (solely for purposes of <u>Section 7.22</u>)

By: _____
      Name: Yuxin Tang
      Title: Executive Director & President

## <u>Schedule A</u>

### Acquired Non-Debtor Affiliates

- ALS Inc. (Japan)

- Czech NewCo (as defined in the TK Europe Acquisition Agreement (as defined in the U.S. Acquisition Agreement))

- Dalphi Metal Espana S.A. (Spain)

- Dalphi Metal International S.A. (Spain)

- Dalphi Metal Portugal S.A. (Portugal)

- Dalphi Metal Seguridad S.A. (Spain)

- Equipo Automotriz Americana S.A. de C.V. (Mexico)

- Falcomex S.A. de C.V. (Mexico)

- Highland Industries, Inc. (U.S.)

- New Mexico Trading Company (Mexico) (as defined in the U.S. Acquisition Agreement)

- PMA NewCos (as defined in the TK Europe Acquisition Agreement (as defined in the U.S. Acquisition Agreement))

- PT. Takata Automotive Safety Systems Indonesia (Indonesia)

- RTA Holdings, Inc. (Philippines)

- RTA Properties, Inc. (Philippines)

- Syntec Seating Solution LLC (U.S.)

- Takata Automotive Electronics Shanghai (China)

- Takata Automotive Safety Systems (M) Sdn. Bhd. (Malaysia)

- Takata Brasil Ltda (Brazil)

- Takata (Changxing) Safety Systems Co., Ltd. (China)

- Takata CPI Singapore (Singapore)

- Takata Deta S.R.L. (Romania)

- Takata Ignition Systems GmbH (Germany)

- Takata India Private Limited (India)

- Takata International Finance B.V. (Netherlands)

- Takata Jibou S.R.L. (Romania)

- Takata (Jingzhou) Automotive Component Co., Ltd. (China)

- Takata Korea Co., Ltd. (South Korea)

- Takata Maroc S.A.R.L. (Morocco)

- Takata Orşova S.R.L. (Romania)

- Takata Parts Polska Sp.zo.o. (Poland)

- Takata (Philippines) Corporation (Philippines)

- Takata PlasTec GmbH (Germany)

- Takata Romania S.R.L. (Romania)

- TAKATA Rus LLC (Russia)

- Takata Safety Systems Hungary Kft. (Hungary)

- Takata (Shanghai) Vehicle Safety Systems Technical Center Co., Ltd. (China)

- Takata Sibiu S.R.L. (Romania)

- TAKATA South Africa (Pty.) Ltd. (South Africa)

- Takata (Tianjin) Automotive Component Co., Ltd. (China)

- Takata Uruguay S.A. (Uruguay)

- Takata-TOA Co., Ltd. (Thailand)

**<u>Schedule B</u>**

**Plan Sponsor Parties**

Joyson KSS Auto Safety, S.A., a Luxembourg société anonyme, and one or more of its current or future Subsidiaries or Affiliates including:

- Joyson KSS Holdings No. 1 S.a.r.l

- Joyson KSS Holdings No. 2 S.a.r.l

- Joyson KSS Holdings No. 3 S.a.r.l

- Joyson Safety Systems Germany GmbH

- Joyson Safety Systems Sachsen GmbH

- Joyson Safety Systems Asia Holdings GK

- Joyson Safety Systems Japan KK

- Joyson Safety Systems Kyushu KK

- Joyson Safety Systems Service KK

- Ningbo Joyson Safety Systems Co., Ltd.

- Joyson Safety Systems (Shanghai) Co., Ltd.

- Joyson Safety Systems Acquisition LLC

- Ningbo Joyson Electronic Corporation

- Joyson Auto Safety Holdings, S.A.

- Joyson KSS Auto Safety S.A.

- Joyson KSS Auto Safety Special Finance Ltd.

- Ningbo Joyson Intelligent Safety Systems Co., Ltd.

- KSS Holdings Inc.

- KSS Acquisition Company

- Key Safety Systems, Inc.

- Joyson Safety Systems Aschaffenburg GmbH

- Joyson Safety Systems Tooling GmbH

- Joyson Safety Systems AFS GmbH

- Joyson Safety Systems Freiberg GmbH

- RSC GmbH

- AMA GmbH

- BAG S.r.l.

- Key Safety Systems France, Eurl

- Aviation Occupant Safety, LLC

- Breed Automotive Technology Inc.

- Key Automotive Accessories Inc.

- Key Safety Restraint Systems, Inc.

- Key Automotive of Florida LLC

- Key Asian Holdings, Inc.

- Active Protective Technologies Inc.

- Key Safety Systems Korea, Ltd.

- Key Safety Systems Japan, K.K.

- YanFeng Key Automotive Safety Systems, Ltd.

- KSS Automotive Electronics Systems (Chongqing) Co.

- Key Automotive Accessory Co., Ltd.

- Key (Huzhou) Safety Systems Co., Ltd.

- Key Safety Systems (China) Trading Co.

- KSS Foreign HoldCo LLC

- Key Safety Systems de Brasil Produtos Automotivios Ltd.

