## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x
:
In re                                                                    :          **Chapter 11**
:
**TK HOLDINGS INC.,** *et al.,*                              :          **Case No. 17-11375 (BLS)**
:
**Debtors.**[1]                                                   :          **Jointly Administered**
:
---------------------------------------------------------x          **Re: Docket No. 2056**

### DECLARATION OF KENNETH BOWLING IN SUPPORT
### OF CONFIRMATION OF FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
### REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS

I, Kenneth Bowling, declare pursuant to 28 U.S.C. § 1746, under penalty of

perjury to the best of my knowledge and belief, that:

1.    I am the Chief Financial Officer for TK Holdings Inc. ("***TKH***") and the

North American subsidiaries and affiliates of Takata Corporation ("***TKJP***" and collectively with

TKH and all of TKJP's direct and indirect subsidiaries, "***Takata***") and have served in this

capacity since being appointed on April 1, 2015.  I have also served in various other finance and

production related capacities at Takata since 1988, including Vice President – Non-Automotive

Safety, Vice President – Production Controller, and Group Controller – Airbag Division.

2.    On June 25, 2017 (the "***Petition Date***"), TKH and its debtor affiliates and

subsidiaries (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter

11 Cases***") each commenced with this Court a voluntary case under chapter 11 of title 11 of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A).  Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases.  The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

United States Code (the "***Bankruptcy Code***").  I submit this declaration (the "***Declaration***") in support of confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors, dated February 14, 2018 [Docket No. 2056] (as may be amended, modified, or supplemented, the "***Plan***").[2]

        3.        In my capacity as Chief Financial Officer of TKH, I was directly involved in the development and implementation of the Plan and overseeing the day-to-day administration of the Chapter 11 Cases.  I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the U.S. Acquisition Agreement, the Disclosure Statement relating to the Plan, the U.S. RSA (as defined herein), and the Global Accommodation Agreement (as defined herein).  Together with the Debtors' legal advisors, I have reviewed the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code and believe they are satisfied.

        4.        I am authorized to submit this Declaration on behalf of the Debtors.  Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge or the personal knowledge of employees who report to me, my review of relevant documents, information provided to me by the Debtors' management or legal advisors, or my opinion based upon my familiarity with the Debtors' business, operations, and financial condition.  If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

### The Global Transaction

        5.        As the Court is aware, the Debtors commenced these Chapter 11 Cases as a result of the unprecedented recalls resulting from certain of the Debtors' airbag inflators

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Memorandum of Law in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors and Response to Objections to Confirmation* Docket No. [2050], as applicable.

containing phase-stabilized ammonium nitrate ("**PSAN Inflators**") rupturing during deployment. As a result of these unprecedented and highly publicized product recalls, the Debtors, with the support of a significant majority of their OEM customers (each a "**Customer**" or an "**OEM**" and each OEM that is a party to the U.S. RSA (as defined herein), a "**Consenting OEM**" and, collectively, the "**Consenting OEMs**"),[3] commenced a robust marketing process prior to the Petition Date to identify a potential purchaser for substantially all of their Assets and, on November 16, 2017, after nearly two years of intensive marketing, diligence, and negotiations between and among Takata, potential sponsor candidates, and the Consenting OEMs, the Debtors entered into that certain Asset Purchase Agreement (the "**U.S. Acquisition Agreement**") with Joyson KSS Auto Safety S.A., a Luxembourg société anonyme ("**KSS**" and, collectively with one or more of its current or future Subsidiaries or Affiliates (each as defined in the U.S. Acquisition Agreement), the "**Plan Sponsor**") and the Cross-Conditioned Agreements (as defined in the U.S. Acquisition Agreement), whereby the Plan Sponsor agreed to purchase substantially all of Takata's worldwide assets (excluding PSAN Inflator-related assets), free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, except for the Assumed Liabilities and Permitted Liens, for an aggregate purchase price of $1.588 billion (the "**Global Transaction**" and the agreements, documents, and instruments executed and

---

[3] The initial Consenting OEMs consist of the following parties and their affiliates and subsidiaries listed on Schedule 1 to the U.S. RSA:  (i) BMW Manufacturing Co., LLC, (ii) Daimler Trucks North America LLC and Mercedes-Benz U.S. International, Inc., (iii) FCA US LLC f/k/a Chrysler Group LLC, FCA Group Purchasing Srl in the name and on behalf of its principals (FCA Italy SpA and FCA Melfi Srl), FCA Fiat Chrysler Automóveis Brasil Ltda., and FCA Automobiles Argentina S.A., (iv) Ford Motor Company, (v) General Motors Holdings LLC, (vi) Honda North America Inc., (vii) Mazda Motor Corporation, (viii) Mitsubishi Motors Corporation, (ix) Nissan North America, Inc. and Nissan Mexicana, S.A. de C.V., (x) Subaru Corporation, (xi) Toyota Motor Corporation, (xii) Volkswagen Group of America, Inc., (xiii) Volvo Group North America LLC and Mack Trucks, Inc., (xiv) Jaguar Land Rover, Ltd (For Voting Purposes Only), and (xv) PSA Automobiles SA (For Voting Purposes Only).

delivered in connection with the Global Transaction, as hereafter amended, supplemented, or otherwise modified, the "*Global Transaction Documents*").  To demonstrate their commitment for the Global Transaction and the Plan, the Debtors, the Consenting OEMs, and the Plan Sponsor (collectively, the "*Support Parties*") entered into that certain Restructuring Support Agreement dated November 16, 2017 (together with all schedules, exhibits, or attachments thereto, and as may be modified, amended, or supplemented from time to time, the "*U.S. RSA*"), which was thereafter approved by the Court by order dated December 13, 2017 [Docket No. 1359].

6.      Under the U.S. Acquisition Agreement, TKAM, TKH, TKML, TKHM, IIM, SMX, and TDM (collectively, the "*Sellers*") will sell substantially all of their non-PSAN Assets to the Plan Sponsor, including the stock of certain subsidiaries of the Sellers, in exchange for the Sellers' allocable portion of the $1.588 billion purchase price (approximately $878 million as of December 31, 2017), subject to certain adjustments in accordance with the U.S. Acquisition Agreement.  The U.S. Acquisition Agreement also provides for certain protections for both the Sellers and the Plan Sponsor.  It is my understanding that, in terms of Seller protections, among other things, the U.S. Acquisition Agreement provides that the Plan Sponsor will be subject to "hell or high water" obligations and regulatory termination fees with respect to both antitrust approvals and clearance by the Committee on Foreign Investment in the United States ("*CFIUS*"), thereby substantially mitigating any antitrust or CFIUS impediments to the closing of the U.S. Acquisition Agreement.  I further understand that the U.S. Acquisition Agreement also provides for certain break-up fees and/or expense reimbursements (the "*Plan Sponsor Protections*") in the event that the U.S. Acquisition Agreement is terminated for, among

other things, certain reasons related to a breach by the Sellers or the Sellers entering into an

Alternative Transaction.

### General Overview of the Plan

7.    With respect to the Debtors, the Global Transaction will be implemented

pursuant to the Plan and the U.S. Acquisition Agreement.  The Plan truly is a remarkable result

for the Debtors' Estates and their constituents.  The Plan has broad support of the Debtors' key

constituencies, including not only the Consenting OEMs (by far the Debtors' largest creditor

constituency) and the Plan Sponsor, but also both Committees, the Future Claims Representative,

and, although voting is still ongoing, a significant number of voting creditors.  Given the status

and posture of all the parties at the commencement of these Chapter 11 Cases a mere seven (7)

months ago, it is a truly remarkable feat and testament to the work of these parties and their

representatives, that the Debtors are before the Court seeking confirmation of their Plan on a

largely consensual basis.  The primary purposes of the Plan include:

- providing for the sale of substantially all of the Debtors' assets, other than the Excluded Assets, to the Plan Sponsor pursuant to the U.S. Acquisition Agreement, with such sale to be free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and the Permitted Liens;

- carving out the PSAN Excluded Assets from the sale to the Plan Sponsor and vesting such assets in TKH and certain of its subsidiaries upon TKH's emergence from chapter 11 (TKH, as reorganized, "***Reorganized TK Holdings***" and, collectively with its reorganized subsidiaries, "***Reorganized Takata***" and with respect to the carve out structure, the "***PSAN Carve-Out***");

- vesting the Warehoused PSAN Assets in a Delaware corporation established under the Plan (the "***Warehousing Entity***") to comply with the Debtors' obligations under the Preservation Order (as defined herein) and to continue the maintenance, shipping, and disposal of the Warehoused PSAN Assets after the Effective Date;

- providing for the establishment of a limited liability company organized under the laws of Delaware ("***TK Global LLC***"), which will be the parent

holding company of Reorganized TK Holdings and the Warehousing Entity;

- settling the Consenting OEMs' Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN Administrative Expense Claims pursuant to Bankruptcy Rule 9019, in exchange for certain consideration including (i) satisfaction of the DOJ Restitution Claim, (ii) the funding of the Warehousing Entity Reserve and Post-Closing Reserve, and (iii) the Business Incentive Plan Payment;

- paying all Administrative Expense Claims, Priority Claims, and Other Secured Claims in full and distributing proceeds of the Global Transaction allocable to the Debtors and other assets to various reserves required to be established under the Plan;

- providing for the establishment of a trust (the "***Reorganized TK Holdings Trust***" and, together with the Warehousing Entity, the "***Legacy Entities***") to, among other things, (i) resolve and make distributions on account of Allowed Administrative Expense Claims until the Non-PSAN PI/WD Claims Termination Date, (ii) hold the Other Excluded Assets belonging to the Debtors' estates, the reserves necessary to pay certain claims in full under the Plan, the recovery funds for each of the Debtors to make distributions to holders of Allowed General Unsecured Claims (the "***Recovery Funds***"), other than the Recovery Funds relating to PSAN PI/WD Claims (the "***PSAN PI/WD Funds***") and the Recovery Funds relating to OEM Claims (the "***OEM Funds***"), and the disputed claims reserves established for benefit of holders of subsequently Allowed Claims, and (iii) otherwise wind-down the Debtors' Estates;

- merging the OEM Funds with the DOJ OEM Restitution Fund to be administered by the Special Master; and

- providing for the establishment of a trust (the "***PSAN PI/WD Trust***") to administer the PSAN PI/WD Funds and resolve Allowed PSAN PI/WD Claims against IIM, SMX, TDM, and the TKH Debtors.

