UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

----------------------------------------------------x
:
In re                                              :    Chapter 11
:
TK HOLDINGS INC., *et al.*,                        :    Case No. 17-11375 (BLS)
:
Debtors.[1]                                        :    Jointly Administered
:
----------------------------------------------------x   Re: Docket No. 2056

### DECLARATION OF ANDREW YEARLEY IN SUPPORT OF DEBTORS' FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS

Pursuant to 28 U.S.C. § 1746, I, Andrew Yearley, hereby declare, under penalty of perjury to the best of my knowledge and belief, that:

1. I am a Managing Director of Lazard, which has its principal offices at 30 Rockefeller Plaza, New York, New York 10020. I am a senior member of the firm's Restructuring practice and a member of the firm's Investment Banking Committee and Opinion Committee.

2. Lazard Frères & Co. LLC ("*Lazard*") is the primary U.S. operating subsidiary of a preeminent global investment banking and financial advisory firm. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 150 years. Lazard and its professionals, including me, have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

complex financial restructurings, both in and out of court. I have considerable experience in the automotive sector having represented automotive suppliers in complex restructurings including Plastech Automotive, Inc., Meridian Automotive Systems, TI Automotive, and Chassix Holdings Inc., as well as representing the United Auto Workers in the restructuring of General Motors and Chrysler and the United States Treasury in the divestment of its stakes in General Motors and Chrysler.

3.  Since joining Lazard, I have advised companies, as well as creditor, labor, and equity constituencies and government agencies in numerous in-court and out-of-court restructuring, recapitalizations, and reorganizations, as well as capital raises, mergers and acquisitions, and other strategic transactions. I have participated in negotiations on behalf of debtors who entered into sale transaction(s) as part of their chapter 11 restructuring strategy and I have advised debtor-sellers on matters relating to valuation and price allocation.

4.  I have a Bachelors of Arts degree (Phi Beta Kappa) from Duke University and a Master of Business Administration degree (with honors) from Columbia University. I began my career in 1989 at Chase Manhattan Bank in the Structured Finance Division, and spent two (2) years in the Leveraged Transactions Group at BZW, at the time the investment banking arm of Barclays PLC. Prior to joining Lazard, I was a Vice President in Deutsche Banc Alex Brown's Restructuring Group and spent five (5) years in the Restructuring and Reorganization Group at Ernst & Young LLP.

5.  I submit this declaration (the "*Declaration*") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* (together with all schedules and exhibits thereto, and as may be modified,

2

amended, or supplemented from time to time, the "***Plan***"), filed contemporaneously herewith.[2] Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors and their professionals, including professionals working at my direction at Lazard. If called upon to testify, I would testify competently to the facts and opinions set forth in this Declaration.[3]

### The Marketing Process

6. Pursuant to the terms and conditions of an engagement letter dated May 2, 2016, Lazard agreed to provide investment banking services to Takata in connection with its restructuring process and to conduct a global sale and marketing process for substantially all of Takata's assets. Since then, a team of professionals at Lazard, including myself, has worked with Takata, the Steering Committee of TKJP (the "***Steering Committee***"), the Initial Consenting OEMs, and other restructuring professionals to structure, negotiate, and consummate a restructuring transaction. By order dated August 30, 2017, the Bankruptcy Court authorized Lazard's retention by the Debtors, as investment banker, in accordance with the terms of an engagement letter, dated August 17, 2017 [Docket No. 654].

7. In providing the foregoing prepetition services to the Debtors, Lazard acted as a primary architect of the strategic sponsor process working closely with management, the Steering Committee, the Initial Consenting OEMs, and other advisors to assist the Debtors to select the highest and best bidder through a competitive sale process. In May 2016, the Steering Committee requested that Lazard commence an expansive marketing and sale process for Takata

---

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

[3] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Lazard and are based on information provided to me by them.

to identify either a third-party investor or a purchaser for Takata's global assets and operations. After careful review and analysis of Takata's and the Debtors' operations, the Debtors, with the assistance of Lazard, Weil, Gotshal & Manges LLP, Nagashima Ohno & Tsunematsu, and Pricewaterhouse Coopers LLP, determined that, due to the nature of Takata's business, the global automotive market, and the interdependencies among and between Takata's business lines across the global regions, a break-up either by region or business line (other than with respect to the PSAN Inflator Business (as defined in the U.S. Acquisition Agreement)), was impractical, if not impossible and would ultimately be value destructive. Accordingly, Lazard pursued the marketing and sale process on behalf of the global enterprise to secure a purchaser interested in keeping the global operations (other than the PSAN Inflator Business) intact. The Initial Consenting OEMs, whose support is critical to any transaction, supported this approach.

