**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

--------------------------------------------------------x
                                      :

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **TK HOLDINGS INC.,** *et al.,* | : | **Case No. 17-11375 (BLS)** |
| | : | |
| **Debtors.**[1] | : | **Jointly Administered** |
| | : | |

--------------------------------------------------------x   Re: Docket No. 2056

**DECLARATION OF STEVEN FLEMING IN SUPPORT OF**
**FOURTH AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

Pursuant to 28 U.S.C. § 1746, I, Steven Fleming, hereby declare, under penalty of perjury to the best of my knowledge and belief, that:

1.      I submit this declaration (the "***Declaration***") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* [Docket No. 2056] (together with all schedules and exhibits thereto, and as may be modified, amended or supplemented from time to time, the "***Plan***").[2] Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors and their professionals, including, professionals working at my direction at PricewaterhouseCoopers LLP ("***PwC***"). If called upon to testify, I would testify competently to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Plan, Disclosure Statement (as defined below), or Liquidation Analysis (as defined below), as applicable.

the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

2.      I am a Principal of PwC, an experienced, leading, full-service financial services, consulting, and accounting firm with over 75 offices and more than 30,000 employees in the United States.  I am the leader of the firm's US Business Recovery Services Practice, a position that I've held since 2016 after being a senior member in the group for seven years.  Prior to these positions, I held a senior position in PwC's Transaction Services practice in Dubai, UAE, where I was responsible for expanding the firm's Corporate Finance and Valuation practices across the Middle East and North Africa.  I have been employed by PwC since August 1998, and have held other senior positions, both domestically and abroad.

3.      I received a Bachelor of Science in Finance from Lehigh University in 1998 and a Master of Business Administration from Columbia Business School in 2004.  I am a Certified Insolvency and Restructuring Advisor and hold a Certification in Distressed Business Valuation, both of which are designations issued by the Association of Insolvency and Restructuring Advisors, where I sit on the board on behalf of PwC.  During the course of my career I have served as a Chief Restructuring Officer and have testified in numerous chapter 11 cases on matters relating to financing, valuation, cash forecasting, liquidation analyses, and sale processes.  I have been qualified as an expert witness with respect to valuation, cash forecasting, and section 363 sale processes.

4.      PwC has considerable experience providing financial advisory services to businesses in chapter 11 scenarios, and has been employed in notable chapter 11 cases, such as: SunEdison Inc.; Chrysler LLC; Metro Affiliates, Inc.; Clayton General, Inc.; Sportscraft, Ltd.; Acadiana Management Group, LLC; Kid Brands, Inc.; National Envelope Corporation; New

Ashley Stewart, Inc.; SDA, Inc; NRAD Medical Associates P.C.; Allied Systems Holdings, Inc.;

Munire Furniture Co., Inc.; and many others.

5.      I have previously served as a financial advisor to a chapter 7 trustee, and

have personally been involved in the development of liquidation analyses in other cases.[3]

6.      It is my understanding that a chapter 11 plan cannot be confirmed unless a

bankruptcy court determines that the plan is in the "best interests" of all holders of claims and

interests that are impaired by the plan and that have not accepted the plan.  I further understand

that the "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires

that a bankruptcy court find either that (a) all members of an impaired class of claims or interests

have accepted the plan or (b) the plan will provide a member of an impaired class of claims or

interests who has not accepted the plan with a recovery of property of a value, as of the effective

date of the plan, that is not less than the amount that such holder would recover if the debtor

were liquidated under chapter 7 of the Bankruptcy Code on such date, prior to confirming the

plan.

7.      I played a prominent role in the preparation of the Debtors' liquidation

analysis (the "***Liquidation Analysis***"), which was filed as Exhibit J to the *Disclosure Statement*

*for the Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its*

*Affiliated Debtors*, filed on January 5, 2018, [Docket No. 1630] (together with all schedules and

exhibits thereto, and as may be modified, amended or supplemented from time to time,

the "***Disclosure Statement***").[4]  The Liquidation Analysis, which was prepared by the Debtors

with the assistance of PwC and the Debtors' other professionals, estimates potential cash

---

[3] I have performed liquidation analyses in numerous cases, including, amongst others, SunEdison Inc., Sportcraft, LTD. (a chapter 7 case), Munire Furniture Co., Inc., Kid Brands, Inc., Allied Systems Holdings, Inc., SDA, Inc., Clayton General, Inc., Victory Healthcare, Inc.

