# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
:
In re                       :       **Chapter 11**
:
**TK HOLDINGS INC.,** *et al.,*    :       **Case No. 17-11375 (BLS)**
:
**Debtors.**[1]          :       **(Jointly Administered)**
:
-------------------------------------------------------x   **Re: Docket Nos. 2116 & 2117**

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF TK HOLDINGS INC. AND ITS AFFILIATED DEBTORS

WHEREAS TK Holdings Inc. ("***TKH***") and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "***Debtors***"), having proposed and filed with the United States Bankruptcy Court for the District of Delaware (the "***Court***") the *Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors*, dated January 5, 2018 [Docket No. 1629] (the "***Third Amended Plan***"); and

WHEREAS on January 5, 2018, the Court entered the *Order (I) Approving the Proposed Disclosure Statement and the Form and Manner of the Notice of a Hearing Thereon, (II) Establishing Solicitation and Voting Procedures, and (III) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Plan* [Docket No. 1639] (together with all schedules and exhibits thereto, the "***Solicitation Procedures Order***"), which, among other things,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Takata Americas (9766); TK Finance, LLC (2753); TK China, LLC (1312); TK Holdings Inc. (3416); Takata Protection Systems Inc. (3881); Interiors in Flight Inc. (4046); TK Mexico Inc. (8331); TK Mexico LLC (9029); TK Holdings de Mexico, S. de R.L. de C.V. (N/A); Industrias Irvin de Mexico, S.A. de C.V. (N/A); Takata de Mexico, S.A. de C.V. (N/A); and Strosshe-Mex, S. de R.L. de C.V. (N/A). Except as otherwise set forth herein, the Debtors' international affiliates and subsidiaries are not debtors in these chapter 11 cases. The location of the Debtors' corporate headquarters is 2500 Takata Drive, Auburn Hills, Michigan 48326.

(i) approved the *Disclosure Statement for Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors*, dated January 5, 2018 [Docket No. 1630] (the "*Disclosure Statement*") as containing "adequate information" (as defined in section 1125 of title 11 of the United States Code (the "*Bankruptcy Code*")), (ii) authorized the Debtors to solicit votes with regards to the acceptance or rejection of the Third Amended Plan, (iii) established certain procedures for soliciting and tabulating votes with respect to the Third Amended Plan (the "*Solicitation Procedures*"), including procedures with respect to individuals who own, or may have owned, vehicles equipped with airbag inflators containing phase-stabilized ammonium nitrate ("*PSAN Inflators*") manufactured or sold by the Debtors (each such individual a "*PPIC*" and, collectively, the "*PPICs*"), (iv) approved notices, forms, and ballots to be submitted to parties in interest (collectively, the "*Solicitation Packages*"), (v) established February 13, 2018, as the date for the commencement of the hearing to consider confirmation of the Third Amended Plan (the "*Confirmation Hearing*"), and (vi) established notice and objection procedures in respect of confirmation of the Third Amended Plan, including the form and method of notice of the Confirmation Hearing (the "*Confirmation Hearing Notice*"); and

WHEREAS on or before January 11, 2018, the Debtors through their administrative agent, Prime Clerk LLC (the "*Solicitation Agent*"), caused the Solicitation Packages to be transmitted in compliance with the Solicitation Procedures as set forth in the *Affidavit of Service of Solicitation Materials*, dated January 19, 2018 [Docket No. 1761] (the "*Affidavit of Service*"), evidencing the timely service of, as applicable, the Disclosure Statement (with the Third Amended Plan annexed thereto) and related solicitation materials, and the following service is adequate as provided by Rule 3017(d) of the Federal Rules of Bankruptcy

2

Procedure (the "***Bankruptcy Rules***"):

(i)     as to holders of Claims in Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), and Class 6 (Other General Unsecured Claims) entitled to vote, but excluding any PPIC that has registered an email address with the Solicitation Agent in connection with the filing of its proof of Claim (each such PPIC, a "***Registered PPIC***" and, collectively, the "***Registered PPICs***"), an appropriate cover letter (a "***Cover Letter***"), the Solicitation Procedures Order, the Disclosure Statement (with the Third Amended Plan annexed thereto), the Third Amended Plan (as independently filed), the Confirmation Hearing Notice, and an appropriate form of ballot and return envelope (such ballot and return envelope being referred to as a "***Ballot***"), and, as to Registered PPICs, the Solicitation Procedures Order, the Confirmation Hearing Notice, the Disclosure Statement (with the Third Amended Plan annexed thereto), the Third Amended Plan (as independently filed), a Ballot, and instructions for voting online; and

(ii)    as to holders of Claims or Interests, as applicable, in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Intercompany Interests), and Class 8 (Subordinated Claims) not entitled to vote, but excluding any Registered PPIC, the Confirmation Hearing Notice and an appropriate notice of non-voting status (a "***Notice of Non-Voting Status***"), and, as to Registered PPICs not entitled to vote, the Confirmation Hearing Notice and an appropriate notice of non-voting status – disputed claim (a "***Notice of Non-Voting Status – Disputed Claim***"); and

(iii)   as to all other parties in interest, the Confirmation Hearing Notice and a Notice of

WEIL:\96411572\24\76903.0004

Non-Voting Status; and

WHEREAS the Debtors caused to be published the Confirmation Hearing Notice in ten (10) publications in the United States and fifty-eight (58) publications in thirty-eight (38) foreign countries in accordance with the Solicitation Procedures Order, as evidenced by the Affidavit of Publication sworn to on February 6, 2018 [Docket No. 1961] (the "*Publication Affidavit*"); and

WHEREAS on January 23, 2018, the Debtors filed the *Notice of Filing of Plan Supplement Pursuant to the Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors* [Docket No. 1789] (the "*Initial Plan Supplement*"); and

WHEREAS the Debtors transmitted or caused to be transmitted a notice of proposed Cure Amounts and a notice of amendments to proposed Cure Amounts as evidenced by the *Affidavits of Service* sworn to on January 18, 2018 [Docket No. 1750] and February 2, 2018 [Docket No. 1905]; and

WHEREAS the Debtors transmitted or caused to be transmitted notices of the treatment of executory contracts and unexpired leases under the Third Amended Plan to all known parties to executory contracts and expired leases, as evidenced by the *Affidavit of Service* sworn to on February 5, 2018 [Docket No. 1917]; and

WHEREAS certain objections to matters related to the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases were filed by (i) Raymond Leasing Corporation [Docket No. 1868], (ii) Valley Fastener Group LLC [Docket No. 1894], (iii) Pro's Choice Printing Inc. [Docket No. 1909], (iv) NBHX Trim USA Corporation [Docket No. 1913], (v) Harrington Industrial Plastics LLC [Docket No. 1919], (vi) Xin Point North America Inc. [Docket No. 1922], (vii) Quantum Plastics, LLC [Docket No. 1923], (viii)

4

Alps Electric (North America), Inc. [Docket No. 1924], (ix) Sigma International Inc. [Docket No. 1931], (x) ARC Automotive, Inc. [Docket No. 1935], (xi) Eissmann Automotive North America [Docket No. 1938], (xii) Pacific Sintered Metals [Docket No. 1939], (xiii) HCL America Inc. [Docket No. 1940], (xiv) XPO Logistics Worldwide, Inc. [Docket No. 1941], (xv) Infor (US), Inc. [Docket No. 1942], (xvi) LMC Industries Inc. [Docket No. 1943], (xvii) Lectera USA Inc. & Lectra Systems SA de CV [Docket No. 1944], (xviii) Robert C. Fisher and Mary Fisher [Docket No. 1947], (xix) Irvin Acquisition LLC [Docket No. 1949], (xx) Automotive Coalition for Traffic Safety, Inc. [Docket No. 1951], (xxi) Dennemeyer & Co., Inc. [Docket No. 1952], (xxii) Liberty Mutual Insurance Company [Docket No. 1954], (xxiii) Comerica Bank [Docket No. 1999], (xxiv) Danhil Containers [Docket No. 2000], (xxv) QAD Inc. [Docket No. 2006], (xxvi) TKJP [Docket No. 2020], (xxvii) TK EMEA [Docket No. 2040], (xxviii) AT&T [Docket No. 2042], and (xxix) Michael O'Boyle, Thomas Messner, Don Schiemann, Shan Cong, and Alby Berman [Docket No. 2044] (collectively, the "*Contract Objections*"); and

WHEREAS certain objections or limited objections to confirmation of the Third Amended Plan were filed by (i) the U.S. Trustee [Docket No. 1869], (ii) the Texas Commission of Environmental Quality [Docket No. 1918], (iii) certain confidential whistleblowers [Docket Nos. 1920, 1945], (iv) Xin Point North America Inc. [Docket No. 1922], (v) the United States on behalf of the Internal Revenue Service [Docket No. 1929], (vi) the Attorneys Information Exchange Group [Docket No. 1930], (vii) the Special Master [Docket No. 1932]; (viii) Howard & Howard Attorneys PLLC [Docket No. 1937], (ix) Pacific Sintered Metals, Inc. [Docket No. 1939], (x) Infor (US), Inc. [Docket No. 1942], (xi) Mitsui Sumitomo Insurance Company, Ltd. [Docket No. 1946], (xii) Automotive Coalition for Traffic Safety, Inc. [Docket No. 1948], (xiii) the State of Hawai'i, the State of New Mexico, and the Government of the U.S. Virgin

5

Islands [Docket No. 1950], (xiv) Rene De Los Santos Olveda and certain other tort claimants [Docket No. 1955], (xv) Samuel M. Johnson [Docket No. 1965], (xvi) the United States on behalf of the U.S. Environmental Protection Agency, the Michigan Department of Environmental Quality, and the Missouri Department of Natural Resources [Docket Nos. 2008, 2011], (xvii) TKJP, (xviii) several executory contract counterparties [Docket Nos. 1868, 1894, 1909, 1913, 1919, 1922, 1923, 1924, 1931, 1935, 1938, 1939, 1940, 1941, 1942, 1943, 1944, 1947, 1949, 1951, 1952, 1954, 1999, 2000, 2006, 2040, 2042, 2044], (xix) certain PSAN PI/WD claimants [Docket Nos. 1185, 1934, 1958], and (xx) several individuals (or parties on their behalf) [Docket Nos. 1116, 1130, 1143, 1149, 1182, 1313, 1338, 1371, 1493, 1634, 1779, 1862, 1964, 1980] (collectively, the "*Plan Objections*" and together with the Contract Objections, the "*Objections*"); and

WHEREAS the Debtors received informal comments to the Third Amended Plan and this Order from (i) National Union Fire Insurance Company, (ii) Cigna Health and Life Insurance Company, (iii) Coilplus, Inc., (iv) CRG Financial LLC, (v) Daicel Safety Systems America Inc., (vi) Joel Nosanchuk, (vii) Mercedes GMBH, (viii) Oracle America, Inc., (ix) Pegasus Auto, (x) Powder Solutions, (xi) Prism Plastics, (xii) Siemens Industry, (xiii) Shinho K'mac, (xiv) STT USA & STT Inc., (xv) Toyota Industries Commercial Finance, Inc., (xvi) Union Pacific Railroad Company, (xvii) Xtra Lease, (xviii) Clariant Corporation, (xix) Crown Credit Company, (xx) Iron Mountain, and (xxi) various NQ Plan Participants; and

WHEREAS on February 11, 2018, the Debtors filed (i) the *Notice of Adjourned Hearing to Consider Confirmation of Plan and Further Extension of Voting Deadline* [Docket No. 2018], and (ii) the *Notice of Filing of Second Plan Supplement to Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings and its Affiliated Debtors* [Docket No. 2019]

6

(the "***First Amended Plan Supplement***"); and

WHEREAS on February 11, 2018, the Debtors filed the *Notice of Filing of Settlement Term Sheets with Creditors' Committee, Tort Claimants' Committee, and Future Claims Representative Regarding Confirmation of Plan* [Docket No. 2017] evidencing the settlements that the Debtors and certain other parties had reached with the Creditors' Committee (the "***UCC Term Sheet***"), and the Tort Claimants' Committee and the Future Claims Representative (the "***TCC/FCR Term Sheet***" and, together with the UCC Term Sheet, the "***Settlement Term Sheets***"); and

WHEREAS on February 12, 2018, the Debtors filed the *Notice of Hearing to Consider Confirmation of Plan for Friday, February 16, 2018 at 10:30 a.m. (ET)* [Docket No. 2025]; and

WHEREAS on February 14, 2018, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 2056], which was subsequently modified by the *Fifth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* (as supplemented by the Plan Supplement, and as otherwise amended in accordance with the terms of this Order, the "***Plan***"),[2] a copy of which is annexed hereto as **Exhibit A**; and

WHEREAS modifications to the Third Amended Plan were primarily made to incorporate the settlements described in the Settlement Term Sheets and to resolve certain Objections; and

WHEREAS on February 14, 2018, the Debtors filed (i) the *Memorandum of Law in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization of*

---

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to such terms in the Plan.

*TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 2050], (ii) the *Declaration of Kenneth*

*Bowling in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of*

*Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 2060] (the "**Bowling**

**Declaration**"), (iii) the *Declaration of Andrew Yearley in Support of Confirmation of the Fourth*

*Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors*

[Docket No. 2061] (the "**Yearley Declaration**"), (iv) the *Declaration of Steven Fleming in*

*Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Reorganization of TK*

*Holdings Inc. and Its Affiliated Debtors* [Docket No. 2062] (the "**Fleming Declaration**"), and (v)

the *Declaration of Thomas Vasquez in Support of Confirmation of the Fourth Amended Joint*

*Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No.

2063] (the "**Vasquez Declaration**"); and

WHEREAS on February 14, 2018, the Plan Sponsor filed (i) the *Statement of*

*Plan Sponsor in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of*

*Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 2052], and (ii) the

*Declaration of Joseph Perkins in Support of Confirmation of Fourth Amended Joint Chapter 11*

*Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 2054] (the

"**Perkins Declaration**"); and

WHEREAS on February 14, 2018, the Consenting OEMs filed the *Consenting*

*OEMs' Reply in Support of Confirmation of the Debtors' Fourth Amended Plan of*

*Reorganization* [Docket No. 2066]; and

WHEREAS on February 14, 2018, the Future Claims Representative (defined

below) filed the *Declaration of Roger Frankel, the Future Claimants' Representative, in Support*

*of Confirmation of the Fourth Amended Joint Plan of Reorganization of TK Holdings Inc. and Its*

8

*Affiliated Debtors* [Docket No. 2067] (the "***Frankel Declaration***" and together with the Bowling Declaration, the Yearley Declaration, the Fleming Declaration, the Vasquez Declaration, and the Perkins Declaration, the "***Confirmation Declarations***"); and

WHEREAS on February 15, 2018, the Debtors, through their Solicitation Agent, filed the *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 2089], which was subsequently revised by the *Revised Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* filed on February 16, 2018 [Docket No. 2089] (the "***Voting Certification***"), attesting and certifying the method and results of the tabulation for the Classes of Claims (Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), and Class 7 (Other PI/WD Claims) entitled to vote to accept or reject the Plan, for each applicable Debtor; and

WHEREAS on February 16, 2018, the Debtors filed the *Notice of Filing of Third Plan Supplement to Fourth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings and its Affiliated Debtors* [Docket No. 2098] (the "***Second Amended Plan Supplement***," and together with the Initial Plan Supplement and the First Amended Plan Supplement, the "***Plan Supplement***"); and

WHEREAS the Confirmation Hearing commenced on February 16, 2018; and

WHEREAS the Court admitted the Confirmation Declarations and the Voting Certification into evidence at the Confirmation Hearing; and

9

WHEREAS the Court being familiar with the Disclosure Statement and the Plan and other relevant factors affecting the Debtors' Chapter 11 Cases (defined below); and the Court being familiar with, and having taken judicial notice of, the entire record of the Debtors' Chapter 11 Cases; and upon the arguments of counsel and the evidence proffered and adduced at the Confirmation Hearing; and the Court having found and determined that the Plan should be confirmed as reflected by the Court's rulings made herein and at the Confirmation Hearing; and after due deliberation and sufficient cause appearing therefor; the Court hereby **FINDS, DETERMINES, AND CONCLUDES** that:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A.    <u>Findings and Conclusions</u>.  The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    <u>Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>.  The Court has jurisdiction over the Debtors' Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto.  The Debtors are eligible debtors under section 109 of the Bankruptcy Code.  The Debtors are proper plan proponents under section 1121(a) of the Bankruptcy Code.

10

C.      Chapter 11 Petitions. On June 25, 2017 (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed or requested in these Chapter 11 Cases. Further, in accordance with an order of this Court [Docket No. 102], the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

D.      Adequate Protection Order. On June 27, 2017, the Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, 506, and 507 and Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 (I) Authorizing the Debtors to Enter into Accommodation Agreement and Access Agreement with Certain Customers, (II) Granting Adequate Protection In Connection therewith, (III) Modifying the Automatic Stay to Implement and Effectuate the Terms Thereof; and (IV) Scheduling a Final Hearing* [Docket No. 107] the "**Interim Adequate Protection Order**"). On October 3, 2017, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 503, 506, and 507 and Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 (I) Authorizing the Debtors to Enter into Accommodation Agreement and Access Agreement with Certain Customers, (II) Granting Adequate Protection In Connection therewith, and (III) Modifying the Automatic Stay to Implement and Effectuate the Terms Thereof* [Docket No. 953] (the "**Final Adequate Protection Order**" and, together with the Interim Adequate Protection Order, the "**Adequate Protection Order**"). Among other things, the Adequate Protection Order authorized the Debtors to enter into the Global Accommodation Agreement and granted the Adequate Protection Claims to the Consenting OEMs party to the Global Accommodation Agreement.

11

E.    Statutory Committees.  On July 7, 2017, the United States Trustee for Region 3 (the "*U.S. Trustee*") appointed the statutory committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "*Creditors' Committee*") and the statutory committee of tort claimant creditors pursuant to section 1102(a)(2) of the Bankruptcy Code (the "*Tort Claimants' Committee*" and, together with the Creditors' Committee, the "*Committees*").

F.    Future Claims Representative.  On October 13, 2017, the Court, pursuant to sections 105 and 1109(b) of the Bankruptcy Code, entered an Amended Order appointing Roger Frankel as the legal representative (the "*Future Claims Representative*" or the "*FCR*") for individuals who sustain personal injuries after the Petition Date arising from or related to PSAN Inflators or their component parts manufactured by the Debtors or their affiliates prior to the Effective Date (such individuals as defined therein, the "*Future Claimants*").  The manufacture date of PSAN Inflators or their component parts manufactured by the Debtors occurs in close proximity to the date such products are incorporated into airbag systems and sold or supplied by the Debtors to an OEM.

G.    Judicial Notice.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court or its duly-appointed agent Prime Clerk LLC, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of these Chapter 11 Cases.

H.    Burden of Proof.  Each of the Debtors has met the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

12

I.    Adequate Notice. The publication notice as provided in the *Order For Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, and (III) Approve Procedures for Providing Notice of Bar Date and Other Important Deadlines and Information to Potential PSAN Inflator Claimants* [Docket No. 959], constituted adequate notice of the Bar Dates and other matters described therein on all unknown creditors, including PPICs, without regard to the additional elements of the Supplemental Notice Plan.

J.    Modifications to the Third Amended Plan. The modifications made to the Third Amended Plan since the solicitation (i) complied in all respects with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, (ii) do not adversely affect the treatment of any holder of Allowed Claims, and (iii) do not require re-solicitation of votes with respect to the Plan. Adequate and sufficient notice of such modifications has been given, no further notice is or shall be required, and such modifications are approved in full. The votes cast to accept the Third Amended Plan are deemed to have been cast with respect to the Plan. Pursuant to Section 12.3(a) of the Plan, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, subject to any applicable consent or approval rights, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or this Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Third Amended Plan shall be deemed to have accepted the Plan as further amended, modified, or supplemented.

K.    Solicitation Procedures Order. On January 5, 2018, the Court entered the Solicitation Procedures Order, which, among other things, approved the Disclosure Statement as

13

containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code, authorized the Debtors to solicit acceptances and rejections of the Plan, and established February 6, 2018 at 4:00 p.m. (ET) as the deadline to vote to accept or reject the Plan (the "*Voting Deadline*"). On February 3, 2018, the Debtors extended the Voting Deadline to February 9, 2018 at 4:00 p.m. (ET) as set forth in the *Notice of Extension of Voting Deadline to Accept or Reject Plan to February 9, 2018 at 4:00 P.M. (ET)* [Docket No. 1907]. On February 8, 2018, the Debtors further extended the Voting Deadline to February 12, 2018 at 5:00 p.m. (ET) as set forth in the *Notice of Further Extension of Voting Deadline to Accept or Reject Plan to February 12, 2018 at 5:00 P.M. (ET)* [Docket No. 1907]. On February 11, 2018, the Debtors further extended the Voting Deadline to February 14, 2018 at 8:00 p.m. (ET) as set forth in the *Notice of Adjourned Hearing to Consider Confirmation of Plan and Further Extension of Voting Deadline* [Docket No. 2018], which deadline was further extended to 9:00 p.m. (ET) by notice posted on the website maintained by the Solicitation Agent.

      L.    Solicitation. The Solicitation Packages were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*"), and the Solicitation Procedures Order. The forms of the Ballots adequately addressed the particular needs of these Chapter 11 Cases and were appropriate for the holders of Claims in Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), and Class 7 (Other PI/WD Claims) – the Classes of Claims entitled to vote to accept or reject the Plan (the "*Voting Classes*"). The period during which the Debtors solicited votes on the Plan was a reasonable period of time for the holders of Claims in the

14

Voting Classes to make an informed decision to accept or reject the Plan. The Debtors were not required to solicit votes from the holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) as each such Class is Unimpaired under the Plan and is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. The Debtors were not required to solicit votes from the holders of Claims or Interests in Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) as such holders are not entitled to receive a distribution under the Plan on account of their Claims or Interests, and, thus, pursuant to section 1126(g) of the Bankruptcy Code, the holders are deemed to reject the Plan. As described in and as evidenced by the Voting Certification and the Affidavit of Service, the transmittal and service of the Solicitation Packages was timely, adequate, and sufficient under the circumstances. The solicitation of votes on the Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable rules, laws, and regulations.

        M.    <u>Notice</u>. The transmittal and service of the Solicitation Packages were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Solicitation Procedures Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required.