- Key Safety Systems (Thailand) Ltd.

- KSS India Private Limited

- KSS Abhishek Safety Systems Private Ltd.

- Key Safety Systems Hong Kong Limited

- Shanghai Taichuang Development Company

- Tsinda KSS Automobile Active Safety Systems Co. Ltd.

- KSS-ImageNext Co., Ltd.

- KSS Automotive Active Safety Systems (Suzhou) Co., Ltd.

- Key Cayman GP LLC

- Key Cayman LP

- Key Safety Systems Luxembourg S.a.r.l.

- Key Safety Systems, S.r.l.

- Key European Sales Limited

- KSS Macedonia Dooel Kicevo

- Key Safety System Deutschland, GmbH

- Key Automotive Accessories de Mexico

- Key Automotive Direct de Mexico S. de R.L. de C.V.

- Key Safety Systems de Mexico

- Key Safety Systems Italia, S.r.l.

- Key Safety Systems RO, S.r.l.

- Logico Design, S.r.l.

- Palm Vision Co. Ltd.

- KSS-ImageNext (Yantal) Electronic Co., Ltd.

- ALS Inc.

- Czech NewCo (as defined in the TK Europe Acquisition Agreement (as defined in the U.S. Acquisition Agreement))

- Dalphi Metal Espana S.A.

- Dalphi Metal International S.A.

- Dalphi Metal Portugal S.A.

- Dalphi Metal Seguridad S.A.

- Equipo Automotriz Americana S.A. de C.V.

- Falcomex S.A. de C.V.

- Highland Industries, Inc.

- New Mexico Trading Company (as defined in the U.S. Acquisition Agreement)

- PMA NewCos (as defined in the TK Europe Acquisition Agreement (as defined in the U.S. Acquisition Agreement))

- PT. Takata Automotive Safety Systems Indonesia

- RTA Holdings, Inc.

- RTA Properties, Inc.

- Syntec Seating Solution LLC

- Takata Automotive Electronics Shanghai

- Takata Automotive Safety Systems (M) Sdn. Bhd.

- Takata Brasil Ltda

- Takata (Changxing) Safety Systems Co., Ltd.

- Takata CPI Singapore

- Takata Deta S.R.L.

- Takata Ignition Systems GmbH

- Takata India Private Limited

- Takata International Finance B.V.

- Takata Jibou S.R.L.

- Takata (Jingzhou) Automotive Component Co., Ltd.

- Takata Korea Co., Ltd.

- Takata Maroc S.A.R.L.

- Takata Orşova S.R.L.

- Takata Parts Polska Sp.zo.o.

- Takata (Philippines) Corporation

- Takata PlasTec GmbH

- Takata Romania S.R.L.

- TAKATA Rus LLC

- Takata Safety Systems Hungary Kft.

- Takata (Shanghai) Vehicle Safety Systems Technical Center Co., Ltd.

- Takata Sibiu S.R.L.

- TAKATA South Africa (Pty.) Ltd.

- Takata (Tianjin) Automotive Component Co., Ltd.

- Takata Uruguay S.A.

- Takata-TOA Co., Ltd.

Any Person that makes a loan to or investment in the Plan Sponsor for purposes of consummating the sale of the Purchased Assets to the Plan Sponsor pursuant to the Plan including:[3]

- Deutsche Bank AG, Tokyo branch

- Mizuho Bank, Ltd.

- China Merchants Bank Co., Ltd., New York Branch

- Industrial and Commercial Bank of China Limited

- Ningbo Joyson Electronic Corp

- Tea (BC) Sarl

- Tea (BC) 2 Sarl

---

[3] The list of debt and equity investors in the Plan Sponsor for purposes of consummating the sale of the Purchased Assets to the Plan Sponsor is subject to change up until consummation of the proposed investments.

## **Schedule C**

### **PSAN Consenting OEMs**

PSAN Consenting OEMs may consist of the following (including their applicable subsidiaries and affiliates):

FCA US LLC

Nissan Motor Co., Ltd.

PSA Automobiles SA and Opel Automobile GmbH

Toyota Motor Corporation

## Schedule D

### Warehouse Consenting OEMs

Warehouse Consenting OEMs consist of the following (including their applicable subsidiaries and affiliates):

Aktiebolaget Volvo

BMW Manufacturing Co., LLC

Daimler Trucks North America LLC/Mercedes-Benz U.S. International, Inc.

FCA US LLC

Ford Motor Company

General Motors Holdings LLC

Honda North America, Inc. or one of its affiliated designees

Jaguar Land Rover Ltd.

Mazda Motor Corporation

Mitsubishi Motors Corporation

Nissan Motor Co., Ltd.

PSA Automobiles SA and Opel Automobile GmbH

Subaru Corporation

Toyota Motor Corporation

Volkswagen Group of America, Inc.

**Schedule E**

| The Warehousing Entity Disposal Trust Funds | |
|---|---|
| Michigan | $21,468,116 |
| Missouri | $6,804,988 |
| Texas | $8,425,223 |
| **Total** | **$36,698,326** |