8.    In addition, the Plan provides for the consensual resolution and settlement of several Claims and controversies between the Consenting OEMs, the Plan Sponsor, the Committees, the Future Claims Representative, and their respective constituents with respect to, among other things, (a) the validity and amount of the Consenting OEMs' General Unsecured Claims, (b) the validity and amount of the Adequate Protection Claims, (c) the release of Claims and causes of action subject to the Challenge Period, (d) resolution of all disputes by the

Committees relating to the Global Transaction, including, without limitation, certain provisions of the U.S. Acquisition Agreement, (e) the treatment of contracts and leases, (f) the treatment of the NHTSA Claims, (g) the treatment of Other PI/WD Claims, (h) the estimated amount of current and future PSAN PI/WD Claims, (i) the Trust Distribution Procedures, (j) the assignment of the Debtors' rights in Takata's product liability insurance, (k) the netting and treatment of Intercompany Claims, (l) the governance of the Reorganized TK Holdings Trust, and (m) the Debtors' release of the Consenting OEMs.  In connection with, and as consideration for, these and other settlements, the Debtors have amended the Plan to provide for the following:

- The classification and allowance of the NHTSA Claim as a Class 6 Other General Unsecured Claim against TKH instead of being paid in full, which provides the Debtors' General Unsecured Creditors with an additional $50 million in Available Cash to be distributed on account of their Claims;

- The establishment of a new Class—Class 7 (Other PI/WD Claims)—specifically for General Unsecured Claims relating to a personal injury or harm caused by a Takata Product, other than the Debtors' PSAN Inflator-related products;

- The contribution by the Plan Sponsor of $25 million (the "***Plan Sponsor Contribution Amount***") to the PSAN PI/WD Trust for the benefit of PSAN PI/WD Claims and Other PI/WD Claims as soon as practicable after the Plan Sponsor receives repayment of up to $25 million drawn on the Plan Sponsor Backstop Funding Agreement by TKAM (on behalf of TSAC);

- The establishment of a fund by the Consenting OEMs (the "***Plan Settlement Fund***") in which the Consenting OEMs contribute their rights to certain recoveries as and when such amounts would otherwise be paid or payable to the Consenting OEMs under the Plan, with such contributed recoveries in the Plan Settlement Fund being transferred pursuant to the Plan to the PSAN PI/WD Trust for the benefit of holders of PSAN PI/WD Claims and Other PI/WD Claims:

    o Eighty percent (80%) of the Consenting OEM GUC Recoveries until the Consenting OEMs have contributed $5 million to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety (90%) of Consenting OEM GUC Recoveries until the Consenting OEM GUC Recovery Threshold is

met (which is the Consenting OEMs' Pro Rata share of the first $89.9 million of Available Cash);

- o Twenty-five percent (25%) of the Consenting OEM GUC Recoveries in excess of the Consenting OEM GUC Recovery Threshold (the Consenting OEM Additional GUC Recoveries);

- o Eighty percent (80%) of the incremental amount of Consenting OEM GUC Recoveries resulting from or attributable to the NTHSA Claims being treated as Other General Unsecured Claims and/or the TKJP 503(b)(9) Claim being setoff or otherwise eliminated until the Consenting OEMs have contributed $5 million) to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety percent (90%) of such "Consenting OEM Incremental GUC Recoveries;" and

- o Eighty percent (80%) of any amounts that the Consenting OEMs would be entitled to receive on account of the Business Incentive Plan Payment, excluding any amounts of the Business Incentive Plan Payment that are allocable to TKAM;

- The establishment of a single coordinated process through which the holders of PSAN PI/WD Claims are able to access funds from both the PSAN PI/WD Trust and the DOJ PI/WD Restitution Fund;

- The establishment of a fund by the Consenting OEMs and the Plan Sponsor (the "***Support Party Creditor Fund***"), funded in an amount not less than $7.5 million—with $5 million to be contributed by the Consenting OEMs and not less than $2.5 million, inclusive of any remaining amount of the $5 million Cure Claims Cap, to be contributed by the Plan Sponsor—for the benefit of settling Eligible Creditors (as defined below) in Class 6; and

- The Plan Sponsor's agreement to assume all third-party executory contracts related to the Purchased Assets, subject to certain exclusions.

9.      I believe that these Plan modifications are favorable changes that allow for additional funding to Estate creditors without any decrease in the value available for, or the redistribution of value away from, any specific Class.  Accordingly, as these changes will only increase the amount of Available Cash available for distribution to holders Allowed Claims, based on conversations with counsel, I do not believe that any of the modifications warrant re-solicitation of the Plan.

10.     Consummation of the Plan and the closing of the Global Transaction are in the best interests of the Debtors' creditors, employees, vendors, and all other parties in interest. The Plan and the Global Transaction will allow the Debtors to continue operating as a going-concern, including with respect to Reorganized Takata for a limited period of time, while also ensuring that the Debtors are able to comply with their ongoing obligations to the National Highway Traffic Safety Administration ("***NHTSA***"), fulfilling a fundamental commitment laid out by the Debtors at the onset of these Chapter 11 Cases—that the commencement of these bankruptcy cases would not impact or impede the general public's ability to fulfill their recalls. In addition, I believe that confirmation of the Plan and consummation of the Global Transaction in accordance with the timeline set forth herein will ensure that TKJP is able to comply with the Joint Restitution Order entered by the United States District Court for the Eastern District of Michigan on February 27, 2017 in the case captioned *U.S. v. Takata Corporation*, Case No. 16-cr-20810 (E.D. Mich.) (the "***DOJ Restitution Order***") in connection with the settlement of the two (2)-year criminal investigation by the Department of Justice (the "***DOJ***") into Takata.[4] Absent satisfaction of the DOJ Restitution Claim in accordance with the DOJ Restitution Order, I do not believe that any third-party would be willing to purchase the Debtors' assets as a going concern and the Debtors would likely be forced into a piecemeal liquidation, which could result in the eventual loss of employment for nearly all of the Debtors' employees, the loss of future revenues and contracts for the Debtors' vendors and suppliers, and significantly lower recoveries for creditors.  In short, I believe that the Plan preserves the going-concern value of the Debtors'

---

[4] Pursuant to the DOJ Restitution Order, the Debtors have a deadline of February 27, 2018 to consummate the Global Transaction.  The Debtors are currently in discussions with Judge Steeh of the United States District Court for the Eastern District of Michigan to extend the DOJ closing deadline.

businesses, maximizes creditor recoveries, provides for an equitable distribution to all of the

Debtors' stakeholders, and protects the jobs of the Debtors' invaluable employees.

### The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation

11.     Based on my understanding of the Plan, the events that led to the

commencement of the Debtors' Chapter 11 Cases, and legal advice I have received from the

Debtors' legal advisors, it is my belief that the Plan satisfies all of the applicable requirements

for confirmation of a plan under the Bankruptcy Code as discussed below.

12.     *Section 1129(a)(1):  The Plan Complies with the Applicable Provisions of the Bankruptcy Code*.  Based on my understanding and discussions with the Debtors' legal

advisors, the Plan satisfies section 1129(a)(1) of the Bankruptcy Code.  In that regard, I believe

that the Plan satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code,

which, respectively, govern the classification of claims and the contents of a plan.

13.     *Section 1122:  The Plan's Classification Structure is Proper*.  Except for

Administrative Expense Claims, Adequate Protection Claims, Fee Claims, and Priority Tax

Claims, which I am advised need not be designated as Classes under the Plan, Article III of the

Plan designates the following nine (9) Classes of  Claims and Interests as required under section

1123(a)(1) of the Bankruptcy Code:

| Class | Type of Claim or Interest |
|---|---|
| **Class 1** | **Other Secured Claims** |
| Class 1(a) | Other Secured Claims against TKAM |
| Class 1(b) | Other Secured Claims against TKF |
| Class 1(c) | Other Secured Claims against TKC |
| Class 1(d) | Other Secured Claims against the TKH Debtors |
| Class 1(e) | Other Secured Claims against IIM |
| Class 1(f) | Other Secured Claims against TDM |

| Class | Type of Claim or Interest |
|---|---|
| Class 1(g) | Other Secured Claims against SMX |
| **Class 2** | **Other Priority Claims** |
| Class 2(a) | Other Priority Claims against TKAM |
| Class 2(b) | Other Priority Claims against TKF |
| Class 2(c) | Other Priority Claims against TKC |
| Class 2(d) | Other Priority Claims against the TKH Debtors |
| Class 2(e) | Other Priority Claims against IIM |
| Class 2(f) | Other Priority Claims against TDM |
| Class 2(g) | Other Priority Claims against SMX |
| **Class 3** | **Mexico Class Action Claims and Mexico Labor Claims** |
| Class 3(a) | Mexico Class Action Claims and Mexico Labor Claims against IIM |
| Class 3(b) | Mexico Class Action Claims and Mexico Labor Claims against TDM |
| **Class 4** | **OEM Unsecured Claims** |
| Class 4(a) | OEM Unsecured Claims against the TKH Debtors |
| Class 4(b) | OEM Unsecured Claims against IIM |
| Class 4(c) | OEM Unsecured Claims against TDM |
| Class 4(d) | OEM Unsecured Claims against SMX |
| **Class 5** | **PSAN PI/WD Claims** |
| Class 5(a) | PSAN PI/WD Claims against the TKH Debtors |
| Class 5(b) | PSAN PI/WD Claims against IIM |
| Class 5(c) | PSAN PI/WD Claims against TDM |
| Class 5(d) | PSAN PI/WD Claims against SMX |
| **Class 6** | **Other General Unsecured Claims** |
| Class 6(a) | Other General Unsecured Claims against TKAM |
| Class 6(b) | Other General Unsecured Claims against TKF |
| Class 6(c) | Other General Unsecured Claims against TKC |
| Class 6(d) | Other General Unsecured Claims against the TKH Debtors |
| Class 6(e) | Other General Unsecured Claims against IIM |
| Class 6(f) | Other General Unsecured Claims against TDM |
| Class 6(g) | Other General Unsecured Claims against SMX |

| Class | Type of Claim or Interest |
|---|---|
| **Class 7** | **Other PI/WD Claims** |
| Class 7(a) | Other PI/WD Claims against the TKH Debtors |
| Class 7(b) | Other PI/WD Claims against IIM |
| Class 7(c) | Other PI/WD Claims against TDM |
| Class 7(d) | Other PI/WD Claims against SMX |
| **Class 8** | **Intercompany Interests** |
| Class 8(a) | Intercompany Interests in TKAM |
| Class 8(b) | Intercompany Interests in TKF |
| Class 8(c) | Intercompany Interests in TKC |
| Class 8(d) | Intercompany Interests in the TKH Debtors |
| Class 8(e) | Intercompany Interests in IIM |
| Class 8(f) | Intercompany Interests in TDM |
| Class 8(g) | Intercompany Interests in SMX |
| **Class 9** | **Subordinated Claims** |
| Class 9(a) | Subordinated Claims against TKAM |
| Class 9(b) | Subordinated Claims against TKF |
| Class 9(c) | Subordinated Claims against TKC |
| Class 9(d) | Subordinated Claims against the TKH Debtors |
| Class 9(e) | Subordinated Claims against IIM |
| Class 9(f) | Subordinated Claims against TDM |
| Class 9(g) | Subordinated Claims against SMX |

14.     I believe that the Claims or Interests in each particular Class are substantially similar to the other Claims or Interests, as the case may be, in such Class.  I also believe that to the extent that Claims or Interests of equal priority are placed in different Classes, a valid business, factual, and/or legal reason exists for such separate classification.