8. Beginning in July 2016, Lazard had contact with forty (40) potential candidates. This list included potential candidates that Lazard contacted to solicit interest, as well as candidates that independently approached Lazard having heard of the marketing and sale process in the press. The forty (40) potential sponsor candidates consisted of nineteen (19) strategic partners, eighteen (18) financial investors, and three (3) trading houses. Eighteen (18) potential candidates (eight (8) strategic and ten (10) financial) expressed an interest in considering the transaction, were provided with a teaser, and were asked to submit a qualification letter explaining why, based on a number of factors (*e.g.* financial profile, management team, global presence, operational track record, and ability to execute a transaction expeditiously) it would be the right counterparty for Takata.

9. Following the first phase of the marketing and sale process, nine (9) candidates (five (5) strategic and four (4) financial) submitted qualification letters. Six (6) of the

candidates that submitted qualification letters were selected by the Debtors and TKJP to advance in the process and were provided with access to due diligence, detailed presentations prepared by management and, in most cases, global site visits. On September 16, 2016, Lazard received preliminary proposals from five (5) potential candidates (three (3) strategic, one (1) financial, and one (1) consortium (joint bid from a strategic and financial sponsor)). Lazard, the Initial Consenting OEMs, the Steering Committee, and Takata's advisors met to review, evaluate, and discuss the proposals. Ultimately, four (4) potential candidates were selected by the Debtors and TKJP to present to and meet with the Initial Consenting OEMs. By November 2016, three (3) candidates (two (2) strategic and one (1) newly formed consortium) were invited to proceed to a final round of diligence, including additional site visits, workshops, and Q&A sessions with management. In this final round of diligence, Lazard and Takata's other advisors addressed approximately eight hundred (800) questions through an online portal and conducted twelve (12) diligence workshops globally.

10. On January 13, 2017, an updated process letter was sent to the three (3) remaining candidates requesting final bids by January 25, 2017. Two (2) of the three (3) remaining sponsors submitted final bids (one (1) strategic and one (1) consortium). At the end of January 2017, the Initial Consenting OEMs, certain additional OEMs, Takata management, the Steering Committee, and Takata's advisors convened to discuss and evaluate the two (2) final proposals. In addition, the remaining bidders made presentations to and met with the Initial Consenting OEMs, Lazard, and Takata's other advisors to further refine the terms of their respective bids.

11. Following these discussions, on February 3, 2017, taking into account advice from Lazard, Takata's other advisors, and the Steering Committee, as well as the support

of the Initial Consenting OEMs, TKJP's board of directors determined that it would proceed with the bid submitted by the Plan Sponsor, without exclusivity, for the sale of substantially all of Takata's worldwide assets unrelated to the manufacture of PSAN Inflators for an aggregate purchase price of $1.588 billion (the "***Global Transaction***").  The Plan Sponsor's bid represented the highest and best offer submitted for Takata's assets with the least impediments to closing and the greatest transaction certainty.  In addition to a higher purchase price relative to the bid submitted by the other candidate, there was significant concern that the bid submitted by the competing candidate faced substantial antitrust hurdles, which risked a lengthy and uncertain review process by various governmental entities that at best was expected to lead to significant asset dispositions and at worst an unfavorable ruling.

12. I believe that the prepetition marketing and sale process led by Lazard with the support of Takata's other advisors was comprehensive and robust, involving solicitation of interest from a diverse set of potential strategic and financial partners.  I also believe that diligence was inclusive and thorough, including compiling hundreds of documents in an electronic data room, facilitating discussions with Takata management around the world, hosting site visits, and coordinating extensive legal due diligence, among other efforts.  The Initial Consenting OEMs, which observed and participated in the prepetition marketing and sale process, expressed collective support for the Plan Sponsor.

13. Following the selection of the Plan Sponsor, Takata (including the Debtors), the Plan Sponsor, the Initial Consenting OEMs, and their respective advisors engaged in extensive arms' length negotiations, devoting significant time, resources, and efforts towards structuring, negotiating, and documenting the terms of the Global Transaction.  Due to the global and highly complex nature of the Global Transaction, the process was a laborious one, requiring

numerous calls, in-person meetings, and drafting sessions to negotiate the terms of over a dozen substantive agreements and numerous ancillary agreements, schedules and exhibits, and other documents necessary to implement the Global Transaction in the various regions around the world.