[4] A copy of the Liquidation Analysis is attached as Exhibit A hereto.

distributions to holders of Allowed Claims and Interests in a hypothetical chapter 7 liquidation of the Debtors' Assets.

### The Liquidation Analysis

8.     The Liquidation Analysis assumes a conversion of the Chapter 11 Cases to chapter 7 liquidation cases on or about March 1, 2018 (the "***Conversion Date***") and presents high and low creditor recovery scenarios on a debtor-by-debtor basis.  Both scenarios assume that, on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee ("***Trustee***") to oversee the liquidation of the Debtors' Estates.[5]  The Liquidation Analysis also assumes that given the complexity of the Debtors' global supply chain, the conversion of the Chapter 11 Cases to chapter 7 cases will cause many of the Debtors' foreign affiliates to commence formal insolvency proceedings in local jurisdictions around the world, including TKHDM, TDM, IIM, and SMX (collectively, the "***Mexican Debtors***"), as well as their non-Debtor Mexican affiliates, which are assumed to each commence local insolvency proceedings in Mexico, *e.g.*, *concurso mercantil* proceedings (collectively, the "***Concurso Proceedings***") on the Conversion Date.[6]

9.     Any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  I believe this is particularly true given the complexity of these Chapter 11 Cases, the global nature and interdependencies of the Debtors' operations, and the impact of the ongoing recalls, which make it difficult for the Debtors to predict, among other things, (a) the anticipated lifetime and length

---

[5] The Liquidation Analysis assumes that the Trustee's fees would equal three percent (3%) of cash on hand plus the aggregate Liquidation Proceeds.

[6] For purposes of the Liquidation Analysis, the Debtors assumed that the Mexican insolvency court would grant a joint proceeding and appoint only one visitor and/or receiver to administer the Concurso Proceedings and that the Trustee would not receive a commission based on assets liquidated in the Concurso Proceedings—an assumption the Trustee might challenge and, if successful, would further increase administrative costs at these entities.

of any wind-down and liquidation of the Debtors, which may be significant in order to comply

with the Debtors' recall obligations under the NHTSA Orders; (b) the uncertain sources of

financing in connection with a lengthy and protracted wind-down and liquidation; (c) the

Consenting OEMs' response to a hypothetical liquidation in terms of continued business,

resourcing, potential setoffs or recoupments, and treatment of tooling and warranty claims and

programs; (d) the collections of accounts receivables owing to the Debtors both on the

Conversion Date (as defined herein) and during the lengthy liquidation; (e) the impact of

currently pending and potential future litigation; (f) the response of the United States Department

of Justice (the "***DOJ***"), the National Highway Transportation Safety Administration ("***NHTSA***"),

and other governmental entities to a conversion of the Chapter 11 Cases to cases under chapter 7

and any additional fines or penalties such entities may seek to impose and/or enforce against the

Debtors; and (g) the significant amount of professional fees and other administrative expenses

that would be incurred in connection with a protracted, contested and complicated liquidation.  In

addition, the following is a non-exhaustive list of considered factors that could negatively impact

the amount of proceeds generated by the liquidation of the Debtors' Assets (the "***Liquidation***

***Proceeds***"): (a) turnover of key personnel; (b) litigation with stakeholders, including the OEMs;

and (c) delays in the liquidation process.  Furthermore, as previously stated, the Liquidation

Analysis assumes that the conversion of the Chapter 11 Cases to chapter 7 cases will cause many

of the Debtors' foreign affiliates to commence formal insolvency proceedings in local

jurisdictions around the world.  As a result, it is likely that intercompany receivables owed to the

Debtors from these foreign affiliates will not be paid and that such proceedings will result in

additional Claims against the Debtors, which Claims have not been factored into the Liquidation

Analysis.