WEIL:\96411572\24\76903.0004

N.    <u>Voting</u>. Votes to accept or reject the Third Amended Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

O.    <u>Plan Supplement</u>. On January 23, 2018, the Debtors filed the Initial Plan Supplement, containing the following documents: (i) updated Post-Closing Date structure for Reorganized Takata, Warehousing Entity, and TK Global LLC, (ii) list of material definitive documents relating to Restructuring Transactions, (iii) schedule of Allowed OEM Claims of Consenting OEMs, (iv) Indemnity Agreement, (v) TK Global Operating Agreement, (vi) Plan Administrator Agreement, (vii) Plan Administrator qualifications, (viii) Transition Services Agreement, (ix) Shared Services Agreement, (x) Reorganized TK Holdings Organizational Documents, (xi) Reorganized TK Holdings Trust Agreement, (xii) Schedule of Causes of Action (including Avoidance Actions) not Acquired by the Plan Sponsor or Waived Pursuant to Section 10.11 of the Plan, (xiii) PSAN PI/WD Trust Agreement, (xiv) PSAN PI/WD TDP, (xv) Participating OEM Contribution Agreement, (xvi) Claims Estimation Report, (xvii) Other PI/WD Claims Analysis, and (xviii) the identities of the Legacy Trustee, the OEM Claims Administrator, the initial PSAN PI/WD Trustee, the initial members of the PSAN PI/WD Trust Advisory Committee, and the initial members of the PSAN PI/WD OEM Advisory Committee. On February 11, 2018, the Debtors filed the First Amended Plan Supplement, containing a revised version of the PSAN PI/WD TDP. On February 16, 2018, the Debtors filed the Second Amended Plan Supplement, containing a revised version of the PSAN PI/WD Trust Agreement and a revised version of the Participating OEM Contribution Agreement. All such materials comply with the terms of the Plan, and the filing and notice of such documents, including the

16

notice of filing of the Plan Supplement, is good and proper in accordance with the Bankruptcy

Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations, and no other or

further notice is or shall be required.  All documents included in the Plan Supplement are integral

to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, the

Debtors reserve all rights to, and, to the extent required by the Settlement Term Sheets, shall,

alter, amend, update, or modify the Plan Supplement before the Effective Date subject to

compliance with the Bankruptcy Code and the Bankruptcy Rules, provided that no such

alteration, amendment, update, or modification shall be inconsistent with the terms of this Order

or the Plan.

        P.      <u>State Governmental Claims</u>.  All Claims against the Debtors arising out of

or related to (a) the complaint filed by the State of Hawai'i ("*Hawai'i*"), by its Office of

Consumer Protection, in Hawai'i state court (the "*Hawai'i Proceeding*"), asserting Causes of

Action for unfair or deceptive acts or practices pursuant to Hawai'i Revised Statute chapters 480

and 487 and applicable Hawai'i common law and seeking a permanent injunction barring the

Debtors "from engaging in their unfair and deceptive conduct," civil penalties per violation in

accordance with H.R.S. §§ 480-15, restitution and disgorgement (collectively with any similar or

related Claims asserted by Hawai'i in any proof of claim filed in these Chapter 11 Cases, the

"*Hawai'i Claim*"); (b) the complaint filed by the Government of the United States Virgin Islands

("*USVI*") in USVI state court (the "*USVI Proceeding*") asserting Causes of Action under certain

USVI consumer protection laws, the USVI Criminally Influenced and Corrupt Organizations Act

(14 V.I.C. §§600-14), the USVI Consumer Fraud & Deceptive Business Practices Act (12A

V.I.C. §301), and USVI common law, seeking civil penalties, administrative fines, restitution,

disgorgement, and an injunction requiring the defendants to cease their alleged violations of the

law and to expand their public education efforts (collectively with any similar or related Claims asserted by the USVI in any proof of claim filed in these Chapter 11 Cases, the "*USVI Claim*"); and (c) the complaint filed by the State of New Mexico ("*New Mexico*") in New Mexico state court (the "*New Mexico Proceeding*") alleging violations of New Mexico's Unfair Practices Act (N.M. Stat. Ann. § 57-12-1, *et seq.*), seeking disgorgement as well as five thousand dollars ($5,000) per defective airbag inflator that entered into New Mexico and five thousand dollars ($5,000) a day for each day that the Debtors allegedly hid or obscured defects in airbag inflators (collectively with any similar or related Claims asserted by New Mexico in any proof of claim filed in these Chapter 11 Cases, the "*New Mexico Claim*") are properly classified as Class 9 (Subordinated Claims).

Q.    The Hawai'i Proceeding, the USVI Proceeding, and the New Mexico Proceeding are subject to the Plan Injunction.

## Compliance with the Requirements of Section 1129 of the Bankruptcy Code

R.    Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)). The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

(a)    Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). In addition to Administrative Expense Claims, Fee Claims, Adequate Protection Claims, and Priority Tax Claims, which need not be classified, Articles III and IV of the Plan classify nine (9) Classes of Claims against and Interests in the Debtors, based on differences in the legal nature or priority of such Claims against and Interests in each Debtor. The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of

18

WEIL:\96411572\24\76903.0004

Claims and Interests created under the Plan. The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(b)     Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  Articles III and IV of the Plan specify that Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(c)     Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles III and IV of the Plan designate Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), Class 7 (Other PI/WD Claims), Class 8 (Intercompany Interests), and Class 9 (Subordinated Claims) as Impaired within the meaning of section 1124 of the Bankruptcy Code and specify the treatment of the Claims and Interests in such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(d)     Equal Treatment (11 U.S.C. § 1123(a)(4)).  The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(e)     Implementation of the Plan (11 U.S.C. § 1123(a)(5)).  The Plan and the various documents and agreements set forth in the Plan Supplement as well as the exhibits and schedules to the Plan provide adequate and proper means for the implementation of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code, including (i) the sale of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, except for the Assumed

19

Liabilities and Permitted Liens, in accordance with the terms of the Plan and the U.S.

Acquisition Agreement and the allocation of Cash Proceeds, (ii) the vesting of the PSAN Assets

in Reorganized Takata, (iii) the vesting of the Warehoused PSAN Assets and Other Excluded

Assets in the applicable Legacy Entity, (iv) the provision of the Plan Sponsor Backstop Funding

(if any) in accordance with the Plan and the Plan Sponsor Backstop Funding Agreement, (v) the

continued corporate existence of the Reorganized Debtors, (vi) the consummation of the Plan

Settlement, including payment of the Plan Settlement Payment, (vii) the establishment and

funding of the Support Party Creditor Fund, (viii) the execution of the Reorganized TK Holdings

Trust Agreement and the establishment of the Reorganized TK Holdings Trust, (ix) the

establishment of TK Global LLC and the Warehousing Entity and the funding thereof through,

among other things, the Warehousing Entity Reserve and the Post-Closing Reserve, (x) the

establishment and funding of the PSAN PI/WD Trust, (xi) the transfer of the PI/WD Insurance

Rights to the PSAN PI/WD Trust, (xii) the creation of the Claims Reserves and the Recovery

Funds to make Distributions to holders of Allowed General Unsecured Claims, (xiii) the

provisions for the Plan Sponsor Contribution and any TKJP Contribution Amount for the benefit

of PSAN PI/WD Claims, solely as an administrative convenience for the settling parties, and the

establishment and funding of the Plan Settlement Fund, (xiv) the consummation of the TKC and

Mexico restructuring transactions contemplated by Sections 5.11 and 5.13 of the Plan,

respectively, (xv) the funding of the TSAC DOJ Restitution Claim Funding Deficiency in

accordance with Section 5.12 of the Plan, and (xvi) the taking of all necessary or appropriate

actions by the Debtors or the Reorganized Debtors, as applicable, to effectuate the Restructuring

Transactions and the Plan.

WEIL:\96411572\24\76903.0004

(f)     Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).  The certificate of incorporation, articles of incorporation, limited liability company agreement, operating agreement, or similar governing document, as applicable, of each Debtor has been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

(g)     Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).  The Plan Supplement and Sections 5.7 through 5.9 of the Plan contain provisions with respect to the manner of selection of directors and officers of Reorganized Takata, TK Global LLC, and the Warehousing Entity that are consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.  The Debtors have identified the directors and officers of each Reorganized Debtor in the Plan Supplement to the extent such information is available.

(h)     Impairment/Unimpairment of Classes of Claims and Interests (11 U.S.C. § 1123(b)(1)).  Pursuant to Articles III and IV of the Plan, as set forth in section 1123(b)(1) of the Bankruptcy Code, Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired and Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), Class 7 (Other PI/WD Claims), Class 8 (Intercompany Interests), and Class 9 (Subordinated Claims) are Impaired.

(i)     Assumption and Rejection (11 U.S.C. § 1123(b)(2)).  Article VIII of the Plan, subject to the provisions of Section 5.19(h) of the Plan and Section 2.7(g) of the U.S. Acquisition Agreement, addresses the assumption and rejection of executory contracts and

unexpired leases, and meets the requirements of section 365(b) of the Bankruptcy Code. In accordance with Section 8.2 of the Plan, the Debtors have filed and served, as set forth in the *Affidavits of Service* [Docket Nos. 1750, 1905], the *Notice of Filing of Proposed Cure Costs for Executory Contracts and Unexpired Leases* [Docket No. 1703] (the "***Initial Cure Amount Notice***"), and the *Notice of Filing of Amendments to Proposed Cure Costs for Executory Contracts and Unexpired Leases* [Docket No. 1859] (the "***Notice of First Amendments to the Cure Amount Notice***") on parties to executory contracts and unexpired leases setting forth the proposed Cure Amount (if any).  On February 15, 2018, the Debtors further filed the *Notice of Filing of Second Amendments to Proposed Cure Costs for Executory Contracts and Unexpired Leases* [Docket No. 2091] (the "***Notice of Second Amendments to the Cure Amount Notice***," and together with the Initial Cure Amount Notice and the Notice of First Amendments to the Cure Amount Notice, the "***Cure Amount Notice***").

      (j)     If an executory contract or unexpired lease is not listed on the Cure Amount Notice, the Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0); *provided, however*, that the foregoing shall not apply if the counterparty to such executory contract or unexpired lease otherwise filed a proof of Claim with the Court with respect to such executory contract or unexpired lease; and, *provided, further*, that the Contract Notices (as defined below) shall not apply to any OEM Assumed Contracts. Furthermore, notwithstanding anything to the contrary herein or in any Contract Notice, the assumption, assignment, cure and/or other assumption of liabilities under, and/or rejection of any contract between the Debtors and the OEMs shall be governed in all respects by Section 8.4 of the Plan and, as between the Consenting OEMs and the Plan Sponsor, the Indemnity Agreement. On January 31, 2017, the Debtors filed the (i) *Notice of Assumption of Executory Contracts and*

22

*Unexpired Leases by Reorganized Takata* [Docket No. 1857], (ii) *Notice of Assumption of*

*Executory Contracts and Unexpired Leases by the Warehousing Entity* [Docket No. 1858], and

(iii) *Notice of Rejection of Executory Contracts and Unexpired Leases* [Docket No. 1860]

(collectively, the "***Initial Notices of Assumed and Rejected Contracts***").  On February 15, 2018,

the Debtors further filed the (i) *Notice of Amendments to Schedule of Executory Contacts and*

*Unexpired Leases to be Rejected* [Docket No. 2092], (ii) *Notice of Amendments to Schedule of*

*Executory Contracts and Unexpired Leases to be Assumed by Reorganized Takata* [Docket No.

2093], and (iii) *Notice of Amendments to Schedule of Executory Contracts and Unexpired Leases*

*to be Assumed and Assigned to the Warehousing Entity* [Docket No. 2094] (collectively, the

"***Amended Notices of Assumed and Rejected Contracts***," and together with the Cure Amount

Notice, the "***Contract Notices***").  The time given to parties in interest to object to the

assumption, assumption and assignment, and rejection of their executory contracts or expired

leases was good and sufficient and no other or further notice is required.  Notwithstanding

anything in this Order, the Plan, the Disclosure Statement, or any of the Contract Notices to the

contrary, any Cure Dispute that has not been resolved on or prior to the Confirmation Hearing

shall be adjourned to a later date to be determined by the Court in accordance with section 8.2(c)

of the Plan.  All rights, remedies, and/or claims arising from or relating to such Cure Disputes are

preserved.

(k)     Settlement and Retention of Claims and Causes of Action and Reservation

of Rights (11 U.S.C. § 1123(b)(3)).  Pursuant to section 1123(b)(3) of the Bankruptcy Code and

Bankruptcy Rule 9019 and in consideration for the distributions and other benefits, including

releases, provided under the Plan (as supplemented by the documents memorializing the Plan

Settlement), the provisions of the Plan constitute a good faith compromise or settlement of all

23

Claims, Interests, and controversies resolved thereunder, and the entry of this Order constitutes approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise and settlement is (i) in the best interests of the Debtors, their Estates, and their respective property and stakeholders, including the holders of Claims and Interests, and (ii) fair, equitable, and within the range of reasonableness.  Further, in accordance and compliance with section 1123(b)(3)(A) of the Bankruptcy Code, Section 10.12 of the Plan properly retains certain Causes of Action of the Debtors and, in accordance and compliance with section 1123(b)(3)(B) of the Bankruptcy Code, Section 5.6(b) of the Plan properly transfers and provides for commencement and pursuit of Causes of Action that are expressly preserved and not released under the Plan by the Reorganized TK Holdings Trust.

(l)      Sale of Substantially All Assets (11 U.S.C. § 1123(b)(4)).  The Plan provides for the sale, transfer, and/or conveyance of substantially all of the Debtors' non-PSAN assets to the Plan Sponsor pursuant to the U.S. Acquisition Agreement.  Thus, the Plan complies with section 1123(b)(4) of the Bankruptcy Code.

(m)      Unaffected Rights of Holders of Classes of Claims (11 U.S.C. § 1123(b)(5)).  In accordance and in compliance with section 1123(b)(5) of the Bankruptcy Code, the Plan properly modifies the rights of holders of Claims in Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims), and Class 7 (Other PI/WD Claims).  The Plan leaves unaffected the rights of holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims).  Thus, the Plan complies with section 1123(b)(5) of the Bankruptcy Code.

WEIL:\96411572\24\76903.0004

     (n)    <u>Additional Plan Provisions (11 U.S.C. § 1123(b)(6))</u>.  The permissive provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.  The failure to address specifically a provision of the Bankruptcy Code in this Order shall not diminish or impair the effectiveness of this Order.

     (o)    <u>Debtors Are Not Individuals (11 U.S.C. § 1123(c))</u>.  The Debtors are not individuals.  Accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

     (p)    <u>Cure of Defaults (11 U.S.C. § 1123(d))</u>.  Sections 8.3 (subject to the provisions of Section 5.19(h) of the Plan) and 8.4 of the Plan, provide for the satisfaction (or, in the case of Consenting OEM PSAN Cure Claims, the settlement) of default Claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code other than OEM Assumed Contracts.  All Cure Amounts will be determined in accordance with the underlying agreements and applicable non-bankruptcy law.  Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

     S.    <u>Bankruptcy Rule 3016</u>.  In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as proponents.  The Debtors appropriately filed the Disclosure Statement and the Plan with the Court, thereby satisfying Bankruptcy Rule 3016(b).

     T.    <u>The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>.  The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically, the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the

WEIL:\96411572\24\76903.0004

Local Rules, applicable non-bankruptcy law, and the Solicitation Procedures Order in transmitting the Disclosure Statement, the Plan, the Plan Supplement, the Ballots, and related documents and notices and in soliciting and tabulating votes on the Plan.

       U.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have proposed the Plan (and all documents necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, including testimony adduced at the Confirmation Hearing, the contents of the Confirmation Declarations, and the record of the Confirmation Hearing and these Chapter 11 Cases.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and recoveries to holders of Claims under the circumstances of the Chapter 11 Cases.  The Plan (including the Plan Supplement and all other documents necessary to effectuate the Plan) was negotiated at arm's length among representatives of the Debtors, the Restructuring Support Parties, the Committees, the Future Claims Representative, and their respective professionals.  Each of the Restructuring Support Parties, the Committees, and the Future Claims Representative supports confirmation of the Plan.  Further, the Plan's classification, indemnification, exculpation, release, and injunction provisions, including Sections 5.19(j), 10.5, 10.6, 10.7, and 10.8 of the Plan, have been negotiated in good faith and at arm's length, and are consistent with sections 105, 1122, 1123(b)(3)(A), 1123(b)(6), 1129, and 1142 of the Bankruptcy Code.

       V.    <u>Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the

WEIL:\96411572\24\76903.0004

Chapter 11 Cases has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

W.  Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).  The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  The identity and affiliations of the persons proposed to serve as the initial directors and officers of the Reorganized Takata, TK Global LLC, and the Warehousing Entity upon the Effective Date of the Plan, and the identity of and nature of any compensation for any insider to be employed or retained by Reorganized Takata, TK Global LLC, and the Warehousing Entity, have been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such offices of such persons is consistent with the interests of holders of Claims against and Interests in the Debtors and with public policy.

X.  No Rate Changes (11 U.S.C. § 1129(a)(6)).  The Plan does not provide for rate changes by any of the Reorganized Debtors.  Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in these Chapter 11 Cases.

Y.  Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis provided in the Disclosure Statement and other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

27

Z.      Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).  Class 1 (Other
Secured Claims) and Class 2 (Other Priority Claims) are Classes of Unimpaired Claims that are
conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the
Bankruptcy Code.  As reflected in the Voting Certification, Class 3 (Mexico Class Action Claims
and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims),
Class 6 (Other General Unsecured Claims) at IIM, SMX, and TDM, and Class 7 (Other PI/WD
Claims) have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy
Code.  Class 6 (Other General Unsecured Claims) at the TKH Debtors has voted to reject the
Plan, and Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) are Classes of
Impaired Claims or Interests that are deemed to have rejected the Plan in accordance with section
1126(g) of the Bankruptcy Code.[3]  Therefore, section 1129(a)(8) of the Bankruptcy Code has not
been satisfied with respect to the rejecting Classes.  Accordingly, confirmation of the Plan is
sought pursuant to section 1129(b) of the Bankruptcy Code with respect to the rejecting Classes.

AA.     Treatment of Administrative Expense Claims, Priority Tax Claims, and
Other Priority Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Allowed Administrative
Expense Claims, Adequate Protection Claims, and Fee Claims pursuant to Sections 2.3, 2.4, and
2.5, respectively, of the Plan satisfies the requirements of section 1129(a)(9)(A) of the
Bankruptcy Code.  The treatment of Other Priority Claims pursuant to Article IV of the Plan
satisfies the requirements of section 1129(a)(9)(B) of the Bankruptcy Code.  The treatment of
Priority Tax Claims pursuant to Section 2.6 of the Plan satisfies the requirements of section
1129(a)(9)(C) of the Bankruptcy Code.  The Debtors have sufficient Cash to pay Allowed
Administrative Expense Claims, Fee Claims, Other Priority Claims, and Priority Tax Claims and

[3] In the event that the Claim of the Commonwealth of Puerto Rico [Proof of Claim No. 4215] (the "**Puerto Rico Claim**") is classified as a Subordinated Claim in Class 9, Class 6 (Other General Unsecured Claims) would have voted to accept the Plan at all applicable Debtors.

28

to provide the treatment of Adequate Protection Claims set forth in the Plan through the payment of the Plan Settlement Payment.

BB.    Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).  Class 3 (Mexico Class Action Claims and Mexico Labor Claims), Class 4 (OEM Unsecured Claims), Class 5 (PSAN PI/WD Claims), Class 6 (Other General Unsecured Claims) at IIM, SMX, and TDM, and Class 7 (Other PI/WD Claims) are each Impaired and have accepted the Plan.[4] Accordingly, at least one Class of Claims against the Debtors that is Impaired under the Plan has voted to accept the Plan by the requisite majorities, determined without including any acceptance of the Plan by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code.

CC.    Feasibility (11 U.S.C. § 1129(a)(11)).  The information in the Disclosure Statement (including the financial projections attached thereto), the Bowling Declaration, and the evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that the Plan is feasible and that there is a reasonable prospect of Reorganized Takata, TK Global LLC, and the Warehousing Entity being able to meet their financial obligations under the Plan and their business in the ordinary course and that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Reorganized Takata, TK Global LLC, or the Warehousing Entity, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

DD.    Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)).  The Plan provides that all fees payable under section 1930 of title 28 of the United States Code, as determined by

---

[4] As indicated above, Class 6 (Other General Unsecured Claims) has voted to accept the Plan at all applicable Debtors, except the TKH Debtors.  If the Puerto Rico Claim is classified as a Subordinated Claim in Class 9, Class 6 (Other General Unsecured Claims) would have voted to accept the Plan at all applicable Debtors.

the Court, have been or will be paid on or before the Effective Date pursuant to Section 12.5 of the Plan, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

      EE.    <u>Benefit Plans (11 U.S.C. § 1129(a)(13))</u>.  The Plan complies with section 1129(a)(13) of the Bankruptcy Code by reason of the provisions of Section 8.7 of the Plan and the *Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 1114(e) and Fed. R. Bankr. P. 9019(a) (I) Authorizing Debtors to Enter Into Settlement and Release Agreements with the Covered Executives And (II) Authorizing Debtors to Terminate or Cease Providing Retiree Benefits*, entered on February 1, 2018 [Docket No. 1879].

      FF.    <u>No Domestic Support Obligations (11 U.S.C. § 1129(a)(14))</u>.  The Debtors are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation.  Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

      GG.    <u>Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15))</u>.  The Debtors are not individuals, and accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

      HH.    <u>No Applicable Non-Bankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16))</u>.  Each of the Debtors is a moneyed business, commercial corporation, or trust, and accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

      II.    <u>Nonconsensual Confirmation (11 U.S.C. § 1129(b))</u>.  As set forth above, all of the requirements of section 1129(a) of the Bankruptcy Code, other than 1129(a)(8), have been satisfied.  Class 8 (Intercompany Interests) and Class 9 (Subordinated Claims) are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and Class 6 (Other

WEIL:\96411572\24\76903.0004

General Unsecured Claims) at the TKH Debtors voted to reject the Plan. Notwithstanding the

foregoing rejection, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy

Code and, accordingly, can be confirmed. First, as set forth above, the Plan does not

discriminate unfairly because holders of Claims or Interests with similar legal rights will not be

receiving materially different treatment under the Plan. Second, the Plan is fair and equitable

with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the

Plan. With respect to Classes 6 at the TKH Debtors, 8 and 9, no holders of Claims or Interests

junior to such Classes will receive or retain any property under the Plan on account of such

Claims or Interests. In addition, as set forth below, no holder of a Claim senior to such Classes is

receiving a Distribution under the Plan in excess of the amount of its Allowed Claim.