15.     The Plan provides for five (5) Classes of general unsecured Claims—Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), and Class 6 (Other General Unsecured Claims), and Class 7

(Other PI/WD Claims).  Class 3 exists only at Mexico Debtors IIM and TDM and contains the

unsecured litigation Claims of Mexican creditors against these Mexican Debtors, Class 4

contains the general unsecured Claims of the Debtors' OEM customers, Class 5 contains the

general unsecured Claims of the individuals who have (or may) suffer a personal injury or harm

related to the Debtors' PSAN Inflators, Class 6 contains the general unsecured Claims of all the

Debtors' trade and other creditors, including contingent, unliquidated, and disputed litigation

Claims and any Claims asserted by individuals alleging to have suffered an economic loss related

to the Debtors' PSAN Inflators, and Class 7 contains the general unsecured Claims of individuals

who have suffered a personal injury or harm caused by a Takata Product, other than the Debtors'

PSAN Inflator-related products.  I believe that each of these Classes of creditors represent a

voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision of

whether the proposed reorganization should proceed.

       16.     First, the OEMs are the Debtors' customers and primary source of

revenue—without their business the Debtors would not have a business to reorganize or sell.

Moreover, the Consenting OEMs have made unique contributions to these Chapter 11 Cases,

providing financial accommodations to the Debtors, agreeing to volume commitments with the

Plan Sponsor, and agreeing to the Plan Settlement, including the resolution of the Settled OEM

Claims pursuant to the Plan Settlement and material contributions to the Plan Settlement Fund

and the Support Party Creditor Fund.

       17.     Second, I believe that the unique shared interest that holders of PSAN

PI/WD Claims and holders of Other PI/WD Claims have in these Chapter 11 Cases is of

significant importance.  I believe that holders of PSAN PI/WD Claims, due to the personal (and

sometimes severe) nature of the injuries that gave (or will give) rise to their Claims against the

Debtors, deserve an independent voice in these Chapter 11 Cases, especially because they may otherwise be outnumbered by the Debtors' other creditors, most of whom have only suffered monetary losses.  In addition, I understand that PSAN PI/WD Claims are potentially subject to the Channeling Injunction, and, therefore, I believe that it is reasonable and appropriate that these Claims constitute a separate Class from Other PI/WD Claims.

18.    Third, I understand that because the Mexico Labor Claims and the Mexico Class Action Claims are filed by and against foreign entities (*i.e.*, IIM and TDM), such Claims are dissimilar from other unsecured Claims at these Debtors because of the potential recourse against these Debtors available to such claimants, *i.e.*, these Mexican creditors may be able to obtain a Lien or seize Assets pursuant to a judgment rendered by a Mexican court not obligated to recognize these proceedings.

19.    In contrast, Class 6 (Other General Unsecured Claims) includes Claims arising out of, or relating to, contingent, unliquidated, and/or disputed litigation Claims (including, with respect to TKH, the Mexico Class Action Claims), trade and vendor Claims, certain employee Claims, and Claims arising out of, or relating to, the rejection of executory contracts and unexpired leases.  Accordingly, I believe that it is appropriate that OEM Unsecured Claims, PSAN PI/WD Claims, Other PI/WD Claims, and, solely with respect to IIM and TDM, Mexico Labor Claims and Mexico Class Action Claims be separately classified from Other General Unsecured Claims.

20.    ***Section 1123(a):  The Plan's Content is Appropriate***.

(a)    *Section 1123(a)(1):  Designation of Classes of Claims and Interests*: As discussed above, Article III of the Plan designates nine (9) Classes of Claims and Interests, in accordance with section 1123(a)(1) of the Bankruptcy Code.

(b)    *Section 1123(a)(2):  Specified Unimpaired Classes*.  Section 3.2 of the Plan specifies that Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired by the Plan, as required by section 1123(a)(2) of the Bankruptcy Code.

(c)    *Section 1123(a)(3): Specified Treatment of Impaired Classes.*  Article IV of the Plan specifies the treatment of Impaired Classes of Claims and Interests, of which the following Classes are Impaired within the meaning of section 1124 of the Bankruptcy Code: Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), Class 7 (Other PI/WD Claims), Class 8 (Intercompany Interests), and Class 9 (Subordinated Claims). Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

(d)    *Section 1123(a)(4):  Equal Treatment.*  Pursuant to the Plan, each Claim against, or Interest in, a Debtor in each respective Class receives the same treatment from the Debtors as every other Claim or Interest in such Class.

As described in greater detail below, pursuant to the terms of the UCC Settlement, the Plan provides that, in addition to recoveries received from the Debtors' Estates, Eligible Creditors in Class 6 will receive their Pro Rata Share of Support Party Funds held in the Support Party Creditor Fund.  Eligible Creditors include a significant number of vendors and suppliers that may not be parties to executory contracts, but with whom the Plan Sponsor, the Reorganized Debtors, and/or the Consenting OEMs may, directly or indirectly, continue to do business going forward.  In connection with the UCC Settlement, the Plan Sponsor and the Consenting OEMs agreed to provide additional consideration to these parties.  Functionally, the structure is an alternative to the Plan Sponsor assuming some but not all of these Claims. Accordingly, the Support Party Creditor Fund—which will be established and funded by the Plan Sponsor and the Consenting OEMs—is not a distribution from the Debtors' Estates.[5]  As such, I believe that the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

(e)    *Section 1123(a)(5):  Implementation of the Plan.*  The Plan and the various documents and agreements set forth in the Plan Supplement as well as the exhibits and schedules to the Plan provide adequate and proper means for the implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including, without limitation, (a) the sale of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind in nature whatsoever, in accordance with the terms of the Plan and the U.S. Acquisition Agreement, (b) the vesting of the PSAN Assets in Reorganized Takata, (c) the vesting of the Warehoused PSAN Assets and Other Excluded Assets in the applicable Legacy Entity, (d) the continued corporate existence of the Reorganized Debtors, (e) the Plan Settlement Payment, (f) the execution of the Reorganized TK Holdings Trust Agreement, (g) the establishment of TK Global LLC and the Warehousing Entity, (h) the establishment of the PSAN PI/WD Trust, (i) the creation of the Claims Reserves and the Recovery Funds to make Distributions to holders of Allowed General Unsecured Claims, and (j) the taking of all necessary or appropriate actions by the Debtors or the Reorganized Debtors, as applicable, to effectuate the Restructuring Transactions and the Plan.

---

[5] Although the terms of the UCC Settlement do provide that, in certain remote and limited circumstances, the Debtors may be called upon to contribute certain limited amounts to the Support Party Creditor Fund (*i.e.*, Additional Support Party Funds) pursuant to Section 5.19(g)(iii) of the Plan, I believe that the likelihood of such obligation being triggered is extremely remote given the analysis and identification of contracts and Claims conducted by the Debtors and their advisors to date.

In addition, Article 5 of the Plan implements the terms of the Plan Settlement, which (i) provides for the resolution of the Claims and controversies relating to the Consenting OEMs' Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN Administrative Expense Claims, and (ii) incorporates the terms of the UCC and TCC Settlements, as well as agreements of the Plan Sponsor with respect to the Plan Sponsor Backstop Funding Agreement. Further, the Debtors are assigning their rights in Takata's product liability insurance to the PSAN PI/WD Trust.

Accordingly, I believe that the Plan, together with the documents and arrangements set forth in the Plan Supplement, provide the means for implementing the Plan as required by section 1123(a)(5) of the Bankruptcy Code.

(f)    *Section 1123(a)(6): Non-Voting Equity Securities.* With respect to section 1123(a)(6) of the Bankruptcy Code, the certificate of incorporation, articles of incorporation, limited liability company agreement, operating agreement, or similar governing document, as applicable, of each Debtor have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities.

(g)    *Section 1123(a)(7): Designation of Directors and Officers.* Consistent with section 1123(a)(7) of the Bankruptcy Code, the Plan Supplement and Sections 5.7, 5.8, and 5.9 of the Plan contain provisions with respect to the manner of selection of directors and officers of the TK Global LLC, Reorganized Takata, and the Warehousing Entity, that are consistent with the interests of creditors, equity security holders, and public policy.

(h)    S*ection 1123(a)(8): Postpetition Person Service Payments—Inapplicable Provision.* Section 1123(a)(8) of the Bankruptcy Code is inapplicable to the Plan because the Debtors are not "individuals" (as that term is defined in the Bankruptcy Code).

21.    In view of the foregoing, I believe that the Plan satisfies section 1123(a) of the Bankruptcy Code.

22.    **Section 1123(b):  The Plan's Content is Permitted**. In addition to the aforementioned, it is my understanding that section 1123(b) of the Bankruptcy Code sets forth six (6) permissive provisions that define what may be incorporated into a chapter 11 plan. Based on my understanding of the Plan, the events that have led to the commencement of the Debtors' Chapter 11 Cases, and discussions I have had with the Debtors' professional advisors, I believe that the Plan is consistent with section 1123(b).

23.    **Section 1123(b)(1): Impairment/Unimpairment of Classes of Claims and Interests**. As discussed above, it is my understanding that Articles III and IV of the Plan classify

and describe the treatment for each Impaired and Unimpaired Class, in accordance with section 1123(b)(1) of the Bankruptcy Code.

24.    ***Section 1123(b)(2): Assumption, Assignment, and Rejection of Executory Contracts and Unexpired Leases***.  Section 8.1 of the Plan provides that, as of, and subject to, the occurrence of the Effective Date, each of the Debtors' executory contracts and unexpired leases will be deemed assumed by, and assigned to, the Plan Sponsor, except for an executory contract or unexpired lease that:  (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (b) is specifically designated on (i) the Schedules of Assumed Contracts, or (ii) the Schedule of Rejected Contracts;[6] (c) is being assumed, assumed and assigned, or otherwise assigned pursuant to Section 8.4 of the Plan; (d) is the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of the Bankruptcy Code pending on the Confirmation Date; or (e) is the subject of a pending Cure Dispute.  The Debtors conducted an extensive review and analysis to determine which executory contracts and unexpired leases to assume or reject, and which have expired or been terminated by operation of law or contract.  To calculate the cure amounts listed on the Schedules of Assumed Contracts, the Debtors and/or their advisors reviewed the terms and provisions governing the applicable executory contract or unexpired lease, the proofs of claim, if any, filed by the applicable contract counterparty, and the Debtors' books and records, and determined the amount owed for all outstanding defaults as of the time of assumption.  I believe the Debtors exercised sound business judgment in identifying the executory contracts and unexpired leases included on the Schedules of Assumed Contracts and the Schedule of Rejected Contracts.  Accordingly, the Plan provides for the assumption or rejection of executory contracts and unexpired leases that

---

[6] I understand that, pursuant to the terms of the UCC Settlement and Section 5.19(h) of the Plan, additional modification of the Schedule of Rejected Contracts is subject to certain limitations and restrictions.

have not been previously assumed or rejected under section 365 of the Bankruptcy Code, as I understand is contemplated by section 1123(b)(2) of the Bankruptcy Code.