14. These negotiations culminated in the execution of the Global Transaction Documents on November 16, 2017, including the following three (3) acquisition agreements pursuant to which the Global Sellers (as defined herein) agree to sell substantially all of their non-PSAN Assets to the Plan Sponsor, including the stock of certain subsidiaries of the Sellers, in exchange for the Sellers' allocable portion of the $1.588 billion purchase price (the "***Global Purchase Price***"):  (i) the U.S. Acquisition Agreement for the sale of the non-PSAN Assets of TKAM, TKH, TKML, TKHM, IIM, SMX, and TDM (collectively, the "***North American Sellers***"); (ii) the EMEA Acquisition Agreement for the sale of the non-PSAN Assets of TAKATA Europe GmbH ("***TKEUR***"), TKAG, and TKSAC (the "***European Sellers***"); (iii) the Japan Acquisition Agreement for the sale of the non-PSAN Assets of TKJP, Takata Kyushu Corporation, and Takata Service Corporation (the "***Japanese Sellers***" and together with North American Sellers, the European Sellers, and TSAC (for which an acquisition agreement is to be executed in the near term), the "***Global Sellers***").

### Allocation of Purchase Price

15. In connection with its bid, the Plan Sponsor did not allocate the Global Purchase Price by region or by Global Seller.  Accordingly, as investment banker to Takata, Lazard, as well as Takata's other advisors, assisted the Debtors in developing a methodology for allocating the Global Purchase Price among all the Takata entities to be acquired by the Plan Sponsor.

16.     Lazard explored several methods for allocating the Global Purchase Price to each entity, including by each entity's projected EBITDA (Earnings before Interest, Taxes, Depreciation, and Amortization) or operating cash flow, as well as discounted cash flow.  Takata does not, however, maintain and could not produce entity-level records of EBITDA or projected cash flows rendering each of the foregoing methodologies infeasible on an entity-by-entity basis. Ultimately, Takata, based on the advice of Lazard and its other advisors, determined that the most reasonable method for allocating Global Purchase Price based on existing data was to use available audited net asset value ("***NAV***") by entity.

17.     To apply the NAV methodology, Lazard relied on the last audited NAV information available from the Debtors contained in financial statements as of March 2017.  This audited information was available for each seller entity and acquired subsidiary subject to sale in connection with the Global Transaction.  Lazard made certain appropriate adjustments to normalize NAV, including consolidating adjustments to eliminate the double counting of capital stock, cash adjustments to eliminate excess cash, and transaction adjustments to remove assets and liabilities not being assumed or purchased by the Plan Sponsor such as recall-related liabilities, third-party debt, goodwill, and intercompany balances based on the Final Joint Proposal (as defined in the U.S. Acquisition Agreement).  Subject to certain limited exceptions described below, the Global Purchase Price was ratably allocated among each Takata entity based on the percentage of the respective adjusted NAV by entity relative to the total adjusted NAV or alternatively the entity's liquidation value to the extent adjusted NAV was less than its estimated liquidation value as of September 2017 (the "***NAV Allocated Amount***").

18.     At the request of the Plan Sponsor, with respect to certain assets and/or entities in Europe, Mexico, and China, Takata employed independent third-party appraisers to

conduct a fair market value analysis with respect to the value to be transferred to the Plan Sponsor by such entity (the "**Appraised Allocated Amount**"). Lazard allocated the Global Purchase Price for entities subject to third-party appraisals based on the Appraised Allocated Amount to the extent required. Specifically, the Global Purchase Price for the following entities was allocated based on the Appraised Allocated Amount: TSAC, TKEUR, TKAG and TKSAC. The amount allocated to a Global Seller (whether it is the Appraised Allocated Amount or the NAV Allocated Amount) is referred to herein as the "**Entity Allocated Amount**."

19. In order to determine the Global Purchase Price allocated to each Takata entity, Lazard reduced the Global Purchase Price by the Entity Allocated Amount of each entity that was subject to a fair market value appraisal. The remaining purchase price was ratably allocated among the remaining Global Sellers and equity sale entities based on their NAV Allocated Amount. The purchase price allocated to each Takata entity is set forth on **Exhibit A** annexed hereto.

20. The calculation of the allocation of the Global Purchase Price to the Global Sellers was conducted by Lazard based on information provided by Takata. Jefferies LLC, the Plan Sponsor's investment banker, discussed and reviewed Lazard's allocation and, as noted above, requested that Takata obtain the Appraised Allocated Amount for certain Takata entities. I believe that the allocation of the Global Purchase Price based on the foregoing methodology is reasonable.