10. The Liquidation Analysis considers two alternative hypothetical scenarios: (a) Scenario A (the "**_Orderly Liquidation Scenario_**"), under which the Trustee liquidates the Debtors' assets in a series of separate transactions over a twenty-four (24) month period, and (b) Scenario B (the "**_Transaction Approach Scenario_**"), under which the Trustee pursues a going concern sale of substantially all of Takata's assets and operations to Joyson KSS Auto Safety S.A. (collectively, with one or more of its current or future subsidiaries or affiliates, "**KSS**" and, such sale, the "**_KSS Transaction_**").[7] Both Scenarios demonstrate that projected recoveries under the proposed Plan meet or exceed those projected in a hypothetical chapter 7 liquidation, even under the conservative assumptions[8] used in the Liquidation Analysis. Specifically, the Plan contemplates a 0.1–0.4% recovery for General Unsecured Claims, whereas General Unsecured Claims would receive a $0 recovery under the Orderly Liquidation Scenario and significantly less recoveries under the Transaction Approach Scenario when compare to the Plan.

11. The Liquidation Analysis was prepared in a manner accordant with the approaches and methodologies that I have consistently utilized in my twenty years of experience as a financial advisor. If called upon to testify, I would testify in a manner consistent with the Liquidation Analysis.

### Global Assumptions

12. Both Scenario A and B assume the following: (a) the Trustee would have access to approximately Fifty Million Dollars ($50 Million) of cash on the Conversion Date;

---

[7] For purposes of the Liquidation Analysis, the Debtors also contemplated a regional going concern sale of only the Debtors' assets to KSS but determined that such a transaction was unlikely due to the globally integrated and interdependent nature of the Takata enterprise.

[8] As set forth in the Liquidation Analysis, the Debtors believe many assumptions used in the Liquidation Analysis were conservative and actual recoveries in a chapter 7 liquidation could be substantially less than recoveries set forth in the Liquidation Analysis.

(b) the Equipo Transfer (as defined in the *Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Authority to Effect Certain Pre-Restructuring Steps and Transactions with Respect to the Debtors' Mexican Affiliates Necessary for the Global Transaction* [Docket No. 1314]) will have been implemented prior to the Conversion Date; (c) the conversion of the Chapter 11 Cases to chapter 7 cases will lead to significant disruptions in the Debtors' global supply chain and uncertainty amongst the Debtors' vendors, employees, and OEM customers; (d) the Trustee will retain investment banking, legal, accounting, consulting and forensic professionals not currently involved in the Chapter 11 Cases, which will result in certain inefficiencies, higher run rates, and lower recoveries on Assets; and (e) the Trustee will continue to comply with the NHTSA Consent Order, including continuing to pay the costs associated with the recalls, the NHTSA monitor, and the warehousing/disposal of recalled PSAN Inflators.

### Scenario A – Orderly Liquidation Scenario

13.     Given the complexity of the Debtors' global supply chain,[9] the Orderly Liquidation Scenario assumes that the conversion of the Chapter 11 Cases to chapter 7 cases would trigger disruptions in the Debtors' operations that would make it nearly impossible for the Trustee to maintain operations and fulfill customer purchase orders, and even if such an attempt were made, maintaining operations would be both risky and extremely costly.  Thus, the Liquidation Analysis assumes that there would be little or no benefit to the Trustee in attempting to maintain the Debtors' ongoing operations for any meaningful period of time.

14.     Further, under the Orderly Liquidation Scenario the Debtors assumed that, given the "just-in-time" nature of the Debtors' supply to their Customers, if the Debtors' operations abruptly ceased, their Customers would face severe consequences, including, without

---

[9] The Debtors and their affiliates operate across twenty-one (21) countries in fifty-seven (57) facilities and have over two (200) hundred vendors.

limitation, production downtime on vehicle assembly operations while alternative sources are

identified and qualified.  Given the potential liability associated with the production of PSAN

Inflators and their component parts, the Orderly Liquidation Scenario assumes that certain

Customers may be unable to find alternative suppliers of these products.  Accordingly, the

Orderly Liquidation Scenario assumes that the Debtors' OEM customers (the "***Accessing***

***OEMs***") who are party to that certain access and security agreement, dated August 9, 2017

[Docket No. 953] (the "***Access Agreement***"), either (a) exercise their rights of access[10]

thereunder or (b) negotiate a similar agreement with the Trustee to allow such OEMs to access

and operate the Debtors' manufacturing facilities until such time as their production could be

transitioned to an alternative supplier.