Accordingly, the Plan does not discriminate unfairly and is fair and equitable, as required by

section 1129(b)(1) and (b)(2) of the Bankruptcy Code, and may be confirmed notwithstanding

the rejection or deemed rejection by Class 6 (Other General Unsecured Claims) at the TKH

Debtors, Class 8 (Intercompany Interests), and Class 9 (Subordinated Claims).

JJ.   Only One Plan (11 U.S.C. § 1129(c)). The Plan is the only plan filed in

each of these Chapter 11 Cases, and accordingly, section 1129(c) of the Bankruptcy Code is

inapplicable in these Chapter 11 Cases.

KK.   Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal

purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5

of the Securities Act, and no governmental entity has objected to the confirmation of the Plan on

any such grounds. The Plan, therefore, satisfies the requirements of section 1129(d) of the

Bankruptcy Code.

31

LL.   <u>Small Business Case (11 U.S.C. § 1129(e))</u>.  None of these Chapter 11 Cases are a "small business case," as that term is defined in the Bankruptcy Code, and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

MM.   <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based on the record before the Court in these Chapter 11 Cases, including evidence presented at the Confirmation Hearing, the Debtors, the Restructuring Support Parties, the Committees, and the Future Claims Representative, and their respective directors, officers, employees, members, agents, advisors, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, or regulation in connection with all their respective activities relating to the solicitation of acceptances to the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 10.8 of the Plan.

NN.   Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

<b><u>Findings Relating to the Sale of Purchased Assets</u></b>

OO.   <u>Valid Transfer</u>.  Except as expressly set forth in the U.S. Acquisition Agreement, the Debtors are the sole and lawful owners of the Purchased Assets, and no other Person has any ownership right, title, or interests therein.  The Purchased Assets constitute property of the Debtors' Estates and good title thereto is vested in the Debtors' Estates within the meaning of section 541(a) of the Bankruptcy Code.  The sale and transfer of the Purchased Assets pursuant to the U.S. Acquisition Agreement and this Order will be a legal, valid, enforceable, and effective sale and transfer of the Purchased Assets.  On the Effective Date,

32

except for the Assumed Liabilities and the Permitted Liens, the Purchased Assets shall, in accordance with sections 1141(c) and 363(f) of the Bankruptcy Code, be purchased by or otherwise transferred to the Plan Sponsor in accordance with the U.S. Acquisition Agreement free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities (as defined below).

      PP.    <u>No Fraudulent Transfer</u>.  The U.S. Acquisition Agreement is a valid and binding contract between the Debtors and the Plan Sponsor and shall be enforceable pursuant to its terms.  The U.S. Acquisition Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia, or foreign jurisdiction.  The consideration provided by the Plan Sponsor for the Purchased Assets pursuant to the U.S. Acquisition Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes equivalent value and fair consideration under or with respect to the fraudulent transfer or comparable laws of any jurisdiction, foreign or domestic, as to which equivalence and/or fairness of consideration is a constitutive element, defense, or otherwise a legally relevant fact.  Neither the Debtors nor the Plan Sponsor is entering into the transactions contemplated by the U.S. Acquisition Agreement and the Plan fraudulently for the purpose of statutory and common-law fraudulent conveyance and fraudulent transfer claims.

      QQ.    <u>Sale Free and Clear; No Merger; Plan Sponsor Not an Insider; No Successor Liability</u>.  Following the Effective Date, the Plan Sponsor will not be a successor or

33

mere continuation of the Debtors or their Estates, and there is no continuity of enterprise or

common identity between the Plan Sponsor and the Debtors. The Plan Sponsor is not an alter

ego of the Debtors. The Plan Sponsor is not holding itself out to the public as a successor to or a

continuation of the Debtors or their Estates. The Plan Sponsor is not a successor to any of the

Debtors or their Estates by reason of any theory of law or equity, and the sale and transfer of

Purchased Assets does not amount to a consolidation, succession, merger, or *de facto* merger of

Plan Sponsor and the Debtors. The Plan Sponsor is paying substantial cash consideration,

among other consideration, to purchase the Purchased Assets of the Debtors. As noted, the

consideration provided by Plan Sponsor for the Purchased Assets is fair and reasonable. The sale

does not eliminate all remedies for the Debtors' creditors.

RR.    Immediately prior to the Effective Date, the Plan Sponsor was not an

"insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no

common identity of incorporators, directors, or controlling stockholders existed between the

Debtors and the Plan Sponsor. The sale and transfer of the Purchased Assets to the Plan

Sponsor, and the assumption of the Assumed Liabilities, except for Assumed Liabilities and

Permitted Liens or as otherwise explicitly set forth in the U.S. Acquisition Agreement, does not,

and will not, subject the Plan Sponsor to any liability whatsoever, with respect to the Debtors or

the operation of the Debtors' businesses prior to the Effective Date or by reason of such transfer,

including under the laws of the United States, any state, territory, or possession thereof, or the

District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly,

on any, or any theory of, successor, transferee, vicarious, antitrust, environmental, revenue,

pension, ERISA, tax, labor (including any WARN Act), employment or benefits, de facto

merger, business continuation, substantial continuity, alter ego, derivative, transferee, veil

34

piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability

or law, or other applicable law, rule, or regulation (including filing requirements under any such

law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise

(collectively, the "*Successor or Other Liabilities*").

SS.     Pursuant to the U.S. Acquisition Agreement, the Plan Sponsor is not

purchasing all of the Debtors' assets in that the Plan Sponsor is not purchasing any of the

Excluded Assets or assuming the Excluded Liabilities (as defined in the U.S. Acquisition

Agreement) and shall have no liability for the Excluded Liabilities.

TT.     The injunction set forth in Section 10.5 of the Plan is in aid of the sale and

transfer of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens,

other encumbrances, and liabilities of any kind or nature whatsoever (other than Permitted Liens

and Assumed Liabilities), including rights or claims based on any Successor or Other Liabilities

in accordance with sections 1123(a)(5)(D), 1123(b), 1141(c), and 363(f) of the Bankruptcy Code

and does not violate section 524(e) of the Bankruptcy Code.

UU.     The Debtors and the Plan Sponsor have submitted good and sufficient

evidence in respect of each of the foregoing findings of fact concerning the sale and transfer free

and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature

whatsoever (including with respect to any claims grounded in Successor or Other Liabilities),

which evidence has not been timely objected to or otherwise timely challenged by any party.

## Other Findings

VV.     <u>Executory Contracts and Unexpired Leases</u>.  Article VIII, Section 5.19(h)

of the Plan, and Section 2.7(g) of the U.S. Acquisition Agreement, governing the assumption,

rejection, and assumption and assignment of executory contracts and unexpired leases, satisfy the

requirements of section 365(b) of the Bankruptcy Code.

WEIL:\96411572\24\76903.0004

WW.   <u>Injunction, Releases, and Exculpation</u>.  The Court has jurisdiction under

section 1334 of title 28 of the United States Code to approve the injunctions, releases, and

exculpation set forth in Section 5.19(j) and Article X of the Plan.  Section 105(a) of the

Bankruptcy Code permits issuance of the injunction and approval of the releases set forth in

Sections 5.19(j), 10.5, 10.6, and 10.7 of the Plan if, as has been established here, based upon the

record in the Chapter 11 Cases and the evidence presented at the Confirmation Hearing, such

provisions (i) were integral to the agreement among the various parties in interest, as reflected in

the *Order (I) Authorizing Debtors to Enter Into and Perform Under Restructuring Support*

*Agreement; (II) Approving Plan Sponsor Protections; and (III) Modifying the Automatic Stay*,

dated December 13, 2017 [Docket No. 1335] and the Plan Settlement, and are essential to the

formulation and implementation of the Plan, as provided in section 1123 of the Bankruptcy

Code, (ii) confer substantial benefits on the Debtors' estates, (iii) are fair, equitable, and

reasonable, (iv) are in the best interests of the Debtors, their Estates, and parties in interest, (v)

were given in exchange for good and valuable consideration, including the consideration being

provided in connection with the Plan Settlement, (vi) were given and made after  due notice and

opportunity for hearing, (vi) serve as a bar to any of the releasing parties asserting any Claim or

Cause of Action released pursuant to the release against any of the Consenting OEMs, the

Released Parties, or the Protected Parties, as applicable, and (vii) are consistent with sections

105, 524, 1123, 1129, 1141, and other applicable provisions of the Bankruptcy Code.

The release contained in Section 10.6(b) of the Plan was adequately disclosed and

explained on the Ballots, in the Disclosure Statement, and in the Plan.  The releases contained in

Section 10.6(b) of the Plan are consensual because they are being provided only by (i) the

holders of all Claims, other than the Consenting OEMs, that voted to accept the Plan, (ii) the

36

holders of Claims, other than the Consenting OEMs, that are Unimpaired under the Plan, (iii) the

holders of Claims, other than the Consenting OEMs, whose vote to accept or reject the Plan was

solicited but who did not vote either to accept or to reject the Plan, (iv) the holders of Claims,

other than the Consenting OEMs, or Interests who voted, or are deemed, to reject the Plan but

did not opt out of granting such releases, (v) the holders of Claims, other than the Consenting

OEMs, and Interests who were given notice of the opportunity to opt out of granting these

releases but did not opt out, and (vi) all other holders of Claims, other than the Consenting

OEMs, and Interests to the maximum extent permitted by law. *See In re Indianapolis Downs,*

*LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013).

The releases of non-Debtors under the Plan and the related injunction are fair to

holders of Claims and are necessary to the proposed reorganization, thereby satisfying the

applicable standards contained in *In re Indianapolis Downs*, 486 B.R. at 303 and are otherwise

appropriate under *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012).  Such releases and

injunction are given in exchange for and are supported by fair, sufficient, and adequate

consideration provided by or for each and all of the Consenting OEMs, Released Parties, or

Protected Parties, as applicable.  With respect to the Consenting OEMs, and the Plan Sponsor

Parties, and their respective related parties, the injunctions and releases set forth in the Plan and

implemented by this Order are also fair, equitable, reasonable, and in the best interests of the

Debtors and their Estates pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy

Rule 9019(a).  Based on the record of these Chapter 11 Cases, the representations of the parties,

and the evidence proffered, adduced, and presented at the Confirmation Hearing, this Court finds

that the injunction, releases, and exculpation set forth in Section 5.19(j) and Article X of the Plan

are consistent with the Bankruptcy Code and applicable law.  The failure to implement the

37

injunctions, releases, and exculpation would seriously impair the Debtors' ability to confirm and consummate the Plan.

The Channeling Injunction described in Section 10.7 of the Plan was adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan. The Channeling Injunction is essential to effectuate the Plan and essential to the Debtors' reorganization efforts and is to be implemented in accordance with the Plan and the PSAN PI/WD Trust Agreement. Pursuant to the Channeling Injunction established under Section 10.7 of the Plan and section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert, or that will hold or assert any PSAN PI/WD Claim against the Protected Parties, or any of them, shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any such Protected Party with respect to any such PSAN PI/WD Claims. Pursuant to the Plan and the PSAN PI/WD Trust Agreement, liability for all such PSAN PI/WD Claims against the Protected Parties shall be channeled to and assumed by the PSAN PI/WD Trust. The sole recourse of any such holder of a PSAN PI/WD Claim against any of the Protected Parties shall be to the PSAN PI/WD Trust. All PSAN PI/WD Claims against the Protected Parties shall be channeled to the PSAN PI/WD Trust to be treated in accordance with the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP.

(a)     Identity of Interest. The Debtors and the Protected Parties jointly formulated the Plan over a period of over one (1) year and share a common interest in having the Plan confirmed, thereby ensuring an identity of interest with the Debtors. Absent the involvement of each of the Protected Parties, none of the settlements and contributions required

38

for, or entered into in connection with, the confirmation of the Plan would be possible, and few, if any, assets would be available for distribution to the Debtors' creditors.

       (b)    <u>Substantial Contribution</u>.  The Restructuring Support Parties have provided substantial contributions necessary to implement the Global Transaction and to make the Plan feasible and to provide a fair result and fair consideration for affected creditors in exchange for the releases and injunctions provided in Sections 5.19(j), 10.5, 10.6 and 10.7 of the Plan.  The Plan Sponsor Parties' contributions include:

     i.    The Base Purchase Price under the U.S. Acquisition Agreement, and significant sources of potential additional value, including the Business Incentive Plan Payment and the Plan Sponsor Backstop Funding, all of which will fund substantial recoveries for creditors. The Plan Sponsor's commitment under the Plan Sponsor Backstop Funding Agreement increases the likelihood that the Debtors will have sufficient liquidity to fund certain elements that are critical to the Global Transaction.

     ii.    In the settlement with the Debtors, the Consenting OEMs, the Tort Claimants' Committee, and the Future Claims Representative, in exchange for the releases and injunction in favor of the Plan Sponsor Parties, the Plan Sponsor has agreed to contribute $25 million, which amount is expected to be drawn under the Plan Sponsor Backstop Funding at closing to the PSAN PI/WD Trust upon repayment of such amount to the Plan Sponsor from post-closing dividends from TSAC to TKC.

     iii.    The Plan Sponsor agreed in the settlement with the Creditors' Committee to, subject to certain exclusions, assume all third-party executory contracts related to the non-PSAN acquired business, and contribute $2.5 million (inclusive of any remaining amount of the Cure Claims Cap) to fund recoveries to general unsecured creditors with non-contingent, liquidated claims.

The Consenting OEMs' contributions include:

     i.    the Consenting OEMs' obligations under the Indemnity Agreement (without which the Plan Sponsor would have been unwilling to enter into the Restructuring Transactions and pay the Purchase Price for the Purchased Assets);

     ii.    the Consenting OEMs' post-Effective Date commitments to the Plan Sponsor's business;

39

iii.  the Consenting OEMs' agreement to certain modifications to the OEM Assumed Contracts and to have such OEM Assumed Contracts be assigned to the Plan Sponsor;

iv.  the Consenting OEMs' agreement to resolve the Settled OEM Claims on the terms set forth in the Plan Settlement;

v.  the Consenting OEMs' contributions to the Plan Settlement Fund, as set forth in Sections 5.19(b)(iv) and 5.19(e) of the Plan; and

vi.  the Consenting OEMs' contributions to the Support Party Creditor Fund as set forth in Section 5.19(g) of the Plan.

(c)    <u>Necessity to the Reorganization</u>.  The injunction and release provisions are critical to the success of the Plan.  Without the releases, and the enforcement of such releases through the Plan's injunction provisions, the Restructuring Support Parties are not willing to make their contributions under the Plan.  The releases and injunctions in favor of the Plan Sponsor Parties contained in Sections 10.5, 10.6 and 10.7 of the Plan constitute an essential inducement for the Plan Sponsor's participation in the Global Transaction as it relates to the Debtors and are material to the settlements to be effectuated pursuant to the Plan.  The release in favor of the Consenting OEMs contained in Section 5.19(j) of the Plan constitutes an essential inducement for the Consenting OEMs' agreement to contribute to the Plan Settlement Fund and Support Party Creditor Fund in accordance with the Plan Settlement.  Without these assurances, the Plan Sponsor would not have undertaken the Global Transaction and the Plan Sponsor and Consenting OEMs would not have agreed to settlements with Creditors Committee, Tort Claimants' Committee, and the Future Claims Representative.  Absent those contributions, the Plan would not have been feasible.  The injunctions are necessary to preserve and enforce the releases and are narrowly tailored to achieve that purpose.

(d)    <u>Support of Affected Creditors</u>.  The Creditors' Committee, the Tort Claimants' Committee, the Future Claims Representative, and the Consenting OEMs

WEIL:\96411572\24\76903.0004

affirmatively support the release and injunction provisions in favor of the Released Parties and the Protected Parties (as applicable).

(e)     Fair Consideration.  The Plan affords substantial recoveries to holders of Claims affected by the releases and injunctions that would not otherwise be available.  The Plan provides a mechanism to pay fair consideration to affected creditors by providing distributions under the Plan including the Plan Sponsor Contribution Amount, establishing a Support Party Creditor Fund, establishing a Plan Settlement Fund and establishing the PSAN PI/WD Trust, which will receive directly the Plan Sponsor Contribution Amount and, if a subsequent settlement is achieved in accordance with the Plan, any TKJP Contribution Amount.

(f)     The Record Supports Specific Factual and Legal Findings.  The record of the Confirmation Hearing and these Chapter 11 Cases is sufficient to support the releases and injunctions contained in the Plan.

(g)     Extraordinary Circumstances.  Extraordinary circumstances surrounding the Chapter 11 Cases support the release and channeling injunction in sections 10.6(c) and 10.7 of the Plan.  The Debtors filed these Chapter 11 Cases in the face of mounting mass-tort liabilities arising out of PSAN Inflators to pursue a sale of substantially all of the Debtors non-PSAN assets through coordinated insolvency proceedings.  The Protected Parties were involved with the Debtors' reorganization process for two years, and the Plan, which incorporates the Plan Settlement and has the support of the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative, maximizes the value of the Debtors' estates.  The extensive efforts and substantial contributions by each of the Released Parties, along with the significant recoveries under the Plan, constitute extraordinary circumstances warranting the releases and injunctions set forth in the Plan.

41

(h)    <u>Subject Matter Jurisdiction</u>.  The Court has subject matter jurisdiction over the Claims subject to the release and injunction provisions in the Plan.

XX.    <u>Acceptance of Releases and Channeling Injunction</u>.  Holders of PSAN PI/WD Claims in each applicable Class voting on the Plan have indicated their acceptance of the releases and the Channeling Injunction in Sections 10.6(c) and 10.7 of the Plan in a sufficient number within each such Class to support granting the releases and an issuance of the Channeling Injunction.

YY.    <u>Approval of the Channeling Injunction and Related Releases</u>.  The Court, having considered both the confirmation of the Plan and the granting of the releases under Section 10.6(c) and the issuance of the Channeling Injunction at the Confirmation Hearing, finds and determines that the releases, the Channeling Injunction, and the PSAN PI/WD Trust to be established by virtue of the Plan and this Order are consistent with the provisions of the Bankruptcy Code.  The releases and the Channeling Injunction are subject to affirmance by the District Court, unless the requirement for such affirmance is waived by the applicable parties pursuant to Section 10.7(f) of the Plan.

ZZ.    <u>9019 Settlements</u>.  The complexity of the Debtors' Chapter 11 Cases necessitated a consensual exit strategy, particularly in light of the potential for complex disputes on multiple fronts, including with respect to all Claims and controversies relating to the Settled OEM Claims and the U.S. Acquisition Agreement, and Claims subject to investigation in connection with the Challenge Period.  The litigations of any of these items would be costly and time consuming, reducing liquidity and value otherwise available for creditor recoveries.  The evidence establishes that the Debtors concluded that it was in the best interests of the Debtors' stakeholders to resolve such disputes and related matters on the terms set forth in the Plan,

42

including the Plan Settlement.  For the reasons stated herein, the Court agrees and so finds.  The

evidence establishes that each of the factors to be considered in determining whether to approve

a settlement pursuant to Bankruptcy Rule 9019 — probability of success, complexity, and likely

duration of litigation, and certain other factors bearing on the wisdom of the compromise —

weighs in favor of resolution of the parties' disputes on the terms set forth in the Plan.  In

addition, the evidence establishes that sound business justifications exist for the Debtors to enter

into the Plan Settlement.  Each component of the Plan Settlement, including the Consenting

OEM Contributions, the establishment of the Plan Settlement Fund, the establishment and

funding of the Support Party Creditor Fund, and the Plan Sponsor Contribution Amount is an

integral, integrated, and inextricably linked part of the Plan that is not severable from the entirely

of the Plan.  Accordingly, the Debtors have met their burden of proving that the Plan Settlement,

and the treatment of creditors as provided under the Plan, are fair, reasonable, and in the best

interests of the Debtors' Estates and the Debtors' stakeholders.  For the avoidance of doubt, the

Plan Sponsor's and Consenting OEMs' contributions to the Support Party Creditor Fund do not

constitute property of the Estate.

AAA.  Implementation.  The Plan Documents and all other related, necessary, or

appropriate documents have been negotiated in good faith and at arm's length, the terms and

conditions thereof are fair and reasonable and entry therein is in the best interests of the Debtors,

the Estates, and all holders of Claims and Interests.  The Plan Documents and all other related,

necessary, or appropriate documents shall, upon completion of documentation and execution, be

valid, binding, and enforceable agreements that are not in conflict with any federal or state law.

BBB.  Good Faith.  The Debtors, the Consenting OEMs, the Committees, the

Future Claims Representative, and the Plan Sponsor have been, are, and will continue to act in

43

good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers set forth therein and (ii) take the actions authorized and directed by this Order. The Plan Sponsor is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and has otherwise acted in good faith in connection with the Restructuring Transactions.

CCC.    Objections. All parties have had a full and fair opportunity to litigate all issues raised, or which might have been raised, in the Objections and informal comments, and all Objections have been fully and fairly litigated.

DDD.    Waiver of Stay. Given the facts and circumstances of these Chapter 11 Cases, it is appropriate that the stays of effectiveness of this Order imposed by Bankruptcy Rules 3020(e), 6004(h), 6006(d), and 7062, to the extent applicable, be waived.

EEE.    Retention of Jurisdiction. Except as otherwise provided for in the Plan, the Court may properly, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

## ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1.    Findings of Fact and Conclusions of Law. The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7051, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

44

2.      <u>Confirmation Hearing Notice</u>.  The Confirmation Hearing Notice complied with the terms of the Solicitation Procedures Order, was appropriate and satisfactory based upon the  circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law.

3.      <u>Solicitation</u>.  The solicitation of votes on the Third Amended Plan complied with the Solicitation Procedures, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and applicable non-bankruptcy law.