25.    ***Section 1123(b)(3): Settlement and Retention of Claims and Causes of Action***.  I understand that pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, a debtor is permitted to incorporate the settlement of claims belonging to the debtor or the estate into a plan.  The Plan incorporates several claim settlements: (i) the Plan Settlement; (ii) the UCC Settlement; (iii) the TCC/FCR Settlement; and (iv) the Debtors' Releases.

26.    *The Plan Settlement*:  I understand that, pursuant to Section 5.19(a) of the Plan, all Claims and controversies among the Debtors, the Restructuring Support Parties, the Committees, and the Future Claims Representative will be settled, including the Claims and controversies relating to the Consenting OEMs' Adequate Protection Claims (currently estimated to be approximately $285 million), Consenting OEM PSAN Cure Claims (currently estimated to be approximately $4 billion),[7] and Consenting OEM PSAN Administrative Expense Claims (which Claims are contingent and unliquidated) (collectively, the "***Settled OEM Claims***"), which will be resolved and extinguished in exchange for receipt by the Consenting OEMs of (a) a Distribution in an amount equal to (i) the positive difference between the $850 million DOJ Restitution Claim and the aggregate amount of (1) all actual payments to the Special Master from any other source on account of the DOJ Restitution Claim and (2) any amounts received by the OEMs that are credited by the Special Master against such OEMs' share of the DOJ Restitution Claim, plus (ii) the Plan Settlement Turnover Amount, which is up to $400,000

---

[7] The Debtors considered Customer Recalled Inflators Claims as applicable for Consenting OEM PSAN Cure Claims, which, based on the Consenting OEMs' proofs of claim, totaled approximately $8 billion.  After reconciling these proofs of claim with the volume of PSAN Inflators shipped by the Debtors, the Debtors estimate Consenting OEM PSAN Cure Claims to be an amount up to approximately $4 billion.

payable by the Debtors in accordance with the payment waterfall set forth in section 5.19(c) of the Plan, which may constitute Available Cash for IIM, SMX, TDM, and the TKH Debtors (collectively, the "***Plan Settlement Payment***") and (b) payment of the Business Incentive Plan Payment under the terms of the U.S. Acquisition Agreement, as modified by Section 5.19(b) of the Plan.  I understand that the Plan Settlement Payment on account of the Settled OEM Claims is currently estimated to be approximately $246 million.

      27.     In addition, the Plan Settlement incorporates the terms of the TCC Settlement whereby the Consenting OEMs contribute to the Plan Settlement Fund their rights to certain recoveries as and when such amounts would otherwise be paid or payable to the Consenting OEMs under the Plan, with such contributed recoveries in the Plan Settlement Fund being transferred pursuant to the Plan to the PSAN PI/WD Trust for the benefit of holders of PSAN PI/WD Claims and Other PI/WD Claims as follows:

- Eighty percent (80%) of the Consenting OEM GUC Recoveries until the Consenting OEMs have contributed $5 million to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety (90%) of Consenting OEM GUC Recoveries until the Consenting OEM GUC Recovery Threshold is met (which is the Consenting OEMs' share of the first $89.9 million of Available Cash);

- Twenty-five (25%) of the Consenting OEM GUC Recoveries in excess of the Consenting OEM GUC Recovery Threshold (the Consenting OEM Additional GUC Recoveries);

- Eighty percent (80%) of the incremental amount of Consenting OEM GUC Recoveries resulting from or attributable to the NTHSA Claims being treated as Other General Unsecured Claims and/or the TKJP 503(b)(9) Claim being setoff or otherwise eliminated until the Consenting OEMs have contributed $5 million to the Support Party Creditor Fund in accordance with Section 5.19(g) of the Plan and, thereafter, ninety percent (90%) of such "Consenting OEM Incremental GUC Recoveries;" and

- Eighty percent (80%) of any amounts that the Consenting OEMs would be entitled to receive on account of the Business Incentive Plan Payment, excluding any amounts of the Business Incentive Plan Payment that are allocable to TKAM.

28.     The Plan Sponsor has also agreed to contribute the Plan Sponsor

Contribution Amount of $25 million to the PSAN PI/WD Trust as soon as practicable after the

Plan Sponsor receives repayment of up to $25 million drawn on the Plan Sponsor Backstop

Funding Agreement by TKAM (on behalf of TSAC).  All funds contributed by the Plan

Settlement Fund to the PSAN PI/WD Trust will be shared Pro Rata by holders of Class 5 (PSAN

PI/WD Claims) and Class 7 (Other PI/WD Claims).

29.     Lastly, the Plan Settlement incorporates the terms of the UCC Settlement

and provides for the establishment and funding by the Consenting OEMs and the Plan Sponsor,

for the benefit of Eligible Creditors, of the Support Party Creditor Fund with not less than $7.5

million—with $5 million to be contributed by the Consenting OEMs and $2.5 million to be

contributed by the Plan Sponsor, inclusive of any remaining amount of the $5 million Cure

Claims Cap.  The UCC Settlement also provides for certain limitations on the Debtors' and the

Plan Sponsor's ability to reject additional executory contracts going forward.

30.     I believe that the Plan Settlement provides significant benefit to the

Debtors' estates.  First, the Plan Settlement resolves a litany of Claims and controversies

involving the Consenting OEMs, the Plan Sponsor, both Committees, and the Future Claims

Representative.  The Plan Settlement resolves over $4 billion in Claims on account of the

Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN

Administrative Expense Claims in exchange for an estimated $246 million Plan Settlement

Payment.  I believe that litigating the Debtors' liability for these Claims with the Consenting

OEMs would be both extremely time consuming and expensive with the outcome only serving to

crystalize the magnitude of the Consenting OEMs' Claims against the Debtors' Estates.  Further,

the Plan Settlement resolves significant confirmation disputes related to the treatment of General

Unsecured Claims and the propriety of the Channeling Injunction and the other Release

Provisions (as defined below)—issues if litigated by the Committees and the Future Claims

Representative could have resulted in the incurrence of substantial administrative expenses to the

direct detriment of unsecured creditors.

       31.    Second, I believe that the delay that litigating the Debtors' liability for,

and the amount of, the Settled OEM Claims, as well as the treatment of General Unsecured

Claims and the propriety of the Channeling Injunction and the other Release Provisions under the

Plan, could be fatal to the Debtors' ability to consummate the Global Transaction.   The Plan

Settlement avoids protracted, complicated and expensive litigation involving fifteen (15) OEMs,

two (2) Committees, and the Future Claims Representative and provides a significant level of

certainty regarding confirmation of the Plan.  Simply put, the Plan Settlement allows the Debtors

to conserve their limited financial resources in order to reorganize, pay creditors, and produce

replacement kits, rather than to engage in costly and protracted litigation.

       32.    In addition to the resolution of the Settled OEM Claims, the treatment of

General Unsecured Claims, and the propriety of the Channeling Injunction and the other Release

Provisions, the Plan Settlement provides for (a) the funding in full of the Post-Closing Reserve

and the Warehousing Entity Reserve in accordance with the Plan, (b) the Consenting OEMs'

obligations under the Indemnity Agreement, without which the Plan Sponsor would have been

unwilling to enter into the Global Transaction, (c) the Consenting OEMs' post-Effective Date

commitments to the Plan Sponsor's business, (d) the Plan Sponsor's obligation to provide the

Plan Sponsor Backstop Funding subject to the terms of the Plan Sponsor Backstop Funding

Agreement, (e) the Plan Sponsor's commitment to provide the Business Incentive Plan Payment,

subject to the terms of the U.S. Acquisition Agreement, (f) the Plan Sponsor's Agreement to

enter into the Transition Services Agreement, (g) the Consenting OEMs' contributions to the

Plan Settlement Fund, (h) the Plan Sponsor Parties' payment of the Plan Sponsor Contribution

Amount to the PSAN PI/WD Trust, and (i) the contributions by the Plan Sponsor and the

Consenting OEMs to the Support Party Creditor Fund.  Without these benefits, I do not believe

that consummation of the Global Transaction, and the resulting creditor recoveries provided for

under the Plan, would be possible.  For example, I believe that without the Consenting OEMs

agreeing to settle their billions of dollars of secured and priority Claims for a fraction of their

potential value, the Debtors would be administratively insolvent and unable to confirm a Plan.

The Consenting OEMs would be entitled to substantially all of the value of the Debtors' Estates

and other unsecured creditors would likely recover nothing on account of their Claims.  In

contrast, as a result of the satisfaction of the Settled OEM Claims pursuant to the Plan

Settlement, significant funds are now available for the benefit of unsecured creditors.

33.     Finally, the Plan Settlement (a) facilitates the sale of the Debtors' non-

PSAN businesses as a going-concern, thereby maximizing creditor recoveries, (b) provides

material benefits to the Debtors' suppliers and other businesses that depend on the go-forward

business by assuming and assigning many of the Debtors' vendor and supplier contracts to the

Plan Sponsor, (c) preserves fourteen thousand (14,000) jobs, and (d) facilitates the uninterrupted

supply of replacement kits to PSAN Consenting OEMs.

34.     Accordingly, I believe that the Plan Settlement satisfies section

1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019.

35.     *The Debtors' Releases*:  As discussed in paragraph 63 below, Sections

5.19(j) and 10.6(a) of the Plan respectively provide for the release of any and all Claims against

the Consenting OEMs and the Released Parties (as defined below) by the Debtors, the

Reorganized Debtors, and the Debtors' Estates (subject to certain limited exceptions outlined in the Plan).  For each of the reasons set forth in paragraph 63, I believe that these releases are permissible under, and consistent with, section 1123(b)(3)(A) of the Bankruptcy Code.

36.      ***Section 1123(b)(3)(B): Retention of Causes of Action and Reservation of Rights***.  Pursuant to Section 10.11 of the Plan, all Avoidance Actions that relate to the continued operation of the Business (as defined in the U.S. Acquisition Agreement), Reorganized Takata, or the Warehousing Entity, including with respect to ongoing trade vendors, suppliers, licensors, manufacturers, strategic or other business partners, customers, employees, or counterparties to all Purchased Contracts to be acquired by the Plan Sponsor, assumed by Reorganized Takata, or assumed and assigned to the Warehousing Entity will be waived and released on the Effective Date.  Further, subject to certain exceptions including with respect to the Purchased Contracts, the Plan preserves and vests in the Reorganized TK Holdings Trust any rights, Claims, Causes of Action (including Avoidance Actions), rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  Accordingly, I believe that the Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

37.      ***Section 1123(b)(4): Sale of Substantially all Assets***.  As discussed above, pursuant to Section 5.2 of the Plan, on the Effective Date, the Debtors will consummate the sale and transfer of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any successor or transferee liabilities, in accordance with section 1123(b)(4) of the Bankruptcy Code.