### Allocation of Base Purchase Price to North American Sellers

21. As of December 31, 2017, in accordance with the foregoing methodology, $878.9 million (the "**Base Purchase Price**") of the Global Purchase Price was allocated to the North American Sellers. The Base Purchase Price was then allocated to each North American

9

Seller and their acquired subsidiaries under the U.S. Acquisition Agreement (with respect to purchase price allocated to each North American Seller, the "***Seller Allocated Purchase Price***"). On the Closing Date, pursuant to section 3.1 of the U.S. Acquisition Agreement, certain closing price adjustments will be allocated and applied to the Seller Allocated Purchase Price for those North American Sellers to which the applicable price adjustment specifically relates. Such adjustments were the product of extensive and exhaustive arms' length negotiations with the Plan Sponsor.

22. After allocating and applying the adjustments in section 3.1 of the U.S. Acquisition Agreement to each Seller Allocated Purchase Price, if applicable, the cash available on the Effective Date for each Debtor as of December 31, 2017 and assuming a Closing Date of February 27, 2018, is estimated to be approximately as follows:

| Allocation of Base Purchase Price to U.S. Sellers ($ in millions) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Description | Consolid. | TKH | TKAM | TKHM | TDM | IIM | SMX |
| Base Purchase Price | $878.9 | $462.9 | $314.5 | $41.6 | $21.1 | $2.6 | $36.3 |
| (-) Illustrative Adjustments Under 3.1 of the U.S. Acquisition Agreement | (345.0) | (21.8) | (315.3) | (2.1) | (5.8) | -- | -- |
| **Purchase Price** | **$533.9** | **$441.1** | **($0.9)** | **$39.5** | **$15.3** | **$2.6** | **$36.3** |
| (+) Balance Sheet Cash Available for Distribution | 16.5 | 15.6 | .9 | -- | -- | -- | -- |
| (+) Value from Subsidiaries | -- | 39.5 | -- | (39.5) | -- | -- | -- |
| **Proceeds Available to U.S. Sellers** | **$550.4** | **$496.2** | **--** | **--** | **$15.3** | **$2.6** | **$36.3** |

### Allocation of DOJ Restitution Claim

23. From the outset, the Plan Sponsor conditioned its bid on the satisfaction of the DOJ Restitution Claim. Indeed, in its bid letter, dated January 26, 2017, which is annexed hereto as **Exhibit B**, the Plan Sponsor provided that the "proceeds of the purchase price will be used to satisfy the DOJ Settlement in full in cash." After the selection of the Plan Sponsor as the successful bidder and throughout the negotiations of the Global Transaction Documents, the Plan Sponsor insisted on the full satisfaction of the DOJ Restitution Claim as a condition to the Global Transaction. As a result, the Global Transaction Documents require, as a condition to closing the Global Transaction, payment in full of the DOJ Restitution Claim.

24. Recognizing that TKJP could not satisfy the DOJ Restitution Claim without the support of its affiliates (as authorized in the DOJ Restitution Order) and that the beneficiaries of the DOJ Restitution Claim include creditors of Takata entities around the world and not only creditors of TKJP, Takata, including the Debtors, in consultation with Lazard and its global advisors, developed a methodology for allocating payment of the DOJ Restitution Claim among the Takata entities based on a reasonable approach.

25. I understand that the DOJ Restitution Claim is the result of damages caused by PSAN Inflators on a global basis. Accordingly, Takata and its advisors determined that allocating the DOJ Restitution Claim amongst Takata entities who have potential exposure arising from or related to the PSAN Inflators is reasonable. To that end, Lazard first, with the guidance of Takata and its global advisors, identified which Takata entities shipped PSAN Inflators (the "***Restitution Payment Funding Entities***"). I understand that the shipping entity is, in almost all instances, the best proxy for contracting entity because in most instances, the entity that is recorded as having shipped the PSAN Inflator is also the entity that contracted for the sale of the PSAN Inflator.

26. Takata then determined, with the assistance of Lazard and Takata's other advisors, that with the exception of the parent seller entities (TKH, TKJP, TKAG, and TKSAC), each of the Restitution Payment Funding Entities would contribute their Entity Allocated Amount less any transaction or other similar costs (*e.g.*, taxes and reserves for local creditors) to the satisfaction of the DOJ Restitution Claim. In exchange for such contribution, the Consenting OEMs agreed to release any PSAN Claims (as defined in the Global Settlement Agreement) against TSAC, TSM, TKK, TKI, TASSI, TTC, TKBR, TKRU, and TKSAF (as defined in the Global Settlement Agreement), each a Restitution Payment Funding Entity, and certain other

Takata Entities (as defined in the Global Settlement Agreement). I believe, based on information provided by Takata and estimations prepared by professionals at Lazard in consultation with Takata's other professionals, that the potential PSAN Claims held by the Consenting OEMs would exceed the Entity Allocated Amount to such entity. SMX, a debtor entity that is also a Restitution Payment Funding Entity, will also contribute its Entity Allocated Amount less any taxes and wind-down costs pursuant to the Plan; however, such contribution is not a payment on account of the DOJ Restitution Claim, but rather a payment in connection with the Plan Settlement.