   15. The Orderly Liquidation Scenario assumes that the primary production

operations continue for a period of approximately twelve (12) months, followed by a twelve (12)

month wind-down period (the "***Liquidation Period***") to administer the Estates (*e.g.*, dispose of

remaining Assets, finalize reconciliation of Claims, resolve any outstanding litigation, complete

distributions, close the Estates, etc.).  All ordinary direct costs associated with production during

the Liquidation Period are assumed to be funded by the Accessing OEMs in accordance with the

terms of the Access Agreement (or any similar agreement reached with the Trustee).  All other

costs of administering the chapter 7 cases are assumed to be borne by the Estates and funded by a

combination of cash on hand and the monetization of Assets.[11]

---

[10] The right of access provides the Accessing OEMs with the right to use the Debtors' operating Assets and the ability to occupy any or all of the Debtors' real property in order to manufacture component parts for a period of up to three hundred sixty (360) days from the date such customer provides written notice of the occurrence and continuation of a Default (as defined in the Access Agreement).

[11] These costs include the Trustee's fees, which would equal three percent (3%) of cash on hand plus the aggregate Liquidation Proceeds, the Trustee's professional fees (legal and financial), wind down costs, which primarily include employee-related costs, rent, and overhead expenses, and the costs of complying with the NHTSA Consent Order.  These costs, however, do not include the value of the NHTSA Civil Penalty Claim or other subordinated claims.

16.     Notwithstanding the assumptions regarding the funding of direct production costs by the Accessing OEMs set forth above, the Debtors assumed that the liquidation of the Debtors' business—a tier one automotive supply business—would be a complicated process, which would likely result in severe disruptions to the global automotive supply chain.  Even with the Accessing OEMs exercising rights of access, it is expected that the Debtors' OEM customers would experience a minimum production interruption of two (2) to four (4) weeks, assuming that such OEM customers have built up inventory banks of two (2) weeks, due to the difficulty in transitioning operations to the Accessing OEMs, particularly in light of the interdependence of the Debtors' global supply chain, which will undoubtedly experience significant challenges after the conversion to chapter 7.

17.     As a result, the Debtors estimated that the interruption in OEM customer production would result in their OEM customers asserting, at minimum, One Billion Five Hundred Million Dollars ($1.5 Billion) in damages against the Estates.[12]  For purposes of the Liquidation Analysis, the Debtors have conservatively assumed that these damages constitute General Unsecured Claims against the Estates; however, there remains uncertainty as to whether some or all of these damages would be entitled to administrative expense, secured, or other priority status under the Bankruptcy Code, which would have a further material impact on available Liquidation Proceeds.

18.     With the assistance of PwC, the Debtors also analyzed the various Claims of the Consenting OEM customers, consisting of secured claims related to Adequate Protection Claims, Consenting OEM PSAN Cure Claims, and General Unsecured Claims.  In aggregate, the

---

[12] The cost of factory downtime in the automotive industry varies widely by vehicle type, but the global average per vehicle profit, as estimated by PwC, is approximately $1,000 per vehicle.  The Debtors' parts affect approximately 750,000 vehicles per week.  Accordingly, a two-week shutdown of production lines would minimally result in potential damages of approximately One Billion Five Hundred Million Dollars ($1.5 Billion).  The Debtors' OEM customers may incur significant additional damages from the shutdown of their assembly operations.