4.      <u>Confirmation of the Plan</u>.  The Plan and each of its provisions shall be, and hereby are, **CONFIRMED** under section 1129 of the Bankruptcy Code.  The terms of the Plan, all Exhibits and Schedules thereto, the Plan Documents, and the Plan Supplement are incorporated by reference into and are an integral part of the Plan and this Order (whether or not such terms are expressly referenced or described herein).

5.      <u>Plan Supplement and Exhibits and Schedules to the Plan</u>.  The documents, substantially in the form contained in the Plan Supplement, the Exhibits and Schedules to the Plan, and any amendments, modifications, and supplements thereto, and the execution, delivery, and performance thereof by the Debtors, the Reorganized Debtors, the Reorganized TK Holdings Trust, TK Global LLC, or the Warehousing Entity, as applicable, are authorized and approved, subject to, as to certain of such documents, the reasonable acceptance of the Creditors' Committee, the Tort Claimants' Committee, and the Future Claims Representative in accordance with the applicable Settlement Term Sheet.

45

6.      <u>Settlement of Claims and Controversies</u>.  Pursuant to sections 105(a) and 1123 of the Bankruptcy Code, Bankruptcy Rule 9019, and Section 5.19 of the Plan, the Plan (as supplemented by the terms of the documents memorializing the Plan Settlement) incorporates an integrated compromise, settlement, and release of claims, including all Claims subject to investigation in connection with the Challenge Period and the Settled OEM Claims.  The entry of this Order shall constitute the Court's approval, as of the Effective Date, of the Plan Settlement as well as the Court's determination that the Plan Settlement is (i) in the best interest of the Debtors and the Estates and their respective property and stakeholders; and (ii) fair, equitable, and within the range of reasonableness.  In the event that, for any reason, the Effective Date does not occur, the Debtors, the Committees, the Future Claims Representative, the Consenting OEMs, and the Plan Sponsor reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan Settlement.

7.      The Settlement Term Sheets and the Plan, as such documents relate to the fixing or determination of Claim amounts or point values, and the Consenting OEM contributions to the Plan Settlement Fund, shall not constitute or be construed as admissions of any fact or liability, stipulation or waiver, but rather are in furtherance of settlement negotiations in the Chapter 11 Cases and shall not be admissible against any Consenting OEM or holder of a PSAN PI/WD Claim or Other PI/WD Claim in any non-bankruptcy proceeding involving such parties.

8.      The Consenting OEMs may use, contribute, or reallocate the remaining portion of the Resolution Reserve in accordance with the Settlement Term Sheets without further order of the Court; *provided, however*, that the Debtors shall file a notice on the docket in the

46

Chapter 11 Cases describing any such use, contribution, or reallocation of the Resolution Reserve.

9.    Modifications to the Plan.  The modifications made to the Third Amended Plan following solicitation of votes thereon satisfy the requirements of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and do not adversely affect the treatment of any Claims and, accordingly, neither require additional disclosure under section 1125 of the Bankruptcy Code nor re-solicitation of votes on the Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Third Amended Plan.

10.    Objections.  All Objections that have not been withdrawn, waived, settled, or deferred, and all reservations of rights pertaining to confirmation of the Plan, other than those withdrawn with prejudice in their entirety prior to, or on the record at, the Confirmation Hearing, shall be, and hereby are, overruled on the merits.

11.    Binding Effect.  Except as provided in section 1141(d)(3) of the Bankruptcy Code, on or after entry of this Order and subject to the occurrence of the Effective Date, the provisions of the Plan shall be binding on the Debtors, the Reorganized Debtors, TK Global LLC, the Warehousing Entity, the Plan Administrator, the Legacy Trustee, the OEM Claims Administrator, the PSAN PI/WD Trustee, the Plan Sponsor, any entity acquiring or receiving property or a Distribution under the Plan, every holder of a Claim against or Interest in any Debtor, any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, estates, or assigns, if any, of any of the foregoing

47

regardless of whether the Claim or Interest of such holder is Impaired under the Plan or whether such holder has accepted or is deemed to have accepted the Plan.

12.    No Action.  Pursuant to applicable non-bankruptcy law and section 1142(b) of the Bankruptcy Code, no action of the respective directors, managers, members, or stockholders, as applicable, of the Debtors, TK Global LLC, or the Warehousing Entity shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including any contract, instrument, or other document included in the Plan Supplement.

13.    Plan Classification Controlling.  The classification of Claims and Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan (i) were set forth on the Ballots for purposes of voting to accept or reject the Plan, (ii) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classifications of such Claims and Interests under the Plan for distribution purposes, and (iii) shall not be binding on the Debtors.

14.    Implementation of the Plan.  Pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, on, prior to the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the sale of the Purchased Assets to the Plan Sponsor free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any

48

kind or nature whatsoever, except for the Assumed Liabilities and Permitted Liens, in accordance with the terms of the Plan and the U.S. Acquisition Agreement and the allocation of Cash Proceeds, (ii) the vesting of the PSAN Assets in Reorganized Takata, (iii) the vesting of the Warehoused PSAN Assets and Other Excluded Assets in the applicable Legacy Entity, (iv) the provision of the Plan Sponsor Backstop Funding (if any) in accordance with the Plan and the Plan Sponsor Backstop Funding Agreement, (v) the continued corporate existence of the Reorganized Debtors, (vi) the consummation of the Plan Settlement, including payment of the Plan Settlement Payment, (vii) the establishment and funding of the Support Party Creditor Fund, (viii) the execution of the Reorganized TK Holdings Trust Agreement and the establishment of the Reorganized TK Holdings Trust, (ix) the establishment of TK Global LLC and the Warehousing Entity and the funding thereof through, among other things, the Warehousing Entity Reserve and the Post-Closing Reserve, (x) the establishment and funding of the PSAN PI/WD Trust, (xi) the transfer of the PI/WD Insurance Rights to the PSAN PI/WD Trust, (xii) the creation of the Claims Reserves and the Recovery Funds to make Distributions to holders of Allowed General Unsecured Claims, (xiii) the provisions for the Plan Sponsor Contribution Amount and any TKJP Contribution Amount for the benefit of PSAN PI/WD Claims, solely as an administrative convenience for the settling parties, and the establishment and funding of the Plan Settlement Fund, (xiv) the consummation of the TKC and Mexico restructuring transactions contemplated by Sections 5.11 and 5.13 of the Plan, respectively, (xv) the funding of the TSAC DOJ Restitution Claim Funding Deficiency in accordance with Section 5.12 of the Plan, and (xvi) the taking of all necessary or appropriate actions by the Debtors or the Reorganized Debtors, as applicable, to effectuate the Restructuring Transactions and the Plan. All such actions taken or caused to be taken consistent with the terms of this Order and the Plan,

including any such actions taken with respect to the Restructuring Transactions prior to the date

of entry of the Confirmation Order, shall be deemed to have been authorized and approved by

the Court without further approval, act, or action under any applicable law, order, rule, or

regulation. At no time shall any property deposited in the Support Party Creditor Fund constitute

property of the Debtors' Estates. For the avoidance of doubt, the mechanics of the establishment

of, and distributions under, the Support Party Creditor Fund shall be set forth in the Reorganized

TK Holdings Trust Agreement.

       15.    <u>Compliance with Section 1123(a)(6) of the Bankruptcy Code</u>. The

adoption and filing by the Debtors or Reorganized Debtors, as applicable, of the Amended By-

Laws, Amended Certificates of Incorporation, the Reorganized TK Holdings Organizational

Documents, or similar governing documents, as applicable, of each Debtor on or after the

Effective Date to prohibit the issuance of non-voting equity securities to the extent required by

section 1123(a)(6) of the Bankruptcy Code is hereby authorized, ratified, and approved. The

Debtors have complied in all respects, to the extent necessary, with section 1123(a)(6) of the

Bankruptcy Code.

       16.    <u>Setoffs and Recoupments</u>. Subject to Sections 2.2 and 10.5 through 10.8

and Section 5.19(j) of the Plan, the applicable Claims Administrator may, but shall not be

required to, set off against or recoup from any Claim and from any payments to be made

pursuant to the Plan in respect of such Claim any claims of any nature whatsoever (to the extent

permitted by applicable law) that the Debtors may have against the claimant; provided, that

neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or

release by the Debtors or the Claims Administrators of any such Claim it may have against such

claimant.

50

17.    <u>Claims Resolution Procedures Approved</u>.  The procedures for resolving Disputed Claims set forth in Article VII of the Plan are hereby approved.

18.    <u>Disputed Claims Reserves</u>.  In accordance with Section 7.1 of the Plan, from and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by a Final Order of the Court, the Legacy Trustee shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from the Available Cash an aggregate amount equal to the Pro Rata Share of each Distribution that would have been made to a holder of a Disputed Claim from the applicable Recovery Fund in accordance with the Distribution Formula and allocate such amount to the applicable Disputed Claims Reserve in accordance with the Distribution Formula as if such Disputed Claim were an Allowed Claim against the Debtors in an amount equal to the least of (i) the filed amount of such Disputed Claim, (ii) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Court for purposes of fixing the amount to be reserved for such Disputed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the applicable Claims Administrator.

19.    From and after the Effective Date, and until such time as all Disputed Other PI/WD Claims have been compromised and settled or determined by a Final Order of the Court, the PSAN PI/WD Trustee shall retain from the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount an aggregate amount equal to the Pro Rata Share of each contribution that would have been made to a holder of a Disputed Other PI/WD Claim from the Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor Contribution Amount in accordance with the Contributions Distribution Formula and allocate such amount to the Disputed Contributions Reserve in accordance with the

51

Contributions Distribution Formula as if such Disputed Other PI/WD Claim was an Allowed

Other PI/WD Claim against the Debtors in an amount equal to the least of (i) the filed amount of

such Disputed Other PI/WD Claim, (ii) the amount determined, to the extent permitted by the

Bankruptcy Code and Bankruptcy Rules, by the Court for purposes of fixing the amount to be

retained for such Disputed Other PI/WD Claim, and (iii) such other amount as may be agreed

upon by the holder of such Disputed Other PI/WD Claim and the PSAN PI/WD Trustee. On the

first Distribution Date following the date on which a Disputed Other PI/WD Claim becomes an

Allowed Other PI/WD Claim against a Debtor, the PSAN PI/WD Trustee shall remit to the Other

PI/WD Funds, for Distribution to the holder of such Allowed Other PI/WD Claim, the

Consenting OEM Contributions, any TKJP Contribution Amount, and the Plan Sponsor

Contribution Amount retained in the Disputed Contributions Reserve in an amount equal to the

amount that would have been distributed to the holder of such Other PI/WD Claim from the

Effective Date through and including the Distribution Date had such Other PI/WD Claim been

Allowed as of the Effective Date. For the avoidance of doubt, the amount to be contributed

pursuant to this paragraph shall be based on the Contributions Distribution Formula as applied on

the applicable Distribution Date and not the Contributions Distribution Formula as applied on the

Effective Date. After the Initial Distribution Date, the PSAN PI/WD Trustee shall make

contributions on the Periodic Distribution Dates from the Disputed Contributions Reserve to the

Other PI/WD Funds and the PSAN PI/WD Funds for holders of Allowed Other PI/WD Claims

and PSAN PI/WD Claims against the Debtors as a result of resolving Disputed Other PI/WD

Claims and releasing Cash from the Disputed Contributions Reserve into the Other PI/WD Funds

and the PSAN PI/WD Funds in accordance with the Contributions Distribution Formula, as re-

applied at each Distribution Date.

WEIL:\96411572\24\76903.0004

20.     Assumption, Rejection, or Assignment of Executory Contracts and

Unexpired Leases (11 U.S.C. § 1123(b)(2)).  Pursuant to Section 8.1 of the Plan, and subject to

the provisions of Section 5.19(h) of the Plan and Section 2.7(g) of the U.S. Acquisition

Agreement, as of and subject to the occurrence of the Effective Date, all executory contracts or

unexpired leases to which any of the Debtors are parties shall be assumed and assigned to the

Plan Sponsor, including those executory contracts and unexpired leases identified on the

Contract Notices, except for any executory contract or unexpired lease that (i) has previously

been assumed or rejected pursuant to a Final Order of the Court, (ii) is specifically designated on

the Schedule of Assumed Contracts [Docket Nos. 1857, 1858, 2093, 2094], which includes

executory contracts and unexpired leases to be assumed by the applicable Debtor and executory

contracts and unexpired leases to be assumed by the applicable Debtor and assigned to the

Warehousing Entity, or the Schedule of Rejected Contracts [Docket No. 1860, 2092], which

were filed and served on January 31, 2018 and amended on February 15, 2018, (iii) is being

assumed, assumed and assigned, or otherwise assigned pursuant to section 8.4 of the Plan, (iv) is

the subject of a separate assumption or rejection motion filed by the Debtors under section 365 of

the Bankruptcy Code pending on the Confirmation Date, or (iv) is the subject of a pending Cure

Dispute.  Notwithstanding anything to the contrary set forth in the Plan or this Order, but subject

to Section 8.4 of the Plan and paragraph 28 of this Order, the Plan Sponsor will not assume any

contracts related to the PSAN Inflator Business.  Notwithstanding anything to the contrary herein

or in any Contract Notice, the assumption, assignment, cure and/or other assumption of liabilities

under, and/or rejection of any contract between the Debtors and the OEMs shall be governed in

all respects by Section 8.4 of the Plan and, as between the Consenting OEMs and the Plan

Sponsor, the Indemnity Agreement.  Additionally, notwithstanding anything to the contrary in

53

Article VIII of the Plan, all Excluded Contracts described in clauses (i)(a), (i)(b), (i)(d), (ii), (iii), (iv), and (vi) thereof shall be rejected unless the Plan Sponsor otherwise instructs the Debtors in writing.

21.     The Court hereby approves (i) the assumption of the executory contracts or unexpired leases in accordance with the Plan, and (ii) the assignment of such executory contracts and unexpired leases to the Plan Sponsor, the Reorganized TK Holdings Trust, and the Warehousing Entity, as applicable, and (iii) the rejection of the executory contracts and unexpired leases identified on the Schedule of Rejected Contracts.

22.     Notwithstanding anything to the contrary in the Plan, this Order, the U.S. Acquisition Agreement or any notices of assumption or assumption and assignment of executory contracts filed by the Debtors, absent a further order of this Court or agreement between the applicable parties, (i) none of the agreements between one or more of the Debtors, on the one hand, and Oracle America, Inc. (including any of its predecessors-in-interest) ("*Oracle Agreements*") shall be assumed, assumed and assigned or otherwise transferred to any party, (ii) no Oracle Agreements, software, products or services shall be transferred to any party, (iii) no Oracle Agreements, software, products or services shall be subject to the Transition Services Agreement or the Shared Services Agreement contemplated by the Plan, and (iv) all parties' rights are specifically reserved with respect to the Oracle Agreements, including but not limited to, their assumption, assignment, transferability, cure issues, adequate assurance or otherwise.

23.     Rejection Claims.  Pursuant to Section 8.5 of the Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.1 of the Plan results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred

54

and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective

Estates, properties or interests in property, unless a proof of Claim is filed with the Court and

served upon the Debtors no later than thirty (30) days after the later of (i) the Confirmation Date

and (ii) the effective date of the rejection of such executory contract or unexpired lease.  Any

such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured

Claims.

          24.      <u>Determination of Cure Disputes and Deemed Consent</u>.  On January 18,

2018, the Debtors filed and served the Initial Cure Amount Notice on all counterparties to the

Debtors' executory contracts and unexpired leases (other than the contracts addressed in Section

8.4 of the Plan), which set forth the proposed Cure Amount (if any) for each executory contract

and unexpired lease.  On January 31, 2018, the Debtors filed and served the Notice of First

Amendments to the Cure Amount Notice on all counterparties to the Debtors' executory

contracts and unexpired leases that had been modified in, added to, or deleted from the Cure

Amount Notice.  Additionally, on January 31, 2018, the Debtors filed the Schedule of Assumed

Contracts, which indicated whether an executory contract or unexpired lease (other than

contracts addressed in Section 8.4 of the Plan) is being assumed by a Debtor or being assumed

by a Debtor and assigned to the Warehousing Entity.  On February 15, 2018, the Debtors further

filed the Notice of Second Amendments to the Cure Amount Notice.  Subject to Sections 5.19(h)

and 8.1 of the Plan and Section 2.7(g) of the U.S. Acquisition Agreement, any executory

contracts or unexpired leases not identified on the Schedule of Assumed Contracts or Schedule

of Rejected Contracts or otherwise subject to one of the exceptions set forth in Section 8.1 (a) of

the Plan shall be deemed assumed and assigned to the Plan Sponsor.

25.     Notwithstanding anything in this Order, the Plan, the Disclosure Statement, or any of the Cure Amount Notices to the contrary, any Cure Dispute that has not been resolved on or prior to the Confirmation Hearing shall be adjourned to a later date to be determined by the Court in accordance with section 8.2(c) of the Plan.  All rights, remedies, and/or claims arising from or relating to such Cure Disputes are preserved.

26.     To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Amount set forth in the Cure Amount Notice, then the counterparty to the applicable contract or lease shall be deemed to have assented to (i) the Cure Amount proposed by the Debtors and (ii) the assumption of such contract or lease, notwithstanding any provision thereof that (a) prohibits, restricts, or conditions the transfer or assignment of such contract or lease, or (b) terminates or permits the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan.  To the extent (i) any Cure Dispute with respect to a Purchased Contract has not been resolved prior to the Effective Date and (ii) (a) the aggregate amount of all Disputed Cure Claims with respect to the Purchased Contracts plus (b) the aggregate amount of all other Cure Claims paid by the Plan Sponsor on the Effective Date exceeds the Cure Claims Cap, the Debtors shall establish the Disputed Cure Claims Reserve.  Any amounts remaining in the Disputed Cure Claims Reserve after the resolution and payment, if applicable, of all Disputed Cure Claims with respect to the Purchased Contracts, shall be included in the Claims Reserve of the applicable Reorganized Debtor, subject to the provisions of Section 5.19(h) of the Plan.

56

27.   Upon payment of the applicable Cure Claims, the Plan Sponsor shall have no obligations for any amounts outstanding on or prior to the Effective Date under the Purchased Contracts, except as otherwise set forth in the U.S. Acquisition Agreement or the Plan.

28.   <u>OEM Contracts</u>.  Notwithstanding anything to the contrary set forth in Article VIII of the Plan, this Order, any Contract Notice or any other notice of assumption or assumption and assignment of executory contracts:

(a)   Each Standalone OEM Assumed Contract shall be assumed by the applicable Debtor and assigned (and to the extent not executory, assigned) to the Plan Sponsor entity to which the applicable Consenting OEM consents (in its sole discretion), as of the Effective Date on an "as is" basis (and without giving effect to any accommodations provided pursuant to the Global Accommodation Agreement) without modification of any kind, including as to terms or price, other than (i) to substitute the Plan Sponsor entity to whom such Standalone OEM Assumed Contract is being assigned (with the consent of the applicable Consenting OEM, in its sole discretion) for the applicable Debtor and (ii) for any Standalone OEM Assumed Contract of a Consenting OEM, incorporate the ROLR (as defined in the Indemnity Agreement) on the terms set forth in Section 10 of the Indemnity Agreement, to the extent such Standalone OEM Assumed Contract is not otherwise deemed amended in accordance with Section 8.4(d) of the Plan.

(b)   All Standalone PSAN Assumed Contracts shall be assumed by Reorganized TK Holdings or its applicable subsidiary (and to the extent not executory, assigned to Reorganized TK Holdings or its applicable subsidiary) as of the Effective Date on an "as is" basis (and without giving effect to any accommodations provided pursuant to the Global Accommodation Agreement) without modification of any kind, including as to terms or price,

57

other than to (i) substitute Reorganized TK Holdings (or its applicable subsidiary) for the applicable Debtor and (ii) account for pricing adjustments consistent with the Reorganized Takata Business Model on a cost basis.

(c)     Each Non-Standalone OEM Contract shall be automatically severed on the Effective Date (to the extent such severance has not occurred prior to the Effective Date) so as to create a Modified Assumed OEM Contract and, in the case of a Non-Standalone OEM Contract of a PSAN Consenting OEM, Consenting OEM PSAN Contract Manufacturer, or Consenting OEM PSAN Tier One, severed so as to create a Modified Assumed OEM Contract and either a Modified Assumed PSAN Contract or a standalone contract for the sale of PSAN Inflators that shall be rejected in accordance with the below, as applicable. Each such severed Non-Standalone OEM Contract shall be: (i) as it relates to a Modified Assumed OEM Contract, assumed by the applicable Debtor and assigned (and to the extent not executory, assigned) to the Plan Sponsor entity to which the applicable Consenting OEM consents (in its sole discretion), "as is" (and without giving effect to any accommodations provided by the Global Accommodation Agreement), without modification of any kind, including as to terms or price, other than (A) as necessary to separate the manufacture and sale of the PSAN Inflators and release the Plan Sponsor (including the Acquired Non-Debtor Affiliates) from all Liabilities (as defined in the Indemnity Agreement) and obligations thereunder with respect to PSAN Inflators on the terms set forth in the Indemnity Agreement (and such released obligations shall be (I) in the case of a Modified Assumed PSAN Contract, transferred to, and the severed portion of the contract related to such manufacture, sale, Liabilities (as defined in the Indemnity Agreement), and obligations novated to and assumed by, Reorganized TK Holdings (or its applicable subsidiary) as a Modified Assumed PSAN Contract; or (II) in all other cases, rejected as of the Effective

58

Date), (B) to account for pricing adjustments for the PSAN Inflator production not being

assumed by the Plan Sponsor, where such adjustments are to be resolved between the applicable

Consenting OEM and the Plan Sponsor pursuant to normal commercial dealings, (C) to

substitute the Plan Sponsor entity to whom the Modified Assumed OEM Contract is assigned

(with the consent of the applicable Consenting OEM, in its sole discretion) for the applicable

Debtor, and (D) for a Non-Standalone OEM Contract of a Consenting OEM, to incorporate the

ROLR (as defined in the Indemnity Agreement) on the terms set forth in Section 10 of the

Indemnity Agreement to the extent such Consenting OEM's Non-Standalone OEM Contract is

not otherwise deemed amended in accordance with Section 8.4 of the Plan; and (ii) as it relates

to a Modified Assumed PSAN Contract, assumed by Reorganized TK Holdings or its applicable

subsidiary (and to the extent not executory, assigned to Reorganized TK Holdings or its

applicable subsidiary) "as is" (and without giving effect to any accommodations provided

pursuant to the Global Accommodation Agreement) without modification of any kind, including

as to terms or price, other than (A) as necessary to separate the manufacture and sale of the

PSAN Inflators and release Reorganized Takata from all Liabilities (as defined in the Indemnity

Agreement), and obligations thereunder unrelated to PSAN Inflators, and such released

obligations shall be transferred to, and the severed portion of the contract related to such

manufacture, sale, Liabilities (as defined in the Indemnity Agreement), and obligations novated

to and assumed by, the Plan Sponsor entity to whom the Modified Assumed OEM Contract is

assigned (with the consent of the applicable Consenting OEM, in its sole discretion) as a

Modified Assumed OEM Contract, (B) to account for pricing adjustments consistent with the

Reorganized Takata Business Model on a cost basis, and (C) to substitute Reorganized TK

Holdings (or its applicable subsidiary) for the applicable Debtor.