38.     ***Section 1123(b)(5): Modification of Rights***.  In accordance and in compliance with section 1123(b)(5) of the Bankruptcy Code, Article IV of the Plan modifies the rights of holders of Claims in Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), Class 7 (Other PI/WD Claims), and Class 9 (Subordinated Claims), and leaves unaffected the rights of holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims).

39.     ***Section 1123(b)(6): Additional Plan Provisions***.  In accordance with section 1123(b)(6), the Plan provides for (a) the establishment of Disputed Claims Reserves (as defined below); (b) releases of Claims held by certain *consenting* creditors and interest holders of the Debtors (the "***Consensual Releases***") against certain non-Debtor third parties (collectively, the "***Released Parties***"); (c) a release and permanent injunction of certain PSAN PI/WD Claims (collectively, the "***Channeling Injunction***") against certain non-Debtor third parties (the "***Protected Parties***"); (d) releases of certain Claims held by the Debtors and their Estates (the "***Debtor Releases***" and, together with the Consensual Releases and the Channeling Injunction, the "***Release Provisions***") against the Consenting OEMs and the Released Parties; and (e) an exculpation of the Debtors and certain Estate fiduciaries (the "***Exculpated Parties***").

40.     ***Establishment of Disputed Claims Reserves***:  The Plan contemplates that the Debtors will establish and adequately fund four (4) separate disputed claims reserves—the IIM Disputed Claims Reserve, the SMX Disputed Claims Reserve, the TDM Disputed Claims Reserve, and the TKH Disputed Claims Reserve—for the benefit of holders of Allowed General Unsecured Claims at IIM, SMX, TDM, and the TKH Debtors, as applicable (collectively the "***Disputed Claims Reserves***"), with amounts in such Disputed Claims Reserves being

released to holders of Allowed General Unsecured Claims or the applicable Claims

Administrator as Disputed Claims are resolved.

41.     *Consensual Releases*:  Section 10.6(b) of the Plan provides for the

consensual release of certain Claims against the Released Parties held by certain Claim and

Interest holders.  Specifically, Section 10.6(b) of the Plan provides that the following parties will

be determined to have consented to the Consensual Releases:  (a) holders of Claims who vote to

accept the Plan; (b) holders of Claims that are Unimpaired under the Plan; (c) holders of Claims

whose vote to accept or reject the Plan is solicited but who do not vote either to accept or reject

the Plan; (d) the holders of Claims or Interests who vote, or are deemed, to reject the Plan but do

not opt out of granting the releases set forth therein; (e) the holders of Claims and Interests who

are given notice of the opportunity to opt out of granting such releases but who do not opt of

granting the releases; and (f) all other holders of Claims and Interests to the maximum extent

permitted by law.  The Debtors' solicitation materials provided clear conspicuous notice of both

the Consensual Releases and the process for opting out of the Consensual Releases.

Accordingly, I believe that the Consensual Releases should be approved.

42.     *Channeling Injunction*:  Section 10.6(c) and Section 10.7 of the Plan

provide for the release and permanent injunction of certain PSAN PI/WD Claims against the

Protected Parties.  The Protected Parties consist of the following:  (i) the Debtors and their non-

Debtor affiliates; (ii) the Participating OEMs (but no other OEMs),[8] only to the extent certain

conditions are met; and (iii) the Plan Sponsor Parties and the Acquired Non-Debtor Affiliates; as

well as each of the foregoing parties' directors, officers, principals, employees, professionals,

and other related parties.  Specifically, the Plan provides that PSAN PI/WD Claims against such

---

[8] As of the date of this filing, only American Honda Motor Co., Inc. and its subsidiaries and affiliates have elected to become Participating OEMs.

Protected Parties are released and channeled to the PSAN PI/WD Trust.  As set forth below, I

believe that the Channeling Injunction is an essential component of the Plan, appropriate under

the circumstances, and should be approved.

43.     Pursuant to the Channeling Injunction, PSAN PI/WD Claims that are

released pursuant to Section 10.6(c) of the Plan, are enjoined and channeled to the PSAN PI/WD

Trust.  Pursuant to the Plan Settlement, the Consenting OEMS and the Plan Sponsor Parties are

contributing more than $130 million in additional value to the Plan Settlement Fund, which

includes amounts paid to the PSAN PI/WD Trust to pay PSAN PI/WD Claims asserted against

the Takata Defendants (the "***TD Claims***").

44.     Claimants with TD Claims will recover from the PSAN PI/WD Trust

Funds, based on the Points Schedule employed by the Special Master in administering claims

against the DOJ PI/WD Restitution Fund.  The Points Schedule provides a methodology for

classifying injuries into a manageable process, thereby ensuring the consistent and fair treatment

of current and future claimants.  By applying the same methodology, the process allows PSAN

PI/WD Claimants to use the same claim form to recover from both the PSAN PI/WD Trust and

the DOJ PI/WD Restitution Fund.  I understand that the Special Master of the DOJ PI/WD

Restitution Fund will serve as the Trustee of the PSAN PI/WD Trust.

45.     In addition, pursuant to the terms of the Plan and the PSAN PI/WD TDP,

and in exchange for the Channeling Injunction, Consenting OEMs that elect to become

Participating OEMs will contribute additional, uncapped funds to resolve PSAN PI/WD Claims

that have been asserted against such OEMs (the "***P-OEM Claims***").[9]  In doing so, each PSAN

---

[9] All claims against non-Participating OEMs are preserved and all PSAN PI/WD Claimants shall retain full rights to
proceed against such non-Participating OEMs in the tort system.

PI/WD Claimant with a P-OEM Claim will receive recovery of the full amount of their P-OEM Claim, as determined by the Trustee and in accordance with the PSAN PI/WD TDP.

46.     The Channeling Injunction facilitates a comprehensive process for resolving PSAN PI/WD Claims, including both TD Claims and P-OEM Claims, in a speedy, transparent, and fair manner.  Indeed, once a PSAN PI/WD Claim has been filed with the PSAN PI/WD Trust, it will be evaluated on the basis of clear, evidence-based criteria, to determine compensability.  The Trustee has significant flexibility to ensure that PSAN PI/WD Claims are treated fairly in light of the severity of the injury.  Where warranted, the Trustee may evaluate a PSAN PI/WD Claim pursuant to an Extraordinary Review Process or an Individual Review Process in accordance with the PSAN PI/WD TDP.  Holders of TD Claims may seek supplemental review of the Trustee's determination of the TD Claims, on the basis of both compensability and valuation, from the Future Claims' Representative for upward adjustment in accordance with the PSAN PI/WD TDP.

47.     With respect to P-OEM Claims, after the Trustee has made his determination, the PSAN PI/WD Trust provides for a Valuation Schedule and a Scheduled Claim Process, as well as an Individual Review Process.  The Trustee's determination with respect to P-OEM Claims may be appealed to a Review Panel consisting of reviewers from around the country—including from NHTSA's "Zone A" areas with high heat and humidity where PSAN PI/WD Claims are more likely to arise.

48.     Importantly, at the conclusion of the PSAN PI/WD Trust evaluation process, as relates to the P-OEM Claims, each PSAN PI/WD Claimant may elect to opt-out of the PSAN PI/WD Trust and file a lawsuit in the tort system against the applicable Participating

OEM.[10]  PSAN PI/WD Claimants may do so without fear of being subject to defenses such as

contributory negligence or the statute of limitations or statute of repose

       49.    I believe that the Channeling Injunction is appropriate under the

circumstances for several reasons.  First, I understand from discussion with counsel that this

Court has "related to" jurisdiction to grant the Channeling Injunction and enjoin third-parties

from bringing claims against the Protected Parties in non-bankruptcy forums because of the

nature of the Debtors' Purchase Orders (as defined below) with the Consenting OEMs.  Pursuant

to certain master purchase agreements, supply contracts, purchase orders, general terms and

conditions, releases, and/or other contracts (collectively, the "***Purchase Orders***") between the

Debtors and the Participating OEMs, the Debtors have supplied such Participating OEMs with

PSAN Inflators.  I understand that under the terms of the Purchase Orders, these parties have

various rights of indemnification, reimbursement, setoff, deduction, and/or recoupment against

the Debtors for, *inter alia*, PSAN PI/WD Claims.  Accordingly, any PSAN PI/WD Claims

asserted against these parties would give rise, and indeed have given rise, to Claims being

asserted against the Debtors' Estates for the cost of defending such Claims and for

indemnification of losses.  Because these Participating OEMs' contractual indemnity Claims

would automatically create liabilities for the Debtors' Estates in favor of such parties, I believe

that this Court has "related to" jurisdiction to enjoin third parties from commencing litigation

that would give rise to such Claims and thereby impact the administration of these Chapter 11

Cases.

       50.    With respect to the Debtors' directors and officers, I understand from

discussion with counsel that the Court similarly has "related to" jurisdiction over PSAN Inflator-

---

[10] Claimants may not seek punitive or exemplary damages in connection therewith.

related actions asserted against these individuals as they too have rights of indemnification and reimbursement against the Debtors pursuant to one or more of the following: (a) specific board actions or resolutions; (b) articles of incorporation or articles of organization (as applicable); (c) bylaws and operating agreements; (d) employment agreements; or (e) statute or common law. Accordingly, as a lawsuit against the Protected Parties would be equivalent to a lawsuit against the Debtors, I believe that this Court has jurisdiction to approve the Channeling Injunction established under the Plan.

51.     In addition to the above, I understand that the Debtors are named under the same products liability and officer and director insurance policies as certain of the Protected Parties, *i.e.*, certain non-Debtor affiliates, and share in the proceeds thereof. Accordingly, the assertion of PSAN Inflator-related actions against such entities or their directors and officers would deplete Assets that would otherwise form part of the Estates.

52.     Second, I believe that extraordinary circumstances exist in these circumstances such that the Channeling Injunction is appropriate. As described above, the Protected Parties' indemnification rights and rights to share in the proceeds of the Debtors' insurance policies create an identity of interest among the Debtors and the Protected Parties. Moreover, the Debtors and the Protected Parties share a further identity of interest in the form of their common goal of implementing a mutually beneficial restructuring, which they have been jointly pursuing for more than two (2) years.

53.     Further, I believe that the Protected Parties have made a substantial contribution to the Debtors' efforts to reorganize. I understand that TKJP and TKSAC, two non-Debtor affiliates of the Debtors that do not constitute Acquired Non-Debtor Affiliates, shall not be included as Protected Parties unless such affiliates agree to waive all net intercompany

payables owed by the Debtors in excess of $4 million. I believe that such a waiver would constitute a substantial contribution to the Estate.