27.      The remaining DOJ Restitution Claim, after reducing the amount for contributions made by the Restitution Payment Funding Entities, was allocated pro rata among TKH, TKJP, TKAG, and TKSAC, each a parent seller entity, based on PSAN Inflators shipped by each entity relative to the other parent seller entities. The resulting contributions to the DOJ Restitution Claim, as of December 31, 2017, are outlined as follows:

| Entities | $ in Millions |
|---|---|
| TSAC | $199 |
| SMX | 31 |
| TSM | 11 |
| TKK | 24 |
| TKI | 10 |
| TASSI | 3 |
| TTC | 48 |
| TKBR | 29 |
| TKRU | 11 |
| TKSAF | 4 |
| TKAG | 86 |
| TKSAC | 67 |
| TKJP | 113 |
| TKH | 214 |
| **Total DoJ Payment** | **$850** |

28.      Importantly, despite a portion of the DOJ Restitution Claim having been allocated to the Debtors, the Debtors are not making any direct payments to the OEMs or the DOJ on account of the DOJ Restitution Claim. Rather, the Consenting OEMs have agreed that

12

the distribution they receive under the Plan on account of the Plan Settlement will fully resolve and settle the Consenting OEMs' Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and Consenting OEM PSAN Administrative Expense Claims.

### Allocation of PSAN Legacy Costs

29. The PSAN Legacy Costs (*i.e.*, costs for funding the Post-Closing Reserve and the Warehousing Entity Reserve) are also allocated on a global basis in accordance with the U.S. Acquisition Agreement and the Global Settlement Agreement. The amounts necessary to fund the Post-Closing Reserve (including costs and fees of the Special Master, DOJ Monitor, and NHTSA Monitor) and the amount of the Warehousing Entity Reserve that is unrelated to warehousing, shipping, and disposal costs (primarily costs relating to the continued operation and overhead of the Debtors' Product Safety Group, which is responsible for, among other things, completing the Debtors' root cause investigation and working with NHTSA) are allocated to TKH, TKAM, TKJP, TKSAC, TKEUR, and TKAG based on the PSAN Inflators shipped by those entities and their subsidiaries. Given that a majority of the costs constituting the Post-Closing Reserve are a direct result of the recall of PSAN Inflators globally and each region benefits from the Product Safety Group, which is funded through the Warehousing Entity Reserve, I believe that it is reasonable to allocate the costs of the Post-Closing Reserve and the costs of the Warehousing Entity related to the Product Safety Group based on the PSAN Inflators shipped by such region.

30. The amounts necessary to fund the portion of the Warehousing Entity Reserve relating to the costs of warehousing, shipping, and disposal were allocated based on an estimated "bottoms up" analysis prepared by Takata's other global advisors and my understanding is that such analysis reflects the warehousing, shipping, and disposal needs by

13

region based on each region's estimate of recalls, capacity, and various related costs. I believe that allocating the cost for funding the Warehousing Entity Reserve based on the specific needs or uses of each region is reasonable.

### Projected Waterfall

31. Finally, based on the foregoing methodology, including the methodology for allocating the Global Purchase Price, as well as the DOJ Restitution Claim and the PSAN Legacy Costs, and information provided by Takata, Lazard, in consultation with Takata and its global advisors, prepared an illustrative waterfall, as of December 31, 2017, which is annexed hereto as **Exhibit C** (the "*Projected Waterfall*"). The Projected Waterfall demonstrates the uses by each Debtor of its Seller Allocated Purchase Price and the resulting Effective Date Available Cash for general unsecured creditors at each Debtor as of December 31, 2017 and assuming a Closing Date of February 27, 2018.

32. The Projected Waterfall is a complex global analysis that is subject to numerous assumptions and estimates and accordingly actual realized Effective Date Available Cash is subject to change based on, among other factors, updated transaction cost estimates, adjustment to the Closing Date, and operating performance. Based on information received as of the date of this Declaration, Lazard does not believe that such changes will result in a material adverse impact on creditor recoveries.

33. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 14, 2018

                LAZARD FRÈRES & CO. LLC

                By: <u>*/s/* Andrew Yearley</u>
                   Andrew Yearley
                   Managing Director