Consenting OEMs asserted Claims totaling Two Hundred Seventy-Nine Billion Dollars ($279,000,000,000); that number falls to approximately Forty-Nine Billion Dollars ($49,000,000,000) when multi-Debtor Claims are excluded.[13]

19.    Under the Adequate Protection Order, those Consenting OEMs with outstanding payables to the Debtors as of the Petition Date were granted the Adequate Protection Claims and replacement liens for and equal in amount to the aggregate diminution in the amount of such Consenting OEMs' prepetition setoff rights and customer Secured Claims.  Based on our review of the Debtors' books and records, the Consenting OEMs released their outstanding payables to the Debtors as of the Petition Date in the aggregate amount of approximately $283 million.  The Debtors computed Consenting OEM PSAN Cure Claims based on certain Consenting OEM customers' Claims under the Debtors' PSAN contracts with such Consenting OEM customers, excluding those OEM claims related to PSAN inflators shipped by the Debtors to a non-Debtor affiliate which were then subsequently sold to an OEM customer pursuant to a non-Debtor contract.  We also reviewed OEM customers' General Unsecured Claims, excluding their Adequate Protection Claims and that portion of Consenting OEM PSAN Cure Claims to which the Debtors and such Consenting OEM customers agreed, including the proofs of claim filed by each Consenting OEM customer for the various categories of costs, expenses, and other damages that the Consenting OEM customer incurred, and related to products sold by Debtors and their global affiliates prior to the Petition Date (including, but not limited to, a General Unsecured Claim related to tooling, engineering, development, design, and other services provided by alternative suppliers in connection with the Debtors' breach or inability to perform under their contracts with a Consenting OEM).

---

[13] Under a chapter 7 liquidation scenario, the full value of liquidated Claims by the Consenting OEMs could be much larger.

20.    To analyze Consenting OEM customer Claims, the Debtors, with the assistance of PwC, reviewed proofs of claim filed pursuant to the Consenting OEM Claims Protocol, as described in the Disclosure Statement, and also reviewed supporting documentation subsequently provided by the Consenting OEMs.  In accordance with the Claims Protocol, Consenting OEMs filed proofs of claim within the following categories:

- **Customer Recalled Inflators Claims:**  based on rights of reimbursement and indemnification relating to PSAN Inflators that the Debtors developed, designed, manufactured, stored, transported, disposed of, sold, supplied to the Claimant, and/or as to which the Debtors are obligated to indemnify the Claimant as of the Petition Date.  Further, for Customer Recalled Inflators Claims, Consenting OEMs used the following agreed-upon cost categories with accompanying notes provided in the Claims Protocol:

|    | Claim Components (See the Notes attached hereto for additional information on the Claim Components) |
|----|---|
| 1  | Labor Costs and Expense |
| 2  | Parts (including Replacement Kits) |
| 3  | Dealer Charges |
| 4  | Rental Car Charges |
| 5  | Transportation, Shipping and Other Logistical Costs |
| 6  | Notification/Customer Communications/Advertising and Similar Charges |
| 7  | Freight for Returned Inflators |
| 8  | Warehouse and Disposal |
| 9  | Administrative Expenses |
| 10 | Alternative Sourcing Costs |

| Claim Component | Description |
|---|---|
| Labor Costs and Expense | These include the costs, including hourly fees, associated with the installation of new Inflators or Replacement Kits for PSAN Inflators. |
| Parts (including Replacement Kits) | These include the costs for Inflators, Replacement Kits, modules and other Component Parts sold by the Debtors or third parties to the Consenting OEM to fulfill orders for PSAN Inflators. |
| Dealer Charges | These include dealer markup and other amounts charged back to Consenting OEM (not otherwise included in any other Claim Component) that are paid by such Consenting OEM in complying with and completing the Recalls. |
| Rental Car Charges | These include the costs associated with (i) rental cars provided to customers (a) as their Subject Takata Inflator is being replaced with a Replacement/Replacement Kit or (b) during the period of time a customer is waiting for the commencement of their Replacement/Replacement Kit installation or (ii) if the Subject Vehicle needs to be towed to dealership to have the Replacement/Replacement Kit installed. |
| Transportation, Shipping and Other Logistical Costs | These include the out-of-pocket costs to ship, warehouse and distribute Replacement/Replacement Kits to dealerships. |
| Notification/Customer Communications/Advertising and Similar Charges | These include the costs to identify, notify, and/or educate customers of the Recalls. |
| Freight for Returned Inflators | These include the out-of-pocket costs associated with the return of the old PSAN Inflators to the Debtors (other than the Warehouse and Disposal Claim Component). |
| Warehouse and Disposal | These include the out-of-pocket costs associated with the warehouse and disposal of any returned PSAN Inflators. |
| Administrative Expenses | These include the fees and costs associated with Recalls that are not otherwise included in any other Claim Component; but for the avoidance of doubt shall exclude any of the Other Commercial Claims. |
| Alternative Sourcing Costs | These include the fees, costs, and expenses to source Component Parts with alternative third-party and/or Takata suppliers as a result of the Recalls, including, without limitation, (i) Component Part price increases paid to alternative and/or Takata suppliers, (ii) engineering, testing, validating costs and expenses, or (iii) any costs incurred in connection with the manufacture and production of any tooling necessary to comply with any Consenting OEM obligations in connection with the Recalls. |