59

(d)    The Plan and this Order shall constitute an amendment to the applicable OEM Assumed Contracts and Assumed PSAN Contracts to incorporate the provisions set forth herein, including, in the case of OEM Assumed Contracts, the ROLR on the terms set forth in Section 10 of the Indemnity Agreement, and no additional amendments to such contracts shall be necessary to effectuate any of the provisions hereof.

(e)    Notwithstanding the foregoing, in respect of any Non-Standalone OEM Contracts where a Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One is the counterparty, (i) the applicable Consenting OEM and Plan Sponsor will work cooperatively to cause the Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One to modify its Non-Standalone OEM Contracts consistent with Section 8.4 of the Plan and the Plan shall not constitute a deemed amendment to such Non-Standalone OEM Contracts, and (ii) Plan Sponsor shall have no obligation to assume any Non-Standalone OEM Contract where a Consenting OEM PSAN Contract Manufacturer or Consenting OEM PSAN Tier One is the counterparty unless (A) such counterparty modifies its Non-Standalone OEM Contract consistent with Section 8.4 of the Plan and (B) either (x) such counterparty grants a release consistent with Sections 8.a, 8.b, and 8.e of the Indemnity Agreement and agrees to the contractual subordination terms set forth in the penultimate paragraph of Section 5 of the Indemnity Agreement or (y) the applicable Consenting OEM is required to, or agrees to, indemnify and hold harmless Joyson KSS Auto Safety S.A. pursuant to Section 6 of the Indemnity Agreement with respect to any related PSAN Claims (as defined in the Indemnity Agreement) asserted by such counterparty in respect of such Non-Standalone OEM Contract (to the extent such Claim relates to the applicable OEM's vehicles), it being understood that any Non-Standalone OEM Contract that Plan Sponsor does not assume as permitted by Section 8.4

60

of the Plan shall not constitute an OEM Assumed Contract for any purposes hereunder and,

notwithstanding anything to the contrary set forth in the Plan, neither Plan Sponsor nor any

Acquired Non-Debtor Affiliate shall have any obligation under the Plan with respect to any such

counterparty with respect to the applicable Non-Standalone OEM Contract.

(f)     Except as otherwise agreed to between the Plan Sponsor and the

Consenting OEMs, the Plan Sponsor shall assume all Assumed Liabilities (as defined in the

Indemnity Agreement) in accordance with Section 4.b of the Indemnity Agreement.

(g)     The Consenting OEM PSAN Cure Claims shall be deemed fully and

finally satisfied upon consummation of the Plan Settlement in accordance with Section 5.19 of

the Plan.

(h)     Notwithstanding anything to the contrary in the Plan or this Order, any

Cure Claims of Consenting OEMs, other than Consenting OEM PSAN Cure Claims, shall be

assumed by the Plan Sponsor and paid to the respective Consenting OEM in the ordinary course

of business. The Debtors shall have no obligations with respect to such Cure Claims, and such

Cure Claims shall not be counted for determining the Disputed Cure Claims Reserve or included

in or limited by the Cure Claims Cap. Such Cure Claims shall not be subject to any Cure Claim

procedures set forth in the Plan or the Solicitation Procedures Order.  Further, nothing in the Plan

shall be deemed a waiver of such Cure Claims by the Consenting OEMs nor affect the

assumption and assignment of the OEM Assumed Contracts on an "as is" basis as provided

above.

(i)     All Purchase Orders and other executory contracts and unexpired leases

between any Debtor and any OEM that purchased PSAN Inflators from the Debtors that is not a

Consenting OEM shall be deemed rejected as of the Effective Date, to the extent not rejected

61

prior to the Effective Date. For the avoidance of doubt, any Purchase Orders between any

Debtor and any OEM relating solely to PSAN Inflators not assumed or assumed and assigned

pursuant to Section 8.4 of the Plan shall be deemed rejected as of the Effective Date, to the

extent not rejected prior to the Effective Date.

       29.    <u>General Authorizations</u>. Each of the Debtors, TK Global LLC, the

Warehousing Entity, the Reorganized TK Holdings Trust, and the PSAN PI/WD Trust is

authorized to execute, deliver, file, or record such contracts, instruments, releases, and other

agreements or documents and take such actions as may be necessary or appropriate to effectuate,

implement, and further evidence the terms and provisions of the Plan and the Plan Settlement.

The Debtors and their directors, officers, members, agents, and attorneys are authorized and

empowered to issue, execute, deliver, file, or record any agreement or document, including the

documents contained in the Plan Supplement and the Exhibits and Schedules to the Plan, as

modified, amended, and supplemented, in substantially the form included therein, and to take

any action necessary or appropriate to implement, effectuate, and consummate the Plan in

accordance with its terms, or take any or all corporate actions authorized to be taken pursuant to

the Plan, including merger of any of the Debtors and the dissolution of each of the Debtors, and

any release, amendment, or restatement of any bylaws, certificates of incorporation, or other

organizational documents of the Debtors, whether or not specifically referred to in the Plan or the

Plan Supplement, without further order of the Court, and any or all such documents shall be

accepted by each of the respective state filing offices and recorded in accordance with the

applicable state law and shall become effective in accordance with their terms and the provisions

of state law. Pursuant to Section 5.17 of the Plan, the Reorganized Debtors are authorized to file

certificates of cancellation, dissolution, or merger without further action under applicable law,

WEIL:\96411572\24\76903.0004

regulation, order, or rule, including, without express or implied limitation, any action by the stockholders, members, or directors (or other governing body) of the Reorganized Debtors.

30. _Restructuring Transactions_.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions consistent with the Plan and the U.S. RSA as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### Sale of Purchased Assets

31. _Approval of Sale of Purchased Assets_.  Pursuant to Bankruptcy Code sections 1123(a)(5), 1123(b), 1141(c), and 363(f), the sale and transfer of the Purchased Assets to the Plan Sponsor in accordance with the terms of the Plan and the U.S. Acquisition Agreement, and all transactions contemplated thereby, and all the terms and conditions thereof are authorized and approved.  The failure to specifically reference any particular provision of the U.S. Acquisition Agreement in this Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the U.S. Acquisition Agreement and each and every provision, term, and condition thereof be authorized and approved in its entirety.

32. The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the U.S. Acquisition Agreement, together with all additional instruments and documents that the Debtors or the Plan Sponsor deem necessary or appropriate to implement the U.S. Acquisition Agreement and effectuate the sale and transfer of the Purchased Assets and the assumption of the Assumed Liabilities, and to take all further actions as may reasonably be required by the Plan Sponsor for the purpose of assigning, transferring, granting, conveying, and conferring to the Plan Sponsor or reducing to

63

possession the Purchased Assets and assumption of the Assumed Liabilities or as may be necessary or appropriate to the performance of the parties' obligations under the U.S. Acquisition Agreement and the Plan, including any and all actions reasonably requested by the Plan Sponsor that are consistent with the U.S. Acquisition Agreement and the Plan. On the Effective Date, any and all acts and transactions required to be consummated in connection with the sale and transfer of Purchased Assets and the assumption of the Assumed Liabilities and any and all documents entered into in connection therewith shall be deemed authorized, approved, and consummated.

33.     This Order is binding on all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons and Entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease ("***Recordation Officers***"). Each and every Recordation Officer is authorized, from and after the Closing, to strike all Claims, interests, Liens, or other encumbrances in or against the Purchased Assets (other than Assumed Liabilities or Permitted Liens) from their records, official and otherwise, without further order of the Court or act of any party. Each and every Recordation Officer is authorized (i) to file, record, and/or register any and all documents and instruments presented to consummate or memorialize the U.S. Acquisition Agreement and the Restructuring Transactions, and (ii) to accept and rely on this Order as the sole and sufficient evidence of the transfer of title of the Purchased Assets.

WEIL:\96411572\24\76903.0004

34.     Compliance with the legal requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

35.     The terms and provisions of the U.S. Acquisition Agreement, the Plan, and this Order shall upon the Effective Date be binding in all respects upon the Debtors, their affiliates, all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Claims, interests, Liens, and other encumbrances, including alleged rights or claims based on any Successor or Other Liabilities, all non-Debtor parties to the Purchased Contracts, all successors and assigns of the Plan Sponsor, the Purchased Assets, all interested parties, and their successors and assigns.

36.     Sale of Purchased Assets Free and Clear.  On the Effective Date, except for the Assumed Liabilities and the Permitted Liens, the Purchased Assets shall, in accordance with section 1141(c) and 363(f) of the Bankruptcy Code, be purchased by or otherwise transferred to the Plan Sponsor in accordance with the U.S. Acquisition Agreement free and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including rights or claims based on any Successor or Other Liabilities.

37.     The Plan Sponsor is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and has otherwise acted in good faith in connection with the Restructuring Transactions.  Specifically, (a) the Plan Sponsor is not an "insider" of the Debtors, as that term is defined in the Bankruptcy Code; (b) the U.S. Acquisition Agreement was negotiated at arm's length and in good faith, and at all times each of the Plan Sponsor and the Sellers (as defined in the U.S. Acquisition Agreement) was represented by competent counsel of their choosing; (c) the Plan Sponsor did not in any way induce or cause the filing of the Chapter 11 Cases; (d) the consideration provided

65

by the Plan Sponsor pursuant to the U.S. Acquisition Agreement is fair and reasonable; and (e) the Restructuring Transactions are not the result of fraud or collusion. Neither the Debtors nor the Plan Sponsor has engaged in any conduct that would cause or permit the Restructuring Transactions to be avoided or result in the imposition of any costs or damages under Bankruptcy Code section 363(n).

38.     This Order is and shall be effective as a determination that all Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever, including any Successor or Other Liabilities, shall be and are, without further action by any person or entity, released with respect to the Purchased Assets as of the Effective Date, except for the Assumed Liabilities and Permitted Liens or as otherwise specifically set forth in this Order and the U.S. Acquisition Agreement. The Plan Sponsor Parties are not, and shall not be liable for any Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever released hereunder, including those based on Successor or Other Liabilities. Without limiting the foregoing, all Liens granted to the Consenting OEMs under the Access Agreement and the Adequate Protection Order are released on the Effective Date.

39.     <u>No Successor Liability; Prohibition of Actions Against the Plan Sponsor Parties</u>. The Plan Sponsor is not a "successor" to, continuation of, or alter ego of, any of the Debtors or their Estates by reason of any theory of law or equity. Except for the Assumed Liabilities and the Permitted Liens, the Plan Sponsor shall not have, assume, or be deemed to assume, or in any way be responsible for, any liability or obligation of any of the Debtors or their Estates, or any of the Debtors' predecessors or affiliates with respect to the Purchased Assets or otherwise. Without limiting the generality of the foregoing, and except for Assumed Liabilities and Permitted Liens or as otherwise specifically provided in the U.S. Acquisition Agreement, the

66

Plan Sponsor shall not be liable for any interests against, or with respect to, the Debtors, their Estates, or any of the Debtors' predecessors or affiliates, including but not limited to, any Successor or Other Liabilities.   Neither the purchase of the Purchased Assets by the Plan Sponsor nor the fact that the Plan Sponsor is using any of the Purchased Assets previously operated by the Debtors will cause the Plan Sponsor to be deemed a successor to, combination of, or alter ego of, in any respect, any of the Debtors or the Debtors' businesses, or incur any liability derived therefrom within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax, antitrust, environmental, labor law (including any WARN Act), employment or benefits law, de facto merger, business continuation, substantial continuity, successor, vicarious, alter ego, derivative, or transferee liability, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or other law, rule, regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine, whether now known or unknown, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether matured or unmatured, whether contingent or noncontingent, whether liquidated or unliquidated, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, liabilities on account of warranties, intercompany loans, and receivables among the Debtors, and any taxes, arising, accruing, or payable under, out of, in connection with, or in any way relating to the cancellation of debt of the Debtors or their affiliates, or in any way relating to the operation of any of the Purchased Assets prior to the Effective Date.

40.     Pursuant to section 1141(c) and 363(f) of the Bankruptcy Code, on the Effective Date, all Persons are forever prohibited and enjoined from taking any action against the Plan Sponsor based on any Successor or Other Liabilities, including commencing or continuing any action or other proceeding, whether at law or equity, in any judicial, administrative, arbitral, or other proceeding against the Plan Sponsor with respect to any Claims, interests, Liens, other encumbrances, and liabilities of any kind or nature whatsoever against the Debtors or the Debtors' property.

41.     All Persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Plan Sponsor in accordance with the terms of the U.S. Acquisition Agreement, the Plan, and this Order.

42.     <u>Regulatory Approvals</u>.  The Plan Sponsor and the sellers under the U.S. Acquisition Agreement are authorized to take, or cause to be taken, all action contemplated by Section 7.4(c) of the U.S. Acquisition Agreement.  Any amendments to the U.S. Acquisition Agreement or the Plan required to effectuate any such action are hereby approved.

43.     <u>Assumed Liabilities</u>.  As of the Effective Date, on the terms and subject to the conditions set forth in the U.S. Acquisition Agreement, the Plan Sponsor shall assume and be solely responsible for the Assumed Liabilities.  Any holder of such Assumed Liabilities shall be able to assert such liability against the Plan Sponsor and the Debtors shall not retain any liability for such Assumed Liabilities.

44.     <u>Plan Sponsor Backstop Funding</u>.  Reorganized Takata, the Reorganized TK Holdings Trust, the Warehousing Entity, and the Plan Administrator shall keep the Plan Sponsor and the Consenting OEMs reasonably informed of all material developments that could

68

reasonably be expected to increase the likelihood that the Plan Sponsor Backstop Funding would
be triggered during the period commencing on the Closing Date and ending on the Backstop
Expiration Date and shall promptly comply with any reasonable requests by the Plan Sponsor for
financial information relating to its obligation to provide Plan Sponsor Backstop Funding. So
long as the Plan Sponsor Backstop Funding remains potentially available for Reorganized
Takata, the Reorganized TK Holdings Trust, and the Warehousing Entity, each of those entities
shall, and shall cause each of their subsidiaries (if any) during the period commencing on the
Closing Date, and ending on the Backstop Expiration Date to (i) keep proper books of record and
accounts in which true and correct entries in conformity in all material respects with U.S.
generally accepted accounting principles shall be made of all dealings and transactions in
relation to its business and activities and (ii) permit any authorized representatives designated by
the Plan Sponsor to visit and inspect any of the properties of Reorganized Takata, the
Reorganized TK Holdings Trust, or the Warehousing Entity to inspect, copy, and take extracts
from its and their financial and accounting records and to discuss its and their affairs, finances,
and accounts with its and their officers and independent public accountants, all upon reasonable
notice and at such reasonable times during normal business hours and as often as may reasonably
be requested.

      45.    <u>Vesting of Assets</u>. On the Effective Date, and if applicable, pursuant to
sections 1141(b) and 1141(c) of the Bankruptcy Code, all PSAN Assets shall vest in each of the
Reorganized Debtors which, as Debtors, owned such PSAN Assets as of the Effective Date, free
and clear of all Claims, interests, Liens, other encumbrances, and liabilities of any kind, except
as otherwise provided in the Plan. For the avoidance of doubt, (i) no Warehoused PSAN Assets
or Other Excluded Assets shall vest in any Reorganized Debtor and such assets shall instead be

69

transferred to and vest in the Warehousing Entity and the Reorganized TK Holdings Trust,

respectively, and (ii) Reorganized Takata shall not acquire, own, or maintain the Warehoused

PSAN Assets or be required to, or otherwise be authorized to, comply with the obligations under

the NHTSA Preservation Order related to the Warehoused PSAN Assets.  The Warehousing

Entity shall instead be required to comply with the obligations under the NHTSA Preservation

Order related to the Warehoused PSAN Assets.

46.    Allocation of Purchase Price.  Pursuant to Section 5.5(a) of the Plan, on

the Effective Date, the Plan Sponsor shall pay the Purchase Price for the Purchased Assets.  The

Purchase Price shall be allocated, either directly or indirectly, to each of IIM, SMX, TDM,

TKAM, TKC, TKF, and the TKH Debtors based on the allocation methodology described in

Sections 7.1 and 7.2 of the Disclosure Statement.  From the Cash Proceeds and the Plan Sponsor

Backstop Funding, if any (in accordance with the terms and subject to the conditions set forth in

the Plan Sponsor Backstop Funding Agreement and the Plan), the Debtors shall, pursuant to the

Plan Settlement and the other terms of the Plan (i) distribute the Plan Settlement Turnover

Amount in accordance with Section 5.19(b) of the Plan, (ii) establish the IIM Claims Reserve,

the SMX Claims Reserve, the TDM Claims Reserve, the TKAM Claims Reserve, the TKC

Claims Reserve, the TKF Claims Reserve, and the TKH Claims Reserve from each applicable

Debtor's Cash Proceeds, (iii) establish the PSAN PI/WD Trust Reserve from the IIM Cash

Proceeds, the SMX Cash Proceeds, the TDM Cash Proceeds, and the TKH Cash Proceeds

pursuant to each of IIM's, SMX's, TDM's, and the TKH Debtors' Allocable Shares, (v) establish

the Reorganized TK Holdings Trust Reserve from the IIM Cash Proceeds, the SMX Cash

Proceeds, the TDM Cash Proceeds, and the TKH Cash Proceeds pursuant to each of IIM's,

SMX's, TDM's, and the TKH Debtors' Allocable Shares, (vi) establish the Warehousing Entity

70

Reserve from (a) the IIM Cash Proceeds, the SMX Cash Proceeds, the TDM Cash Proceeds, and the TKH Cash Proceeds pursuant to each of IIM's, SMX's, TDM's, and the TKH Debtors' Allocable Shares in accordance with the Plan Settlement and (b) the Plan Sponsor Backstop Funding, if any (in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and the Plan), (vii) establish the Post-Closing Reserve from (a) the TDM Cash Proceeds and the TKH Cash Proceeds pursuant to each of TDM's and the TKH Debtors' Allocable Shares in accordance with the Plan Settlement and (b) the Plan Sponsor Backstop Funding, if any (in accordance with the terms and subject to the conditions set forth in the Plan Sponsor Backstop Funding Agreement and the Plan), (viii) make the Plan Settlement Payment, less the Plan Settlement Turnover Amount, pursuant to the Plan Settlement Payment Waterfall.

47.    <u>Transferability of Distribution Rights</u>.  Any right to receive a Distribution from the Reorganized TK Holdings Trust or any Claims Reserve or Recovery Fund shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Reorganized TK Holdings Trust by the Legacy Trustee.  Further, any right to receive a Distribution from the Reorganized TK Holdings Trust or any Claims Reserve or Recovery Fund shall be nontransferable and non-assignable except by will, intestate succession, or operation of law.  Any right to receive a Distribution from the Reorganized TK Holdings Trust or any Claims Reserve or Recovery Fund shall not constitute "securities" and shall not be registered pursuant to the Securities Act.  If it is determined that such rights constitute "securities," the exemption provisions of section 1145(a)(1) of the Bankruptcy Code are satisfied and such securities are exempt from registration.

71

48.    <u>Establishment of Reorganized TK Holdings Trust</u>. This Order authorizes (i) the creation and implementation of the Reorganized TK Holdings Trust in accordance with the terms of this Order, the Plan, and the Reorganized TK Holdings Trust Agreement, and (ii) the Legacy Trustee to accomplish the purposes of the Reorganized TK Holdings Trust, as set forth in and subject to the Reorganized TK Holdings Trust Agreement and the Plan, notwithstanding any otherwise applicable non-bankruptcy law. The Reorganized TK Holdings Trust may be established prior to the Effective Date to the extent necessary, desirable, or appropriate to effectuate the Plan.

49.    <u>Role of the Legacy Trustee</u>. In furtherance of and consistent with the purpose of the Reorganized TK Holdings Trust and the Plan, the Legacy Trustee shall have the power and authority to (i) hold, manage, sell, invest, and distribute the Reorganized TK Holdings Trust Assets to the holders of Allowed Claims (other than Trust Claims and OEM Unsecured Claims) and the PSAN PI/WD Trustee, (ii) hold the Reorganized TK Holdings Trust Assets for the benefit of holders of Allowed Claims (other than (a) PSAN PI/WD Claims, (b) after the Non-PSAN PI/WD Claims Termination Date, Allowed Administrative Expense PI/WD Claims, and Allowed Administrative Expense PSAN PI/WD Claims, and (c) Allowed OEM Unsecured Claims), (iii) hold, manage, sell, invest, and distribute the Reorganized TK Holdings Trust Assets obtained through the exercise of its power and authority, (iv) maintain and administer the Claims Reserves and the Reorganized TK Holdings Trust Reserve, (v) prosecute and resolve objections to Disputed Claims (other than Disputed Trust Claims and OEM Unsecured Claims), (vi) perform such other functions as are provided in the Plan and the Reorganized TK Holdings Trust Agreement, (vii) solely as an administrative convenience to the parties to the Plan Settlement, administer and make distributions from the Support Party Creditor Fund, and (viii)

72

administer the closure of the Chapter 11 Cases in accordance with the Bankruptcy Code and the

Bankruptcy Rules, in all cases, consistent with the Plan. The Legacy Trustee shall be responsible

for all decisions and duties with respect to the Reorganized TK Holdings Trust and the

Reorganized TK Holdings Trust Assets. In all circumstances, the Legacy Trustee shall act in the

best interests of all beneficiaries of the Reorganized TK Holdings Trust, in furtherance of the

purpose of the Reorganized TK Holdings Trust, and in accordance with the Reorganized TK

Holdings Trust Agreement.