54. In addition to compromising billions of dollars in Claims in order to facilitate the Debtors' restructuring, the Participating OEMs have also provided the Debtors with substantial liquidity by agreeing to provide valuable postpetition accommodations including, among other things, acceleration of payables (only as necessary), limitations on setoffs, limitations on resourcing, and other accommodations and liquidity enhancements. Similarly, the Plan Sponsor's contributions include not only the Base Purchase Price under the U.S. Acquisition Agreement, but also significant sources of potential incremental value, including the Business Incentive Plan Payment and the Plan Sponsor Backstop Funding.

55. In addition to these substantial contributions, as specific consideration for the Channeling Injunction, the Participating OEMs are also effectively agreeing to pay in full their respective portion of the PSAN PI/WD Claims affected by the Channeling Injunction. The Participating OEMs, along with all Consenting OEMs, which retain the right to become Participating OEMs, also agreed to contribute significant recoveries to the Plan Settlement Fund for the benefit of holders of PSAN PI/WD Claims.

56. Further, the Plan Sponsor is agreeing to contribute the Plan Sponsor Contribution Amount (*i.e.*, $25 million) to the PSAN PI/WD Trust, in exchange for the protections of the Release Provisions, including the Channeling Injunction, to enhance further the recoveries of PSAN PI/WD Claims. I believe that these contributions, which are for the benefit of holders of channeled claims, constitute a substantial contribution in the context of approving the Channeling Injunction.

57.     Last, but certainly not least, the Protected Parties, including their directors and officers, have devoted untold resources over the past two (2) years toward negotiating and facilitating the implementation and execution of the Debtors' restructuring.

58.     Third, I believe that the Channeling Injunction is essential to the Debtors' reorganization.  From the outset of the negotiations surrounding the Debtors' restructuring, it has been clear that the substantial benefits conferred upon the Debtors' Estates by the Protected Parties—namely, (a) the compromise of significant Claims, (b) the provision of valuable accommodations, financing, and other contributions, (c) the provision of substantial value including the Base Purchase Price, the Business Incentive Plan Payment and the Plan Sponsor Backstop Funding, and (d) the support of the Protected Parties—were conditioned upon structuring the Plan to adequately address PSAN PI/WD Claims.  I believe that adequately addressing the liabilities associated with PSAN PI/WD Claims was a principal motivating factor in structuring and implementing the Debtors' Plan and restructuring, particularly for the Plan Sponsor, for whom limiting exposure to PSAN Inflator-related liability was a precondition to the Global Transaction.  Because the aforementioned contributions were critical to the Debtors' restructuring and were long-premised on the resolution of PSAN PI/WD Claims as ultimately embodied in the Channeling Injunction, I believe that the Channeling Injunction is essential to the Debtors' restructuring.

59.     Fourth, the Plan and, significantly, the Channeling Injunction contemplated therein, is supported by the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative—the parties tasked with ensuring that the interests of the

claimants most impacted by the Channeling Injunction are adequately represented.[11]  Moreover, as set forth below, I expect the final voting results to confirm that a significant majority of holders of Claims in Class 5 (PSAN PI/WD Claims), at each of the applicable Debtors, voted in favor of the Plan and expressed support for the Channeling Injunction.

60.     In addition, I understand that as to each Participating OEM, the support of a significant number of such Participating OEM's own respective PSAN PI/WD Claimants (on an individual Participating OEM basis), as well as the Future Claims Representative, is a precondition to the effectiveness of the Channeling Injunction with respect to each such Participating OEM.  In view of the foregoing, I believe that the Channeling Injunction has the overwhelming support of all relevant parties in interest.

61.     Fifth, the Plan affords substantial recoveries to holders of Claims affected by the Channeling Injunction that would otherwise be unavailable.  More precisely, I understand that the Plan provides for significant payments to holders of PSAN PI/WD Claims by the Protected Parties in a manner that avoids the otherwise significant litigation costs associated with the liquidation of these PSAN PI/WD Claims and by the Plan Sponsor on account of the Plan Sponsor Contribution Amount.  In addition, as stated above, I understand that the Participating OEMs are agreeing to pay the full value of all PSAN PI/WD Claims that would be impacted by the Channeling Injunction as it applies to them.

62.     Finally, in addition to each of the reasons set forth above, I believe that approval of the Channeling Injunction is warranted by the exceptional circumstances surrounding the Debtors' Chapter 11 Cases.  The Debtors are involved in the largest automotive safety recall in United States history—a significant undertaking that they have been navigating

---

[11] Indeed, the Channeling Injunction as ultimately embodied in the Plan was the product of intense, good faith, and arms-length negotiations between the Debtors and these constituencies aimed at ensuring that affected claimants received fair treatment.

while simultaneously working to sell as a going concern a global business with over fourteen thousand (14,000) employees.  The Protected Parties have been intimately involved with the Debtors' reorganization process for the past two (2) years—negotiating, formulating, and preparing to implement the Plan.  This process has been long, painstaking, and exceedingly complex, and the Protected Parties have been instrumental and, indeed, invaluable throughout.

63.    *Debtor Releases*:  Sections 5.19(j) and 10.6(a) of the Plan respectively provide for the release of any and all Claims by the Debtors against the Released Parties, including the Consenting OEMs, subject to certain limited exceptions outlined in the Plan.  The Debtors, in their business judgement, have determined that the Debtor Releases are fair, reasonable, and in the best interests of the Debtors and the Estates.  I also believe that the Debtor Releases are integral to the overall Plan Settlement, including the Plan Sponsor's and the Consenting OEMs' contributions in connection therewith, the latter of which being premised in substantial part upon receiving the benefit of the Debtor Releases.  Moreover, I do not believe that the Debtors are releasing any material Claims pursuant to the Debtor Releases.  Indeed, my belief in this regard is further evidenced by the fact that both the Creditors' Committee and the Tort Claimants' Committee—*i.e.*, the primary creditor groups that have been investigating the Claims that would be released pursuant to the Debtor Releases throughout the Challenge Period (and which have conducted substantial discovery in connection therewith)—have determined to support the Debtor Releases.

64.    *Exculpation*:  Section 10.8 of the Plan exculpates the Exculpated Parties (which parties consist only of Estate Fiduciaries) on account of any act or omission in connection with or arising out of (a) the administration of the Chapter 11 Cases; (b) the negotiation and pursuit of (i) the Disclosure Statement (including any information provided or statements made

in the Disclosure Statement or omitted therefrom), (ii) the Restructuring Transactions, (iii) the

Global Accommodation Agreement, (iv) the U.S. RSA, and (v) the Plan, and the solicitation of

votes for, and confirmation of, the Plan, and the funding of the Plan; (c) the occurrence of the

Effective Date; (d) the administration of the Plan and the property to be distributed under the

Plan; (e) the wind-down of the Reorganized Debtors and Reorganized Takata; (f) the issuance of

securities under or in connection with the Plan; and (g) the transactions in furtherance of any of

the foregoing; except for breaches of fiduciary duty, fraud, gross negligence, willful misconduct,

failure to comply with the Confirmation Order and failure to distribute Assets according to the

Plan.  I believe that this exculpation provision is reasonable and should be approved.

65.      In view of the foregoing, I believe that the Plan satisfies section 1123(b)

of the Bankruptcy Code.

66.      ***Section 1123(c):  Non-Debtor Proposed Sales—Inapplicable Provision***.

Section 1123(c) of the Bankruptcy Code is not applicable to the Plan.

67.      ***Section 1123(d):  Cure of Defaults***.  Section 8.3 of the Plan provides for

the satisfaction of default Claims associated with each executory contract and unexpired lease to

be assumed or assumed and assigned pursuant to the Plan in accordance with section 365(b)(1)

of the Bankruptcy Code.  All Cure Amounts, as set forth in the Schedule of Cure Amounts

mailed to each applicable counterparty to an executory contract or unexpired lease with the

Debtors, were determined in accordance with the underlying agreements and applicable

bankruptcy and nonbankruptcy law.  Accordingly, I believe that the Plan complies with section

1123(d) of the Bankruptcy Code.

68.      ***Section 1129(a)(2):  The Debtors' Compliance with the Bankruptcy***

***Code***.  To the best of my knowledge and belief, based on discussions with the Debtors' legal

counsel, and as evidenced by the Solicitation Order, prior orders of the Bankruptcy Court, and the filings submitted by the Debtors, I believe that the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126 regarding disclosure and Plan solicitation.

69.     *Section 1125:  Postpetition Disclosure Statement and Solicitation*.  By entry of the Disclosure Statement Order on January 5, 2018, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b) of the Bankruptcy Code.  As will be set forth in the Voting Certification, the Debtors solicited votes on the Plan from holders of Claims in the Voting Classes consistent with the Court-approved Solicitation and Voting Procedures.  In compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from any holder of a Claim or Interest prior to entry of the Disclosure Statement Order.

70.     Lastly, the Debtors provided an eight (8) day extension of the Voting Deadline, during which time the Debtors filed the Settlement Term Sheets.  This extension of the Voting Deadline permitted holders of Claims in the Voting Classes with an opportunity to change their vote in light of the agreed terms set forth therein and ultimately incorporated into the Plan.

71.     **_Section 1126:  Acceptance of the Plan_**.  As will be set forth in the Voting Certification, the Debtors solicited acceptances of the Plan from the holders of Claims against the Debtors in each Voting Class under the Plan in accordance with section 1126 of the Bankruptcy Code.  The Voting Classes include Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), and Class 7 (Other PI/WD Claims).

72.     The Debtors did not solicit votes for the Plan from any holder of Claims in Class 1 (Other Secured Claims) or Class 2 (Other Priority Claims), as such Classes are Unimpaired and, therefore, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Further, the Debtors also did not solicit votes for the Plan by any holder of Claims or Interests, as applicable, in Class 8 (Intercompany Interests) or Class 9 (Subordinated Claims), as such Classes will not receive or retain any property on account of their Claims or Interests and, therefore, are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.

73.     Although final voting results were not available prior to the filing of this Declaration, I understand that preliminary voting results suggest that Class 5 (PSAN PI/WD Claims) at TKH, IIM, TDM, and SMX and Class 6 (Other General Unsecured Claims) at TKH have not voted to accept the Plan.

74.     ***Section 1129(a)(3):  The Plan has been Proposed in Good Faith***.  The Debtors have proposed the Plan in good faith and solely for the legitimate and honest purposes of maximizing the value of the Debtors' Estates for the benefit of creditors by facilitating the sale of the Debtors' non-PSAN businesses to the Plan Sponsor as a going-concern, and preserving the Debtors' PSAN Inflator business to ensure ongoing production of replacement kits for use in connection with the ongoing PSAN Inflator recalls.  Further, the Plan (including the Plan Supplement and all other documents necessary to effectuate the Plan) was negotiated at arm's length among representatives of the Debtors, the Restructuring Support Parties, the Committees, the Future Claims Representative, and their respective professionals solely for the purposes outlined above and the facts support no other conclusion.