- **Customer Non-Recalled Inflators Claims:** claims relating to PSAN Inflators that are not yet the subject of a recall in the U.S., Japan, or any other jurisdiction as of the Petition Date, using the same methodology used to calculate the first category, Customer Recalled Inflators Claims.

- **Other Commercial Claims:** claims for (a) all fees, costs, expenses, damages or losses sustained, incurred or to be incurred by Claimant as a result of or in connection with any failure of the Debtors to perform any of their respective duties or obligations under the Purchase Orders, including, without limitation, all warranty, recall, product liability, or indemnification obligations, and (b) any loans or similar accommodations, with respect to PSAN Inflators and/or non-PSAN Inflators (excluding any losses asserted as part of any Customer Inflator Claim), or with respect to non-PSAN Inflator Component Part programs of Claimants.

- **Other PSAN Claims:** claims for (a) fees, costs, and expenses incurred in connection with any pending litigation relating to the Debtors, including,

but not limited to, the Covered Litigation (including any professional fees incurred in connection therewith), (b) amounts incurred in connection with any settlements negotiated for any third-party claims arising out of or relating to the Debtors, including, without limitation, the Covered Litigation, and (c) fees, costs, expenses, damages or losses sustained or incurred, by Claimant as a result of or in connection with any alleged misrepresentations or omissions by the Debtors, including, without limitation, those allegations or admissions set forth in the DOJ Plea Agreement as of January 13, 2017 between DOJ and TKJP.

21.    With respect to Customer Recalled Inflators Claims and Customer Non-Recalled Inflators Claims, Consenting OEMs included Claims for applicable PSAN Inflators shipped by the Debtors as well as where the Debtors provided a Debtor manufactured PSAN Inflator propellant.  However, except for one instance based on the Debtors' contract with the OEM regarding indemnification provisions, Customer Recalled Inflator Claims or Customer Non-Recalled Inflator Claims only included Claims for PSAN Inflators shipped by the Debtors. For purposes of this analysis, the Debtors categorized as Other PSAN Claims instances where a non-Debtor shipped a PSAN Inflator to a Consenting OEM, but the PSAN Inflator propellant was manufactured by the Debtors.

22.    Further, the Debtors considered Customer Recalled Inflators Claims as applicable for Consenting OEM PSAN Cure Claims, which, based on the Consenting OEMs' proofs of claim, totaled approximately Eight Billion Dollars ($8,000,000,000).  After reconciling these proofs of claim with the volume of PSAN Inflators shipped by the Debtors, the Debtors estimate Consenting OEM PSAN Cure Claims to be an amount up to approximately Four Billion Dollars ($4,000,000,000).[14]

23.    The Debtors also reconciled the Consenting OEM Unsecured Claims with the Debtors' books and records and the contracts each Consenting OEM has with one or more of

---

[14] The Consenting OEMs reserve all rights to challenge this estimate.

the Debtors, and the number of PSAN Inflators purchased by the Consenting OEMs; in addition, the Debtors requested and reviewed OEM documentation on PSAN Inflator related costs incurred.  Ultimately, following this analysis, and discussions with the Consenting OEMs, the Debtors settled the Consenting OEM Unsecured Claims at Thirty-Eight Billion Six-Hundred-Forty-Five Million Eight-Hundred-Sixty-Two Thousand Eight-Hundred-Twenty-Three Dollars ($38,645,862,823).  This settlement is conditioned on the Effective Date of the Plan, and under the Claims Protocol, the Consenting OEMs have rights to amend their Claims in the event that the Restructuring Support Agreement terminates before the Closing Date.