      50.    <u>Costs and Expenses of the Reorganized TK Holdings Trust</u>. The costs and

expenses of the Reorganized TK Holdings Trust, including the fees and expenses of the Legacy

Trustee and the OEM Claims Administrator and their retained professionals, shall be paid out of

the Reorganized TK Holdings Trust Reserve, subject to the terms of the Reorganized TK

Holdings Trust Agreement.

      51.    <u>Establishment of TK Global LLC</u>. This Order authorizes the creation and

formation of TK Global LLC and the appointment of the Plan Administrator and the Oversight

Committee, as set forth in and subject to the TK Global Operating Agreement and the Plan. TK

Global LLC may be established prior to the Effective Date to the extent necessary, desirable, or

appropriate to effectuate the Plan.

      52.    <u>Exculpation of Plan Administrator and Oversight Committee</u>. The Plan

Administrator and the Oversight Committee shall be exculpated (subject, in each case, to

exceptions for willful misconduct, bad faith, gross negligence, and fraud) to the fullest extent

allowable by applicable law with respect to the operation and wind-down of TK Global LLC,

Reorganized Takata's estates, and the Warehousing Entity, including the services the Plan

Administrator provides to Reorganized Takata related to the manufacture and sale of PSAN

73

Inflators to PSAN Consenting OEMs, the liquidation of Reorganized Takata's remaining assets, the services the Plan Administrator provides to the Warehousing Entity related to the warehousing, shipping, and disposal of the Warehoused PSAN Assets, and the liquidation of the Warehousing Entity's remaining assets, and as otherwise provided in the TK Global Operating Agreement.

53.   **Establishment of the Warehousing Entity.** This Order authorizes the creation and formation of the Warehousing Entity to acquire, own, maintain, operate, and control the Warehoused PSAN Assets and to comply with the obligations under the NHTSA Preservation Order and any other obligations related to the Warehoused PSAN Assets or otherwise in accordance with Section 5.9 of the Plan and the Warehousing Entity Organizational Documents.  The Warehousing Entity may be established prior to the Effective Date to the extent necessary, desirable, or appropriate to effectuate the Plan.

54.   **Establishment of PSAN PI/WD Trust.**  This Order authorizes (i) the creation and implementation of the PSAN PI/WD Trust in accordance with the terms of this Order, the Plan, and the PSAN PI/WD Trust Agreement, and (ii) the PSAN PI/WD Trustee to accomplish the purposes of the PSAN PI/WD Trust, as set forth in and subject to the Plan and the PSAN PI/WD Trust Agreement, notwithstanding any otherwise applicable non-bankruptcy law.  The PSAN PI/WD Trust may be established prior to the Effective Date to the extent necessary, desirable, or appropriate to effectuate the Plan.  The PSAN PI/WD Trust shall qualify as a "Qualified Settlement Fund" within the meaning of section 468B of the Internal Revenue Code and shall be created to hold the PSAN PI/WD Trust Funds, make certain distributions pursuant to Section 5.10 of the Plan and liquidate or otherwise administer the PSAN PI/WD Funds.

55.   **Transfer of PI/WD Insurance Rights.**  This Order confirms that the Insurance Rights Transfer, as provided by Section 5.10(f) of the Plan, is valid and enforceable

74

under sections 541(e), 1123(a)(5)(B), and 1129(a)(1) of the Bankruptcy Code, and the Bankruptcy Code preempts any anti-assignment contractual provisions and applicable state law.

56.     *Appointment and Role of the PSAN PI/WD Trustee.* Eric D. Green is hereby appointed as the PSAN PI/WD Trustee. The PSAN PI/WD Trustee shall serve in accordance with and shall have the functions and rights provided in, the PSAN PI/WD Trust Agreement. Any successor PSAN PI/WD Trustee shall be appointed in accordance with the terms of the PSAN PI/WD Trust Agreement. For purposes of any PSAN PI/WD Trustee performing his or her duties and fulfilling his or her obligations under the PSAN PI/WD Trust and the Plan, the PSAN PI/WD Trust and the PSAN PI/WD Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The PSAN PI/WD Trustee shall be the "administrator" of the PSAN PI/WD Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

57.     *Appointment of the Future Claimants' Representative to the PSAN PI/WD Trust.* Effective as of the Effective Date, Roger Frankel is hereby appointed to serve as the Future Claimants' Representative for the PSAN PI/WD Trust. The Future Claimants' Representative shall serve in accordance with, and shall have the functions and rights provided in, the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP. Any successor Future Claimants' Representative shall be appointed in accordance with the terms of the PSAN PI/WD Trust Agreement.

58.     *Costs and Expenses of the PSAN PI/WD Trust.* The PSAN PI/WD Trust shall pay all PSAN PI/WD Trust Expenses and Other PI/WD Claims Expenses from the PSAN PI/WD Trust, as provided for in the PSAN PI/WD Trust Agreement. The PSAN PI/WD Trust Reserve is to be funded to the PSAN PI/WD Trust to assist in the funding of such expenses. The

WEIL:\96411572\24\76903.0004

Protected Parties shall have no obligation to pay any PSAN PI/WD Trust Expenses, except as expressly provided in the PSAN PI/WD Trust Agreement and the Participating OEM Contribution Agreements (as applicable); *provided, however*, that neither the PSAN PI/WD Trust Agreement nor the Participating OEM Contribution Agreements shall impose on the Plan Sponsor Parties any obligation to pay PSAN PI/WD Trust Expenses without their express consent.

      59.    Insurance Neutrality.

      (a)    Nothing contained in the Plan, the Plan Documents, or this Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any of the Insurers or (b) any rights or obligations of the Debtors arising out of or under any Insurance Policy.  For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.

      (b)    For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or this Order shall operate to require any PI/WD Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of this Plan.  This subparagraph (b) in no way modifies, alters or limits the rights and/or obligations set forth in subparagraph (a), above.

      (c)    None of (a) the Court's or District Court's approval of the Plan or the Plan Documents, (b) this Order or any findings and conclusions entered with respect to confirmation, nor (c) any estimation or valuation of any PSAN PI/WD Claims or Trust Administered Claims, either individually or in the aggregate in the Chapter 11 Cases, shall, with respect to any

76

insurance company, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Trust Claim.

60.    <u>NHTSA Claims</u>:  The NHTSA Claims are Allowed as Class 6(d) (Other General Unsecured Claims) against TKH in the aggregate amount of $50 million.  NHTSA, as the holder of the NHTSA Claims, shall be entitled to receive its Pro Rata Share of the TKH Available Cash Allocated to the TKH Other Creditors Fund.  The Distributions to be made to NHTSA under the Plan, as set forth herein, shall constitute full and complete satisfaction of the NHTSA Claims, including with respect to Reorganized TK Holdings and the other Reorganized Debtors, for all purposes, including for purposes of compliance with the NHTSA Consent Order, and such Claims shall be deemed to have been forever waived, released, and discharged.  The NHTSA Consent Order shall remain binding on TK Global LLC, Reorganized TK Holdings, and the Warehousing Entity under the terms in Section 5.8(m) of the Plan.

61.    <u>TKC Restructuring Transaction</u>.  Pursuant to this Order and immediately upon entry thereof, TKC shall be authorized to assume, in one or more transactions, some or all of TSAC's obligations under the Global Settlement Agreement to pay or cause to be paid certain settlement amounts owed to the Consenting OEMs and/or certain of their affiliates.  TKC's assumed payment obligation(s) shall (i) constitute Administrative Expense Claims against TKC, (ii) be in an amount equal to any dividend(s) made by TSAC to TKC, and (iii) be conditioned on receipt of such dividends.  Such dividend(s) shall be used solely to pay the TSAC payment obligation(s) assumed by TKC under the Global Settlement Agreement.  For the avoidance of doubt, nothing in Section 5.11 of the Plan or this Order shall be construed as limiting or otherwise altering the Plan Sponsor's right under the Plan Sponsor Backstop Agreement to

WEIL:\96411572\24\76903.0004

receive the Plan Sponsor Backstop Funding Repayment from distributions to TKC after the Effective Date on account of Intercompany Interests held by TKC in TSAC.

62.    Mexico Restructuring Transaction. Pursuant to this Order and immediately upon entry hereof, IIM, SMX, TDM, and TKHDM shall be authorized to take any and all steps necessary to prepare for the closing of the sale of the Purchased Assets to the Plan Sponsor pursuant to the U.S. Acquisition Agreement.  Such steps may include (i) completing any remaining unperformed steps authorized by the Court pursuant to the *Order for Authority to Effect Certain Pre-Restructuring Steps and Transactions with Respect to the Debtors' Mexican Affiliates Necessary for the Global Transaction* [Docket No. 1314], including the sale of certain assets and liabilities of SMX, (ii) undertaking any changes to the cash management and cash pooling arrangement in Mexico that the Debtors deem necessary in furtherance of the Restructuring Transactions, (iii) satisfying some or all prepetition and postpetition Intercompany Claims owed by TKHDM to IIM, SMX, TDM, and the Debtors' non-Debtor Mexican affiliates in connection with the cash pooling arrangement in Mexico, and (iv) making, approving, or receiving intercompany transfers, dividends, or capital contributions between and among TKHDM, IIM, SMX, TDM and the Debtors' non-Debtor Mexican affiliates in furtherance of the Restructuring Transactions.

63.    Merger; Dissolution; Consolidation; Discharge.  On or after the Effective Date, Reorganized TK Holdings or the Legacy Trustee may, subject to the terms of the Plan, the Amended Certificates of Incorporation and Amended By-Laws for the Reorganized Debtors, and the Reorganized TK Holdings Organizational Documents, (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved, or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, and

WEIL:\96411572\24\76903.0004

(iii) engage in any other transaction in furtherance of the Plan. Notwithstanding the foregoing,

within thirty (30) days after its completion of the acts required by the Plan, or as soon as

reasonably practicable thereafter, each Reorganized Debtor shall be deemed dissolved for all

purposes without the necessity for any other or further actions to be taken by or on behalf of each

Reorganized Debtor; *provided, however*, that each Reorganized Debtor, as applicable, shall file

with the office of the Secretary of State or other appropriate office for the state of its

organization a certificate of cancellation or dissolution. No corporate transaction undertaken

pursuant to Section 5.17 of the Plan shall excuse the Legacy Trustee or the Plan Administrator,

as applicable, from repayment of the RTK Loan, the RTKHT Loan, the PSAN Assets Advance

Payment, and the Plan Sponsor Backstop Funding Repayment (including repayment of any

unreimbursed Restructuring Expenses) in accordance with the terms and subject to the conditions

of the Plan Sponsor Backstop Funding Agreement and section 5.12 of the Plan, and, in the case

of any corporate transaction under Section 5.17 of the Plan involving TKC, the terms and

conditions of the Plan and the Plan Sponsor Backstop Funding Agreement shall apply mutatis

mutandis to TKC's successor-in-interest or the assignee of TKC's payment receivable from its

subsidiary. The Debtors, prior to the Effective Date, and the Reorganized Debtors, after the

Effective Date, reserve the right to convert any Debtor or Reorganized Debtor entity, as

applicable, that is a corporation to an LLC.

   64.  Upon the liquidation and dissolution of any subsidiary of Reorganized TK

Holdings, any proceeds thereof shall be treated as Reorganized Takata Post-Closing Cash. In

addition, any Reorganized TK Holdings Trust Post-Closing Cash arising from distributions after

the Effective Date on account of Intercompany Interests held by TKAM, TKC, and TKF shall (i)

first, solely with respect to distributions from TKC's subsidiary, be used towards the repayment

of the RTK Loan, the RTKHT Loan, the PSAN Assets Advance Payment, and the Plan Sponsor

Backstop Funding Repayment (including repayment of any unreimbursed Restructuring

Expenses) in accordance with the terms and subject to the conditions of the Plan Sponsor

Backstop Funding Agreement and section 5.12 of the Plan and (ii) second, constitute Available

Cash of such Debtor.

65.     Discharge.  As of the Effective Date, except as otherwise provided in the

Plan or in this Order, each holder (as well as any trustee or agent on behalf of such holder) of a

Claim or Interest and any successor, assign, and affiliate of such holder shall be deemed to have

forever waived, released, and discharged the Debtors, to the fullest extent permitted by  section

1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities

that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the

Effective Date, all such holders of Claims and Interests and their successors, assigns, and

affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the

Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or

terminated Interest in any Debtor or any Reorganized Debtor.

66.     Plan Injunction.  Pursuant to Section 10.5(a) of the Plan, this Order shall,

except as otherwise provided in the Plan or this Order, constitute an injunction, as of the entry of

this Order but subject to the occurrence of the Effective Date, permanently enjoining all Persons

or entities who have held, hold, or may hold Claims against or Interests in any Debtor with

respect to any such Claim or Interest, from (i) commencing, conducting, or continuing in any

manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any

proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or

indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing,

WEIL:\96411572\24\76903.0004

or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Parties mentioned in this subparagraph (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Parties mentioned in this subparagraph (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subparagraph (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however*, that nothing contained herein shall preclude such Parties who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan and the Plan Documents.

67.    Plan Injunction as to Plan Sponsor Parties. Pursuant to Section 10.5(b) of the Plan, as of the Effective Date, except as expressly permitted by the U.S. Acquisition Agreement and except as to Assumed Liabilities and Permitted Liens, all Persons, including all debt security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, customers, employees, litigation claimants, and other creditors, holding Claims, Liens,

81

Interests, charges, encumbrances, and other interests of any kind or nature whatsoever, including

rights or Claims based on any successor or transferee liability, against or in a Debtor or the

Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured,

contingent or noncontingent, known or unknown), arising under or out of, in connection with, or

in any way relating to the Debtors, the Purchased Assets, the operation of the Purchased Assets

prior to the Effective Date, or the Restructuring Transactions, are forever barred, estopped and

permanently enjoined from asserting against the Plan Sponsor Parties, their respective successors

and assigns, their property or the Purchased Assets, such Person's Claims, Liens, Interests,

charges, encumbrances, and other interests (including rights or Claims based on any successor or

transferee liability), including, without limitation, by: (i) commencing, conducting, or continuing

in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including

any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly

or indirectly, a Plan Sponsor Party or the property of any Plan Sponsor Party, or any direct or

indirect transferee of any property of, or direct or indirect successor in interest to, any of the

foregoing Persons mentioned in this subsection (i) or any property of any such transferee or

successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting,

or otherwise recovering in any manner or by any means, whether directly or indirectly, any

judgment, award, decree, or order against a Plan Sponsor Party or its property, or any direct or

indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the

foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or

successor; (iii) creating, perfecting, or otherwise enforcing any encumbrance of any kind or

asserting any Released Claims in any manner, directly or indirectly, against a Plan Sponsor Party

or any of its property, or any direct or indirect transferee of any property of, or successor in

WEIL:\96411572\24\76903.0004

interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.

68.     No Successor Liability.  Pursuant to Section 10.14 of the Plan, as of the Effective Date, except for Assumed Liabilities and Permitted Liens or as otherwise expressly provided in the Plan, this Order, or the U.S. Acquisition Agreement, each of the Plan Sponsor Parties (i) is not, and shall not be deemed to assume, agree to perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations of or the  assets of the Debtors on or prior to the Effective Date; (ii) is not, and shall not be, a successor to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date; and (iii) shall not have any successor or transferee liability of any kind or character; *provided, however*, that the Plan Sponsor shall timely perform and discharge the obligations specified in the U.S. Acquisition Agreement, including the Assumed Liabilities.

69.     Pre-Confirmation Injunctions and Stays.  Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay,

70.     Plan Settlement Release.  Pursuant to Section 5.19(j) of the Plan, as of the Effective Date, the Debtors, the Reorganized Debtors, and their Estates shall be deemed to have

WEIL:\96411572\24\76903.0004

conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each

Consenting OEM (and its respective subsidiaries and affiliates) from any and all Claims,

counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes

of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees

and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the

Debtors, the Reorganized Debtors, or their Estates (including any Causes of Action arising under

chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted,

accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding

in tort or contract, whether arising under federal or state statutory or common law, or any other

applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty,

requirement, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would

have been legally entitled to assert in their own right (whether individually or collectively) or on

behalf of the holder of any Claim or Interest or other Person, against any Consenting OEM,

based on acts or omissions occurring on or prior to the Effective Date of the Plan.  For the

avoidance of doubt, as of the Effective Date, all Claims, counterclaims, disputes, obligations,

suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses,

contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever shall be

released in all respects as set forth in the foregoing sentence.  The Reorganized Debtors, the

Reorganized TK Holdings Trust, and any other newly-formed entities that shall be administering

the Excluded Assets and/or continuing the Debtors' businesses after the Effective Date shall be

bound, to the same extent the Debtors are bound, by the releases and discharges set forth in

Section 5.19(j) of the Plan.

WEIL:\96411572\24\76903.0004

71.     <u>Releases by the Debtors</u>.  Pursuant to Section 10.6(a) of the Plan, as of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, this Order, and the obligations contemplated by the Restructuring Transactions, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise provided in the Plan or in this Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged, to the maximum extent permitted by law, as such law may be extended subsequent to the Effective Date, by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, counterclaims, disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Liens, remedies, losses, contributions, indemnities, costs, liabilities, attorneys' fees and expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates (including, any Causes of Action arising under chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their non-Debtor affiliates (including the Acquired Non-

85

Debtor Affiliates), or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the U.S. Acquisition Agreement, the Global Accommodation Agreement, the U.S. RSA, and the Plan and related agreements, instruments, and other documents, and the negotiation, formulation, preparation or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.  The Reorganized Debtors and any newly-formed entities that shall be continuing the Debtors' businesses after the Effective Date shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth in Section 10.6(a) of the Plan.

72.    <u>Releases by Holders of Claims and Interests</u>.  Pursuant to Section 10.6(b) of the Plan, as of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, this Order, and the obligations contemplated by the Restructuring Transactions and the Settlement Term Sheets, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring Transactions, and except as otherwise provided in the Plan or in this Order, the Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and

WEIL:\96411572\24\76903.0004

forever released and discharged, to the maximum extent permitted by law, as such law may be

extended subsequent to the Effective Date, except as otherwise provided in the Plan, by (i) the

holders of all Claims, other than the Consenting OEMs, who vote to accept the Plan, (ii) the

holders of all Claims, other than the Consenting OEMs, that are Unimpaired under the Plan, (iii)

the holders of all Claims, other than the Consenting OEMs, whose vote to accept or reject the

Plan is solicited but who do not vote either to accept or to reject the Plan, (iv) the holders of all

Claims, other than the Consenting OEMs, or Interests who vote, or are deemed, to reject the Plan

but do not opt out of granting the releases set forth in Section 10.6(b) of the Plan, (v) the holders

of all Claims, other than the Consenting OEMs, and Interests who were given notice of the

opportunity to opt out of granting the releases set forth in Section 10.6(b) of the Plan but did not

opt out, and (vi) all other holders of Claims, other than the Consenting OEMs, and Interests to

the maximum extent permitted by law, in each case from any and all Claims, counterclaims,

disputes, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action,

Liens, remedies, losses, contributions, indemnities, costs, liabilities, and attorneys' fees and

expenses whatsoever, including any derivative claims, asserted or assertable on behalf of the

Debtors, the Reorganized Debtors, or their Estates (including any Causes of Action arising under

chapter 5 of the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent,

matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted,

accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding

in tort or contract, whether arising under federal or state statutory or common law, or any other

applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty,

requirement or otherwise, that such holders or their estates, affiliates, heirs, executors,

administrators, successors, assigns, managers, accountants, attorneys, representatives,

87

consultants, agents, and any other Persons or parties claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their non-Debtor affiliates (including the Acquired Non-Debtor Affiliates), the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party (including the exercise of any common law or contractual rights of setoff or recoupment by any Released Party at any time on or prior to the Effective Date), the Restructuring Transactions, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Disclosure Statement, the U.S. Acquisition Agreement, the Global Accommodation Agreement, the U.S. RSA, and the Plan and related agreements, instruments, and other documents, and the negotiation, formulation, preparation, or implementation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that constitutes fraud, gross negligence or willful misconduct.  For the avoidance of doubt, no OEM shall receive a release from holders of Claims and Interests pursuant to Section 10.6(b) of the Plan, and the failure of any holder of a PSAN PI/WD Claim to opt out of granting the releases set forth in Section 10.6(b) of the Plan and the confirmation of the Plan shall not waive any such holder's right, if any, to participate in the DOJ PI/WD Restitution Fund.

WEIL:\96411572\24\76903.0004

73.     Adequate Protection Order and Plan Settlement Releases.  Nothing in the

Plan shall limit, modify, or affect in any way the releases granted under paragraph 4(g) of the

Adequate Protection Order or Section 5.19(j) of the Plan, and such releases shall remain in full

force and effect through and after the Effective Date (in the case of releases under paragraph 4(g)

of the Adequate Protection Order), and shall be in full force and effect from and after the

Effective Date (in the case of releases under section 5.19(j) of the Plan).

74.     No Releases Among OEMs.  Notwithstanding anything to the contrary

herein, in the Plan, or in the Plan Supplement, no OEM has provided, or shall be deemed to have

provided, a release to any other OEM.

75.     Releases by Holders of PSAN PI/WD Claims.  Pursuant to Section 10.6(c)

of the Plan, as of the Effective Date, except for the rights that remain in effect from and after the

Effective Date to enforce the Plan, to the maximum extent permitted under applicable law, the

holders of PSAN PI/WD Claims shall be deemed to provide a full and complete discharge and

release to the Protected Parties and their respective property and successors and assigns from any

and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted,

derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or

otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability,

contribution, indemnification, joint liability, or otherwise, arising from or related in any way to

such holders' PSAN PI/WD Claims.  Notwithstanding anything to the contrary in the Plan or this

Order, nothing in the Plan or this Order shall release any OEM that is not a Participating OEM

from liability for a PSAN PI/WD Claim.