75.     The Restructuring Support Parties as well as the Committees and the Future Claims Representative support confirmation of the Plan.  I believe that the support of the Plan by the Committees and the Future Claims Representative reflects the inherent fairness of the Plan and the good faith efforts of the Debtors to achieve the objectives of chapter 11.

76.     ***Section 1129(a)(4):  The Plan Provides that Fee Claims are Subject to Court Approval***.  All payments made or to be made by the Debtors for services or for costs and expenses of the Debtors' professionals in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court as reasonable.  Specifically, Section 2.5 of the Plan subjects payment of all Professional Persons to the filing and approval of final fee applications before the Court. Further, Section 11.1(a)(ix) of the Plan provides that the Court shall retain jurisdiction to hear and determine all Fee Claims.

77.     ***Section 1129(a)(5):  The Debtors have Disclosed all Necessary Information Regarding Directors, Officers, and Insiders***.  As disclosed in the Plan Supplement, the Debtors have proposed David Michael Rains as the Plan Administrator and Chief Executive Officer of TK Global LLC, which entity will be the owner of the sole equity interest in Reorganized TK Holdings, as well as all the equity interests in the Warehousing Entity. Accordingly, I believe that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

78.     ***Section 1129(a)(6):  Governmental Rate Approvals—Inapplicable Provision***.  It is my understanding that section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

79.     ***Section 1129(a)(7):  The Plan is in the Best Interests of All Creditors and Interest Holders***.  The Bankruptcy Code requires that, with respect to each impaired Class

of Claims and Interests, each holder of such Claim or Interest must either (a) accept the Plan or (b) receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

80.     I reviewed the liquidation analysis annexed as <u>Exhibit J</u> to the Disclosure Statement (the "***Liquidation Analysis***") prepared by PricewaterhouseCoopers LLP ("***PwC***") and rely on the *Declaration of Steven Fleming in Support of the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* filed contemporaneously herewith (the "***Fleming Declaration***").

81.     I understand that section 1129(a)(7) is satisfied as to each holder of a Claim or Interest in a Non-Voting Class because each such holder is unimpaired and deemed to have accepted the Plan.  As explained in detail in the Liquidation Analysis Declaration, the Liquidation Analysis demonstrates that all Voting Classes of Claims and Interests will recover substantially more value under the Plan than through a liquidation of the Debtors under chapter 7.  As a result, I believe each holder of a Claim or Interest either has (i) accepted the Plan or (ii) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Accordingly, I believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

82.     ***Section 1129(a)(8):  The Plan is Expected to have been Accepted by Certain Impaired Classes Entitled to Vote***:  As set forth above, the holders of Claims or Interests in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code and are conclusively

presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Final

voting results were not available prior to the filing of this Declaration. Based on the preliminary

results available to the Debtors at the time of filing, the Debtors expect each of the following

Classes to have voted to accept the Plan in accordance with section 1126 of the Bankruptcy

Code: Class 3 (Mexican Class Action Claims and Mexican Labor Claims);[12] Class 4 (OEM

Unsecured Claims); Class 6 (Other General Unsecured Claims) at all applicable Debtors except

TKH; and Class 7 (Other PI/WD Class). Accordingly, Section 1129(a)(8) is satisfied with

respect to these Classes.

83.    Likewise, based on the preliminary voting results available, the Debtors

expect each of the following Classes to vote to reject the Plan in accordance with section 1126 of

the Bankruptcy Code: Class 5 (PSAN PI/WD Claims) at TKH, IIM, TDM, and SMX, and

Class 6 (Other General Unsecured Claims) at TKH. In addition, I understand that holders of

Claims or Interests, as applicable, in Class 8 (Intercompany Interests) and Class 9 (Subordinated

Claims) are not entitled to receive or retain any property on account of their Interests in the

Debtors and, as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the

Bankruptcy Code.

84.    ***Section 1129(a)(9):  The Plan Provides for Payment in Full of All***

***Allowed Priority Claims***. Pursuant to Articles II and IV of the Plan, and in accordance with

sections 1129(a)(9)(A) and (B), the Plan provides that all Allowed Administrative Expense

Claims, Adequate Protection Claims, Fee Claims, and Other Priority Claims will be paid in full,

except as otherwise agreed by the parties. Likewise, pursuant to Section 2.6 of the Plan, all

---

[12] As the Mexican Class Action Claims and the Mexican Labor Claims were listed as contingent, unliquidated, and/or disputed on the Debtors' Schedules, holders of these Claims were required to file a proof of claim in order to vote on the Plan. However, as no holders filed a proof of claim, the Debtors did not solicit or receive any votes in Class 3.

Priority Tax Claims under section 507(a)(8) of the Bankruptcy Code will be paid in full, except as otherwise agreed by the parties.  Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

85.     ***Section 1129(a)(10):  Acceptance of the Plan by an Impaired Class***.  As set forth above, although the final voting results were not available prior to the filing of this Declaration, the Debtors are confident that at least one impaired Class at each Debtor has voted to accept the Plan, even excluding the acceptance of the Plan by any insiders in such Classes.  Accordingly, I believe that the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

86.     ***Section 1129(a)(11):  The Plan is Feasible***.  Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is feasible, *i.e.*, it is not likely to be followed by liquidation or the need for further financial reorganization.  I understand that, in the context of the Plan, feasibility is established by demonstrating the Debtors' ability to timely perform all obligations described in the Plan.  In particular, I believe that the Plan satisfies the feasibility requirement with respect to each of (i) obligations to pay creditors and fund various reserves on the Effective Date, (ii) the sufficiency of the funding of Reorganized Takata and the Warehousing Entity, and (iii) the sufficiency of the Reorganized TK Holdings Trust Reserve.

87.     Each of the foregoing obligations will be funded by proceeds from the Global Transaction, including the Plan Sponsor Backstop Funding (if necessary), and the Debtors' other cash on hand not acquired by the Plan Sponsor.  I am confident that, in accordance with the Plan, the Global Transaction will close immediately prior to or simultaneously with the occurrence of the Effective Date.  Indeed, the Plan Sponsor has already obtained commitments for significant acquisition financing and the Guarantor (as defined in the

U.S. Acquisition Agreement) is guaranteeing the Plan Sponsor's payment and performance obligations under the U.S. Acquisition Agreement.

88.     I believe that the foregoing amounts will be sufficient to satisfy all of the Debtors' obligations under the Plan that are due on the Effective Date, as well as the reserves that are being funded on the Effective Date, including the funding of Reorganized Takata, the Warehousing Entity, and the Reorganized TK Holdings Trust Reserve.  In addition, the Plan Sponsor has committed to backstop up to $75 million in the funding of, among other things, the Post-Closing Reserve and the Warehousing Entity Reserve, in each case up to certain caps, to the extent that they cannot be satisfied by the sale proceeds of the Global Transaction in accordance with the terms and subject to the conditions of the Plan Sponsor Backstop Funding Agreement.

89.     Further, recent steps taken by the Debtors support my conviction that the Global Transaction will be closed in a timely manner and the Debtors will be able to satisfy their obligations under the Plan.  First, on December 5, 2017, the Bankruptcy Court entered an order [Docket No. 1314] authorizing the Debtors to perform certain preparatory, pre-restructuring transactions with respect to the Debtors' Mexican affiliates, which will allow such affiliates to timely implement the Global Transaction.  Second, on February 7, 2018, the Debtors filed a motion [Docket No. 1978] requesting entry of an order estimating the maximum amount of certain contingent, unliquidated, and disputed General Unsecured Claims in Class 6 for purposes of establishing the Dispute Claims Reserve under the Plan.  Establishing the upper limit of the reserved amounts of the Disputed Claims for purposes of establishing the Disputed Claims Reserve will allow the Debtors to timely and efficiently allocate funds under the Plan.  Third, on February 12, 2018, the Court entered an order [Docket No. 2024] approving the capitalization of an intercompany receivable owed to TKH thereby avoiding $9 million in potential tax liability to

the Mexican government and ensuring the orderly consummation of the Global Transaction.
Fourth, as described in detail below, together with the Plan Sponsor, the Debtors continue to
work constructively with regulatory authorities, and I believe that the Global Transaction will
receive all necessary regulatory approvals.

90.     With respect to the sufficiency of the funding of Reorganized Takata and
the Warehousing Entity, the Debtors' Disclosure Statement included at Exhibit K financial
projections for Reorganized Takata and the Warehousing Entity (the "**Projections**").  An updated
version of these projections for the Warehousing Entity is attached hereto as Exhibit A (the
"**Updated Warehousing Entity Projections**").  The Projections and Updated Warehousing Entity
Projections indicate that Reorganized Takata and the Warehousing Entity should have sufficient
cash flow or reserves to satisfy their obligations (including Claims arising in the ordinary course
of Reorganized Takata's business) and to fund their operations.[13]  Indeed, the PSAN Inflators
produced by Reorganized Takata will be priced to cover the costs of such production.
Additionally, the Plan Sponsor Backstop Funding may be available to Reorganized Takata and
the Warehousing Entity to cover PSAN Legacy Costs after the Effective Date, subject to certain
caps, in accordance with the terms of the Plan Sponsor Backstop Funding Agreement.

91.     Similarly, I believe that the Reorganized TK Holdings Trust Reserve to be
funded pursuant to the Plan, along with Surplus Reserved Cash, Post-Closing Cash, and
Dissolution Date Cash that may be available to the Reorganized TK Holdings Trust Reserve after
the Effective Date, will be sufficient for the Reorganized TK Holdings Trust to carry out the
purpose for which it was established.

---

[13] It is expected that Reorganized Takata will also have general commercial liability insurance to cover claims that
arise in the ordinary course.

92.     For these reasons, I believe that the Plan provides for an achievable reorganization, which exceeds the Debtors' burden of showing that the Plan carries a reasonable likelihood of success.  Accordingly, I believe the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

93.     ___Section 1129(a)(12):  All Statutory Fees Have or Will be Paid___.  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.5 of the Plan provides that on the Effective Date, and thereafter as may be required, all fees payable pursuant to section 1930 of title 28 of the United States Code, together with interest, if any, shall be paid by the Reorganized Debtors.

94.     ___Section 1129(a)(13):  Continuation of Retiree Benefits___.  I understand that the Debtors have agreed to settlement and release agreements with all individuals entitled to retiree benefits under the Bankruptcy Code.  Moreover, these agreements were approved by the Court pursuant to the *Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 1114(e) and Fed. R. Bankr. P. 9019(a) (I) Authorizing Debtors to Enter into Settlement and Release Agreements with the Covered Executives and (II) Authorizing Debtors to Terminate or Cease Providing Retiree Benefits*, entered on February 1, 2018 [Docket No. 1879].  Accordingly, I believe that the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

95.     ___Section 1129(a)(14), 1129(a)(15), and 1129(a)(16):  Inapplicable Provisions___.  Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Plan.