24.     Furthermore, the Orderly Liquidation Scenario assumes that the OEMs assert additional Claims arising from or relating to a Takata product[15] against certain non-debtor subsidiaries, including, among others, direct and indirect subsidiaries Takata Brasil S.A. and Takata (Shanghai) Automotive Component Co. LTD.  Given these additional asserted Claims, it is assumed that these entities provide no value to equity holders, including TKAM.

25.     Exhibit 1 to the Liquidation Analysis provides, on a debtor-by-debtor basis, the estimated value of each Debtor's assets in the Orderly Liquidation Scenario, as well as the estimated value of claims against that Debtor's estate under such scenario.  The line items to those tables contain additional assumptions, which are more fully described in the Liquidation Analysis.  Specifically, the Orderly Liquidation Scenario assumes that the Global Accommodation Agreement[16] will either expire on its own terms due to the occurrence of the Outside Date (as defined in the Global Accommodation Agreement) or be terminated by the

---

[15] These Claims include, but are not limited to, a General Unsecured Claim related to tooling, engineering, development, design, and other services provided by alternative suppliers in connection with the Debtors' breach or inability to perform under their contracts with an OEM.

[16] My understanding of the Global Accommodation Agreement is based on information provided to me by the Debtors' outside counsel, Weil, Gotshal & Manges LLP.

Consenting OEMs party thereto as a result of the conversion of the Chapter 11 Cases to chapter 7. As a result, the Liquidation Analysis assumes that Consenting OEMs party to the Global Accommodation Agreement will setoff outstanding and anticipated post-petition Claims (including customer professional fees) against outstanding receivable balances prior to remitting payment to the Debtors. Given that the Debtors' OEM customers will likely incur significant additional expenses related to the operation of the Debtors' production lines under the Access Agreement (or any similar agreement reached with the Trustee), such set-offs and/or recoupments are expected to represent a material percentage of accounts receivable.

26.     Additionally, during the Chapter 11 Cases, in accordance with the terms of the Global Accommodation Agreement, the Consenting OEMs have been paying the Debtors for replacement kits at currently applicable pricing. Although the Debtors are obligated under the NHTSA Consent Order and other applicable law to continue manufacturing replacement kits for the OEMs in connection with the recalls, there is no guarantee that the Debtors' OEM customers would continue to pay or reimburse the Debtors for replacement kits at the current pricing levels post-Conversion Date, which would have a material impact on accounts receivable and further dilute net Liquidation Proceeds that are available for General Unsecured Creditors.

27.     Further, because the Debtors are obligated under the NHTSA Consent Order and other applicable law to continue manufacturing replacement kits for the OEMs in connection with the recalls, the Orderly Liquidation Scenario includes the recall-related costs of complying with the NHTSA Consent Order. These costs primarily include estimated costs associated with NHTSA monitor fees, and the warehousing, shipping, and disposal costs of the recalled PSAN Inflators. These recall-related costs reflect only those costs expected to be incurred by TKH and do not include additional costs likely to be incurred in other regions.

Because there is no guarantee that the Debtors' OEM customers would continue to pay or reimburse the Debtors for replacement kits at the current pricing levels post-Conversion Date, in the event that the Trustee was ordered, pursuant to the NHTSA Consent Order or other applicable law, to continue manufacturing PSAN Inflators post-Conversion Date, the Estates may incur significant additional costs in manufacturing replacement kits. These additional costs could have a material impact on the Assets of the Estates, potentially rendering the Estates administratively insolvent and without sufficient capital and liquidity to continue operations.

28.    Based on the above noted reductions to value, including the assumptions underlying each line item in Exhibit 1 to the Liquidation Analysis, recoveries under the Orderly Liquidation Scenario would be less than recoveries under the Plan. Specifically, General Unsecured Claims would receive nothing under the Orderly Liquidation Scenario, and Administrative Claims would receive less than a full recovery.