76.     Imposition of Channeling Injunction.  In order to preserve and promote the

settlements contemplated by and provided for in the Plan and to supplement, where necessary,

WEIL:\96411572\24\76903.0004

the injunctive effect of the Plan Injunction and the Releases described in Sections 10.5 and 10.6 of the Plan, and pursuant to the exercise of the equitable jurisdiction and power of the Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, that hold or assert, or that will hold or assert any PSAN PI/WD Claim against the Protected Parties, or any of them, shall be permanently and forever stayed, restrained, and enjoined from taking all action for the purpose of directly or indirectly collecting, recovering or receiving payments, satisfaction, or recovery from any such Protected Party with respect to any such PSAN PI/WD Claim, including:

(a)     commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such PSAN PI/WD Claim, against or affecting any of the Protected Parties, or any property or interests in property of any Protected Party with respect to any such PSAN PI/WD Claim;

(b)     enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any of the Protected Parties or against the property of any Protected Party with respect to any such PSAN PI/WD Claim;

(c)     creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Protected Party or the property of any Protected Party with respect to any such PSAN PI/WD Claims;

(d)     asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Protected Party or against the property of any Protected Party with respect to any such PSAN PI/WD Claim; and

WEIL:\96411572\24\76903.0004

Case 17-11375-BLS   Doc 2156-1   Filed 02/27/18   Page 91 of 117

(e)      taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to such PSAN PI/WD Claims.

77.      Notwithstanding anything to the contrary in Section 10.7 of the Plan or paragraph 75 and 76 above, this Channeling Injunction shall not enjoin:

(a)      the rights of Entities to the treatment afforded them under the Plan or this Order, including the rights of Entities holding (or, from time to time, assigned or subrogated to) PSAN PI/WD Claims to assert such Claims in accordance with the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP solely against the PSAN PI/WD Trust whether or not there are funds to pay such PSAN PI/WD Claims;

(b)      the rights of Entities to assert any Claim, debt, litigation, or liability for payment of PSAN PI/WD Trust Expenses solely against the PSAN PI/WD Trust whether or not there are funds to pay such PSAN PI/WD Trust Expenses;

(c)      the PSAN PI/WD Trust from enforcing its rights under the PSAN PI/WD Trust Agreement and the PSAN PI/WD TDP; and

(d)      the PSAN PI/WD Trust from asserting any Claim, cause of action, debt, obligation, or liability for payment from any PI/WD Insurance Company.

78.      Nothing in the Plan or the PSAN PI/WD Trust Agreement shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction issued in connection with the Plan or the PSAN PI/WD Trust's assumption of all liabilities of Protected Parties with respect to PSAN PI/WD Claims.

79.      Participating OEM Contribution Agreement.  Execution of the Participating OEM Contribution Agreement by the Initial Participating OEM and the PSAN

91

PI/WD Trust shall be a condition to effectiveness of the Channeling Injunction with respect to

the applicable Participating OEM but shall not be a condition to the Effective Date of the Plan.

In the event that the Initial Participating OEM, the Tort Claimants' Committee, and the Future

Claims Representative have not agreed to the form of the Participating OEM Contribution

Agreement by 4:00 p.m. (ET) on March 9, 2018, any of the Initial Participating OEM, the Tort

Claimants' Committee, or the Future Claims Representative may submit to the Court for

expedited resolution of any dispute as to the form of the Participating OEM Contribution

Agreement, and the Court's resolution shall be binding on the Initial Participating OEM and the

PSAN PI/WD Trust.

80.     PSAN PI/WD Trust Agreement.  In the event that the Consenting OEMs,

the Tort Claimants' Committee, and the Future Claims Representative have not agreed to the

form of the PSAN PI/WD Trust Agreement and all exhibits thereto, other than the PSAN PI/WD

TDP (which form has already been agreed upon) by 4:00 p.m. (ET) on March 9, 2018, any of the

Consenting OEMs, the Tort Claimants' Committee, or the Future Claims Representative may

submit to the Court for expedited resolution of any dispute as to the form of the PSAN PI/WD

Trust Agreement, and the Court's resolution shall be binding on the Consenting OEMs and the

PSAN PI/WD Trust.

81.     Exculpation.  Notwithstanding anything in the Plan to the contrary, and to

the maximum extent permitted by applicable law, except for the rights that remain in effect from

and after the Effective Date to enforce the Plan, this Order, and obligations contemplated by the

Restructuring Transactions, no Exculpated Party shall have or incur, and each Exculpated Party

is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand,

debt, right, Cause of Action, remedy, loss, and liability for any Claim in connection with or

92

arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the

Disclosure Statement (including any information provided or statements made in the Disclosure

Statement or omitted therefrom), the Restructuring Transactions, the Global Accommodation

Agreement, the U.S. RSA, the Plan, and the solicitation of votes for, and confirmation of, the

Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan

and the property to be distributed under the Plan; the wind-down of the Reorganized Debtors and

Reorganized Takata; the issuance of securities under or in connection with the Plan; and the

transactions in furtherance of any of the foregoing; except for breach of fiduciary duty, fraud,

gross negligence, willful misconduct, failure to comply with this Order and failure to distribute

assets according to the Plan. This exculpation shall be in addition to, and not in limitation of, all

other releases, indemnities, exculpations, and any other applicable law or rules protecting such

Exculpated Parties from liability.

   82. <u>Special Provisions for Governmental Units</u>.

   (a) Notwithstanding anything to the contrary in the Plan or this Order, nothing

in the Plan shall release, bar, or discharge any liability of any OEM to any Governmental Unit,

including any Claim by any state attorney general or similar Governmental Unit enforcing

consumer protection laws or any other statutory or common law or principles of equity for any

Claim against any OEM, whenever arising, and nothing in the Plan shall stay or enjoin any state

attorney general or similar Governmental Unit from enforcing consumer protection laws or any

statutory or common law or principles of equity for any Claim, whenever arising, against an

OEM.  Further, notwithstanding any provision of the Plan, OEMs are not relieved from any

obligations to address or comply with requests or inquiries from any state attorney general or

similar Governmental Unit enforcing consumer protection laws.  Nothing in the Plan or this

WEIL:\96411572\24\76903.0004

Order shall be a waiver or other limitation of any OEM's rights, Claims, and defenses with

respect to any Claims or other Causes of Action by a Governmental Unit.

    (b)    Notwithstanding anything to the contrary herein, nothing in this Order, the

Plan, or the Plan Documents:

    i.  (a) with respect to any Entity other than the Plan Sponsor and its affiliates, which shall be dealt with in (i)(b): discharges, releases, precludes, or enjoins (1) any liability to any Governmental Unit that is not a "claim" as defined in 11 U.S.C. § 101(5); (2) except as otherwise agreed to by a Governmental Unit, any claim of a Governmental Unit arising on or after the Effective Date; (3) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Effective Date; (4) any liability to a Governmental Unit on the part of any Entity other than the Debtors or Reorganized Debtors (including but not limited to any OEM or any warehouse owner or landlord). Nor shall anything in the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of the Court, any liability described in the preceding sentence; *provided, however*, that all parties' rights and defenses under non-bankruptcy law with respect to (1)-(4) above are fully preserved; and (b) with respect to the Plan Sponsor and its affiliates: discharges, releases, precludes, or enjoins any (1) liability of the Plan Sponsor and its affiliates to a Governmental Unit under environmental statutes or regulations that the Plan Sponsor and its affiliates would be subject to as the owner or operator of property after the Effective Date or (2) obligation by the Plan Sponsor and its affiliates to comply with any police and regulatory statutes or regulations that the Plan Sponsor and its affiliates would be subject to as the owner or operator of property after the Effective Date. Nor shall anything in this Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of the Court, any liability described in the preceding sentence; *provided, however*, that all parties' rights and defenses under non-bankruptcy law are fully preserved;

    ii.  authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law;

    iii.  affects any valid setoff or recoupment rights of any Governmental Unit against any of the Debtors or the Reorganized Debtors; *provided, however*, that the Debtors, the Reorganized Debtors, and the Plan Sponsor reserve all of their rights and defenses under applicable nonbankruptcy law with respect thereto; for the avoidance of doubt, nothing in the Plan,

the Plan Documents, or the Confirmation Order shall bar the IRS from exercising its nonbankruptcy rights to offset any request for a tax refund for a tax year ending prior to the Petition Date against any prepetition claim of the United States government against any of the Debtors;

iv.   divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or the Plan or to adjudicate any defense asserted under this Order or the Plan; *provided, however*, that the Court retains jurisdiction as set forth in and pursuant to the terms of the Plan, including jurisdiction, but not exclusive jurisdiction, to determine whether liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Order, the Plan, or the Bankruptcy Code;

v.   shall be construed to deprive the Plan Sponsor of the benefits of the Confirmation Order and sections 5.2(c) and 10.14 of the Plan; *provided, however*, that such provisions shall not be construed to override (b)(i)(b) above; and

vi.   shall be interpreted to deem Plan Sponsor, Reorganized Takata, or the Warehousing Entity the successor to the Debtors under any state or federal law successor liability doctrine with respect to any liabilities under police or regulatory statutes, laws, or regulations, except solely with respect to Reorganized TK Holdings as set forth in section 5.8(m) of the Plan, for penalties for days of violation prior to the Effective Date or for liabilities relating to off-site disposal of wastes by the Debtors prior to the Effective Date, or be construed as a waiver by any party, including the Plan Sponsor, of any applicable rights or defenses under non-bankruptcy law or be construed to create for any Governmental Unit any substantive right that does not already exist under law.  For the avoidance of doubt, nothing in paragraph (b)(i)(a) applies to the Plan Sponsor or its affiliates.

(c)   Notwithstanding anything to the contrary contained in this Order, nothing in the Plan or Plan Documents: (i) shall grant any relief to any Entity that the Court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a); (ii) release or discharge any claim for federal taxes against any Entity other than the Debtors, or enjoin the collection or assessment of such taxes; or (iii) grant the Debtors a release or discharge of any claims for federal taxes except as provided by 11 U.S.C. §§ 524 and 1141(d), or enjoin the collection or assessment of such taxes except as provided by those provisions.  Notwithstanding the reservation of rights in the preceding sentence, the Plan

95

Sponsor is acquiring the Purchased Assets free and clear of all claims and interests of creditors, including, without limitation, the IRS, and including, for the avoidance of doubt, taxes of the Debtors that are not Assumed Liabilities.

83.   TCEQ Settlement.  The Debtors and Texas Commission on Environmental Quality ("*TCEQ*"), by and through the Office of the Texas Attorney General possessing the authority to enter into the settlement contained in this paragraph of the Order, have reached a settlement of the *Objection to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 1918] (the "*TCEQ Objection*") and the adversary proceeding styled *The Texas Commission on Environmental Quality v. TK Holdings, Inc. et al., and J Azteca Express, Inc.* (Adv. Proc. 18-50282) (the "*TCEQ Adversary Proceeding*").

(a)   Eagle Pass Warehouse.  The Debtors, the Reorganized Debtors, and the Warehousing Entity shall use commercially reasonable efforts to provide TCEQ with written supplemental, documentation from the Debtors' retained risk management professionals or from the Eagle Pass fire marshal, that the fire suppression system at the Debtors' leased Eagle Pass, Texas Warehouse (the "*Eagle Pass Warehouse*") is now adequate by no later than April 2, 2018, subject to extension by the TCEQ in writing or by order of the Court.  Such documentation shall be sent via certified mail and electronic mail to the following addresses:  Abigail Ryan; Senior Attorney, Bankruptcy Program Manager, TCEQ, MC-132, P.O. Box 1308, Austin TX 78711-3087; Email: Abigail.Ryan@tceq.texas.gov.  Each of the Debtors and the Warehousing Entity shall use commercially reasonable efforts to remove from Texas all inflators currently being stored in the Eagle Pass Warehouse (the "*Eagle Pass Inflators*"); provided that all of the Eagle Pass Inflators shall be removed no later than four months from the Effective Date.  The Debtors, the Warehousing Entity, or Reorganized Debtors may request extensions, but any such extension

96

shall be authorized only if approved by TCEQ in writing or by order of the Court. On or before

sixty days after the Effective Date, the Debtors, the Reorganized Debtors, and/or the

Warehousing Entity shall provide a report to TCEQ regarding the status of removing the inflators

from Texas including what commercially reasonable efforts they have undertaken and how many

inflators have been removed.

        (b)    Eagle Pass Injunction. The obligation to remove from Texas all of the

Eagle Pass Inflators shall be enforced as an injunction of this Court against the Debtors,

Reorganized Debtors, and the Warehousing Entity. The Debtors' Plan shall provide for adequate

funding to fully accomplish the above injunction. With the exception of inflators currently in

transit to the Eagle Pass Warehouse, the Debtors, Reorganized Debtors, and Warehousing Entity

shall stop shipping inflators to Texas and the Eagle Pass Warehouse for storage as of the

Effective Date. On or before four months after the Effective Date, the Debtors, the Reorganized

Debtors, and/or the Warehousing Entity shall send written notice to the TCEQ certifying as to

the Debtors' compliance with the injunction unless any extension has been granted by TCEQ or

the Court, in which case they shall send the notice to the TCEQ on or before the expiration of the

extension (the "*Certification Notice Date*"). At such time, in the future, after the Certification

Notice Date or by written mutual agreement, as a TCEQ permitted facility is able to lawfully

store, process and/or dispose of inflators, the Debtors may notify TCEQ to request permission to

ship inflators, in accordance with applicable transportation laws and regulations, into Texas and

such approval shall not be unreasonably withheld. Upon receipt of such certification notice,

TCEQ may, but shall not be required to, file a notice of same with the Court. Upon the

transmittal of the certification in accordance with the preceding paragraphs, TCEQ shall, within

three (3) business days, voluntarily dismiss with prejudice the *Request of the Texas Commission*

97

*on Environmental Quality for Declaratory Judgment and Complaint for Injunctive Relief* (Adv. Proc. 18-50282) [Docket No. 1] as to all defendants.  The TCEQ Adversary Proceeding is stayed/abated until the Certification Notice Date.  Similarly, TCEQ shall voluntarily stay enforcement action against the Debtors, the Reorganized Debtors, or the Warehousing Entity for matters arising out of the Eagle Pass Warehouse while the Debtors, the Reorganized Debtors, and the Warehousing Entity are complying with the injunction.  TCEQ, as part of the settlement contained herein, has agreed that upon full compliance with the above injunction, shall not pursue any Defendants in the TCEQ Adversary Proceeding or any of the Debtors, the Reorganized Debtors, or the Warehousing Entity for alleged non-compliance with the Resource Conservation and Recovery Act, Tier II reporting, or any other Texas environmental laws in connection with the Eagle Pass Warehouse arising prior to the Certification Notice Date.

      84.    Administrative Expense Claims Bar Date.  Except as otherwise provided in Section 2.1 of the Plan, holders of Administrative Expense Claims (other than holders of Administrative Expense Claims paid in the ordinary course of business, holders of Administrative Expense Claims arising under section 1930 of chapter 123 of title 28 of the United States Code, holders of Fee Claims, holders of Cure Claims, holders of Consenting OEM PSAN Administrative Expense Claims, holders of Administrative Expense PSAN PI/WD Claims, and holders of Administrative Expense PI/WD Claims) must file and serve on the Debtors requests for the payment of their respective Administrative Expense Claims not already Allowed by a Final Order on or before the first Business Day that is sixty (60) days following the Effective Date, unless otherwise ordered by the Court (the "***Administrative Expense Claims Bar Date***").  Holders of Administrative Expense Claims that are required to, but do not, file and serve requests for the payment of such Administrative Expense Claims by the Administrative

98

Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such

Claims against the Debtors or their assets or properties, and such Claims shall be deemed

discharged as of the Effective Date.

85.    Fee Claims.  Pursuant to Section 2.5 of the Plan, all Professional Persons

seeking awards by the Court of compensation for services rendered or reimbursement of

expenses incurred through and including the Effective Date under sections 327, 328, 330, 331,

503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file and

serve on the Reorganized Debtors, on or before the date that is forty five (45) days after the

Effective Date, their respective applications for final allowances of compensation for services

rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such

amounts as are Allowed by the Court or authorized to be paid in accordance with the order(s)

relating to or allowing any such Fee Claim.

86.    On the Effective Date, the Debtors shall establish and fund the Fee Escrow

Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to each Professional

Person's good faith estimate of its aggregate Fee Claims.  Funds held in the Fee Escrow Account

shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors,

but shall revert to the Reorganized TK Holdings Trust only after all Fee Claims allowed by the

Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for

Professional Persons retained by the Debtors and for no other parties until all Fee Claims

Allowed by the Court have been paid in full.  Fees owing to the applicable Professional Persons

shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account

when such Claims are Allowed by an order of the Court or authorized to be paid under the Order

Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals; *provided, however*, that the Reorganized Debtors' obligations with respect to Fee

Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow

Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the

amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons

shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be

satisfied in accordance with Section 2.3 of the Plan (but for the avoidance of doubt shall not be

subject to any Administrative Expense Claims Bar Date). No Claims, interests, Liens, other

encumbrances, or liabilities of any kind shall encumber the Fee Escrow Account in any way.

      87.    TKJP 503(b)(9) Claim. Notwithstanding the foregoing, the rights of the

Tort Claimants' Committee and the Future Claims Representative to object to or otherwise

challenge (which challenge may include the commencement of an adversary proceeding) the

TKJP 503(b)(9) Claim and TKJP Intercompany Claims, and TKJP's right to assert the TKJP

503(b)(9) Claim and TKJP Intercompany Claims and interpose any defense available under

applicable law, shall be preserved (and the Tort Claimants' Committee and the Future Claims

Representative shall have the standing and authority as of the Confirmation Date to control and

assert the Estates' rights with respect to any such objection or challenge and the PSAN PI/WD

Trustee shall succeed to the Tort Claimants' Committee's rights and position after the Effective

Date), and the TKJP 503(b)(9) Claim or Intercompany Claims of TKJP shall not be treated as

Allowed Claims under the Plan for up to ninety (90) days following the Confirmation Date or

such later date as TKJP may agree; *provided, however*, in the event that an objection or

adversary proceeding is filed (under applicable law) prior to the expiration of the ninety (90) day

period following the Confirmation Date, the TKJP 503(b)(9) Claim or Intercompany Claims of

TKJP shall not be treated as Allowed Claims until resolved by the parties or by an order of the

WEIL:\96411572\24\76903.0004

Court. For the avoidance of doubt, unless and until they become Released Parties, Avoidance Actions against TKSAC and the Japan Debtors are not waived.

        88.    <u>Restructuring Expenses</u>. Pursuant to Section 12.6 of the Plan, subject to review by the U.S. Trustee, the Committees, and the Future Claims Representative for reasonableness in accordance with the RSA Order and the related procedures set forth in paragraph 9 thereof, the Debtors or the Reorganized Debtors, as applicable, shall pay the Restructuring Expenses in accordance with the terms of the U.S. Acquisition Agreement without the need for any application or notice to or approval by the Court. All Restructuring Expenses payable pursuant to Section 12.6 of the Plan shall be paid as follows: (A) if and to the extent that at such time any advisor or other third party providing services to the Plan Sponsor in connection with the Restructuring Transactions has not been paid in full (including all estimated amounts for unbilled fees and expenses, subject to the terms hereof) by the Plan Sponsor, such payment shall be made directly to the applicable advisor or other third party in accordance with the documentation and written instructions of such advisors or other third parties; *provided, however,* that if the aggregate amounts owing to such advisors or other third parties exceed the amount of the applicable Restructuring Expenses required to be paid by the Debtors or the Reorganized Debtors under the U.S. Acquisition Agreement, then the Debtors or the Reorganized Debtors shall pay all such advisors and other third parties ratably based on their relative total percentage of recovery; and (B) with respect to any Restructuring Expenses not paid directly to advisors and other third parties pursuant to subpart (A) hereof, the payment shall be made directly to the Plan Sponsor as reimbursement for Restructuring Expenses previously paid. In order to receive a Direct Expense Payment for unbilled fees and expenses, the advisors and other third parties entitled thereto shall, as part of the documentation provided to the Debtors

101

or the Reorganized Debtors hereunder, estimate fees and expenses due for periods that have not

been billed as of the Effective Date, it being understood that within forty-five (45) days after the

Effective Date, an advisor or other third party receiving payment for the estimated period shall

submit a detailed invoice covering such period and, if the estimated payment received by such

third party or other advisor exceeds the actual fees and expenses for such period, this excess

amount shall be paid over to the Plan Sponsor as reimbursement for Restructuring Expenses

previously paid or, if all Restructuring Expenses subject to Direct Expense Payment or

reimbursement to the Plan Sponsor have been paid or reimbursed in full, then such excess

amount shall be returned to the Debtors or the Reorganized Debtors.

89.     Executive Compensation Related Assets.

(a)     NQ Plan Rabbi Trust.  The Debtors are authorized, but not directed, in

their sole discretion, pursuant to section 363(b) of the Bankruptcy Code, to terminate the TK

Holdings Supplemental Management Retirement Plan & Trust sponsored by TK Holdings Inc.

effective immediately.  Wells Fargo Bank, N.A. ("**NQ Plan Trustee**") serves as trustee for the

Plan under the rabbi trust agreement ("**NQ Plan Rabbi Trust**") dated April 1, 2013.  Pursuant to

section 542 of the Bankruptcy Code, the NQ Plan Trustee, as trustee of the NQ Plan Rabbi Trust,

shall promptly distribute to the Debtors all assets held by the NQ Plan Trustee in connection with

the TK Holdings Inc. Supplemental Management Retirement Plan & Trust that remain following

reduction for amounts owed to the NQ Plan Rabbi Trustee for fees and expenses.  Upon

distribution of assets, the NQ Plan Trustee shall close the trust account.  For the avoidance of

doubt, the NQ Plan Rabbi Trust shall not constitute a Purchased Asset and termination of the

Trust shall be deemed in compliance with Article XII of the NQ Plan Rabbi Trust. The Debtors

shall provide assistance, to the extent reasonable, to the NQ Plan Rabbi Trustee to the extent

WEIL:\96411572\24\76903.0004

needed for the distribution of assets and the closing of the NQ Plan Rabbi Trust, including, but not limited to, execution of any documentation associated with each.