96.     ___Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements with Respect to the Rejecting Classes___.  It is my understanding that a plan may be confirmed notwithstanding the rejection or deemed rejection by a class of claims or equity interests so long

as the plan does not discriminate unfairly and is fair and equitable.  It is my further understanding that (a) a plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and (b) the "fair and equitable" requirement is met as set forth in section 1129(b)(2) of the Bankruptcy Code.  For the reasons described below, I believe that the Plan does not "unfairly discriminate" and the "fair and equitable" requirement is satisfied as to Class 5 (PSAN PI/WD Claims) at TKH, IIM, TDM, and SMX and Class 6 (Other General Unsecured Claims) at TKH, each of which is expected to vote to reject the Plan, as well as Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims), which were deemed to have rejected the Plan at all Debtors.

97.    The Plan provides for an approximate recovery of 0.1% to 0.4% to holders of General Unsecured Claims from the Debtors' Estates (based on estimates as of the date of the Disclosure Statement), regardless of whether such Claims are included in Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), or Class 7 (Other PI/WD Claims).  Accordingly, as each of these Classes is expected to receive the same percentage recovery from the Debtors' Estates, there is no discrimination amongst these Classes.  The contributions of the Consenting OEMs and the Plan Sponsor Parties of the applicable Plan Settlement Funds and the Plan Sponsor Contribution Amount, respectively, to the PSAN PI/WD Trust for the benefit of, and Pro Rata distribution to, holders of Class 5 (PSAN PI/WD Claims) and Class 7 (Other PI/WD Claims), does not change this analysis as such contributions are not coming from the Debtors' Estates and accordingly do not "result in," or otherwise cause there to be, a materially lower recovery to any other Class.  In the case of the Plan Sponsor Contribution Amount, such contribution is the consideration paid by the Plan

Sponsor for the benefit of being a Protected Party.  In addition, with respect to the contributions

from the Consenting OEMs, I believe that these contributions are justified by, among other

things, the fact that the Consenting OEMs have the opportunity to become a "Participating

OEM" and become eligible to participate in the Channeling Injunction, as well as the fact that at

least one Consenting OEM is a co-defendant with the Debtors in all litigations asserting PSAN

PI/WD Claims.

        98.     With respect to the Debtors IIM and TDM, the Plan provides for an

approximate recovery of 1% to 76.9% and 4.7% to 100%, respectively, for Class 3 (Mexican

Class Action Claims and Mexican Labor Claims).  I do not believe that this treatment is unfair

because the payment of these Claims protects the Assets of IIM and TDM—Assets from which

replacement kits will be manufactured until Reorganized Takata is wound down, at which time

such Assets will be liquidated for the benefit of all creditors—from attachment by foreign

litigation creditors not subject to the jurisdiction of this Court.

        99.     With respect to Class 8 (Intercompany Interests) and Class 9

(Subordinated Claims), no other Classes of equal priority are provided for under the Plan.

Accordingly, I do not believe that there can be a presumption of unfair discrimination with

respect to these Classes and I believe that the Plan does not "discriminate unfairly" with respect

to any Impaired Classes of Claims or Interests.

        100.     Section 1129(b)(2)(B)(ii) of the Bankruptcy Code provides that a plan is

fair and equitable with respect to a class of impaired unsecured claims that did not accept such

plan if, pursuant to the plan, no holder of a claim or interest that is junior to the interests of such

class will receive or retain any property on account of their junior interest.  Similarly, section

1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect

to a class of impaired interests that did not accept the plan if, pursuant to the plan, no holder of an interest that is junior to the interests of such class will receive or retain any property on account of their junior interest.

101.    Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule.  With respect to rejecting Classes of General Unsecured Claims, no Claims or Interests junior to these Classes will receive recoveries under the Plan on account of such Claims or Interests.  Specifically, Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) will not recover or retain any property on account of their respective Interests and Claims under the Plan.  Similarly, with respect to Class 8 (Intercompany Interests), no Classes of Interests junior to this Class exists, and with respect to Class 9 (Subordinated Claims), the only junior Class is Class 8 (Intercompany Interests) and such Class is not receiving any recoveries under the Plan. Accordingly, I believe that the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

102.    ***Section 1129(c):  The Plan is the Only Plan***.  The Plan is the only plan filed in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

103.    ***Section 1129(d):  The Principal Purpose of the Plan is not the Avoidance of Taxes***.  The Plan has not been filed for the purpose of the avoidance of taxes or the application of Section 5 of the Securities Act of 1933, as amended.

104.    ***Section 1129(e):  Small Business Case Plans—Inapplicable Provision***. Section 1129(e) of the Bankruptcy Code does not apply to the Plan.

105. ***Section 1127:  Modification of the Plan***.  The Debtors modified the Plan on February 14, 2018 to, among other things, (a) provide for the classification of the NHTSA Claims as Class 6(d) (Other General Unsecured Claims), the Allowance of such Claims in the amount of $50 million, and the survival of the NHTSA Consent Order (as modified by the Plan) with respect to Reorganized TK Holdings; (b) establish a new Class—Class 7 (Other PI/WD Claims)—specifically for General Unsecured Claims relating to a personal injury or harm caused by a Takata Product, other than the Debtors' PSAN Inflator-related products; (c) revise the Plan Settlement to implement the terms of the TCC and UCC Settlements, including the establishment and funding of the Plan Settlement Fund and the Sponsor Party Creditor Fund, and the contribution of the Plan Sponsor Contribution Amount to the PSAN PI/WD Trust; (d) assign and transfer whatever rights the Debtors have in Takata's products liability insurance policies to the PSAN PI/WD Trust, subject to applicable law; (e) provide for the selection of Joseph J. Farnan, Jr. as the Legacy Trustee and the appointment of a Claims Oversight Committee with three members (two selected by the Tort Claimants' Committee and one selected by the Creditors' Committee) to represent the interests of certain holders of Other General Unsecured Claims and to review the resolution of certain Claims by the Reorganized TK Holdings Trust; (f) stipulate to an estimated amount of current and future PSAN PI/WD Claims in the amount of $1.3 billion and to an amount of Allowed Consenting OEM Claims of approximately $38 billion; (g) remove the reallocation of Available Cash under the Distribution Formula to give effect to recoveries to holders of PSAN PI/WD Claims from insurance proceeds; and (h) reflect various clean up changes, such as entering missing docket numbers and correcting typographical errors.  These changes do not adversely change the treatment of the Claim of any creditor or the Interest of any

equity security holder.  Accordingly, I believe that the Debtors' modifications of the Plan are in accordance with Section 1127 of the Bankruptcy Code.

### Additional Considerations

106.    ***Regulatory Approvals***.  The Debtors have received or expect to receive all regulatory approvals required for consummation of the Global Transaction, including approval by the Committee on Foreign Investment in the United States ("***CFIUS***").  The *Notice of the United States of America Concerning the Review of Certain Transactions by the Committee on Foreign Investment in the United States*, filed February 9, 2018 [Docket No. 2012] (the "***CFIUS Notice***") describes the process for CFIUS approval.  Based on discussions that the Debtors and the Plan Sponsor have had with CFIUS and the terms of the U.S. Acquisition Agreement, which requires that the Plan Sponsor take any and all actions necessary to achieve CFIUS approvals, including any required divestitures (without an adjustment to the purchase price), I do not expect that CFIUS approval will be an obstacle to closing the Global Transaction.

107.    ***Subordination of Claims***.  As described herein, the Plan provides for the separate classification of Claims against, and Interests in, each of the Debtors based upon differences in the legal nature and/or priority of such Claims and Interests.  The Debtors established Class 9 (Subordinated Claims) under the Plan to capture any Claims which, pursuant to the priority scheme set forth under the Bankruptcy Code, were not entitled to receive distributions until holders of all other Claims were paid in full.

108.    As set forth in the Plan, only Claims that are "subject to subordination under section 510 of the Bankruptcy Code" or "constitute a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the

48

Bankruptcy Code *or otherwise*," can be classified in Class 9.[14]  Allowing punitive claims to

recover in the same manner as General Unsecured Claims would be wholly inequitable to the

Debtors' other creditors, many of whom are victims of the alleged misconduct of the Debtors

that formed the basis for the Class 9 Claims.  I do not believe that it would be fair to allow

holders of Class 9 Claims to recover for injuries that they did not suffer at the expense of the

individual claimants who were directly injured by the PSAN Inflator defect.

109.     Accordingly, I believe that the subordination of Class 9 Claims is

appropriate.

110.     ***Treatment of the NHTSA Claims***.  As discussed herein, the Debtors

modified the Plan to classify and Allow the NHTSA Claims as Class 6 (Other General

Unsecured Claims) as part of an overall resolution with NHTSA.  I believe that several factors

weigh in favor of this resolution of the NHTSA Claims, and the Debtors' decision not to seek

subordination of the NHTSA Claims.  First, NHTSA is the Debtors' regulator and the NHTSA

Claims stem directly from violations of the Debtors' reporting duties to it.  Second, the Plan

Sponsor's obligation to consummate the Global Transaction is conditioned on NHTSA's consent

to the transaction.  Third, there were several bases on which NHTSA—as the Debtors' regulator

and a party with consent rights on the Global Transaction—could have insisted that the Debtors

pay its Claims in full (including requiring the Debtors to assume the NHTSA Consent Order as

an executory contract), but as part of an overall compromise, NHTSA agreed not to object to the

treatment of its Claims as Other General Unsecured Claims, which allowed substantial value to

flow to other creditors as compared to what would have flown to them if the NHTSA Claims

were treated as priority Claims.  The consensual resolution of the NHTSA Claims and the

---

[14] I understand that the Claims classified in Class 9 all seek fines, penalties, or punitive damages relating to defective PSAN Inflators manufactured by the Debtors.

treatment of the NHTSA Consent Order under the Plan provided significant benefits to the

Debtors and their creditors.  In view of the foregoing, I believe that the equities weigh in favor of

classifying and Allowing the NHTSA Claims as Class 6 (Other General Unsecured Claims).

111.    ***Stay of the Confirmation Order***.  I believe that under the circumstances

and to conserve estate resources, it is appropriate for the Bankruptcy Court to permit the Debtors

to consummate the Plan and commence its implementation without delay after the entry of the

Confirmation Order.  I believe that such relief is in the best interests of the Debtors' Estates and

creditors and will not prejudice any parties in interest.

112.    In light of all of the foregoing, I believe that confirmation of the Plan is

appropriate, is in the best interests of all parties in interest, and should, therefore, be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 14, 2018                    TK Holdings Inc.


By: */s/* Kenneth Bowling
Kenneth Bowling
Chief Financial Officer