### Scenario B – Transaction Approach Scenario

29.    The Transaction Approach Scenario assumes that the KSS Transaction is consummated by the Trustee three (3) to six (6) months after the Conversion Date. When compared to the distributions under the Plan, the Transaction Approach Scenario results in a material reduction in proceeds available for distribution to the Debtors' creditors.

30.    The material reduction of proceeds available for distribution is a combination of a number of factors, including without limitation, (a) a substantial reduction in the One Billion Five Hundred Eighty-Eight Million Dollar ($1.588 Billion) global purchase price due to, among other reasons, additional resourcing by the OEMs, which would materially depress the value of the businesses, and the added costs and expenses of the insolvency proceedings commenced in other regions; (b) additional administrative expenses due to the

retention of new professionals by the Trustee; (c) additional regulatory risk associated with the

transaction; and (d) a three percent (3%) commission for the Trustee.  Together, these factors

would likely result in a substantial reduction in available Liquidation Proceeds under the

Transaction Approach Scenario, which would render the Debtors' Estates administratively

insolvent with no available distribution to holders of General Unsecured Claims.[17]

    31.  In addition to the risk of administrative insolvency, the Debtors also

determined that the consummation of a going concern sale to KSS (or any other buyer)[18] would

be unlikely for a number of reasons.  First, the Debtors Assets comprise only a portion of what is

a highly complex, global enterprise.  Notwithstanding the best efforts of a Trustee and his or her

professionals, the Trustee will only be able to control the Debtors' Assets and a going concern

sale to KSS would be dependent on the cooperation and coordination of the Debtors' foreign

affiliates, many of which are assumed to commence local insolvency proceedings upon the

Debtors' conversion to chapter 7 (and others are already in such proceedings).

    32.  Second, as noted above, it is not clear what impact the conversion of the

Chapter 11 Cases to cases under chapter 7 and the failure to close the Global Transaction by the

DOJ Deadline would have on the Plea Agreement and the DOJ Restitution Order.  Specifically,

it is not clear whether the DOJ would extend the time for Takata to perform under the DOJ

Restitution Order or whether the DOJ would bring new Claims, charges, or actions against

---

[17] The analysis conducted by the Debtors, with the assistance of PwC, regarding Consenting OEM Unsecured Claims, also applies to the Transaction Approach.  *See supra* ¶¶ 18–23.

[18] The Debtors and their advisors ran an extensive, global marketing process that took more than eight (8) months to complete.  The global nature and complexity of these transactions required months of due diligence and extensive negotiations in order to consummate a deal.  For these reasons, the Debtors believe that it is highly unlikely that another qualified buyer exists who could step into the shoes of KSS and close these global transactions.

Takata, including direct Claims, charges, or actions against the Debtors.[19]  The Debtors do not believe KSS would close on a transaction unless all DOJ fines and penalties are fully satisfied.

33.    Because the likelihood of consummating a transaction under the Transaction Approach Scenario is low, and recoveries under this approach are estimated to be significantly less than recoveries under the Orderly Liquidation Scenario, the Liquidation Analysis presented only the recoveries under the Orderly Liquidation Scenario in detail.

<u>**Conclusion**</u>

34.    I believe that the assumptions and estimates in the Liquidation Analysis are reasonable and appropriate in the context of these Chapter 11 Cases and that the Liquidation Analysis establishes that the Plan is in the best interests of all creditors.  Accordingly, I believe that the Plan satisfies the requirements of section 1129(a)(7).

35.    Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  February 14, 2018                    PricewaterhouseCoopers LLP


                                      By: */s/ Steven Fleming*
                                          Steven Fleming
                                          Principal

---

[19] One of the Debtors' affiliates (TKJP) is a party to the DOJ Restitution Order, to which the Debtors are not parties. However, the Debtors believe that the conversion of the Chapter 11 Cases to cases under chapter 7, as contemplated by the Liquidation Analysis, would likely result in a breach of the DOJ Restitution Order that would permit the DOJ to assert new and additional Claims, charges, or actions against all Takata entities, including certain of the Debtors.