(b)     COLI Trust Agreement.  The Debtors are authorized, but not directed in their sole discretion, pursuant to section 363(b) of the Bankruptcy Code, to terminate the Executive Retirement Plan Trust Agreement by and between TK Holdings Inc. and MassMutual Trust Company (the "**COLI Trustee**"), dated September 30, 2002, as amended effective as of November 11, 2015 (the "**COLI Trust Agreement**"), effective immediately. In accordance with the U.S. Acquisition Agreement and section 542 of the Bankruptcy Code, the COLI Trustee as trustee of the COLI Trust Agreement shall transfer (if such transfer has not already occurred) on the Effective Date (i) the corporate owned life insurance policies on Jack P. Fedorchak and Robert C. Fisher to the Reorganized TK Holdings Trust and (ii) the corporate owned life insurance policy on Scott E. Caudill to the Debtors. For the avoidance of doubt, the COLI Trust Agreement shall not constitute a Purchased Asset.

(c)     Corporate Owned Life Insurance Policy.  The Debtors are authorized, but not directed, in their sole discretion, pursuant to section 363(b) of the Bankruptcy Code and in accordance with the U.S. Acquisition Agreement, to transfer the corporate owned life insurance policy on Scott E. Caudill to the Plan Sponsor.

(d)     TK Holdings Supplemental Management Retirement Plan.  The Debtors and Plan Sponsor agree that, for purposes of the TK Holdings Supplemental Management Retirement Plan, the Transferred Employees' transfer of employment from the Debtors and their affiliates to Plan Sponsor and its affiliates shall not constitute a "separation from service" pursuant to Treas. Reg. Section 1.409A-1(h)(4).

103

90.    <u>Insurance Policies</u>.  On or prior to the Effective Date, the Debtors may fund an upfront premium payment to purchase "tail insurance" to continue the Debtors' existing directors' and officers' insurance subject to the reasonable consent of the Requisite Consenting OEMs.  All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts, shall be assumed by the applicable Debtor, and shall vest in the Reorganized Debtors (other than the PI/WD Insurance Policies) and continue in full force and effect thereafter in accordance with their respective terms.

91.    <u>Return of Deposits</u>.  Pursuant to the *Final Order Pursuant to 11 U.S.C. §§ 366 and 105(a) (I) Approving Debtors' Proposed Form of Adequate* Assurance *of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* [Docket No. 329] (the "***Utilities Order***"), on the Effective Date, the Debtors are authorized to release any and all funds deposited into any segregated accounts maintained for the benefit of any utility companies pursuant to the Utilities Order and such funds shall be available to the Debtors.

92.    <u>Retention of Causes of Action and Reservation of Rights</u>.  Except as expressly provided in Section 10.11 of the Plan or this Order, and subject to Sections 5.19, 10.5, 10.6, 10.7, and 10.8 of the Plan, nothing contained in the Plan or this Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action (including Avoidance Actions), rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  Subject to Sections 5.19, 10.5, 10.6, 10.7, and 10.8 of the Plan, the Reorganized TK Holdings Trust shall

WEIL:\96411572\24\76903.0004

have, retain, reserve, and be entitled to assert all such Claims, Causes of Action (including

Avoidance Actions), rights of setoff, or recoupment, and other legal or equitable defenses as

fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and

equitable rights in respect of an Unimpaired Claim may be asserted after the Effective Date to

the same extent as if the Chapter 11 Cases had not been commenced.  For the avoidance of

doubt, on the Effective Date, all Avoidance Actions that relate to the continued operation of the

Business (as defined in the U.S. Acquisition Agreement), Reorganized Takata, or the

Warehousing Entity, including with respect to ongoing trade vendors, suppliers, licensors,

manufacturers, strategic or other business partners, customers, employees, or counterparties to all

Purchased Contracts to be acquired by the Plan Sponsor, assumed by Reorganized Takata, or

assumed and assigned to the Warehousing Entity shall be waived and released.  For the

avoidance of doubt, no rights, Claims, Causes of Action, rights of setoff or recoupment, or other

legal or equitable defenses of the Debtors against the Consenting OEMs are preserved under the

Plan, and all such rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal

or equitable defenses of the Debtors against the Consenting OEMs are being released pursuant to

Section 5.19(j) of the Plan.

 93.     Dissolution of the Committees; Discharge of the Future Claims
Representative.  Upon the Effective Date, (i) the Committees shall be dissolved, (ii) the retention

and employment of the Committees' respective attorneys, accountants, and other professionals

and agents shall terminate, (iii) the retention and employment of the Future Claims

Representative's attorneys, experts, and other professionals and agents shall terminate, and (iv)

the Future Claims Representative (subject to paragraph 57 of this Order) and the Committees and

their respective current and former members shall be released and discharged of and from all

105

further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases; *provided, however*, that the Committees shall not be dissolved and the Future Claims Representative shall not be discharged, and the retention and employment of their respective attorneys and other professionals and agents shall not terminate, solely with respect to (i) prosecuting and defending any fee applications or related objections, (ii) prosecuting or participating in any appeals or stays of any orders related to the Plan until such time as such orders become Final Orders, and (iii) enforcing the terms of the Settlement Term Sheets to the extent not enforced by the Legacy Trustee or the PSAN PI/WD Trustee, as applicable.

94.  Removal of Related Proceedings.  Notwithstanding anything herein or in any prior order of the Court to the contrary, including the *Order Pursuant to Fed. R. Bankr. P. 9006(b) and 9027 and Local Rule 9006-2 Enlarging the Time Within Which to File Notices of Removal of Related Proceedings* [Docket No. 780] (the "**Removal Order**"), the time period provided by Bankruptcy Rule 9027 within which the Debtors or any other party as contemplated by 28 U.S.C. § 1452 may file notices of removal of the Civil Actions (as defined in the Removal Order), as well as any other civil proceeding that may be removed pursuant to 28 U.S.C. § 1452, is enlarged and extended to the date that is seven (7) days following the filing with the Court of the Notice of Effective Date (as herein defined).

95.  State Governmental Claims.  The Hawai'i Claim, the USVI Claim, and the New Mexico Claim are properly classified as Class 9 (Subordinated Claims).

96.  The Hawai'i Proceeding, the USVI Proceeding, and the New Mexico Proceeding are subject to the Plan Injunction.

106

97.    ACTS.  Notwithstanding any other provision in this Order, the *Limited Objection of Automotive Coalition for Traffic Safety, Inc. to Confirmation of the Third Amended Joint Plan of Reorganization of TK Holdings and its Affiliated Debtors* [Docket No. 1948] (the "**ACTS Limited Plan Objection**") and the *Objection of Automotive Coalition for Traffic Safety, Inc. to Assumption of Executory Contract and Proposed Cure Amount* [Docket No. 1951] (the "**ACTS Contract Objection**") are continued to the March 26, 2018 omnibus hearing.  Until such hearing, (i) the ACTS IP (as defined in paragraph 2 of the ACTS Limited Plan Objection), and (ii) the ACTS Agreements (referenced in paragraph 1 of the ACTS Contract Objection) shall not be deemed to be Purchased Assets transferred to the Plan Sponsor.

98.    Fisher.  Subject to paragraph 89 of this Order, nothing in this Order or the Plan shall serve as an adjudication, finding or determination of the nature, extent, validity, priority or amount of the claims asserted in the Claim filed by Mr. and Mrs. Robert C. Fisher [Proof of Claim No. 3621] (the "**Fisher Claim**") against the Debtors, including, to the extent asserted in the Fisher Claim or the *Limited Objection of Mr. and Mrs. Robert C. Fisher to (I) Notice of Proposed Cure Costs (D.I. 1703), (II) Notice of Rejection of Executory Contracts and Unexpired Leases (D.I. 1860), and (III) Confirmation of the Third Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors* [Docket No. 1947], claims Mr. and Mrs. Fisher have asserted against:  (i)  Sun Life Financial Insurance Policy, Policy Number 020169319; (ii) Pacific Life, Pacific Secure Income Fixed, Deferred Income Annuity 2015-8EJSL-1; or (iii) any other annuity contracts or insurance policies purchased by the Debtors for the benefit of Mr. and Mrs. Robert C. Fisher.  All of the parties' respective rights with respect thereto are hereby reserved.

WEIL:\96411572\24\76903.0004

99.    <u>H&H</u>. Notwithstanding anything to the contrary in the Solicitation Procedures Order, the Disclosure Statement, the Plan, any Ballot for voting on the Plan, this Order, any Plan Documents, or any amendment or supplement to any of the foregoing items: (1) Howard & Howard Attorneys PLLC ("*H&H*") holds only a General Unsecured Claim in the amount of $7,151.50 against TKH, which Claim is Impaired under the Plan, and therefore H&H is entitled to exercise, and has timely exercised, its right to opt out of the Releases set forth in Section 10.6(b) of the Plan; (2) H&H withdrew Claim No. 2743 effectively via its *Notice of Withdrawal* filed on January 26, 2018 [Docket No. 1828] and the Ballot pertaining to Claim No. 2743 (bearing Voter ID 60745) was cancelled and, consequently, H&H's failure to vote such Ballot does not impair H&H's opt out of the Releases in Section 10.6(b) of the Plan; and (3) H&H has not granted any Released Party any release whatsoever in connection with these Chapter 11 Cases, and all of H&H's defenses to any Cause of Action are expressly preserved.

100.    <u>Infor</u>. Notwithstanding anything to the contrary in the Plan, this Order, the U.S. Acquisition Agreement or any notices of assumption or assumption and assignment of executory contracts filed by the Debtors, absent a further order of this Court or agreement between the applicable parties, (i) none of the agreements between one or more of the Debtors, on the one hand, and Infor (US), Inc. (including any of its predecessors-in-interest) ("*Infor Agreements*") shall be assumed, assumed and assigned, or otherwise transferred to any party, (ii) no Infor Agreement, software, products or services shall be transferred to any party, (iii) no Infor Agreement, software, products or services shall be subject to the Transition Services Agreement or the Shared Services Agreement contemplated by the Plan, and (iv) all parties' rights are specifically reserved with respect to the Infor Agreements, including but not limited to, their assumption, assignment, transferability, cure issues, adequate assurance or otherwise.

108

101.    <u>Pacific Sintered</u>.  Notwithstanding anything to the contrary in the Plan or

this Order, Pacific Sintered Metal, Inc.'s opt out of the releases in Section 10.6(b) of the Plan

elected in the Plan Ballot timely submitted by Pacific Sintered Metals, Inc. (identified in the

Ballot as "Pacific Sintered") is valid and effective as to Pacific Sintered Metals, Inc. and its

affiliates ("***Pacific***") regardless of the treatment, amount, priority, classification, allowance or

disallowance of any Claim of Pacific under the Plan, whether or not all or any portion of

Pacific's Claims are Unimpaired, whether or not any of Pacific's executory contracts are

assumed and assigned and the Cure Amounts thereunder paid in accordance with the Plan, or

whether any of Pacific's Claims or any portion thereof are allowed as an Administrative Expense

Claim rather than as General Unsecured Claims.  Further, such opt out by Pacific does not

release, diminish, impair or otherwise affect Pacific's rights, Claims and remedies whether or not

any of its executory contracts are assumed, assumed and assigned or rejected, or the amounts of

its Claims, which are reserved.

102.    <u>Sigma</u>.  Notwithstanding anything herein to the contrary, Sigma

International Inc. ("***Sigma***") shall be paid, by the Debtors, the Reorganized TK Holdings Trust

and/or the Plan Sponsor, pursuant to and in accordance with, *inter alia*, Section 2.3(a) of the

Plan, for any allowed postpetition amounts owed on any unpaid invoices in accordance with the

terms and subject to the conditions of any invoices, orders, or agreements by and between Sigma

and the Debtors, the Reorganized Debtors and/or the Plan Sponsor.

103.    <u>TX Litigation</u>.  Notwithstanding any provision of this Order, the Plan or

any Plan-related documents to the contrary, and for the avoidance of doubt, if any, nothing in the

Plan or this Order shall release, prejudice, impair or otherwise affect any claims by (i) Serena

Martinez, (ii) Rene De Los Santos Olveda, (iii) Richard Walter Mott, (iv) Roxana Hernandez

109

Mott, (v) Jesus Pena, (vi) Maria Pena, (vii) Juan Perez, (viii) Haisa Utter, (ix) Pedro Utter, (x)

Gennise Marquez, (xi) Individually and as Next Friend of XXXXX XXXXX, (xii) Bobby J.

Mason, (xiii) Sandra Perez, Individually and as Next Friend of XXXXX XXXXX, (xiv) Jesus

Jaime Perez, (xv) Jose Alberto Perez, (xvi) Julio Grajales, (xvii) Olga G. Perez, (xviii) Harold D.

Langley, (xix) Nadia Navejas, Individually and as Next Friend of XXXX XXXXXX and XXX

XXXXXX, (xx) Ana Torres, (xxi) Gregory Torres, (xxii) Homero Galindo, (xxiii) Argelia

Galindo, Individually and as Next Friend of XXXXXXX XXXXXXX, (xxiv) Homero Galindo,

Jr. as existing Plaintiffs of record and San Juanita Marisela Rodriguez, (xxv) Miguel Angel

Almaguer, (xxvi) Phillip Lopez, (xxvii) Rolando Galindo, (xxviii) Teresita Hambly, (xxix)

Elvira Langley, (xxx) Merle Mott, (xxxi) Becky Davis, (xxxii) Stan Davis, (xxxiii) Antonio

Flores, (xxxiv) Ernest Flores, (xxxv) Rosa Flores, (xxxvi) Rosa Flores, parent of E.D., (xxxvii)

Rosa Flores – J.D., (xxxviii) Beatriz Galvan, (xxxix) Jose Luis Galvan, (xl) Tomasita Galvan,

(xli) Mary Jason, (xlii) Chris Robles, individually, (xliii) Chris Robles, estate of Lucia Robles,

(xliv) Mark Robles, (xlv) Sofia Robles, (xlvi) Juan Rodriguez, (xlvii) Maria Guadalupe

Rodriguez, (xlviii) and Matilda Rodriguez (collectively, the "*TX Plaintiffs*") against the existing,

as of the date hereof, non-Debtor Defendants (the "*TX Third Parties*") in Cause No. 16-09-

33479, pending before the District Court of the 365th Judicial District in Maverick County,

Texas (the "*TX Litigation*").  Notwithstanding any provision of this Order or the Plan to the

contrary, the automatic stay provisions under section 362(a) of the Bankruptcy Code and any

injunctions, stays or similar provisions in the Plan or this Order, shall be modified and lifted to

the extent necessary to enable any TX Plaintiffs to become Plaintiffs of record in the TX

Litigation and for the TX Plaintiffs to prosecute the TX Litigation to final judgment or settlement

against the Debtors and the TX Third Parties and to engage in one or more legal actions with

Debtors' insurers to collect against Debtors' insurance coverage; *provided, however*, that the TX

Plaintiffs may attempt to recover any liquidated final judgment or settlement against the Debtors

with respect to the TX Litigation solely from insurance coverage, if any, available under one or

more insurance policies issued to the Debtors that cover the TX Litigation and are:  (1) not

PI/WD Insurance Policies or (2) are PI/WD Insurance Policies that contain an exclusion for

products-completed operations claims; for the avoidance of doubt, if any, the foregoing shall not

impede the TX Plaintiffs ability to recover from any TX Third Parties either directly or through

their insurance.  The Debtors will use commercially reasonable efforts to obtain and provide the

relevant insurance policies but will have no further duties to cooperate including to participate in

any discovery.  Notwithstanding any provision of the Plan or this Order to the contrary, to the

extent there are any PI/WD Insurance Policies that contain an exclusion for products-completed

operation claims, and such policies provide or may provide coverage for the TX Litigation,

the PSAN PI/WD Trust agrees that its right to pursue such coverage will not be exclusive and

that the TX Plaintiffs may immediately pursue and receive payment on claims against such

policies.

      104.   Separate Plans.  The Plan constitutes a separate chapter 11 plan for each

Debtor.  Voting was properly calculated on a Debtor-by-Debtor basis, and, except as otherwise

provided in the Plan or this Order, the Debtors are authorized to make distributions on a Debtor-

by-Debtor basis.

      105.   Documents, Mortgages, and Instruments.  Each federal, state,

commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any

and all documents, mortgages, and instruments necessary or appropriate to effectuate,

implement, or consummate the transactions contemplated by the Plan and this Order.

106.    <u>Revocation or Withdrawal of the Plan</u>.  The Debtors are hereby granted

the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the

Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the

Effective Date, or if the occurrence of the Effective Date as to such Debtor does not occur on the

Effective Date, then, with respect to such Debtor: (i) the Plan shall be null and void in all

respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting

to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of

executory contracts or unexpired leases affected by the Plan, and any document or agreement

executed pursuant to the Plan shall be deemed null and void; and (iii) nothing contained in the

Plan shall (a) constitute a waiver or release of any Claim by or against, or any Interest in, such

Debtor or any other Person; (b) prejudice in any manner the rights of such Debtor or any other

Person; or (c) constitute an admission of any sort by any Debtor or any other Person.

107.    <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise

provided in this Order, if any or all of the provisions of this Order are hereafter reversed,

modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal,

stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation,

indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or the Reorganized

Debtors, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.

Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or

obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective

date of such reversal, stay, modification, or vacatur shall be governed in all respects by the

provisions of this Order, the Plan, the Plan Documents, or any amendments or modifications to

the foregoing.

108.   <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Court, except as otherwise provided in the Plan, the Plan Documents, or this Order, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest extent as is legally permissible, including jurisdiction over the matters set forth in Article XI of the Plan.

109.   <u>Exemption from Certain Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan, including the sale of the Purchased Assets to the Plan Sponsor under the U.S. Acquisition Agreement, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

110.   <u>Modifications and Amendments</u>.  The Plan and the other Plan Documents may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Court; *provided*, *however*, that any such amendments, modifications, or supplements shall be made in accordance with the terms of the U.S. RSA.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents, or this Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or

113

Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended,

modified, or supplemented.  Prior to the Effective Date, the Debtors may make appropriate

technical adjustments and modifications to the Plan and the Plan Documents without further

order or approval of the Court; *provided*, *however*, that such technical adjustments and

modifications do not adversely affect in a material way the treatment of holders of Claims or

Interests under the Plan.

111.    <u>Consent Rights of Certain Parties</u>.  Notwithstanding anything in the Plan

or this Order to the contrary, any and all consent rights of the Restructuring Support Parties, the

Committees, and the Future Claims Representative, as set forth in the U.S. RSA, the Settlement

Term Sheets, or Section 1.4 of the Plan, as applicable, with respect to the form and substance of

the Plan, all Exhibits to the Plan, the Plan Supplement, and the other Plan Documents, including

any amendments, restatements, supplements, or other modifications to such documents, and any

consents, waivers, or other deviations under or from any such documents, shall be incorporated

herein by this reference (including to the applicable definitions in Section 1.1 of the Plan) and

fully enforceable as if stated in full herein.

112.    <u>Applicable Non-Bankruptcy Law</u>.  Pursuant to section 1123(a) and

1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan, and related documents,

or any amendments or modifications thereto shall apply and be enforceable notwithstanding any

otherwise applicable non-bankruptcy law.

113.    <u>Waiver of Filings</u>.  Any requirement under section 521 of the Bankruptcy

Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with

the Court or the Office of the U.S. Trustee (except for monthly operating reports or any other

114

post-confirmation reporting obligations to the U.S. Trustee), is hereby waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

114.    <u>Governmental Approvals Not Required</u>.  This Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

115.    <u>Nonoccurrence of the Effective Date</u>.  In the event that the Effective Date does not occur, then (i) the Plan, (ii) the rejection of executory contracts or unexpired leases pursuant to the Plan, (iii) any document or agreement executed pursuant to the Plan, and (iv) any actions, releases, waivers, or injunctions authorized by this Order or any order in aid of consummation of the Plan shall be deemed null and void.  In such event, nothing contained in this Order, any order in aid of consummation of the Plan, or the Plan, and no acts taken in preparation for consummation of the Plan shall be (y) deemed to constitute a waiver or release of any Claims against or Interests in the Debtors or any other Persons, to prejudice in any manner the rights of the Debtors or any person or entity in any further proceedings involving the Debtors or otherwise, or to constitute an admission of any sort by the Debtors or any other Persons as to any issue, or (z) construed as a finding of fact or conclusion of law in respect thereof.

116.    <u>Notice of Entry of Confirmation Order</u>.  On or before the thirtieth (30th) day following the date of entry of this Order, the Debtors shall serve notice of entry of this Order (which, in the Debtors' discretion, may be combined with the Notice of the Effective Date (as defined below)) pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all known creditors and interest holders, the U.S. Trustee, and other parties in interest, by causing notice of

115

entry of the Confirmation Order (the "*Notice of Confirmation*"), to be delivered to such parties by first-class mail, postage prepaid. The Debtors shall also post the Notice of Confirmation on the website maintained by the Debtors' claims and noticing agent, at https://restructuring.primeclerk.com/takata. The notice described herein is adequate under the particular circumstances and no other or further notice is necessary.

117.   Notice of the Effective Date. On the Effective Date, the Legacy Trustee shall file a notice of the occurrence of the Effective Date (the "*Notice of Effective Date*") with the Court. As soon as practicable after the occurrence of the Effective Date, the Legacy Trustee, on behalf of the Reorganized Debtors, shall serve the Notice of Effective Date on all holders of Claims and Interests, the U.S. Trustee, and other parties in interest, by causing the Notice of Effective Date to be delivered to such parties by first-class mail, postage prepaid.

118.   Substantial Consummation. On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

119.   Severability. Each term and provision of the Plan, as it may have been altered or interpreted by the Court in accordance with Section 12.7 of the Plan, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified except in accordance with the terms of the Plan, and (iii) nonseverable and mutually dependent.

120.   Governing Law. Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

116

121.    _Immediate Effectiveness; Waiver of Stay_.  The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen (14) days after entry of the order are hereby waived.  The terms and provisions of this Order shall be immediately effective and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062.

122.    _Inconsistency_.  To the extent of any inconsistency between this Order and the Plan, this Order shall govern.

123.    _No Waiver_.  The failure to include specifically any particular provision of the Plan in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of the Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

124.    _Final Order_.  This Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

Dated: February 21, 2018
Wilmington, Delaware

THE HONORABLE BRENDAN L. SHANNON
CHIEF UNITED STATES BANKRUPTCY JUDGE